## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

FRANCESCA GINO,

*Plaintiff,*

v.

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE, SRIKANT
DATAR, URI SIMONSOHN, LEIF
NELSON, JOSEPH SIMMONS, JOHN
DOES 1-10, AND JANE DOES 1-10,

*Defendants.*

Civil Action No. 1:23-cv-11775-MJJ

<u>FIRST AMENDED COMPLAINT</u>

JURY TRIAL DEMANDED

Plaintiff Francesca Gino, by and through her attorneys, Nesenoff & Miltenberg, LLP, whose offices are located at 101 Federal Street, 19th Floor, Boston, Massachusetts 02110, alleges upon knowledge with respect to herself, and upon knowledge, information and belief as to all other matters, as follows:

## <u>THE NATURE OF THIS ACTION</u>

1.      Plaintiff Francesca Gino ("Plaintiff" or "Professor Gino") is employed by the President and Fellows of Harvard College ("Harvard University") as a tenured Professor at the Harvard Business School.

2.      Plaintiff is an internationally renowned behavioral scientist, author, and teacher. She has written over 140 academic articles, both as an author and as a co-author, exploring the psychology of people's decision-making.

3.      Plaintiff has never falsified or fabricated data.

4.      In July 2021, a trio of professors and behavioral scientists (all male), Defendant Uri Simonsohn, Defendant Leif Nelson, and Defendant Joseph Simmons, who have a blog named

"Data Colada," (and who are collectively referred to herein as "Data Colada"), approached Harvard Business School with alleged concerns about perceived anomalies and "fraud" in the data of four studies in academic articles authored by Plaintiff.

5.      Data Colada threatened to post the "fraud" allegations on their blog, thereby subjecting Plaintiff, and by extension, Harvard Business School, to public scrutiny.

6.      Without Plaintiff's knowledge, Harvard University and the Dean of Harvard Business School, Defendant Srikant Datar ("Dean Datar"), negotiated an agreement with Data Colada pursuant to which Harvard Business School investigated the allegations, in accordance with a new employment policy *created solely for Plaintiff*, in exchange for Data Colada's silence during the investigation period. Unbeknownst to Plaintiff, Harvard Business School further agreed to disclose the outcome of the investigation to Data Colada, who could then subject Plaintiff's work and professional reputation to public disparagement on its blog.

7.      Pursuant to its negotiations with Data Colada, in August 2021, Harvard Business School created the "Interim Policy and Procedures for Responding to Allegations of Research Misconduct" ("Interim Policy") just for Plaintiff, which included a range of potential sanctions, including termination of employment.

8.      Under said Interim Policy, a finding of research misconduct required an investigation committee to prove, by a preponderance of the evidence, that Plaintiff *"intentionally, knowingly, or recklessly"* falsified or fabricated data, and to specify for each allegation the requisite intent.

9.      Under said Interim Policy, as with any other policy at Harvard, allegations were required to be made in good faith, and an investigation was required to be fair. Neither of those things happened in this case.

10.     After subjecting Plaintiff to an onerous 18-month investigation pursuant to the new employment policy that Harvard Business School created just for her, the investigation committee failed to make the requisite, specific findings of intent, supported by a preponderance of the evidence, yet concluded that Plaintiff was responsible for "research misconduct."

11.     In reaching its findings, the investigation committee also ignored exculpatory evidence, failing to consider or give credence to credible witness testimony, in violation of the Interim Policy's mandates that it diligently pursue all leads and conduct a thorough and fair investigation.

12.     On June 13, 2023, Dean Datar accepted the investigation committee's conclusions and imposed unwarranted and excessive sanctions against Plaintiff, a tenured Professor, which included placing her on unpaid administrative leave (a decision to strip Plaintiff of her entire salary), and immediately removing her from all of her teaching duties, research responsibilities, mentorship of students, and her titled professorship.

13.     Contemporaneously, and pursuant to the agreement that Dean Datar and Harvard Business School negotiated with Data Colada, the results of Harvard Business School's investigation "report" were disclosed to Data Colada, which caused Plaintiff to be subjected to false and defamatory statements on Data Colada's blog.

14.     Harvard Business School and Dean Datar ensured the impairment of Plaintiff's professional reputation and standing by announcing on the Harvard Business School website that Plaintiff was placed on "administrative leave," and aggressively contacting Plaintiff's editors and co-authors about retracting the research papers at issue in the investigation.

15.     Beginning on June 17, 2023 and continuing through June 30, 2023, Data Colada launched a vicious, defamatory smear campaign against Plaintiff in a four-part series of blog posts

which falsely asserted that Plaintiff engaged in "data fraud." Data Colada lodged this incredibly damaging accusations against Plaintiff despite having **no evidence** that Plaintiff engaged in any act of "data fraud." Data Colada implied that they were in possession of non-disclosed evidence to support their baseless accusations—their own report which was, in large part, based on sheer speculation and Harvard's investigation report, which they had not seen.

16.    Data Colada's blog posts quickly garnered significant media attention.

17.    Even sophisticated members of the media who read Data Colada's blog posts and saw that Plaintiff was placed on administrative leave by Harvard Business School presumed that Plaintiff had engaged in data fraud.

18.    Harvard Business School has never found Plaintiff responsible for "research misconduct" within the meaning of that term, as defined by Harvard Business School's own Interim Policy, or within the meaning of federal regulations (which the Interim Policy mirrors), or within the meaning of that term as widely understood by scientists and academics, which requires a *specific intent* to fabricate or falsify data, and as those words are understood by the general public.

19.    After the release of its defamatory blog series against Plaintiff, Data Colada admitted that it had no evidence that Plaintiff committed data fraud. This admission was made to a limited audience and, in any event, the damage to Plaintiff's reputation had already been done.

20.    Defendants Harvard University, Dean Datar, and Data Colada impaired Plaintiff's professional reputation and standing by defaming Plaintiff with false charges of research misconduct, and they conspired to defame her by communicating false and defamatory statements on Data Colada's blog.

21.    Harvard University also violated Plaintiff's contractual rights as a tenured Professor and numerous provisions of its employment policies, including Plaintiff's right to confidentiality

and, ironically, Plaintiff's rights under the terms of its "Interim Policy," by which Harvard Business School was required, *inter alia*, to prove, by a preponderance of the evidence, *specific intent* for each allegation of research misconduct, before concluding that Plaintiff was responsible.

22.     Harvard Business School discriminated against Plaintiff on the basis of sex when it elected to investigate her under a newly created policy specific to her case as opposed to relying on its existing policy and procedures. Harvard has treated similarly situated male professors differently. It recently investigated allegations of research misconduct against a male junior faculty member pursuant to its *existing* "Research Integrity" policy, (which, unlike the Interim Policy, did not specify any particular sanctions for violations), and its usual Faculty Review Board procedures, a policy and procedures that Harvard University chose to abandon in Plaintiff's case. In contrast to its treatment of Plaintiff, Harvard Business School protected the confidentiality of the male junior faculty member, and it subsequently promoted him to tenure.

23.     As a result of Defendants' unlawful actions, Plaintiff has suffered tremendous harm. Her reputation as a highly sought-after author, consultant and researcher has been sullied if not destroyed. Plaintiff has not only been stripped of her salary, but her career has been derailed by her inability to engage in any work or research as a highly-esteemed tenured Professor at Harvard Business School. Plaintiff has also suffered severe emotional distress.

24.     Through this civil action, Plaintiff seeks damages of at least $25 million and injunctive relief.

## **THE PARTIES**

25.     Plaintiff Francesca Gino ("Plaintiff" or "Professor Gino") is a natural person and resident of the Commonwealth of Massachusetts.

26.     At all relevant times, Plaintiff was a faculty member at Harvard Business School ("HBS") and an employee of Harvard University.

27.     Defendant President and Fellows of Harvard College ("Harvard University" or "Harvard"), provides educational services and was and is the duly empowered governing board of Harvard University, with a principal office located at Harvard University Massachusetts Hall, Cambridge, Massachusetts 02138.

28.     At all relevant times, Defendant Srikant Datar was the Dean of HBS.

29.     Defendant Uri Simonsohn ("Simonsohn") is employed as a professor at ESADE business school in Ramon Llull University in Barcelona, Spain, and is a resident of Barcelona, Spain.

30.     Defendant Joseph Simmons ("Simmons") is a professor at the Wharton School at the University of Pennsylvania, and a resident of Pennsylvania.

31.     Defendant Leif Nelson ("Nelson") is a professor at Haas School of Business at the University of California, Berkeley, and a resident of California.

## JURISDICTION AND VENUE

32.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367 because the federal law claim arises under the Constitution and statutes of the United States, and the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

33.     This Court has personal jurisdiction over the Defendants on the grounds that they conduct business within the Commonwealth of Massachusetts.

34.     At all relevant times, the acts and omissions complained of occurred within the Commonwealth of Massachusetts.

35.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.   **Plaintiff's Professional Background and Employment at Harvard.**

36.     Plaintiff is a behavioral scientist. The focus of Plaintiff's work is studying the psychology behind the decisions people make, to learn how people can thrive at work and better engage with one another.

37.     Plaintiff is a prolific author and an award-winning researcher. She has authored or co-authored countless journal publications, business articles, and books.

38.     Most of Plaintiff's work, whether it is the many academic articles she has written (over 140 of them), or the case studies she has worked on (over 50 of them), has been in collaboration with others.

39.     Plaintiff has regularly presented her work at conferences and has been invited to speak at some of the most prestigious colleges and universities in the world.

40.     Plaintiff has received numerous honors and awards and has been honored as one of the world's top "40 Business Professors under 40" and one of the world's most influential management thinkers by Thinkers50. Plaintiff has also won awards for her research, including the 2013 Cummings Scholarly Achievement Award, from the Academy of Management Organizational Behavior Division.

41.     Plaintiff's work has been covered in numerous media outlets including *The Atlantic, The Boston Globe, Business Week, The Economist, The Financial Times, National Public Radio, Scientific American, The Wall Street Journal,* and *The New York Times.*

42.     Plaintiff's consulting clients include several Fortune 100 companies, as well as the United States Air Force, Army, and Navy.

43.     Plaintiff received her Bachelor of Arts degree in Business Economics from the University of Trento (Trento, Italy) in 2001, graduating *magna cum laude.* Plaintiff earned her M.S. and Ph.D. degrees in economics and management from Sant'Anna School of Advanced Studies (Pisa, Italy) in 2004.

44.     Plaintiff went on to academic positions as a post-doctoral fellow and senior researcher and lecturer at Harvard University (2004-2006), a visiting assistant professor of organizational behavior at Carnegie Mellon University (2006-2008), and as an assistant professor of organizational behavior at the University of North Carolina Kenan-Flagler Business School ("UNC") (Chapel Hill, North Carolina), (2008-2010).

45.     As a Visting Assistant Professor at Carnegie Melon University ("CMU"), Plaintiff was the lab manager for scholars in Behavioral Sciences and Organizational Behavior, where she obtained a full understanding of the common practices for managing a lab and a deep understanding of the research process.

46.     As a faculty member at UNC, Plaintiff created the behavioral lab at UNC.

47.     Defendant Harvard recruited Plaintiff through an offer letter dated February 16, 2010, in which Harvard Business School ("HBS") offered Plaintiff an appointment as an Associate Professor at HBS, effective July 1, 2010.

48.     The offer letter promised Plaintiff that, should she accept, she would be appointed to a tenure-track position as an Associate Professor, beginning July 1, 2010, continuing three years, through the academic year ending June 30, 2013, with the expectation that, in the Fall 2012, her

appointment would be renewed for two additional years, through June 30, 2015, and that her "formal review for promotion to Professor with tenure would take place in Fall 2014."

49.     Plaintiff had offers from other prestigious business schools (Stern, Wharton, and Berkeley's Haas Business School), but chose to accept Harvard's offer, and began her employment on July 1, 2010, as an Associate Professor of Business Administration at HBS. On July 1, 2014, Plaintiff was promoted to a position as a Full Professor with tenure, joining the small minority of female professors to achieve tenure at HBS.

50.     By letter dated July 24, 2015, HBS informed Plaintiff that she had been named the "Tandon Family Professor of Business Administration," and that she could use this title on her letterhead, business cards, and other HBS materials.

51.     Plaintiff has won numerous awards for her teaching, including the Harvard Business School Wyss Award for Excellence in Mentoring (2022) and the HBS Faculty Award by Harvard Business School's MBA Class of 2015. Plaintiff also won an award for her service to HBS, the Greenhill Award (2017), "given annually by the Dean to members of the HBS community who contribute to the School in significant ways."[1]

52.     Plaintiff, a working mother of four young children and the breadwinner in her family, has also received praise by her female colleagues and collaborators for serving as a role model for other women at HBS.

53.     In December 2018, Plaintiff emailed a female colleague, Frances Frei ("Frei"), Professor of Technology and Operations Management at HBS, about teaching a course together on diversity and leveraging differences. Plaintiff and Frei received approval to teach their new

---

[1] https://www.hbs.edu/about/campus-and-culture/campus-built-on-philanthropy/Pages/greenhill-house.aspx

course, Leading Difference, on March 18, 2019, which they taught for the first time in the Winter of 2020. Plaintiff and Frei launched an executive education version of this course in August 2020.

54.     In 2022 and 2023, Plaintiff was the course head for the new course, which was renamed "Inclusion," and it was taught to all 1,000 plus MBA students at HBS as part of the Required Curriculum. The course is about creating environments that are not only diverse, but also equitable and inclusive.

55.     In 2023, after a decade-plus at HBS, Plaintiff has taught courses on negotiation, decision making, collaboration, conflict resolution, and diversity, equity and inclusion at both the MBA and Executive Education levels.

### A.  Applicable Policies Governing Tenure and Discipline of Tenured Professors.

#### i.  The Tenure Policy.

56.     At Harvard, the conferral of tenure carries with it the promise of lifetime appointment.

57.     In a letter dated September 24, 2014, Plaintiff received official notification of her appointment as a tenured Professor of Business Administration, effective July 1, 2014, and advised her that her appointment was "subject to such terms, conditions, and policies as are stipulated by the Faculty of Business Administration, and to the Third Statute of the University." (*See* attached **Exhibit 10, henceforth referred to as the "Appointment Letter.")**

58.     Under the Third Statute that was attached to Plaintiff's appointment letter, she entered into a permanent contract with Harvard, a lifetime appointment, subject to removal by the Corporation (i.e., Harvard) only for "grave misconduct."

59.     HBS's "Policies and Procedures with Respect to Faculty Appointments and Promotions" ("Tenure Policy") emphasize that tenure is reserved for "extraordinary individuals

who have demonstrated their ability and willingness to make a sustained contribution to the study, teaching, and practice of business," and refer to faculty with tenure as "permanent faculty."

### ii.  The Third Statute and the Discipline Policy.

60.    Under the "Third Statute of the University," (the policy attached to Plaintiff's official notification of her tenured appointment), "Professors . . . are appointed without express limitation of time unless otherwise specified" and are "subject to removal . . . by the Corporation [Harvard] only for grave misconduct or neglect of duty." (*See* attached **Exhibit 11, henceforth referred to as the "Third Statute."**)

61.    Harvard's President and governing body adopted the "Discipline of Officers, Tentative Recommendations" ("Discipline Policy") on October 4, 1971. The Discipline Policy sets forth the procedures applicable "to the discipline of tenured faculty in cases of "grave misconduct or neglect of duty arising under the Third Statute." (*See* attached **Exhibit 12, henceforth referred to as the "Discipline Policy."**)

62.    Under the Discipline Policy, if a complaint is made against a Professor with Tenure, the Professor is entitled to a two-tiered proceeding prior to the imposition of discipline, consisting of an initial assessment by a Screening Committee and, if not resolved at that state, a full evidentiary hearing before a Hearing Committee, which shall then "make recommendations to the President and Fellows on what, if any, action is appropriate." *See id*.

63.    Under the Discipline Policy, a tenured faculty member is presumed innocent, and [t]he burden of proof that there has been . . . grave misconduct or neglect of duty (as contemplated by the Third Statute of the University) rests with the Complainant and shall be satisfied only by clear and convincing evidence in the record as a whole" following the conclusion of a full evidentiary hearing before Hearing Committee and a decision by the President and governing bodies of Harvard. *See id*. at 5-6 (item 6 under "Statement of Hearing Procedures").

64.     Under the Discipline Policy, Harvard is obligated to keep information related to the complaint and impending disciplinary proceeding against a tenured faculty member confidential until the conclusion of the proceeding and a final decision by Harvard.

65.     The Discipline Policy provides that, "[e]xcept for such simple announcements as may be required, covering the time of the hearing and similar matters, public statements, and publicity about the case by either parties or member of the Hearing Committee will be avoided so far as possible until the proceedings have been completed, including consideration by the Corporation [Harvard]."

## II.   In July 2021, Data Colada Approaches HBS with Allegations Concerning Plaintiff's Work and Defendants' Subsequent Agreement.

66.     Through the Data Colada blog, Defendants Simonsohn, Nelson, and Simmons have targeted the work of prominent female academics and subjected it to an exceptionally high level of public scrutiny.

67.     In July 2021, Data Colada approached Plaintiff's employer, Harvard, with false allegations about perceived anomalies in the data of four studies co-authored by Plaintiff. Despite having no evidence, they attributed responsibility for the anomalies to Plaintiff, whom they accused of falsifying and/or fabricating data.

68.     In the field of behavioral science, if a researcher cannot replicate the results of a study or has questions about another behavioral scientist's findings, it is standard practice for that researcher to reach out to the author of the study for an explanation. Data Colada references this practice on its website in the following statement:

> Author feedback:
> Our policy (.htm) is to share drafts of blog posts with authors whose work we discuss, in order to solicit suggestions for things we should change prior to posting, and to invite them to write a response that we link to at the end of the post.

12.

69.     Though Data Colada has followed this normative practice in the past, as evidenced by their 100 plus blog posts, Data Colada did not share drafts of any blog posts with Professor Gino and ask for her "feedback" but, instead, went to Plaintiff's employer, Harvard, with false allegations of malfeasance against Plaintiff and threats to publicize their claims on their blog.

70.     In or about July or August 2021, HBS, concerned about negative publicity, negotiated with Data Colada and reached an agreement. In exchange for Data Colada's agreement to refrain from making public accusations against Plaintiff that would, by extension, subject HBS to public scrutiny, HBS agreed to create a new employment policy to investigate Data Colada's allegations against Plaintiff's work.  HBS further agreed that when it concluded its investigation, it would disclose the results to Data Colada, which would then be free to publicly disparage Plaintiff's work and professional reputation on its blog.

71.     Gary Pisano ("Dean Pisano"), then Senior Associate Dean for Faculty Development, has known Plaintiff for more than 20 years, collaborated with her on research and teaching, and served as Plaintiff's advisor.

72.     On or about July 20, 2021, Jean Cunningham ("Dean Cunningham"), Associate Dean for Faculty and Academic Affairs at HBS, who works closely with Dean Datar, alerted Dean Pisano that four studies co-authored by Plaintiff were the subject of allegations by Data Colada, that an investigation was pending, and that Plaintiff was going to need "a lot of help" from him.

