**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| FRANCESCA GINO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| PRESIDENT AND FELLOWS OF | ) | Case No. 1:23-cv-11775-MJJ |
| HARVARD COLLEGE, SRIKANT DATAR, | ) | |
| URI SIMONSOHN, LEIF NELSON, JOSEPH | ) | JURY TRIAL DEMANDED |
| SIMMONS, JOHN DOES 1-10, AND JANE | ) | |
| DOES 1-10, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

## <u>MEMORANDUM OF LAW OF DEFENDANTS PRESIDENT AND FELLOWS OF HARVARD COLLEGE AND SRIKANT DATAR IN SUPPORT OF THEIR PARTIAL MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT</u>

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................... 4

      A.     Plaintiff's Employment and Harvard Policies ........................................ 4

      B.     HBS Investigation and Plaintiff's Ensuing Lawsuit ............................... 5

ARGUMENT ........................................................................................................................ 7

I.      PLAINTIFF FAILS TO STATE A CLAIM FOR BREACH OF CONTRACT, BECAUSE SHE DOES NOT ALLEGE A VIOLATION OF THE NON-CONTRACTUAL POLICIES AT ISSUE (COUNT TWO) ............................................. 7

II.     PLAINTIFF FAILS TO STATE A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING BECAUSE HER OWN ALLEGATIONS SHOW THAT HARVARD ACTED FAIRLY AND WITHIN ITS AUTHORITY (COUNT THREE) ...................................................................... 8

      A.     Adoption of Interim Policy and Procedures ........................................... 9

      B.     Alleged Bad-Faith Investigation ......................................................... 10

III.    PLAINTIFF FAILS TO STATE A CLAIM FOR ESTOPPEL BECAUSE GENERALIZED REPRESENTATIONS REGARDING NON-DISCRIMINATION AND FAIRNESS IN EMPLOYMENT CANNOT SUPPORT SUCH A CLAIM (COUNT FOUR) ............................................................. 13

IV.    PLAINTIFF FAILS TO STATE A CLAIM FOR DEFAMATION BECAUSE THE ALLEGED STATEMENTS WERE NOT DEFAMATORY AND THERE IS NO PLAUSIBLE ALLEGATION SUPPORTING ACTUAL MALICE (COUNTS FIVE AND SIX) ........................................................................... 14

      A.     Retraction Notices ............................................................................... 15

      B.     Administrative Leave Status ................................................................ 17

V.     PLAINTIFF FAILS TO STATE A CLAIM FOR CONSPIRACY FOR THE SAME REASONS THE DEFAMATION COUNTS FAIL (COUNT NINE) ................ 17

VI.    PLAINTIFF FAILS TO STATE A CLAIM FOR INTENTIONAL INTERFERENCE WITH ADVANTAGEOUS RELATIONS BECAUSE HER VAGUE AND CONCLUSORY ALLEGATIONS DO NOT SUGGEST ACTUAL MALICE (COUNT ELEVEN) ..................................................................... 18

VII.   PLAINTIFF FAILS TO STATE A CLAIM FOR INVASION OF PRIVACY, M.G.L. c. 214, § 1B BECAUSE NO PRIVATE INFORMATION WAS DISCLOSED (COUNT TWELVE) .................................................................... 19

CONCLUSION ................................................................................................................... 20

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................................................7

*Berkowitz v. Pres. & Fellows of Harvard Coll.*,
789 N.E.2d 575 (Mass. App. Ct. 2003) ........................................................................7

*Bois v. United States HHS*,
No. 11-1563, 2012 WL 13042904 (D.D.C. Mar. 2, 2012) ......................................11

*Branyan v. Southwest Airlines Co.*,
105 F. Supp. 3d 120 (D. Mass. 2015) ....................................................................19, 20

*Britton v. Athenahealth, Inc.*,
No. MI-cv-201202457, 2013 WL 2181654 (Mass. Sup. Ct. May 3, 2013)..............8

*Ciccone v. City of Newton Police Dep't*,
No. 054456A, 2009 WL 4282087 (Mass. Sup. Ct. Nov. 5, 2009) .........................14

*Cohen v. Trs. of Tufts Univ.*,
No. 064016, 2007 WL 1302591 (Mass. Sup. Ct. Apr. 12, 2007) ..........................18

*Croce v. Sanders*,
843 F. App'x 710 (6th Cir. 2021) ............................................................................16

*CrossFit, Inc. v. Mustapha*,
No. 13-11498-FDS, 2014 WL 949609 (D. Mass. Mar. 10, 2014)..........................18

*DePasquale v. Ogden Suffolk Downs, Inc.*,
564 N.E.2d 584 (Mass. 1990) ..................................................................................19

*Doe v. Amherst Coll.*,
238 F. Supp. 3d 195 (D. Mass. 2017) ......................................................................17

*Doe v. Backpage.com, LLC*,
817 F.3d 12 (1st Cir. 2016)..........................................................................................7

*Doe v. Brandeis Univ.*,
177 F. Supp. 3d 561 (D. Mass. 2016) ......................................................................13

*Doe v. Trs. of Boston Coll.*,
892 F.3d 67 (1st Cir. 2018)........................................................................................10

*Egan v. Tenet Health Care*,
   193 F. Supp. 3d 73 (D. Mass. 2016) .......................................................14

*Evans v. Boston Red Sox*,
   No. 13-13259-GAO, 2014 WL 4966081 (D. Mass. Sept. 30, 2014) .......................................19

*Farzinpour v. Berklee Coll. Of Music*,
   516 F. Supp. 3d 33 (D. Mass. 2021) .......................................................10

*Fiorillo v. Winiker*,
   85 F. Supp. 3d 565 (D. Mass. 2015) .......................................................14

*Foley v. Lowell Sun. Pub. Co.*,
   533 N.E.2d 196 (Mass. 1989) .......................................................16

*French v. United Parcel Serv., Inc.*,
   2 F. Supp. 2d 128 (D. Mass. 1998) .......................................................19

*Haglund v. Estee Lauder Cos., Inc.*,
   466 F. Supp. 3d 292 (D. Mass. 2020) .......................................................9

*Kelleher v. Lowell Gen. Hosp.*,
   152 N.E.3d 126 (Mass. App. Ct. 2020) .......................................................18

*Larson v. Perry*,
   No. 19-cv-10203-IT, 2020 WL 1495883 (D. Mass. Mar. 27, 2020) .......................................19

*Lee v. Howard Hughes Medical Inst.*,
   457 F. Supp. 3d 9 (D. Mass. 2020) .......................................................8, 9

*Lemelson v. Bloomberg LP*,
   253 F. Supp. 3d 333 (D. Mass. 2017) .......................................................15

