UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FRANCESCA GINO,

             *Plaintiff,*

        v.

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE, SRIKANT
DATAR, URI SIMONSOHN, LEIF
NELSON, JOSEPH SIMMONS, JOHN
DOES 1-10, AND JANE DOES 1-10,

             *Defendants.*

Civil Action No. 1:23-cv-11775-MJJ

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

NESENOFF & MILTENBERG, LLP
*Attorneys for Plaintiff Francesca Gino*
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500

101 Federal Street, 19th Floor
Boston, Massachusetts 02110
(617) 209-2188

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

FACTS .......................................................................................................................... 1

STANDARD OF REVIEW ............................................................................................ 4

ARGUMENT ................................................................................................................ 4

  I.   PLAINTIFF HAS SUFFICIENTLY ALLEGED A BREACH OF CONTRACT CLAIM.. 4

  II.  PLAINTIFF HAS SUFFICIENTLY ALLEGED A CLAIM FOR BREACH OF THE
IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING ........................................ 6

    A.  Defendants' Bad Faith Adoption of the Interim Policy .................................... 6

    B.  Defendants' Bad Faith Investigation ............................................................. 8

    C.  Defendants' Breach of Plaintiff's Confidentiality Is Not a "Gripe" ............................... 11

  III.  PLAINTIFF HAS SUFFICIENTLY ALLEGED A CLAIM FOR ESTOPPEL ............... 13

  IV.  PLAINTIFF HAS SUFFICIENTLY ALLEGED A CLAIM FOR DEFAMATION ......... 13

    A.  Retraction Notices ...................................................................................... 14

    B.  Announcement of Plaintiff's Administrative Leave ....................................... 18

  V.  PLAINTIFF'S CLAIM FOR CONSPIRACY SHOULD NOT BE DISMISSED ............ 18

  VI.  PLAINTIFF'S CLAIM FOR INTENTIONAL INTERFERENCE WITH
ADVANTAGEOUS RELATIONS SHOULD NOT BE DISMISSED. ................................... 19

  VII.  PLAINTIFF'S CLAIM FOR INVASION OF PRIVACY SHOULD NOT BE
DISMISSED. ............................................................................................................... 20

CONCLUSION ............................................................................................................ 20

REQUEST FOR ORAL ARGUMENT ........................................................................ 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alharbi v. Beck,*
   62 F. Supp. 3d 202 (D. Mass. 2014) ................................................................................ 10

*Alston v. Spiegel,*
   988 F.3d 564 (1st Cir. 2021) ........................................................................................... 4

*Anthony's Pier Four, Inc. v. HBC Assocs.,*
   411 Mass. 451, 583 N.E.2d 806 (1991) ........................................................................... 6

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ....................................................................................................... 4

*Atlas Glass & Mirror, Inc. v. Tri-N. Builders, Inc.,*
   997 F.3d 367 (1st Cir. 2021) .......................................................................................... 1

*Ayash v. Dana-Farber Cancer Inst.,*
   822 N.E.2d 667 (2005) ........................................................................................ 6, 7, 8, 9

*Barry v. Trustees of Emmanuel Coll.,*
   No. 16-CV-12473-IT, 2019 WL 499774 (D. Mass. Feb. 8, 2019) .................................... 5

*Beitzell v. Jeffrey,*
   643 F.2d 870 (1st Cir. 1981) ....................................................................................... 4, 5

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ....................................................................................................... 4

*Blackstone v. Cashman,*
   448 Mass. 255, 860 N.E.2d 7, 18 (2007) ...................................................................... 19

*Branyan v. Sw. Airlines Co.,*
   105 F. Supp. 3d 120 (D. Mass. 2015) ........................................................................... 20

*Bratt v. Int'l Bus. Machines Corp.,*
   467 N.E.2d 126 (1984) ................................................................................................. 18

*Britton v. Athenahealth, Inc.,*
   No. MICV201202457, 2013 WL 2181654 (Mass. Super. May 3, 2013) ........................... 6

*Charles River Data Sys., Inc. v. Oracle Complex Sys. Corp.,*
   788 F. Supp. 54 (D. Mass. 1991) .................................................................................. 19

*Chedid v. Children's Hosp.,*
   No. 09-0981, 2011 WL 2477235 (Mass. Super. May 20, 2011) ....................................... 8

*Cohen v. Trustees of Tufts Univ.,*
   No. 064016, 2007 WL 1302591 (Mass. Super. Apr. 12, 2007) ...................................... 19

*Comeau v. Town of Webster, Mass.,*
   881 F. Supp. 2d 177 (D. Mass. 2012) ........................................................................... 19

*Conte v. Bank of Am., N.A.,*
   52 F. Supp. 3d 265 (D. Mass. 2014) ............................................................................. 13

*DePasquale v. Ogden Suffolk Downs, Inc.,*
   564 N.E.2d 584 (1990) ................................................................................................. 19

*Doe v. Harvard Univ.,*
   462 F. Supp. 3d 51 (D. Mass. 2020) ............................................................................... 9

*Dorn v. Astra USA,*
   975 F. Supp. 388 (D.Mass.1997)...................................................................... 14

*Dragonas v. Sch. Comm. of Melrose,*
   833 N.E.2d 679 (2005) ...................................................................................... 18

*Eigerman v. Putnam Investments, Inc.,*
   450 Mass 281 (2007)........................................................................................... 8

*Evans v. Bos. Red Sox,*
   No. CIV.A. 13-13259-GAO, 2014 WL 4966081 (D. Mass. Sept. 30, 2014) ........... 19

*Farzinpour v. Berklee Coll. of Music,*
   516 F. Supp. 3d 33 (D. Mass. 2021).................................................................... 9

*Foley v. Polaroid Corp.,*
   508 N.E.2d 72 (1986) ........................................................................................ 18

*Fortune v. Nat'l Cash Reg. Co.,*
   364 N.E.2d 1251 (1977).................................................................................... 9

*French v. United Parcel Serv., Inc.,*
   2 F. Supp. 2d 128 (D. Mass. 1998)................................................................... 20

*Gertz v. Robert Welch, Inc.,*
   418 U.S. 323 (1974) .......................................................................................... 13

*Haglund v. Estee Lauder Companies, Inc.,*
   466 F. Supp. 3d 292 (D. Mass. 2020)................................................................. 6

*Hutchinson v. Proxmire,*
   443 U.S. 111 (1979) .......................................................................................... 13

*Kelleher v. Lowell Gen. Hosp.,*
   152 N.E.3d 126 (2020) ..................................................................................... 19

*Larson v. Perry,*
   No. 19-CV-10203-IT, 2020 WL 1495883 (D. Mass. Mar. 27, 2020)................ 14, 19

*Lass v. Bank of Am.,*
   N.A., 695 F.3d 129 (1st Cir. 2012).................................................................... 5

*Lee v. Howard Hughes Medical Inst.,*
   457 F. Supp. 3d 9 (D. Mass 2020)..................................................................... 6

*Linn v. Andover-Newton Theological Sch.,*
   638 F. Supp. 1114 (D. Mass. 1986) ............................................................... 4, 5

*Lluberes v. Uncommon Prods., LLC,*
   663 F.3d 6 (1st Cir. 2011)................................................................................. 14

