UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ ) | | |
| FRANCESCA GINO, ) | | |
| ) | | |
| Plaintiff, ) | | |
| ) | | |
| v. ) | | C.A. No. 23-cv-11775-MJJ |
| ) | | |
| PRESIDENT AND FELLOWS OF ) | | |
| HARVARD COLLEGE, SRIKANT ) | | |
| DATAR, URI SIMONSOHN, ) | | |
| LEIF NELSON, JOSEPH SIMMONS, ) | | |
| JOHN DOES 1-10 AND JANE DOES 1-10, ) | | |
| ) | | |
| Defendants ) | | |
| _____ ) | | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OF
URI SIMONSOHN, LEIF NELSON, AND JOSEPH SIMMONS**

Jeffrey J. Pyle, BBO #647438
jpyle@princelobel.com
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA  02110
(617) 456-8000 (tel.)
(617) 456-8100 (fax)

Date:  November 8, 2023

<u>INTRODUCTION</u>

In June 2021, three business school professors uncovered troubling anomalies in the data supporting four papers in behavioral science. The anomalies suggested that someone had manipulated data to reach the desired result. Ironically, some of the papers were about honesty.

The professors – Uri Simonsohn, Leif Nelson, and Joseph Simmons – conveyed their concerns to Harvard University, the employer of the researcher who had been responsible for the collection of the suspicious data. In December 2021, they gave Harvard an 18-page report setting forth the basis of their suspicions that the data were fake. In two of the four studies, they explained, entries were sorted out of order in such a way that could not have occurred without manual manipulation. For the others, implausible responses to survey questions suggested that associated data had been changed. Most suspiciously, in each case the anomalous data strongly supported the study's hypothesis and had a sizeable impact on its reported outcome, a pattern extremely unlikely to occur by chance. The professors suggested to Harvard that it access the original (un-altered) data files and determine whether their suspicions were justified.

Harvard investigated, with the assistance of a data forensics consultant. Eighteen months later, in June 2023, it determined that the researcher responsible for the data, Harvard Business School professor Francesca Gino, had committed research misconduct. Harvard put Gino on administrative leave and sent retraction requests for all four studies to the respective journals. The professors later published articles about their findings on their blog, "Data Colada."

Gino has now sued Simonsohn, Nelson, and Simmons (the "Data Colada Defendants") for defamation, "intentional interference with contract," and "conspiracy to defame" based on their report to Harvard and their blog posts. She demands an award of $25 million, an injunction prohibiting further criticism, and an order that the professors retract their posts and apologize.

Gino's complaint against the Data Colada Defendants fails to state a claim upon which relief may be granted, for three reasons. *First*, the Data Colada Defendants comprehensively disclosed the facts on which they based their conclusions, immunizing their publications from defamation liability. *Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 730 (1st Cir. 1992) (defendant's "full disclosure of the facts underlying his judgment" renders statement protected under the First Amendment). No reasonable reader would believe their conclusions were based on undisclosed defamatory facts.

*Second*, Gino has pleaded facts establishing that she is a public figure, yet she has failed plausibly to allege that the Data Colada Defendants made the allegedly defamatory statements with "actual malice," meaning knowledge of falsity or reckless disregard for the truth. *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 56 (1st Cir. 2012).

*Third*, Gino's claims for interference with contract and "conspiracy" are based on the same allegations as her defective libel claim, so they fail for the same reasons. *Brown v. Hearst Corp.*, 54 F.3d 21, 27 (1st Cir. 1995). A plaintiff cannot plead around the First Amendment's limitations on defamation by repackaging such a claim as another tort.

The stakes in this motion are unusually high. Defamation is a traditionally disfavored action, *Eyal v. Helen Broadcasting Corp.*, 411 Mass. 426, 432 n.7 (1991), for which the courts favor summary disposition. *Biro v. Condé Nast*, 963 F. Supp. 2d 255, 279 (S.D.N.Y. 2013). Beyond that, for a university researcher to sue fellow academics based on their criticism of her work poses a threat to the very possibility of scientific debate and inquiry. Courts have long sought to ensure that libel claims do not chill "debate on public issues," which "should be uninhibited, robust, and wide-open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). This is especially true for matters of academic and scientific debate. *Underwager v. Salter*, 22 F.3d

730, 736 (7th Cir. 1994) ("More papers, more discussion, better data, and more satisfactory models—not larger awards of damages—mark the path toward superior understanding of the world around us."); *cf. Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 603 (1967)("academic freedom" is "of transcendent value to all of us," and "a special concern of the First Amendment."). To require the Data Colada Defendants to suffer the burden and expense of discovery would send a chilling message to others who might seek to uncover data fraud:  the risks of financial ruin are too great. Gino's claims should be dismissed.

<u>FACTUAL ALLEGATIONS</u>

Plaintiff Francesca Gino is a Professor at the Harvard Business School, ("HBS"), and "an internationally renowned behavioral scientist, author, and teacher." (Am. Compl. ¶ 2). She has received many awards, and has been deemed one of the world's "most influential management thinkers." (*Id.* ¶ 40). Her work has been covered in *The Atlantic*, *The Boston Globe*, *Business Week*, *The Economist*, *The Financial Times*, *Scientific American*, *The Wall Street Journal*, and *The New York Times*. (*Id.* ¶ 41). Much of Gino's research has examined honesty.[1]

Defendant Uri Simonsohn is a professor in the Department of Operations, Innovation and Data Sciences at the ESADE Business School, in Barcelona, Spain.[2] (Am. Compl. ¶ 29). Defendant Leif Nelson is the Ewald T. Grether Professor in Business Administration & Marketing at the Haas School of Business at the University of California, Berkeley.[3] (*Id.* ¶ 31).

