UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **FRANCESCA GINO,**<br><br>*Plaintiff,*<br><br>v.<br><br>**PRESIDENT AND FELLOWS OF HARVARD COLLEGE, SRIKANT DATAR, URI SIMONSOHN, LEIF NELSON, JOSEPH SIMMONS, JOHN DOES 1-10, AND JANE DOES 1-10,**<br><br>*Defendants.* | Civil Action No. 1:23-cv-11775-MJJ |

<u>**MEMORANDUM IN OPPOSITION TO MOTION OF THE REPORTERS COMMITTEE**</u>

<u>**FOR FREEDOM OF THE PRESS AND THE NEW YORKER TO INTERVENE AND TO**</u>

<u>**UNSEAL JUDICIAL RECORD**</u>

**NESENOFF &MILTENBERG, LLP**
*Attorneys for Plaintiff Francesca Gino*
**363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500**

**101 Federal Street, 19th Floor
Boston, Massachusetts 02110
(617) 209-2188**

## INTRODUCTION

Plaintiff Francesca Gino ("Plaintiff") respectfully submits this Memorandum of Law in Opposition to the Motion filed by the Reporters Committee for Freedom of the Press and the New Yorker, (together, "Media Intervenors"), to Intervene and to Unseal Judicial Record (*See* Doc. 34). As discussed *infra,* the Motion should be denied because (i) the document at issue, a so-called "Final Report," is not a "judicial record" to which a common law or First Amendment right of access attaches; and (ii) to the extent the document were deemed a "judicial record," in the context of this case, the presumption of public access is outweighed by competing considerations weighing in favor of Plaintiff's privacy interests, at least until the close of discovery.

## **FACTS**[1]

On October 27, 2021, Plaintiff, a faculty member at the Harvard Business School ("HBS"), was informed of allegations against her of research misconduct and HBS's intent to open an "initial inquiry" into pursuant to a new Interim Policy. (Doc. No. 6 at ¶¶ 93-96).[2] Plaintiff has alleged that the inquiry and investigation process and findings were flawed and inconsistent with the standards set forth in the new Interim Policy, resulting in an erroneous outcome. (*Id.* ¶¶ 168-176). Among the procedural irregularities, Plaintiff was given insufficient time to review data forensic reports, (*see id.* at ¶¶ 121-122, 127), for which she was never provided the underlying data (*id.* ¶ 128) which, although lengthy, were ultimately non-probative and inconclusive. (*Id.* ¶¶ 117, 129).

Plaintiff has alleged that Defendant President and Fellows of Harvard College ("Harvard") and Defendant Srikant Datar ("Dean Datar"), (together, "Defendants"), disclosed confidential information concerning the investigation and misconduct process, in violation of Harvard's

---

[1] A full recitation of the facts can be found in the Second Amended Complaint. (Doc. No. 6).
[2] The allegations against Plaintiff were made by Defendants Leif Nelson, Joseph Simmons, and Uri Simonsohn, a trio of behavioral scientists with a blog named Data Colada, (and who are collectively referred to herein as "Data Colada"), who, instead of following their usual practice of reaching out directly to the scientist with concerns, reached out in secret to Plaintiff's employer. (*See id*. ¶¶ 68-70.)

1

applicable employment policies, including the Discipline Policy (Doc. No. 6 at ¶¶ 64-65), the Faculty Review Board ("FRB") Policy and FRB process (*id*. ¶¶ 189-193, 295), the 2013 Policy (*id*. ¶¶ 188, 292), as well as the Interim Policy (*id*. ¶¶ 186-187, 228).  The Interim Policy limited disclosures of information concerning Plaintiff's research misconduct proceeding to a *"need to know"* basis. (*See* Doc. No. 6 at ¶¶ 186-187, 228; Doc. No. 6-2 at 3).[3]  However, Plaintiff's peers in the academic and scientific communities, the media, and the general public learned about the investigation and research misconduct process. (*See id.* at ¶¶ 195--230).

For instance, on or about the evening of June 13, 2023, HBS publicly announced on its website that it was placing Plaintiff on administrative leave, (*id*. ¶ 196), while Defendants contemporaneously began to aggressively send excessive retraction notices that unnecessarily publicized the details of the confidential investigation, (*id*. ¶¶ 202-218).  The retraction notices Harvard sent to third-parties were contrary to Defendants' standard practices, and selectively publicized details of the investigation, removing all information that was exculpatory and limiting. (*Id*. ¶ 204).

