**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **FRANCESCA GINO,** | |
| *Plaintiff,* | |
| **v.** | Civil Action No. 1:23-cv-11775-MJJ |
| **PRESIDENT AND FELLOWS OF HARVARD COLLEGE, SRIKANT DATAR, URI SIMONSOHN, LEIF NELSON, JOSEPH SIMMONS, JOHN DOES 1-10, AND JANE DOES 1-10,** | |
| *Defendants.* | |

<u>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**</u>

**NESENOFF & MILTENBERG, LLP**
***Attorneys for Plaintiff Francesca Gino***
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**

**101 Federal Street, 19th Floor**
**Boston, Massachusetts 02110**
**(617) 209-2188**

**November 22, 2023**

**INTRODUCTION**

Plaintiff Francesca Gino ("Plaintiff" or "Professor Gino") respectfully submits this Memorandum of Law in Opposition to the Rule 12(b)(6) motion filed by Defendants Uri Simonsohn ("Simonsohn"), Leif Nelson ("Nelson"), and Joseph Simmons ("Simmons"), (collectively, "Data Colada" or "Defendants"), seeking to dismiss Plaintiff's Amended Complaint (the "Motion"). As Plaintiff has plausibly alleged entitlement to relief on all her claims, Defendants' Motion should be denied in its entirety.

Defendants argue that their defamatory statements should be viewed as "opinion" and "immunized" under the First Amendment. However, Defendants' defamatory statements are not "opinion," but defamatory statements of fact, express and implied, that are capable of being proved true or false. "Neither lies nor false communications serve the ends of the First Amendment." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1992). Binding precedent has "acknowledged the important social values which underlie the law of defamation, and recognized that society has a pervasive and strong interest in preventing and redressing attacks upon reputation." *See Milkovich v. Lorain J. Co.*, 497 U.S. 1, 22–23 (1990). Accordingly, it would be inappropriate to resolve Plaintiff's allegations at the motion to dismiss stage, without a full examination of the facts. Defendants' Motion should be denied, discovery should proceed, and the offenders should be held responsible for their wrongdoing.

**RELEVANT FACTS**[1]

Plaintiff is employed by the President and Fellows of Harvard College ("Harvard University" or "Harvard") as a tenured Professor at the Harvard Business school ("HBS"). (Doc. No. 6 at ¶ 1). Plaintiff is a behavioral scientist and an award-winning researcher and author. (*Id.*

---

[1] A full recitation of the facts can be found in the Second Amended Complaint. (Doc. No. 6).

at ¶¶ 36-38, 40, 51, 55, 57). The focus of Plaintiff's work is studying the psychology behind the decisions people make, to learn how people can thrive at work and better engage with one another. (*Id.* ¶ 36). Plaintiff has written over 140 academic articles, many of them in collaboration with others. (*Id.* at 38). Plaintiff has never falsified or fabricated data. (*Id.* ¶ 3).

Defendants are behavioral scientists and employed as university professors: Simonsohn at ESADE business school in Ramon Llull University in Barcelona, Spain, Simmons at the Wharton School at the University of Pennsylvania, and Nelson at Haas School of Business at the University of California, Berkeley. (*Id.* at ¶¶ 29-31). Defendants have a blog named "Data Colada" through which they have targeted the work of prominent female academics and subjected it to an exceptionally high level of public scrutiny. (*Id.* at ¶¶ 67). One female professor whose research practices were publicly eviscerated by Data Colada subsequently left her tenure track position at HBS. (*Id.* at ¶¶ 307-311).

In July 2021, Defendants approached Harvard and the dean of HBS, Srikant Datar ("Dean Datar") with false allegations concerning perceived anomalies in the data of four studies co-authored by Plaintiff. (*Id.* at ¶ 67). Without any evidence that Plaintiff was responsible for what they identified as perceived anomalies or "data fraud," Data Colada accused Plaintiff of falsifying and/or fabricating data. (*Id.* ¶¶ 67, 232).

In the field of behavioral science, if a researcher cannot replicate the results of a study or has questions about another behavioral scientist's findings, it is standard practice for that researcher to reach out to the author of the study for an explanation. (Id. ¶¶ 68). Data Colada references this practice on its website in the following statement:

> Author feedback:
> Our policy (.htm) is to share drafts of blog posts with authors whose work we discuss, in order to solicit suggestions for things we should change prior to posting, and to invite them to write a response that we link to at the end of the post.

(*Id.*).

Though Data Colada has followed this practice in the past, as evidenced by their 100 plus blog posts, Data Colada did not share drafts of any blog posts with Professor Gino and ask for her "feedback" but, instead, Defendants went to Plaintiff's employer, Harvard, with false allegations of malfeasance against Plaintiff and threats to publicize their claims on their blog. (*Id.* at ¶ 69).

In exchange for Data Colada's agreement to refrain from making public accusations about Plaintiff that would, by extension, subject HBS to public scrutiny, Defendants agreed to create a new employment policy to investigate and evaluate Data Colada's allegations against Plaintiff. (*Id.* at 70). Harvard and Dean Datar agreed with Data Colada that, after they concluded their investigation, they would disclose the results to Data Colada, who would then be free to publicly disparage Plaintiff's work and professional reputation on its blog. (*Id.* ¶¶ 70, 233).

