UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS


_____

Francesca Gino,

                   Plaintiff,          Civil Action
                                       No. 1:23-CV-11775
V.
                                       April 26, 2024
President and Fellows of Harvard
College, et al,                         11:00 a.m.

                   Defendants.
_____




                BEFORE THE HONORABLE MYONG J. JOUN

                UNITED STATES DISTRICT COURT

                JOHN J. MOAKLEY U.S. COURTHOUSE

                    1 COURTHOUSE WAY

                   BOSTON, MA  02210




                    JAMIE K. HALPIN, RPR, RMR
                    Official Court Reporter
                 John J. Moakley U.S. Courthouse
                 1 Courthouse Way, Room 5205
                    Boston, MA  02210
                    jkhhalpin@gmail.com

```
 1      APPEARANCES:

 2      FOR THE PLAINTIFF:
        Julie Ann Sacks
 3      Nesenoff & Miltenberg, LLP
        101 Federal St.
 4      19th Floor
        Boston, MA 10001
 5      617-209-2188
        Email: Jsacks@nmllplaw.com
 6
        Tara Jill Davis
 7      Nesenoff & Miltenberg LLP
        363 Seventh Avenue
 8      5th Floor
        New York, NY 10001
 9      212-736-4500
        Email: Tdavis@nmllplaw.com
10
        Regina M. Federico
11      Nesenoff & Miltenberg LLP
        101 Federal Street, 19th Flr.
12      Boston, MA 02110
        617-209-2127
13      Email: Rfederico@nmllplaw.com

14      FOR THE HARVARD DEFENDANTS:
        Douglas E. Brayley
15      Ropes & Gray LLP - MA
        Prudential Tower
16      800 Boylston St.
        Boston, MA 02199-3600
17      617-951-7119
        Email: Douglas.brayley@ropesgray.com
18
        Elena W. Davis
19      Ropes & Gray - MA
        Prudential Tower
20      800 Boylston Street
        Boston, MA 02199-3600
21      617-951-7017
        Email: Elena.davis@ropesgray.com
22
        Jenny K. Cooper
23      Ropes & Gray - MA
        Prudential Tower
24      800 Boylston Street
        Boston, MA 02199-3600
25      617-951-8473
        Email: Jenny.cooper@ropesgray.com
```

1    **FOR DEFENDANTS URI SIMONSOHN, LEIF NELSON & JOSEPH SIMMONS**

2

3    Jeffrey Jackson Pyle
     Prince Lobel Tye LLP
4    One International Place
     Suite 3700
5    Boston, MA 02110
     617-456-8143
6    Fax: 617-456-8100
     Email: Jpyle@princelobel.com

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      P-R-O-C-E-E-D-I-N-G-S

 2

 3              THE CLERK:  All rise.

 4              (The Honorable Court Entered)

 5

 6              THE COURT:  Today is April 26, 2024.  We're on the

 7      record in the matter of Gino v. President and Fellows of

 8      Harvard College, et al., Case Number 23-CV-11775.  Will counsel

 9      please identify yourselves for the record.

10              MS. SACKS:  Julie Sacks, counsel for plaintiff.

11              THE COURT:  Good morning.

12              MS. TARA DAVIS:  Good morning, your Honor.  Tara Davis

13      for the plaintiff.

14              MS. FEDERICO:  Good morning.  Regina Federico for the

15      plaintiff.

16              MR. BRAYLEY:  Good morning.  Doug Brayley for the

17      Harvard defendants.

18              MS. ELENA DAVIS:  Good morning, your Honor.  Elena

19      Davis for the Harvard defendants.

20              MS. COOPER:  Good morning, your Honor.  Jenny Cooper

21      also for the Harvard defendants.

22              MR. PYLE:  Good morning, your Honor.  Jeffrey Pyle for

23      the defendants, Joseph Simmons, Leif Nelson and Uri Simonsohn.

