## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

|  |  |
|---|---|
| FRANCESCA GINO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 23-11775-MJJ |
| | ) |
| PRESIDENT AND FELLOWS OF | ) |
| HARVARD COLLEGE, SRIKANT DATAR, | ) |
| URI SIMONSOHN, LEIF NELSON, | ) |
| JOSEPH SIMMONS, JOHN DOES 1–10, | ) |
| and JANE DOES 1–10, | ) |
| | ) |
| Defendants. | ) |

---

## MEMORANDUM OF DECISION

September 11, 2024

JOUN, D.J.

On August 2, 2023, Plaintiff Francesca Gino ("Professor Gino") brought suit against several defendants, claiming various torts, contractual breaches, and statutory violations related to allegations that Professor Gino had engaged in research misconduct and the ensuing investigation by her employer of those allegations. [Doc. No. 1]. On August 8, 2023, Professor Gino filed the First Amended Complaint ("FAC"), which is substantively identical to the original Complaint.[1] [Doc. No. 6]. On October 10, 2023, defendants President and Fellows of Harvard College ("Harvard") and Srikant Datar ("Dean Datar") (collectively, "Harvard Defendants")

---

[1] **Count I**: Violation of Title IX; **Count II**: Breach of Contract; **Count III**: Breach of Implied Covenant of Good Faith and Fair Dealing; **Count IV**: Estoppel; **Count V–VIII**: Defamation; **Count IX**: Civil Conspiracy to Commit Defamation; **Count X**: Intentional Interference with Contractual Relations; **Count XI**: Intentional Interference with Advantageous Relations; **Count XII**: Violation of Privacy, M.G.L. c. 214, § 1B.

moved to dismiss all claims brought against them, apart from the Title IX discrimination claim (i.e., Counts II through VI, IX, and XI through XII). [Doc. No. 18]. On November 8, 2023, defendants Uri Simonsohn, Leif Nelson, and Joseph Simmons (collectively, "Data Colada Defendants") likewise moved to dismiss all claims against them (i.e., Counts VII through X).[2] [Doc. No. 41]. On April 26, 2024, a hearing was held on both motions. [Doc. No. 71]. For the reasons below, the Harvard Defendants' Motion to Dismiss is <u>GRANTED</u> in part and <u>DENIED</u> in part, and the Data Colada Defendants' Motion to Dismiss is <u>GRANTED</u>.

## I.    BACKGROUND

The following facts, taken from the FAC, are accepted as true for purposes of resolving the motions to dismiss. *See Rosenberg v. City of Everett*, 328 F.3d 12, 15 (1st Cir. 2003). The Court also considers those documents "central to [Professor Gino's] claims" and "documents sufficiently referred to" in the FAC.[3] *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993). All reasonable inferences are made in favor of Professor Gino, the non-moving party here. *Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 527–28 (1st Cir. 2023).

### A.    <u>Professor Gino's Employment and the Initial Harvard Policies</u>

Professor Gino is an internationally renowned behavioral scientist, prolific author, researcher, and teacher who has received many awards and considerable media attention for her academic research regarding people's decision-making. [Doc. No. 6 at ¶¶ 2, 36–42]. She is currently employed by Harvard, as a tenured professor at the Harvard Business School ("HBS"). [*Id.* at ¶ 1]. She joined HBS as an Associate Professor in 2010 and was promoted to Full

---

[2] The American Civil Liberties Union and American Civil Liberties Union of Massachusetts submitted an amici curiae brief in support of neither party with regard to the Data Colada Defendants' motion. [Doc. No. 46].

[3] This includes Harvard's various policies allegedly related to tenure and discipline, as well as documents containing the defendants' allegedly defamatory statements.

Professor with tenure in 2014. [*Id.* at ¶ 49]. Her tenure appointment was confirmed via a letter dated September 22, 2014 (the "Appointment Letter"), stating that her appointment began on July 1, 2014, and was "subject to such terms, conditions and policies as are stipulated by the Faculty of Business Administration, and to the Third Statute of the University." [*Id.* at ¶ 57; Doc. No. 6-10 at 2].

The Third Statute of the University ("Third Statute"), a copy of which was attached to Professor Gino's Appointment Letter, states: "Professors . . . are appointed without express limitation of time unless otherwise specified." [Doc. No. 6 at ¶¶ 58, 60; Doc. No. 6-10 at 3]. The Third Statute goes on to state: "[a]ll Officers who hold teaching appointments . . . are subject to removal from such appointments by the Corporation only for grave misconduct or neglect of duty," and "Officers are subject to other rules not inconsistent herewith from time to time in effect." [Doc. No. 6 at ¶ 60; Doc. No. 6-10 at 3]. A separate document, titled "Discipline of Officers, Tentative Recommendations" ("Discipline Policy"), was adopted in 1971 and sets forth the procedures applicable to "the discipline of officers of instruction holding Corporation appointments in any Faculty, in cases involving violations of the third paragraph of the University-wide Statement on Rights and Responsibilities, and in other cases involving grave misconduct or neglect of duty arising under the Third Statute." [Doc. No. 6 at ¶ 61; Doc. No. 6-12 at 2].

Relatedly, HBS's "Policies and Procedures with Respect to Faculty Appointments and Promotions" ("Tenure Policy") emphasize that tenure is reserved for "extraordinary individuals who have demonstrated their ability and willingness to make a sustained contribution to the study, teaching, and practice of business," and refer to faculty with tenure as "permanent faculty." [Doc. No. 6 at ¶ 59].

### B.  HBS Investigation

The Data Colada Defendants are a trio of male professors and behavioral scientists who, since 2013, have published a blog called "Data Colada." [*Id.* at ¶ 4]. In July 2021, the Data Colada Defendants approached HBS with concerns about perceived anomalies and alleged fraud in the data of four studies in academic articles authored by Professor Gino. [*Id.* at ¶¶ 4, 67]. The studies were published in the following papers, [*id*. at ¶ 94]:

- Gino, F., Kouchaki, M., & Casciaro, T. (2020). Why connect? Moral consequences of networking with a promotion or prevention focus. *Journal of Personality and Social Psychology*, 119(6), 1221–1238;

- Gino, F., Kouchaki, M., & Galinsky, A. D. (2015). The moral virtue of authenticity: How inauthenticity produces feelings of immorality and impurity. *Psychological Science*, 26(7), 983–996;

- Gino, F., & Wiltermuth, S. S. (2014). Evil genius? How dishonesty can lead to greater creativity. *Psychological Science*, 25(4), 973–981; and

- Shu, L. L., Mazar, N., Gino, F., Ariely, D., and Bazerman, M. H. (2012). Signing at the beginning makes ethics salient and decreases dishonest self-reports in comparison to signing at the end. *Proceedings of the National Academy of Sciences of the United States of America*, 109, 15197–15200.

#### 1.  The Interim Policy

At the time that the Data Colada Defendants approached HBS, HBS had in place a "Research Integrity Policy" from 2013, describing "the steps to be followed when allegations are brought against faculty at [HBS] over the integrity of journal research, books, course materials, and all other research." [*Id.* at ¶ 76; Doc. No. 6-1 at 1]. HBS did not apply this Research Integrity Policy to evaluate the allegations against Professor Gino. [Doc. No. 6 at ¶ 77]. Rather, in August 2021, HBS created a new policy entitled "Interim Policy and Procedures for Responding to Allegations of Research Misconduct" (the "Interim Policy") and applied this Interim Policy to investigate the allegations against Professor Gino. [*Id.* at ¶ 78; Doc. No. 6-2].

HBS spent approximately three weeks creating the Interim Policy, which was never vetted by HBS faculty, in contrast to HBS's usual practice of taking months to create policies and having those policies vetted by HBS faculty. [Doc. No. 6 at ¶ 80]. While HBS normally announces new policies affecting faculty members or emails around the new policy, HBS never announced to faculty the existence of the Interim Policy. [*Id.* at ¶ 296–97]. The 2013 Research Integrity Policy remains available for download on HBS's internal website for faculty, staff, and students. [*Id.* at ¶ 299].

The Interim Policy was modeled on federal regulations promulgated by the Secretary of the U.S. Department of Health and Human Services, found in 42 C.F.R. pt. 93 and entitled "Public Health Service Policies on Research Misconduct." [*Id.* at ¶ 83]. Its stated scope is limited:

> only to allegations of research misconduct that occurred within six years of the date HBS received the allegation, unless the respondent has continued or renewed an incident of alleged research misconduct through the citation, republication, or other use for the potential benefit of the respondent of the research record in question.

[*Id.* at ¶ 98; Doc. No. 6-2 at 2].

The Interim Policy notes that its purpose is to "guide [HBS's] efforts in reviewing, investigating, and reporting allegations of research misconduct," including "fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results." [Doc. No. 6-2 at 2]. Under the Interim Policy, HBS bears the burden of proving an allegation by a preponderance of the evidence. [Doc. No. 6 at ¶ 86; Doc. No. 6-2 at 3]. In investigating, HBS is required to "[t]ake reasonable steps to ensure an impartial and unbiased investigation to the maximum extent practical." [Doc. No. 6 at ¶ 92; Doc. No. 6-2 at 9]. The research misconduct must have been committed "intentionally, knowingly, or recklessly" and constituted a "significant departure from accepted practices of the relevant research community."

