# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **FRANCESCA GINO,** | |
| *Plaintiff,* | **Civil Action No. 1:23-cv-11775-MJJ** |
| **v.** | |
| **PRESIDENT AND FELLOWS OF HARVARD COLLEGE, SRIKANT DATAR, JOHN DOES 1-10, AND JANE DOES 1-10,** | **DEFENDANTS' ANSWER TO PLAINTIFF'S SECOND AMENDED COMPLAINT** |
| *Defendants.* | |

## ADMISSIONS AND DENIALS

Defendants President and Fellows of Harvard College and Srikant Datar (together, "Harvard") hereby respond to the numbered paragraphs in Plaintiffs' Second Amended Complaint.

1. Plaintiff Francesca Gino ("Plaintiff" or "Professor Gino") is employed by the President and Fellows of Harvard College ("Harvard University") as a tenured Professor at the Harvard Business School.

    <u>RESPONSE TO NO. 1:</u> Harvard admits the allegations in Paragraph 1.

2.      Plaintiff is an internationally renowned behavioral scientist, author, and teacher. She has written over 140 academic articles, both as an author and as a co-author, exploring the psychology of people's decision-making.

> RESPONSE TO NO. 2: Upon information and belief, Harvard admits the allegations in Paragraph 2.

3.      Plaintiff has never falsified or fabricated data.

> RESPONSE TO NO. 3: Harvard denies the allegations in Paragraph 3.

4.      In July 2021, a trio of professors and behavioral scientists (all male), who have a blog named "Data Colada," (and who are collectively referred to herein as "Data Colada"), approached Harvard Business School with alleged concerns about perceived anomalies and "fraud" in the data of four studies in academic articles authored by Plaintiff.

> RESPONSE TO NO. 4: Harvard admits that in or around July 2021, Data Colada informally contacted Harvard Business School ("HBS") employees to raise concerns about perceived anomalies in numerous studies authored by Plaintiff.  Harvard denies the remaining allegations in Paragraph 4.

5.      Data Colada threatened to post the "fraud" allegations on their blog, thereby subjecting Plaintiff, and by extension, Harvard Business School, to public scrutiny.

> RESPONSE TO NO. 5: Harvard denies the allegations in Paragraph 5.

6.      Without Plaintiff's knowledge, Harvard University and the Dean of Harvard Business School, Defendant Srikant Datar ("Dean Datar"), negotiated an agreement with Data Colada pursuant to which Harvard Business School investigated the allegations, in accordance with a new employment policy *created solely for Plaintiff*, in exchange for Data Colada's silence during the investigation period. Unbeknownst to Plaintiff, Harvard Business School further agreed

to disclose the outcome of the investigation to Data Colada, who could then subject Plaintiff's work and professional reputation to public disparagement on its blog.

RESPONSE TO NO. 6: Harvard denies the allegations in Paragraph 6.

7.     Pursuant to its negotiations with Data Colada, in August 2021, Harvard Business School created the "Interim Policy and Procedures for Responding to Allegations of Research Misconduct" ("Interim Policy") just for Plaintiff, which included a range of potential sanctions, including termination of employment.

RESPONSE TO NO. 7: Harvard denies the allegations in Paragraph 7.

8.     Under said Interim Policy, a finding of research misconduct required an investigation committee to prove, by a preponderance of the evidence, that Plaintiff *"intentionally, knowingly, or recklessly"* falsified or fabricated data, and to specify for each allegation the requisite intent.

RESPONSE TO NO. 8: The Interim Policy cited in Paragraph 8 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 8.

9.     Under said Interim Policy, as with any other policy at Harvard, allegations were required to be made in good faith, and an investigation was required to be fair. Neither of those things happened in this case.

RESPONSE TO NO. 9: The Interim Policy cited in Paragraph 9 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 9.

10.     After subjecting Plaintiff to an onerous 18-month investigation pursuant to the new employment policy that Harvard Business School created just for her, the investigation committee

failed to make the requisite, specific findings of intent, supported by a preponderance of the evidence, yet concluded that Plaintiff was responsible for "research misconduct."

> RESPONSE TO NO. 10: Harvard admits the allegation in Paragraph 10 that Plaintiff was found to have committed research misconduct. Harvard denies the remaining allegations in Paragraph 10.

11. In reaching its findings, the investigation committee also ignored exculpatory evidence, failing to consider or give credence to credible witness testimony, in violation of the Interim Policy's mandates that it diligently pursue all leads and conduct a thorough and fair investigation.

> RESPONSE TO NO. 11: Harvard denies the allegations in Paragraph 11.

12. On June 13, 2023, Dean Datar accepted the investigation committee's conclusions and imposed unwarranted and excessive sanctions against Plaintiff, a tenured Professor, which included placing her on unpaid administrative leave (a decision to strip Plaintiff of her entire salary), and immediately removing her from all of her teaching duties, research responsibilities, mentorship of students, and her titled professorship.

> RESPONSE TO NO. 12: Harvard admits the allegations in Paragraph 12 that Dean Srikant Datar ("Dean Datar") accepted the investigation committee's conclusions, and then he placed Plaintiff on administrative leave and imposed sanctions on Plaintiff on June 13, 2023. Harvard denies the remaining allegations in Paragraph 12.

13. Contemporaneously, and pursuant to the agreement that Dean Datar and Harvard Business School negotiated with Data Colada, the results of Harvard Business School's

investigation "report" were disclosed to Data Colada, which caused Plaintiff to be subjected to false and erroneous allegations of data manipulation on Data Colada's blog.

> RESPONSE TO NO. 13: Harvard denies the allegations in Paragraph 13.

14.    Harvard Business School and Dean Datar ensured the impairment of Plaintiff's professional reputation and standing by announcing on the Harvard Business School website that Plaintiff was placed on "administrative leave," and aggressively contacting Plaintiff's editors and co-authors about retracting the research papers at issue in the investigation.

> RESPONSE TO NO. 14: Harvard admits the allegations in Paragraph 14 that it stated on Plaintiff's faculty page on the HBS website that she was on administrative leave. Harvard denies the remaining allegations in Paragraph 14.

15.    Following Harvard and Dean Datar's breach of Plaintiff's right to confidentiality under Harvard's various policies, on June 17, 2023 and continuing through June 30, 2023, Data Colada launched a four-part series of blog posts in which they published their erroneous conclusions that Plaintiff engaged in "data fraud," despite having *no evidence* that Plaintiff engaged in any act of "data fraud."

> RESPONSE TO NO. 15: Harvard denies the allegations in Paragraph 15 that it breached Plaintiff's right to confidentiality.  Harvard lacks sufficient knowledge to admit or deny the remaining allegations in Paragraph 15 and on that basis denies them.

16.    Data Colada's blog posts quickly garnered significant media attention.

> RESPONSE TO NO. 16: Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 16 and on that basis denies them.

17.     Even sophisticated members of the media who read Data Colada's blog posts and saw that Plaintiff was placed on administrative leave by Harvard Business School presumed that Plaintiff had engaged in data fraud.

> RESPONSE TO NO. 17: Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 17 and on that basis denies them.

18.     Harvard Business School has never found Plaintiff responsible for "research misconduct" within the meaning of that term, as defined by Harvard Business School's own Interim Policy, or within the meaning of federal regulations (which the Interim Policy mirrors), or within the meaning of that term as widely understood by scientists and academics, which requires a *specific intent* to fabricate or falsify data, and as those words are understood by the general public.

> RESPONSE TO NO. 18: Harvard admits the allegations in Paragraph 18 that the HBS Interim Policy mirrors the federal regulations and denies the remaining allegations in Paragraph 18.

19.     Defendants Harvard University and Dean Datar's acts and omissions have resulted in the impairment of Plaintiff's professional reputation and standing with false and erroneous allegations of research misconduct.

> RESPONSE TO NO. 19: The allegations in Paragraph 19 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 19.

20.     Harvard University violated Plaintiff's contractual rights as a tenured Professor and numerous provisions of its employment policies, including Plaintiff's right to confidentiality and, ironically, Plaintiff's rights under the terms of its "Interim Policy," by which Harvard Business School was required, *inter alia*, to prove, by a preponderance of the evidence, *specific intent* for each allegation of research misconduct, before concluding that Plaintiff was responsible.

RESPONSE TO NO. 20: The documents cited in Paragraph 20 speak for themselves, and Harvard denies any characterization of these documents. Harvard denies the remaining allegations in Paragraph 20.

21.     Harvard Business School discriminated against Plaintiff on the basis of sex when it elected to investigate her under a newly created policy specific to her case as opposed to relying on its existing policy and procedures. Harvard has treated similarly situated male professors differently. It recently investigated allegations of research misconduct against a male junior faculty member pursuant to its *existing* "Research Integrity" policy, (which, unlike the Interim Policy, did not specify any particular sanctions for violations), and its usual Faculty Review Board procedures, a policy and procedures that Harvard University chose to abandon in Plaintiff's case. In contrast to its treatment of Plaintiff, Harvard Business School protected the confidentiality of the male junior faculty member, and it subsequently promoted him to tenure.

RESPONSE TO NO. 21: Harvard denies the allegations in Paragraph 21.

22.     As a result of Defendants' unlawful actions, Plaintiff has suffered tremendous harm. Her reputation as a highly sought-after author, consultant and researcher has been destroyed. Plaintiff has not only been stripped of her salary, but her career has been derailed by her inability to engage in any work or research as a highly-esteemed tenured Professor at Harvard Business School. Plaintiff has also suffered severe emotional distress.

RESPONSE TO NO. 22: Harvard denies the allegations in Paragraph 22.

23.     Through this civil action, Plaintiff seeks damages of at least $25 million and injunctive relief.

RESPONSE TO NO. 23: Paragraph 23 is a conclusory statement to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 23.

## THE PARTIES

24.   Plaintiff Francesca Gino ("Plaintiff" or "Professor Gino") is a natural person and resident of the Commonwealth of Massachusetts.

RESPONSE TO NO. 24: Harvard admits the allegations in Paragraph 24.

25.   At all relevant times, Plaintiff was a faculty member at Harvard Business School ("HBS") and an employee of Harvard University within the meaning of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Massachusetts Fair Employment Practices Act ("FEPA"), Mass. Gen. Laws. Ch. 151B.

RESPONSE TO NO. 25: Harvard admits the allegations in Paragraph 25 that Plaintiff was a faculty member at HBS and a Harvard employee. The remaining allegations in Paragraph 25 state a legal conclusion to which no response is required.

26.   Defendant President and Fellows of Harvard College ("Harvard University" or "Harvard"), provides educational services and was and is the duly empowered governing board of Harvard University, with a principal office located at Harvard University Massachusetts Hall, Cambridge, Massachusetts 02138.

RESPONSE TO NO. 26: Harvard admits that President and Fellows of Harvard College is the formal name of Harvard University, a Massachusetts nonprofit educational corporation, and that the President's office is located

in Massachusetts Hall, Cambridge, MA 02138. Harvard denies the remaining allegations in Paragraph 26.

27.     At all relevant times, Defendant Srikant Datar ("Dean Datar") was the Dean of HBS. Dean Datar and Harvard are together referred to herein as "Defendants."

> RESPONSE TO NO. 27: Harvard admits the allegations in Paragraph 27 that Srikant Datar was the Dean of HBS starting on January 1, 2021. Harvard lacks knowledge regarding what times Plaintiff deems relevant, and on that basis denies the allegation in Paragraph 27 that Srikant Datar was the Dean of HBS at all relevant times.

## JURISDICTION AND VENUE

28.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367 because the federal law claim arises under the Constitution and statutes of the United States, and the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

> RESPONSE TO NO. 28: The allegations in Paragraph 28 state a legal conclusion to which no response is required.

29.     This Court has personal jurisdiction over the Defendants on the grounds that they conduct business within the Commonwealth of Massachusetts.

> RESPONSE TO NO. 29: The allegations in Paragraph 29 state a legal conclusion to which no response is required.

30.     At all relevant times, the acts and omissions complained of occurred within the Commonwealth of Massachusetts.

RESPONSE TO NO. 30: The allegations in Paragraph 30 state a legal conclusion to which no response is required.

31.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

RESPONSE TO NO. 31: The allegations in Paragraph 31 state a legal conclusion to which no response is required.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

On October 31, 2023, Plaintiff filed an administrative Charge of Discrimination with both the Massachusetts Commission against Discrimination ("MCAD"), MCAD Charge No. 23BEM03139, and the United States Equal employment Opportunity Commission ("EEOC"), EEOC Charge No. 16-C-2024-00345, against Defendants, alleging discrimination on the basis of sex, in violation of the Massachusetts Fair Employment Practices Act, Massachusetts General laws c. 151B ("Chapter 151B") and of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e2(a)(1).

RESPONSE TO UNNUMBERED PARAGRAPH 1: Upon information and belief, Harvard admits the allegations in unnumbered Paragraph 1.[1]

32.     Plaintiff filed an Amended Charge of Discrimination on November 24, 2023.

RESPONSE TO NO. 32: Harvard admits the allegation in Paragraph 32.

---

[1] Plaintiff's Second Amended Complaint fails to number this Paragraph. Harvard therefore responds to this Paragraph as unnumbered Paragraph 1.

33.     Thereafter, on or about September 18, 2024, and in accordance with M.G.L. § 151b, § 9, Plaintiff elected to withdraw her complaint from both the MCAD and the EEOC and to file a lawsuit in this Court.

> RESPONSE TO NO. 33: Harvard denies the allegations in Paragraph 33 that Plaintiff withdrew her complaint on September 18, 2024. By way of further response, Plaintiff withdrew her complaint on September 19, 2024. The remaining allegations in Paragraph 33 state a legal conclusion to which no response is required.

34.     On or about October 4, 2024, the MCAD issued Plaintiff a letter acknowledging it received notice of her intent to file her complaint in court and its dismissal of her administrative charge ("right-to-sue letter").

> RESPONSE TO NO. 34: Harvard admits the allegations in Paragraph 34.

35.     On or about October 8, 2024, the EEOC issued Plaintiff a right-to-sue letter. Accordingly, Plaintiff has timely and properly exhausted her administrative remedies and satisfied all pre-conditions to bring the within action.

> RESPONSE TO NO. 35: The allegations in Paragraph 35 state a legal conclusion to which no response is required.

**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

I.     **Plaintiff's Professional Background and Employment at Harvard.**

36.     Plaintiff is a behavioral scientist. The focus of Plaintiff's work is studying the psychology behind the decisions people make, to learn how people can thrive at work and better engage with one another.

> RESPONSE TO NO. 36: Upon information and belief, Harvard admits the allegations in Paragraph 36.

37.     Plaintiff is a prolific author and an award-winning researcher. She has authored or co-authored countless journal publications, business articles, and books.

> RESPONSE TO NO. 37: Upon information and belief, Harvard admits the allegations in Paragraph 37.

38.     Most of Plaintiff's work, whether it is the many academic articles she has written (over 140 of them), or the case studies she has worked on (over 50 of them), has been in collaboration with others.

> RESPONSE TO NO. 38: Upon information and belief, Harvard admits the allegations in Paragraph 38.

39.     Plaintiff has regularly presented her work at conferences and has been invited to speak at some of the most prestigious colleges and universities in the world.

> RESPONSE TO NO. 39: Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 39 and on that basis denies them.

40.     Plaintiff has received numerous honors and awards and has been honored as one of the world's top "40 Business Professors under 40" and one of the world's most influential management thinkers by Thinkers50. Plaintiff has also won awards for her research, including the 2013 Cummings Scholarly Achievement Award, from the Academy of Management Organizational Behavior Division.

> RESPONSE TO NO. 40: Upon information and belief, Harvard admits the allegations in Paragraph 40.

41.     Plaintiff's work has been covered in numerous media outlets including The Atlantic, The Boston Globe, Business Week, The Economist, The Financial Times, National Public Radio, Scientific American, The Wall Street Journal, and The New York Times.

> RESPONSE TO NO. 41: Upon information and belief, Harvard admits the allegations in Paragraph 41.

42.     Plaintiff's consulting clients include several Fortune 100 companies, as well as the United States Air Force, Army, and Navy.

> RESPONSE TO NO. 42: Harvard admits that Gino consulted with certain Fortune 100 companies. Harvard lacks sufficient knowledge to admit or deny the remaining allegations in Paragraph 42 and on that basis denies them.

43.     Plaintiff received her Bachelor of Arts degree in Business Economics from the University of Trento (Trento, Italy) in 2001, graduating *magna cum laude*. Plaintiff earned her M.S. and Ph.D. degrees in economics and management from Sant'Anna School of Advanced Studies (Pisa, Italy) in 2004.

> RESPONSE TO NO. 43: Upon information and belief, Harvard admits the allegations in Paragraph 43.

44.     Plaintiff went on to academic positions as a post-doctoral fellow and senior researcher and lecturer at Harvard University (2004-2006), a visiting assistant professor of organizational behavior at Carnegie Mellon University (2006-2008), and as an assistant professor of organizational behavior at the University of North Carolina Kenan-Flagler Business School ("UNC") (Chapel Hill, North Carolina), (2008-2010).

> RESPONSE TO NO. 44: Harvard admits the allegations in Paragraph 44.

45.     As a Visiting Assistant Professor at Carnegie Mellon University ("CMU"), Plaintiff was the lab manager for scholars in Behavioral Sciences and Organizational Behavior, where she obtained a full understanding of the common practices for managing a lab and a deep understanding of the research process.

> RESPONSE TO NO. 45: Harvard admits the allegation in Paragraph 45 that Plaintiff was a Visiting Assistant Professor at Carnegie Melon University. Harvard lacks sufficient knowledge to admit or deny the remaining allegations in Paragraph 45 and on that basis denies them.

46.     As a faculty member at UNC, Plaintiff created the behavioral lab at UNC.

> RESPONSE TO NO. 46: Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 46 and on that basis denies them.

47.     Defendant Harvard recruited Plaintiff through an offer letter dated February 16, 2010, in which Harvard Business School ("HBS") offered Plaintiff an appointment as an Associate Professor at HBS, effective July 1, 2010.

> RESPONSE TO NO. 47: Harvard admits the allegations in Paragraph 47.

48.     The offer letter promised Plaintiff that, should she accept, she would be appointed to a tenure-track position as an Associate Professor, beginning July 1, 2010, continuing three years, through the academic year ending June 30, 2013, with the expectation that, in the Fall 2012, her appointment would be renewed for two additional years, through June 30, 2015, and that her "formal review for promotion to Professor with tenure would take place in Fall 2014."

> RESPONSE TO NO. 48: The offer letter cited in Paragraph 48 is a written document that speaks for itself, and Harvard denies any characterization of this offer letter.

49.     Plaintiff had offers from other prestigious business schools (Stern, Wharton, and Berkeley's Haas Business School), but chose to accept Harvard's offer, and began her employment on July 1, 2010, as an Associate Professor of Business Administration at HBS.

> RESPONSE TO NO. 49: Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 49 and on that basis denies them.

50.     On July 1, 2014, Plaintiff was promoted to a position as a Full Professor with tenure, joining the small minority of female professors to achieve tenure at HBS.

> RESPONSE TO NO. 50: Harvard admits the allegation in Paragraph 50 that Plaintiff was promoted to Full Professor in July 2014. Harvard denies the remaining allegations in Paragraph 50.

51.     In 2014, male tenured professors at HBS outnumbered female tenured professors 76 to 19. *See The Tenure Pipeline at Harvard Business School,* https://www.nytimes.com/interactive/2014/02/27/education/harvard-tenure-pipeline.html.

> RESPONSE TO NO. 51: The article cited in Paragraph 51 is written document that speaks for itself, and Harvard denies any characterization of this document.  To the extent a response is required, Harvard denies the allegations in Paragraph 51.

52.     By letter dated July 24, 2015, HBS informed Plaintiff that she had been named the "Tandon Family Professor of Business Administration," and that she could use this title on her letterhead, business cards, and other HBS materials.

> RESPONSE TO NO. 52: The letter cited in Paragraph 52 is a written document that speaks for itself, and Harvard denies any characterization of this letter.

53.     Plaintiff has won numerous awards for her teaching, including the Harvard Business School Wyss Award for Excellence in Mentoring (2022) and the HBS Faculty Award by Harvard Business School's MBA Class of 2015. Plaintiff also won an award for her service to HBS, the Greenhill Award (2017), "given annually by the Dean to members of the HBS community who contribute to the School in significant ways."[2]

RESPONSE TO NO. 53: Harvard admits the allegations in Paragraph 53.

54.     Plaintiff, a working mother of four young children and the breadwinner in her family, has also received praise by her female colleagues and collaborators for serving as a role model for other women at HBS.

RESPONSE TO NO. 54: Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 54 and on that basis denies them.

55.     In December 2018, Plaintiff emailed a female colleague, Frances Frei ("Frei"), Professor of Technology and Operations Management at HBS, about teaching a course together on diversity and leveraging differences. Plaintiff and Frei received approval to teach their new course, Leading Difference, on March 18, 2019, which they taught for the first time in the Winter of 2020. Plaintiff and Frei launched an executive education version of this course in August 2020.

RESPONSE TO NO. 55: Harvard admits the allegation in Paragraph 55 that Plaintiff and Frances Frei taught a new course named Leading Differences for the first time in 2020, that this course was approved in 2019, and that the executive education version of this course was launched in August 2020. Harvard lacks sufficient knowledge to admit or deny the remaining allegations in Paragraph 55 and on that basis denies them.

---

[2] https://www.hbs.edu/about/campus-and-culture/campus-built-on-philanthropy/Pages/greenhill-house.aspx

56. In 2022 and 2023, Plaintiff was the course head for the new course, which was renamed "Inclusion," and it was taught to all 1,000 plus MBA students at HBS as part of the Required Curriculum. The course is about creating environments that are not only diverse, but also equitable and inclusive.

RESPONSE TO NO. 56: Harvard admits the allegations in Paragraph 56.

57. In 2023, after a decade-plus at HBS, Plaintiff has taught courses on negotiation, decision making, collaboration, conflict resolution, and diversity, equity and inclusion at both the MBA and Executive Education levels.

RESPONSE TO NO. 57: Harvard admits the allegations in Paragraph 57.

**A.** **Applicable Policies Governing Tenure and Discipline of Tenured Professors.**

**i.** **The Tenure Policy.**

58. At Harvard, the conferral of tenure carries with it the promise of lifetime appointment.

RESPONSE TO NO. 58: Harvard admits the allegation in Paragraph 58 that tenure is a lifetime appointment provided that the individual receiving tenure is not removed for committing "grave misconduct or neglect of duty." Doc. 6-11, pg. 2.

59. In a letter dated September 24, 2014, Plaintiff received official notification of her appointment (the "Appointment Letter") as a tenured Professor of Business Administration, effective July 1, 2014, that advised her that her appointment was "subject to such terms, conditions, and policies as are stipulated by the Faculty of Business Administration, and to the Third Statute of the University." (Doc. No. 6-10 at 2).

