UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                      )
FRANCESCA GINO,                                       )
                                                      )
      Plaintiff,                                   )
                                                      )
v.                                                    )         C.A. No. 23-cv-11775-MJJ
                                                      )
PRESIDENT AND FELLOWS OF                              )
HARVARD COLLEGE et al.,                               )
                                                      )
      Defendants.                                  )
_____)

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF
URI SIMONSOHN, LEIF NELSON, AND JOSEPH SIMMONS
FOR SANCTIONS AGAINST PLAINTIFF FRANCESCA GINO
AND HER FORMER COUNSEL, NESENOFF & MILTENBERG LLP**

Jeffrey J. Pyle (BBO #647438)
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA 02110
(617) 456-8000 (tel)
(617) 456-8100 (fax)
jpyle@princelobel.com

Date:   May 9, 2025

INTRODUCTION

In August 2023, Plaintiff Francesca Gino and her then-counsel, Nesenoff & Miltenberg

LLP, sued Joseph Simmons, Leif Nelson, and Uri Simonsohn (the "Data Colada Defendants")

for defamation based on statements in which they suggested that data fabrication appeared to be

present in four of Gino's published studies. Months before Gino filed her claims, a Harvard

University investigation had concluded that all four of the studies were, in fact, riddled with

falsified data. Gino knew this. Indeed, when Harvard confronted Gino with its findings, she

acknowledged, and could not credibly explain, the massive discrepancies between her original

and published datasets. However, she later turned around and sued the Data Colada Defendants

based on the false premise those discrepancies didn't exist.

A defamation plaintiff cannot reasonably expect to recover damages for a statement she

knows is true. *Piccone v. Bartels*, 40 F. Supp. 3d 198, 201 (D. Mass. 2014), aff'd, 785 F.3d 766

(1st Cir. 2015). Further, a litigant who files claims without "any reasonable hope of prevailing on

merits" and "for an oppressive reason" is subject to sanctions under the Court's inherent

authority. *Whitney Bros. Co. v. Sprafkin*, 60 F.3d 8, 13 (1st Cir. 1995) (internal quotations and

citations omitted). Gino and her counsel at the time, Nesenoff & Miltenberg LLP, sued the Data

Colada Defendants without any reasonable hope of recovery, to punish them for blowing the

whistle on her apparent academic fraud. That warrants imposition of sanctions and an award of

the Data Colada Defendants' reasonable attorneys' fees and costs.

Gino's claims against the Data Colada Defendants were plainly meritless for other

reasons. She had no evidence the Data Colada Defendants published the statements knowing

they were false or with reckless disregard for their truth, as required; the claims relied on made-

up allegations of a "conspiracy" between the Data Colada Defendants and Harvard; and the

claims rested on blatant mischaracterizations of the Data Colada Defendants' statements. In addition, the evidence shows that Gino sued the Data Colada Defendants for the "oppressive reason" of punishing them for exposing the fraud to Harvard. *Whitney Bros. Co.*, 60 F.3d at 13.

Absent the imposition of sanctions, Gino will have successfully punished three academics merely for raising legitimate concerns about the integrity of her studies. To allow her to do so would cast a profound chill over the efforts of other researchers to study and expose data fabrication, posing a threat to the integrity of science. As more fully explained below, this is one of the rare cases that justifies the exercise of the court's inherent power to issue sanctions.

## FACTUAL BACKGROUND

### A.    The December 2021 Memorandum

On December 3, 2021, the Data Colada Defendants submitted a memorandum to Harvard Business School ("HBS") titled "Evidence of Fraud in Academic Articles Authored by Francesca Gino." (Affidavit of Jeffrey J. Pyle ("Pyle Aff.,"), Exhibit 1 ("December Memorandum")). The December Memorandum identified anomalies in the data for four studies conducted by HBS Professor Francesca Gino and explained why they indicated that the data had been falsified. (*Id.*)

The December Memorandum identifies two kinds of anomalies in the datasets. The first, present in two of the studies, "consists of datasets that are sorted, but sorted imperfectly," leaving "a trace of rows that were moved and/or values that were changed." (*Id.* at 1). "For example," the Data Colada Defendants wrote, "imagine a dataset sorted by participant ID, but in which some observations are out of sequence, say IDs being 1, 2, 3, 4, 81, 82**,** 5, 6, 7. If the out-of-order rows of data (e.g., those with IDs 81 and 82) exhibit extraordinarily large effect sizes" – meaning an unusually strong relationship between the variables studied – "that would represent fairly strong evidence of data tampering," especially where the out-of-order data "produce the overall effect

[observed in the study] in its entirety." (Pyle Aff., Ex. 1 at 1). Out-of-order rows with large effect sizes were present in two of the four studies. (*Id.* at 2-5, 15-18).

In the other two studies, the Data Colada Defendants reported, "answers provided by participants [were] inconsistent with the question being asked." (*Id.* at 1). For example, many participants in a study answered "'Harvard' to the question of how many years they have spent at school." (*Id.*) In another, participants provided inconsistent values in the dataset, at once indicating that "they felt maximally disgusted with a networking event" but then "describing that same networking event with words such as 'exciting' and 'great.'" (*Id.*) These "anomalous observations, again, show extraordinarily large effects consistent with the researcher's hypothesis," evidence that the values associated with them were fake. (*Id.* at 1, 5-8, 8-15).

