UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FRANCESCA GINO,<br><br>    Plaintiff,<br><br>    v.<br><br>PRESIDENTS AND FELLOWS OF HARVARD COLLEGE, SRIKANT DATAR, JOHN DOES 1-10, AND JANE DOES 1-10,<br><br>    Defendants. | Civil Action No. 1:23-cv-11775-MJJ |

### PLAINTIFF'S OPPOSITION TO MOTION FOR SANCTIONS

Francesca Gino ("Professor Gino" or "Gino") did not falsify any data or otherwise engage in any kind of research misconduct. Gino Aff. ¶ 9 (attached as Exhibit A). In July 2021, however, a group of bloggers known as Data Colada began a secret campaign that was seemingly aimed at discrediting Professor Gino and ruining her career. Relying on a mix of innuendo, half-truths, and outright falsehoods, Data Colada conveyed to Professor Gino's employer—Harvard—that she was engaged in a pattern and practice of falsifying research data for use in her academic writings. Leaving nothing to chance, Data Colada further sought to pressure Harvard into validating their claims, threatening in no uncertain terms that they would "take matters into their own hands" if Harvard's response was unsatisfactory.

Data Colada's campaign was a rousing success. Harvard proved all too willing to offer Professor Gino as its sacrificial lamb, and promptly developed a new investigation protocol that would deliver Data Colada's desired result. Harvard then used this new protocol to impose on Professor Gino the impossible burden of proving her innocence, all while depriving her of any reasonable opportunity to do so.

While much more could be said about Harvard's "investigation" and all that followed, it suffices to say that Data Colada has (at least for the time being) gotten everything they wanted. Not only has Professor Gino's once thriving career been completely decimated, but Data Colada has escaped liability (at least for the time being) for the extensive harm that they caused.

Yet, Data Colada can't leave well enough alone. Relying again on a mix of innuendo, half-truths, and outright misrepresentations, Data Colada asks this Court to take the extraordinary step of sanctioning Professor Gino and her former counsel under its "inherent powers." But, as reflected in the sworn statement from Professor Gary Pisano (attached as Exhibit B), there is compelling evidence that Data Colada submitted false affidavits in support of their motion. Compare Affidavits of Leif Nelson, Joseph Simmons, and Uri Simonsohn (Doc. Nos. 101-103) (swearing that there was no agreement between Data Colada and Harvard) with Exhibit B, ¶ 18 (describing conversation with Harvard's Dean Datar in November 2021, in which Datar admitted to the existence of such an agreement).

While the battling affidavits raise serious questions about Data Colada's motives here, the Court need not resolve those questions to decide the instant motion. As detailed below, there is no basis for Data Colada's request for sanctions—either legally or factually—and it should be summarily denied.

**I.   FACTS**

Although the "Factual Background" presented in Data Colada's motion begins in December 2021, the evidence shows that their attacks on Professor Gino started months earlier. Pisano Statement, ¶ 10. On July 24, 2021, Harvard Business School ("HBS") Professor Gary Pisano was told that "serious research misconduct allegations had been made against Professor

Gino by Data Colada." Id. This was conveyed to Professor Pisano by Jean Cunnigham, who was then serving as Associate Dean for Faculty and Academic Affairs at HBS. Id.

While this information was shared with Professor Pisano on July 24, 2021, he was forbidden from sharing it with Gino and was warned that there would be "serious consequences" if he did. Id. at ¶ 11. Meanwhile, HBS hurriedly crafted a new "Interim Policy" for adjudicating allegations of research misconduct, replacing the procedure HBS faculty had formally adopted in 2013. First Am. Compl. (Doc. No. 6) ¶¶ 78-80. Among other things, this new procedure severely limited her ability to obtain assistance in evaluating and responding to the allegations, as she was forbidden from speaking about the allegations with anyone beyond just two advisors. Id. ¶ 288.

The full extent of Data Colada's communications with Harvard during this time are not yet known, but there is strong evidence that a "deal" was reached. According to Professor Pisano, Dean Datar told him of such an agreement in November 2021, explaining "he had made a deal with the complainant (Data Colada) whereby they (Data Colada) would not go public with the allegations against Professor Gino and that HBS would do the investigation itself." Pisano Statement, ¶18. And while the available evidence may not define the precise contours of this "deal," a fair inference may be drawn that Dean Datar's hurriedly crafted "Interim Policy" was part of Data Colada's bargained for exchange.

