# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FRANCESCA GINO,<br><br>    Plaintiff,<br><br>    v.<br><br>PRESIDENTS AND FELLOWS OF HARVARD COLLEGE, SRIKANT DATAR, JOHN DOES 1-10, AND JANE DOES 1-10,<br><br>    Defendants. | Civil Action No. 1:23-cv-11775-MJJ |

## AFFIDAVIT OF FRANCESCA GINO

I, Francesca Gino, hereby depose and state under penalty of perjury:

1. I am the plaintiff in this matter and have personal knowledge of the facts set forth below.

2. I am a behavioral scientist. Like most researchers in my field, I rely on research assistants ("RAs") to prepare the data that I then analyze. This means that after I design an experiment, that experiment is typically conducted by others, the data is collected by others, it is "cleaned" by others, and prepared by others for me to analyze.

3. "Cleaning" is a complicated, error-prone, multistep process. It can include: (1) identifying and correcting errors (e.g., a participant's age recorded as "205" instead of "25"), (2) removing incomplete or irrelevant responses (e.g., participants who didn't finish the study, failed attention checks or provided nonsensical answers), (3) handling missing data (e.g., deciding whether to impute missing survey answers to the participant), (4) ensuring consistency in formatting and coding (e.g., standardizing category responses,

such as "Male" and "M"), and (5) restructuring the dataset to prepare it for analysis (e.g., collapsing experimental conditions from separate blocks into a single column for each participant). Sometimes the data needs to be re-scored (e.g., if a survey question is worded negatively—"I feel unhappy at work"—a response of 7 should be flipped to a 1 so that higher numbers indicate greater happiness). Often it must be "coded" (e.g., assigning "very satisfied" a score of 5). These steps can take many hours to complete, sometimes days if the coding is complex and the sample is large. Multiple researchers can be involved, as well as lab operators, administrative staff, research assistants, and students.

4. Every step of the data preparation process transforms the raw data in some way. And whenever researchers (or our staff) are working with datasets to prepare them for analysis, there is some risk of mistakes or misunderstandings. Thus, apparent anomalies in the final datasets can be entirely benign (due to data preparation and cleaning), can be inadvertent (such as data processing mistakes), or can be intentional malfeasance.

5. Given the knowledge and experience of the Data Colada authors, I expect them to be aware that malfeasance is not the only possible explanation for apparent data anomalies.

6. During Harvard's investigation of the allegations made against me by Data Colada, I was only permitted two "advisors" and, therefore, was unable to utilize a forensic expert in my defense. After learning that the Committee had hired Maidstone, in a Zoom call, on May 18, 2022, I asked HBS RIO Bonacossa if I could hire a forensic expert, and he told me I could not. Bonacossa explained that the reason I could not hire a

forensic expert was that I had only two slots for advisors, and I had used them both. I had hired a lawyer based on his recommendation and chose an HBS professor as advisor.

7. I have since been able to retain, through counsel, Michael F. McGowan of Metafor LLC to conduct forensic analysis on my behalf. Mr. McGowan's expert report presents clear evidence of the cause of some of the alleged "anomalies," and confirmed that they were not the result of any malfeasance by me.

8. For example, Mr. McGowan explains that the "Harvard" anomaly claimed in Data Colada's "Case #1" was not caused by anyone "tampering" with the data. Instead, it was the result of a "survey farmer" who took the online survey multiple times to obtain the $10 Amazon gift card offered for each survey completed.

9. As I have maintained from the outset of this ordeal, I did not falsify any data or otherwise engage in any kind of research misconduct.

10. I brought claims against the Data Colada authors in this action in good faith, as I believe that their publications about me were defamatory, malicious and extremely harmful to me and my career.

11. For example, after they published their Blog Posts concerning their allegations against me, a number of my clients rescinded their contracts with me citing the Blog Posts as the reason.

12. I also received a death threat, which I believe was a direct result of the Data Colada Blog Posts.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 23RD DAY OF JUNE, 2025.

_____
FRANCESCA GINO