## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

FRANCESCA GINO,

        *Plaintiff,*

    v.

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE, SRIKANT
DATAR, JOHN DOES 1-10, AND JANE
DOES 1-10,

        *Defendants.*

Civil Action No. 1:23-cv-11775-MJJ

Leave to File Granted July
22, 2025

## THIRD AMENDED COMPLAINT

1.    "We have to make an example of this woman." Those are the words of Claudine

Gay in late 2023—then President of Harvard University—succinctly describing Harvard's

intention to destroy Plaintiff's career. While President Gay would step down shortly thereafter, in

the wake of allegations that she herself had engaged in research misconduct, President Gay is

just one of many Harvard leaders who have carried the baton in its race to sacrifice Plaintiff to

protect Harvard's own image.

2.    Harvard adorns its symbols with the word "veritas," but its fidelity to truth largely

ends there. For years, Harvard has swept under the rug suspicions of research misconduct by its

tenured faculty—President Gay included. Rather than confront a potentially embarrassing truth,

that adequate safeguards may not exist to ensure the integrity of its research, Harvard has time

and again sought the appearance of propriety rather than the thing itself.

3.    In July 2021, however, an esteemed group of bloggers known as "Data Colada"

contacted Harvard and threatened to go public with salacious allegations that one of Harvard

Business School's star professors—Plaintiff—had been falsifying research data for more than a decade. The allegations were false, as Plaintiff has never falsified any data or otherwise engaged in any form of research misconduct. But truth be damned, Harvard was eager to cut a deal.

4.      Without Plaintiff's knowledge, Harvard negotiated an agreement with Data Colada that would best serve their respective interests. See Exhibit A, Witness Statement of Gary Pisano, ¶ 18 (describing conversation in which Dean Datar admitted to the existence of such a deal). Data Colada would hold-off on going public with the allegations, allowing Harvard to conduct an investigation aimed at showing that (1) it took allegations of research misconduct seriously and (2) that the data "anomalies" underlying Data Colada's allegations were simply the result of one bad actor—Plaintiff—as opposed to deeper and more problematic institutional deficiencies. In turn, Data Colada hoped to use the outcome of Harvard's investigation as public validation of its work.

5.      Leaving nothing to chance, Harvard literally re-wrote the rules in hopes of achieving its desired result. Contrary to Plaintiff's contractual rights as a tenured professor, Harvard hurriedly created an "Interim Policy and Procedures for Responding to Allegations of Research Misconduct" (the "Interim Policy") just for Plaintiff. Among other things, the Interim Policy (1) restricted Plaintiff's ability to obtain information from potential witnesses and experts that might be relevant to the allegations made against her and (2) purported to allow Harvard to institute a range of potential sanctions, including termination of employment.

6.      No sooner had Harvard written these new rules than it began breaking them—at least to the extent that they potentially favored Plaintiff. For example, the "Research Integrity Officer"—a critical role that was created and staffed pursuant to the newly-minted Interim Policy—failed to gather and preserve all potentially relevant evidence (as the Interim Policy

Required). And when it became apparent that three of the four studies at issue were actually outside the scope of the Interim Policy, because they had been published too many years ago, Harvard simply disregarded that aspect of the Interim Policy and moved forward with its preconceived plan to deliver findings in accordance with the deal it had struck with Data Colada.

7.    But try as it might, Harvard simply could not find the evidence needed to support its public relations strategy. Without exception, every witness interviewed over the 18-month investigation confirmed that Plaintiff was of high moral character, conducted her research with integrity, and never attempted to cut corners in her research to support her hypotheses. And while there appeared to be at least some anomalies in the data underlying the studies at issue, the investigation showed that there was no way to determine whether such anomalies were the result of customary data preparation and cleaning, data processing mistakes, or intentional malfeasance—or that they were even caused by Plaintiff. In short, none of the information gathered in the investigation came close to sustaining Harvard's burden under the Interim Policy to prove, by a preponderance of the evidence, that Plaintiff "intentionally, knowingly, or recklessly" falsified or fabricated data.

8.    So Harvard lied. On March 7, 2023, the so-called investigation committee acting at Harvard's behest, and purportedly authorized by the Interim Policy, issued a report falsely claiming that Plaintiff was responsible for "research misconduct." The report further recommended that a number of punitive measures be taken against Plaintiff, again under the purported authority granted by the Interim Policy. Among those recommendations was that "the Deciding Official consider placing [Plaintiff] immediately on an unpaid leave and initiating steps leading to termination of employment."

9.    That "Deciding Official" was Srikant Datar, Dean of Harvard Business School. Despite having actual knowledge that the findings in the report were deeply flawed and unreliable, including because potentially relevant research files had not been considered, Dean Datar adopted its conclusions and informed Plaintiff that she would be subjected to a bevy of harsh and punitive sanctions. These included placing her on unpaid administrative leave (a decision to strip Plaintiff of her entire salary and benefits); immediately removing Plaintiff from all of her teaching duties, research responsibilities, mentorship of students, and her titled professorship; and publicly disclosing that these actions were being taken because Plaintiff had engaged in "research misconduct."

10.    True to form, however, there was more to Harvard's plan. Within hours of delivering this news to Plaintiff, Dean Datar's office contacted one of Plaintiff's colleagues and asked her to "counsel out" Plaintiff, meaning to persuade Plaintiff to resign. This female colleague was told that, if Plaintiff agreed to leave Harvard, "this will all go away; we won't say anything to anyone."

11.    But that too was a lie. Harvard knew that Data Colada still planned to publicly disclose its salacious allegations against Plaintiff and that, when it did so, Data Colada would be disclosing information concerning Harvard's purported investigation—which Harvard had agreed to provide in accordance with their deal. Of course, none of that had been disclosed to Plaintiff, as Harvard had intentionally kept secret Data Colada's role in the investigation, referring to it only as an "anonymous" complainant.

12.    Far from making the allegations "go away," Plaintiff's resignation would have been publicly interpreted as an admission of guilt. And that is precisely what Harvard wanted. Unable to carry its burden to prove that Plaintiff had engaged in research misconduct, Harvard

simply wanted to prevail in the court of public opinion, even if that required engaging in dishonest and deceitful tactics.

13.    Fortunately, Plaintiff refused to resign. Not because she had any suspicion of the trap that had been laid—she didn't—but for a simpler and more fundamental reason: she had not engaged in any kind of research misconduct. Plaintiff steadfastly believed that the truth would ultimately prevail and that she would be permitted to resume the career that she loved so much and had worked so hard to earn.

14.    Harvard, however, would soon make that virtually impossible. Its public disclosure of Plaintiff's suspension, coupled with a series of incendiary blog posts from Data Colada, ignited a public firestorm. Plaintiff received venomous, misogynistic hate emails from people all over the world. One person even threatened to take her life.

15.    Upon discovering Data Colada's role in these events, and finally recognizing Harvard's plan, Plaintiff filed this lawsuit asserting claims for discrimination, breach of contract and a variety of torts. Meanwhile, Harvard moved forward with efforts to formally revoke Plaintiff's tenure by instituting another committee (the "TS Committee") to proclaim that there is "clear and convincing evidence" that Plaintiff engaged in "grave misconduct," which is the standard required to terminate a tenured professor under Harvard's "Third Statute."

16.    The TS Committee, like Dean Datar before it, trampled on Plaintiff's procedural and substantive rights as a tenured professor. For example, the TS Committee denied virtually all of Plaintiff's requests for relevant documents and information from Harvard, even though ¶ 10 of the Discipline Policy required that "[e]very possible effort will be made to obtain the most reliable evidence available." The TS Committee also allowed Harvard to "move the goal posts" by completely abandoning the purported forensic analysis relied on by the investigation

committee (after Plaintiff and her experts had spent months preparing to show why the analysis was erroneous and unreliable). Specifically, fourteen months after declaring Plaintiff's guilt, and just three months before the TS hearing, Harvard abandoned its primary expert and radically changed the factual basis of its charges against Plaintiff. The TS Committee thereafter refused to allow Plaintiff a reasonable opportunity to rebut the bevy of different arguments and claims put forth by Harvard's new purported expert, including by refusing to allow a continuance of the hearing date and then allotting Plaintiff only 6 hours of hearing time, which effectively denied Plaintiff a meaningful opportunity to confront her accusers.

17.     Perhaps not surprisingly, these procedural and substantive violations of Plaintiff's rights culminated with the TS Committee issuing a report that grossly mischaracterized the evidence and falsely asserted there was "clear and convincing evidence" that Plaintiff had engaged in "grave misconduct."

18.     Of course, others at Harvard greatly contributed to these procedural and substantive violations. In particular, the public firestorm ignited by Dean Datar and his deal with Data Colada irreparably tainted the proceedings conducted by the TS Committee by, among other things, dissuading the Research Assistants involved in the studies at issue from participating. This deprived Plaintiff, and the TS Committee, of access to critically important evidence, as it was the Research Assistants who had been primarily responsible for handling the data at issue.

19.     Harvard leadership also submitted false testimony to the TS Committee. This included Dean Datar, who falsely claimed that he had not made a deal with Data Colada, and Research Integrity Officer Alain Bonacossa, who (among other things) lied to the TS Committee by stating that he had "specifically informed Prof. Gino that she could hire her own forensic

expert to work on her behalf" during the process conducted under the Interim Policy. (He had done the exact opposite.)

20.     Further fueling the fire that caused Harvard to dishonestly attack Plaintiff before the TS Committee, was the fact that Plaintiff had sued Harvard for discrimination. Indeed, Harvard repeatedly brought that fact to the attention of the TS Proceeding in a transparent attempt to engender retaliatory animus.

21.     In May 2025, President Gay's promise to "make an example of this woman" was fulfilled, as Harvard purported to adopt the findings and recommendations of the TS Committee and formally revoked Plaintiff's tenure. But Harvard was not done. Just weeks later, on July 7, 2025, Harvard filed a motion announcing its intention to pursue a counterclaim against Plaintiff for defamation. Based on Harvard's filing, the proposed counterclaim has no legitimate basis in either law or fact, and is simply a further act of retaliation intended to annoy, harass and disparage Plaintiff.

22.     As a result of Defendants' unlawful actions, Plaintiff has suffered tremendous harm. Her reputation as a highly sought-after author, consultant and researcher has been destroyed. Plaintiff has not only been stripped of her salary and position as a tenured Professor, but her career has been derailed. Plaintiff has also suffered severe emotional distress.

23.     In bringing this action, Plaintiff seeks not only to recover for the extensive harm that Defendants have caused, but to finally obtain a fair, impartial, and unbiased consideration of the evidence concerning the allegations that Harvard has falsely and maliciously claimed she is guilty of.

## THE PARTIES

24.     Plaintiff Francesca Gino ("Plaintiff" or "Professor Gino") is a natural person and resident of the Commonwealth of Massachusetts.

25.     At all relevant times, Plaintiff was a faculty member at Harvard Business School ("HBS") and an employee of Harvard University within the meaning of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.,* and the Massachusetts Fair Employment Practices Act ("FEPA"), Mass. Gen. Laws. Ch. 151B.

26.     Defendant President and Fellows of Harvard College ("Harvard University" or "Harvard"), provides educational services and was and is the duly empowered governing board of Harvard University, with a principal office located at Harvard University Massachusetts Hall, Cambridge, Massachusetts 02138.

27.     At all relevant times, Defendant Srikant Datar ("Dean Datar") was the Dean of HBS. Dean Datar and Harvard are together referred to herein as "Defendants."

## JURISDICTION AND VENUE

28.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367 because the federal law claim arises under the Constitution and statutes of the United States, and the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

29.     This Court has personal jurisdiction over the Defendants on the grounds that they conduct business within the Commonwealth of Massachusetts.

30.     At all relevant times, the acts and omissions complained of occurred within the Commonwealth of Massachusetts.

31.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

32.     Plaintiff has timely and properly exhausted her administrative remedies and satisfied all pre-conditions to bring the within action.

33.     On October 31, 2023, Plaintiff filed an administrative Charge of Discrimination with both the Massachusetts Commission against Discrimination ("MCAD"), MCAD Charge No. 23BEM03139, and the United States Equal Employment Opportunity Commission ("EEOC"), EEOC Charge No. 16-C-2024-00345, against Defendants, alleging discrimination on the basis of sex, in violation of the Massachusetts Fair Employment Practices Act, Massachusetts General Laws c. 151B ("Chapter 151B") and of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e2(a)(1). Plaintiff filed an Amended Charge of Discrimination on November 24, 2023.

34.     Thereafter, on or about September 18, 2024, and in accordance with M.G.L. § 151b, § 9, Plaintiff elected to withdraw her complaint from both the MCAD and the EEOC and to file a lawsuit in this Court.

35.     On or about October 4, 2024, the MCAD issued Plaintiff a letter acknowledging it received notice of her intent to file her complaint in court and its dismissal of her administrative charge ("right-to-sue letter").

36.     On or about October 8, 2024, the EEOC issued Plaintiff a right-to-sue letter. Accordingly, Plaintiff has timely and properly exhausted her administrative remedies and satisfied all pre-conditions to bring the within action.

37.    As alleged below, additional acts of discrimination and retaliation have occurred since Plaintiff filed her Amended Charge of Discrimination on November 24, 2023 (the "Subsequent Acts"). The Subsequent Acts are a continuation of, and inextricably intertwined with, the acts complained of in the Amended Charge and, therefore, no additional administrative filing is required to bring those claims in this Court.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.    Plaintiff's Professional Background and Employment at Harvard.

38.    Plaintiff is a behavioral scientist. The focus of Plaintiff's work is studying the psychology behind the decisions people make, to learn how people can thrive at work and better engage with one another.

39.    Plaintiff is a prolific author and an award-winning researcher. She has authored or co-authored countless journal publications, business articles, and books.

40.    Most of Plaintiff's work, whether it is the many academic articles she has written (over 140 of them), or the case studies she has worked on (over 50 of them), has been in collaboration with others.

41.    Plaintiff has regularly presented her work at conferences and has been invited to speak at some of the most prestigious colleges and universities in the world.

42.    Plaintiff has received numerous honors and awards and has been honored as one of the world's top "40 Business Professors under 40" and one of the world's most influential management thinkers by Thinkers50.

43.    Plaintiff has also won awards for her research, including the 2013 Cummings Scholarly Achievement Award, from the Academy of Management Organizational Behavior Division.

44.    Plaintiff's work has been covered in numerous media outlets including *The Atlantic, The Boston Globe, Business Week, The Economist, The Financial Times, National Public Radio, Scientific American, The Wall Street Journal*, and *The New York Times.*

45.    Plaintiff's consulting clients include several Fortune 100 companies, as well as the United States Air Force, Army, and Navy.

46.    Plaintiff received her Bachelor of Arts degree in Business Economics from the University of Trento (Trento, Italy) in 2001, graduating *magna cum laude.* Plaintiff earned her M.S. and Ph.D. degrees in economics and management from Sant'Anna School of Advanced Studies (Pisa, Italy) in 2004.

47.    Plaintiff went on to academic positions as a post-doctoral fellow and senior researcher and lecturer at Harvard University (2004-2006), a visiting assistant professor of organizational behavior at Carnegie Mellon University (2006-2008), and as an assistant professor of organizational behavior at the University of North Carolina Kenan-Flagler Business School ("UNC") (Chapel Hill, North Carolina), (2008-2010).

48.    As a Visiting Assistant Professor at Carnegie Mellon University ("CMU"), Plaintiff was the lab manager for scholars in Behavioral Sciences and Organizational Behavior, where she obtained a full understanding of the common practices for managing a lab and a deep understanding of the research process.

49.    As a faculty member at UNC, Plaintiff created the behavioral lab at UNC.

50.    Defendant Harvard recruited Plaintiff through an offer letter dated February 16, 2010, in which Harvard Business School ("HBS") offered Plaintiff an appointment as an Associate Professor at HBS, effective July 1, 2010.

51.     The offer letter promised Plaintiff that, should she accept, she would be appointed to a tenure-track position as an Associate Professor, beginning July 1, 2010, continuing three years, through the academic year ending June 30, 2013, with the expectation that, in the Fall 2012, her appointment would be renewed for two additional years, through June 30, 2015, and that her "formal review for promotion to Professor with tenure would take place in Fall 2014."

52.     Plaintiff had offers from other prestigious business schools (Stern, Wharton, and Berkeley's Haas Business School), but chose to accept Harvard's offer, and began her employment on July 1, 2010, as an Associate Professor of Business Administration at HBS.

53.     On July 1, 2014, Plaintiff was promoted to a position as a Full Professor with tenure, joining the small minority of female professors to achieve tenure at HBS.

54.     In 2014, male tenured professors at HBS outnumbered female tenured professors 76 to 19. *See The Tenure Pipeline at Harvard Business School,* https://www.nytimes.com/interactive/2014/02/27/education/harvard-tenure-pipeline.html.

55.     By letter dated July 24, 2015, HBS informed Plaintiff that she had been named the "Tandon Family Professor of Business Administration," and that she could use this title on her letterhead, business cards, and other HBS materials.

56.     Plaintiff has won numerous awards for her teaching, including the Harvard Business School Wyss Award for Excellence in Mentoring (2022) and the HBS Faculty Award by Harvard Business School's MBA Class of 2015. Plaintiff also won an award for her service to HBS, the Greenhill Award (2017), "given annually by the Dean to members of the HBS community who contribute to the School in significant ways."[1]

---

[1] https://www.hbs.edu/about/campus-and-culture/campus-built-on-philanthropy/Pages/greenhill-house.aspx

57.    Plaintiff, a working mother of four young children and the breadwinner in her family, has also received praise by her female colleagues and collaborators for serving as a role model for other women at HBS.

