# EXHIBIT A

| | |
|---|---|
| *Professor Robin Greenwood* (on behalf of Harvard Business School), *Complainant* <br><br> - against - <br><br> *Professor Francesca Gino,* *Respondent* | **HARVARD UNIVERSITY** <br><br> **THIRD STATUTE PROCEEDING HEARING COMMITTEE** |

## WITNESS STATEMENT OF GARY PISANO

I, Gary Pisano, state that the following is true and correct to the best of my personal knowledge:

1. I am over the age of 18 and am under no disability or influence that would render me incompetent to attest to the matters herein.

2. I make this Witness Statement based upon my personal knowledge of the matters reflected herein, for consideration by the Hearing Committee overseeing the Third Statute Proceedings against Professor Francesca Gino.

### I. Background and Experience

3. I am the Harry E. Figgie, Jr. Professor of Business Administration at the Harvard Business School ("HBS"), where I have been on the faculty since 1988.

4. My expertise is in innovation, competitive strategy, and organizational effectiveness. Over the course of my career, I have explored questions about how organizations innovate, learn, compete, and grow. My research regularly involves collecting and analyzing empirical data obtained from companies. I have published approximately 150 scholarly articles and case studies and have written six books.

1

5. From 2018 to 2022, I was the Senior Associate Dean for Faculty Development at HBS, where I focused on promotions and tenure decisions.

6. From 2004 to 2008, I served as the head of the Technology and Operations Management Unit at HBS.

## II. My Professional Association with Professor Gino

7. I first met Professor Gino approximately 20 years ago, when she was a visiting doctoral student at Harvard. I was impressed by Professor Gino's diligence, exceptional energy, and willingness to work extremely hard. I became the chair of her thesis committee (which was formed by faculty from both Harvard and her home institution of Sant'Anna Pisa in Italy).

8. Professor Gino and I have worked together on a number of research and case writing projects. We have published three papers together (and worked on more that didn't get published) and eleven case studies.

9. In addition to our writing projects, we have also collaborated in developing and delivering two executive education programs (Driving Profitable Growth and Strategic Agility).

## III. Serving as an Advisor to Professor Gino in the HBS Research Misconduct Investigation

10. On July 24, 2021, while I was on vacation in Italy (where I go every year in July), I received an email from HBS Associate Dean for Faculty and Academic Affairs Jean Cunningham saying that she wanted to discuss something urgent with me. I asked her if it was an appointments committee issue (promotion and tenure) and whether she could brief me now. She responded "FRANCESCA" and we spoke a few minutes later. She told me that serious research misconduct allegations had been made against Professor Gino by Data Colada. Dean Cunningham told me that Professor Gino was allowed a faculty advisor in connection with the allegations and that she and Dean Srikant Datar thought that I would be the right advisor for her. I was under the

2

impression from the call that I could reach out to Professor Gino. However, before calling her, I thought it best that I speak to Dean Datar to understand exactly what the allegations were (I thought it would be strange to call Professor Gino to inform her of serious allegations without being able to explain to her what they were). I called Dean Datar (likely the next day) to ask him what the allegations were. He told me he was not sure what I could tell Professor Gino and that I should ask Dean Cunningham for counsel.

11. In a conversation with Dean Cunningham the following day, she told me that I could not say anything to Professor Gino and could not even tell her about the allegations. Dean Cunningham said that Professor Gino did not know about the allegations, and she was not to know about them. She warned of serious consequences to me and to Professor Gino if I were to divulge anything. Dean Cunningham gave me no reason why Professor Gino could not be told about the allegations. My first reaction was that it was unfair that I could not tell somebody that they were under investigation. In my experience as Senior Associate Dean for Faculty Development, when someone was coming up for promotion and there was any kind of misconduct allegation, we would let the person know fairly quickly of the allegations.

12. From the end of July and throughout the month of August 2021, I checked in periodically with Dean Cunningham to understand when these allegations might be made known to Professor Gino, but received no new information.

13. On August 9, I received an email that was sent to all members of the Dean's Management Committee that contained a draft report of an interim policy for handling research misconduct cases. The email from Dean Datar explained that he was looking for feedback as he was hoping the policy could be posted by the end of the day the following Monday. I found this

3

odd as I was under the impression we had existing policies and processes for handling research misconduct cases.