73.     The allegations concerned four studies in which Plaintiff had been the principal investigator.

74.     Dean Pisano contacted Dean Datar to try to learn the substance of the specific allegations against Plaintiff so he could advise her, but Dean Datar told him to ask Dean Cunningham.

75.     Dean Cunningham instructed Dean Pisano that he must not inform Plaintiff of what was happening and provided no rationale for this secrecy.

**A.  HBS Abandons its Existing Research Integrity Policy and Procedure and Creates a New Policy Specifically for Professor Gino.**

76.     In July 2021, HBS already had in place a "Research Integrity Policy" (**attached as Exhibit 1 and henceforth, referred to as "Research Integrity Policy"**) (the "2013 Research Integrity Policy") that was applicable to allegations of faculty research misconduct that did not involve activities funded by outside agencies that sponsor research or proposals submitted to such agencies for funding.

77.     Although Professor Gino's work that was the subject of Data Colada's allegations did not involve agency funding, HBS did not apply its existing 2013 Research Integrity Policy and usual Faculty Review Board ("FRB") procedures to evaluate the allegations against her.

78.     Instead, after negotiating with Data Colada, in August 2021, HBS created a *new* research misconduct policy and procedure*s*, entitled the "Interim Policy and Procedures for Responding to Allegations of Research Misconduct" (**attached as Exhibit 2 and henceforth, referred to as "Interim Policy"**), that it used to evaluate and investigate the allegations against Professor Gino.

79.     On information and belief, HBS has never previously created an employment conduct policy and procedure *for just one employee* because of pressure exerted by a third-party.

80.     On information and belief, HBS spent approximately three weeks creating the new Interim Policy, just for Plaintiff. The Interim Policy was never vetted by HBS faculty. On information and belief, HBS's past practice has been to take many months to create policies applicable to faculty members. Prior HBS policies have been commonly vetted by HBS faculty.

14.

81.     From the time HBS received the allegations against Professor Gino in July 2021 and through the creation of its new Interim Policy, HBS kept Professor Gino in the dark about the allegations against her and Harvard's pending investigation.

82.     Keeping Plaintiff in the dark was inconsistent with HBS practice, which normally gives an accused timely notice of the allegations. Normally, HBS employs its FRB procedures to investigate allegations of misconduct by members of the faculty, including alleged violations of the Research Integrity Policy. Pursuant to HBS's usual FRB process, the faculty member is notified of the charges against him/her within a week of HBS's receipt of the allegations.

83.     With respect to the Interim Policy, i.e., the policy that HBS crafted just for Plaintiff, HBS modeled it on federal regulations promulgated by the Secretary of the U.S. Department of Health and Human Services ("HHS"), found in 42 C.F.R. pt. 93 entitled "Public Health Service Policies on Research Misconduct" ("PHS Regulations").[2]

84.     In September 2021, HBS assigned its employee Alain Bonacossa ("Bonacossa" or "RIO"), (who had held a position as Senior Director, Research Administration and Behavioral Research Services), to a new position as a Research Integrity Officer, with functions modeled after a Research Integrity Officer in an administrative proceeding under the PHS Regulations, to handle the proceeding against Plaintiff.

85.     On information and belief, this was the first time that Bonacossa performed this role.

### i.  <u>The Interim Policy</u>

---

[2] The PHS Regulations apply to "[e]ach institution that applies for or receives PHS support for biomedical or behavioral research, research training or activities or activities related to that research or training." 42 C.F.R. § 93.102(a). To the extent that HBS is an institution that applies for or receives PHS funding, allegations concerning Plaintiff's research did not implicate Harvard's institutional obligations under the PHS Regulations, as Plaintiff's alleged conduct did not occur in the context of "research" within the meaning of the PHS Regulations. *See* 42 C.F.R. § 93.222.

86.    Under the HBS Interim Policy, HBS bore the burden of proving any charge of "research misconduct" by a preponderance of the evidence. *See* Interim Policy at § (III) (A) ("Standard of Proof").[3]

87.    The Interim Policy defines "research misconduct" to mean "fabrication, falsification, or plagiarism" in proposing, performing, or reviewing research, or in reporting research results," and excludes "honest error." Interim Policy at App. A.[4]

88.    "Fabrication" is defined as "making up data or results." *See* Interim Policy at App. A.[5] "Falsification" is defined as "manipulating research materials, equipment or processes, or changing or omitting data or results such that the research is not accurately represented in the research record." *Id.*[6]

89.    "Research" is defined as "a systematic experiment, study, evaluation, demonstration, or survey designed to develop or contribute to general knowledge or specific knowledge by establishing, discovering, developing, elucidating, or confirming information about, or the underlying mechanism relating to, the matters to be studied." *See id.*

90.    For a finding of research misconduct, the alleged fabrication or falsification must be proved, by a preponderance of the evidence, to have been committed "*intentionally, knowingly or recklessly*," _and_ to constitute a "*significant departure from accepted practices of the relevant research community." See id. at* § (III)(A).[7] Importantly, "[r]esearch misconduct does not include honest error or differences of opinion." *See id.* at App. A.[8]

---

[3] *See also* 42 C.F.R. § 93.104(c).
[4] *See also* 42 C.F.R. §§ 93.103, 93.103(d).
[5] *See also* 42 C.F.R. § 93.103(a).
[6] *See also* 42 C.F.R. § 93.103(b).
[7] *See also* 42 C.F.R. § 93.104 (a)-(b).
[8] *See also* 42 C.F.R. §§ 93.104(a)-(c).

91.    Although the Interim Policy does not define the terms "intentional," "knowing," or "reckless," administrative decisions rendered by the HHS analyzing research misconduct findings under the PHS Regulations have looked to Black's Law Dictionary for the definitions of these terms, and have adopted the following definitions:

- **intentional:** "[d]one with the aim of carrying out the act";
- **knowing:**   "[h]aving or showing awareness or understanding; well-informed" or "[d]eliberate; "conscious";
- **"reckless:**   "characterized by the creation of a substantial and unjustifiable risk of harm to others and by a conscious (and sometimes deliberate) disregard for or indifference to that risk; heedless; rash," and "much more than mere negligence: it is a gross deviation from what a reasonable person would do."

*See id*. at p. 14; *see* Black's Law Dictionary (11th ed. 2019).

92.    The Interim Policy required Harvard to take all reasonable steps to ensure an impartial, fair, and unbiased investigation. *See* Interim Policy at § (VII)(E). [9]

B.  **The HBS Proceeding.**

i.  **The "Initial Inquiry" and Data Colada's False and Defamatory December 3, 2021 Report to Harvard.**

93.    Professor Gino first learned of the allegations against her on October 27, 2021, when she received a letter ("Notice of Inquiry") from Bonacossa, HBS's newly appointed RIO.

94.    The Notice of Inquiry informed Plaintiff that the RIO had received allegations from an "anonymous" source. The anonymous source was, in fact, Data Colada. The allegations related to four studies, for which Professor Gino had been the principal investigator, that were published in the following research papers:

Gino, F., Kouchaki, M., & Casciaro, T. (2020). Why connect? Moral consequences of networking with a promotion or prevention focus. *Journal of Personality and Social Psychology*, 119(6), 1221–1238 ("**2020 JPSP Paper**")

---

[9] *See* 42 C.F.R. § 93.310(f).

Gino, F., Kouchaki, M., & Galinsky, A. D. (2015). The moral virtue of authenticity: How inauthenticity produces feelings of immorality and impurity. Psychological Science, 26(7), 983–996 (*"2015 Psychological Science Paper"*)

Gino, F., & Wiltermuth, S. S. (2014). Evil genius? How dishonesty can lead to greater creativity. Psychological Science, 25(4), 973–981 (*"2014 Psychological Science Paper"*)

Shu, L. L., Mazar, N., Gino, F., Ariely, D., and Bazerman, M. H. (2012). Signing at the beginning makes ethics salient and decreases dishonest self-reports in comparison to signing at the end. Proceedings of the National Academy of Sciences of the United States of America, 109, 15197–15200 (*"2012 PNAS Paper"*)

95.     The Notice of Inquiry further informed Professor Gino that HBS had already sequestered "certain research records" relating to her research and instructed her to turn in her "HBS-issued devices" by 5 p.m. that same day.  In an unnecessary demonstration of force, the RIO called Harvard University police to oversee the transfer.

96.     The Notice of Inquiry advised Plaintiff that HBS had opened a formal "initial inquiry" into the allegations, and that Dean Datar had appointed an "inquiry committee" comprised of HBS Professor Emerita Teresa Amabile, serving as Chair, and HBS Professor Emeritus, Robert Kaplan. Although not known to Plaintiff at the time, Professor Kaplan was Dean Datar's mentor early on in his academic career and was instrumental in bringing Dean Datar to HBS. *See* "Playing the Long Game: How Dean Datar Came to be at HBS," (Jan. 3, 2021), available at: https://www.hbs.edu/news/articles/Pages/dean-datar-to-hbs.aspx (last visited July 31, 2023).

97.     Under the Interim Policy, the Inquiry Committee was tasked with determining whether: there was (1) "a reasonable basis for concluding that the allegation falls within the definition of research misconduct"; and (2) whether "the preliminary information-gathering and preliminary fact-finding from the inquiry indicate[d] that the allegation may have substance." *See* Interim Policy at § (VI) (C). The Interim Policy required the Inquiry Committee to produce a draft

18.

inquiry report to Professor Gino, with opportunity to comment, and then a final inquiry report, with its decision whether an investigation was warranted, within 60 days from the start of the inquiry.   *See id*. at § VI (E), (H).

98.    In pertinent part, the Interim Policy's stated "scope" is limited "only to allegations of research misconduct that occurred **within six years of the date** HBS received the allegation, unless the respondent has continued or renewed an incident of alleged research misconduct through the citation, republication, or other use for the potential benefit of the respondent of the research record in question." *See* Interim Policy at § II (emphasis added).

99.    Other than allegations concerning the *2020 JPSP Paper,* the remaining three allegations noted in the Notice of Inquiry should have been time-barred. Allegations concerning the *2015 Psychological Science Paper*, the *2014 Psychological Science Paper,* and the *2012 PNAS Paper* were all more than six years old and should not have been the subject of an inquiry under the Interim Policy.

100.   In the course of the initial inquiry, on December 3, 2021, the complainant/Data Colada submitted to the Inquiry Committee a statement titled "Evidence of Fraud in Academic Articles Authored by Francesca Gino" (the "December Report").

101.   The December Report included the same allegations outlined in the Notice of Inquiry, plus new details that implied that the complainant/Data Colada had *additional, non-disclosed* "evidence of fraud" by Professor Gino, including evidence "going as far back as 2008, (when she was a post-doc at Carnegie Mellon)" and that the December Report contained only a "subset of the evidence [they] had collected."

102.   Data Colada never asked Professor Gino for papers she worked on or published in 2008, nor for data related to projects she worked on during her time at CMU. Data Colada could

not possibly have had any good faith basis for their purported "strong suspicions" for her published data going back to 2008, a period *before* Open Science Framework ("OSF"), an open-source web application, made it possible for behavioral scientists to share their data.

103.   The December Report included the following statements by the complainant, i.e., Data Colada:

> A small number of individuals raised concerns to us and asked for our involvement in trying to reconcile those concerns. In collaboration, we have collectively tried to identify some of the biggest issues.
>
> We report direct evidence of data tampering in four different datasets from four different published articles. We focus on those because they appear the most unambiguous. We have strong suspicions about some her [sic] published data going as far back as 2008 (when she was a post-doc at Carnegie Mellon University), but the most direct evidence is included it [sic] in this report.
>
> Indeed, we should be clear that neither this report, nor our investigation, are exhaustive. We have not analyzed, or even read, the majority of Professor Gino's published articles. If the Harvard University investigators determine that there is sufficient evidence in these four studies, it would certainly be worth considering others as well.
>
> Finally, although the evidence can, in most of these cases, rule out malfeasance by co-authors, it cannot definitively rule in malfeasance by Professor Gino. It may be that some research assistant or otherwise unnamed person/people was/were responsible for producing these anomalies.
>
> . . .
>
> 7. Reminder
>
> This report includes a subset of the evidence of tampering we have collected, which was obtained by analyzing a small subset of the data that [Professor] Gino has published.

104.   In the December Report, the complainant/Data Colada presented what it described as "imperfect data tampering" for data that appeared to be "out of sort" in published data sets. Like

the allegations set forth in the initial Notice of Inquiry, the allegations contained in the December Report are based on unwarranted inferences that perceived anomalies in the data resulted from "fraud," and ignored other plausible and innocent reasons for perceived anomalies.

105.    Like the allegations in Data Colada's original complaint, set forth in the October 27, 2021 Notice of Inquiry, the December Report demonstrates that the complainant/Data Colada, had, misrepresented so-called perceived "anomalies" in data as "evidence of data tampering" based on:

- Data Colada's *deliberate decision to ignore* the relevant *stud*y at issue and the prior research on which the study at issue was based;

- Data Colada's *malicious, intentional, bad faith representations* to HBS of so-called "evidence of fraud," for which the complainant/Data Colada had no good faith belief; and

- Data Colada's *unwarranted, unsupported assumption* that, where data had been presented as "imperfectly sorted," that amounted to evidence of "fraud."

106.    On February 22, 2022, Plaintiff's advisor in the matter, Attorney Paul S. Thaler, Esq., of the law firm Cohen Seglias Pallas Greenhall & Furman PC, submitted a letter on Plaintiff's behalf to Diane Lopez, Esq., Harvard's Vice President and General Counsel, and requested that she forward it to Bonacossa and the members of the Inquiry Committee. Mr. Thaler explained that, under the Interim Policy, the Inquiry Committee should find that there was insufficient evidence to warrant an investigation into Plaintiff's work because the allegations lacked substance, and in multiple incidences did not align with actions that fell within the definition of research misconduct.

107.    Mr. Thaler explained that, to the extent there were anomalies in the datasets, in all four of the studies in question, Professor Gino had relied on the help of research assistants on any given project to help her prepare IRB applications, conduct laboratory studies, clean the data, prepare it for analyses, and often conduct preliminary analyses on the data. Professor Gino's

practice in this regard was consistent with other behavioral scientists in her field. Given that, in all of the studies in question, Professor Gino did not run the studies or sort or handle the data, and that there was no evidence that the culture of Plaintiff's lab incentivized or motivated research assistants to manipulate data, there was no substance to any of the allegations.

108.     Mr. Thaler also explained that, under the Interim Policy, the unavailability of records is only to be considered evidence of research misconduct where it can be shown by a preponderance of evidence that the respondent *intentionally, knowingly, or recklessly* had research records and destroyed them, had the opportunity to maintain the records but did not do so, or maintained the records and failed to produce them in a timely manner ***and*** that the respondent's conduct constitutes a significance departure from accepted practices of the relevant research community. *See* Interim Policy § (III) (A).[10]

109.     Mr. Thaler noted that the original paper records for the *2012 PNAS Paper* studies could not be found because the records were older than six years and would not normally be reviewed under analogous federal law, *see* 42 C.F.R. § 93.105(a).

110.     The raw data—the original source data—for the study in question in the *2014 Psychological Science Paper* could not be found either. Data retention policies indicate that records older than six years do not need to be retained so unavailability of this data should be expected given the year the study was conducted (2012).

111.     The same data retention policy also applied to the *2015 Psychological Science* paper as the data for study in question was collected in 2014.

112.     On April 1, 2022, Professor Gino submitted her own written responses to the draft inquiry report.

---

[10] *See* 42 C.F.R. § 93.106(b)(1).

113.    HBS ignored the numerous procedural and substantive deficiencies in the draft report identified by Mr. Thaler and highlighted in Professor Gino's comments and, on April 8, 2022, produced a final inquiry report ("Inquiry Report"), in which the committee found that an investigation was warranted.

## ii.  **HBS's Unfair and Biased Investigation.**

114.    On April 15, 2022, HBS notified Professor Gino that Dean Datar had concluded that an investigation was warranted and was instituting an investigation, and that a third member of the HBS faculty, HBS Professor Shawn Cole, would join Amabile and Kaplan, forming an "investigation committee," pursuant to the Interim Policy.

115.     In or about May 2022, the investigation committee hired an external forensic firm Maidstone Consulting Group ("MCG") to produce forensic reports and analyses of documents and Plaintiffs' electronic files that had been sequestered.

116.    The investigation committee provided information (documents/records) to MCG for the purpose of evaluating the allegations against Professor Gino, without consulting with Professor Gino to locate or ascertain where the pertinent information was stored and, in particular, whether the electronic files sequestered on her HBS devices contained the final documents and raw data relevant to the studies in question.

117.    Over the months of June July, and August 2022, MCG produced a massive amount of forensic reports (over 180 pages) on each of the four allegations, but they were based on an examination of documents that did not contain information used by research assistants to merge datasets or code variables in them, and that contained data that was not confirmed to be raw data. As such, the forensics reports were non-probative evidence that were, at best, inconclusive as to the allegations.

118.    During the months of June, July, and August 2022, the investigation committee also met with and interviewed six of Professor Gino's collaborators and two research assistants for the papers in question, resulting in hundreds of pages of recorded and transcribed testimony from the following individuals:

a.  J.F. (research assistant)
b.  A.R. (research assistant)
c.  Professor M.K. (co-author)
d.  Professor S.W. (co-author)
e.  Dr. L.S. (co-author)
f.  Professor A.G. (co-author)
g.  Professor T.G. (co-author), and
h.  Professor N.M. (co-author).

119.    All of the witnesses interviewed by the investigation committee corroborated Professor Gino's account of how the research was performed and spoke about the integrity of her work and lab practices.

120.    All witnesses interviewed corroborated Professor Gino's assertion of her innocence of falsification and/or fabrication of data.

121.    During June 2022 through September 2022, the investigation committee reviewed the MCG forensic reports and had several meetings to discuss them. The investigation committee completed its review before providing Professor Gino copies of the forensic reports or giving her an opportunity to review and respond to them.

122.    On August 24, 2022, the RIO informed Professor Gino (for the first time) that the investigation committee had hired a forensics firm and advised her that it would share the forensic reports with her in September 2022, and that it would want to discuss the reports with her.

123.    Throughout the inquiry and the investigation, Professor Gino was performing her regular duties as a Professor at HBS.

124.    At the end of August 2022, the RIO contacted Professor Gino to schedule two three-hour interviews with the investigation committee and was offered dates at the end of October 2022 and November 2022 to discuss both the MCG reports and witness interviews.

125.    When, after a few weeks, Professor Gino had still not been provided copies of the MCG reports, she contacted the RIO, who told her he was about to send her the first of the forensic reports. Professor Gino requested that the RIO permit her more time to review the forensics reports—which she had still not been provided—so she could prepare for the upcoming meetings with the investigation committee.

126.    The RIO told Professor Gino that the investigation committee wanted to meet before Thanksgiving. To accommodate the investigation committee's schedule, the RIO canceled the earlier of the two scheduled 3-hour meetings, leaving just one three-hour meeting for Professor Gino to meet with the investigation committee, on November 14, 2022.