*Ligotti v. Daly XXL Comms., Inc.*,
   No. 16-11522, 2018 WL 1586340 (D. Mass. Mar. 26, 2018) .......................................16

*Lu v. Davis*,
   No. 19-11968-PBS, 2020 WL 7408278 (D. Mass. Nov. 2, 2020).......................................1

*Martin v. Roy*,
   767 N.E.2d 603 (Mass. App. Ct. 2002) .......................................................15

*Mullane v. Breaking Media, Inc.*,
   433 F. Supp. 3d 102 (D. Mass. 2020) .......................................................14, 17

*Oberg v. City of Taunton*,
   972 F. Supp. 2d 174 (D. Mass. 2013) .......................................................19

*ORI, U.S. Dep't of Health and Hum. Servs. v. Rakesh Srivastava*,
   No. C-15-3830, 2018 HHSDAB LEXIS 624 (Sept. 5, 2018)..................................................11

*Peckham v. Boston Herald, Inc.*,
   719 N.E.2d 888 (Mass. 1999) ..............................................................................................20

*Piper v. Talbots, Inc.*,
   507 F. Supp. 3d 339 (D. Mass. 2020) ...................................................................................12

*Pollalis v. Harvard Univ., et al.*,
   No. 1681-cv-30985, 2018 WL 7199754 (Mass. Sup. Ct. Apr. 24, 2018), *aff'd*,
   No. 18-P-362, 2019 WL 1261472 (Mass. App. Ct. Mar. 18, 2019)
   (unpublished) ....................................................................................................................9, 13

*Ravnikar v. Bogojavlensky*,
   782 N.E.2d 508 (Mass. 2003) ..............................................................................................16

*Revil v. Coleman*,
   54 N.E.3d 608 (Mass. App. Ct. 2016) ..................................................................................16

*Rodden v. Savin Hill Enters.*,
   No. 15-03194-C, 2016 WL 1688688 (Mass. Sup. Ct. Apr. 21, 2016).....................................13

*Saad v. Am. Diabetes Assoc.*,
   123 F. Supp. 3d 175 (D. Mass. 2015) ...................................................................................16

*Salmon v. Lang*,
   57 F.4th 296 (1st Cir. 2022)..................................................................................................15

*Schaer v. Brandeis Univ.*,
   735 N.E.2d 373 (Mass. 2000) .............................................................................................7, 8

*Schatz v. Republican State Leadership Comm.*,
   669 F.3d 50 (1st Cir. 2012)...............................................................................................15, 16

*SEC v. Tambone*,
   597 F.3d 436 (1st Cir. 2010) (en banc) ...................................................................................7

*Sonoiki v. Harvard Univ.*,
   37 F.4th 691 (1st Cir. 2022)..................................................................................................13

*Speleos v. BAC Home Loans Servicing, L.P.*,
   755 F. Supp. 2d 304 (D. Mass. 2010) .....................................................................................3

*Tynecki v. Tufts Univ. Sch. of Dental Med.*,
   875 F. Supp. 26 (D. Mass. 1994) ..........................................................................................17

*Watterson v. Page*,
   987 F.2d 1 (1st Cir. 1993) ................................................................................12

**Statutes**

M.G.L. c. 214, § 1B ...........................................................................................19

**Other Authorities**

42 C.F.R. Part 93 .................................................................................................5

Findings of Research Misconduct, 88 Fed. Reg. 22461 (Apr. 13, 2023) ....................................11

Fed. R. Civ. P. 12(b)(6) .......................................................................................3

Defendants President and Fellows of Harvard College and Harvard Business School Dean Srikant Datar ("Harvard") respectfully submit this memorandum of law in support of their Partial Motion to Dismiss the Amended Complaint filed by Plaintiff Francesca Gino ("Plaintiff").[1]

## PRELIMINARY STATEMENT[2]

After a thorough, fair, and objective process, Harvard found, by a preponderance of the evidence, that Plaintiff intentionally, knowingly, or recklessly committed research misconduct. To protect research integrity, it took justified actions within the scope of its policies. Plaintiff's 439-paragraph Complaint boils down to an inappropriate and unjustified demand that this Court intervene in these internal affairs of an academic institution all because she disagrees with the results of a painstaking investigation into alleged data anomalies in certain of her published works. Plaintiff is a tenured Professor of Business Administration at Harvard Business School ("HBS"), currently on administrative leave following HBS' investigation. That investigation—conducted by a committee of three highly-experienced senior HBS faculty members (the "Committee") and involving eight witness interviews, extensive analysis by third-party forensic experts, the review of hundreds of pages of documents, and careful consideration of Plaintiff's defenses asserted in interviews and in writing—concluded that Plaintiff had engaged in a pattern of serious research misconduct relating to four publications spanning eight years, with different co-authors, in different journals, assisted by different research personnel, and out of different home institutions. Contrary to the Complaint's assertions, the Committee's final report (the "Final Report," which the Complaint extensively cites yet tellingly does not attach for the Court's review) states plainly

---

[1] As courts in this district routinely have held, this motion suspends the deadline for serving an answer to the Complaint. *See, e.g.*, *Lu v. Davis*, No. 19-11968-PBS, 2020 WL 7408278, at *2 n.4 (D. Mass. Nov. 2, 2020).

[2] Citations to "¶ _" are to the Amended Complaint, Doc. No. 6 (the "Complaint" or "Compl."). Citations to "Ex. _" are to the exhibits attached to the concurrently-filed Declaration of Jenny K. Cooper, dated October 10, 2023. Unless indicated otherwise, internal quotation marks and citations are omitted and emphasis is added.

that, by a preponderance of the evidence, the Committee determined Plaintiff committed the misconduct "intentionally, knowingly, or recklessly"—the standard set forth in the federal research misconduct regulations upon which HBS' policy is based.  After reviewing the Final Report and its 1240 pages of exhibits, Dean Datar accepted the Committee's findings and imposed the recommended sanctions, which he deemed appropriate given the unprecedented gravity of the misconduct.