*Loranger Constr. Corp. v. E.F. Hauserman Co.,*
   6 Mass. App. Ct. 152 (1978) ............................................................................ 13

*Mandel v. Bos. Phoenix, Inc.,*
   456 F.3d 198 (1st Cir. 2006)........................................................................ 13, 14

*McLaughlin v. J-PAC, LLC,*
   No. 10-2594-BLS1, 2011 WL 1758945 (Mass. Super. Apr. 14, 2011) ................ 19

*McNeill v. New England Sch. of Law,*
   No. 940091, 1994 WL 879640 (Mass. Super. July 12, 1994) ............................. 4

iii

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1, 19 & n. 7 (1990) ............................................................................. 16
*Mullane v. Breaking Media, Inc.*,
    433 F. Supp. 3d 102 (D. Mass. 2020) ......................................................... 16, 18
*Neuhoff v. Marvin Lumber & Cedar Co.*,
    370 F.3d 197 (1st Cir. 2004) ............................................................................. 13
*New York Times v. Sullivan*,
    376 U.S. 254 (1964) .......................................................................................... 18
*Noonan v. Staples, Inc.*,
    556 F.3d 20 (1st Cir. 2009) ............................................................................... 18
*Powderly v. MetraByte Corp.*,
    866 F. Supp. 39 (D. Mass. 1994) ...................................................................... 19
*Ravnikar v. Bogojavlensky*,
    782 N.E.2d 508 (2003) ...................................................................................... 17
*Reilly v. Associated Press*,
    797 N.E.2d 1204 (2003) .................................................................................... 16
*Sharratt v. Hous. Innovations, Inc.*,
    365 Mass. 310 N.E.2d 343 (1974) .................................................................... 17
*Sonoiki v. Harvard Univ.*,
    37 F.4th 691 (1st Cir. 2022) ............................................................................ 5, 9
*Sterman v. Brown Univ.*,
    513 F. Supp. 3d 243 (D.R.I. 2021) .................................................................... 13
*Sullivan v. W. New England Univ.*,
    No. 3:19-CV-30063-LTS, 2019 WL 13395618 (D. Mass. Nov. 22, 2019) ........... 4, 5
*Williams v. B & K Med. Sys., Inc.*,
    732 N.E.2d 300 (2000) ........................................................................................ 9

**INTRODUCTION**

Plaintiff Francesca Gino ("Plaintiff") respectfully submits this Memorandum of Law in Opposition to Defendants' President and Fellows of Harvard College ("Harvard") and Srikant Datar ("Dean Datar"), (together, "Defendants"), Motion to Dismiss Plaintiff's Amended Complaint (the "Motion").[1] As Plaintiff has plausibly alleged entitlement to relief on all her claims, Defendants' Motion should be denied in its entirety.

**FACTS**[2]

Plaintiff is a behavioral scientist, an award-winning researcher, author, and tenured professor at Harvard Business School ("HBS"). (Doc. No. 6 at ¶¶ 36-38, 40, 51, 55, 57). When Defendant Harvard recruited Plaintiff to work as an Associate professor at HBS in 2010, Plaintiff gave up multiple tenure track positions at other universities to accept a position at Harvard. (*Id.* at ¶¶ 47, 49). Plaintiff began her employment with Harvard on July 1, 2010 as an Associate Professor and was appointed to a position as a full professor with tenure on July 1, 2014. (*Id.* ¶ 57).

Under Harvard's practices, policies, and procedures, tenure confers a lifetime appointment.  (*Id.* at ¶¶ 56-60). The terms of Plaintiff's 2014 appointment letter state that her appointment as a tenured professor were "subject to such terms, conditions, and policies as are stipulated by the Faculty of Business Administration, and to the Third Statute of the University ["Third Statute"]." (*Id.* ¶ 57; Doc. No. 6-10). Plaintiff's appointment letter, read in conjunction with the Third Statute and the Tenure Policy, indicate that her appointment was "without express limitation of time" and "subject to removal only for grave misconduct or neglect of duty." (*See id.* ¶¶ 59-60; Doc. No. 6-10). Harvard's Discipline Policy, which was adopted in 1971 and is incorporated by reference in Plaintiff's appointment letter, sets forth the procedures

---

[1] Defendants primarily rely on extrinsic documents, including a so-called "final report" prepared by Defendants. (*See* Doc. No. 19). However, at this stage of the litigation, when the Court is tasked with determining the viability of Plaintiff's Amended Complaint, Defendants' emphasis on evidence is misplaced. *See Atlas Glass & Mirror, Inc. v. Tri-N. Builders, Inc.*, 997 F.3d 367, 372 (1st Cir. 2021).

[2] A full recitation of the facts can be found in the Second Amended Complaint. (Doc. No. 6.)

applicable "to the discipline" of tenured faculty in cases of "grave misconduct or neglect of duty arising under the Third Statute." (Doc. No. 6 at ¶¶ 61-65; Doc. No. 6-12).

In July 2021, a trio of male professors and behavioral scientists who have a blog named "Data Colada" (and who are collectively referred to herein as "Data Colada") and who have previously targeted the work of prominent female academics, approached Defendants with false allegations concerning perceived anomalies in the data of four studies co-authored by Plaintiff. (*Id.* at ¶ 67). Without any evidence that Plaintiff was responsible for the perceived anomalies or "data fraud," Data Colada accused Plaintiff of falsifying and/or fabricating data. (*Id.* ¶¶ 67, 232). In exchange for Data Colada's agreement to refrain from making public accusations about Plaintiff that would, by extension, subject HBS to public scrutiny, Defendants agreed to create a new employment policy to investigate and evaluate Data Colada's allegations against Plaintiff. (*Id.* at 70). Defendants further agreed that, after they concluded the investigation, they would disclose the results to Data Colada, who would then be free to publicly disparage Plaintiff's work and professional reputation on its blog. (*Id.* ¶¶ 70, 233).

Abandoning their existing Research Integrity Policy (the "2013 Policy") (*see* Doc. No. 6-1) and Faculty Review Board ("FRB") process—which Defendants had only recently used to investigate allegations of research misconduct against a *male* junior professor—Defendants went about crafting a brand-new policy and procedure just for Plaintiff, the so-called "Interim Policy." (*Id.* ¶¶ 76, 78-80, 293-294; *see* Doc. No. 6-2). The Interim Policy that Defendants created for Plaintiff was procedurally more onerous than the existing 2013 Policy (*id.* ¶¶ 287-288).[3] In addition, the Interim Policy, unlike the 2013 Policy, purported to authorize Dean Datar to impose specific disciplinary sanctions against Plaintiff's employment, including "*probation, suspension, leave without pay, salary reduction, or initiation of steps*

---

[3] Although Plaintiff's research did not involve federal funding, Defendants modeled the Interim Policy on federal regulations promulgated by the Secretary of the U.S. Department of Health and Human Services ("HHS"), titled, "Public Health Service Policies on Research Misconduct." (*See* Doc. No. 6 at ¶ 83 and note 2).