---

[1] *See, e.g.*, F. Gino and S. Ayal, "Honest Rationales for Dishonest Behavior," in *The Social Psychology of Morality: Exploring the Causes of Good and Evil*, edited by M. Mikulincer and P.R. Shaver, 149–166, Washington, D.C. (2011); J.J. Lee, H. Hardin, B. Parmar, & F. Gino, "The interpersonal costs of dishonesty: How dishonest behavior reduces individuals' ability to read others' emotions." *Journal of Experimental Psychology: General*, 148(9), 1557-1574 (2019).

[2] https://www.esade.edu/faculty/uri.simonsohn

[3] https://haas.berkeley.edu/faculty/nelson-leif/

Defendant Joseph Simmons is the Dorothy Silberg Professor of Applied Statistics at the Wharton School of Business at the University of Pennsylvania.[4] (*Id.* ¶ 30). Since 2013, Simonsohn, Nelson, and Simmons have published a blog called "Data Colada" (datacolada.org), which is devoted to exploring questionable uses of data and advocating for research integrity.[5]

In July 2021, the Data Colada Defendants, in collaboration with other researchers, raised concerns with HBS about suspicious anomalies in the data for four studies by Gino – anomalies that suggested someone had falsified the data. (Am. Compl. ¶ 67).[6] Harvard opened an investigation into the studies. (*Id.* ¶¶ 93-94). On December 3, 2021, the Data Colada Defendants submitted a report titled "Evidence of Fraud in Academic Articles Authored by Francesca Gino" (the "December Report") (*Id.* ¶ 100). The December Report, attached to the Affidavit of Jeffrey J. Pyle as Exhibit A,[7] states that its purpose is to present evidence of the apparent fraud "so that [Harvard's] investigators can consider the case while giving full opportunity for Professor Gino

---

[4] https://oid.wharton.upenn.edu/profile/jsimmo/

[5] As a review of the website plainly shows, Data Colada does not "target" the "work of prominent female academics," and "subject[]it to an exceptionally high level of public scrutiny," as Gino baselessly alleges. (Am. Compl. ¶ 66). The blog, which Gino incorporates by reference in her Complaint (Am. Compl., ¶¶ 271, 331), includes a statement by Gino dated August 16, 2021, in which she praises the Data Colada Defendants' work and methods. See https://datacolada.org/storage_strong/Gino-memo-data-colada-August16.pdf (statement by Gino) ("The work they do takes talent and courage and vastly improves our research field. I am grateful for their efforts.")

[6] In threadbare and conclusory fashion, Gino asserts that Harvard and Data Colada made an "agreement," whereby Data Colada would "refrain from making public accusations against Plaintiff that would, by extension, subject HBS to public scrutiny." (Am. Compl. ¶ 70). In exchange, "HBS agreed to create a new employment policy to investigate Data Colada's allegations against Plaintiff's work." (*Id.*). The Amended Complaint reveals no explanation for why the Harvard Business School would negotiate with three professors at other institutions over the terms of its own "employment policy," nor how Gino has a good faith basis to allege that this "agreement" was even formed. She simply asserts it in conclusory fashion, so it may be disregarded. *Peñalbert–Rosa v. Fortuño–Burset*, 631 F.3d 592, 595 (1st Cir.2011) ("[S]ome allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross the line between the conclusory and the factual.")

[7] The Court may consider the December Report and the other allegedly defamatory publications on this motion to dismiss without converting it to one for summary judgment because the Amended Complaint quotes the documents at length and the defamation counts depend on their text. (Am. Compl., Counts VII and VIII). *Edwin v. Blenwood Associates, Inc.*, 9 F. Supp. 2d 70, 72 (D. Mass. 1998).

to explain apparent anomalies." (Pyle Aff., Ex. A at 1). It identifies the anomalous data entries, shows that they all strongly (and suspiciously) support the authors' hypotheses, and identifies data files that Harvard could review to verify or refute the conjecture of data fraud. (*Id.*).

Harvard conducted an 18-month investigation, aided by a data forensics firm. (Am. Compl. ¶¶ 114-151). Prof. Gino provided evidence and responded to Harvard's draft findings. (*Id.* ¶ 148). On June 13, 2023, Harvard determined that Gino had engaged in intentional, knowing, or reckless research misconduct and placed her on administrative leave. (*Id.* ¶¶ 157, 177-179). Harvard updated Gino's faculty webpage accordingly, and sent retraction requests to the three journals that had published the studies at issue. (*Id.* ¶ 196 and Exs. 3-5).

On June 16, 2023, the *Chronicle of Higher Education* reported that Harvard had placed Gino on administrative leave after finding that data in a 2012 study she conducted for a paper in the *Proceedings of the National Academy of Sciences* (the "2012 *PNAS* Study") had been manipulated. (Am. Compl. ¶¶ 224-227; Pyle Aff. Ex. B). This was the first of the four studies the Data Colada Defendants analyzed in the December Report. (Pyle Aff. Ex. A). According to a HBS professor quoted in the article, Harvard produced "compelling evidence" that "somebody had accessed a database" for a study "and added and altered data in the file." (*Id.* Ex. B).

On June 17, 2023 and over the ensuing two weeks, the Data Colada Defendants published four blog posts on datacolada.org explaining why the studies at issue were likely falsified (the "Blog Posts") (Pyle Aff. Exs C-F).[8]  Each Blog Post consists of a description of a study, the observed anomalies, analysis of their directionality (whether or not they favored the authors' hypothesis), and an explanation why they suggest the data were likely fake. (*Id.*).