The retraction notices also contained false and defamatory statements, express or implied, (*id*. at ¶¶ 202-220; Doc. No. 6-3, Doc. No. 6-4, and Doc. No. 6-5) and falsely conveyed to any reader that Plaintiff had intentionally tampered with data to affect the outcome of the study (*id*. ¶ 205).[4]  After sending out the retraction notices, Defendants unnecessarily disclosed information about the retraction notices, themselves, to persons other than the editors of the journals involved

---

[3] Imprinted on every page of the so-called Final Report rendered by the Harvard investigation committee that handled Plaintiff's misconduct process was the word: "CONFIDENTIAL." (Doc. No. 6 at ¶ 185).

[4] Defendants attached to each of the retractions notices an "appendix" that contained a mash-up of unattributed portions of a false and defamatory statement submitted by Data Colada to the HBS investigative committee in December 2021 ("the December Report") and a forensic report from Harvard's investigation. (*See* Doc. No. 6 at ¶¶ 100-105, 115-117, 129, 209, 211, 214; Doc. No. 6-3; Doc. No. 6-4, Doc. No. 6-5).  To the extent that Defendants relied on a statement that Data Colada had provided during the in December 2021 (the "December Report") for the retraction notices, they knew that Data Colada was a biased, unreliable source, interested in creating controversy for Harvard. (*See* Doc. No. 6 at ¶¶ 66-70, 203-221).

2

in publishing the original research, who had no need to know about the retractions or the research misconduct proceeding. (*Id.* ¶¶ 219-220).

In addition, on June 14, 2023, Defendants informed the doctoral students in Plaintiff's unit, all of Plaintiff's colleagues at HBS, and other third-parties who did not need to know of the confidential misconduct proceeding (*id.* ¶ 221). On June 17, 2023, Defendant Uri Simonsohn, Defendant Leif Nelson, and Defendant Joseph Simmons, launched a vicious, defamatory smear campaign against Plaintiff in a four-part series of blog posts on their blog, Data Colada, in which they falsely asserted Plaintiff engaged in "data fraud" and referenced Harvard's investigation (*id.* ¶¶ 15, 233-276), resulting in Plaintiff receiving even more negative media attention as well as misogynistic hate mail from around the world. (*Id.* at ¶¶ 267, 278-279). And, on June 22, 2023, Dean Datar emailed the entire faculty at HBS to notify them of Plaintiff's research misconduct proceeding and connected it to Plaintiff's administrative leave, effectively disclosing to the entire faculty the status and outcome of Plaintiff's investigation process, an action that Defendants had never done previously in connection with a misconduct proceeding (*id.* ¶¶ 197-198).

As a result of Defendants' multiple disclosures concerning the investigation process and their false and defamatory statements, Plaintiff has suffered devastating reputational damage, lost income and career opportunities, and economic harm from damage to her contractual relationships, including with Harvard Business Publishing and Portfolio, a book publisher. (*Id.* at ¶¶ 226, 314-318, 360-379, 426-432, 433-439).

On August 8, 2023, Plaintiff filed her Amended Complaint.[5] On October 10, 2023, Defendants Harvard and Dean Datar filed a Partial Motion to Dismiss the Complaint (Doc. No.

---

[5] Plaintiff's Complaint states claims for breach of contract, breach of the implied covenant of good faith and fair dealing, estoppel, defamation, civil conspiracy to commit defamation, intentional interference with contractual relations, intentional interference with advantageous relations, violation of privacy under Mass. G.L. c. 21, § 1B, and gender discrimination under Title IX. (Doc. No. 6)

3

18) and a motion for leave to file partially under seal, seeking to (i) "publicly file a copy of the Final Report [i.e., Defendant Harvard's investigative report in Plaintiff's misconduct case] containing minimal redactions" (of third-party witnesses) and (ii) "file, under seal, an unredacted copy of the Final Report indefinitely or until further order of this Court." (*See* Doc. 22 at 1-2).

Plaintiff opposes the filing of the Final Report (see Doc. No. 29) and has filed a cross motion to request that, in the event the Court grants Defendants' motion to file the Final Report partially under seal, that the entire Final Report remain under seal until the completion of discovery in this case. (Doc. No. 27). Consistent with Local Rule 7.2(c), the Final Report has not yet been presented to the Court.[6] Media Intervenors have filed a Motion seeking to intervene and to contest any sealing of the Final Report. (*See* Doc. No. 34).