On or about July 20, 2021, Dean Datar's office informed Plaintiff's advisor, Gary Pisano, that Data Colada had made allegations against Plaintiff and that she was going to "need a lot of help" from him, (*id.* ¶¶ 72-73), but that he could not inform Plaintiff of the allegations. (*Id.* ¶ 74-75). Harvard's normal practices were to notify a faculty member within a week of the allegations, but Harvard kept Plaintiff in the dark of Data Colada's allegations for three months. (*Id.* ¶¶ 81-82).

Pressured by Data Colada, Harvard abandoned its existing Research Integrity Policy (*see* Doc. No. 6-1) and, in August 2021, crafted a new policy and procedure for Plaintiff (*id.* ¶¶ 76, 78-80, 293-294). On October 27, 2021, Harvard informed Plaintiff of so-called "anonymous" allegations against her and its intent to evaluate them under its new Interim Policy. (*Id.* ¶¶ 93-94).

### December Report

With Harvard's "Initial Inquiry" into Defendants' allegations underway, on December 3, 2021, Defendants submitted to Harvard's inquiry committee a statement titled "Evidence of Fraud

in Academic Articles Authored by Francesca Gino" (the "December Report"). (*Id*. ¶¶ 100-105; *see* Doc. No. 43-1).[2]   The December Report contained numerous false and misleading statements that Plaintiff had committed data "fraud" in the four papers that were the subject of their initial allegations, (Doc. No. 6 at ¶ 101), including the false assertion that they had ***"direct evidence"*** **t**hat Plaintiff committed "data tampering."  (*Id.* at 104).

The December Report also contained statements implying that Defendants had *additional, non-disclosed* "evidence of fraud" by Plaintiff "going as far back as 2008 (when she was a post-doc at Carnegie Mellon)" and stated that the December Report contained *only a "subset of the evidence [Data Colada] had collected,"* (*id.* ¶101).  Defendants had no factual basis for their purported "strong suspicions" concerning Plaintiff's published data going back to 2008, as that time period pre-dated the Open Science Framework ("OSF"), (an open-source web application that makes it possible for behavioral scientists to share their data), and Defendants had never asked Professor Gino for papers she worked on or published in 2008.  (*Id.* ¶102).[3]

In April 2022, HBS notified Plaintiff that an investigation into Defendants' allegations was warranted, despite that three of the four studies identified by Defendants were time-barred under Harvard's new Interim Policy. (*Id.* ¶¶ 98-99, 114, 154).  Following a biased and procedurally irregular investigation, on March 7, 2023, Harvard concluded that Plaintiff was "responsible" for purported research misconduct based on non-probative and inconclusive forensic reports concerning the four studies at issue.  (*Id.* ¶¶ 115-117, 128, 133-134, 155-168, 171-173).

---

[2]Defendants have submitted an Affidavit by their counsel (Doc. No. 43) to which they attached a copy of the defamatory December Report (Doc. No. 43-1), a document that is referenced in and does not contradict the allegations in the Amended Complaint (Doc. No. 6). (Doc. No. 43-1).  However, Plaintiff confines this Memorandum to the four corners of the Amended Complaint.

[3] The December Report largely tracks Defendants' false and defamatory four-part blog post series, and the substance of the Amended Complaint's factual allegations concerning the four blog posts relative to the four studies are also applicable to the December Report.  (*See* Doc. No. 6 at ¶¶ 231, 233-274).

On June 13, 2023, Dean Datar adopted the investigative committee's findings and recommendations and imposed severe sanctions against Plaintiff's employment, including an unpaid two-year administrative leave, disproportionate to sanctions imposed by Harvard in similar cases, and in violation of the terms of Plaintiff's tenured appointment.  (*Id.* ¶¶ 60-65, 175, 177).

**Defendants' Blog Posts:  "Data Falsification" Parts 1 through 4[4]**

Harvard's applicable employment policies required Harvard to maintain the confidentiality of Plaintiff's research misconduct process and did not entitle Data Colada—as the "complainant" in the process—to information concerning the outcome.  (¶¶ 185-193).  However, beginning on June 17, 2023 and continuing through June 30, 2023, Data Colada launched a vicious campaign against Plaintiff in a four-part series of blog posts titled "Data Falsification" (Parts 1 through 4), containing numerous false and misleading statements, express or implied, that Plaintiff had "faked data" engaged in "data fraud," and claims of "data tampering." (*Id.* ¶¶ 15, 233-275).

Defendant' statements in the Data Falsification series were substantially similar to the false and misleading statements in Defendants' December Report (*id.* ¶ 231), with each of the individual four blog posts corresponding to one of the four research studies discussed in Defendants' December Report.  (*Id.* ¶ 231, 233-275).  Data Colada lodged their damaging accusations against Plaintiff despite having no evidence that Plaintiff engaged in any act of "data fraud." (*Id.* ¶ 232 and note 18).

Defendants' Data Falsification series of blog posts also contained statements that implied that Defendants were in possession of *non-disclosed* facts and evidence to support their baseless

---

[4] Defendants have submitted an Affidavit by their counsel (Doc. No. 43) to which they attached copies of the "fully expanded" blog posts (Doc. 43-3, Doc. No. 43-4, Doc. No. 43-5, Doc. No. 43-6).  These documents are referenced in the Amended Complaint and do not contradict Plaintiff's Amended Complaint, but Plaintiff confines this Memorandum to the four corners of her Amended Complaint.

accusations—including their own December report which was, in large part, based on sheer speculation and Harvard's investigation report, which they had not seen.  (*Id.* ¶¶ 236-239, 250-251, 255, 266-269).