24              THE COURT:  Good morning to everyone.  So I thought

25      what we would do is I would hear from Harvard first and then
```

1    from you, Mr. Pyle, and then I will let you respond to all of

2    them.

3           MR. BRAYLEY:  Thank you very much, your Honor.  The

4    claims at issue today, which is not all of them but most of

5    them, ask the Court to second-guess an exhaustive 18-month

6    academic proceeding in contravention of well-established

7    Massachusetts and First Circuit precedent.  The complaint,

8    though lengthy, is ultimately implausible and conclusory on the

9    key legal points and, therefore, Counts 2 through 12 must be

10   dismissed.

11        The complaint asks the Court to superimpose new wished for

12   procedures beyond those that the plaintiff has already enjoyed,

13   but there is no support nor any plausible allegation that the

14   existing policies and procedures were not followed.  The

15   handful of allegations that do relate to a breach of a specific

16   policy are simply implausible because they're contradicted by

17   the very documents incorporated by reference in the complaint.

18        Additionally, the defamation claims against the Harvard

19   defendants must be dismissed because Professor Gino is a public

20   figure and the Court need not look to any extrinsic evidence to

21   make that determination.  The complaint makes it abundantly

22   clear with citations to her extensive public profile.  Because

23   she's a public figure, it was the plaintiff's obligation to

24   plead actual malice which the complaint does not do.

25        With regard to the defamation counts against the Harvard

1    defendants, first, there is an allegation that posting on a

2    website that the professor was on administrative leave was

3    defamation.  It was not defamation because it was true, she was

4    put on administrative leave.  As to the letters to the

5    journals, they specifically identified that concerns had been

6    raised regarding data, also true, and to the extent that those

7    letters to journals articulated Harvard's conclusions regarding

8    those concerns, that was opinion based on thoroughly disclosed

9    evidence, again, not defamatory with respect to a public

10   figure.

11       The remaining claims in the complaint against the Harvard

12   defendants are ancillary, insufficiently pled and are legally

13   deficient.  I'm happy to go through the counts in the order

14   that they are pled in the complaint unless the Court would like

15   to jump in with any questions.

16           THE COURT:  Yeah, I just had some questions about the

17   interim policy.  Did that supersede the 2013 research integrity

18   policy?

19           MR. BRAYLEY:  Yes, it did supersede that.

20           THE COURT:  So that's the official policy today?

21           MR. BRAYLEY:  It is indeed, yes.  What I was about to

22   point out though is it is not inconsistent with or

23   contradictory with the 2013 policy.  As you've seen from the

24   documents, the 2013 policy is broad and gives the Dean a

25   tremendous amount of discretion.  The interim policy then

1    imposes a great deal of process on Harvard Business School

2    before it can reach any conclusions.  So, yes, although it is

3    superseded, I would also point out it is not contradictory.

4              THE COURT:  And when was it officially adopted?

5              MR. BRAYLEY:  In 2021.

6              THE COURT:  And has that policy been applied to anyone

7    else other than Ms. Gino?

8              MR. BRAYLEY:  I'm not aware of that and it's certainly

9    not alleged in the complaint that it has been and we at this

10   stage are confined to what's in the complaint.

11             THE COURT:  Okay.

12             MR. BRAYLEY:  So on the breach of contract claim, I

13   think it's important here to look again at the pleadings which

14   is where we must be focused on a motion to dismiss.  The

15   pleadings say that the breach of contract consisted of a

16   violation of the tenure policy and the third statute, the third

17   statute being the name that Harvard applies to its policy with

18   regard to the revocation of tenure.  The other concerns that

19   the plaintiff raises in the complaint relating to process or

20   not being given enough time to respond to allegations, those

21   come under her claim for the breach of the implied covenant of

22   good faith and fair dealing.

23         So focusing on the breach of contract claim, there simply

24   is no plausible allegation in the complaint that the tenure

25   policy has been violated and that's because in Paragraph one of

1    the complaint, the plaintiff acknowledges that she remains an

2    employee of Harvard and that she retains tenure.  That is true

3    today and it's pled in the complaint.  Given that, there simply

4    is no breach of contract alleged.  There are no contract

5    provisions cited that limit the discipline short of employment

6    termination or short of tenure revocation that can be imposed.

7    There are no contract provisions that guarantee her the right

8    to keep teaching students for any given period of time or while

9    the third statute proceedings may be underway.  There simply

10   could be no reasonable expectation that she would be entitled

11   to protection from discipline short of tenure revocation under

12   the third statute, and indeed Professor Gino's position would

13   be ultimately untenable for any academic institution to say

14   that the school lacks the authority to impose any discipline or

15   sanctions short of tenure revocation without going through the

16   really extensive process of revoking tenure and finding grave

17   misconduct.  It would imply, for example, that a professor who

18   had been credibly accused of violence or sexual assault could

19   not be barred from campus without going through the full-blown

20   third statute proceeding.  That's not a reasonable expectation.

21   It's not what the contract says, and I think this is an

22   important time to point out, as we did in our papers, the long

23   line of cases, both in the Commonwealth of Massachusetts and in

24   the First Circuit pointing out that on core academic

25   proceedings such as tenure matters, such as academic discipline

1    and student discipline, courts owe a great deal of deference to

2    the internal proceedings of academic institutions.  That is not

3    to say, to be clear, that academic institutions are immune from

4    court overview.  In fact, it's clear from the cases, for

5    example, the Berkowitz and the Schaer cases, that to the extent

6    there is an allegation of violation of statute, right, so take,

7    for example, Count 1 of the complaint, we are not arguing that

8    Harvard is somehow immune from court oversight there.  That is

9    not the subject of this complaint or not this motion to dismiss

10   rather; but when it comes to matters such as breach of

11   contract, breach of the implied covenant of good faith and fair

12   dealing with respect to internal academic proceedings, the

13   courts have said over and over again that absent a violation of

14   a reasonable expectation, the courts should not intrude upon

15   core academic judgments.

16        So in light of the lack of a pleading with regard to a

17   breach of an express contract and the background principle of

18   non-interference, Count 2, the breach of contract count, simply

19   must be dismissed as implausibly pled.

20        Count 3 then relates to the implied covenant of good faith

21   and fair dealing.  This is, frankly, somewhat vaguely pled

22   because as acknowledged in the complaint and as is clear in the

23   case law, the implied covenant of good faith and fair dealing

24   is not some free-floating common law obligation.  It's an

25   obligation that is tied to a contract.  There is an obligation

1    for parties to act in good faith and fairly with respect to a
2    contract.  The complaint, Count 3, does not identify which
3    contracts' implied covenant of good faith and fair dealing is
4    being implicated.  The count then goes on to allege numerous
5    supposed deficiencies in the proceedings, ways in which Harvard
6    allegedly did not follow its own processes.  This again is
7    curious because it implies the interim policy is a contract.
8    It's not pled that it's a contract, Harvard doesn't concede
9    that the interim policy is a contract, and I think I would be
10   surprised if Professor Gino were to admit that the interim
11   policy were a contract because she seems to allege that she
12   never agreed to it and if it was never accepted, how can it be
13   a contract?
14        The only other document that Professor Gino plausibly
15   refers to with respect to the implied covenant is the
16   appointment letter.  This is the very short one-page letter
17   that refers to her appointment as a tenured faculty member of
18   the Harvard Business School.  That document, of course, on its
19   face, it's one-page long, contains none of the procedures
20   referred to in the interim policy or in the 2013 research
21   misconduct policy.  At most, there is a reference at the end of
22   that short letter saying that this appointment is subject to
23   the policies and procedures of the faculty of Business
24   Administration as they may be amended from time to time.
25        So not clear what contracts' implied covenant is at issue

1    here, but if we assume for purposes of this argument, which we

2    do not concede, but if we assume for purposes of this argument

3    that there is an implied covenant claim or there can be an

4    implied covenant claim with respect to the interim policy or

5    perhaps the 2013 research misconduct policy, I can walk through

6    right now in brief why each of the complaints that Professor

7    Gino has with respect to the process simply are not well

8    founded, and I think an initial point before I go through point

9    by point is to point out the extraordinary way in which the

10   investigation committee's final report really is incorporated

11   into the complaint, and therefore, as we argue in our papers,

12   should be considered by this Court in connection with the

13   motion to dismiss.  We fully recognize the background principle

14   that the Court should not rely on extrinsic evidence in

15   deciding a motion to dismiss, but there is also well

16   established case law in the District of Massachusetts and

17   elsewhere that when a document is so central to a plaintiff's

18   claims and incorporated into a complaint, that it fairly is

19   part of the papers at issue in deciding whether it has been

20   improperly pled.

21        Going through the complaint, it relies on the final report

22   for topics such as what burden of proof did the committee

23   apply, did the committee consider alternative theories, was

24   there a bias and unfair investigation, what was the timing of

25   the investigation process, was Professor Gino allowed time to

1    respond.  The complaint also extensively refers to the exhibits

2    to the final report such as the notice of inquiry, Professor

3    Gino's written responses, the draft report and various policies

4    and procedures.

5         To be clear, we are not asking the Court to adopt the

6    findings or conclusions of the investigation committee report.

7    I think that would not be appropriate in the motion to dismiss

8    stage, but what this Court can look at and what there is

9    precedent for which we've cited in our papers is looking at the

10   process itself.  What standard does the investigation committee

11   say that it is applying?  What are the dates on which the

12   various notices were given?  As pointed out in Professor Gino's

13   opposition, there is no dispute over the authenticity of the

14   final report.  There is no claim that this is somehow a

15   counterfeit document.  The opposition says that the plaintiff

16   disagrees with the conclusions and disagrees with the

17   inferences to be drawn, certainly, but there is no dispute as

18   to the accuracy and the authenticity of the document itself and

19   what the investigation committee said that it did.

20        So moving then to the specific arguments that Professor

21   Gino makes with respect to the covenant of good faith and fair

22   dealing.  First, Professor Gino says the adoption of the

23   interim policy itself was a violation of the covenant of good

24   faith and fair dealing.  Somewhat puzzling because the interim

25   policy imposes far greater procedural and substantive

1   limitations on the Business School in its investigations into
2   research misconduct than existed under the 2013 policy that was
3   in place at the time of the appointment letter.  So, in other
4   words, how could Professor Gino have been harmed by Harvard
5   limiting its own process, limiting itself and imposing onerous
6   processes on itself?  Another reason why this cannot support a
7   claim on the implied covenant is that the appointment letter
8   makes clear that this school's policies may be amended from
9   time to time.
10       Moving then to the next item in Count 3 which is that
11  there supposedly was a violation of the covenant with respect
12  to the committee's consideration of reports -- of publications
13  that were more than six years old.  First, notably absent from
14  this allegation is that one of the papers at issue was
15  published in 2020 and so clearly within the six-year window.
16       With respect to the other three papers, Exhibits 2, 3 and
17  4 to our motion to dismiss, show publicly available documents
18  published within the last six years in which Professor Gino
19  cited these studies.  Professor Gino has no response to this in
20  her papers other than to say these were quote-unquote
21  "lightweight citations," a term that appears nowhere in the
22  interm procedures and therefore cannot plausibly violate any
23  covenant of good faith and fair dealing, and I would point out
24  that to the extent that Professor Gino says that the interim
25  policy itself is inapplicable or should never been passed,

1    there is no six-year lookback limit in the 2013 policy which

2    she would say was incorporated into the appointment letter.

3         Next there is an allegation that she was not allowed time

4    to respond to various allegations or that in some way she was

5    rushed in her response to the committee's work.  Again, looking

6    at the undisputed facts as laid out in the final report and

7    indeed in the complaint itself, this Court can see that

8    Professor Gino received notice of the concerns raised about the

9    data no later than October 27 of 2021 when she received a

10   formal notice of inquiry.  It was not until March 7 of 2023

11   that the committee issued -- that the investigation committee

12   issued its final report or about 18 months later.  In between

13   then, the complaint and the final report together document

14   about ten different opportunities that Professor Gino had to

15   interface directly with either the inquiry committee or the

16   investigation committee to share her point of view.  She wrote

17   responses.  She was interviewed.  Her attorney submitted

18   materials.  She submitted comments on various draft reports

19   over and over again.  Again, this Court -- although this Court

20   must accept the plausible allegations in the complaint as true,

21   the complaint itself and its incorporated final report show