[Doc. No. 6 at ¶ 90; Doc. No. 6-2 at 3]. Research misconduct is to be reported to a Research Integrity Officer ("RIO"); in September 2021, HBS appointed Alain Bonacossa to this new position. [Doc. No. 6 at ¶ 84].

Generally, the Interim Policy authorizes the Dean to take specific adverse employment actions following a research misconduct finding, including but not limited to "suspension, leave without pay, salary reduction," and "initiation of steps leading to rank reduction or termination of employment." [*Id.* at ¶ 291; Doc. No. 6-2 at 11]. In contrast, the 2013 Research Integrity Policy does not authorize the Dean to impose any specific adverse employment action against a tenured professor; it simply authorizes the Dean to "decide the matter and take whatever action he or she believes justified." [Doc. No. 6 at ¶ 289; Doc. No. 6-1 at 3]. The Research Integrity Policy also "permit[s] flexibility in its procedures" in other ways. [Doc. No. 6 at ¶ 287 (cleaned up); Doc. No. 6-1 at 2]. For example, the Research Integrity Policy: (1) places no limits on the Dean's ability to request additional information at any phase in the proceeding; (2) imposes no particular structure on either the assessment or investigation of allegations (whereas the Interim Policy imposes a stringent, two-tier process); (3) places no limit on the accused's right to seek support from persons who might serve as advisors from within or outside the university (whereas the Interim Policy permits the respondent to "choose up to two personal advisors for support during the process"); (4) does not require taking custody and sequestration of the respondent's research records and email records; and (5) places no time limits on any aspect of the process (whereas the Interim Policy imposes strict time limits). [Doc. No. 6 at ¶ 288].

In Professor Gino's case, under the Interim Policy, an inquiry committee was tasked with determining (1) whether there was a "reasonable basis for concluding that the allegation falls within the definition of research misconduct," and (2) whether "the preliminary information-

gathering and preliminary fact-finding from the inquiry indicate[d] that the allegation may have substance." [*Id.* at ¶ 97; Doc. No. 6-2 at 6]. The inquiry committee was required to produce a draft report to Professor Gino, with opportunity for her to comment, and then a final report with a decision on whether an investigation was warranted, within 60 days from the start of the inquiry. [Doc. No. 6 at ¶ 97; Doc. No. 6-2 at 8].

## 2. <u>The Inquiry and Investigation</u>

On October 27, 2021, Professor Gino first learned of the allegations against her and was informed that HBS had opened an initial inquiry pursuant to the new Interim Policy, via a letter from RIO Bonacossa. [Doc. No. 6 at ¶ 93]. Professor Gino was informed that HBS had sequestered certain records relating to her research and was instructed to turn in her HBS-issued devices by 5 p.m. that same day. [*Id.* at ¶ 95].

On December 3, 2021, the Data Colada Defendants submitted to the inquiry committee a report titled "Evidence of Fraud in Academic Articles Authored by Francesca Gino" (the "December Report"), setting forth "direct evidence of data tampering" in the four datasets underlying the four articles published by Professor Gino. [*Id.* at ¶¶ 100, 103–05; Doc. No. 43-1]. In the December Report, the Data Colada Defendants wrote, "A small number of individuals raised concerns to us and asked for our involvement in trying to reconcile those concerns" regarding data tampering in Professor Gino's studies. [Doc. No. 6 at ¶ 103]. The December Report notes that the Data Colada Defendants had "strong suspicions about some her [sic] published data going as far back as 2008 (when she was a post-doc at Carnegie Mellon University)," but that only "the most direct evidence" of data tampering was included in the December Report, based on "a subset of the evidence of tampering [they] have collected." [*Id.*]. The December Report includes caveats that "neither this report, nor our investigation are

exhaustive," that the Data Colada Defendants "have not analyzed, or even read, the majority of Professor Gino's published articles," and that the evidence "cannot definitively rule in malfeasance by Professor Gino. It may be that some research assistant or otherwise unnamed person/people was/were responsible for producing these anomalies." [*Id.*].

On February 22, 2022, Professor Gino's counsel submitted a letter contesting the allegations and asserting that the inquiry committee should find insufficient evidence to warrant an investigation into Professor Gino's work. [*Id.* at ¶¶ 106–09]. On April 1, 2022, Professor Gino submitted her own written responses to the draft inquiry report. [*Id.* at ¶ 112]. On April 8, 2022, HBS produced a final inquiry report ("Inquiry Report") in which the inquiry committee found that an investigation was warranted. [*Id.* at ¶ 113].

HBS subsequently formed an investigation committee (the "Committee"), which then hired an external forensic firm to produce forensic reports and analyses of documents and Professor Gino's electronic files in May 2022. [*Id.* at ¶¶ 114–15]. Over the months of June, July, and August 2022, the firm produced forensic reports on each of the four allegations. [*Id.* at ¶ 117]. From June through July 2022, the Committee also interviewed six of Professor Gino's collaborators and two research assistants for the papers in question. [*Id.* at ¶ 118]. From June through September 2022, the Committee reviewed the forensic reports and had several meetings to discuss them. [*Id.* at ¶ 121]. On August 24, 2022, Professor Gino was informed that these forensic reports would be shared with her the next month; she then received them piecemeal, over multiple dates between September 30, 2022, through October 31, 2022. [*Id.* at ¶¶ 122, 127]. She was not provided the underlying documents on which the reports were based. [*Id.* at ¶ 128]. Throughout this time, Professor Gino was also performing her regular duties as a professor at HBS. [*Id.* at ¶¶ 123, 128]. A few weeks later, on November 14, 2022, Professor Gino

participated in a three-hour meeting with the Committee, during which she was questioned about the studies at issue and related forensic analyses. [*Id.* at ¶ 129].

### 3. The Reports and Findings

On December 14, 2022, the Committee provided Professor Gino with its draft report. [*Id.* at ¶ 131]. Professor Gino submitted a detailed written response to the draft report on February 17, 2023. [*Id.* at ¶¶ 148, 153]. The Committee issued its final report two weeks later, on March 7, 2023, finding "by a preponderance of the evidence" that Professor Gino had "intentionally, knowingly, or recklessly" engaged in research misconduct. [*Id.* at ¶ 157; Doc. No. 20-5 at 2]. The final report was substantially unchanged from the draft report. [Doc. No. 6 at ¶ 158].

On June 13, 2023, Professor Gino met with Dean Datar and received his written decision, adopting in full the final report. [*Id.* at ¶ 177]. Dean Datar informed Professor Gino that she was being placed on unpaid administrative leave for two years, that she would receive no salary or benefits after July 31, 2023, and that he would request the commencement of tenure revocation proceedings pursuant to the Third Statute. [*Id.* at ¶¶ 178–79]. Professor Gino was further informed that, for the period of her administrative leave, (a) she was not permitted to conduct research, to teach, to mentor, or to advise; (b) she would receive no administrative or research support; (c) she was barred from campus, effectively immediately; and (d) she was prohibited from publishing or disseminating research via HBS platforms. [*Id.* at ¶ 180]. Dean Datar's written decision also stated:

> It is my intention to continue to handle this matter as confidentially as circumstances allow. Apart from the communications to journals and co-authors you can expect that I will share with your Unit and relevant faculty and staff leadership that you have been placed on administrative leave as a consequence of research misconduct findings such that you will be unavailable to engage in research, teaching, and mentoring or advising. Communications will also be necessary with students whose work you have been supervising.

[*Id.* at ¶ 181].

### 4. **Selective Enforcement of the Interim Policy**

Professor Gino has alleged that her treatment throughout the HBS investigative

proceedings and the outcome would have been different had she been male. [*Id.* at ¶ 282]. HBS

and Harvard have never previously terminated, suspended, placed on unpaid administrative leave

for two years, constructively discharged, demoted, removed from duty, or otherwise disciplined

any male tenured professor without the procedural protections provided under the Discipline

Policy, nor have they ever fired, constructively discharged, or recommended revoking the tenure

of any male full professor whom Harvard has found responsible for research misconduct. [*Id.* at

¶¶ 283–84].

### C. **Public Disclosures**

### 1. **Policies Regarding Confidentiality**

At the bottom of every page of the Committee's final report appeared the following

paragraph:

> **THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.**

[*Id.* at ¶ 185]. The Interim Policy provides as follows regarding the duty to maintain

confidentiality in research misconduct proceedings:

> Because of the potential jeopardy to the reputation and rights of a respondent, the RIO and all Committee members (as defined in this Policy) as well as all others at HBS who may be involved in the research misconduct proceeding shall to the extent possible: (1) limit disclosure of the identity of respondents and complainants to those who need to know in order to carry out a thorough, competent, objective, and fair research misconduct proceeding; and (2) except as otherwise prescribed by law, limit the disclosure of any records or evidence from which research subjects might be identified to those who need to know in order to carry out a research misconduct

> proceeding. Where communications about research misconduct proceedings may be considered necessary or advisable, University officials should be guided by the Guiding Principles for Communication in Research Misconduct Proceedings. Inappropriate dissemination of information may result in sanctions up to and including termination.