RESPONSE TO NO. 59: The letter cited in Paragraph 59 is a written document that speaks for itself, and Harvard denies any characterization of this letter.

60.     Under the Third Statute that was attached to Plaintiff's Appointment Letter, Plaintiff entered into a permanent contract with Harvard, a lifetime appointment, subject to removal by the Corporation (i.e., Harvard) only for "grave misconduct." (Doc. No. 6-10 at 3).

RESPONSE TO NO. 60: The Third Statute of Harvard University ("Third Statute") cited in Paragraph 60 is a written document that speaks for itself, and Harvard denies any characterization of this document.

61.     HBS's "Policies and Procedures with Respect to Faculty Appointments and Promotions" ("Tenure Policy") emphasize that tenure is reserved for "extraordinary individuals who have demonstrated their ability and willingness to make a sustained contribution to the study, teaching, and practice of business," and refer to faculty with tenure as "permanent faculty."

RESPONSE TO NO. 61: HBS's Policies and Procedures with Respect to Faculty Appointments and Promotions" ("Tenure Policy") cited in Paragraph 61 is a written document that speaks for itself, and Harvard denies any characterization of this document.

## ii.     The Third Statute and the Discipline Policy.

62.     Under the "Third Statute of the University," ("Third Statute"), (the policy attached to Plaintiff's official notification of her tenured appointment), "Professors . . . are appointed without express limitation of time unless otherwise specified" and are "subject to removal . . . by the Corporation [Harvard] only for grave misconduct or neglect of duty." (Doc. No. 6-11 at 2).

> RESPONSE TO NO. 62: The Third Statute cited in Paragraph 62 is a written document that speaks for itself, and Harvard denies any characterization of this document.

63.     Harvard's President and governing body adopted the "Discipline of Officers, Tentative Recommendations" ("Discipline Policy") on October 4, 1971. The Discipline Policy sets forth the procedures applicable "to the discipline of tenured faculty in cases of "grave misconduct or neglect of duty arising under the Third Statute." (Doc. No. 6-12 at 2).

> RESPONSE TO NO. 63: The Discipline of Officers, Tentative Recommendations ("Discipline Policy") cited in Paragraph 63 is a written document that speaks for itself, and Harvard denies any characterization of this document.

64.     Under the Discipline Policy, if a complaint is made against a Professor with Tenure, the Professor is entitled to a two-tiered proceeding prior to the imposition of discipline, consisting of an initial assessment by a Screening Committee and, if not resolved at that state, a full evidentiary hearing before a Hearing Committee, which shall then "make recommendations to the President and Fellows on what, if any, action is appropriate." (Doc. No. 6-12).

> RESPONSE TO NO. 64: The Discipline Policy cited in Paragraph 64 is a written document that speaks for itself, and Harvard denies any characterization of this document.

65.     Under the Discipline Policy, a tenured faculty member is presumed innocent, and [t]he burden of proof that there has been . . . grave misconduct or neglect of duty (as contemplated by the Third Statute of the University) rests with the Complainant and shall be satisfied only by clear and convincing evidence in the record as a whole" following the conclusion of a full

evidentiary hearing before Hearing Committee and a decision by the President and governing bodies of Harvard. (Doc. No. 6-12 at 6-7); *see id.* (at item 6 under "Statement of Hearing Procedures").

> RESPONSE TO NO. 65: The Discipline Policy cited in Paragraph 65 is a written document that speaks for itself, and Harvard denies any characterization of this document.

66.     Under the Discipline Policy, Harvard is obligated to keep information related to the complaint and impending disciplinary proceeding against a tenured faculty member confidential until the conclusion of the proceeding and a final decision by Harvard. (Doc. No. 6-12 at 7).

> RESPONSE TO NO. 66: The Discipline Policy cited in Paragraph 66 is a written document that speaks for itself, and Harvard denies any characterization of this document.

67.     The Discipline Policy provides that, "[e]xcept for such simple announcements as may be required, covering the time of the hearing and similar matters, public statements, and publicity about the case by either parties or member of the Hearing Committee will be avoided so far as possible until the proceedings have been completed, including consideration by the Corporation [Harvard]." (Doc. No. 6-12 at 7).

> RESPONSE TO NO. 67: The Discipline Policy cited in Paragraph 67 is a written document that speaks for itself, and Harvard denies any characterization of this document.

## II.   In July 2021, Data Colada Approaches HBS with Allegations Concerning Plaintiff's Work and Defendants' Subsequent Agreement.

68.    Through their blog, Data Colada has targeted the work of prominent female academics and subjected it to an exceptionally high level of public scrutiny.

> RESPONSE TO NO. 68: Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 68 and on that basis denies them.

69.    In May 2015, Data Colada publicly targeted the research of another prominent Harvard professor at HBS, social psychologist Amy Cuddy, eviscerating her research practices.[3] Cuddy subsequently left her tenure track position at HBS and academia.

> RESPONSE TO NO. 69: Harvard admits that Amy Cuddy is no longer a tenure-track member of HBS faculty.  Harvard lacks sufficient knowledge to admit or deny the remaining allegations in Paragraph 69 and on that basis denies them.

70.    In July 2021, Data Colada approached Plaintiff's employer, Harvard, with false allegations about perceived anomalies in the data of four studies co-authored by Plaintiff. Despite having no evidence, they attributed responsibility for the anomalies to Plaintiff, whom they accused of falsifying and/or fabricating data.

> RESPONSE TO NO. 70: Harvard admits that in or around July 2021, Data Colada informally contacted HBS employees to raise concerns about

---

[3] Cuddy had become famous in her field for a 2010 study about the effects of "power poses" after her presentation in a TED Talk video went viral with a record number of views. *See* "When the Revolution Came for Amy Cuddy," New York Times (Oct. 18, 2017), available at: https://www.nytimes.com/2017/10/18/magazine/when-the-revolutioncame-for-amy-cuddy.html (last visited July 26, 2023).

perceived anomalies in numerous studies authored by Plaintiff.  Harvard

denies the remaining allegations in Paragraph 70.

71.     In the field of behavioral science, if a researcher cannot replicate the results of a

study or has questions about another behavioral scientist's findings, it is standard practice for that

researcher to reach out to the author of the study for an explanation. Data Colada references this

practice on its website in the following statement:

> Author feedback:
>
> Our policy (.htm) is to share drafts of blog posts with authors whose work
> we discuss, in order to solicit suggestions for things we should change prior
> to posting, and to invite them to write a response that we link to at the end
> of the post.

> RESPONSE TO NO. 71: The Data Colada website referenced in Paragraph
> 71 is a written document that speaks for itself, and Harvard denies any
> characterization of this document.  Harvard lacks sufficient knowledge to
> admit or deny the remaining allegations in Paragraph 71 and on that basis
> denies them.

72.     Though Data Colada has followed this normative practice in the past, as evidenced

by their 100 plus blog posts, Data Colada did not share drafts of any blog posts with Professor

Gino and ask for her "feedback" but, instead, went to Plaintiff's employer, Harvard, with false

allegations of malfeasance against Plaintiff and threats to publicize their claims on their blog.

> RESPONSE TO NO. 72: Harvard lacks sufficient knowledge to admit or
> deny the allegations related to Data Colada's past practices in Paragraph 72

and on that basis denies them. Harvard denies the remaining allegations in Paragraph 72.

73.     In or about July or August 2021, HBS, concerned about negative publicity, negotiated with Data Colada and reached an agreement. In exchange for Data Colada's agreement to refrain from making public accusations against Plaintiff that would, by extension, subject HBS to public scrutiny, HBS agreed to create a new employment policy to investigate Data Colada's allegations against Plaintiff's work. HBS further agreed that when it concluded its investigation, it would disclose the results to Data Colada, which would then be free to publicly disparage Plaintiff's work and professional reputation on its blog.

RESPONSE TO NO. 73: Harvard denies the allegations in Paragraph 73.

74.     Gary Pisano ("Dean Pisano"), then Senior Associate Dean for Faculty Development, has known Plaintiff for more than 20 years, collaborated with her on research and teaching, and served as Plaintiff's advisor.

RESPONSE TO NO. 74: Harvard admits that Dean Pisano was identified as one of Plaintiff's advisors during the research misconduct process. Harvard lacks sufficient knowledge to admit or deny the remaining allegations in Paragraph 74 and on that basis denies them.

75.     On or about July 20, 2021, Jean Cunningham ("Dean Cunningham"), Associate Dean for Faculty and Academic Affairs at HBS, who works closely with Dean Datar, alerted Dean Pisano that four studies co-authored by Plaintiff were the subject of allegations by Data Colada, that an investigation was pending, and that Plaintiff was going to need "a lot of help" from him.

RESPONSE TO NO. 75: Harvard admits the allegation in Paragraph 75 that Jean Cunningham informed Dean Gary Pisano that there were concerns

raised about Plaintiff's research to HBS faculty members who informed

Jean Cunningham about the communications. Harvard denies the remaining

allegations in Paragraph 75. By way of further response, Harvard did not

start an investigation into Professor Gino's research until Data Colada made

their formal complaint in October 2021.

76.     The allegations concerned four studies in which Plaintiff had been the principal

investigator.

> RESPONSE TO NO. 76: Harvard denies that there were research
>
> misconduct allegations made to Harvard in July 2021. Harvard admits the
>
> allegations in Paragraph 76 that when research misconduct allegations were
>
> brought in October 2021, Plaintiff was the principal investigator in the
>
> studies subject to the research misconduct allegations.

77.     Dean Pisano contacted Dean Datar to try to learn the substance of the specific

allegations against Plaintiff so he could advise her, but Dean Datar told him to ask Dean

Cunningham.

> RESPONSE TO NO. 77: Harvard denies the allegations in Paragraph 77.

78.     Dean Cunningham instructed Dean Pisano that he must not inform Plaintiff of what

was happening and provided no rationale for this secrecy.

> RESPONSE TO NO. 78: Harvard denies the allegations in Paragraph 78.

A.      **HBS Abandons its Existing Research Integrity Policy and Procedure and**
        **Creates a New Policy Specifically for Professor Gino.**

79.     In July 2021, HBS already had in place a "Research Integrity Policy" (**"Research**

**Integrity Policy"**) (the "2013 Research Integrity Policy") that was applicable to allegations of

faculty research misconduct that did not involve activities funded by outside agencies that sponsor research or proposals submitted to such agencies for funding. (Doc. No. 6-1).

> RESPONSE TO NO. 79: The 2013 Research Integrity Policy ("2013 Policy") cited in Paragraph 79 is a written document that speaks for itself, and Harvard denies any characterization of this document.

80.     Although Professor Gino's work that was the subject of Data Colada's allegations did not involve agency funding, HBS did not apply its existing 2013 Research Integrity Policy and usual Faculty Review Board ("FRB") procedures to evaluate the allegations against her.

> RESPONSE TO NO. 80: Harvard admits that HBS applied the Interim Policy and Procedures for Responding to Allegations of Research Misconduct to the allegations brought against Plaintiff. Harvard denies the remaining allegations in Paragraph 80.

81.     Instead, after negotiating with Data Colada, in August 2021, HBS created a *new* research misconduct policy and procedure*s*, entitled the "Interim Policy and Procedures for Responding to Allegations of Research Misconduct" ("Interim Policy"), that it used to evaluate and investigate the allegations against Professor Gino. (Doc. No. 6-2).

> RESPONSE TO NO. 81: Harvard denies the allegations in Paragraph 81 that Harvard negotiated with Data Colada. Harvard admits that the Interim Policy applied to the allegations against Plaintiff.

82.     On information and belief, HBS has never previously created an employment conduct policy and procedure *for just one employee* because of pressure exerted by a third-party.

> RESPONSE TO NO. 82: Harvard denies the allegations in Paragraph 82. By way of further response, Harvard states that it has *never* created an

employment conduct policy and procedure for just one employee because of third-party pressure, including without limitation with respect to Plaintiff.

83. On information and belief, HBS spent approximately three weeks creating the new Interim Policy, just for Plaintiff. The Interim Policy was never vetted by HBS faculty. On information and belief, HBS's past practice has been to take many months to create policies applicable to faculty members. Prior HBS policies have been commonly vetted by HBS faculty.

RESPONSE TO NO. 83: Harvard denies the allegations in Paragraph 83.

84. From the time HBS received the allegations against Professor Gino in July 2021 and through the creation of its new Interim Policy, HBS kept Professor Gino in the dark about the allegations against her and Harvard's pending investigation.

RESPONSE TO NO. 84: Harvard denies the allegations in Paragraph 84.

85. Keeping Plaintiff in the dark was inconsistent with HBS practice, which normally gives an accused timely notice of the allegations. Normally, HBS employs its FRB procedures to investigate allegations of misconduct by members of the faculty, including alleged violations of the Research Integrity Policy. Pursuant to HBS's usual FRB process, the faculty member is notified of the charges against him/her within a week of HBS's receipt of the allegations.

RESPONSE TO NO. 85: Harvard denies the allegations in Paragraph 85, including the suggestion that the FRB process applies to allegations of research misconduct.

86. With respect to the Interim Policy, i.e., the policy that HBS crafted just for Plaintiff, HBS modeled it on federal regulations promulgated by the Secretary of the U.S. Department of

Health and Human Services ("HHS"), found in 42 C.F.R. pt. 93 entitled "Public Health Service Policies on Research Misconduct" ("PHS Regulations").[4]

> RESPONSE TO NO. 86: Harvard admits the allegation in Paragraph 86 that the Interim Policy was modeled after 42 C.F.R. § 93. Harvard denies the remaining allegations in Paragraph 86.

87.     In September 2021, HBS assigned its employee Alain Bonacossa ("Bonacossa" or "RIO"), (who had held a position as Senior Director, Research Administration and Behavioral Research Services), to a new position as a Research Integrity Officer, with functions modeled after a Research Integrity Officer in an administrative proceeding under the PHS Regulations, to handle the proceeding against Plaintiff.

> RESPONSE TO NO. 87: Harvard denies the allegation in Paragraph 87 that Alain Bonacossa relinquished his position as of Senior Director, Research Administration and Behavioral Research Services when he started his role of Research Integrity Officer. Harvard denies that Alain Bonacossa became HBS's Research Integrity Officer in September 2021. Harvard admits that Alain Bonacossa serves as the Research Integrity Officer for Harvard Business School, that he began in August 2021, and that his functions in that role are modeled after a Research Integrity Officer under the PHS Regulations.

---

[4] The PHS Regulations apply to "[e]ach institution that applies for or receives PHS support for biomedical or behavioral research, research training or activities or activities related to that research or training." 42 C.F.R. § 93.102(a). To the extent that HBS is an institution that applies for or receives PHS funding, allegations concerning Plaintiff's research did not implicate Harvard's institutional obligations under the PHS Regulations, as Plaintiff's alleged conduct did not occur in the context of "research" within the meaning of the PHS Regulations. *See* 42 C.F.R. § 93.222.

88.     On information and belief, this was the first time that Bonacossa performed this role.

RESPONSE TO NO. 88: Harvard admits the allegation in Paragraph in 88.

i.     **The Interim Policy**

89.     Under the HBS Interim Policy, HBS bore the burden of proving any charge of "research misconduct" by a preponderance of the evidence. *See* Interim Policy at § (III) (A) ("Standard of Proof").[5] (Doc. No. 6-2 at 2-3).

RESPONSE TO NO. 89: The Interim Policy cited in Paragraph 89 is a written document that speaks for itself, and Harvard denies any characterization of this document.

90.     The Interim Policy defines "research misconduct" to mean "fabrication, falsification, or plagiarism" in proposing, performing, or reviewing research, or in reporting research results," and excludes "honest error." Interim Policy at App. 1.[6] (Doc. No. 6-2 at 14).

RESPONSE TO NO. 90: The Interim Policy cited in Paragraph 90 is a written document that speaks for itself, and Harvard denies any characterization of this document.

91.     "Fabrication" is defined as "making up data or results." *Id.*[7] "Falsification" is defined as "manipulating research materials, equipment or processes, or changing or omitting data or results such that the research is not accurately represented in the research record." *Id.*[8]

---

[5] *See also* 42 C.F.R. § 93.104(c).
[6] *See also* 42 C.F.R. §§ 93.103, 93.103(d).
[7] *See also* 42 C.F.R. § 93.103(a).
[8] *See also* 42 C.F.R. § 93.103(b).

> RESPONSE TO NO. 91: The Interim Policy cited in Paragraph 91 is a written document that speaks for itself, and Harvard denies any characterization of this document.

92.     "Research" is defined as "a systematic experiment, study, evaluation, demonstration, or survey designed to develop or contribute to general knowledge or specific knowledge by establishing, discovering, developing, elucidating, or confirming information about, or the underlying mechanism relating to, the matters to be studied." *Id.*

> RESPONSE TO NO. 92: The Interim Policy cited in Paragraph 92 is a written document that speaks for itself, and Harvard denies any characterization of this document.

93.     For a finding of research misconduct, the alleged fabrication or falsification must be proved, by a preponderance of the evidence, to have been committed "*intentionally, knowingly or recklessly*," *and* to constitute a "*significant departure from accepted practices of the relevant research community.*" Interim Policy *at* § (III)(A).[9] (Doc. No. 6-2 at 3). Importantly, "[r]esearch misconduct does not include honest error or differences of opinion." *See id.* at App. 1.[10] (Doc. No. 6-2 at 14).

> RESPONSE TO NO. 93: The Interim Policy cited in Paragraph 93 is a written document that speaks for itself, and Harvard denies any characterization of this document.

94.     Although the Interim Policy does not define the terms "intentional," "knowing," or "reckless," administrative decisions rendered by the HHS analyzing research misconduct findings

---

[9] *See also* 42 C.F.R. § 93.104 (a)-(b).
[10] *See also* 42 C.F.R. §§ 93.104(a)-(c).

under the PHS Regulations have looked to Black's Law Dictionary for the definitions of these terms, and have adopted the following definitions:

- **intentional:** "[d]one with the aim of carrying out the act";

- **knowing:** "[h]aving or showing awareness or understanding; well-informed" or "[d]eliberate; "conscious";

- **"reckless:** "characterized by the creation of a substantial and unjustifiable risk of harm to others and by a conscious (and sometimes deliberate) disregard for or indifference to that risk; heedless; rash," and "much more than mere negligence: it is a gross deviation from what a reasonable person would do."

*See* Black's Law Dictionary (11th ed. 2019).

> RESPONSE TO NO. 94: The Interim Policy cited in Paragraph 94 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard lacks sufficient knowledge to admit or deny the remaining allegations in Paragraph 94 and on that basis denies them.

95.     The Interim Policy required Harvard to take all reasonable steps to ensure an impartial, fair, and unbiased investigation. *See* Interim Policy at § (VII)(E) .[11] (Doc. No. 6-2 at 9).

> RESPONSE TO NO. 95: The Interim Policy cited in Paragraph 95 is a written document that speaks for itself, and Harvard denies any characterization of this document.

---

[11] *See* 42 C.F.R. § 93.310(f).

B.     **The HBS Proceeding.**

    i.     **The "Initial Inquiry" and Data Colada's False and Erroneous December 3, 2021 Report to Harvard.**

96.     Professor Gino first learned of the allegations against her on October 27, 2021, when she received a letter ("Notice of Inquiry") from Bonacossa, HBS's newly appointed RIO. (Doc. No. 20-5 at 73-75).

> RESPONSE TO NO. 96: Harvard admits the allegation in Paragraph 96 that the Notice of Inquiry was sent to Plaintiff by Alain Bonacossa on October 27, 2021. Harvard lacks sufficient knowledge to admit or deny the remaining allegations in Paragraph 96 and on that basis denies them.

97.     The Notice of Inquiry informed Plaintiff that the RIO had received allegations from an "anonymous" source. The anonymous source was, in fact, Data Colada. The allegations related to four studies, for which Professor Gino had been the principal investigator, that were published in the following research papers:

> Gino, F., Kouchaki, M., & Casciaro, T. (2020). Why connect? Moral consequences of networking with a promotion or prevention focus. *Journal of Personality and Social Psychology,* 119(6), 1221-1238 ("***2020 JPSP Paper***")

> Gino, F., Kouchaki, M., & Galinsky, A. D. (2015). The moral virtue of authenticity: How inauthenticity produces feelings of immorality and impurity. Psychological Science, 26(7), 983-996 ( "***2015 Psychological Science Paper***")

Gino, F., & Wiltermuth, S. S. (2014). Evil genius? How dishonesty can lead to greater creativity. Psychological Science, 25(4), 973-981 *("2014 Psychological Science Paper")*

Shu, L. L., Mazar, N., Gino, F., Ariely, D., and Bazerman, M. H. (2012). Signing at the beginning makes ethics salient and decreases dishonest self-reports in comparison to signing at the end. Proceedings of the National Academy of Sciences of the United States of America, 109, 15197-15200 ("*2012 PNAS Paper*")

(*Id*. at 73).

RESPONSE TO NO. 97: The Notice of Inquiry cited in Paragraph 97 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard admits that Data Colada raised allegations of research misconduct to HBS's Research Integrity Officer, and otherwise denies the allegations in Paragraph 97.

98. The Notice of Inquiry further informed Professor Gino that HBS had already sequestered "certain research records" relating to her research and instructed her to turn in her "HBS-issued devices" by 5 p.m. that same day. (*Id*. at 74-75). In an unnecessary demonstration of force, the RIO called Harvard University police to oversee the transfer.

RESPONSE TO NO. 98: Harvard denies the allegation in Paragraph 98 that Alain Bonacossa called the Harvard University Police Department ("HUPD") or that any individual from HUPD was present during the transfer of records from Plaintiff's HBS-issued device. The remaining allegations in Paragraph 98 relate to the Notice of Inquiry, which is a

document that speaks for itself, and Harvard denies any characterization of this document.

99.     The Interim Policy states: "the RIO must take all reasonable and practical steps to obtain custody of all the research records and evidence needed to conduct the research misconduct proceeding." (Doc. 6-2 at 5). As alleged below, and as HBS's own inventory of the RIO's sequestration efforts shows, the RIO failed to do so. (Doc. 20-5 at 257-59).

> RESPONSE TO NO. 99: The Interim Policy cited in Paragraph 99 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegation in Paragraph 99.

100.    The Notice of Inquiry advised Plaintiff that HBS had opened a formal "initial inquiry" into the allegations, and that Dean Datar had appointed an "inquiry committee" comprised of HBS Professor Emerita Teresa Amabile, serving as Chair, and HBS Professor Emeritus, Robert Kaplan. (*Id.* at 74). Although not known to Plaintiff at the time, Professor Kaplan was Dean Datar's mentor early on in his academic career and was instrumental in bringing Dean Datar to HBS. *See* "Playing the Long Game: How Dean Datar Came to be at HBS," (Jan. 3, 2021), available at: https://www.hbs.edu/news/articles/Pages/dean-datar-to-hbs.aspx (last visited July 31, 2023).