The December Memorandum does *not* state that Gino herself was responsible for the apparent data falsification in the four studies. (Pyle Aff., Ex. 1). To the contrary, it states: "[A]lthough the evidence can, in most of these cases, rule out malfeasance by co-authors, it cannot definitively rule in malfeasance by Professor Gino. It may be that some research assistant or otherwise unnamed person/people was/were responsible for producing these anomalies." (*Id.* at 1). The Data Colada Defendants urged Harvard to "consider the case while giving full opportunity for Professor Gino to explain apparent anomalies." (*Id.*).

B.    Harvard's Investigation and Findings

Based on the Data Colada Defendants' analysis, Harvard opened a preliminary investigation, sequestered Gino's computers, and took possession of her original datasets for the four studies. (Ex. 5 to Declaration of Jenny Cooper (Doc. 20-5), Report of Harvard University Investigation Committee Concerning Allegations Against Professor Francesca Gino – Case

3

RI21-001 (hereinafter, "Harvard Report") at 46-47).[1] Harvard gave the datasets to the Maidstone

Consulting Group ("MCG"), a computer forensics firm, which compared them to the datasets

that Gino had disclosed as providing the data for the studies, which were obtained from the

"Open Science Framework" ("OSF") platform or from other locations. (*Id.* at 5, 18, 20, 25, 38).

After comprehensively analyzing the data, MCG found that the Data Colada Defendants'

suspicions were correct:  in each case, Gino's data had been altered. (*Id.*). Further, the alterations

were directional: in all four cases, the data were changed to better support the studies'

hypotheses. (*Id.*). Indeed, the evidence of data manipulation was so overwhelming that Gino,

who was represented by counsel throughout, did not even try to contest it.[2] (*Id.* at 11-17).

Instead, Gino sought to create doubt by speculating that "one or more persons who had

access to her computer, Qualtrics [online survey] account, and/or data files altered copies of data

in those locations, after the studies were published and data had been posted" publicly, "in a

malicious effort to plant false evidence of data manipulation." (Harvard Report, Doc. 20-5 at 11).

Gino offered no evidence of this allegation beyond naming a former colleague who might want

to harm her. (*Id.* at 12). Harvard determined that any "bad actor" who set out to alter her data

files in this way would have needed the password for Gino's Qualtrics account, access to Gino's

personal computer, and the means of bypassing two-factor authentication (likely meaning access

to Gino's cell phone), not to mention the computer of another collaborator. (*Id.* at 15). Any such

"bad actor" would also have needed "to time their data manipulation carefully, after Professor

Gino had accessed and analyzed the data for each study;" the motive to set out to alter her data

---

[1] The Harvard Report, Exhibit 5 to the Declaration of Jenny Cooper (Doc. E20-5)) consists of 1,281 pages. Page references to the Harvard Report in this memorandum will correspond to the pages of the pdf file that comprises this exhibit, not the page numbers of the many documents contained within the Harvard Report.

[2] Gino was then represented by Paul S. Thaler of the firm Cohen Segalis. (Harvard Report at 199).

4

over the eight-year period during which the studies were published; and the sophistication to undertake this digital sabotage without leaving a trace. (*Id.* at 11-13).

Harvard ultimately found that Gino "presented no evidence of any data falsification actions by actors with malicious intentions," but rather offered "only speculation." (Harvard Report, Doc. 20-5, at 16). Gino's "repeated and strenuous argument for a scenario of data falsification by bad actors across four different studies, an argument we find to be highly implausible, leads us to doubt the credibility of her written and oral statements to this Committee more generally." (*Id.*) Harvard found that Gino "engaged in multiple instances of research misconduct, across all four studies at issue in these allegations." (*Id.* at 41).

C.    The Investigation and Findings Concerning "Allegation 1"

To illustrate the overwhelming evidence of data falsification in the Harvard Report, which was transmitted to Gino months before she filed suit against the Data Colada Defendants, we will focus on one example in detail: the report's "Allegation 1," about a 2020 study Gino conducted.[3] (Harvard Report, Doc. 20-5, at 18-20). As we show below, Gino was forced to admit during the Harvard investigation that the data for this study were falsified, meaning she knew the Data Colada Defendants' statements to that effect were substantially true.

Allegation 1 concerned the data for a study reported in an article titled, "Why connect? Moral consequences of networking with a promotion or prevention focus."[4] The authors' hypothesis was that "self-regulatory focus, in the form of prevention and promotion, provides an

---

[3] This study was the subject of one of the Data Colada Defendants' blog posts, referred to in the Amended Complaint as "Blog Post 4." (Am. Compl., ¶¶ 260-270 and Ex. 9). It was also "Case #3" in the December Memorandum. (Pyle Aff., Ex. 1, p. 8).

[4] *Journal of Personality and Social Psychology,* 119(6), 1221-1238 (2020).