Indeed, the evidence strongly suggests that Data Colada did not simply want HBS to investigate the alleged anomalies they had found—Data Colada was trying to influence the outcome of that investigation. For example, in a June 27, 2022 email (attached as Exhibit C), Data Colada's Joseph Simons communicated a not-so-veiled threat that Data Colada's sources, if not satisfied, would "take matters into their own hands." The existence of this pressure campaign was further confirmed by Dean Datar himself, who admitted to Professor Pisano that Data Colada was

3

"pressuring" HBS and baselessly accusing the school of engaging in "whitewashing." Pisano Statement, ¶ 19.

Data Colada's intent can also be inferred from the content of their "December Memorandum." Doc. No. 100-1. To begin, the December Memorandum expressly asserts that the data "anomalies" they found were "direct evidence of tampering." Id., p. 1. That is objectively false, as "tampering" was just one possible explanation for the "anomalies" described by Data Colada. Gino Aff. ¶ 4; Pisano Statement, ¶¶ 21-22.

Indeed, it is common practice in Professor Gino's field for research data to be "cleaned" before it is analyzed. Gino Aff. ¶¶ 2-3. "Cleaning" is a complicated, error-prone, multistep process. Id. at ¶ 3. It can include: (1) identifying and correcting errors (e.g., a participant's age recorded as "205" instead of "25"), (2) removing incomplete or irrelevant responses (e.g., participants who didn't finish the study, failed attention checks or provided nonsensical answers), (3) handling missing data (e.g., deciding whether to impute missing survey answers to the participant), (4) ensuring consistency in formatting and coding (e.g., standardizing category responses, such as "Male" and "M"), and (5) restructuring the dataset to prepare it for analysis (e.g., collapsing experimental conditions from separate blocks into a single column for each participant). Id. Sometimes the data needs to be re-scored (e.g., if a survey question is worded negatively—"I feel unhappy at work"—a response of 7 should be flipped to a 1 so that higher numbers indicate greater happiness). Id. Often it must be "coded" (e.g., assigning "very satisfied" a score of 5). Id. These steps can take many hours to complete, sometimes days if the coding is complex and the sample is large. Id. Multiple researchers can be involved, as well as lab operators, administrative staff, research assistants, and students. Id.

In short, every step of the data preparation process transforms the raw data in some way. Id. at ¶ 4. And whenever researchers (or their staff) are working with datasets to prepare them for analysis, there is some risk of mistakes or misunderstandings. Id. Thus, apparent anomalies in the final datasets can be entirely benign (due to data preparation and cleaning), can be inadvertent (such as data processing mistakes), or can be intentional malfeasance. Id.

Data Colada's December Memorandum failed to disclose any of this critical context. Instead, it posited that the only possible explanation for the alleged data anomalies was some form of malfeasance. Doc. No. 100-1, p. 2. Given the knowledge and experience of the authors, a fair inference may be drawn that they either knew this was false or at least acted recklessly by expressing such a conclusion. Gino Aff. ¶ 5.

Further, while the December Memorandum noted that Professor Gino should be allowed an opportunity "to explain apparent anomalies," it failed to disclose another critical fact—that providing such explanations, years after the research had been completed, would likely be impossible for a researcher like Professor Gino. Id. at ¶ 2; Pisano Statement ¶ 23.

Gino is a behavioral scientist. Gino Aff. ¶ 2. Like most researchers in her field, she relies on research assistants ("RAs") to prepare the data that she then analyzes. Id. This means that after Gino designs an experiment, that experiment is conducted by others, the data is collected by others, it is "cleaned" by others, and prepared by others for Gino to analyze. Id.

Against this backdrop, a fair inference may be drawn that Data Colada's suggestion—that Professor Gino should be asked "to explain the apparent anomalies"—was not intended to assure that Professor Gino was subjected to a fair investigatory process. To the contrary, it falsely implied that Professor Gino could be judged guilty simply for failing to provide such an explanation. Again,

it is fair to infer that Data Colada knew otherwise, or at least acted recklessly by making such an implicit assertion.