58.    In December 2018, Plaintiff emailed a female colleague, Frances Frei ("Frei"), Professor of Technology and Operations Management at HBS, about teaching a course together on diversity and leveraging differences. Plaintiff and Frei received approval to teach their new course, Leading Difference, on March 18, 2019, which they taught for the first time in the Winter of 2020. Plaintiff and Frei launched an executive education version of this course in August 2020.

59.    In 2022 and 2023, Plaintiff was the course head for the new course, which was renamed "Inclusion," and it was taught to all 1,000 plus MBA students at HBS as part of the Required Curriculum. The course is about creating environments that are not only diverse, but also equitable and inclusive.

60.    In 2023, after a decade-plus at HBS, Plaintiff taught courses on negotiation, decision making, collaboration, conflict resolution, and diversity, equity and inclusion at both the MBA and Executive Education levels.

**A. <u>Applicable Policies Governing Tenure and Discipline of Tenured Professors.</u>**

**i. <u>The Tenure Policy.</u>**

61.    At Harvard, the conferral of tenure carries with it the promise of lifetime appointment.

62.    In a letter dated September 24, 2014, Plaintiff received official notification of her appointment (the "Appointment Letter") as a tenured Professor of Business Administration, effective July 1, 2014, that advised her that her appointment was "subject to such terms, conditions,

and policies as are stipulated by the Faculty of Business Administration, and to the Third Statute of the University." (Doc. No. 6-10 at 2).

63.     Under the Third Statute that was attached to Plaintiff's Appointment Letter, Plaintiff entered into a permanent contract with Harvard, a lifetime appointment, subject to removal by the Corporation (i.e., Harvard) only for "grave misconduct." (Doc. No. 6-10 at 3).

64.     HBS's "Policies and Procedures with Respect to Faculty Appointments and Promotions" ("Tenure Policy") emphasize that tenure is reserved for "extraordinary individuals who have demonstrated their ability and willingness to make a sustained contribution to the study, teaching, and practice of business," and refer to faculty with tenure as "permanent faculty."

### ii. The Third Statute and the Discipline Policy.

65.     Under the "Third Statute of the University," ("Third Statute"), (the policy attached to Plaintiff's official notification of her tenured appointment), "Professors . . . are appointed without express limitation of time unless otherwise specified" and are "subject to removal . . . by the Corporation [Harvard] only for grave misconduct or neglect of duty." (Doc. No. 6-11 at 2).

66.     Harvard's President and governing body adopted the "Discipline of Officers, Tentative Recommendations" ("Discipline Policy") on October 4, 1971. The Discipline Policy sets forth the procedures applicable to the discipline of tenured faculty in cases of "grave misconduct or neglect of duty arising under the Third Statute." (Doc. No. 6-12 at 2)

67.     Under the Discipline Policy, if a complaint is made against a Professor with Tenure, the Professor is entitled to a two-tiered proceeding prior to the imposition of discipline, consisting of an initial assessment by a Screening Committee and, if not resolved at that state, a full evidentiary hearing before a Hearing Committee, which shall then "make recommendations to the President and Fellows on what, if any, action is appropriate.". (Doc. No. 6-12).

68.    Under the Discipline Policy, a tenured faculty member is presumed innocent, and "[t]he burden of proof that there has been . . . grave misconduct or neglect of duty (as contemplated by the Third Statute of the University) rests with the Complainant and shall be satisfied only by clear and convincing evidence in the record as a whole" following the conclusion of a full evidentiary hearing before Hearing Committee and a decision by the President and governing bodies of Harvard. (Doc. No. 6-12 at 6-7); *see id.* (at item 6 under "Statement of Hearing Procedures").

69.    Under the Discipline Policy, Harvard is obligated to keep information related to the complaint and impending disciplinary proceeding against a tenured faculty member confidential until the conclusion of the proceeding and a final decision by Harvard. (Doc. No. 6-12 at 7).

70.    The Discipline Policy provides that, "[e]xcept for such simple announcements as may be required, covering the time of the hearing and similar matters, public statements, and publicity about the case by either parties or member of the Hearing Committee will be avoided so far as possible until the proceedings have been completed, including consideration by the Corporation [Harvard]." (Doc. No. 6-12 at 7).

## II.    In July 2021, Data Colada Approaches HBS with Allegations Concerning Plaintiff's Work and Defendants' Subsequent Agreement.

71.    Through their blog, Data Colada has targeted the work of prominent female academics and subjected it to an exceptionally high level of public scrutiny.

72.    In May 2015, Data Colada publicly targeted the research of another prominent Harvard professor at HBS, social psychologist Amy Cuddy, eviscerating her research practices.[2] Cuddy subsequently left her tenure track position at HBS and academia.

---

[2] Cuddy had become famous in her field for a 2010 study about the effects of "power poses" after her presentation in a TED Talk video went viral with a record number of views. *See* "When the Revolution Came for Amy Cuddy," New York Times (Oct. 18, 2017), available at: https://www.nytimes.com/2017/10/18/magazine/when-the-revolution-came-for-amy-cuddy.html (last visited July 26, 2023).

73.    In July 2021, Data Colada approached Plaintiff's employer, Harvard, with false allegations about perceived anomalies in the data of four studies co-authored by Plaintiff. Despite having no evidence, they attributed responsibility for the anomalies to Plaintiff, whom they accused of falsifying and/or fabricating data.

74.    In the field of behavioral science, if a researcher cannot replicate the results of a study or has questions about another behavioral scientist's findings, it is standard practice for that researcher to reach out to the author of the study for an explanation. Data Colada references this practice on its website in the following statement:

> Author feedback:
> Our policy (.htm) is to share drafts of blog posts with authors whose work we discuss, in order to solicit suggestions for things we should change prior to posting, and to invite them to write a response that we link to at the end of the post.

75.    Though Data Colada has followed this normative practice in the past, as evidenced by their 100 plus blog posts, Data Colada did not share drafts of any blog posts with Professor Gino and ask for her "feedback" but, instead, went to Plaintiff's employer, Harvard, with false allegations of malfeasance against Plaintiff and threats to publicize their claims on their blog.

76.    In or about July or August 2021, HBS, concerned about negative publicity, negotiated with Data Colada and reached an agreement. In exchange for Data Colada's agreement to refrain from making public accusations against Plaintiff that would, by extension, subject HBS to public scrutiny, HBS agreed to create a new employment policy to investigate Data Colada's allegations against Plaintiff's work. HBS further agreed that when it concluded its investigation, it would disclose the results to Data Colada, which would then be free to publicly disparage Plaintiff's work and professional reputation on its blog.

77.     Gary Pisano ("Dean Pisano"), then Senior Associate Dean for Faculty Development, has known Plaintiff for more than 20 years, collaborated with her on research and teaching, and served as Plaintiff's advisor.

78.     On or about July 20, 2021, Jean Cunningham ("Dean Cunningham"), Associate Dean for Faculty and Academic Affairs at HBS, who works closely with Dean Datar, alerted Dean Pisano that four studies co-authored by Plaintiff were the subject of allegations by Data Colada, that an investigation was pending, and that Plaintiff was going to need "a lot of help" from him.

79.     The allegations concerned four studies in which Plaintiff had been the principal investigator.

80.     Dean Pisano contacted Dean Datar to try to learn the substance of the specific allegations against Plaintiff so he could advise her, but Dean Datar told him to ask Dean Cunningham.

81.     Dean Cunningham instructed Dean Pisano that he must not inform Plaintiff of what was happening and provided no rationale for this secrecy.

### A.  HBS Abandons its Existing Research Integrity Policy and Procedure and Creates a New Policy Specifically for Professor Gino.

82.     In July 2021, HBS already had in place a "Research Integrity Policy" (the "2013 Research Integrity Policy") that was applicable to allegations of faculty research misconduct that did not involve activities funded by outside agencies that sponsor research or proposals submitted to such agencies for funding. (Doc. No. 6-1).

83.     Although Professor Gino's work that was the subject of Data Colada's allegations did not involve agency funding, HBS did not apply its existing 2013 Research Integrity Policy and usual Faculty Review Board ("FRB") procedures to evaluate the allegations against her.

84.     Instead, after negotiating with Data Colada, in August 2021, HBS created a *new* research misconduct policy and procedure*s*, entitled the "Interim Policy and Procedures for Responding to Allegations of Research Misconduct" ("Interim Policy"), that it used to evaluate and investigate the allegations against Professor Gino. (Doc. No. 6-2).

85.     HBS has never previously created an employment conduct policy and procedure *for just one employee* because of pressure exerted by a third-party.

86.     On information and belief, HBS spent approximately three weeks creating the new Interim Policy, just for Plaintiff. The Interim Policy was never vetted by HBS faculty. HBS's past practice has been to take many months to create policies applicable to faculty members. Prior HBS policies have been commonly vetted by HBS faculty.

87.     From the time HBS received the allegations against Professor Gino in July 2021 and through the creation of its new Interim Policy, HBS kept Professor Gino in the dark about the allegations against her and Harvard's pending investigation.

88.     Keeping Plaintiff in the dark was inconsistent with HBS practice, which normally gives an accused timely notice of the allegations. Normally, HBS employs its FRB procedures to investigate allegations of misconduct by members of the faculty, including alleged violations of the Research Integrity Policy. Pursuant to HBS's usual FRB process, the faculty member is notified of the charges against him/her within a week of HBS's receipt of the allegations.

89.     With respect to the Interim Policy, i.e., the policy that HBS crafted just for Plaintiff, HBS modeled it on federal regulations promulgated by the Secretary of the U.S. Department of Health and Human Services ("HHS"), found in 42 C.F.R. pt. 93 entitled "Public Health Service Policies on Research Misconduct" ("PHS Regulations").[3]

---

[3] The PHS Regulations apply to "[e]ach institution that applies for or receives PHS support for biomedical or behavioral research, research training or activities or activities related to that research or training." 42 C.F.R. §

90.    In September 2021, HBS assigned its employee Alain Bonacossa ("Bonacossa" or "RIO"), (who had held a position as Senior Director, Research Administration and Behavioral Research Services), to a new position as a Research Integrity Officer, with functions modeled after a Research Integrity Officer in an administrative proceeding under the PHS Regulations, to handle the proceeding against Plaintiff.

91.    This was the first time that Bonacossa performed this role.

### i. The Interim Policy

92.    Under the HBS Interim Policy, HBS bore the burden of proving any charge of "research misconduct" by a preponderance of the evidence. *See* Interim Policy at § (III) (A) ("Standard of Proof").[4] (Doc. No. 6-2 at 2-3).

93.    The Interim Policy defines "research misconduct" to mean "fabrication, falsification, or plagiarism" in proposing, performing, or reviewing research, or in reporting research results," and excludes "honest error." Interim Policy at App. 1.[5] (Doc. No. 6-2 at 14).

94.    "Fabrication" is defined as "making up data or results." *Id.*[6] "Falsification" is defined as "manipulating research materials, equipment or processes, or changing or omitting data or results such that the research is not accurately represented in the research record." *Id.*[7]

95.    "Research" is defined as "a systematic experiment, study, evaluation, demonstration, or survey designed to develop or contribute to general knowledge or specific

---

93.102(a). To the extent that HBS is an institution that applies for or receives PHS funding, allegations concerning Plaintiff's research did not implicate Harvard's institutional obligations under the PHS Regulations, as Plaintiff's alleged conduct did not occur in the context of "research" within the meaning of the PHS Regulations. See 42 C.F.R. § 93.222.

[4] *See also* 42 C.F.R. § 93.104(c).
[5] *See also* 42 C.F.R. §§ 93.103, 93.103(d).
[6] *See also* 42 C.F.R. § 93.103(a).
[7] *See also* 42 C.F.R. § 93.103(b).

knowledge by establishing, discovering, developing, elucidating, or confirming information about, or the underlying mechanism relating to, the matters to be studied." *Id.*

96.     For a finding of research misconduct, the alleged fabrication or falsification must be proved, by a preponderance of the evidence, to have been committed "*intentionally, knowingly or recklessly*," <u>*and*</u> to constitute a *"significant departure from accepted practices of the relevant research community." See* Interim Policy *at* § (III)(A). [8] (Doc. No. 6-2 at 3). Importantly, "[r]esearch misconduct does not include honest error or differences of opinion." *See id.* at App. 1.[9] (Doc. No. 6-2 at 14).

97.     Although the Interim Policy does not define the terms "intentional," "knowing," or "reckless," administrative decisions rendered by the HHS analyzing research misconduct findings under the PHS Regulations have looked to Black's Law Dictionary for the definitions of these terms, and have adopted the following definitions:

- **intentional:** "[d]one with the aim of carrying out the act";
- **knowing:** "[h]aving or showing awareness or understanding; well-informed" or "[d]eliberate; "conscious";
- **"reckless:** "characterized by the creation of a substantial and unjustifiable risk of harm to others and by a conscious (and sometimes deliberate) disregard for or indifference to that risk; heedless; rash," and "much more than mere negligence: it is a gross deviation from what a reasonable person would do."

*See* Black's Law Dictionary (11th ed. 2019).

98.     The Interim Policy required Harvard to take all reasonable steps to ensure an impartial, fair, and unbiased investigation. *See* Interim Policy at § (VII)(E).[10] (Doc. No. 6-2 at 9).

---

[8] *See also* 42 C.F.R. § 93.104 (a)-(b).
[9] *See also* 42 C.F.R. §§ 93.104(a)-(c).
[10] *See* 42 C.F.R. § 93.310(f).

B. **The HBS Proceeding.**

i. **The "Initial Inquiry" and Data Colada's False and Erroneous December 3, 2021 Report to Harvard.**

99.     Professor Gino first learned of the allegations against her on October 27, 2021, when she received a letter ("Notice of Inquiry") from Bonacossa, HBS's newly appointed RIO. (Doc. No. 20-5 at 73-75).

100.     The Notice of Inquiry informed Plaintiff that the RIO had received allegations from an "anonymous" source. The anonymous source was, in fact, Data Colada. The allegations related to four studies, for which Professor Gino had been the principal investigator, that were published in the following research papers:

> Gino, F., Kouchaki, M., & Casciaro, T. (2020). Why connect? Moral consequences of networking with a promotion or prevention focus. *Journal of Personality and Social Psychology*, 119(6), 1221–1238 ("***2020 JPSP Paper***")
>
> Gino, F., Kouchaki, M., & Galinsky, A. D. (2015). The moral virtue of authenticity: How inauthenticity produces feelings of immorality and impurity. Psychological Science, 26(7), 983–996 (*"**2015 Psychological Science Paper**"*)
>
> Gino, F., & Wiltermuth, S. S. (2014). Evil genius? How dishonesty can lead to greater creativity. Psychological Science, 25(4), 973–981 (*"**2014 Psychological Science Paper**"*)
>
> Shu, L. L., Mazar, N., Gino, F., Ariely, D., and Bazerman, M. H. (2012). Signing at the beginning makes ethics salient and decreases dishonest self-reports in comparison to signing at the end. Proceedings of the National Academy of Sciences of the United States of America, 109, 15197–15200 ("***2012 PNAS Paper***")

(*Id.* at 73.)

101.     The Notice of Inquiry further informed Professor Gino that HBS had already sequestered "certain research records" relating to her research and instructed her to turn in her

"HBS-issued devices" by 5 p.m. that same day. (*Id.* at 74-75). In an unnecessary demonstration of force, the RIO called Harvard University police to oversee the transfer.

102.   The Interim Policy states: "the RIO must take all reasonable and practical steps to obtain custody of all the research records and evidence needed to conduct the research misconduct proceeding." (Doc. 6-2 at 5). As alleged below, and as HBS's own inventory of the RIO's sequestration efforts shows, the RIO failed to do so. (Doc. 20-5 at 257-59).

103.   The Notice of Inquiry advised Plaintiff that HBS had opened a formal "initial inquiry" into the allegations, and that Dean Datar had appointed an "inquiry committee" comprised of HBS Professor Emerita Teresa Amabile, serving as Chair, and HBS Professor Emeritus, Robert Kaplan. (*Id.* at 74). Although not known to Plaintiff at the time, Professor Kaplan was Dean Datar's mentor early on in his academic career and was instrumental in bringing Dean Datar to HBS. *See* "Playing the Long Game: How Dean Datar Came to be at HBS," (Jan. 3, 2021), available at: https://www.hbs.edu/news/articles/Pages/dean-datar-to-hbs.aspx (last visited July 31, 2023).

104.   Under the Interim Policy, the Inquiry Committee was tasked with determining whether: there was (1) "a reasonable basis for concluding that the allegation falls within the definition of research misconduct"; and (2) whether "the preliminary information-gathering and preliminary fact-finding from the inquiry indicate[d] that the allegation may have substance." *See* Interim Policy at § (VI) (C). (Doc. No. 6-2 at 17). The Interim Policy required the Inquiry Committee to produce a draft inquiry report to Professor Gino, with opportunity to comment, and then a final inquiry report, with its decision whether an investigation was warranted, within 60 days from the start of the inquiry. *See id.* at § VI (E), (H). (Doc. No. 6-2 at 7-8).