14. In the first week of September 2021, I attended a Dean's Management Committee meeting at which the new research misconduct policy that HBS would use for research misconduct was discussed. It is not unusual for the Dean's Management Committee to discuss policy changes. What I found strange here was that we did not follow our normal procedure for instituting significant policy changes impacting faculty. From my experience, before significant policy changes affecting faculty are made at HBS, there is a discussion of the policy at a meeting of the school's senior (tenured) faculty members, where they can provide feedback to the Dean on the proposed policy change. While a formal vote is not necessarily taken, it is customary for the Dean to consider the input of the senior faculty before making a policy change, and for the Dean to report back to the senior faculty on the decision regarding the policy change thereafter. To my knowledge, this procedure was not followed in this case.

15. To my knowledge, the appointment of a Research Integrity Officer ("RIO"), who oversaw the research misconduct investigation of Professor Gino, was the first time that HBS ever employed a RIO for such purpose.

16. In the months between July 2021 and October 2021, I repeatedly checked in with Dean Cunningham to see if I could tell Professor Gino about the allegations against her, and each time I was told that I could not. On August 17, I corresponded with Dean Cunningham again noting the disparity in how these allegations against Professor Gino were being handled in comparison to Data Colada's allegations regarding an article published by Professors Dan Ariely, Max Bazerman, Gino, Nina Mazar, and Lisa Shu. I wrote, "They [Data Colada] have some concerns about Francesca's other papers, but have not brought those concerns to her attention.

4

That's not typically how Datacolada [sic] works. In the case of the Ariely, Bazerman, Gino, Mazur [sic], Shu paper, DataColada [sic] wrote to the authors back in July and asked them to respond. I am confused here why someone is making allegations to Harvard University about Francesca, but has not contacted Srikant officially, nor have they contacted her. This seems like a very odd approach, and leads me to question the motives of the individual (or group) making those allegations. I am very bothered by it to be honest."

17. In late October 2021, I received a call from Dean Cunningham saying that Professor Gino would know by the end of the day about the allegations against her. I thereafter had a conversation with Professor Gino in which I told her that I had known about the allegations against her since July, but I was not permitted to inform her. I thereafter served as Professor Gino's faculty advisor in connection with the HBS research misconduct allegations against her.

18. In or about early November 2021, after an appointments committee meeting, I had a conversation with Dean Datar about the allegations against Professor Gino. Dean Datar said that he had made a deal with the complainant (Data Colada), whereby they (Data Colada) would not go public with the allegations against Professor Gino and that HBS would do the investigation itself. I found this surprising. From my prior experience at HBS when misconduct allegations were made against a faculty member, HBS did not negotiate in this manner with the accuser regarding the investigative process.

19. About a year later, while the HBS investigation relating to Professor Gino was still underway, I had a conversation with Dean Datar in which I complained that Professor Gino was not being given sufficient time to respond to the forensics report commissioned by Harvard. During this conversation, he mentioned that Data Colada was pressuring HBS to move the investigation along and they were accusing HBS of "whitewashing" this. By "whitewashing" I

5

understood Dean Datar to mean that he wanted to avoid the impression that HBS would simply make the allegations against Professor Gino go away without a thorough investigation.

20. I am aware that HBS's new research misconduct policy that was applied to Professor Gino's case allowed for only "two personal advisors." I served as Professor Gino's faculty advisor, and Professor Gino also had an attorney representing her in the HBS research misconduct proceeding.

IV. **Preparing Data for Analysis**

21. From my experience,[1] research associates frequently make mistakes during the process of preparing data for analysis, "cleaning" data (to correct errors originating from the process used to generate the data), coding data, and merging files.

22. From my experience, it is the norm for datasets to change during the process of preparing data for analysis, due to data cleaning, the merging of files, and for other reasons.

23. From my experience, it is typically hard for a researcher after the fact to explain how and why the data progressed during the course of preparing it for analysis, in which preparation is usually handled by one or more research associates, despite our best efforts to document changes in datasets. There are many small changes that occur. We might find, for instance, that certain respondents who provided data were unreliable (or themselves made errors in providing data). We might discover that different respondents who provided data used different criteria or different assumptions that created "noise" in the dataset. Research associates sometimes make judgements whether or not to include a data point based on a prior conversation relating to exclusion criteria. They might spot their own errors in coding or merging files, and then correct

---

[1] While Professor Gino does experimental work (generating data in some kind of lab setting) and I do empirical work (analyzing data that is already out in the world), I believe that mistakes – and research misconduct – can happen with either type of work.

those. We try to document those as best we can, but I do not think I would be able to tell you why a particular observation was dropped or parts of a dataset were changed in a dataset prepared by one of my research associates a few years ago. (If it was recent enough, I might recall a conversation, *e.g.*, we decided that certain values were likely errors generated by respondents filling out forms in which data were collected, so we dropped those observations or we discovered that in merging a file we inadvertently left out a set of observations.) The task of such after-the-fact explanation was further complicated in the case of Professor Gino, who was told by HBS that she could not contact co-authors or research associates to discuss the work that was done on the papers in question.