127.    The RIO delayed in providing Professor Gino copies of the MCG Reports, and when he finally did send them to her, he sent them piecemeal, over multiple dates between September 30, 2022 through October 31, 2022.

128.    Though Dean Datar had confirmed to Professor Gino's advisor, Dean Pisano, that, during the proceeding, Professor Gino would be given all the time she needed to respond to the investigation committee's requests for information, HBS did not provide the forensic reports to her in a timely manner, leaving her insufficient time to review the 180-plus pages of dense reports prior to her November 14 2022 meeting with the investigation committee. While the three members of the investigation committee had months to digest the reports and a vendor working on their behalf, Professor Gino was given only a few weeks, while she was also teaching intensively for a month and a half in September and October of 2022, a new course for which she was the

course-head.[11] Additionally, when the investigation committee did finally provide her the reports, it did not provide her the underlying documents (e.g., data and emails) on which the reports were based, making it difficult for her to make sense of the reports.

129.    Nonetheless, Professor Gino met, as requested by the investigation committee, for a 3-hour interview on November 14, 2022. At the meeting, Professor Gino was questioned about studies that were done seven, eight, and 10 years previously, and about forensic analyses that were largely irrelevant, in an unfair interrogation that reflected the committee's bias against her.

130.    Professor Gino maintained her innocence throughout the entire proceeding, and fully cooperated with the investigation committee, providing information about the publication process, access to data, to the extent it was available, and answering the committee's question on collaborators and research assistants on the studies in question. Professor Gino provided plausible explanations for the perceived "anomalies" in the data.

### iii.    The Investigation Committee's Draft Report.

131.    At 5:38 p.m. on December 14, 2022, the investigation committee provided Professor Gino a copy of its draft investigation report ("Draft Report") for comment. When the RIO gave her the Draft Report, both HBS and the RIO knew that Professor Gino was leaving for a scheduled family vacation two days later, on December 16, 2022, to see her family in Italy for approximately two weeks, whom she had not seen in four years. Under the Interim Policy, Professor Gino had just 30 days to provide comments to the Draft Report, and she requested an extension of time to review and submit her comments.

---

[11] Professor Gino was not provided a copy of the MCG Report on Allegation 1 until September 30, 2022 though the committee met to discuss it about 5 weeks earlier. Professor Gino was not provided a copy of the MCG Report on Allegation 2 until October 21, 2022 though the committee met to discuss it about three weeks earlier. She was not provided a copy of the MCG forensic report on Allegation 3 until October 31, 2022, though the committee had it for some time and met to discuss it three days earlier. She was not provided a copy of the MCG report on Allegation 4 until October 12, 2022, though the committee met to discuss it about 7 weeks earlier.

132.    The Draft Report informed Professor Gino that the investigation committee had found her guilty of all the charges and, incredibly, without consideration of the various mitigating factors set forth in the Interim Policy, recommended the harshest and most punitive sanction available under the Interim Policy: termination of Professor Gino's employment.

### iv.   The Investigation Committee Failed to Prove Research Misconduct.

133.    In the Draft Report, the investigation committee acknowledged but chose to ignore evidence that was directly relevant to the question at hand: whether Professor Gino had knowingly, intentionally, or recklessly manipulated data. The investigation committee prefaced its findings with the following statement, indicating that "all witnesses" whom the committee interviewed *"never doubted the integrity of the data in the study or studies in question*," and that there was also *no evidence of any incentive or pressure to manipulate data in Professor Gino's lab*, writing:

> We acknowledge, and we took seriously in our decision-making, statements by all witnesses that they never doubted the integrity of the data in the study or studies in question. One witness who knew Professor Gino well said they never doubted her integrity in any way. The witnesses also said that they had no evidence that Professor Gino had ever pressured colleagues, doctoral students, post-docs, or research associates, including themselves, to produce particular results in a study, or that Professor Gino had created a negative atmosphere in her lab. Moreover, some witnesses spontaneously said that they had worked on multiple studies with Professor Gino that were never published because the studies didn't work out.

134.    In concluding Professor Gino was responsible, the investigation committee made findings based on mere speculation, in reliance on some discrepancies noted in the MCG reports— reports that were, at best, inconclusive. Without **any** supporting witness statements, email correspondence, or other evidence, such as the original "raw" data (that is, data submitted by study participants before being handled or "cleaned" by anyone), the investigation committee concluded that Professor Gino was responsible for misconduct.

135.    Under the Interim Policy a finding of research misconduct required HBS's investigation committee to prove, *by a preponderance of the evidence*, that Plaintiff *"intentionally, knowingly, or recklessly" falsified or fabricated* data, and to specify for each allegation the requisite intent. *See* Interim Policy at § (III) (A), (VII) (F). Instead, the investigation committee reversed the policy's stated burden of proof, and found Professor Gino guilty of misconduct because she had not *disproved* the allegations against her.

136.    Although the investigation committee stated in the draft report that it found all witnesses to be credible, it inexplicably ignored witness testimony that corroborated Professor Gino's explanations concerning the allegations, and established Professor Gino's integrity, style of working, and lab practices. The committee also irrationally ignored relevant testimony from Professor Gino's research assistants and collaborators that corroborated Professor Gino's plausible and innocent explanations concerning data "anomalies."

137.    In its Draft Report, the investigation committee failed to specify the intent of the misconduct, i.e., whether it had been committed "intentionally, knowingly, or recklessly," as it was required to do under the Interim Policy. *See* Interim Policy § (VII) (F). Instead, and in the absence of any evidence of intent to commit misconduct, the investigation committee merely parroted the phrase, "intentionally, knowingly, or recklessly" for each allegation.

138.    Indeed, ***not a single witness*** interviewed by the investigation committee reported any type of behavior or attitude that is consistent with the speculative intent that was posed by the investigation committee—intent that was unspecified and unsupported by any evidence whatsoever.

139.    In addition to the investigation committee's failure to make specific findings supported by a preponderance of the evidence, the overly harsh sanctions recommended by the

investigation committee bore no connection to the intended rehabilitative nature of the research misconduct proceedings. As set forth in the PHS Regulations, on which the Interim Policy is based, such proceedings are intended to be remedial in nature, and to avoid overly harsh and punitive outcomes.

140.    Under the Interim Policy, a respondent is "allowed 30 days from receipt of the draft report to submit comments to the RIO," which "must be included and considered in the final report." (See Interim Policy at § (VII) (G)(1). The RIO is permitted under the Interim Policy to extend the deadlines for completion of any phase of the investigation, including the preparing of the draft investigation report and finalizing the draft report. *See* Interim Policy at § (VII)(J).

141.    Professor Gino was entitled access to **all** of the documents relied on in the report, including the lengthy MCG forensics documents that she had never had a meaningful opportunity to review and respond to, as well as the underlying documents to those reports, which she was ***never*** provided—a clear violation of the policy. *See* Interim Policy at § (VII)(G)(1).

142.    Despite the rules, on December 14, 2022, the RIO declined to grant Professor Gino's reasonable request for an extension and told her to wait until she returned from her vacation in January 2023, to see if she actually needed the time.

143.    The RIO also told Professor Gino that she should expect the process to get much harder going forward (saying the "road would get much tougher"). He advised her that the committee was *very unlikely to change its conclusions*, and that *all she could ask for was a reduction in the recommended sanctions*. The RIO even suggested to Professor Gino that she should seek mental health counseling to deal with potential mental health issues arising from the anticipated difficulty of the proceeding.

144.    Though HBS had taken months to prepare and review the MCG forensic reports, it was giving Professor Gino roughly three weeks to respond to the draft report, without the documents underlying that report, all two days before she was going on a two-week trip to Italy.

145.    Dean Pisano went to Dean Datar to intervene on Professor Gino's behalf, telling him that she needed more time to respond to the draft report, particularly since the committee had reversed the Interim Policy's stated standard of proof, and was requiring her *to disprove* the allegations.

146.    When Dean Pisano spoke with Dean Datar, he emphasized that, throughout the proceeding, Professor Gino had continued to perform her regular duties as a Professor at HBS and had put "Harvard's interests first," including co-creating and teaching a course on Inclusion, (with 1,011 MBA students enrolled), and that, as a matter of basic fairness, she should have time to focus on her rebuttal, and to digest and respond to the 180-plus pages of MCG forensic reports. Dean Datar was dismissive, telling him to speak with Dean Cunningham. Dean Cunningham was also dismissive, telling Dean Pisano, "oh, she's getting all the time she needs."

147.    After Professor Gino's return to Boston, on January 10, 2023, she wrote the RIO to again request an extension of time to respond to the investigation committee's draft report and was granted a "hard deadline" of February 17, 2023.

148.    On February 17, 2023, Professor Gino submitted a written response to the investigation committee's Draft Report.

149.    In her response to the Draft Report, Professor Gino sought to clarify that, "[w]hile the [Interim Policy] notes that defenses must be proven by a preponderance of the evidence in their consideration, the burden of proof for making a finding of research misconduct is *actually* on the

committee, as any findings of research misconduct must themselves be supported by a preponderance of the evidence." (Citing Interim Policy at (III)(A) and App. 1.)

150.    Maintaining her innocence, Professor Gino's response thoroughly outlined the substantive factual evidence that the investigation committee had ignored for each of the four allegations against her, and that weighed in favor of her innocence, and provided specific citations to the record.

151.    In addition, and without violating any rules, Professor Gino contacted potential witnesses (without telling them about the ongoing investigation) who could corroborate her statements to the investigation committee. Although it was not her burden to prove her innocence under the Interim Policy, Professor Gino's response to the committee's Draft Report introduced *new evidence* of her own, including statements from others whom the committee had failed to interview. Prior to the issuance of the Draft Report and during the investigation, Professor Gino had not spoken to potential witnesses to avoid any appearance of influencing them, as well as to comply with the Interim Policy's "duty to maintain confidentiality," of the proceeding, "to the extent possible."  *See* Interim Policy § (III) D).[12]

### v.  The Investigation Committee Failed and/or Refused to Diligently Pursue All Leads.

152.    Professor Gino had also expected that the committee would evaluate each allegation of research misconduct *thoroughly, fairly, and objectively*, *see* Interim Policy § (III)(A),[13] and to interview all witnesses and diligently pursue all leads. *See* Interim Policy § (VII)(E).[14]

153.    Seeing that the investigation committee had failed to fulfill these duties and had also reversed the Interim Policy's standard of proof by imposing upon *her* the burden of *disproving*

---

[12] *See also* 42 C.F.R. §§ 93.108, 93.300(e).
[13] *See also* 42 C.F.R. § 93.300(b).
[14] *See also* 42 C.F.R. §§ 93.310(g), (h).

the allegations of misconduct, Professor Gino provided the committee with independent corroboration of her innocence, and attached to her detailed February 17, 2023 response to the Draft Report statements of colleagues concerning her integrity and the integrity of her lab and work practices, in addition to substantive statements concerning specific factual issues pertinent to the individual allegations.

154.    Professor Gino also noted in her response to the Draft Report that, with respect to allegations that related to studies conducted more than three years ago and that concerned records that were more than three years old (and in some cases, more than 10 years old), under the applicable document retention rules of Harvard and UNC, there had been no departure from accepted research practices for the data to have been discarded or unavailable. Under the Interim Policy, there should have been no basis for the investigation committee to infer misconduct from the *absence* of such records. *See* Interim Policy at § (II) (A).

155.    Professor Gino's response to the investigation committee's Draft Report specifically addressed the investigation committee's unwarranted assumptions made based on the MCG reports, which concerned only the examination of sequestered documents located on Professor Gino's hard drive. Professor Gino outlined in detail why the MCG reports were, at best, inconclusive, as even MCG acknowledged in the reports that they were not clearly based on the relevant records, (i.e., the original raw data and research records for the studies at issue).

156.    Similarly, Professor Gino explained that, for another study at issue, the data had been collected *on paper*, not, as the investigation committee assumed based on an MCG forensic report, in a computer spreadsheet. To presume an "anomaly" based on participant IDs being out of sort was unwarranted because the data collected on paper had been entered into a spreadsheet in no particular order (i.e., unsorted).

157.     Though the investigation committee could not possibly have digested Professor Gino's comprehensive response to the Draft Report in just two weeks, it issued its final investigative report ("Final Report") on March 7, 2023.

### vi.  The Final Report: A Biased and Deficient Foregone Conclusion.

158.     The Final Report, which was substantially unchanged from the investigation committee's Draft Report, evidenced that the committee had reached a foregone conclusion. That the committee members had already made up their minds is also evidenced by the speedy turnaround of such an important document, as well as the minimal changes from the Draft Report.

159.     While acknowledging receipt of Professor Gino's response, in its Final Report, the investigation committee unreasonably dismissed the evidence she presented as *"not germane"* and *"irrelevant."*

160.     As in its Draft Report, the investigation committee discounted or ignored evidence directly relevant to the question of *intent,* and stated:

> We acknowledge, and we took seriously in our decision-making, ***statements by all witnesses that they never doubted the integrity of the data in the study or studies in question.*** One witness who knew Professor Gino well said they never doubted her integrity in any way. In addition, several exhibits appended by Professor Gino to her Response (Exhibit 29) contained messages to her from co-authors, colleagues, and former doctoral students expressing their admiration for her research rigor and integrity. ***The witnesses we interviewed also said that they had no evidence that Professor Gino had ever pressured colleagues, doctoral students, post-docs, or research associates, including themselves, to produce particular results in a study, or that Professor Gino had created a negative atmosphere in her lab.*** Moreover, some witnesses spontaneously said that they had worked on multiple studies with Professor Gino that were never published because the studies didn't work out.

(Emphasis added.)

161.     Incredibly, despite that the burden was *on the committee* to prove intentional misconduct by a preponderance of the evidence, the draft report indicated that the investigation

committee found that witnesses' statements concerning the "integrity of the data" or the integrity of Professor Gino were "not germane," writing:

> ***We carefully considered all these statements, but did not find them germane to the specific allegations before us or a plausible explanation of data anomalies or discrepancies.***

162.    Under the Interim Policy, evidence of Professor Gino's *intent* (or lack of intent) to fabricate or falsify data was directly relevant to a finding of research misconduct, as such finding requires proof, by a preponderance of the evidence, of *knowing, intentional, or reckless conduct.*

163.    In addition to ignoring evidence directly relevant to the issue of *intent,* the investigation committee ignored evidence relevant to the specific allegations that provided reasonable and innocent explanations for the perceived anomalies.

164.    The committee failed to apply the Interim Policy's burden of proof and shifted the burden of proof onto Professor Gino *to disprove* research misconduct. That is not the appropriate standard of proof under the Interim Policy.

165.    Under the Interim Policy, the definition of research misconduct specifically excludes "honest error," and the burden of proving *research* misconduct remained at all times on Harvard. *See* Interim Policy at (III)(A) and App. 1; *see also* 42 C.F.R. § 93.106; *see* 70 FR 28370-01 (discussing evidentiary standard under 42 C.F.R. 93.106); *see, e.g., Martin v. Ohio,* 480 U.S. 228, 233 (1987).

166.    Though the Interim Policy required the investigation committee to give due consideration to admissible, credible evidence of honest error or difference of opinion presented by Professor Gino, it ignored credible evidence of honest error, holding her to a higher standard of proof than required under the Interim Policy.

167.    The Investigation Committee reached this finding despite that (1) there was no evidence that Professor Gino had collected or maintained the data in question; (2) all of the evidence, including the witness testimony, established that Professor Gino and her lab always demonstrated the highest level of integrity; and (3) Professor Gino had always maintained her innocence.

168.    On March 9, 2023, Professor Gino's counsel, Mr. Thaler, wrote a letter to Harvard's General Counsel, requesting that she please forward it to Dean Datar, and highlighting the deficiencies of the investigation committee's decision and its many failures to adhere to the Interim Policy requirements, including the following:

> **(1)** <u>The investigation committee failed to prove, by a preponderance of the evidence, "research misconduct" within the meaning of the policy.</u> Under the Interim Policy, to make a finding of research misconduct required the investigation committee "to identify whether the research misconduct was falsification, fabrication, or plagiarism," and whether Professor Gino had committed such misconduct with the requisite *intent*: *"intentionally, knowingly, or recklessly."* The burden was *on the committee* to establish any such finding by "a *preponderance of the evidence*." The investigation committee's conclusory findings were based on *mere speculation*, and. in the *absence of supporting witness statements and evidence,* the committee determined that Plaintiff was responsible for misconduct.[15]

> **(2)** <u>The investigation committee failed to apply the Interim Policy's standard of proof.</u> The investigation committee erroneously concluded that Professor Gino was responsible because she had failed to *disprove* misconduct by a preponderance of the evidence.

> **(3)** <u>The investigation committee had irrationally ignored relevant evidence.</u> The investigation committee had given no credence to credible witness testimony concerning Plaintiff's known integrity and style of working, all of which was relevant to the issue of intent. *Not a single witness* reportedly mentioned any concern about Professor Gino's data practices or integrity. Quite the opposite, witnesses stated that Professor Gino had *not* pressured them to produce certain results and had even abandoned projects when appropriate.

> **(4)** <u>The investigation committee concluded Professor Gino was responsible without making any finding of *specific intent* to falsify or fabricate data.</u> The Interim Policy required the investigation committee to issue a written decision in which it states

---

[15] *See also* 42 CFR § 93.103, federal regulations expressly incorporated in the Interim Policy.

a finding of *specific intent* for each allegation, but the investigation committee concluded that Professor Gino was responsible without specifying *any particular intent*.

**(5)** <u>The committee recommended overly punitive sanctions in disregard of applicable policy considerations</u>. Under the Interim Policy', misconduct proceedings, (as also stated in the PHS Regulations on which the Interim Policy was based), are intended to be *rehabilitative* in nature. In disregard of this policy, the investigation committee had recommended extremely punitive sanctions, that appeared untethered to any policy factor.

169.   Harvard's General Counsel advised Professor Gino that her advisor's letter would not be forwarded to Dean Datar.

170.   In a letter dated April 3, 2023, Dean Pisano appealed to Dean Datar. Like Mr. Thaler, Dean Pisano tried to explain to Dean Datar that, under the Interim Policy, the investigation committee had failed to prove by a preponderance of the evidence that Professor Gino had engaged in intentional, knowing, or reckless falsification and/or fabrication of data. Dean Pisano emphasized that the committee had misapplied the standard of proof when it simply concluded that Professor Gino was guilty on the basis that she had not *disproved* the allegations.

171.   Dean Pisano urged Dean Datar to read the letter sent by Professor Gino's counsel, Mr. Thaler, advising him that Mr. Thaler had handled many cases at Harvard on behalf of other faculty members and was *"simply appalled"* by both the investigation committee's decision and its proposed sanctions against Professor Gino.

172.   Dean Pisano also emphasized that the investigation committee had appeared biased against Professor Gino, as indicated by the RIO's comments to her in December, which suggested to him the investigation committee had reached "a foregone conclusion."