Plaintiff now asks this Court to second-guess the Committee's careful and thorough work, and to limit Dean Datar's discretion to determine the appropriate sanctions.  Not only does the law disfavor such involvement in a university's academic decision-making, but also the Complaint offers little to justify this Court taking such action.  Plaintiff provides no explanation for the significant data anomalies on which the Committee's conclusion was based,[3] nor does she offer any reason to conclude that the sanctions imposed are disproportionate given the paramount importance of research ethics and integrity to academic institutions such as HBS.  She also does not offer any reasonable exculpatory evidence.  Instead, she offers vague assurances about her honesty and integrity, and speculates, with no supporting evidence, that Harvard gave in to the demands of data integrity blog Data Colada[4] and agreed to investigate the data anomalies to avoid negative publicity—only (puzzlingly) to conspire later with Data Colada to publicize that very

---

[3] As Plaintiff's own exhibits show, HBS found that virtually all of the anomalies supported her favored hypotheses. *See* Doc. No. 6-3 at 2 ("All but one of these discrepancies favor the hypothesized and reported effects."); Doc. No. 6-4 at 2 ("In summary, a comparison of the original Qualtrics dataset with the dataset posted on OSF revealed discrepancies that strongly support the hypothesized and reported results."); Doc No. 6-5 at 2 ("In summary, a comparison of the original Qualtrics dataset with the dataset posted on OSF revealed discrepancies . . . , all of which favored the hypothesized and reported effects.").  "OSF" refers to the Open Science Framework website, which contains publicly available versions of study data posted by researchers.  "Qualtrics," by contrast, refers to a private account held by Plaintiff containing non-public versions of her study data.  *See* Ex. 5 at 10.
[4] Data Colada is run by Defendants Uri Simonsohn, Leif Neilson, and Joseph Simmons, ¶ 4, who are collectively referred to herein as "Data Colada."

misconduct once the investigation was complete.  This internally inconsistent theory is absurd on its face and has no basis whatsoever in reality.

Unsurprisingly, to assert such a theory, the Complaint is forced to rely on conclusory allegations, egregious mischaracterizations, and outright falsehoods.  Plaintiff also selectively declined to attach key documents that the Complaint cites repeatedly and thus incorporates, including the Final Report.[5]  In so doing, Plaintiff conveniently omits highly probative facts that are clear from the face of these documents, such as that third-party witnesses uniformly confirmed that Plaintiff was the sole co-author responsible for data collection and analysis in each of the studies at issue.  Similarly absent from the Complaint, yet obvious from the Final Report, is one of the primary defenses Plaintiff asserted, without evidence, during the investigation—that someone maliciously gained access to and tampered with her data on various password-protected devices and a private data repository over the course of several years in an elaborate attempt to frame her.  The Committee found this theory highly implausible.[6]

Despite the great lengths to which the Complaint goes to invent facts favorable to Plaintiff and omit actual facts that are not, its laundry list of contract and tort claims against Harvard does not state a claim for which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  Indeed, Plaintiff's breach of contract claim fails because none of the policies to which she points (to the extent they

---

[5] The Final Report and its exhibits are discussed extensively in, and are central to, the Complaint.  *See, e.g.*, ¶¶ 106-109, 117-20, 131-37, 157-167, 185, 363.  They are therefore incorporated by reference and Harvard has sought to provide them for the Court's consideration, with appropriate redactions to protect both the legitimate privacy interests belonging to Plaintiff and third parties and the public's strong presumption of access to judicial records.  *See Speleos v. BAC Home Loans Servicing, L.P.*, 755 F. Supp. 2d 304, 307 (D. Mass. 2010) (court may look to, *inter alia*, documents "incorporated by reference in the complaint"); *see also* Ex. 5; Harvard's Motion for Leave to File Partially Under Seal.

[6] Specifically, the Committee noted that, for malicious actors to achieve such a result, they would have needed (among other things), at specific points in time over the course of years, (1) access to *both* (a) Plaintiff's Qualtrics accounts *and* (b) Plaintiff's computer's hard drive; (2) access to Plaintiff's second "factor" in HBS' two-factor authentication system; (3) access to Plaintiff's research assistant's personal computer; (4) the ability to find multiple versions of datasets scattered across various locations with idiosyncratic file names; (5) the expertise to make changes to eliminate significant effects in the data while leaving it otherwise intact; and (6) the ability to carefully time their data manipulation to avoid detection.  Ex. 5 at 14.

could be considered contracts) prohibit any of Harvard's alleged conduct.  The implied covenant and estoppel claims fail because Plaintiff has not alleged that Harvard did anything it was not expressly authorized to do or otherwise treated her unlawfully.  Her defamation, civil conspiracy, and tortious interference claims fail because they are based on statements that are either true (even based solely on the Complaint's allegations) or are non-actionable statements of opinion, among other reasons.  Finally, her invasion of privacy claim fails because the mere fact of Plaintiff's administrative leave status is not the type of highly private information protected from disclosure.  Thus, Counts 2–6, 9, and 11–12 of the Complaint should be dismissed with prejudice.[7]

## FACTUAL BACKGROUND

### A.    Plaintiff's Employment and Harvard Policies

Plaintiff is a well-known behavioral scientist, author, and teacher.  ¶ 2.  She has received numerous awards and considerable attention for her academic research.  ¶¶ 37-42.  She has been a tenured professor at HBS since 2014.  ¶ 49.

Plaintiff's tenure appointment letter explained that her tenure is "subject to such terms, conditions and policies as are stipulated by [HBS], and to the Third Statute of the University . . . as these may be amended from time to time" (the "Appointment Letter").   Doc. No. 6-10 at 2.  The Third Statute of the University (the "Third Statute") states that tenured professors are "subject to *removal* . . . only for grave misconduct or neglect of duty."  ¶ 60; Doc. No. 6-11 at 2.  A separate policy document, entitled "Discipline of Officers, Tentative Recommendations" (the "Discipline Policy"), sets forth the applicable procedures for assessing such cases of "grave misconduct or neglect of duty."  ¶ 61; Doc. No. 6-12.

---

[7] Harvard also forcefully denies the allegations of gender discrimination in Count 1.  However, because Count 1 relies on disputed factual allegations, it is not appropriate for resolution at the stage of a motion to dismiss, which must assume all factual allegations are true.  Count 1 thus will be addressed further in Harvard's forthcoming Answer.  Counts 7, 8, and 10 do not name Harvard and accordingly are not addressed here.

In 2013, HBS adopted a two-page Research Integrity Policy (the "2013 Policy") delegating broad authority to the Dean of HBS to determine the appropriate procedures in a research misconduct investigation and to "decide the matter and take whatever action he or she believes is justified." ¶ 76; Doc. No. 6-1 at 3. In 2021, HBS created the Interim Policy and Procedures for Responding to Allegations of Research Misconduct (the "Interim Policy and Procedures"), which describe detailed procedures to investigate allegations of research misconduct. ¶ 7; Doc. No. 6-2. The Interim Policy and Procedures represent best practices by mirroring federal regulations promulgated by the U.S. Department of Health & Human Services, Office of Research Integrity (the "ORI Regulations"). *See, e.g.*, ¶¶ 18, 83; 42 C.F.R. Part 93. The Interim Policy and Procedures contain significant procedural safeguards and guarantees for the accused. *See* Doc. No. 6-2 (detailing required process, including preliminary assessment and initial inquiry prior to an investigation, preparation of written inquiry and investigation reports, and opportunities for respondent to participate).