*leading to rank reduction or termination of employment,"* and absent the procedural protections afforded tenured faculty under the Discipline Policy. (*Id.* ¶¶ 289-291; *Doc.* 6-2 at 11.)[4]

On October 27, 2021, Plaintiff was informed of the allegations of research misconduct and of HBS's intent to open an "initial inquiry" pursuant to the new Interim Policy. (*Id.* ¶¶ 93-96). The inquiry and investigation process and findings were flawed, inconsistent with the standards set forth in the new Interim Policy and guarantees of basic fairness common to the Interim Policy and the 2013 Policy (*id.* ¶¶ 168-176). On June 13, 2023, Dean Datar informed Plaintiff that he was imposing immediate and severe sanctions on her employment. Plaintiff has consequently suffered: (i) a two-year unpaid administrative leave; (ii) the immediate revocation of her named professorship; and (iii) a complete ban from campus for the duration of her administrative leave, precluding her from teaching, researching, or publishing via HBS platforms. (*Id.* at ¶ 179-180). After announcing the sanctions to her, and Plaintiff began to weep, Dean Datar told her, *"you are a capable, smart woman. I am sure you'll find other opportunities."* (*Id.* at ¶ 182).

On June 13-14, 2023, Defendants also began sending out excessive and defamatory retraction notices to scholarly journals that contained false allegations, express and implied, disparaging Plaintiff's professional reputation (*id.* ¶¶ 202-220), while simultaneously announcing on HBS's public-facing website that Plaintiff had been placed on administrative leave—news that triggered an onslaught of media attention to Plaintiff's purported malfeasance. (*Id.* ¶¶ 196-198). These disclosures, in conjunction with Defendants' multiple other failures to safeguard Plaintiff's confidentiality, have all but destroyed Plaintiff's professional reputation and once thriving career. (*See id.* ¶¶ 200-201, 222, 224, 225-227, 229). Defendants' conduct gives rise to Plaintiff's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, estoppel, defamation, civil conspiracy to commit defamation, intentional interference with advantageous relations, and violation of privacy under Mass. G.L. c. 21, § 1B.[5]

---

[4] The Interim Policy was never vetted by or stipulated to by Plaintiff or the HBS faculty. (*Id.* ¶¶ 79-80).
[5] The Amended Complaint includes a claim for Title IX which Defendants have not moved to dismiss.

## STANDARD OF REVIEW

In deciding a Rule 12(b)(6) motion to dismiss, the court must "take all of the factual allegations in the complaint as true," and all reasonable inferences are drawn in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Alston v. Spiegel*, 988 F.3d 564, 571 (1st Cir. 2021). Assessing whether a complaint's factual allegations plausibly give rise to an entitlement of relief "does not impose a probability requirement at the pleading stage: it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of 'illegal' conduct." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

## ARGUMENT[6]

### I.    PLAINTIFF HAS SUFFICIENTLY ALLEGED A BREACH OF CONTRACT CLAIM

Massachusetts courts have consistently enforced contractual procedures that protect tenured faculty from wrongful dismissal. *See, e.g., Sullivan v. W. New England Univ.*, No. 3:19-CV-30063-LTS, 2019 WL 13395618, at *6 (D. Mass. Nov. 22, 2019) ("courts consistently affirm the strength of tenure protections and require universities to adhere to the procedural protections granted by employment contracts"); *McNeill v. New England Sch. of Law*, No. 940091, 1994 WL 879640, at *4 (Mass. Super. July 12, 1994) (the "main purpose behind any faculty tenure system is, of course, the protection of tenured faculty"); *Linn v. Andover-Newton Theological Sch.*, 638 F. Supp. 1114, 1116 (D. Mass. 1986) (holding that university breached employment contract by disregarding "procedures to be followed in terminating a tenured faculty member"); *see also Beitzell v. Jeffrey*, 643 F.2d 870, 875 (1st Cir. 1981) ("Tenure involves a long-term academic and financial commitment by a university to an individual, providing faculty with unusually secure positions tantamount to life contracts.").

While Massachusetts courts have been "chary" to interfere with a university's *initial* academic decision whether *to award tenure*, that deference presupposes enforceable contractual protections for *tenured* faculty. As this Court has explained:

---

[6] Unless indicated otherwise, internal quotation marks and citations are omitted and emphasis is added.

> When considering university contracts, Massachusetts courts are guided by two fundamental principles.  First, Massachusetts courts employ the standard of reasonable expectation—what meaning the party making the manifestation, the university, should reasonably expect the other party to give it.  As with all contracts, a university's written manifestation must be construed according to its plain meaning.  Second, Massachusetts courts adhere to the principle that courts are chary about interfering with academic and disciplinary decisions made by private colleges and universities. ***Critically, however, this second principle is premised on the existence of strong procedural protections to prevent the wrongful dismissal of a tenured teacher.***

*Sullivan*, 2019 WL 13395618, at *4.[7]

Employing the "standard of reasonable expectation," Plaintiff's appointment letter, along with the Third Statute, the Tenure Policy, and the Discipline Policy, incorporated by reference therein, constitute a binding contact. *See, e.g., Sullivan*, 2019 WL 13395618, at *4; *Linn,* 638 F. Supp. at 1116; *see also Barry v. Trustees of Emmanuel Coll.*, No. 16-CV-12473-IT, 2019 WL 499774, at *6 (D. Mass. Feb. 8, 2019). Tellingly, Defendants do not dispute that when they subjected Plaintiff to a ***two-year unpaid administrative leave***, that disciplinary action was *tantamount to her removal from her tenured appointment*.  (Indeed, Dean Datar's statement to her that she would find *"other opportunities"* indicates Defendants intended and expected that she would resign.)  Nor do Defendants dispute that when they took that adverse action against her employment, *they failed to follow* the procedural protections of the Discipline Policy.

Defendants make two erroneous arguments in response to these undeniable facts. First, they contend that Harvard's policies and procedures "govern the removal of a tenured appointment" and do not govern "any discipline of tenured professors falling short of tenure revocation" (Doc. No. 19 at 14). This argument is patently absurd and is also belied by the *plain language* of the Discipline policy, which states that "[t]he procedures shall apply to *the discipline"* of tenured professors. (*See* Doc. No. 6-12).[8] Second,

---

[7] *See also Beitzell*, 643 F.2d at 875.

[8] Any ambiguities in the contract language, whether "between two contract terms or between multiple documents that comprise one overarching contract," cannot be resolved on a 12(b)(6) motion. *Sonoiki v. Harvard Univ.,* 37 F.4th 691, 704 (1st Cir. 2022); *see, e.g., Lass v. Bank of Am.*, N.A., 695 F.3d 129, 137 (1st Cir. 2012).

Defendants rely on factually inapposite cases involving at will employees to contend that "these policies" (i.e., the Third Statute, the Tenure Policy, and the Discipline policy) "are not contractual in nature." (*See* Doc. 19 at 14) (citing *Haglund v. Estee Lauder Companies, In*c., 466 F. Supp. 3d 292, 299 (D. Mass. 2020); *Lee v. Howard Hughes Medical Inst.,* 457 F. Supp. 3d 9 (D. Mass 2020); *Britton v. Athenahealth, Inc.,* No. MICV201202457, 2013 WL 2181654 (Mass. Super. May 3, 2013)). However, Plaintiff is not an at-will employee, but a tenured professor with a contractual appointment recognized under Massachusetts law.