On August 4, 2023, Gino filed this action. She asserts four claims against the Data Colada Defendants: two for defamation based on the Blog Posts and the December Report,

---

[8] Full copies of the Blog Posts are attached to the Pyle Affidavit as Exhibits C-F.

respectively (Counts VII and VIII); "civil conspiracy to commit defamation" with the Harvard

defendants, (Count IX); and intentional interference with contract (Count X). Gino demands an

award of $25 million in damages, (Am. Compl. at 97-98), an injunction restraining the professors

from future "statements that Plaintiff committed data fraud," (*id.* ¶ 415), and an order compelling

them to "retract Blog Posts 1-4," to apologize, and to publicly state "that Plaintiff did not

fabricate or falsify data, or engage in 'data fraud' or research misconduct." (*Id.*).[9]

ARGUMENT

**I.    PLAINTIFF FAILS TO STATE A DEFAMATION CLAIM AGAINST THE DATA COLADA DEFENDANTS BECAUSE THEIR STATEMENTS ARE PROTECTED OPINIONS BASED ON DISCLOSED, NON-DEFAMATORY FACTS.**

Gino's defamation claims against the Data Colada Defendants are based on their

interpretations of disclosed, undisputed, non-defamatory facts. Such statements – especially in

the area of academic debate – are constitutionally protected and cannot support a libel claim.

A.    The Law of Opinion

"'Defamation is the publication, either orally or in writing, of a statement concerning the

plaintiff which is false and causes damage to the plaintiff.'" *Ayyadurai v. Floor64, Inc.*, 270 F.

Supp. 3d 343, 355 (D. Mass. 2017), quoting *Yohe v. Nugent*, 321 F.3d 35, 39–40 (1st Cir. 2003).

In addition to this common-law definition, "[t]he Supreme Court—reading the First Amendment

(made binding on the states through the Fourteenth)—has hedged about defamation suits with

lots of safeguards designed to protect a vigorous market in ideas and opinions." *Pan Am Sys.,*

*Inc. v. Atl. Ne. Rails & Ports, Inc.*, 804 F.3d 59, 65 (1st Cir. 2015) (internal quotations omitted).

"Under the First Amendment there is no such thing as a false idea. However pernicious an

---

[9] This requested injunction would amount to an unconstitutional prior restraint on the Data Colada Defendants' speech, the "most serious and the least tolerable infringement on First Amendment rights," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976), as well as unconstitutional order compelling their speech. *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943).

opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40 (1974).

The Supreme Court has articulated several principles to "assure[] that opinions about matters of public concern . . . receive substantial constitutional protection" from defamation claims. *Phantom Touring, Inc.*, 953 F.2d at 727. *First*, an allegedly "false statement is not actionable if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts. . . ." *Riley v. Harr*, 292 F.3d 282, 289 (1st Cir. 2002) (internal quotation omitted).

*Second*, an opinion is protected if it is based on disclosed, non-defamatory facts. *Phantom Touring*, 953 F.2d at 730 (defendant's "full disclosure of the facts underlying his judgment" protects statement). "When an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment." *Riley*, 292 F.3d at 289 (cleaned up); *see also Piccone v. Bartels*, 785 F.3d 766, 771 (1st Cir. 2015) ("[A] speaker can immunize his statement from defamation liability by fully disclosing the non-defamatory facts on which his opinion is based.").[10]

*Third*, courts are obliged to "'make an independent examination of the whole record,' to 'assure that the foregoing determinations will be made in a manner so as not to 'constitute a forbidden intrusion o[n] the field of free expression.'" *Phantom Touring*, 953 F.2d at 727-28, quoting *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 17 (1990) (cleaned up). This gestalt review acts as a final layer of protection against infringements on protected speech. *Id.* at 727.

---

[10] In the analysis of "whether a statement is factual or inactionable opinion, a court must 'examine the statement in its totality in the context in which it was uttered or published,' and 'must consider all the words used, not merely a particular phrase or sentence.'" *Salmon v. Lang*, 57 F.4th 296, 322 (1st Cir. 2022), quoting *Scholz v. Delp,* 473 Mass. 242, 250 (2015).

Applying these principles, courts have frequently protected statements made in the context of academic debate from defamation liability. *Underwager*, 22 F.3d at 736 ("Scientific controversies must be settled by the methods of science rather than by the methods of litigation.") Judges and juries are ill-equipped to assess "inferences about the nature of reality based on the results of experimentation and observation." *ONY, Inc. v. Cornerstone Therapeutics, Inc*., 720 F.3d 490, 496–97 (2d Cir. 2013) (courts should not "referee . . . controversies" between researchers when they "analyz[e] or refut[e] the soundness of the experimental design or the validity of the inferences drawn from the results.") Academic give-and-take is immune from liability where "the conclusions reached by experiments are presented alongside an accurate description of the data taken into account and the methods used," so that "the validity of the authors' conclusions may be assessed on their face by other members of the relevant discipline or specialty." *ONY, Inc.*, 720 F.3d at 497–98; *see Saad v. American Diabetes Association,* 123 F. Supp. 3d 175, 178 (D. Mass. 2015) (dismissing defamation claim based on statement of concern about falsified data where it "clearly discloses the basis for the concerns.").

As explained below, the Data Colada Defendants' allegedly defamatory statements are protected as a matter of law. *Piccone*, 785 F.3d at 772 ("Whether a statement constitutes verifiable fact or is non-actionable opinion can be decided by the court as a matter of law.").