## ARGUMENT[7]

### I. The Final Report Does Not Qualify As A "Judicial Record"

The Media Intervenors seek to intervene under Rule 24(b) "for the limited purpose of arguing in favor of unsealing the Final Report." (Doc. No. 34 at 3.) The threshold question is whether the Final Report qualifies as a *judicial record*, as only judicial records are subject to a presumptive right of public access, whether on common law or First Amendment grounds. *See United States v. Kravetz*, 706 F.3d 47, 54 (1st Cir. 2013); *In Re Boston Herald,* 321 F.3d 174, 181 (1st Cir. 2003); *Dahl v. Bain Cap. Partners, LLC*, 891 F. Supp. 2d 221, 224 (D. Mass. 2012). The common law presumption of access applies generally to all judicial documents, but can be overcome if outweighed by countervailing privacy interests, as determined in the Court's discretion. *See, e.g., Boston Herald,* 321 F.3d at 190.

---

[6] On October 10, 2023, Defendants' counsel submitted a "Declaration" to which she attached a document titled "Exhibit 5" as a "placeholder" for a minimally redacted copy of the Final Report. (Doc. No. 20 at 2).
[7] Unless indicated otherwise, internal quotation marks and citations are omitted and emphasis added.

4

To qualify as a 'judicial document' subject to a presumptive right of public access, the item filed must be relevant to the performance of the judicial function and useful in the judicial process. *United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 134 (2d Cir. 2017). "Though filing a document with the court is not sufficient to render the document a judicial record, *it is very much a prerequisite*." *S.E.C. v. Am. Int'l Grp*, 712 F.3d 1, 4 (D.C. Cir. 2013) ("A judicial decision is a function of the underlying record, and if a document was never part of that record, it cannot have played any role in the adjudicatory process.").

The Final Report has not been filed with the Court, so does not qualify as a "judicial record."[8]  However, even if the Final Report had been filed with the Court, it would still not qualify as a "judicial record."  Whether something is a judicial record depends on the *role* it plays in the adjudicatory process; the presumption of access extends only to "materials on which a court relies in determining the litigants' substantive rights." *See Kravetz*, 706 F.3d at 54; *F.T.C. v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 408 (1st Cir. 1987) (same).

Accordingly, that a document may be filed with the court as the subject of a protective order or the court's ruling on a motion to seal does *not* render the document a judicial record for purposes of the right of public access. *S.E.C. v. Am. Int'l Grp.,* 712 F.3d 1, 4 (D.C. Cir. 2013) (citing *United States v. El-Sayegh*, 131 F.3d 158, 162 (D.C. Cir. 1997)). Likewise, no public right of access attaches to pre-trial discovery documents and proceedings in civil cases. *See Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 104 (1984).  Rather, a document must have immediate *relevance* to the judicial function to qualify as a judicial record. *Kravetz*, 706 F.3d at 55 (judicial records are those "on which a judge actually decides the central issues in a case"); *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995) (An item is properly designated a judicial document where it is "relevant

---

[8] *See supra* note 6.

to the performance of the judicial function and useful in the judicial process."); *United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 134 (2d Cir. 2017) ("to qualify as a 'judicial document' subject to a presumptive right of public access, the item filed must be *relevant* to the performance of the judicial function and useful in the judicial process")

Here, the Final Report, while not yet filed in the Court, would not become a "judicial record" simply by virtue of being filed, as it is not germane to assessing the viability of the Amended Complaint; and, it is not sufficient that the document could become relevant *later. See HSBC Bank USA*, N.A., 863 F.3d at 139 ("The mere filing of a paper or document with the court is insufficient to render that paper a judicial document. If the rule were otherwise, deposition transcripts, interrogatories, and documents exchanged in discovery would become "judicial documents" to which the public could demand access before the parties had even contemplated filing such documents with the court.")

That the Final Report *could* later become relevant to the judicial function at the summary judgment stage does not make the document a judicial record now. *See HSBC Bank USA*, 863 F.3d at 141–42 ("Our case law is clear that *pleadings and summary judgment papers*, for example, are judicial documents upon filing—which is eminently sensible given that such documents, by definition, ask the court to grant (or reject) some relief. But that does not mean that any document that is docketed with a court is a judicial document, *regardless of the likelihood that it will ever be relevant to the judicial function.*"). The Final Report may well become relevant *later,* in summary judgment papers, but it is not relevant now to the judicial function of the Court, and does not require the Court to make any decisions about it at the pleadings stage.