Data Colada's inflammatory blog posts swiftly drew media attention and public reaction that reverberated in multiple platforms and contexts over the internet, including blog posts and major news outlets. (*Id.* ¶¶ 278-279). Plaintiff began receiving hate mail, much of it misogynistic, from around the world.  (*Id.* ¶ 276).  Academic journals began taking steps to remove Plaintiff from their editorial boards. *(Id.* ¶ 280).  Plaintiff began receiving emails and calls from her clients, who requested to cancel their contracts to avoid potential "liability" or "bad press," and who cited the Data Falsification blog posts.   (*Id.* ¶¶ 280-281).

On July 18, 2023, Simonsohn participated in a webinar on the topic of data fraud and admitted that Defendants had "no evidence" that Plaintiff had falsified or tampered with data. (Doc. No. 6 at  ¶ 280 and n. 18).  Simonsohn stated: "My belief is that she did it but there's no evidence of it.  But it doesn't really matter, though.  Because maybe let's say somebody else did it in her computer somehow.  You as a coauthor are equally victimized by that by that person. So primarily you are a victim of that person."  (Doc. No. 42 at 18).

However, in a prior Data Colada blog post, when Defendants discussed perceived discrepancies in the research record of another behavioral scientist, they distinguished between data "tampering," which calls into question the *integrity of the author*, and Defendants' concerns about "data irregularities" or "anomalies," which call into question the *plausibility or validity of data*.  (Doc. No. 6 at ¶¶ 272-273) (citing *[74] In Press at Psychological Science: A New 'Nudge' Supported by Implausible Data, DATA COLADA* (Dec. 5, 2018), available at: http://datacolada.org/74). In that blog post, Defendants accepted that the study's author could not

explain a particular anomaly because the author had not personally "handled the data."  (Doc. No.

6 at ¶ 272).  Defendants wrote:

> We should maintain a very high burden of proof to conclude that any individual
> tampered with data.
>
> But the burden of proof for dataset concerns should be considerably lower. We do
> not need to know the source of contamination in order to lose trust in the data.

(Doc. No. 6 at ¶ at 273) (quoting *[74] In Press at Psychological Science: A New 'Nudge' Supported*

*by Implausible Data*, DATA COLADA (Dec. 5, 2018), available at: http://datacolada.org/74).

Defendants also acknowledged that an author of a study who works with others who handle

or collect the data is not necessarily aware or responsible for the cause of data "peculiarities," and

opined:

> It is important to say at the outset we have not identified who is responsible for the
> problems. In the correction, for example, the authors themselves make clear that
> they 'do not have an explanation' for some peculiarities, in part because many other
> people handled the data between collection and reporting. This post is therefore not
> about who caused the problems.

(*Id.* ¶ 272) (quoting *[74] In Press at Psychological Science: A New 'Nudge' Supported by*

*Implausible Data*, DATA COLADA (Dec. 5, 2018), available at: http://datacolada.org/74).


## STANDARD OF REVIEW

In deciding a Rule 12(b)(6) motion to dismiss, the court must "take all of the factual

allegations in the complaint as true, and all reasonable inferences are drawn in the plaintiff's favor.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Alston v. Spiegel*, 988 F.3d 564, 571 (1st Cir. 2021).

The assessment of whether a complaint's factual allegations plausibly give rise to an entitlement

of relief "does not impose a probability requirement at the pleading stage:  it simply calls for

enough fact to raise a reasonable expectation that discovery will reveal evidence of 'illegal' conduct." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

## ARGUMENT[5]

**I.   COUNTS VII AND VIII OF THE COMPLAINT PLAUSIBLY ALLEGES CLAIMS FOR DEFAMATION AND SHOULD NOT BE DISMISSED.**

Under Massachusetts law, a plaintiff states a claim for defamation, a plaintiff must establish five elements: (1) that the defendant published a written statement; (2) of and concerning the plaintiff; that was both (3) defamatory, and (4) false; and (5) either caused economic loss, or is actionable without proof of economic loss. *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009). On a 12(b)(6) motion to dismiss, the Court is "not called upon to determine the ultimate issue of whether the article is defamatory, but to answer threshold question of whether the communication is reasonably susceptible of a defamatory meaning." *Stanton v. Metro Corp.*, 438 F.3d 119, 124 (1st Cir. 2006); *Koppel v. Moses*, No. CV 20-11479-LTS, 2020 WL 6292871, at *6 (D. Mass. Oct. 27, 2020). "A communication is susceptible to defamatory meaning if it would tend to hold the plaintiff up to scorn, hatred, ridicule or contempt, in the minds of any considerable and respectable segment in the community." *Stanton,* 438 F.3d at 125.

Defendants' statements in both their December Report and blog posts have accused her of "fraud" and plainly meet the test for susceptibility of a defamatory meaning. *Stanton v. Metro Corp.*, 438 F.3d 119, 127 (1st Cir. 2006). However, Defendants contend that Plaintiff has no reasonable expectation of proving their disparaging statements are false because their statements are "opinions" based on "disclosed facts." (Doc. No. 42 at 6-13).[6]

---

[5] Unless indicated otherwise, internal quotation marks and citations are omitted and emphasis added.