22   that it's simply implausible that she was not afforded basic

23   fairness with respect to the opportunity to respond to the

24   concerns of the committee.

25        Professor Gino's next concern is with respect to the

1    burden of proof.  The complaint argues that the committee did

2    not apply the proper burden of proof, that it somehow shifted

3    the burden of proof to Professor Gino.  This is probably the

4    most black and white example of why the final report should be

5    incorporated into the complaint, at least for the limited

6    purpose of detailing the process.  There on Page 1 of the final

7    report, the investigation committee makes clear the standard of

8    proof that it applied, and it applied a preponderance of the

9    evidence standard to the question of research misconduct.  It

10   was only on Professor Gino's affirmative defenses of either

11   honest mistake or some unknown bad actor to which the committee

12   applied the preponderance of the evidence standard to Professor

13   Gino.  Similarly, the final report on its face shows that the

14   committee decided and found by preponderance of the evidence

15   that Professor Gino had intentionally, knowingly or recklessly

16   committed research misconduct.  So, in other words, there was a

17   specific finding of intent.

18       Next point on which Professor Gino argues is that the

19   sanctions imposed as a result of these 18-month long exhaustive

20   proceedings were not within the Dean's authority.  Again, I

21   would cite to the Pollalis case, for example, the implied

22   covenant cannot override the express terms and agreement, and

23   so to the extent that Professor Gino argues that the interim

24   policy is a contract and, therefore, can have a covenant of

25   good faith applied to it, we would point out that all of the

1    sanctions that were imposed were expressly spelled out in that

2    policy, and to the extent that she's instead said that the

3    relevant covenant is with respect to the 2013 research policy,

4    we would point out that there are no limitations in that

5    document on the Dean's authority.

6        Now, she may argue that because there are none listed, the

7    Dean was not authorized to make any sanctions under the 2013

8    policy but that's belied by the plain language of the document

9    which says that the Dean may take such measures as he or she

10   deems appropriate, and I think on that point I would also refer

11   back to the numerous cases we cited in our papers talking about

12   courts' reluctance to impose policies and terms on universities

13   in particular in the academic context.  That is count -- or

14   sorry, one more in Count 3.  She also says there was a breach

15   of an implied covenant with regard to confidentiality.  Again,

16   we would point to the Enstar case, the Pollalis palace case,

17   for the proposition that the express terms govern.  The interim

18   policies do state that for sound reasons the proceedings will

19   be kept as confidential as possible and only disclosed to the

20   extent necessary or advisable.

21       The first point is that the alleged violations of this

22   confidentiality promise occurred after the investigation had

23   been completed and so, therefore, not during the time that the

24   policy was in place or that policy applied.  Second, to the

25   extent that that confidentiality policy outlived the running of

1   the investigation committee's process, they were indeed, to the

2   extent necessary or advisable, they were, for example, to the

3   very students working under Professor Gino and whose

4   reputations and publication work was most at jeopardy as a

5   result of what was happening.

6         THE COURT:  So the school's position is if there was a

7   confidentiality agreement, that it was only valid during the

8   investigation process itself, but once conclusions have been

9   made and certain findings have been made, that it didn't apply

10   anymore?

11        MR. BRAYLEY:  I think that that's the clear reading of

12   the confidentiality assurances in the interim policy, and the

13   reasons for that are straightforward which is that before there

14   has been a conclusion with respect to research misconduct, it's

15   in everyone's interest for the matter to keep confidential to

16   protect the potentially wrongfully accused.  Once the finding

17   has been made that by a preponderance of the evidence someone

18   has intentionally, knowingly or recklessly committed research

19   misconduct, the same considerations simply are not in play.

20        THE COURT:  And just as a matter of clarification on

21   the facts, did Harvard share with the Data Colada defendants

22   the results or the school's findings?

23        MR. BRAYLEY:  No.  It is not alleged in the complaint

24   either that the Data Colada folks did not see the final report

25   at any time until they were put in the --

1            THE COURT:  Well, maybe not the report itself but the

2      ultimate conclusion.

3            MR. BRAYLEY:  Well, the ultimate conclusion was made

4      clear, for example, in the retraction suggestions to the

5      papers.

6            THE COURT:  Sure, but not directly to the Data Colada

7      defendants?

8            MR. BRAYLEY:  I'm not 100 percent sure of the facts so

9      I don't want to misrepresent anything.  I don't think that

10     anything is clearly alleged in the complaint with regard to

11     that.

12         The next count in the complaint is with regard to

13     estoppel.  So this one I suppose is pled in the alternative

14     because it's clear that it is not available if there is a

15     contract so I suppose this is Professor Gino saying even if

16     there is no contract, there was some sort of violation.  Under

17     well-established Massachusetts law, estoppel can only be there

18     if there is a definite and certain promise.  Here, the only

19     promise that she's alleged to have relied upon is a vague

20     assurance of nondiscrimination and basic fairness which is not

21     specifically articulated anywhere.

22         If you look at cases such as the Rodden case, the Egan

23     case and the Ciccone case, those all point out that a promise

24     needs to be definite, concrete and intended to be relied upon.

25     Here, Professor Gino cites no case in which a vague assurance

1    regarding nondiscrimination has turned into an estoppel claim.

2    We're not aware of any cases like that, and indeed, just

3    thinking it through, that would suggest that the common law

4    claim of estoppel would either supersede or be a part of

5    essentially every claim under Title VII, Title IX or Chapter

6    151B in Massachusetts.  There simply is no authority for that

7    proposition.

8         Moving on then to the defamation counts against the

9    Harvard counts, and I will leave, of course, the defamation

10   counts against the Data Colada defendants to Mr. Pyle, the

11   first point is that, as I already mentioned, Professor Gino is

12   clearly a public figure.  Although, in some circumstances, that

13   would require looking to extrinsic facts to determine.  Here,

14   that simply is not the case.  The complaint is thorough in

15   reciting her various professional accomplishments, her 140

16   articles, her listing of the 40 top business professors, her

17   extensive media contacts, she has top-selling books, she has

18   speaking engagements at top corporations, all specifically

19   relating to her research and the findings of her research, and

20   indeed her claims, Professor Gino's claims for damages relating

21   to the alleged damage to her reputation, would make no sense

22   were she not a public figure.  Her reputation and her potential

23   from speaking to these corporations is precisely because of her

24   public fame and notoriety.

25        Therefore, under well-established Supreme Court precedent

1    and precedent in the First Circuit and the Commonwealth of

2    Massachusetts, because she's a public figure, defamation claims

3    can only survive if there is actual malice which is to say

4    knowing that a statement is false or having serious doubts

5    about its truth.  That simply is not alleged with respect to

6    the two types of defamation alleged against the Harvard

7    defendants.

8         So taking a look at the notice of administrative leave, so

9    the allegation here is that Harvard defamed Professor Gino by

10   posting on her bio on the website on administrative leave,

11   there is no allegation of actual malice that Harvard knew that

12   this was false or had serious doubts about its truth because it

13   was true.  She was in fact placed on administrative leave.

14        THE COURT:  Let me ask you this, does Harvard update

15   its website to reflect that a professor is on, for example,

16   sabbatical leave or maternity leave or some other leave?

17        MR. BRAYLEY:  Well, it's not pled in the complaint one

18   way or another.

19        THE COURT:  I'm just asking.

20        MR. BRAYLEY:  My understanding is that they do and

21   there is certainly good reasons why they would do so, to

22   prevent confusion about who was or was not available for

23   comment.  For example, sometimes Harvard professors, actually

24   not infrequently, Harvard professors will be on leave to serve

25   in government administration and it's important to understand

1    in what capacity those individuals are working during the

2    period of leave.

3         THE COURT:  So their status is updated regularly?

4      It's not just Professor Gino?

5         MR. BRAYLEY:  No.  I don't believe that to be true,

6    and I don't think it's pled and I don't believe it to be true

7    in any event.  There has been no disparate treatment here.  To

8    the extent she would argue disparate treatment, that would be

9    with respect to the Title IX claim that isn't the subject of

10   today's motion.

11        With respect to the letters to the journals, these, of

12   course, were sent by Harvard in connection with its obligation

13   as a leading academic institution to make sure that there is a

14   correct academic record and despite the mischaracterizations of

15   those letters in the complaint, the letters are attached to the

16   complaint and incorporated into it, and this Court can see that

17   the statements do not actually accuse Professor Gino of

18   anything.  They say, for example, that the university has

19   reviewed concerns about certain data previously published by

20   Dr. Francesca Gino in the following article.

21        First of all, that is not false.  The university did

22   review concerns about certain data.  Second, when they then go

23   on to explain the basis for their concerns about the data, that

24   is opinion based on disclosed evidence, and there is nothing in

25   the complaint that plausibly alleges that Harvard knew or had

1    serious reason to doubt the truth of what it was saying to

2    these journals.

3          The only, in the opposition papers, Professor Gino's only

4    response to this point is to say that the letters to the

5    journals say original data when she wishes that they simply had

6    said earlier data.  She disputes whether the Business School

7    analyzed that it believed it was original data that was truly

8    original.  That's the only falsity alleged.  Couple of

9    responses to that.  First of all, it's substantially true.

10   Whether or not it was the original, original data or just an

11   earlier investigation of the data, it's still substantially

12   true.  It doesn't go to what's supposedly defamatory about

13   these statements.  What Professor Gino is objecting to is the

14   conclusion that she committed research misconduct.  She would

15   not be saying that these statements were defamatory if Harvard

16   had said we analyzed the original data and the data publicly

17   filed and found they were the same.  She would not say those

18   are defamatory which shows that the question of original versus

19   earlier is irrelevant to the question of defamation.  There is

20   no question about its truth or substantial truth in that

21   regard.

22          And, finally, and I don't think the Court even needs to

23   get there, it's important to point out an employer's

24   conditional privilege to make statements that are not

25   unreasonable, unnecessary or excessive with regard to the

1    posting on the website that Professor Gino was on academic

2    leave, we've talked about the various reasons why this would be

3    important, so there is no confusion about in what capacity

4    she's operating during that leave, and with respect to the

5    letters to the journals, these were limited to the journals,

6    publishing the four papers that were at issue in the

7    investigation.  There was no broad-based letter writing

8    campaign to other journals or other academics.  It was limited

9    to those journals where there was reason to believe that there

10   may be concerns about the data published in those journals.

11        Briefly on the last few claims that are relevant to the

12   Harvard defendants, the conspiracy claim, it's a single

13   conspiracy claim that's entirely derivative of the defamation

14   counts and actually primarily the defamation counts against the

15   Data Colada defendants so I will let Mr. Pyle address why those

16   counts must fail, but we share that belief that the counts

17   against the Data Colada must fail as a matter of law, and

18   therefore, the civil conspiracy claim cannot stand.  The

19   Mullane case, for example, stands for the proposition that if

20   the underlying conduct doesn't stand, then the civil conspiracy

21   case cannot proceed either.

22        Two more, intentional interference, there is no allegation

23   that Harvard defendants interfered with a contract, and so then

24   the claim must be that there is interference with an

25   advantageous business relation.  The elements of that count

1    under Massachusetts law include that the business relationship

2    must have been broken.  That's the language.  There is actually

3    no allegations that any business relationship with Portfolio,

4    the publisher, was broken.  The allegation in the complaint was

5    there was a one-year delay in publication.

6         With respect to the allegation of interference with

7    Harvard Business publishing, first, I would point out that this

8    is a claim for intentional interference.  There is no

9    allegation that the Business School or Dean Datar instructed

10   Amy Edmondson to contact Portfolio so not sure how it could be

11   intentional against the defendants named here.  With respect to

12   the subsidiary publishing company, there is no allegation of

13   actual malice or ill will as would be required for interference

14   with one's own corporate affiliate.

15        Finally, with respect to the privacy claim, as pled in the

16   complaint, this is relevant only to the posting of

17   administrative leave on the website, yet the clearly

18   established case law in Massachusetts is that a privacy claim

19   can stand only where the information disclosed is highly

20   personal or intimate.  We have not found and we haven't seen

21   the plaintiff cite any case that suggests that the mere fact

22   that an employee is on administrative leave is this sort of

23   highly personal or intimate information that can give rise to a

24   privacy claim, and by contrast, we cited cases, for example,