[Doc. No. 6-2 at 3–4]. And the Discipline Policy provides:

> Except for such simple announcements as may be required, covering the time of the hearing and similar matters, public statements, and publicity about the case by either parties or member of the Hearing Committee will be avoided so far as possible until the proceedings have been completed, including consideration by the Corporation [Harvard].

[Doc. No. 6 at ¶ 65; Doc. No. 6-12 at 7].

## 2.  **HBS's Announcement of Plaintiff's Leave and Retraction Notices**

On or about June 13, 2023, HBS updated Professor Gino's faculty page on the HBS website so that the words "**ADMINISTRATIVE LEAVE**" appeared next to Plaintiff's photograph and following her name and title. [*Id.* at ¶ 196]. On June 22, 2023, Dean Datar sent an email to all HBS faculty, stating that Professor Gino was on administrative leave and connecting her leave to the outcome and status of her research misconduct proceeding. [*Id.* at ¶ 197]. HBS never previously announced the placement of a tenured professor on administrative leave on the faculty's webpage as an immediate consequence of a research misconduct proceeding, nor had HBS ever previously emailed all HBS faculty announcing the placement of a tenured professor on administrative leave in connection to a research misconduct proceeding. [*Id.* at ¶¶ 198-99]. HBS also directly notified certain of Professor Gino's colleagues and doctoral students about the finding of research misconduct and the administrative leave. [*Id.* at ¶ 221].

On June 13 and 14, 2023, the RIO sent letters ("Retraction Notices") to the scholarly journals that had published the papers at issue in Professor Gino's research misconduct proceedings. [*Id.* at ¶¶ 206-18]. Each Retraction Notice was marked "CONFIDENTIAL" and stated that HBS had "reviewed concerns" about certain of Professor Gino's published data and

"believe[s]" that the results of the relevant paper(s) were invalid "due to alterations of the data that affect[] the significance of the findings." [Doc. Nos. 6-3 at 2, 6-4 at 2, 6-5 at 2]. Each included an appendix detailing the data anomalies. [*Id.*]. The Retraction Notices did not mention research misconduct or directly accuse Professor Gino of altering the data. [*Id.*].

On June 13, 2023, the RIO also reached out via email to Professor Gino's co-authors on the papers at issue. [Doc. No. 6 at ¶ 219]. The emails told co-authors that "our process has concluded" and HBS believed that the results of the studies in question are invalid "due to alteration of data that affects the significance of the findings." [*Id.*]. The RIO attached a formal notification, which included a summary of the data discrepancies and informed co-authors that HBS had notified the relevant journals with a recommendation that the articles be retracted. [*Id.*].

On June 15, 2023, an HBS professor contacted an editor of Portfolio, Professor Gino's book publisher. [*Id.* at ¶ 222]. Professor Gino had a book scheduled for publication in February 2024. [*Id.*]. The HBS professor stated to the Portfolio editor that Professor Gino had "committed fraud" and that this would become public very soon. [*Id.*]. The publication date for Professor Gino's book was then delayed until February 2025. [*Id.*].

On June 16, 2023, a publication titled *The Chronicle of Higher Education* released an article, discussing the research misconduct allegations against Professor Gino related to one of the studies. [*Id.* at ¶¶ 224–25]. It noted as follows, [*id.*]:

> Harvard University found that the study contained even more fraudulent data than previously revealed and it's now asking the journal to note this new information. The finding is part of an investigation into a series of papers that Harvard has been conducting for more than a year . . . . Francesca Gino, a world-renowned Harvard Business School professor who studies dishonesty, and is a co-author on the disputed study, is now on administrative leave, according to her faculty page.

Furthermore, Professor Gino has previously had her articles and books published by Harvard Business Publishing, including through its "Harvard Business Review" magazine

("HBR"). [*Id.* at ¶¶ 313–14]. As of July 10, 2023, Professor Gino had an article accepted for publication in the next issue of HBR. [*Id.* at ¶ 317]. That day, an HBR editor informed Professor Gino that HBS had directed HBR not to publish her article unless she removed her name from it. [*Id.*] An HBS colleague and staff also informed Professor Gino that HBS had asked for her name to be removed from HBS case studies and HBS multi-media case studies in order for the studies to be published. [*Id.* at ¶ 318].

### 3. Data Colada's Blog Posts

From June 17, 2023, through June 30, 2023, the Data Colada Defendants published a four-part series of blog posts titled "Data Falsificada," where each part corresponded to the four studies by Professor Gino that were the subject of Data Colada's data manipulation allegations. [*Id.* at ¶¶ 231, 233, 247, 253, 260]. In these posts, the Data Colada Defendants asserted that the four studies contained manipulated data, implied that there was additional, non-disclosed information that would prove Professor Gino had manipulated data, and asserted a belief that "many more Gino-authored papers contain fake data. Perhaps dozens." [*Id.* at ¶¶ 233–67].

Following these blog posts, major newspapers reported on the allegations against Professor Gino, academic journals began taking steps to remove Professor Gino from their editorial boards, and Professor Gino started receiving emails and phone calls from clients requesting for their contractual relationships with her to be terminated. [*Id.* at ¶¶ 278–81].

## II.   STANDARD OF REVIEW

In evaluating a Rule 12(b)(6) motion to dismiss, the Court must determine "whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiff[], the complaint states a claim for which relief can be granted." *Cortés-Ramos v. Martin-Morales*, 956 F.3d 36, 41 (1st Cir. 2020) (quoting *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 7 (1st

Cir. 2011)). The complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679.

## III.   DISCUSSION

I will first consider the Harvard Defendants' motion to dismiss and then turn to the motion of the Data Colada Defendants.

### A.   Harvard Defendants' Motion to Dismiss

#### 1.   Breach of Contract

Count II asserts that the Harvard Defendants "breached Professor Gino's employment contract by subjecting her employment to discipline absent 'grave misconduct' and in violation of the Third Statute, the procedural protections outlined in the Discipline Policy, the principles of the Tenure Policy, and Harvard's other policies and procedures." [Doc. No. 6 at ¶ 343]. The Harvard Defendants argue that this breach of contract claim should be dismissed because: (1) Professor Gino's Appointment Letter and Harvard's various policies do not constitute a contract; and (2) the policies do not apply here, because they govern the removal of tenure only and not the discipline of tenured professors falling short of tenure revocation. [Doc. No. 19 at 13–14].

##### i.   Existence of Contract

As to the first point, "[i]t is well-settled in Massachusetts that an employee handbook or personnel manual may form the basis of an employment contract that is beyond that of at-will employment." *Grant v. Target Corp.*, 126 F. Supp. 3d 183, 188 (D. Mass. 2015) (quoting *Beebe*

14

*v. Williams Coll.*, 430 F. Supp. 2d 18, 23 (D. Mass. 2006)). "There is no explicit test or rigid list of prerequisites to aid in ascertaining if a personnel manual comprises a binding contract under Massachusetts law." *Hinchey v. NYNEX Corp.*, 144 F.3d 134, 141 (1st Cir. 1998) (cleaned up). Rather, there exists a "host of factual circumstances that may impact" this determination. *Grant*, 126 F. Supp. 3d at 188; *see O'Brien v. New England Tel. & Tel. Co.*, 422 Mass. 686, 691–93 (1996) (noting factors of whether there were any negotiations over the terms of the policies, whether the policies allow the employer to amend them at will, whether the employer called special attention to the policies, and whether the employee manifested assent or acknowledged understanding of the policies' terms); *Beebe*, 430 F. Supp. 2d at 23 (noting additional factors of "agreements made by the parties before employment, other oral or written agreements, general circumstances of employment, and whether the employer itself adheres to the policies and procedures of the handbook"). Because the parties have not yet fully "explored the material facts surrounding this issue, it would be premature to dispose of" Professor Gino's contract breach claim on this basis. *Grant*, 126 F. Supp. 3d at 189; *see also Beebe*, 430 F. Supp. 2d at 23.

### ii.  <u>Applicability of Contract</u>

As to the second point, assuming the existence of a contract, the Harvard Defendants argue that the contract does not apply here because it applies to the removal of tenure only. But the Appointment Letter states that Professor Gino's tenure appointment is "subject" to two categories: (1) "to such terms, conditions and policies as are stipulated by the Faculty of Business Administration," and (2) "to the Third Statute of the University." [Doc. No. 6-10 at 2].

Taking the latter category first, the Third Statute sets forth that "Professors . . . are appointed without express limitation of time unless otherwise specified," i.e., with tenure, and "[a]ll Officers who hold teaching appointments . . . are *subject to removal from such*

15

*appointments* by the Corporation only for grave misconduct or neglect of duty." [Doc. No. 6 at ¶ 60 (emphasis added); Doc. No. 6-11 at 2]. The only discipline discussed under the Third Statute with respect to tenured professors is removal from such appointments. Accordingly, the Third Statute may only apply to Professor Gino's case if it involves the removal of a tenured appointment.