> RESPONSE TO NO. 100: The Notice of Inquiry and the article cited in Paragraph 100 are written documents that speak for themselves, and Harvard denies any characterization of these documents.  To the extent a response is required, Harvard denies the allegations in Paragraph 100.

101.    Under the Interim Policy, the Inquiry Committee was tasked with determining whether: there was (1) "a reasonable basis for concluding that the allegation falls within the

definition of research misconduct"; and (2) whether "the preliminary information-gathering and preliminary fact-finding from the inquiry indicate[d] that the allegation may have substance." *See* Interim Policy at § (VI) (C). (Doc. No. 6-2 at 17). The Interim Policy required the Inquiry Committee to produce a draft inquiry report to Professor Gino, with opportunity to comment, and then a final inquiry report, with its decision whether an investigation was warranted, within 60 days from the start of the inquiry. *See id*. at § VI (E), (H). (Doc. No. 6-2 at 7-8).

> RESPONSE TO NO. 101: The Interim Policy cited in Paragraph 101 is a written document that speaks for itself, and Harvard denies any characterization of this document.

102.    In pertinent part, the Interim Policy's stated "scope" is limited "only to allegations of research misconduct that occurred ***within six years of the date*** HBS received the allegation, unless the respondent has continued or renewed an incident of alleged research misconduct through the citation, republication, or other use for the potential benefit of the respondent of the research record in question." *See* Interim Policy at § II (emphasis added). (Doc. No. 6-2 at 2).

> RESPONSE TO NO. 102: The Interim Policy cited in Paragraph 102 is a written document that speaks for itself, and Harvard denies any characterization of this document.

103.    Other than allegations concerning the *2020 JPSP Paper,* the remaining three allegations noted in the Notice of Inquiry should have been time-barred. Allegations concerning the *2015 Psychological Science Paper*, the *2014 Psychological Science Paper,* and the *2012 PNAS Paper* were all more than six years old and should not have been the subject of an inquiry under the Interim Policy. (*See id*.)

> RESPONSE TO NO. 103: Harvard denies the allegations in Paragraph 103.

104.    In the course of the initial inquiry, on December 3, 2021, the complainant/Data Colada submitted to the Inquiry Committee a statement titled "Evidence of Fraud in Academic Articles Authored by Francesca Gino" (the "December Report"). (Doc. No. 20-5 at 142-160).

> RESPONSE TO NO. 104: Harvard admits the allegation in Paragraph 104 that Data Colada submitted a statement titled "Evidence of Fraud in Academic Articles Authored by Francesca Gino" to Alain Bonacossa. Harvard denies that Data Colada sent any statement directly to the Inquiry Committee.

105.    In the December Report, the complainant/Data Colada presented what it described as "imperfect data tampering" for data that appeared to be "out of sort" in published data sets. (Doc. No. 20-5 at 144-147). Like the allegations set forth in the initial Notice of Inquiry, the allegations contained in the December Report are based on unwarranted inferences that perceived anomalies in the data resulted from "fraud," and ignored other plausible and innocent reasons for perceived anomalies.

> RESPONSE TO NO. 105: The December Report and Notice of Inquiry cited in Paragraph 105 are written documents that speak for themselves, and Harvard denies any characterization of these documents.

106.    On February 22, 2022, Plaintiff's advisor in the matter, Attorney Paul S. Thaler, Esq., of the law firm Cohen Seglias Pallas Greenhall & Furman PC, submitted a letter on Plaintiff's behalf to Diane Lopez, Esq., Harvard's Vice President and General Counsel, and requested that she forward it to Bonacossa and the members of the Inquiry Committee. (*See* Doc. No. 20-5 at 199-208). Mr. Thaler explained that, under the Interim Policy, the Inquiry Committee should find that there was insufficient evidence to warrant an investigation into Plaintiff's work because the

allegations lacked substance, and in multiple incidences did not align with actions that fell within the definition of research misconduct. (*See id.*)

>RESPONSE TO NO. 106: Harvard admits the allegation in Paragraph 106 that Paul Thaler sent a letter to Diane Lopez on February 22, 2022. The remaining allegations in Paragraph 106 relate to the letter, which is a written document that speaks for itself, and Harvard denies any characterization of this document.

107.     Mr. Thaler explained that, to the extent there were anomalies in the datasets, in all four of the studies in question, Professor Gino had relied on the help of research assistants on any given project to help her prepare IRB applications, conduct laboratory studies, clean the data, prepare it for analyses, and often conduct preliminary analyses on the data. (*See* Doc. No. 20-5 at 201-207). Professor Gino's practice in this regard was consistent with other behavioral scientists in her field. Given that, in all of the studies in question, Professor Gino did not run the studies or sort or handle the data, and that there was no evidence that the culture of Plaintiff's lab incentivized or motivated research assistants to manipulate data, there was no substance to any of the allegations.  (*See id.*)

>RESPONSE TO NO. 107: The letter cited in Paragraph 107 is a written document that speaks for itself, and Harvard denies any characterization of this document.

108.     Mr. Thaler also explained that, under the Interim Policy, the unavailability of records is only to be considered evidence of research misconduct where it can be shown by a preponderance of evidence that the respondent *intentionally, knowingly, or recklessly* had research records and destroyed them, had the opportunity to maintain the records but did not do so, or

maintained the records and failed to produce them in a timely manner **_and_** that the respondent's conduct constitutes a significance departure from accepted practices of the relevant research community. *See* Interim Policy § (III) (A).[12] (*id*. at 205; *see* Doc. No. 6-2 at 3).

> RESPONSE TO NO. 108: The letter and the Interim Policy cited in Paragraph 108 are written documents that speak for themselves, and Harvard denies any characterization of these documents.

109.    Mr. Thaler noted that the original paper records for the *2012 PNAS Paper* studies could not be found because the records were older than six years and would not normally be reviewed under analogous federal law, *see* 42 C.F.R. § 93.105(a). (Doc. No. 20-5 at 205).

> RESPONSE TO NO. 109: The letter cited in Paragraph 109 is a written document that speaks for itself, and Harvard denies any characterization of this document.

110.    The raw data—the original source data—for the study in question in the *2014 Psychological Science Paper* could not be found either. (Doc. No. 20-5 at 203-205). Data retention policies indicate that records older than six years do not need to be retained so unavailability of this data should be expected given the year the study was conducted (2012). (*See id*. At 205).

> RESPONSE TO NO. 110:  Harvard lacks sufficient information to admit or deny the allegations regarding the "data retention policies" referenced in Paragraph 110.  Harvard denies the remaining allegations in Paragraph 110.

111.    The same data retention policy also applied to the *2015 Psychological Science* paper as the data for study in question was collected in 2014. (*See id*. At 205).

---

[12] *See* 42 C.F.R. § 93.106(b)(1).

RESPONSE TO NO. 111: Harvard lacks sufficient information to admit or deny the allegations regarding the "data retention policy" referenced in Paragraph 111.  Harvard denies the remaining allegations in Paragraph 111.

112.    On April 1, 2022, Professor Gino submitted her own written responses to the draft inquiry report. (*See* Doc. No. 20-5 at 252-256).

RESPONSE TO NO. 112: Harvard admits the allegations in Paragraph 112.

113.    HBS ignored the numerous procedural and substantive deficiencies in the draft report identified by Mr. Thaler and highlighted in Professor Gino's comments and, on April 8, 2022, produced a final inquiry report ("Inquiry Report"), in which the committee found that an investigation was warranted. (*See* Doc. No. 20-5 at 43-54).

RESPONSE TO NO. 113: The Inquiry Report is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 113.

**ii.     HBS's Unfair and Biased Investigation.**

114.    On April 15, 2022, HBS notified Professor Gino that Dean Datar had concluded that an investigation was warranted and was instituting an investigation, and that a third member of the HBS faculty, HBS Professor Shawn Cole, would join Amabile and Kaplan, forming an "investigation committee," pursuant to the Interim Policy. (*See* Doc. No. 20-5 at 262-331).

RESPONSE TO NO. 114: Harvard admits the allegations in Paragraph 114.

115.    In or about May 2022, the investigation committee hired an external forensic firm Maidstone Consulting Group ("MCG") to produce forensic reports and analyses of documents and Plaintiffs' electronic files that had been sequestered.

RESPONSE TO NO. 115: Harvard admits the allegations in Paragraph 115.

116.    The investigation committee provided information (documents/records) to MCG for the purpose of evaluating the allegations against Professor Gino, without consulting with Professor Gino to locate or ascertain where the pertinent information was stored and, in particular, whether the electronic files sequestered on her HBS devices contained the final documents and raw data relevant to the studies in question.

RESPONSE TO NO. 116: Harvard denies the allegations in Paragraph 116.

117.    Over the months of June, July, and August 2022, MCG produced a massive amount of forensic reports (over 180 pages) on the four allegations, but they were based on an examination of documents that did not contain information used by research assistants to merge datasets or code variables in them, and that contained data that was not confirmed to be raw data. (*See* Doc. No. Ex. 20-5 at 509-530, 579-629, 612-628, 632-646).[13] As such, the forensics reports were non-probative evidence that were, at best, inconclusive as to the allegations. (*See id.* at 1029-30, 1032-33).

RESPONSE TO NO. 117: Harvard denies the allegations in Paragraph 117.

118.    During the months of June, July, and August 2022, the investigation committee also met with and interviewed six of Professor Gino's collaborators and two research assistants for the

---

[13] MCG produced documents for the investigation committee's review which are absent from the Final Report. (*See* Doc. No. 20-5). *See infra* ¶ 145.

papers in question, resulting in hundreds of pages of recorded and transcribed testimony from the following individuals:

    a.    J.F. (research assistant)

    b.    A.R. (research assistant)

    c.    Professor M.K. (co-author)

    d.    Professor S.W. (co-author)

    e.    Dr. L.S. (co-author)

    f.    Professor A.G. (co-author)

    g.    Professor T.G. (co-author), and

    h.    Professor N.M. (co-author).

> RESPONSE TO NO. 118: Harvard denies the allegations in Paragraph 118. By way of further response, the Investigation Committee interviewed five co-authors and two research assistants.

119.    All of the witnesses interviewed by the investigation committee corroborated Professor Gino's account of how the research was performed and spoke about the integrity of her work and lab practices. (*See* Doc. No. 20-5 at 10.)

> RESPONSE TO NO. 119: Harvard denies the allegations in Paragraph 119.

120.    All witnesses interviewed corroborated Professor Gino's assertion of her innocence of falsification and/or fabrication of data. The HBS investigation committee interviewed at least one witness who suggested the committee collect and review his research records (Doc. No. 20-5 at 414, 417), but the Final Report contains no indication the committee ever did so (*id*. at 18, 257-59).

> RESPONSE TO NO. 120: Harvard denies the allegations in Paragraph 120.

121.     HBS also did not sequester the research records of key members of the research teams involved (Doc. No. 20-5 at 257-59), and the HBS Investigation Committee only interviewed two of them.

> RESPONSE TO NO. 121: Harvard denies the allegations in Paragraph 121, including the suggestion that it had access to the research records of research collaborators affiliated with other institutions.

122.     During June 2022 through September 2022, the investigation committee reviewed the MCG forensic reports and had several meetings to discuss them. (Doc. No. 20-5 at 5, 7-8). The investigation committee completed its review before providing Professor Gino copies of the forensic reports or giving her an opportunity to review and respond to them. (*See id*. at 7-8).

> RESPONSE TO NO. 122: Harvard denies the allegations in Paragraph 122.

123.     On August 24, 2022, the RIO informed Professor Gino (for the first time) that the investigation committee had hired a forensics firm and advised her that it would share the forensic reports with her in September 2022, and that it would want to discuss the reports with her.

> RESPONSE TO NO. 123: Harvard denies the allegations in Paragraph 123.

124.     Throughout the inquiry and the investigation, Professor Gino was performing her regular duties as a Professor at HBS.

> RESPONSE TO NO. 124: Harvard admits the allegations in Paragraph 124.

125.     At the end of August 2022, the RIO contacted Professor Gino to schedule two three-hour interviews with the investigation committee and was offered dates at the end of October 2022 and November 2022 to discuss both the MCG reports and witness interviews.

> RESPONSE TO NO. 125: Harvard admits the allegations in Paragraph 125.

126.     When, after a few weeks, Professor Gino had still not been provided copies of the MCG reports, she contacted the RIO, who told her he was about to send her the first of the forensic reports. Professor Gino requested that the RIO permit her more time to review the forensics reports—which she had still not been provided—so she could prepare for the upcoming meetings with the investigation committee.

> RESPONSE TO NO. 126: Harvard admits the allegations in Paragraph 126 that it provided Plaintiff with the forensic reports once they were finalized. Harvard denies the remaining allegations in Paragraph 126.

127.     The RIO told Professor Gino that the investigation committee wanted to meet before Thanksgiving. To accommodate the investigation committee's schedule, the RIO canceled the earlier of the two scheduled 3-hour meetings, leaving just one three-hour meeting for Professor Gino to meet with the investigation committee, on November 14, 2022. (*See* Doc. No. 20-5 at 665-715).

> RESPONSE TO NO. 127: Harvard admits that the Investigation Committee met with Plaintiff of November 14, 2022. Harvard denies the remaining allegations in Paragraph 127.

128.     The RIO delayed in providing Professor Gino copies of the MCG Reports, and when he finally did send them to her, he sent them piecemeal, over multiple dates between September 30, 2022 through October 31, 2022. (*See* Doc. No. 20-5 at 7-8).

> RESPONSE TO NO. 128: Harvard admits the allegations in Paragraph 128
> that it provided Plaintiff with the forensic reports once they were finalized.
> Harvard denies the remaining allegations in Paragraph 128.

129.    Though Dean Datar had confirmed to Professor Gino's advisor, Dean Pisano, that, during the proceeding, Professor Gino would be given all the time she needed to respond to the investigation committee's requests for information, HBS did not provide the forensic reports to her in a timely manner, leaving her insufficient time to review the 180-plus pages of dense reports prior to her November 14 2022 meeting with the investigation committee.[14] While the three members of the investigation committee had months to digest the reports and a vendor working on their behalf, Professor Gino was given only a few weeks, while she was also teaching intensively for a month and a half in September and October of 2022, a new course for which she was the course-head.[15] Additionally, when the investigation committee did finally provide her the reports, it did not provide her the underlying documents (e.g., data and emails) on which the reports were based, making it difficult for her to make sense of the reports.

> RESPONSE TO NO. 129: Harvard denies the allegations in Paragraph 129.

130.    Nonetheless, Professor Gino met, as requested by the investigation committee, for a 3-hour interview on November 14, 2022. (See Doc. No. 20-5 at 665-715). At the meeting, Professor Gino was questioned about studies that were done seven, eight, and 10 years previously,

---

[14] Unlike the Research Misconduct Policy, the Interim Policy limited Plaintiff to two advisors, a prohibition that precluded her from hiring her own forensics expert without giving up one of her two advisors, a faculty advisor, Gary Pisano, and her attorney. Interim Policy § III(F) (See Doc. No. 6-2 at 3).

[15] Professor Gino was not provided a copy of the MCG Report on Allegation 1 until September 30, 2022 though the committee met to discuss it about 5 weeks earlier. Professor Gino was not provided a copy of the MCG Report on Allegation 2 until October 21, 2022 though the committee met to discuss it about three weeks earlier. She was not provided a copy of the MCG forensic report on Allegation 3 until October 31, 2022, though the committee had it for some time and met to discuss it three days earlier. She was not provided a copy of the MCG report on Allegation 4 until October 12, 2022, though the committee met to discuss it about seven weeks earlier. (See Doc. No. 20-5 at 7-8).

and about forensic analyses that were largely irrelevant, in an unfair interrogation that reflected the committee's bias against her. (*See id.*)

> RESPONSE TO NO. 130: Harvard admits the allegation in Paragraph 130 that the Investigation Committee met with Plaintiff of November 14, 2022. Harvard denies the remaining allegations in Paragraph 130.

131.    Professor Gino maintained her innocence throughout the entire proceeding, and fully cooperated with the investigation committee, providing information about the publication process, access to data, to the extent it was available, and answering the committee's question on collaborators and research assistants on the studies in question. Professor Gino provided plausible explanations for the perceived "anomalies" in the data. (*See id.; see also id.* at 332-352, 716-1282).

> RESPONSE TO NO. 131: Harvard admits the allegation in Paragraph 131 that Plaintiff maintained that she did not commit research misconduct throughout the Inquiry and Investigation Committee proceedings.  Harvard denies the remaining allegations in Paragraph 131.

### iii.    The Investigation Committee's Draft Report.

132.    At 5:38 p.m. on December 14, 2022, the investigation committee provided Professor Gino a copy of its draft investigation report ("Draft Report") for comment. When the RIO gave her the Draft Report, both HBS and the RIO knew that Professor Gino was leaving for a scheduled family vacation two days later, on December 16, 2022, to see her family in Italy for approximately two weeks, whom she had not seen in four years. Under the Interim Policy, Professor Gino had just 30 days to provide comments to the Draft Report, and she requested an extension of time to review and submit her comments.

RESPONSE TO NO. 132: Harvard admits the allegation in Paragraph 132 that Plaintiff was provided with the Inquiry Committee's Draft Report ("Draft Report") on December 14, 2022. Harvard further admits that Plaintiff requested, and was granted, an extension to provide comments to the Draft Report. Harvard lacks sufficient knowledge to admit or deny whether Plaintiff had not seen her family for four years and on that basis denies this allegation. As to the allegations in Paragraph 132 relating to the Interim Policy, that document speaks for itself, and Harvard denies any characterization of it. Harvard denies the remaining allegations in Paragraph 132.

133.    The Draft Report informed Professor Gino that the investigation committee had found her guilty of all the charges and, incredibly, without consideration of the various mitigating factors set forth in the Interim Policy, recommended the harshest and most punitive sanction available under the Interim Policy: termination of Professor Gino's employment.

RESPONSE TO NO. 133: The Draft Report cited in Paragraph 133 is a written document that speaks for itself, and Harvard denies any characterization of this document.

iv.    **The Investigation Committee Failed to Prove Research Misconduct.**

134.    In the Draft Report, the investigation committee acknowledged but chose to ignore evidence that was directly relevant to the question at hand: whether Professor Gino had knowingly, intentionally, or recklessly manipulated data. The investigation committee prefaced its findings with the following statement, indicating that "all witnesses" whom the committee interviewed

"*never doubted the integrity of the data in the study or studies in question*," and that there was also *no evidence of any incentive or pressure to manipulate data in Professor Gino's lab*, writing:

> We acknowledge, and we took seriously in our decision-making, statements by all witnesses that they never doubted the integrity of the data in the study or studies in question. One witness who knew Professor Gino well said they never doubted her integrity in any way. The witnesses also said that they had no evidence that Professor Gino had ever pressured colleagues, doctoral students, post-docs, or research associates, including themselves, to produce particular results in a study, or that Professor Gino had created a negative atmosphere in her lab. Moreover, some witnesses spontaneously said that they had worked on multiple studies with Professor Gino that were never published because the studies didn't work out.

> <u>RESPONSE TO NO. 134:</u> The Draft Report cited in Paragraph 134 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 134.

135.    In concluding Professor Gino was responsible, the investigation committee made findings based on mere speculation, in reliance on some discrepancies noted in the MCG reports—reports that were, at best, inconclusive. Without **any** supporting witness statements, email correspondence, or other evidence, such as the original "raw" data (that is, data submitted by study participants before being handled or "cleaned" by anyone), the investigation committee concluded that Professor Gino was responsible for misconduct.

> <u>RESPONSE TO NO. 135:</u> Harvard denies the allegations in Paragraph 135.

136.     Under the Interim Policy a finding of research misconduct required HBS's investigation committee to prove, *by a preponderance of the evidence*, that Plaintiff *"intentionally, knowingly, or recklessly" falsified or fabricated* data, and to specify for each allegation the requisite intent. *See* Interim Policy at § (III) (A), (VII) (F). (Doc. No. 6-2 at 2-3, 10). Instead, the investigation committee reversed the policy's stated burden of proof, and found Professor Gino guilty of misconduct because she had not *disproved* the allegations against her.

> RESPONSE TO NO. 136: Harvard denies the allegation in Paragraph 136 that the Investigation Committee reversed the burden of proof. The remaining allegations in Paragraph 136 relate to the Interim Policy, which is a written document that speaks for itself, and Harvard denies any characterization of this document.

137.     Although the investigation committee stated in the draft report that it found all witnesses to be credible, it inexplicably ignored witness testimony that corroborated Professor Gino's explanations concerning the allegations, and established Professor Gino's integrity, style of working, and lab practices. The committee also irrationally ignored relevant testimony from Professor Gino's research assistants and collaborators who spoke favorably about Plaintiff's integrity (Doc. No. 20-5 at 369, 433, 445) and the role of research assistants in the research process for the studies at issue. (*See* Doc. No. 20-5 at 353-383, 384-410, 436-449, 450-472).

> RESPONSE TO NO. 137: The Draft Report cited in Paragraph 137 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 137.

138.   In its Draft Report, the investigation committee failed to specify the intent of the misconduct, i.e., whether it had been committed "intentionally, knowingly, or recklessly," as it was required to do under the Interim Policy. *See* Interim Policy § (VII) (F). (Doc. No. 6-2 at 10). Instead, and in the absence of any evidence of intent to commit misconduct, the investigation committee merely parroted the phrase, "intentionally, knowingly, or recklessly" for each allegation.

RESPONSE TO NO. 138: Harvard denies the allegations in Paragraph 138.

139.   Indeed, ***not a single witness*** interviewed by the investigation committee reported any type of behavior or attitude that is consistent with the speculative intent that was posed by the investigation committee—intent that was unspecified and unsupported by any evidence whatsoever.

RESPONSE TO NO. 139: Harvard denies the allegations in Paragraph 139.

140.   In addition to the investigation committee's failure to make specific findings supported by a preponderance of the evidence, the overly harsh sanctions recommended by the investigation committee bore no connection to the intended rehabilitative nature of the research misconduct proceedings. As set forth in the PHS Regulations, on which the Interim Policy is based, such proceedings are intended to be remedial in nature, and to avoid overly harsh and punitive outcomes.

RESPONSE TO NO. 140: Harvard denies the allegations in Paragraph 140. To the extent that Plaintiff purports to quote from a federal regulation in making the allegations in Paragraph 140, those regulations speak for themselves, and Harvard denies any characterization of those regulations.