5

essential motivational basis for networking behavior which shapes the emotional and psychological experience of networking." (Harvard Report, Doc. No. 20-5, at 80).

Gino conducted Study 3A for the paper on Qualtrics, an electronic survey platform. (*Id.* at 17). Participants in this study were instructed to write an essay corresponding to their assigned experimental group. Those in the "promotion" condition were told to write about their hopes and aspirations; the "prevention" group wrote about duties and obligations; and the control condition wrote about what they do on a normal day. (*Id.* at 85-86). The participants were then instructed to rate, on 7-point scales, whether they would feel "dirty," "tainted," "inauthentic," or four other negative feelings after attending a networking event. (*Id.* at 86-87). A "1" response meant the participant did not feel "dirty" or "inauthentic" at all from networking, and a "7" meant they found networking to be maximally impure. (*Id.* at 87). The participants were also asked to list a few words describing their feelings about the networking event. (*Id.*) The study reported that participants who considered a networking event with a "promotion focus" had lower feelings of moral impurity than those in the "prevention" frame of mind. (*Id.* at 82).

The Data Colada Defendants reviewed Gino's posted dataset for this study and noticed a discrepancy between the numbers supposedly representing respondents' feelings of moral impurity and the words those same participants used to describe the networking event. For example, participants whose numerical responses were all "3's" – a relatively high value of felt impurity – nonetheless supposedly wrote positive words to describe the event. (*Id.* at 14-15). Likewise, some participants who rated a "1" to all seven items (indicating they found nothing impure about networking) wrote words like "Gross, phony, supercilious, unpleasant, disingenuous." (Pyle Aff., Ex. 2, "Forgetting the Words," at 8). The Data Colada Defendants suspected that someone had altered the numbers to make the correlation between "promotion

focus" and low felt impurity appear stronger than it was, but didn't bother changing the corresponding words, which the researchers didn't analyze. (*Id.*).

Harvard obtained the original dataset for this study from Gino's Qualtrics account and gave it to MCG, the computer forensics firm, which compared it to the anomalous dataset Gino had posted publicly. (Harvard Report, Doc. 20-5, at 510). Just as the Data Colada Defendants suspected, MCG found that the posted data for the study "appear to be modified with directionality": they were altered to support the study's hypothesis. (*Id.* at 524). In fact, MCG reported that 168 survey scores had been modified, or about 28% of the data in the survey areas. (*Id.* at 525). MCG produced a "heatmap" showing the direction and degree of these changes. (*Id.* at 518-520). Without exception, each of the changes had the effect of making the study results appear to be more in line with the authors' hypothesis: that attending a networking event with a "promotion focus" in mind results in lower feelings of impurity.[5] (*Id.* at 517). MCG also ran the calculations for the study using the original (unmodified) Qualtrics data, and reported that the outcomes were contrary to the reported study results. (*Id.* at 525). In other words, the data had been falsified to make the study appear successful when it was not.

On November 11, 2022, Gino submitted a response to Harvard asserting that the MCG report showed a "lack of evidence that data alterations occurred at all," but included no analysis disputing that the Qualtrics data for the study didn't match the publicly posted version. (*Id.* at 651, 655). In an interview on November 22, however, Gino backtracked. Harvard investigator

---

[5] After the Court deemed the Harvard Report a court record available for public inspection, the Data Colada Defendants published a blog post explaining its conclusions about Allegation 1. (Pyle Aff., Exhibit 3, "Harvard's Gino Report Reveals How a Dataset Was Altered"). Among other things, the post looked at the responses for participant 538 of the study, who was part of the "promotion" group. The Harvard Report found this participant provided all "7" responses, consistent with the words that participant used to describe the networking event: "dirty, fake, cheap, butt kisser. . . ." (*Id.*). This participant's "7" responses were all changed to "1's," which aligned with the study authors' hypothesis that promotion-focused participants feel better about networking. (*Id.*)

Theresa Amabile noted that "[t]he MCG report lays out a number – a large number of discrepancies between the [posted] data set and your Qualtrics data set," and asked, "do you have an explanation for these discrepancies other than data alterations?" (Harvard Report, Doc. 20-5, at 676). Gino clarified: "Yeah, So I should have been more clear in my language. There is no alteration <u>done by me</u>." (*Id.*) (emphasis supplied). In other words, Gino acknowledged that her data had been falsified.[6]

Harvard's Investigation Committee issued its final report on March 7, 2023. Consistent with the above, Harvard noted that Gino "<u>does not question</u> or convincingly explain any of the analyses, data anomalies, or data discrepancies described in the forensic reports," including those related to Allegation 1. (Harvard Report, Doc. 20-5, at 11) (emphasis supplied). After rejecting Gino's "bad actor" speculation, Harvard found her responsible for research misconduct.