To be sure, HBS should not have acquiesced to the Data Colada pressure campaign. But the evidence strongly suggests that it did. As reflected in the self-serving "Harvard Report" (which Data Colada misleadingly cites as fact), Professor Gino was—contrary to Harvard's own policies and practices—presumed guilty of having falsified the research data at issue and given the nearly impossible burden of proving otherwise. Doc. 20-5, pp. 10-17. She was further hamstrung in those efforts by Dean Datar's "Interim Policy" which, because she was limited to only two advisors, effectively prohibited Professor Gino from obtaining a forensic expert to counter Harvard's own analysis. Gino Aff. ¶ 6.

The end result of this process was a deeply flawed self-serving "Report," in which Harvard ignored substantial exculpatory evidence in favor of adopting the conclusion that Data Colada had preordained. See, e.g., Witness Statement of Frances Frei (attached as Exhibit D), ¶¶ 47-51 (summarizing evidence and noting that "the investigating committee was misled by Data Colada in ways that it could have and should have identified"). As will be shown at trial, analysis performed by Professor Gino's expert—now that she has been permitted the opportunity to get one—has found glaring mistakes in the Harvard Report. Gino Aff. ¶¶ 7-8. The analysis has also found clear evidence of the cause of some of the alleged "anomalies," and they were not the result of malfeasance by Professor Gino. Id.

For example, the evidence will show that the "Harvard" anomaly claimed in Data Colada's "Case #1" was not caused by anyone "tampering" with the data—as Data Colada had conclusively asserted. Instead, it was the result of a "survey farmer" who took the online survey multiple times

6

to obtain the $10 Amazon gift card offered for each survey completed. Id. at ¶ 8. This was notably missed by Harvard's forensic "expert," who failed to uncover this at the time of the investigation.

Of course, this still begs the question: Why did Data Colada mount this campaign against Professor Gino? Although Data Colada has presented themselves to this Court as "three academics merely…raising legitimate concerns," the evidence discussed above strongly suggests otherwise. Indeed, if Data Colada were truly just seeking to get answers, and if they truly believed that Professor Gino should have those answers, why not just ask her? Why secretly go to HBS, negotiate a "deal," and then continuously apply pressure to get their desired result?

Given the dismissal of Professor Gino's claims against Data Colada, those questions may never be litigated. But Professor Gino had a sufficient factual basis for alleging that Data Colada's motives were improper, and that they targeted her maliciously. Indeed, Professor Gino is not the only Harvard Professor who has doubted Data Colada's motives here. Pisano Statement, ¶ 16. And as reflected in the Frei Statement, there is reason to suspect that at least one of those motives may be related to gender bias. Frei Statement, ¶¶ 16, 17, 25, 46(a)

In any event, there is no evidence to suggest that Professor Gino brought her claims against Data Colada in bad faith or for an improper purpose. Gino Aff, ¶ 10.

II.  **ARGUMENT**

    A. <u>Even if Data Colada's Allegations Were All True, Sanctions Under the Court's "Inherent Powers" Would be Inappropriate.</u>

Although the Court's inherent powers provide a strong tool to ensure the fair administration of justice, they must be "used sparingly and reserved for egregious circumstances." <u>Jones v. Winnepesaukee Realty</u>, 990 F.2d 1, 4 (1st Cir. 1993). Sanctionable conduct should normally be addressed through the applicable statutes and Rules. <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 50 (1991) ("when there is bad-faith conduct in the course of litigation that could be adequately

7

sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power"). Resort to the Court's inherent powers is only appropriate when "neither the statute nor the Rules are up to the task." Id.

Here, as a preliminary matter, Data Colada has made no showing that the Rules are not up to the task. Indeed, each of the arguments that they raise would (if true) be governed by Rule 11. In particular, their argument that the allegations against Data Colada in the complaint were made in bad faith is governed by Rule 11(b)(1). Likewise, their arguments that seemingly challenge the legal and factual grounds for the complaint are governed by Rule 11(b)(2) and Rule 11(b)(3), respectively.