105.   In pertinent part, the Interim Policy's stated "scope" is limited "only to allegations of research misconduct that occurred *within six years of the date* HBS received the allegation, unless

22

the respondent has continued or renewed an incident of alleged research misconduct through the citation, republication, or other use for the potential benefit of the respondent of the research record in question." *See* Interim Policy at § II (emphasis added). (Doc. No. 6-2 at 2).

106.   Other than allegations concerning the *2020 JPSP Paper,* the remaining three allegations noted in the Notice of Inquiry should have been time-barred. Allegations concerning the *2015 Psychological Science Paper*, the *2014 Psychological Science Paper,* and the *2012 PNAS Paper* were all more than six years old and should not have been the subject of an inquiry under the Interim Policy. (*See id*.)

107.   In the course of the initial inquiry, on December 3, 2021, the complainant/Data Colada submitted to the Inquiry Committee a statement titled "Evidence of Fraud in Academic Articles Authored by Francesca Gino" (the "December Report"). (Doc. No. 20-5 at 142-160).

108.   In the December Report, the complainant/Data Colada presented what it described as "imperfect data tampering" for data that appeared to be "out of sort" in published data sets. (Doc. No. 20-5 at 144-147). Like the allegations set forth in the initial Notice of Inquiry, the allegations contained in the December Report are based on unwarranted inferences that perceived anomalies in the data resulted from "fraud," and ignored other plausible and innocent reasons for perceived anomalies.

109.   On February 22, 2022, Plaintiff's advisor in the matter, Attorney Paul S. Thaler, Esq., of the law firm Cohen Seglias Pallas Greenhall & Furman PC, submitted a letter on Plaintiff's behalf to Diane Lopez, Esq., Harvard's Vice President and General Counsel, and requested that she forward it to Bonacossa and the members of the Inquiry Committee. (*See* Doc. No. 20-5 at 199-208). Mr. Thaler explained that, under the Interim Policy, the Inquiry Committee should find that there was insufficient evidence to warrant an investigation into Plaintiff's work because the allegations lacked

substance, and in multiple incidences did not align with actions that fell within the definition of research misconduct. (*See id.*)

110.    Mr. Thaler explained that, to the extent there were anomalies in the datasets, in all four of the studies in question, Professor Gino had relied on the help of research assistants on any given project to help her prepare IRB applications, conduct laboratory studies, clean the data, prepare it for analyses, and often conduct preliminary analyses on the data. (Doc. No. 20-5 at 201-207). Professor Gino's practice in this regard was consistent with other behavioral scientists in her field. Given that, in all of the studies in question, Professor Gino did not run the studies or sort or handle the data, and that there was no evidence that the culture of Plaintiff's lab incentivized or motivated research assistants to manipulate data, there was no substance to any of the allegations. (*See id.*)

111.    Mr. Thaler also explained that, under the Interim Policy, the unavailability of records is only to be considered evidence of research misconduct where it can be shown by a preponderance of evidence that the respondent *intentionally, knowingly, or recklessly* had research records and destroyed them, had the opportunity to maintain the records but did not do so, or maintained the records and failed to produce them in a timely manner ***and*** that the respondent's conduct constitutes a significance departure from accepted practices of the relevant research community. *See* Interim Policy § (III) (A).[11] (*id.* at 205; *see* Doc. No. 6-2 at 3).

112.    Mr. Thaler noted that the original paper records for the *2012 PNAS Paper* studies could not be found because the records were older than six years and would not normally be reviewed under analogous federal law, *see* 42 C.F.R. § 93.105(a). (Doc. No. 20-5 at 205).

---

[11] *See* 42 C.F.R. § 93.106(b)(1).

113.    The raw data—the original source data—for the study in question in the *2014 Psychological Science Paper* could not be found either. (Doc. No. 20-5 at 203-205). Data retention policies indicate that records older than six years do not need to be retained so unavailability of this data should be expected given the year the study was conducted (2012). (*See id.* at 205).

114.    The same data retention policy also applied to the *2015 Psychological Science* paper as the data for study in question was collected in 2014. (*See id*. at 205).

115.    On April 1, 2022, Professor Gino submitted her own written responses to the draft inquiry report. (*See* Doc. No. 20-5 at 252-256).

116.    HBS ignored the numerous procedural and substantive deficiencies in the draft report identified by Mr. Thaler and highlighted in Professor Gino's comments and, on April 8, 2022, produced a final inquiry report ("Inquiry Report"), in which the committee found that an investigation was warranted. (*See* Doc. No. 20-5 at 43-54).

### ii. HBS's Unfair and Biased Investigation.

117.    On April 15, 2022, HBS notified Professor Gino that Dean Datar had concluded that an investigation was warranted and was instituting an investigation, and that a third member of the HBS faculty, HBS Professor Shawn Cole, would join Amabile and Kaplan, forming an "investigation committee," pursuant to the Interim Policy. (*See* Doc. No. 20-5 at 262-331).

118.    In or about May 2022, the investigation committee hired an external forensic firm Maidstone Consulting Group ("MCG") to produce forensic reports and analyses of documents and Plaintiffs' electronic files that had been sequestered.

119.    Shortly after learning that the investigation committee had hired MCG, Professor Gino asked the RIO if she could hire a forensic expert. The RIO asserted that she could not, because the Interim Policy only permitted her to select two advisors, and Professor Gino had already done

so by hiring a lawyer (based on the RIO's recommendation) and choosing Dean Pisano as her other advisor.

120.    The 2013 Research Integrity Policy contained no such advisor limitation. If Professor Gino had not been limited to just two advisors, she would have hired a forensic expert to assist her in connection with the investigation.

121.    The investigation committee provided information (documents/records) to MCG for the purpose of evaluating the allegations against Professor Gino, without consulting with Professor Gino to locate or ascertain where the pertinent information was stored and, in particular, whether the electronic files sequestered on her HBS devices contained the final documents and raw data relevant to the studies in question.

122.    Over the months of June, July, and August 2022, MCG produced a massive amount of forensic reports (over 180 pages) on the four allegations, but they were based on an examination of documents that did not contain information used by research assistants to merge datasets or code variables in them, and that contained data that was not confirmed to be raw data. (*See* Doc. No. Ex. 20-5 at 509-530, 579-629, 612-628, 632-646).[12] As such, the forensics reports were non-probative evidence that were, at best, inconclusive as to the allegations. (*See id.* at 1029-30, 1032-33). The RIO only shared a subset of the files available for each study with MCG. This is an important omission as MCG itself corrected some errors in their analysis in December 2023, after more datafiles were made available to them.

123.    During the months of June, July, and August 2022, the investigation committee also met with and interviewed six of Professor Gino's collaborators and two research assistants for the

---

[12] MCG produced documents for the investigation committee's review which are absent from the Final Report. (See Doc. No. 20-5). *See infra* ¶ 145.

papers in question, resulting in hundreds of pages of recorded and transcribed testimony from the following individuals:

      a.  J.F. (research assistant)
      b.  A.R. (research assistant)
      c.  Professor M.K. (co-author)
      d.  Professor S.W. (co-author)
      e.  Dr. L.S. (co-author)
      f.  Professor A.G. (co-author)
      g.  Professor T.G. (co-author), and
      h.  Professor N.M. (co-author).

124.    All of the witnesses interviewed by the investigation committee corroborated Professor Gino's account of how the research was performed and spoke about the integrity of her work and lab practices. (*See* Doc. No. 20-5 at 10.)

125.    All witnesses interviewed corroborated Professor Gino's assertion of her innocence of falsification and/or fabrication of data. The HBS investigation committee interviewed at least one witness who suggested the committee collect and review his research records (Doc. No. 20-5 at 414, 417), but the Final Report contains no indication the committee ever did so (*id.* at 18, 25759).

126.    HBS also did not sequester the research records of key members of the research teams involved (Doc. No. 20-5 at 257-59), and the HBS Investigation Committee only interviewed two of them.

127.    During June 2022 through September 2022, the investigation committee reviewed the MCG forensic reports and had several meetings to discuss them. (Doc. No. 20-5 at 5, 7-8). The investigation committee completed its review before providing Professor Gino copies of the forensic reports or giving her an opportunity to review and respond to them. (*See id*. at 7-8.)

128.    On August 24, 2022, the RIO informed Professor Gino (for the first time) that the investigation committee had hired a forensics firm and advised her that it would share the forensic reports with her in September 2022, and that it would want to discuss the reports with her.

129.    Throughout the inquiry and the investigation, Professor Gino was performing her regular duties as a Professor at HBS.

130.    At the end of August 2022, the RIO contacted Professor Gino to schedule two three-hour interviews with the investigation committee and was offered dates at the end of October 2022 and November 2022 to discuss both the MCG reports and witness interviews.

131.    When, after a few weeks, Professor Gino had still not been provided copies of the MCG reports, she contacted the RIO, who told her he was about to send her the first of the forensic reports. Professor Gino requested that the RIO permit her more time to review the forensics reports—which she had still not been provided—so she could prepare for the upcoming meetings with the investigation committee.

132.    The RIO told Professor Gino that the investigation committee wanted to meet before Thanksgiving. To accommodate the investigation committee's schedule, the RIO canceled the earlier of the two scheduled 3-hour meetings, leaving just one three-hour meeting for Professor Gino to meet with the investigation committee, on November 14, 2022. (*See* Doc. No. 20-5 at 665-715).

133.    The RIO delayed in providing Professor Gino copies of the MCG Reports, and when he finally did send them to her, he sent them piecemeal, over multiple dates between September 30, 2022 through October 31, 2022. (*See* Doc. No. 20-5 at 7-8).

134.    Though Dean Datar had confirmed to Professor Gino's advisor, Dean Pisano, that, during the proceeding, Professor Gino would be given all the time she needed to respond to the investigation committee's requests for information, HBS did not provide the forensic reports to her in a timely manner, leaving her insufficient time to review the 180-plus pages of dense reports prior to her November 14 2022 meeting with the investigation committee. While the three members of

the investigation committee had months to digest the reports and a vendor working on their behalf, Professor Gino was given only a few weeks, while she was also teaching intensively for a month and a half in September and October of 2022, a new course for which she was the course-head.[13] Additionally, when the investigation committee did finally provide her the reports, it did not provide her the underlying documents (e.g., data and emails) on which the reports were based, making it difficult for her to make sense of the reports.

135.    Professor Gino's ability to review, analyze and respond to the forensic reports was also substantially impaired because she was precluded from hiring a forensic expert of her own under the Interim Policy.

136.    Nonetheless, Professor Gino met, as requested by the investigation committee, for a 3-hour interview on November 14, 2022. (*See* Doc. No. 20-5 at 665-715). At the meeting, Professor Gino was questioned about studies that were done seven, eight, and 10 years previously, and about forensic analyses that were largely irrelevant, in an unfair interrogation that reflected the committee's bias against her. (*See id.*)

137.    Professor Gino maintained her innocence throughout the entire proceeding, and fully cooperated with the investigation committee, providing information about the publication process, access to data, to the extent it was available, and answering the committee's question on collaborators and research assistants on the studies in question. Professor Gino provided plausible explanations for the perceived "anomalies" in the data. (*See id.; see also id.* at 332-352, 7161282).

---

[13] Professor Gino was not provided a copy of the MCG Report on Allegation 1 until September 30, 2022 though the committee met to discuss it about 5 weeks earlier. Professor Gino was not provided a copy of the MCG Report on Allegation 2 until October 21, 2022 though the committee met to discuss it about three weeks earlier. She was not provided a copy of the MCG forensic report on Allegation 3 until October 31, 2022, though the committee had it for some time and met to discuss it three days earlier. She was not provided a copy of the MCG report on Allegation 4 until October 12, 2022, though the committee met to discuss it about seven weeks earlier. (*See* Doc. No. 20-5 at 7-8).

### iii. **The Investigation Committee's Draft Report.**

138.    At 5:38 p.m. on December 14, 2022, the investigation committee provided Professor Gino a copy of its draft investigation report ("Draft Report") for comment. When the RIO gave her the Draft Report, both HBS and the RIO knew that Professor Gino was leaving for a scheduled family vacation two days later, on December 16, 2022, to see her family in Italy for approximately two weeks, whom she had not seen in four years. Under the Interim Policy, Professor Gino had just 30 days to provide comments to the Draft Report, and she requested an extension of time to review and submit her comments.

139.    The Draft Report informed Professor Gino that the investigation committee had found her guilty of all the charges and, incredibly, without consideration of the various mitigating factors set forth in the Interim Policy, recommended the harshest and most punitive sanction available under the Interim Policy: termination of Professor Gino's employment.

### iv. **The Investigation Committee Failed to Prove Research Misconduct.**

140.    In the Draft Report, the investigation committee acknowledged but chose to ignore evidence that was directly relevant to the question at hand: whether Professor Gino had knowingly, intentionally, or recklessly manipulated data. The investigation committee prefaced its findings with the following statement, indicating that "all witnesses" whom the committee interviewed *"never doubted the integrity of the data in the study or studies in question*," and that there was also *no evidence of any incentive or pressure to manipulate data in Professor Gino's lab*, writing:

> We acknowledge, and we took seriously in our decision-making, statements by all witnesses that they never doubted the integrity of the data in the study or studies in question. One witness who knew Professor Gino well said they never doubted her integrity in any way. The witnesses also said that they had no evidence that Professor Gino had ever pressured colleagues, doctoral students, post-docs, or research associates, including themselves, to produce particular results in a study, or that Professor Gino had created a negative atmosphere in her lab. Moreover, some

witnesses spontaneously said that they had worked on multiple studies with Professor Gino that were never published because the studies didn't work out.

141.   In concluding Professor Gino was responsible, the investigation committee made findings based on mere speculation, in reliance on some discrepancies noted in the MCG reports—reports that were, at best, inconclusive. Without **any** supporting witness statements, email correspondence, or other evidence, such as the original "raw" data (that is, data submitted by study participants before being handled or "cleaned" by anyone), the investigation committee concluded that Professor Gino was responsible for misconduct.

142.   Under the Interim Policy a finding of research misconduct required HBS's investigation committee to prove, *by a preponderance of the evidence*, that Plaintiff *"intentionally, knowingly, or recklessly" falsified or fabricated* data, and to specify for each allegation the requisite intent. *See* Interim Policy at § (III) (A), (VII) (F). (Doc. No. 6-2 at 2-3, 10). Instead, the investigation committee reversed the policy's stated burden of proof, and found Professor Gino guilty of misconduct because she had not *disproved* the allegations against her.

143.   The Interim Policy also requires the investigation committee to evaluate conduct in the context of the norms of the field, but the committee failed to do so. A project triggered by the charges against Prof. Gino — the "Many Co-Authors Project" (manycoauthors.org) — launched by Gino's co-authors to evaluate the integrity of the data in the papers that Gino co-authored with them. That project identified many cases in which the data reveal anomalies. In none of them was Gino responsible for the data. For example, one coauthor audited 7 articles she had co-authored with Gino. Three of those seven had significant data issues, not attributable to Gino. Intentional manipulation is not the only source of data anomalies, and the investigation committee could have uncovered this had they examined error rates in Plaintiff's field.

31

144.    Although the investigation committee stated in the draft report that it found all witnesses to be credible, it inexplicably ignored witness testimony that corroborated Professor Gino's explanations concerning the allegations, and established Professor Gino's integrity, style of working, and lab practices. The committee also irrationally ignored relevant testimony from Professor Gino's research assistants and collaborators who spoke favorably about Plaintiff's integrity (Doc. No. 20-5 at 369, 433, 445) and the role of research assistants in the research process for the studies at issue. (*See* Doc. No. 20-5 at 353-383, 384-410, 436-449, 450-472).

145.    In its Draft Report, the investigation committee failed to specify the intent of the misconduct, i.e., whether it had been committed "intentionally, knowingly, or recklessly," as it was required to do under the Interim Policy. *See* Interim Policy § (VII) (F). (Doc. No. 6-2 at 10). Instead, and in the absence of any evidence of intent to commit misconduct, the investigation committee merely parroted the phrase, "intentionally, knowingly, or recklessly" for each allegation.

146.    Indeed, ***not a single witness*** interviewed by the investigation committee reported any type of behavior or attitude that is consistent with the speculative intent that was posed by the investigation committee—intent that was unspecified and unsupported by any evidence whatsoever.

147.    In addition to the investigation committee's failure to make specific findings supported by a preponderance of the evidence, the overly harsh sanctions recommended by the investigation committee bore no connection to the intended rehabilitative nature of the research misconduct proceedings. As set forth in the PHS Regulations, on which the Interim Policy is based, such proceedings are intended to be remedial in nature, and to avoid overly harsh and punitive outcomes.

148.    Under the Interim Policy, a respondent is "allowed 30 days from receipt of the draft report to submit comments to the RIO," which "must be included and considered in the final report." (*See* Interim Policy at § (VII) (G)(1)). (Doc. No. 6-2 at 10). The RIO is permitted under the Interim Policy to extend the deadlines for completion of any phase of the investigation, including the preparing of the draft investigation report and finalizing the draft report. *See* Interim Policy at § (VII)(J). (Doc. No. 6-2 at 11).

149.    Professor Gino was entitled access to **all** of the documents relied on in the report, including the lengthy MCG forensics documents that she had never had a meaningful opportunity to review and respond to, as well as the underlying documents to those reports, which she was ***never*** provided—a clear violation of the policy. *See* Interim Policy at § (VII)(G)(1). (Doc. No. 62 at 10).