## V.    Professor Gino's Work Product, Character, and Integrity

24.    Professor Gino works very hard and takes on many projects. From what I have observed, she delegates a lot to research associates. This is part of what has allowed her to be very productive.

25.    Professor Gino and I together worked on more studies that were terminated than went forward, because the expected results did not pan out as expected. I regard this as evidence that Professor Gino did not have the habit of falsifying results when the desired results were not obtained, but rather would simply terminate the project and move on.

26.    From my experience working with Professor Gino, she has very high standards and is a person with incredibly high integrity.

## VI.    The Lack of Time Professor Gino Had to Properly Defend Herself

27.    One of the frustrating parts of this process, from my point of view as Professor Gino's advisor, was the lack of time she was given to respond to the forensics report commissioned by Harvard. That report seems to have taken several months to prepare. I recall Professor Gino

7

received the results of that report in two parts, with the second part coming to her just weeks before her response deadline. I raised this concern to Dean Cunningham in person as I was leaving the Dean's office around that time, and she assured me Professor Gino would have all the time she needed. But, unfortunately, no extension was granted. As noted above, I then raised this concern to Dean Datar (and this is when he referred to the pressure coming from Data Colada about timing). Professor Gino and I then met at my home office to try to sort through the report and understand what it said. Frankly, it was overwhelming. It was fairly dense and referred to very specific files and file name extensions. I believe the task of properly checking the accuracy of the forensics report would have taken *months* (and would have required a professional forensics expert). This made me very concerned that the forensics analysis could have been inaccurate.

### VII.   Conclusion (Including My View of the Final Report)

28.   I disbelieve the research misconduct allegations against Professor Gino and believe that she did not commit the alleged research misconduct.

29.   The basis for my belief is set forth above and includes:

   a.   the creation of a new research misconduct policy to apply to Professor Gino's case, the enactment of which did not follow the normal practice at HBS;

   b.   the "deal" that was struck with Data Colada and comments made by Dean Datar, indicating to me that he felt pressure not to be perceived by Data Colada as "whitewashing" the investigation of Professor Gino;

   c.   my understanding of Professor Gino's research practices, including her extensive use of and reliance on research associates, the prevalence of mistakes by research associates, and the difficulty of after-the-fact

8

Docusign Envelope ID: 25D6CBD8-3847-4C92-B92D-54D1DE8D5179
Case 1:23-cv-11775-MJJ    Document 126-1    Filed 08/04/25    Page 10 of 10

      reconstruction of the progression of data as it is prepared for analysis, which commonly results in changes from the initial dataset or raw data;

   d. my personal experience working with Professor Gino, including that she dropped projects when the results did not pan out (rather than attempting to falsify or manipulate the data);

   e. my view that Professor Gino is a person of incredibly high integrity.

  30. An additional basis for my belief is my own review of the Investigation Committee's Final Report, which I found to be unpersuasive. In my opinion, the evidence overwhelmingly did not support any finding of research misconduct.

  31. I also think the Final Report disregarded relevant evidence. For example, the Investigation Committee ignored the statements of people who worked with Professor Gino and said they never saw anything in her behavior suggesting that she would commit research misconduct. Additionally, Professor Gino posted her data online, publicly, before it was standard practice or required practice to do so. To believe that she committed research misconduct, one would have to believe that she intentionally manipulated her data, posted it publicly, but left the incriminating original data on her computer. This is implausible.

  32. In April 2023, I wrote a letter to Dean Datar in which I suggested that HBS contact eight named collaborators of Professor Gino and ask them about her research integrity and ethics. To my knowledge, HBS never contacted any of them.

Sworn to by:

*Gary Pisano*
838D5950607F421...
Gary Pisano

Dated: September 12, 2024

9