173.   On April 14, 2023, Dean Pisano met with Dean Datar in the presence of Dean Cunningham. Dean Pisano implored Dean Datar to realize that the "process was broken." Dean Pisano again emphasized that the investigation committee had failed to carry its burden of proof

under the Interim Policy, and that it was required under the Interim Policy to prove, by a preponderance of the evidence, that Professor Gino possessed the requisite intent to fabricate or falsify data, and to address allegations fairly and objectively. *See* Interim Policy at § (III) (A).[16]

174.    Dean Pisano, who had dispassionately served on FRB panels in HBS tenure and misconduct proceedings, told Dean Datar that the investigation committee appeared to have simply ignored the evidence in Professor Gino's rebuttal to the Draft Report.

175.    Dean Datar ignored Dean Pisano's entreaties to give Professor Gino a fair and just decision, in line with the Interim Policy requirements, and his pleas to make him understand that the investigation committee had found *no evidence of misconduct* under the Interim Policy and that, even if the evidence did support a finding of misconduct, which it did *not,* the committee's recommended sanctions were grossly disproportionate and out of step with sanctions in other cases, even in cases where very serious misconduct occurred.

176.    Dean Pisano urged Dean Datar to speak with Professor Gino if he had any specific questions about evidence, but Dean Datar showed no interest in hearing from Professor Gino. Dean Datar told Dean Pisano that he was meeting with him only out of "respect" for him.

**C.  Despite Knowledge that the Findings and Conclusions of the Investigation Committee were Unproved, Dean Datar Rendered a Decision Imposing Harsh Sanctions against Dr. Gino's Employment, in Violation of the Interim Policy.**

177.    On June 13, 2023, Dean Datar issued a written decision that adopted in full the unreasonable findings and conclusions of the investigative panel and its overly-punitive sanctions that were not aligned with the Interim Policy's stated considerations and purpose and out of step as compared to other misconduct cases at HBS and Harvard.

---

[16] *See also* 42 C.F.R. § 93.300(b).

178.     At 5:30 p.m., Professor Gino met with Dean Datar and Dean Cunningham in Dean

Datar's office. Dean Datar told Professor Gino that she would not have the opportunity to say

anything, and that he simply wanted the process to be "humane" so had decided to meet with her

in person to deliver the news of his decision. Dean Datar proceeded to read, word for word, his

decision letter, dated June 13, 2023.

179.     Dean Datar informed Plaintiff that she was being placed on unpaid administrative

leave "for a period of two years," and that she would receive no salary or benefits after July 31,

2023. Dean Datar immediately revoked Plaintiff's named professorship the Tandon Family

Professor of Business. Datar informed Plaintiff that he was requesting to Harvard's President that

Harvard institute "Third Statute proceedings" to revoke her tenured professorial appointment at

Harvard.

180.     Plaintiff was further informed that, for the period of her administrative leave, and

effective immediately: (a) she was not permitted to conduct research, to teach, to mentor or advise;

(b) she would receive no administrative or research support; (c) she was barred from campus,

effectively immediately; and (d) she was prohibited from publishing or disseminating research via

HBS platforms.

181.     Additionally, Dean Datar's June 13, 2023 letter stated that:

> *It is my intention to continue to handle this matter as confidentially as
> circumstances allow. Apart from the communications to journals and co-authors
> you can expect that I will share with your Unit and relevant faculty and staff
> leadership that you have been placed on administrative leave as a consequence of
> research misconduct findings* such that you will be unavailable to engage in
> research, teaching, and mentoring or advising. *Communications will also be
> necessary with students whose work you have been supervising.*

(Emphasis added.)

182.     When he finished the letter and Professor Gino began to weep, Dean Datar told her,

"you are a capable, smart woman. I am sure you'll find other opportunities."

183.    Dean Datar's remarks that he would "share" "research misconduct findings" was inconsistent with the confidentiality provision of the Interim Policy and Harvard's other employment policies, as well as HBS and Harvard's normal practices. Misconduct proceedings and findings under the FRB are always confidential, including proceedings that were heard under the 2013 Research Integrity Policy.

184.    Dean Datar told Plaintiff that he was being "nice" to her by waiting until the end of July 2023, to place her on unpaid leave, rather than doing so immediately.

### III.    Harvard Breaches Confidentiality Provisions in Numerous Policies and Spreads False and Defamatory Statements

#### A.    Confidentiality Policies

185.    At the bottom of every single page of the 41-page Final Report rendered by the investigation committee appeared the following paragraph:

> **THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.**

(All capitals and bold font in original.)

186.    The Interim Policy, like the PHS Regulations on which it is based, recognizes that accusations of research misconduct are potentially devastating to an academic's professional reputation, and imposes conditions of *strict confidentiality* on allegations of research misconduct. Interim Policy at § (III) (D); *see* 42 C.F.R. § 93.108(a).

187.    Under the Interim Policy, Harvard was obligated to limit disclosure of Professor Gino's research misconduct proceeding and the identity of Professor Gino, except on a need-to-

know basis for the purpose of carrying out a fair proceeding, and to the extent required by law. *See* Interim Policy § (III) (D).[17]

188.    Consistent with the Interim Policy, the 2013 Research Integrity Policy also emphasizes Harvard's duties of confidentiality to a faculty member accused of misconduct, providing that: "It is important that, whatever process the Dean determines to be appropriate is thorough, fair, and objective," and should take into account "***protecting the rights and reputation[] of the individual accused.***" (Emphasis added.)

189.    HBS normally (i.e., as a matter of recent and ongoing practice) utilizes its Faculty Review Board ("FRB") process to review both applications of faculty seeking tenure, as well as allegations of faculty misconduct, including alleged research misconduct.

190.    As a matter of its normal practice, when HBS convenes an FRB (i.e., a panel of tenured professors) to investigate allegations of faculty misconduct, it follows the FRB procedure set forth in the "Principles and Procedures for Responding to Matters of Faculty Conduct" ("FRB Principles"). Under the FRB Principles, in a case of *research misconduct*, the FRB applies the aforementioned 2013 Research Integrity Policy to evaluate alleged research misconduct by faculty (when no federal funding is involved).

191.    Little is known about specific misconduct cases, including research misconduct cases, that have been handled by HBS under the routine FRB process because, as stated in the FRB Principles, the expectation is that the *"work and activities of the FRB are considered private."* (Emphasis added.)

---

[17] *See also* 42 C.F.R. §§ 93.108, 93.300(e).

192. The FRB Principles, like the 2013 Research Integrity Policy and the Interim Policy, sets forth a duty of confidentiality, pursuant to which those involved *"are expected to respect the confidentiality of the process."* (Emphasis added.)

193. According to the FRB Principles, (which generally apply to all types of misconduct proceedings at HBS), while "the FRB procedure aims to provide a framework to allow an appropriate resolution of concerns in a wide variety of circumstances," certain "principles and considerations shall guide those carrying out the FRB procedure," including that:

- *"Every reasonable effort should be made to protect the reputations of the individuals involved."*

- *"Privacy and confidentiality are important considerations; information generally should be shared only on a need-to-know basis, and consistent with what is practicable."*

194. On information and belief, little is known of research misconduct cases that have been handled by other departments within Harvard and even at HBS because these proceedings are maintained in confidence pursuant to Harvard policy and/or applicable laws.

195. In the course of the HBS investigation into allegations of Professor Gino's alleged research misconduct, Harvard and Dean Datar committed serious and significant breaches of confidentiality required by the Interim Policy, and other HBS and Harvard Policies, needlessly causing tremendous damage to Professor Gino's reputation, professional standing and economic interests.

### (1) <u>Announcement of Professor Gino's administrative leave on the HBS website.</u>

196. On or about June 13, 2023, HBS announced to the world that it had placed Plaintiff on administrative leave by prominently placing a banner on Professor Gino's faculty page on the HBS website. Next to Professor Gino's photo, following her name and title appear the words: **ADMINISTRATIVE                LEAVE.**                *See*

https://www.hbs.edu/faculty/Pages/profile.aspx?facId=271812 (All capital letters and bold font in original) (last visited July 26, 2023).

197.    On June 22, 2023, Dean Datar sent an email to all faculty at the HBS, informing them that, "as reflected on Professor Gino's public Faculty & Research page, she is now on an administrative leave," and connecting her status to the outcome and status of her research misconduct proceeding.

198.    On information and belief, HBS never previously sent out an email announcing the placement of a tenured member of the faculty on administrative leave to all members of the HBS faculty in connection with the status or outcome of the professor's research misconduct proceeding.

199.    On information and belief, HBS never previously publicly announced the placement of a tenured professor on administrative leave on the faculty member's webpages on the HBS website as an immediate consequence of a research misconduct proceeding.

200.    In the context of Harvard's numerous breaches of confidentiality, third parties reasonably understood HBS's public announcement of Professor Gino's administrative leave to be connected to and a result of the outcome of her research misconduct proceeding and to mean that Professor Gino had falsified or fabricated data.

201.    For example, on or about June 17, 2023, an individual using the web-moniker "Headtwerker" posted the following image from Professor Gino's faculty page off the HBR's website, on Reddit, under the headline: "BREAKING: HBS professor placed on 'administrative leave' following bombshell investigation into fake data":

 **r/Professors** · 1 mo. ago
by headtwerker

 **Join** ···

BREAKING: HBS professor placed on "administrative leave" following bombshell investigation into fake data

# Francesca Gino

**PROFESSOR OF BUSINESS ADMINISTRATION (ADMINISTRATIVE LEAVE)**



**Francesca Gino** is an award-winning researcher who focuses on why people make the decisions they do at work, and how leaders and employees have more productive, creative and fulfilling lives. She is the best-selling author, most recently, of "Rebel Talent: Why it Pays to Break the Rules in Work and Life." Gino is also affiliated with the Program on Negotiation at Harvard Law School, the Mind, Brain, Behavior Initiative at Harvard, and the Behavioral Insight Group at Harvard Kennedy School.

Gino has been honored as one of the world's Top 40 Business Professors under 40 and one of the world's 50 most influential management thinkers by Thinkers 50. Professor Gino has won numerous awards for her teaching, including the HBS Faculty Award by Harvard Business School's MBA Class of 2015, and for her research, including the 2013 Cummings Scholarly Achievement Award, from the Academy of Management Organizational Behavior Division. Her studies have also been featured in The Economist, The New York Times, Newsweek, Scientific American, Psychology Today, and The Wall Street Journal, and her work has been discussed on National Public Radio and CBS Radio.

**UNIT**
Negotiation, Organizations & Markets

**CONTACT INFORMATION**
(617) 495-0875
Send Email

karlstack.com                                           Open

*See*

https://www.reddit.com/r/Professors/comments/14c64se/breaking_hbs_professor_placed_on_administrative/ (last visited July 31, 2023).

### (2) Excessive, false and defamatory retraction notices

202.    On the evening of June 13, 2023, the HBS RIO, on behalf of Harvard, began to aggressively send out retraction notices to scholarly journals that published the papers at issue in Professor Gino's research misconduct proceeding. In its retraction notices, Harvard defamed

43.

Professor Gino and acted with actual malice by knowingly, falsely suggesting that Harvard had proved she had falsified and/or fabricated data, conduct that Harvard had *never proved* under its own policy, omitting details as to the inadequacy of the HBS investigation and the unfair and biased decision, including the investigation committee's reliance on Data Colada's biased and unsupported inferences of "tampering" and the inconclusive and non-probative information contained in the MCG forensic reports.

203.   The retractions defamed Professor Gino by omitting two salient facts:  (a) that Harvard never established that Professor Gino was even the person *responsible* for perceived anomalies, (indeed, all of the evidence showed that, in each of the studies at issue, she was *not* the person who handled or collected the data); ***and*** (b) that Harvard *never proved* that Professor Gino had *any intent* to fabricate or falsify data.

204.   To the extent that Harvard insisted on retractions with which Professor Gino adamantly disagreed, the manner in which Harvard notified journals of retractions of Professor Gino's articles was excessive and inconsistent with its normal practices and policies, including the Interim Policy, which required Harvard to protect Professor Gino's *reputation and right to confidentiality to the extent possible*. Instead, Harvard aggressively and selectively publicized details of its confidential investigation, and unreasonably did not allow Professor Gino, the author of the studies in question, to work out the substance and timing of the retractions directly with the publishers of her articles to avoid unnecessary damage to her professional reputation.

205.   To the extent Harvard had concerns about the validity of the data, Harvard went far beyond what was reasonably necessary to correct the research record, defaming Professor Gino with retraction notices that falsely, and ***absent any evidence***, conveyed that she had intentionally tampered with data to affect the outcome of the study.

###### i.  Retraction Notice to PNAS

206.    On the evening of June 13, 2023, the RIO, Bonacossa, emailed a letter on HBS letterhead, to Dr. May R. Berenbaum, Ph.D., Editor-in-Chief of the journal, *Proceedings of the National Academy of Sciences of the America,* stating that that "[HBS] has reviewed concerns about certain data previously published by Dr. Francesca Gino in [the *2012 PNAS Paper*]. (*See* **attached Exhibit 3 and henceforth referred to as "Retraction Notice to PNAS."**) Attached to the Retraction Notice to PNAS as an appendix was a corresponding section of Data Colada's false and defamatory **December Report** and an MCG forensic report.

207.    In the **Retraction Notice to PNAS**, the RIO referenced so-called "data anomalies" for Study 1 relative to discrepancies between data voluntarily posted by Professor Gino on the Open Sciences Framework ("OSF") in 2020 and a dataset that the RIO falsely described as an "original dataset provided by a research assistant." *See* **Retraction Notice to PNAS**.

208.    This statement was demonstrably and verifiably *false.* The data provided to HBS by Professor Gino's former research assistant was in an Excel spreadsheet and was *not* the "original dataset" for Study 1. The "original dataset" for Study 1 had been *collected on paper* in 2010, a fact that was *clearly* documented in the original *2012 PNAS Paper*.

209.    Harvard knew that its statements in the retraction notices about the "data anomalies" were false when it sent the Retraction Notice to PNAS to Dr. Berenbaum or, in the very least, acted in reckless disregard of the falsity of its statements. To the extent Harvard relied on Data Colada's December Report in requesting the retraction, it knew that Data Colada was a biased, unreliable source that was mostly interested in creating controversy for the University.

210.    The PNAS Retraction notice was also obviously excessive because the *2012 PNAS Paper had already been retracted.* Professor Gino and a team of collaborators had retracted the

*2012 PNAS Paper* on March 16, 2020, (for reasons having nothing to do with alleged research misconduct by Plaintiff), after the experiment described in the study failed to replicate.

### ii. Retraction Notice to Psychological Science

211. On June 13, 2023, the RIO emailed a letter on HBS letterhead to Dr. Patricia J. Bauer, Ph.D., Editor of the journal, *Psychological Science,* stating that "[HBS] has reviewed concerns about certain data previously published by Dr. Francesca Gino in [the *2015 Psychological Science Paper*] and [*the 2014 Psychological Science Paper*]. (*See* **attached Exhibit 4 and henceforth referred to as "Retraction Notice to Psychological Science."**) Attached to the Retraction Notice to Psychological Science were "two appendices" with copies of the related portions of Data Colada's false and defamatory December Report and an MCG forensic report.

212. With respect to the *2015 Psychological Science Paper*, the RIO referenced so-called "data anomalies" for Study 4 relative to discrepancies in the data for this study, which had been voluntarily posted by Professor Gino on the Open Sciences Framework ("OSF"), and so-called "original data for Study 4 gathered using Qualtrics." *See* **Retraction Notice to Psychological Science.**

213. This statement was false and defamatory, as the dataset in Study 4 that was in Qualtrics was verifiably edited and the data posted in the OSF accurately represented the original dataset.

### iii. Retraction Notice to JPSP

214. On June 14, 2023, the RIO emailed a letter on HBS letterhead to Dr. Dolores Albarracin, Editor of *The Journal of Personality and Social Psychology,* stating that he was writing to inform her that "[HBS] has reviewed concerns about certain data previously published by Dr. Francesca Gino in [the ***2020 JPSP Paper***]. (*See* **attached Exhibit 5 and henceforth referred to**

as **"Retraction Notice to JPSP."**) Attached as "appendices" to the Retraction Notice to JPSP was a copy of the related portion of Data Colada's false and defamatory December Report and a portion of the MCG forensic report.

215.    In the Retraction Notice to PNAS, the RIO referenced so-called "data anomalies" for Study 3a relative to discrepancies between the data Professor Gino voluntarily posted on the Open Sciences Framework ("OSF") and data that the RIO erroneously referred to as an "original dataset gathered using Qualtrics."  (*See* **"Retraction Notice to JPSP."**)

216.    This statement was false. The data in Qualtrics was *not* the original data for Study 3a, as it was verifiably edited. The RIO's statement was false and defamatory in the context of the entire Retraction Notice to JPSP, as it falsely conveyed that Professor Gino fabricated or falsified data.

217.    Due to the fact that Harvard knew that the data in Qualtrics was not the original data at the time it issued the Retraction Notice to JPSP, Harvard knowingly and falsely attributed responsibility for "data anomalies" to Professor Gino.

218.    At the top of each retraction notice, that is, the **Retraction Notice to PNAS**, **the Retraction Notice to Psychological Science,** and the **Retraction Notice to JPSP**, was the word: **CONFIDENTIAL.** (All capital letters and bold font in original.) In addition to unnecessarily and excessively publishing false and defamatory statements about Plaintiff's misconduct proceeding to the scientific journals, Harvard also breached its duty of confidentiality by unnecessarily disclosing information about the retraction notices, themselves, to persons other than the editors of these journals.

47.

**(3) Excessive, False and Defamatory Retraction Notices to Co-Authors.**

219.    On the evening of June13, 2023, the HBS RIO reached out to Professor Gino's co-authors on the papers at issue in her research misconduct proceeding. The emails the RIO sent told co-authors that "our process has concluded" and that HBS believed that the results of the studies in question are invalid "*due to alteration of data that affects the significance of the findings."* The RIO attached a formal notification, which included a summary of the data discrepancies, and that informed co-authors that HBS had notified journals' editors with a recommendation that articles be retracted.

220.    With these emails, Harvard again defamed Professor Gino by falsely suggesting that Harvard had proved she had falsified and/or fabricated data, conduct that Harvard had *never proved* under its own policy, omitting details as to the inadequacy of the HBS investigation and the unfair and biased decision, including the investigative committee's reliance on Data Colada's unwarranted inferences of "tampering" and the inconclusive and non-probative information contained in the MCG forensic reports.

221.    On June 14, 2023, the HBS Senior Associate Dean for Faculty Development and Research, Professor Robin Greenwood, met with Professor Gino's colleagues in her unit, the Negotiation, Organizations & Markets unit ("NOM") at HBS and disclosed to them both the finding of research misconduct and that she had been placed on administrative leave. Doctoral students under Professor Gino's mentorship were also informed by the HBS Doctoral Office staff about the finding of research misconduct and the administrative leave.  Dean Datar's office also reached out to other colleagues of Professor Gino to inform them that she had been placed on administrative leave.