### B.    HBS Investigation and Plaintiff's Ensuing Lawsuit

After receiving a formal complaint from Data Colada that the data in multiple papers co-authored by Plaintiff (the "Papers") appeared to have been manipulated (¶ 67), HBS began an inquiry pursuant to the Interim Policy and Procedures. After gathering information, including from Plaintiff, an inquiry committee composed of senior HBS faculty concluded that a full investigation was warranted. ¶¶ 97-114. Over the following eleven months, the Committee interviewed multiple witnesses (including Plaintiff) and gathered additional evidence, including analyses from an independent data forensics firm and hundreds of pages of argument submitted by Plaintiff and her counsel. ¶¶ 114-130. During this same time, there were many opportunities for Plaintiff to respond to the allegations, including through interviews with the Committee and by submitting written materials. *See, e.g.*, Ex. 5 at 5-8.

On December 14, 2022, HBS provided Plaintiff with the Committee's draft report.  ¶ 131.
Plaintiff submitted an extensive written response on February 17, 2023.  ¶ 148.  After receiving
and considering Plaintiff's response, the Committee issued its Final Report on March 7, 2023,
finding "by a preponderance of the evidence" that Plaintiff had "intentionally, knowingly, or
recklessly" engaged in research misconduct.  ¶ 157; Ex. 5 at 1.  For each allegation, the Committee
discussed at length its findings and its evaluation of Plaintiff's arguments (including that witnesses
uniformly identified Plaintiff as responsible for the anomalous data, Ex. 5 at 17-39, that data
cleaning by Plaintiff's research associates did not persuasively explain the anomalies, *id.* at 10,
and that Plaintiff's bad actor theory was highly implausible, *id.* at 10-16).  For some allegations,
the Plaintiff acknowledged the data anomalies but could offer no explanation.

On June 13, 2023, Plaintiff met with Dean Datar and received his written decision adopting
the Final Report.  ¶ 177.  Dean Datar informed Plaintiff that she was being placed on unpaid
administrative leave for two years and that he would request the commencement of tenure
revocation proceedings pursuant to the Third Statute.  ¶¶ 178-79.  (The Complaint does not and
cannot allege that Plaintiff actually has been "removed" from her tenured position.)  HBS informed
selected HBS faculty members and the doctoral students under Plaintiff's mentorship of Plaintiff's
administrative leave, and updated Plaintiff's faculty webpage accordingly.  ¶¶ 196, 221.

On June 13 and 14, 2023, HBS sent letters to the three journals in which the four Papers
were published (the "Retraction Notices").  ¶¶ 206-18; Doc. Nos. 6-3, 6-4, 6-5.  Each Retraction
Notice was marked "CONFIDENTIAL" and stated that HBS had "reviewed concerns" about
certain of Plaintiff's published data and "believe[s]" that the results of the relevant Paper(s) were
invalid "due to alterations of the data that affect[] the significance of the findings."  Doc Nos. 6-3

at 2, 6-4 at 2, 6-5 at 2.  Each included an appendix detailing the data anomalies.  *Id.*  The Retraction

Notices did not accuse Plaintiff of altering the data, nor did they mention research misconduct.  *Id.*

On August 2, 2023, Plaintiff initiated this action.  *See* Doc. No. 1.

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009).  A court must ignore conclusory legal allegations and then "determine whether

the remaining facts allow it to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Doe v. Backpage.com, LLC*, 817 F.3d 12, 24 (1st Cir. 2016).  A complaint

must be dismissed where its factual averments are "too meager, vague, or conclusory to remove

the possibility of relief from the realm of mere conjecture."  *SEC v. Tambone*, 597 F.3d 436, 442

(1st Cir. 2010) (en banc).

## I.    PLAINTIFF FAILS TO STATE A CLAIM FOR BREACH OF CONTRACT, BECAUSE SHE DOES NOT ALLEGE A VIOLATION OF THE NON-CONTRACTUAL POLICIES AT ISSUE (COUNT TWO)

In interpreting a university/professor contract, a court's review should be guided by: (i) the

meaning the university "should reasonably expect the other party to give [the contract]"; and

(ii) the principle that "courts are chary about interfering with academic and disciplinary decisions

made by private colleges and universities."  *Schaer v. Brandeis Univ.*, 735 N.E.2d 373, 378, 381

(Mass. 2000).  Accordingly, courts "are reluctant to read in restrictions that limit [a] university's

discretion."  *Berkowitz v. Pres. & Fellows of Harvard Coll.*, 789 N.E.2d 575, 584 (Mass. App. Ct.

2003).  These principles, and the plain language of the policies at issue, compel dismissal of

Plaintiff's breach of contract claim.

Plaintiff primarily asserts that Harvard imposed certain disciplinary sanctions without a

finding of "grave misconduct," thereby supposedly violating "the Third Statute, the . . . Discipline

Policy, the . . . Tenure Policy, and Harvard's other policies and procedures." ¶ 343. But this claim ignores the plain language of the Third Statute and Discipline Policy, which govern the *removal* of tenure only.[8] The Third Statute does not even address, let alone purport to govern, any discipline of tenured professors falling short of tenure revocation. Doc. No. 6-11. The Discipline Policy likewise is inapplicable. Doc. No. 6-12 (providing "the applicable procedures for cases involving the *removal of a tenured appointment*"). Plaintiff thus has failed to allege any breach of such policies, requiring dismissal. *Schaer*, 735 N.E.2d at 378 & n.8 (no breach of contract provision that "does not apply to" the investigation at issue).

Even if there were a plausible allegation of breach, these policies are not contractual in nature. They contain nothing preventing Harvard from amending them unilaterally at will, and Harvard did not negotiate with or require Plaintiff's assent to them as a condition of employment. *See Lee v. Howard Hughes Medical Inst.*, 457 F. Supp. 3d 9, 12-13 (D. Mass. 2020) (dismissing claim where employee failed to demonstrate reasonable belief that employee handbook subject to unilateral employer modification constituted contract); *Britton v. Athenahealth, Inc.*, No. MI-cv-201202457, 2013 WL 2181654, at *6 (Mass. Sup. Ct. May 3, 2013) (dismissing breach of contract claim where plaintiff failed to allege "that the employment manual constituted a contract").