Given the express terms of Plaintiff's appointment letter, pursuant to which Plaintiff had an objectively reasonable expectation in a lifetime tenured appointment subject to specific procedural protections, and Defendants' failure to afford her these contractual procedural protections when taking adverse action against her employment, the Court should find that Plaintiff has plausibly alleged a breach of contract claim.

## II.   PLAINTIFF HAS SUFFICIENTLY ALLEGED A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Plaintiff's employment contract, like *every contract* in Massachusetts, is subject to an implied covenant of good faith and fair dealing, *see Ayash v. Dana-Farber Cancer Inst.,* 822 N.E.2d 667, 683–84 (2005), which "provides that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 471, 583 N.E.2d 806, 820 (1991).

### A.   Defendants' Bad Faith Adoption of the Interim Policy

Defendants breached the implied covenant of good faith and fair dealing when they abandoned the Harvard Business School's existing 2013 Policy and FRB process and created a new employee policy, specifically for Plaintiff, that purported to *supersede* the terms of her appointment, (*see supra* Part I), by authorizing Dean Datar to take disciplinary action against Plaintiff, up to and including the termination of her employment, without the procedural protections of her contract. (*See* Doc. No. 6, ¶ 350).

Plaintiff's appointment letter states that her appointment "was subject to such terms, conditions,

6

and policies as are stipulated by the Faculty of Business Administration, and to the Third Statute . . . , as these may be amended from time to time." (Doc. No. 6-10.) Defendants disingenuously contend that this language authorized HBS to *unilaterally amend* the applicable policies. (Doc. 19 at 15.) However, the plain language of the Plaintiff's employment contract prohibits Defendants from amending the policies incorporated by reference in Plaintiff's appointment letter unless *"stipulated by"* the faculty of HBS. (*See* Doc. No. 6-10). Defendants failed to even vet the new policy with HBS faculty. (Doc. 6 at ¶¶ 296-297). Contrary to Defendants contentions (*see* Doc. No. 19 at 15), the fact that HBS modeled its new policy on federal regulations does not diminish or excuse their bad faith in creating the Interim Policy *specifically for Plaintiff* when its *purpose and effect* were to *destroy the procedural guarantees of Plaintiff's tenured appointment. See Ayash ,* 822 N.E.2d 667, 683–84 ("the implied covenant exists so that the objectives of the contract may be realized").[9]

Additional facts highlighting Defendants' bad faith in creating the case-specific Interim Policy for Plaintiff include, *inter alia*, that: (i) Defendants had *never previously* created a misconduct policy for just one employee (Doc. No. 6 at ¶ 79); (ii) contrary to Harvard's practice and the terms of Plaintiff's appointment, Defendants created a new policy that was never stipulated to or vetted by HBS faculty (*id.* at ¶ 80); (iii) contrary to Harvard's practice and policies, Defendants kept Plaintiff in the dark of the allegations against her for three months, as they crafted the new Interim Policy (*id.* at ¶¶ 82, 84, 93); and (iv) HBS had only recently used its existing policy, the 2013 Policy, to evaluate allegations against a *male* junior professor accused of research misconduct (*id.* at ¶ 294).

To the extent there were overlapping provisions between the 2013 Research Policy and the Interim Policy, the *stark differences* between the two policies further underscore Defendants' bad faith. First, the

---

[9] Further underscoring Defendants' bad faith in drafting a case-specific policy for Plaintiff are the facts that Plaintiff's research did not implicate federal funds, (*see* Doc No. 6 at 15, n.2; ¶¶ 76-77, 83,190), and that there was therefore *no need* for HBS to create a new research integrity policy modeled on the federal regulations.

Interim Policy was far more procedurally onerous than its existing 2013 Policy (*id.* ¶¶ 287-288). Second, and most significantly, the Interim Policy, unlike the 2013 Policy, purported to authorize Dean Datar to impose *specific sanctions* against Plaintiff that purported to supersede the procedural protections of her appointment, (*see* Doc. No. 6-2 at 10) ("probation, suspension, leave without pay, salary reduction, or initiation of steps leading to rank reduction or termination of employment"). Contrary to Defendants' contentions (*see* Doc. No. 19 at 15-16), the 2013 Policy did *not* authorize termination of a tenured faculty member's employment or her placement on unpaid administrative leave for two years in violation of the terms of her appointment. (*See* Doc. No. 6 at ¶¶ 287, 289-291; Doc. No. 6-1).[10]

Defendants also erroneously contend that the language in the Interim Policy, itself, authorized Dean Datar to impose the sanctions that he imposed against Plaintiff. (*See* Doc. No. 19 at 15).[11] However, *the extra-contractual* provisions of the Interim Policy—which were never stipulated to by Plaintiff or the HBS faculty and that contradict the terms of Plaintiff's appointment—cannot provide Defendants legal cover to eviscerate Plaintiff's procedural protections as a tenured faculty member. *See Chedid v. Children's Hosp.*, No. 09-0981, 2011 WL 2477235 (Mass. Super. May 20, 2011) ("The fundamental purpose of implying a covenant of good faith and fair dealing in all contracts is to prevent one party from exercising its discretionary power so as to deprive the right of the other party to receive the fruits of the contract.").

### B. Defendants' Bad Faith Investigation

The implied covenant of good faith and fair dealing governs "*the manner* in which existing contractual duties are performed." *Eigerman v. Putnam Investments, Inc.*, 450 Mass 281, 289 (2007). Termination of employment not made in good faith constitutes a breach of the contract. *See Fortune v. Nat'l*

---

[10] *See Ayash*, 822 N.E.2d at 683–84 ("The concept of good faith and fair dealing in any one context is shaped by the nature of the contractual relationship from which the implied covenant derives.").

[11] In their Memorandum, Defendants cite to a factually inapposite case, *Pollalis v. Harvard University*, No. 1681CV03095, 2018 WL 7199754, at *9 (Mass. Super. Apr. 24, 2018), (*see* Doc. 19 at 15), involving a Harvard tenured professor who *voluntarily* gave up his "lifetime tenure" to enter into an agreement with his employer to take an extended leave of absence to work in Greece. Plaintiff, unlike the plaintiff in *Pollalis*, never entered into an agreement with Defendants to or otherwise voluntarily gave up her rights as a tenured faculty member.

*Cash Reg. Co.*, 364 N.E.2d 1251, 1256 (1977). Likewise, conducting an unfair investigation in support of a bad faith termination also constitutes a violation of the implied covenant of good faith and fair dealing. *See Ayash v.*, 822 N.E.2d at 684; *Williams v. B & K Med. Sys., Inc.*, 732 N.E.2d 300, 305 (2000) ("refusal to allow the plaintiff time to respond to the accusations").