B.    The Data Colada Defendants' Statements Are Protected Interpretations and Conjectures Based on Stated Facts.

Each of the five publications is non-actionable because it is "'plain that the speaker[s are] expressing a subjective view, an interpretation, a theory, conjecture, or surmise'" based on disclosed, non-defamatory facts. *Scholz v. Delp*, 473 Mass. 242, 251 (2015), quoting *Haynes v. Alfred A. Knopf, Inc*., 8 F.3d 1222, 1227 (7th Cir. 1993). The December Report and the four

Blog Posts make clear that they draw their conclusions of data fraud from the observed anomalies in the datasets, not from any independent knowledge.[11] (Pyle Aff. Exs. A, C-F).

For example, in the December Report, the Data Colada Defendants identify out-of-order rows of data in the databases for two studies: Study 1 of the 2012 *PNAS* Paper, and Experiment 4 of a 2014 *Psychological Science* Paper. (Pyle Aff. Ex. A at 1, 15). They posit that "[i]f the out-of-order rows of data . . . exhibit extraordinarily large effect sizes – at the extreme, effect sizes that produce the overall effect in its entirety – then that would represent fairly strong evidence of data tampering." (*Id.* at 1). They then show that the rows of data do just that, in language that clearly shows they are drawing inferences. They note that in the 2012 *PNAS* Study, there are

> eight observations that are out of order . . . and to our knowledge no sorting function [in Excel] can account for their placement. This <u>suggests to us</u> that these eight observations <u>may have been altered</u> to produce the desired effect. <u>Supporting that contention</u>, those eight observations play a sizable role in producing the published effect in Study 1, as all eight observations have values on the dependent variables that are extremely consistent with the authors' hypothesis.

(Pyle Aff. Ex. A at 4-5) (emphasis supplied). The Data Colada Defendants "outline[d] the facts available to [them], thus making it clear that the challenged statements represent [their] own interpretation of those facts and leaving the [reader] free to draw his own conclusions." *Salmon v. Lang*, 57 F.4th 296, 323 (1st Cir. 2022) (cleaned up).[12]

---

[11] Contrary to Gino's complaint, the Data Colada Defendants never state that Gino *herself* falsified data. (See, e.g., Am. Compl. ¶ 234 (alleging that in Blog Post 1, "Data Colada asserted, as a matter of fact (not opinion) that *Professor Gino* had 'faked data' in this study.") (emphasis supplied)); (see also Am. Compl. ¶¶ 248, 255, 262). Rather, they state that there is "evidence of fraud in four academic papers co-authored by Harvard Business School Professor Francesca Gino," deriving from datasets that she was responsible for handling and analyzing. (Pyle Aff., Ex. C (Blog Post 1); *see generally* Exs. A, C-F); *Cheng v. Neumann*, 51 F.4th 438, 445 (1st Cir. 2022) ("It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations"), quoting *Clorox Co. P.R. v. Proctor & Gamble Com. Co.*, 228 F.3d 24, 32 (1st Cir. 2000).

[12] Likewise, for a 2014 study, "Dishonesty May Lead to Creativity," the report shows that participants are listed out of order, and sets forth three reasons why this suggests data fraud: (1) "it is not possible to sort the dataset to generate the order in which the data were saved" without manual manipulation, (2) "rows

Similarly, the December Report identifies odd textual responses in a 2015 Gino-managed study:  twenty out of 491 participating Harvard University students purportedly wrote down the word "Harvard" for their "class year." (Ex. A p. 5). "[M]aking things even more peculiar, those students' responses are very close to one another, all within 35 rows (450 through 484) in the posted dataset." (*Id.*). The "my class year is Harvard" survey respondents strongly supported the study's hypothesis – a pattern that would have a one in a million chance of occurring at random. (*Id.* p. 8). The report suggests that these circumstances (none of which Gino disputes) are "very much consistent with the possibility that these 'Harvard' observations were altered to produce the desired effect." (*Id.*). Again, the report plainly draws inferences from the stated facts.

The same is true of the Blog Posts, which largely track the analyses in the December Report. (Pyle Aff. Exs. C-E). For example, Blog Post 1, about the 2012 *PNAS* Study, provides evidence from Excel metadata showing the out-of-order data was manually moved, suggesting fraud. (Pyle Aff. Ex. C). The Data Colada Defendants' description of how they came to this conclusion is exhaustive, including text boxes that a reader may expand showing how they determined that each suspicious row was likely altered. (Pyle Aff. ¶ 4 and Ex. C). The other Blog Posts similarly explain why the anomalies "strongly suggest[]" data fraud. (Pyle Aff. Exs. D-F).

Crucially, Gino's Amended Complaint does not deny that the datasets contained the out-of-sequence entries or the unexpected textual responses from which the Data Colada Defendants drew their conclusions. Rather, she asserts that their conclusions were "unwarranted" because her own explanations allegedly provide "a reasonable and plausible reason" why the data was non-fraudulent. (Am. Compl. ¶¶ 244-246). That is irrelevant, however, because the Data Colada

---

are sorted by the variable of interest," so "it is straightforward to impute what they were changed from," and (3) "when one reconstructs the data in this way, by replacing the [suspicious] values with the values one would impute based on the order in which data are sorted, the significant relationship between" the cause and effect posited in the study "entirely disappears." (Ex. A at 17-18).