For example, in a factually analogous case, *Doe v. Harvard Univ.*, 462 F. Supp. 3d 51, 59–60 (D. Mass. 2020), in which the defendant requested that the court consider an investigative report

6

attached to its motion to dismiss, the court declined to consider the document for its truth. The court distinguished the investigative report from policy documents, the authenticity of which were undisputed and which were "central to Plaintiff's contract claims," explaining:

> That a complaint mentions a document, or even repeatedly refers to the document, is not enough, however, if that document is not integral to the claim or explicitly relied upon as a basis for liability.
>
> Here, the court has considered the FAS Policy and the University Procedures submitted by Defendants as they are central to Plaintiff's contract claims and their authenticity is not in dispute. *The court declines to consider the Final Report proffered by Defendants for the truth of the statements set forth therein, for although Plaintiff has referenced the Final Report, it is generally because he disagrees with its conclusions, and not because he has adopted the university's investigatory findings*.

*Id.*

In *Doe,* 462 F. Supp. 3d 51, the parties had stipulated to the filing of the investigative report under seal. However, in other factually analogous cases, courts in other jurisdictions have held that documents filed in connection with a defendant's motion to dismiss do *not* constitute "judicial records" for which the right of public access attaches, reasoning that such documents play no role in the adjudication of the motion to dismiss. *See In re Policy Mgmt. Sys. Corp.*, 67 F.3d 296, 1995 WL 541623, at *4 (4th Cir. 1995) (holding that documents filed in connection with a motion to dismiss and excluded by the court" which played no role in the district court's adjudication of the motion to dismiss did not "constitute judicial records" for purposes of the common law presumption of access); *see also Trustees of Purdue Univ. v. Wolfspeed, Inc.*, 620 F. Supp. 3d 393, 401 (M.D.N.C. 2022) (same).[9]

---

[9] In contrast to a proposed exhibit to a motion to dismiss, "a complaint, which initiates judicial proceedings, is the cornerstone of every case, the very architecture of the lawsuit, and access to the complaint is almost always necessary if the public is to understand a court's decision," and the "modern trend in federal cases is to classify pleadings in civil litigation (other than discovery motions and accompanying exhibits) as judicial records. *Bernstein v. Bernstein Litowitz Berger & Grossman LLP*, 814 F.3D 132, 140. (2nd Cir. 2016).

While at *the summary judgment stage*, the Final Report may well become a judicial record, if it is relevant to the motion for summary judgment, that day has not yet arrived. Because the Final Report is not a "judicial document" filed with the Court and is not relevant to the adjudication of the pending motions to dismiss (Doc. No. 18; Doc. No. 41), there is no need to reach the question of whether a First Amendment or common law right of access attaches. However, as discussed *infra*, even assuming, *arguendo,* that the Final Report were a "judicial record" for purposes of the public right of access, no common law right of access or First Amendment right of access attaches in this case.

### II. Assuming, Arguendo, the Common-Law Presumption of Access Attaches, It is Outweighed by Countervailing Interests

The First Circuit has explained that:

> Under the common law, there is a long-standing presumption of public access to judicial records. This presumption of access helps safeguard the integrity, quality, and respect in our judicial system, and permits the public to keep a watchful eye on the workings of public agencies. Despite these important interests advanced by public access to judicial records, the right of access is not absolute. As the Supreme Court has recognized, every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes. Courts have exercised their discretion under the common law to abrogate the right of public access where doing so was necessary to prevent judicial records from being used to gratify private spite or promote public scandal or to prevent their records from becoming reservoirs of libelous statements for press consumption or sources of business information that might harm a litigant's competitive standing.

*In re Gitto Glob. Corp.*, 422 F.3d 1, 6 (1st Cir. 2005).[10]

To the extent that a document is deemed a public record, "*good cause"* can override the public's rights of access. *Tourangeau v. Nappi Distributors*, No. 2:20-CV-00012-JAW, 2022 WL 768688, at *7 (D. Me. Mar. 14, 2022); *see also Bradford & Bigelow, Inc. v. Richardson,* 109 F.

---

[10] *In re Gitto Glob. Corp.*, the First Circuit examined the presumption of the right of public access to "defamatory and scandalous" material in the context of a bankruptcy statute. *See* 422 F.3d at 16-17.