[6] (*See* Doc. No. 42 at 7) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40 (1974) ("However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas."). In *Milkovich,* the Supreme Court explained that "we do not think this passage from *Gertz* was intended

### A.  There Is No Wholesale Immunity For Alleged "Opinions" That State Or Imply Assertions That May Be Proven False.

As a threshold matter, there is no wholesale constitutional "opinion" privilege immunizing Defendants' false and defamatory statements from liability.  *See Milkovich*, 497 U.S. at 17–19; *Lyons v. Globe Newspaper Co*., 415 Mass. 258, 266–67, 612 N.E.2d 1158, 1164 (1993); *see e.g., McManus v. Doubleday & Co*., 513 F. Supp. 1383, 1386 (S.D.N.Y. 1981) (alleged "opinion" that priest had "homicidal tendencies" could support defamation claim).

Opinions which imply that they are based on undisclosed defamatory facts are actionable. *Milkovich,* 497 U.S. at 17–19.  However, "[e]ven if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." *Id.* at 18-19.  As the *Milkovich* Court explained:

> If a speaker says, 'In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar.' As Judge Friendly aptly stated: "[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.'

*Milkovich*, 497 U.S. at 18–19.

Thus, under *Milkovich*, "the relevant question is not whether the challenged language may be described as an opinion, **but whether it reasonably would be understood to declare or imply provable assertions of fact."**  *See Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 727 (1st Cir. 1992) (citing *Milkovich*, 497 U.S. at 21).

---

to create a wholesale defamation exemption for anything that might be labeled "opinion," and that the "fair meaning of the passage is to equate the word "opinion" in the second sentence with the word "idea" in the first sentence."

To determine whether a statement is one of fact or opinion, a court must examine the statement "in its totality in the context in which it was published," all the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published." *Reilly v. Associated Press*, 59 Mass. App. Ct. 764, 770, 797 N.E.2d 1204, 1210 (2003); *see, e.g., Milkovich*, 497 U.S. at 21 (not "the sort of loose, figurative, or hyperbolic language which would negate the impression" that a *factual statement* was being made, and evaluating the "general tenor of the article"); *Levinsky's, Inc. v. Wal-Mart Stores, Inc*., 127 F.3d 122, 128 (1st Cir. 1997) ("the First Amendment prohibits defamation actions based on loose, figurative language that no reasonable person would believe presented facts").

### a. Defendants' Statements Are Reasonably Understood to Contain Multiple False and Defamatory Statements, Express and Implied.

### 1. The December Report Is Not Opinion

As stated in the Amended Complaint, in December 2021, Defendants published a false and defamatory statement when it submitted the December Report to Plaintiff's employer accusing her of data fraud. (Doc. No. 6 at ¶ 100).  Defendants published their "report" under the false and accusing title, "Evidence of Fraud in Academic Articles Authored by Francesca Gino." (*Id.;* Doc. 43-1 at 2). Plaintiff has never committed "fraud" in her academic papers (Doc. No. 6 at ¶ 3) and this statement is *verifiably false* and misleading, as none of the content provided in the report constitute "evidence of fraud."  A non-exhaustive list of false and misleading statements following the false and misleading title of the document include the following:

a. "A small number of individuals raised concerns to us and asked for our involvement in trying to reconcile those concerns."  (Doc. No. 6 at 103; Doc. 43-1 at 2).

b. "In collaboration, we have collectively tried to identify some of the biggest issues." (Doc. No. 6 at 103; Doc. 43-1 at 2).

c. "We report direct evidence of data tampering in four different datasets from four different published articles." (Doc. No. 6 at 103; Doc. 43-1 at 2).

d. "We focus on those because they appear the most unambiguous." (Doc. No. 6 at 103; Doc. 43-1 at 2).

e. "We have strong suspicions about some her [sic] published data going as far back as 2008 (when she was a post-doc at Carnegie Mellon University), but the most direct evidence is included it [sic] in this report." (Doc. No. 6 at 103; Doc. 43-1 at 2).

f. "This report includes a subset of the evidence of tampering we have collected, which was obtained by analyzing a small subset of the data that [Professor] Gino has published." (Doc. No. 6 at 103; Doc. No. 43-19).[7]

g. Defendants refer to what they described as "imperfect data tampering" for data that they indicate appeared "out of sort" in published data sets. (Doc. No. 6 ¶ 104; Doc. No. 43-2).

The December Report can reasonably be understood to bear multiple defamatory connotations, including: (1) that Plaintiff engaged in "fraud" in her academic papers which caused unidentified individuals to approach Defendants to "reconcile" their "concerns"; (2) that the December Report offers "direct evidence" of "fraud" and "data tampering" in "four different studies" by Plaintiff; (3) that Defendants had additional, non-disclosed defamatory facts supporting their "strong suspicions" about Plaintiff's "fraud" going back to 2008; (4) that the December Report represents only the most "unambiguous" evidence of "fraud" by Plaintiff, and a "small subset of the evidence of tampering" by Plaintiff that Defendants had collected, (again suggesting Defendants had additional, undisclosed defamatory facts; and that (5) "out of sort" data was "direct evidence" of fraud" by Plaintiff.