25   where asking co-workers about someone's alleged alcoholism was

1    not sufficiently personal or intimate or supported by

2    legitimate business reasons and, therefore, did not sound of

3    privacy claim under Massachusetts law.

4         Those are my points.  I'm happy to answer any questions

5    the Court may have.

6              THE COURT:  I think I'm all set.

7              MR. BRAYLEY:  Thank you.

8              MR. PYLE:  Good morning, your Honor.  Jeffrey Pyle for

9    Joseph Simmons, Leif Nelson and Uri Simonsohn.  I would like to

10   point out my clients are here in the courtroom today.  They

11   have flown here from their respective institutions in

12   California, Philadelphia and Barcelona, Spain for this hearing

13   today.

14        There are three reasons why the First Amendment requires

15   the dismissal of all claims against my clients.  First, their

16   statements are opinions based on unchallenged, truthful,

17   disclosed non-defamatory facts, and the First Amendment

18   protects opinions like that, especially in the realm of

19   scientific discourse and debate.

20        Second, Professor Gino, as my brother has ably argued, is

21   a public figured.  Therefore, must prove actual malice and the

22   same failure of proof as to Harvard applies to my client.  She

23   has alleged no facts showing that they did not believe what

24   they said or that they lied in their analysis of the data

25   anomalies that they identified to Harvard and then to the

1    public.  That is required by the First Amendment.  The

2    complaint fails that test.

3        Third, Professor Gino's add-on claims of conspiracy and

4    tortious interference fail for the same reasons as the

5    defamation claims as Mr. Brayley has also argued.  As I said,

6    my clients are professors at UPenn, Berkeley, and Esade in

7    Barcelona, and in their spare time, they're data investigators.

8    They identify suspicious data in published studies and they

9    expose potential fraud.  They do that, not for money, but

10    because they want to improve their field of behavioral sciences

11    and they publish their analysis on their blog which is called

12    Data Colada, a fun name for a blog about data.

13        In this case, they identified suspicious data in four

14    studies published by Professor Gino.  My clients have extensive

15    experience in identifying fake data, and it looked to them like

16    the data for these studies was manufactured to create more

17    successful outcomes.  They reported their suspicions to Harvard

18    in December of 2021 in an 18-page memo full of graphs, analysis

19    and statistical methodology, all of which is in Exhibit A to my

20    affidavit, and they said, here is why we think the data looked

21    fake, but Harvard Business School, you should investigate this.

22    What you should do is you should obtain access to the original

23    data that was collected for these studies and compare it to the

24    posted data, the data that was posted publicly, and we think

25    what you'll find is that the data was modified between the time

1    it was collected and the time it was published in order to

2    create a more successful outcome.  That will either confirm or

3    disprove our tentative conclusions based on the data that we

4    see, and by the way, you should give Professor Gino a full

5    opportunity to explain the anomalies to you.

6         Harvard did exactly that, and Harvard's investigation

7    report, Exhibit 5 to the affidavit of Ms. Cooper, shows that

8    everything my client said in their report to Harvard was

9    correct.  My clients didn't have access to Professor Gino's

10   original study data, but they said based on the anomalies we

11   see, we think it's modified from the original data to the

12   published data.  Harvard got access to those original data

13   sets, and sure enough, my clients were right, and the scope of

14   the fraud in fact was a great deal more than what my clients

15   were able to identify just by looking at the anomalies.

16        So Harvard issues -- the next thing my clients hear about

17   this is 18-months later that Harvard issues public retraction

18   notices for these four studies and put Professor Gino on

19   administrative leave, and to answer the Court's earlier

20   question, no, Harvard did not communicate with my clients about

21   the results of the study.  We found out the same time everybody

22   else did in the news media with an article in the Chronicle of

23   Higher Education.

24        Now, Professor Gino could have responded to this

25   circumstance in the Marketplace of Ideas.  She could have

1    publicly defended her research and tried to convince the world

2    that her data isn't fake.  Instead, she has sued my clients for

3    $25 million and for what?  For identifying data anomalies to

4    Harvard and writing publicly about those anomalies after, after

5    Harvard confirmed that everything they said was right.

6         The chilling effect of a lawsuit like this on science is

7    obvious.  It is not an exaggeration to say that the very idea

8    of science depends on scientists checking each other's work,

9    and that kind of checking and identification of potential data

10   manipulation leads to lawsuits that get to discovery and the

11   burdens and expense of litigation.  Very few people would do

12   what my clients have done, which is to go out and try to

13   identify fake data for the betterment of science.  They have

14   been sued for a public service.  It would greatly harm the

15   public and the public's interest in good science for this case

16   to proceed any further, and that is where the First Amendment

17   comes in.

18        I'd like to begin with the law of opinion which you've

19   already heard a little bit about.  Everything that Data Colada

20   is accused of saying here, everything, all five publications,

21   fit comfortably within the law of opinion.  The defamation

22   claim requires a false statement of fact.  The Supreme Court

23   has said and the lower courts have said that repeatedly that

24   statements that amount to opinions are protected against

25   liability, and in the law, the shorthand for opinions includes

1     statements that express the speaker's subjective judgment or

2     interpretation about what facts show.

3          So, for example, someone says, Attorney John Smith is an

4     alcoholic.  That would be a defamatory statement.  It's

5     intended to harm the attorney's reputation, it's provable as

6     false, and if said with a required level of fault, it would be

7     actionable; but if someone says, I saw Attorney Smith drink a

8     beer yesterday at lunch just before an important court argument

9     and the previous night I saw him go into a bar after work and

10    from that I conclude that Attorney Smith must be an alcoholic.

11    That conclusion, he must be an alcoholic, is not an actionable

12    statement in defamation because the speaker discloses all the

13    facts upon which the conclusion is based and lets the listener

14    or the reader decide whether or not that opinion, that

15    conclusion, is justified and that's what my clients did here.

16    They identified anomalies in Professor Gino's published data,

17    they analyzed it with charts and graphs and statistical

18    analysis and they explained why in their opinion the anomaly

19    suggested that someone manipulated the data.  They disclosed

20    all the facts both to Harvard and to the public on their blog.

21    They even hyper linked to the underlying data sets so that

22    others could run the same analysis and check their work as good

23    scientists do.

24         Their conclusions are an open book based on disclosed,

25    unchallenged, non-defamatory facts.  It is a classic case of

1  protected opinion.  This, by the way, is strictly an issue of

2  law.  The Court can determine whether or not my client's

3  statements are opinions based on their publications alone.

4  It's not a factual issue and many cases have so helped.

5          Also, you don't, as Mr. Brayley mentioned, you don't

6  have to accept mischaracterizations of what my clients have

7  said in their publications that are made in the complaint.  The

8  publications are what control.

9          Now, Professor Gino has boilerplate in her complaint

10  saying that there are undisclosed facts that underlie my

11  clients' opinions but she doesn't really say what she means by

12  that.  Her real beef with my clients' analysis is that she

13  calls my conclusions "unwarranted," her word.  She uses that

14  word at Paragraphs 104 and 105 of the complaint.  She says,

15  they should have assumed that there were innocent explanations

16  for these issues, but you can't sue somebody for drawing the

17  wrong conclusions about what the facts show.  That's standard

18  Hornbook law of opinion.  That's what my clients are being sued

19  for.

20          Now, she will say and her counsel will say and has said in

21  her brief that the statements that was whether or not she

22  committed data fraud or whether data fraud existed in her

23  studies are provable as false, and therefore, they're not

24  opinion, but provability of falsity is only one aspect of the

25  opinion case law.  The case law also says, and the case Riley

1    <u>v. Harr</u> stands for this, that even a provably false statement

2    of fact is non-defamatory, non-actionable if it is based on

3    disclosed non-defamatory facts, and it's clear that the speaker

4    is drawing their conclusions from those facts, and I'd like to

5    bring the Court's attention to a case that was decided just

6    last month after our briefing in this case that is squarely on

7    point with this one.  It's called <u>Cassava Sciences v. Bredt</u> and

8    it's out of the Southern District of New York and the Westlaw

9    cite is <u>2024 WL 1347362</u>.  I have paper copies of the case if

10   the Court would like me to hand them up.  The plaintiff in that

11   case was a biotech company that was developing an Alzheimer's

12   drug and the defendants included a group of neuroscientists who

13   found data anomalies in the company's clinical trials for the

14   Alzheimer's drug.  So the neuroscientists sent a 40-page report

15   to the FDA outlining those anomalies and explaining why they

16   appeared to show data manipulation, just like this case.  They

17   told the FDA they should do a rigorous audit of the plaintiff's

18   research, just as my clients asked Harvard to do, and they did

19   public presentations about their findings too, and the drug

20   company sues them for defamation saying you've impugned your

21   research integrity, you've harmed our reputation.  The Court

22   dismissed the case based on the law of opinion and the absence

23   of actual malice, exactly what we are arguing here.  The Court

24   held that the neuroscientists had fully disclosed the

25   non-defamatory facts on which their conclusions were based and

1    held, importantly, and I think this is an important principle

2    for this case, that a scientific disagreement isn't a proper

3    subject for a defamation claim.  Courts and lawyers and juries

4    are ill-equipped, this Court observed, to referee scientific

5    controversies about what data shows, and we've cited cases that

6    make the same point in our brief, ONY Therapeutics which the

7    Cassava Court cites and Saad v. American Diabetes Association

8    by Judge Hillman in this court, all making the same point, when

9    you have a scientific disagreement and the scientists put

10   forward the basis of their concerns, you can't sue somebody

11   over that, it's protected by opinion, and the Court goes on in

12   the Cassava case to say that if the case were allowed to

13   proceed, it would be dangerous to science.  If the plaintiff's

14   position in that case were correct, the Court says, a direct

15   developer could sue its critics "no matter how thorough and

16   earnest the reasoning expressed by the scientist for her

17   concerns so long as the drug developer alleged that those

18   concerns were unfounded and presented competing analyses in

19   support of that claim.  Such a result risks stifling scientific

20   debate and undermining the vital role of whistle blowers in

21   scientific discourse both in the academy and industry."

22   Therefore, the Court dismissed the case.  We submit the Court

23   should do the same here.  Cassava Sciences is on all fours with

24   this complaint.

25              Now, there is one allegation in the Amended Complaint

1    where Professor Gino says that the underlying facts were not

2    disclosed and this is a statement in Blog Post Number one, that

3    there were perhaps dozens of other cases where Professor Gino

4    may have also or where Professor Gino's data may also be fake,

5    and statements like that the cases say really have to be read

6    in context.  When a statement is clearly speculating about what

7    evidence would show based on inferences to be drawn from what

8    they found so far, that also is not a statement of fact, and

9    here you had four separate studies that my clients identified

10   as containing fake data, published over ten years while

11   Professor Gino was at different research institutions, and

12   essentially, their statement was she's published 140 papers,

13   there is no reason to believe that these four are the only ones

14   where her data turns out to be fake, and cases say that

15   speculation like that, complete with the word perhaps which

16   precedes the word dozens, becomes a qualified statement that is

17   not a statement of fact.  It is a statement of speculation and

18   not actionable.

19        Now I'd like to address the second issue I mentioned which

20   is the absence of pleaded facts showing actual malice.  I won't

21   rehearse what Mr. Brayley said about how the plaintiff has

22   clearly pleaded facts showing that she is a public figure.  I

23   would simply also point out that the case law also says that

24   whenever someone puts research and writing and academic

25   articles out into the public, they become a limited purpose

1    public figure for the purposes of commenting on that research.

2    There is a Seventh Circuit case that we've cited to that

3    nature.  Professor Gino invited comment and the criticism of

4    her work when she put that work out into the Marketplace of

5    Ideas.  She is a public figure for purposes of discussion of

6    her research, especially with all the attention that her

7    research has gotten in the public.  So she has to plead facts

8    plausibly showing that my clients either lied in their

9    statements or that they did not genuinely, honestly believe

10   what they said but rather harbored subjective serious doubts

11   about the truth of what they actually said in the articles, and

12   there is no evidence pleaded in the amended complaint showing

13   my clients harbored any doubt that these studies had anomalies

14   that pointed to fraud and that is the crux of what the

15   allegedly defamatory statement would be.

16       Many times a liable plaintiff would say that the

17   conclusion is so outlandish that it would have seemed

18   implausible to the speaker to reach the defamatory conclusion,

19   but as you can see in the December report my clients provided

20   and the blog posts, the data just objectively looks fishy even

21   to someone who isn't trained in statistical analysis.  So for