Professor Gino has not suffered the literal removal of her tenured appointment; indeed, the FAC notes that she remains currently employed as a tenured professor at HBS. [Doc. No. 6 at ¶ 1]. Nevertheless, there remains a question of whether Professor Gino's administrative leave status, accompanied by numerous disciplinary sanctions, can be *tantamount* to tenure removal. The FAC alleges that, "[a]t Harvard, pursuant to the Third Statute, a tenured professor enjoys a secure position, tantamount to a lifetime contract." [*Id.* at ¶ 340]. And the Third Statute sets forth that tenured professors are "appointed without express limitation of time unless otherwise specified." [Doc. No. 6-11 at 2]. On the one hand, Professor Gino's disciplinary sanctions are not permanent and are imposed for a limited two-year period. On the other hand, during those two years, Professor Gino must go without pay, without the ability to enter campus, and without permission to research, teach, mentor, advise, publish research via HBS, and so on. [Doc. No. 6 at ¶ 180]. In substance, she has been stripped of any ability to be a professor for at least those two years, without knowing whether she will be reinstated afterwards.[4] The FAC thus plausibly

---

[4] By contrast, in *Kashdan v. George Mason University*, the Fourth Circuit affirmed the dismissal of a tenured professor's due process claim that his disciplinary sanctions "were a significant demotion tantamount to dismissal," upon evaluating the totality of the circumstances. 70 F.4th 694, 702 (4th Cir. 2023). The court weighed the severity of the professor's sanctions—including his preclusion from "teaching graduate-level courses, mentoring new graduate students, or hiring new graduate students as research assistants," and disaffiliation from the department's clinical psychology program—against factors such as the time limitation on the professor's sanctions, his continued affiliation with the university's psychology department, his ability to teach general psychology courses at the university, and his ability to continue "writing and publishing in the field of clinical psychology, attending clinical psychology conferences, collaborating with other professors in the clinical psychology field, or from consulting or engaging in other clinical psychology work." *Id.* at 700, 702. His salary remained the same. *Id.* at 700.

alleges that Professor Gino's secure, lifetime position as a professor has been interrupted, effectively constituting removal of her tenure status, such that it would be premature for me to dismiss her claims on this issue.

Separately, Professor Gino's Appointment Letter also provides that her tenure appointment is subject "to such terms, conditions and policies as are stipulated by the Faculty of Business Administration." [Doc. No. 6-10 at 2]. The FAC likewise alleges breach based on policies and procedures beyond the Third Statute, including the Discipline Policy, the Tenure Policy, and a catch-all "Harvard's other policies and procedures"—which may include the Research Integrity Policy and Interim Policy, as the other policies explicitly noted in the FAC. [Doc. No. 6 at ¶¶ 342-43].

The Discipline Policy relies upon the Third Statute and provides that it "shall apply to the discipline of officers of instruction holding Corporation appointments in any Faculty, in cases involving violations of the third paragraph of the University-wide Statement on Rights and Responsibilities, and in other cases involving grave misconduct or neglect of duty arising under the Third Statute of the University." [Doc. No. 6-12 at 2]. On a straightforward reading, the Discipline Policy thus limits its application to two situations: (1) "cases involving violations of the third paragraph of the University-wide Statement on Rights and Responsibilities,"[5] and (2) "cases involving grave misconduct or neglect of duty *arising under* the Third Statute of the University." [*Id.* (emphasis added)]. Cases arising under the Third Statute, as previously established, concern removal from tenure only. The Discipline Policy's prefatory note confirms

---

Under these circumstances, the court found that the sanctions did not "effectively exclude [plaintiff] from his trade or calling." *Id.* at 702. The sanctions imposed on Professor Gino are far more restrictive.

[5] The FAC does not reference or provide the University-wide Statement on Rights and Responsibilities, nor do any of the parties discuss it.

the limitations of its application, where it states that it provides "the applicable procedures for *cases involving the removal of a tenured appointment*." [*Id.* (emphasis added)]. As with the Third Statute, the Discipline Policy may therefore apply—and breach thereof may be found—if Professor Gino's disciplinary sanctions equate tenure removal.

As to the other policies discussed in the FAC, the Research Integrity Policy and the Interim Policy provide procedures for responding to "allegations of research misconduct." [Doc. No. 6-1 at 2; Doc. No. 6-2 at 2]. These policies thus cover the discipline of tenured professors for research misconduct outside of tenure removal, including the discipline imposed upon Professor Gino here.[6] The FAC also plausibly alleges contract breach based on Professor Gino's subjection to policies not properly "stipulated by the Faculty of Business Administration," as required by the Appointment Letter. [Doc. No. 6-10 at 2]; *see, e.g.*, [Doc. No. 6 at ¶ 80 ("On information and belief, HBS spent approximately three weeks creating the new Interim Policy, just for Plaintiff. The Interim Policy was never vetted by HBS faculty. On information and belief, HBS's past practice has been to take many months to create policies applicable to faculty members. Prior HBS policies have been commonly vetted by HBS faculty.")].

Accordingly, whether Professor Gino's claims arise from her discipline as tantamount to tenure removal or as separate from tenure removal, the breach of contract claim may proceed.

## 2. **Breach of Implied Covenant of Good Faith and Fair Dealing**

Count III asserts that the Harvard Defendants breached an implied covenant of good faith and fair dealing. [Doc. No. 6 at ¶¶ 347–51]. "Every contract in Massachusetts is subject, to some

---

[6] This leaves an open question of whether Harvard may impose discipline on tenured professors outside of grave misconduct—i.e., tenure removal—and research misconduct. While the Appointment Letter notes Professor Gino's appointment is subject generally "to such terms, conditions and policies as are stipulated by the Faculty of Business Administration," the parties have not discussed any other terms, conditions, or policies (beyond the Tenure Policy, which the FAC mentions only fleetingly and which no parties have produced) governing other misconduct.

extent, to an implied covenant of good faith and fair dealing." *Ayash v. Dana-Farber Cancer Inst.*, 443 Mass. 367, 385 (2005). "[W]ithout a contract, there is no covenant to be breached." *Guldseth v. Fam. Med. Assocs. LLC*, 45 F.4th 526, 538 (1st Cir. 2022). The purpose of the implied covenant is to "'guarantee that the parties remain faithful to the intended and agreed expectations' of the contract." *Reem Prop., LLC v. Engleby*, 251 F. Supp. 3d 274, 277 (D. Mass. 2017) (quoting *Uno Rests., Inc. v. Bos. Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004)). It also ensures "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 471 (1991) (cleaned up).

### i. Bad Faith Adoption of New Policy

Assuming the existence of a contract here, the Harvard Defendants assert that the implied covenant claim fails where it is based on their "crafting a new employee disciplinary policy, just for Plaintiff, the so-called Interim Policy," in bad faith. [Doc. No. 6 at ¶ 350]. In so arguing, the Harvard Defendants claim that: (1) the adoption of the Interim Policy was expressly authorized by the alleged contract at issue, and (2) the adoption of the Interim Policy did not prejudice Professor Gino as a matter of law, as it mandates a fair process and procedural safeguards in research misconduct investigations. [Doc. No. 19 at 15–16]. These arguments are not persuasive.

Professor Gino's Appointment Letter states that her appointment "was subject to such terms, conditions, and policies as are stipulated by the Faculty of Business Administration, and to the Third Statute . . . *as these may be amended from time to time*." [Doc. No. 6-10 at 2 (emphasis added)]. The Research Integrity Policy further states that the "Dean has principal responsibility" for determining HBS's proper response to allegations of research misconduct. [Doc. No. 6-1 at 2–3]. The Harvard Defendants contend that this language explicitly authorized

them to adopt the Interim Policy. But at most, in considering the language that Professor Gino was subject only to such policies "as are stipulated by the Faculty of Business Administration," [Doc. No. 6-10 at 2], there exists ambiguity as to what that stipulation entails and how it interacts with the Dean's role. Where the FAC sets forth that the "Interim Policy was never vetted by HBS faculty" and that "HBS never announced . . . to faculty the existence of the Interim Policy," [Doc. No. 6 at ¶¶ 80, 297], the FAC plausibly alleges that the adoption of the Interim Policy was not authorized by the contract at issue.

As to the Harvard Defendants' claim that the adoption of the Interim Policy did not cause Professor Gino to suffer any prejudice, the FAC plausibly alleges that the Interim Policy was more onerous than the Research Integrity Policy that would have otherwise controlled her research misconduct investigation. *See, e.g.*, [*id.* at ¶¶ 287–91].

### ii.  <u>Bad Faith Investigation</u>

The Harvard Defendants also contest Professor Gino's claim that the implied covenant of good faith and fair dealing was breached by the research misconduct investigation. In the context of university disciplinary proceedings, the implied covenant imposes "an independent duty to provide basic fairness." *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 87 (1st Cir. 2018). However, when the policy at issue already promises basic fairness, "the implied covenant of good faith and fair dealing is rendered superfluous by [defendant's] express contractual promise of fairness," and a court's analysis focuses on compliance with the expressly promised process. *Farzinpour v. Berklee Coll. of Music*, 516 F. Supp. 3d 33, 43 (D. Mass. 2021).