-48-

141.     Under the Interim Policy, a respondent is "allowed 30 days from receipt of the draft report to submit comments to the RIO," which "must be included and considered in the final report." (See Interim Policy at § (VII) (G)(1)). (Doc. No. 6-2 at 10). The RIO is permitted under the Interim Policy to extend the deadlines for completion of any phase of the investigation, including the preparing of the draft investigation report and finalizing the draft report. *See* Interim Policy at § (VII)(J). (Doc. No. 6-2 at 11).

>       RESPONSE TO NO. 141: The Interim Policy cited in Paragraph 141 is a written document that speaks for itself, and Harvard denies any characterization of this document.

142.     Professor Gino was entitled access to **all** of the documents relied on in the report, including the lengthy MCG forensics documents that she had never had a meaningful opportunity to review and respond to, as well as the underlying documents to those reports, which she was ***never*** provided—a clear violation of the policy. *See* Interim Policy at § (VII)(G)(1). (Doc. No. 6-2 at 10).

>       RESPONSE TO NO. 142: Harvard denies the allegations in Paragraph 142.

143.     Despite the rules, on December 14, 2022, the RIO declined to grant Professor Gino's reasonable request for an extension and told her to wait until she returned from her vacation in January 2023, to see if she actually needed the time.

>       RESPONSE TO NO. 143: Harvard denies the allegations in Paragraph 143.

144.     The RIO also told Professor Gino that she should expect the process to get much harder going forward (saying the "road would get much tougher"). He advised her that the committee was *very unlikely to change its conclusions*, and that *all she could ask for was a reduction in the recommended sanctions*. The RIO even suggested to Professor Gino that she

should seek mental health counseling to deal with potential mental health issues arising from the anticipated difficulty of the proceeding.

<u>RESPONSE TO NO. 144:</u> Harvard denies the allegations in Paragraph 144.

145.    Though HBS had taken months to prepare and review the MCG forensic reports, it was giving Professor Gino roughly three weeks to respond to the draft report, without the documents underlying that report, all two days before she was going on a two-week trip to Italy. (*See* Doc. No. 20-5 at 1043) (Plaintiff's Feb. 17, 2023 letter to the investigation committee stating, "[t]hough the HBS Policy states that I would be given access to the detailed analyses from the MCG firm and all the files they used, I did not have access to their analyses and excel files other than their final report.").[16]

<u>RESPONSE TO NO. 145:</u> The letter cited in Paragraph 145 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 145.

146.    Dean Pisano went to Dean Datar to intervene on Professor Gino's behalf, telling him that she needed more time to respond to the draft report, particularly since the committee had reversed the Interim Policy's stated standard of proof, and was requiring her *to disprove* the allegations.

<u>RESPONSE TO NO. 146:</u> Harvard admits the allegation in Paragraph 146 that Dean Gary Pisano spoke with Dean Datar regarding the Draft Report. Harvard denies the remaining allegations in Paragraph 146.

147.    When Dean Pisano spoke with Dean Datar, he emphasized that, throughout the proceeding, Professor Gino had continued to perform her regular duties as a Professor at HBS and

---

[16] *See supra* note 12.

had put "Harvard's interests first," including co-creating and teaching a course on Inclusion, (with 1,011 MBA students enrolled), and that, as a matter of basic fairness, she should have time to focus on her rebuttal, and to digest and respond to the 180-plus pages of MCG forensic reports. Dean Datar was dismissive, telling him to speak with Dean Cunningham. Dean Cunningham was also dismissive, telling Dean Pisano, "oh, she's getting all the time she needs."

> RESPONSE TO NO. 147: Harvard admits the allegation in Paragraph 147 that Dean Gary Pisano spoke with Dean Datar and Dean Jean Cunningham regarding the Draft Report. Harvard denies the remaining allegations in Paragraph 147.

148.    After Professor Gino's return to Boston, on January 10, 2023, she wrote the RIO to again request an extension of time to respond to the investigation committee's draft report and was granted a "hard deadline" of February 17, 2023.

> RESPONSE TO NO. 148: Harvard admits the allegation in Paragraph 148 that Plaintiff was given an extension until February 17, 2023 to submit her response to the Draft Report.

149.    On February 17, 2023, Professor Gino submitted a written response to the investigation committee's Draft Report. (*See* Doc. No. 20-5 at 1024-1060).

> RESPONSE TO NO. 149: Harvard admits the allegations in Paragraph 149.

150.    In her response to the Draft Report, Professor Gino sought to clarify that, "[w]hile the [Interim Policy] notes that defenses must be proven by a preponderance of the evidence in their consideration, the burden of proof for making a finding of research misconduct is *actually* on the committee, as any findings of research misconduct must themselves be supported by a

preponderance of the evidence." (Citing Interim Policy at (III)(A) and App. 1.) (*See* Doc. No. 20-5 at 1025; *see also id.* at 1058-59; Doc. No. 6-2 at 3).

> RESPONSE TO NO. 150: Plaintiff's response to the Draft Report cited in Paragraph 150 is a written document that speaks for itself, and Harvard denies any characterization of this document.

151.    Maintaining her innocence, Professor Gino's response thoroughly outlined the substantive factual evidence that the investigation committee had ignored for each of the four allegations against her, and that weighed in favor of her innocence, and provided specific citations to the record. (*See* Doc. No. 20-5 at 1024-1060).

> RESPONSE TO NO. 151: Plaintiff's response to the Draft Report cited in Paragraph 151 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 151.

152.    In addition, and without violating any rules,[17] Professor Gino contacted potential witnesses (without telling them about the ongoing investigation) who could corroborate her statements to the investigation committee. (*See* id. at 1026-27 and corresponding n. 2). Although it was not her burden to prove her innocence under the Interim Policy, Professor Gino's response to the committee's Draft Report introduced *new evidence* of her own, including statements from others whom the committee had failed to interview. (*See* Doc. No. 20-5 at 1061-1282). Prior to the issuance of the Draft Report and during the investigation, Professor Gino had not spoken to potential witnesses to avoid any appearance of influencing them, as well as to comply with the

---

[17] The Interim Policy, unlike the Research Misconduct Policy, limited disclosure of information under a threat of "sanctions up to and including termination." (*See* Doc. No. 6-2 at 3-4).

Interim Policy's "duty to maintain confidentiality," of the proceeding, "to the extent possible." *See* Interim Policy § (III) D).[18] (Doc. No. 6-2 at 3-4).

> RESPONSE TO NO. 152: Plaintiff's response to the Draft Report cited in Paragraph 152 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard lacks sufficient knowledge to admit or deny the remaining allegations in Paragraph 152 regarding Plaintiff's actions and therefore denies them.

### v.    The Investigation Committee Failed and/or Refused to Diligently Pursue All Leads.

153.    Professor Gino had also expected that the committee would evaluate each allegation of research misconduct *thoroughly, fairly, and objectively*, *see* Interim Policy § (III)(A),[19] (Doc. No. 6-2 at 2) and to interview all witnesses and diligently pursue all leads. *See* Interim Policy § (VII)(E).[20] (Doc. No. 6-2 at 9-10).

> RESPONSE TO NO. 153: Harvard lacks sufficient knowledge to admit or deny the allegation in Paragraph 153 regarding Plaintiff's expectations and therefore denies them. The remaining allegations in Paragraph 153 relate to the Interim Policy, which is a written document that speaks for itself, and Harvard denies any characterization of this document.

154.    Seeing that the investigation committee had failed to fulfill these duties and had also reversed the Interim Policy's standard of proof by imposing upon *her* the burden of *disproving* the allegations of misconduct, Professor Gino provided the committee with independent

---

[18] *See also* 42 C.F.R. §§ 93.108, 93.300(e).
[19] *See also* 42 C.F.R. § 93.300(b).
[20] *See also* 42 C.F.R. §§ 93.310(g), (h).

corroboration of her innocence, and attached to her detailed February 17, 2023 response to the Draft Report statements of colleagues concerning her integrity and the integrity of her lab and work practices, in addition to substantive statements concerning specific factual issues pertinent to the individual allegations. (*See* Doc. No. 20-5 at 1061-1282).

> RESPONSE TO NO. 154: Harvard denies the allegations in Paragraph 154.

155.    Professor Gino also noted in her response to the Draft Report that, with respect to allegations that related to studies conducted more than three years ago and that concerned records that were more than three years old (and in some cases, more than 10 years old), under the applicable document retention rules of Harvard and UNC, there had been no departure from accepted research practices for the data to have been discarded or unavailable. (*See* Doc. No. 20-5 at 1031 n. 4 and corresponding text). Under the Interim Policy, there should have been no basis for the investigation committee to infer misconduct from the *absence* of such records. *See* Interim Policy at § (III) (A). (Doc. No. 6-2 at 3).

> RESPONSE TO NO. 155: Plaintiff's response to the Draft Report cited in Paragraph 155 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 155.

156.    Professor Gino's response to the investigation committee's Draft Report specifically addressed the investigation committee's unwarranted assumptions made based on the MCG reports, which concerned only the examination of sequestered documents located on Professor Gino's hard drive. (Doc. No. 20-5 at 1029-1030, 1032-33), Professor Gino outlined in detail why the MCG reports were, at best, inconclusive, as even MCG acknowledged in the reports

that they were not clearly based on the relevant records, (i.e., the original raw data and research records for the studies at issue). (Doc. No. 20-5 at 1029-1030, 1031.").

> RESPONSE TO NO. 156: Plaintiff's response to the Draft Report cited in Paragraph 156 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 156.

157.    Similarly, Professor Gino explained that, for another study at issue, the data had been collected *on paper*, not, as the investigation committee assumed based on an MCG forensic report, in a computer spreadsheet. (*Id.* at 1029-31, 1033-34). To presume an "anomaly" based on participant IDs being out of sort was unwarranted because the data collected on paper had been entered into a spreadsheet in no particular order (i.e., unsorted). (*See id.* at 1031).

> RESPONSE TO NO. 157: Plaintiff's response to the Draft Report cited in Paragraph 157 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 157.

158.    Though the investigation committee could not possibly have digested Professor Gino's comprehensive response to the Draft Report in just two weeks, it issued its final investigative report ("Final Report") on March 7, 2023. (*See id.* at 2-42).

> RESPONSE TO NO. 158: Harvard admits that the Final Report was completed on March 7, 2023. Harvard denies the remaining allegations in Paragraph 158.

######     vi.      **The Final Report: A Biased and Deficient Foregone Conclusion.**

159.     The Final Report, which was substantially unchanged from the investigation committee's Draft Report, evidenced that the committee had reached a foregone conclusion. That the committee members had already made up their minds is also evidenced by the speedy turnaround of such an important document, as well as the minimal changes from the Draft Report.

<u>RESPONSE TO NO. 159:</u> Harvard denies the allegations in Paragraph 159.

160.     While acknowledging receipt of Professor Gino's response, in its Final Report, the investigation committee unreasonably dismissed the evidence she presented as *"not germane"* and *"irrelevant."* (Doc. No. 20-5 at 10, 11 n. 7).

<u>RESPONSE TO NO. 160:</u> Harvard denies the allegations in Paragraph 160.

161.     As in its Draft Report, the investigation committee discounted or ignored evidence directly relevant to the question of *intent,* and stated:

> We acknowledge, and we took seriously in our decision-making, ***statements by all witnesses that they never doubted the integrity of the data in the study or studies in question.*** One witness who knew Professor Gino well said they never doubted her integrity in any way. In addition, several exhibits appended by Professor Gino to her Response (Exhibit 29) contained messages to her from co-authors, colleagues, and former doctoral students expressing their admiration for her research rigor and integrity. ***The witnesses we interviewed also said that they had no evidence that Professor Gino had ever pressured colleagues, doctoral students, post-docs, or research associates, including themselves, to produce particular results in a study, or that Professor Gino had created a negative***

> *atmosphere in her lab.* Moreover, some witnesses spontaneously said that
> they had worked on multiple studies with Professor Gino that were never
> published because the studies didn't work out.

(Emphasis added.) (Doc. No. 20-5 at 10).

> RESPONSE TO NO. 161: The Investigation Committee's final report
> ("Final Report") cited in Paragraph 161 is a written document that speaks
> for itself, and Harvard denies any characterization of this document.
> Harvard denies the remaining allegations in Paragraph 161.

162.    Incredibly, despite that the burden was *on the committee* to prove intentional
misconduct by a preponderance of the evidence, the draft report indicated that the investigation
committee found that witnesses' statements concerning the "integrity of the data" or the integrity
of Professor Gino were "not germane," writing:

> *We carefully considered all these statements, but did not find them*
> *germane to the specific allegations before us or a plausible explanation*
> *of data anomalies or discrepancies.*

(*Id.* at 9).

> RESPONSE TO NO. 162: The Draft Report cited in Paragraph 162 is a
> written document that speaks for itself, and Harvard denies any
> characterization of this document.

163.    Under the Interim Policy, evidence of Professor Gino's *intent* (or lack of intent) to
fabricate or falsify data was directly relevant to a finding of research misconduct, as such finding

requires proof, by a preponderance of the evidence, of *knowing, intentional, or reckless conduct*. Interim Policy § (III)(A) (Doc. No. 6-2 at 3).

> RESPONSE TO NO. 163: The Interim Policy cited in Paragraph 163 is a written document that speaks for itself, and Harvard denies any characterization of this document.

164.    In addition to ignoring evidence directly relevant to the issue of *intent,* the investigation committee ignored evidence relevant to the specific allegations that provided reasonable and innocent explanations for the perceived anomalies. (*See* Doc. No. 20-5 at 1024-1060).

> RESPONSE TO NO. 164: Harvard denies the allegations in Paragraph 164.

165.    The committee failed to apply the Interim Policy's burden of proof and shifted the burden of proof onto Professor Gino *to disprove* research misconduct. (*See* Doc. No. 20-5 at 1-42). That is not the appropriate standard of proof under the Interim Policy. (*See* Doc. No. 6-2 at 2-3).

> RESPONSE TO NO. 165: Harvard denies the allegations in Paragraph 165.

166.    Under the Interim Policy, the definition of research misconduct specifically excludes "honest error," and the burden of proving *research* misconduct remained at all times on Harvard. *See* Interim Policy at (III)(A) and App. 1 (Doc. No. 6-2 at 2-3, 14); *see also* 42 C.F.R. § 93.106; *see* 70 FR 2837001 (discussing evidentiary standard under 42 C.F.R. 93.106); *see, e.g., Martin v. Ohio,* 480 U.S. 228, 233 (1987).

> RESPONSE TO NO. 166: The Interim Policy cited in Paragraph 166 is a written document that speaks for itself, and Harvard denies any characterization of this document. The remaining allegations in Paragraph

-58-

166 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 166.

167.   Though the Interim Policy required the investigation committee to give due consideration to admissible, credible evidence of honest error or difference of opinion presented by Professor Gino, it ignored credible evidence of honest error, holding her to a higher standard of proof than required under the Interim Policy.

> RESPONSE TO NO. 167: The Interim Policy cited in Paragraph 167 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegation in Paragraph 167.

168.   The Investigation Committee reached this finding despite that (1) there was no evidence that Professor Gino had collected or maintained the data in question; (2) all of the evidence, including the witness testimony, established that Professor Gino and her lab always demonstrated the highest level of integrity; and (3) Professor Gino had always maintained her innocence.

> RESPONSE TO NO. 168: Harvard denies the allegations in Paragraph 168.

169.   On March 9, 2023, Professor Gino's counsel, Mr. Thaler, wrote a letter to Harvard's General Counsel, requesting that she please forward it to Dean Datar, and highlighting the deficiencies of the investigation committee's decision and its many failures to adhere to the Interim Policy requirements, including the following:

> **(1)**   The investigation committee failed to prove, by a preponderance of the evidence, "research misconduct" within the meaning of the policy. Under the Interim Policy, to make a finding of research misconduct required

the investigation committee "to identify whether the research misconduct was falsification, fabrication, or plagiarism," and whether Professor Gino had committed such misconduct with the requisite *intent*: *"intentionally, knowingly, or recklessly."* The burden was *on the committee* to establish any such finding by "a *preponderance of the evidence*." The investigation committee's conclusory findings were based on *mere speculation*, and. in the *absence of supporting witness statements and evidence,* the committee determined that Plaintiff was responsible for misconduct.[21]

**(2)**   The investigation committee failed to apply the Interim Policy's standard of proof. The investigation committee erroneously concluded that Professor Gino was responsible because she had failed to *disprove* misconduct by a preponderance of the evidence.

**(3)**   The investigation committee had irrationally ignored relevant evidence. The investigation committee had given no credence to credible witness testimony concerning Plaintiff's known integrity and style of working, all of which was relevant to the issue of intent. *Not a single witness* reportedly mentioned any concern about Professor Gino's data practices or integrity. Quite the opposite, witnesses stated that Professor Gino had *not* pressured them to produce certain results and had even abandoned projects when appropriate.

---

[21] *See also* 42 CFR § 93.103, federal regulations expressly incorporated in the Interim Policy.

**(4)**     The investigation committee concluded Professor Gino was responsible without making any finding of *specific intent* to falsify or fabricate data. The Interim Policy required the investigation committee to issue a written decision in which it states a finding of *specific intent* for each allegation, but the investigation committee concluded that Professor Gino was responsible without specifying *any particular intent*.

**(5)**     The committee recommended overly punitive sanctions in disregard of applicable policy considerations. Under the Interim Policy', misconduct proceedings, (as also stated in the PHS Regulations on which the Interim Policy was based), are intended to be *rehabilitative* in nature. In disregard of this policy, the investigation committee had recommended extremely punitive sanctions, that appeared untethered to any policy factor.

RESPONSE TO NO. 169: Harvard admits the allegation in Paragraph 169 that Paul Thaler sent a letter to Harvard's General Counsel on March 9, 2023. The remaining allegations in Paragraph 169 relate to a letter that speaks for itself, and Harvard denies any characterization of this document.

170.     Harvard's General Counsel advised Professor Gino that her advisor's letter would not be forwarded to Dean Datar. Professor Gino's advisor's letter is also absent from the committee's "Final Report." (Doc. No. 20-5).

RESPONSE TO NO. 170: The letter cited in Paragraph 170 is written document that speaks for itself, and Harvard denies any characterization of this letter. Harvard admits the remaining allegation in Paragraph 170.

171.    In a letter dated April 3, 2023, Dean Pisano appealed to Dean Datar. Like Mr. Thaler, Dean Pisano tried to explain to Dean Datar that, under the Interim Policy, the investigation committee had failed to prove by a preponderance of the evidence that Professor Gino had engaged in intentional, knowing, or reckless falsification and/or fabrication of data. Dean Pisano emphasized that the committee had misapplied the standard of proof when it simply concluded that Professor Gino was guilty on the basis that she had not *disproved* the allegations.

> RESPONSE TO NO. 171: The letter cited in Paragraph 171 is a written document that speaks for itself, and Harvard denies any characterization of this document.

172.    Dean Pisano urged Dean Datar to read the letter sent by Professor Gino's counsel, Mr. Thaler, advising him that Mr. Thaler had handled many cases at Harvard on behalf of other faculty members and was *"simply appalled"* by both the investigation committee's decision and its proposed sanctions against Professor Gino.

> RESPONSE TO NO. 172: The letter cited in Paragraph 172 is a document that speaks for itself, and Harvard denies any characterization of this document.

173.    Dean Pisano also emphasized that the investigation committee had appeared biased against Professor Gino, as indicated by the RIO's comments to her in December, which suggested to him the investigation committee had reached "a foregone conclusion."

> RESPONSE TO NO. 173: The letter cited in Paragraph 173 is a document that speaks for itself, and Harvard denies any characterization of this document.

174.    On April 14, 2023, Dean Pisano met with Dean Datar in the presence of Dean
Cunningham. Dean Pisano implored Dean Datar to realize that the "process was broken." Dean
Pisano again emphasized that the investigation committee had failed to carry its burden of proof
under the Interim Policy, and that it was required under the Interim Policy to prove, by a
preponderance of the evidence, that Professor Gino possessed the requisite intent to fabricate or
falsify data, and to address allegations fairly and objectively. *See* Interim Policy at § (III) (A).[22]
(Doc. No. 6-2 at 2-3).

> RESPONSE TO NO. 174: Harvard admits the allegation in Paragraph 174
> that Dean Datar and Dean Cunningham met with Dean Gary Pisano on April
> 14, 2023 and that Dean Pisano discussed the Investigation Committee's
> application of the burden of proof. Harvard denies the remaining allegations
> in Paragraph 174.

175.    Dean Pisano, who had dispassionately served on FRB panels in HBS tenure and
misconduct proceedings, told Dean Datar that the investigation committee appeared to have simply
ignored the evidence in Professor Gino's rebuttal to the Draft Report.

> RESPONSE TO NO. 175: Harvard admits the allegation in Paragraph 174
> that Dean Datar met with Dean Gary Pisano and that Dean Pisano discussed
> Professor Gino's rebuttal to the Draft Report. Harvard denies the allegation
> in Paragraph 175 that Dean Gary Pisano has served on FRB panels at HBS.
> Harvard denies the remaining allegations in Paragraph 175.

176.    Dean Datar ignored Dean Pisano's entreaties to give Professor Gino a fair and just
decision, in line with the Interim Policy requirements, and his pleas to make him understand that

---

[22] *See also* 42 C.F.R. § 93.300(b).

the investigation committee had found *no evidence of misconduct* under the Interim Policy and that, even if the evidence did support a finding of misconduct, which it did *not,* the committee's recommended sanctions were grossly disproportionate and out of step with sanctions in other cases, even in cases where very serious misconduct occurred.

> RESPONSE TO NO. 176: Harvard denies the allegations in Paragraph 176.

177.    Dean Pisano urged Dean Datar to speak with Professor Gino if he had any specific questions about evidence, but Dean Datar showed no interest in hearing from Professor Gino. Dean Datar told Dean Pisano that he was meeting with him only out of "respect" for him.

> RESPONSE TO NO. 177: Harvard denies the allegations in Paragraph 177.

**C.    Despite Knowledge that the Findings and Conclusions of the Investigation Committee were Unproved, Dean Datar Rendered a Decision Imposing Harsh Sanctions against Dr. Gino's Employment, in Violation of the Interim Policy.**

178.    On June 13, 2023, Dean Datar issued a written decision that adopted in full the unreasonable findings and conclusions of the investigative panel and its overly-punitive sanctions that were not aligned with the Interim Policy's stated considerations and purpose and out of step as compared to other misconduct cases at HBS and Harvard.

> RESPONSE TO NO. 178: Harvard admits that on June 13, 2023, Dean Datar informed Plaintiff that he adopted the Investigation Committee's findings. Harvard denies the remaining allegations in Paragraph 178.