D.    <u>Gino Sues the Data Colada Defendants Based on False Premise that the Data at Issue in Allegation 1 Were Not Manipulated</u>

On August 2, 2023, Gino filed her complaint in this action, followed by an Amended Complaint filed on August 8, 2023. (Doc. 1, 6). In both pleadings, Gino asserted defamation and related claims against the Data Colada Defendants based on the premise that there had been no alteration of the datasets at all, and that the Data Colada Defendants had defamed her by suggesting otherwise. *Id.*

For example, Gino identified the following as a defamatory statement made by the Data Colada Defendants in their blog post about the study in Allegation 1: "We have received

---

[6] In a later submission to the Investigation Committee, Gino reaffirmed that data alteration had occurred. She confessed that she remained "puzzled" by the "additional analyses conducted by MCG and my own re-analysis of the data I downloaded from my Qualtrics account." (Harvard Report, Doc. 20-5, at 1043). "As the report noted," Gino states, "'there appear to be multiple discrepancies in certain sets related to the raw data source ("Qualtrics Data") and public repository data associated with the 2020 JPSP Paper ("OSF data") provided by the client.'" (*Id.*). She further stated that she "[t]ried to recreate their analysis," and "I did find discrepancies." (*Id.*.) Thus, Gino adopted, and did not dispute, MCG's conclusions.

confirmation, from outside of Harvard, that Harvard's investigators did look at the original

Qualtrics data file and that the data had been modified." (Am. Compl., Doc. 6, ¶ 266). As shown

above, that is <u>exactly</u> what MCG did and found, and Gino did not even dispute the finding.

(Harvard Report, Doc. 20-5, at 510-525). Yet Gino alleged that the Data Colada Defendants'

statement was false, and that they should have known that "[s]ources 'from outside of Harvard'

were clearly not reliable." (Am. Compl. ¶ 267). "In fact," Gino alleged, "Harvard did not

establish that data manipulation occurred, and also did not establish that Professor Gino was

responsible for data manipulation." (*Id.* ¶ 269). She so alleged despite having previously

acknowledged the presence of data manipulation in this very study, as explained above.

     E.     <u>Allegations 2, 3, and 4b</u>

     The sequence and substance of the other allegations of data falsification covered in the

Harvard Report – designated as Allegations 2, 3, and 4b – were much the same as for Allegation

1. In each case, Gino failed meaningfully to contest the evidence of data fabrication, and then

sued the Data Colada Defendants for pointing it out. We summarize these allegations briefly.

- Allegation 2 arose from Data Colada Defendants' observation that, in a dataset posted by

  Gino to the Open Science Framework ("OSF"), 24 respondents in an experiment Gino

  ran about "authenticity" had purportedly put down "Harvard" as their class year. (Pyle

  Aff., Ex. 1 at 5-8).[7] The responses with the odd "class year" entries heavily favored the

  study authors' hypothesis, suggesting they were dummy responses inserted to improve

  the results. (*Id.*). In her interview on February 22, 2022, Gino asserted that the "Harvard"

  responses were not suspicious (without addressing their directionality) and blamed the

---

[7] Allegation 2 concerned Gino et al., "The moral virtue of authenticity: How inauthenticity produces feelings of immorality and impurity," *Psychological Science,* 26(7), 983-996 ("2015 *Psychological Science* Paper"). Harvard's findings concerning Allegation 2 are summarized at pages 21-23 of the Harvard Report (Doc. 20-5).

issue on data cleaning mistakes by research assistants. (Harvard Report, Doc. 20-5, at 229). MCG analyzed Gino's earlier Qualtrics datasets and found both the presence of entries that did not appear in the posted OSF dataset, and the absence of data that appeared on OSF – damning evidence of fabrication. (*Id.* at 22, 613-628). After being provided with MCG's analysis, Gino asserted that "somebody" must have gone into her Qualtrics account and altered the data to frame her. (*Id.* at 702). Harvard determined that she was responsible for research misconduct. (*Id.* at 22-23). Gino then sued the Data Colada Defendants for their true statements that there was evidence of data fabrication in the study. (Am. Compl. ¶¶ 247-252).

- Allegation 3 concerned data observations that appeared out of sequence in a Gino-managed dataset for a study on dishonesty and creativity, which the Data Colada Defendants had obtained from another researcher.[8] (Pyle Aff., Ex. 1 at 15). The out-of-order entries were sorted in Excel in a way that indicated that their values had been manually changed. (*Id.*) Based on the ordering, the Data Colada Defendants deduced the original values, which did not support the study's conclusion (that dishonesty leads to creativity). (*Id.* at 17-18). In her interview on February 22, 2022, Gino stated that she did not know why the data were out of order because "I was not the person in charge of dealing with the original data." (Harvard Report, Doc. 20-5, at 230). However, MCG's report on Allegation 3, produced in July 2022, (*Id.* at 633) concludes that "In the earliest version of source documentation available, a series of data, which <u>were already color coded by an unknown individual</u>, demonstrate manual alterations of data points that

---

[8] Allegation 3 had to do with Gino et al., "Evil genius? How dishonesty can lead to greater creativity," *Psychological Science,* 25(4), 973-981 ("2014 *Psychological Science* Paper"). Harvard's findings concerning Allegation 3 are set forth at pages 24-27 of the Harvard Report, Doc. 20-5.