As Data Colada has not sought relief under Rule 11, the instant motion should be summarily denied. But if the Court considers the merits of this motion nonetheless, it should do so under the standards applicable to Rule 11, which, among other things, prohibits an award of monetary sanctions against a represented party for legal infirmities in their claim. See Rule 11(c)(5) ("The court must not impose a monetary sanction against a represented party for violating Rule 11(b)(2).")

B. Professor Gino Brought her Defamation Claims Against Data Colada in Good Faith.

Data Colada's "bad faith" argument is based on three alleged "facts" that they assert are proven by the record: First, that Professor Gino "knew" she had no hope of ever succeeding on her defamation claim; Second, that she "invented out of thin air an alleged 'agreement' between [Data Colada] and Harvard;" and Third, that she had no factual basis for alleging actual malice.[1] Each of these claims is wrong, and we address each in turn.

---

[1] In a footnote, Data Colada advances a fourth possible argument—that Professor Gino could not possibly show that the statements "fell outside the protection of the First Amendment." Motion at 18, fn 12. As this argument appears to be directed to Professor Gino's former counsel—as

      1.  <u>Anomalies do not Equal Fraud</u>

As they did in their December Memorandum and subsequent Blog Posts, Data Colada's brief consistently equates unexplained anomalies in data sets with unequivocal proof of fraud. But as demonstrated by the facts set forth above, that is blatantly false. Data of the type at issue here is regularly "altered" in many ways as part of the ordinary "cleaning" process. In doing so, there are a multitude of ways in which "anomalies" may arise—including from inadvertent errors by those handling the data.

Contrary to Data Colada's assertions, Professor Gino has never contended otherwise and Harvard has never proven otherwise. Professor Gino maintained throughout the investigation process that she could not state definitively how the alleged anomalies had arisen, but that they could have been caused by someone else either accidentally or intentionally. Doc. No. 20-5, p. 10. And ultimately, the Harvard Report does not reflect that the evidence **<u>proved</u>** someone committed malfeasance. Instead, the Committee found that Professor Gino had **<u>not proven</u>** that the anomalies were caused by "honest error," and therefore should be judged guilty.

Moreover, Professor Gino has never contended that she was defamed because someone identified potential anomalies in her data. Her claim in this case was that Data Colada's statements conveyed a more nefarious message—that the apparent anomalies in the data were caused by Professor Gino engaging in data fraud. First Am. Compl. ¶¶ 382, 385, 388, 391, 398. Those are the defamatory statements alleged by Professor Gino, and there is no question she has steadfastly maintained her innocence of those allegations.

---

opposed to Professor Gino herself—we will simply note that (1) it appears evident from the arguments advanced in opposition to Data Colada's motion to dismiss that her counsel did not violate Rule 11(b)(2) (see Doc. No. 52, pp. 9-16) and (2) even if they did, Rule 11(c)(5) would preclude the Court from awarding monetary sanctions against Professor Gino on that basis.

As this Court has previously observed, the alleged defamatory statements at issue here do not expressly state that Professor Gino engaged in data fraud. But the meaning of an alleged defamatory statement is not based solely on the words that are expressly used. "When determining whether a statement is defamatory, the court must analyze the statement in light of the totality of the circumstances, including the entire context of the publication."[2] Cass v. Town of Wayland, 383 F. Supp. 3d 66, 87 (D. Mass. 2019) (quotation omitted). Ultimately, the question is whether the communication "is reasonably susceptible of a defamatory meaning." Phelan v. May Dep't Stores Co., 443 Mass. 52, 56 (2004).

Thus, for example, in Lemelson v. Bloomberg LP, 253 F. Supp. 3d 333, 339 (D. Mass. 2017), aff'd sub nom. Lemelson v. Bloomberg L.P., 903 F.3d 19 (1st Cir. 2018), the court held that a newspaper article claiming the plaintiff was the subject of an SEC investigation could have a defamatory meaning. Notably, the court reached this conclusion even though the article contained language that purported to caution the reader against drawing an adverse inference based on the existence of the investigation. Id. ("The opening of an SEC probe is typically a preliminary step and doesn't mean Lemelson, who hasn't been accused of wrongdoing, will ever face an enforcement action").