150.    Despite the rules, on December 14, 2022, the RIO declined to grant Professor Gino's reasonable request for an extension and told her to wait until she returned from her vacation in January 2023, to see if she actually needed the time.

151.    The RIO also told Professor Gino that she should expect the process to get much harder going forward (saying the "road would get much tougher"). He advised her that the committee was *very unlikely to change its conclusions*, and that *all she could ask for was a reduction in the recommended sanctions*. The RIO even suggested to Professor Gino that she should seek mental health counseling to deal with potential mental health issues arising from the anticipated difficulty of the proceeding.

152.    Though HBS had taken months to prepare and review the MCG forensic reports, it was giving Professor Gino roughly three weeks to respond to the draft report, without the documents underlying that report, all two days before she was going on a two-week trip to Italy. (*See* Doc. No. 20-5 at 1043) (Plaintiff's Feb. 17, 2023 letter to the investigation committee stating,

"[t]hough the HBS Policy states that I would be given access to the detailed analyses from the MCG firm and all the files they used, I did not have access to their analyses and excel files other than their final report.").[14]

153.   Dean Pisano went to Dean Datar to intervene on Professor Gino's behalf, telling him that she needed more time to respond to the draft report, particularly since the committee had reversed the Interim Policy's stated standard of proof, and was requiring her *to disprove* the allegations.

154.   When Dean Pisano spoke with Dean Datar, he emphasized that, throughout the proceeding, Professor Gino had continued to perform her regular duties as a Professor at HBS and had put "Harvard's interests first," including co-creating and teaching a course on Inclusion, (with 1,011 MBA students enrolled), and that, as a matter of basic fairness, she should have time to focus on her rebuttal, and to digest and respond to the 180-plus pages of MCG forensic reports. Dean Datar was dismissive, telling him to speak with Dean Cunningham. Dean Cunningham was also dismissive, telling Dean Pisano, "oh, she's getting all the time she needs."

155.   After Professor Gino's return to Boston, on January 10, 2023, she wrote the RIO to again request an extension of time to respond to the investigation committee's draft report and was granted a "hard deadline" of February 17, 2023.

156.   On February 17, 2023, Professor Gino submitted a written response to the investigation committee's Draft Report. (*See* Doc. No. 20-5 at 1024-1060).

157.   In her response to the Draft Report, Professor Gino sought to clarify that, "[w]hile the [Interim Policy] notes that defenses must be proven by a preponderance of the evidence in their consideration, the burden of proof for making a finding of research misconduct is *actually* on the

---

[14] *See supra* note 12.

committee, as any findings of research misconduct must themselves be supported by a preponderance of the evidence." (Citing Interim Policy at (III)(A) and App. 1) (*See* Doc. No. 205 at 1025; *see also id.* at 1058-59; Doc. No. 6-2 at 3).

158.    Maintaining her innocence, Professor Gino's response thoroughly outlined the substantive factual evidence that the investigation committee had ignored for each of the four allegations against her, and that weighed in favor of her innocence, and provided specific citations to the record. (*See* Doc. No. 20-5 at 1024-1060).

159.    In addition, and without violating any rules, Professor Gino contacted potential witnesses (without telling them about the ongoing investigation) who could corroborate her statements to the investigation committee. (*See id.* at 1026-27 and corresponding n. 2). Although it was not her burden to prove her innocence under the Interim Policy, Professor Gino's response to the committee's Draft Report introduced *new evidence* of her own, including statements from others whom the committee had failed to interview. (*See* Doc. No. 20-5 at 1061-1282). Prior to the issuance of the Draft Report and during the investigation, Professor Gino had not spoken to potential witnesses to avoid any appearance of influencing them, as well as to comply with the Interim Policy's "duty to maintain confidentiality," of the proceeding, "to the extent possible." *See* Interim Policy § (III) D).[15] (Doc. No. 6-2 at 3-4). The Interim Policy, unlike the 2013 Research Misconduct Policy, limited disclosure of information under a threat of "sanctions up to and including termination." (*See* Doc. No. 6-2 at 3-4).

---

[15] *See also* 42 C.F.R. §§ 93.108, 93.300(e).

### v. The Investigation Committee Failed and/or Refused to Diligently Pursue All Leads.

160.    Professor Gino had also expected that the committee would evaluate each allegation of research misconduct *thoroughly, fairly, and objectively*, *see* Interim Policy § (III)(A),[16] (Doc. No. 6-2 at 2) and to interview all witnesses and diligently pursue all leads. *See* Interim Policy § (VII)(E).[17] (Doc. No. 6-2 at 9-10).

161.    Seeing that the investigation committee had failed to fulfill these duties and had also reversed the Interim Policy's standard of proof by imposing upon *her* the burden of *disproving* the allegations of misconduct, Professor Gino provided the committee with independent corroboration of her innocence, and attached to her detailed February 17, 2023 response to the Draft Report statements of colleagues concerning her integrity and the integrity of her lab and work practices, in addition to substantive statements concerning specific factual issues pertinent to the individual allegations. (*See* Doc. No. 20-5 at 1061-1282).

162.    Professor Gino also noted in her response to the Draft Report that, with respect to allegations that related to studies conducted more than three years ago and that concerned records that were more than three years old (and in some cases, more than 10 years old), under the applicable document retention rules of Harvard and UNC, there had been no departure from accepted research practices for the data to have been discarded or unavailable. (*See* Doc. No. 205 at 1031 n. 4 and corresponding text). Under the Interim Policy, there should have been no basis for the investigation committee to infer misconduct from the *absence* of such records. *See* Interim Policy at § (III) (A). (Doc. No. 6-2 at 3).

---

[16] *See also* 42 C.F.R. § 93.300(b).
[17] *See also* 42 C.F.R. §§ 93.310(g), (h).

163.    Professor Gino's response to the investigation committee's Draft Report specifically addressed the investigation committee's unwarranted assumptions made based on the MCG reports, which concerned only the examination of sequestered documents located on Professor Gino's hard drive. (Doc. No. 20-5 at 1029-1030, 1032-33, Professor Gino outlined in detail why the MCG reports were, at best, inconclusive, as even MCG acknowledged in the reports that they were not clearly based on the relevant records, (i.e., the original raw data and research records for the studies at issue). (Doc. No. 20-5 at 1029-1030, 1031.").

164.    Similarly, Professor Gino explained that, for another study at issue, the data had been collected *on paper*, not, as the investigation committee assumed based on an MCG forensic report, in a computer spreadsheet. (*Id.* at 1029-31, 1033-34). To presume an "anomaly" based on participant IDs being out of sort was unwarranted because the data collected on paper had been entered into a spreadsheet in no particular order (i.e., unsorted). (*See id*. at 1031)

165.    Though the investigation committee could not possibly have digested Professor Gino's comprehensive response to the Draft Report in just two weeks, it issued its final investigative report ("Final Report") on March 7, 2023. (*See id*. at 2-42).

### vi. <u>The Final Report: A Biased and Deficient Foregone Conclusion.</u>

166.    The Final Report, which was substantially unchanged from the investigation committee's Draft Report, evidenced that the committee had reached a foregone conclusion.

167.    That the committee members had already made up their minds is also evidenced by the speedy turnaround of such an important document, as well as the minimal changes from the Draft Report. While acknowledging receipt of Professor Gino's response, in its Final Report, the investigation committee unreasonably dismissed the evidence she presented as *"not germane"* and *"irrelevant."* (Doc. No. 20-5 at 10, 11 n. 7).

168.    As in its Draft Report, the investigation committee discounted or ignored evidence directly relevant to the question of *intent,* and stated:

> We acknowledge, and we took seriously in our decision-making, ***statements by all witnesses that they never doubted the integrity of the data in the study or studies in question.*** One witness who knew Professor Gino well said they never doubted her integrity in any way. In addition, several exhibits appended by Professor Gino to her Response (Exhibit 29) contained messages to her from co-authors, colleagues, and former doctoral students expressing their admiration for her research rigor and integrity. ***The witnesses we interviewed also said that they had no evidence that Professor Gino had ever pressured colleagues, doctoral students, post-docs, or research associates, including themselves, to produce particular results in a study, or that Professor Gino had created a negative atmosphere in her lab.*** Moreover, some witnesses spontaneously said that they had worked on multiple studies with Professor Gino that were never published because the studies didn't work out.

(Emphasis added.) (Doc. No. 20-5 at 10).

169.    Incredibly, despite that the burden was *on the committee* to prove intentional misconduct by a preponderance of the evidence, the draft report indicated that the investigation committee found that witnesses' statements concerning the "integrity of the data" or the integrity of Professor Gino were "not germane," writing:

> ***We carefully considered all these statements, but did not find them germane to the specific allegations before us or a plausible explanation of data anomalies or discrepancies.***

(*Id.* at 9).

170.    Under the Interim Policy, evidence of Professor Gino's *intent* (or lack of intent) to fabricate or falsify data was directly relevant to a finding of research misconduct, as such finding requires proof, by a preponderance of the evidence, of *knowing, intentional, or reckless conduct.* Interim Policy § (III)(A) (Doc. No. 6-2 at 3).

171.    In addition to ignoring evidence directly relevant to the issue of *intent,* the investigation committee ignored evidence relevant to the specific allegations that provided

reasonable and innocent explanations for the perceived anomalies. (*See* Doc. No. 20-5 at 1024-1060).

172.    The committee failed to apply the Interim Policy's burden of proof and shifted the burden of proof onto Professor Gino *to disprove* research misconduct. (*See* Doc. No. 20-5 at 142). That is not the appropriate standard of proof under the Interim Policy. (*See* Doc. No. 6-2 at 23).

173.    Under the Interim Policy, the definition of research misconduct specifically excludes "honest error," and the burden of proving *research* misconduct remained at all times on Harvard. *See* Interim Policy at (III)(A) and App. 1 (Doc. No. 6-2 at 2-3, 14); *see also* 42 C.F.R. § 93.106; *see* 70 FR 28370-01 (discussing evidentiary standard under 42 C.F.R. 93.106); *see, e.g., Martin v. Ohio,* 480 U.S. 228, 233 (1987).

174.    Though the Interim Policy required the investigation committee to give due consideration to admissible, credible evidence of honest error or difference of opinion presented by Professor Gino, it ignored credible evidence of honest error, holding her to a higher standard of proof than required under the Interim Policy.

175.    The Investigation Committee reached this finding despite that (1) there was no evidence that Professor Gino had collected or maintained the data in question; (2) all of the evidence, including the witness testimony, established that Professor Gino and her lab always demonstrated the highest level of integrity; and (3) Professor Gino had always maintained her innocence.

176.    On March 9, 2023, Professor Gino's counsel, Mr. Thaler, wrote a letter to Harvard's General Counsel, requesting that she please forward it to Dean Datar, and highlighting the deficiencies of the investigation committee's decision and its many failures to adhere to the Interim Policy requirements, including the following:

(1) <u>The investigation committee failed to prove, by a preponderance of the evidence, "research misconduct" within the meaning of the policy.</u> Under the Interim Policy, to make a finding of research misconduct required the investigation committee "to identify whether the research misconduct was falsification, fabrication, or plagiarism," and whether Professor Gino had committed such misconduct with the requisite *intent*: *"intentionally, knowingly, or recklessly."* The burden was *on the committee* to establish any such finding by a *preponderance of the evidence*." The investigation committee's conclusory findings were based on *mere speculation*, and. in the *absence of supporting witness statements and evidence,* the committee determined that Plaintiff was responsible for misconduct.[18]

(2) <u>The investigation committee failed to apply the Interim Policy's standard of proof.</u> The investigation committee erroneously concluded that Professor Gino was responsible because she had failed to *disprove* misconduct by a preponderance of the evidence.

(3) <u>The investigation committee had irrationally ignored relevant evidence.</u> The investigation committee had given no credence to credible witness testimony concerning Plaintiff's known integrity and style of working, all of which was relevant to the issue of intent. *Not a single witness* reportedly mentioned any concern about Professor Gino's data practices or integrity. Quite the opposite, witnesses stated that Professor Gino had *not* pressured them to produce certain results and had even abandoned projects when appropriate.

(4) <u>The investigation committee concluded Professor Gino was responsible without making any finding of *specific intent* to falsify or fabricate data.</u> The Interim Policy required the investigation committee to issue a written decision in which it states a finding of *specific intent* for each allegation, but the investigation committee concluded that Professor Gino was responsible without specifying *any particular intent*.

(5) <u>The committee recommended overly punitive sanctions in disregard of applicable policy considerations.</u> Under the Interim Policy', misconduct proceedings, (as also stated in the PHS Regulations on which the Interim Policy was based), are intended to be *rehabilitative* in nature. In disregard of this policy, the investigation committee had recommended extremely punitive sanctions, that appeared untethered to any policy factor.

177.    Harvard's General Counsel advised Professor Gino that her advisor's letter would not be forwarded to Dean Datar. Professor Gino's advisor's letter is also absent from the committee's "Final Report." (Doc. No. 20-5).

---

[18] *See also* 42 CFR § 93.103, federal regulations expressly incorporated in the Interim Policy.

178.    In a letter dated April 3, 2023, Dean Pisano appealed to Dean Datar. Like Mr. Thaler, Dean Pisano tried to explain to Dean Datar that, under the Interim Policy, the investigation committee had failed to prove by a preponderance of the evidence that Professor Gino had engaged in intentional, knowing, or reckless falsification and/or fabrication of data. Dean Pisano emphasized that the committee had misapplied the standard of proof when it simply concluded that Professor Gino was guilty on the basis that she had not *disproved* the allegations.

179.    Dean Pisano urged Dean Datar to read the letter sent by Professor Gino's counsel, Mr. Thaler, advising him that Mr. Thaler had handled many cases at Harvard on behalf of other faculty members and was *"simply appalled"* by both the investigation committee's decision and its proposed sanctions against Professor Gino.

180.    Dean Pisano also emphasized that the investigation committee had appeared biased against Professor Gino, as indicated by the RIO's comments to her in December, which suggested to him the investigation committee had reached "a foregone conclusion."

181.    On April 14, 2023, Dean Pisano met with Dean Datar in the presence of Dean Cunningham. Dean Pisano implored Dean Datar to realize that the "process was broken." Dean Pisano again emphasized that the investigation committee had failed to carry its burden of proof under the Interim Policy, and that it was required under the Interim Policy to prove, by a preponderance of the evidence, that Professor Gino possessed the requisite intent to fabricate or falsify data, and to address allegations fairly and objectively. *See* Interim Policy at § (III) (A).[19] (Doc. No. 6-2 at 2-3).

---

[19] *See also* 42 C.F.R. § 93.300(b).

182.    Dean Pisano, who had dispassionately served on FRB panels in HBS tenure and misconduct proceedings, told Dean Datar that the investigation committee appeared to have simply ignored the evidence in Professor Gino's rebuttal to the Draft Report.

183.    Dean Datar ignored Dean Pisano's entreaties to give Professor Gino a fair and just decision, in line with the Interim Policy requirements, and his pleas to make him understand that the investigation committee had found no evidence of misconduct under the Interim Policy and that, even if the evidence did support a finding of misconduct, which it did *not,* the committee's recommended sanctions were grossly disproportionate and out of step with sanctions in other cases, even in cases where very serious misconduct occurred.

184.    Dean Pisano urged Dean Datar to speak with Professor Gino if he had any specific questions about evidence, but Dean Datar showed no interest in hearing from Professor Gino. Dean Datar told Dean Pisano that he was meeting with him only out of "respect" for him.

   **B.  Despite Knowledge that the Findings and Conclusions of the Investigation Committee were Unproved, Dean Datar Rendered a Decision Imposing Harsh Sanctions against Dr. Gino's Employment, in Violation of the <u>Interim Policy.</u>**

185.    Around the same time that Dean Pisano was expressing his concerns to Dean Datar concerning the investigation committee's work, Dean Datar received information from the RIO that confirmed there was good reason to question the validity of its report. Specifically, the RIO advised Dean Datar that there were relevant files in Harvard's possession that had been overlooked in the investigation and never analyzed or considered by the investigation committee.

186.    Despite being aware of the overlooked files, and before any analysis had been done to determine how they might undercut the investigation committee's report, Dean Datar informed the RIO on April 19, 2023 that he had accepted all of its findings.

187.    On June 13, 2023, Dean Datar issued a written decision that formally adopted in full the unreasonable findings and conclusions of the investigative panel and its overly-punitive sanctions that were not aligned with the Interim Policy's stated considerations and purpose and out of step as compared to other misconduct cases at HBS and Harvard.

188.    At 5:30 p.m., Professor Gino met with Dean Datar and Dean Cunningham in Dean Datar's office. Dean Datar told Professor Gino that she would not have the opportunity to say anything, and that he simply wanted the process to be "humane" so had decided to meet with her in person to deliver the news of his decision. Dean Datar proceeded to read, word for word, his decision letter, dated June 13, 2023.

189.    Dean Datar informed Plaintiff that she was being placed on unpaid administrative leave "for a period of two years," and that she would receive no salary or benefits after July 31, 2023. Dean Datar immediately revoked Plaintiff's named professorship the Tandon Family Professor of Business. Datar informed Plaintiff that he was requesting to Harvard's President that Harvard institute "Third Statute proceedings" to revoke her tenured professorial appointment at Harvard.