222.    As a result of Harvard's breach of confidentiality, on June 15, 2023, an HBS professor (Amy Edmondson) in the Technology and Operations Management unit contacted the

editor of Portfolio, Professor Gino's book publisher. Professor Edmondson falsely stated to the editor at Portfolio that Professor Gino had ***"committed fraud"*** and that this would become public very soon. Professor Gino's book (All Hands: How Diverse Teams Win) was scheduled to be published on February 13, 2024, but as a result of the publicity of alleged "fraud," is now delayed until February 5, 2025.

223.    When Professor Gino contacted Dean Cunningham to question whether a faculty member should have contacted her publisher in this manner, Dean Cunningham told Professor Gino, "no," but added that, once the "retraction" notices are out, "everyone" would know her situation. Cunningham's statement suggests that Harvard intended to severely damage Professor Gino's reputation through the issuance of the false and defamatory retraction notices which were not intended to remain confidential.

224.    On June 16, 2023, *The Chronicle of Higher Education* published an article, that referenced the allegations against Professor Gino's work in Study 1 in the *2012 PNAS Paper,* and featured the comments from Professor Max Bazerman ("Bazerman"), a colleague of Professor Gino's in the NOM unit at HBS and also a co-author with Professor Gino of the *2012 PNAS Paper*:

> Almost two years ago, a famous study about a clever way to prompt honest behavior was retracted due to an ironic revelation: It relied on fraudulent data. But The Chronicle has learned of yet another twist in the story.

> According to one of the authors, Harvard University found that the study contained even more fraudulent data than previously revealed and it's now asking the journal to note this new information. The finding is part of an investigation into a series of papers that Harvard has been conducting for more than a year, the author said.

> Details about the reported fabrications are unclear. Francesca Gino, a world-renowned Harvard Business School professor who studies dishonesty, and is a co-author on the disputed study, is now on administrative leave, according to her faculty page.

*See* "A Weird Research-Misconduct Scandal About Dishonesty Just Got Weirder," by Stephanie Lee, available at: https://www.chronicle.com/article/a-weird-research-misconduct-scandal-about-dishonesty-just-got-weirder?bc_nonce=1qs2zmrz1wl2eepa050jf3&cid=reg_wall_signup

225.    The reporter at *The Chronicle of Higher Education* noted that HBS had announced on Professor Gino's faculty webpage that she was on "administrative leave," and hinted that the reason was connected to the Harvard "investigation" of "fraudulent data" and suggested that Professor Gino's job and future at Harvard were at risk:

> And as of recently, [Professor Gino's] role at Harvard is unclear. Within the last month, her faculty website was updated to say that she is on administrative leave, according to screenshots captured by the Wayback Machine.

*See id.*

226.    Harvard had no legitimate reason to disclose to Bazerman or Professor Edmonton confidential information concerning either Professor Gino's research misconduct proceeding or the pending retractions of her scientific journal articles. Harvard's breach of its duties of confidentiality is evident by Bazerman's comments to the reporter from *The Chronicle of Higher Education,* in which he made unwarranted assumptions concerning "altered data" and the HBS investigation:

> The alleged new problems involve experiment No. 1 — one of the two conducted in a lab with students. Bazerman told The Chronicle that on Tuesday, ***Harvard informed him that it believed fabricated data for this experiment made it invalid***. According to Bazerman, Harvard provided a 14-page document with what he described as 'compelling evidence' of data alterations. Their analysis found that somebody had accessed a database and added and altered data in the file, he said. "I did not have anything to do with the fabrication," he told The Chronicle.
>
> According to Bazerman, Harvard is recommending to the Proceedings of the National Academy of Sciences that it update the study's retraction notice to reflect its new concerns.
>
> . . .

Bazerman told The Chronicle that his understanding is that the 2012 paper is one of four papers 'of significant concern' to Harvard. He declined to identify the other three, but said he was not a co-author on them.

*Id.* (Emphasis added.)

227.     As a result of Harvard's breach of confidential information concerning Professor Gino's research misconduct proceeding and retraction notice, Bazerman made statements to the media containing rumors and factual inaccuracies, including that, "[Harvard's] analysis found that somebody had accessed a database and added and altered data in the file," statements that were false.

228.     Under the Interim Policy, the Complainant of research misconduct "is responsible for making allegations in good faith" and "maintaining confidentiality" Interim Policy § (III) (E). The complainant "*is not entitled to receive information about the status or outcome of that process." Id.*

229.     In violation of the Interim Policy, immediately following Dean Datar's June 13, 2023 decision, Harvard disclosed of confidential information concerning Professor Gino's research misconduct process with third parties that enabled Data Colada, the purported "complainant," to ascertain the status and outcome of Harvard's process.

230.     With Harvard's public announcement of professor Gino's placement on administrative leave, its aggressive, excessive, and false retraction notices, and Harvard's disclosures to third-parties, including HBS faculty within Professor Gino's NOM unit about Professor Gino's research misconduct proceeding, Harvard set in motion the destruction of Professor Gino's well-earned professional reputation and standing in a matter of a few days.

51.

IV.   **Data Colada's False and Defamatory Statements: June 17, 2023 – June 30, 2023.**

231.    Between June 17, 2023 and June 30, 2023, Data Colada posted a four-part series that was substantially similar to its false and defamatory December Report to Harvard's investigation committee, and corresponds to the four studies that were the subject of its original allegations to HBS in July 2021.

232.    In a July 18, 2023 webinar titled "Data Fraud and What to do Next: A conversation with Uri Simonsohn and Maurice Schweitzer,"[18] Defendant Simonsohn admitted (at min 8:47) that, there was ***no evidence*** that Professor Gino manipulated data. Simonsohn stated:  "Nobody has unambiguously claimed that this was Francesca Gino . . .   The retractions don't say that. They just say data she had and data she posted. Uh, my belief is that she did it, but there's no evidence of that. But, but it doesn't really matter."   Though Simonsohn himself recognizes there is no evidence for concluding research misconduct by Professor Gino, the four blogs he co-authored in the prior month consistently assert that Professor Gino committed data fraud.

A.   **Blog Post 1**

233.    On June 17, 2023, Data Colada posted the first of a four-part series of false and defamatory blog posts disparaging Professor Gino's professional reputation and integrity, titled "[109]" Data Falsificada (Part 1): 'Clusterfake,'" relating to Study 1 in the *2012 PNAS Paper*. (*See* attached **Exhibit 6**, **henceforth referred to as "Blog Post 1."**).

234.    In Blog Post 1, Data Colada asserted, as a matter of fact (not opinion) that Professor Gino had "faked data" in this study.

235.    Data Colada made this statement with knowledge that it was false or with reckless disregard as to its falsity. This is evidenced by Data Colada's knowledge that the study discussed

---

[18] A recording of the webinar can be found here: https://www.youtube.com/watch?v=OPUKyeetdt8&t=6s It was publicized here: https://iafcm.org/data-fraud/

in the 2012 PNAS Paper was conducted on paper and, accordingly, Data Colada's review of a spreadsheet years later could not have accurately reflected the results of the study.

236.    In Blog Post 1, Data Colada also made a number of statements that, in the context of the entire blog post and surrounding circumstances, defamed Professor Gino by falsely suggesting, through innuendo and implication, that it had additional, non-disclosed evidence of "fraud." These statements included the following:

> In the Fall of 2021, we shared our concerns with Harvard Business School (HBS). Specifically, we wrote a report about four studies for which we had accumulated the strongest evidence of fraud. We believe that many more Gino-authored papers contain fake data. Perhaps dozens.

237.    Data Colada had absolutely no support for the statement that any of Professor Gino's papers contained "fake data" no less "dozens." Accordingly, Data Colada made the above statement with knowledge that it was false or reckless disregard as to its falsity.

238.    In Blog Post 1, Data Colada also claimed: *"The evidence of fraud detailed in our report almost certainly represents a mere subset of the evidence that the Harvard investigators were able to uncover about these four articles."* (Emphasis added.)

239.    This statement was false and defamatory. The December   Report   that   Data Colada submitted to the HBS Inquiry Committee was not a "mere subset" of evidence, and Harvard investigators did not "uncover" evidence of fraud. In fact, Harvard's investigators had focused *exclusively* on Data Colada's bad faith allegations.

240.    In Blog Post 1, Data Colada described a study in which it claims that the data Plaintiff voluntarily posted (with her collaborators) on the Open Science Framework ("OSF") in 2020 was evidence of data fraud based on what Data Colada described as "out of order observations" and a "duplicate observation."  As experienced behavioral scientists, Data Colada

knew that when collecting data on paper, data is usually entered into an Excel database from *stacks of paper*, and that data entered this way is not necessarily sorted.

241.    Data Colada also knew that the so-called "duplicate observation" was not evidence of tampering, as it was equally likely that the same index card was used for participants' IDs or the research assistant who conducted the study entered the ID twice—an honest error.

242.    Data Colada's statements concerning "out of order observations" and a "duplicate observation" as evidence of fraud by Professor Gino were stated with actual malice and/or with reckless disregard of whether their statements were false or not.

243.    In fact, Data Colada *knew* that the study described in the *2012 PNAS Paper,* which had been conducted in 2010, had been conducted *on paper.* Data Colada also knew that it was common practice in 2010 for studies to be conducted on paper.

244.    The published Study 1 of the *2012 PNAS Paper* described a "math puzzles task wherein participants could cheat for financial gain. The description of the experiment in *2012 PNAS Paper* included many details that made it clear to anyone who read the paper that the study at issue had been conducted *on paper,* including descriptions of paper "worksheets" collected from participants and "forms" that participants filled out.

245.    These references included including, *inter alia:*

**(1)** a "one page form,"
**(2)** "[a]ll materials were coded with unique identifiers that were imperceptible to participants";
**(3)** "participants received a worksheet with 20 math puzzles";
**(4)** "[a]fter the problem-solving task, participants went to a second room to fill out a research study tax return form (based on IRS Form 1040). The one-page form we used was based on a typical tax return form. We varied whether participants were asked to sign the form." .

246.    Data Colada knew that Study 1 was conducted in 2010, and that the data that was uploaded in 2020 on OSF was not evidence of "fraud" on the basis that data was out of sequence

("out of sort"). Data Colada knew that Study 1 was conducted on paper, with data collected on paper in 2010. Data Colada also knew that the fact the study had been conducted on paper provided a reasonable and plausible reason why the data that was later uploaded to OSF in 2020 was not sorted in any particular order, and that the "out of sort" data was not "evidence of fraud."

   **B.   Blog Post 2**

   247.   On June 20, 2023, Data Colada posted the second of its four-part series of false and defamatory blog posts about Professor Gino, titled "[110] Data Falsificada (Part 2): 'My Class Year is Harvard,'" relating to Study 4 in the *2015 Psychological Science Paper.* (*See* attached **Exhibit 7, henceforth referred to as "Blog Post 2"**).   In this study, participants were asked demographic questions before proceeding with the substance of the study.

   248.   In Blog Post 2, Data Colada found it problematic that, in the data that Professor Gino had voluntarily posted publicly in 2015 on the OSF, 20 students had filled in "Harvard" to the demographic question asking for a response to the query, "year in school." Read in its entirety, Blog Post 2, defames Professor Gino by falsely conveying that this peculiar demographic response establishes that Professor Gino "tampered" with data.

   249.   Data Colada, as experienced behavioral scientists, knew that participants frequently respond to a survey to obtain payment due for their participation (as study participants) and may rush through questions, sometimes more than once to get paid, and use extreme values as their answers.   It is widely known in behavioral science that participants in online studies at times provide poor-quality data by answering surveys without the attention they require.

   250.   In addition, in Blog Post 2, Data Colada falsely implied that there was additional, non-disclosed information that would prove Professor Gino manipulated data, stating that:

> [W]e should note that while for all four studies covered in this series we found evidence of data tampering, we do not believe (in the least) that we've identified all of the tampering that happened within these studies. Without access to the

original (un-tampered) data files – files we believe Harvard had access to – we can only identify instances when the data tamperer slipped up, forgetting to re-sort here, making a copy-paste error there. There is no reason (at all) to expect that when a data tamperer makes a mistake when changing one thing in a database, that she makes the same mistake when changing all things in that database.

*Id.* (Emphasis added.)

251.    Data Colada's above statements defame Professor Gino by falsely conveying that she tampered with the data she publicly posted to the OSF in 2015, and that non-disclosed evidence in Harvard's possession can irrefutably prove Professor Gino's malfeasance. In fact, Harvard did *not* collect "original (un-tampered) data files" in its investigation, and Harvard *never proved* that Professor Gino tampered with the data she posted on the OSF in 2015 or that the data files posted on the OSF were not the "original (un-tampered) data."

252.    Because Data Colada had no evidence that Professor Gino tampered with the data underlying the 2015 Psychological Science Paper, Data Colada published Blog Post 2 with knowledge of its falsity or, at the very least, reckless disregard as to its falsity.

### C.  **Blog Post 3**

253.    On June 23, 2023, Data Colada posted the third of its four-part series of false and defamatory blog posts about Professor Gino, titled "[111]' Data Falsificada (Part 3): 'The Cheaters Are Out of Order,'" relating to Study 4 in the *2014 Psychological Science Paper.* (*See* attached **Exhibit 8**, **henceforth referred to as "Blog Post 3"**).

254.    In Blog Post 3, Data Colada asserts, authoritatively, that, as a matter of fact, "[a]s in Part 1 of this series (Colada 109 .htm), the tell-tale sign of fraud in this dataset comes from how the data are sorted."  Data Colada points to data in the "NumberOfResponses" as being "out of order." As experienced behavioral scientists who presumably read the study at issue, Data Colada knew that the variable called "NumberOfResponses" needed to be coded by a research assistant.

And they also knew that it was very likely that the data in this case was sorted *before,* not *after,* the variable "NumverOfResponses" was coded by the research assistant.[19]

255.    Data Colada again falsely implied that non-disclosed and additional facts within Harvard's possession irrefutably proved that Professor Gino intentionally falsified or fabricated data, stating that:

> We believe that Harvard University has access to the Qualtrics file that could have perfectly verified (or disputed) our concerns. We told them which file to get, which cells to check, and which values they would find in the Qualtrics file if we were right. We don't know if they did this, or what they found if they did. All we know is that, 16 months later, they requested that the article be retracted.

*Id.*

256.    Data Colada's assertion of purported "fraud" based on a so-called sorting error was made without making a reasonable inquiry and determination as to its truth or falsity.

257.    Data Colada's assertion of purported "fraud" based on a so-called sorting error was stated with actual malice because Data Colada had not confirmed—nor could it have since Harvard did not rely on any original data—that Harvard made any findings of fraud consistent with any analysis of the Qualtrics file for the 2014 Psychological Science Paper. Indeed, the original source data for this study *no longer exists*, having been discarded in accordance with routine data maintenance practices, given its age.

258.    The *2014 Psychological Science Paper* was written in a time before it was standard practice to post data online. In 2014, Defendant Leif Nelson of Data Colada contacted Professor Gino and her co-author Scott Wiltermuth and asked them for the data, informing them that the data would be discussed in a weekly journal discussion group he organizes at Berkeley's Haas School

---

[19] Coding occurs when the research assistant eliminates repeated or nonsensical responses.  For example, if the survey question asks the participant "to generate as many creative uses for a newspaper as possible within 1 minute," if the participant answered, "door stopper, wrapping paper, fly swatter, bee swatter, xxx, yyy, zzz," the recorded answer would be 7 but the coded answer would be 3 as the invalid answers (i.e., xxx, yyy, zzz) and the repeated use (bee swatter after fly swatter) would be eliminated.

of Business. Professor Gino emailed Defendant Nelson with the data and offered to answer any questions.

259.    That Defendant Nelson never contacted Professor Gino or Dr. Wiltermuth with any questions or concerns, but waited seven (7) years to raise allegations of "fraud" to Professor Gino's employer demonstrates that Data Colada's statements were made maliciously and with knowledge of their falsity. That Nelson failed to raise any issues with the data for such a long period of time suggests that when Professor Gino gave him the data he found no evidence of fraud, and accordingly Data Colada published Blog Post 3 with knowledge of its falsity.

### D.   **Blog Post 4**

260.    On June 30, 2023, Data Colada posted the last in its four-part series of false and defamatory blog posts about Professor Gino, titled "[112" Data Falsificada (Part 4): 'Forgetting the Words,'" relating to Study 3a in the *2020 JPSP Paper.* (*See* attached **Exhibit 9, henceforth referred to as "Blog Post 4"**).

261.    The study at issue was a study that focused on whether participants felt more or less impure after they imagined engaging in professional networking depending on whether they had a "promotion" mindset to networking (i.e., focusing on professional growth), or a "prevention" mindset, (focusing on networking as a professional obligation).

262.    In Blog Post 4, DataColada claimed to find it problematic that the data that Professor Gino had voluntarily posted publicly in 2020 on the OSF indicated that a number of participants reported feeling impure after imagining participating in a networking event —even if they used words to think back to that event later on that were somewhat positive, as rated by coders Data Colada hired for scoring.   Read in its entirety, Blog Post 4 conveys that this peculiar pattern establishes that Professor Gino "tampered" with data.

263.    To the extent that Data Colada read the paper, they knew that how "impure" a person feels about networking is not equivalent to how positive or negative that same person feels about Networking, as the study in the paper showed.

264.    Data Colada also knew that coding the "words" they had their coders rate for positivity or negativity not only had nothing to do with the hypothesis that was being tested in Professor Gino's study, but further, would such a subjective exercise as to be useless.

265.    Overall, Data Colada's statements that it was looking at the words that study participants had used to describe their subjective feelings to uncover purported malfeasance were false, as Data Colada knew such words did not, and indeed, could not, demonstrate evidence of data tampering.

266.    Blog Post 4 includes presumptive statements that falsely convey that Data Colada's analysis establishes, as a matter of fact, that Professor Gino committed fraud. Blog Post 4 defames Professor Gino by falsely implying that there are additional, non-disclosed facts that irrefutably demonstrate Professor Gino's malfeasance, stating:

**We have received confirmation, from outside of Harvard, that Harvard's investigators did look at the original Qualtrics data file and that the data had been modified**.

*See id.*

267.    Sources "from outside of Harvard" were clearly not reliable. Harvard never proved either (a) that the dataset posted on OSF by Professor Gino does not reflect the original data or (b) that Professor Gino modified the original Qualtrics data.

268.   Data Colada concludes each of Blog Posts 1, 2, 3 and 4 with the following statement:

Author feedback.
Our policy is to solicit feedback from authors whose work discuss. We did not do so this time, given (1) the nature of the post, (2) *that the claims made here were*

> ***presumably vetted by Harvard University,*** (3) that the articles we cast doubt on
> have already had retraction requests issued, and (4) that discussions of these issues
> were already surfacing on social media and by some science journalists, without
> their having these facts, making a traditional multi-week back-and-forth with
> authors self-defeating.

*See* Blog Post 1, Blog Post 2, Blog Post 3, and Blog Post 4. (emphasis added).

269.    In fact, Harvard did not establish that data manipulation occurred, and also did not establish that Professor Gino was responsible for data manipulation.