## II.   PLAINTIFF FAILS TO STATE A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING BECAUSE HER OWN ALLEGATIONS SHOW THAT HARVARD ACTED FAIRLY AND WITHIN ITS AUTHORITY (COUNT THREE)

Plaintiff next asserts that Harvard breached an implied covenant of good faith and fair dealing, but—tellingly—the Complaint does not identify which purported contract's implied

---

[8] The "Tenure Policy" governs appointments and promotions only, and is thus equally inapplicable. The "FRB Principles" Plaintiff cites are also unavailing, as they expressly carve out research misconduct from their purview. Ex. 1 at 1 & n.1. The Complaint extensively cites to the "FRB Principles" (¶¶ 77, 82, 183, 189-93), which therefore may be considered for purposes of the present Motion. *See supra* Note 5.

8

covenant has been violated, requiring dismissal.  *See Haglund v. Estee Lauder Cos., Inc.*, 466 F. Supp. 3d 292, 300 (D. Mass. 2020).  Moreover, as set forth above, the policies obliquely referenced in the relevant portion of the Complaint are not even contractual in nature, meaning that no implied covenant attaches to them as a matter of law.  *See Lee*, 457 F. Supp. 3d at 12-13.

Even setting those fatal flaws aside, Plaintiff's claim still fails.  Plaintiff asserts a laundry list of supposed implied covenant breaches, which focus on Harvard's allegedly "crafting a new employee disciplinary policy, just for Plaintiff" and conducting a bad faith investigation.[9]  ¶¶ 347-51.  Plaintiff's own allegations and the policies themselves foreclose these claims.

### A.    Adoption of Interim Policy and Procedures

The Complaint fails to plausibly allege that Harvard breached the implied covenant by crafting a new policy "just for Plaintiff."  As an initial matter, Harvard cannot have breached the implied covenant by taking an action expressly authorized under the contract at issue.  *See Pollalis*, 2018 WL 7199754, at *9.  Here, the Appointment Letter states that Plaintiff's appointment was subject to policies that HBS could "amend[] from time to time."  Doc. No. 6-10 at 2.  Further, the Complaint affirmatively admits that the Interim Policy and Procedures are modeled on the federal ORI Regulations—foreclosing any reasonable inference that they were designed just for Plaintiff. *See, e.g.*, ¶ 83.

Nor was the adoption of the Interim Policy and Procedures in any way prejudicial to Plaintiff, as a matter of law.  The 2013 Policy states that the dean must determine procedures that are thorough, fair, and objective, depending on the type and seriousness of the alleged misconduct

---

[9] Plaintiff also alleges that Harvard breached the implied covenant by imposing "overly harsh and punitive sanctions," ¶ 350, but all such sanctions were authorized by the plain language of the Interim Policy and Procedures, and therefore cannot sustain an implied covenant claim.  *See* Doc. No. 6-2 at 11; *Pollalis v. Harvard Univ., et al.*, No. 1681-cv-30985, 2018 WL 7199754, at *9 (Mass. Sup. Ct. Apr. 24, 2018), *aff'd*, No. 18-P-362, 2019 WL 1261472 (Mass. App. Ct. Mar. 18, 2019) (unpublished).

and authorizes the dean to "take whatever action he or she believes justified." ¶ 289. The Interim Policy and Procedures similarly mandate a fair process, but also establish detailed procedures designed to be *beneficial to and protective* of those whose work is under investigation.[10] Indeed, the Complaint admits that the 2013 Policy "is similar to the Interim Policy [and Procedures]," ¶ 285, but the latter policy requires specific procedural safeguards for assuring fairness. Given this, any differences in the policies that Plaintiff highlights do not support an inference of bad faith.

### B.    Alleged Bad-Faith Investigation

Even if it applied here, the implied covenant of good faith and fair dealing does not authorize this Court to edit Harvard's policies and procedures or to second-guess its conclusions regarding the allegations against Plaintiff. Although it is true that, in the context of university disciplinary proceedings, the implied covenant imposes "an independent duty to provide basic fairness," *Doe v. Trs. of Boston Coll.*, 892 F.3d 67, 87 (1st Cir. 2018), when the policy at issue expressly promises procedures guaranteeing no less than basic fairness, the implied covenant is "rendered superfluous" and the court's analysis focuses on compliance with the expressly promised process. *Farzinpour v. Berklee Coll. Of Music*, 516 F. Supp. 3d 33, 43 (D. Mass. 2021). Here, both the 2013 Policy and the Interim Policy and Procedures expressly provide for fair proceedings. *See, e.g.*, Doc. No. 6-1 at 2 ("It is important that whatever process the Dean determines to be appropriate is thorough, fair, and objective . . . ."); Doc. No. 6-2 at 2 ("Throughout the research misconduct process . . . all participants shall bear in mind the importance . . . of thoroughness, fairness, and objectivity."). And Plaintiff received fair

---

[10] For example, the Interim Policy and Procedures require a preliminary assessment of any allegations *and* an inquiry phase before determining whether an investigation is warranted, Doc. No. 6-2 at 4-7; prohibit individuals with conflicts of interest from reviewing the allegations or conducting the proceedings, *id.* at 5-6, 8-9; require a detailed statement of investigation findings that address the respondent's arguments, *id.* at 10; and entitle the respondent to numerous opportunities to participate in the inquiry and investigation process through interviews and written comments on the draft inquiry and investigation reports, *id.* at 7, 9-10.

proceedings:  as the Final Report confirms, a formal investigation was initiated only after the completion of both a preliminary assessment and initial inquiry (Ex. 5 at 3-4), Plaintiff was promptly notified of the inquiry and initiation of the investigation (*id.*), and Plaintiff was afforded ample opportunity to participate, including by responding to the allegations brought against her in person (*e.g.*, *id.* at 208-248, 664-714) and in writing (*e.g.*, *id.* at 249-255, 649-663, 715-720, 1023-1059).  None of the Complaint's allegations support a reasonable inference to the contrary.

*First*, Plaintiff asserts that Harvard was required under the Interim Policy and Procedures to "prove . . . *specific intent* for each allegation of research misconduct."  ¶ 21.  This reading of the policy is manifestly incorrect:  The Interim Policy and Procedures require only a finding that misconduct was undertaken "intentionally, knowingly, or recklessly," which is precisely what the Committee found in Plaintiff's case.  ¶ 135; Ex. 5 at 1 (finding that Plaintiff committed research misconduct "*intentionally, knowingly, or recklessly*, *with regard to all five allegations examined herein*").[11]

*Second*, Plaintiff asserts that Harvard improperly found "[Plaintiff] guilty of misconduct because she had not *disproved* the allegations against her."  *Id.* ¶ 135 (emphasis in original).  But this claim confuses the Committee's burden—a finding of misconduct by a preponderance of the evidence—with Plaintiff's entirely distinct burden to prove any affirmative defenses by a preponderance of the evidence.  As the Final Report confirms, the Committee found Plaintiff's culpability (under the "intentional, knowing or reckless" standard) by a preponderance of the evidence.  Ex. 5 at 1.  It was then Plaintiff's burden to establish any affirmative defenses—of which

---

[11] Indeed, the federal Office of Research Integrity itself does not require a finding of "specific intent."  *See ORI, U.S. Dep't of Health and Hum. Servs. v. Rakesh Srivastava*, No. C-15-3830, 2018 HHSDAB LEXIS 624, at *35 (Sept. 5, 2018) (it is sufficient to "find that Respondent either intentionally or knowingly" engaged in misconduct, where no recklessness was charged); Findings of Research Misconduct, 88 Fed. Reg. 22461 (Apr. 13, 2023) ("ORI found that Respondent engaged in research misconduct by knowingly, intentionally or recklessly falsifying and/or fabricating data . . . .").