Under First Circuit and Massachusetts law, Defendants were also obligated to provide Plaintiff *basic fairness* in the context of her university disciplinary process. *See Sonoiki v. Harvard Univ.,* 37 F.4th 691, 714 (1st Cir. 2022); *Doe v. Trustees of Bos. Coll.*, 892 F.3d 67, 87 (1st Cir. 2018).[12] In *Sonoiki,* the First Circuit explained that, "***whether the procedures followed were conducted with basic fairness mean[s] that, at a minimum, the school complied with the express procedures laid out in the policies that formed the contract***." 37 F.4th 691, 714-15;[13] *see also Doe v. Harvard Univ.*, 462 F. Supp. 3d 51, 66 (D. Mass. 2020) (a breach of the implied covenant of good faith and fair dealing, predicated on a violation of an unfair disciplinary process occurs, similar to a breach of the contract itself, when one party violates the reasonable expectations of the other).

Defendants argue that they could not have breached the implied covenant of good faith and fair dealing in the investigation because the 2013 Policy and the Interim Policy "expressly provide for fair proceedings." (*See* Doc. No. 19 at 16). However, as noted *supra,* the duty of good faith and fair dealing required Defendants, *at a minimum, to comply with the express policies that formed the contract. See Sonoiki*, 37 F.4th at 715. It is not enough that the Interim Policy contains language providing for "fair proceedings"; the implied covenant of good faith and fair dealing requires *compliance*.

Plaintiff's allegations establish that Defendants breached multiple specific promises of basic

---

[12] Contrary to Defendants' erroneous contention otherwise (*see* Doc. No. 19 at 16), an express contractual provision providing for "basic fairness" does not render the duty to comply with basic fairness "superfluous." *See Sonoiki*, 37 F.4th at 715 ("this court has also clearly recognized in Massachusetts law a denial of basic fairness claim as distinct from a breach of contract claim"). The duty applies equally to student or faculty proceedings. *See, e.g., Farzinpour v. Berklee Coll. of Music*, 516 F. Supp. 3d 33, 41 (D. Mass. 2021) (faculty proceeding).
[13]*Sonoiki,* 37 F.4th 691, 716 ("basic fairness is the student disciplinary adjudications' version of claiming a breach of the implied covenant of good faith and fair dealing").

fairness in the procedures relating to the investigation process. For instance, Defendants failed to follow *the scope* of the policy they created by subjecting Plaintiff's work to an investigation that should have been time-barred.  (Doc. No. 6 at ¶¶ 98-99.) The Interim Policy provides, in pertinent part, that:

> [This Policy] applies only to allegations of research misconduct that occurred within six years of the date HBS received the allegation, unless the respondent has *continued or renewed an incident of alleged research misconduct* through the citation, republication, or *other use for the potential benefit of the respondent of the research record in question*.

(Doc. No. 6-2.)

Thus, to qualify as an exception to the six-year limitations period, the "citation" or "use" must *both* (i) have *"continued or renewed"* alleged wrongdoing and (ii) offer a *"potential benefit"* to the accused. Conversely, if the citation is so lightweight that it cannot be said to have continued or renewed the past wrongdoing, or if the potential benefit of the citation is so little, then the investigation is time-barred. No facts alleged in the Amended Complaint suggest that Plaintiff has ever "continued or renewed" an incident of alleged misconduct for her "potential benefit" within the meaning of the Interim Policy (or that Defendants even considered the issue of scope).[14]

Also in violation of Plaintiff's reasonable expectations, Defendants found her "responsible" for "research misconduct" without applying the *applicable standard* of proof promised under the Interim Policy:  proof by a preponderance of the evidence, that alleged fabrication or falsification of data had been committed "*intentionally,*" "*knowingly,*" or *recklessly*;" *and* constituted a "*significant departure from accepted practices of the relevant research community*." (*Id.* ¶¶ 90-91, 137, 154; Doc. 6-2). Given the plain language of the Interim Policy, and the analogous federal regulations on which it was purportedly modeled

---

[14] The Court should deny Defendants' request to consider extrinsic documents (*see* Doc. No. 19 at 18) (citing Doc. No. 20-2-Doc. No. 20-4)). Federal Rule of Evidence 201(b) permits a court to notice an "adjudicative fact if it is "not subject to reasonable dispute." To the extent Defendants contend the extraneous documents establish a "citation" or "use" qualifying under the Interim Policy's high bar for an exception under the six-year rule, that "fact" is *disputed*. *See, e.g., Alharbi v. Beck,* 62 F. Supp. 3d 202, 208 (D. Mass. 2014).

(*see* Doc. No. 6 at ¶ 91), Plaintiff reasonably expected that she would not be found responsible for "research misconduct" unless the investigative committee, after a full and fair investigation, could explain, for each finding, why a preponderance of the evidence supported a finding of a *particular level of intent*, and a significant departure from accepted practices of the research community. This they plainly did not do. (*Id.* ¶¶ 133, 135-137, 152—154, 160-163, 168, 170).

Plaintiff has also plausibly alleged a breach of the implied covenant of good faith and fair dealing on the basis that she did not have ample opportunity to participate in the process. In particular, Plaintiff was given insufficient time to review data forensic reports. Although the investigative committee had been reviewing these data forensic reports from June through September 2022 and had met several times to discuss the reports, (*id.* ¶ 121), Plaintiff was not informed of the reports until August 24, 2022, at which point she was told they would be shared with her in September 2022. (*Id.* ¶ 122). However, Defendants' investigators sent her the investigative reports piecemeal, over multiple dates between September 2022 through October 31, 2022. (*Id.* ¶ 127). When Plaintiff was finally provided the reports, she was not provided the underlying documents (data) on which the forensic analyses were based, which were needed to make sense of the reports. Plaintiff, who was teaching and performing all of her regular duties as a full-time professor, was given only a few weeks to digest 180-pages of forensics report, for which the underlying data was not provided to her. (*Id.* ¶128). Then, during a three-hour meeting with the investigative committee meeting on November 14, 2022, Plaintiff was questioned about studies that were done seven, eight, and 10 years previously, and about forensic analyses that were largely non-probative and inconclusive, in an unfair interview that reflected the committee's bias against her. (*Id.* ¶¶ 117, 129).

### C.  Defendants' Breach of Plaintiff's Confidentiality Is Not a "Gripe"

Defendants mischaracterize Plaintiff's well-pled allegations concerning Defendants' breach of her contractual right to confidentiality and other procedural irregularities as a "hodgepodge of remaining gripes." (Doc. 19 at 12-13). Defendants breached their obligations to maintain Plaintiff's confidentiality, as

specifically promised in *all* of Harvard's applicable contractual policies, including the Discipline Policy (*id.* ¶¶ 64-65), the FRB Policy and FRB process (*id.* ¶¶ 189-193, 295), the 2013 Policy (*id.* ¶¶ 188, 292), and the newly created Interim Policy (*id.* ¶¶ 186-187, 228). The Interim Policy expressly acknowledges that accusations of research misconduct are potentially devastating to an academic's professional reputation and imposed a requirement of strict confidentiality, limiting disclosures of information concerning Plaintiff's research misconduct proceeding to a *"need to know"* basis. (*See* Doc. No. 6-2 at 3). Imprinted on every single page of the so-called Final Investigation Report rendered by the investigation committee was the word: "CONFIDENTIAL." (Doc. No. 6 at ¶ 185).