Defendants cannot be held liable for having a "false" opinion about what disclosed facts reveal. *Gertz*, 418 U.S. at 339–40 ("Under the First Amendment there is no such thing as a false idea.") Their statements are "personal conclusions about the information presented," and therefore non-actionable as a matter of law. *Salmon*, 57 F.4th at 323 (internal quotation omitted).

 C. <u>The Data Colada Defendants Fully Disclosed the Facts Behind Their Conclusions.</u>

 The Data Colada Defendants are not liable for defamation for a second, related reason: they fully disclosed the facts underlying their judgment that there was likely data fraud in the studies. The December Report and the Blog Posts identify the source material from which they draw their conclusions. Indeed, the Blog Posts hyperlink to the primary documents, including the suspicious data files. (Pyle Aff., ¶¶ 4-7 and Exs. C-F); *Cheng*, 51 F.4th at 447 (article was non-actionable because it "provides a link to the source material, which, in the context of the Article, enables readers to draw their own conclusions 'based on facts accessible to everyone'"), quoting *McKee v. Cosby*, 874 F.3d 54, 63 (1st Cir. 2017); *Abbas v. Foreign Policy Grp.*, LLC, 975 F. Supp. 2d 1, 16 (D.D.C. 2013), aff'd, 783 F.3d 1328 (D.C. Cir. 2015) (same).

 This full disclosure dooms Gino's defamation claim, because no reader of any of the five publications could "reasonably conclude that [the Data Colada Defendants'] comments" were "based on undisclosed defamatory facts." *Pritsker v. Brudnoy*, 389 Mass. 776, 779 (1983). The publications never state or imply that the three professors have any independent knowledge that the data in these four studies was falsified, let alone that Gino did the falsifying. *Faltas v. State Newspaper*, 928 F. Supp. 637, 648 (D.S.C. 1996), aff'd, 155 F.3d 557 (4th Cir. 1998) (accusation that plaintiff was a "liar" was protected where defendant never "insinuate[ed] that [he] ha[d] independent knowledge" apart from what he disclosed); *contrast Milkovich*, 497 U.S. at 21.

Ironically, Gino herself has persuasively demonstrated that the Data Colada Defendants disclosed the facts behind their conclusions. She has created a website, francesca-v-harvard.org, in which she critiques their analysis of the 2012 *PNAS* Study based on the same data they used. (Pyle Aff. Ex. G). Gino argues that the Data Colada Defendants "cherry picked" data, that they misunderstood the Excel metadata, and that they exaggerated the directionality of the out-of-order values. (*Id*.). In turn, a third party named Matthew Lilly has published an analysis of Gino's defense, arguing that some of her criticisms are unwarranted or unsupported, and that she herself engages in cherry picking. (Pyle Aff. Ex. H). This give-and-take would not be possible but for the fact the Data Colada Defendants disclosed the basis of their conclusions.

Gino makes much of the fact that in some of the publications, the Data Colada Defendants speculate that there might be more manipulation in the four studies than what they could spot, or that fraud may exist in other Gino-authored studies. (Am. Compl. ¶¶ 101-102; 237, 250). For example, the December Report states, "we do not believe that these eight [out-of-order] observations" in the data for the 2012 *PNAS* Study "are necessarily the only ones that may have been tampered with," and they may be "a mere subset, identifiable only because the person tampering with the data neglected to re-sort the dataset."[13] (Am. Compl. ¶ 101; Pyle Aff. Ex. A, at 5). Similarly, in Blog Post 1, the Data Colada Defendants speculate that given the evidence of fraud in Gino studies spanning "over a decade," they "believe that many more Gino-authored papers contain fake data. Perhaps dozens." (Am. Compl. ¶ 236; Pyle Aff. Ex. C).

Gino's reliance on these statements is unavailing. When a statement, read in context, is "'properly understood as purely speculation,'" it is "'protected as opinion.'" *Piccone*, 785 F.3d at 774, quoting *Gray v. St. Martin's Press,* 221 F.3d 243, 250 (1st Cir. 2000); *Lyons v. Globe*

---

[13] This statement evidently turned out to be correct. Harvard's forensics consultant determined that <u>52 percent</u> of the entries in the dataset for the 2012 *PNAS* Study had been altered with no apparent justification. (Am. Compl, Ex. 3 at 6). Gino's Amended Complaint does not dispute this finding.

*Newspaper Co.*, 415 Mass. 258, 266 (1993) (report that others had "voiced suspicion" of allegedly defamatory fact "plainly cautioned the reader that the article referred to a theory rather than to facts."). The statements about other potential fraud convey only the theory that, if a researcher's datasets over a decade show signs of fraud, other such examples may exist. "[I]n combination with the disclosure of underlying facts," it was clear the Data Colada Defendants were merely "speculating . . . about [an] inference," not stating facts. *Gray*, 221 F.3d at 250–51.

## II.   GINO, A PUBLIC FIGURE, HAS FAILED TO PLEAD FACTS PLAUSIBLY SHOWING ACTUAL MALICE.

Even if Gino could show that the Data Colada Defendants made some actionable statement, her complaint should still be dismissed. Gino is a public figure – meaning a person who "injects [her]self or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues," *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 13 (1st Cir. 2011) – and she has failed plausibly to allege that the Data Colada Defendants spoke with "actual malice," meaning "knowledge of the statement's falsity or reckless disregard for its truth." *Lemelson v. Bloomberg L.P.*, 903 F.3d 19, 23 (1st Cir. 2018).