Supp. 3d 445, 448 (D. Mass. 2015). Accordingly, the Court has discretion to deny public access to court files that are used as a vehicle for improper purposes. *See In Re Boston Herald, Inc.,* 321 F.3d at 190; *F.T.C. v. Standard Fin. Mgmt. Corp.,* 830 F.2d at 410 ("[T]he public's right to inspect such records is not absolute. It can be blunted if court files might become a vehicle for improper purposes or where access could interfere with the administration of justice."); *In re Caswell's Request*, 18 R.I. 835, 29 A. 259, 259 (1893) ("no one has a right to examine or obtain copies of public records from mere curiosity, or for the purpose of creating public scandal" or "to gratify private spite").

Here, Plaintiff opposes Defendants' motion to file the investigative report (*see* Doc. No. 29) and has called into question Defendants' purpose in seeking to publicly file the Final Report, suggesting Defendants' aim is to further damage her reputation, by "making public a complex and unwieldy 1,200-page report that comports with their own narrative of events" and which, "[b]ereft of expert analysis or interpretation, . . . would have little probative value yet be accepted as true by the public." (*See* Doc. No. 29 at 13). Plaintiff has also filed a cross motion, requesting that, to the extent the Court deems the Final Report a "judicial record," the document remain under seal until discovery in this case is complete. (*See* Doc. No. 28). In her memorandum in support of her cross-motion, Plaintiff again addressed the potential for further damage to her reputation from the "premature" release of the Final Report. (*See id.* at 3). The Court should exercise its discretion to deny access to the Final Report at this time based on the potential improper purpose of Defendants' sought disclosure.

In addition, when assessing the privacy interests of the person opposing the disclosure, a court should also balance the interests of public access with an asserted right to privacy by looking to factors that include "the extent to which the subject matter is traditionally considered private,

9

the sensitivity of the information at issue, the intended use of the information, the reliability of the information, and the extent to which the party would have a fair opportunity to respond to accusations contained in the material." *Pascal Abidor, Nat'l Ass'n of Crim. Def. Laws. v. Johnson*, No. 10-CV-4059 (ERK), 2016 WL 3102017, at *5 (E.D.N.Y. June 2, 2016); *United States v. Amodeo*, 71 F.3d at 1051 (examining the need to assess the weight of "the nature and degree of injury" to the person opposing disclosure).

Here, consideration of the above factors weighs in favor of non-disclosure. The subject matter of the document is a research misconduct proceeding which is traditionally considered private. It is commonly understood that allegations of research misconduct can deal a deathblow to the professional reputation and career of a scientist. As alleged in the Complaint, although Harvard's Interim Policy promised Plaintiff confidentiality, Defendants breached their obligations of confidentiality under that policy and Harvard's other employment policies. (*See supra* at 1-3). Contrary to the Media Intervenors contentions otherwise (Doc. 34 at 10), Plaintiff has cited significant reputational and professional harms through the dissemination of the Final Report, particularly as it would be taken out of context, and without the benefit of expert analysis. (*See* Doc. No. 29 at 13; Doc. No. 28 at 3). Courts have found that such privacy interests do overcome the public right of access. *Pascal Abidor, Nat'l Ass'n of Crim. Def. Laws. v. Johnson*, No. 10-CV-4059 (ERK), 2016 WL 3102017, at *7 (finding "sympathetic and persuasive the plaintiff's arguments that publication would cause "reputational and professional harms, and would be prejudicial to [his] efforts to obtain academic employment," particularly when the records to be disclosed would be "without context, leave[ing] the public to draw the most damaging conclusions"). Accordingly, the Court should consider these privacy interests and balance them against the weak presumption of access presented by the document at issue.

Defendants' intended use of the information also favors non-disclosure, as Defendants arguments in support of disclosure indicate that they are motivated by spite or to suppress Plaintiff's efforts to mitigate the damage they have already wrought to her reputation through their disclosures. (*See* Doc. No. 23 at 6) (referencing Plaintiff's "*public statements*" and emphasizing that Plaintiff *"cannot be permitted to quote [the Final Report] . . . to the public"*). However, Plaintiff's public comments concerning the Final Report are *not* a valid ground to discount her privacy interest. *See Pascal Abidor*, 2016 WL 3102017, at *5 ("A party's issuance of a press release on the matter in question, . . . does not provide grounds to discount a privacy claim.") (citing *United States v. Amodeo*, 44 F.3d at 144).