At least one of the reasonably understood connotations—that Plaintiff committed data fraud—is sufficiently factual to be proved true or false. *See, e.g., Milkovich*, 497 U.S. at 21.

---

[7] As noted *supra*, Defendants have submitted a copy of the December Report (see Doc. 43-1) which does not contradict the allegations in the Amended Complaint. (*See* Doc. No. 6). For purposes of this memorandum, Plaintiff addresses only the false statements of fact contained in the December Report that were addressed within the four corners of the Amended Complaint (Doc. No. 6) and does not address an exhaustive discussion of *all* of the false and defamatory assertions of fact contained in the entirety of the December Report (Doc. 43-1).

However, Defendants contend that the December Report represented only their own interpretation of the "facts." (Doc. No. 42 at 10.) Defendants' so-called "opinion," rests on "facts" that are themselves erroneous and, as such, are not protected by the First amendment. Contrary to Defendant's assertions that their statements are "non-actionable" "opinion," the December Report conveys defamatory statements of fact, express and implied, that are capable of being proved false. *See Scholz v. Delp*, 473 Mass. 242, 249–50, 41 N.E.3d 38, 45 (2015) ("Statements of pure opinion are constitutionally, but there is no constitutional value in false statements of fact."). Defendants have accused plaintiff of "fraud" in the context of academic papers, a professional standard of research misconduct that is capable of being proved false.

Defendants argue that they "never state that Gino *herself* falsified data." (*See* Doc. 42 at 10, note 11). However, the *intended audience* of the document was Plaintiff's employer, and *the intended purpose* of the document was to further Defendants' false allegations against Plaintiff of data fraud that they had brought to her employer in July 2021. Given all of the circumstances, including (i) the statement's title, "**Evidence of Fraud in Academic Articles Authored by Francesca Gino;** (ii) the statement's assertion that the December Report was *"direct evidence"* of "fraud" by Plaintiff; (iii) the implied statements that Defendants knew undisclosed defamatory facts, (including the suggestion that the "evidence" in the December Report was a "small subset" of what Defendants had collected); (iv) the authoritative tone (indicating that "individuals" had "approached" Defendants to help "reconcile" "concerns" about Plaintiff's alleged misconduct), the December Report is reasonably understood as a statement of fact: that Plaintiff had committed academic "fraud," and *not* non-actionable opinion. *See Levinsky's, Inc. v. Wal-Mart Stores,* 127 F.3d 122, 127 (1st Cir. 1997).[8] Accordingly, the statement is actionable under state defamation

---

[8] On a motion to dismiss, any ambiguities as to whether the December Report could be understood as fact or opinion, should be construed in favor of Plaintiff. *Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 535 (1st Cir. 2023).

law.  *See Gray v. St. Martin's Press, Inc*., 221 F.3d 243, 248 (1st Cir. 2000) (citing *Milkovich*, 497 U.S. at 18–20).

### 2.    The Four Blog Posts Are Not Opinion[9]

**Blog Post 1:**  Defendants titled their four-part series of blogs "**Data Falsificada."**  (Doc. No. 6 at ¶ 233).  The title of the first in the series is:  [109] **Data Falsificada** (Part 1): "**Clusterfake**."  (Doc. No. 6 at ¶ 233; Doc. No. 6-1) (referred to herein as Blog Post 1).  The first sentence of  Blog Post 1 reiterated Defendant's theme that Plaintiff had committed data fraud, stating: "*This is the introduction to a four-part series of posts detailing evidence of fraud in four academic papers co-authored by Harvard Business School Professor Francesca Gino*."  (*See* Doc. No. 6-6 at 2).  Blog Post 1 made a number of statements of *fact,* express and implied, suggesting that Plaintiff had "faked data," including, but not limited to the following:

a. "In the Fall of 2021, we shared our concerns with Harvard Business School (HBS). Specifically, we wrote a report about four studies for which we had accumulated the strongest evidence of fraud. We believe that many more Gino-authored papers contain fake data. Perhaps dozens." (Doc. No. 6 at ¶ 233; Doc. No. 6-6 at 2).

b. "The evidence of fraud detailed in our report almost certainly represents a mere subset of the evidence that the Harvard investigators were able to uncover about these four articles." (Doc. No. 6 at ¶ 233; Doc. No. 6-6 at 2).

Defendants also asserted that data which Plaintiff had voluntarily posted on the Open Science Framework ("OSF") in 2020 was evidence of data "fraud" based on what they described as "out of order observations" and a "duplicate observation," despite Defendants' knowledge that the original data for this study had been collected on paper, and that when collecting data on

---

[9]The four-part blog post series are attached to Plaintiff's Amended Complaint as Doc. No. 6-6, Doc. No. 6-7, Doc. No. 6-8, and Doc. No. 6-9, respectfully.  Defendants submitted an Affidavit of their counsel to which they attached the "fully expanded" blog posts, which do not contradict Plaintiff's Amended Complaint.  For purposes of this memorandum, Plaintiff does not expand on her original allegations by commenting on statements in the fully expanded blog posts that are outside the four corners of the Amended Complaint.

paper, it is customary to enter it into an Excel database from *stacks of paper,* and that data

entered this way *is not necessarily sorted*.  (Doc. No. 6 at ¶¶ 240-241).

**Blog Post 2:**  In Blog Post 2, Defendants falsely asserted that an anomalous response by

data participants in a second study established that Plaintiff had "tampered" with data.  (Doc. No.