22   example, you have survey responses asked to write down their

23   class year.  Most of them put down freshman, sophomore, for

24   their graduation year, but a bunch of them mysteriously put

25   down the word Harvard for their class year and those responses

1    were all bunched together in one portion of the data set and

2    all those responses just happened to have provided other

3    answers that very strongly supported the study's ultimate

4    conclusion.  That looks like fishy data and that's what my

5    clients said to Harvard, and as it turns out, Harvard's

6    investigation, which you can see in Exhibit 5 to the Cooper

7    affidavit, would later find that those Harvard class year study

8    participants were manufactured.  They don't appear in either of

9    the original data sets recovered in the investigation.  So my

10   clients were right.  Those Harvard responses were fake, and yet

11   Professor Gino is here suing them saying they couldn't have

12   possibly even believed that what they said was true when in

13   fact it turns out to be true.

14        We'll take Blog Post Number four which is about the study

15   that Professor Gino did in 2020.  The hypothesis is that if a

16   person is primed to think about their hopes and dreams and

17   aspirations before they attend a networking event, they will

18   enjoy it more than if they think about it as an obligation, and

19   different groups had to rate how they felt about a networking

20   event based on adjectives like dirty, inauthentic, impure,

21   ashamed, wrong, and they had to put a number, like do you feel

22   really dirty, seven, or not dirty at all attending a networking

23   event which would be one, but they also were asked to write

24   down words describing how the networking event would make them

25   feel.  What my clients found out is that the numbers put down

1  by some of the participants didn't match the words that they
2  independently had written.  So somebody would write, yeah, a
3  networking event would make them feel really inauthentic but
4  when you look over at the numerical responses on the
5  inauthentic, they put down a one for not being inauthentic at
6  all.  There wasn't just a few of these.  There was like 26 of
7  them that my clients identified as being non-matching where you
8  had the same words but completely non-matching responses, and
9  as it turns out, Harvard's forensic firm found out that that is
10  exactly what had happened.  Whoever fudged the data had changed
11  the numbers but didn't bother to change the word responses and
12  that's why Blog Post four is called Forgetting the Words, but
13  the data wasn't just changed in 26 entries.  Someone changed
14  the data in 168 entries all in a direction that the study
15  authors wanted the study to go.  That is set forth on Pages 516
16  to 520 of the Harvard report, and what is Professor Gino's
17  response to Harvard?  Well, the report says that her excuse was
18  someone must have hacked my account.  The evidence of a data
19  fraud was so bad that that was the defense, somebody must have
20  hacked my account and made these data sets look different
21  because I can't otherwise explain it, and you know who might
22  have done it, it might have been the Data Colada team.  Who is
23  defaming who here?
24      Harvard found her bad actor explanation totally
25  implausible last summer, and apparently, when Professor Gino

1    decided to file her complaint, they decided that it was

2    implausible here too so it's not included in this lawsuit, but

3    the notion that my clients disbelieved that the data anomalies

4    pointed to fraud is not plausibly supported in the complaint.

5    That is the burden she has to bear and she has not borne that

6    burden.

7         I will also, finally on this point, point out that the

8    blog posts are particularly deficient as to actual malice

9    because as I said earlier, the blog posts were all posted after

10   it had become public knowledge that Professor Gino's studies

11   had been retracted by Harvard, very unusual thing to happen and

12   that she had been put on administrative leave.  So at that

13   point my clients knew or reasonably could have inferred that

14   Harvard's investigation had validated their concerns and that

15   their concerns were right.  So how can it be said that they

16   disbelieved what they had reported to Harvard as of the time

17   they published the blog post?  There is clearly no evidence of

18   actual malice as of that point.

19        What Professor Gino does do is she points to an interview

20   by Professor Simonsohn where he says, we don't know exactly who

21   fudged the data.  I think it was Professor Gino but suppose it

22   was somebody who did it on her computer somehow, we wouldn't

23   know that.  That just shows Professor Simonsohn being careful,

24   like a good academic saying what he knows and what he doesn't

25   know.  It's not evidence that they disbelieved anything they

1    said about the fake studies.

2         Now, finally, as to the ancillary claims of conspiracy and

3    tortious interference, both of them, as Mr. Brayley said,

4    depend on there being a valid libel claim because the law is

5    very clear that if you fail the law of defamation because the

6    speech is protected by the First Amendment, you can't get

7    around the First Amendment by repackaging your libel claim as

8    something else, and that's what both of these counts try to do.

9    They also totally fail on their own terms.

10        On the conspiracy count, the complaint concocts this

11   implausible scenario where my clients threaten to go public

12   with their concerns about Professor Gino unless Harvard agreed

13   to create a new employment policy to investigate the

14   allegations against plaintiff's work.  First of all, why would

15   Harvard negotiate about its policies with three professors who

16   work for other institutions?  It's not a plausible allegation,

17   and the Court need not credit fanciful, implausible allegations

18   in the complaint that don't have any factual heft.  This meets

19   that categorization, and why would my clients care what

20   procedures Harvard used anyway?  It's not a factual allegation

21   that makes any sense.  It's just an attempt to try to make an

22   agreement where there wasn't one.  There is no evidence that

23   she has any insight into what they agreed or what they said or

24   what their understanding was.

25        That claim fails also because it's pointless because the

1    whole purpose is to try to hold, appears to be, try to hold

2    Harvard liable for what my clients said and try to hold my

3    clients liable for what Harvard did and said.  That is not

4    permissible under the law of defamation.  You can only be sued

5    for a statement you participate in or that you direct or that

6    you order.  You can't be sued for a statement somebody else

7    made and there is no pleaded allegation that my clients had

8    anything to do with Harvard's retraction notices or that

9    Harvard had anything to do with what my clients said.

10        Finally, as to tortious interference, there is no

11   plausible allegation that my clients induced Harvard to break

12   any contract with Professor Gino.  They said, Harvard, here are

13   our concerns about data anomalies.  You should investigate

14   them.  That's not inducement to break the contract and apply

15   some different standard than what Professor Gino reasonably

16   expected.  That's what's required in a tortious interference

17   claim is intent to cause the other party to breach the

18   contract, intent to cause the other party to conduct an

19   investigation while giving Professor Gino an adequate chance to

20   respond, as my clients asked Harvard to do, is not tortious

21   interference with anything.

22        So to sum up, unless the Court has any additional

23   questions, the complaint challenges speech that is absolutely

24   protected by the First Amendment.  The communications were

25   statements of opinion, there are no allegations plausibly

1    showing actual malice, and the tagalong claims of tortious

2    interference and conspiracy fail as well.  We request that all

3    counts against Joe Simmons, Uri Simonsohn and Leif Nelson be

4    dismissed.

5            THE COURT:  Thank you.  Ms. Sacks.

6            MS. SACKS:  Good morning, your Honor.  Before I get

7    into the heart of the argument, I would just like to

8    respectfully remind the Court we're here on a motion to

9    dismiss, two motions to dismiss.  It's not appropriate at this

10   stage for the Court to be weighing evidence or facts as to what

11   are true.  Our client obviously maintains that the statements

12   are fact, not opinion, that she engaged in fraud is verifiably

13   false, and it's not appropriate at this stage to decide whether

14   there's truth of these statements of facts or the falsity of

15   these statements.

16           THE COURT:  But to the extent that there are

17   statements contained in the retraction letters, for example, to

18   the extent that there is any contradiction with what is alleged

19   in the complaint, I can rely on the letters themselves, you

20   would agree?

21           MS. SACKS:  I would agree that in terms of what the

22   complaint describes as being the retraction letters can be

23   considered by the Court, but as to what the content and the

24   substance of the retraction letters themselves, they consist of

25   hearsay, and as alleged in the complaint, and I want to kind of

1    keep that in the argument, but as alleged in the complaint, the
2    retraction notices themselves are filled with false and
3    verifiably defamatory statements of fact that Professor Gino
4    engaged in fraud.  They also contain defamation by innuendo
5    with their mash-up of unattributed forensics analyses which are
6    not the entire analysis so they exclude exculpatory and
7    limiting material that was in the forensics reports of
8    Mainstone and they combine them with a December report, what
9    was called the December report, an earlier submission by Data
10   Colada and so it gives the impression that Data Colada's
11   accusations were ultimately vetted and proved by -- it's
12   unclear.  It's, frankly, unclear and it leads to -- I will
13   explain that more in the argument, but I also want to say just
14   as an initial matter, on a motion to dismiss, it's wholly
15   inappropriate for counsel to testify on behalf of their
16   clients, and this morning, we heard Mr. Pyle speak to what was
17   actually communicated between Harvard and Data Colada.  We
18   heard Mr. Pyle speak about what his clients believed as to the
19   evidence of their allegations.
20           THE COURT:  I think one of them was in response to a
21   question that I had posed
22           MS. SACKS:  It was but at this stage --
23           THE COURT:  I understand.  I understand your point.
24           MS. SACKS:  He can't speak.  He should not be -- his
25   opinion as attorney, he's a zealous advocate, but he's not a

1    fact witness.  He also even really testified as to the quality

2    of the data that was at issue in Data Colada's blogs.  Wholly

3    inappropriate at this stage for the Court to make

4    determinations about those studies.  These are issues of fact.

5         The other point I would say is that he also spoke to what

6    is the original data.  We don't even know yet what data, what

7    universe of data, Mainstone examined and whether or not -- our

8    client disputes the term that it was original.  Without getting

9    into the facts, because this isn't a factual dispute at this

10   stage or shouldn't be, behavioral scientists have stages of

11   data.  So just as background information, your Honor, when data

12   sets are produced, they go through multiple stages, data is

13   cleaned.  So, in other words, if a participant in this study

14   gives answers to questions that are duplicative or nonsensical,

15   that data comes out.  We don't know what the world -- data sets

16   can change, and we know here that Professor Gino, as alleged in

17   the complaint, disputes what has been referred to as the

18   original data and the characterization of so-called

19   discrepancies between what she voluntarily posted on something

20   called the Open Source Framework which is a place where the

21   public can see the data set and the false statements of fact

22   attributing so-called discrepancies as to being the result of

23   fraud.  So I just want to point that out, that, you know, this

24   is -- zealous advocacy is one thing but testimony on a 12(b)(6)

25   motion is another.

1          This case presents too many issues, and the first is
2    whether a university is free to disregard the procedural
3    protections afforded to tenured professors by the terms of
4    appointment letters and written policies.  The second is
5    whether the First Amendment immunizes from liability statements
6    that destroy someone's professional reputation with false
7    accusations of dishonesty.

8          At this stage in the pleadings, this Court should find in
9    favor of Professor Gino.  First, under rulings of Massachusetts
10   federal and state courts, it is well-settled that the
11   procedural protections that universities guarantee to their
12   tenured professors in the form of appointment letters and
13   written policies constitute enforceable and contractual
14   rights.  Second, there is no constitutional opinion privilege
15   immunizing false and defamatory statements from liability.

16         Now addressing the first issue, Professor Gino has
17   plausibly alleged contract claims against Harvard, both with
18   respect to breach of contract and with breach of the implied
19   covenant of good faith and fair dealing.

20         I respectfully refer your Honor to two cases cited in
21   plaintiff's brief which were decided by another session of this
22   court, Sullivan v. Western New England University and Barry v.
23   Trustees of Emmanuel College.  Both of these are discussed in
24   plaintiff's memoranda, but as those cases indicate, federal and
25   state courts in Massachusetts recognize that appointment

1    letters which incorporate written university policies can, in
2    the circumstance of this case as presented here, constitute a
3    binding contract.

4         Now, there was some mischaracterization by Mr. Brayley
5    concerning what the appointment letter and the terms of the
6    policies incorporated therein actually conveyed to Professor
7    Gino.  Professor Gino's appointment letter conferred on her
8    under Harvard's own policies, when they conferred on her her
9    tenured appointment, they conferred a lifetime appointment.
10   The appointment letter specifically states that Professor
11   Gino's appointment was subject to such terms, condition and
12   policies -- sorry -- subject to such terms, conditions and
13   policies as are stipulated by the faculty of the Business
14   Administration and to the third statute of the university.
15   That's important because I didn't -- that term stipulated by
16   the faculty of the Business Administration means that the
17   Harvard Business School was not free to create a new employment
18   policy for one tenured professor, Professor Gino, that would
19   purport to supersede the stipulated policies.

20        So to Professor Gino's appointment letter, a copy of the
21   third statute was attached.  Under the terms of the third