Such is the case here, with regard to the Interim Policy and the Research Integrity Policy. The Interim Policy sets forth that, "[t]hroughout the research misconduct process … all participants shall bear in mind the importance . . . of thoroughness, fairness, and objectivity."

20

[Doc. No. 6-2 at 2]. Similarly, in discussing a "framework that should enable equitable resolution of allegations of misconduct," the Research Integrity Policy provides, "[i]t is important that whatever process the Dean determines to be appropriate is thorough, fair, and objective." [Doc. No. 6-1 at 2]. These policies thus expressly provide for fair proceedings, rendering superfluous the implied covenant. *See Farzinpour*, 516 F. Supp. 3d at 42–43 (finding express fairness requirement in professor's employment contract where it provided that "[t]he parties agree on the importance of prompt, fair, transparent, and thorough investigations"). In contrast, the Appointment Letter, the Third Statute, and the Discipline Policy lack such express language promising basic fairness regarding the tenure removal process.

Accordingly, Professor Gino's claim for breach of the implied covenant arising from the research misconduct investigation under the Interim Policy and the Research Integrity Policy is dismissed. But, to the extent that the FAC alleges breach of the implied covenant arising from the adoption of the Interim Policy or the imposition of administrative leave tantamount to tenure removal, Count III may proceed. [7]

### 3. **Estoppel**

Count IV alleges estoppel as to the Harvard Defendants. [Doc. No. 6 at ¶¶ 355–56]. "[W]here an enforceable contract exists, a claim for promissory estoppel will not lie." *Sonoiki v. Harvard Univ.*, 37 F.4th 691, 717 (1st Cir. 2022) (cleaned up). However, estoppel may be asserted as an alternative theory of recovery. Given Professor Gino's separate breach of contract claim, I read the estoppel claim as pled in the alternative, though Professor Gino does not

---

[7] Professor Gino paradoxically alleges both that the Interim Policy should not have been crafted and that the Harvard Defendants should have adhered to the Interim Policy. *See* [Doc. No. 6 at ¶ 350]. The latter allegation is understood to be in the alternative, to the extent the Interim Policy is construed as part of her employment contract.

explicitly assert it as such.[8] Because the FAC states a plausible claim for breach of contract, "the Court need not consider the alternative promissory estoppel theory at this juncture." *Conte v. Bank of Am., N.A.*, 52 F. Supp. 3d 265, 269 (D. Mass. 2014) (collecting cases). Accordingly, I decline to dismiss Count IV at this stage of the case.

### 4. <u>Defamation</u>

Counts V and VI allege defamation as to the Harvard Defendants, through the Retraction Notices and through HBS's announcement of Professor Gino's administrative leave on her faculty webpage and in an email to her colleagues. [Doc. No. 6 at ¶¶ 360-79].

Defamation requires "(1) a false or defamatory communication, (2) of and concerning the plaintiff, which is (3) published or shown to a third party." *Fiorillo v. Winiker*, 85 F. Supp. 3d 565, 575–76 (D. Mass. 2015) (citation omitted). Generally, a defendant may assert a statement's truth as an absolute defense to a defamation claim. *See Noonan v. Staples, Inc.*, 556 F.3d 20, 26 (1st Cir. 2009). And "[w]hen a statement is substantially true, a minor inaccuracy will not support a defamation claim." *Salmon v. Lang*, 57 F.4th 296, 320 (1st Cir. 2022) (citation omitted). In addition, a statement cannot be defamatory if it is plain that the speaker is expressing a pure opinion (i.e., a statement that is not capable of being proved true or false) and discloses the non-defamatory facts on which his or her opinion is based. *Piccone v. Bartels*, 785 F.3d 766, 771 (1st Cir. 2015). The primary question, then, is whether the challenged language "reasonably would be understood to declare or imply provable assertions of fact." *Id.* (citation omitted).

If a plaintiff qualifies as a "public figure," she "may recover for defamation only if she proves actual malice by clear and convincing evidence . . . . [S]uch a plaintiff must demonstrate

---

[8] Of note, in her claim for estoppel, Professor Gino incorporates by reference "each and every allegation hereinabove." [Doc. No. 6 at ¶ 352]. These include allegations of an express contract. *See, e.g.*, [*id.* at ¶¶ 337–46]. I will strike Paragraph 352 of the FAC to the extent that it incorporates allegations of an express contract.

with convincing clarity that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." *Sindi v. El-Moslimany*, 896 F.3d 1, 14 (1st Cir. 2018) (cleaned up). Public-figure status arises where "an individual may achieve such pervasive fame or notoriety that [s]he becomes a public figure for all purposes and in all contexts," or where "an individual voluntarily injects [herself] or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 13 (1st Cir. 2011) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974)).

### i.   **Public Figure Status**

The FAC alleges that Professor Gino is an "internationally renowned behavioral scientist, author, and teacher" who "has authored or co-authored countless journal publications, business articles, and books," "has regularly presented her work at conferences and has been invited to speak at some of the most prestigious colleges and universities in the world," "has received numerous honors and awards" internationally, and has had her work "covered in numerous media outlets." [Doc. No. 6 at ¶¶ 2, 37, 39–41]. Accordingly, Professor Gino is a public figure.[9] *See, e.g.*, *Lemelson v. Bloomberg LP*, 253 F. Supp. 3d 333, 340 (D. Mass. 2017) (finding plaintiff to be public figure where he alleged he was a "world-renowned" expert, subject to "a great deal of interest and scrutiny due to his unique qualifications and unprecedented success"); *Ayyadurai v. Floor64, Inc.*, 270 F. Supp. 3d 343, 357 (D. Mass. 2017) (parties did not dispute public figure status where plaintiff involved himself in specific controversy "[t]hrough his own actions, including publishing books, participating in interviews, and posting on his own website,"

---

[9] While this public-figure inquiry might require a "detailed fact-sensitive determination, . . . the matter is resolved as a question of law" and may be determined at the motion-to-dismiss stage. *McKee v. Cosby*, 874 F.3d 54, 61–62 (1st Cir. 2017) (cleaned up).

and where complaint alleged that he "is a world-renowned scientist, inventor, lecturer, philanthropist and entrepreneur"); *Dilworth v. Dudley*, 75 F.3d 307, 309 (7th Cir. 1996) ("[A]nyone who publishes becomes a public figure in the world bounded by the readership of the literature to which [she] has contributed.").

> ii.   **Retraction Notices**

The Retraction Notices express HBS's concerns regarding the validity of the data in the four articles published by Professor Gino. The Retraction Notices disclose the bases for these concerns, including detailed appendices explaining the alleged data anomalies and disclosing the forensic assessments conducted. The ultimate conclusion expressed in these Retraction Notices is that, based on the data discrepancies set forth in the appendices, HBS "thus believe[s] the results reported . . . are invalid due to alteration of the data that affects the significance of the findings." [Doc. Nos. 6-3 at 2, 6-4 at 2, 6-5 at 2]. As such, I find the Retraction Notices amount "only to a statement of [HBS]'s evolving, subjective view or interpretation of its investigation into inaccuracies in certain [data] contained in the articles," rather than defamation. *Saad v. Am. Diabetes Ass'n*, 123 F. Supp. 3d 175, 178 (D. Mass. 2015); *see also Salmon*, 57 F.4th at 323 (rejecting defamation claim where speaker's "statement, at most, amounts to his own personal conclusions about the information presented" and he "outline[d] the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the listener free to draw his own conclusions" (cleaned up)). Further, the Retraction Notices were "measured and professional" in tone, describing in detail the forensic investigation conducted and declining to directly accuse Professor Gino of data manipulation. *See Saad*, 123 F. Supp. 3d at 178–79 ("This is the type of cautionary language that suggests a statement of opinion rather than a defamatory falsehood.").

Professor Gino asserts that the Retraction Notices incorrectly refer to alterations in an "original dataset" or "original data," but this misses the mark. The Retraction Notices express the Harvard Defendants' conclusion of data invalidity based on the evidence and data provided to them, including "data provided to HBS by Professor Gino's former research assistant." [Doc. No. 6 at ¶ 208]. A comparison of the datasets underlying the published studies with earlier versions of the same datasets revealed discrepancies—and whether the earlier datasets were the "original" sets or simply earlier versions is immaterial to the Harvard Defendants' conclusion. *See Salmon*, 57 F.4th at 320 ("When a statement is substantially true, a minor inaccuracy will not support a defamation claim." (cleaned up)); *Noonan v. Staples, Inc.*, 556 F.3d 20, 28 (1st Cir. 2009) (noting that, under Massachusetts law, "substantial truth is all that is required" to defeat a defamation claim). And Professor Gino's assertion that Harvard defamed her by omitting certain details—that it "never established that Professor Gino was even the person *responsible* for perceived anomalies" and "*never proved* that Professor Gino had *any intent* to fabricate or falsify data," [*id.* at ¶ 203]—also fails where the omission of factual context from otherwise truthful statements does not give rise to a defamation claim. *Revil v. Coleman*, 89 Mass. App. Ct. 1132, 2016 WL 3902840, at *1 (2016) ("We have found no Massachusetts authority recognizing a cause of action for defamation by failure to provide factual context to an otherwise truthful statement.").