179.    At 5:30 p.m., Professor Gino met with Dean Datar and Dean Cunningham in Dean Datar's office. Dean Datar told Professor Gino that she would not have the opportunity to say anything, and that he simply wanted the process to be "humane" so had decided to meet with her

in person to deliver the news of his decision. Dean Datar proceeded to read, word for word, his decision letter, dated June 13, 2023.

>**RESPONSE TO NO. 179:** Harvard admits the allegation in Paragraph 179 that Dean Datar met with Plaintiff on June 13, 2022, and read his decision letter to Plaintiff. Harvard denies the remaining allegations in Paragraph 179.

180.    Dean Datar informed Plaintiff that she was being placed on unpaid administrative leave "for a period of two years," and that she would receive no salary or benefits after July 31, 2023. Dean Datar immediately revoked Plaintiff's named professorship the Tandon Family Professor of Business. Datar informed Plaintiff that he was requesting to Harvard's President that Harvard institute "Third Statute proceedings" to revoke her tenured professorial appointment at Harvard.

>**RESPONSE TO NO. 180:** Harvard admits the allegations in Paragraph 180.

181.    Plaintiff was further informed that, for the period of her administrative leave, and effective immediately: (a) she was not permitted to conduct research, to teach, to mentor or advise; (b) she would receive no administrative or research support; (c) she was barred from campus, effectively immediately; and (d) she was prohibited from publishing or disseminating research via HBS platforms.

>**RESPONSE TO NO. 181:** Harvard admits the allegation in Paragraph 181.

182.    Additionally, Dean Datar's June 13, 2023 letter stated that:

*It is my intention to continue to handle this matter as confidentially as circumstances allow. Apart from the communications to journals and co-authors*

*you can expect that I will share with your Unit and relevant faculty and staff leadership that you have been placed on administrative leave as a consequence of research misconduct findings such that you will be unavailable to engage in research, teaching, and mentoring or advising. Communications will also be necessary with students whose work you have been supervising.*

(Emphasis added.)

> RESPONSE TO NO. 182: The letter cited in Paragraph 182 is a document that speaks for itself, and Harvard denies any characterization of this document.

183.    When he finished the letter and Professor Gino began to weep, Dean Datar told her, "you are a capable, smart woman. I am sure you'll find other opportunities." Dean Datar's remarks that he would "share" "research misconduct findings" was inconsistent with the confidentiality provisions of the Interim Policy and Harvard's other employment policies, as well as HBS and Harvard's normal practices. Misconduct proceedings and findings under the FRB are always confidential, including proceedings that were heard under the 2013 Research Integrity Policy.

> RESPONSE TO NO. 183: Harvard denies the allegation in Paragraph 183.

184.    Dean Datar told Plaintiff that he was being "nice" to her by waiting until the end of July 2023, to place her on unpaid leave, rather than doing so immediately.

> RESPONSE TO NO. 184: Harvard denies the allegation in Paragraph 184.

185.    Later that same day, Dean Datar's office contacted a female professor and Plaintiff's colleague and asked her to "counsel out" Plaintiff, meaning to ask Plaintiff to resign based on anonymous allegations of research misconduct. This female colleague was told by Dean

Cunningham that, if Plaintiff agreed to leave HBS, "this will all go away; we won't say anything to anyone."

>    RESPONSE TO NO. 185: Harvard denies the allegations in Paragraph 185.

186.    This was not the first time that Dean Datar had tried to "counsel out" female faculty. Dean Datar had used "counseling out" in other personnel matters when the evidence did not support his desired objective, such as attempting to "counsel out" a qualified senior female professor to discourage her from applying for tenure and "counseling out" female junior professors to persuade them to resign for unsubstantiated disciplinary matters.

>    RESPONSE TO NO. 186: Harvard denies the allegations in Paragraph 186.

187.    When the female colleague met with Plaintiff to "counsel her out," Plaintiff told the female colleague that she did not want to resign because she did not commit research misconduct.

>    RESPONSE TO NO. 187: Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 187 and on that basis denies them.

188.    Plaintiff's female colleague was surprised to learn from Professor Gino about the new Interim Policy that HBS created for her and applied to her case retroactively. As an HBS tenured professor for many years, Plaintiff's colleague had never known HBS to have previously created a new policy for a case, and then to apply it retroactively to that case.

>    RESPONSE TO NO. 188: Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 188 and on that basis denies them.

189.    Plaintiff's female colleague was also surprised that HBS had not applied its existing Research Integrity policy (*see* Doc. No. 6-2) to Plaintiff's case, a policy with which she was familiar.

> RESPONSE TO NO. 189: Harvard lacks sufficient knowledge to admit or
> deny the allegations in Paragraph 189 and on that basis denies them.

190.    This same colleague was also surprised that HBS had adopted the new Interim Policy without the customary disclosure to and vetting by HBS faculty, which were HBS's usual practice when promulgating new employment policies.

> RESPONSE TO NO. 190: Harvard lacks sufficient knowledge to admit or
> deny the allegations in Paragraph 190 regarding the colleague's state of
> mind and on that basis denies them. Further answering, Harvard denies that
> HBS's employment policies must be vetted by HBS faculty.

## III. Harvard Breaches Confidentiality Provisions in Numerous Policies and Spreads False and Defamatory Statements

### A. Confidentiality Policies

191.    At the bottom of every single page of the 41-page Final Report rendered by the investigation committee appeared the following paragraph:

> **THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL
> REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF
> ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS
> DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS
> PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS
> REQUIRED BY LAW.**

(All capitals and bold font in original.)

> RESPONSE TO NO. 191: The Final Report cited in Paragraph 191 is a written document that speaks for itself, and Harvard denies any characterization of this document.

192.     The Interim Policy, like the PHS Regulations on which it is based, recognizes that accusations of research misconduct are potentially devastating to an academic's professional reputation, and imposes conditions of *strict confidentiality* on allegations of research misconduct. Interim Policy at § (III) (D) (Doc. No. 6-2 at 3-4); *see* 42 C.F.R. § 93.108(a).

> RESPONSE TO NO. 192: The Interim Policy cited in Paragraph 192 is a written document that speaks for itself, and Harvard denies any characterization of this document.

193.     Under the Interim Policy, Harvard was obligated to limit disclosure of Professor Gino's research misconduct proceeding and the identity of Professor Gino, except on a need-to-know basis for the purpose of carrying out a fair proceeding, and to the extent required by law. *See* Interim Policy § (III) (D). (Doc. No. 6-2 at 3-4).[23] Consistent with the Interim Policy, the 2013 Research Integrity Policy also emphasizes Harvard's duties of confidentiality to a faculty member accused of misconduct, providing that: "It is important that, whatever process the Dean determines to be appropriate is thorough, fair, and objective," and should take into account "***protecting the rights and reputation[] of the individual accused.***" (Emphasis added.) (Doc. No. 6-1 at 1).

> RESPONSE TO NO. 193: The Interim Policy cited in Paragraph 193 is a written document that speaks for itself, and Harvard denies any characterization of this document.

---

[23] *See also* 42 C.F.R. §§ 93.108, 93.300(e).

194.    HBS normally (i.e., as a matter of recent and ongoing practice) utilizes its Faculty Review Board ("FRB") process to review both applications of faculty seeking tenure, as well as allegations of faculty misconduct, including alleged research misconduct.

RESPONSE TO NO. 194: Harvard denies the allegations in Paragraph 194.

195.    As a matter of its normal practice, when HBS convenes an FRB (i.e., a panel of tenured professors) to investigate allegations of faculty misconduct, it follows the FRB procedure set forth in the "Principles and Procedures for Responding to Matters of Faculty Conduct" ("FRB Principles"). Under the FRB Principles, in a case of *research misconduct*, the FRB applies the aforementioned 2013 Research Integrity Policy to evaluate alleged research misconduct by faculty (when no federal funding is involved).

RESPONSE TO NO. 195: Harvard denies the allegations in Paragraph 195.

196.    Little is known about specific misconduct cases, including research misconduct cases, that have been handled by HBS under the routine FRB process because, as stated in the FRB Principles, the expectation is that the *"work and activities of the FRB are considered private."* (Emphasis added.)

RESPONSE TO NO. 196: The allegations in Paragraph 196 are vague and Harvard therefore denies them. Further, the FRB Principles cited in Paragraph 196 is a written document that speaks for itself, and Harvard denies any characterization of this document.

197.    The FRB Principles, like the 2013 Research Integrity Policy and the Interim Policy, sets forth a duty of confidentiality, pursuant to which those involved *"are expected to respect the confidentiality of the process."* (Emphasis added.)

<u>RESPONSE TO NO. 197:</u> The policies cited in in Paragraph 197 are written documents that speak for themselves, and Harvard denies any characterization of these documents.

198.     According to the FRB Principles, (which generally apply to all types of misconduct proceedings at HBS), while "the FRB procedure aims to provide a framework to allow an appropriate resolution of concerns in a wide variety of circumstances," certain "principles and considerations shall guide those carrying out the FRB procedure," including that:

- *"Every reasonable effort should be made to protect the reputations of the individuals involved."*

- *"Privacy and confidentiality are important considerations; information generally should be shared only on a need-to-know basis, and consistent with what is practicable."*

<u>RESPONSE TO NO. 198:</u> The FRB Principles cited in Paragraph 198 is a document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 198.

199.     Tenured faculty protected by the provisions of the Discipline Policy are further afforded a reasonable expectation that, whenever discipline is proposed based on a charge of "grave misconduct," the case will be treated confidentially. (Doc. No. 6-12 at 7).

<u>RESPONSE TO NO. 199:</u> The Discipline Policy cited in Paragraph 199 is a written document that speaks for itself, and Harvard denies any characterization of this document.

200.     On information and belief, little is known of research misconduct cases that have been handled by other departments within Harvard and even at HBS because these proceedings are maintained in confidence pursuant to Harvard policy and/or applicable laws.

> RESPONSE TO NO. 200: The allegations in Paragraph 200 are vague and Harvard therefore denies them.

201.    In the course of the HBS investigation into allegations of Professor Gino's alleged research misconduct, Harvard and Dean Datar committed serious and significant breaches of confidentiality required by the Interim Policy, and other HBS and Harvard Policies, needlessly causing tremendous damage to Professor Gino's reputation, professional standing and economic interests.

> RESPONSE TO NO. 201: Harvard denies the allegations in Paragraph 201.

**(1)    Announcement of Professor Gino's administrative leave on the HBS website.**

202.    On or about June 13, 2023, HBS announced to the world that it had placed Plaintiff on administrative leave by prominently placing a banner on Professor Gino's faculty page on the HBS website. Next to Professor Gino's photo, following her name and title appear the words: **ADMINISTRATIVE                                    LEAVE.**                *See* https://www.hbs.edu/facuhy/Pages/profi]e.aspx?facId=271812 (All capital letters and bold font in original) (last visited July 26, 2023).

> RESPONSE TO NO. 202: Harvard admits the allegation in Paragraph 202 that HBS added to Plaintiff's faculty web page that she was on administrative leave. Harvard denies the remaining allegations in Paragraph 202.

203.    On June 22, 2023, Dean Datar sent an email to all faculty at the HBS, informing them that, "as reflected on Professor Gino's public Faculty & Research page, she is now on an

administrative leave," and connecting her status to the outcome and status of her research misconduct proceeding.

>RESPONSE TO NO. 203: The email cited in Paragraph 203 is a written document that speaks for itself, and Harvard denies any characterization of this document.

204.    On information and belief, HBS never previously sent out an email announcing the placement of a tenured member of the faculty on administrative leave to all members of the HBS faculty in connection with the status or outcome of the professor's research misconduct proceeding.

>RESPONSE TO NO. 204: Harvard admits the allegations in Paragraph 204. By way of further response, Plaintiff is the first tenured faculty member at HBS to have been found to have committed research misconduct and to have been put on administrative leave because of such finding.

205.    On information and belief, HBS never previously publicly announced the placement of a tenured professor on administrative leave on the faculty member's webpages on the HBS website as an immediate consequence of a research misconduct proceeding.

>RESPONSE TO NO. 205: Harvard admits the allegations in Paragraph 205. By way of further response, Plaintiff is the first tenured faculty member at HBS to have been found to have committed research misconduct and to have been put on administrative leave because of such finding.

206.    In the context of Harvard's numerous breaches of confidentiality, third parties reasonably understood HBS's public announcement of Professor Gino's administrative leave to be

connected to and a result of the outcome of her research misconduct proceeding and to mean that Professor Gino had falsified or fabricated data.

> RESPONSE TO NO. 206: Harvard denies the allegation in Paragraph 206 that it breached confidentiality.  Harvard lacks sufficient information to admit or deny the allegation in Paragraph 206 regarding what third parties understood, and on that basis denies this allegation. Harvard denies the remaining allegations in Paragraph 206.

207.   For example, on or about June 17, 2023, an individual using the web-moniker "Headtwerker" posted the following image from Professor Gino's faculty page off the HBR's website, on Reddit, under the headline: "BREAKING: HBS professor placed on 'administrative leave' following bombshell investigation into fake data":



See https://www.reddit.com/r/Professors/comments/14c64se/breaking hbs professor placed on administrative/ (last visited July 31, 2023).

> RESPONSE TO NO. 207: The post cited in Paragraph 207 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard further lacks sufficient knowledge to admit or deny the allegations in Paragraph 207 regarding this Reddit Post and on that basis denies the allegations in Paragraph 207.

**(2)      Excessive and factually erroneous retraction notices**

208.     On the evening of June 13, 2023, the HBS RIO, on behalf of Harvard, began to aggressively send out retraction notices to scholarly journals that published the papers at issue in Professor Gino's research misconduct proceeding. (Doc. No 6-3, Doc. No. 6-4, and Doc. No. 6-5).

> RESPONSE TO NO. 208: Harvard admits that Alain Bonacossa sent out retraction notices on June 13, 2023, and denies any characterization of those notices.

209.     The retractions omitted two salient facts: (a) that Harvard never established that Professor Gino was even the person *responsible* for perceived anomalies, (indeed, all of the evidence showed that, in each of the studies at issue, she was *not* the person who handled or collected the data); ***and*** (b) that Harvard *never proved* that Professor Gino had *any intent* to fabricate or falsify data.

> RESPONSE TO NO. 209: The allegations in Paragraph 209 state a legal conclusion to which no response is required. To the extent that a response is required, Harvard denies the allegations in Paragraph 209.

210.     To the extent that Harvard insisted on retractions with which Professor Gino adamantly disagreed, the manner in which Harvard notified journals of retractions of Professor Gino's articles was excessive and inconsistent with its normal practices and policies, including the Interim Policy, which required Harvard to protect Professor Gino's *reputation and right to confidentiality to the extent possible*. Instead, Harvard aggressively and selectively publicized details of its confidential investigation, and unreasonably did not allow Professor Gino, the author

of the studies in question, to work out the substance and timing of the retractions directly with the publishers of her articles to avoid unnecessary damage to her professional reputation.

RESPONSE TO NO. 210: Harvard denies the allegations in Paragraph 210.

211.   To the extent Harvard had concerns about the validity of the data, Harvard went far beyond what was reasonably necessary to correct the research record with retraction notices that falsely, and ***absent any evidence****,* conveyed that Plaintiff had intentionally tampered with data to affect the outcome of the study.

RESPONSE TO NO. 211: Harvard denies the allegations in Paragraph 211.

**i.      Retraction Notice to PNAS**

212.   On the evening of June 13, 2023, the RIO, Bonacossa, emailed a letter on HBS letterhead, to Dr. May R. Berenbaum, Ph.D., Editor-in-Chief of the journal, *Proceedings of the National Academy of Sciences of the America,* stating that that "[HBS] has reviewed concerns about certain data previously published by Dr. Francesca Gino in [the *2012 PNAS Paper*]. (**"Retraction Notice to PNAS."**) (Doc. No. 6-3). Attached to the Retraction Notice to PNAS as an appendix was a corresponding section of Data Colada's erroneous **December Report** and an MCG forensic report.

RESPONSE TO NO. 212: Harvard admits the allegation in Paragraph 212 that Alain Bonacossa sent out a retraction notice to the journal of Proceedings of the National Academy of Sciences of the America on June 13, 2023. The notice is a written document that speaks for itself, and Harvard denies any characterization of this document.  Harvard denies the remaining allegations in Paragraph 212.

213.    In the **Retraction Notice to PNAS**, the RIO referenced so-called "data anomalies" for Study 1 relative to discrepancies between data voluntarily posted by Professor Gino on the Open Sciences Framework ("OSF") in 2020 and a dataset that the RIO described as an "original dataset provided by a research assistant." *See* **Retraction Notice to PNAS**. (Doc. No. 6-3).

> RESPONSE TO NO. 213: The retraction notice cited in Paragraph 213 is a written document that speaks for itself, and Harvard denies any characterization of this document.

214.    This statement was demonstrably and verifiably *false.* The data provided to HBS by Professor Gino's former research assistant was in an Excel spreadsheet and was *not* the "original dataset" for Study 1. The "original dataset" for Study 1 had been *collected on paper* in 2010, a fact that was *clearly* documented in the original *2012 PNAS Paper*. (*See* Doc. No. 20-5 at 1029-31, 1033-34).

> RESPONSE TO NO. 214: Harvard denies the allegations in Paragraph 214.

215.    The PNAS Retraction notice was obviously excessive because the *2012 PNAS Paper had already been retracted.* Professor Gino and a team of collaborators had retracted the *2012 PNAS Paper* on March 16, 2020, (for reasons having nothing to do with alleged research misconduct by Plaintiff), after the experiment described in the study failed to replicate.

> RESPONSE TO NO. 215: Harvard denies the allegations in Paragraph 215.

### ii.    Retraction Notice to Psychological Science

216.    On June 13, 2023, the RIO emailed a letter on HBS letterhead to Dr. Patricia J. Bauer, Ph.D., Editor of the journal, *Psychological Science,* stating that "[HBS] has reviewed concerns about certain data previously published by Dr. Francesca Gino in [the *2015 Psychological Science Paper*] and [*the 2014 Psychological Science Paper*] ("Retraction Notice to

Psychological Science.") (Doc. No. 6-4). Attached to the Retraction Notice to Psychological Science were "two appendices" with copies of the related portions of Data Colada's false and defamatory December Report and an MCG forensic report. *Id*.

> RESPONSE TO NO. 216: Harvard admits the allegation in Paragraph 216 that Alain Bonacossa sent out a retraction notice to the journal of Psychological Science on June 13, 2023. The notice is a written document that speaks for itself, and Harvard denies any characterization of this document.  Harvard denies the remaining allegations in Paragraph 216.

217.    With respect to the *2015 Psychological Science Paper*, the RIO referenced so-called "data anomalies" for Study 4 relative to discrepancies in the data for this study, which had been voluntarily posted by Professor Gino on the Open Sciences Framework ("OSF"), and so-called "original data for Study 4 gathered using Qualtrics." (Doc. No. 6-4).

> RESPONSE TO NO. 217: The retraction notice cited in Paragraph 217 is a written document that speaks for itself, and Harvard denies any characterization of this document.

218.    The investigation committee erroneously concluded that the final OSF data contained new records not found in the Qualtrics studies based on an error made by MCG, which the committee incorporated into its Final Report. (*See* Doc. No. 20-5 at 22).

> RESPONSE TO NO. 218: Harvard denies the allegations in Paragraph 218.

**iii.    Retraction Notice to JPSP**

219.    On June 14, 2023, the RIO emailed a letter on HBS letterhead to Dr. Dolores Albarracin, Editor of *The Journal of Personality and Social Psychology,* stating that he was writing to inform her that "[HBS] has reviewed concerns about certain data previously published by Dr.

Francesca Gino in [the ***2020 JPSP Paper***] (*See* **"Retraction Notice to JPSP"**). (Doc. No. 6-5). Attached as "appendices" to the Retraction Notice to JPSP was a copy of the related portion of Data Colada's erroneous December Report and a portion of a MCG forensic report. *Id*.

> RESPONSE TO NO. 219: Harvard admits the allegation in Paragraph 219 that Alain Bonacossa sent out a retraction notice to the Journal of Personality and Social Psychology on June 13, 2023. The notice is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 219.

220.    In the Retraction Notice to PNAS, the RIO referenced so-called "data anomalies" for Study 3a relative to discrepancies between the data Professor Gino voluntarily posted on the Open Sciences Framework ("OSF") and data that the RIO erroneously referred to as an "original dataset gathered using Qualtrics." (Doc. No. 6-5).

> RESPONSE TO NO. 220: The retraction notice cited in Paragraph 220 is a written document that speaks for itself, and Harvard denies any characterization of this document.

221.    This statement was false. The data in Qualtrics was *not* the original data for Study 3a, as it was verifiably edited. Others besides Plaintiff had been involved in the research process and many of the alleged discrepancies were irrelevant to the study hypotheses.

> RESPONSE TO NO. 221: Harvard denies the allegations in Paragraph 221.

222.    At the top of each retraction notice, that is, the **Retraction Notice to PNAS**, **the Retraction Notice to Psychological Science,** and the **Retraction Notice to JPSP**, was the word: **CONFIDENTIAL.** (All capital letters and bold font in original.) In addition to unnecessarily and excessively publishing false and erroneous statements about Plaintiff's misconduct proceeding to

the scientific journals, Harvard also breached its duty of confidentiality by unnecessarily disclosing information about the retraction notices, themselves, to persons other than the editors of these journals.

> RESPONSE TO NO. 222: The retractions notices cited in Paragraph 222 are written documents that speak for themselves, and Harvard denies any characterization of these documents. Harvard denies the remaining allegations in Paragraph 222.

**(3)** **Excessive, False and Defamatory Retraction Notices to Co-Authors.**

223.    On the evening of June 13, 2023, the HBS RIO reached out to Professor Gino's co-authors on the papers at issue in her research misconduct proceeding. The emails the RIO sent told co-authors that "our process has concluded" and that HBS believed that the results of the studies in question are invalid "*due to alteration of data that affects the significance of the findings.*" The RIO attached a formal notification, which included a summary of the data discrepancies, and that informed co-authors that HBS had notified journals' editors with a recommendation that articles be retracted.

> RESPONSE TO NO. 223: Harvard admits that the HBS RIO sent out retraction notices on June 13, 2023. By way of further response, the emails cited in Paragraph 223 are written documents that speak for themselves, and Harvard denies any characterization of these documents.

224.    With these emails, Harvard again publicized the flawed outcome of the HBS investigation, while erroneously suggesting that Harvard had proved Plaintiff had falsified and/or fabricated data, conduct that Harvard had *never proved* under its own policy, omitting details as to the inadequacy of the HBS investigation and the unfair and biased decision, including the

investigative committee's reliance on Data Colada's unwarranted inferences of "tampering" and the inconclusive and non-probative information contained in the MCG forensic reports.