5235601

ultimately appear in the dataset that Dr. Gino expressly states is the basis for the research." (*Id.* at 634)(emphasis supplied). In other words, someone color coded the lines of data that needed to change, and later datasets showed that those lines *had* been changed. Gino had no explanation, and Harvard found her responsible. (*Id.* at 25-26). Gino then sued the Data Colada Defendants based on the false premise that there was nothing wrong with the data. (Am. Compl. ¶¶ 253-259).

- Allegation 4b: This allegation also concerned out-of-order data entries that strongly supported the study's hypothesis.[9] (Pyle Aff., Ex. 1 at 2-5). At the start of the investigation, Gino attributed the anomalies to sorting done by research assistants and asserted: "I don't believe that there is an error in the data." (Harvard Report, Doc. 20-5, at 207, 243). In August 2022, MCG produced its report on Allegation 4b, which compared posted datasets from OSF with earlier datasets obtained from Gino's research assistant. (*Id.* at 611). The report found that "52% of reported responses contained entries that were modified without apparent cause" – more than half of the data was modified. (*Id.* at 602-603)(emphasis supplied). In an interview after this MCG report, Gino stated: "I don't question the existence of the discrepancies." (*Id.* at 699) (emphasis supplied). Instead she speculated that her research assistant from UNC Chapel Hill, who had sent the original data to the committee, might have modified it under the influence of another person who Gino thought might want to "hurt" her and who was "friends with the Data Colada team." (*Id.* at 658). Harvard determined that this assertion lacked any basis and found Gino

---

[9] Allegation 4b arose from Shu et al., "Signing at the beginning makes ethics salient and decreases dishonest self-reports in comparison to signing at the end," *Proceedings of the National Academy of Sciences of the United States of America,* 109, 15197-15200 ("2012 *PNAS* Paper"). Harvard's conclusions relating to Allegation 4b are contained in pages 38-39 of the Harvard Report, Doc. 20-5.

responsible. (p. 39). She then sued the Data Colada Defendants for truthfully alerting Harvard and the public to evidence if this fabrication. (Am. Compl. ¶¶ 233-246).

As these summaries show, Gino acknowledged the discrepancies between her datasets, and never plausibly explained them. Nonetheless, she brought claims against the Data Colada Defendants for $25 million based on the false allegation that there were no discrepancies. (Compare Harvard Report, Doc. 20-5, at 699 ("I don't question the existence of the discrepancies,"); and 676 ("I should have been more clear . . . [t]here is no alteration done by me.") with Am. Compl., ¶ 269 ("Harvard did not establish that data manipulation occurred.").

## ARGUMENT

## I.    THE COURT HAS THE INHERENT AUTHORITY TO IMPOSE SANCTIONS.

A District Court "may use its inherent powers to assess attorneys' fees against a party that has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Whitney Bros. Co.*, 60 F.3d at 13 (internal quotations and citations omitted). A court may find bad faith where a party or her counsel maintains an unfounded action without "any reasonable hope of prevailing on merits." *Id.*, citing *Perichak v. Int'l Union of Elec. Radio & Mach. Workers, Loc. 601, AFL-CIO*, 715 F.2d 78, 83 (3d Cir. 1983). This inherent authority is not supplanted by other statutes or court rules, such as Fed. R. Civ. P. 11. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991) (rules and statutes do not displace "the inherent power to impose sanctions" for bad-faith conduct, which is "both broader and narrower than other means of imposing sanctions."). "Because of their very potency," of course, "inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44; *Jones v. Winnepesaukee Realty*, 990 F.2d 1, 4 (1st

Cir. 1993) ("This power should be used sparingly and reserved for egregious circumstances.")

As explained below, the use of such powers is amply justified here.[10]

## II.    GINO FILED HER CLAIMS AGAINST THE DATA COLADA DEFENDANTS IN BAD FAITH, WITHOUT A REASONABLE HOPE OF PREVAILING.

Gino sued the Data Colada Defendants in bad faith, to punish them for blowing the

whistle on her apparent fraud. *Whitney Bros. Co.*, 60 F.3d 13. Gino knew that the Data Colada

Defendants' core thesis – that the data in the four studies was falsified – was true, so she could

not have reasonably hoped to prevail on her defamation-related claims. The Data Colada

Defendants' statements also were clearly non-actionable because Gino had no plausible evidence

of actual malice, as any reasonable attorney would have told her. Further, Gino or her counsel

simply invented an alleged "conspiracy" between the Data Colada Defendants and Harvard out

of whole cloth. Their conduct warrants the imposition of sanctions.

### A.    Gino Sued the Data Colada Defendants Based on Allegedly Defamatory Conclusions That She Knew Were True

As demonstrated above, all of Gino's claims against the Data Colada Defendants were

based on the false premise that there was no data falsification in her studies. She filed the claims

knowing the data for each of the four studies had been modified to be more supportive of the

study's hypothesis. In most cases, Gino acknowledged that the discrepancies existed and

admitted she couldn't explain them, except to blame an unknown "bad actor." Yet in her

complaint, Gino pretended that no data falsification had taken place, and baselessly alleged that

the Data Colada Defendants *knew* that. (*See, e.g.,* Am. Compl., ¶¶ 265, 270, 399, 412).