---

[2] As one writer has noted,

> Precluding a plaintiff from recovering for defamation that is cleverly couched in implication is inequitable. It rewards a defendant for having the foresight or literary facility to secrete a "classic and coolly-crafted libel" in the overtones of a facially neutral statement. It may provide a loophole through which media defendants can escape liability for "high-profile" defamatory stories by insinuating what they may not state.

Nicole Alexandra LaBarbera, The Art of Insinuation: Defamation by Implication, 58 Fordham L.Rev. 677, 701 (1990).

Here, the "totality of the circumstances" strongly supported Professor Gino's belief that Data Colada's statements could reasonably be interpreted as accusing her of data fraud. Indeed, the statements not only unequivocally asserted that there had been "fraud" and "tampering," they allude to the existence of additional undisclosed facts that could cause a reader to infer that Professor Gino was the culprit. For example, in the December Memorandum, Data Colada included the unsupported allegation that "[w]e have strong suspicions about some [of] her published data going as far back as 2008 (when she was a post-doc at Carnegie Mellon University), but the most direct evidence is included it [sic] in this report." Doc. No. 100-1, p. 2. Likewise, the series of Blog Posts at issue were prefaced with an introductory statement that claimed "[w]e believe that many more Gino-authored papers contain fake data. Perhaps dozens." Doc. No. 6-6. p. 2. This same introductory statement also publicized Data Colada's role in Harvard's investigation, and suggested that they had pointed Harvard to "airtight evidence" that Professor Gino had engaged in fraud.[3] Id. at p. 3.

Lastly, it bears mention that Professor Gino's "good faith" in bringing her claim is further buttressed by the overwhelming response to Data Colada's statements. Their secret reports to Harvard prompted an inherently unfair investigatory process, in which she was not only presumed guilty but also deprived of a fair opportunity to prove otherwise. Likewise, as alleged in her complaint, their Blog Posts prompted "venomous, misogynistic hate emails from people all over the world." First Am. Compl. ¶ 276. She also received a death threat, and her clients cited the

---

[3] Of course, the "totality of the circumstances" here would also include all of Data Colada's other communications with Harvard concerning this matter, which began in July 2021 when they raised "serious research misconduct allegations." Pisano Statement, ¶ 10.

Blogposts when they rescinded their contracts. Gino Aff. ¶¶ 11-12. Given these reactions, Professor Gino can hardly be faulted for believing that Data Colada defamed her.[4]

### 2. Professor Gino did not "Invent" the Agreement

Data Colada's second argument is far simpler to refute, as they argue that "[Professor Gino] invented out of thin air an alleged 'agreement' between [Data Colada] and Harvard, and asserted claims…based on that imaginary 'agreement.'" Motion at 15.

As reflected in the Pisano Statement, Professor Gino's allegations concerning there being an agreement between Harvard and Data Colada are based on statements made by Dean Datar himself. Specifically, Dean Datar told Professor Pisano in November 2021 that "he had made a deal with the complainant (Data Colada) whereby they (Data Colada) would not go public with the allegations against Professor Gino and that HBS would do the investigation itself." Pisano Statement, ¶ 18. Accordingly, there is simply no merit to Data Colada's claim that the agreement was "invented out of thin air" by Professor Gino.

### 3. Professor Gino had a Sufficient Factual Basis to Allege Malice

As explained above, the meaning of the defamatory statements at issue cannot be determined based solely on the express words used by Data Colada. A reviewing court must consider the "totality of the circumstances," and the totality of the circumstances in this case supported a good faith argument that the defamatory meaning here was that Professor Gino herself had engaged in data fraud.

If this were the defamatory meaning found by the Court, Data Colada would seemingly concede that there was evidence of "malice." Motion at 17. Indeed, Data Colada has expressly

---

[4] In any event, even if Professor Gino's factual allegations were not legally sufficient to state a colorable claim for defamation, Rule 11 precludes the Court from issuing monetary sanctions against her because she was a represented party. See Fed. R. Civ. P. 11(c)(5).

admitted that there was no evidence of fraud by Professor Gino, and that they had no means to reliably determine whether any fraud may have caused by someone else.