190.    Plaintiff was further informed that, for the period of her administrative leave, and effective immediately: (a) she was not permitted to conduct research, to teach, to mentor or advise; (b) she would receive no administrative or research support; (c) she was barred from campus, effectively immediately; and (d) she was prohibited from publishing or disseminating research via HBS platforms.

191.    Additionally, Dean Datar's June 13, 2023 letter stated that:

*It is my intention to continue to handle this matter as confidentially as circumstances allow. Apart from the communications to journals and co-authors you can expect that I will share with your Unit and relevant faculty and staff*

43

*leadership that you have been placed on administrative leave as a consequence of research misconduct findings such that you will be unavailable to engage in* research, teaching, and mentoring or advising. *Communications will also be necessary with students whose work you have been supervising.*

(Emphasis added.)

192.    When he finished the letter and Professor Gino began to weep, Dean Datar told her, "you are a capable, smart woman. I am sure you'll find other opportunities."

193.    Dean Datar's remarks that he would "share" "research misconduct findings" was inconsistent with the confidentiality provisions of the Interim Policy and Harvard's other employment policies, as well as HBS and Harvard's normal practices. Misconduct proceedings and findings under the FRB are always confidential, including proceedings that were heard under the 2013 Research Integrity Policy. Dean Datar told Plaintiff that he was being "nice" to her by waiting until the end of July 2023, to place her on unpaid leave, rather than doing so immediately.

194.    Later that same day, Dean Datar's office contacted a female professor and Plaintiff's colleague and asked her to "counsel out" Plaintiff, meaning to ask Plaintiff to resign based on anonymous allegations of research misconduct. This female colleague was told by Dean Cunningham that, if Plaintiff agreed to leave HBS, "this will all go away; we won't say anything to anyone."

195.    This was not the first time that Dean Datar had tried to "counsel out" female faculty. Dean Datar had used "counseling out" in other personnel matters when the evidence did not support his desired objective, such as attempting to "counsel out" a qualified senior female professor to discourage her from applying for tenure and "counseling out" female junior professors to persuade them to resign for unsubstantiated disciplinary matters.

196. When the female colleague met with Plaintiff to "counsel her out," Plaintiff told the female colleague that she did not want to resign because she did not commit research misconduct.

197. Plaintiff's female colleague was surprised to learn from Professor Gino about the new Interim Policy that HBS created for her and applied to her case retroactively. As an HBS tenured professor for many years, Plaintiff's colleague had never known HBS to have previously created a new policy for a case, and then to apply it retroactively to that case.

198. Plaintiff's female colleague was also surprised that HBS had not applied its existing Research Integrity policy (*see* Doc. No. 6-2) to Plaintiff's case, a policy with which she was familiar.

199. This same colleague was also surprised that HBS had adopted the new Interim Policy without the customary disclosure to and vetting by HBS faculty, which were HBS's usual practice when promulgating new employment policies.

## III.    Defendants Ignite a Public Firestorm in Violation of Confidentiality Provisions in Numerous Policies

### A. Confidentiality Policies

200. At the bottom of every single page of the 41-page Final Report rendered by the investigation committee appeared the following paragraph:

> **THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.**

(All capitals and bold font in original.)

201. The Interim Policy, like the PHS Regulations on which it is based, recognizes that

accusations of research misconduct are potentially devastating to an academic's professional reputation, and imposes conditions of *strict confidentiality* on allegations of research misconduct. Interim Policy at § (III) (D) (Doc. No. 6-2 at 3-4); *see* 42 C.F.R. § 93.108(a).

202.    Under the Interim Policy, Harvard was obligated to limit disclosure of Professor Gino's research misconduct proceeding and the identity of Professor Gino, except on a need-to-know basis for the purpose of carrying out a fair proceeding, and to the extent required by law. *See* Interim Policy § (III) (D). (Doc. No. 6-2 at 3-4).[20]

203.    Consistent with the Interim Policy, the 2013 Research Integrity Policy also emphasizes Harvard's duties of confidentiality to a faculty member accused of misconduct, providing that: "It is important that, whatever process the Dean determines to be appropriate is thorough, fair, and objective," and should take into account "***protecting the rights and reputation[] of the individual accused.***" (Emphasis added) (Doc. No. 6-1 at 1).HBS normally (i.e., as a matter of recent and ongoing practice) utilizes its Faculty Review Board ("FRB") process to review both applications of faculty seeking tenure, as well as allegations of faculty misconduct, including alleged research misconduct.

204.    As a matter of its normal practice, when HBS convenes an FRB (i.e., a panel of tenured professors) to investigate allegations of faculty misconduct, it follows the FRB procedure set forth in the "Principles and Procedures for Responding to Matters of Faculty Conduct" ("FRB Principles"). Under the FRB Principles, in a case of *research misconduct*, the FRB applies the aforementioned 2013 Research Integrity Policy to evaluate alleged research misconduct by faculty (when no federal funding is involved).

---

[20] *See also* 42 C.F.R. §§ 93.108, 93.300(e).

205.    Little is known about specific misconduct cases, including research misconduct cases, that have been handled by HBS under the routine FRB process because, as stated in the FRB Principles, the expectation is that the *"work and activities of the FRB are considered private."* (Emphasis added.)

206.    The FRB Principles, like the 2013 Research Integrity Policy and the Interim Policy, sets forth a duty of confidentiality, pursuant to which those involved *"are expected to respect the confidentiality of the process."* (Emphasis added.)

207.    According to the FRB Principles, (which generally apply to all types of misconduct proceedings at HBS), while "the FRB procedure aims to provide a framework to allow an appropriate resolution of concerns in a wide variety of circumstances," certain "principles and considerations shall guide those carrying out the FRB procedure," including that:

- *"Every reasonable effort should be made to protect the reputations of the individuals involved."*

- *"Privacy and confidentiality are important considerations; information generally should be shared only on a need-to-know basis, and consistent with what is practicable."*

208.    Tenured faculty protected by the provisions of the Discipline Policy are further afforded a reasonable expectation that, whenever discipline is proposed based on a charge of "grave misconduct," the case will be treated confidentially. (Doc. No. 6-12 at 7).

209.    That confidentiality serves a critical purpose: to ensure that premature publicity and public scrutiny does not prevent tenured professors from receiving the full panoply of procedural and substantive rights to which they are contractually entitled.

210.    On information and belief, little is known of research misconduct cases that have been handled by other departments within Harvard and even at HBS because these proceedings are maintained in confidence pursuant to Harvard policy and/or applicable laws.

211.    In the course of the HBS investigation into allegations of Professor Gino's alleged research misconduct, Harvard and Dean Datar committed serious and significant breaches of confidentiality required by the Interim Policy, and other HBS and Harvard Policies. These breaches not only needlessly caused tremendous damage to Professor Gino's reputation, professional standing and economic interests, but also made it virtually impossible for her to obtain the fair, impartial and unbiased hearing to which she was entitled as a tenured professor.

(1) **Announcement of Professor Gino's administrative leave on the HBS website.**

212.    On or about June 13, 2023, HBS announced to the world that it had placed Plaintiff on administrative leave by prominently placing a banner on Professor Gino's faculty page on the HBS website. Next to Professor Gino's photo, following her name and title appear the words:

**ADMINISTRATIVE LEAVE.**

*See* https://www.hbs.edu/faculty/Pages/profile.aspx?facId=271812 (All capital letters and bold font in original) (last visited July 26, 2023).

213.    On June 22, 2023, Dean Datar sent an email to all faculty at the HBS, informing them that, "as reflected on Professor Gino's public Faculty & Research page, she is now on an administrative leave," and connecting her status to the outcome and status of her research misconduct proceeding.

214.    On information and belief, HBS never previously sent out an email announcing the placement of a tenured member of the faculty on administrative leave to all members of the HBS

faculty in connection with the status or outcome of the professor's research misconduct proceeding.

215.    On information and belief, HBS never previously publicly announced the placement of a tenured professor on administrative leave on the faculty member's webpages on the HBS website as an immediate consequence of a research misconduct proceeding.

216.    In the context of Harvard's numerous breaches of confidentiality, third parties reasonably understood HBS's public announcement of Professor Gino's administrative leave to be connected to and a result of the outcome of her research misconduct proceeding and to mean that Professor Gino had falsified or fabricated data.

217. For example, on or about June 17, 2023, an individual using the web-moniker "Headtwerker" posted the following image from Professor Gino's faculty page off the HBR's website, on Reddit, under the headline: "BREAKING: HBS professor placed on 'administrative leave' following bombshell investigation into fake data":



**(2)  Excessive and factually erroneous retraction notices**

218.    On the evening of June 13, 2023, the HBS RIO, on behalf of Harvard, began to aggressively send out retraction notices to scholarly journals that published the papers at issue in Professor Gino's research misconduct proceeding. (Doc. No 6-3, Doc. No. 6-4, and Doc. No. 65).

219.    The retractions omitted two salient facts: (a) that Harvard never established that Professor Gino was even the person *responsible* for perceived anomalies, (indeed, all of the evidence showed that, in each of the studies at issue, she was *not* the person who handled or collected the data); ***and***  (b) that Harvard *never proved* that Professor Gino had *any intent* to fabricate or falsify data.

220.    To the extent that Harvard insisted on retractions with which Professor Gino adamantly disagreed, the manner in which Harvard notified journals of retractions of Professor Gino's articles was excessive and inconsistent with its normal practices and policies, including the Interim Policy, which required Harvard to protect Professor Gino's *reputation and right to confidentiality to the extent possible*. Instead, Harvard aggressively and selectively publicized details of its confidential investigation, and unreasonably did not allow Professor Gino, the author of the studies in question, to work out the substance and timing of the retractions directly with the publishers of her articles to avoid unnecessary damage to her professional reputation.

221.    To the extent Harvard had concerns about the validity of the data, Harvard went far beyond what was reasonably necessary to correct the research record with retraction notices that falsely, and ***absent any evidence***, conveyed that Plaintiff had intentionally tampered with data to affect the outcome of the study.

### i. **Retraction Notice to PNAS**

222.    On the evening of June 13, 2023, the RIO, Bonacossa, emailed a letter on HBS letterhead, to Dr. May R. Berenbaum, Ph.D., Editor-in-Chief of the journal, *Proceedings of the National Academy of Sciences of the America,* stating that that "[HBS] has reviewed concerns about certain data previously published by Dr. Francesca Gino in [the *2012 PNAS Paper*]. ( **"Retraction Notice to PNAS."**) (Doc. No. 6-3). Attached to the Retraction Notice to PNAS as an appendix was a corresponding section of Data Colada's erroneous **December Report** and an MCG forensic report.

223.    In the **Retraction Notice to PNAS**, the RIO referenced so-called "data anomalies" for Study 1 relative to discrepancies between data voluntarily posted by Professor Gino on the Open Sciences Framework ("OSF") in 2020 and a dataset that the RIO described as an "original dataset provided by a research assistant." *See* **Retraction Notice to PNAS**. (Doc. No. 6-3).

224.    This statement was demonstrably and verifiably *false.* The data provided to HBS by Professor Gino's former research assistant was in an Excel spreadsheet and was *not* the "original dataset" for Study 1. The "original dataset" for Study 1 had been *collected on paper* in 2010, a fact that was *clearly* documented in the original *2012 PNAS Paper*. (*See* Doc. No. 20-5 at 1029-31, 1033-34).

225.    The PNAS Retraction notice was obviously excessive because the *2012 PNAS Paper had already been retracted.* Professor Gino and a team of collaborators had retracted the *2012 PNAS Paper* on March 16, 2020, (for reasons having nothing to do with alleged research misconduct by Plaintiff), after the experiment described in the study failed to replicate.

## ii. <u>Retraction Notice to Psychological Science</u>

226.    On June 13, 2023, the RIO emailed a letter on HBS letterhead to Dr. Patricia J. Bauer, Ph.D., Editor of the journal, *Psychological Science,* stating that "[HBS] has reviewed concerns about certain data previously published by Dr. Francesca Gino in [the *2015 Psychological Science Paper*] and [*the 2014 Psychological Science Paper*] ("Retraction Notice to Psychological Science.") (Doc. No. 6-4). Attached to the Retraction Notice to Psychological Science were "two appendices" with copies of the related portions of Data Colada's false and defamatory December Report and an MCG forensic report. *Id.*

227.    With respect to the *2015 Psychological Science Paper*, the RIO referenced so-called "data anomalies" for Study 4 relative to discrepancies in the data for this study, which had been voluntarily posted by Professor Gino on the Open Sciences Framework ("OSF"), and so-called "original data for Study 4 gathered using Qualtrics." (Doc. No. 6-4).

228.    The investigation committee erroneously concluded that the final OSF data contained new records not found in the Qualtrics studies based on an error made by MCG, which the committee incorporated into its Final Report. (*See* Doc. No. 20-5 at 22).

## iii. <u>Retraction Notice to JPSP</u>

229.    On June 14, 2023, the RIO emailed a letter on HBS letterhead to Dr. Dolores Albarracin, Editor of *The Journal of Personality and Social Psychology,* stating that he was writing to inform her that "[HBS] has reviewed concerns about certain data previously published by Dr. Francesca Gino in [the ***2020 JPSP Paper***] ( **"Retraction Notice to JPSP"**). (Doc. No. 6-5). Attached as "appendices" to the Retraction Notice to JPSP was a copy of the related portion of Data Colada's erroneous December Report and a portion of a MCG forensic report. *Id.*

230.    In the Retraction Notice to PNAS, the RIO referenced so-called "data anomalies" for Study 3a relative to discrepancies between the data Professor Gino voluntarily posted on the Open Sciences Framework ("OSF") and data that the RIO erroneously referred to as an "original dataset gathered using Qualtrics." (Doc. No. 6-5).

231.    This statement was false. The data in Qualtrics was *not* the original data for Study 3a, as it was verifiably edited. Others besides Plaintiff had been involved in the research process and many of the alleged discrepancies were irrelevant to the study hypotheses.

232.    At the top of each retraction notice, that is, the **Retraction Notice to PNAS**, **the Retraction Notice to Psychological Science,** and the **Retraction Notice to JPSP**, was the word: **CONFIDENTIAL.** (All capital letters and bold font in original.) In addition to unnecessarily and excessively publishing false and erroneous statements about Plaintiff's misconduct proceeding to the scientific journals, Harvard also breached its duty of confidentiality by unnecessarily disclosing information about the retraction notices, themselves, to persons other than the editors of these journals.

**(3)  Excessive and Factually Erroneous Retraction Notices to Co-Authors.**

233.    On the evening of June13, 2023, the HBS RIO reached out to Professor Gino's co-authors on the papers at issue in her research misconduct proceeding. The emails the RIO sent told co-authors that "our process has concluded" and that HBS believed that the results of the studies in question are invalid "*due to alteration of data that affects the significance of the findings."* The RIO attached a formal notification, which included a summary of the data discrepancies, and that informed co-authors that HBS had notified journals' editors with a recommendation that articles be retracted.

234.    With these emails, Harvard again publicized the flawed outcome of the HBS investigation, while erroneously suggesting that Harvard had proved Plaintiff had falsified and/or fabricated data, conduct that Harvard had *never proved* under its own policy, omitting details as to the inadequacy of the HBS investigation and the unfair and biased decision, including the investigative committee's reliance on Data Colada's unwarranted inferences of "tampering" and the inconclusive and non-probative information contained in the MCG forensic reports.

235.    On June 14, 2023, the HBS Senior Associate Dean for Faculty Development and Research, Professor Robin Greenwood, met with Professor Gino's colleagues in her unit, the Negotiation, Organizations & Markets unit ("NOM") at HBS and disclosed to them both the finding of research misconduct and that she had been placed on administrative leave. Doctoral students under Professor Gino's mentorship were also informed by the HBS Doctoral Office staff about the finding of research misconduct and the administrative leave. Dean Datar's office also reached out to other colleagues of Professor Gino to inform them that she had been placed on administrative leave.

236.    As a result of Harvard's breach of confidentiality, on June 15, 2023, after an HBS professor reached out to her, an author contacted the editor of Portfolio, Professor Gino's book publisher, and falsely stated to the editor at Portfolio that Professor Gino had ***"committed fraud"*** and that this would become public very soon. Professor Gino's book (All Hands: How Diverse Teams Win) was scheduled to be published on February 13, 2024, but as a result of the publicity of alleged "fraud," is now delayed until February 5, 2025.

237.    When Professor Gino contacted Dean Cunningham to question whether a faculty member should have contacted her publisher in this manner, Dean Cunningham told Professor Gino, "no," but added that, once the "retraction" notices are out, "everyone" would know her

situation. Cunningham's statement suggests that Harvard intended to severely damage Professor Gino's reputation through the issuance of the false and defamatory retraction notices which were not intended to remain confidential.

238.    On June 16, 2023, *The Chronicle of Higher Education* published an article, that referenced the allegations against Professor Gino's work in Study 1 in the *2012 PNAS Paper,* and featured the comments from Professor Max Bazerman ("Bazerman"), a colleague of Professor Gino's in the NOM unit at HBS and also a co-author with Professor Gino of the *2012 PNAS Paper*:

> Almost two years ago, a famous study about a clever way to prompt honest behavior was retracted due to an ironic revelation: It relied on fraudulent data. But The Chronicle has learned of yet another twist in the story.
>
> According to one of the authors, Harvard University found that the study contained even more fraudulent data than previously revealed and it's now asking the journal to note this new information. The finding is part of an investigation into a series of papers that Harvard has been conducting for more than a year, the author said.
>
> Details about the reported fabrications are unclear. Francesca Gino, a world-renowned Harvard Business School professor who studies dishonesty, and is a co-author on the disputed study, is now on administrative leave, according to her faculty page.