270.    Relevant to all four of Data Colada's blog posts (i.e., Blog Posts 1, 2, 3, and 4), Data Colada knew that its statements that equate perceived "anomalies" and "discrepancies" in data with evidence of intentional manipulation of data, i.e., "fraud," were both false and defamatory.

271.    An examination of Data Colada's past blogs in which Defendants discussed perceived anomalies or discrepancies in data demonstrate that, other than in the case of Professor Gino, Data Colada has *never* contacted the author or behavioral scientist's *employer,* but has contacted *the author* to ask questions and to engage in a back and forth discussion regarding the study in question.

272.    In a representative prior blog post in which Data Colada discussed discrepancies perceived in the research record of another behavioral scientist, Data Colada concluded the blog post with the following remarks, distinguishing between intentional fraud—which calls into question the ***integrity of the autho***r—and concerns about "problems" with data, i.e., "data irregularities" or "anomalies," which call into questions ***the plausibility or validity of data***:

> It is important to say at the outset we have not identified who is responsible for the
> problems. In the correction, for example, the authors themselves make clear that they
> 'do not have an explanation' for some peculiarities, in part because many other
> people handled the data between collection and reporting. This post is therefore not
> about who caused the problems.

*See* "[74] In Press at Psychological Science: A New 'Nudge' Supported by Implausible Data," available at: http://datacolada.org/74 (last visited July 26, 2023).

273.     Importantly, Data Colada also acknowledged in this recent blog post that it knows that an author of a study is not always the person responsible for handling or collecting the data and, therefore, is also not always the person responsible for any resulting "data irregularities." *See id.* Doubtless, as behavioral scientists at leading universities, Data Colada knew or had reason to know that Professor Gino works with research assistants and others and may not have been the person responsible for any perceived anomalies in studies she authored.

274.     In this blog post, Data Colada concludes with the following remarks:

**We should maintain a very high burden of proof to conclude that any individual tampered with data.**

**But the burden of proof for dataset concerns should be considerably lower. We do not need to know the source of contamination in order to lose trust in the data.**

*Id.* (Emphasis added.)

275.     In addition to spreading false and defamatory statements that disparage Professor Gino's professional reputation, Blog Posts 1 through 4, in their many references to Professor Gino's misconduct proceeding and the pending retraction notices, provide further evidence of Harvard's breach of confidentiality.

276.     After Data Colada launched its 4-part blog posts series, Professor Gino began to receive venomous, misogynistic hate emails from people all over the world.

277.     On June 22, 2023, Harvard implicitly admitted its failure to protect Professor Gino's confidentiality when Dean Datar's office sent out an official email to all faculty members at HBS (but mysteriously excluding Professor Gino), with the subject "Chronicle of Higher Education piece on Francesca Gino." Dean Datar's email reminded recipients that, *"[w]hile I know*

*you may have questions, confidentiality is an important consideration in these matters*." (Emphasis added.)

278.    Following Data Colada's release of Blog Post 1 on June 17, 2023, headlines from major newspapers throughout the world evidence the immediate and widespread damage to Plaintiff's professional reputation caused by Harvard's breach of confidentiality and Harvard and Data Colada's false and defamatory statements. For example:

- The Guardian: "*Harvard Professor Who Studies Honesty Accused of Falsifying Data In Studies,*" (Maya Yang, June 25, 2023);

- Daily Caller: *"Harvard Honesty Expert Accused of Academic Dishonesty,"* (Gretchen Clayson, June 25, 2023);

- FOX: *"'Leading Scholar' at Harvard Accused of Fabricating Findings In Famous Study on Honesty,*" (Gabriel Hays, June 25, 2023);

- The Washington Post: *"Harvard Professor Who Researches Honesty Accused of Falsifying Data,"* (Matt Delaney, June 25, 2023).

279.    Within days of Harvard's breach of confidentiality and Data Colada's blog posts, permutations of their false and defamatory statements reverberated on the internet, and were repeated in multiple platforms and contexts, including, as but one example, in the following reviews on Amazon.com for Plaintiff's latest book, *Rebel* Talent, which reflect Data Colada's terminology ("fraud") and Harvard's public announcement of her administrative leave:



280.    Within days of Harvard's breach of confidentiality and Data Colada's blog posts, academic journals started to take steps to remove Professor Gino from their editorial board, without contacting her directly.

281.    Within days of Harvard's breach of confidentiality and Data Colada's blog posts, Professor Gino started receiving emails and phone calls from clients with whom she had ongoing or existing contractual relationships, asking for those contracts to be terminated to avoid potential "liability" or "bad press." *All* of those contractual relationships, except for one, were terminated or postponed until Professor Gino's reputation is restored.  These clients took these actions because they saw Plaintiff's placement on administrative leave by HBS and Data Colada's blog posts.

V.     **Selective Enforcement of the Interim Policy.**

282.    Plaintiff has been told by multiple colleagues at Harvard, including Senior Associate Dean Pisano, who has worked for HBS for 35 years, that her treatment throughout the HBS proceeding and the outcome *would have been different if she had been a male*.

283.    On information and belief, neither HBS nor Harvard has ever fired, constructively discharged, or recommended revoking the tenure of *any* male full professor whom Harvard has found responsible for research misconduct.

284.    On information and belief, neither Harvard nor HBS has ever previously terminated, suspended, placed on unpaid administrative leave for two years, constructively discharged, demoted, removed from duty, or otherwise disciplined *any* male tenured professor without the procedural protections provided under the Discipline Policy.

285.    The 2013 Research Integrity Policy that HBS abandoned is similar to the Interim Policy in that it also incorporates the definition of "research misconduct" provided for under the aforementioned PHS Regulations.

286.    In addition, under the 2013 Research Integrity Policy, the Dean is authorized to appoint an individual or a committee to investigate the allegation, who will then make a recommendation to the Dean.

287.    However, the 2013 Research Integrity Policy is far less onerous than the Interim Policy in terms of its procedures and overall treatment of a faculty member accused of research misconduct. Unlike the Interim Policy, the existing 2013 Research Integrity Policy expressly "permitted flexibility" in its procedures, and did not subject an employee to the sequestration of documents, did not impose strict deadlines on the completion of any phase of the investigation, and, most significantly, did not impose any particular disciplinary action to be taken against a faculty member's employment or status as a tenured faculty member.

288.    In particular, unlike the Interim Policy, the 2013 Research Integrity Policy:

**(1)** placed no limits on the dean's ability to request additional information at any phase in the proceeding;

**(2)** imposed no particular structure on either the assessment or investigation of allegations, (whereas the Interim Policy imposed a stringent, 2-tier process (consisting of an inquiry and investigative phase), modeled after the regime set forth in the PHS Regulations);

**(3)** placed no limit on the accused's right to seek support from persons who might serve as an advisor(s), from within or outside the university, (whereas the Interim Policy permitted the respondent to "choose up to two personal advisors for support during the process");

**(4)** did not require taking custody and sequestration of the respondent's research records and email records;

**(5)** placed no time limits on any aspect of the process, whereas the Interim Policy imposed strict time limits, including, *inter alia*: (a) ten (10) business days for "a respondent" (i.e., Plaintiff) to comment on the inquiry committee's draft inquiry report; (b) a conclusion of a "final inquiry report" and decision on whether an investigation is warranted within 60 calendar days of initiation of the initial inquiry; (c) 30 days for "the respondent" (i.e., Plaintiff) to submit comments on the investigation committee's draft investigation report; and (d) 120 days for the completion of the investigation.

289.    Importantly, whereas the 2013 Research Integrity Policy authorizes the dean to "decide the matter and take whatever action he or she believes justified," the 2013 Research Integrity Policy does not purport to authorize the dean to impose any specific *adverse employment action* against a tenured Professor, (e.g., to suspend, to demote, or terminate).

290.    The 2013 Research Integrity Policy does not purport to supersede the terms of Plaintiff's appointment as a tenured Professor, or to supersede Harvard's collective policies and procedures, including the Tenure Policy, the Third Statute, the Discipline Policy.

291.     In contrast, the Interim Policy purported to authorize the Dean of HBS to take the following adverse employment actions against Plaintiff: "*suspension, leave without pay, salary reduction,*" *and* "*initiation of steps leading to rank reduction or termination of employment.*" (Emphasis added).

292.     Like the Interim Policy, the 2013 Research Integrity Policy also emphasized Harvard's duties of confidentiality and fairness to the professor accused of misconduct, providing that: "It is important that, whatever process the Dean determines to be appropriate is thorough, fair, and objective," and should take into account "protecting the rights and reputation[] of the individual accused."

293.     In the past, HBS utilized its Faculty Review Board process to review both applications of faculty seeking tenure, as well as allegations of faculty misconduct, including alleged research misconduct.

294.     In November 2019, a male junior professor, "John Doe," [20] employed at HBS who was charged with research misconduct received no sanction by Harvard. HBS used its existing 2013 Research Integrity Policy and FRB process to investigate the allegations.  Consistent with the established 2013 Research Integrity Policy and the FRB Principles, when questions were raised about the research processes performed by a male junior professor at HBS, John Doe, Nitin Nohria, (then Dean of HBS), convened an FRB to investigate.

295.     Because Harvard and HBS have historically safeguarded the privacy of a faculty member accused of misconduct, including research misconduct, Professor Gino only knows about Mr. Doe's proceeding because HBS asked her to serve as a "witness" in her male colleague's FRB process. Plaintiff is aware that, in Mr. Doe's case, the FRB process consisted of the FRB speaking

---

[20] A pseudonym is used to avoid unfairly stigmatizing this faculty member.

with senior faculty and others at HBS who advised Mr. Doe on his research or writing.  All of the questions Plaintiff was asked as a witness during Mr. Doe's research misconduct proceeding before the FRB committee were phrased in a leading way to help establish his innocence.

296.    When HBS introduces new policies that affect faculty members, it normally announces them to the entire faculty or emails the new policy.

297.    On information and belief, HBS never announced the Interim Policy to faculty the existence of the Interim Policy.

298.    On November 4, 2021, soon after Plaintiff learned of the allegations against her, she asked the RIO, Bonacossa, to share the previous version of the Interim Policy, dated August 2021. Bonacossa indicated that, "[t]he [Interim Policy] was established in August 2021, and that "[he] [did] not have a copy of the previous policy."

299.    As of today, the 2013 Research Integrity Policy, is still available for download on HBS's internal website for Faculty Staff and Students and, on information and belief, remains the official HBS policy for investigating and evaluating allegations of research misconduct by faculty.

300.    Outside of HBS, other schools within Harvard do not fire tenured faculty, or subject them to unpaid administrative leave, based on alleged research misconduct. *See, e.g.,* "Fire Marc Hauser," available at https://www.thecrimson.com/article/2011/4/27/harvard-faculty-academic-university/ (discussing Faculty of Arts and Sciences's treatment of tenured professor Marc Hauser). On information and belief, Professor Hauser remained a psychology professor at Harvard following a three-year investigation by Harvard that found him responsible for research misconduct until he chose to resign, without a constructive discharge or the institution of tenure revocation proceedings.

301.     On information and belief, male tenured professors who have been found guilty of more serious ethical misconduct at HBS have not been sanctioned as harshly as Plaintiff, even in cases where the charges are undisputed and the evidence against them uncontroverted.

302.     For example, according to an article in the Harvard Crimson, in the case of Andrei Shleifer, when a federal court found economics professor Andrei Shleifer liable for conspiracy to defraud the U.S. government while leading a Harvard economic reform program in Russia, the University not only refused to fire Shleifer, but it also went so far as to pay $26.5 million to settle a government lawsuit against him.

303.     *See*        "fire        Marc        Hauser,"        available        at https://www.thecrimson.com/article/2011/4/27/harvard-faculty-academic-university/

304.     In particular, another male associate professor employed at HBS who was charged with a serious ethical violation that was a blatant and obvious disregard of Harvard's conflict of interest policy received no sanction whatsoever by Harvard, despite incontrovertible evidence that the misconduct occurred. That male professor had written scholarly articles about the development of cryptocurrencies, without disclosing that he had a financial interest in the product and was working in collaboration with a firm to develop cryptocurrencies. Despite the obvious conflict of interest and the undisputed and blatant violations of HBS standards of conduct and ethics by this male professor, who was only an associate professor and not a full tenured professor like Plaintiff, he received *no sanction* from HBS. The investigation concluded that the male professor demonstrated "poor judgment," but took no adverse action against his employment.

305.     Female faculty members facing accusations about meeting "the colleagueship standard" face harsher treatment than male faculty members for more serious misconduct, even when the FRB concludes that female faculty *do* meet the standard.  In one case, a female professor

was accused by her colleagues of treating staff and research assistants poorly. Dean Cunningham and previous Dean Nitin Nohria determined this warranted an FRB process. After the FRB report concluded the issues were not serious enough to warrant sanctions, the Dean overruled the report and counseled her to resign. Prominent senior women faculty were up in arms and met with Dean Nohria to make the case that this seemed unfair and was not consistent with how male faculty had been treated. Dean Nohria refused to change his position.

306.    HBS has a history of pushing out female faculty members who become the focus of negative media attention.

307.    In May 2015, Simonsohn, Nelson, and Simmons publicly went after the research of another prominent Harvard professor at HBS, social psychologist Amy Cuddy, eviscerating her research practices.[21]

308.    Cuddy became famous in her field for a 2010 study about the effects of "power poses" after her presentation in a TED Talk video went viral with a record number of views.  *See* "When the Revolution Came for Amy Cuddy," New York Times (Oct. 18, 2017), available at: https://www.nytimes.com/2017/10/18/magazine/when-the-revolution-came-for-amy-cuddy.html (last visited July 26, 2023).[22]

309.    Between 2008 and 2017, Cuddy was an Associate Professor in the Negotiation, Organizations, & Markets Unit at HBS, where Plaintiff was and currently works.

310.    After Data Colada publicly questioned Cuddy's findings, Cuddy's then colleague, HBS Professor Max Bazerman, among other male colleagues, vocally expressed his distress that Cuddy was continuing to speak publicly about her work.

---

[21] https://datacolada.org/37
[22] Cuddy's "study found that subjects who were directed to stand or sit in certain positions — legs astride, or feet up on a desk — reported stronger 'feelings of power' after posing than they did before," and that subjects' "testosterone levels went up, and their cortisol levels, which are associated with stress, went down." *See id.*

311.    As a result of pressure exerted by Harvard on the basis of the accusation of Data Colada and Bazerman, Cuddy felt pressured to leave her tenure-track position, which she did that year.

312.    In a second case in which accusations were raised at HBS about a female professor's alleged violations of the so-called "colleagueship standard," Dean Cunningham and Dean Datar determined they did not warrant an FRB process. Some time later, when said female professor was preparing materials for promotion to tenure, the accusations came back and this time the accuser threatened to file a lawsuit. Fearing public scrutiny, Dean Cunningham and Dean Datar determined an FRB was now appropriate, even though there was no new information. On information and belief, the process did not provide transparency or clarity to this female professor and was used to intimidate her into leaving HBS. HBS was successful in counseling this faculty member to resign on the grounds of the "colleagueship standard."  On information and belief, there is no single instance of a male faculty being counseled to resign (or "counseled out") for reasons of collegiality.

## VI.    Defendants Interfered With Plaintiff's Existing And Prospective Contractual and Relationships.

### A.    Interference by Dean Datar and HBS with Plaintiff's Contractual Relationships with Harvard Business Publishing.

313.    As a prolific author who is a tenured member of Harvard's faculty, Plaintiff has benefitted from opportunities to have her articles and books published by Harvard Business Publishing.

> According to its website, Harvard Business Publishing is a "wholly-owned subsidiary of Harvard University, reporting into Harvard Business School," and markets to higher education, corporate learning, and managers and professionals around the world.

314.    Harvard Business Publishing publishes the "Harvard Business Review" ("HBR"), a general management magazine that is published six times a year. Plaintiff has regularly written articles for HBR.

315.    Plaintiff's publications for HBR are separate and apart from her duties as a Harvard employee.

316.    The benefits Plaintiff has enjoyed from publishing articles in the HBR are twofold. First, Professor Gino receives royalties for the sale of her articles by Harvard Business Publishing. Second, HBR offers published authors tremendous opportunities for exposure. Professor Gino has regularly received invitations from companies to do work with them (e.g., workshops, speaking engagements, and consulting) because of this exposure.

317.    On July 10, 2023, Plaintiff was informed by an editor of HBR that HBS had instructed HBR not to publish Plaintiff's article unless she removed her name from it. The article was accepted and expected to be published in the next issue of HBR.  As Plaintiff was told, unless HBS advised otherwise, HBR would either publish the piece without Plaintiff's name or pull the entire piece.

318.    Plaintiff was also informed by an HBS colleague and staff members that HBS had asked for her name to be removed from HBS case studies and HBS multi-media case studies that were already completed and simply needed sign-off from protagonists (i.e., real-life business persons featured in case studies) in order to be published. HBS stated they would proceed with publishing these cases only if other faculty members' names were substituted for Plaintiff's name. As in the case of the HBR article, even though removing or replacing Plaintiff's name would misrepresent authorship on completed work, HBS advocated this as a viable option. On

information and belief, HBS has never previously advocated misrepresentation of authorship for any male faculty member charged with misconduct.

**(1) Interference by Dean Datar and HBS with other Plaintiff's contractual relationships.**

319.    Plaintiff has written a book, <u>All Hands, How Diverse Teams Win</u>. The book was to be published by Portfolio with an expected release on February 13, 2024. Due to the way in which Portfolio learned about the alleged misconduct—through a senior faculty member (Amy Edmondson) falsely telling them "Francesca committed fraud"—the publisher cancelled the anticipated publication date and pushed it back for another year.  Plaintiff will only be paid the next installment of the advance on the book at the time it is published.  By moving the publication date by a year, the payment is also delayed by a year.  Similar to Plaintiff's articles for HBR, her books are also important in providing exposure that drives speeches, workshops and consulting work.

320.    But for Harvard and Dean Datar's breach of confidentiality, Amy Edmondson would not have been informed of the status and outcome of Plaintiff's research misconduct proceeding and would not have contacted Portfolio and falsely communicated that Plaintiff had committed "fraud" and that "the news would become public very soon."

321.    As a direct and proximate result of Respondent's unlawful actions, Plaintiff has suffered damages, including tremendous financial costs, reputational harm, loss of existing contractual relations and prospective economic opportunities and advantage, mental anguish, physical pain and suffering, embarrassment, and severe emotional distress.

**COUNT I**
**Violation of Title IX of the Education Amendments of 1972, U.S.C. § 1681 et seq.**
**(As to Defendant President and Fellows of Harvard College)**

322.    Plaintiff repeats and realleges each and every allegation hereinafter above as if fully set forth herein.

323.    Title IX of the Education Amendments of Title IX of the Education Amendments of 1972 20 U.S.C. § 1681 *et. seq.,* provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

324.    Title IX applies to all public and private educational institutions that receive federal funding, including Defendant Harvard.