"honest error" is one—by a preponderance of the evidence.  Doc. No. 6-2 at 3 ("A respondent has the burden of proving, by a preponderance of the evidence, any and all affirmative defenses raised (such as honest error)."); *see also Bois v. United States HHS*, No. 11-1563, 2012 WL 13042904, at *14 & n.9 (D.D.C. Mar. 2, 2012) (under ORI Regulations, "honest error is an affirmative defense, for which *Respondent* bears the burden . . . of proving by a preponderance of evidence") (emphasis in original).  Plaintiff failed to establish any affirmative defense by a preponderance of the evidence (Ex. 5 at 649-720), and her Complaint fails even to allege that she met this standard.  Plaintiff cannot flip this burden of proof to support an inference of bad faith.

*Third*, Plaintiff asserts that Harvard unfairly considered allegations relating to three of the four Papers because they supposedly were time-barred under the Interim Policy and Procedures.  ¶¶ 98-99.  However, as the Interim Policy and Procedures state (and the Complaint affirmatively admits), that time-bar *does not apply* where "respondent has continued or renewed an incident of alleged research misconduct through the citation, republication, or other use . . . of the research record in question."  *Id.* ¶ 98 (quoting Doc. No. 6-2 at 2).  Plaintiff does not allege that she never cited, republished, or otherwise used the Papers in the last six years, and indeed publicly available examples of her having done so abound.  Exs. 2-4.[12]  Nor did Plaintiff argue the time-bar issue to the Committee.  Ex. 5 at 252-55.

*Finally*, Plaintiff's hodgepodge of remaining gripes about the Committee's process and conclusions are equally meritless.  For example, she asserts that the Committee "ignored exculpatory evidence" and failed "to consider or give credence to credible witness testimony," ¶ 11, but nothing in the hundreds of paragraphs of her Complaint offers any well-pled facts in

---

[12] The Court may consider these articles for the limited purpose of ascertaining whether Plaintiff made subsequent use of the Papers, as this issue is central to Plaintiff's claims and the authenticity of these articles cannot be disputed. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993); *see also Piper v. Talbots, Inc.*, 507 F. Supp. 3d 339, 343 (D. Mass. 2020) (taking judicial notice of publicly available website printouts).

support of this assertion, such as the identities of these supposedly ignored witnesses or the supposedly exculpatory substance of such testimony.  Indeed, the Final Report confirms that the Committee did consider, exceedingly carefully, the arguments and evidence she presented.  Ex. 5 at 10-16.  She also asserts that HBS failed to provide her with timely notice of the allegations, ¶ 82, yet the documents incorporated into the Complaint demonstrate that she appropriately received notice at the beginning of HBS' formal inquiry process.  *See* Doc. No. 6-2 at 3; Ex. 5 at 4.  Because Plaintiff fails to plausibly allege any actions by Harvard that contradict the express promises of fairness in the Interim Policy and Procedures, her claim fails.  *See Pollalis*, 2019 WL 1261472, at *3.

### III. PLAINTIFF FAILS TO STATE A CLAIM FOR ESTOPPEL BECAUSE GENERALIZED REPRESENTATIONS REGARDING NON-DISCRIMINATION AND FAIRNESS IN EMPLOYMENT CANNOT SUPPORT SUCH A CLAIM (COUNT FOUR)

Plaintiff's estoppel claim fares no better.  Plaintiff premises this claim on her supposed "reasonable expectations based on Harvard's various policies and procedures" that Harvard "would not deny Plaintiff basic fairness in its disciplinary proceedings."  ¶¶ 353, 356.  But Plaintiff also alleges breach of contract based on these same "policies and procedures," ¶ 343, and "recovery under a[n estoppel] theory is not available where there is a written contract governing the same subject matter."  *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 612 (D. Mass. 2016). Plaintiff cannot have it both ways: if the policies are contractual, as Plaintiff elsewhere alleges, they plainly govern the fairness of her disciplinary proceedings and Plaintiff's estoppel claim is barred.  *See, e.g.*, *Sonoiki v. Harvard Univ.*, 37 F.4th 691, 716-17 (1st Cir. 2022).

Even if Harvard's policies are non-contractual, Count Four would still fail.  The vague promises Plaintiff cites—that "Harvard would not tolerate, and Plaintiff would not suffer, discrimination, and would not deny Plaintiff basic fairness in its disciplinary proceedings,"

¶ 356—cannot form the basis of a promissory estoppel claim because they are not sufficiently "definite and certain."  *Rodden v. Savin Hill Enters.*, No. 15-03194-C, 2016 WL 1688688, at *3 (Mass. Sup. Ct. Apr. 21, 2016).  Courts applying Massachusetts law have consistently dismissed estoppel claims based on similar supposed promises for precisely this reason.  *See Egan v. Tenet Health Care*, 193 F. Supp. 3d 73, 86 (D. Mass. 2016) (dismissing estoppel claim based on alleged employer promises to treat employee fairly and follow employer policies); *Ciccone v. City of Newton Police Dep't*, No. 054456A, 2009 WL 4282087, at *1 (Mass. Sup. Ct. Nov. 5, 2009) (dismissing estoppel claim based on promises to treat officer "fairly and equitably" in reinstatement proceedings).  Indeed, allowing a claim such as this to proceed would turn essentially every statutory employment discrimination case into a common law estoppel case, through an allegation that a defendant employer violated its own equal employment opportunity policies.  Such a result would sidestep Title VII and Massachusetts Chapter 151B precedent and administrative process, and Plaintiff can cite no precedent supporting such a departure.

## IV.     PLAINTIFF FAILS TO STATE A CLAIM FOR DEFAMATION BECAUSE THE ALLEGED STATEMENTS WERE NOT DEFAMATORY AND THERE IS NO PLAUSIBLE ALLEGATION SUPPORTING ACTUAL MALICE (COUNTS FIVE AND SIX)

The Complaint asserts that Harvard defamed Plaintiff simply by: (i) sending out Retraction Notices, *see* ¶¶ 360-69; and (ii) making statements conveying that she was placed on administrative leave, *see* ¶¶ 370-79.  Both claims fail as a matter of law.