Plaintiff has plausibly alleged that Defendants breached her reasonable expectations that Defendants would maintain her confidentiality. On or about June 13, 2023, HBS publicly announced on its website that it was placing Plaintiff on administrative leave (*id.* ¶ 196). Also on that date, Defendants began to aggressively send excessive retraction notices that unnecessarily publicized the details of the confidential investigation (*id.* ¶ 204). And, in further breach of their duties of confidentiality, Defendants unnecessarily disclosed information about the retraction notices, themselves, to persons *other than the editors of the journals* involved in publishing the original research, who had no need to know about the retractions, the misconduct proceeding, or flawed outcome of the "process." (*Id.* ¶ 218-219).

On June 14, 2023, Defendants informed doctoral students in Plaintiff's unit, her colleagues at HBS, and other third-parties who did not need to know of the confidential misconduct proceeding (*id.* ¶ 221). On June 22, 2023, Dean Datar *emailed the entire faculty at HBS* to notify them of Plaintiff's research misconduct proceeding *and connected it to Plaintiff's administrative leave,* in effect, needlessly disclosing to the entire faculty the status and outcome of the process, an action that Defendants had *never done previously in connection with a misconduct proceeding* (*id.* ¶¶ 197-198). Defendants' failure to safeguard Plaintiff's confidentiality resulted in the erroneous findings against her and her placement on administrative

leave becoming a topic of public discussion (*id.* ¶¶ 200-201, 222, 224, 225-227, 229). Plaintiff has plausibly pleaded a claim for the breach of the implied duty of good faith and fair dealing. Count III should not be dismissed.

### III.    PLAINTIFF HAS SUFFICIENTLY ALLEGED A CLAIM FOR ESTOPPEL

Plaintiff has alleged that Defendant Harvard promised her a tenured appointment at HBS, on which she "reasonably relied" to her "detriment." (Doc. No. 6, ¶¶ 335-357). Under Massachusetts law, Plaintiff has stated a claim for promissory estoppel. *See Loranger Constr. Corp. v. E.F. Hauserman Co.*, 6 Mass. App. Ct. 152, 154 (1978). Contrary to Defendants' contention (Doc. No. 19 at 19), Plaintiff's breach of contract claim does not preclude her from stating a claim for estoppel as an alternative theory at the pleadings stage. *See Conte v. Bank of Am., N.A.*, 52 F. Supp. 3d 265, 269 (D. Mass. 2014); *see also Sterman v. Brown Univ.*, 513 F. Supp. 3d 243, 253 (D.R.I. 2021) (same). Plaintiff's second argument—that the alleged promise is too "vague"—also fails.  At the motion to dismiss stage, Plaintiff has adequately alleged a promise and all of the elements of the claim. *See, e.g., Neuhoff v. Marvin Lumber & Cedar Co.*, 370 F.3d 197, 204 (1st Cir. 2004). Accordingly, Count IV should not be dismissed.

### IV.    PLAINTIFF HAS SUFFICIENTLY ALLEGED A CLAIM FOR DEFAMATION

In a defamation claim, the status that the plaintiff occupies along the public/private continuum determines what must be proved in order to recover damages. *Mandel v. Bos. Phoenix, Inc.*, 456 F.3d 198, 201 (1st Cir. 2006); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974). "Public figures are persons who have assumed roles of especial prominence in the affairs of society," and commonly "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Mandel*, 456 F. 3d at 204. While Plaintiff enjoys success in her field, her public profile, like that of other successful academics, does not establish her as a "public figure" for purposes of her claims. *See, e.g., Hutchinson v. Proxmire*, 443 U.S. 111, 134–35 (1979) ("published writings reach a relatively small category of professionals concerned with research in human behavior"). Although Plaintiff does not allege that she is

a "public figure," she has adequately pleaded actual malice to support the heightened pleading standard.[15]

However, at the 12(b)(6) stage, it is unnecessary for the Court to determine Plaintiff's status, and dismissal

of her defamation claims based on whether she has met the "actual malice" pleading standard would be

inappropriate on this insufficiently developed factual record.  *See Larson v. Perry,* No. 19-CV-10203-IT,

2020 WL 1495883, at *7 (D. Mass. Mar. 27, 2020) (the inquiry is so fact specific, on motion to dismiss, the

court is not required to determine plaintiff's status) (citing *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6,

14 (1st Cir. 2011); *Mandel*, 456 F.3d 198, 204 (1st Cir.2006)).

To state a claim for defamation, Plaintiff must establish: (1) a false or defamatory communication,

(2) of and concerning the plaintiff, which is (3) published or shown to a third party. *See Dorn v. Astra USA*,

975 F. Supp. 388, 396 (D.Mass.1997).

### A.  Retraction Notices

On June 13 and June 14, 2023, Defendants sent out three retraction notices to scholarly journals

that had published the four research papers at issue in Plaintiff's misconduct proceeding. (*See* Doc. No. 6 at

¶¶ 202-220; Doc. No. 6-3, Doc. No. 6-4, and Doc. No. 6-5), summarized *infra:*

**(1)  Retraction Notice to PNAS:** On June 13, 2023, on behalf of Defendants, HBS's

Research Integrity Officer (the "RIO") emailed a letter to the editor of the journal *Proceedings of the*

*National Academy of Sciences of the Americas* ("PNAS"), stating that, "[HBS] had reviewed concerns

about certain data previously published by [Plaintiff] in the [*2012 PNAS Paper*]." (Doc. No. 6-3 at 2.) The

RIO referenced so-called "data anomalies" for Study 1 relative to discrepancies between data voluntarily

posted for the study by Plaintiff in the Open Science Framework ("OSF") in 2020[16] and a dataset the RIO

---

[15] Plaintiff has not alleged she is a "public figure" and her status is factually distinguishable from plaintiffs in cases cited by Defendants. (*See* Doc. No. 19 at 21) (citing *Lemelson v. Bloomberg*, LP, 253 F. Supp. 3d 333, 340 (D. Mass 2017) (religious leader and hedge fund manager) and *Martin v. Roy,* 54 Mass. App. Ct. 642, 645, 767 N.E.2d 603, 606 (2002) (plaintiff *stipulated* that he was a "public figure")).
[16] Open Science Framework ("OSF") is an open-source web application that makes it possible for behavioral scientists to share their data.  (Doc. No. 6 at ¶ 102).

falsely described as ***"an original dataset provided by a former research staff member***." (*See* Doc. No. 6-3 at 2). This statement concerning "an original dataset" was demonstrably false and defamatory. (Doc. No. 6 at ¶¶ 207-208.). The data Plaintiff's former research assistant provided to HBS was in an Excel spreadsheet and *not* the "original dataset" for Study 1. (*Id.* ¶ 208). The "original dataset" for Study 1 had been collected *on paper* in 2010—a fact clearly documented in the original *2012 PNAS Paper*. (*Id.* ¶ 208).