The facts pleaded in Gino's Amended Complaint conclusively establish that she is a public figure.[14] She is "an <u>internationally renowned</u> behavioral scientist, author, and teacher." (Am. Compl. ¶ 2) (emphasis supplied); *see Ayyadurai*, 270 F. Supp. 3d at 357 (plaintiff was a public figure where "the complaint itself alleges that he 'is a world-renowned scientist, inventor, lecturer, philanthropist and entrepreneur.'"). She has been deemed one of the world's "most

---

[14] Contrary to Gino's argument in her opposition to Harvard's motion to dismiss, the determination of public figure status can be made on a motion to dismiss, and need not await discovery where (as here) the question "'can be determined based upon the pleadings alone.'" *Prince v. Intercept*, 634 F. Supp. 3d 114, 134 (S.D.N.Y. 2022), quoting *Biro*, 963 F. Supp. 2d at 270. In any event, Gino acknowledges her heightened burden by repeatedly asserting – albeit without supporting facts – that the Data Colada Defendants spoke with knowing or reckless falsity. (*See, e.g.,* Am. Compl. ¶¶ 384, 387, 390, 393).

influential management thinkers," (*id.* ¶ 40), and her work has been covered extensively in the media. (*Id.* ¶ 41); see *Gertz*, 418 U.S. at 344 ("[P]ublic figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy."). Gino has also voluntarily injected herself into an ongoing public controversy over the role and effects of dishonest behavior in society, and she has sought to influence the public's understanding of that subject in the media,[15] in her publications,[16] and via her website, francescagino.com – thereby inviting scrutiny into the accuracy (and honesty) of that work. *Lemelson,* 903 F.3d at 23. Moreover, Gino has published more than 140 academic articles, (Am. Compl. ¶ 2), and "anyone who publishes becomes a public figure in the world bounded by the readership of the literature to which [she] has contributed." *Dilworth v. Dudley*, 75 F.3d 307, 309 (7th Cir. 1996). Accordingly, Gino is a public figure, and must show that the Data Colada Defendants spoke with actual malice.[17]

"Actual malice is a 'wholly subjective' standard." *Lemelson*, 903 F.3d at 24, quoting *Levesque v. Doocy*, 560 F.3d 82, 90 (1st Cir. 2009). Neither "a mere deviation from reasonably

---

[15] *See, e.g.,* Francesca Gino et al., "How Dishonesty Drains You: Deceitful Behavior Diminishes our Ability to Read Emotions, with Many Consequences," *Scientific American,* Oct. 2, 2019; Francesca Gino, "Do Bonuses Promote Cheating?" *cnn.com*, June 3, 2014 ("[i]ncentives can lead to greater performance, but employees may be so focused on the potential of receiving them that they end up cutting corners and crossing ethical boundaries.")

[16] https://francescagino.com/researchpapers

[17] In her opposition to Harvard's motion to dismiss, Gino compares herself to the plaintiff in *Hutchinson v. Proxmire*, an obscure researcher at Kalamazoo State Mental Hospital. 443 U.S. 111 (1979) (Doc. No. 40 at 13). The comparison is inapt. Before the allegedly defamatory statements at issue, Hutchinson's "published writings" reached only "a relatively small category of professionals concerned with research in human behavior." *Id.* at 135. Professor Gino pleads very different facts: that her work was highly influential and was regularly discussed in the popular media. (Am. Compl. ¶¶ 40-41). Hutchinson's access to the media, "such as it was, came after the alleged libel," 443 U.S. at 135, whereas Gino had such access long before the Data Colada Defendants' statements. *See, e.g.,* Francesca Gino, "Leaders say they want nonconformist employees. They sure don't act like it." *Wall Street Journal*, May 16, 2017. Apart from the fact that both plaintiffs studied human behavior, they are nothing alike.

prudent conduct," nor "a departure from industry standards, alone, is insufficient to allege actual malice, even if that departure is 'extreme.'"[18] *Id.*, citing *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 665 (1989). "Rather, to satisfy the actual malice requirement, a plaintiff must point to sufficient evidence to permit the conclusion that the defendant <u>in fact entertained serious doubts</u> as to the truth of his publication, or actually had a high degree of awareness of probable falsity." *Id.* (emphasis supplied, internal quotations and citations omitted).

On a motion to dismiss, the courts ask whether the plaintiff has "laid out enough facts from which malice might reasonably be inferred," meaning her "well-pleaded facts must nudge [her] actual malice claim across the line from conceivable to plausible." *Lemelson,* 903 F.3d at 24 (cleaned up). Mere "buzzwords" will not do. *Schatz*, 669 F.3d at 56 (bare allegations that defendant "had 'knowledge' that its statements were 'false' or had 'serious doubts' about their truth and a 'reckless disregard' for whether they were false" insufficient). Courts perform a searching review of such allegations at the 12(b)(6) stage, because it "protects against the costs of meritless litigation" and "provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive." *Biro*, 963 F.Supp.2d at 279.

Here, Gino does not show that the Data Colada Defendants "in fact entertained serious doubts as to the truth of [their] publication[s]." *Lemelson,* 903 F.3d at 24 (cleaned up). Crucially, she does not plead facts showing they disbelieved that the suspicious data entries strongly supported her studies' reported outcomes in a way that couldn't be explained by chance. The lack of any dispute about the directionality of the suspicious data entries precludes any inference that data fraud "would have seemed so implausible as to cast doubt on [the Data Colada

---

[18] Thus, Gino's reliance on the fact that the Data Colada Defendants did not follow their typical policy of approaching the study author with their findings before going to her employer is insufficient to show actual malice, because it does not have any bearing on their subjective orientation to the truth of what they said. (Am. Compl. ¶¶ 68-69).