The Media Intervenors similarly erroneously contend that "Plaintiff initiated this high-profile lawsuit in response to the already public—indeed, highly publicized accusations—that she falsified data." (Doc. No. 34 at 8). First, Plaintiff's initiation of a lawsuit is irrelevant to her privacy interest. Second, as alleged in the Amended Complaint, Defendants' conduct, *not* Plaintiff's, precipitated the publicity surrounding her misconduct proceeding by breaching their duties of confidentiality through their multiple disclosures to third parties with no need to know of the misconduct process. Again, Plaintiff's public statements concerning the Final Report (which can be seen as an effort to mitigate damages), is *not* a ground to discount her privacy interests.

Plaintiff should be permitted a fair opportunity to respond to the accusations in the materials contained in the Final Report, including the forensic data analyses. Plaintiff has plausibly alleged that Defendants' investigation and inquiry process unfairly deprived her of an opportunity to respond to the allegations, and that she was never provided the underlying data used for the forensic data analyses, *see supra* at 1. As Plaintiff discussed in her memorandum in support of her cross motion to impound the Final Report, by waiting to release the Final Report until discovery

11

in this case is complete, Plaintiff would have a fair opportunity to respond to the materials in the Final Report, without abrogating any legitimate right of public access to the document. (*See* Doc. 28 at 3). Plaintiff should not be prejudiced, either in this Court's proceedings or in the public sphere, by having to contest the one-sided, false and erroneous allegations in the Final Report without a fair opportunity to respond. *See Amodeo*, 71 F.3d at 1051 ("raw, unverified information should not be as readily disclosed as matters that are verified").

### III. No First Amendment Right of Access Attaches to the Final Report.

The Media Intervenors have asserted—with no explanation—a First Amendment right to access the Final Report. (*See* Doc. No. 34 at 1.) In *Press–Enterprise Co. v. Superior Court*, 478 U.S. 1, 8–9 (1986) ("*Press-Enter II*"), the Supreme Court set forth a two-part standard to determine if a First Amendment right of access attaches to a court proceeding or document. Under *Press-Enter II*, a First Amendment right of access attaches when (1) *the documents or proceeding at issues "have historically been open to the press and general public"* and (2) *"public access plays a significant positive role in the functioning of the particular process in question*." *See Kravetz*, 706 F.3d at 54; *see also Washington Post v. Robinson*, 935 F.2d 282, 288 (D.C. Cir. 1991) ("if such access has historically been available and serves an important function of monitoring prosecutorial or judicial misconduct").

Under this standard, the Supreme Court has recognized a qualified First Amendment right of access to certain judicial proceedings and documents. *See Com. v. Winfield*, 464 Mass. 672, 674, 985 N.E.2d 86, 89 (2013) (discussing *Commonwealth v. Cohen*, 456 Mass. 94, 106, 921 N.E.2d 906 (2010)*, Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604–606 (1982), and *Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 508 (1984)). Even assuming*, arguendo*, that the First Amendment right of access applies to anything beyond criminal proceedings, the

Media Intervenors have provided no more than a generalized claim to a First Amendment right of access, which fails to meet the standard under *Press-Enter II*. *See Kravetz*, 706 F.3d at 57.

## CONCLUSION

Based on the foregoing, Plaintiff Francesca Gino respectfully requests that the Court deny in its entirety the Motion filed by the Reporters Committee for Freedom of the Press and the New Yorker to Intervene and to Unseal the Judicial Record.

**Dated: November 17, 2023**

      **Boston, Massachusetts**      Respectfully submitted,

            **NESENOFF & MILTENBERG, LLP**
            *Attorneys for Plaintiff Francesca Gino*

            **By:** /s/ *Julie A. Sacks*
            **Andrew T. Miltenberg, Esq.**
            (***pro hac vice*** **forthcoming**)
            **Kara L. Gorycki, Esq.**
            (***pro hac vice*** **forthcoming**)
            **363 Seventh Avenue, Fifth Floor**
            **New York, New York 10001**
            **(212) 736-4500**
            **amiltenberg@nmllplaw.com**
            **kgorycki@nmllplaw.com**

            **Tara Davis, Esq. (BBO No. 675346)**
            **Julie A. Sacks, Esq. (BBO No. 674384)**
            **101 Federal Street, 19th Floor**
            **Boston, Massachusetts 02110**
            **(617) 209-2188**
            **tdavis@nmllplaw.com**
            **jsacks@nmllplaw.com**

**CERTIFICATION OF SERVICE**

I hereby certify that on November 17, 2023, this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated:  November 17, 2023              */s/ Julie A. Sacks*
                                       Julie A. Sacks