6 at ¶ 248).   Defendants knew that such data irregularities do not signify research misconduct.

(Doc. No. 6 at ¶¶ 249, 272-273).  Defendants also falsely implied that they knew of additional,

undisclosed evidence of "fraud," and stated:

> "[W]e should note that while for all four studies covered in this series we found evidence
> of data tampering, we do not believe (in the least) that we've identified all of the
> tampering that happened within these studies. Without access to the original (un-
> tampered) data files – files we believe Harvard had access to – we can only identify
> instances when the data tamperer slipped up, forgetting to re-sort here, making a copy-
> paste error there. There is no reason (at all) to expect that when a data tamperer makes a
> mistake when changing one thing in a database, that she makes the same mistake when
> changing all things in that database."

(Doc. No. 6 ¶ 247; Doc. No. 6-7 at 6.)

**Blog Post 3:**  Defendants titled the third of its four-part series of false and defamatory blog

posts about Plaintiff, "[111] Data Falsificada (Part 3): 'The Cheaters Are Out of Order.'"(Doc. No.

253; Doc. No. 6-8).  A non-exhaustive list of false statements, includes the following:

a.  "As in Part 1 of this series (Colada 109 .htm), the tell-tale sign of fraud in this dataset
    comes from how the data are sorted."  (Doc. No. 6 at ¶ 254).

b.  "We believe that Harvard University has access to the Qualtrics file that could have
    perfectly verified (or disputed) our concerns. We told them which file to get, which cells
    to check, and which values they would find in the Qualtrics file if we were right. We don't
    know if they did this, or what they found if they did. All we know is that, 16 months later,
    they requested that the article be retracted."  (Doc. No. ¶ 256).

**Blog Post 4:**  Defendants again made presumptive statements that falsely convey that Data

Colada's analysis established, as a matter of fact, that Plaintiff committed fraud. (Doc. No. ¶ 266)

and implied that they knew of additional, non-disclosed facts that she committed fraud, stating:

"We have received confirmation, from outside of Harvard, that Harvard's investigators did look at the original Qualtrics data file and that the data had been modified."

(Doc. No. ¶ 266).

All four of Defendants' blog posts concludes each with the following statement:

Data Colada concludes each of Blog Posts 1, 2, 3 and 4 with the following

Author feedback.

Our policy is to solicit feedback from authors whose work discuss. We did not do so this time, given (1) the nature of the post, (2) that **the claims made here were presumably vetted by Harvard University**, (3) that the articles we cast doubt on have already had retraction requests issued, and (4) that discussions of these issues were already surfacing on social media and by some science journalists, without their having these facts, making a traditional multi-week back-and-forth with authors self-defeating.

(Doc. No. 6 ¶ 268).

However, Harvard did not vet Defendants' claims, and their statements are not immunized from liability on the basis of Defendants' belief that Harvard "vetted" their false allegations.

The language, tone and tenor of the four blog posts, (including the headlines that made puns with the words "fake" and "falsification") considered in their entirety, would be reasonably understood by any reader as a statement of fact: that Plaintiff committed data fraud. And, readers of Defendants' blog posts did, in fact, understand from their blog that Plaintiff committed data fraud.  (Doc. No. 6 at ¶¶ 278-281).  Defendants contend that, because they provided links in their blog posts to their analyses, their statements should be understood as "opinion."  (Doc. No. 42 at 12.)  Defendants ignore, however, the medium of the blog, which must be considered, and whether all of the people who read the headlines took the time to read Defendants' hyperlinked "analyses" within the blog, (or even understood them).  *See Stanton v. Metro Corp.*, 438 F.3d 119, 126 (1st Cir. 2006) ("the public frequently reads only the headline of the article or reads the article itself so hastily or imperfectly as not to realize its full significance," and finding it likely that "some percentage of readers who see the article, particularly casual readers who only glance at it or skim

it, will ignore the disclaimer").  Defendants' statements, both express and implied, accusing Plaintiff of fraud are not "opinion," but are factual assertions capable of being proved false.  *See Gray v. St. Martin's Press, Inc*., 221 F.3d 243, 248 (1st Cir. 2000) (citing *Milkovich*, 497 U.S. at 18–20).

### C.  Defendants' Statements Are Not Part of Scientific Debate

Relying on inapposite cases, Defendants erroneously contend that their false and defamatory statements should be understood as protected opinion as part of a scientific debate. (Doc. No. 42 at 9).[10]  This is a case of common-law defamation based on Defendants' disparagement of Plaintiff's professional reputation in five publications, first secretly to her employer and then on a blog as self-appointed data police, for which the law provides a remedy.[11]

### II.  PLAINTIFF IS NOT A PUBLIC FIGURE, BUT TO EXTENT THAT SHE WERE DEEMED A "PUBLIC FIGURE" AT THIS EARLY STAGE, SHE HAS PLAUSIBLY ALLEGED MALICE.