22   statute, Professor Gino, like all tenured professors at Harvard
23   at the Business School and outside the Business School, was
24   subject to removal from her appointment by the Harvard
25   Corporation only for "grave misconduct or neglect of duty."

1        In 1971, Harvard's governing body adopted a policy

2    entitled "Discipline of Officers Tentative Recommendations,"

3    and that's referred to throughout the complaint and in the

4    memoranda as the Discipline Policy.  The Discipline Policy

5    adopted by the Harvard Corporation is also incorporated in

6    Professor Gino's appointment letter.  It sets forth the

7    procedures specifically for the discipline of tenured faculty

8    for grave misconduct or neglect of duty.

9        I know that in Harvard's memoranda, memorandum, it

10   contends that -- it quotes from the preamble to try to argue

11   that the Discipline Policy only concerns removal of

12   appointment, but, in fact, the Discipline Policy doesn't do

13   that.  It governs the procedures for discipline.  Under the

14   Discipline Policy, before imposing discipline on a tenured

15   professor, Harvard must prove grave misconduct or neglected

16   duty by clear and convincing evidence following a full

17   evidentiary hearing before a hearing committee and a decision

18   by the President and governing bodies of Harvard.

19       In this case, after receiving erroneous allegations

20   regarding Professor Gino from Data Colada, the Harvard

21   defendants abandoned their preexisting research misconduct

22   policy and faculty review board process and created a new

23   policy just for plaintiff, the so-called interim policy.  The

24   interim policy that they created purported to supersede the

25   terms of Professor Gino's tenured appointment by authorizing

1    the Dean of Harvard Business School to impose on Professor Gino

2    sanctions up to and including termination of her tenured

3    appointment.

4        Following an investigation conducted by Dean Datar's

5    handpicked investigative committee, Dean Datar imposed

6    substantial discipline on Professor Gino.  It was tantamount to

7    dismissal without regard to her contractual rights as a tenured

8    professor.  Specifically, Dean Datar placed Professor Gino on

9    unpaid leave for two years.  He stripped Professor Gino of her

10   entire compensation including 100 percent of her base salary

11   and benefits and barred her from campus and all research.

12       Harvard does not dispute that it did not follow the

13   Discipline Policy, but it makes two main arguments.  First, it

14   contends that the policies were not contractual in nature.

15   Harvard cites to inapposite cases in which courts have applied

16   a multi-factored test to determine if a handbook creates

17   enforceable rights, but none of the cases Harvard cites to

18   involved a tenured professor at a university.

19       Second, all of the cases Harvard cites to involved at-will

20   employees and employment policies that expressly disclaimed any

21   contract rights, and an example of one of these cases would be

22   Lee v. Howard Hughes Medical Institute and they discuss a 2020

23   case, again from another session of this court, and they

24   discuss the so-called Jackson factors where Massachusetts state

25   courts have applied analyses to determine if a policy creates a

1    binding contract.  None of those factors apply here.  Professor

2    Gino's appointment letter specifically called attention to

3    these binding policies.  Professor Gino's appointment letter

4    never disclaimed that those policies were binding on her

5    employment.

6         Harvard also, as I mentioned, quoted selectively from the

7    preamble to somehow say, oh, the Discipline Policy only applies

8    to the revocation of tenure, but again, that's not what the

9    Discipline Policy actually states, and to the extent that there

10   is any ambiguity in the contract language, at this stage of the

11   pleading, all plausible inferences need to be decided in the

12   plaintiff's favor.

13        Plaintiff's opposition memorandum references an

14   illustrative case that I would respectfully refer your Honor to

15   which is Sullivan v. Western New England University.  Again, a

16   case -- another case decided by a different session of this

17   court in which similar to the present situation, the Court

18   denied the employer's 12(b)(6) motion on a breach of contract

19   claim.  In that case, a tenured professor was found to have

20   plausibly alleged a claim for breach of contract where the

21   university had terminated his employment under a generally

22   applicable university policy without invoking the just cause

23   provisions as the reason for his dismissal and also without

24   following the requisite procedures due to a tenured professor.

25   In that case, there was a generally applicable policy that

1    covered disability leave, that Western New England University

2    fired the terminated professor for exceeding his disability

3    leave.   In that case, Judge Sorokin held that there were two

4    reasons that the employee successfully stated a breach of

5    contract claim on the 12(b)(6) motion.   One, is the basic rule

6    that a specific provision outweighs a general provision; Two,

7    the judicial solicitude that courts in Massachusetts, federal

8    and state, had given to the procedural protections of tenured

9    professors.

10        Here, Professor Gino's complaint plausibly alleges a

11   breach of contract based on Harvard's failure to adhere to the

12   procedural protections to which she reasonably expected under

13   the terms of her appointment letters and Harvard's written

14   policies that were incorporated therein, and that is the

15   fundamental principle that this Court should consider in

16   analyzing at this stage whether she plausibly states a breach

17   of contract claim is given the policies at issue were her

18   expectations reasonable given the manifestations of the

19   university and the meaning that it could have reasonably

20   expected Professor Gino to understand.

21        Professor Gino has also plausibly stated a claim for

22   breach of the implied covenant of good faith and fair dealing.

23   The covenant of good faith and fair dealing exists so that

24   neither party shall do anything that will have the effect of

25   destroying or injuring the right of the other party to receive

1   the fruits of the contract.  As alleged in the complaint, there

2   are ample facts to support a plausible inference that Harvard

3   breached that duty of good faith and fair dealing.

4        First, at the time Harvard received the erroneous

5   allegations against Professor Gino, Harvard Business School

6   already had a research misconduct policy, the Research

7   Integrity Policy, and something called the Faculty Review Board

8   Process, the FRB process, that it had used to examine

9   allegations of research misconduct at the Harvard Business

10  School.  As alleged in the complaint, Harvard Business School

11  had only recently applied this pre-existing policy and

12  procedure to a male junior faculty member who had been accused

13  of research misconduct in 2019.  Harvard chose to deviate from

14  this existing policy and procedure, which, pursuant to the

15  terms of Professor Gino's appointment letter, had been vetted

16  by the Harvard Business School, and they kept her in the dark

17  of the allegations while they crafted a new policy just for

18  her.

19       While counsel for Harvard can't testify as to whether or

20  not Harvard deviated or has never before created a policy for

21  just one employee or whether Harvard has ever applied the

22  interim policy to any other employee, at this stage, the Court

23  should respectfully look at Professor Gino's complaint because,

24  as alleged in the complaint, Harvard has never, Harvard

25  Business School has never created a policy, an employment

policy, for just one person and has certainly never created an

employment policy that purports to take away the procedural

protections afforded tenured professors at Harvard.

The new interim policy that defendants created just for

plaintiff was never vetted or adopted by the Harvard Business

School as required under the terms of plaintiff's appointment

letter.  While it is true that the existing Research Integrity

Policy that had been established in 2013 had given the Dean

discretion to take action as he thought appropriate, it was a

generally applicable policy that applied, could have applied to

a tenured or non-tenured professor.  That policy didn't purport

to authorize the Dean to impose discipline on a tenured

professor that would supersede the protections provided by the

third statute of the Discipline Policy.

In this case, the interim policy that Harvard created, it

created it just for Professor Gino and specifically purported

to authorize Dean Datar to take actions up to and including

termination.  That's ample factual support for an inference of

bad faith when the employer creates a policy for one employee

specific to her that will undermine the terms of her

appointment.

Defendants, the Harvard defendants, also contend that the

language in the interim policy authorize the Dean to impose the

severe sanctions on plaintiff that it did -- that he did, but

again, the Harvard defendants cannot point to an

1    extra-contractual policy that was never vetted by the Harvard

2    Business School as authority for its actions.

3        Harvard also states that, well, if the Dean were unable to

4    take this action, this would be a policy issue because it would

5    limit an employer's actions -- it would limit Harvard from

6    taking actions against an employee for severe kind of emergency

7    type of misconduct, but that's not -- first of all, this is a

8    contract breach claim.  So it's really about what the language

9    of the policy says.  Secondly, what Dean Datar did, what the

10   Harvard defendants did, was tantamount to a dismissal by

11   stripping the plaintiff of all compensation and benefits and

12   making -- based on a finding that was never made under the

13   procedures, this tiered process in the Discipline Policy.  If

14   there had been an emergency removal from campus, a ban from

15   campus for somebody exhibiting dangerous conduct, banning

16   someone from campus is one thing, but they didn't just ban her

17   from campus.  There is no allegation in the complaint to

18   suggest they were afraid of her.  What they did was they

19   stripped her of all the benefits of her employment, and as

20   alleged in the complaint, when Dean Datar announced all these

21   sanctions, he said to her, when she began to weep, "don't

22   worry, you're a smart woman, you'll find another job."

23       So the Harvard defendants knew what they did was

24   tantamount to a constructive discharge.  She hasn't quit.  She

25   hasn't resigned because the damage perpetuated, and I'll save

1    that for later, but the damage perpetuated by its breach of
2    confidentiality, its defamatory and excessive announcement of
3    retraction notices and her administrative leave have made it --
4    she's unable to find a job.  They didn't give her an
5    opportunity which is also a violation of the duty of good faith
6    and fair dealing because under its own -- every single policy
7    Harvard has, there was a duty of confidentiality, including the
8    Discipline Policy, and I would say it's striking to think the
9    Discipline Policy requires confidentiality in all proceedings
10   which presume that that proceeding is the proceeding where
11   misconduct is determined, grave misconduct for purposes of
12   disciplining of a tenured professor.
13       Professor Gino does not rely on the substance of the
14   interim policy.  I just want to clarify something stated by Mr.
15   Brayley.  Professor Gino's complaint does not rely on the
16   substance of the interim policy to state her claims for breach
17   of contract.
18            THE COURT:  Yeah, I got that.
19            MS. SACKS:  Okay.  It points to that duty of good
20   faith and fair dealing, an abuse of discretion, and also and I
21   won't -- they didn't follow their own procedure, and while
22   we're not going to argue the facts today because it would be
23   inappropriate of what the investigation report does or does not
24   contain, I will just submit there is ample, you know, in terms
25   of your Honor mentioned in our last hearing that it might be

1     fair to consider whether there were conflicts between the

2     investigation report and the factual allegations in the

3     complaint, and I would offer your Honor, if it would be

4     helpful, not to make -- not to decide issues of fact but it's a

5     lengthy report, it's a table, if that would be helpful, a quick

6     memo, showing that in fact the investigation report does not

7     refute and actually corroborates the allegations in the

8     complaint.

9          The complaint also -- plaintiff's complaint also

10    sufficiently alleges claims for defamation against Harvard and

11    Dean Datar.  These defamation claims against the Harvard

12    defendants are based on two sets of communications; One, the

13    retraction notices that Harvard sent to plaintiff's publishers

14    and co-authors, and the second is on Harvard's announcement on

15    its website of Professor Gino's administrative leave.

16         With respect to the retraction notices, Harvard sent

17    excessive retraction notices both to journals that had

18    published plaintiff's papers and to her co-authors.  At least

19    one of these retraction notices was entirely unnecessary.  As

20    alleged in the complaint, the paper at issue had already been

21    retracted.  Also as alleged in the complaint, there was

22    absolutely no need for Harvard to submit retraction notices to

23    the plaintiff's collaborators and co-authors.  All of the

24    retraction notices contained express or implied allegations

25    that there were "discrepancies" between "an original data set"

1    and a data set that Professor Gino had posted on the Open

2    Source Framework.  All of the retraction notices contain

3    statements that the data sets that Professor Gino posted on the

4    Open Source Network were not the "original data sets" used for

5    the study at issue.  All of the retraction notices said that

6    the "original data" had been altered.  These are all false

7    statements of fact.  All of these statements obviously impacted

8    for the worst Professor Gino's professional reputation.  Under

9    Massachusetts common law, they're what they would be called

10   defamation per se.

11       Accordingly, where there are false and defamatory

12   statements of fact that can be verifiably demonstrated false,

13   it would be inappropriate at the motion to dismiss stage to not

14   find in plaintiff's favor prior to discovery without full

15   examination of the facts.

16       THE COURT:  Let me ask you.  On the one hand you say

17   that the Harvard defendants knew that these statements were

18   false, but the final report says the opposite, and if I'm

19   understanding the Harvard defendants' position, they believed

20   that what the final report, the investigation, concluded was

21   true.

22       MS. SACKS:  Respectfully, your Honor, what the

23   investigators state in their findings and conclusions are

24   hearsay, and even as I've heard counsel for the Harvard

25   defendants, they don't urge that this Court adopt the findings