Regarding actual malice, Professor Gino has not plausibly alleged that the Harvard Defendants "either knew that [their] statements were false or had serious doubts about their truth and dove recklessly ahead anyway." *Schatz v. Republican State Lead. Comm.*, 669 F.3d 50, 58 (1st Cir. 2012). "[T]o satisfy the actual malice requirement, a plaintiff must point to sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the

truth of his publication, or actually had a high degree of awareness of probable falsity."

*Lemelson v. Bloomberg L.P.*, 903 F.3d 19, 24 (1st Cir. 2018) (cleaned up). At the motion to

dismiss stage, Professor Gino's well-pleaded facts must "nudge [her] actual malice claim across

the line from conceivable to plausible." *Schatz*, 669 F.3d at 58 (cleaned up). Mere "actual-malice

buzzwords" will not do. *Id.* at 56 (explaining it to be insufficient for a complaint to allege bare

allegations that defendant "had 'knowledge' that its statements were 'false' or had 'serious

doubts' about their truth and a 'reckless disregard' for whether they were false"). The FAC

makes the bare allegation that the Harvard Defendants "acted with actual malice by knowingly,

falsely suggesting that Harvard had proved she had falsified and/or fabricated data" in the

Retraction Notices. [Doc. No. 6 at ¶ 202]. But, again, the Retraction Notices do not directly

accuse Professor Gino of data fraud, and they disclose at length the basis for the Harvard

Defendants' opinions regarding data fraud. The FAC thus does not plausibly allege that the

Harvard Defendants knew that they were making false statements through the Retraction Notices

or that they had reason to doubt the truth thereof.

### iii.   Announcement of Administrative Leave

Professor Gino premises her second defamation claim against the Harvard Defendants on

HBS's publication of the text "**ADMINISTRATIVE LEAVE**" on Plaintiff's HBS faculty page,

as well as Dean Datar's email on June 22, 2023, to Professor Gino's colleagues that announced

Professor Gino's administrative leave status, while referring to research integrity and the

research misconduct allegations. [Doc. No. 6 at ¶¶ 371, 373].

While the FAC admits that Professor Gino in fact was placed on administrative leave,

*see*, *e.g.*, [*id.* at ¶¶ 12, 179], Professor Gino argues that "under Massachusetts law, even a true

statement can form the basis of a libel action if the plaintiff proves that the defendant acted with

'actual malice'"—meaning, in this context, "actual malevolent intent or ill will." *Noonan*, 556

F.3d at 28. But that "exception to the truth defense is not constitutional when applied to matters

of public concern." *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 226 (D. Mass. 2017) (quoting

*Noonan*, 556 F.3d at 28 n.7). Matters of public concerns are those that can be "fairly considered

as relating to any matter of political, social, or other concern to the community." *Connick v.*

*Myers*, 461 U.S. 138, 146 (1983). "[T]he relevant community need not be very large and the

relevant concern need not be of paramount importance or national scope. Rather, it is sufficient

that the speech concern matters in which even a relatively small segment of the general public

might be interested." *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 132 (1st Cir. 1997)

(cleaned up). Where Professor Gino is a public figure, and the issue of research integrity and

potential misconduct concerns her colleagues, the FAC fails to state a claim for defamation

based on the Harvard Defendants' announcement of her administrative leave status.

Counts V and VI are therefore dismissed.

## 5.  <u>Intentional Interference with Advantageous Relations</u>

The FAC next asserts through Count XI that Professor Gino had "advantageous economic

and contractual relationships with Harvard Business Publishing, Portfolio, and many other

businesses and entities," and that the Harvard Defendants "maliciously interfered" with these

relationships "by breaching [their] duties of confidentiality and spreading false and defamatory

information concerning Professor Gino that disparaged her professional reputation." [Doc. No. 6

at ¶¶ 429–30]. To the extent that this claim is premised on Professor Gino's insufficient

allegations of defamation, it fails with them. *See, e.g.*, *CrossFit, Inc. v. Mustapha*, No. 13-cv-

11498, 2014 WL 949609, at *3 (D. Mass. Mar. 10, 2014) (dismissing intentional interference

claim as duplicative of dismissed defamation claim); *Fitzgerald v. Town of Kingston*, 13 F. Supp. 2d 119, 127 (D. Mass. 1998) (same).

Professor Gino's claim also fails because the FAC does not plausibly allege improper motive. To establish intentional interference, "[t]he improper motive required . . . is actual malice: a spiteful, malignant purpose, unrelated to the legitimate corporate interest." *Comeau v. Town of Webster, Mass.*, 881 F. Supp. 2d 177, 190 (D. Mass. 2012) (cleaned up); *see also Eaton v. Town of Townsend*, No. 22-1334, 2023 WL 3317986, at *12 (1st Cir. May 9, 2023) (malice must be the "controlling factor," and the showing must be "probable rather than possible" (cleaned up)). Bare allegations of improper interference are insufficient; Professor Gino "must demonstrate a link between the defendants' conduct and evidence of spiteful purpose or personal hostility." *Eissa v. Ledvance LLC*, 626 F. Supp. 3d 209, 218 (D. Mass. 2022), *on reconsideration in part*, No. 21-cv-11515, 2023 WL 3260220 (D. Mass. May 3, 2023).

With regard to Professor Gino's relationship with HBR, she correctly points out that a plaintiff may state a claim based on the corporate parent interfering with her relationship with a subsidiary. *See, e.g.*, *Powderly v. MetraByte Corp.*, 866 F. Supp. 39, 43–44 (D. Mass. 1994) (denying motion to dismiss tortious interference claim in part, where plaintiff alleged that parent "mismanaged [its subsidiary's] business, mischarged expenses and diverted revenues, with the deliberate purpose of depriving him of his bonus"); *Charles River Data Sys., Inc. v. Oracle Complex Sys. Corp.*, 788 F. Supp. 54, 59 (D. Mass. 1991). Upon conducting an investigation, finding that Professor Gino engaged in research misconduct, and placing her on administrative leave, the Harvard Defendants instructed HBR as Harvard's subsidiary to no longer publish Professor Gino's article unless she removed her name from it and to remove her name from case

study publications, demonstrating a legitimate corporate interest in protecting HBR's reputation, and Professor Gino fails to plausibly allege the requisite malice.[10]

As to Professor Gino's relationship with Portfolio, a successful claim for intentional interference with advantageous relations requires Professor Gino to prove the Harvard Defendants "knowingly induced a breaking of the relationship." *Jakuttis v. Town of Dracut*, 95 F.4th 22, 36 (1st Cir. 2024). Professor Gino alleges that her colleague contacted Portfolio and reported she had committed fraud, [Doc. No. 6 at ¶ 222], but there is no allegation that the Harvard Defendants instructed or intended for Professor Gino's colleague to contact Portfolio and otherwise interfere with the relationship. Thus, Professor Gino has not satisfied the "knowingly induced" element of the claim. The same holds true for Professor Gino's vague claim that the Harvard Defendants interfered with her advantageous relationships with "many other businesses and entities." [*Id.* at ¶ 429]; *see also, e.g.*, [*id.* at ¶¶ 280–81].

For these reasons, the FAC does not plausibly allege intentional interference with advantageous relations, and Count XI is dismissed.

### 6.  **Violation of Privacy**

Under Count XII, Professor Gino claims invasion of privacy based on the Harvard Defendants' announcement of her administrative leave on the HBS website. [Doc. No. 6 at ¶¶ 433–39]. Such a claim requires Professor Gino to "establish that the disclosure was both unreasonable and either substantial or serious." *Oberg v. City of Taunton*, 972 F. Supp. 2d 174, 207 (D. Mass. 2013) (quoting *Ayash v. Dana–Farber Cancer Inst.*, 443 Mass. 367, 382 (2005)).

---

[10] Relatedly, when Dean Datar informed Professor Gino that she would be placed on administrative leave, he stated that she would be "prohibited from publishing or disseminating research via HBS platforms" as a consequence of the research misconduct findings. [Doc. No. 6 at ¶ 180].

In an employment context, the information must be of a "highly personal or intimate nature" and a "legitimate countervailing interest in disclosure" must not exist. *Id.* at 207–08 (cleaned up).

Professor Gino's administrative leave status is not information of a highly personal or intimate nature, "such as matters concerning her health or her lifestyle." *Ayash*, 443 Mass. at 385. And, though the FAC does allege HBS never previously publicly announced a tenured professor's administrative leave status on its website, it cannot be said that there exists "no legitimate countervailing interest in disclosure." *Oberg*, 972 F. Supp. 2d at 207–08 (cleaned up). As Dean Datar informed Professor Gino, an intended purpose behind disclosure was to notify others that she would be "unavailable to engage in research, teaching, and mentoring and advising." [Doc. No. 6 at ¶ 181]. The violation of privacy claim thus cannot stand.

Count XII is dismissed.