> RESPONSE TO NO. 224: The emails cited in Paragraph 224 are written documents that speak for themselves. To the extent a response is required, Harvard denies the allegations in Paragraph 224.

225. On June 14, 2023, the HBS Senior Associate Dean for Faculty Development and Research, Professor Robin Greenwood, met with Professor Gino's colleagues in her unit, the Negotiation, Organizations & Markets unit ("NOM") at HBS and disclosed to them both the finding of research misconduct and that she had been placed on administrative leave. Doctoral students under Professor Gino's mentorship were also informed by the HBS Doctoral Office staff about the finding of research misconduct and the administrative leave. Dean Datar's office also reached out to other colleagues of Professor Gino to inform them that she had been placed on administrative leave.

> RESPONSE TO NO. 225: Harvard admits the allegation in Paragraph 225 that members of the Negotiation, Organization & Marketing unit at HBS and doctoral students for whom Plaintiff then was serving as a mentor were informed that Plaintiff was on administrative leave. The remaining allegations in Paragraph 225 are vague and Harvard therefore denies them.

226. As a result of Harvard's breach of confidentiality, on June 15, 2023, after an HBS professor reached out to her, an author contacted the editor of Portfolio, Professor Gino's book publisher, and falsely stated to the editor at Portfolio that Professor Gino had ***"committed fraud"*** and that this would become public very soon. Professor Gino's book (All Hands: How Diverse

Teams Win) was scheduled to be published on February 13, 2024, but as a result of the publicity of alleged "fraud," is now delayed until February 5, 2025.

> RESPONSE TO NO. 226: Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 226 that an author contacted Portfolio and the date that *All Hands: How Diverse Teams Win* was scheduled to be published. Harvard denies the remaining allegations in Paragraph 226.

227.    When Professor Gino contacted Dean Cunningham to question whether a faculty member should have contacted her publisher in this manner, Dean Cunningham told Professor Gino, "no," but added that, once the "retraction" notices are out, "everyone" would know her situation. Cunningham's statement suggests that Harvard intended to severely damage Professor Gino's reputation through the issuance of the false and defamatory retraction notices which were not intended to remain confidential.

> RESPONSE TO NO. 227: Harvard denies the allegations in Paragraph 227.

228.    On June 16, 2023, *The Chronicle of Higher Education* published an article, that referenced the allegations against Professor Gino's work in Study 1 in the *2012 PNAS Paper,* and featured the comments from Professor Max Bazerman ("Bazerman"), a colleague of Professor Gino's in the NOM unit at HBS and also a co-author with Professor Gino of the *2012 PNAS Paper*:

> Almost two years ago, a famous study about a clever way to prompt honest behavior was retracted due to an ironic revelation: It relied on fraudulent data. But The Chronicle has learned of yet another twist in the story.

> According to one of the authors, Harvard University found that the study contained even more fraudulent data than previously revealed and it's now asking the journal to note this new information. The finding is part of an

investigation into a series of papers that Harvard has been conducting for more than a year, the author said.

Details about the reported fabrications are unclear. Francesca Gino, a world-renowned Harvard Business School professor who studies dishonesty, and is a coauthor on the disputed study, is now on administrative leave, according to her faculty page.

*See* "A Weird Research-Misconduct Scandal About Dishonesty Just Got Weirder," by Stephanie Lee, available at: https://www.chronicle.com/article/a-weird-research-misconduct-scandal-about-dishonesty-just-got₁weirder?bc nonce=1qs2zmrz1wl2eepaO50jf3&cid=reg wall signup

> RESPONSE TO NO. 228: The article cited in Paragraph 228 is a written document that speaks for itself, and Harvard denies any characterization of this document.

229.     The reporter at *The Chronicle of Higher Education* noted that HBS had announced on Professor Gino's faculty webpage that she was on "administrative leave," and hinted that the reason was connected to the Harvard "investigation" of "fraudulent data" and suggested that Professor Gino's job and future at Harvard were at risk:

> And as of recently, [Professor Gino's] role at Harvard is unclear. Within the last month, her faculty website was updated to say that she is on administrative leave, according to screenshots captured by the Wayback Machine.

*See id.*

        <u>RESPONSE TO NO. 229:</u> The article cited in Paragraph 229 speaks for itself, and Harvard denies any characterization of this article.

230.    Harvard had no legitimate reason to disclose to Bazerman or Plaintiff's other HBS colleagues confidential information concerning either Professor Gino's research misconduct proceeding or the pending retractions of her scientific journal articles. Harvard's breach of its duties of confidentiality is evident by Bazerman's comments to the reporter from *The Chronicle of Higher Education,* in which he made unwarranted assumptions concerning "altered data" and the HBS investigation:

> The alleged new problems involve experiment No. 1 — one of the two conducted in a lab with students. Bazerman told The Chronicle that on Tuesday, ***Harvard informed him that it believed fabricated data for this experiment made it invalid***.

> According to Bazerman, Harvard provided a 14-page document with what he described as 'compelling evidence' of data alterations. Their analysis found that somebody had accessed a database and added and altered data in the file, he said.

> "I did not have anything to do with the fabrication," he told The Chronicle.

> According to Bazerman, Harvard is recommending to the Proceedings of the National Academy of Sciences that it update the study's retraction notice to reflect its new concerns.

-85-

Bazerman told The Chronicle that his understanding is that the 2012 paper

is one of four papers 'of significant concern' to Harvard. He declined to

identify the other three, but said he was not a co-author on them.

*Id.* (Emphasis added.)

RESPONSE TO NO. 230: The article cited in Paragraph 230 is a document

that speaks for itself, and Harvard denies any characterization of this article.

Harvard denies the remaining allegations in Paragraph 230.

231.    As a result of Harvard's breach of confidential information concerning Professor

Gino's research misconduct proceeding and retraction notice, Bazerman made statements to the

media containing rumors and factual inaccuracies, including that, "[Harvard's] analysis found that

somebody had accessed a database and added and altered data in the file," statements that were

false.

RESPONSE TO NO. 231: Harvard denies the allegations in Paragraph 231

that Harvard breached confidentiality. Harvard lacks sufficient knowledge

to admit or deny the remaining allegations in Paragraph 231 and on that

basis denies them.

232.    Under the Interim Policy, the Complainant of research misconduct "is responsible

for making allegations in good faith" and "maintaining confidentiality" Interim Policy § (III) (E).

(Doc. No. 6-2 at 4). The complainant "*is not entitled to receive information about the status or

outcome of that process." Id.*

RESPONSE TO NO. 232: The Interim Policy cited in Paragraph 232 is a

written document that speaks for itself, and Harvard denies any

characterization of this document.

233.    Consequently, between June 17, 2023 and June 30, 2023, Data Colada posted a four-part series of blogs (Doc. Nos. 6-6, 6-7, 6-8, 6-9) that was substantially similar to its erroneous December Report which it submitted to Harvard's investigation committee and that corresponds to the four studies that were the subject of its original allegations to HBS in July 2021.[24]

> RESPONSE TO NO. 233: The blog posts cited in Paragraph 233 are written documents that speak for themselves, and Harvard denies any characterization of these documents. To the extent that a response is required, Harvard denies the allegations in Paragraph 233.

234.    In violation of the Interim Policy, immediately following Dean Datar's June 13, 2023 decision, Harvard disclosed confidential information concerning Professor Gino's research misconduct process with third parties that enabled Data Colada, the purported "complainant," to ascertain the status and outcome of Harvard's process.

> RESPONSE TO NO. 234: Harvard denies the allegations in Paragraph 234.

235.    With Harvard's public announcement of professor Gino's placement on administrative leave, its aggressive, excessive, and false retraction notices, and Harvard's disclosures to third-parties, including HBS faculty within Professor Gino's NOM unit about Professor Gino's research misconduct proceeding, Harvard set in motion the destruction of Professor Gino's well-earned professional reputation and standing in a matter of a few days.

> RESPONSE TO NO. 235: Harvard denies the allegations in Paragraph 235.

---

[24] In a July 18, 2023 webinar titled "Data Fraud and What to do Next: A conversation with Uri Simonsohn and Maurice Schweitzer," Data Colada member Simonsohn clarified that there was "no evidence" that Plaintiff had manipulated data. Simonsohn stated (at min 8:47): "Nobody has unambiguously claimed that this was Francesca Gino . . . The retractions don't say that. They just say data she had and data she posted. Uh, my belief is that she did it, but there's no evidence of that. But, but it doesn't really matter." A recording of the webinar can be found here: https://www.youtube.com/watch?v=OPUKyeetdt8&t=6s It was publicized here: https://iafcm.org/data-fraud/

236.     Data Colada's Blog Posts 1 through 4, in their many references to Professor Gino's misconduct proceeding and the pending retraction notices, provide further evidence of Harvard's breach of confidentiality. (Doc. Nos. 6-6, 6-7, 6-8, 6-9).

> RESPONSE TO NO. 236: The blog posts cited in Paragraph 236 are written documents that speaks for themselves, and Harvard denies any characterization of these documents. To the extent that a response is required, Harvard denies the allegations in Paragraph 236.

237.     After Data Colada launched its 4-part blog posts series, Professor Gino began to receive venomous, misogynistic hate emails from people all over the world.

> RESPONSE TO NO. 237: Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 237 and on that basis denies them.

238.     On June 22, 2023, Harvard implicitly admitted its failure to protect Professor Gino's confidentiality when Dean Datar's office sent out an official email to all faculty members at HBS (but mysteriously excluding Professor Gino), with the subject "Chronicle of Higher Education piece on Francesca Gino." Dean Datar's email reminded recipients that, *"[w]hile I know you may have questions, confidentiality is an important consideration in these matters*." (Emphasis added.)

> RESPONSE TO NO. 238: Harvard denies the allegation in Paragraph 238 that it breached any confidentiality obligation to Plaintiff. The email cited in Paragraph 238 is a written document that speaks for itself, and Harvard denies any characterization of this document.

239.     Following Data Colada's release of Blog Post 1 on June 17, 2023, headlines from major newspapers throughout the world evidence the immediate and widespread damage to

Plaintiff's professional reputation caused by Harvard's breach of confidentiality and Harvard and Data Colada's false and defamatory statements. For example:

- The Guardian: "*Harvard Professor Who Studies Honesty Accused of Falsifying Data In Studies*," (Maya Yang, June 25, 2023);

- Daily Caller: "*Harvard Honesty Expert Accused of Academic Dishonesty,*" (Gretchen Clayson, June 25, 2023);

- FOX: "*'Leading Scholar' at Harvard Accused of Fabricating Findings In Famous Study on Honesty*," (Gabriel Hays, June 25, 2023);

- The Washington Post: "*Harvard Professor Who Researches Honesty Accused of Falsifying Data,*" (Matt Delaney, June 25, 2023).

> RESPONSE TO NO. 239: The documents cited in Paragraph 239 are written documents that speak for themselves, and Harvard denies any characterization of these documents. Harvard denies the allegation in Paragraph 239 that it breached any confidentiality obligation to Plaintiff.

240.  Within days of Harvard's breach of confidentiality and Data Colada's ensuing blog posts, false allegations of research misconduct reverberated on the internet, and were repeated in multiple platforms and contexts, including, as but one example, in the following reviews on Amazon.com for Plaintiff's latest book, *Rebel* Talent, which reflect Data Colada's terminology ("fraud") and Harvard's public announcement of her administrative leave:



RESPONSE TO NO. 240: The reviews cited in Paragraph 240 are written documents that speak for themselves, and Harvard denies any characterization of these documents. Harvard denies the remaining allegations in Paragraph 240.

241.     Within days of Harvard's breach of confidentiality and Data Colada's ensuing blog posts, academic journals started to take steps to remove Professor Gino from their editorial board, without contacting her directly.

RESPONSE TO NO. 241: Harvard denies the allegation in Paragraph 241 that it breached confidentiality. Harvard lacks sufficient knowledge to admit

or deny the remaining allegations in Paragraph 241 and on that basis denies them.

242.    Within days of Harvard's breach of confidentiality and Data Colada's ensuing blog posts, Professor Gino started receiving emails and phone calls from clients with whom she had ongoing or existing contractual relationships, asking for those contracts to be terminated to avoid potential "liability" or "bad press." *All* of those contractual relationships, except for one, were terminated or postponed until Professor Gino's reputation is restored. These clients took these actions because they saw Plaintiff's placement on administrative leave by HBS and Data Colada's ensuing blog posts.

> RESPONSE TO NO. 242: Harvard denies the allegation in Paragraph 242 that it breached confidentiality. Harvard further lacks sufficient knowledge to admit or deny the remaining allegations in Paragraph 242 and on that basis denies them.

## IV.    Selective Enforcement of the Interim Policy.

243.    Plaintiff has been told by multiple colleagues at Harvard, including Senior Associate Dean Pisano, who has worked for HBS for 35 years, that her treatment throughout the HBS proceeding and the outcome *would have been different if she had been a male*.

> RESPONSE TO NO. 243: Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 243 regarding what colleagues have stated to Plaintiff, and on that basis denies them.

244.    On information and belief, neither HBS nor Harvard has ever fired, constructively discharged, or recommended revoking the tenure of ***any*** male full professor whom Harvard has found responsible for research misconduct.

RESPONSE TO NO. 244: The allegations in Paragraph 244 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 244.

245.    On information and belief, neither Harvard nor HBS has ever previously terminated, suspended, placed on unpaid administrative leave for two years, constructively discharged, demoted, removed from duty, or otherwise disciplined **any** male tenured professor without the procedural protections provided under the Discipline Policy.

RESPONSE TO NO. 245: Harvard denies the allegations in Paragraph 245.

246.    The 2013 Research Integrity Policy that HBS abandoned is similar to the Interim Policy in that it also incorporates the definition of "research misconduct" provided for under the aforementioned PHS Regulations.

RESPONSE TO NO. 246: The 2013 Policy and Interim Policy cited in Paragraph 246 are written documents that speak for themselves, and Harvard denies any characterization of these documents.

247.    In addition, under the 2013 Research Integrity Policy, the Dean is authorized to appoint an individual or a committee to investigate the allegation, who will then make a recommendation to the Dean.

RESPONSE TO NO. 247: The 2013 Policy cited in Paragraph 247 is a written document that speaks for itself, and Harvard denies any characterization of this document.

248.    However, the 2013 Research Integrity Policy is far less onerous than the Interim Policy in terms of its procedures and overall treatment of a faculty member accused of research misconduct. Unlike the Interim Policy, the existing 2013 Research Integrity Policy expressly

"permitted flexibility" in its procedures, and did not subject an employee to the sequestration of documents, did not impose strict deadlines on the completion of any phase of the investigation, and, most significantly, did not impose any particular disciplinary action to be taken against a faculty member's employment or status as a tenured faculty member.

> RESPONSE TO NO. 248: The 2013 Policy and Interim Policy cited in Paragraph 248 are written documents that speak for themselves, and Harvard denies any characterization of these documents. Harvard denies the remaining allegations in Paragraph 248.

249. In particular, unlike the Interim Policy, the 2013 Research Integrity Policy:

(1) placed no limits on the dean's ability to request additional information at any phase in the proceeding;

(2) imposed no particular structure on either the assessment or investigation of allegations, (whereas the Interim Policy imposed a stringent, 2-tier process (consisting of an inquiry and investigative phase), modeled after the regime set forth in the PHS Regulations);

(3) placed no limit on the accused's right to seek support from persons who might serve as an advisor(s), from within or outside the university, (whereas the Interim Policy permitted the respondent to "choose up to two personal advisors for support during the process");

(4) did not require taking custody and sequestration of the respondent's research records and email records;

**(5)**     placed no time limits on any aspect of the process, whereas the
Interim Policy imposed strict time limits, including, *inter alia*: (a) ten (10)
business days for "a respondent" (i.e., Plaintiff) to comment on the inquiry
committee's draft inquiry report; (b) a conclusion of a "final inquiry report"
and decision on whether an investigation is warranted within 60 calendar
days of initiation of the initial inquiry; (c) 30 days for "the respondent" (i.e.,
Plaintiff) to submit comments on the investigation committee's draft
investigation report; and (d) 120 days for the completion of the
investigation.

**(6)**     did not threaten an accused "respondent" with sanctions, up to
termination of employment, for breaching confidentiality, a prohibition that
effectively precludes an accused's ability to secure witnesses in their
defense.

> RESPONSE TO NO. 249: The 2013 Policy and Interim Policy cited in
> Paragraph 249 are written documents that speak for themselves, and
> Harvard denies any characterization of these documents. Harvard denies the
> remaining allegations in Paragraph 249.

250.     Importantly, whereas the 2013 Research Integrity Policy authorizes the dean to
"decide the matter and take whatever action he or she believes justified," the 2013 Research
Integrity Policy does not purport to authorize the dean to impose any specific *adverse employment
action* against a tenured Professor, (e.g., to suspend, to demote, or terminate).

> RESPONSE TO NO. 250: The 2013 Policy cited in Paragraph 250 is a
> written document that speaks for itself, and Harvard denies any

characterization of this document. Harvard denies the remaining allegations in Paragraph 250.

251.    The 2013 Research Integrity Policy does not purport to supersede the terms of Plaintiff's appointment as a tenured Professor, or to supersede Harvard's collective policies and procedures, including the Tenure Policy, the Third Statute, and the Discipline Policy.

>    RESPONSE TO NO. 251: The 2013 Policy cited in Paragraph 251 is a written document that speaks for itself, and Harvard denies any characterization of this document.

252.    In contrast, the Interim Policy purported to authorize the Dean of HBS to take the following adverse employment actions against Plaintiff: "*suspension, leave without pay, salary reduction,*" and "*initiation of steps leading to rank reduction or termination of employment.*" (Emphasis added). Like the Interim Policy, the 2013 Research Integrity Policy also emphasized Harvard's duties of confidentiality and fairness to the professor accused of misconduct, providing that: "It is important that, whatever process the Dean determines to be appropriate is thorough, fair, and objective," and should take into account "protecting the rights and reputation[] of the individual accused." In the past, HBS utilized its Faculty Review Board process to review both applications of faculty seeking tenure, as well as allegations of faculty misconduct, including alleged research misconduct.

>    RESPONSE TO NO. 252: The Interim Policy cited in Paragraph 252 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 252.

253.     In November 2019, a male junior professor, "John Doe," [25] employed at HBS who was charged with research misconduct received no sanction by Harvard. Defendants did not subject Mr. Doe to the procedurally onerous Interim Policy but instead used HBS's existing 2013 Research Integrity Policy and Faculty Review Board ("FRB") process to investigate the allegations against him. Consistent with the established 2013 Research Integrity Policy and the FRB Principles, when questions were raised about the research processes performed by a male junior professor at HBS, John Doe, HBS convened an FRB to investigate.

RESPONSE TO NO. 253: Harvard denies the allegations in Paragraph 253.

254.     Because Harvard and HBS have historically safeguarded the confidentiality and reputation of a faculty member accused of misconduct, including research misconduct, Professor Gino only knows about Mr. Doe's proceeding because HBS asked her to serve as a "witness" in her male colleague's FRB process. Plaintiff is aware that, in Mr. Doe's case, the FRB process consisted of the FRB speaking with senior faculty and others at HBS who advised Mr. Doe on his research or writing. All of the questions Plaintiff was asked as a witness during Mr. Doe's research misconduct proceeding before the FRB committee were phrased in a leading way to help establish his innocence.

RESPONSE TO NO. 254: Harvard denies the allegations in Paragraph 254.

255.     In contrast to its treatment of Plaintiff, HBS protected the confidentiality of Mr. Doe, and it subsequently awarded him tenure.

RESPONSE TO NO. 255: Harvard denies the allegations in Paragraph 255.

256.     When HBS introduces new policies that affect faculty members, it normally announces them to the entire faculty after vetting them and receiving faculty input.

---

[25] A pseudonym is used to avoid unfairly stigmatizing this faculty member.

RESPONSE TO NO. 256: Harvard denies the allegations in Paragraph 256.

257.    HBS never announced the Interim Policy to faculty, and never vetted it through HBS's customary, collaborative process before applying it to Plaintiff's case.

RESPONSE TO NO. 257: Harvard denies the allegations in Paragraph 257.

258.    On November 4, 2021, soon after Plaintiff learned of the allegations against her, she asked the RIO, Bonacossa, to share the previous version of the Interim Policy, dated August 2021. Bonacossa indicated that, "[t]he [Interim Policy] was established in August 2021, and that "[he] [did] not have a copy of the previous policy."

RESPONSE TO NO. 258: Harvard admits the allegations in Paragraph 258. By way of further response, the 2013 Policy was available on HBS's internal website to which Plaintiff had access.

259.    After Defendants imposed sanctions upon Plaintiff under the Interim Policy, the 2013 Research Integrity Policy was still available for download on HBS's internal website for Faculty Staff and Students and remained the official HBS policy for investigating and evaluating allegations of research misconduct by faculty. On information and belief, HBS did not announce the Interim Policy on its website until after Plaintiff filed this lawsuit.

RESPONSE TO NO. 259: Harvard admits the allegation in Paragraph 259 that the 2013 Policy is still available on HBS's internal website. Harvard denies the remaining allegations in Paragraph 259.

260.    In another recent case, another male associate professor employed at HBS who was charged with a blatant and obvious disregard of Harvard's conflict of interest policy received no sanction by Harvard and Dean Datar. It was undisputed that the male professor had written scholarly articles about the development of cryptocurrencies without disclosing in his working

papers that he had a financial interest in the product and was working in collaboration with a firm to develop cryptocurrencies.

RESPONSE TO NO. 260: Harvard denies the allegations in Paragraph 260.

261.    Despite the obvious conflict of interest and the undisputed and serious violations of HBS standards of conduct and ethics by this male professor, who was only an associate professor, not a full tenured professor like Plaintiff, he received no sanction from HBS. At the conclusion of the FRB process, the FRB concluded that the male professor had demonstrated "poor judgment," and Harvard and Dean Datar took no adverse action against his employment.

RESPONSE TO NO. 261: Harvard denies the allegations in Paragraph 261.

A.    **Defendants Subject Female Professors to Disproportionately Harsher Sanctions Than Male Faculty.**

262.    Female faculty members at HBS facing accusations of misconduct have received disproportionately harsher treatment than male faculty members, even when the charges against them are for lesser violations or not substantiated.

RESPONSE TO NO. 262: Harvard denies the allegations in Paragraph 262.

263.    In one such case, a female professor, "Jane Roe,"[26] was accused by her colleagues of treating staff and research assistants poorly—a violation of the "colleagueship" standard. Dean Cunningham (who presently functions as Dean Datar's right-hand woman) and previous HBS Dean Nitin Nohria determined the allegations warranted an FRB process. After the FRB report concluded that the issues against Ms. Roe were not sufficiently serious to warrant sanctions, the former HBS dean overruled the report and "counseled her out" (i.e., convinced her to resign).