---

[10] The Data Colada Defendants seek sanctions against both Gino and her counsel at the time, Nesenoff & Miltenberg LLP, notwithstanding the withdrawal of that firm's counsel from this case. *Dangerfield v. Merrill Lynch Pierce, Fenner & Smith*, 2003 WL 22227956 (S.D.N.Y. Sept. 26, 2003), at *7 ("an attorney's withdrawal from a case does not prevent the imposition of Rule 11 sanctions for papers filed prior to the withdrawal."); *Gold v. The Last Experience*, 1999 WL 156005 (S.D.N.Y. Mar. 22, 1999), at *4 (same).

As is well known, a defamation claim cannot be based on a substantially true statement. *Piccone*, 40 F. Supp. 3d at 201 ("as a matter of Massachusetts common law, neither true statements nor 'pure' expressions of opinion, meaning those that do not imply the existence of undisclosed facts, are actionable.") Further, an allegedly defamatory statement need not "state the precise truth" to be deemed substantially true, and thus immune from liability. *Reilly v. Associated Press*, 59 Mass. App. Ct. 764, 770 (2003), citing *Dulgarian v. Stone*, 420 Mass. 843, 847 (1995); *Tartaglia v. Townsend*, 19 Mass.App.Ct. 693, 698 (1985). "Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 516 (1991) (cleaned up).

Gino had no hope of prevailing in her claims against the Data Colada Defendants because she knew that the ultimate gist of their statements – that data falsification was present in the four studies – was true, as proved in the 1,200-page Harvard Report. (Doc. 20-5). Gino and her counsel had "overwhelming evidence" in their possession "that directly refute[d] [their] own factual allegations" of the absence of data manipulation, such that they "should have been aware that the claim was frivolous." *Lechter v. Aprio,* LLP, 622 F. Supp. 3d 1297, 1310 (N.D. Ga. 2022). Their decision to sue the Data Colada Defendants anyway warrants sanctions.

Gino and her counsel also engaged in "cherry-pick[ing] portions of . . . reports and filings to support a false factual narrative," which also warrants sanctions under the Court's inherent authority. *Trump v. Clinton*, 653 F. Supp. 3d 1198, 1215 (S.D. Fla. 2023), *appeal dismissed*, No. 23-10536-J, 2023 WL 3477967 (11th Cir. Apr. 6, 2023) (imposing sanctions on plaintiff and his counsel based on false factual allegations concerning Mueller Report on Russian interference with election). Gino and her counsel presented the false narrative that there were no problems with the data for Gino's studies; that Harvard never established otherwise; and that the Data

Colada Defendants had knowingly defamed her by even suggesting there were issues. (Am. Compl. ¶¶ 231-281). Her allegations concerning the Harvard investigation were either flatly false, (*Id.* ¶ 269 ("In fact, Harvard did not establish that data manipulation occurred,")) or were so incomplete as to be false.[11]

        B.      <u>Gino's Conspiracy and Tortious Interference Claims Were Based on Made-up Allegations of an "Agreement" Between the Data Colada Defendants and Harvard</u>

Gino had no hope of prevailing for a second reason: she made "factual allegations without 'evidentiary support' or the 'likely' prospect of such support." *Young v. City of Providence ex rel. Napolitano,* 404 F.3d 33, 39 (1st Cir.2005). Specifically, she invented out of thin air an alleged "agreement" between the Data Colada Defendants and Harvard, and asserted claims for "Civil Conspiracy to Commit Defamation" and "Intentional Interference with Contractual Relations" based on that imaginary "agreement." (Am. Compl. ¶¶ 403-425). No such agreement ever existed, and Gino had no basis to allege that it did.

In her complaint, Gino baselessly alleged that in 2021, the Data Colada Defendants approached Harvard about Gino's studies and "threatened to post the 'fraud' allegations on their blog." (Am. Compl. ¶ 5). Harvard, she alleged, then "negotiated an agreement with Data Colada" under which HBS would investigate the allegations "in exchange for Data Colada's silence during the investigation period." (*Id.* ¶¶ 6, 70, 406-407). Gino further alleged that Harvard agreed to adopt its new "Interim Policy" that would apply to the investigation as consideration for the Data Colada Defendants' period of silence, (*Id.* ¶¶ 6, 70) and would

---

[11] Notably, Gino omitted any reference to the "bad actor" theory from her complaint. She then baselessly attempted to prevent the Data Colada Defendants and the public from having access to the Harvard Report reflecting her aggressive advancement of that theory, notwithstanding that she had paraphrased and quoted from the report extensively (and selectively) in her Amended Complaint. (*See generally* Doc. 27-29). The Court may infer that Gino and her lawyers knew they could not advance their false narrative that there was no data fabrication when Gino had said the opposite to Harvard.

"disclose the results" of the investigation "to Data Colada, which would then be free to publicly disparage Plaintiff's work and professional reputation on its blog." (*Id.* at ¶ 70).