But even if the Court were only to consider the statements expressly made by Data Colada, the record makes clear that there was still an adequate factual basis for Professor Gino to allege that those statements were made maliciously. As discussed above, Data Colada expressly asserted that the alleged anomalies they found were "direct evidence of tampering." That was an untrue statement because—once again—anomalies do not equal fraud. And given the background and expertise of Data Colada, Professor Gino had a good faith basis for alleging that they either knew their "direct evidence" claim was false, or acted recklessly by making it without conducting any further inquiry (such as contacting Professor Gino to see if there were other explanations for such anomalies).

Moreover, it bears repeating that Professor Gino was not the only Harvard professor who questioned the motives of Data Colada. The Pisano Statement confirms that he was suspicious of their motives, particularly given the manner in which they pursued their claims against Professor Gino—which differed significantly from how they typically handled claims of this sort. Pisano Statement, ¶ 16. Likewise, the Frei Statement confirms that she was suspicious of Data Colada as well, particularly given Professor Frei's prior observations of Data Colada's treatment of women. Frei Statement, ¶¶ 16-17, 25, 46.

In short, Professor Gino had (and has) good reason to question the motives of Data Colada in this case, and there was an adequate factual basis for her to allege that they acted maliciously—even if it was not enough to meet the Rule 12(b)(6) standard.

C.  Professor Gino did not Bring her Claims Against Data Colada for an "Oppressive Reason"

Data Colada's next argument is that sanctions are appropriate because Professor Gino wrote the following on her website:

> **What Data Colada wrote about my work is false and defamatory.** That alone would not have led me to bring them into this suit. But when they went behind my back to accuse me to my employer of the worst kind of fraud, in violation of their own stated procedure and in reckless disregard for actual facts, they became a critical cause of the harm that I have suffered.

Doc. No. 100-4 (emphasis in original). Nothing in that statement suggests, as Data Colada wrongly asserts, that Professor Gino brought this action for an "oppressive reason." Professor Gino is simply stating the unremarkable fact that her decision to sue Data Colada was heavily influenced by the manner in which they made their alleged concerns public, which provides strong evidence that they acted maliciously, with the intention of not just raising concerns but ruining her career, and were ultimately successful in doing so.

Moreover, the statement is somewhat akin to a plaintiff in a malpractice case saying "I would not have sued the doctor if he had just apologized for the mistake." That is not evidence that the claim is brought in bad faith—it only shows that the plaintiff may have chosen to forego their legal rights if they had judged the totality of the defendant's actions as being less egregious or harmful.

D.  Sanctions are not Warranted to "Alleviate the Chilling Effect"

In a final effort to persuade the Court that sanctions are appropriate, Data Colada argues that sanctions are appropriate because it would "counteract the chilling effect that Gino's conduct may otherwise have on future efforts to detect data fraud." Motion at 19. That argument is, in a word, specious. There is no authority to suggest that the Court may consider any such alleged

14

"chilling effect" in awarding sanctions. Indeed, if Data Colada's argument were correct, then every defendant in a failed defamation claim would be presumptively entitled to their fees.

Of course, that is not the law, and for good reason. While the First Amendment may prevent Professor Gino from holding Data Colada responsible for the extensive harm they have caused, it also "protects [her] constitutional right to seek judicial resolution of disputes." Sahli v. Bull HN Info. Sys., Inc., 437 Mass. 696, 700 (2002). Professor Gino exercised that right here in good faith, and there is no basis for an award of sanctions.

### III.   CONCLUSION

For all of these reasons, Professor Gino respectfully requests that the motion for sanctions be denied.

                                                   Francesca Gino

                                                   By her attorneys,

*/s/ Patrick J. Hannon*
Barbara A. Robb (BBO #639976)
Patrick Hannon (BBO #664958)
Hartley Michon Robb Hannon LLP
101 Federal Street, Suite 1810
Boston, MA 02210
brobb@hmrhlaw.com
phannon@hmrhlaw.com
P: (617) 723-8000