*See* "A Weird Research-Misconduct Scandal About Dishonesty Just Got Weirder," by Stephanie Lee,    available    at:    https://www.chronicle.com/article/a-weird-research-misconduct-scandal-about-dishonesty-just-got-weirder?bc nonce=1qs2zmrz1wl2eepa050jf3&cid=reg wall signup

239.    The reporter at *The Chronicle of Higher Education* noted that HBS had announced on Professor Gino's faculty webpage that she was on "administrative leave," and hinted that the reason was connected to the Harvard "investigation" of "fraudulent data" and suggested that Professor Gino's job and future at Harvard were at risk:

> And as of recently, [Professor Gino's] role at Harvard is unclear. Within the last month, her faculty website was updated to say that she is on administrative leave, according to screenshots captured by the Wayback Machine.

*See id.*

240.    Harvard had no legitimate reason to disclose to Bazerman or Plaintiff's other HBS colleagues confidential information concerning either Professor Gino's research misconduct proceeding or the pending retractions of her scientific journal articles. Harvard's breach of its duties of confidentiality is evident by Bazerman's comments to the reporter from *The Chronicle of Higher Education,* in which he made unwarranted assumptions concerning "altered data" and the HBS investigation:

> The alleged new problems involve experiment No. 1 — one of the two conducted in a lab with students. Bazerman told The Chronicle that on Tuesday, ***Harvard informed him that it believed fabricated data for this experiment made it invalid***. According to Bazerman, Harvard provided a 14-page document with what he described as 'compelling evidence' of data alterations. Their analysis found that somebody had accessed a database and added and altered data in the file, he said. "I did not have anything to do with the fabrication," he told The Chronicle.
>
> According to Bazerman, Harvard is recommending to the Proceedings of the National Academy of Sciences that it update the study's retraction notice to reflect its new concerns.
>
> . ..
>
> Bazerman told The Chronicle that his understanding is that the 2012 paper is one of four papers 'of significant concern' to Harvard. He declined to identify the other three, but said he was not a co-author on them.

*Id.* (Emphasis added.)

241.    As a result of Harvard's breach of confidential information concerning Professor Gino's research misconduct proceeding and retraction notice, Bazerman made statements to the media containing rumors and factual inaccuracies, including that, "[Harvard's] analysis found that somebody had accessed a database and added and altered data in the file," statements that were false.

242.    Under the Interim Policy, the Complainant of research misconduct "is responsible for making allegations in good faith" and "maintaining confidentiality" Interim Policy § (III) (E). (Doc. No. 6-2 at 4). The complainant "*is not entitled to receive information about the status or outcome of that process.*" *Id.*

243.    Consequently, between June 17, 2023 and June 30, 2023, Data Colada posted a four-part series of blogs (Doc. Nos. 6-6, 6-7, 6-8, 6-9) that was substantially similar to its erroneous December Report which it submitted to Harvard's investigation committee and that corresponds to the four studies that were the subject of its original allegations to HBS in July 2021.[21]

244.    In violation of the Interim Policy, immediately following Dean Datar's June 13, 2023 decision, Harvard disclosed confidential information concerning Professor Gino's research misconduct process with third parties that enabled Data Colada, the purported "complainant," to ascertain the status and outcome of Harvard's process.

245.    With Harvard's public announcement of professor Gino's placement on administrative leave, its aggressive, excessive, and false retraction notices, and Harvard's disclosures to third-parties, including HBS faculty within Professor Gino's NOM unit about Professor Gino's research misconduct proceeding, Harvard set in motion the destruction of Professor Gino's well-earned professional reputation and standing in a matter of a few days.

246.    Data Colada's Blog Posts 1 through 4, in their many references to Professor Gino's misconduct proceeding and the pending retraction notices, provide further evidence of Harvard's breach of confidentiality. (Doc. Nos. 6-6, 6-7, 6-8, 6-9).

---

[21] In a July 18, 2023 webinar titled "Data Fraud and What to do Next: A conversation with Uri Simonsohn and Maurice Schweitzer," Data Colada member Simonsohn clarified that there was "no evidence" that Plaintiff had manipulated data. Simonsohn stated (at min 8:47): "Nobody has unambiguously claimed that this was Francesca Gino . . . The retractions don't say that. They just say data she had and data she posted. Uh, my belief is that she did it, but there's no evidence of that. But, but it doesn't really matter." A recording of the webinar can be found here: https://www.youtube.com/watch?v=OPUKyeetdt8&t=6s It was publicized here: https://iafcm.org/data-fraud/

247.    After Data Colada launched its 4-part blog posts series, Professor Gino began to receive venomous, misogynistic hate emails from people all over the world.

248.    On June 22, 2023, Harvard implicitly admitted its failure to protect Professor Gino's confidentiality when Dean Datar's office sent out an official email to all faculty members at HBS (but mysteriously excluding Professor Gino), with the subject "Chronicle of Higher Education piece on Francesca Gino." Dean Datar's email reminded recipients that, *"[w]hile I know you may have questions, confidentiality is an important consideration in these matters*." (Emphasis added.)

249.    Following Data Colada's release of Blog Post 1 on June 17, 2023, headlines from major newspapers throughout the world evidence the immediate and widespread damage to Plaintiff's professional reputation caused by Harvard's breach of confidentiality and Harvard and Data Colada's false and defamatory statements. For example:

- The Guardian: "*Harvard Professor Who Studies Honesty Accused of Falsifying Data In Studies,"* (Maya Yang, June 25, 2023);

- Daily Caller: *"Harvard Honesty Expert Accused of Academic Dishonesty,"* (Gretchen Clayson, June 25, 2023);

- FOX: *"'Leading Scholar' at Harvard Accused of Fabricating Findings In Famous Study on Honesty,"* (Gabriel Hays, June 25, 2023);

- The Washington Post: *"Harvard Professor Who Researches Honesty Accused of Falsifying Data,"* (Matt Delaney, June 25, 2023).

250. Within days of Harvard's breach of confidentiality and Data Colada's ensuing blog posts, false allegations of research misconduct reverberated on the internet, and were repeated in multiple platforms and contexts, including, as but one example, in the following reviews on [Amazon.com](Amazon.com) for Plaintiff's latest book, *Rebel* Talent, which reflect Data Colada's terminology ("fraud") and Harvard's public announcement of her administrative leave:



251.    Within days of Harvard's breach of confidentiality and Data Colada's ensuing blog posts, academic journals started to take steps to remove Professor Gino from their editorial board, without contacting her directly.

252.    Within days of Harvard's breach of confidentiality and Data Colada's ensuing blog posts, Professor Gino started receiving emails and phone calls from clients with whom she had ongoing or existing contractual relationships, asking for those contracts to be terminated to avoid potential "liability" or "bad press." *All* of those contractual relationships, except for one, were terminated or postponed until Professor Gino's reputation is restored. These clients took these

actions because they saw Plaintiff's placement on administrative leave by HBS and Data Colada's ensuing blog posts.

## IV.    Selective Enforcement of the Interim Policy.

253.    Plaintiff has been told by multiple colleagues at Harvard, including Senior Associate Dean Pisano, who has worked for HBS for 35 years, that her treatment throughout the HBS proceeding and the outcome would have been different if she had been a male.

254.    On information and belief, neither HBS nor Harvard has ever fired, constructively discharged, or recommended revoking the tenure of **_any_** male full professor whom Harvard has found responsible for research misconduct.

255.    On information and belief, neither Harvard nor HBS has ever previously terminated, suspended, placed on unpaid administrative leave for two years, constructively discharged, demoted, removed from duty, or otherwise disciplined **_any_** male tenured professor without the procedural protections provided under the Discipline Policy.

256.    The 2013 Research Integrity Policy that HBS abandoned is similar to the Interim Policy in that it also incorporates the definition of "research misconduct" provided for under the aforementioned PHS Regulations.

257.    In addition, under the 2013 Research Integrity Policy, the Dean is authorized to appoint an individual or a committee to investigate the allegation, who will then make a recommendation to the Dean.

258.    However, the 2013 Research Integrity Policy is far less onerous than the Interim Policy in terms of its procedures and overall treatment of a faculty member accused of research misconduct. Unlike the Interim Policy, the existing 2013 Research Integrity Policy expressly

"permitted flexibility" in its procedures, and did not subject an employee to the sequestration of documents, did not impose strict deadlines on the completion of any phase of the investigation, and, most significantly, did not impose any particular disciplinary action to be taken against a faculty member's employment or status as a tenured faculty member.

259.    In particular, unlike the Interim Policy, the 2013 Research Integrity Policy:

(1)  placed no limits on the dean's ability to request additional information at any phase in the proceeding;

(2)  imposed no particular structure on either the assessment or investigation of allegations, (whereas the Interim Policy imposed a stringent, 2-tier process (consisting of an inquiry and investigative phase), modeled after the regime set forth in the PHS Regulations);

(3)  placed no limit on the accused's right to seek support from persons who might serve as an advisor(s), from within or outside the university, (whereas the Interim Policy permitted the respondent to "choose up to two personal advisors for support during the process");

(4)  did not require taking custody and sequestration of the respondent's research records and email records;

(5)  placed no time limits on any aspect of the process, whereas the Interim Policy imposed strict time limits, including, *inter alia*: (a) ten (10) business days for "a respondent" (i.e., Plaintiff) to comment on the inquiry committee's draft inquiry report; (b) a conclusion of a "final inquiry report" and decision on whether an investigation is warranted within 60 calendar days of initiation of the initial inquiry; (c) 30 days for "the respondent" (i.e., Plaintiff) to submit comments on the investigation committee's draft investigation report; and (d) 120 days for the completion of the investigation.

(6)  did not threaten an accused "respondent" with sanctions, up to termination of employment, for breaching confidentiality, a prohibition that effectively precludes an accused's ability to secure witnesses in their defense.

260.    Importantly, whereas the 2013 Research Integrity Policy authorizes the dean to

"decide the matter and take whatever action he or she believes justified," the 2013 Research Integrity Policy does not purport to authorize the dean to impose any specific *adverse employment action* against a tenured Professor, (e.g., to suspend, to demote, or terminate).

261.    The 2013 Research Integrity Policy does not purport to supersede the terms of Plaintiff's appointment as a tenured Professor, or to supersede Harvard's collective policies and procedures, including the Tenure Policy, the Third Statute, and the Discipline Policy.

262.    In contrast, the Interim Policy purported to authorize the Dean of HBS to take the following adverse employment actions against Plaintiff: "*suspension, leave without pay, salary reduction,*" and "*initiation of steps leading to rank reduction or termination of employment.*" (Emphasis added).

263.    Like the Interim Policy, the 2013 Research Integrity Policy also emphasized Harvard's duties of confidentiality and fairness to the professor accused of misconduct, providing that: "It is important that, whatever process the Dean determines to be appropriate is thorough, fair, and objective," and should take into account "protecting the rights and reputation[] of the individual accused." In the past, HBS utilized its Faculty Review Board process to review both applications of faculty seeking tenure, as well as allegations of faculty misconduct, including alleged research misconduct. In November 2019, a male junior professor, "John Doe,"[22] employed at HBS who was charged with research misconduct received no sanction by Harvard. Defendants did not subject Mr. Doe to the procedurally onerous Interim Policy but instead used HBS's existing 2013 Research Integrity Policy and Faculty Review Board ("FRB") process to investigate the allegations against him. Consistent with the established 2013 Research Integrity Policy and the FRB Principles, when

---

[22] A pseudonym is used to avoid unfairly stigmatizing this faculty member.

questions were raised about the research processes performed by a male junior professor at HBS, John Doe, HBS convened an FRB to investigate.

264.    Because Harvard and HBS have historically safeguarded the confidentiality and reputation of a faculty member accused of misconduct, including research misconduct, Professor Gino only knows about Mr. Doe's proceeding because HBS asked her to serve as a "witness" in her male colleague's FRB process. Plaintiff is aware that, in Mr. Doe's case, the FRB process consisted of the FRB speaking with senior faculty and others at HBS who advised Mr. Doe on his research or writing. All of the questions Plaintiff was asked as a witness during Mr. Doe's research misconduct proceeding before the FRB committee were phrased in a leading way to help establish his innocence.

265.    In contrast to its treatment of Plaintiff, HBS protected the confidentiality of Mr. Doe, and it subsequently awarded him tenure.

266.    When HBS introduces new policies that affect faculty members, it normally announces them to the entire faculty after vetting them and receiving faculty input.

267.    HBS never announced the Interim Policy to faculty, and never vetted it through HBS's customary, collaborative process before applying it to Plaintiff's case.

268.    On November 4, 2021, soon after Plaintiff learned of the allegations against her, she asked the RIO, Bonacossa, to share the previous version of the Interim Policy, dated August 2021. Bonacossa indicated that, "[t]he [Interim Policy] was established in August 2021, and that "[he] [did] not have a copy of the previous policy."

269.    After Defendants imposed sanctions upon Plaintiff under the Interim Policy, the 2013 Research Integrity Policy was still available for download on HBS's internal website for Faculty Staff and Students and remained the official HBS policy for investigating and evaluating

allegations of research misconduct by faculty. On information and belief, HBS did not announce the Interim Policy on its website until after Plaintiff filed this lawsuit.

270.    In another recent case, another male associate professor employed at HBS who was charged with a blatant and obvious disregard of Harvard's conflict of interest policy received no sanction by Harvard and Dean Datar. It was undisputed that the male professor had written scholarly articles about the development of cryptocurrencies without disclosing in his working papers that he had a financial interest in the product and was working in collaboration with a firm to develop cryptocurrencies.

271.    Despite the obvious conflict of interest and the undisputed and serious violations of HBS standards of conduct and ethics by this male professor, who was only an associate professor, not a full tenured professor like Plaintiff, he received no sanction from HBS. At the conclusion of the FRB process, the FRB concluded that the male professor had demonstrated "poor judgment," and Harvard and Dean Datar took no adverse action against his employment.

A.    **Defendants Subject Female Professors to Disproportionately Harsher Sanctions Than Male Faculty.**

272.    Female faculty members at HBS facing accusations of misconduct have received disproportionately harsher treatment than male faculty members, even when the charges against them are for lesser violations or not substantiated.

273.    In one such case, a female professor, "Jane Roe,"[23] was accused by her colleagues of treating staff and research assistants poorly—a violation of the "colleagueship" standard. Dean Cunningham (who presently functions as Dean Datar's right-hand woman) and previous HBS Dean Nitin Nohria determined the allegations warranted an FRB process. After the FRB report concluded

---

[23] Pseudonyms are used in reference to the former female employees whom Defendants have subjected to discriminatory treatment by forcing them out of their teaching jobs at Harvard to avoid unfairly stigmatizing them.

that the issues against Ms. Roe were not sufficiently serious to warrant sanctions, the former HBS

dean overruled the report and "counseled her out" (i.e., convinced her to resign).

274.    Even after prominent senior female faculty met with the former HBS dean to protest

that this seemed unfair and inconsistent with how similarly situated male faculty had been treated,

HBS refused to change its position.

275.    On information and belief, in the course of handling Jane Roe's case, it was

revealed that male professors had treated staff and research assistants poorly (the same violation

of colleagueship of which Jane Roe had been accused), but these male professors were not made

to go through FRB processes. In other words, the same or similar allegations, when about *male*

professors, did not trigger an FRB process.

276.    Defendants have a history of pushing out female faculty members who become the

focus of negative media attention. In a second case involving allegations against an HBS female

professor's purported violations of the so-called "colleagueship standard," Dean Cunningham and

Dean Datar determined that the allegations did not warrant an FRB process. Some time later, when

said female professor was preparing materials for promotion to tenure, the accusations resurfaced and

this time the accuser threatened to file a lawsuit. Despite that there was no new information, Dean

Cunningham and Dean Datar—faced with the negative publicity of a potential lawsuit— determined

an FRB was now appropriate.

277.    On information and belief, HBS used the FRB process to intimidate this female

professor into leaving HBS and succeeded in "counseling her out" on the basis of unsubstantiated

violations of the "colleagueship standard," (and before she could apply for promotion to a tenured

position at HBS).

278.    On information and belief, there is no single instance of a male faculty member at HBS being "counseled out" for an alleged violation of the "collegiality" standard.

279.    In contrast to its treatment of female faculty, Defendants have allowed male faculty at HBS and other schools to remain in their positions and to retain their salary and benefits, even *after* finding them responsible for egregious misconduct, including severe sexual harassment against female junior professors and students.

280.    Defendants have not fired similarly-situated tenured male faculty, or subjected them to unpaid administrative leave, based on alleged research misconduct. *See, e.g.,* "Fire Marc Hauser," available at https://www.thecrimson.com/article/2011/4/27/harvard-faculty-academic-university/ (discussing Faculty of Arts and Sciences' treatment of tenured professor Marc Hauser). On information and belief, Professor Hauser remained a psychology professor at Harvard following a three-year investigation by Harvard that found him responsible for research misconduct until he chose to resign, without a constructive discharge or the institution of tenure revocation proceedings.