325.    Title IX may be violated by a school's imposition of discipline where gender is a motivating factor in the decision. *See Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979); *Harrington v. Lesley Univ.*, 554 F. Supp. 3d 211, 233 (D. Mass. 2021)

326.    Plaintiff is a female.

327.    As described in the foregoing paragraphs, when Defendant Harvard abandoned its existing 2013 RI Policy and the procedures outlined in the FRB Principles, and created an onerous policy just for Plaintiff, it subjected Plaintiff to selective enforcement of a Policy, motivated by gender, in violation of Title IX.

328.    Defendant Harvard has never previously applied the Interim Policy to allegations of research misconduct by a male professor at HBS.

329.    In 2019, Harvard applied its existing 2013 RI Policy and FRB process to investigate allegations of research misconduct made against a junior male faculty member, who was subjected to no punitive sanctions. Unlike the Interim Policy that Harvard created for Plaintiff, the 2013 RI

Policy and FRB procedures do not specifically authorize the Dean of Faculty at HBS to terminate the employment of a tenured professor if found responsible for alleged research misconduct.

330.   Defendant Harvard has never placed a similarly situated tenured male professor at HBS on unpaid administrative leave or initiated tenure revocation proceedings based on allegations of research misconduct.

331.   Data Colada is known for targeting prominent female behavioral scientists and subjecting their work to unusually high scrutiny.

332.   Harvard and HBS are also known for treating female faculty less favorably than male faculty.

333.    Harvard's gender bias against women was a motivating factor in HBS's decision to subject Plaintiff to an onerous investigation and to impose upon her severe penalties, including unpaid administrative leave for two years.

334.   As a consequence of Defendant Harvard's selective enforcement of the Interim Policy, Plaintiff has suffered harms that no similarly situated male tenured professor at HBS has suffered, including, *inter alia,* that Plaintiff: (1) has been placed on immediate administrative leave for two years and stripped of all compensation; (2) had her professorship at HBS revoked; (3) has been removed from all of her teaching, publishing, and research duties, and any opportunity to earn a livelihood; and (4) has had her tenured position at Harvard made the subject of revocation proceedings.

335.   As a direct and proximate result of the foregoing conduct, Plaintiff suffered damages including *inter alia*, reputational harm, lost income, lost career opportunities, and other direct and consequential damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

336.    As a result of Defendant Harvard's violation of Title IX, which resulted in unduly severe and unwarranted sanctions against Plaintiff which continue to injure Plaintiff's reputation and rights as a tenured Professor an injunction should issue, directing Defendant Harvard to: i) reverse the findings, outcome and sanctions resulting from the Harvard Business School investigation of the research misconduct allegations against Plaintiff; ii) remove any record of, or reference to, the findings and outcome from Plaintiff's personnel file; and iii) restore Plaintiff to her full teaching, mentorship and research responsibilities.

### COUNT II
### Breach of Contract
### (As to Defendant President and Fellows of Harvard College)

337.    Plaintiff repeats and realleges each and every allegation hereinafter above as if fully set forth herein.

338.    Under Massachusetts law, to state a breach of contract claim the plaintiff must demonstrate that: "(1) there was a valid contract; (2) the defendant breached its duties under the contractual agreement; and (3) the breach caused the plaintiff damage." *NExTT Sols., LLC v. XOS Techs., Inc*., 113 F. Supp. 3d 450, 456 (D. Mass. 2015).

339.    "Tenure involves a long-term academic and financial commitment by a university to an individual, providing faculty with unusually secure positions tantamount to life contracts." *Beitzell v. Jeffrey*, 643 F.2d 870, 875 (1st Cir. 1981).

340.    At Harvard, pursuant to the Third Statute, a tenured professor enjoys a secure position, tantamount to a lifetime contract.

341.    Before a tenured professor at Harvard can be disciplined, the Third Statute and the Discipline Policy require a finding of "grave misconduct" and only following the procedures set forth in the Discipline Policy.

342.    Plaintiff's appointment letter, which incorporates the terms of the Tenure Policy, the Third Statute and the Discipline Policy, sets forth the terms of her employment as a full professor with tenure and constitutes an employment contract.

343.    Defendant Harvard breached Professor Gino's employment contract by subjecting her employment to discipline absent "grave misconduct" and in violation of the Third Statute, the procedural protections outlined in the Discipline Policy, the principles of the Tenure Policy, and Harvard's other policies and procedures.

344.    Plaintiff fully complied with all provisions set forth under the terms of her employment and under Harvard's policies and procedures.

345.    Without any legal justification, Harvard breached its contract with Professor Gino by failing to follow Harvard's policies and procedures, including, without limitation, by the following:

  a.    Placing Plaintiff on unpaid administrative leave for two years;

  b.    Stripping Plaintiff of her entire compensation, including 100% of her base salary and benefits, as of July 31, 2023;

  c.    Revoking Plaintiff's Tandon Family Professorship;

  d.    Barring Plaintiff from all research, teaching, mentoring, and advising duties;

  e.    Prohibiting Plaintiff from conducting research using Harvard resources to teach, mentor, or advise;

  f.    Cutting Plaintiff off from administrative and research support;

  g.    Barring Plaintiff from campus and her office;

h.  Prohibiting Plaintiff from publishing or disseminating her research through Harvard Business School platforms, and prohibited her from publishing research on other platforms at Harvard absent approval from Dean Datar;

i.  Disclosing confidential information concerning her misconduct proceeding and findings;

j.  Subjecting Plaintiff to discipline against her employment absent a finding of "grave misconduct," pursuant to the Third Statute, and without a "full hearing and fair representation before an impartial tribunal" and the other procedural protections required under the Discipline Policy;

k.  Subjecting Plaintiff to a disciplinary process in which she was subjected to an unfair and biased investigation, denied the presumption of innocence, and required to bear the burden of disproving the allegations against her.

346.  Plaintiff has suffered damages in an amount to be determined at trial but not less than $25 million, as a direct and proximate cause of Defendant Harvard's breach of Plaintiff's employment agreement and the terms of Harvard's policies, including but not limited to:

a.  Long-term injury to her professional reputation and career;

b.  Loss of her annual compensation (inclusive of base salary, fringe benefits, additional compensation for supplemental contributions), salary increases and bonuses;

c.  Loss of her Tandon Family professorship;

d.  Loss of opportunities for writing, publishing, and teaching activities, including teaching Executive Education programs, writing and publishing activities for Harvard Business Publishing, and teaching for Harvard Business School Online;

e.   Loss of capacity to generate future earnings;

f.   Loss of physical well being, emotional and psychological pain and suffering;

g.   Loss of career and performance opportunities;

h.   Loss of future career prospects.

**COUNT III**
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**(As to Defendant President and Fellows of Harvard College)**

347.   Plaintiff repeats and realleges each and every allegation hereinafter above as if fully set forth herein.

348.   "Every contract in Massachusetts ifs subject, to some extent, to an implied covenant of good faith and fair dealing." *Ayash v. Dana-Farber Cancer Inst.,* 443 Mass. 367, 385 (2005); *Boston. Med. Ctr. Corp. v. Secretary of Executive Office of Health & Human Servs*., 463 Mass. 447, 460 (2012).

349.   The implied covenant governs "the manner in which existing contractual duties are performed." *Eigerman v. Putnam Investments, Inc*., 450 Mass. 281, 289 (2007).

350.   Defendant Harvard breached the implied covenant of good faith and fair dealing in the following ways:

(1)   Abandoning its existing 2013 RI Policy and FRB process and crafting a new employee disciplinary policy, just for Plaintiff, the so-called Interim Policy, that purported to supersede the Third Statute and the Discipline Policy, and to nullify the rules and rights appliable to tenured factual, by authorizing Dean Datar to take disciplinary action against Plaintiff, up to and including the termination of her employment;

**(2)** Seeking to impose upon Plaintiff a so-called two-year unpaid "administrative leave," an adverse employment action that was tantamount to a constructive discharge, but without the procedural protections due Plaintiff under the Discipline Policy;

**(3)** Failing to timely notify Plaintiff of the allegations against her and keeping her in the dark for three months of both the charges against her and Harvard's impending investigation, as Harvard worked on crafting a new discipline policy, to apply just to her;

**(4)** Failing to adhere to the procedural and substantive requirements of the Interim Policy that HSB created, purportedly to investigate and assess allegations of "research misconduct";

**(5)** Conducting a bad faith investigation into allegations of research misconduct that were not made in good faith, as required under the Interim Policy;

**(6)** Conducting a bad faith investigation into allegations of research misconduct that fell outside the stated "scope" of the Interim Policy and should have been time-barred ;

**(7)** Conducting a bad faith investigation that was not thorough, fair, or objective, and that disregarded exculpatory evidence and testimony;

**(8)** Rendering a bad faith decision that concluded that Plaintiff was guilty of charged conduct without meeting its burden of proof, in reliance on inconclusive evidence and unwarranted inferences, in the absence of supporting witness statements and evidence;

**(9)** Imposing overly harsh and punitive sanctions that were unreasonable and lacking

any connection to Harvard's applicable policies and standards;

**(10)** Breaching its duties of confidentiality owed to Plaintiff for no legitimate

purpose.

351. As a direct and proximate result of this breach, Plaintiff suffered damages in an amount to be determined at trial, but not less than $25 million, including *inter alia*, lost income, lost career opportunities, reputational harm and emotional distress.

**COUNT IV**
**Estoppel**
**(As to Defendant President and Fellows of Harvard College)**

352. Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

353. Plaintiff's relationship with Defendant Harvard was governed by her employment contract with Harvard as well as Plaintiff's reasonable expectations based on Harvard's various policies and procedures.

354. Under Massachusetts law, a party is liable for estoppel when: (1) a promisor makes a promise which it should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee; (2) the promise did induce action or forbearance; and (3) "injustice can be avoided only by enforcement of the promise." *See Neuhoff v. Marvin Lumber & Cedar Co.*, 370 F.3d 197, 203 (1st Cir. 2004)) (applying Massachusetts law); *Anzalone v. Admin. Office of the Trial Court*, 457 Mass. 647, 661 (2010).

355. Harvard's various policies and procedures constitute unambiguous representations and promises that Harvard should have reasonably expected to induce action or forbearance by Plaintiff and which did induce Plaintiff's actions or forbearance.

80.

356.     Harvard expected or should have expected Plaintiff to accept its offer of employment and to choose not to pursue employment at other colleges or universities based on its express and implied promises that Harvard would not tolerate, and Plaintiff would not suffer, discrimination, and would not deny Plaintiff basic fairness in its disciplinary proceedings should she be accused of a violation of Harvard policies.

357.     Plaintiff relied to her detriment on these express and implied promises and representations made by Harvard and was induced by Harvard's promises in making her decision to further her career at Harvard instead of at another school of equal caliber.

358.     Based on the foregoing, Harvard is liable to Plaintiff based on Estoppel.

359.     As a direct and proximate result of the above conduct, Plaintiff has sustained tremendous damages in an amount to be determined at trial but not less than $25 million, including without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

**COUNT V**
**Defamation**
**Retraction Notices**
**(As to Defendants President and Fellows of Harvard College and Dean Datar)**

360.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

361.     On June 13 and June 14, 2023, Defendants Harvard and Dean Datar sent out retraction notices to Plaintiff's editors, co-authors and collaborators.

362.     Defendants Harvard and Dean Datar knew that HBS's investigating committee had not proved, by a preponderance of the evidence, that Plaintiff was responsible for *intentionally, knowingly, or recklessly* fabricating or falsifying data under the Interim Policy, but published false

and defamatory retraction notices that communicated to any reasonable reader that Plaintiff had intentionally fabricated or falsified data.

363.    Despite knowing that Harvard had never proved that Plaintiff had engaged in "research misconduct," under its own policies, Defendants Harvard and Dean Datar disclosed portions of the investigation committee's final report to third parties, that disparaged Plaintiff's professional reputation through false statements and selective omissions.

364.    Any reader of Defendants' false and defamatory retraction notices would reasonably conclude that Harvard had proved through its investigation that Plaintiff had engaged in research misconduct.

365.    To the extent that Defendants Harvard and Dean Datar had a conditional privilege to disclose defamatory information as Plaintiff's employer that Plaintiff had been found responsible for misconduct, they lost that conditional privilege because they: (i) knew the information they communicated to third parties was false and disparaging; (ii) had no reason to believe the information in the investigation committee's report was true; and/or (iii) recklessly published the information unnecessarily, unreasonably, or excessively. *See Bratt v. Int'l Bus. Machines Corp.*, 392 Mass. 508, 514, 467 N.E.2d 126, 131–32 (1984).

366.    Defendants Harvard and Dean Datar acted with "actual malice" in publishing their statements in the false and defamatory retraction notices, as evidenced by the foregoing paragraphs of the Complaint, including ¶¶ 203-221.

367.    As a direct result of Defendants' false and defamatory communications about Plaintiff to third parties, Plaintiff has suffered, *inter alia*, economic damages, in an amount to be determined at trial but not less than $25 million, including lost income and career opportunities, monetary losses resulting from the loss of existing and anticipated contracts, damage to her

reputation among the community at large, as well as damage to her reputation in the academic community and the professional community of behavioral scientists in which she works, and emotional distress for which Defendants are liable.

368.   These damages were proximately caused by Defendants' conduct.

369.   Because the harm resulting from Defendants' false and defamatory communications about Plaintiff to third parties is continuing in nature, the damages sought herein will not provide Plaintiff with a complete remedy. For this reason, Plaintiff further seeks injunctive relief against Defendants Harvard and Dean Datar, directing them to issue a public statement apologizing to Plaintiff and stating that Plaintiff did not fabricate or falsify data, or engage in "data fraud" or research misconduct.

**COUNT VI**
**Defamation**
**<u>Announcements of Plaintiff's Administrative Leave to Third Parties</u>**
**(As to Defendants President and Fellows of Harvard College and Dean Datar)**

370.   Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

371.   On or about June 13, 2023, Defendants Harvard and Dean Datar caused HBS to publish a statement on Plaintiff's faculty page on HBS's website that: "**PROFESSOR OF BUSINESS ADMINISTRATION (ADMINISTRATIVE LEAVE),**" (bold and capital letters in original), to the general public.

372.   Under the attendant circumstances, including but not limited to Harvard's aggressive retractions of Plaintiff's research papers and Harvard's numerous breaches of confidentiality, viewers of Defendant's public announcement on the HBS website concerning Plaintiff's "administrative leave" could and did reasonably conclude that Plaintiff's placement on administrative leave was connected to alleged research misconduct.

373.     On June 22, 2023, Dean Datar sent out an email to all of Plaintiff's colleagues at HBS that referenced HBS's placement of Plaintiff on administrative leave in connection to an article in *The Chronicle of Higher Education* "describing concerns" about allegations of research misconduct and a statement that "[r]esearch integrity is and must be one of our core values as an institution."

374.     Third parties who received Harvard and Dean Datar's statements concerning Plaintiff's placement on administrative leave could, and did, reasonably conclude that Professor Gino had been placed on administrative leave because she fabricated or falsified data.

375.     Under the circumstances, Defendants Harvard and Dean Datar (i) knew the information they communicated to third parties was false and disparaging; (ii) had no reason to believe the information conveyed by the announcement of Plaintiff's placement on administrative leave was true; and/or (iii) recklessly published the information unnecessarily, unreasonably, or excessively.

376.     In making the announcements concerning Plaintiff's administrative leave, Defendants Harvard and Dean Datar acted with actual malice, and intended to further disparage Plaintiff's professional reputation by falsely communicating that she had been placed on administrative leave because she had falsified and/or fabricated data, when they knew that she did not. Defendants' actual malice is demonstrated by numerous facts, including, but not limited to, those averred in the foregoing paragraphs of the Complaint, including ¶¶ 199-202.

377.     As a direct result of Defendants' false and defamatory communications to third parties, Plaintiff has suffered, *inter alia*, economic damages, in an amount to be determined at trial but not less than $25 million, including lost income and career opportunities, monetary losses resulting from the loss of existing and anticipated contracts, damage to her reputation among the

community at large, as well as damage to her reputation in the academic community and the professional community of behavioral scientists in which she works, and emotional distress for which Defendants are liable.

378.    These damages were proximately caused by Defendants' conduct.

379.    Because the harm resulting from Defendants' false and defamatory communications about Plaintiff to third parties is continuing in nature, the damages sought herein will not provide Plaintiff with a complete remedy. For this reason, Plaintiff further seeks injunctive relief against Defendants President and Fellows of Harvard College and Dean Datar, directing them to issue a public statement apologizing to Plaintiff and stating that Plaintiff did not fabricate or falsify data or engage in "data fraud" or research misconduct.

**COUNT VII**
**Defamation**
**Blog Posts 1-4**
**(As to Defendants Simonsohn, Nelson, and Simmons, collectively, "Data Colada")**

380.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

381.    Data Colada published false and defamatory statements on their blog, via Blog Posts 1-4, which were published throughout the United States and the world.

382.    On June 17, 2023, Data Colada published false and defamatory statements about Plaintiff in Blog Post 1, as alleged in ¶¶ 234-247, that Plaintiff "faked data" in Study 1 in the 2012 PNAS Paper.

383.    The statements made by Data Colada in Blog Post 1 were false.

384.    Data Colada published the statements about Plaintiff in Blog Post 1 with actual malice, because they knew the statements were false, entertained serious doubts as to the truth of their publication or, at the very least, acted in reckless disregard as to the truth or falsity of their

statements. Data Colada was also negligent in its publication of the false statements in Blog Post 1. This is evidenced *inter alia* by Defendant Simonsohn's July 18, 2023 admission that he has no evidence that Plaintiff committed data fraud. *See* ¶ 233; *see also* ¶¶ 234-247, 269-275 *supra*.

385.    On June 20, 2023, Data Colada published false and defamatory statements about Plaintiff in Blog Post 2, as alleged in ¶¶ 248-253, that Plaintiff manipulated and tampered with the data for the 2015 Psychological Science Paper.

386.    The statements made by Data Colada in Blog Post 2 were false.

387.    Data Colada published the statements about Plaintiff in Blog Post 2 with actual malice, because they knew the statements were false, entertained serious doubts as to the truth of their publication or, at the very least, acted in reckless disregard as to the truth or falsity of their statements. Data Colada was also negligent in its publication of the false statements in Blog Post 2. This is evidenced *inter alia* by Defendant Simonsohn's July 18, 2023 admission that he has no evidence that Plaintiff committed data fraud. *See* ¶ 233; *see also* ¶¶ 248-253, 269-275 *supra*.

388.    On June 23, 2023, Data Colada published false and defamatory statements about Plaintiff in Blog Post 3, as alleged in ¶¶ 254-260, that Plaintiff committed data fraud in regard to the 2014 Psychological Science Paper.

389.    The statements made by Data Colada in Blog Post 3 were false.

390.    Data Colada published the statements about Plaintiff in Blog Post 3 with actual malice, because they knew the statements were false, entertained serious doubts as to the truth of their publication or, at the very least, acted in reckless disregard as to the truth or falsity of their statements. Data Colada was also negligent in its publication of the false statements in Blog Post 3. This is evidenced *inter alia* by Defendant Simonsohn's July 18, 2023 admission that he has no evidence that Plaintiff committed data fraud. *See* ¶ 233; *see also* ¶¶ 254-260, 269-275 *supra*.