To proceed on her defamation claims, Plaintiff must plead that: (i) Harvard made defamatory statements about Plaintiff; (ii) to at least one other person; and (iii) the statements were false.  *Fiorillo v. Winiker*, 85 F. Supp. 3d 565, 576 (D. Mass. 2015).  Under Massachusetts law, "the tort of defamation is subject to a stricter pleading standard than other claims, requiring plaintiffs to plead the elements of their claims with specificity in order to survive a motion to

dismiss." *Id.*; *see also Mullane v. Breaking Media, Inc.,* 433 F. Supp. 3d 102, 110 (D. Mass. 2020) ("[S]ummary disposition of defamation claims is especially favored in Massachusetts because meritless cases put an unjustified and serious damper on freedom of expression and the costs of litigation may induce an unnecessary and undesirable self-censorship.").

Further, because the Complaint itself alleges Plaintiff to be a public figure with respect to her research career, Plaintiff must plausibly allege actual malice. *See* ¶¶ 2, 39-41 (alleging that Plaintiff is an "internationally renowned behavioral scientist, author, and teacher" who "has been invited to speak at some of the most prestigious colleges and universities in the world," and her "work has been covered in numerous media outlets"); *see also Lemelson v. Bloomberg LP*, 253 F. Supp. 3d 333, 340 (D. Mass. 2017) (plaintiff was public figure where, among other reasons, he alleged he was a "world-renowned" expert); *Martin v. Roy*, 767 N.E.2d 603, 606 (Mass. App. Ct. 2002) (tenured professor was public figure where his public lectures and writings attracted national attention). Actual malice requires that the defendant "either knew that [their] statements were false or had serious doubts about their truth and dove recklessly ahead anyway." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012). The Complaint appears to implicitly accept that the "actual malice" standard applies. *See, e.g.*, ¶¶ 202, 366, 376.

## A.    Retraction Notices

Count V must be dismissed because Plaintiff fails to allege that the statements in the Retraction Notices were false or otherwise actionable, or that they were made with actual malice.

*First,* the statements in the Retraction Notices are either true or non-actionable opinion. The Complaint admits that HBS investigated the data underlying the Papers, and thus the statement that HBS "reviewed concerns about certain data previously published by Dr. Francesca Gino" (*e.g.*, Doc. No. 6-3) is true as a matter of law. And the statement that HBS "believe[s]" that the papers "are invalid due to alteration[s] of the data that affects the significance of the findings"

(*e.g.*, *id.*) merely "amounts to [Harvard's] own personal conclusions about the information presented." *Salmon v. Lang*, 57 F.4th 296, 323 (1st Cir. 2022). Any reasonable reader would make such an interpretation, particularly because Harvard supported this belief with its analysis. *See, e.g.*, *Saad v. Am. Diabetes Assoc.*, 123 F. Supp. 3d 175, 178 (D. Mass. 2015) ("expression of concern" appended to articles Plaintiff authored was not actionable where it "clearly disclose[d] the basis for the concerns" and described the findings of defendant's investigation).

*Second*, Plaintiff fails to plausibly allege that any statements in the Retraction Notices were made with actual malice. Plaintiff has alleged nothing to suggest that Harvard "either knew that its statements were false or had serious doubts about their truth and dove recklessly ahead anyway." *Schatz*, 669 F.3d at 58. Rather, Plaintiff asserts that Harvard omitted that it: (i) "never established that Professor Gino was even the person *responsible* for perceived anomalies" and (ii) "*never proved* that Professor Gino had *any intent* to fabricate or falsify data." ¶ 203 (emphasis in original). But the omission of details from otherwise non-actionable statements does not give rise to a defamation claim. *Revil v. Coleman*, 54 N.E.3d 608, at *1 (Mass. App. Ct. 2016) ("We have found no Massachusetts authority recognizing a cause of action for defamation by failure to provide factual context to an otherwise truthful statement."). Further, the Complaint's insinuations simply are not true, as the plain language of the Final Report confirms. *See* Ex. 5 at 1; *see also Croce v. Sanders*, 843 F. App'x 710, 713 (6th Cir. 2021) (affirming dismissal of professor's defamation claim where allegations of his lab's research misconduct were investigated and found to be substantially true).[13]

---

[13] Nor has Plaintiff sufficiently alleged that the Retraction Notices contained the kind of harmful statements considered defamatory under Massachusetts law. *See Ravnikar v. Bogojavlensky*, 782 N.E.2d 508, 510-11 (Mass. 2003). The Retraction Notices *did not* state that Harvard found that Plaintiff had committed research misconduct, nor did they mention an investigation into Plaintiff. Plaintiff cannot claim defamation from hypothetical inferences a reasonable reader would not make based on the Retraction Notices' context and content. *See Foley v. Lowell Sun. Pub. Co.*, 533 N.E.2d 196, 197 (Mass. 1989).

Moreover, even if Plaintiff plausibly alleged that the Retraction Notices were defamatory (she has not), Harvard, as Plaintiff's employer, had a conditional privilege to disclose them. *Ligotti v. Daly XXL Comms., Inc.*, No. 16-11522, 2018 WL 1586340, at *5 (D. Mass. Mar. 26, 2018). As a preeminent research university, Harvard unquestionably has a legitimate interest in correcting the scientific record in accordance with its conclusions regarding its own employee's misconduct. *See Tynecki v. Tufts Univ. Sch. of Dental Med.*, 875 F. Supp. 26, 35 (D. Mass. 1994) (Tufts University had legitimate interest in discussing disciplinary proceeding to preserve ideals of "integrity" and "ethical practices," among others).

### B.     Administrative Leave Status

Plaintiff's second defamation claim against Harvard is similarly meritless. This claim is premised solely on Harvard's publication of the text "(ADMINISTRATIVE LEAVE)" next to her title on her HBS faculty page. ¶ 371. But the Complaint repeatedly admits that Plaintiff in fact was placed on administrative leave. *E.g.*, ¶¶ 12, 179. This straightforwardly bars her claim. *See Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 226-27 (D. Mass. 2017) (dismissing defamation claim premised on accurate campus-wide email stating that student was expelled after being found to have committed sexual assault).

### V.     PLAINTIFF FAILS TO STATE A CLAIM FOR CONSPIRACY FOR THE SAME REASONS THE DEFAMATION COUNTS FAIL (COUNT NINE)

Plaintiff's conspiracy claim is predicated on her threadbare allegations that Harvard and Data Colada conspired to defame her with allegations of "research misconduct" and "data fraud." ¶ 405. It therefore fails for the same reasons as her underlying defamation claims. *Mullane*, 433 F. Supp. 3d at 115 (granting motion to dismiss civil conspiracy claim where underlying defamation claim also failed); *see also supra* Part IV.