**(2)   Retraction Notice to Psychological Science:** On June 13, 2023, the RIO sent a retraction notice to the editor of *Psychological Science*, "expressing "concerns about certain data previously published by [Plaintiff] in [*the 2015 Psychological Science Paper]* and *[2014 Psychological Science Paper]*. (Doc. No. 6 at ¶ 211; Doc. No. 6-4). With respect to the *2015 Psychological Science Paper*, the RIO referenced so-called "data anomalies" for Study 4 relating to "discrepancies" in the data for this study that Plaintiff had voluntarily posted on OSF, and so-called ***"original data for Study 4 gathered using Qualtrics."*** (Doc. No. 6 at ¶ 212; Doc. No. 6-4 at 1). This statement referencing "the original data" was false and defamatory, as the dataset in Study 4 that was in Qualtrics had been verifiably edited and the data posted by Plaintiff on OSF accurately represented the original dataset for the study. (Doc. No. 6 at ¶ 213).

**(3)   Retraction Notice to JPSP:** On June 14, 2023, the RIO emailed a retraction notice to the the editor of *The Journal of Personality and Social Psychology* ("JPSP")*,* expressing "concerns" about data published by Plaintiff in [the *2020 JPSP Paper*]. The RIO referenced "data anomalies" for Study 3a relative to "discrepancies" between the data Plaintiff had voluntarily posted on the OSF and data that the RIO falsely referred to as an ***"the original dataset using Qualtrics."*** (Doc. No. 6 ¶ 215; Doc. No. 6-5 at 1). The RIO's statement concerning the "original dataset" was false and defamatory. The data in Qualtrics was not the original data for study 3a, as it was verifiably edited. (Doc. No. ¶ 216).

**Appendices to Retraction Notices:** In addition to the RIO's statements in the three retraction notices summarized *supra*, the RIO attached an "appendix" to each retraction notice that contained a mash-

15

up of unattributed portions of a false and defamatory statement submitted by Data Colada to the HBS investigative committee on December 3, 2021 ("the December Report") and a forensic report. (*See* Doc. No. 6 at ¶¶ 100-105, 115-117, 129, 209, 211, 214; Doc. No. 6-3; Doc. No. 6-4, Doc. No. 6-5).

**Analysis:** Each of the retraction notices that HBS sent to *PNAS, Psychological Science*, and *JPSP* contained express or implied allegations that: (a) there were "discrepancies" between an "original dataset" and a dataset that Plaintiff had posted on the OSF, (b) that the dataset that Plaintiff posted to the OSF was not the "original dataset" used for the study at issue; and (c) that the "original data" had been altered. All of these statements are capable of being proved true or false: either the data Plaintiff posted on the OSF is the original data *set or it is not, and either the data in the study was or was not altered*. *See Mullane v. Breaking Media, Inc*., 433 F. Supp. 3d 102, 111 (D. Mass. 2020); *Reilly v. Associated Press,* 797 N.E.2d 1204, 1212 (2003) (citing *Milkovich v. Lorain Journal Co*., 497 U.S. 1, 19 & n. 7 (1990)).

In addition to the express and implied statements in the retraction notices, there are other statements in the retraction notices that are capable of conveying the defamatory *suggestion or innuendo* that Plaintiff tampered with data. *See Reilly,* 797 N.E.2d at 1213 ("Defamation can occur by innuendo as well as by explicit assertion.") These statements include, *inter alia*, statements in the appendices from the December Report, (*see* Doc. No. 6 at ¶¶ 100), which itself, contains false and defamatory statements by Data Colada that Plaintiff had "tampered" with data. (*See id.*   ¶¶ 103-105, 398-399). For instance, portions of the December Report attached as an appendix to the retraction notice to *Psychological Science* include false allegations by Data Colada that Plaintiff *"tampered"* with data. (*See* Doc. No. 6-4 at 14.) The forensics reports were also selectively excerpted and, in this context, convey the false impression that they were *probative and conclusive* evidence of data tampering, which, in fact, they were not. (*See* Doc. No. 6 at ¶ 117). These *insinuations are equally as actionable as direct statements* because the insinuation that Plaintiff was responsible for data tampering is false. *See Sharratt v. Hous. Innovations, Inc.*, 365 Mass. 310 N.E.2d

343, 346–47 (1974).  Because the statements suggest that Plaintiff lacks professional integrity, they are also defamatory. *Ravnikar v. Bogojavlensky*, 782 N.E.2d 508, 511 (2003).[17]

Assuming, *arguendo*, that Plaintiff is required to allege "actual malice" at this stage of the action, she has plausibly done so. When Defendants sent the retraction notices, they knew that Plaintiff had not been found responsible for "research misconduct" as defined under the Interim Policy, which requires proof of *specific intent*: "knowing," "reckless," or "intentional" falsification or fabrication of data"—and an exclusion of "honest error" (*id.* ¶¶ 167-168, 90; Doc. 6-2 at 2). Contrary to Defendants' standard practices, the retraction notices selectively publicized details of the investigation, removing all information that was exculpatory and limiting. (*Id.* ¶¶ 155, 204). In so doing, Defendants falsely conveyed to any reader that Plaintiff had intentionally tampered with data to affect the outcome of the study. (*Id.* ¶ 205). To the extent that Defendants relied on the December Report for the retraction notices, they knew that Data Colada was a biased, unreliable source, interested in creating controversy for Harvard. (*See id.* at ¶¶ 203-221).

With respect to the retraction notice for the 2012 PNAS Paper, Defendants specifically *knew* that its statements concerning the data for the 2012 PNAS Paper were false, or at the very least, acted in reckless disregard of the falsity of the statements, because they knew that the data for the study in question *had been gathered on paper* (a fact documented in the original 2012 PNAS Paper) and no longer existed, and that the data provided by a research assistant *in an Excel spreadsheet* was not the "original dataset.  (*Id.* ¶ 156.) Defendants' defamatory statements were also *excessive.* The PNAS Paper had *already been retracted,* in March of 2020 (for reasons that had nothing to do with alleged misconduct by Plaintiff), so there was *no need* for HBS to send a retraction notice for that paper (*id.* ¶ 210). Moreover, *the retraction notices for all four studies were excessive*, being inconsistent with normal retraction practices as well as the Interim

---

[17] Defendants disregard the numerous allegations in Plaintiff's well-plead Complaint concerning the false and defamatory allegations in the retraction notices as to Plaintiff's professional character, and erroneously cite to factually inapposite cases that involve no single false or defamatory statement.   (*See* Doc. 19 at 22).

Policy's confidentiality provisions, unnecessarily damaging to Plaintiff's professional reputation, and going well beyond what was necessary to correct any concerns about the data. (*See id*. 6 ¶¶ 204, 219-220).

Under Massachusetts law, "an employer has a ***conditional privilege*** to disclose defamatory information if the publication is reasonably necessary to the protection or furtherance of a legitimate business interest, *Foley v. Polaroid Corp*, 508 N.E.2d 72, 79 (1986), but the *conditional privilege can be lost by abusing it. Id.* at 74. Here, Defendants lost the conditional privilege to disclose defamatory facts because they (1) knew the information was false, (2) had no reason to believe it to be true, and/or (3) recklessly published the information unnecessarily, unreasonably, or excessively. *See Dragonas v. Sch. Comm. of Melrose,* 833 N.E.2d 679, 687–88 (2005); *Bratt v. Int'l Bus. Machines Corp.,* 467 N.E.2d 126, 131–32 (1984).