Defendants'] belief that it was true." *Id.*[19] Gino insists that she has "innocent explanations" for these highly convenient anomalies – and alternatively that her research assistants, not her, were responsible. (Am. Compl. ¶¶ 130, 136, 273). But even if her excuses had merit, that would not show that the Data Colada Defendants doubted what they wrote. *Lemelson,* 903 F.3d at 24.

Gino is especially bereft of facts showing actual malice as to the Blog Posts, which were all published after the Data Colada Defendants knew that Harvard had issued retraction notices for the four articles and had put Gino on administrative leave. (Am. Compl. ¶¶ 196, 224; Pyle Aff. Ex. C (Blog Post 1, dated June 17, noting Gino's leave and issuance of retraction notices)). Indeed, the Amended Complaint acknowledges that "third parties reasonably understood HBS's public announcement of Professor Gino's administrative leave to be connected to and a result of the outcome of her research misconduct proceeding and to mean that Professor Gino had falsified or fabricated data." (Am. Compl. ¶ 200). It is therefore undisputed that the Data Colada Defendants reasonably understood that Harvard's 18-month investigation had confirmed their suspicions of data fraud, so Gino cannot plausibly allege they "entertained serious doubts as to the truth" of the Blog Posts they published thereafter. *Lemelson*, 903 F.3d at 24.

Instead of presenting facts showing knowledge of falsity or recklessness at the time of publication, Gino attempts to sustain her burden by mischaracterizing a later statement by Simonsohn. In an online interview on July 18, 2023, Simonsohn was asked, "how do you think

---

[19] Gino alleges a number of facts that, if proven, would at most show that the Data Colada Defendants were negligent in their analysis. For example, she alleges that a duplicate observation they mentioned in Blog Post 1 was "equally likely" to be an "honest error" as it was "evidence of tampering," but that the Data Colada Defendants allegedly did not consider the alternative explanation. Similarly, Gino asserts that the Data Colada Defendants spoke "without making a reasonable inquiry and determination" as to the "truth or falsity" of other statements. (Am. Compl. ¶ 256). However, "the fact that . . . a reasonably prudent person would have investigated further, will not be sufficient to show actual malice." *Murphy v. Bos. Herald, Inc.*, 449 Mass. 42, 49 (2007).

we should be thinking about Francesca Gino's coauthors? recognizing that both you and I are in that set of, I think it's 151 people." Simonsohn replied:

> ". . . I think of coauthors as, primarily as victims. Right so they, so there's a, and –so I want to draw a distinction. No one has unambiguously claimed that this was Francesca Gino's doing. So the retractions don't say that. They just say, data she had and data she posted. My belief is that she did it but there's no evidence of it. But it doesn't really matter. <u>Because maybe let's say somebody else did it in her computer somehow.</u> You as a coauthor are equally victimized by that by that person. So primarily you are a victim of that person.

(Compare Am. Compl., ¶ 232, and https://www.youtube.com/watch?v=OPUKyeetdt8&t=6s) (at min. 8:35).[20] From this, Gino alleges that "Defendant Simonsohn admitted . . . that there was no evidence that Professor Gino manipulated data." (*Id.*).

This allegation attacks a straw man. The publications do not state that Francesca Gino *herself* committed the manipulation. They do show (in great detail) that there was "evidence" of "manipulated data" in the studies, and that Gino was responsible for collecting the data – a fact that is both undisputed and plainly constitutes some "evidence" that she did the manipulating. (Pyle Aff., Exs. A, C-F). Still, the Data Colada Defendants carefully framed their findings as "Evidence of Fraud in Academic Articles Authored by Francesca Gino," (Pyle Aff., Ex. A, p. 1), not "evidence Francesca Gino committed fraud." Further, they allow for the possibility that someone else with access to Gino's computer or passwords may have been responsible. (*See, e.g.*, Pyle Aff. Ex. D ("We retrieved the data from the OSF . . . where Gino (<u>or someone using her credentials</u>) posted it in 2015." (emphasis supplied)). Thus, Simonsohn's similar statement that there was no direct evidence Gino manipulated data as opposed to "somebody else" who "did it in her computer somehow" does not come close to showing actual malice.

---

[20] Gino's quotation of the statement in her Amended Complaint misleadingly omits the underlined sentence and everything after it.

Otherwise, Gino relies on conclusory statements about research practices generally to argue the Data Colada Defendants knew their "inferences" were "unwarranted." (Am. Compl. ¶¶ 243, 249, 263-264). For example, she asserts that the Data Colada Defendants would have known that the original survey responses for the 2012 *PNAS* Study collected on paper, and this was a "plausible reason" why the spreadsheet data "was not sorted in any particular order." (Am. Compl. ¶ 246). Gino ignores what the Data Colada Defendants actually stated: that the 2012 *PNAS* Study data was moved *within* Excel. (Pyle Aff. Ex. C). It also ignores that the out-of-order data all supported the hypothesized outcome, a trend that would have had an infinitesimally small likelihood of occurring at random. (*Id.*). In short, none of Gino's factual allegations remotely shows that any of the Data Colada Defendants subjectively disbelieved that the inference of data fraud was the correct one.[21] (Am. Compl. ¶¶ 246, 254). *Portnoy v. Insider, Inc.*, No. CV 22-10197-FDS, 2022 WL 16748583, at *6 (D. Mass. Nov. 7, 2022), appeal dismissed, No. 22-1880, 2023 WL 3444838 (1st Cir. Feb. 2, 2023) (dismissing complaint where its "specific factual allegations do not support" the "conclusion" of actual malice).