In a defamation claim, the status that the plaintiff occupies along the public/private continuum determines what must be proved in order to recover damages. *Mandel v. Bos. Phoenix, Inc*., 456 F.3d 198, 201 (1st Cir. 2006); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342 (1974). "Public figures are persons who have assumed roles of especial prominence in the affairs of society," and commonly "have thrust themselves

---

[10] *See Ony, Inc. v. Cornerstone Therapeutics, Inc*., 720 F.3d 490, 497 (2d Cir. 2013) (involving an unsettled matter of scientific debate concerning how to draw conclusions from undisputed, non-fraudulent data); *Saad v. Am. Diabetes Ass'n,* 123 F. Supp. 3d 175, 178 (D. Mass. 2015) (involving an "expression of concern" published in a peer review medical journal that expressed concerns about data, but no false or defamatory statements directed at plaintiff).

[11] The Court should decline to consider extrinsic documents submitted by Defendants without motion (Doc. No. 43-2, Doc. No. 43-7, and Doc. No. 43-8) which are not incorporated into the Amended Complaint and for which no other exception applies. *See Alharbi v. Beck*, 62 F. Supp. 3d 202, 205 (D. Mass. 2014) ("the deciding court cannot consider information outside the four corners of the complaint" absent recognized "narrow exceptions" to this rule "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiff's claim; or for documents sufficiently referred to in the complaint").

to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Mandel,* 456 F. 3d at 204. While Plaintiff enjoys success in her field, her public profile, like that of other successful academics, does not establish her as a "public figure" for purposes of her claims. *See, e.g., Hutchinson v. Proxmire,* 443 U.S. 111, 134–35 (1979) ("published writings reach a relatively small category of professionals concerned with research in human behavior"); *see Lluberes v. Uncommon Prods., LLC,* 663 F.3d 6, 20 n.14 (1st Cir. 2011) (citing *Bowman v. Heller,* 420 Mass. 517, 651 N.E.2d 369, 373 (1995) ("The fame required for an individual to be a public figure for all purposes, as opposed to a limited purpose public figure, is very great; the individual must be a 'household name' on a national scale.").

Plaintiff is also not a limited public figure, as she has not attempted to thrust herself to the forefront to "influence the resolution" of a controversy. *See Lluberes v. Uncommon Prods., LLC,* 663 F.3d 6, 14 (1st Cir. 2011) ("otherwise private figure who "voluntary injects himself or is drawn into a particular public controversy"); *see Time, Inc. v. Firestone,* 424 U.S. 448, 457, (1976) ('while participants in some litigation may be legitimate 'public figures,' either generally or for the limited purpose of that litigation, the majority will more likely resemble respondent, drawn into a public forum largely against their will in order to attempt to obtain the only redress available to them.").[12]

Although Plaintiff does not allege that she is a "public figure," she has adequately pleaded actual malice to support the heightened pleading standard.[13] However, at the 12(b)(6) stage, it is unnecessary for the Court to determine Plaintiff's status, and dismissal of her defamation claims based on whether she has met the "actual malice" pleading standard would be inappropriate on this insufficiently developed factual

---

[12] Defendants erroneously contend that because she wrote on "the role and effects of dishonesty" that she injected is a limited public figure. (Doc. No. 42 at 15). However, Plaintiff's academic activities pre-dating this litigation did not involve research misconduct and she never chose to become involved in a controversy that implicates this litigation. *See Hutchinson v. Proxmire,* 443 U.S. 111, 135, (1979) ("Those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure.").

[13] Plaintiff has not alleged she is a "public figure" and her status is factually distinguishable from plaintiffs in cases cited by Defendants. (*See* Doc. No. 42 at 22) (citing *Lemelson v. Bloomberg,* LP, 903 F.3d 19, 23 (1st Cir. 2018) (religious leader and hedge fund manager); *Ayyadurai v. Floor64, Inc.,* 270 F. Supp. 3d 343, 356 (D. Mass. 2017) (parties did not dispute that plaintiff was a limited public figure).

record.  *See Mandel*, 456 F.3d 198, 204 (1st Cir.2006) ("although status determinations normally are "grist

for the court's—not the jury's—mill, such questions are inescapably fact-specific.  In other words, a plaintiff's

status, though calling for a legal determination, is heavily dependent on the underlying factual record.

Consequently, there are cases in which it may not be possible to resolve the public-figure issue until trial.")

(cleaned up); *Larson v. Perry,* No. 19-CV-10203-IT, 2020 WL 1495883, at *7 (D. Mass. Mar. 27, 2020) (the

inquiry is so fact specific, on motion to dismiss, the court is not required to determine plaintiff's status) (citing

*Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 14 (1st Cir. 2011).[14]

Assuming, *arguendo,* that Plaintiff is required to allege "actual malice" at this stage of the action,

she has plausibly alleged that Defendants entertained serious doubts as to the truth of the publication, St.

*Amant v. Thompson,* 390 U.S. 727, 731 (1968) or else had a subjective awareness of either falsity or

probable falsity of their defamatory statements, or acted with reckless disregard of their truth or falsity.  *See*

*Garrison v. Louisiana,* 379 U.S. 64, 13 (1964).  Each of the Five Statements that Defendants published is

a product of actual malice.  Defendants contend that they conducted an investigation; however, the critical

issues is that they avoided and ignored contradictory information

"A publisher cannot feign ignorance or profess good faith when there are clear indications present

which bring into question the truth or falsity of defamatory statements."  *Gertz v. Robert Welch, Inc.,* 680

F.2d 527, 538 (7th Cir. 1932).  Where, as here, a publisher undertakes to investigate the accuracy of a story

and learns facts casting doubt on the information contained therein, it may not ignore those doubts, even

though it had no duty to conduct the investigation in the first place.  *Masson v. New York Magazine, Inc.,*