1    and conclusions for the truth of the matter asserted.

2         THE COURT:  That's not the issue here.  It's your

3    allegation in the complaint that the defendants knew that these

4    statements were false.  I'm just trying to get a sense from you

5    where do you get that basis from?

6         MS. SACKS:  Well, for one thing, one kind of quick and

7    easy one is the forensic reports themselves, okay.  So some of

8    this, and I don't want to get too into the weeds on the facts,

9    but we know in the forensics reports, when we actually review

10   what's in the investigation report, at least one of the reports

11   Mainstone acknowledged the reports were not conclusive, not

12   probative, because they didn't have the original data set.

13   These papers were so old, as alleged in the complaint, the

14   retention policies at the respective universities where the

15   studies were conducted didn't require the original data to be

16   maintained.  Mainstone acknowledges that.  I don't have the

17   page number but it's in the investigative report.

18        So by juxtaposing the forensics report selectively without

19   information about what limited that report and about the

20   exculpatory evidence that Professor Gino submitted and the fact

21   that these reports were not conclusive on the issue of fraud,

22   by limiting that, Harvard defendants did so knowingly.  That

23   was a deliberate act of omission.

24        They also, the Harvard defendants, combined, attached to

25   their retraction notices an appendix without attributing what

1    were allegations by Data Colada and what were allegations --
2    and what were reports, these selectively excerpted reports from
3    Mainstone, combined them creating a false and defamatory
4    insinuation that Mainstone's reports were conclusive on
5    findings of fraud, they were not, and the Harvard defendants
6    knew that because if they read the reports, and presumably they
7    did, they would know those reports weren't conclusive and they
8    would know that the original data set -- for instance, in one
9    of the cases, and again, we're not at a motion for summary
10   judgment stage and we're not arguing all the facts, but in one
11   of the studies at issue, we know that Harvard knew that the
12   original data wasn't the original data set, that there was no
13   original data set because one study was conducted on paper.  In
14   that case, I believe there was an RA who brought in an Excel
15   spreadsheet.  That wasn't the original data set.  The original
16   data set was gone.

17        Insinuations of data tampering in this hodgepodge of
18   materials are as equally as actionable as direct statements
19   because the insinuation that plaintiff was responsible for data
20   tampering is false and obviously damaging to her professional
21   reputation.

22        Now, at this stage in the pleadings, Professor Gino does
23   not need to plead malice, but there is ample allegations
24   supporting malice including the numerous deviations by Harvard
25   from its own policies.  However, both sets of defendants have

1    contended that Professor Gino is a public figure for purposes
2    of defamation claim.

3        First of all, Professor Gino has not stipulated that she's
4    a public figure.  Professor Gino is not an all-purpose public
5    figure under say Gertz v. Robert Welch or Mandel v. Boston
6    Phoenix.  Public figures are persons who have assumed rules of
7    special prominence in the affairs of society and have commonly
8    thrust themselves to the forefront of particular controversies
9    in order to influence the resolution of the issues involved.
10   She's not a general public figure and she is certainly not a
11   limited public figure.  Professor Gino did not thrust herself
12   into the center of her own accusations of misconduct.  Bringing
13   a lawsuit to defend oneself from claims of dishonesty in a
14   defamation case does not, under Supreme Court precedent,
15   establish that person as a limited public figure.

16       THE COURT:  We have a little bit more than that here.
17   The complaint itself describes her as an internationally
18   renowned scientist.  At least in her field, would you agree
19   that she's a public figure in her field?

20       MS. SACKS:  I would say she's a public -- she's a
21   successful academic, and I would respectfully refer your Honor
22   to the U.S. Supreme Court case Hutchinson v. Proxmire, 443 U.S.
23   111, cited in plaintiff's opposition memorandum.  In fact, it
24   was a very similar case.  It was a behavioral scientist, highly
25   successful in his field, and the U.S. Supreme Court said that

1    doesn't make him a general purpose public figure, and similarly

2    with Professor Gino, if you've looked at the allegations, as

3    I'm sure you have, looked at the allegations in the complaint,

4    all of them describe her as winning top awards as a scholar in

5    her circle of business management, publishing papers that are

6    known in her circle of business management executives.  These

7    achievements are in a limited circle of academics.  She's not

8    an all-purpose public figure under the law.

9        To the extent that even if one argues or sees an issue of

10   fact in this, the case law in Massachusetts states that -- and

11   there are cases that are referenced in plaintiff's opposition

12   memorandum which again I would respectfully refer your Honor

13   to, they have held on that point that it's a fact-specific

14   inquiry and it's so fact specific and so important in a

15   defamation claim that courts, where there is any issue, at this

16   stage that issue should be decided in plaintiff's favor.

17   Courts in Massachusetts, federal courts, have held that it's so

18   fact-specific that it can't even be decided at the summary

19   judgment stage, but, again, and I won't beat that dead horse

20   here, the plaintiff has alleged facts including the selective

21   limiting and omission with respect to the published retraction

22   notices that do in fact show malice.

23       In terms of Harvard defendants raised this notion of a

24   conditional privilege as an employer, Massachusetts state law

25   -- courts have held that an employer can lose that conditional

1    privilege by abusing it, and I would refer your Honor to a

2    case, I would like to give you the citation, MGH, Mass General

3    Hospital -- or I'm sorry, Lopez v. Massachusetts General

4    Hospital, 91 Mass.App.Ct 1128, and it discusses how in all

5    cases an employer can lose the conditional right of publishing

6    even defamatory statements by abuse and that includes reckless

7    and excessive publication as well as malice which in this

8    sense, under the Massachusetts common law, doesn't mean the

9    knowing and reckless publication without regard to truth or

10   falsity, but it means when defamatory words, although spoken on

11   a privileged occasions, were not spoken pursuant to the right

12   and duty which created the privilege but were spoken out of

13   some base ulterior motive.

14        Here, I know the complaint is lengthy, but it's

15   interesting, one of the allegations, the factual allegations,

16   when Professor Gino complained to the Dean's administrative --

17   I'm not sure of her title, Jean Cunningham, as the person who

18   works in the Dean's office closely with the Dean and complained

19   that one of her colleagues had appeared to have discussed with

20   Professor Gino's publisher the outcome of the misconduct

21   proceeding, Jean Cunningham, who works with the Dean, said,

22   well, once the retraction notices come out, everybody is going

23   to know.  That's, again, I don't want to get too much in the

24   weeds, but retraction notices are different from letters of

25   correction.  Retraction notices didn't express concerns about

1    the data.  They expressed accusations of fraud by Professor

2    Gino.  That's not a correction of the scientific record.

3         The announcement --

4         THE COURT:  Just before you go on, when you say the

5    retraction notices were excessive, it just occurred to me I

6    don't fully understand that.  Are you saying it's excessive in

7    the number of retraction notices that were sent out or what's

8    in the notice itself, the information?

9         MS. SACKS:  Both.  So what was in the retraction

10   notices made accusatory statements of fact entirely unnecessary

11   to correct the scientific record.  Two, they disclosed what

12   plaintiff alleges was the erroneous outcome of the misconduct

13   proceeding.  Retraction notices are meant to correct the

14   scientific record, not to defame or accuse a researcher of

15   misconduct.  In one case, it was entirely excessive where, as I

16   earlier stated, the study at issue had already been retracted

17   for reasons that had nothing to do with Professor Gino.

18        The other reason it was excessive was to whom Harvard sent

19   the retraction notices.  They didn't just send them to the

20   publishers at issue, they also sent them to Professor Gino's

21   co-authors which is wholly unnecessary and not required under

22   Harvard's policy, and as alleged in the complaint, the

23   retraction notices themselves in their substance deviated from

24   Harvard's normal policies on retraction notices.  Retraction

25   notices normally, because they do have the potential to damage

1    a professional scientist, a researcher's reputation, normally

2    the institution including Harvard will work, this is alleged in

3    the complaint, will work the author of the study and do a

4    collaborative submission of retractions or corrections,

5    whatever the case may be, to the publishing journal.  Here,

6    Harvard deviated from that policy and that standard normative

7    practice in the scientific community.

8         THE COURT:  Let's move on to the issues related to the

9    administrative leave announcement.

10         MS. SACKS:  I'm sorry, I couldn't hear.

11         THE COURT:  Let's move on to the issues you raised in

12    connection with the announcement on the website that she's on

13    administrative leave.

14         MS. SACKS:  Okay.  So under Massachusetts law, even a

15    true statement of fact can support a claim for libel if the

16    plaintiff proves that the defendant acted with actual malice

17    within the meaning of Massachusetts state law which is Mass

18    General Laws Chapter 231, Section 92l.  Under state law, as

19    opposed to the New York Times v. Sullivan standard, actual

20    malice is defined as ill will or malevolent intent, and I refer

21    your Honor to Mullane v. Breaking Media, Inc., 433 F.Supp. 3d

22    102 D.Mass. 2020.

23        So, for example, in Noonan v. Staples, which is discussed

24    in plaintiff's opposition memoranda, Staples, the employer,

25    terminated an employee for an alleged violation of employment

1    policy.  The plaintiff's supervisor sent a mass e-mail
2    communication to 1,500 employees.  The employer had never done
3    that before.  They had never identified an employee in a mass
4    e-mail who had committed misconduct.  At the summary judgment
5    stage -- first, I should preface, the statements in the e-mail
6    were all true.  The plaintiff had been terminated for a
7    violation of policy.  It was undisputed.  The issue was malice
8    under state law and whether the -- it was a defamatory
9    statement because it disparaged the plaintiff's professional
10   reputation, but even though true, the facts in that case
11   supported a libel claim under the state law, and the facts,
12   very similar to the present case, were that the employer had
13   never previously sent an e-mail, a mass e-mail identifying a
14   terminated employee, and the employer had e-mailed persons who
15   had no reason to know of the policy violation.

16        Similarly here, Professor Gino's announcement
17   administratively is true.  However, in this case, Dean Datar
18   e-mailed the entire faculty at the Harvard Business School of
19   plaintiff's research misconduct proceeding and connected it to
20   plaintiff's administrative leave.  There were so many breaches
21   in confidentiality as alleged in the complaint, the excessive
22   retraction notices that went well beyond Harvard's policy, the
23   scientific norms for such notices, that we can -- the claim
24   supports in this instance, certainly the 12(b)(6) stage, facts
25   showing actual malice within the meaning of state law.

1    Professor -- is there any other questions on that?

2         Professor Gino has also sufficiently stated her remaining

3    claims against the Harvard defendants including promissory

4    estoppel.  Without getting too much into it, it's alleged in

5    the complaint that Professor Gino was offered other

6    opportunities at different institutions.  She relied, to her

7    detriment, on the promises made of a lifetime tenured

8    appointment with procedural protections by a Harvard defendant.

9    She chose to make a career and she has suffered damages because

10   of that reliance.  At this stage in the pleadings where the

11   Harvard defendants do not concede that their policies created

12   an enforceable contract, other courts in this circuit and in

13   Massachusetts courts, state courts, a recent case, Edelman v.

14   Harvard, has held that a plaintiff at this stage can plead

15   alternative claims and it's not necessary to dismiss one or the

16   other without further fact finding.

17        THE COURT:  Yeah, I don't think I need anything

18   further on that.  Can we move on to the Data Colada defendants?

19        MS. SACKS:  Sure.  So the Data Colada motion -- sorry,

20   the motion -- the Data Colada claims primarily -- I'm sorry,

21   the plaintiff's claims against -- I'm just going to call them

22   the Data Colada defendants instead of identifying them by name.

23   The Data Colada defendants concern five sets of publications,

24   four blog posts and one so-called December report.  I can go

25   over the facts, the context surrounding that report -- okay, if

1   you're good on that.

2       The essence of the Data Colada defendants' arguments is

3   that their statements are immunized as protected opinion based

4   on disclosed non-defamatory facts.  Well, first, as a threshold

5   matter, the law does not immunize so called opinions as

6   privileged.  To quote Milkovich, even -- well, even if the

7   speaker states the facts upon which he bases his opinion, if

8   those facts are either incorrect or incomplete or if his

9   assessment of them is erroneous, the statement may still imply

10  a false assertion of fact.

11      So, as I stated previously, it's wholly inappropriate at

12  this stage for Mr. Pyle to testify as to the quality of the

13  data or so-called sorting errors and the quality of his

14  clients' assessment of so-called discrepancies.  These are

15  statements of fact that are in dispute and plaintiff has

16  alleged erroneous, and at this stage we're not fact finding.

17  Plaintiff disputes the facts, the false statement of facts

18  disparaging her reputation by calling her a fraud and

19  concluding that she committed fraud and the underlying

20  assertions.

21      THE COURT:  What if instead of using the word fraud,

22  they pointed out various inconsistencies in the data and then

23  opined about it, would that make a difference?

24      MS. SACKS:  I'm sorry.  I couldn't hear your Honor.  I

25  just couldn't hear you.

1          THE COURT:  I understand.  I will speak up a little