### B.   Data Colada Defendants' Motion to Dismiss

#### 1.   Defamation

Counts VII and VIII allege defamation as to the Data Colada Defendants based on (1) the four blog posts published on their public blog regarding Professor Gino's alleged research misconduct, and (2) the December Report provided to HBS. [Doc. No. 6 at ¶¶ 380-402].

Defamation is a disfavored action for which the courts prefer summary disposition. *See Eyal v. Helen Broad. Corp.*, 411 Mass. 426, 432 n.7 (1991). This is especially so for matters of academic and scientific debate. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (considering a libel claim "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open"); *Saad*, 123 F. Supp. 3d at 179 (granting motion for judgment on the pleadings where "[t]he dispute . . . over the reliability of the data in [plaintiff's] articles is not fit for resolution in the form of a

defamation lawsuit. Instead, this is a case where the trial of ideas plays out in the pages of peer-reviewed journals, and the scientific public sits as the jury." (cleaned up)); *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994) (affirming summary judgment against defamation claims and stating that "[s]cientific controversies must be settled by the methods of science rather than by the methods of litigation").

When viewed through this filter, the FAC fails to plausibly allege a defamation claim against the Data Colada Defendants. As with the defamation claims against the Harvard Defendants, the Data Colada Defendants' statements in both the December Report and the blog posts reflect "personal conclusions about the information presented," *Salmon*, 57 F.4th at 323 (citation omitted), and they disclose the facts underlying their judgment that there was likely data fraud in the studies, *see Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 731 n.13 (1st Cir. 1992) ("A number of courts, including Massachusetts, have immunized statements of opinion based on fully disclosed nondefamatory facts."); *Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 534 (1st Cir. 2023) ("[A]n opinion is not actionable if it merely draws a conclusion from disclosed non-defamatory facts").

### i.   **The December Report**

Professor Gino asserts that the Data Colada Defendants' statements "reasonably would be understood to declare or imply provable assertions of fact," *Phantom Touring*, 953 F.2d at 727 (citing *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 21 (1990)), thereby amounting to actionable non-opinion.[11] Regarding the December Report, Professor Gino specifically argues:

> Given all of the circumstances, including (i) the statement's title, "**Evidence of Fraud in Academic Articles Authored by Francesca Gino;** (ii) the statement's

---

[11] Professor Gino also asserts that the Data Colada Defendants base their opinion concerning data tampering on "erroneous" facts and thus are not protected, but Professor Gino fails to identify any examples of such facts. *See* [Doc. No. 52 at 13].

assertion that the December Report was *"direct evidence"* of "fraud" by Plaintiff; (iii) the implied statements that Defendants knew undisclosed defamatory facts, (including the suggestion that the "evidence" in the December Report was a "small subset" of what Defendants had collected); (iv) the authoritative tone (indicating that "individuals" had "approached" Defendants to help "reconcile" "concerns" about Plaintiff's alleged misconduct), the December Report is reasonably understood as a statement of fact: that Plaintiff had committed academic "fraud," and *not* non-actionable opinion.

[Doc. No. 52 at 13 (emphases in original)].

While whether Professor Gino in fact committed academic fraud may be proved true or false, "even a provably false statement is not actionable if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts." *Riley v. Harr*, 292 F.3d 282, 289 (1st Cir. 2002) (cleaned up). In making this determination, I must consider "[t]he sum effect of the format, tone and entire content" of the December Report. *Phantom Touring*, 953 F.2d at 729. "[W]hen an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment." *Riley*, 292 F.3d at 289 (quoting *Partington v. Bugliosi*, 56 F.3d 1147, 1156–57 (9th Cir. 1995)); *see also Phantom Touring*, 953 F.2d at 730 (finding non-actionable opinion where author "not only discussed all the facts underlying his views but also gave information from which readers might draw contrary conclusions"). In contrast, if a statement is "not based on facts accessible to everyone" and the audience is "implicitly . . . told that only one conclusion [is] possible," the statement does not qualify as a protected opinion. *Riley*, 292 F.3d at 290 (quoting *Phantom Touring*, 953 F.2d at 730–31).

The December Report constitutes the Data Colada Defendants' subjective interpretation of the facts available to them, as disclosed in the December Report through its thorough

discussion of the potential data anomalies observed in Professor Gino's four studies. *See generally* [Doc. No. 43-1]. As set forth in its title, the December Report walks the reader through "Evidence of Fraud in Academic Articles Authored by Francesca Gino"; it does not directly state anywhere that Professor Gino committed fraud. Nor does it state that data tampering definitively occurred, using cautionary language to couch any conclusions. *See, e.g.*, [*id.* at 5 (data "*suggests* to us that these eight observations *may* have been altered" (emphases added)); *id.* at 18 ("we *believe* that these observations were manually altered" (emphasis added))]; *see also Piccone v. Bartels*, 785 F.3d 766, 772 (1st Cir. 2015) (holding that whether challenged statement constitutes provable assertion of fact requires considering "any cautionary terms used by the person publishing the statement").

In fact, the December Report explicitly acknowledges the limitations of its work and the possibility of conclusions besides tampering by Professor Gino herself. *See., e.g.*, [Doc. No. 43-1 at 2 (noting that the December Report and the underlying investigation were not exhaustive, that the evidence "cannot definitively rule in malfeasance by Professor Gino," and that others may have been responsible for producing the alleged anomalies); *id.* at 14 ("Though we find this evidence to be fairly convincing, it is not conclusive, as it suffers from the limitations of being somewhat subjective and also reliant on a small number of observations.")]. And while the December Report does allege the existence of other evidence of data tampering in Professor Gino's studies, the Data Colada Defendants do not indicate that they are "uniquely situated" to access this additional evidence, nor do they imply that they are "singularly capable of evaluating [Professor Gino's] conduct." *Phantom Touring*, 953 F.2d at 730–31. Indeed, the December Report notes that the Harvard University investigators could and should consider Professor Gino's other studies themselves for additional evidence of tampering if so desired. [Doc. No. 43-

1 at 2]. And the statements about other potential fraud convey only the Data Colada Defendants'

inference that, if a researcher's datasets over a decade show signs of fraud, other such examples

may exist. *See Gray v. St. Martin's Press, Inc.*, 221 F.3d 243, 250–51 (1st Cir. 2000) (finding a

statement to be protected opinion where writer is "merely speculating ('if so') about [an]

inference" based on disclosed underlying facts). Accordingly, "[t]he sum effect of the format,

tone and entire content" of the December Report, *Phantom Touring*, 953 F.2d at 729, make clear

that the December Report represents the Data Colada Defendants' subjective interpretation of the

disclosed facts and is therefore not actionable.[12]

Further, distinct statements identified by Professor Gino—e.g., statements that

individuals had raised concerns with the Data Colada Defendants, that the Data Colada

Defendants tried to "identify some of the biggest issues," that they believe Harvard has access to

files that could have verified or disputed their concerns—are not actionable because they are

neither susceptible to defamatory meaning nor are they alleged to be false, as briefed by the Data

Colada Defendants. *See* [Doc. No. 55 at 3–4]; *see also Amrak Prods., Inc. v. Morton*, 410 F.3d

69, 72 (1st Cir. 2005) ("A communication is susceptible to defamatory meaning if it would tend

to hold the plaintiff up to scorn, hatred, ridicule or contempt, in the minds of any considerable

and respectable segment in the community."); *Veilleux v. Nat'l Broad. Co.*, 206 F.3d 92, 108 (1st

Cir. 2000) (explaining that plaintiff has a "constitutional burden to show the falsity of each

statement").

---

[12] Professor Gino also asserts that the conclusions of the Data Colada Defendants were "unwarranted" because her own explanations allegedly provide "a reasonable and plausible reason" why the data was non-fraudulent. *See, e.g.*, [Doc. No. 6 at ¶¶ 244–46; *id.* at ¶ 130]. Such an assertion is irrelevant to Professor Gino's defamation claim, where the Data Colada Defendants cannot be held liable for having a "false" opinion about what disclosed facts reveal. *Gertz*, 418 U.S. at 339 ("Under the First Amendment there is no such thing as a false idea.").

The FAC thus does not plausibly allege defamation as to the December Report and the individual statements contained in it.

### ii.  **The Blog Posts**

The four blog posts similarly evince that the Data Colada Defendants are "expressing a subjective view," based on facts that they disclose in the blog posts, "rather than claiming to be in possession of objectively verifiable facts." *Riley*, 292 F.3d at 289. The posts analyze each study and the underlying data at length, describe how the Data Colada Defendants reached their conclusions regarding data tampering, and provide many screenshots from and hyperlinks to the primary documents from each study—including the allegedly suspicious data files. *See Cheng v. Neumann*, 51 F.4th 438, 447 (1st Cir. 2022) (holding article to be nonactionable opinion where it "provides a link to the source material, which, in the context of the Article enables readers to draw their own conclusions based on facts accessible to everyone" (cleaned up)); *McKee v. Cosby*, 874 F.3d 54, 63–64 (1st Cir. 2017) (finding nonactionable opinion where letter "details upfront, in multiple bullet points footnoted with citations and hyperlinks to the underlying sources," the information forming its basis); *Ayyadurai v. Floor64, Inc.*, 270 F. Supp. 3d 343, 361 (D. Mass. 2017) (finding nonactionable opinion where, "by providing hyperlinks to the relevant information, the articles enable readers to review the underlying information for themselves and reach their own conclusions"); *cf. Stanton v. Metro Corp.*, 438 F.3d 119, 126 (1st Cir. 2006) (rejecting finding that any reasonable reader would notice a single, small disclaimer in a printed magazine article).