RESPONSE TO NO. 263: Harvard denies the allegations in Paragraph 263.

---

[26] Pseudonyms are used in reference to the former female employees whom Defendants have subjected to discriminatory treatment by forcing them out of their teaching jobs at Harvard to avoid unfairly stigmatizing them.

264.     Even after prominent senior female faculty met with the former HBS dean to protest that this seemed unfair and inconsistent with how similarly situated male faculty had been treated, HBS refused to change its position.

> RESPONSE TO NO. 264: Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 264 and on that basis denies them.

265.     On information and belief, in the course of handling Jane Roe's case, it was revealed that male professors had treated staff and research assistants poorly (the same violation of colleagueship of which Jane Roe had been accused), but these male professors were not made to go through FRB processes. In other words, the same or similar allegations, when about *male* professors, did not trigger an FRB process.

> RESPONSE TO NO. 265: Harvard denies the allegations in Paragraph 265.

266.     Defendants have a history of pushing out female faculty members who become the focus of negative media attention. In a second case involving allegations against an HBS female professor's purported violations of the so-called "colleagueship standard," Dean Cunningham and Dean Datar determined that the allegations did not warrant an FRB process. Some time later, when said female professor was preparing materials for promotion to tenure, the accusations resurfaced and this time the accuser threatened to file a lawsuit. Despite that there was no new information, Dean Cunningham and Dean Datar—faced with the negative publicity of a potential lawsuit— determined an FRB was now appropriate.

> RESPONSE TO NO. 266: Harvard denies the allegations in Paragraph 266.

267.     On information and belief, HBS used the FRB process to intimidate this female professor into leaving HBS and succeeded in "counseling her out" on the basis of unsubstantiated

violations of the "colleagueship standard," (and before she could apply for promotion to a tenured position at HBS).

RESPONSE TO NO. 267: Harvard denies the allegations in Paragraph 267.

268. On information and belief, there is no single instance of a male faculty member at HBS being "counseled out" for an alleged violation of the "collegiality" standard.

RESPONSE TO NO. 268: The allegations in Paragraph 268 are vague and Harvard therefore denies them. To the extent a response is required, Harvard denies the allegations in Paragraph 268.

269. In contrast to its treatment of female faculty, Defendants have allowed male faculty at HBS and other schools to remain in their positions and to retain their salary and benefits, even *after* finding them responsible for egregious misconduct, including severe sexual harassment against female junior professors and students.

RESPONSE TO NO. 269: Harvard denies the allegations in Paragraph 269.

270. Defendants have not fired similarly-situated-tenured male faculty, or subjected them to unpaid administrative leave, based on alleged research misconduct. *See, e.g.,* "Fire Marc Hauser," available at https://www.thecrimson.com/article/2011/4/27/harvard-faculty-academic-university/ (discussing Faculty of Arts and Sciences' treatment of tenured professor Marc Hauser). On information and belief, Professor Hauser remained a psychology professor at Harvard following a three-year investigation by Harvard that found him responsible for research misconduct until he chose to resign, without a constructive discharge or the institution of tenure revocation proceedings.

RESPONSE TO NO. 270: Harvard admits that Marc Hauser was found responsible for research misconduct and resigned from Harvard. The article

cited in Paragraph 270 is a written document that speaks for itself, and Harvard denies any characterization of this document. The remaining allegations in Paragraph 270 state a legal conclusion to which no response is required.

271.     When publicized complaints of plagiarism were made against two male Harvard Law School Professors, Laurence Tribe and Charles Ogletree, although the allegations were apparently undisputed, both remained employees at Harvard and neither was subjected to a procedurally onerous investigation or sanctions like Plaintiff. *See* https://www.thecrimson.com/article/2005/6/9/punishing-its-own-hours-after-news/.

RESPONSE TO NO. 271: The article cited in Paragraph 271 is a written document that speaks for itself, and Harvard denies any characterization of this document.

272.     And, when a federal court found economics professor Andrei Shleifer liable for conspiracy to defraud the U.S. government while leading a Harvard economic reform program in Russia, Harvard not only refused to fire Shleifer, but it also went so far as to pay $26.5 million to settle a government lawsuit against him.   *See* "Fire Marc Hauser," available at https://www.thecrimson.com/article/2011/4/27/harvard-faculty-academic-university/.

RESPONSE TO NO. 272: The article cited in Paragraph 272 is a written document that speaks for itself, and Harvard denies any characterization of this document.

273.     Schleifer currently holds a position as an HBS Visiting Professor.  Even when Harvard has felt compelled to place male tenured professors on administrative leave amidst highly publicized allegations of sexual misconduct, Harvard has routinely placed such male professors

on **paid** administrative leave, and permitted these male professors to return to their teaching and administrative roles, *see, e.g.,* John Comaroff (following two years of administrative leave for sexual harassment and retaliation, returned to classroom);[27] and Jorge Dominguez (after being "barred from administrative responsibilities for three years" for sexual harassment, permitted to hold high-level positions at Harvard),[28] or else permitted such male faculty to quietly retire with salary, reputation, and benefits intact, *see, e.g.,* the case of Gary Horton (sexual misconduct).[29]

> RESPONSE TO NO. 273: The articles cited in Paragraph 273 are written documents that speak for themselves, and Harvard denies any characterization of these documents. To the extent a response is required, Harvard denies the allegations in Paragraph 273.

## V.   Additional Indicia of Discriminatory Animus

274.    Prior to becoming dean of HBS in January of 2021, Dean Datar had been a tenured professor at HBS and had taught in HBS's Accounting & Management Unit since the mid-1990s.

> RESPONSE TO NO. 274: Harvard admits the allegations in Paragraph 274.

---

[27] *See* Meimei Xu*, Following Sexual Harassment Allegations, Comaroff Returns to Teaching at Harvard, Sparking Outrage,* (June 27, 2022), *THE HARVARD CRIMSON,* https://www.thecrimson.com/article/2022/6/24/comaroffreturns-aaas ("After being placed on two years of administrative leave due to allegations of sexual harassment and retaliation, Harvard professor John L. Comaroff will return to the classroom to teach an elective course this fall").

[28] *See* Laura Ly, *Harvard professor retires amid allegations of sexual misconduct,* (March 7, 2018), *CNN.COM* ("A female junior professor "filed a complaint with the [Respondent Harvard] in 1983 and Dominguez was found guilty of 'serious misconduct.' Although he was barred from administrative responsibilities for three years, Dominguez was allowed to remain at the university and went on to hold various positions of power, including vice provost for international affairs."), https://www.cnn.com/2018/03/06/us/harvard-professor-retires-amid-allegations-of-sexualmisconduct/index.html

[29] Ann Gibbons, *Harvard anthropology professor retires amid accusations of sexual harassment, Alleged victims dissatisfied with prospect of scholar's quiet retiremen*t, (July 14, 2020), https://www.science.org/content/article/harvard-anthropology-professor-retires-amid-accusations-sexual-harassment. ("Harvard put Urton on **paid** administrative leave on 2 June, the same day the anthropology department removed Urton from his position as director of undergraduate studies.") (emphasis added).

275.    Accounting & Management is a particularly unwelcome unit for female professors at HBS.  On information and belief, in 2019, there had not been a single tenured woman in the Accounting & Management Unit for more than 20 years.

RESPONSE TO NO. 275: Harvard denies the allegations in Paragraph 275.

276.    In the fall of 2022, during Appointments Committee meetings in which HBS tenured professors discuss faculty members under consideration for promotion, the tenured professors were reviewing the applications of two female professors for possible promotion within HBS's Accounting & Management Unit.  (One female professor was being considered for promotion to Associate Professor and the other one to a position as Full Professor with tenure).

RESPONSE TO NO. 276: Harvard admits the allegations in Paragraph 276.

277.    A male professor emeritus who has taught in the Accounting & Management Unit for over 35 years, went outside of the normal review process by drafting two letters in which he subjected each of the two female applicants to harsh criticism for their research.

RESPONSE TO NO. 277: Harvard denies the allegations in Paragraph 277.

278.    As a tenured professor, Plaintiff was present in this review process.  When she expressed to two of her female colleagues that she was troubled by the male professor's actions and language in the letters, they told her that that this was "always done" to women going through promotion in the Accounting & Management Unit.

RESPONSE TO NO. 278: Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 278 and on that basis denies them.

279.    Tenured faculty members participating in the discussion of candidates up for promotion were able to submit their feedback on a card, for review by Dean Datar, together with

their vote on the potential promotion. On her card, Plaintiff expressed her concern that two female applicants from the Accounting & Management Unit were subjected to a level of scrutiny to which their similarly situated male colleagues were not subjected in the review process.

> RESPONSE TO NO. 279: Harvard admits that Plaintiff submitted a feedback card. Harvard denies the remaining allegations in Paragraph 279.

280.   On information and belief, Dean Datar took no action to investigate Plaintiff's report or to correct the disparate treatment of women in the Appointments Process.

> RESPONSE TO NO. 280: Harvard denies the allegations in Paragraph 280.

### A.   Datar Cancels Inclusion Course

281.   After placing Plaintiff on unpaid administrative leave, Dean Datar cancelled the Inclusion course as a required MBA course offering in the fall of 2023.

> RESPONSE TO NO. 281: Harvard denies the allegations in Paragraph 281.

282.   As noted *supra*, the focus of the Inclusion course, which had been developed by Plaintiff and a female colleague, was the value of diverse leadership in business and creating more inclusive and gender equitable workplaces.

> RESPONSE TO NO. 282: Harvard admits the allegations in Paragraph 282 that the Inclusion course was developed by Plaintiff and another female HBS professor and that the focus of the course was the value of diverse leadership in business. Harvard denies the remaining allegations in Paragraph 282.

283.   On August 1, 2023, Dean Datar's office sent an email to all incoming MBA students announcing the cancellation of the Inclusion course, and blaming Plaintiff's administrative leave for the cancellation.

> RESPONSE TO NO. 283: Harvard denies the allegations in Paragraph 283.

284.    Faculty other than Plaintiff had already committed to teaching the Inclusion course in the fall of 2023.  If Dean Datar had wanted to continue to offer Inclusion as a required offering, he could have done so, regardless that Plaintiff was unavailable.

RESPONSE TO NO. 284: Harvard denies the allegations in Paragraph 284.

275.    Despite Plaintiff's tremendous achievements and success, her competence, knowledge, and credibility have been subjected to greater scrutiny during her employment by Harvard because of her sex in the male-dominated environment at HBS.

RESPONSE TO NO. 275: Harvard denies the allegations in Paragraph 275.[30]

276.    Even after Plaintiff became head of her unit at HBS in 2018, the Negotiations, Organizations, Markets ("NOM") Unit, she was second-guessed and subjected to heightened scrutiny by her male colleagues at HBS.

RESPONSE TO NO. 276: Harvard denies the allegations in Paragraph 276.

277.    Plaintiff was the only female Unit Head across the ten different units at HBS.[31]

RESPONSE TO NO. 277: Harvard denies the allegations in Paragraph 277.

278.    After Harvard appointed Srikant Datar as the new dean of HBS, effective January 1, 2021, Dean Datar, asked one of Plaintiff's male colleagues to take over her role as head of the NOM Unit.

RESPONSE TO NO. 278: Harvard denies the allegations in Paragraph 278.

279.    Due to institutional mistreatment of women, there has been an exodus of capable, bright female professors from HBS.  *See Tackling Gender Inequality at HBS: A Case Study*, Julia

---

[30] Plaintiff's Second Amended Complaint repeats Paragraphs 275-274, Harvard has responded to the allegations in the order that they appear in the Second Amended Complaint and therefore provides Responses to the out of order second set of Paragraphs numbered 275-284.
[31] As of July 2023, within the NOM Unit, male tenured professors outnumber female tenured professors 8 to 3.

E. Debenedictis, (May 4, 2016), *THE HARVARD CRIMSON*, https://www.thecrimson.com/article/2016/5/4/tacking-gender-inequality-at-hbs/.

RESPONSE TO NO. 279: Harvard denies the allegations in Paragraph 279.

280.    As of July 2023, male tenured professors outnumber female tenured professors 87 to 27.

RESPONSE TO NO. 280: Harvard denies the allegations in Paragraph 280.

281.    Women have left HBS because they have been unfairly denied tenure on the basis of sex.

RESPONSE TO NO. 281: Harvard denies the allegations in Paragraph 281.

282.    While the ratio of male to female assistant professors (beginning-level professors) is roughly equal (50/50), due to gender bias and discrimination, HBS has promoted female junior professors to positions as full tenured professors at a fraction of the rate of their male colleagues.

RESPONSE TO NO. 282: Harvard admits that the male to female assistant professors ratio is approximately equal. Harvard denies the remaining allegations in Paragraph 282.

283.    In the history of HBS, Harvard has hired a total of 107 senior lateral hires (i.e., "full professors" with tenure) to teach at HBS. Only seven (7) of these senior lateral hires have been women.

RESPONSE TO NO. 283: The allegations in Paragraph 283 are vague and Harvard therefore denies them. To the extent that a response is required, Harvard denies the allegations in Paragraph 283.

284.     Women have also left HBS because they have been pressured to resign from Harvard and to seek positions elsewhere due to disparate discipline and selective enforcement of employment policies.

RESPONSE TO NO. 284: Harvard denies the allegations in Paragraph 284.

285.     The following tables show the proportion of male and female faculty at all levels at HBS, as of July 2023, and illustrates the significant decline in the proportion of female faculty at the more senior levels:

**OVERALL, across units (total number)**

|  | Assistant | Associate | Full | Senior Lecturer | Professor of Management Practice | Visiting Professor | Emeritus |
|---|---|---|---|---|---|---|---|
| Female | 35 | 14 | 27 | 20 | 1 | 0 | 5 |
| Male | 35 | 21 | 87 | 55 | 11 | 10 | 26 |

**OVERALL, across units (%)**

|  | Assistant | Associate | Full | Senior Lecturer | Professor of Management Practice | Visiting Professor | Emeritus |
|---|---|---|---|---|---|---|---|
| Female | 50% | 40% | 24% | 27% | 8% | 0% | 16% |
| Male | 50% | 60% | 76% | 73% | 92% | 100% | 84% |

RESPONSE TO NO. 285: Harvard denies the allegations in Paragraph 285.

286.     As of today, the demographics shown in ¶ 285 remain substantially the same.

RESPONSE TO NO. 286: The allegations in Paragraph 286 are vague and Harvard therefore denies them.

287.     Against this backdrop of institutional gender bias, in July 2021, Defendants received false allegations against Plaintiff for purported research misconduct ("data fraud") and created a new policy to investigate the allegations and applied it retroactively to her case as opposed to relying on its existing policy and procedures.

RESPONSE TO NO. 287: Harvard denies the allegations in Paragraph 287.

288.    Throughout the so-called investigation process, an investigative committee handpicked by Dean Datar demonstrated Defendants' bias by disregarding evidence and testimony that could have exculpated Plaintiff of Data Colada's false allegations of "data fraud" and purported "research misconduct."

RESPONSE TO NO. 288: Harvard denies the allegations in Paragraph 288.

289.    One member of Dean Datar's hand-picked, three-member investigative committee included Robert S. Kaplan ("Kaplan"), a professor emeritus in the Accounting & Management Unit, the same unit where Dean Datar had himself taught for decades, and who was Dean Datar's mentor in his academic career.  In Kaplan's more than 35 years teaching in the Accounting & Management Unit, his HBS unit had not promoted a single woman.

RESPONSE TO NO. 289: Harvard admits the allegation in Paragraph 289 that Robert Kaplan and Dean Datar were in the Accounting and Management Unit at HBS and that Robert Kaplan was on the investigation Committee. Harvard denies the remaining allegations in Paragraph 289.

290.    After Defendants erroneously found Plaintiff "responsible" for purported "research misconduct," Defendants imposed disparately harsh and punitive sanctions against her employment, which included, among other things, placing Plaintiff on a two-year unpaid administrative leave, a sanction that, on information and belief, is without precedent at HBS.

RESPONSE TO NO. 290: Harvard admits the allegations in Paragraph 290 that Dean Datar imposed two-year unpaid administrative leave on Plaintiff. Harvard denies the remaining allegations in Paragraph 290.

**VI.**   **Defendants' Actions Have Deprived Plaintiff of Economic Opportunities at Harvard.**

291.    As a prolific author who is a tenured member of Harvard's faculty, Plaintiff has benefitted from opportunities to have her articles and books published by Harvard Business Publishing.

According to its website, Harvard Business Publishing is a "wholly-owned subsidiary of Harvard University, reporting into Harvard Business School," and markets to higher education, corporate learning, and managers and professionals around the world.

RESPONSE TO NO. 291: Harvard admits that Plaintiff had published with Harvard Business Publishing. By way of further response, the website cited in Paragraph 291 speaks for itself, and Harvard denies any characterization of this website. The remaining allegations in Paragraph 291 are vague and Harvard therefore denies them.

292.    Harvard Business Publishing publishes the "Harvard Business Review" ("HBR"), a general management magazine that is published six times a year. Plaintiff has regularly written articles for HBR.

RESPONSE TO NO. 292: Harvard admits the allegations in Paragraph 292.

293.    Plaintiff's publications for HBR are separate and apart from her duties as a Harvard employee.

RESPONSE TO NO. 293: Harvard denies the allegation in Paragraph 293.

294.     The benefits Plaintiff has enjoyed from publishing articles in the HBR are twofold. First, Professor Gino receives royalties for the sale of her articles by Harvard Business Publishing. Second, HBR offers published authors tremendous opportunities for exposure. Professor Gino has regularly received invitations from companies to do work with them (e.g., workshops, speaking engagements, and consulting) because of this exposure.

> RESPONSE TO NO. 294: Harvard admits the allegation in Paragraph 294 that Plaintiff has received royalties for the sale of her articles by Harvard Business Publishing. Harvard lacks sufficient knowledge to admit or deny the remaining allegations in Paragraph 294 and on that basis denies them.

295.     On July 10, 2023, Plaintiff was informed by an editor of HBR that HBS had instructed HBR not to publish Plaintiff's article unless she removed her name from it. The article was accepted and expected to be published in the next issue of HBR. As Plaintiff was told, unless HBS advised otherwise, HBR would either publish the piece without Plaintiff's name or pull the entire piece.

> RESPONSE TO NO. 295: Harvard denies the allegations in Paragraph 295 that HBS instructed Harvard Business Review not to publish Plaintiff's articles unless her name was removed from the publication. Harvard lacks sufficient knowledge to admit or deny the remaining allegations in Paragraph 295 and on that basis denies them.

296.     Plaintiff was also informed by an HBS colleague and staff members that HBS had asked for her name to be removed from HBS case studies and HBS multi-media case studies that were already completed and simply needed sign-off from protagonists (i.e., real-life business persons featured in case studies) in order to be published. HBS stated they would proceed with

publishing these cases only if other faculty members' names were substituted for Plaintiff's name. As in the case of the HBR article, even though removing or replacing Plaintiff's name would misrepresent authorship on completed work, HBS advocated this as a viable option. On information and belief, HBS has never previously advocated misrepresentation of authorship for any male faculty member charged with misconduct.

> RESPONSE TO NO. 296: Harvard denies the allegations in Paragraph 296 that HBS asked anyone to remove Plaintiff's names from completed case studies or that HBS would publish completed case studies if Plaintiff's name was substituted with another faculty member. Harvard lacks sufficient knowledge to admit or deny the remaining allegations in Paragraph 296 and on that basis denies them.

297.    Plaintiff has written a book, All Hands, How Diverse Teams Win. The book was to be published by Portfolio with an expected release on February 13, 2024. Due to the way in which Portfolio learned about the alleged misconduct—through a senior faculty member falsely telling them "Francesca committed fraud"—the publisher cancelled the anticipated publication date and pushed it back for another year. Plaintiff will only be paid the next installment of the advance on the book at the time it is published. By moving the publication date by a year, the payment is also delayed by a year. Similar to Plaintiff's articles for HBR, her books are also important in providing exposure that drives speeches, workshops and consulting work.

> RESPONSE TO NO. 297: Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 297 and on that basis denies them.

298.    But for Harvard and Dean Datar's breach of confidentiality, a faculty member at HBS would not have been unnecessarily informed of the status and outcome of Plaintiff's research

misconduct proceeding and would not have contacted Portfolio and falsely communicated that Plaintiff had committed "fraud" and that "the news would become public very soon."

RESPONSE TO NO. 298: Harvard denies the allegations in Paragraph 298.

299.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered damages, including tremendous financial costs, reputational harm, loss of existing contractual relations and prospective economic opportunities and advantage, mental anguish, physical pain and suffering, embarrassment, and severe emotional distress.

RESPONSE TO NO. 299: The allegations in Paragraph 299 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 299.

## COUNT I

## Violation of Title IX of the Education Amendments of 1972, U.S.C. § 1681 et seq.

### (As to Defendant President and Fellows of Harvard College)

300.    Plaintiff repeats and realleges each and every allegation hereinafter above as if fully set forth herein.

RESPONSE TO NO. 300: Harvard incorporates its responses to Paragraphs 1-299 of the Second Amended Complaint.

301.    Title IX of the Education Amendments of Title IX of the Education Amendments of 1972 20 U.S.C. § 1681 *et. seq.,* provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

RESPONSE TO NO. 301: The allegations in Paragraph 301 state a legal conclusion to which no response is required.

302.    Title IX applies to all public and private educational institutions that receive federal funding, including Defendant Harvard.

> RESPONSE TO NO. 302: The allegations in Paragraph 302 state a legal conclusion to which no response is required.

303.    Title IX may be violated by a school's imposition of discipline where gender is a motivating factor in the decision. *See Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979); *Harrington v. Lesley Univ.*, 554 F. Supp. 3d 211, 233 (D. Mass. 2021)

> RESPONSE TO NO. 303: The allegations in Paragraph 303 state a legal conclusion to which no response is required. To the extent a response is required, Harvard states that the referenced case law and statute speak for themselves, and any interpretation is hereby denied.

304.    Plaintiff is a female.

> RESPONSE TO NO. 304: Harvard admits the allegations in Paragraph 304.

305.    As described in the foregoing paragraphs, when Defendant Harvard abandoned its existing 2013 RI Policy and the procedures outlined in the FRB Principles, and created an onerous policy just for Plaintiff, it subjected Plaintiff to selective enforcement of a Policy, motivated by gender, in violation of Title IX.

> RESPONSE TO NO. 305: The allegations in Paragraph 305 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 305.

306.    Defendant Harvard has never previously applied the Interim Policy to allegations of research misconduct by a male professor at HBS.

> RESPONSE TO NO. 306: Harvard admits the allegation in Paragraph 306 that Plaintiff was the first person accused of research misconduct whose research was investigated under the Interim Policy for research misconduct.