The Court had no difficulty holding that these allegations were "so threadbare or speculative that they fail to cross the line between the conclusory and the factual." (Sept. 11, 2024 Order, Doc. 74, at 38) (quoting *Peñalbert–Rosa v. Fortuño–Burset*, 631 F.3d 592, 595 (1st Cir. 2011)). Gino, the Court ruled, "fails to plausibly allege any facts showing a common intent or establishing the existence of an agreement, either explicit or implied, between the Harvard and Data Colada Defendants to defame Professor Gino." (*Id.* at 39-40). The same was true of her claims "that the Data Colada Defendants exerted pressure on the Harvard Defendants to improperly investigate and subject her to adverse employment actions." (*Id.* at 38).

Gino's allegation of an "agreement" was not just implausible; it was made up. The Data Colada Defendants have submitted with their motion the affidavits of Leif Nelson, Joseph Simmons, and Uri Simonsohn. Each of these individuals attests that the Data Colada Defendants did not negotiate or reach any "agreement" with Harvard of any kind; that they did not discuss the "Interim Policy" with Harvard; and that Harvard did not promise or provide them with access to its investigation results in exchange for their silence during the investigation. Gino has never disclosed any factual basis for her "conspiracy" allegations, and she will be unable to do so.

In *Galanis v. Szulik*, 841 F. Supp. 2d 456, 461 (D. Mass. 2011), the plaintiffs, like Gino, baselessly alleged that the defendants were conspirators. In support of a request for sanctions, defendants "submitted undisputed affidavits in which they attest that they have never met or communicated, much less conspired, with one another." *Id.* In response, plaintiffs failed to present evidence that supported their conspiracy allegation, so they were sanctioned under the court's inherent authority. *Id.* Gino and her counsel should suffer the same fate.

16

C.    Gino Had No Hope of Prevailing Because She Had No Evidence of Actual Malice

Gino and her counsel should have understood at the outset that she had no evidence the Data Colada Defendants made their statements with knowledge of the falsity of their statements or reckless disregard for whether they were true or not. As Court has already observed, Gino's allegations of "actual malice" depended on blatant mischaracterizations of what the Data Colada Defendants said, providing yet more evidence that she filed her claims in bad faith.

"[T]o satisfy the actual malice requirement, a plaintiff must point to sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication, or actually had a high degree of awareness of probable falsity." *Lemelson v. Bloomberg L.P.*, 903 F.3d 19, 24 (1st Cir. 2018) (cleaned up). Gino's principal assertion of actual malice was that "in their December Report, Defendants represented to Plaintiff's employer in 2021 that they had '*direct evidence*' of fraud *by Plaintiff*, but two years later, after defaming her in four blog posts, Defendant Simonsohn acknowledged that Defendants did not have such evidence." (Doc. No. 52, Opp. to Motion to Dism. at 19, citing Am. Compl., Doc. No. 6 at ¶¶ 104, 280 and n. 18)(emphasis supplied). As the Court noted in its September 2024 decision, nothing about this assertion was true. "A plain reading of the December report does not assert 'direct evidence' of fraud by Professor Gino anywhere," and neither do the blog posts. (*Id.* at 36, 37). And, contrary to Gino's strained allegations, "[n]othing in [Simonsohn's] statement contradicts what was articulated in the December Report or the blog posts," so it does not show the Data Colada Defendants "'in fact entertained serious doubts as to the truth of [their] publications." (*Id.* at 37, quoting *Lemelson,* 903 F.3d at 24.).

Otherwise, Gino alleged that the Data Colada Defendants "knew that data irregularities occur within the norms of the field of behavioral science with respect to data collection and

handling, and engaged in knowing falsehood and reckless disregard for the truth by attributing data irregularities to 'fraud' in Plaintiff's case." (Opp. to Mot. to Dism. at 19, citing Am. Compl., ¶¶ 272-273) (emphasis supplied). This allegation was not made in good faith. Apart from having no evidence that the Data Colada Defendants believed there was anything normal about the anomalies, Gino herself acknowledged that the datasets were altered, so she knew the discrepancies did not fall "within the norms" of science.[12] (Doc. 20-5 at 676, 1043).

## III.    GINO FILED HER CLAIMS FOR THE OPPRESSIVE REASON OF PUNISHING THE DATA COLADA DEFENDANTS.

Gino brought her claims against the Data Colada Defendants for the "oppressive reason" of punishing them for blowing the whistle on her apparent fraud. That improper motive further supports imposition of sanctions. *Whitney Bros. Co.*, 60 F.3d at 13.