281.    When publicized complaints of plagiarism were made against two male Harvard Law School Professors, Laurence Tribe and Charles Ogletree, although the allegations were apparently undisputed, both remained employees at Harvard and neither was subjected to a procedurally onerous  investigation or sanctions like Plaintiff.

282.    And, when a federal court found economics professor Andrei Shleifer liable for conspiracy to defraud the U.S. government while leading a Harvard economic reform program in Russia, Harvard not only refused to fire Shleifer, but it also went so far as to pay $26.5 million to settle a government lawsuit against him.

283.    Schleifer currently holds a position as an HBS Visting Professor.

284.    Even when Harvard has felt compelled to place male tenured professors on administrative leave amidst highly publicized allegations of sexual misconduct, Harvard has routinely placed such male professors on **paid** administrative leave, and permitted these male professors to return to their teaching and administrative roles, *see, e.g.,* John Comaroff (following two years of administrative leave for sexual harassment and retaliation, returned to classroom);[24] and Jorge Dominguez (after being "barred from administrative responsibilities for three years" for sexual harassment, permitted to hold high-level positions at Harvard),[25] or else permitted such male faculty to quietly retire with salary, reputation, and benefits intact, *see, e.g.,* the case of Gary Horton (sexual misconduct).[26]

## IV.    Additional Indicia of Discriminatory Animus

285.    Prior to becoming dean of HBS in January of 2021, Dean Datar had been a tenured professor at HBS and had taught in HBS's Accounting & Management Unit since the mid-1990s.

286.    Accounting & Management is a particularly unwelcome unit for female professors at HBS. On information and belief, in 2019, there had not been a single tenured woman in the Accounting & Management Unit for more than 20 years.

287.    In the fall of 2022, during Appointments Committee meetings in which HBS tenured professors discuss faculty members under consideration for promotion, the tenured professors were reviewing the applications of two female professors for possible promotion within

---

[24]  *See* Meimei Xu, Following Sexual Harassment Allegations, Comaroff Returns to Teaching at Harvard, Sparking Outrage, (June 27, 2022), THE HARVARD CRIMSON, https://www.thecrimson.com/article/2022/6/24/comaroff-returns-aaas ("After being placed on two years of administrative leave due to allegations of sexual harassment and retaliation, Harvard professor John L. Comaroff will return to the classroom to teach an elective course this fall").
[25] *See* Meimei Xu, Following Sexual Harassment Allegations, Comaroff Returns to Teaching at Harvard, Sparking Outrage, (June 27, 2022), THE HARVARD CRIMSON, https://www.thecrimson.com/article/2022/6/24/comaroff-returns-aaas ("After being placed on two years of administrative leave due to allegations of sexual harassment and retaliation, Harvard professor John L. Comaroff will return to the classroom to teach an elective course this fall").
[26] *See* Laura Ly, Harvard professor retires amid allegations of sexual misconduct, (March 7, 2018), CNN.COM ("A female junior professor "filed a complaint with the [Respondent Harvard] in 1983 and Dominguez was found guilty of 'serious misconduct.' Although he was barred from administrative responsibilities for three years, Dominguez was

HBS's Accounting & Management Unit. (One female professor was being considered for promotion to Associate Professor and the other one to a position as Full Professor with tenure).

288.    A male professor emeritus who has taught in the Accounting & Management Unit for over 35 years, went outside of the normal review process by drafting two letters in which he subjected each of the two female applicants to harsh criticism for their research.

289.    As a tenured professor, Plaintiff was present in this review process. When she expressed to two of her female colleagues that she was troubled by the male professor's actions and language in the letters, they told her that that this was "always done" to women going through promotion in the Accounting & Management Unit.

290.    Tenured faculty members participating in the discussion of candidates up for promotion were able to submit their feedback on a card, for review by Dean Datar, together with their vote on the potential promotion. On her card, Plaintiff expressed her concern that two female applicants from the Accounting & Management Unit were subjected to a level of scrutiny to which their similarly situated male colleagues were not subjected in the review process.

291.    On information and belief, Dean Datar took no action to investigate Plaintiff's report or to correct the disparate treatment of women in the Appointments Process.

### A. Datar Cancels Inclusion Course

292.    After placing Plaintiff on unpaid administrative leave, Dean Datar cancelled the Inclusion course as a required MBA course offering in the fall of 2023.

293.    As noted *supra*, the focus of the Inclusion course, which had been developed by Plaintiff and a female colleague, was the value of diverse leadership in business and creating more inclusive and gender equitable workplaces.

294.    On August 1, 2023, Dean Datar's office sent an email to all incoming MBA students announcing the cancellation of the Inclusion course, and blaming Plaintiff's administrative leave for the cancellation.

295.    Faculty other than Plaintiff had already committed to teaching the Inclusion course in the fall of 2023. If Dean Datar had wanted to continue to offer Inclusion as a required offering, he could have done so, regardless that Plaintiff was unavailable.

296.    Despite Plaintiff's tremendous achievements and success, her competence, knowledge, and credibility have been subjected to greater scrutiny during her employment by Harvard because of her sex in the male-dominated environment at HBS.

297.    Even after Plaintiff became head of her unit at HBS in 2018, the Negotiations, Organizations, Markets ("NOM") Unit, she was second-guessed and subjected to heightened scrutiny by her male colleagues at HBS.

298.    Plaintiff was the only female Unit Head across the ten different units at HBS.[27]

299.    After Harvard appointed Srikant Datar as the new dean of HBS, effective January 1, 2021, Dean Datar, asked one of Plaintiff's male colleagues to take over her role as head of the NOM Unit.

300.    Due to institutional mistreatment of women, there has been an exodus of capable, bright female professors from HBS. *See Tackling Gender Inequality at HBS: A Case Study,* Julia

E. Debenedictis, (May 4, 2016), *THE HARVARD CRIMSON,*

https://www.thecrimson.com/article/2016/5/4/tacking-gender-inequality-at-hbs/

301.     As of July 2023, male tenured professors outnumber female tenured professors 87 to 27.

---

[27] As of July 2023, within the NOM Unit, male tenured professors outnumber female tenured professors 8 to 3.

302.    Women have left HBS because they have been unfairly denied tenure on the basis of sex.

303.    While the ratio of male to female assistant professors (beginning-level professors) is roughly equal (50/50), due to gender bias and discrimination, HBS has promoted female junior professors to positions as full tenured professors at a fraction of the rate of their male colleagues.

304.    In the history of HBS, Harvard has hired a total of 107 senior lateral hires (i.e., "full professors" with tenure) to teach at HBS. Only seven (7) of these senior lateral hires have been women.

305.    Women have also left HBS because they have been pressured to resign from Harvard and to seek positions elsewhere due to disparate discipline and selective enforcement of employment policies.

306.    The following tables show the proportion of male and female faculty at all levels at HBS, as of July 2023, and illustrates the significant decline in the proportion of female faculty at the more senior levels:

**OVERALL, across units (total number)**

|        | Assistant | Associate | Full | Senior Lecturer | Professor of Management Practice | Visiting Professor | Emeritus |
|--------|-----------|-----------|------|-----------------|----------------------------------|--------------------|----------|
| Female | 35        | 14        | 27   | 20              | 1                                | 0                  | 5        |
| Male   | 35        | 21        | 87   | 55              | 11                               | 10                 | 26       |

**OVERALL, across units (%)**

|        | Assistant | Associate | Full | Senior Lecturer | Professor of Management Practice | Visiting Professor | Emeritus |
|--------|-----------|-----------|------|-----------------|----------------------------------|--------------------|----------|
| Female | 50%       | 40%       | 24%  | 27%             | 8%                               | 0%                 | 16%      |
| Male   | 50%       | 60%       | 76%  | 73%             | 92%                              | 100%               | 84%      |

307.    As of today, the demographics shown in ¶ 296 remain substantially the same.

308.    Against this backdrop of institutional gender bias, in July 2021, Defendants received false allegations against Plaintiff for purported research misconduct ("data fraud") and created a new policy to investigate the allegations and applied it retroactively to her case as opposed to relying on its existing policy and procedures.

309.    Throughout the so-called investigation process, an investigative committee hand-picked by Dean Datar demonstrated Defendants' bias by disregarding evidence and testimony that could have exculpated Plaintiff of Data Colada's false allegations of "data fraud" and purported "research misconduct."

310.    One member of Dean Datar's hand-picked, three-member investigative committee included Robert S. Kaplan ("Kaplan"), a professor emeritus in the Accounting & Management Unit, the same unit where Dean Datar had himself taught for decades, and who was Dean Datar's mentor in his academic career. In Kaplan's more than 35 years teaching in the Accounting & Management Unit, his HBS unit had not promoted a single woman.

311.    After Defendants erroneously found Plaintiff "responsible" for purported "research misconduct," Defendants imposed disparately harsh and punitive sanctions against her employment, which included, among other things, placing Plaintiff on a two-year unpaid administrative leave, a sanction that, on information and belief, is without precedent at HBS.

V.    **Defendants' Continued Campaign of Contractual Breaches and Discriminatory**
      **Conduct.**

312.    On October 24, 2023, shortly after this action was filed, a newspaper informed

Harvard that it intended to publish an article about allegations of research misconduct against

then-President Gay.

313.    The next day, then-President Gay informed Plaintiff that she was convening a

hearing committee to formally revoke Plaintiff's tenure under the Third Statute (the "TS

Committee").

314.    Around that same time, an HBS Professor asked then-President Gay a question

about Professor Gino, to which she responded "We have to make an example of this woman."

315.    While Gay would step down as President less than two months later, the TS

Committee dutifully continued the work to fulfill Gay's promise.

316.    Pursuant to the Discipline Policy, Professor Gino was contractually entitled to "a

full hearing and fair representation before an impartial tribunal." She did not receive any such

hearing.

317.    The TS Committee demonstrated partiality and bias throughout the hearing

process. For example, virtually all of Plaintiff's requests for access to relevant documents and

information from Harvard were denied without valid reasons and in violation of ¶ 10 of the

Hearing Procedures set forth in the Discipline Policy ("Every possible effort will be made to

obtain the most reliable evidence available.").

318.    Similarly, the TS Committee allowed Harvard to make wholesale changes to the

allegations against Plaintiff after she had expended years working to identify the flaws and

inconsistencies underlying the investigation committee's report. Specifically, over a year after

filing its Complaint, two weeks after Professor Gino had answered that Complaint (having spent

almost a year developing her defense to that Complaint), and with just three months left before the TS hearing, the TS Committee allowed Harvard to simply abandon the analysis previously done by MCG and rely instead on a new purported expert who presented hundreds of pages of analysis and advanced a bevy of previously undisclosed and unreviewed claims and assertions against Professor Gino.

319.    Additionally, despite Professor Gino being entitled under the Discipline Policy to an adjournment to enable her to investigate and respond to the claims made in the alleged expert's report, the TS Committee wrongfully and unreasonably refused to provide any such opportunity.

320.    The TS Committee also refused to provide Professor Gino with a meaningful opportunity to examine the witnesses upon whom Harvard relied in support of its allegations. In total, Plaintiff was afforded only six-hours to present testimony—including both direct examination and cross. Given the complexity of information and number of witnesses, this was wholly inadequate, unjustified and unreasonable.

321.    Most critically, however, the TS Committee's partiality and bias is reflected in its written decision, which grossly mischaracterized the evidence and falsely asserted there was "clear and convincing evidence" that Plaintiff had engaged in "grave misconduct."

322.    For example, the written decision asserted that certain paper receipts, which confirmed the accuracy of the data at issue in Allegation 4b, had not been produced by Professor Gino before the hearing. That was blatantly wrong, however, as the receipts had, in fact, been submitted as an exhibit.

323.    Indeed, the TS Committee's decision entirely ignored—without any justifiable reason—all of the exculpatory evidence Plaintiff presented at hearing. This included evidence from witnesses who had observed Professor Gino's work first-hand for many years, and

uniformly confirmed that she conducts research with the utmost integrity. This also included evidence submitted by the research assistant who conducted the experiment at issue in Allegation 4a and confirmed that the experiment had been conducted in the manner described in Professor Gino's testimony, and therefore had not been falsified as alleged by Harvard.

324.    In addition to exhibiting partiality and bias, these same actions by the TS Committee also denied Plaintiff the "full hearing and full representation" to which she was entitled, and denied her the right to meaningfully "confront and cross-examine all witnesses."

325.    There was no legitimate non-discriminatory reason for the TS Committee to violate Plaintiff's contractual rights in this manner and, upon information and belief, it did so as a result of discriminatory and/or retaliatory animus.

326.    These violations of Plaintiff's contractual rights were also caused in part by Defendants' other prior misconduct. As alleged above, the confluence of Defendants' violations ignited a public firestorm that made it virtually impossible for Plaintiff to obtain a full and fair hearing. Not only were the members of the TS Committee made more partial and biased due to the publicity, but it dissuaded critical witnesses—such as the research assistants who actually handled the data at issue—from cooperating with the hearing process.

327.    False testimony provided to the TS Committee by Dean Datar and the RIO also contributed to these breaches. For example, Dean Datar falsely claimed that he had not made a deal with Data Colada, when in fact he had made such a deal and it had precipitated the false and erroneous conclusions set forth in the investigation committee report. Research Integrity Officer Alain Bonacossa also lied to the TS Committee, stating (among other things) that he had "specifically informed Prof. Gino that she could hire her own forensic expert to work on her

behalf" during the process conducted under the Interim Policy, when, in fact, he had done the opposite.

328.    Harvard also sought to improperly influence the TS Committee by making repeated reference to the fact that Plaintiff had brought this suit against Harvard. Such comments were intended to, and likely had the effect of, fostering retaliatory animus against Plaintiff and causing the TS Committee to act upon it.

329.    But even after the TS Proceeding had concluded and its written decision submitted to Harvard, there was still one last chance for "veritas" to prevail. The rebuttal submitted to Harvard on Professor Gino's behalf, a copy of which is attached hereto as Exhibit B, laid out in detail both the procedural flaws and evidentiary weaknesses in TS Committee's report. In short, the written rebuttal laid bare that the evidence could not sustain a finding of "grave misconduct," that Professor Gino had been made the victim of an inherently unjust process, and that this misadventure should conclude with Harvard fully restoring Professor Gino to her position as tenured professor. But Harvard was undeterred, and finished the plan it had devised years before by formally revoking Plaintiff's tenure and terminating her employment.

## VI. <u>Harvard's Retaliatory Counterclaim</u>

330.    On July 7, 2025, Harvard filed a motion announcing its intention to pursue a counterclaim against Plaintiff for defamation. According to its filing, Harvard now claims that it suffered "reputational harm" because "Professor Gino's statements about HBS using the 'wrong file' during the HBS investigation were lies."

331.    This claim has no legitimate basis in either law or fact, is simply a further act of retaliation for Plaintiff's filing of this suit, and is intended to annoy, harass and disparage Plaintiff.

332.    To begin, Professor Gino's statement was not false or defamatory. In fact, Defendants themselves have admitted that they overlooked relevant files in the investigation conducted pursuant to the Interim Policy. Further, the evidence confirms that in many instances Harvard did use the wrong file in its analysis.

333.    Rather than admit this basic truth, Harvard's filing provides an intentionally misleading account of certain events that unfolded in the final days leading up to the abbreviated hearing conducted by the TS Committee.

334.    Contrary to Harvard's assertions otherwise, Professor Gino never created any kind of "cover-up file" or otherwise attempted to falsify or manufacture evidence. It was *Harvard* who attempted to manufacture this false claim on the virtual eve of hearing to distract the TS Committee from the actual evidence that was being brought forward by Professor Gino—which included the "receipts" referenced in the blogpost that Harvard now claims was false.

335.    Indeed, each time that Professor Gino has successfully rebutted one of the false claims made against her, Harvard and its collaborators have employed this same strategy—moving the goalposts by advancing a new, and ultimately meritless, claim of wrongdoing. This is no different.

336.    But even there were a legitimate factual basis for Harvard's defamation claim—which there is not—the lack of a legitimate legal basis is even more obvious. As Harvard's own filing admits that it actually did overlook relevant files in its investigation, the alleged defamatory statements are at least "substantially true" and therefore not actionable. Moreover, the harm that Harvard claims to have suffered, which it describes in wholly conclusory terms as "harm to Harvard's reputation by causing at least some HBS faculty members and members of the pubic to believe that HBS had not been appropriately careful in…its investigation of significant research

misconduct allegations against one of its tenured faculty members," falls far short of the actual harm needed to state a valid claim for relief.

**COUNT I**
**<u>Violation of Title IX of the Education Amendments of 1972, U.S.C. § 1681 et seq.</u>**
**(As to Defendant President and Fellows of Harvard College)**

337.    Plaintiff repeats and realleges each and every allegation hereinafter above as if fully set forth herein.

338.    Title IX of the Education Amendments of Title IX of the Education Amendments of 1972 20 U.S.C. § 1681 *et. seq.,* provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

339.    Title IX applies to all public and private educational institutions that receive federal funding, including Defendant Harvard.

340.    Title IX may be violated by a school's imposition of discipline where gender is a motivating factor in the decision. *See Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979); *Harrington v. Lesley Univ*., 554 F. Supp. 3d 211, 233 (D. Mass. 2021)

341.    Plaintiff is a female.

342.    As described in the foregoing paragraphs, when Defendant Harvard abandoned its existing 2013 RI Policy and the procedures outlined in the FRB Principles, and created an onerous policy just for Plaintiff, it subjected Plaintiff to selective enforcement of a Policy, motivated by gender, in violation of Title IX.