391.    On June 30, 2023, Data Colada published false and defamatory statements about Plaintiff in Blog Post 4, as alleged in ¶¶ 261-268, that Plaintiff committed manipulated the data in Study 3a in the 2020 JSP Paper.

392.    The statements made by Data Colada in Blog Post 4 were false.

393.    Data Colada published the statements about Plaintiff in Blog Post 4 with actual malice, because they knew the statements were false, entertained serious doubts as to the truth of their publication or, at the very least, acted in reckless disregard as to the truth or falsity of their statements. Data Colada was also negligent in its publication of the false statements in Blog Post 4. This is evidenced *inter alia* by Defendant Simonsohn's July 18, 2023 admission that he has no evidence that Plaintiff committed data fraud. *See* ¶ 233; *also* ¶¶ 261-268, 269-275 *supra*.

394.    As a direct result of Data Colada's false and defamatory blog posts, Plaintiff suffered economic damages, in an amount to be determined at trial but not less than $25 million, including *inter alia* lost income and career opportunities, monetary losses resulting from the loss of existing and anticipated contracts, damage to her reputation among the community at large, as well as damage to her reputation in the academic community and the professional community of behavioral scientists in which she works and emotional distress for which Defendants are liable.

395.    These damages were proximately caused by Data Colada's conduct.

396.    Because the harm resulting from Data Colada's false and defamatory communications about Plaintiff to third parties is continuing in nature, the damages sought herein will not provide Plaintiff with a complete remedy. For this reason, Plaintiff further seeks injunctive relief against Data Colada directing them to: i) remove Blog Posts 1-4 from their website; ii) retract any other public statements they have made concerning Plaintiff committing data fraud; iii) post a statement to their website, Twitter/X, Facebook and other social media accounts in which they

apologize to Plaintiff and admit that they have no evidence that she tampered with or manipulated data or engaged in "data fraud;" and iv) refrain from making statements that Plaintiff committed data fraud in the future.

**COUNT VIII**
**Defamation**
**December Report**
**(As to Defendants Simonsohn, Nelson, and Simmons, collectively, "Data Colada")**

397.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

398.    On December 31, 2021, Data Colada provided a report to Harvard Business School which falsely accused Plaintiff of committing data fraud.

399.    Defendant Data Colada published the statements contained in the December Report with knowledge that it had no evidence that Plaintiff committed data fraud. Defendant Simonsohn admitted that their was no such evidence on July 18, 2023. At the very least, Data Colada was negligent in making the false and defamatory statements about Plaintiff that are contained in the December Report.

400.    As a direct result of Data Colada's publication of false and defamatory statements about Plaintiff, Plaintiff has suffered, inter alia, economic damages, in an amount to be determined at trial but not less than $25 million, including *inter alia* lost income and career opportunities, monetary losses resulting from the loss of existing and anticipated contracts, damage to her reputation among the community at large, as well as damage to her reputation in the academic community and the professional community of behavioral scientists in which she works, and emotional distress for which Defendants are liable.

401.    These damages were proximately caused by Data Colada's conduct.

402.     Because the harm resulting from Data Colada's false and defamatory communications about Plaintiff to Harvard Business School is continuing in nature, the damages sought herein will not provide Plaintiff with a complete remedy. For this reason, Plaintiff further seeks injunctive relief against Data Colada directing them to retract the December Report and any other statements they made to Harvard Business School concerning Plaintiff committing data fraud, including an admission that they have no evidence that Plaintiff committed data fraud.

### COUNT IX
### Civil Conspiracy to Commit Defamation
### (As to All Defendants)

403.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

404.     Massachusetts recognizes a cause of action for civil conspiracy based on "concerted activity." *See McLaughlin v. J-PAC, LLC*, No. 10-2594-BLS1, 2011 WL 1758945, at *2 (Mass. Super. Apr. 14, 2011).

405.     Defendants Harvard President and Fellows of Harvard College, Dean Datar and Data Colada conspired to defame Plaintiff with false and defamatory statements that she committed "research misconduct" and "data fraud."

406.     In June of 2021, when Data Colada approached HBS with allegations concerning Plaintiff's research, Data Colada agreed to refrain from posting content on its blog that could subject Plaintiff and, by extension, HBS, to public scrutiny.

407.     In exchange, Defendant Harvard and Dean Datar agreed that HBS would create a new employment policy, the Interim Policy, that it would apply to Plaintiff and, at the conclusion of its investigation, HBS would disclose the results to Data Colada, which Data Colada would then be free to post on its website as "evidence" of purported "data fraud" by Plaintiff.

408.    Data Colada's allegations of research misconduct were not made in good faith, as they had no reasonable belief that Plaintiff had committed "data fraud."

409.    HBS caved to pressure exerted by Data Colada's threats of public scrutiny when it agreed to subject Plaintiff to an unwarranted investigation that had nothing to do with a legitimate interest in protecting the integrity of research.

410.    On or about June 13, 2023, when Harvard and Dean Datar disclosed the status and outcome of the HBS investigation to third parties, they knew that Plaintiff had not committed research misconduct under the terms of HBS's own Interim Policy.

411.    In a series of four false and defamatory blog posts about Plaintiff's research, Data Colada referenced an HBS investigative report as "evidence" of data fraud by Plaintiff, as well as HBS's announcement that it had placed Plaintiff on "administrative leave," falsely communicating to readers of its blog posts, that, as a matter of *fact,* Plaintiff had been found responsible for intentional falsification or fabrication of data, when she had not.

412.    Defendant Data Colada and Defendant Harvard knew that HBS had not found Plaintiff responsible for research misconduct within the meaning of that term under Harvard and HBS policies, including the Interim Policy and the PHS Regulations on which the Interim Policy was based, and that Plaintiff was not responsible for *intentional* falsification or fabrication of data.

413.    As a direct result of Defendants' conspiracy to spread false and defamatory statements that she has intentionally falsified and/or fabricated data, Plaintiff has suffered, *inter alia,* economic damages, including monetary losses resulting from the loss of existing and anticipated contracts, damage to her reputation among the community at large, as well as damage to her reputation in the academic community and the professional community of behavioral

scientists in which she works, personal humiliation, and mental pain for which Defendants are liable.

414.    These damages were proximately caused by Defendants' conduct.

415.    Because the harm resulting from Defendants' conspiracy to defame Plaintiff is continuing in nature, the damages sought herein will not provide Plaintiff with a complete remedy. For this reason, Plaintiff further seeks injunctive relief against all Defendants, directing: i) Defendants to issue public statements apologizing to Plaintiff and stating that Plaintiff did not fabricate or falsify data or engage in "data fraud" or research misconduct; ii) Data Colada to retract the December Report and any other statements they made to Harvard Business School concerning Plaintiff committing data fraud, including an admission that they have no evidence that Plaintiff committed data fraud; iii) Data Colada to remove Blog Posts 1-4 from their website; iv) Data Colada to retract any other public statements they have made concerning Plaintiff committing data fraud; v) Data Colada to post a statement to their website, Twitter/X, Facebook and other social media accounts in which they apologize to Plaintiff and admit that they have no evidence that she tampered with or manipulated data or engaged in "data fraud;" and vi) Defendants to refrain from making statements that Plaintiff committed data fraud in the future.

**COUNT X**
**Intentional Interference with Contractual Relations**
**(As to Defendants Simonsohn, Nelson, and Simmons, collectively, "Data Colada")**

416.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth within.

417.    To establish a claim for intentional interference with a contract, a plaintiff has the burden of proving (1) that he or she had a contract with a third party, (2) that the defendant knowingly induced the third party to violate the contract, (3) the interference was intentional and

improper in motive or means, and (4) that the plaintiff was harmed by the defendant's actions,. *Kahalas v. Schiller*, 164 F. Supp. 3d 241, 245 (D. Mass. 2016) (citing *G.S. Enters., Inc. v. Falmouth Marine, Inc*., 410 Mass. 262, 272, 571 N.E.2d 1363 (1991).

418.     The third element is satisfied where a party "used threats, misrepresented any facts [or] defamed anyone' in the course of the interference." *Kahalas*, 164 F. Supp. 3d at 246 (quoting *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 817, 551 N.E.2d 20 (1990)).

419.     Plaintiff had been appointed as a tenured member of the faculty at HBS and, as such, had an employment contract with Defendant Harvard of which Defendant Data Colada was aware.

420.     In our about July of 2021, Defendant Data Colada exerted pressure on Defendant Harvard by threatening to post content on its website that could subject Plaintiff's work, and by extension, HBS, to public scrutiny, based on false allegations that Plaintiff engaged in research misconduct.

421.     Defendant Data Colada's allegations in July of 2021 concerning Plaintiff were not made in good faith. Further, Data Colada intentionally defamed Plaintiff to her employer with false allegations that she had falsified and/or fabricated data in her work.

422.     In or about December 3, 2021, Data Colada submitted false and defamatory statements to the HBS Inquiry Committee to bolster its initial false and defamatory allegations to HBS concerning Plaintiff's work.

423.     As a consequence of Defendant Data Colada's conduct, (threats and false and defamatory statements concerning Plaintiff's work), Defendant Harvard subjected Plaintiff to an onerous and unwarranted investigation of her work, and a series of adverse employment actions against Plaintiff, in violation of Plaintiff's contractual rights as a tenured professor at HBS.

424.     As a direct and proximate result of Defendant Data Colada's actions, Plaintiff has suffered harms that include, *inter alia*, the following adverse actions by her employer, Defendant Harvard: (i) being placed on unpaid administrative leave for two years, stripped of all compensation and benefits; (iii) removal of all of her job duties; (iii) the revocation of her Tandon Family professorship, and (iv) and the institution of a proceeding to revoke Plaintiff's tenure.

425.     As a direct and proximate result of Defendant Data Colada's actions, Plaintiff has suffered a total loss of compensation, has been constructively and effectively discharged from her employment, and faces the permanent loss of her continued employment as a tenured professor.

## COUNT XI
### Intentional Interference with Advantageous Relations
**(As to Defendants President and Fellows of Harvard College and Dean Datar)**

426.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

427.     Massachusetts law protects a plaintiff's present and future economic interests from wrongful interference.  *See Blackstone v. Cashman,* 448 Mass. 255, 259, 860 N.E.2d 7, 12 (2007); *see also* Restatement (Second) of Torts §§ 766–766B,

428.     To establish wrongful interference with present and future economic interests, a plaintiff must establish that (1) she had an advantageous relationship with a third party, (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions. *See Blackstone*, 448 Mass. At 260.

429.     Plaintiff had advantageous economic and contractual relationships with Harvard Business Publishing, Portfolio, and many other businesses and entities of which Defendants Harvard and Dean Datar had knowledge.

93.

430.     Defendants Harvard and Dean Datar have maliciously interfered with Plaintiff's present and future economic interests by breaching its duties of confidentiality and spreading false and defamatory information concerning Plaintiff that disparaged her professional reputation.

431.     Plaintiff has suffered the loss of existing and prospective contractual relationships, including, *inter alia*, the disruption and/or loss of book deals, publication of articles, visiting professorships, contracts for speaking and consulting, and other contractual engagements.

432.     As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered damages, including tremendous financial costs, reputational harm, loss of existing contractual relations and prospective economic opportunities and advantage, mental anguish, physical pain and suffering, embarrassment, and severe emotional distress.

**COUNT XII**
**Violation of Privacy – Massachusetts G. L. c. 214, § 1B**
**(As to Defendants President and Fellows of Harvard College and Dean Datar)**

433.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth within.

434.     "To sustain a claim for invasion of privacy under G.L. c. 214, § 1B, the invasion must be both unreasonable and substantial or serious." *Squeri v. Mount Ida Coll.*, 954 F.3d 56, 69 (1st Cir. 2020) (interpreting Massachusetts state law) (internal citations and quotation marks omitted).

435.     On about June 13, 2023, Harvard and Dean Datar caused the HBS website to publicly announce their decision to place Plaintiff on administrative leave.

436.     The public dissemination of Plaintiff's private information concerning her placement on administrative leave served no legitimate business interest.

437.    In the context of the surrounding facts and circumstances, including Defendant Harvard and Dean Datar's contemporaneous disclosure of the false and defamatory results of the HBS investigative report and the resulting defamatory blog posts by Data Colada, Defendants' announcement of Plaintiff's administrative leave received excessive attention both within and outside of Harvard.

438.    Defendants' dissemination of her administrative leave status unnecessarily disclosed to the general public sensitive and private information concerning Plaintiff's employment status at Harvard, and was unwarranted under the circumstances since, to date, Plaintiff remains employed by Harvard as a Full Professor with tenure based at HBS.

439.    Defendants' public announcement of Plaintiff's administrative leave status constituted an unreasonable and substantial invasion of Plaintiff's privacy, which has subjected her to unnecessary attention and stigma.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff Professor Gino prays for the following relief:

(i) On the first count, against Defendant President and Fellows of Harvard College for violation of Title IX, a judgment awarding Plaintiff damages of at least $25 million, in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and an injunction enjoining enforcement of the unpaid administrative

leave the institution of tenure revocation proceedings and a declaration that Plaintiff did not commit research misconduct and did not violate the Interim Policy;

(ii) on the second cause of action for breach of contract against Defendant President and Fellows of Harvard College, damages of at least $25 million, in an amount to be determined at trial, including damages for physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii) on the third cause of action for breach of the implied covenant of good faith and fair dealing against Defendant President and Fellows of Harvard College, damages in an amount of at least $25 million, in an amount to be determined at trial, including damages for physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv) on the fourth cause of action for estoppel against Defendant President and Fellows of Harvard College, damages of at least $25 million, in an amount to be determined at trial, including damages for physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v) on the fifth cause of action for defamation against Defendants President and Fellows of Harvard College and Dean Datar, damages of at least $25 million, in an amount to

be determined at trial, including economic losses, lost career opportunities, reputational harm, emotional distress and punitive damages, costs and attorneys' fees. Plaintiff further seeks injunctive relief against Defendants, directing them to issue a public statement apologizing to Plaintiff and stating that Plaintiff did not fabricate or falsify data, or engage in "data fraud" or research misconduct;

(vi) On the sixth cause of action for defamation against Defendants President and Fellows of Harvard College and Dean Datar, damages of at least $25 million, including economic losses, lost career opportunities, reputational harm, emotional distress and punitive damages, costs and attorneys' fees. Plaintiff further seeks injunctive relief against Defendants, directing them to issue a public statement apologizing to Plaintiff and stating that Plaintiff did not fabricate or falsify data, or engage in "data fraud" or research misconduct;

(vii)   On the seventh cause of action for defamation against Defendants Simonsohn, Nelson, and Simmons, damages of at least $25 million, in an amount to be determined at trial, including economic losses, lost career opportunities, reputational harm, emotional distress and punitive damages, costs and attorneys' fees. Plaintiff further seeks injunctive relief against Defendants, directing them to issue a public statement apologizing to Plaintiff and stating that Plaintiff did not fabricate or falsify data, or engage in "data fraud" or research misconduct;

(viii)   On the eighth cause of action for defamation against Defendants Simonsohn, Nelson, and Simmons, damages of at least $25 million, in an amount to be determined at trial, including economic losses, lost career opportunities, reputational harm, emotional distress and punitive damages, costs and attorneys' fees. Plaintiff further

seeks injunctive relief against Defendants, directing them to retract Blog Posts 1-4 and to issue a public statement apologizing to Plaintiff and stating that Plaintiff did not fabricate or falsify data, or engage in "data fraud" or research misconduct;

(ix) On the nineth cause of action for civil conspiracy against all Defendants, damages of at least $25 million, in an amount to be determined at trial, including economic losses, lost career opportunities, reputational harm, emotional distress and punitive damages, costs and attorneys' fees. Plaintiff further seeks injunctive relief against Defendants, directing them to issue a public statement apologizing to Plaintiff and stating that Plaintiff did not fabricate or falsify data, or engage in "data fraud" or research misconduct;

(x) On the tenth cause of action for intentional interference with contractual relations as to Defendants Simonsohn, Nelson, and Simmons, damages of at least $25 million, in an amount to be determined at trial, including economic losses, lost career opportunities, reputational harm, emotional distress and punitive damages, costs and attorneys' fees;

(xi) On the eleventh cause of action for intentional interference with advantageous relations against Defendants President and Fellows of Harvard College and Dean Datar, damages of at least $25 million, including economic losses, lost career opportunities, reputational harm, emotional distress and punitive damages, costs and attorneys' fees. Plaintiff further seeks injunctive relief against Defendants, directing them to issue a public statement apologizing to Plaintiff and stating that Plaintiff did not fabricate or falsify data, or engage in "data fraud" or research misconduct;

(xii)    On the twelfth cause of action for violation of privacy against Defendants President and Fellows of Harvard College and Dean Datar, damages of at least $25 million,

including economic losses, lost career opportunities, reputational harm, emotional distress and punitive damages, costs and attorneys' fees. Plaintiff further seeks injunctive relief against Defendants, directing them to issue a public statement apologizing to Plaintiff and stating that Plaintiff did not fabricate or falsify data, or engage in "data fraud" or research misconduct;

(xiii)   Equitable relief in the form of an injunction directing:  i) all Defendants to issue public statements apologizing to Plaintiff and stating that Plaintiff did not fabricate or falsify data or engage in "data fraud" or research misconduct; ii) Data Colada to retract the December Report and any other statements they made to Harvard Business School concerning Plaintiff committing data fraud, including an admission that they have no evidence that Plaintiff committed data fraud; iii) Data Colada to remove Blog Posts 1-4 from their website; iv) Data Colada to retract any other public statements they have made concerning Plaintiff committing data fraud; v) Data Colada to post a statement to their website, Twitter/X, Facebook and other social media accounts in which they apologize to Plaintiff and admit that they have no evidence that she tampered with or manipulated data or engaged in "data fraud;" and vi) all Defendants to refrain from making statements that Plaintiff committed data fraud in the future.

## JURY DEMAND

Professor Gino herein demands a trial by jury of all triable issues in the present matter.

**Dated: Boston, Massachusetts**

**August 8, 2023**

**Respectfully submitted,**

**NESENOFF & MILTENBERG, LLP**
***Attorneys for Plaintiff Francesca Gino***

**By: /s/ Julie A. Sacks**
**Andrew T. Miltenberg, Esq.**
(***pro hac vice*** **forthcoming**)
**Kara L. Gorycki, Esq.**
(***pro hac vice*** **forthcoming**)
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
**amiltenberg@nmllplaw.com**
**kgorycki@nmllplaw.com**


**Tara Davis, Esq. (BBO # 675346)**
**Julie A. Sacks, Esq. (BBO #674384)**
**101 Federal Street, 19th Floor**
**Boston, Massachusetts 02110**
**(617) 209-2188**
**tdavis@nmllplaw.com**
**jsacks@nmllplaw.com**

100.