17

## VI.   PLAINTIFF FAILS TO STATE A CLAIM FOR INTENTIONAL INTERFERENCE WITH ADVANTAGEOUS RELATIONS BECAUSE HER VAGUE AND CONCLUSORY ALLEGATIONS DO NOT SUGGEST ACTUAL MALICE (COUNT ELEVEN)

The Complaint next asserts that Harvard "maliciously interfered with Plaintiff's present and future economic interests by breaching its duties of confidentiality and spreading false and defamatory information concerning Plaintiff that disparaged her professional reputation." ¶ 430. Because this claim is premised entirely on Plaintiff's insufficient allegations of defamation, it should be dismissed for that reason alone. *See CrossFit, Inc. v. Mustapha*, No. 13-11498-FDS, 2014 WL 949609, at *3 (D. Mass. Mar. 10, 2014).

Even setting aside that fatal defect, courts in this district have held that, where an employee alleges intentional interference against her employer, she must plausibly allege "actual malice," which in this context "must rise to the level of personal hostility or ill-will." *Cohen v. Trs. of Tufts Univ.*, No. 064016, 2007 WL 1302591, at *3 (Mass. Sup. Ct. Apr. 12, 2007). But Plaintiff's boilerplate assertion in this regard—that Harvard "maliciously interfered" with Plaintiff's interests—does not suffice, particularly where Harvard had obvious and legitimate interests in taking the alleged actions. *See Kelleher v. Lowell Gen. Hosp.*, 152 N.E.3d 126, 133 (Mass. App. Ct. 2020) (dismissing claim where employee failed to allege a malignant purpose "unrelated to any corporate interest"). Accordingly, Plaintiff's claim fails in its entirety.

Plaintiff's claim is additionally defective for reasons distinct to each of the supposed "economic and contractual relationships" identified in the Complaint. ¶ 429.

Harvard Business Publishing. Plaintiff asserts that Harvard interfered with her relationship with the Harvard Business Review by directing it not to publish her work. ¶¶ 317-18. But Plaintiff affirmatively admits that the Harvard Business Review is published by Harvard Business Publishing, a "wholly owned subsidiary of Harvard University." ¶¶ 313-14. Because Harvard

"cannot be liable for tortious interference with its own relationship with the plaintiff," this claim fails. *DePasquale v. Ogden Suffolk Downs, Inc.*, 564 N.E.2d 584, 586 (Mass. 1990).

Portfolio. Plaintiff's claim with respect to her book publisher Portfolio fails because she does not even allege any underlying breach or breaking of the relationship. In fact, the Complaint affirmatively alleges that Plaintiff's book is still going to be published, and does not allege that the publisher's delay breached her contract. ¶¶ 319-21; *see Larson v. Perry*, No. 19-cv-10203-IT, 2020 WL 1495883, at *8 (D. Mass. Mar. 27, 2020) (no interference claim based on plagiarism allegations where publisher contract was not breached).

"Other Businesses and Entities". Finally, although Plaintiff asserts that Harvard "had knowledge" of her supposed relationships with "other businesses and entities," the Complaint fails even to identify such "businesses and entities," let alone offer anything to support a reasonable inference that Harvard knew of those relationships. *See Evans v. Boston Red Sox*, No. 13-13259-GAO, 2014 WL 4966081, at *5 (D. Mass. Sept. 30, 2014).

## VII.   PLAINTIFF FAILS TO STATE A CLAIM FOR INVASION OF PRIVACY, M.G.L. C. 214, § 1B BECAUSE NO PRIVATE INFORMATION WAS DISCLOSED (COUNT TWELVE)

Plaintiff's invasion of privacy claim fails because Plaintiff fails to allege the "dissemination of facts of a private nature" that "resulted in an unreasonable, substantial or serious interference with [her] privacy." *Branyan v. Southwest Airlines Co.*, 105 F. Supp. 3d 120, 126 (D. Mass. 2015). Plaintiff's claim focuses exclusively on her allegation that Harvard updated Plaintiff's faculty webpage to reflect the fact that she is on administrative leave. *See* ¶¶ 196, 434-39. But Plaintiff's employment status plainly is not the type of "highly personal or intimate" information required to form the predicate for an invasion of privacy claim. *See Oberg v. City of Taunton*, 972 F. Supp. 2d 174, 207-08 (D. Mass. 2013) ("Where the invasion takes place in the context of employment, the information at issue must be of a 'highly personal or intimate nature . . . .'"); *French v. United*

*Parcel Serv., Inc.*, 2 F. Supp. 2d 128, 132 (D. Mass. 1998) (dismissing invasion of privacy claim predicated on putting employee on involuntary leave).[14]  HBS professors such as Plaintiff are regularly required to interact with students, faculty, and the public on behalf of HBS—their employment status cannot be a "fact[] of a private nature." *Branyan*, 105 F. Supp. 3d at 126.

Moreover, given that the Complaint affirmatively alleges Plaintiff to be a public figure, *see supra* Part IV, Plaintiff's claim fails because her administrative leave status, and underlying research misconduct allegations, are matters of public concern.  *See Peckham v. Boston Herald, Inc.*, 719 N.E.2d 888, 892-94 (Mass. 1999) (no invasion of privacy claim based on disclosure of public figure's lawsuit because it was "newsworthy" and of "legitimate public concern").

## CONCLUSION

For the foregoing reasons, counts 2-6, 9, and 11-12 should be dismissed with prejudice.

Dated: October 10, 2023                          Respectfully submitted,


                                                 /s/ Douglas E. Brayley
                                                 Douglas E. Brayley (BBO# 674478)
                                                 Jenny K. Cooper (BBO# 646860)
                                                 Ropes & Gray LLP
                                                 800 Boylston Street
                                                 Boston, MA 02199-3600
                                                 Tel: (617) 951-7000
                                                 Douglas.Brayley@ropesgray.com
                                                 Jenny.Cooper@ropesgray.com

                                                 *Counsel for Defendants President and*
                                                 *Fellows of Harvard College and Srikant*
                                                 *Datar*

---

[14] Even if Plaintiff's leave status did constitute a private fact, "[l]egitimate business reasons for the reasonable collection or dissemination of private employee information are not actionable under the statute." *Branyan*, 105 F. Supp. 3d at 126.  The Complaint fails to offer anything to undermine the bevy of obvious legitimate business reasons that a school has in informing its students, faculty, and the public that one of its faculty members is on leave.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 10, 2023, this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated: October 10, 2023

*/s/ Douglas E. Brayley*
Douglas E. Brayley