### B.   Announcement of Plaintiff's Administrative Leave

Defendants contend that the announcement of Plaintiff's administrative leave cannot be defamatory. However, under Massachusetts law, even a true statement can form the basis of a libel action if the plaintiff proves the defendant acted with "actual malice." *See Noonan v. Staples, Inc.*, 556 F.3d 20, 28-29 (1st Cir. 2009) (distinguishing "actual malice" under Mass. Gen. Laws ch. 231, § 92 from the First Amendment standard for "actual malice" as defined in *New York Times v. Sullivan*, 376 U.S. 254, 280 (1964)); *Mullane v. Breaking Media, Inc.*, 433 F. Supp. 3d at 109 (under state statute, "actual malice" is defined as "ill will" or "malevolent intent"). Given that publicly announcing Plaintiff's administrative leave was contrary to Defendants' practice, Defendants' multiple excessive disclosures of confidential information, and Defendants' excessive and defamatory retraction notices, Plaintiff has established Defendants' ill will (*id.* ¶¶ 196-219, 225, 229-230). Accordingly, Count VI should not be dismissed.

## V.   PLAINTIFF'S CLAIM FOR CONSPIRACY SHOULD NOT BE DISMISSED

Plaintiff has adequately set forth her claims for defamation, *see supra* Part IV, and conspiracy. (*See Id.* ¶¶ 66-85, 100-102, 231-279). The same arguments in support of her claim for defamation apply to her

claim for conspiracy; as such, Count IX should not be dismissed. *See McLaughlin v. J-PAC, LLC*, No. 10-2594-BLS1, 2011 WL 1758945, at *2 (Mass. Super. Apr. 14, 2011).

## VI.   PLAINTIFF'S CLAIM FOR INTENTIONAL INTERFERENCE WITH ADVANTAGEOUS RELATIONS SHOULD NOT BE DISMISSED

Plaintiff has adequately pled improper motive to support her claim for intentional interference as she has established that Defendants engaged in conduct that deviated from Harvard's own policies and legitimate interests. (*See* Doc. No. 6 ¶¶ 226, 314-318).  *See Blackstone v. Cashman*, 448 Mass. 255, 267, 860 N.E.2d 7, 18 (2007) (unrelated to a legitimate corporate interest).[18]

Defendants also erroneously contend that they cannot be liable for interference with Plaintiff's business relationships with Harvard Business Publishing, (and rely on an inapposite case involving a bettor who could not bring a claim against a racetrack).[19] However, it is well settled that a plaintiff can state a claim for tortious interference by the parent company into its contractual relationships with a subsidiary. *See, e.g., Powderly v. MetraByte Corp.*, 866 F. Supp. 39, 43 (D. Mass. 1994); *Charles River Data Sys., Inc. v. Oracle Complex Sys. Corp.,* 788 F. Supp. 54, 60 (D. Mass. 1991). Defendants also erroneously contend that Plaintiff's claim concerning her publisher "fails" because there is no underlying breach and cite a case involving a claim for intentional interference with contracts. (Doc. No. 19 at 25) (citing *Larson v. Perry,* No. 19-CV-10203-IT, 2020 WL 1495883, at *8 (D. Mass. Mar. 27, 2020)). However, Plaintiff's claim is for intentional interference with advantageous relations, a different legal theory which does not require Plaintiff to establish a breach of contract to recover damages. *See Comeau v. Town of Webster, Mass.*, 881 F. Supp. 2d 177, 190 (D. Mass. 2012). Plaintiff's claims that Defendants' conduct has caused her to lose relationships with other businesses entities are distinguishable from claims presented in *Evans v. Bos. Red Sox*, No. CIV.A. 13-13259-GAO, 2014 WL 4966081, at *5 (D. Mass. Sept. 30, 2014). Plaintiff, unlike the

---

[18] Erroneously contending that Plaintiff has not established "malice," Defendants rely on two factually inapposite cases involving minor workplace grievances. (Doc. No. 19 at 24) (citing *Cohen v. Trustees of Tufts Univ.*, No. 064016, 2007 WL 1302591, at *3 (Mass. Super. Apr. 12, 2007); *Kelleher v. Lowell Gen. Hosp.*, 152 N.E.3d 126, 134 (2020)).
[19] (Doc. No. 19 at 25) (citing *DePasquale v. Ogden Suffolk Downs, Inc.*, 564 N.E.2d 584 (1990)).

plaintiff in *Evans,* has alleged sufficient facts to support her claims from which the Court may reasonably infer that Defendants were aware of Plaintiff's work and contractual relations and the loss of prospective opportunities resulting from their conduct. (*See* Doc. No. 6 at 316).

## VII.   PLAINTIFF'S CLAIM FOR INVASION OF PRIVACY SHOULD NOT BE DISMISSED

On June 13, 2013, Defendants publicly announced their decision to place Plaintiff on administrative leave on the HBS website. (Doc. No. 6 at ¶ 196). Given Defendants' contemporaneous disclosure of the false and defamatory results of the HBS investigative report to multiple third parties and the excessive and defamatory retraction notices, the post on the HBS website received excessive attention within and outside of Harvard. (*Id.* ¶¶ 200-201). Defendants' practice was *not* to announce employees' administrative leave status. (*Id.* ¶ 198). Defendants *had already notified the entire faculty* of Plaintiff's leave status and the outcome of her misconduct proceeding, so they had no legitimate business interest in posting her leave status on HBS's public-facing website. (*Id.* ¶ 197). In this context, Defendants' dissemination of Plaintiff's administrative leave status constituted an unreasonable and substantial invasion of her privacy, which subjected her to unnecessary attention and stigma. *See Branyan v. Sw. Airlines Co.,* 105 F. Supp. 3d 120, 126 (D. Mass. 2015) ("unreasonable, substantial or serious interference with his privacy"). Accordingly, Count XII should not be dismissed.[20]

## CONCLUSION

Based on the foregoing, Plaintiff Francesca Gino respectfully requests that Defendants' Motion to Dismiss be denied in its entirety.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(d), Plaintiff's undersigned counsel respectfully requests oral argument on the Motion as they believe it may assist the Court in consideration of the issues raised in this opposition.

[signature page to follow]

---

[20] In *French v. United Parcel Serv., Inc.*, 2 F. Supp. 2d 128, 131 (D. Mass. 1998), an inapposite case cited by Defendants (Doc. No. 19 at 25), the employee did not suffer a substantial and unreasonable intrusion.

Dated: November 7, 2023
       Boston, Massachusetts

Respectfully submitted,

**NESENOFF & MILTENBERG, LLP**
*Attorneys for Plaintiff Francesca Gino*

By: */s/  Julie A. Sacks*
Andrew T. Miltenberg, Esq.
(*pro hac vice* forthcoming)
Kara L. Gorycki, Esq.
(*pro hac vice* forthcoming)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
kgorycki@nmllplaw.com

Tara Davis, Esq. (BBO No. 675346)
Julie A. Sacks, Esq. (BBO No. 674384)
101 Federal Street, 19th Floor
Boston, Massachusetts 02110
(617) 209-2188
tdavis@nmllplaw.com
jsacks@nmllplaw.com

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on November 7, 2023, this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated:  November 7, 2023                          */s/ Julie A. Sacks*
                                                            Julie A. Sacks