Finally, Gino baldly asserts that the Data Colada Defendants are "biased" and "unreliable." (Am. Compl., ¶ 209). She asks the Court to draw some inference (she doesn't say what) from the fact that they contacted her employer without soliciting feedback from her first – ignoring that they asked Harvard to give a "full opportunity for Professor Gino to explain apparent anomalies." (Pyle Aff., Ex. A at 1). Gino even asks the Court to infer from their gender

---

[21] In one particularly strained effort to plead actual malice, Gino points to the fact that she provided defendant Leif Nelson with the dataset for the 2014 *Psychological Science* study after he requested it for use in a discussion group, but the Data Colada Defendants did not submit their December Report to Harvard suggesting its data may be fake until seven years later. (Am. Compl. ¶ 258). Contrary to her allegations, this delay does not "suggest[] that when Professor Gino gave [Nelson] the data he found no evidence of fraud, and accordingly Data Colada published Blog Post 3 with knowledge of its falsity." (Am. Compl. ¶ 259). Rather, it suggests only that Nelson did not immediately analyze the data for fraud, as opposed to using it for his discussion group. (*Id.* ¶ 258); *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996) (Rule 12(b)(6) does not force courts to accept "bald assertions" and "unsupportable conclusions.")

("all male") that they were biased against Gino and other women academics. (*Id.* ¶¶ 4, 307-311,

331). However, "a bare assertion of bias, without further facts demonstrating that the alleged bias

was accompanied by knowledge of or reckless disregard for falsehood, has little purchase in the

actual malice assessment." *Davis v. Theriault*, No. 1:22-CV-00275-JDL, 2023 WL 5628193, *58

(D. Me. Aug. 31, 2023) (internal quotation omitted). That is all Gino has, and it is insufficient.

### III. GINO'S CONSPIRACY AND TORTIOUS INTERFERENCE CLAIMS SHOULD BE DISMISSED BECAUSE THEY ARE DERIVATIVE OF HER DEFECTIVE LIBEL CLAIM AND ARE INADEQUATELY PLEADED.

Counts IX and X, for interference with contractual relationships and "conspiracy to

defame," are based on the same facts as Gino's defective libel claims. A plaintiff cannot end-run

First Amendment protections simply by "restat[ing] [a] defamation claim under a different

heading." *Brown*, 54 F.3d at 27; *Piccone*, 785 F.3d at 774 (dismissing interference with

advantageous relations claim based on the same protected opinions as failed defamation claim);

*Mullane v. Breaking Media, Inc.,* 433 F. Supp. 3d 102, 115 (D. Mass. 2020), aff'd, No. 20-1061,

2021 WL 3027150 (1st Cir. Feb. 26, 2021) (dismissing civil conspiracy claim based on allegedly

defamatory article protected by privilege and the First Amendment). Accordingly, Counts IX and

X should be dismissed for the reasons set forth above.

The conspiracy count also fails because it seeks to impose liability on the Data Colada

Defendants for statements that they are not alleged to have participated in making, such as

Harvard's announcement of Gino's administrative leave and its retraction requests. (Am. Compl.

¶¶ 196-201; 202-220; 410-412). A defendant is only liable for statements he participates in

publishing, or statements "by a third person whom as his servant, agent or otherwise he directs or

procures to publish defamatory matter." Restatement (Second) of Torts § 577, comment f (1977).

Gino has not shown that the Data Colada Defendants participated in Harvard's statements or

"direct[ed]" it to publish anything. Further, Gino has failed to allege facts showing the Data Colada Defendants even knew what statements Harvard intended to publish, let alone that they doubted their truth, as is required in this public figure case. *See* Section II, *supra.*

Gino's interference claim also fails on its own terms. She alleges the Data Colada Defendants made "false allegations of malfeasance against Plaintiff and threats [to Harvard] to publicize their claims on their blog," and thereby interfered with her Harvard employment agreement. (Am. Compl. ¶ 69). The tort, however, requires that the defendants "knowingly induced the third party to <u>break the contract</u>," not just that they induced it to take some action. *TalentBurst, Inc. v. Collabera, Inc.,* 567 F. Supp.2d 261, 267 (D. Mass. 2008) (emphasis supplied). Moreover, a defendant must be alleged to "know that he is interfering with [the] performance" of the contract, not just that a contract exists. *Yiakas v. Savoy*, 26 Mass. App. Ct. 310, 315 (1988). Gino alleges no facts showing the Data Colada Defendants knew their actions would cause Harvard to (allegedly) apply the wrong disciplinary standard, or to deprive her of a fair process. To the contrary, they told Harvard in the December Report that it should provide a "full opportunity for Professor Gino to explain apparent anomalies." (Pyle Aff., Ex. A at 1).

CONCLUSION

For the foregoing reasons, Gino's complaint fails to state a claim against Uri Simonsohn, Leif Nelson, or Joseph Simmons, and the Court should dismiss Counts VII-X with prejudice.

Respectfully Submitted,

URI SIMONSOHN, LEIF NELSON, AND
JOSEPH SIMMONS,

By their attorney,

/s/ *Jeffrey J. Pyle*
Jeffrey J. Pyle (BBO #647438)
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA 02110
(617) 456-8000 (tel)
(617) 456-8100 (fax)
jpyle@princelobel.com

## CERTIFICATE OF SERVICE

I hereby certify that the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and by first-class mail to any non-registered participants.

/s/ *Jeffrey J. Pyle*
Jeffrey J. Pyle