960 F.2d 896, 901 (9th Cir. 1992). Moreover, where a publisher deliberately decides not to acquire

---

[14]Defendants erroneously assert that on a motion to dismiss, a plaintiff must demonstrate malice  (See Doc. 42 at 16) (citing factually inapposite case in which the plaintiff conceded he was a public official). *See Schatz v. Republican State Leadership Comm.*, 777 F. Supp. 2d 181, 187–88 (D. Me. 2011), *aff'd,* 669 F.3d 50 (1st Cir. 2012).

knowledge of facts that might confirm the probable falsity of a story, actual malice can be found, because the purposeful avoidance of the truth is in a different category than a failure to investigate. *Harte Hanks Comm'ns v. Connaughton*, 491 U.S. 657, 692 (1989).

After defaming Plaintiff to her employer and in four public blog posts through express statements and innuendo, Simonsohn, *himself,* acknowledged that Defendants had no evidence that Plaintiff committed data fraud; yet, they now contend that "their publications do not state that Plaintiff *herself* committed the manipulation." (*See* Doc. No. 6 at ¶ 323; Doc. No. 42-18). This question of malice is a fact-specific matter that is not appropriate to resolve on a motion to dismiss. However, Plaintiff has plausibly alleged the following non-exhaustive facts demonstrating Defendants' malice:

a. In their December Report, Defendants represented to Plaintiff's employer in 2021 that they had "*direct evidence"* of fraud by Plaintiff, but two years later, after defaming her in four blog posts, Defendant Simonsohn acknowledged that Defendants did not have such evidence. (Doc. No. 6 at ¶¶ 104; 280 and n. 18).

b. Defendants knew that data irregularities occur within the norms of the field of behavioral science with respect to data collection and handling, and engaged in knowing falsehood and reckless disregard for the truth by attributing data irregularities to "fraud" in Plaintiff's case. (*Id.* ¶¶ 272-273).

c. Following the posting of their four-part series, on July 18, 2023, Simonsohn conceded that he had "no evidence" that Plaintiff manipulated data. Now, after destroying Plaintiff's reputation and career, Defendants contend that they "carefully framed their findings" to suggest that their "publications do not state that Francesca Gino *herself* committed the manipulation." (*Id.* ¶ 104; Doc. No. 42 at 18).

## III.  PLAINTIFF HAS PLAUSIBLY ALLEGED CONSPIRACY AND TORTIOUS INTERFERENCE.

Plaintiff has adequately set forth her claims for conspiracy. (*See* Doc. No. 6 ¶¶ 66-85, 100-102). The same arguments in support of her claim for defamation apply to her claim for conspiracy; as such, Count IX should not be dismissed. *See McLaughlin v. J-PAC, LLC*, No. 10-2594-BLS1, 2011 WL 1758945, at *2 (Mass. Super. Apr. 14, 2011).

Plaintiff has also stated a claim for tortious interference with contractual relations.  *See Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 537–38 (1st Cir. 2023).  Plaintiff is a tenured member of the faculty at HBS, and Defendants were aware of her employment relationship.  (Doc. No. 6 at 419).  Defendants interfered with Plaintiff's contractual relationship by going to her employer in July 2021 and threatening to publicize a data fraud story.  In exchange for Defendants' silence, Plaintiff's employer agreed to investigate the allegations pursuant to a new policy.  Defendants had previously subjected a female HBS faculty member to intense public scrutiny on their blog post, after which that professor left her tenure track position. (*Id.* at ¶ 421).

During the course of the investigation, on December 3, 2021, Defendants defamed Plaintiff with the December Report, which amplified their false statements to Plaintiff's employer that Plaintiff had committed data fraud.  Defendants' malicious conduct induced Plaintiff's employer to breach her employment contract and take a series of adverse employment actions against her, including a two-year unpaid administrative leave in violation of her procedural rights and breaching her duties of confidentiality.

## CONCLUSION

Based on the foregoing, Plaintiff Francesca Gino respectfully requests that Defendants' Motion to Dismiss be denied in its entirety.

**Dated: November 22, 2023**
         **Boston, Massachusetts**         **Respectfully submitted,**

                                   **NESENOFF & MILTENBERG, LLP**
                                   *Attorneys for Plaintiff Francesca Gino*

                                 **By*: /s/  Julie A. Sacks***
                                 **Andrew T. Miltenberg, Esq.**
                                 **(*pro hac vice* forthcoming)**
                                 **Kara L. Gorycki, Esq.**
                                 **(*pro hac vice* forthcoming)**
                                 **363 Seventh Avenue, Fifth Floor**
                                 **New York, New York 10001**
                                 **(212) 736-4500**
                                 **amiltenberg@nmllplaw.com**
                                 **kgorycki@nmllplaw.com**

                                 **Tara Davis, Esq. (BBO No. 675346)**
                                 **Julie A. Sacks, Esq. (BBO No. 674384)**
                                 **101 Federal Street, 19th Floor**
                                 **Boston, Massachusetts 02110**
                                 **(617) 209-2188**
                                 **tdavis@nmllplaw.com**
                                 **jsacks@nmllplaw.com**

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on November 22, 2023, this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated:  November 22, 2023                    */s/ Julie A. Sacks*
                                                             Julie A. Sacks