2     bit.  So let's say they didn't use the word fraud but instead

3     they used the word inconsistencies or discrepancies in the data

4     and here is our interpretation of that.

5          MS. SACKS:  That's a fantastic point, and thank you

6     for asking that question.  So thinking of a case, <u>McKee</u>, I

7     believe it's <u>McKee V Cosby</u>, where an attorney questioned the

8     credibility of a plaintiff in that case, a sexual assault case

9     against the defendant, a credibility assumption, a questioning

10    about the quality of data, whether the data is reliable, these

11    are different from questioning whether someone committed an act

12    of falsifying data.  So, yeah, that would be very different,

13    and when you read Data Colada -- and I don't want to belabor

14    the issue if you've already -- you have the memorandum, it

15    discusses the statements, but all of them, which are very much

16    related to what's in the December report, they all contain

17    expressions, express and implied, that Professor Gino committed

18    fraud.  This is demonstrably false.  It's a statement of fact,

19    it's disparaging, and the underlying bases as alleged in the

20    complaint, and it is somewhat complicated and very fact

21    intensive, these four studies, but there is numerous instances

22    where the Data Colada defendants knew or should have known that

23    their statements were false or at least at the minimum with

24    reckless disregard of their truth or falsity, but again,

25    plaintiff does not concede that she is a public figure for

1    purposes of her defamation claims.  Under Massachusetts law,

2    the degree of false in this sense is negligence.

3        As alleged in the complaint, there are, however, even if

4    -- and, again, plaintiff's position is that it would be

5    inappropriate to make a fact-specific decision on her status

6    for purposes of her defamation claim because the circuit court

7    decisions -- the courts' decisions in the circuit have said

8    it's a fact-specific inquiry, not even appropriate necessarily

9    at the level of summary judgment, but here there are

10   allegations supporting an inference of malice in the terms of

11   New York Times v. Sullivan including that after defaming her in

12   four blog posts, Defendant Simonsohn gave a webinar in which he

13   acknowledged that defendants had no actual evidence of data

14   tampering.  Compare that statement to what they stated in the

15   December 2021 report where defendants Data Colada, the Data

16   Colada defendants, submitted a written report to Professor

17   Gino's employer that their report contained direct evidence of

18   fraud and that they were, I don't want to misquote, but they

19   alluded to non-disclosed facts relating to a 2000 -- going back

20   to 2008, an error, when as alleged in the complaint, the Data

21   Colada defendants wouldn't have even known of her data sets

22   because it was a period of time prior to Professor Gino's

23   posting on the Open Source Framework her data which, by the

24   way, she has done voluntarily in all her studies since the Open

25   Source Framework has become available.

1        The Data Colada defendants also knew that data

2   irregularities occur within the norms of the field of

3   behavioral science with respect to data collection and

4   handling, and in their own blog post concerning other so-called

5   anomalus data, and this is discussed in plaintiff's opposition

6   memorandum in opposition to the Data Colada defendants' motion,

7   they've acknowledged on blog posts dealing with anomalus data,

8   data discrepancies that they wanted to be very careful about

9   discussing discrepancies in terms of concerns about the data

10  and not concerns about the scientist at issue and they

11  acknowledged that in the field of behavioral scientists

12  multiple people handle data, and as alleged in the complaint,

13  Professor Gino alleges numerous reasons for such discrepancies

14  which do not -- which are not supportive of accusations of

15  fraud.

16       The other point I'd like to address is the Data Colada

17  defendants' statements are not part of scientific debate.  It

18  is not scientific debate whether or not a researcher is a

19  fraud.  That's not science.  The cases that Mr. Pyle has cited,

20  ONY, Inc. v. Cornerstone Therapeutics, that case involved an

21  unsettled matter of scientific debate concerning how to draw

22  conclusions from undisputed non-fraudulent data.  That was a

23  scientific debate.  There was nothing alleged about fraud and

24  it was all about how to interpret the data.

25       The other case that's inapposite that Mr. Pyle cited was

1    <u>Saad v. American Diabetes Association</u>.  That case involved not
2    a retraction notice but a so-called letter of concern and it
3    was published in a peer-reviewed medical journal that expressed
4    concerns about the data, the quality of the data, but it
5    contained no false or defamatory statements directed at the
6    plaintiff in that case.  They're completely inapposite.

7         This is a common law case of defamation.  Professor Gino
8    has been accused of falsifying data.  This is verifiably true
9    or false.  It impacts her reputation.  The case should go to
10   discovery.  It should not be decided at this stage.

11        I won't address the point about public figure anymore
12   unless you would like to hear more on that.

13        I would just say with respect to the other claims against
14   Data Colada, alleged conspiracy, that claim should survive
15   defendants' motion because the underlying claim of defamation
16   should survive this motion, and there are allegations of fact
17   that support an arrangement between Harvard and the Data Colada
18   defendants and these include the timing of the publication of
19   the broadcast -- I'm sorry, the blog post.  On June 14 or June
20   13, 2023, Dean Datar, on or about that date, put Professor Gino
21   on administrative leave.  Four days later Data Colada began to
22   publish a succession of blog posts, pretty much identical to
23   the so-called findings of the investigative report.

24        There are, besides the timing, there is the indicia of
25   malice by both sets of defendants.  The allegations that show

1    the secrecy with which Data Colada's initial allegations were

2    shrouded in by the Harvard defendants also is suggestive of a

3    conspiracy.

4         THE COURT:  Secrecy meaning not sharing information

5    with Professor Gino that they're looking into this, is that

6    what you mean?  I'll speak up.

7         MS. SACKS:  Yeah, I didn't understand.

8         THE COURT:  So when you say secrecy, are you referring

9    to the fact that Harvard did not share with Professor Gino for

10   the first three months that they were looking into this

11   allegation?

12        MS. SACKS:  That's part of it and also the point, and

13   these are facts, and it is a lengthy complaint, as alleged in

14   the complaint, Professor Gino's supervisor, Professor Gary

15   Pisano, I think he's the Dean there, wanted Harvard to share

16   with plaintiff the allegations so she could respond which would

17   have been pursuant to its usual processes and was told by the

18   Dean's -- by the Dean and/or his support person in the

19   complaint, Jean Cunningham, not to tell Professor Gino and

20   Harvard did not vet this policy, and as alleged in the

21   complaint, Harvard was very concerned about publications that

22   could damage its own reputation as an institution of higher

23   learning, and so, as alleged in the complaint, there is a

24   reasonable inference that in exchange for Data Colada

25   postponing its publications to avoid commentary that could

1    potentially disparage the university, Harvard came up with this

2    brand new policy.  Again, at this early stage, and the

3    defendants' counsel say, oh, that's improbable, it's absurd,

4    well, at this early stage, it's is not a probability

5    requirement, it's a plausibility requirement, and the plaintiff

6    has sufficiently alleged allegations that support a plausible

7    claim of conspiracy.

8         Plaintiff has also plausibly alleged tortious interference

9    where plaintiff has alleged that defendants, the Data Colada

10   defendants, knew or were reckless about the truth or falsity of

11   their allegations of fraud.  They nonetheless went to her

12   employer with accusations of fraud.  They knew that she was

13   employed by Harvard.  Where there is an improper purpose, she

14   has stated a claim for tortious interference based on her

15   employment contract.

16        So, unless there are any other questions, respectfully,

17   your Honor, plaintiff asks that the Court dismiss all of the

18   defendants' motions.

19        THE COURT:  Thank you.  Mr. Brayley, Mr. Pyle, I know

20   you're about to jump up.  I don't think I need any further

21   argument, but if you have something that you're dying to get

22   out --

23        MR. PYLE:  I have about fifteen seconds.

24        MR. BRAYLEY:  I have roughly the same, if I may.

25        THE COURT:  All right, go ahead.

1          MR. BRAYLEY:  Thank you, and I will try very hard not

2     to repeat anything that's in our briefs.  I think one of the

3     most clarifying things from this exchange for your Honor is the

4     point that Professor Gino's counsel made that the interim

5     policy is an extra-contractual policy.  In other words, it is

6     clear that there can be no breach of contract or implied

7     covenant of good faith and fair dealing based on alleged

8     failure to follow the interim policy because if the interim

9     policy --

10         THE COURT:  I don't think that's what they're saying.

11         MR. BRAYLEY:  Well, I heard her say extra-contractual

12    policy so that sounded to me like there was a concession and

13    it's not a contract.

14         I think it would be important, your Honor, to point out

15    that there were some assertions made about allegations of fraud

16    that simply are not backed up by the documents.  I would

17    encourage your Honor when deciding on these motions to look

18    carefully on what was and what was not said and, for example,

19    the letters sent to the journals which very clearly do not

20    state and do not accuse Professor Gino of anything, they

21    express concerns about data and they express a suggestion that

22    there might be retractions from journals.  I think that's an

23    important distinction that was perhaps a little bit unclear

24    from this discussion.

25         Last two points.  Two cases were raised that I think are

1    important to distinguish.  Hutchinson v. Proxmire, this is the
2    Supreme Court case involving an academic.  In that case, the
3    academic was not a public figure.  This was not someone of any
4    prominence until a United States senator plucked him out of
5    obscurity to criticize the cost of their research and that's
6    what the Supreme Court found.  I think that's utterly
7    distinguishable from this case where the first three pages of
8    the complaint are replete with excessive statements about her
9    public figure status.
10        Next, similarly, Noonan v. Staples was extensively
11   discussed.  In that case also the subject of the allegedly
12   defamatory statements was not a public figure.  In
13   Massachusetts when the subject of the statement is a public
14   figure, the state idiosyncratic definition of actual malice or
15   ill will simply does not apply for public figure.  It's the New
16   York Times v. Sullivan test.
17        Finally, Sullivan v. Western New England and Barry v.
18   Emmanuel College are not comparable to this case.  Sullivan
19   involved termination of employment which unambiguously from the
20   complaint is not at issue here, and Barry v. Emmanuel College
21   pled violations of contractual policies which again is not at
22   issue here.  Thank you very much.
23        MR. PYLE:  Thank you, your Honor.  You heard a moment
24   ago from plaintiff's counsel that my client, Mr. Simonsohn, did
25   a webinar where he said that they had no evidence of data

1    falsification after the Harvard report came out and after the

2    blog posts were published, whereas previously he said he had

3    direct evidence of it.  That is, I regret to say, a pattern of

4    misquoting of what my clients said in order to manufacturer

5    allegations of actual malice.  Mr. Simonsohn did not say they

6    had no evidence of data falsification.  What he said was we

7    don't know who did the data falsification which is exactly what

8    they said in the Harvard report.  They said in the Harvard

9    report, in fairness to Professor Gino, while our evidence can

10   rule out co-authors as people who produced the fraud, it cannot

11   rule in necessarily malfeasants by Professor Gino.  It could

12   have been a research assistant who did this.  You should look

13   into it, Harvard.  That is the precise opposite of actual

14   malice.  It shows that my clients were being careful with what

15   they said.

16        Second point, there is this argument that this isn't about

17   scientific debate.  This is about an accusation of fraud

18   against fellow scientists.  Well, the Cassava Sciences court

19   rejected exactly that argument.  In that case, the Alzheimer's

20   drug developer said we're not having a discussion about drug

21   effectiveness.  You're alleging that we manipulated our data to

22   get a better result for our Alzheimer's drug, but the court

23   said, no, no, no, and you impune the motives and integrity of

24   Cassava and accused them of intentional wrongdoing.  That's not

25   scientific debate.  The Court said, oh, yes, it is, and whether

1    plaintiff disagrees with defendant's inferences or whether they

2    might reflect unfavorably on the plaintiff does not determine

3    whether they qualify as scientific inferences worthy of

4    protection under the First Amendment.

5        And the third point, the same thing was said Milkovich

6    which counsel cited as well.  Milkovich says if a person states

7    the basis of their opinion, it doesn't matter how many

8    vituperate or unfair that opinion might be, it doesn't matter

9    they use words like fraud or in my other example alcoholic to

10   summarize their conclusion.  What matters is that the reader

11   understands what the basis of that conclusion is, and with all

12   five statements that my clients are being accused of defaming

13   Professor Gino with, they made the basis of their conclusions

14   perfectly clear.  That's why this case has to be dismissed.

15   Thank you, your Honor.

16       THE COURT:  All right.  Thank you, everyone.

17       MR. PYLE:  If the Court would like, I'm happy to pass up a

18   copy of that case that I just referenced.

19       THE COURT:  The Cassava case?

20       MR. PYLE:  Yes.

21       THE COURT:  Sure.  Thank you very much.  I will take this

22   under advisement.

23

24                    (Adjourned)

25

1

2                              - - - - - - - - - - -

3                                CERTIFICATION

4           I certify that the foregoing is a correct transcript

5      of the record of proceedings in the above-entitled matter to

6      the best of my skill and ability.

7

8

9

10     /s/Jamie K. Halpin_____           May 17, 2024_____
       Jamie K. Halpin, RPR, RMR              Date
11     Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25