The blog posts do reference other information, such as when the Data Colada Defendants note, "We have received confirmation, from outside of Harvard, that Harvard's investigators did look at the original Qualtrics data file and that the data had been modified." [Doc. No. 6-9 at 10].

But even this statement does not indicate access to information beyond that bare fact, and such confirmation plainly does not provide the basis for Data Colada Defendants' theory of data tampering or suggest that they are "singularly capable of evaluating [Professor Gino's] credibility based on undisclosed evidence," *McKee*, 874 F.3d at 63–64 (cleaned up); if anything, it only bolsters what the Data Colada Defendants concluded based on the data disclosed at length in the blog posts. As with the December Report, the sum effect of the blog posts makes plain that they represent the Data Colada Defendants' subjective interpretation of the disclosed facts.

### iii.   **Actual Malice**

Further, as noted above, *supra* at 23-24, Professor Gino's status as a public figure requires her to plausibly allege that the Data Colada Defendants spoke with "actual malice," meaning "knowledge of the statement's falsity or reckless disregard for its truth." *Lemelson*, 903 F.3d at 23. Professor Gino argues that the Data Colada Defendants assert in the December Report and the four blog posts that they had "direct evidence" she had manipulated data, (1) despite knowing that data irregularities occur in behavioral science research with respect to data collection and handling, and (2) despite defendant Simonsohn's later concession that he had "no evidence" that Professor Gino had manipulated data—thereby "demonstrating Defendants' malice." [Doc. No. 52 at 20]. These allegations are not plausible.

A plain reading of the December Report does not assert "direct evidence" of fraud by Professor Gino anywhere. Rather, the December Report reads, "We report direct evidence of data tampering in four different datasets from four different published articles," [Doc. No. 6 at ¶ 103; Doc. No. 43-1 at 2], and it goes on further to caution the reader that, "although the evidence can, in most of these cases, rule out malfeasance by co-authors, *it cannot definitively rule in malfeasance by Professor Gino*. It may be that some research assistant or otherwise unnamed

36

person/people was/were responsible for producing these anomalies." [*Id.* (emphasis added)]. Professor Gino points out that, "as behavioral scientists at leading universities, Data Colada knew or had reason to know that Professor Gino works with research assistants and others and may not have been the person responsible for any perceived anomalies in studies she authored." [Doc. No. 6 at ¶ 273]. Indeed, the Data Colada Defendants acknowledged that and took care to inform readers of this possibility. Nor do the blog posts declare direct evidence of data tampering by Professor Gino. *See, e.g.*, [Doc. No. 6-6 at 2 (introducing a "four-part series of posts detailing evidence of fraud in four academic papers co-authored by Harvard Business School Professor Francesca Gino," without directly tying the data anomalies to Professor Gino)].

It was in this vein that, on July 18, 2023, Simonsohn stated in a webinar, "Nobody has unambiguously claimed that this was Francesca Gino . . . The retractions don't say that. They just say data she had and data she posted. Uh, my belief is that she did it, but there's no evidence of that. But, but it doesn't really matter." [Doc. No. 6 at ¶ 232]. Nothing in his statement contradicts what was articulated in the December Report or the blog posts, and it cannot plausibly be understood as a concession, as Professor Gino alleges, that the Data Colada Defendants "in fact entertained serious doubts as to the truth of [their] publications, or that they actually had a high degree of awareness of probable falsity." *Lemelson*, 903 F.3d at 24. Professor Gino has failed to plead sufficient facts from which malice could be inferred. This is particularly true "where defendants carefully *avoid* making an express defamatory accusation." *Portnoy v. Insider, Inc.*, No. 22-cv-10197, 2022 WL 16748583, at *7 n.6 (D. Mass. Nov. 7, 2022). Professor Gino also fails to plausibly plead facts alleging the Data Colada Defendants acted with reckless disregard in publishing the December Report and the four blog posts.

Counts VII and VIII are dismissed.

### 2.  **Intentional Interference with Contractual Relations**

Count X asserts a claim against the Data Colada Defendants for intentional interference with contractual relations—i.e., Professor Gino's employment with Harvard. [Doc. No. 6 at ¶¶ 416-25]. As with her intentional interference claim against the Harvard Defendants, Professor Gino cannot avoid First Amendment protections simply by "restat[ing] . . . [a] defamation claim under a different heading." *Brown v. Hearst Corp.*, 54 F.3d 21, 27 (1st Cir. 1995); *see Piccone*, 785 F.3d at 774 (dismissing interference with advantageous relations claim "premised on precisely the same facts as [the failed] defamation claim" (quoting *Yohe v. Nugent*, 321 F.3d 35, 44 (1st Cir. 2003)). To the extent that this claim depends on her defamation claim against the Data Colada Defendants, it cannot stand.

Moreover, Professor Gino claims that the Data Colada Defendants exerted pressure on the Harvard Defendants to improperly investigate and subject her to adverse employment actions, and she implies that they were motivated by a bias against female academics in so doing—but she fails to provide a reasonable factual basis for these claims. *See Peñalbert–Rosa v. Fortuño–Burset*, 631 F.3d 592, 595 (1st Cir. 2011) ("[S]ome allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross the line between the conclusory and the factual." (cleaned up)). The December Report states that the Data Colada Defendants were approached by individuals who "raised concerns to [them] and asked for [their] involvement in trying to reconcile those concerns" regarding Professor Gino's work. [Doc. No. 43-1 at 2]. Upon investigation, the Data Colada Defendants presented their concerns about data anomalies in Professor Gino's research to Harvard, noted that "the evidence . . . cannot definitively rule in malfeasance by Professor Gino," and told Harvard to give "full opportunity for Professor Gino to explain [the] apparent anomalies." [*Id.*]. Accordingly,

Professor Gino does not plausibly allege any facts showing the Data Colada Defendants'
"intentional interference with the contract or business relationship for an improper purpose or by
improper means," as required by this tort. *Pure Distributors, Inc. v. Baker*, 285 F.3d 150, 157
(1st Cir. 2002).

Count X is dismissed.

### C.   Civil Conspiracy to Commit Defamation

Finally, both the Harvard Defendants and the Data Colada Defendants move to dismiss
Count IX, which alleges civil conspiracy to commit defamation against all defendants. [Doc. No.
6 at ¶¶ 403-15]. The FAC bases this claim on the allegation that the Harvard Defendants and the
Data Colada Defendants "conspired to defame Professor Gino with false and defamatory
statements that she committed 'research misconduct' and 'data fraud.'" [*Id.* at ¶ 405].

"In Massachusetts, a civil conspiracy typically exists if there is (1) a common design or
agreement . . . between two or more persons to do a wrongful act and (2) proof of some tortious
act in furtherance of the agreement." *Mullane*, 433 F. Supp. 3d at 115 (quoting *Aetna Cas. Sur.
Co. v. P & B Autobody*, 43 F.3d 1546, 1564 (1st Cir. 1994)). Under this claim, "there can be no
liability unless another actor has committed an underlying tort." *Paquette v. Nashoba Reg'l Sch.
Dist.*, No. 05-cv-40099, 2006 WL 8458640, at *10 (D. Mass. Mar. 30, 2006). Civil conspiracy
further requires "proof of intentional conduct." *Robinson v. Bodoff*, 355 F. Supp. 2d 578, 585 (D.
Mass. 2005).

Where Professor Gino's defamation claims fail against all defendants, *supra* at 22-27, 30-
37, her conspiracy claim based on those defamation allegations must also fail. And beyond the
individual defamation claims, the FAC fails to plausibly allege any facts showing a common
intent or establishing the existence of an agreement, either explicit or implied, between the

Harvard and Data Colada Defendants to defame Professor Gino. As previously noted, other individuals approached the Data Colada Defendants with concerns regarding Professor Gino's research, the Data Colada Defendants presented their suspicions to the Harvard Defendants, and the Harvard Defendants proceeded with an independent investigation. *See supra* at 38.

Accordingly, Count IX is dismissed.

## IV.   CONCLUSION

For the reasons above, the Harvard Defendants' Motion to Dismiss is <u>DENIED</u> in part and <u>GRANTED</u> in part. It is denied as to Counts II, III (to the extent that the FAC alleges breach of the implied covenant arising from the adoption of the Interim Policy or the imposition of administrative leave tantamount to tenure removal), and IV. It is granted as to Counts III (to the extent that the FAC alleges breach of the implied covenant arising from the research misconduct investigation conducted under the Interim Policy and the Research Integrity Policy), V, VI, IX, XI, and XII. The Data Colada Defendants' Motion to Dismiss is <u>GRANTED</u> as to all counts at issue, namely, Counts VII through X.

SO ORDERED.

<u>/s/ Myong J. Joun</u>
United States District Judge