307.    In 2019, Harvard applied its existing 2013 RI Policy and FRB process to investigate allegations of research misconduct made against a junior male faculty member, who was subjected to no punitive sanctions. Unlike the Interim Policy that Harvard created for Plaintiff, the 2013 RI Policy and FRB procedures do not specifically authorize the Dean of Faculty at HBS to terminate the employment of a tenured professor if found responsible for alleged research misconduct.

> RESPONSE TO NO. 307: Harvard denies the allegations in Paragraph 307. By way of further response, the policies cited in Paragraph 307 speak for themselves, and Harvard denies any characterization of these policies.

308.    Defendant Harvard has never placed a similarly situated tenured male professor at HBS on unpaid administrative leave or initiated tenure revocation proceedings based on allegations of research misconduct.

> RESPONSE TO NO. 308: Harvard denies the allegations in Paragraph 308. By way of further response, Harvard states that there have been no similarly situated tenured male professors at HBS who have been found to have engaged in research misconduct.

309.    Data Colada is known for targeting prominent female behavioral scientists and subjecting their work to unusually high scrutiny.

> RESPONSE TO NO. 309: Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 309 and on that basis denies them.

310.    Harvard and HBS are also known for treating female faculty less favorably than male faculty.

> RESPONSE TO NO. 310: Harvard denies the allegations in Paragraph 310.

311.    Harvard's gender bias against women was a motivating factor in HBS's decision to subject Plaintiff to an onerous investigation and to impose upon her severe penalties, including unpaid administrative leave for two years.

> RESPONSE TO NO. 311: The allegations in Paragraph 311 state a legal
> conclusion to which no response is required. To the extent a response is
> required, Harvard denies the allegations in Paragraph 311.

312.    As a consequence of Defendant Harvard's selective enforcement of the Interim Policy, Plaintiff has suffered harms that no similarly situated male tenured professor at HBS has suffered, including, *inter alia*, that Plaintiff: (1) has been placed on immediate administrative leave for two years and stripped of all compensation; (2) had her professorship at HBS revoked; (3) has been removed from all of her teaching, publishing, and research duties, and any opportunity to earn a livelihood; and (4) has had her tenured position at Harvard made the subject of revocation proceedings.

> RESPONSE TO NO. 312: The allegations in Paragraph 312 state a legal
> conclusion to which no response is required. To the extent a response is
> required, Harvard denies the allegations in Paragraph 312.

313.    As a direct and proximate result of the foregoing conduct, Plaintiff suffered damages including *inter alia*, reputational harm, lost income, lost career opportunities, and other direct and consequential damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

RESPONSE TO NO. 313: The allegations in Paragraph 313 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 313.

314.    As a result of Defendant Harvard's violation of Title IX, which resulted in unduly severe and unwarranted sanctions against Plaintiff which continue to injure Plaintiff's reputation and rights as a tenured Professor an injunction should issue, directing Defendant Harvard to: i) reverse the findings, outcome and sanctions resulting from the Harvard Business School investigation of the research misconduct allegations against Plaintiff; ii) remove any record of, or reference to, the findings and outcome from Plaintiff's personnel file; and iii) restore Plaintiff to her full teaching, mentorship and research responsibilities.

RESPONSE TO NO. 314: The allegations in Paragraph 314 state a legal conclusion and a prayer for relief, to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 314.

## COUNT II

## Breach of Contract

### (As to Defendant President and Fellows of Harvard College)

315.    Plaintiff repeats and realleges each and every allegation hereinafter above as if fully set forth herein.

RESPONSE TO NO. 315: Harvard incorporates its responses to Paragraphs 1-314 of the Second Amended Complaint.

316.    Under Massachusetts law, to state a breach of contract claim the plaintiff must demonstrate that: "(1) there was a valid contract; (2) the defendant breached its duties under the

contractual agreement; and (3) the breach caused the plaintiff damage." *NExTT Sols., LLC v. XOS Techs., Inc*., 113 F. Supp. 3d 450, 456 (D. Mass. 2015).

> RESPONSE TO NO. 316: The allegations in Paragraph 316 state a legal conclusion to which no response is required. To the extent a response is required, Harvard states that the referenced case law speaks for itself, and any interpretation is hereby denied.

317.    "Tenure involves a long-term academic and financial commitment by a university to an individual, providing faculty with unusually secure positions tantamount to life contracts." *Beitzell v. Jeffrey*, 643 F.2d 870, 875 (1st Cir. 1981).

> RESPONSE TO NO. 317: The case law referenced in Paragraph 317 speaks for itself, and any interpretation is hereby denied.

318.    At Harvard, pursuant to the Third Statute, a tenured professor enjoys a secure position, tantamount to a lifetime contract.

> RESPONSE TO NO. 318: The allegations in Paragraph 318 are vague and Harvard therefore denies them.

319.    Before a tenured professor at Harvard can be disciplined, the Third Statute and the Discipline Policy require a finding of "grave misconduct" and only following the procedures set forth in the Discipline Policy.

> RESPONSE TO NO. 319: The policies referenced in Paragraph 319 are written documents that speak for themselves, and Harvard denies any characterization of these documents.

320.     Plaintiff's appointment letter, which incorporates the terms of the Tenure Policy, the Third Statute and the Discipline Policy, sets forth the terms of her employment as a full professor with tenure and constitutes an employment contract.

> RESPONSE TO NO. 320: The appointment letter and policies referenced in Paragraph 320 are written documents that speak for themselves, and Harvard denies any characterization of these documents.

321.     Defendant Harvard breached Professor Gino's employment contract by subjecting her employment to discipline absent "grave misconduct" and in violation of the Third Statute, the procedural protections outlined in the Discipline Policy, the principles of the Tenure Policy, and Harvard's other policies and procedures.

> RESPONSE TO NO. 321: Harvard denies the allegations in Paragraph 321.

322.     Plaintiff fully complied with all provisions set forth under the terms of her employment and under Harvard's policies and procedures.

> RESPONSE TO NO. 322: Harvard denies the allegations in Paragraph 322.

323.     Without any legal justification, Harvard breached its contract with Professor Gino by failing to follow Harvard's policies and procedures, including, without limitation, by the following:

> a.     Placing Plaintiff on unpaid administrative leave for two years;
>
> b.     Stripping Plaintiff of her entire compensation, including 100% of her base salary and benefits, as of July 31, 2023;
>
> c.     Revoking Plaintiff's Tandon Family Professorship;

d.      Barring Plaintiff from all research, teaching, mentoring, and advising duties;

e.      Prohibiting Plaintiff from conducting research using Harvard resources to teach, mentor, or advise;

f.      Cutting Plaintiff off from administrative and research support;

g.      Barring Plaintiff from campus and her office;

h.      Prohibiting Plaintiff from publishing or disseminating her research through Harvard Business School platforms, and prohibiting her from publishing research on other platforms at Harvard absent approval from Dean Datar;

i.      Disclosing confidential information concerning her misconduct proceeding and findings;

j.      Subjecting Plaintiff to discipline against her employment absent a finding of "grave misconduct," pursuant to the Third Statute, and without a "full hearing and fair representation before an impartial tribunal" and the other procedural protections required under the Discipline Policy;

k.      Subjecting Plaintiff to a disciplinary process in which she was subjected to an unfair and biased investigation, denied the presumption of innocence, and required to bear the burden of disproving the allegations against her.

RESPONSE TO NO. 323: Harvard denies the allegations in Paragraph 323.

324.   Plaintiff has suffered damages in an amount to be determined at trial but not less than $25 million, as a direct and proximate cause of Defendant Harvard's breach of Plaintiff's employment agreement and the terms of Harvard's policies, including but not limited to:

   a.   Long-term injury to her professional reputation and career;

   b.   Loss of her annual compensation (inclusive of base salary, fringe benefits, additional compensation for supplemental contributions), salary increases and bonuses;

   c.   Loss of her Tandon Family professorship;

   d.   Loss of opportunities for writing, publishing, and teaching activities, including teaching Executive Education programs, writing and publishing activities for Harvard Business Publishing, and teaching for Harvard Business School Online;

   e.   Loss of capacity to generate future earnings;

   f.   Loss of physical well being, emotional and psychological pain and suffering;

   g.   Loss of career and performance opportunities;

   h.   Loss of future career prospects.

RESPONSE TO NO. 324: The allegations in Paragraph 324 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 324.

## COUNT III

### Breach of Implied Covenant of Good Faith and Fair Dealing

### (As to Defendant President and Fellows of Harvard College)

325.   Plaintiff repeats and realleges each and every allegation hereinafter above as if fully set forth herein.

RESPONSE TO NO. 325: Harvard incorporates its responses to Paragraphs 1-324 of the Second Amended Complaint.

326.   "Every contract in Massachusetts is subject, to some extent, to an implied covenant of good faith and fair dealing." *Ayash v. Dana-Farber Cancer Inst.,* 443 Mass. 367, 385 (2005); *Boston. Med. Ctr. Corp. v. Secretary of Executive Office of Health & Human Servs.,* 463 Mass. 447, 460 (2012).

RESPONSE TO NO. 326: The allegations in Paragraph 326 state a legal conclusion to which no response is required. To the extent a response is required, Harvard states that the referenced case law speaks for itself, and any interpretation is hereby denied.

327.   The implied covenant governs "the manner in which existing contractual duties are performed." *Eigerman v. Putnam Investments, Inc.,* 450 Mass. 281, 289 (2007).

RESPONSE TO NO. 327: The allegations in Paragraph 327 state a legal conclusion to which no response is required. To the extent a response is

required, Harvard states that the referenced case law speaks for itself, and any interpretation is hereby denied.

328.    Defendant Harvard breached the implied covenant of good faith and fair dealing in the following ways:

(1)     Abandoning its existing 2013 RI Policy and FRB process and crafting a new employee disciplinary policy, just for Plaintiff, the so-called Interim Policy, that purported to supersede the Third Statute and the Discipline Policy, and to nullify the rules and rights appliable to tenured factual, by authorizing Dean Datar to take disciplinary action against Plaintiff, up to and including the termination of her employment;

(2)     Seeking to impose upon Plaintiff a so-called two-year unpaid "administrative leave," an adverse employment action that was tantamount to a constructive discharge, but without the procedural protections due Plaintiff under the Discipline Policy;

(3)     Failing to timely notify Plaintiff of the allegations against her and keeping her in the dark for three months of both the charges against her and Harvard's impending investigation, as Harvard worked on crafting a new discipline policy, to apply just to her;

(4)     Failing to adhere to the procedural and substantive requirements of the Interim Policy that HBS created, purportedly to investigate and assess allegations of "research misconduct";

(5)     Conducting a bad faith investigation into allegations of research misconduct that were not made in good faith, as required under the Interim Policy;

(6)     Conducting a bad faith investigation into allegations of research misconduct that fell outside the stated "scope" of the Interim Policy and should have been time-barred;

(7)     Rendering a bad faith decision that concluded that Plaintiff was guilty of charged conduct without meeting its burden of proof, in reliance on inconclusive evidence and unwarranted inferences, in the absence of supporting witness statements and evidence;

(8)     Imposing overly harsh and punitive sanctions that were unreasonable and lacking any connection to Harvard's applicable policies and standards;

(9)     Breaching its duties of confidentiality owed to Plaintiff for no legitimate purpose.

> RESPONSE TO NO. 328: The allegations in Paragraph 328 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 328.

329.    As a direct and proximate result of this breach, Plaintiff suffered damages in an amount to be determined at trial, but not less than $25 million, including *inter alia*, lost income, lost career opportunities, reputational harm and emotional distress.

> RESPONSE TO NO. 329: The allegations in Paragraph 329 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 329.

**COUNT IV**

**Estoppel**

**(As to Defendant President and Fellows of Harvard College)**

330.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

> RESPONSE TO NO. 330: Harvard    incorporates    its    responses    to
> Paragraphs 1-329 of the Second Amended Complaint.

331.     Plaintiff's relationship with Defendant Harvard was governed by her employment contract with Harvard as well as Plaintiff's reasonable expectations based on Harvard's various policies and procedures.

> RESPONSE TO NO. 331: The allegations in Paragraph 331 state a legal
> conclusion to which no response is required. To the extent a response is
> required, Harvard denies the allegations in Paragraph 331.

332.     Under Massachusetts law, a party is liable for estoppel when: (1) a promisor makes a promise which it should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee; (2) the promise did induce action or forbearance; and (3) "injustice can be avoided only by enforcement of the promise." *See Neuhoff v. Marvin Lumber & Cedar Co*., 370 F.3d 197, 203 (1st Cir. 2004)) (applying Massachusetts law); *Anzalone v. Admin. Office of the Trial Court*, 457 Mass. 647, 661 (2010).

> RESPONSE TO NO. 332: The allegations in Paragraph 332 state a legal
> conclusion to which no response is required. To the extent a response is
> required, Harvard states that the referenced case law speaks for itself, and
> any interpretation is hereby denied.

333.    Harvard's various policies and procedures constitute unambiguous representations and promises that Harvard should have reasonably expected to induce action or forbearance by Plaintiff and which did induce Plaintiff's actions or forbearance.

> RESPONSE TO NO. 333: The allegations in Paragraph 333 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 333.

334.    Harvard expected or should have expected Plaintiff to accept its offer of employment and to choose not to pursue employment at other colleges or universities based on its express and implied promises that Harvard would not tolerate, and Plaintiff would not suffer, discrimination, and would not deny Plaintiff basic fairness in its disciplinary proceedings should she be accused of a violation of Harvard policies.

> RESPONSE TO NO. 334: The allegations in Paragraph 334 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 334.

335.    Plaintiff relied to her detriment on these express and implied promises and representations made by Harvard and was induced by Harvard's promises in making her decision to further her career at Harvard instead of at another school of equal caliber.

> RESPONSE TO NO. 335: The allegations in Paragraph 335 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 335.

336.    Based on the foregoing, Harvard is liable to Plaintiff based on Estoppel.

> RESPONSE TO NO. 336: The allegations in Paragraph 336 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 336.

337.    As a direct and proximate result of the above conduct, Plaintiff has sustained tremendous damages in an amount to be determined at trial but not less than $25 million, including without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

> RESPONSE TO NO. 337: The allegations in Paragraph 337 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 337.

## COUNT V

## Title VII- Disparate Treatment

## (As to Defendant President and Fellows of Harvard)

338.    Plaintiff repeats and reallegaes each and every allegation hereinabove as if fully set forth herein.

> RESPONSE TO NO. 338: Harvard incorporates its responses to Paragraphs 1-337 of the Second Amended Complaint.

339.    Federal law prohibits an employer from taking an adverse employment action based on a person's sex. *See* Title VII, 42 U.S.C. § 2000e *et seq.*.

> RESPONSE TO NO. 339: The allegations in Paragraph 339 state a legal conclusion to which no response is required.

340.    Plaintiff is a female and a member of a protected class under applicable law.

RESPONSE TO NO. 340: Harvard admits the allegation in Paragraph 340 that Plaintiff is female. The remaining allegations in Paragraph 340 state a legal conclusion to which no response is required.

341.    Plaintiff suffered multiple adverse employment actions when Defendant Harvard (1) placed Plaintiff on an unpaid administrative leave and stripped her of all compensation and benefits; (2) revoked her professorship at HBS, (3) stripped Plaintiff of all of her teaching, publishing, and research duties and any opportunities to earn a livelihood, and (4) made her tenured position at Harvard the subject of revocation proceedings.

RESPONSE TO NO. 341: The allegations in Paragraph 341 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 341.

342.    Unlawful discrimination may be inferred where Defendants repeatedly deviated from its employment policies, created a more procedurally onerous new policy just for her, and treated similarly situated male employees more favorably.

RESPONSE TO NO. 342: The allegations in Paragraph 342 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 342.

343.    Plaintiff's sex and gender were a motivating factor for the aforementioned adverse employment actions.

RESPONSE TO NO. 343: The allegations in Paragraph 343 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 343.

344.     As a direct and proximate result of the above conduct, Plaintiff has sustained tremendous damages in an amount to be determined at trial but not less than $25 million, including without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

> RESPONSE TO NO. 344: The allegations in Paragraph 344 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 344.

## COUNT VI

## Fair Employment Practices Act, Mass Gen. Laws Ch. 151B

## Disparate Treatment Based on Sex

## (As to Defendants President and Fellows of Harvard and Srikant Datar)

345.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

> RESPONSE TO NO. 345: Harvard incorporates its responses to Paragraphs 1-344 of the Second Amended Complaint.

346.     Massachusetts law prohibits an employer from taking an adverse employment action based on a person's sex. FEPA, Mass. Gen. Laws. Ch. 151B.

> RESPONSE TO NO. 346: The allegations in Paragraph 346 state a legal conclusion to which no response is required.

347.     Professor Gino is a "person" as defined in G.L. c. 151B, § 1(1), and the right to work in an environment free from unlawful discrimination is "unquestionably among the rights encompassed by the statute." *See Thomas O'Connor Constructors, Inc. v. Massachusetts Comm'n Against Discrimination*, 72 Mass. App. Ct. 549, 556–57, 893 N.E.2d 80, 86 (2008).

<u>RESPONSE TO NO. 347:</u> The allegations in Paragraph 347 state a legal conclusion to which no response is required.

348.     Plaintiff suffered multiple adverse employment actions when Defendants (1) placed Plaintiff on unpaid administrative leave and stripped her of all compensation and benefits; (2) revoked her professorship at HBS, (3) stripped Plaintiff of all of her teaching, publishing, and research duties and any opportunities to earn a livelihood, and (4) made her tenured position at Harvard the subject of revocation proceedings.

<u>RESPONSE TO NO. 348:</u> The allegations in Paragraph 348 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 348.

349.     Unlawful discrimination may be inferred from allegations that include, *inter alia*, the following: (i) Defendants' multiple deviations from its various employment policies; (ii) the creation of a more procedurally onerous research misconduct policy, the Interim Policy, just for Plaintiff; (iii) Defendants' failure to adhere to the provisions set forth in its newly created policy, (including, but not limited to, provisions that barred investigating complaints outside the stated 6-year scope of said policy), and (iv) a pattern and practice of treating similarly situated male and female employees differently, including disparate discipline.

<u>RESPONSE TO NO. 349:</u> The allegations in Paragraph 349 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 349.

350.     Plaintiff also alleges unlawful discrimination by her direct supervisor, Dean Datar.

<u>RESPONSE TO NO. 350:</u> Harvard admits the allegation in Paragraph 350 that Plaintiff alleges unlawful discrimination against Dean Datar.

351.     Plaintiff has specifically alleged facts that, in their totality, support a reasonable inference that Dean Datar bore discriminatory animus toward Professor Gino's protected class and that the animus was the reason he chose to (i) keep Professor Gino in the dark for three months after receiving Data Colada's false allegations, (ii) chose to further deviate from HBS's existing policies and procedures by creating a new policy by which to investigate the false allegations, and (iii) ultimately chose to impose overly harsh and punitive sanctions against Professor Gino, that purported to supersede the written Discipline Policy.

> RESPONSE TO NO. 351: The allegations in Paragraph 351 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 351.

352.     Plaintiff's sex and gender were a motivating factor for the aforementioned adverse employment actions and the various decisions taken by Dean Datar.

> RESPONSE TO NO. 352: The allegations in Paragraph 352 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 352.

353.     As a direct and proximate result of the above conduct, Plaintiff has sustained tremendous damages in an amount to be determined at trial but not less than $25 million, including without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

> RESPONSE TO NO. 353: The allegations in Paragraph 353 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 353.

## AFFIRMATIVE DEFENSES

Harvard incorporates its respective responses to each and every foregoing paragraph as though fully set forth herein and asserts the following defenses with respect to each and every claim pled in the Second Amended Complaint, unless otherwise noted.  By virtue of asserting these defenses, Harvard does not assume any burden of proof or persuasion not otherwise legally assigned to them.  Harvard reserves all other rights to assert other defenses as appropriate.

### FIRST DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff failed to state a claim upon which relief can be granted, and dismissal with prejudice is proper.

### SECOND DEFENSE

Plaintiff's claims are barred, in whole or in part, because to the extent Plaintiff has suffered any injury, such injuries were not proximately or actually caused by Harvard's actions.

### THIRD DEFENSE

Plaintiff has failed to sufficiently allege an actionable injury caused by Harvard.

### FOURTH DEFENSE

The damages Plaintiff seeks are unwarranted and disproportionate as to Harvard such that any award or damages would constitute unjust enrichment.

### FIFTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because, to the extent Plaintiff has suffered any injuries, such injuries were caused, in whole or in part, by Plaintiff's own recklessness and intentional actions.

## SIXTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because Harvard's alleged conduct was at all times justified and undertaken in the good faith exercise of a valid and legitimate business and educational purpose.

## SEVENTH DEFENSE

To the extent Plaintiff has suffered any damages, any damages awarded to Plaintiff must be reduced on the basis of Plaintiff's failure and refusal to make reasonable efforts to mitigate, minimize, or avoid any alleged damages.

## EIGHTH DEFENSE

Plaintiff's claims are barred as Harvard acted at all times in good faith and Harvard's conduct was at all times lawful.

## NINTH DEFENSE

Plaintiff's claims are barred, in whole or in part, under the doctrine of unclean hands.

## RESERVATION OF ADDITIONAL DEFENSES

Harvard hereby gives notice that it intends to rely upon such other and further affirmative defenses as may become available or apparent during pre-trial proceedings in this case, and hereby reserves its rights to amend this Answer and assert such defenses.

## **RESERVATION OF RIGHTS**

Harvard expressly reserves the right to amend its Answer and to assert additional affirmative defenses as may become available during the course of discovery in this action. Harvard further gives notice that it reserves and will rely upon defenses it may have and further reserves the right to assert counterclaims against any such person to the extent required in order to preserve its rights.

**Dated: Boston, Massachusetts**

**November 12, 2024**                                    **Respectfully submitted,**

                                                                    *Douglas E. Brayley*
                                                                    Douglas E. Brayley (BBO# 676821)
                                                                    Jenny K. Cooper (BBO# 646860)
                                                                    Elena W. Davis (BBO# 695956)
                                                                    Ropes & Gray LLP
                                                                    800 Boylston Street
                                                                    Boston, MA 02199-3600
                                                                    Tel: (617) 951-7000
                                                                    Douglas.Brayley@ropesgray.com
                                                                    Jenny.Cooper@ropesgray.com
                                                                    Elena.Davis@ropesgray.com

                                                                    *Counsel for Defendants President and Fellows of Harvard College and Srikant Datar*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 12, 2024, this document was filed through the ECF System of the United States District Court for the District of Massachusetts and will be served electronically on the Registered Participants identified in the Notice of Electronic Filing.

*Douglas E. Brayley*
Douglas E. Brayley