On September 29, 2023, Gino published a website, titled "Francesca v. Harvard," apparently to curry public support for her lawsuit. (Pyle Aff., Exhibit 4). Gino wrote on the website that she decided to sue the Data Colada Defendants not because their statements were false and defamatory, which "alone would not have led me to bring them into this suit," but because they took their concerns directly to Harvard rather than going to her first. (*Id.*). "Anyone," Gino acknowledged, "should be free to challenge academic work" and "try to

---

[12] Gino also lacked any reasonable hope of showing the Data Colada Defendants' statements fell outside the protection of the First Amendment. In its September 11, 2024 decision, the Court determined that the Data Colada Defendants' statements in both the December Report and the blog posts were protected because they "reflect 'personal conclusions about the information presented,'" and "disclose the facts underlying their judgment that there was likely data fraud in the studies." (Doc. 74, p. 31). The December Report, the Court noted, "walks the reader through 'Evidence of Fraud in Academic Articles Authored by Francesca Gino': it does not directly state anywhere that Professor Gino committed fraud." (*Id.* at 33). Likewise, the four blog posts "analyze each study and the underlying data at length, describe how the Data Colada Defendants reached their conclusions regarding data tampering, and provide many screenshots from and hyperlinks to the primary documents from each study – including the allegedly suspicious data files." (*Id.* at 35). In short, "the sum effect of the blog posts makes plain that they represent the Data Colada Defendants' subjective interpretation of the disclosed facts," so they were protected by the First Amendment. (*Id.* at 36).

show . . . fraud, without fear of litigation." (*Id.*). However, the Data Colada Defendants went "behind my back to accuse me to my employer of the worst kind of fraud," and thereby "became a critical cause of the harm that I have suffered."[13] (*Id.*).

This explanation is unintentionally revealing. None of Gino's claims against the Data Colada Defendants was based on their decision to go directly to Harvard. (Doc. 6). Nor is there any reason to believe that Gino could have convinced the Data Colada Defendants that their suspicions were groundless if given the chance. After all, when Harvard interviewed Gino about the anomalies in February 2022, she had no explanation other to point out that it was her research assistants, not her, who had handled the data. (Harvard Report, Doc. 20-5, at 229).

Thus, Gino's explanation strongly suggests that her motivation for suing the Data Colada Defendants was to punish them for blowing the whistle on her apparent fraud. This is an "oppressive reason" for filing a lawsuit, and it warrants the imposition of sanctions. *Whitney Bros. Co.*, 60 F.3d at 13; Wright & Miller, 10 Fed. Prac. & Proc. Civ. § 2675 (4th ed.) ("[c]ourts assess fees when the litigation itself is perceived as having been brought in bad faith to harass or vex a party.") Sanctions under the Court's inherent authority are appropriate to "remind plaintiff and [her] lawyers that the federal court system is not to be used to settle personal grudges," and to "deter them from engaging in similar conduct in the future." *Galanis*, 841 F. Supp. 2d at 461.

An award of sanctions here would also alleviate the chilling effect that Gino's conduct may otherwise have on future efforts to detect data fraud. As the Court noted in its September 11, 2024 opinion, our "profound national commitment to the principle that debate on public

---

[13] Of course, the Data Colada Defendants did not "accuse [Gino] of the worst kind of fraud" in their report to Harvard. As the Court has already determined: "[u]pon investigation, the Data Colada Defendants presented their concerns about data anomalies in Professor Gino's research to Harvard, noted that 'the evidence . . . cannot definitively rule in malfeasance by Professor Gino,' and told Harvard to give 'full opportunity for Professor Gino to explain [the] apparent anomalies.'" (Doc. 74 at 38).

issues should be uninhibited, robust and wide-open," applies with special force in "matters of academic and scientific debate." (Doc. 74 at 30, quoting *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 270 (1964)). Yet "[t]he chilling power of defamation law may be all the greater in the academic setting because of the financial vulnerability of most individual scholars and academic journals." Amy Gajda, THE TRIALS OF ACADEME: THE NEW ERA OF CAMPUS LITIGATION 176 (Havard Univ. Press 2009) (noting universities and publishers do not always pay the legal expenses of employees or authors who are sued for their academic communications, "which can make academic speakers easy targets for legal bullying.")

The goal of a litigant like Gino "is not to win the lawsuit but to punish the opponent and intimidate them into silence." George W. Pring, *SLAPPS: Strategic Lawsuits Against Public Participation*, 7 Pace Envtl. L. Rev. 3, 3, 9–11 (1989). Absent the imposition of sanctions, future researchers who might otherwise undertake the important work identifying fraud in scientific studies will have received the chilling message that the risks of financial ruin are too great. The Court should impose sanctions on Gino and her attorneys to counter that harmful message.

<u>CONCLUSION</u>

For the foregoing reasons, Joseph Simmons, Leif Nelson, and Uri Simonsohn move that the Court impose sanctions pursuant to its inherent authority on plaintiff Francesca Gino and Nesenoff & Miltenberg LLP, and that it afford the Data Colada Defendants 30 days from the date of its ruling on this motion to submit an application for their reasonable attorneys fees and costs in this action.

20

5235601

Respectfully Submitted,

URI SIMONSOHN, LEIF NELSON, AND
JOSEPH SIMMONS,

By their attorney,

/s/ *Jeffrey J. Pyle*
Jeffrey J. Pyle (BBO #647438)
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA 02110
(617) 456-8000 (tel)
(617) 456-8100 (fax)
jpyle@princelobel.com

## **CERTIFICATE OF SERVICE**

I hereby certify that the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and by first-class mail to any non-registered participants.

/s/ *Jeffrey J. Pyle*
Jeffrey J. Pyle

5235601