343.    Defendant Harvard has never previously applied the Interim Policy to allegations of research misconduct by a male professor at HBS.

344.    In 2019, Harvard applied its existing 2013 RI Policy and FRB process to investigate allegations of research misconduct made against a junior male faculty member, who was subjected to no punitive sanctions. Unlike the Interim Policy that Harvard created for Plaintiff, the 2013 RI Policy and FRB procedures do not specifically authorize the Dean of Faculty at HBS to terminate the employment of a tenured professor if found responsible for alleged research misconduct.

345.    Defendant Harvard has never placed a similarly situated tenured male professor at HBS on unpaid administrative leave, initiated tenure revocation proceedings, or revoked tenure based on allegations of research misconduct.

346.    Data Colada is known for targeting prominent female behavioral scientists and subjecting their work to unusually high scrutiny.

347.    Harvard and HBS are also known for treating female faculty less favorably than male faculty.

348.    Harvard's gender bias against women was a motivating factor in HBS's decision to subject Plaintiff to an onerous investigation, to impose upon her severe penalties, including unpaid administrative leave for two years, and to ultimately revoke her tenure.

349.    As a consequence of Defendant Harvard's selective enforcement of its policies, Plaintiff has suffered harms that no similarly situated male tenured professor at HBS has suffered, including, *inter alia,* that Plaintiff: (1) was placed on immediate administrative leave for two years and stripped of all compensation; (2) had her professorship at HBS revoked; (3) has been removed from all of her teaching, publishing, and research duties, and any opportunity to earn a livelihood; and (4) has had her tenured position at Harvard revoked.

350.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered damages, including tremendous financial losses, reputational harm, loss of existing

contractual relations and prospective economic opportunities and advantage, mental anguish, physical pain and suffering, embarrassment, and severe emotional distress.

## COUNT II
## Breach of Contract
### (As to Defendant President and Fellows of Harvard College)

351.    Plaintiff repeats and realleges each and every allegation hereinafter above as if fully set forth herein.

352.    Under Massachusetts law, to state a breach of contract claim the plaintiff must demonstrate that: "(1) there was a valid contract; (2) the defendant breached its duties under the contractual agreement; and (3) the breach caused the plaintiff damage." *NExTT Sols., LLC v. XOS Techs., Inc*., 113 F. Supp. 3d 450, 456 (D. Mass. 2015).

353.    "Tenure involves a long-term academic and financial commitment by a university to an individual, providing faculty with unusually secure positions tantamount to life contracts." *Beitzell v. Jeffrey*, 643 F.2d 870, 875 (1st Cir. 1981).

354.    At Harvard, pursuant to the Third Statute, a tenured professor enjoys a secure position, tantamount to a lifetime contract.

355.    In accordance with the Third Statute and the Discipline Policy, a tenured professor at Harvard can only be disciplined if it is shown by clear and convincing evidence that they have engaged in "grave misconduct," and only following the procedures set forth in the Discipline Policy.

356.    Plaintiff's appointment letter, which incorporates the terms of the Tenure Policy, the Third Statute and the Discipline Policy, sets forth the terms of her employment as a full professor with tenure and constitutes an employment contract.

357.    Through the conduct alleged above, Defendant Harvard breached Professor Gino's employment contract.

358.    Plaintiff fully complied with all provisions set forth under the terms of her employment and under Harvard's policies and procedures.

359.    Without any legal justification, Harvard breached its contract with Professor Gino by failing to follow Harvard's policies and procedures, including, without limitation, by the following:

   a.  Placing Plaintiff on unpaid administrative leave for two years;
   b.  Stripping Plaintiff of her entire compensation, including 100% of her base salary and benefits, as of July 31, 2023;
   c.  Revoking Plaintiff's Tandon Family Professorship;
   d.  Barring Plaintiff from all research, teaching, mentoring, and advising duties;
   e.  Prohibiting Plaintiff from conducting research using Harvard resources to teach, mentor, or advise;
   f.  Cutting Plaintiff off from administrative and research support;
   g.  Barring Plaintiff from campus and her office;
   h.  Prohibiting Plaintiff from publishing or disseminating her research through Harvard Business School platforms, and prohibiting her from publishing research on other platforms at Harvard absent approval from Dean Datar;
   i.  Disclosing confidential information concerning her misconduct proceeding and findings;
   j.  Subjecting Plaintiff to discipline against her employment absent a finding of "grave misconduct," pursuant to the Third Statute, and without a "full hearing and fair representation before an impartial tribunal" and the other procedural protections required under the Discipline Policy;
   k.  Subjecting Plaintiff to a disciplinary process in which she was subjected to an unfair and biased investigation, denied the presumption of innocence, and required to bear the burden of disproving the allegations against her; and
   l.  Revoking her tenure.

360.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered damages, including tremendous financial losses, reputational harm, loss of existing contractual relations and prospective economic opportunities and advantage, mental anguish, physical pain and suffering, embarrassment, and severe emotional distress.

**COUNT III**
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**(As to Defendant President and Fellows of Harvard College)**

361.    Plaintiff repeats and realleges each and every allegation hereinafter above as if fully set forth herein.

362.    "Every contract in Massachusetts is subject, to some extent, to an implied covenant of good faith and fair dealing." *Ayash v. Dana-Farber Cancer Inst.,* 443 Mass. 367, 385 (2005); *Boston. Med. Ctr. Corp. v. Secretary of Executive Office of Health & Human Servs*., 463 Mass. 447, 460 (2012).

363.    The implied covenant governs "the manner in which existing contractual duties are performed." *Eigerman v. Putnam Investments, Inc*., 450 Mass. 281, 289 (2007).

364.    Defendant Harvard breached the implied covenant of good faith and fair dealing in the following ways:

(1)    Abandoning its existing 2013 RI Policy and FRB process and crafting a new employee disciplinary policy, just for Plaintiff, the so-called Interim Policy, that purported to supersede the Third Statute and the Discipline Policy, and to nullify the rules and rights appliable to tenured factual, by authorizing Dean Datar to take disciplinary action against Plaintiff, up to and including the termination of her employment;

(2)    Seeking to impose upon Plaintiff a so-called two-year unpaid "administrative leave," an adverse employment action that was tantamount to a constructive discharge, but without the procedural protections due Plaintiff under the Discipline Policy;

(3)    Failing to timely notify Plaintiff of the allegations against her and keeping her in the dark for three months of both the charges against her and Harvard's impending investigation, as Harvard worked on crafting a new discipline policy, to apply just to her;

(4)    Failing to adhere to the procedural and substantive requirements of the Interim Policy that HBS created, purportedly to investigate and assess allegations of "research misconduct";

(5)    Conducting a bad faith investigation into allegations of research misconduct that were not made in good faith, as required under the Interim Policy;

(6)    Conducting a bad faith investigation into allegations of research misconduct that fell outside the stated "scope" of the Interim Policy and should have been time-barred ;

(7)    Rendering a bad faith decision that concluded that Plaintiff was guilty of charged conduct without meeting its burden of proof, in reliance on inconclusive evidence and unwarranted inferences, in the absence of supporting witness statements and evidence;

(8)    Imposing overly harsh and punitive sanctions that were unreasonable and lacking any connection to Harvard's applicable policies and standards;

(9)    Breaching its duties of confidentiality owed to Plaintiff for no legitimate purpose; and

(10)    Exercising contractual discretion in a bad faith manner that was intended to deprive Plaintiff the fruits of her bargain.

365.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered damages, including tremendous financial losses, reputational harm, loss of existing contractual relations and prospective economic opportunities and advantage, mental anguish, physical pain and suffering, embarrassment, and severe emotional distress.

## COUNT IV
### Estoppel
**(As to Defendant President and Fellows of Harvard College)**

366.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

367.    Plaintiff's relationship with Defendant Harvard was governed by her employment contract with Harvard as well as Plaintiff's reasonable expectations based on Harvard's various policies and procedures.

368.     Under Massachusetts law, a party is liable for estoppel when: (1) a promisor makes a promise which it should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee; (2) the promise did induce action or forbearance; and (3) "injustice can be avoided only by enforcement of the promise." *See Neuhoff v. Marvin Lumber & Cedar Co.*, 370 F.3d 197, 203 (1st Cir. 2004)) (applying Massachusetts law); *Anzalone v. Admin. Office of the Trial Court*, 457 Mass. 647, 661 (2010).

369.     Harvard's various policies and procedures constitute unambiguous representations and promises that Harvard should have reasonably expected to induce action or forbearance by Plaintiff and which did induce Plaintiff's actions or forbearance.

370.     Harvard expected or should have expected Plaintiff to accept its offer of employment and to choose not to pursue employment at other colleges or universities based on its express and implied promises that Harvard would not tolerate, and Plaintiff would not suffer, discrimination, and would not deny Plaintiff basic fairness in its disciplinary proceedings should she be accused of a violation of Harvard policies.

371.     Plaintiff relied to her detriment on these express and implied promises and representations made by Harvard and was induced by Harvard's promises in making her decision to further her career at Harvard instead of at another school of equal caliber.

372.     Based on the foregoing, Harvard is liable to Plaintiff based on Estoppel.

373.     As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered damages, including tremendous financial losses, reputational harm, loss of existing contractual relations and prospective economic opportunities and advantage, mental anguish, physical pain and suffering, embarrassment, and severe emotional distress.

**COUNT V**

**Title VII- Disparate Treatment**
**(As to Defendant President and Fellows of Harvard)**

374.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

375.    Federal law prohibits an employer from taking an adverse employment action based on a person's sex. *See* Title VII, 42 U.S.C. § 2000e *et seq.*.

376.    Plaintiff is a female and a member of a protected class under applicable law.

377.    Plaintiff suffered multiple adverse employment actions when Defendant Harvard (1) placed Plaintiff on an unpaid administrative leave and stripped her of all compensation and benefits; (2) revoked her professorship at HBS, (3) stripped Plaintiff of all of her teaching publishing, and research duties and any opportunities to earn a livelihood, (4) made her tenured position at Harvard the subject of revocation proceedings and (5) revoked her tenure.

378.    Unlawful discrimination may be inferred where Defendants repeatedly deviated from its employment policies, created a more procedurally onerous new policy just for her, and treated similarly situated male employees more favorably.

379.    Plaintiff's sex and gender were a motivating factor for the aforementioned adverse employment actions.

380.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered damages, including tremendous financial losses, reputational harm, loss of existing contractual relations and prospective economic opportunities and advantage, mental anguish, physical pain and suffering, embarrassment, and severe emotional distress.

**COUNT VI**
**Fair Employment Practices Act, Mass Gen. Laws Ch. 151B**
**Disparate Treatment Based on Sex**
**(As to Defendants President and Fellows of Harvard and Srikant Datar)**

381.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

382.    Massachusetts law prohibits an employer from taking an adverse employment action based on a person's sex. FEPA, Mass. Gen. Laws. Ch. 151B.

383.    Professor Gino is a "person" as defined in G.L. c. 151B, § 1(1), and the right to work in an environment free from unlawful discrimination is "unquestionably among the rights encompassed by the statute." *See Thomas O'Connor Constructors, Inc. v. Massachusetts Comm'n Against Discrimination*, 72 Mass. App. Ct. 549, 556–57, 893 N.E.2d 80, 86 (2008).

384.    Plaintiff suffered multiple adverse employment actions when Defendants (1) placed Plaintiff on unpaid administrative leave and stripped her of all compensation and benefits; (2) revoked her professorship at HBS, (3) stripped Plaintiff of all of her teaching, publishing, and research duties and any opportunities to earn a livelihood, (4) made her tenured position at Harvard the subject of revocation proceedings, and (5) revoked her tenure.

385.    Unlawful discrimination may be inferred from allegations that include, *inter alia*, the following: (i) Defendants' multiple deviations from its various employment policies; (ii) the creation of a more procedurally onerous research misconduct policy, the Interim Policy, just for Plaintiff; (iii) Defendants' failure to adhere to the provisions set forth in its newly created policy, (including, but not limited to, provisions that barred investigating complaints outside the stated 6-year scope of said policy), and (iv) a pattern and practice of treating similarly situated male and female employees differently, including disparate discipline.

386.    Plaintiff also alleges unlawful discrimination by her direct supervisor, Dean Datar.

387.    Plaintiff has specifically alleged facts that, in their totality, support a reasonable inference that Dean Datar bore discriminatory animus toward Professor Gino's protected class and

that the animus was the reason he chose to (i) keep Professor Gino in the dark for three months after receiving Data Colada's false allegations, (ii) chose to further deviate from HBS's existing policies and procedures by creating a new policy by which to investigate the false allegations, and (iii) ultimately chose to impose overly harsh and punitive sanctions against Professor Gino, that purported to supersede the written Discipline Policy.

388.    Plaintiff's sex and gender were a motivating factor for the aforementioned adverse employment actions and the various decisions taken by Dean Datar.

389.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered damages, including tremendous financial losses, reputational harm, loss of existing contractual relations and prospective economic opportunities and advantage, mental anguish, physical pain and suffering, embarrassment, and severe emotional distress.

**COUNT VII**
**Retaliation**
**(As to Defendant President and Fellows of Harvard)**

390.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

391.    Through the conduct alleged above, Defendants have retaliated against Plaintiff for engaging in activities protected under Title VII, Title IX and M.G.L. Chapter 151B.

392.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered damages, including tremendous financial losses, reputational harm, loss of existing contractual relations and prospective economic opportunities and advantage, mental anguish, physical pain and suffering, embarrassment, and severe emotional distress.

## COUNT VIII
### Declaratory Judgment
### (As to Defendant President and Fellows of Harvard)

393.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

394.    A controversy exists as to whether there is "clear and convincing evidence" that Plaintiff engaged in "grave misconduct" within the meaning of Harvard's "Third Statute."

395.    Plaintiff requests a declaration that such evidence does not exist, that Plaintiff has not engaged in "grave misconduct" within the meaning of Harvard's Third Statute and that grounds do not exist for the revocation of her tenue.

396.    Plaintiff further requests that the Court enter such further declaratory relief as may be appropriate to fully resolve all disputes that may arise in this action concerning Plaintiff's rights as a tenured professor at Harvard.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff Professor Gino prays for the following relief:

(i) On the first count, against Defendant President and Fellows of Harvard College for violation of Title IX, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and an injunction directing Defendant Harvard to: i) reverse the findings, outcome and sanctions discussed herein; ii) remove any record of, or reference to, the findings and outcome from

87

Plaintiff's personnel file; and iii) restore Plaintiff to her full teaching, mentorship and research responsibilities with full tenure;

(ii) on the second cause of action for breach of contract against Defendant President and Fellows of Harvard College, damages in an amount to be determined at trial, including damages for physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii) on the third cause of action for breach of the implied covenant of good faith and fair dealing against Defendant President and Fellows of Harvard College, damages in an amount to be determined at trial, including damages for physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv) on the fourth cause of action for estoppel against Defendant President and Fellows of Harvard College, damages in an amount to be determined at trial, including damages for physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v) on the fifth cause of action for discrimination on the basis of sex or gender in violation of Title VII, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, an award of back pay, front pay, and other

compensation and/or benefits, and to make Plaintiff whole for all earnings and benefits Plaintiff would have received but for Defendant President and Fellows of Harvard College's unlawful conduct, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and an injunction directing Defendant Harvard to: i) reverse the findings, outcome and sanctions discussed herein; ii) remove any record of, or reference to, the findings and outcome from Plaintiff's personnel file; and iii) restore Plaintiff to her full teaching, mentorship and research responsibilities with full tenure;

(vi) on the sixth cause of action for discrimination on the basis of sex and gender in violation of M.G.L. c. 151B, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, an award of back pay, front pay, and other compensation and/or benefits, and to make Plaintiff whole for all earnings and benefits Plaintiff would have received but for Defendants' unlawful conduct, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and an and an injunction directing Defendant Harvard to: i) reverse the findings, outcome and sanctions discussed herein; ii) remove any record of, or reference to, the findings and outcome from Plaintiff's personnel file; and iii) restore Plaintiff to her full teaching, mentorship and research responsibilities with full tenure;

(vii)    on the seventh cause of action for retaliation, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, an award of back pay, front pay, and other compensation and/or benefits, and to make Plaintiff whole for all earnings and benefits Plaintiff would have received but for Defendants' unlawful conduct, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and an and an injunction directing Defendant Harvard to: i) reverse the findings, outcome and sanctions discussed herein; ii) remove any record of, or reference to, the findings and outcome from Plaintiff's personnel file; and iii) restore Plaintiff to her full teaching, mentorship and research responsibilities with full tenure;

(viii)    on the eight cause of action a declaration that Plaintiff has not engaged in "grave misconduct" within the meaning of Harvard's Third Statute and that grounds do not exist for the revocation of her tenue.

## JURY DEMAND

Professor Gino herein demands a trial by jury of all triable issues in the present matter.


Francesca Gino
By her attorneys,

*/s/ Patrick J. Hannon*
Barbara A. Robb (BBO #639976)
Patrick Hannon (BBO #664958)
Hartley Michon Robb Hannon LLP
101 Federal Street, Suite 1810

Boston, MA 02114
brobb@hmrhlaw.com
phannon@hmrhlaw.com
P: (617) 723-8000
F: (617) 447-2800
Attorneys for Plaintiff