## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **FRANCESCA GINO,** | |
| *Plaintiff,* | |
| **v.** | Civil Action No. 1:23-cv-11775-MJJ |
| **PRESIDENT AND FELLOWS OF HARVARD COLLEGE, SRIKANT DATAR, JOHN DOES 1-10, AND JANE DOES 1-10,** | **DEFENDANTS' ANSWER TO PLAINTIFF'S THIRD AMENDED COMPLAINT AND COUNTERCLAIM** |
| *Defendants.* | |

## ADMISSIONS AND DENIALS

Defendants President and Fellows of Harvard College and Srikant Datar (together, "Harvard") hereby submit an Answer responding to the numbered paragraphs in Plaintiffs' Third Amended Complaint, filed on August 4, 2025 (Doc. No. 126).

1.     "We have to make an example of this woman." Those are the words of Claudine Gay in late 2023—then President of Harvard University—succinctly describing Harvard's intention to destroy Plaintiff's career. While President Gay would step down shortly thereafter, in the wake of allegations that she herself had engaged in research misconduct, President Gay is just one of many Harvard leaders who have carried the baton in its race to sacrifice Plaintiff to protect Harvard's own image.

**RESPONSE TO PARAGRAPH NO. 1:** Harvard admits that Claudine Gay resigned as President of Harvard on January 2, 2024.  Harvard denies the remaining allegations in Paragraph 1.

2.      Harvard adorns its symbols with the word "veritas," but its fidelity to truth largely ends there. For years, Harvard has swept under the rug suspicions of research misconduct by its tenured faculty—President Gay included. Rather than confront a potentially embarrassing truth, that adequate safeguards may not exist to ensure the integrity of its research, Harvard has time and again sought the appearance of propriety rather than the thing itself.

**RESPONSE TO PARAGRAPH NO. 2:** Harvard denies the allegations in Paragraph 2.

3.      In July 2021, however, an esteemed group of bloggers known as "Data Colada" contacted Harvard and threatened to go public with salacious allegations that one of Harvard Business School's star professors—Plaintiff—had been falsifying research data for more than a decade. The allegations were false, as Plaintiff has never falsified any data or otherwise engaged in any form of research misconduct. But truth be damned, Harvard was eager to cut a deal.

**RESPONSE TO PARAGRAPH NO. 3:** Harvard admits that in or around July 2021, Data Colada informally contacted Harvard Business School ("HBS") employees to raise concerns about perceived anomalies in numerous studies authored by Plaintiff.  Harvard denies the remaining allegations in Paragraph 3.

4.      Without Plaintiff's knowledge, Harvard negotiated an agreement with Data Colada that would best serve their respective interests. See Exhibit A, Witness Statement of Gary Pisano, ¶ 18 (describing conversation in which Dean Datar admitted to the existence of such a deal). Data Colada would hold-off on going public with the allegations, allowing Harvard to conduct an investigation aimed at showing that (1) it took allegations of research misconduct seriously and (2) that the data "anomalies" underlying Data Colada's allegations were simply the result of one bad actor—Plaintiff—as opposed to deeper and more problematic institutional deficiencies. In

turn, Data Colada hoped to use the outcome of Harvard's investigation as public validation of its work.

**RESPONSE TO PARAGRAPH NO. 4:** Harvard admits the existence of the Witness Statement of Gary Pisano cited in Paragraph 4, which is a written document that speaks for itself. Harvard denies all allegations in Paragraph 4, including those purportedly supported by this document.

5.      Leaving nothing to chance, Harvard literally re-wrote the rules in hopes of achieving its desired result. Contrary to Plaintiff's contractual rights as a tenured professor, Harvard hurriedly created an "Interim Policy and Procedures for Responding to Allegations of Research Misconduct" (the "Interim Policy") just for Plaintiff. Among other things, the Interim Policy (1) restricted Plaintiff's ability to obtain information from potential witnesses and experts that might be relevant to the allegations made against her and (2) purported to allow Harvard to institute a range of potential sanctions, including termination of employment.

**RESPONSE TO PARAGRAPH NO. 5:** The document cited in Paragraph 5 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 5.

6.      No sooner had Harvard written these new rules than it began breaking them—at least to the extent that they potentially favored Plaintiff. For example, the "Research Integrity Officer"—a critical role that was created and staffed pursuant to the newly-minted Interim Policy—failed to gather and preserve all potentially relevant evidence (as the Interim Policy Required). And when it became apparent that three of the four studies at issue were actually outside the scope of the Interim Policy, because they had been published too many years ago, Harvard

simply disregarded that aspect of the Interim Policy and moved forward with its preconceived plan to deliver findings in accordance with the deal it had struck with Data Colada.

**RESPONSE TO PARAGRAPH NO. 6:** Harvard denies the allegations in Paragraph 6.

7.     But try as it might, Harvard simply could not find the evidence needed to support its public relations strategy. Without exception, every witness interviewed over the 18-month investigation confirmed that Plaintiff was of high moral character, conducted her research with integrity, and never attempted to cut corners in her research to support her hypotheses. And while there appeared to be at least some anomalies in the data underlying the studies at issue, the investigation showed that there was no way to determine whether such anomalies were the result of customary data preparation and cleaning, data processing mistakes, or intentional malfeasance—or that they were even caused by Plaintiff. In short, none of the information gathered in the investigation came close to sustaining Harvard's burden under the Interim Policy to prove, by a preponderance of the evidence, that Plaintiff "intentionally, knowingly, or recklessly" falsified or fabricated data.

**RESPONSE TO PARAGRAPH NO. 7:** Harvard denies the allegations in Paragraph 7, including the characterization of witness testimony.

8.     So Harvard lied. On March 7, 2023, the so-called investigation committee acting at Harvard's behest, and purportedly authorized by the Interim Policy, issued a report falsely claiming that Plaintiff was responsible for "research misconduct." The report further recommended that a number of punitive measures be taken against Plaintiff, again under the purported authority granted by the Interim Policy. Among those recommendations was that "the Deciding Official consider placing [Plaintiff] immediately on an unpaid leave and initiating steps leading to termination of employment."

**RESPONSE TO PARAGRAPH NO. 8:** Harvard admits that the Final Report was issued on March 7, 2023, that it concluded that Plaintiff had committed repeated research misconduct, and that it recommended the imposition of certain sanctions. Harvard denies the remaining allegations in Paragraph 8.

9.      That "Deciding Official" was Srikant Datar, Dean of Harvard Business School. Despite having actual knowledge that the findings in the report were deeply flawed and unreliable, including because potentially relevant research files had not been considered, Dean Datar adopted its conclusions and informed Plaintiff that she would be subjected to a bevy of harsh and punitive sanctions. These included placing her on unpaid administrative leave (a decision to strip Plaintiff of her entire salary and benefits); immediately removing Plaintiff from all of her teaching duties, research responsibilities, mentorship of students, and her titled professorship; and publicly disclosing that these actions were being taken because Plaintiff had engaged in "research misconduct."

**RESPONSE TO PARAGRAPH NO. 9:** Harvard admits that Dean Datar was the Deciding Official pursuant to the Interim Policy, and that Dean Datar accepted the Final Report's findings and imposed sanctions on Plaintiff, including placing Plaintiff on unpaid administrative leave for two years during which time she was not permitted to carry out research, teach, or advise students at the Harvard Business School, and revoking Plaintiff's named professorship.  Harvard denies the remaining allegations in Paragraph 9.

10.      True to form, however, there was more to Harvard's plan. Within hours of delivering this news to Plaintiff, Dean Datar's office contacted one of Plaintiff's colleagues and asked her to "counsel out" Plaintiff, meaning to persuade Plaintiff to resign. This female colleague

was told that, if Plaintiff agreed to leave Harvard, "this will all go away; we won't say anything to anyone."

      **RESPONSE TO PARAGRAPH NO. 10:** Harvard denies the allegations in Paragraph 10.

      11.    But that too was a lie. Harvard knew that Data Colada still planned to publicly disclose its salacious allegations against Plaintiff and that, when it did so, Data Colada would be disclosing information concerning Harvard's purported investigation—which Harvard had agreed to provide in accordance with their deal. Of course, none of that had been disclosed to Plaintiff, as Harvard had intentionally kept secret Data Colada's role in the investigation, referring to it only as an "anonymous" complainant.

      **RESPONSE TO PARAGRAPH NO. 11:** Harvard denies the allegations in Paragraph 11.

      12.    Far from making the allegations "go away," Plaintiff's resignation would have been publicly interpreted as an admission of guilt. And that is precisely what Harvard wanted. Unable to carry its burden to prove that Plaintiff had engaged in research misconduct, Harvard simply wanted to prevail in the court of public opinion, even if that required engaging in dishonest and deceitful tactics.

      **RESPONSE TO PARAGRAPH NO. 12:** Harvard denies the allegations in Paragraph 12.

      13.    Fortunately, Plaintiff refused to resign. Not because she had any suspicion of the trap that had been laid—she didn't—but for a simpler and more fundamental reason: she had not engaged in any kind of research misconduct. Plaintiff steadfastly believed that the truth would

ultimately prevail and that she would be permitted to resume the career that she loved so much and had worked so hard to earn.

**RESPONSE TO PARAGRAPH NO. 13:** Harvard admits that Plaintiff did not resign. Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 13 regarding Plaintiff's mental state and on that basis denies them. Harvard denies the remaining allegations in Paragraph 13.

14.    Harvard, however, would soon make that virtually impossible. Its public disclosure of Plaintiff's suspension, coupled with a series of incendiary blog posts from Data Colada, ignited a public firestorm. Plaintiff received venomous, misogynistic hate emails from people all over the world. One person even threatened to take her life.

**RESPONSE TO PARAGRAPH NO. 14:** Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 14 about the emails Plaintiff purportedly received, and on that basis denies them. Harvard denies the remaining allegations in Paragraph 14.

15.    Upon discovering Data Colada's role in these events, and finally recognizing Harvard's plan, Plaintiff filed this lawsuit asserting claims for discrimination, breach of contract and a variety of torts. Meanwhile, Harvard moved forward with efforts to formally revoke Plaintiff's tenure by instituting another committee (the "TS Committee") to proclaim that there is "clear and convincing evidence" that Plaintiff engaged in "grave misconduct," which is the standard required to terminate a tenured professor under Harvard's "Third Statute."

**RESPONSE TO PARAGRAPH NO. 15:** Harvard admits that Plaintiff filed this lawsuit asserting claims for discrimination, breach of contract, and certain torts. Harvard further admits that it undertook proceedings under the Third Statute of the University, and that Plaintiff's tenure was revoked. By way of further response, Harvard states that the Third Statute process spanned

nearly two years and involved first a Screening Committee of three HBS senior tenured faculty members, who reviewed HBS' complaint and unanimously found that it credibly alleged grave misconduct or neglect of duty; then a Hearing Committee consisting of seven senior tenured faculty members (three from HBS and four from other Harvard schools), who oversaw a hearing process and unanimously concluded that Plaintiff engaged in grave misconduct or neglect of duty; and finally, an independent review by the Harvard Corporation.  Harvard denies the remaining allegations in Paragraph 15.

16.    The TS Committee, like Dean Datar before it, trampled on Plaintiff's procedural and substantive rights as a tenured professor. For example, the TS Committee denied virtually all of Plaintiff's requests for relevant documents and information from Harvard, even though ¶ 10 of the Discipline Policy required that "[e]very possible effort will be made to obtain the most reliable evidence available." The TS Committee also allowed Harvard to "move the goal posts" by completely abandoning the purported forensic analysis relied on by the investigation committee (after Plaintiff and her experts had spent months preparing to show why the analysis was erroneous and unreliable). Specifically, fourteen months after declaring Plaintiff's guilt, and just three months before the TS hearing, Harvard abandoned its primary expert and radically changed the factual basis of its charges against Plaintiff. The TS Committee thereafter refused to allow Plaintiff a reasonable opportunity to rebut the bevy of different arguments and claims put forth by Harvard's new purported expert, including by refusing to allow a continuance of the hearing date and then allotting Plaintiff only 6 hours of hearing time, which effectively denied Plaintiff a meaningful opportunity to confront her accusers.

**RESPONSE TO PARAGRAPH NO. 16:** The Discipline Policy cited in Paragraph 16 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 16.

17.     Perhaps not surprisingly, these procedural and substantive violations of Plaintiff's rights culminated with the TS Committee issuing a report that grossly mischaracterized the evidence and falsely asserted there was "clear and convincing evidence" that Plaintiff had engaged in "grave misconduct."

**RESPONSE TO PARAGRAPH NO. 17:** Harvard denies the allegations in Paragraph 17.

18.     Of course, others at Harvard greatly contributed to these procedural and substantive violations. In particular, the public firestorm ignited by Dean Datar and his deal with Data Colada irreparably tainted the proceedings conducted by the TS Committee by, among other things, dissuading the Research Assistants involved in the studies at issue from participating. This deprived Plaintiff, and the TS Committee, of access to critically important evidence, as it was the Research Assistants who had been primarily responsible for handling the data at issue.

**RESPONSE TO PARAGRAPH NO. 18:** Harvard denies the allegations in Paragraph 18.

19.     Harvard leadership also submitted false testimony to the TS Committee. This included Dean Datar, who falsely claimed that he had not made a deal with Data Colada, and Research Integrity Officer Alain Bonacossa, who (among other things) lied to the TS Committee by stating that he had "specifically informed Prof. Gino that she could hire her own forensic expert to work on her behalf" during the process conducted under the Interim Policy. (He had done the exact opposite.)

**RESPONSE TO PARAGRAPH NO. 19:** Harvard denies the allegations in Paragraph 19.

20.     Further fueling the fire that caused Harvard to dishonestly attack Plaintiff before the TS Committee, was the fact that Plaintiff had sued Harvard for discrimination. Indeed, Harvard repeatedly brought that fact to the attention of the TS Proceeding in a transparent attempt to engender retaliatory animus.

**RESPONSE TO PARAGRAPH NO. 20:** Harvard denies the allegations in Paragraph 20.

21.     In May 2025, President Gay's promise to "make an example of this woman" was fulfilled, as Harvard purported to adopt the findings and recommendations of the TS Committee and formally revoked Plaintiff's tenure. But Harvard was not done. Just weeks later, on July 7, 2025, Harvard filed a motion announcing its intention to pursue a counterclaim against Plaintiff for defamation. Based on Harvard's filing, the proposed counterclaim has no legitimate basis in either law or fact, and is simply a further act of retaliation intended to annoy, harass and disparage Plaintiff.

**RESPONSE TO PARAGRAPH NO. 21:** Harvard admits that it revoked Plaintiff's tenure in May 2025, and that on July 7, 2025, it filed a motion seeking leave to file a counterclaim against Plaintiff in this litigation. Harvard denies the remaining allegations in Paragraph 21.

22.     As a result of Defendants' unlawful actions, Plaintiff has suffered tremendous harm. Her reputation as a highly sought-after author, consultant and researcher has been destroyed. Plaintiff has not only been stripped of her salary and position as a tenured Professor, but her career has been derailed. Plaintiff has also suffered severe emotional distress.

**RESPONSE TO PARAGRAPH NO. 22:** Harvard admits that Plaintiff's tenure was revoked and that Plaintiff no longer receives a salary from Harvard. Harvard denies the remaining allegations in Paragraph 22.

23.    In bringing this action, Plaintiff seeks not only to recover for the extensive harm that Defendants have caused, but to finally obtain a fair, impartial, and unbiased consideration of the evidence concerning the allegations that Harvard has falsely and maliciously claimed she is guilty of.

**RESPONSE TO PARAGRAPH NO. 23:** Harvard denies the allegations in Paragraph 23.

## THE PARTIES

24.    Plaintiff Francesca Gino ("Plaintiff" or "Professor Gino") is a natural person and resident of the Commonwealth of Massachusetts.

**RESPONSE TO PARAGRAPH NO. 24:** Harvard admits the allegations in Paragraph 24.

25.    At all relevant times, Plaintiff was a faculty member at Harvard Business School ("HBS") and an employee of Harvard University within the meaning of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.,* and the Massachusetts Fair Employment Practices Act ("FEPA"), Mass. Gen. Laws. Ch. 151B.

**RESPONSE TO PARAGRAPH NO. 25:** Harvard admits the allegations in Paragraph 25 that Plaintiff was a faculty member at HBS and a Harvard employee. The remaining allegations in Paragraph 25 state legal conclusions to which no response is required.

26.    Defendant President and Fellows of Harvard College ("Harvard University" or "Harvard"), provides educational services and was and is the duly empowered governing board of

11

Harvard University, with a principal office located at Harvard University Massachusetts Hall, Cambridge, Massachusetts 02138.

**RESPONSE TO PARAGRAPH NO. 26:** Harvard admits that President and Fellows of Harvard College is the formal name of Harvard University, a Massachusetts nonprofit educational corporation, and that the President's office is located in Massachusetts Hall, Cambridge, MA 02138. Harvard denies the remaining allegations in Paragraph 26.

27.    At all relevant times, Defendant Srikant Datar ("Dean Datar") was the Dean of HBS. Dean Datar and Harvard are together referred to herein as "Defendants."

**RESPONSE TO PARAGRAPH NO. 27:** Harvard admits the allegations in Paragraph 27 that Srikant Datar was the Dean of HBS starting on January 1, 2021. Harvard lacks knowledge regarding what times Plaintiff deems relevant, and on that basis denies the allegation in Paragraph 27 that Srikant Datar was the Dean of HBS at all relevant times.

## JURISDICTION AND VENUE

28.    This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367 because the federal law claim arises under the Constitution and statutes of the United States, and the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

**RESPONSE TO PARAGRAPH NO. 28:** The allegations in Paragraph 28 state a legal conclusion to which no response is required.

29.    This Court has personal jurisdiction over the Defendants on the grounds that they conduct business within the Commonwealth of Massachusetts.

**RESPONSE TO PARAGRAPH NO. 29:** The allegations in Paragraph 29 state a legal conclusion to which no response is required.

30.     At all relevant times, the acts and omissions complained of occurred within the Commonwealth of Massachusetts.

**RESPONSE TO PARAGRAPH NO. 30:**  The allegations in Paragraph 30 state a legal conclusion to which no response is required.

31.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

**RESPONSE TO PARAGRAPH NO. 31:**  The allegations in Paragraph 31 state a legal conclusion to which no response is required.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

32.     Plaintiff has timely and properly exhausted her administrative remedies and satisfied all pre-conditions to bring the within action.

**RESPONSE TO PARAGRAPH NO. 32:** The allegations in Paragraph 32 state a legal conclusion to which no response is required.

33.     On October 31, 2023, Plaintiff filed an administrative Charge of Discrimination with both the Massachusetts Commission against Discrimination ("MCAD"), MCAD Charge No. 23BEM03139, and the United States Equal Employment Opportunity Commission ("EEOC"), EEOC Charge No. 16-C-2024-00345, against Defendants, alleging discrimination on the basis of sex, in violation of the Massachusetts Fair Employment Practices Act, Massachusetts General Laws c. 151B ("Chapter 151B") and of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e2(a)(1).  Plaintiff filed an Amended Charge of Discrimination on November 24, 2023.

**RESPONSE TO PARAGRAPH NO. 33:**  Harvard admits the allegations in Paragraph 33 to the extent they purport to describe the Charge of Discrimination and Amended Charge of

Discrimination. Harvard denies the substance of the allegations asserted in the Charge of Discrimination and Amended Charge of Discrimination.

34.     Thereafter, on or about September 18, 2024, and in accordance with M.G.L. § 151b, § 9, Plaintiff elected to withdraw her complaint from both the MCAD and the EEOC and to file a lawsuit in this Court.

**RESPONSE TO PARAGRAPH NO. 34:** Harvard denies the allegations in Paragraph 34 that Plaintiff withdrew her complaint on September 18, 2024. By way of further response, Plaintiff withdrew her complaint on September 19, 2024. The remaining allegations in Paragraph 34 state a legal conclusion to which no response is required.

35.     On or about October 4, 2024, the MCAD issued Plaintiff a letter acknowledging it received notice of her intent to file her complaint in court and its dismissal of her administrative charge ("right-to-sue letter").

**RESPONSE TO PARAGRAPH NO. 35:** Harvard admits the allegations in Paragraph 35.

36.     On or about October 8, 2024, the EEOC issued Plaintiff a right-to-sue letter. Accordingly, Plaintiff has timely and properly exhausted her administrative remedies and satisfied all pre-conditions to bring the within action.

**RESPONSE TO PARAGRAPH NO. 36:** The allegations in Paragraph 36 state a legal conclusion to which no response is required.

37.      As alleged below, additional acts of discrimination and retaliation have occurred since Plaintiff filed her Amended Charge of Discrimination on November 24, 2023 (the "Subsequent Acts"). The Subsequent Acts are a continuation of, and inextricably intertwined with,

the acts complained of in the Amended Charge and, therefore, no additional administrative filing is required to bring those claims in this Court.

**RESPONSE TO PARAGRAPH NO. 37:** The allegations in the second sentence of Paragraph 37 state a legal conclusion to which no response is required. Harvard denies the remaining allegations in Paragraph 37.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

I. **Plaintiff's Professional Background and Employment at Harvard.**

38.    Plaintiff is a behavioral scientist. The focus of Plaintiff's work is studying the psychology behind the decisions people make, to learn how people can thrive at work and better engage with one another.

**RESPONSE TO PARAGRAPH NO. 38:** Upon information and belief, Harvard admits the allegations in Paragraph 38.

39.    Plaintiff is a prolific author and an award-winning researcher. She has authored or co-authored countless journal publications, business articles, and books.

**RESPONSE TO PARAGRAPH NO. 39:** Harvard admits the allegations in Paragraph 39 that Plaintiff is a published author. Harvard lacks sufficient information to admit or deny the remaining allegations in Paragraph 39.

40.    Most of Plaintiff's work, whether it is the many academic articles she has written (over 140 of them), or the case studies she has worked on (over 50 of them), has been in collaboration with others.

**RESPONSE TO PARAGRAPH NO. 40:** Upon information and belief, Harvard admits that Plaintiff collaborated with others on academic articles. Harvard lacks sufficient information to admit or deny the remaining allegations in Paragraph 40.

41.    Plaintiff has regularly presented her work at conferences and has been invited to speak at some of the most prestigious colleges and universities in the world.

**RESPONSE TO PARAGRAPH NO. 41:**  Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 41 and on that basis denies them.

42.    Plaintiff has received numerous honors and awards and has been honored as one of the world's top "40 Business Professors under 40" and one of the world's most influential management thinkers by Thinkers50.

**RESPONSE TO PARAGRAPH NO. 42:** Upon information and belief, Harvard admits that Plaintiff was named one of the world's top "40 Business Professors under 40" and one of the world's most influential management thinkers by Thinkers50. Harvard lacks sufficient information to admit or deny the remaining allegations in Paragraph 42.

43.    Plaintiff has also won awards for her research, including the 2013 Cummings Scholarly Achievement Award, from the Academy of Management Organizational Behavior Division.

**RESPONSE TO PARAGRAPH NO. 43:** Upon information and belief, Harvard admits that Plaintiff won the 2013 Cummings Scholarly Achievement Award from the Academy of Management Organizational Behavior Division. Harvard lacks sufficient information to admit or deny the remaining allegations in Paragraph 43.

44.    Plaintiff's work has been covered in numerous media outlets including The Atlantic, The Boston Globe, Business Week, The Economist, The Financial Times, National Public Radio, Scientific American, The Wall Street Journal, and The New York Times.

**RESPONSE TO PARAGRAPH NO. 44:**  Upon information and belief, Harvard admits that Plaintiff has been mentioned in  The Atlantic, The Boston Globe, Business Week, The

Economist, The Financial Times, National Public Radio, Scientific American, The Wall Street Journal, and The New York Times. Harvard lacks sufficient information to admit or deny the remaining allegations in Paragraph 44.

45.     Plaintiff's consulting clients include several Fortune 100 companies, as well as the United States Air Force, Army, and Navy.

**RESPONSE TO PARAGRAPH NO. 45:** Harvard admits that Gino consulted with certain Fortune 100 companies. Harvard lacks sufficient knowledge to admit or deny the remaining allegations in Paragraph 45 and on that basis denies them.

46.     Plaintiff received her Bachelor of Arts degree in Business Economics from the University of Trento (Trento, Italy) in 2001, graduating *magna cum laude.* Plaintiff earned her M.S. and Ph.D. degrees in economics and management from Sant'Anna School of Advanced Studies (Pisa, Italy) in 2004.

**RESPONSE TO PARAGRAPH NO. 46:** Upon information and belief, Harvard admits the allegations in Paragraph 46.

47.     Plaintiff went on to academic positions as a post-doctoral fellow and senior researcher and lecturer at Harvard University (2004-2006), a visiting assistant professor of organizational behavior at Carnegie Mellon University (2006-2008), and as an assistant professor of organizational behavior at the University of North Carolina Kenan-Flagler Business School ("UNC") (Chapel Hill, North Carolina), (2008-2010).

**RESPONSE TO PARAGRAPH NO. 47:** Upon information and belief, Harvard admits the allegations in Paragraph 47.

48.     As a Visiting Assistant Professor at Carnegie Mellon University ("CMU"), Plaintiff was the lab manager for scholars in Behavioral Sciences and Organizational Behavior, where she

obtained a full understanding of the common practices for managing a lab and a deep understanding of the research process.

**RESPONSE TO PARAGRAPH NO. 48:**  Harvard admits the allegation in Paragraph 48 that Plaintiff was a Visiting Assistant Professor at Carnegie Melon University. Harvard lacks sufficient knowledge to admit or deny the remaining allegations in Paragraph 48 and on that basis denies them.

49.    As a faculty member at UNC, Plaintiff created the behavioral lab at UNC.

**RESPONSE TO PARAGRAPH NO. 49:**  Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 49 and on that basis denies them.

50.    Defendant Harvard recruited Plaintiff through an offer letter dated February 16, 2010, in which Harvard Business School ("HBS") offered Plaintiff an appointment as an Associate Professor at HBS, effective July 1, 2010.

**RESPONSE TO PARAGRAPH NO. 50:**  Harvard admits the allegations in Paragraph 50.

51.    The offer letter promised Plaintiff that, should she accept, she would be appointed to a tenure-track position as an Associate Professor, beginning July 1, 2010, continuing three years, through the academic year ending June 30, 2013, with the expectation that, in the Fall 2012, her appointment would be renewed for two additional years, through June 30, 2015, and that her "formal review for promotion to Professor with tenure would take place in Fall 2014."

**RESPONSE TO PARAGRAPH NO. 51:**  The offer letter cited in Paragraph 51 is a written document that speaks for itself, and Harvard denies any characterization of this offer letter.

52.     Plaintiff had offers from other prestigious business schools (Stern, Wharton, and Berkeley's Haas Business School), but chose to accept Harvard's offer, and began her employment on July 1, 2010, as an Associate Professor of Business Administration at HBS.

**RESPONSE TO PARAGRAPH NO. 52:**  Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 52 and on that basis denies them.

53.     On July 1, 2014, Plaintiff was promoted to a position as a Full Professor with tenure, joining the small minority of female professors to achieve tenure at HBS.

**RESPONSE TO PARAGRAPH NO. 53:**  Harvard admits the allegation in Paragraph 53 that Plaintiff was promoted to Full Professor in July 2014. Harvard denies the remaining allegations in Paragraph 53.

54.     In 2014, male tenured professors at HBS outnumbered female tenured professors 76 to 19. *See The Tenure Pipeline at Harvard Business School,* https://www.nytimes.com/inter-active/2014/02/27/education/harvard-tenure-pipeline.html.

**RESPONSE TO PARAGRAPH NO. 54:**  The article cited in Paragraph 54 is written document that speaks for itself, and Harvard denies any characterization of this document.  To the extent a response is required, Harvard denies the allegations in Paragraph 54.

55.     By letter dated July 24, 2015, HBS informed Plaintiff that she had been named the "Tandon Family Professor of Business Administration," and that she could use this title on her letterhead, business cards, and other HBS materials.

**RESPONSE TO PARAGRAPH NO. 55:**  The letter cited in Paragraph 55 is a written document that speaks for itself, and Harvard denies any characterization of this letter.

56.     Plaintiff has won numerous awards for her teaching, including the Harvard Business School Wyss Award for Excellence in Mentoring (2022) and the HBS Faculty Award by

Harvard Business School's MBA Class of 2015. Plaintiff also won an award for her service to HBS, the Greenhill Award (2017), "given annually by the Dean to members of the HBS community who contribute to the School in significant ways."[1]

**RESPONSE TO PARAGRAPH NO. 56:** Harvard admits the allegations in Paragraph 56.

57.    Plaintiff, a working mother of four young children and the breadwinner in her family, has also received praise by her female colleagues and collaborators for serving as a role model for other women at HBS.

**RESPONSE TO PARAGRAPH NO. 57:** Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 57 and on that basis denies them.

58.    In December 2018, Plaintiff emailed a female colleague, Frances Frei ("Frei"), Professor of Technology and Operations Management at HBS, about teaching a course together on diversity and leveraging differences. Plaintiff and Frei received approval to teach their new course, Leading Difference, on March 18, 2019, which they taught for the first time in the Winter of 2020. Plaintiff and Frei launched an executive education version of this course in August 2020.

**RESPONSE TO PARAGRAPH NO. 58:** Harvard admits the allegation in Paragraph 58 that Plaintiff and Frances Frei taught a new course named Leading Differences for the first time in 2020, that this course was approved in 2019, and that the executive education version of this course was launched in August 2020. Harvard lacks sufficient knowledge to admit or deny the remaining allegations in Paragraph 58 and on that basis denies them.

59.    In 2022 and 2023, Plaintiff was the course head for the new course, which was renamed "Inclusion," and it was taught to all 1,000 plus MBA students at HBS as part of the

---

[1] https://www.hbs.edu/about/campus-and-culture/campus-built-on-philanthropy/Pages/greenhill-house.aspx.

Required Curriculum. The course is about creating environments that are not only diverse, but also equitable and inclusive.

**RESPONSE TO PARAGRAPH NO. 59:**  Harvard admits the allegations in Paragraph 59.

60.    In 2023, after a decade-plus at HBS, Plaintiff has taught courses on negotiation, decision making, collaboration, conflict resolution, and diversity, equity and inclusion at both the MBA and Executive Education levels.

**RESPONSE TO PARAGRAPH NO. 60:**  Harvard admits the allegations in Paragraph 60.

A.    **Applicable Policies Governing Tenure and Discipline of Tenured Professors.**

i.    **The Tenure Policy.**

61.    At Harvard, the conferral of tenure carries with it the promise of lifetime appointment.

**RESPONSE TO PARAGRAPH NO. 61:**  Harvard admits the allegation in Paragraph 61 that tenure is a lifetime appointment provided that the individual receiving tenure is not removed for committing "grave misconduct or neglect of duty." Doc. 6-11 at 2.

62.    In a letter dated September 24, 2014, Plaintiff received official notification of her appointment (the "Appointment Letter") as a tenured Professor of Business Administration, effective July 1, 2014, that advised her that her appointment was "subject to such terms, conditions, and policies as are stipulated by the Faculty of Business Administration, and to the Third Statute of the University." (Doc. No. 6-10 at 2).

**RESPONSE TO PARAGRAPH NO. 62:**  The letter cited in Paragraph 62 is a written document that speaks for itself, and Harvard denies any characterization of this letter.

63.     Under the Third Statute that was attached to Plaintiff's Appointment Letter, Plaintiff entered into a permanent contract with Harvard, a lifetime appointment, subject to removal by the Corporation (i.e., Harvard) only for "grave misconduct." (Doc. No. 6-10 at 3).

**RESPONSE TO PARAGRAPH NO. 63:** The Third Statute of Harvard University ("Third Statute") cited in Paragraph 63 is a written document that speaks for itself, and Harvard denies any characterization of this document.  By way of further response, Harvard states that the Third Statute allows for the removal of tenure for grave misconduct or neglect of duty.

64.     HBS's "Policies and Procedures with Respect to Faculty Appointments and Promotions" ("Tenure Policy") emphasize that tenure is reserved for "extraordinary individuals who have demonstrated their ability and willingness to make a sustained contribution to the study, teaching, and practice of business," and refer to faculty with tenure as "permanent faculty."

**RESPONSE TO PARAGRAPH NO. 64:**  HBS's Policies and Procedures with Respect to Faculty Appointments and Promotions" ("Tenure Policy") cited in Paragraph 64 is a written document that speaks for itself, and Harvard denies any characterization of this document.

**ii.     The Third Statute and the Discipline Policy.**

65.     Under the "Third Statute of the University," ("Third Statute"), (the policy attached to Plaintiff's official notification of her tenured appointment), "Professors . . . are appointed without express limitation of time unless otherwise specified" and are "subject to removal . . . by the Corporation [Harvard] only for grave misconduct or neglect of duty." (Doc. No. 6-11 at 2).

**RESPONSE TO PARAGRAPH NO. 65:**  The Third Statute cited in Paragraph 65 is a written document that speaks for itself, and Harvard denies any characterization of this document.

66.     Harvard's President and governing body adopted the "Discipline of Officers, Tentative Recommendations" ("Discipline Policy") on October 4, 1971. The Discipline Policy sets

forth the procedures applicable "to the discipline of tenured faculty in cases of "grave misconduct or neglect of duty arising under the Third Statute." (Doc. No. 6-12 at 2).

**RESPONSE TO PARAGRAPH NO. 66:** The Discipline of Officers, Tentative Recommendations ("Discipline Policy") cited in Paragraph 66 is a written document that speaks for itself, and Harvard denies any characterization of this document.

67.     Under the Discipline Policy, if a complaint is made against a Professor with Tenure, the Professor is entitled to a two-tiered proceeding prior to the imposition of discipline, consisting of an initial assessment by a Screening Committee and, if not resolved at that state, a full evidentiary hearing before a Hearing Committee, which shall then "make recommendations to the President and Fellows on what, if any, action is appropriate.". (Doc. No. 6-12).

**RESPONSE TO PARAGRAPH NO. 67:** The Discipline Policy cited in Paragraph 67 is a written document that speaks for itself, and Harvard denies any characterization of this document.

68.     Under the Discipline Policy, a tenured faculty member is presumed innocent, and [t]he burden of proof that there has been . . . grave misconduct or neglect of duty (as contemplated by the Third Statute of the University) rests with the Complainant and shall be satisfied only by clear and convincing evidence in the record as a whole" following the conclusion of a full evidentiary hearing before Hearing Committee and a decision by the President and governing bodies of Harvard. (Doc. No. 6-12 at 6-7); *see id.* (at item 6 under "Statement of Hearing Procedures").

**RESPONSE TO PARAGRAPH NO. 68:** The Discipline Policy cited in Paragraph 68 is a written document that speaks for itself, and Harvard denies any characterization of this document.

69.     Under the Discipline Policy, Harvard is obligated to keep information related to the complaint and impending disciplinary proceeding against a tenured faculty member confidential until the conclusion of the proceeding and a final decision by Harvard. (Doc. No. 6-12 at 7).

**RESPONSE TO PARAGRAPH NO. 69:**  The Discipline Policy cited in Paragraph 69 is a written document that speaks for itself, and Harvard denies any characterization of this document.

70.     The Discipline Policy provides that, "[e]xcept for such simple announcements as may be required, covering the time of the hearing and similar matters, public statements, and publicity about the case by either parties or member of the Hearing Committee will be avoided so far as possible until the proceedings have been completed, including consideration by the Corporation [Harvard]." (Doc. No. 6-12 at 7).

**RESPONSE TO PARAGRAPH NO. 70:**  The Discipline Policy cited in Paragraph 70 is a written document that speaks for itself, and Harvard denies any characterization of this document.

**II.    In July 2021, Data Colada Approaches HBS with Allegations Concerning Plaintiff's Work and Defendants' Subsequent Agreement.**

71.     Through their blog, Data Colada has targeted the work of prominent female academics and subjected it to an exceptionally high level of public scrutiny.

**RESPONSE TO PARAGRAPH NO. 71:**  Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 71 and on that basis denies them.

72.     In May 2015, Data Colada publicly targeted the research of another prominent Harvard professor at HBS, social psychologist Amy Cuddy, eviscerating her research practices.[2] Cuddy subsequently left her tenure track position at HBS and academia.

---

[2] Cuddy had become famous in her field for a 2010 study about the effects of "power poses" after her presentation in a TED Talk video went viral with a record number of views. *See* "When the Revolution Came for Amy Cuddy," New York Times (Oct. 18, 2017), available at: https://www.nytimes.com/2017/10/18/magazine/when-the-revolution-came-for-amy-cuddy.html (last visited July 26, 2023).

**RESPONSE TO PARAGRAPH NO. 72:**  Harvard admits that Amy Cuddy is no longer a tenure-track member of HBS faculty.  Harvard lacks sufficient knowledge to admit or deny the remaining allegations in Paragraph 72 and on that basis denies them.

73.     In July 2021, Data Colada approached Plaintiff's employer, Harvard, with false allegations about perceived anomalies in the data of four studies co-authored by Plaintiff. Despite having no evidence, they attributed responsibility for the anomalies to Plaintiff, whom they accused of falsifying and/or fabricating data.

**RESPONSE TO PARAGRAPH NO. 73:**  Harvard admits that in or around July 2021, Data Colada informally contacted HBS employees to raise concerns about perceived anomalies in numerous studies authored by Plaintiff.  Harvard denies the remaining allegations in Paragraph 73.

74.     In the field of behavioral science, if a researcher cannot replicate the results of a study or has questions about another behavioral scientist's findings, it is standard practice for that researcher to reach out to the author of the study for an explanation. Data Colada references this practice on its website in the following statement:

> Author feedback:
>
> Our policy (.htm) is to share drafts of blog posts with authors whose work we discuss, in order to solicit suggestions for things we should change prior to posting, and to invite them to write a response that we link to at the end of the post.

**RESPONSE TO PARAGRAPH NO. 74:** The Data Colada website referenced in Paragraph 74 is a written document that speaks for itself, and Harvard denies any characterization of this document.  Harvard lacks sufficient knowledge to admit or deny the remaining allegations in Paragraph 74 and on that basis denies them.

75.     Though Data Colada has followed this normative practice in the past, as evidenced by their 100 plus blog posts, Data Colada did not share drafts of any blog posts with Professor

Gino and ask for her "feedback" but, instead, went to Plaintiff's employer, Harvard, with false allegations of malfeasance against Plaintiff and threats to publicize their claims on their blog.

**RESPONSE TO PARAGRAPH NO. 75:** Harvard lacks sufficient knowledge to admit or deny the allegations related to Data Colada's past practices in Paragraph 75 and on that basis denies them. Harvard denies the remaining allegations in Paragraph 75.

76.    In or about July or August 2021, HBS, concerned about negative publicity, negotiated with Data Colada and reached an agreement. In exchange for Data Colada's agreement to refrain from making public accusations against Plaintiff that would, by extension, subject HBS to public scrutiny, HBS agreed to create a new employment policy to investigate Data Colada's allegations against Plaintiff's work. HBS further agreed that when it concluded its investigation, it would disclose the results to Data Colada, which would then be free to publicly disparage Plaintiff's work and professional reputation on its blog.

**RESPONSE TO PARAGRAPH NO. 76:** Harvard denies the allegations in Paragraph 76.

77.    Gary Pisano ("Dean Pisano"), then Senior Associate Dean for Faculty Development, has known Plaintiff for more than 20 years, collaborated with her on research and teaching, and served as Plaintiff's advisor.

**RESPONSE TO PARAGRAPH NO. 77:** Harvard admits that Dean Pisano was identified as one of Plaintiff's advisors during the research misconduct process. Harvard lacks sufficient knowledge to admit or deny the remaining allegations in Paragraph 77 and on that basis denies them.

78.    On or about July 20, 2021, Jean Cunningham ("Dean Cunningham"), Associate Dean for Faculty and Academic Affairs at HBS, who works closely with Dean Datar, alerted Dean

Pisano that four studies co-authored by Plaintiff were the subject of allegations by Data Colada, that an investigation was pending, and that Plaintiff was going to need "a lot of help" from him.

**RESPONSE TO PARAGRAPH NO. 78:** Harvard admits the allegation in Paragraph 78 that Jean Cunningham informed Dean Gary Pisano that there were concerns raised about Plaintiff's research to HBS faculty members who informed Jean Cunningham about the communications. Harvard denies the remaining allegations in Paragraph 78. By way of further response, Harvard did not start an investigation into Professor Gino's research until Data Colada made their formal complaint in October 2021.

79.     The allegations concerned four studies in which Plaintiff had been the principal investigator.

**RESPONSE TO PARAGRAPH NO. 79:** Harvard denies that there were research misconduct allegations made to Harvard in July 2021. Harvard admits the allegations in Paragraph 79 that when research misconduct allegations were brought in October 2021, Plaintiff was the principal investigator in the studies subject to the research misconduct allegations.

80.     Dean Pisano contacted Dean Datar to try to learn the substance of the specific allegations against Plaintiff so he could advise her, but Dean Datar told him to ask Dean Cunningham.

**RESPONSE TO PARAGRAPH NO. 80:** Harvard denies the allegations in Paragraph 80.

81.     Dean Cunningham instructed Dean Pisano that he must not inform Plaintiff of what was happening and provided no rationale for this secrecy.

**RESPONSE TO PARAGRAPH NO. 81:** Harvard denies the allegations in Paragraph 81.

A.    **HBS Abandons its Existing Research Integrity Policy and Procedure and Creates a New Policy Specifically for Professor Gino.**

82.    In July 2021, HBS already had in place a "Research Integrity Policy" (the "2013 Research Integrity Policy") that was applicable to allegations of faculty research misconduct that did not involve activities funded by outside agencies that sponsor research or proposals submitted to such agencies for funding. (Doc. No. 6-1).

**RESPONSE TO PARAGRAPH NO. 82:** The 2013 Research Integrity Policy ("2013 Policy") cited in Paragraph 82 is a written document that speaks for itself, and Harvard denies any characterization of this document.

83.    Although Professor Gino's work that was the subject of Data Colada's allegations did not involve agency funding, HBS did not apply its existing 2013 Research Integrity Policy and usual Faculty Review Board ("FRB") procedures to evaluate the allegations against her.

**RESPONSE TO PARAGRAPH NO. 83:** Harvard admits that HBS applied the Interim Policy and Procedures for Responding to Allegations of Research Misconduct to the allegations brought against Plaintiff. Harvard denies the remaining allegations in Paragraph 83.

84.    Instead, after negotiating with Data Colada, in August 2021, HBS created a *new* research misconduct policy and procedure*s*, entitled the "Interim Policy and Procedures for Responding to Allegations of Research Misconduct" ("Interim Policy"), that it used to evaluate and investigate the allegations against Professor Gino. (Doc. No. 6-2).

**RESPONSE TO PARAGRAPH NO. 84:** Harvard denies the allegations in Paragraph 84 that Harvard negotiated with Data Colada. Harvard admits that the Interim Policy applied to the allegations against Plaintiff.

85.    HBS has never previously created an employment conduct policy and procedure *for just one employee* because of pressure exerted by a third-party.

**RESPONSE TO PARAGRAPH NO. 85:**  Harvard denies the allegations in Paragraph 85.  By way of further response, Harvard states that it has *never* created an employment conduct policy and procedure for just one employee because of third-party pressure, including without limitation with respect to Plaintiff.

86.    On information and belief, HBS spent approximately three weeks creating the new Interim Policy, just for Plaintiff. The Interim Policy was never vetted by HBS faculty. HBS's past practice has been to take many months to create policies applicable to faculty members. Prior HBS policies have been commonly vetted by HBS faculty.

**RESPONSE TO PARAGRAPH NO. 86:**  Harvard denies the allegations in Paragraph 86.

87.    From the time HBS received the allegations against Professor Gino in July 2021 and through the creation of its new Interim Policy, HBS kept Professor Gino in the dark about the allegations against her and Harvard's pending investigation.

**RESPONSE TO PARAGRAPH NO. 87:**  Harvard denies the allegations in Paragraph 87.

88.    Keeping Plaintiff in the dark was inconsistent with HBS practice, which normally gives an accused timely notice of the allegations. Normally, HBS employs its FRB procedures to investigate allegations of misconduct by members of the faculty, including alleged violations of the Research Integrity Policy. Pursuant to HBS's usual FRB process, the faculty member is notified of the charges against him/her within a week of HBS's receipt of the allegations.

**RESPONSE TO PARAGRAPH NO. 88:**  Harvard denies the allegations in Paragraph 88, including the suggestion that the FRB process applies to allegations of research misconduct.

89.     With respect to the Interim Policy, i.e., the policy that HBS crafted just for Plaintiff, HBS modeled it on federal regulations promulgated by the Secretary of the U.S. Department of Health and Human Services ("HHS"), found in 42 C.F.R. pt. 93 entitled "Public Health Service Policies on Research Misconduct" ("PHS Regulations").[3]

**RESPONSE TO PARAGRAPH NO. 89:**  Harvard admits the allegation in Paragraph 89 that the Interim Policy was modeled after 42 C.F.R. § 93. Harvard denies the remaining allegations in Paragraph 89.

90.     In September 2021, HBS assigned its employee Alain Bonacossa ("Bonacossa" or "RIO"), (who had held a position as Senior Director, Research Administration and Behavioral Research Services), to a new position as a Research Integrity Officer, with functions modeled after a Research Integrity Officer in an administrative proceeding under the PHS Regulations, to handle the proceeding against Plaintiff.

**RESPONSE TO PARAGRAPH NO. 90:**  Harvard denies the allegation in Paragraph 90 that Alain Bonacossa relinquished his position as of Senior Director, Research Administration and Behavioral Research Services when he started his role of Research Integrity Officer. Harvard denies that Alain Bonacossa became HBS's Research Integrity Officer in September 2021. Harvard admits that Alain Bonacossa serves as the Research Integrity Officer for HBS, that he began in August 2021, and that his functions in that role are modeled after a Research Integrity Officer under the PHS Regulations.

91.     This was the first time that Bonacossa performed this role.

---

[3] The PHS Regulations apply to "[e]ach institution that applies for or receives PHS support for biomedical or behavioral research, research training or activities or activities related to that research or training." 42 C.F.R. § 93.102(a). To the extent that HBS is an institution that applies for or receives PHS funding, allegations concerning Plaintiff's research did not implicate Harvard's institutional obligations under the PHS Regulations, as Plaintiff's alleged conduct did not occur in the context of "research" within the meaning of the PHS Regulations. *See* 42 C.F.R. § 93.222.

**RESPONSE TO PARAGRAPH NO. 91:** Harvard admits the allegation in Paragraph 91.

### i.    The Interim Policy

92.    Under the HBS Interim Policy, HBS bore the burden of proving any charge of "research misconduct" by a preponderance of the evidence. *See* Interim Policy at § (III) (A) ("Standard of Proof").[4] (Doc. No. 6-2 at 2-3).

**RESPONSE TO PARAGRAPH NO. 92:** The Interim Policy cited in Paragraph 92 is a written document that speaks for itself, and Harvard denies any characterization of this document.

93.    The Interim Policy defines "research misconduct" to mean "fabrication, falsification, or plagiarism" in proposing, performing, or reviewing research, or in reporting research results," and excludes "honest error." Interim Policy at App. 1.[5] (Doc. No. 6-2 at 14).

**RESPONSE TO PARAGRAPH NO. 93:** The Interim Policy cited in Paragraph 93 is a written document that speaks for itself, and Harvard denies any characterization of this document.

94.    "Fabrication" is defined as "making up data or results." *Id.*[6] "Falsification" is defined as "manipulating research materials, equipment or processes, or changing or omitting data or results such that the research is not accurately represented in the research record." *Id.*[7]

**RESPONSE TO PARAGRAPH NO. 94:** The Interim Policy cited in Paragraph 94 is a written document that speaks for itself, and Harvard denies any characterization of this document.

95.    "Research" is defined as "a systematic experiment, study, evaluation, demonstration, or survey designed to develop or contribute to general knowledge or specific

---

[4] *See also* 42 C.F.R. § 93.104(c).
[5] *See also* 42 C.F.R. §§ 93.103, 93.103(d).
[6] *See also* 42 C.F.R. § 93.103(a).
[7] *See also* 42 C.F.R. § 93.103(b).

knowledge by establishing, discovering, developing, elucidating, or confirming information about, or the underlying mechanism relating to, the matters to be studied." *Id.*

**RESPONSE TO PARAGRAPH NO. 95:** The Interim Policy cited in Paragraph 95 is a written document that speaks for itself, and Harvard denies any characterization of this document.

96.    For a finding of research misconduct, the alleged fabrication or falsification must be proved, by a preponderance of the evidence, to have been committed "*intentionally, knowingly or recklessly," and* to constitute a *"significant departure from accepted practices of the relevant research community." See* Interim Policy *at* § (III)(A). [8] (Doc. No. 6-2 at 3). Importantly, "[r]esearch misconduct does not include honest error or differences of opinion." *See id.* at App. 1.[9] (Doc. No. 6-2 at 14).

**RESPONSE TO PARAGRAPH NO. 96:** The Interim Policy cited in Paragraph 96 is a written document that speaks for itself, and Harvard denies any characterization of this document.

97.    Although the Interim Policy does not define the terms "intentional," "knowing," or "reckless," administrative decisions rendered by the HHS analyzing research misconduct findings under the PHS Regulations have looked to Black's Law Dictionary for the definitions of these terms, and have adopted the following definitions:

- **intentional:** "[d]one with the aim of carrying out the act";

- **knowing:** "[h]aving or showing awareness or understanding; well-informed" or "[d]eliberate; "conscious";

- **"reckless:** "characterized by the creation of a substantial and unjustifiable risk of harm to others and by a conscious (and sometimes deliberate) disregard for or indifference to that risk; heedless; rash," and "much more than mere negligence: it is a gross deviation from what a reasonable person would do."

---

[8] *See also* 42 C.F.R. § 93.104 (a)-(b).
[9] *See also* 42 C.F.R. §§ 93.104(a)-(c).

*See* Black's Law Dictionary (11th ed. 2019).

**RESPONSE TO PARAGRAPH NO. 97:** The Interim Policy cited in Paragraph 97 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard lacks sufficient knowledge to admit or deny the remaining allegations in Paragraph 97 and on that basis denies them.

98.    The Interim Policy required Harvard to take all reasonable steps to ensure an impartial, fair, and unbiased investigation. *See* Interim Policy at § (VII)(E). [10] (Doc. No. 6-2 at 9).

**RESPONSE TO PARAGRAPH NO. 98:** The Interim Policy cited in Paragraph 98 is a written document that speaks for itself, and Harvard denies any characterization of this document.

### B.    The HBS Proceeding.

#### i.    The "Initial Inquiry" and Data Colada's False and Erroneous December 3, 2021 Report to Harvard.

99.    Professor Gino first learned of the allegations against her on October 27, 2021, when she received a letter ("Notice of Inquiry") from Bonacossa, HBS's newly appointed RIO. (Doc. No. 20-5 at 73-75).

**RESPONSE TO PARAGRAPH NO. 99:** Harvard admits the allegation in Paragraph 99 that the Notice of Inquiry was sent to Plaintiff by Alain Bonacossa on October 27, 2021. Harvard lacks sufficient knowledge to admit or deny the remaining allegations in Paragraph 99 and on that basis denies them.

100.    The Notice of Inquiry informed Plaintiff that the RIO had received allegations from an "anonymous" source. The anonymous source was, in fact, Data Colada. The allegations related to four studies, for which Professor Gino had been the principal investigator, that were published in the following research papers:

---

[10] *See* 42 C.F.R. § 93.310(f).

Gino, F., Kouchaki, M., & Casciaro, T. (2020). Why connect? Moral consequences of networking with a promotion or prevention focus. *Journal of Personality and Social Psychology,* 119(6), 1221-1238 ("***2020 JPSP Paper***")

Gino, F., Kouchaki, M., & Galinsky, A. D. (2015). The moral virtue of authenticity: How inauthenticity produces feelings of immorality and impurity. Psychological Science, 26(7), 983-996 (*"**2015 Psychological Science Paper**"*)

Gino, F., & Wiltermuth, S. S. (2014). Evil genius? How dishonesty can lead to greater creativity. Psychological Science, 25(4), 973-981 *("**2014 Psychological Science Paper**")*

Shu, L. L., Mazar, N., Gino, F., Ariely, D., and Bazerman, M. H. (2012). Signing at the beginning makes ethics salient and decreases dishonest self-reports in comparison to signing at the end. Proceedings of the National Academy of Sciences of the United States of America, 109, 15197-15200 ("***2012 PNAS Paper*** ")

(*Id.* at 73.)

**RESPONSE TO PARAGRAPH NO. 100:**  The Notice of Inquiry cited in Paragraph 100 is a written document that speaks for itself, and Harvard denies any characterization of this document.  Harvard admits that Data Colada raised allegations of research misconduct to HBS's Research Integrity Officer, and otherwise denies the allegations in Paragraph 100.

101.    The Notice of Inquiry further informed Professor Gino that HBS had already sequestered "certain research records" relating to her research and instructed her to turn in her "HBS-issued devices" by 5 p.m. that same day. (*Id.* at 74-75). In an unnecessary demonstration of force, the RIO called Harvard University police to oversee the transfer.

**RESPONSE TO PARAGRAPH NO. 101:** Harvard denies the allegation in Paragraph 101 that Alain Bonacossa called the Harvard University Police Department ("HUPD") or that any individual from HUPD was present during the transfer of records from Plaintiff's HBS-issued device. The remaining allegations in Paragraph 101 relate to the Notice of Inquiry, which is a document that speaks for itself, and Harvard denies any characterization of this document.

102.    The Interim Policy states: "the RIO must take all reasonable and practical steps to obtain custody of all the research records and evidence needed to conduct the research misconduct proceeding." (Doc. 6-2 at 5). As alleged below, and as HBS's own inventory of the RIO's sequestration efforts shows, the RIO failed to do so. (Doc. 20-5 at 257-59).

**RESPONSE TO PARAGRAPH NO. 102:**  The Interim Policy cited in Paragraph 102 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegation in Paragraph 102.

103.    The Notice of Inquiry advised Plaintiff that HBS had opened a formal "initial inquiry" into the allegations, and that Dean Datar had appointed an "inquiry committee" comprised of HBS Professor Emerita Teresa Amabile, serving as Chair, and HBS Professor Emeritus, Robert Kaplan. (*Id*. at 74). Although not known to Plaintiff at the time, Professor Kaplan was Dean Datar's mentor early on in his academic career and was instrumental in bringing Dean Datar to HBS. *See* "Playing the Long Game: How Dean Datar Came to be at HBS," (Jan. 3, 2021), available at: https://www.hbs.edu/news/articles/Pages/dean-datar-to-hbs.aspx (last visited July 31, 2023).

**RESPONSE TO PARAGRAPH NO. 103:**  The Notice of Inquiry and the article cited in Paragraph 103 are written documents that speak for themselves, and Harvard denies any characterization of these documents.  To the extent a response is required, Harvard denies the allegations in Paragraph 103.

104.    Under the Interim Policy, the Inquiry Committee was tasked with determining whether: there was (1) "a reasonable basis for concluding that the allegation falls within the definition of research misconduct"; and (2) whether "the preliminary information-gathering and preliminary fact-finding from the inquiry indicate[d] that the allegation may have substance." *See* Interim Policy at § (VI) (C). (Doc. No. 6-2 at 17). The Interim Policy required the Inquiry

Committee to produce a draft inquiry report to Professor Gino, with opportunity to comment, and then a final inquiry report, with its decision whether an investigation was warranted, within 60 days from the start of the inquiry. *See id*. at § VI (E), (H). (Doc. No. 6-2 at 7-8).

**RESPONSE TO PARAGRAPH NO. 104:**  The Interim Policy cited in Paragraph 104 is a written document that speaks for itself, and Harvard denies any characterization of this document.

105.    In pertinent part, the Interim Policy's stated "scope" is limited "only to allegations of research misconduct that occurred ***within six years of the date*** HBS received the allegation, unless the respondent has continued or renewed an incident of alleged research misconduct through the citation, republication, or other use for the potential benefit of the respondent of the research record in question." *See* Interim Policy at § II (emphasis added). (Doc. No. 6-2 at 2).

**RESPONSE TO PARAGRAPH NO. 105:**  The Interim Policy cited in Paragraph 105 is a written document that speaks for itself, and Harvard denies any characterization of this document.

106.    Other than allegations concerning the *2020 JPSP Paper,* the remaining three allegations noted in the Notice of Inquiry should have been time-barred. Allegations concerning the *2015 Psychological Science Paper*, the *2014 Psychological Science Paper,* and the *2012 PNAS Paper* were all more than six years old and should not have been the subject of an inquiry under the Interim Policy. (*See id*.)

**RESPONSE TO PARAGRAPH NO. 106:**  Harvard denies the allegations in Paragraph 106.

107.    In the course of the initial inquiry, on December 3, 2021, the complainant/Data Colada submitted to the Inquiry Committee a statement titled "Evidence of Fraud in Academic Articles Authored by Francesca Gino" (the "December Report"). (Doc. No. 20-5 at 142-160).

**RESPONSE TO PARAGRAPH NO. 107:** Harvard admits the allegation in Paragraph 107 that Data Colada submitted a statement titled "Evidence of Fraud in Academic Articles Authored by Francesca Gino" to Alain Bonacossa. Harvard denies that Data Colada sent any statement directly to the Inquiry Committee.

108.    In the December Report, the complainant/Data Colada presented what it described as "imperfect data tampering" for data that appeared to be "out of sort" in published data sets. (Doc. No. 20-5 at 144-147). Like the allegations set forth in the initial Notice of Inquiry, the allegations contained in the December Report are based on unwarranted inferences that perceived anomalies in the data resulted from "fraud," and ignored other plausible and innocent reasons for perceived anomalies.

**RESPONSE TO PARAGRAPH NO. 108:** The December Report and Notice of Inquiry cited in Paragraph 108 are written documents that speak for themselves, and Harvard denies any characterization of these documents.

109.    On February 22, 2022, Plaintiff's advisor in the matter, Attorney Paul S. Thaler, Esq., of the law firm Cohen Seglias Pallas Greenhall & Furman PC, submitted a letter on Plaintiff's behalf to Diane Lopez, Esq., Harvard's Vice President and General Counsel, and requested that she forward it to Bonacossa and the members of the Inquiry Committee. (*See* Doc. No. 20-5 at 199-208). Mr. Thaler explained that, under the Interim Policy, the Inquiry Committee should find that there was insufficient evidence to warrant an investigation into Plaintiff's work because the allegations lacked substance, and in multiple incidences did not align with actions that fell within the definition of research misconduct. (*See id.*)

**RESPONSE TO PARAGRAPH NO. 109:** Harvard admits the allegation in Paragraph 109 that Paul Thaler sent a letter to Diane Lopez on February 22, 2022. The remaining allegations

in Paragraph 109 relate to the letter, which is a written document that speaks for itself, and Harvard denies any characterization of this document.

110.    Mr. Thaler explained that, to the extent there were anomalies in the datasets, in all four of the studies in question, Professor Gino had relied on the help of research assistants on any given project to help her prepare IRB applications, conduct laboratory studies, clean the data, prepare it for analyses, and often conduct preliminary analyses on the data. (Doc. No. 20-5 at 201-207). Professor Gino's practice in this regard was consistent with other behavioral scientists in her field. Given that, in all of the studies in question, Professor Gino did not run the studies or sort or handle the data, and that there was no evidence that the culture of Plaintiff's lab incentivized or motivated research assistants to manipulate data, there was no substance to any of the allegations. (*See id.*)

**RESPONSE TO PARAGRAPH NO. 110:**  The letter cited in Paragraph 110 is a written document that speaks for itself, and Harvard denies any characterization of this document.

111.    Mr. Thaler also explained that, under the Interim Policy, the unavailability of records is only to be considered evidence of research misconduct where it can be shown by a preponderance of evidence that the respondent *intentionally, knowingly, or recklessly* had research records and destroyed them, had the opportunity to maintain the records but did not do so, or maintained the records and failed to produce them in a timely manner ***and*** that the respondent's conduct constitutes a significance departure from accepted practices of the relevant research community. *See* Interim Policy § (III) (A).[11] (*id.* at 205; *see* Doc. No. 6-2 at 3).

---

[11] *See* 42 C.F.R. § 93.106(b)(1).

**RESPONSE TO PARAGRAPH NO. 111:** The letter and the Interim Policy cited in Paragraph 111 are written documents that speak for themselves, and Harvard denies any characterization of these documents.

112.    Mr. Thaler noted that the original paper records for the *2012 PNAS Paper* studies could not be found because the records were older than six years and would not normally be reviewed under analogous federal law, *see* 42 C.F.R. § 93.105(a). (Doc. No. 20-5 at 205).

**RESPONSE TO PARAGRAPH NO. 112:**  The letter cited in Paragraph 112 is a written document that speaks for itself, and Harvard denies any characterization of this document.

113.    The raw data—the original source data—for the study in question in the *2014 Psychological Science Paper* could not be found either. (Doc. No. 20-5 at 203-205). Data retention policies indicate that records older than six years do not need to be retained so unavailability of this data should be expected given the year the study was conducted (2012). (*See id.* at 205).

**RESPONSE TO PARAGRAPH NO. 113:** Harvard lacks sufficient information to admit or deny the allegations regarding the "data retention policies" referenced in Paragraph 113. Harvard denies the remaining allegations in Paragraph 113.

114.    The same data retention policy also applied to the *2015 Psychological Science* paper as the data for study in question was collected in 2014. (*See id*. at 205).

**RESPONSE TO PARAGRAPH NO. 114:** Harvard lacks sufficient information to admit or deny the allegations regarding the "data retention policy" referenced in Paragraph 114. Harvard denies the remaining allegations in Paragraph 114.

115.    On April 1, 2022, Professor Gino submitted her own written responses to the draft inquiry report. (*See* Doc. No. 20-5 at 252-256).

**RESPONSE TO PARAGRAPH NO. 115:** Harvard admits the allegations in Paragraph 115.

116.    HBS ignored the numerous procedural and substantive deficiencies in the draft report identified by Mr. Thaler and highlighted in Professor Gino's comments and, on April 8, 2022, produced a final inquiry report ("Inquiry Report"), in which the committee found that an investigation was warranted. (*See* Doc. No. 20-5 at 43-54).

**RESPONSE TO PARAGRAPH NO. 116:** The Inquiry Report is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 116.

### ii.    HBS's Unfair and Biased Investigation.

117.    On April 15, 2022, HBS notified Professor Gino that Dean Datar had concluded that an investigation was warranted and was instituting an investigation, and that a third member of the HBS faculty, HBS Professor Shawn Cole, would join Amabile and Kaplan, forming an "investigation committee," pursuant to the Interim Policy. (*See* Doc. No. 20-5 at 262-331).

**RESPONSE TO PARAGRAPH NO. 117:** Harvard admits the allegations in Paragraph 117.

118.    In or about May 2022, the investigation committee hired an external forensic firm Maidstone Consulting Group ("MCG") to produce forensic reports and analyses of documents and Plaintiffs' electronic files that had been sequestered.

**RESPONSE TO PARAGRAPH NO. 118:** Harvard admits the allegations in Paragraph 118.

119.    Shortly after learning that the investigation committee had hired MCG, Professor Gino asked the RIO if she could hire a forensic expert. The RIO asserted that she could not, because the Interim Policy only permitted her to select two advisors, and Professor Gino had already done

so by hiring a lawyer (based on the RIO's recommendation) and choosing Dean Pisano as her other advisor.

**RESPONSE TO PARAGRAPH NO. 119:** Harvard denies the allegations in Paragraph 119.

120.    The 2013 Research Integrity Policy contained no such advisor limitation. If Professor Gino had not been limited to just two advisors, she would have hired a forensic expert to assist her in connection with the investigation.

**RESPONSE TO PARAGRAPH NO. 120:** The 2013 Research Integrity Policy cited in Paragraph 120 is a written document that speaks for itself, and Harvard denies any characterization of this document.  Harvard denies the remaining allegations in Paragraph 120.

121.    The investigation committee provided information (documents/records) to MCG for the purpose of evaluating the allegations against Professor Gino, without consulting with Professor Gino to locate or ascertain where the pertinent information was stored and, in particular, whether the electronic files sequestered on her HBS devices contained the final documents and raw data relevant to the studies in question.

**RESPONSE TO PARAGRAPH NO. 121:**  Harvard denies the allegations in Paragraph 121.

122.    Over the months of June, July, and August 2022, MCG produced a massive amount of forensic reports (over 180 pages) on the four allegations, but they were based on an examination of documents that did not contain information used by research assistants to merge datasets or code variables in them, and that contained data that was not confirmed to be raw data. (*See* Doc. No. Ex. 20-5 at 509-530, 579-629, 612-628, 632-646).[12] As such, the forensics reports were non-

---

[12] MCG produced documents for the investigation committee's review which are absent from the Final Report. (*See* Doc. No. 20-5). *See infra* ¶ 145.

probative evidence that were, at best, inconclusive as to the allegations. (*See id.* at 1029-30, 1032-33). The RIO only shared a subset of the files available for each study with MCG. This is an important omission as MCG itself corrected some errors in their analysis in December 2023, after more datafiles were made available to them.

**RESPONSE TO PARAGRAPH NO. 122:**  Harvard denies the allegations in Paragraph 122.

123.    During the months of June, July, and August 2022, the investigation committee also met with and interviewed six of Professor Gino's collaborators and two research assistants for the papers in question, resulting in hundreds of pages of recorded and transcribed testimony from the following individuals:

      a.      J.F. (research assistant)

      b.      A.R. (research assistant)

      c.      Professor M.K. (co-author)

      d.      Professor S.W. (co-author)

      e.      Dr. L.S. (co-author)

      f.      Professor A.G. (co-author)

      g.      Professor T.G. (co-author), and

      h.      Professor N.M. (co-author).

**RESPONSE TO PARAGRAPH NO. 123:**  Harvard denies the allegations in Paragraph 123. By way of further response, the Investigation Committee interviewed five co-authors and two research assistants.

124.    All of the witnesses interviewed by the investigation committee corroborated Professor Gino's account of how the research was performed and spoke about the integrity of her work and lab practices. (*See* Doc. No. 20-5 at 10.)

**RESPONSE TO PARAGRAPH NO. 124:**  Harvard denies the allegations in Paragraph 124.

125.    All witnesses interviewed corroborated Professor Gino's assertion of her innocence of falsification and/or fabrication of data. The HBS investigation committee interviewed at least one witness who suggested the committee collect and review his research records (Doc. No. 20-5 at 414, 417), but the Final Report contains no indication the committee ever did so (*id.* at 18, 257-59).

**RESPONSE TO PARAGRAPH NO. 125:**  Harvard denies the allegations in Paragraph 125.

126.    HBS also did not sequester the research records of key members of the research teams involved (Doc. No. 20-5 at 257-59), and the HBS Investigation Committee only interviewed two of them.

**RESPONSE TO PARAGRAPH NO. 126:**  Harvard denies the allegations in Paragraph 126, including the suggestion that it had access to the research records of research collaborators affiliated with other institutions.

127.    During June 2022 through September 2022, the investigation committee reviewed the MCG forensic reports and had several meetings to discuss them. (Doc. No. 20-5 at 5, 7-8). The investigation committee completed its review before providing Professor Gino copies of the forensic reports or giving her an opportunity to review and respond to them. (*See id.* at 7-8).

**RESPONSE TO PARAGRAPH NO. 127:**  Harvard denies the allegations in Paragraph 127.

128.    On August 24, 2022, the RIO informed Professor Gino (for the first time) that the investigation committee had hired a forensics firm and advised her that it would share the forensic reports with her in September 2022, and that it would want to discuss the reports with her.

**RESPONSE TO PARAGRAPH NO. 128:**  Harvard denies the allegations in Paragraph 128.

129.    Throughout the inquiry and the investigation, Professor Gino was performing her regular duties as a Professor at HBS.

**RESPONSE TO PARAGRAPH NO. 129:**  Harvard admits the allegations in Paragraph 129.

130.    At the end of August 2022, the RIO contacted Professor Gino to schedule two three-hour interviews with the investigation committee and was offered dates at the end of October 2022 and November 2022 to discuss both the MCG reports and witness interviews.

**RESPONSE TO PARAGRAPH NO. 130:**  Harvard admits the allegations in Paragraph 130.

131.    When, after a few weeks, Professor Gino had still not been provided copies of the MCG reports, she contacted the RIO, who told her he was about to send her the first of the forensic reports. Professor Gino requested that the RIO permit her more time to review the forensics reports—which she had still not been provided—so she could prepare for the upcoming meetings with the investigation committee.

**RESPONSE TO PARAGRAPH NO. 131:**  Harvard admits the allegations in Paragraph 131 that it provided Plaintiff with the forensic reports once they were finalized. Harvard denies the remaining allegations in Paragraph 131.

132.    The RIO told Professor Gino that the investigation committee wanted to meet before Thanksgiving. To accommodate the investigation committee's schedule, the RIO canceled the earlier of the two scheduled 3-hour meetings, leaving just one three-hour meeting for Professor Gino to meet with the investigation committee, on November 14, 2022. (*See* Doc. No. 20-5 at 665-715).

**RESPONSE TO PARAGRAPH NO. 132:** Harvard admits that the Investigation Committee met with Plaintiff of November 14, 2022. Harvard denies the remaining allegations in Paragraph 132.

133.    The RIO delayed in providing Professor Gino copies of the MCG Reports, and when he finally did send them to her, he sent them piecemeal, over multiple dates between September 30, 2022 through October 31, 2022. (*See* Doc. No. 20-5 at 7-8).

**RESPONSE TO PARAGRAPH NO. 133:** Harvard admits the allegations in Paragraph 133 that it provided Plaintiff with the forensic reports once they were finalized. Harvard denies the remaining allegations in Paragraph 133.

134.    Though Dean Datar had confirmed to Professor Gino's advisor, Dean Pisano, that, during the proceeding, Professor Gino would be given all the time she needed to respond to the investigation committee's requests for information, HBS did not provide the forensic reports to her in a timely manner, leaving her insufficient time to review the 180-plus pages of dense reports prior to her November 14 2022 meeting with the investigation committee. While the three members of the investigation committee had months to digest the reports and a vendor working on their behalf, Professor Gino was given only a few weeks, while she was also teaching intensively for a month and a half in September and October of 2022, a new course for which she was the

course-head.[13] Additionally, when the investigation committee did finally provide her the reports, it did not provide her the underlying documents (e.g., data and emails) on which the reports were based, making it difficult for her to make sense of the reports.

**RESPONSE TO PARAGRAPH NO. 134:** Harvard denies the allegations in Paragraph 134.

135.    Professor Gino's ability to review, analyze and respond to the forensic reports was also substantially impaired because she was precluded from hiring a forensic expert of her own under the Interim Policy.

**RESPONSE TO PARAGRAPH NO. 135:** Harvard denies the allegations in Paragraph 135.

136.    Nonetheless, Professor Gino met, as requested by the investigation committee, for a 3-hour interview on November 14, 2022. (*See* Doc. No. 20-5 at 665-715). At the meeting, Professor Gino was questioned about studies that were done seven, eight, and 10 years previously, and about forensic analyses that were largely irrelevant, in an unfair interrogation that reflected the committee's bias against her. (*See id.*)

**RESPONSE TO PARAGRAPH NO. 136:** Harvard admits the allegation in Paragraph 136 that the Investigation Committee met with Plaintiff of November 14, 2022. Harvard denies the remaining allegations in Paragraph 136.

137.    Professor Gino maintained her innocence throughout the entire proceeding, and fully cooperated with the investigation committee, providing information about the publication

---

[13] Professor Gino was not provided a copy of the MCG Report on Allegation 1 until September 30, 2022 though the committee met to discuss it about 5 weeks earlier. Professor Gino was not provided a copy of the MCG Report on Allegation 2 until October 21, 2022 though the committee met to discuss it about three weeks earlier. She was not provided a copy of the MCG forensic report on Allegation 3 until October 31, 2022, though the committee had it for some time and met to discuss it three days earlier. She was not provided a copy of the MCG report on Allegation 4 until October 12, 2022, though the committee met to discuss it about seven weeks earlier. (*See* Doc. No. 20-5 at 7-8).

process, access to data, to the extent it was available, and answering the committee's question on collaborators and research assistants on the studies in question. Professor Gino provided plausible explanations for the perceived "anomalies" in the data. (*See id.; see also id.* at 332-352, 716-1282).

**RESPONSE TO PARAGRAPH NO. 137:**  Harvard admits the allegation in Paragraph 137 that Plaintiff maintained that she did not commit research misconduct throughout the Inquiry and Investigation Committee proceedings.  Harvard denies the remaining allegations in Paragraph 137.

### iii.        The Investigation Committee's Draft Report.

138.    At 5:38 p.m. on December 14, 2022, the investigation committee provided Professor Gino a copy of its draft investigation report ("Draft Report") for comment. When the RIO gave her the Draft Report, both HBS and the RIO knew that Professor Gino was leaving for a scheduled family vacation two days later, on December 16, 2022, to see her family in Italy for approximately two weeks, whom she had not seen in four years. Under the Interim Policy, Professor Gino had just 30 days to provide comments to the Draft Report, and she requested an extension of time to review and submit her comments.

**RESPONSE TO PARAGRAPH NO. 138:**  Harvard admits the allegation in Paragraph 138 that Plaintiff was provided with the Investigation Committee's Draft Report ("Draft Report") on December 14, 2022. Harvard further admits that Plaintiff requested, and was granted, an extension to provide comments to the Draft Report.  Harvard lacks sufficient knowledge to admit or deny whether Plaintiff had not seen her family for four years and on that basis denies this allegation. As to the allegations in Paragraph 138 relating to the Interim Policy, that document speaks for itself, and Harvard denies any characterization of it.  Harvard denies the remaining allegations in Paragraph 138.

139.    The Draft Report informed Professor Gino that the investigation committee had found her guilty of all the charges and, incredibly, without consideration of the various mitigating factors set forth in the Interim Policy, recommended the harshest and most punitive sanction available under the Interim Policy: termination of Professor Gino's employment.

**RESPONSE TO PARAGRAPH NO. 139:**  The Draft Report cited in Paragraph 139 is a written document that speaks for itself, and Harvard denies any characterization of this document.

### iv.    The Investigation Committee Failed to Prove Research Misconduct.

140.    In the Draft Report, the investigation committee acknowledged but chose to ignore evidence that was directly relevant to the question at hand: whether Professor Gino had knowingly, intentionally, or recklessly manipulated data. The investigation committee prefaced its findings with the following statement, indicating that "all witnesses" whom the committee interviewed *"never doubted the integrity of the data in the study or studies in question*," and that there was also *no evidence of any incentive or pressure to manipulate data in Professor Gino's lab*, writing:

> We acknowledge, and we took seriously in our decision-making, statements by all witnesses that they never doubted the integrity of the data in the study or studies in question. One witness who knew Professor Gino well said they never doubted her integrity in any way. The witnesses also said that they had no evidence that Professor Gino had ever pressured colleagues, doctoral students, post-docs, or research associates, including themselves, to produce particular results in a study, or that Professor Gino had created a negative atmosphere in her lab. Moreover, some witnesses spontaneously said that they had worked on multiple studies with Professor Gino that were never published because the studies didn't work out.

**RESPONSE TO PARAGRAPH NO. 140:**  The Draft Report cited in Paragraph 140 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 140.

141.    In concluding Professor Gino was responsible, the investigation committee made findings based on mere speculation, in reliance on some discrepancies noted in the MCG reports—

reports that were, at best, inconclusive. Without **any** supporting witness statements, email correspondence, or other evidence, such as the original "raw" data (that is, data submitted by study participants before being handled or "cleaned" by anyone), the investigation committee concluded that Professor Gino was responsible for misconduct.

**RESPONSE TO PARAGRAPH NO. 141:** Harvard denies the allegations in Paragraph 141.

142.    Under the Interim Policy a finding of research misconduct required HBS's investigation committee to prove, *by a preponderance of the evidence*, that Plaintiff *"intentionally, knowingly, or recklessly" falsified or fabricated* data, and to specify for each allegation the requisite intent. *See* Interim Policy at § (III) (A), (VII) (F). (Doc. No. 6-2 at 2-3, 10). Instead, the investigation committee reversed the policy's stated burden of proof, and found Professor Gino guilty of misconduct because she had not *disproved* the allegations against her.

**RESPONSE TO PARAGRAPH NO. 142:** Harvard denies the allegation in Paragraph 142 that the Investigation Committee reversed the burden of proof. The remaining allegations in Paragraph 142 relate to the Interim Policy, which is a written document that speaks for itself, and Harvard denies any characterization of this document.

143.    The Interim Policy also requires the investigation committee to evaluate conduct in the context of the norms of the field, but the committee failed to do so. A project triggered by the charges against Prof. Gino — the "Many Co-Authors Project" (manycoauthors.org) — launched by Gino's co-authors to evaluate the integrity of the data in the papers that Gino co-authored with them. That project identified many cases in which the data reveal anomalies. In none of them was Gino responsible for the data. For example, one coauthor audited 7 articles she had co-authored with Gino. Three of those seven had significant data issues, not attributable to Gino. Intentional

manipulation is not the only source of data anomalies, and the investigation committee could have uncovered this had they examined error rates in Plaintiff's field.

**RESPONSE TO PARAGRAPH NO. 143:**  The Interim Policy cited in Paragraph 143 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard lacks sufficient knowledge to admit or deny the remaining allegations in Paragraph 143 and on that basis denies them.

144.    Although the investigation committee stated in the draft report that it found all witnesses to be credible, it inexplicably ignored witness testimony that corroborated Professor Gino's explanations concerning the allegations, and established Professor Gino's integrity, style of working, and lab practices. The committee also irrationally ignored relevant testimony from Professor Gino's research assistants and collaborators who spoke favorably about Plaintiff's integrity (Doc. No. 20-5 at 369, 433, 445) and the role of research assistants in the research process for the studies at issue. (*See* Doc. No. 20-5 at 353-383, 384-410, 436-449, 450-472).

**RESPONSE TO PARAGRAPH NO. 144:**  The Draft Report cited in Paragraph 144 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 144.

145.    In its Draft Report, the investigation committee failed to specify the intent of the misconduct, i.e., whether it had been committed "intentionally, knowingly, or recklessly," as it was required to do under the Interim Policy. *See* Interim Policy § (VII) (F). (Doc. No. 6-2 at 10). Instead, and in the absence of any evidence of intent to commit misconduct, the investigation committee merely parroted the phrase, "intentionally, knowingly, or recklessly" for each allegation.

**RESPONSE TO PARAGRAPH NO. 145:**  Harvard denies the allegations in Paragraph 145.

146.    Indeed, ***not a single witness*** interviewed by the investigation committee reported any type of behavior or attitude that is consistent with the speculative intent that was posed by the investigation committee—intent that was unspecified and unsupported by any evidence whatsoever.

**RESPONSE TO PARAGRAPH NO. 146:**  Harvard denies the allegations in Paragraph 146.

147.    In addition to the investigation committee's failure to make specific findings supported by a preponderance of the evidence, the overly harsh sanctions recommended by the investigation committee bore no connection to the intended rehabilitative nature of the research misconduct proceedings. As set forth in the PHS Regulations, on which the Interim Policy is based, such proceedings are intended to be remedial in nature, and to avoid overly harsh and punitive outcomes.

**RESPONSE TO PARAGRAPH NO. 147:**  Harvard denies the allegations in Paragraph 147. To the extent that Plaintiff purports to quote from a federal regulation in making the allegations in Paragraph 147, those regulations speak for themselves, and Harvard denies any characterization of those regulations.

148.    Under the Interim Policy, a respondent is "allowed 30 days from receipt of the draft report to submit comments to the RIO," which "must be included and considered in the final report." (See Interim Policy at § (VII) (G)(1)). (Doc. No. 6-2 at 10). The RIO is permitted under the Interim Policy to extend the deadlines for completion of any phase of the investigation,

including the preparing of the draft investigation report and finalizing the draft report. *See* Interim Policy at § (VII)(J). (Doc. No. 6-2 at 11).

**RESPONSE TO PARAGRAPH NO. 148:** The Interim Policy cited in Paragraph 148 is a written document that speaks for itself, and Harvard denies any characterization of this document.

149.    Professor Gino was entitled access to **all** of the documents relied on in the report, including the lengthy MCG forensics documents that she had never had a meaningful opportunity to review and respond to, as well as the underlying documents to those reports, which she was ***never*** provided—a clear violation of the policy. *See* Interim Policy at § (VII)(G)(1). (Doc. No. 6-2 at 10).

**RESPONSE TO PARAGRAPH NO. 149:** Harvard denies the allegations in Paragraph 149.

150.    Despite the rules, on December 14, 2022, the RIO declined to grant Professor Gino's reasonable request for an extension and told her to wait until she returned from her vacation in January 2023, to see if she actually needed the time.

**RESPONSE TO PARAGRAPH NO. 150:** Harvard denies the allegations in Paragraph 150.

151.    The RIO also told Professor Gino that she should expect the process to get much harder going forward (saying the "road would get much tougher"). He advised her that the committee was *very unlikely to change its conclusions*, and that *all she could ask for was a reduction in the recommended sanctions*. The RIO even suggested to Professor Gino that she should seek mental health counseling to deal with potential mental health issues arising from the anticipated difficulty of the proceeding.

**RESPONSE TO PARAGRAPH NO. 151:**  Harvard denies the allegations in Paragraph 151.

152.    Though HBS had taken months to prepare and review the MCG forensic reports, it was giving Professor Gino roughly three weeks to respond to the draft report, without the documents underlying that report, all two days before she was going on a two-week trip to Italy. (*See* Doc. No. 20-5 at 1043) (Plaintiff's Feb. 17, 2023 letter to the investigation committee stating, "[t]hough the HBS Policy states that I would be given access to the detailed analyses from the MCG firm and all the files they used, I did not have access to their analyses and excel files other than their final report.").[14]

**RESPONSE TO PARAGRAPH NO. 152:**  The letter cited in Paragraph 152 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 152.

153.    Dean Pisano went to Dean Datar to intervene on Professor Gino's behalf, telling him that she needed more time to respond to the draft report, particularly since the committee had reversed the Interim Policy's stated standard of proof, and was requiring her *to disprove* the allegations.

**RESPONSE TO PARAGRAPH NO. 153:**  Harvard admits the allegation in Paragraph 153 that Dean Gary Pisano spoke with Dean Datar regarding the Draft Report. Harvard denies the remaining allegations in Paragraph 153.

154.    When Dean Pisano spoke with Dean Datar, he emphasized that, throughout the proceeding, Professor Gino had continued to perform her regular duties as a Professor at HBS and had put "Harvard's interests first," including co-creating and teaching a course on Inclusion, (with

---

[14] *See supra* note 12.

1,011 MBA students enrolled), and that, as a matter of basic fairness, she should have time to focus on her rebuttal, and to digest and respond to the 180-plus pages of MCG forensic reports. Dean Datar was dismissive, telling him to speak with Dean Cunningham. Dean Cunningham was also dismissive, telling Dean Pisano, "oh, she's getting all the time she needs."

**RESPONSE TO PARAGRAPH NO. 154:** Harvard admits the allegation in Paragraph 154 that Dean Gary Pisano spoke with Dean Datar and Dean Jean Cunningham regarding the Draft Report. Harvard denies the remaining allegations in Paragraph 154.

155.    After Professor Gino's return to Boston, on January 10, 2023, she wrote the RIO to again request an extension of time to respond to the investigation committee's draft report and was granted a "hard deadline" of February 17, 2023.

**RESPONSE TO PARAGRAPH NO. 155:** Harvard admits the allegation in Paragraph 155 that Plaintiff was given an extension until February 17, 2023 to submit her response to the Draft Report.

156.    On February 17, 2023, Professor Gino submitted a written response to the investigation committee's Draft Report. (*See* Doc. No. 20-5 at 1024-1060).

**RESPONSE TO PARAGRAPH NO. 156:** Harvard admits the allegations in Paragraph 156.

157.    In her response to the Draft Report, Professor Gino sought to clarify that, "[w]hile the [Interim Policy] notes that defenses must be proven by a preponderance of the evidence in their consideration, the burden of proof for making a finding of research misconduct is *actually* on the committee, as any findings of research misconduct must themselves be supported by a preponderance of the evidence." (Citing Interim Policy at (III)(A) and App. 1) (*See* Doc. No. 20-5 at 1025; *see also id.* at 1058-59; Doc. No. 6-2 at 3).

**RESPONSE TO PARAGRAPH NO. 157:** Plaintiff's response to the Draft Report cited in Paragraph 157 is a written document that speaks for itself, and Harvard denies any characterization of this document.

158. Maintaining her innocence, Professor Gino's response thoroughly outlined the substantive factual evidence that the investigation committee had ignored for each of the four allegations against her, and that weighed in favor of her innocence, and provided specific citations to the record. (*See* Doc. No. 20-5 at 1024-1060).

**RESPONSE TO PARAGRAPH NO. 158:** Plaintiff's response to the Draft Report cited in Paragraph 158 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 158.

159. In addition, and without violating any rules, Professor Gino contacted potential witnesses (without telling them about the ongoing investigation) who could corroborate her statements to the investigation committee. (*See id.* at 1026-27 and corresponding n. 2). Although it was not her burden to prove her innocence under the Interim Policy, Professor Gino's response to the committee's Draft Report introduced *new evidence* of her own, including statements from others whom the committee had failed to interview. (*See* Doc. No. 20-5 at 1061-1282). Prior to the issuance of the Draft Report and during the investigation, Professor Gino had not spoken to potential witnesses to avoid any appearance of influencing them, as well as to comply with the Interim Policy's "duty to maintain confidentiality," of the proceeding, "to the extent possible." *See* Interim Policy § (III) D).[15] (Doc. No. 6-2 at 3-4).

**RESPONSE TO PARAGRAPH NO. 159:** Plaintiff's response to the Draft Report cited in Paragraph 159 is a written document that speaks for itself, and Harvard denies any

---

[15] *See also* 42 C.F.R. §§ 93.108, 93.300(e).

characterization of this document. Harvard lacks sufficient knowledge to admit or deny the remaining allegations in Paragraph 159 regarding Plaintiff's actions and therefore denies them.

### v.    The Investigation Committee Failed and/or Refused to Diligently Pursue All Leads.

160.    Professor Gino had also expected that the committee would evaluate each allegation of research misconduct *thoroughly, fairly, and objectively*, *see* Interim Policy § (III)(A),[16] (Doc. No. 6-2 at 2) and to interview all witnesses and diligently pursue all leads. *See* Interim Policy § (VII)(E).[17] (Doc. No. 6-2 at 9-10).

**RESPONSE TO PARAGRAPH NO. 160:** Harvard lacks sufficient knowledge to admit or deny the allegation in Paragraph 160 regarding Plaintiff's expectations and therefore denies them. The remaining allegations in Paragraph 160 relate to the Interim Policy, which is a written document that speaks for itself, and Harvard denies any characterization of this document.

161.    Seeing that the investigation committee had failed to fulfill these duties and had also reversed the Interim Policy's standard of proof by imposing upon *her* the burden of *disproving* the allegations of misconduct, Professor Gino provided the committee with independent corroboration of her innocence, and attached to her detailed February 17, 2023 response to the Draft Report statements of colleagues concerning her integrity and the integrity of her lab and work practices, in addition to substantive statements concerning specific factual issues pertinent to the individual allegations. (*See* Doc. No. 20-5 at 1061-1282).

**RESPONSE TO PARAGRAPH NO. 161:** Harvard denies the allegations in Paragraph 161.

---

[16] *See also* 42 C.F.R. § 93.300(b).
[17] *See also* 42 C.F.R. §§ 93.310(g), (h).

56

162.    Professor Gino also noted in her response to the Draft Report that, with respect to allegations that related to studies conducted more than three years ago and that concerned records that were more than three years old (and in some cases, more than 10 years old), under the applicable document retention rules of Harvard and UNC, there had been no departure from accepted research practices for the data to have been discarded or unavailable. (*See* Doc. No. 20-5 at 1031 n. 4 and corresponding text). Under the Interim Policy, there should have been no basis for the investigation committee to infer misconduct from the *absence* of such records. *See* Interim Policy at § (III) (A). (Doc. No. 6-2 at 3).

**RESPONSE TO PARAGRAPH NO. 162:**  Plaintiff's response to the Draft Report cited in Paragraph 162 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 162.

163.    Professor Gino's response to the investigation committee's Draft Report specifically addressed the investigation committee's unwarranted assumptions made based on the MCG reports, which concerned only the examination of sequestered documents located on Professor Gino's hard drive. (Doc. No. 20-5 at 1029-1030, 1032-33, Professor Gino outlined in detail why the MCG reports were, at best, inconclusive, as even MCG acknowledged in the reports that they were not clearly based on the relevant records, (i.e., the original raw data and research records for the studies at issue). (Doc. No. 20-5 at 1029-1030, 1031.").

**RESPONSE TO PARAGRAPH NO. 163:**  Plaintiff's response to the Draft Report cited in Paragraph 163 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 163.

164.    Similarly, Professor Gino explained that, for another study at issue, the data had been collected *on paper*, not, as the investigation committee assumed based on an MCG forensic

report, in a computer spreadsheet. (*Id.* at 1029-31, 1033-34). To presume an "anomaly" based on participant IDs being out of sort was unwarranted because the data collected on paper had been entered into a spreadsheet in no particular order (i.e., unsorted). (*See id.* at 1031)

**RESPONSE TO PARAGRAPH NO. 164:** Plaintiff's response to the Draft Report cited in Paragraph 164 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 164.

165.    Though the investigation committee could not possibly have digested Professor Gino's comprehensive response to the Draft Report in just two weeks, it issued its final investigative report ("Final Report") on March 7, 2023. (*See id.* at 2-42).

**RESPONSE TO PARAGRAPH NO. 165:** Harvard admits that the Final Report was completed on March 7, 2023. Harvard denies the remaining allegations in Paragraph 165.

### vi.    The Final Report: A Biased and Deficient Foregone Conclusion.

166.    The Final Report, which was substantially unchanged from the investigation committee's Draft Report, evidenced that the committee had reached a foregone conclusion.

**RESPONSE TO PARAGRAPH NO. 166:** Harvard denies the allegations in Paragraph 166.

167.    That the committee members had already made up their minds is also evidenced by the speedy turnaround of such an important document, as well as the minimal changes from the Draft Report. While acknowledging receipt of Professor Gino's response, in its Final Report, the investigation committee unreasonably dismissed the evidence she presented as *"not germane"* and *"irrelevant."* (Doc. No. 20-5 at 10, 11 n. 7).

**RESPONSE TO PARAGRAPH NO. 167:** Harvard denies the allegations in Paragraph 167.

168.    As in its Draft Report, the investigation committee discounted or ignored evidence directly relevant to the question of *intent,* and stated:

> We acknowledge, and we took seriously in our decision-making, ***statements by all witnesses that they never doubted the integrity of the data in the study or studies in question.*** One witness who knew Professor Gino well said they never doubted her integrity in any way. In addition, several exhibits appended by Professor Gino to her Response (Exhibit 29) contained messages to her from co-authors, colleagues, and former doctoral students expressing their admiration for her research rigor and integrity. ***The witnesses we interviewed also said that they had no evidence that Professor Gino had ever pressured colleagues, doctoral students, post-docs, or research associates, including themselves, to produce particular results in a study, or that Professor Gino had created a negative atmosphere in her lab.*** Moreover, some witnesses spontaneously said that they had worked on multiple studies with Professor Gino that were never published because the studies didn't work out.

(Emphasis added.) (Doc. No. 20-5 at 10).

**RESPONSE TO PARAGRAPH NO. 168:**  The Investigation Committee's final report ("Final Report") cited in Paragraph 168 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 168.

169.    Incredibly, despite that the burden was *on the committee* to prove intentional misconduct by a preponderance of the evidence, the draft report indicated that the investigation committee found that witnesses' statements concerning the "integrity of the data" or the integrity of Professor Gino were "not germane," writing:

> ***We carefully considered all these statements, but did not find them germane to the specific allegations before us or a plausible explanation of data anomalies or discrepancies.***

(*Id.* at 9).

**RESPONSE TO PARAGRAPH NO. 169:**  The Draft Report cited in Paragraph 169 is a written document that speaks for itself, and Harvard denies any characterization of this document.

170.    Under the Interim Policy, evidence of Professor Gino's *intent* (or lack of intent) to fabricate or falsify data was directly relevant to a finding of research misconduct, as such finding requires proof, by a preponderance of the evidence, of *knowing, intentional, or reckless conduct.* Interim Policy § (III)(A) (Doc. No. 6-2 at 3).

**RESPONSE TO PARAGRAPH NO. 170:**  The Interim Policy cited in Paragraph 170 is a written document that speaks for itself, and Harvard denies any characterization of this document.

171.    In addition to ignoring evidence directly relevant to the issue of *intent,* the investigation committee ignored evidence relevant to the specific allegations that provided reasonable and innocent explanations for the perceived anomalies. (*See* Doc. No. 20-5 at 1024-1060).

**RESPONSE TO PARAGRAPH NO. 171:**  Harvard denies the allegations in Paragraph 171.

172.    The committee failed to apply the Interim Policy's burden of proof and shifted the burden of proof onto Professor Gino *to disprove* research misconduct. (*See* Doc. No. 20-5 at 1-42). That is not the appropriate standard of proof under the Interim Policy. (*See* Doc. No. 6-2 at 2-3).

**RESPONSE TO PARAGRAPH NO. 172:**  Harvard denies the allegations in Paragraph 172.

173.    Under the Interim Policy, the definition of research misconduct specifically excludes "honest error," and the burden of proving *research* misconduct remained at all times on Harvard. *See* Interim Policy at (III)(A) and App. 1 (Doc. No. 6-2 at 2-3, 14); *see also* 42 C.F.R. § 93.106; *see* 70 FR 28370-01 (discussing evidentiary standard under 42 C.F.R. 93.106); *see, e.g., Martin v. Ohio,* 480 U.S. 228, 233 (1987).

**RESPONSE TO PARAGRAPH NO. 173:** The Interim Policy cited in Paragraph 173 is a written document that speaks for itself, and Harvard denies any characterization of this document. The remaining allegations in Paragraph 173 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 173.

174.    Though the Interim Policy required the investigation committee to give due consideration to admissible, credible evidence of honest error or difference of opinion presented by Professor Gino, it ignored credible evidence of honest error, holding her to a higher standard of proof than required under the Interim Policy.

**RESPONSE TO PARAGRAPH NO. 174:** The Interim Policy cited in Paragraph 174 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegation in Paragraph 174

175.    The Investigation Committee reached this finding despite that (1) there was no evidence that Professor Gino had collected or maintained the data in question; (2) all of the evidence, including the witness testimony, established that Professor Gino and her lab always demonstrated the highest level of integrity; and (3) Professor Gino had always maintained her innocence.

**RESPONSE TO PARAGRAPH NO. 175:** Harvard denies the allegations in Paragraph 175.

176.    On March 9, 2023, Professor Gino's counsel, Mr. Thaler, wrote a letter to Harvard's General Counsel, requesting that she please forward it to Dean Datar, and highlighting the deficiencies of the investigation committee's decision and its many failures to adhere to the Interim Policy requirements, including the following:

(1)    The investigation committee failed to prove, by a preponderance of the evidence, "research misconduct" within the meaning of the policy. Under

the Interim Policy, to make a finding of research misconduct required the investigation committee "to identify whether the research misconduct was falsification, fabrication, or plagiarism," and whether Professor Gino had committed such misconduct with the requisite *intent*: *"intentionally, knowingly, or recklessly."* The burden was *on the committee* to establish any such finding by "a *preponderance of the evidence*." The investigation committee's conclusory findings were based on *mere speculation*, and. in the *absence of supporting witness statements and evidence,* the committee determined that Plaintiff was responsible for misconduct.[18]

(2) <u>The investigation committee failed to apply the Interim Policy's standard of proof</u>. The investigation committee erroneously concluded that Professor Gino was responsible because she had failed to *disprove* misconduct by a preponderance of the evidence.

(3) <u>The investigation committee had irrationally ignored relevant evidence</u>. The investigation committee had given no credence to credible witness testimony concerning Plaintiff's known integrity and style of working, all of which was relevant to the issue of intent. *Not a single witness* reportedly mentioned any concern about Professor Gino's data practices or integrity. Quite the opposite, witnesses stated that Professor Gino had *not* pressured them to produce certain results and had even abandoned projects when appropriate.

(4) <u>The investigation committee concluded Professor Gino was responsible without making any finding of *specific intent* to falsify or fabricate data</u>. The Interim Policy required the investigation committee to issue a written decision in which it states a finding of *specific intent* for each allegation, but the investigation committee concluded that Professor Gino was responsible without specifying *any particular intent*.

(5) <u>The committee recommended overly punitive sanctions in disregard of applicable policy considerations</u>. Under the Interim Policy', misconduct proceedings, (as also stated in the PHS Regulations on which the Interim Policy was based), are intended to be *rehabilitative* in nature. In disregard of this policy, the investigation committee had recommended extremely punitive sanctions, that appeared untethered to any policy factor.

**RESPONSE TO PARAGRAPH NO. 176:** Harvard admits the allegation in Paragraph

176 that Paul Thaler sent a letter to Harvard's General Counsel on March 9, 2023. The remaining

---

[18] *See also* 42 CFR § 93.103, federal regulations expressly incorporated in the Interim Policy.

allegations in Paragraph 176 relate to a letter that speaks for itself, and Harvard denies any characterization of this document.

177.     Harvard's General Counsel advised Professor Gino that her advisor's letter would not be forwarded to Dean Datar. Professor Gino's advisor's letter is also absent from the committee's "Final Report." (Doc. No. 20-5).

**RESPONSE TO PARAGRAPH NO. 177:**  The letter cited in Paragraph 177 is a written document that speaks for itself, and Harvard denies any characterization of this letter. Harvard admits the remaining allegation in Paragraph 177.

178.     In a letter dated April 3, 2023, Dean Pisano appealed to Dean Datar. Like Mr. Thaler, Dean Pisano tried to explain to Dean Datar that, under the Interim Policy, the investigation committee had failed to prove by a preponderance of the evidence that Professor Gino had engaged in intentional, knowing, or reckless falsification and/or fabrication of data. Dean Pisano emphasized that the committee had misapplied the standard of proof when it simply concluded that Professor Gino was guilty on the basis that she had not *disproved* the allegations.

**RESPONSE TO PARAGRAPH NO. 178:**  The letter cited in Paragraph 178 is a written document that speaks for itself, and Harvard denies any characterization of this document.

179.     Dean Pisano urged Dean Datar to read the letter sent by Professor Gino's counsel, Mr. Thaler, advising him that Mr. Thaler had handled many cases at Harvard on behalf of other faculty members and was *"simply appalled"* by both the investigation committee's decision and its proposed sanctions against Professor Gino.

**RESPONSE TO PARAGRAPH NO. 179:**  The letter cited in Paragraph 179 is a document that speaks for itself, and Harvard denies any characterization of this document.

180.    Dean Pisano also emphasized that the investigation committee had appeared biased against Professor Gino, as indicated by the RIO's comments to her in December, which suggested to him the investigation committee had reached "a foregone conclusion."

**RESPONSE TO PARAGRAPH NO. 180:** The letter cited in Paragraph 180 is a document that speaks for itself, and Harvard denies any characterization of this document.

181.    On April 14, 2023, Dean Pisano met with Dean Datar in the presence of Dean Cunningham. Dean Pisano implored Dean Datar to realize that the "process was broken." Dean Pisano again emphasized that the investigation committee had failed to carry its burden of proof under the Interim Policy, and that it was required under the Interim Policy to prove, by a preponderance of the evidence, that Professor Gino possessed the requisite intent to fabricate or falsify data, and to address allegations fairly and objectively. *See* Interim Policy at § (III) (A).[19] (Doc. No. 6-2 at 2-3).

**RESPONSE TO PARAGRAPH NO. 181:**  Harvard admits the allegation in Paragraph 181 that Dean Datar and Dean Cunningham met with Dean Gary Pisano on April 14, 2023 and that Dean Pisano discussed the Investigation Committee's application of the burden of proof. Harvard denies the remaining allegations in Paragraph 181.

182.    Dean Pisano, who had dispassionately served on FRB panels in HBS tenure and misconduct proceedings, told Dean Datar that the investigation committee appeared to have simply ignored the evidence in Professor Gino's rebuttal to the Draft Report.

**RESPONSE TO PARAGRAPH NO. 182:** Harvard admits the allegation in Paragraph 182 that Dean Datar met with Dean Gary Pisano and that Dean Pisano discussed Professor Gino's

---

[19] *See also* 42 C.F.R. § 93.300(b).

rebuttal to the Draft Report. Harvard denies the allegation in Paragraph 182 that Dean Gary Pisano has served on FRB panels at HBS. Harvard denies the remaining allegations in Paragraph 182.

183.     Dean Datar ignored Dean Pisano's entreaties to give Professor Gino a fair and just decision, in line with the Interim Policy requirements, and his pleas to make him understand that the investigation committee had found no evidence of misconduct under the Interim Policy and that, even if the evidence did support a finding of misconduct, which it did *not,* the committee's recommended sanctions were grossly disproportionate and out of step with sanctions in other cases, even in cases where very serious misconduct occurred.

**RESPONSE TO PARAGRAPH NO. 183:** Harvard denies the allegations in Paragraph 183.

184.     Dean Pisano urged Dean Datar to speak with Professor Gino if he had any specific questions about evidence, but Dean Datar showed no interest in hearing from Professor Gino. Dean Datar told Dean Pisano that he was meeting with him only out of "respect" for him.

**RESPONSE TO PARAGRAPH NO. 184:** Harvard denies the allegations in Paragraph 184.

**C.     Despite Knowledge that the Findings and Conclusions of the Investigation Committee were Unproved, Dean Datar Rendered a Decision Imposing Harsh Sanctions against Dr. Gino's Employment, in Violation of the Interim Policy.**

185.     Around the same time that Dean Pisano was expressing his concerns to Dean Datar concerning the investigation committee's work, Dean Datar received information from the RIO that confirmed there was good reason to question the validity of its report. Specifically, the RIO advised Dean Datar that there were relevant files in Harvard's possession that had been overlooked in the investigation and never analyzed or considered by the investigation committee.

**RESPONSE TO PARAGRAPH NO. 185:** Harvard admits that in April 2023, at Dean Datar's request, the RIO conducted searches of Plaintiff's sequestered files and located additional

datasets that Plaintiff had not identified to the investigation committee. Harvard denies the remaining allegations in Paragraph 185.

186.    Despite being aware of the overlooked files, and before any analysis had been done to determine how they might undercut the investigation committee's report, Dean Datar informed the RIO on April 19, 2023 that he had accepted all of its findings.

**RESPONSE TO PARAGRAPH NO. 186:** Harvard admits that Dean Datar informed the RIO on April 19, 2023 that he had accepted the Investigation Committee's findings. Harvard denies the remaining allegations in Paragraph 186.

187.    On June 13, 2023, Dean Datar issued a written decision that formally adopted in full the unreasonable findings and conclusions of the investigative panel and its overly-punitive sanctions that were not aligned with the Interim Policy's stated considerations and purpose and out of step as compared to other misconduct cases at HBS and Harvard.

**RESPONSE TO PARAGRAPH NO. 187:**  Harvard admits that on June 13, 2023, Dean Datar informed Plaintiff of his adoption of the Investigation Committee's findings and of the sanctions he had decided to impose. Harvard denies the remaining allegations in Paragraph 187.

188.    At 5:30 p.m., Professor Gino met with Dean Datar and Dean Cunningham in Dean Datar's office. Dean Datar told Professor Gino that she would not have the opportunity to say anything, and that he simply wanted the process to be "humane" so had decided to meet with her in person to deliver the news of his decision. Dean Datar proceeded to read, word for word, his decision letter, dated June 13, 2023.

**RESPONSE TO PARAGRAPH NO. 188:** Harvard admits the allegation in Paragraph 188 that Dean Datar met with Plaintiff on June 13, 2022, and read his decision letter to Plaintiff. Harvard denies the remaining allegations in Paragraph 188.

189.    Dean Datar informed Plaintiff that she was being placed on unpaid administrative leave "for a period of two years," and that she would receive no salary or benefits after July 31, 2023. Dean Datar immediately revoked Plaintiff's named professorship the Tandon Family Professor of Business. Datar informed Plaintiff that he was requesting to Harvard's President that Harvard institute "Third Statute proceedings" to revoke her tenured professorial appointment at Harvard.

**RESPONSE TO PARAGRAPH NO. 189:**  Harvard admits the allegations in Paragraph 189.

190.    Plaintiff was further informed that, for the period of her administrative leave, and effective immediately: (a) she was not permitted to conduct research, to teach, to mentor or advise; (b) she would receive no administrative or research support; (c) she was barred from campus, effectively immediately; and (d) she was prohibited from publishing or disseminating research via HBS platforms.

**RESPONSE TO PARAGRAPH NO. 190:**  Harvard admits the allegation in Paragraph 190.

191.    Additionally, Dean Datar's June 13, 2023 letter stated that:

> *It is my intention to continue to handle this matter as confidentially as circumstances allow. Apart from the communications to journals and co-authors you can expect that I will share with your Unit and relevant faculty and staff leadership that you have been placed on administrative leave as a consequence of research misconduct findings such that you will be unavailable to engage in research, teaching, and mentoring or advising. Communications will also be necessary with students whose work you have been supervising.*

(Emphasis added.)

**RESPONSE TO PARAGRAPH NO. 191:**  The letter cited in Paragraph 191 is a document that speaks for itself, and Harvard denies any characterization of this document.

192.    When he finished the letter and Professor Gino began to weep, Dean Datar told her, "you are a capable, smart woman. I am sure you'll find other opportunities."

**RESPONSE TO PARAGRAPH NO. 192:** Harvard denies the allegations in Paragraph 192.

193.    Dean Datar's remarks that he would "share" "research misconduct findings" was inconsistent with the confidentiality provisions of the Interim Policy and Harvard's other employment policies, as well as HBS and Harvard's normal practices. Misconduct proceedings and findings under the FRB are always confidential, including proceedings that were heard under the 2013 Research Integrity Policy. Dean Datar told Plaintiff that he was being "nice" to her by waiting until the end of July 2023, to place her on unpaid leave, rather than doing so immediately.

**RESPONSE TO PARAGRAPH NO. 193:** Harvard denies the allegations in Paragraph 193.

194.    Later that same day, Dean Datar's office contacted a female professor and Plaintiff's colleague and asked her to "counsel out" Plaintiff, meaning to ask Plaintiff to resign based on anonymous allegations of research misconduct. This female colleague was told by Dean Cunningham that, if Plaintiff agreed to leave HBS, "this will all go away; we won't say anything to anyone."

**RESPONSE TO PARAGRAPH NO. 194:** Harvard denies the allegations in Paragraph 194.

195.    This was not the first time that Dean Datar had tried to "counsel out" female faculty. Dean Datar had used "counseling out" in other personnel matters when the evidence did not support his desired objective, such as attempting to "counsel out" a qualified senior female

professor to discourage her from applying for tenure and "counseling out" female junior professors to persuade them to resign for unsubstantiated disciplinary matters.

**RESPONSE TO PARAGRAPH NO. 195:** Harvard denies the allegations in Paragraph 195.

196. When the female colleague met with Plaintiff to "counsel her out," Plaintiff told the female colleague that she did not want to resign because she did not commit research misconduct.

**RESPONSE TO PARAGRAPH NO. 196:** Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 196 and on that basis denies them.

197. Plaintiff's female colleague was surprised to learn from Professor Gino about the new Interim Policy that HBS created for her and applied to her case retroactively. As an HBS tenured professor for many years, Plaintiff's colleague had never known HBS to have previously created a new policy for a case, and then to apply it retroactively to that case.

**RESPONSE TO PARAGRAPH NO. 197:** Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 197 and on that basis denies them.

198. Plaintiff's female colleague was also surprised that HBS had not applied its existing Research Integrity policy (*see* Doc. No. 6-2) to Plaintiff's case, a policy with which she was familiar.

**RESPONSE TO PARAGRAPH NO. 198:** Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 198 and on that basis denies them.

199. This same colleague was also surprised that HBS had adopted the new Interim Policy without the customary disclosure to and vetting by HBS faculty, which were HBS's usual practice when promulgating new employment policies.

**RESPONSE TO PARAGRAPH NO. 199:**  Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 199 regarding the colleague's state of mind and on that basis denies them. Further answering, Harvard denies that HBS's employment policies must be vetted by HBS faculty.

### III.    Defendants Ignite a Public Firestorm in Violation of Confidentiality Provisions in Numerous Policies

### A.    Confidentiality Policies

200.    At the bottom of every single page of the 41-page Final Report rendered by the investigation committee appeared the following paragraph:

> **THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.**

(All capitals and bold font in original.)

**RESPONSE TO PARAGRAPH NO. 200:**  The Final Report cited in Paragraph 200 is a written document that speaks for itself, and Harvard denies any characterization of this document.

201.    The Interim Policy, like the PHS Regulations on which it is based, recognizes that accusations of research misconduct are potentially devastating to an academic's professional reputation, and imposes conditions of *strict confidentiality* on allegations of research misconduct. Interim Policy at § (III) (D) (Doc. No. 6-2 at 3-4); *see* 42 C.F.R. § 93.108(a).

**RESPONSE TO PARAGRAPH NO. 201:**  The Interim Policy cited in Paragraph 201 is a written document that speaks for itself, and Harvard denies any characterization of this document.

202.    Under the Interim Policy, Harvard was obligated to limit disclosure of Professor Gino's research misconduct proceeding and the identity of Professor Gino, except on a need-to-

know basis for the purpose of carrying out a fair proceeding, and to the extent required by law. *See* Interim Policy § (III) (D). (Doc. No. 6-2 at 3-4).[20]

**RESPONSE TO PARAGRAPH NO. 202:**  The Interim Policy cited in Paragraph 202 is a written document that speaks for itself, and Harvard denies any characterization of this document.

203.    Consistent with the Interim Policy, the 2013 Research Integrity Policy also emphasizes Harvard's duties of confidentiality to a faculty member accused of misconduct, providing that: "It is important that, whatever process the Dean determines to be appropriate is thorough, fair, and objective," and should take into account "***protecting the rights and reputation[] of the individual accused.***" (Emphasis added) (Doc. No. 6-1 at 1). HBS normally (i.e., as a matter of recent and ongoing practice) utilizes its Faculty Review Board ("FRB") process to review both applications of faculty seeking tenure, as well as allegations of faculty misconduct, including alleged research misconduct.

**RESPONSE TO PARAGRAPH NO. 203:**  The 2013 Policy cited in Paragraph 203 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 203.

204.    As a matter of its normal practice, when HBS convenes an FRB (i.e., a panel of tenured professors) to investigate allegations of faculty misconduct, it follows the FRB procedure set forth in the "Principles and Procedures for Responding to Matters of Faculty Conduct" ("FRB Principles"). Under the FRB Principles, in a case of *research misconduct*, the FRB applies the aforementioned 2013 Research Integrity Policy to evaluate alleged research misconduct by faculty (when no federal funding is involved).

---

[20] *See also* 42 C.F.R. §§ 93.108, 93.300(e).

**RESPONSE TO PARAGRAPH NO. 204:** Harvard denies the allegations in Paragraph 204.

205.    Little is known about specific misconduct cases, including research misconduct cases, that have been handled by HBS under the routine FRB process because, as stated in the FRB Principles, the expectation is that the *"work and activities of the FRB are considered private."* (Emphasis added.)

**RESPONSE TO PARAGRAPH NO. 205:** The allegations in Paragraph 205 are vague and Harvard therefore denies them. Further, the FRB Principles cited in Paragraph 205 is a written document that speaks for itself, and Harvard denies any characterization of this document.

206.    The FRB Principles, like the 2013 Research Integrity Policy and the Interim Policy, sets forth a duty of confidentiality, pursuant to which those involved *"are expected to respect the confidentiality of the process."* (Emphasis added.)

**RESPONSE TO PARAGRAPH NO. 206:** The policies cited in in Paragraph 206 are written documents that speak for themselves, and Harvard denies any characterization of these documents.

207.    According to the FRB Principles, (which generally apply to all types of misconduct proceedings at HBS), while "the FRB procedure aims to provide a framework to allow an appropriate resolution of concerns in a wide variety of circumstances," certain "principles and considerations shall guide those carrying out the FRB procedure," including that:

- *"Every reasonable effort should be made to protect the reputations of the individuals involved."*

- *"Privacy and confidentiality are important considerations; information generally should be shared only on a need-to-know basis, and consistent with what is practicable."*

**RESPONSE TO PARAGRAPH NO. 207:** The FRB Principles cited in Paragraph 207 is a document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 207.

208.    Tenured faculty protected by the provisions of the Discipline Policy are further afforded a reasonable expectation that, whenever discipline is proposed based on a charge of "grave misconduct," the case will be treated confidentially. (Doc. No. 6-12 at 7).

**RESPONSE TO PARAGRAPH NO. 208:** The Discipline Policy cited in Paragraph 208 is a written document that speaks for itself, and Harvard denies any characterization of this document.

209.    That confidentiality serves a critical purpose: to ensure that premature publicity and public scrutiny does not prevent tenured professors from receiving the full panoply of procedural and substantive rights to which they are contractually entitled.

**RESPONSE TO PARAGRAPH NO. 209:** The Discipline Policy referred to in Paragraph 209 is a written document that speaks for itself, and Harvard denies any characterization of this document.

210.    On information and belief, little is known of research misconduct cases that have been handled by other departments within Harvard and even at HBS because these proceedings are maintained in confidence pursuant to Harvard policy and/or applicable laws.

**RESPONSE TO PARAGRAPH NO. 210:** The allegations in Paragraph 210 are vague and Harvard therefore denies them.

211.    In the course of the HBS investigation into allegations of Professor Gino's alleged research misconduct, Harvard and Dean Datar committed serious and significant breaches of confidentiality required by the Interim Policy, and other HBS and Harvard Policies. These

breaches not only needlessly caused tremendous damage to Professor Gino's reputation, professional standing and economic interests, but also made it virtually impossible for her to obtain the fair, impartial and unbiased hearing to which she was entitled as a tenured professor.

**RESPONSE TO PARAGRAPH NO. 211:** Harvard denies the allegations in Paragraph 211.

### (1) Announcement of Professor Gino's administrative leave on the HBS website.

212.    On or about June 13, 2023, HBS announced to the world that it had placed Plaintiff on administrative leave by prominently placing a banner on Professor Gino's faculty page on the HBS website. Next to Professor Gino's photo, following her name and title appear the words: **ADMINISTRATIVE LEAVE.** *See* https://www.hbs.edu/faculty/Pages/profile.aspx?facId=271-812 (All capital letters and bold font in original) (last visited July 26, 2023).

**RESPONSE TO PARAGRAPH NO. 212:** Harvard admits the allegation in Paragraph 212 that HBS added to Plaintiff's faculty web page that she was on administrative leave. Harvard denies the remaining allegations in Paragraph 212.

213.    On June 22, 2023, Dean Datar sent an email to all faculty at the HBS, informing them that, "as reflected on Professor Gino's public Faculty & Research page, she is now on an administrative leave," and connecting her status to the outcome and status of her research misconduct proceeding.

**RESPONSE TO PARAGRAPH NO. 213:** The email cited in Paragraph 213 is a written document that speaks for itself, and Harvard denies any characterization of this document.

214.    On information and belief, HBS never previously sent out an email announcing the placement of a tenured member of the faculty on administrative leave to all members of the HBS

faculty in connection with the status or outcome of the professor's research misconduct proceeding.

**RESPONSE TO PARAGRAPH NO. 214:** Harvard admits the allegations in Paragraph 214. By way of further response, Plaintiff is the first tenured faculty member at HBS to have been found to have committed research misconduct and to have been put on administrative leave because of such finding.

215.    On information and belief, HBS never previously publicly announced the placement of a tenured professor on administrative leave on the faculty member's webpages on the HBS website as an immediate consequence of a research misconduct proceeding.

**RESPONSE TO PARAGRAPH NO. 215:** Harvard admits the allegations in Paragraph 215. By way of further response, Plaintiff is the first tenured faculty member at HBS to have been found to have committed research misconduct and to have been put on administrative leave because of such finding.

216.    In the context of Harvard's numerous breaches of confidentiality, third parties reasonably understood HBS's public announcement of Professor Gino's administrative leave to be connected to and a result of the outcome of her research misconduct proceeding and to mean that Professor Gino had falsified or fabricated data.

**RESPONSE TO PARAGRAPH NO. 216:** Harvard denies the allegation in Paragraph 216 that it breached confidentiality.  Harvard lacks sufficient information to admit or deny the allegation in Paragraph 216 regarding what third parties understood, and on that basis denies this allegation. Harvard denies the remaining allegations in Paragraph 216.

217.    For example, on or about June 17, 2023, an individual using the web-moniker "Headtwerker" posted the following image from Professor Gino's faculty page off the HBR's

website, on Reddit, under the headline: "BREAKING: HBS professor placed on 'administrative leave' following bombshell investigation into fake data":



**RESPONSE TO PARAGRAPH NO. 217:**  The post cited in Paragraph 217 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard further lacks sufficient knowledge to admit or deny the allegations in Paragraph 217 regarding this Reddit Post and on that basis denies the allegations in Paragraph 217.

### (2)  Excessive and factually erroneous retraction notices

218.  On the evening of June 13, 2023, the HBS RIO, on behalf of Harvard, began to aggressively send out retraction notices to scholarly journals that published the papers at issue in

Professor Gino's research misconduct proceeding. (Doc. No 6-3, Doc. No. 6-4, and Doc. No. 6-5).

**RESPONSE TO PARAGRAPH NO. 218:** Harvard admits that Alain Bonacossa sent out retraction notices on June 13, 2023, and denies any characterization of those notices.

219.    The retractions omitted two salient facts: (a) that Harvard never established that Professor Gino was even the person *responsible* for perceived anomalies, (indeed, all of the evidence showed that, in each of the studies at issue, she was *not* the person who handled or collected the data); ***and*** (b) that Harvard *never proved* that Professor Gino had *any intent* to fabricate or falsify data.

**RESPONSE TO PARAGRAPH NO. 219:** The allegations in Paragraph 219 state a legal conclusion to which no response is required. To the extent that a response is required, Harvard denies the allegations in Paragraph 219.

220.    To the extent that Harvard insisted on retractions with which Professor Gino adamantly disagreed, the manner in which Harvard notified journals of retractions of Professor Gino's articles was excessive and inconsistent with its normal practices and policies, including the Interim Policy, which required Harvard to protect Professor Gino's *reputation and right to confidentiality to the extent possible*. Instead, Harvard aggressively and selectively publicized details of its confidential investigation, and unreasonably did not allow Professor Gino, the author of the studies in question, to work out the substance and timing of the retractions directly with the publishers of her articles to avoid unnecessary damage to her professional reputation.

**RESPONSE TO PARAGRAPH NO. 220:** Harvard denies the allegations in Paragraph 220.

221.    To the extent Harvard had concerns about the validity of the data, Harvard went far beyond what was reasonably necessary to correct the research record with retraction notices that falsely, and ***absent any evidence***, conveyed that Plaintiff had intentionally tampered with data to affect the outcome of the study.

**RESPONSE TO PARAGRAPH NO. 221:**  Harvard denies the allegations in Paragraph 221.

### (i)    Retraction Notice to PNAS

222.    On the evening of June 13, 2023, the RIO, Bonacossa, emailed a letter on HBS letterhead, to Dr. May R. Berenbaum, Ph.D., Editor-in-Chief of the journal, *Proceedings of the National Academy of Sciences of the America,* stating that that "[HBS] has reviewed concerns about certain data previously published by Dr. Francesca Gino in [the *2012 PNAS Paper*]. (**"Retraction Notice to PNAS."**) (Doc. No. 6-3). Attached to the Retraction Notice to PNAS as an appendix was a corresponding section of Data Colada's erroneous **December Report** and an MCG forensic report.

**RESPONSE TO PARAGRAPH NO. 222:**  Harvard admits the allegation in Paragraph 222 that Alain Bonacossa sent out a retraction notice to the journal of Proceedings of the National Academy of Sciences of the America on June 13, 2023. The notice is a written document that speaks for itself, and Harvard denies any characterization of this document.  Harvard denies the remaining allegations in Paragraph 222.

223.    In the **Retraction Notice to PNAS**, the RIO referenced so-called "data anomalies" for Study 1 relative to discrepancies between data voluntarily posted by Professor Gino on the Open Sciences Framework ("OSF") in 2020 and a dataset that the RIO described as an "original dataset provided by a research assistant." *See* **Retraction Notice to PNAS**. (Doc. No. 6-3).

**RESPONSE TO PARAGRAPH NO. 223:** The retraction notice cited in Paragraph 223 is a written document that speaks for itself, and Harvard denies any characterization of this document.

224. This statement was demonstrably and verifiably *false*. The data provided to HBS by Professor Gino's former research assistant was in an Excel spreadsheet and was *not* the "original dataset" for Study 1. The "original dataset" for Study 1 had been *collected on paper* in 2010, a fact that was *clearly* documented in the original *2012 PNAS Paper*. (*See* Doc. No. 20-5 at 1029-31, 1033-34).

**RESPONSE TO PARAGRAPH NO. 224:** Harvard denies the allegations in Paragraph 224.

225. The PNAS Retraction notice was obviously excessive because the *2012 PNAS Paper had already been retracted.* Professor Gino and a team of collaborators had retracted the *2012 PNAS Paper* on March 16, 2020, (for reasons having nothing to do with alleged research misconduct by Plaintiff), after the experiment described in the study failed to replicate.

**RESPONSE TO PARAGRAPH NO. 225:** Harvard denies the allegations in Paragraph 225.

### (ii)    Retraction Notice to Psychological Science

226. On June 13, 2023, the RIO emailed a letter on HBS letterhead to Dr. Patricia J. Bauer, Ph.D., Editor of the journal, *Psychological Science,* stating that "[HBS] has reviewed concerns about certain data previously published by Dr. Francesca Gino in [the *2015 Psychological Science Paper*] and [*the 2014 Psychological Science Paper*]" ("Retraction Notice to Psychological Science.") (Doc. No. 6-4). Attached to the Retraction Notice to Psychological Science were "two appendices" with copies of the related portions of Data Colada's false and defamatory December Report and an MCG forensic report. *Id.*

**RESPONSE TO PARAGRAPH NO. 226:**  Harvard admits the allegation in Paragraph 226 that Alain Bonacossa sent out a retraction notice to the journal of Psychological Science on June 13, 2023. The notice is a written document that speaks for itself, and Harvard denies any characterization of this document.  Harvard denies the remaining allegations in Paragraph 226.

227.    With respect to the *2015 Psychological Science Paper*, the RIO referenced so-called "data anomalies" for Study 4 relative to discrepancies in the data for this study, which had been voluntarily posted by Professor Gino on the Open Sciences Framework ("OSF"), and so-called "original data for Study 4 gathered using Qualtrics." (Doc. No. 6-4).

**RESPONSE TO PARAGRAPH NO. 227:**  The retraction notice cited in Paragraph 227 is a written document that speaks for itself, and Harvard denies any characterization of this document.

228.    The investigation committee erroneously concluded that the final OSF data contained new records not found in the Qualtrics studies based on an error made by MCG, which the committee incorporated into its Final Report. (*See* Doc. No. 20-5 at 22).

**RESPONSE TO PARAGRAPH NO. 228:**  Harvard denies the allegations in Paragraph 228.

### (iii)    Retraction Notice to JPSP

229.    On June 14, 2023, the RIO emailed a letter on HBS letterhead to Dr. Dolores Albarracin, Editor of *The Journal of Personality and Social Psychology,* stating that he was writing to inform her that "[HBS] has reviewed concerns about certain data previously published by Dr. Francesca Gino in [the ***2020 JPSP Paper***] (**"Retraction Notice to JPSP"**). (Doc. No. 6-5). Attached as "appendices" to the Retraction Notice to JPSP was a copy of the related portion of Data Colada's erroneous December Report and a portion of a MCG forensic report. *Id.*

**RESPONSE TO PARAGRAPH NO. 229:** Harvard admits the allegation in Paragraph 229 that Alain Bonacossa sent out a retraction notice to the Journal of Personality and Social Psychology on June 13, 2023. The notice is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 229.

230.    In the Retraction Notice to PNAS, the RIO referenced so-called "data anomalies" for Study 3a relative to discrepancies between the data Professor Gino voluntarily posted on the Open Sciences Framework ("OSF") and data that the RIO erroneously referred to as an "original dataset gathered using Qualtrics." (Doc. No. 6-5).

**RESPONSE TO PARAGRAPH NO. 230:** The retraction notice cited in Paragraph 230 is a written document that speaks for itself, and Harvard denies any characterization of this document.

231.    This statement was false. The data in Qualtrics was *not* the original data for Study 3a, as it was verifiably edited. Others besides Plaintiff had been involved in the research process and many of the alleged discrepancies were irrelevant to the study hypotheses.

**RESPONSE TO PARAGRAPH NO. 231:** Harvard denies the allegations in Paragraph 231.

232.    At the top of each retraction notice, that is, the **Retraction Notice to PNAS**, **the Retraction Notice to Psychological Science,** and the **Retraction Notice to JPSP**, was the word: **CONFIDENTIAL.** (All capital letters and bold font in original.) In addition to unnecessarily and excessively publishing false and erroneous statements about Plaintiff's misconduct proceeding to the scientific journals, Harvard also breached its duty of confidentiality by unnecessarily

disclosing information about the retraction notices, themselves, to persons other than the editors of these journals.

**RESPONSE TO PARAGRAPH NO. 232:** The retractions notices cited in Paragraph 232 are written documents that speak for themselves, and Harvard denies any characterization of these documents. Harvard denies the remaining allegations in Paragraph 232.

**(3)    Excessive and Factually Erroneous Retraction Notices to Co-Authors.**

233.    On the evening of June13, 2023, the HBS RIO reached out to Professor Gino's co-authors on the papers at issue in her research misconduct proceeding. The emails the RIO sent told co-authors that "our process has concluded" and that HBS believed that the results of the studies in question are invalid "*due to alteration of data that affects the significance of the findings.*" The RIO attached a formal notification, which included a summary of the data discrepancies, and that informed co-authors that HBS had notified journals' editors with a recommendation that articles be retracted.

**RESPONSE TO PARAGRAPH NO. 233:** Harvard admits that the HBS RIO sent out retraction notices on June 13, 2023. By way of further response, the emails cited in Paragraph 233 are written documents that speak for themselves, and Harvard denies any characterization of these documents.

234.    With these emails, Harvard again publicized the flawed outcome of the HBS investigation, while erroneously suggesting that Harvard had proved Plaintiff had falsified and/or fabricated data, conduct that Harvard had *never proved* under its own policy, omitting details as to the inadequacy of the HBS investigation and the unfair and biased decision, including the investigative committee's reliance on Data Colada's unwarranted inferences of "tampering" and the inconclusive and non-probative information contained in the MCG forensic reports.

**RESPONSE TO PARAGRAPH NO. 234:** The emails cited in Paragraph 234 are written documents that speak for themselves. To the extent a response is required, Harvard denies the allegations in Paragraph 234.

235.    On June 14, 2023, the HBS Senior Associate Dean for Faculty Development and Research, Professor Robin Greenwood, met with Professor Gino's colleagues in her unit, the Negotiation, Organizations & Markets unit ("NOM") at HBS and disclosed to them both the finding of research misconduct and that she had been placed on administrative leave. Doctoral students under Professor Gino's mentorship were also informed by the HBS Doctoral Office staff about the finding of research misconduct and the administrative leave. Dean Datar's office also reached out to other colleagues of Professor Gino to inform them that she had been placed on administrative leave.

**RESPONSE TO PARAGRAPH NO. 235:** Harvard admits the allegation in Paragraph 235 that members of the Negotiation, Organization & Marketing unit at HBS and doctoral students for whom Plaintiff then was serving as a mentor were informed that Plaintiff was on administrative leave. The remaining allegations in Paragraph 235 are vague and Harvard therefore denies them.

236.    As a result of Harvard's breach of confidentiality, on June 15, 2023, after an HBS professor reached out to her, an author contacted the editor of Portfolio, Professor Gino's book publisher, and falsely stated to the editor at Portfolio that Professor Gino had ***"committed fraud"*** and that this would become public very soon. Professor Gino's book (All Hands: How Diverse Teams Win) was scheduled to be published on February 13, 2024, but as a result of the publicity of alleged "fraud," is now delayed until February 5, 2025.

**RESPONSE TO PARAGRAPH NO. 236:** Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 236 that an author contacted Portfolio and the date that *All*

*Hands: How Diverse Teams Win* was scheduled to be published. Harvard denies the remaining allegations in Paragraph 236.

237.    When Professor Gino contacted Dean Cunningham to question whether a faculty member should have contacted her publisher in this manner, Dean Cunningham told Professor Gino, "no," but added that, once the "retraction" notices are out, "everyone" would know her situation. Cunningham's statement suggests that Harvard intended to severely damage Professor Gino's reputation through the issuance of the false and defamatory retraction notices which were not intended to remain confidential.

**RESPONSE TO PARAGRAPH NO. 237:** Harvard denies the allegations in Paragraph 237.

238.    On June 16, 2023, *The Chronicle of Higher Education* published an article, that referenced the allegations against Professor Gino's work in Study 1 in the *2012 PNAS Paper,* and featured the comments from Professor Max Bazerman ("Bazerman"), a colleague of Professor Gino's in the NOM unit at HBS and also a co-author with Professor Gino of the *2012 PNAS Paper*:

> Almost two years ago, a famous study about a clever way to prompt honest behavior was retracted due to an ironic revelation: It relied on fraudulent data. But The Chronicle has learned of yet another twist in the story.
>
> According to one of the authors, Harvard University found that the study contained even more fraudulent data than previously revealed and it's now asking the journal to note this new information. The finding is part of an investigation into a series of papers that Harvard has been conducting for more than a year, the author said.
>
> Details about the reported fabrications are unclear. Francesca Gino, a world-renowned Harvard Business School professor who studies dishonesty, and is a coauthor on the disputed study, is now on administrative leave, according to her faculty page.

*See* "A Weird Research-Misconduct Scandal About Dishonesty Just Got Weirder," by Stephanie Lee, available at: https://www.chronicle.com/article/a-weird-research-misconduct-scandal-about-dishonesty-just-got-weirder?bc_nonce=1qs2zmrz1wl2eepa050jf3&cid=reg_wall_signup.

**RESPONSE TO PARAGRAPH NO. 238:**  The article cited in Paragraph 238 is a written document that speaks for itself, and Harvard denies any characterization of this document.

239.    The reporter at *The Chronicle of Higher Education* noted that HBS had announced on Professor Gino's faculty webpage that she was on "administrative leave," and hinted that the reason was connected to the Harvard "investigation" of "fraudulent data" and suggested that Professor Gino's job and future at Harvard were at risk:

> And as of recently, [Professor Gino's] role at Harvard is unclear. Within the last month, her faculty website was updated to say that she is on administrative leave, according to screenshots captured by the Wayback Machine.

*See id.*

**RESPONSE TO PARAGRAPH NO. 239:**  The article cited in Paragraph 239 speaks for itself, and Harvard denies any characterization of this article.

240.    Harvard had no legitimate reason to disclose to Bazerman or Plaintiff's other HBS colleagues confidential information concerning either Professor Gino's research misconduct proceeding or the pending retractions of her scientific journal articles. Harvard's breach of its duties of confidentiality is evident by Bazerman's comments to the reporter from *The Chronicle of Higher Education,* in which he made unwarranted assumptions concerning "altered data" and the HBS investigation:

> The alleged new problems involve experiment No. 1 — one of the two conducted in a lab with students. Bazerman told The Chronicle that on Tuesday, ***Harvard informed him that it believed fabricated data for this experiment made it invalid***. According to Bazerman, Harvard provided a 14-page document with what he described as 'compelling evidence' of data alterations. Their analysis found that somebody had accessed a database and

added and altered data in the file, he said. "I did not have anything to do with the fabrication," he told The Chronicle.

According to Bazerman, Harvard is recommending to the Proceedings of the National Academy of Sciences that it update the study's retraction notice to reflect its new concerns.

…

Bazerman told The Chronicle that his understanding is that the 2012 paper is one of four papers 'of significant concern' to Harvard. He declined to identify the other three, but said he was not a co-author on them.

*Id.* (Emphasis added.)

**RESPONSE TO PARAGRAPH NO. 240:** The article cited in Paragraph 240 is a document that speaks for itself, and Harvard denies any characterization of this article. Harvard denies the remaining allegations in Paragraph 240.

241.    As a result of Harvard's breach of confidential information concerning Professor Gino's research misconduct proceeding and retraction notice, Bazerman made statements to the media containing rumors and factual inaccuracies, including that, "[Harvard's] analysis found that somebody had accessed a database and added and altered data in the file," statements that were false.

**RESPONSE TO PARAGRAPH NO. 241:**  Harvard denies the allegations in Paragraph 241 that Harvard breached confidentiality. Harvard lacks sufficient knowledge to admit or deny the remaining allegations in Paragraph 241 and on that basis denies them.

242.    Under the Interim Policy, the Complainant of research misconduct "is responsible for making allegations in good faith" and "maintaining confidentiality" Interim Policy § (III) (E). (Doc. No. 6-2 at 4). The complainant "*is not entitled to receive information about the status or outcome of that process." Id.*

**RESPONSE TO PARAGRAPH NO. 242:** The Interim Policy cited in Paragraph 242 is a written document that speaks for itself, and Harvard denies any characterization of this document.

243.    Consequently, between June 17, 2023 and June 30, 2023, Data Colada posted a four-part series of blogs (Doc. Nos. 6-6, 6-7, 6-8, 6-9) that was substantially similar to its erroneous December Report which it submitted to Harvard's investigation committee and that corresponds to the four studies that were the subject of its original allegations to HBS in July 2021.[21]

**RESPONSE TO PARAGRAPH NO. 243:** The blog posts cited in Paragraph 243 are written documents that speak for themselves, and Harvard denies any characterization of these documents. To the extent that a response is required, Harvard denies the allegations in Paragraph 243.

244.    In violation of the Interim Policy, immediately following Dean Datar's June 13, 2023 decision, Harvard disclosed confidential information concerning Professor Gino's research misconduct process with third parties that enabled Data Colada, the purported "complainant," to ascertain the status and outcome of Harvard's process.

**RESPONSE TO PARAGRAPH NO. 244:** Harvard denies the allegations in Paragraph 244.

245.    With Harvard's public announcement of professor Gino's placement on administrative leave, its aggressive, excessive, and false retraction notices, and Harvard's disclosures to third-parties, including HBS faculty within Professor Gino's NOM unit about

---

[21] In a July 18, 2023 webinar titled "Data Fraud and What to do Next: A conversation with Uri Simonsohn and Maurice Schweitzer," Data Colada member Simonsohn clarified that there was "no evidence" that Plaintiff had manipulated data. Simonsohn stated (at min 8:47): "Nobody has unambiguously claimed that this was Francesca Gino . . . The retractions don't say that. They just say data she had and data she posted. Uh, my belief is that she did it, but there's no evidence of that. But, but it doesn't really matter." A recording of the webinar can be found here: https://www.youtube.com/watch?v=OPUKyeetdt8&t=6s It was publicized here: https://iafcm.org/data-fraud/

Professor Gino's research misconduct proceeding, Harvard set in motion the destruction of Professor Gino's well-earned professional reputation and standing in a matter of a few days.

**RESPONSE TO PARAGRAPH NO. 245:** Harvard denies the allegations in Paragraph 245.

246.    Data Colada's Blog Posts 1 through 4, in their many references to Professor Gino's misconduct proceeding and the pending retraction notices, provide further evidence of Harvard's breach of confidentiality. (Doc. Nos. 6-6, 6-7, 6-8, 6-9).

**RESPONSE TO PARAGRAPH NO. 246:** The blog posts cited in Paragraph 246 are written documents that speaks for themselves, and Harvard denies any characterization of these documents. To the extent that a response is required, Harvard denies the allegations in Paragraph 246.

247.    After Data Colada launched its 4-part blog posts series, Professor Gino began to receive venomous, misogynistic hate emails from people all over the world.

**RESPONSE TO PARAGRAPH NO. 247:** Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 247 and on that basis denies them.

248.    On June 22, 2023, Harvard implicitly admitted its failure to protect Professor Gino's confidentiality when Dean Datar's office sent out an official email to all faculty members at HBS (but mysteriously excluding Professor Gino), with the subject "Chronicle of Higher Education piece on Francesca Gino." Dean Datar's email reminded recipients that, *"[w]hile I know you may have questions, confidentiality is an important consideration in these matters*." (Emphasis added.)

**RESPONSE TO PARAGRAPH NO. 248:** Harvard denies the allegation in Paragraph 248 that it breached any confidentiality obligation to Plaintiff. The email cited in Paragraph 248 is a written document that speaks for itself, and Harvard denies any characterization of this document.

249.    Following Data Colada's release of Blog Post 1 on June 17, 2023, headlines from major newspapers throughout the world evidence the immediate and widespread damage to Plaintiff's professional reputation caused by Harvard's breach of confidentiality and Harvard and Data Colada's false and defamatory statements. For example:

- The Guardian: "*Harvard Professor Who Studies Honesty Accused of Falsifying Data In Studies,*" (Maya Yang, June 25, 2023);

- Daily Caller: "*Harvard Honesty Expert Accused of Academic Dishonesty,*" (Gretchen Clayson, June 25, 2023);

- FOX: "'*Leading Scholar' at Harvard Accused of Fabricating Findings In Famous Study on Honesty,*" (Gabriel Hays, June 25, 2023);

- The Washington Post: "*Harvard Professor Who Researches Honesty Accused of Falsifying Data,*" (Matt Delaney, June 25, 2023).

**RESPONSE TO PARAGRAPH NO. 249:** The documents cited in Paragraph 249 are written documents that speak for themselves, and Harvard denies any characterization of these documents. Harvard denies the allegation in Paragraph 249 that it breached any confidentiality obligation to Plaintiff.

250.    Within days of Harvard's breach of confidentiality and Data Colada's ensuing blog posts, false allegations of research misconduct reverberated on the internet, and were repeated in multiple platforms and contexts, including, as but one example, in the following reviews on Amazon.com for Plaintiff's latest book, *Rebel* Talent, which reflect Data Colada's terminology ("fraud") and Harvard's public announcement of her administrative leave:

 Kurt Vonnegut

★☆☆☆☆ **Author fabricated results**

Reviewed in the United States on July 17, 2023

This behavioral scientist has focused on dishonesty while manipulating her results. This should be removed, or at least refiled under fiction.

2 people found this helpful

| Helpful | | Report |
| --- | --- | --- |

 OddPrimes

★☆☆☆☆ **The author is on leave from Harvard for committing fraud**

Reviewed in the United States on June 28, 2023

Ironically (or maybe not!), Gino has been credibly accused of fabricating data for several of her studies. so far, Harvard has placed her on administrative leave and requested that journals retract four of her papers.

11 people found this helpful

| Helpful | | Report |
| --- | --- | --- |

 Jack A. Johnson

★☆☆☆☆ **Fraud**

Reviewed in the United States on June 27, 2023

It's worth noting that i was once a huge fan (since hearing her on the Hidden Brain podcast, i've been wearing eye-catching footwear to the lectures i give) and am also a Harvard alum. As such, i was incredibly disappointed to learn that several independent groups determined that Professor Gino had committed academic fraud. While the final word is not yet out and people are supposed to be presumed innocent until proven guilty, several signs point to the allegations very likely being true: at least one of her most well known original papers in PNAS has been retracted; several independent investigations identified fraud in several works over a decade; and Dr. Gino's statement in response was equivocal to me, rather than being the indignant response of an innocent person. I guess that in the drive to achieve accolades as a young person under the age of 40, she took several shortcuts.

10 people found this helpful

| Helpful | Report |
| --- | --- |

 Coe

★☆☆☆☆ **The author is accused of fabricating data on multiple papers**

Reviewed in the United States on June 23, 2023

Recent news adds a fresh dimension to the glowing blurb: "Francesca Gino is one of the world's most productive and creative social scientists". Alas, she's bit TOO creative... Gino is on administrative leave from Harvard amid allegations that research she co-authored contains fabricated data. Many, many papers. Many, many co-authors involved. A big, hot, mess.

13 people found this helpful

| Helpful | Report |
| --- | --- |

**RESPONSE TO PARAGRAPH NO. 250:** The reviews cited in Paragraph 250 are written documents that speak for themselves, and Harvard denies any characterization of these documents. Harvard denies the remaining allegations in Paragraph 250.

251.    Within days of Harvard's breach of confidentiality and Data Colada's ensuing blog posts, academic journals started to take steps to remove Professor Gino from their editorial board, without contacting her directly.

**RESPONSE TO PARAGRAPH NO. 251:** Harvard denies the allegation in Paragraph 251 that it breached confidentiality. Harvard lacks sufficient knowledge to admit or deny the remaining allegations in Paragraph 251 and on that basis denies them.

252.    Within days of Harvard's breach of confidentiality and Data Colada's ensuing blog posts, Professor Gino started receiving emails and phone calls from clients with whom she had ongoing or existing contractual relationships, asking for those contracts to be terminated to avoid potential "liability" or "bad press." *All* of those contractual relationships, except for one, were terminated or postponed until Professor Gino's reputation is restored. These clients took these actions because they saw Plaintiff's placement on administrative leave by HBS and Data Colada's ensuing blog posts.

**RESPONSE TO PARAGRAPH NO. 252:** Harvard denies the allegation in Paragraph 252 that it breached confidentiality. Harvard further lacks sufficient knowledge to admit or deny the remaining allegations in Paragraph 252 and on that basis denies them.

**IV.    <u>Selective Enforcement of the Interim Policy.</u>**

253.    Plaintiff has been told by multiple colleagues at Harvard, including Senior Associate Dean Pisano, who has worked for HBS for 35 years, that her treatment throughout the HBS proceeding and the outcome would have been different if she had been a male.

**RESPONSE TO PARAGRAPH NO. 253:**  Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 253 regarding what colleagues have stated to Plaintiff, and on that basis denies them.

254.    On information and belief, neither HBS nor Harvard has ever fired, constructively discharged, or recommended revoking the tenure of ***any*** male full professor whom Harvard has found responsible for research misconduct.

**RESPONSE TO PARAGRAPH NO. 254:**  The allegations in Paragraph 254 state a legal conclusion to which no response is required.  To the extent a response is required, Harvard denies the allegations in Paragraph 254.

255.    On information and belief, neither Harvard nor HBS has ever previously terminated, suspended, placed on unpaid administrative leave for two years, constructively discharged, demoted, removed from duty, or otherwise disciplined ***any*** male tenured professor without the procedural protections provided under the Discipline Policy.

**RESPONSE TO PARAGRAPH NO. 255:**  Harvard denies the allegations in Paragraph 255.

256.    The 2013 Research Integrity Policy that HBS abandoned is similar to the Interim Policy in that it also incorporates the definition of "research misconduct" provided for under the aforementioned PHS Regulations.

**RESPONSE TO PARAGRAPH NO. 256:**  The 2013 Policy and Interim Policy cited in Paragraph 256 are written documents that speak for themselves, and Harvard denies any characterization of these documents.

257.    In addition, under the 2013 Research Integrity Policy, the Dean is authorized to appoint an individual or a committee to investigate the allegation, who will then make a recommendation to the Dean.

**RESPONSE TO PARAGRAPH NO. 257:**  The 2013 Policy cited in Paragraph 257 is a written document that speaks for itself, and Harvard denies any characterization of this document.

258.    However, the 2013 Research Integrity Policy is far less onerous than the Interim Policy in terms of its procedures and overall treatment of a faculty member accused of research misconduct. Unlike the Interim Policy, the existing 2013 Research Integrity Policy expressly "permitted flexibility" in its procedures, and did not subject an employee to the sequestration of documents, did not impose strict deadlines on the completion of any phase of the investigation, and, most significantly, did not impose any particular disciplinary action to be taken against a faculty member's employment or status as a tenured faculty member.

**RESPONSE TO PARAGRAPH NO. 258:**  The 2013 Policy and Interim Policy cited in Paragraph 258 are written documents that speak for themselves, and Harvard denies any characterization of these documents. Harvard denies the remaining allegations in Paragraph 258.

259.    In particular, unlike the Interim Policy, the 2013 Research Integrity Policy:

(1)    placed no limits on the dean's ability to request additional information at any phase in the proceeding;

(2)    imposed no particular structure on either the assessment or investigation of allegations, (whereas the Interim Policy imposed a stringent, 2-tier process (consisting of an inquiry and investigative phase), modeled after the regime set forth in the PHS Regulations);

(3)    placed no limit on the accused's right to seek support from persons who might serve as an advisor(s), from within or outside the university, (whereas the Interim Policy permitted the respondent to "choose up to two personal advisors for support during the process");

(4)    did not require taking custody and sequestration of the respondent's research records and email records;

(5)     placed no time limits on any aspect of the process, whereas the Interim Policy imposed strict time limits, including, *inter alia*: (a) ten (10) business days for "a respondent" (i.e., Plaintiff) to comment on the inquiry committee's draft inquiry report; (b) a conclusion of a "final inquiry report" and decision on whether an investigation is warranted within 60 calendar days of initiation of the initial inquiry; (c) 30 days for "the respondent" (i.e., Plaintiff) to submit comments on the investigation committee's draft investigation report; and (d) 120 days for the completion of the investigation.

(6)     did not threaten an accused "respondent" with sanctions, up to termination of employment, for breaching confidentiality, a prohibition that effectively precludes an accused's ability to secure witnesses in their defense.

**RESPONSE TO PARAGRAPH NO. 259:**  The 2013 Policy and Interim Policy cited in Paragraph 259 are written documents that speak for themselves, and Harvard denies any characterization of these documents. Harvard denies the remaining allegations in Paragraph 259.

260.    Importantly, whereas the 2013 Research Integrity Policy authorizes the dean to "decide the matter and take whatever action he or she believes justified," the 2013 Research Integrity Policy does not purport to authorize the dean to impose any specific *adverse employment action* against a tenured Professor, (e.g., to suspend, to demote, or terminate).

**RESPONSE TO PARAGRAPH NO. 260:**  The 2013 Policy cited in Paragraph 260 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 260.

261.    The 2013 Research Integrity Policy does not purport to supersede the terms of Plaintiff's appointment as a tenured Professor, or to supersede Harvard's collective policies and procedures, including the Tenure Policy, the Third Statute, and the Discipline Policy.

**RESPONSE TO PARAGRAPH NO. 261:**  The 2013 Policy cited in Paragraph 261 is a written document that speaks for itself, and Harvard denies any characterization of this document.

262.    In contrast, the Interim Policy purported to authorize the Dean of HBS to take the following adverse employment actions against Plaintiff: "*suspension, leave without pay, salary*

*reduction,"* and *"initiation of steps leading to rank reduction or termination of employment."* (Emphasis added).

**RESPONSE TO PARAGRAPH NO. 262:** The Interim Policy cited in Paragraph 262 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 262.

263.    Like the Interim Policy, the 2013 Research Integrity Policy also emphasized Harvard's duties of confidentiality and fairness to the professor accused of misconduct, providing that: "It is important that, whatever process the Dean determines to be appropriate is thorough, fair, and objective," and should take into account "protecting the rights and reputation[] of the individual accused." In the past, HBS utilized its Faculty Review Board process to review both applications of faculty seeking tenure, as well as allegations of faculty misconduct, including alleged research misconduct. In November 2019, a male junior professor, "John Doe,"[22] employed at HBS who was charged with research misconduct received no sanction by Harvard. Defendants did not subject Mr. Doe to the procedurally onerous Interim Policy but instead used HBS's existing 2013 Research Integrity Policy and Faculty Review Board ("FRB") process to investigate the allegations against him. Consistent with the established 2013 Research Integrity Policy and the FRB Principles, when questions were raised about the research processes performed by a male junior professor at HBS, John Doe, HBS convened an FRB to investigate.

**RESPONSE TO PARAGRAPH NO. 263:** The 2013 Policy cited in Paragraph 263 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 263.

---

[22] A pseudonym is used to avoid unfairly stigmatizing this faculty member.

264.     Because Harvard and HBS have historically safeguarded the confidentiality and reputation of a faculty member accused of misconduct, including research misconduct, Professor Gino only knows about Mr. Doe's proceeding because HBS asked her to serve as a "witness" in her male colleague's FRB process. Plaintiff is aware that, in Mr. Doe's case, the FRB process consisted of the FRB speaking with senior faculty and others at HBS who advised Mr. Doe on his research or writing. All of the questions Plaintiff was asked as a witness during Mr. Doe's research misconduct proceeding before the FRB committee were phrased in a leading way to help establish his innocence.

**RESPONSE TO PARAGRAPH NO. 264:** Harvard denies the allegations in Paragraph 264.

265.     In contrast to its treatment of Plaintiff, HBS protected the confidentiality of Mr. Doe, and it subsequently awarded him tenure.

**RESPONSE TO PARAGRAPH NO. 265:** Harvard denies the allegations in Paragraph 265.

266.     When HBS introduces new policies that affect faculty members, it normally announces them to the entire faculty after vetting them and receiving faculty input.

**RESPONSE TO PARAGRAPH NO. 266:** Harvard denies the allegations in Paragraph 266.

267.     HBS never announced the Interim Policy to faculty, and never vetted it through HBS's customary, collaborative process before applying it to Plaintiff's case.

**RESPONSE TO PARAGRAPH NO. 267:** Harvard denies the allegations in Paragraph 267.

268.    On November 4, 2021, soon after Plaintiff learned of the allegations against her, she asked the RIO, Bonacossa, to share the previous version of the Interim Policy, dated August 2021. Bonacossa indicated that, "[t]he [Interim Policy] was established in August 2021, and that "[he] [did] not have a copy of the previous policy."

**RESPONSE TO PARAGRAPH NO. 268:**  Harvard admits the allegations in Paragraph 268. By way of further response, the 2013 Policy was available on HBS's internal website to which Plaintiff had access.

269.    After Defendants imposed sanctions upon Plaintiff under the Interim Policy, the 2013 Research Integrity Policy was still available for download on HBS's internal website for Faculty Staff and Students and remained the official HBS policy for investigating and evaluating allegations of research misconduct by faculty. On information and belief, HBS did not announce the Interim Policy on its website until after Plaintiff filed this lawsuit.

**RESPONSE TO PARAGRAPH NO. 269:**  Harvard admits the allegation in Paragraph 269 that the 2013 Policy is still available on HBS's internal website. Harvard denies the remaining allegations in Paragraph 269.

270.    In another recent case, another male associate professor employed at HBS who was charged with a blatant and obvious disregard of Harvard's conflict of interest policy received no sanction by Harvard and Dean Datar. It was undisputed that the male professor had written scholarly articles about the development of cryptocurrencies without disclosing in his working papers that he had a financial interest in the product and was working in collaboration with a firm to develop cryptocurrencies.

**RESPONSE TO PARAGRAPH NO. 270:**  Harvard denies the allegations in Paragraph 270.

271.    Despite the obvious conflict of interest and the undisputed and serious violations of HBS standards of conduct and ethics by this male professor, who was only an associate professor, not a full tenured professor like Plaintiff, he received no sanction from HBS. At the conclusion of the FRB process, the FRB concluded that the male professor had demonstrated "poor judgment," and Harvard and Dean Datar took no adverse action against his employment.

**RESPONSE TO PARAGRAPH NO. 271:**  Harvard denies the allegations in Paragraph 271.

A.    **Defendants Subject Female Professors to Disproportionately Harsher Sanctions Than Male Faculty.**

272.    Female faculty members at HBS facing accusations of misconduct have received disproportionately harsher treatment than male faculty members, even when the charges against them are for lesser violations or not substantiated.

**RESPONSE TO PARAGRAPH NO. 272:**  Harvard denies the allegations in Paragraph 272.

273.    In one such case, a female professor, "Jane Roe,"[23] was accused by her colleagues of treating staff and research assistants poorly—a violation of the "colleagueship" standard. Dean Cunningham (who presently functions as Dean Datar's right-hand woman) and previous HBS Dean Nitin Nohria determined the allegations warranted an FRB process. After the FRB report concluded that the issues against Ms. Roe were not sufficiently serious to warrant sanctions, the former HBS dean overruled the report and "counseled her out" (i.e., convinced her to resign).

**RESPONSE TO PARAGRAPH NO. 273:**  Harvard denies the allegations in Paragraph 273.

---

[23] Pseudonyms are used in reference to the former female employees whom Defendants have subjected to discriminatory treatment by forcing them out of their teaching jobs at Harvard to avoid unfairly stigmatizing them.

274.    Even after prominent senior female faculty met with the former HBS dean to protest that this seemed unfair and inconsistent with how similarly situated male faculty had been treated, HBS refused to change its position.

**RESPONSE TO PARAGRAPH NO. 274:**  Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 274 and on that basis denies them.

275.    On information and belief, in the course of handling Jane Roe's case, it was revealed that male professors had treated staff and research assistants poorly (the same violation of colleagueship of which Jane Roe had been accused), but these male professors were not made to go through FRB processes. In other words, the same or similar allegations, when about *male* professors, did not trigger an FRB process.

**RESPONSE TO PARAGRAPH NO. 275:**  Harvard denies the allegations in Paragraph 275.

276.    Defendants have a history of pushing out female faculty members who become the focus of negative media attention. In a second case involving allegations against an HBS female professor's purported violations of the so-called "colleagueship standard," Dean Cunningham and Dean Datar determined that the allegations did not warrant an FRB process. Some time later, when said female professor was preparing materials for promotion to tenure, the accusations resurfaced and this time the accuser threatened to file a lawsuit. Despite that there was no new information, Dean Cunningham and Dean Datar—faced with the negative publicity of a potential lawsuit— determined an FRB was now appropriate.

**RESPONSE TO PARAGRAPH NO. 276:**  Harvard denies the allegations in Paragraph 276.

277.    On information and belief, HBS used the FRB process to intimidate this female professor into leaving HBS and succeeded in "counseling her out" on the basis of unsubstantiated violations of the "colleagueship standard," (and before she could apply for promotion to a tenured position at HBS).

**RESPONSE TO PARAGRAPH NO. 277:**  Harvard denies the allegations in Paragraph 277.

278.    On information and belief, there is no single instance of a male faculty member at HBS being "counseled out" for an alleged violation of the "collegiality" standard.

**RESPONSE TO PARAGRAPH NO. 278:**  The allegations in Paragraph 278 are vague and Harvard therefore denies them. To the extent a response is required, Harvard denies the allegations in Paragraph 278.

279.    In contrast to its treatment of female faculty, Defendants have allowed male faculty at HBS and other schools to remain in their positions and to retain their salary and benefits, even *after* finding them responsible for egregious misconduct, including severe sexual harassment against female junior professors and students.

**RESPONSE TO PARAGRAPH NO. 279:**  Harvard denies the allegations in Paragraph 279.

280.    Defendants have not fired similarly-situated tenured male faculty, or subjected them to unpaid administrative leave, based on alleged research misconduct. *See, e.g.,* "Fire Marc Hauser," available at https://www.thecrimson.com/article/2011/4/27/harvard-faculty-academic-university/ (discussing Faculty of Arts and Sciences' treatment of tenured professor Marc Hauser). On information and belief, Professor Hauser remained a psychology professor at Harvard following a three-year investigation by Harvard that found him responsible for research

misconduct until he chose to resign, without a constructive discharge or the institution of tenure revocation proceedings.

**RESPONSE TO PARAGRAPH NO. 280:**  Harvard admits that Marc Hauser was found responsible for research misconduct and resigned from Harvard. The article cited in Paragraph 280 is a written document that speaks for itself, and Harvard denies any characterization of this document. The remaining allegations in Paragraph 280 state a legal conclusion to which no response is required.

281.    When publicized complaints of plagiarism were made against two male Harvard Law School Professors, Laurence Tribe and Charles Ogletree, although the allegations were apparently undisputed, both remained employees at Harvard and neither was subjected to a procedurally onerous investigation or sanctions like Plaintiff.

**RESPONSE TO PARAGRAPH NO. 281:**  Harvard denies the allegations in Paragraph 281.

282.    And, when a federal court found economics professor Andrei Shleifer liable for conspiracy to defraud the U.S. government while leading a Harvard economic reform program in Russia, Harvard not only refused to fire Shleifer, but it also went so far as to pay $26.5 million to settle a government lawsuit against him.

**RESPONSE TO PARAGRAPH NO. 282:**  Harvard admits that it agreed to pay $26.5 million to settle a civil lawsuit arising out of a project awarded to the former Harvard Institute for International Development.  Harvard denies the remaining allegations in Paragraph 282.

283.    Schleifer currently holds a position as an HBS Visting [sic] Professor.

**RESPONSE TO PARAGRAPH NO. 283:** Harvard admits the allegation in Paragraph 283 that Andrei Shleifer is currently a Visiting Professor of Business Administration at HBS.

284.    Even when Harvard has felt compelled to place male tenured professors on administrative leave amidst highly publicized allegations of sexual misconduct, Harvard has routinely placed such male professors on **paid** administrative leave, and permitted these male professors to return to their teaching and administrative roles, *see, e.g.,* John Comaroff (following two years of administrative leave for sexual harassment and retaliation, returned to classroom);[24] and Jorge Dominguez (after being "barred from administrative responsibilities for three years" for sexual harassment, permitted to hold high-level positions at Harvard),[25] or else permitted such male faculty to quietly retire with salary, reputation, and benefits intact, *see, e.g.,* the case of Gary Horton (sexual misconduct).[26]

**RESPONSE TO PARAGRAPH NO. 284:** The articles cited in Paragraph 284 are written documents that speak for themselves, and Harvard denies any characterization of these documents. To the extent a response is required, Harvard denies the allegations in Paragraph 284.

## V.    Additional Indicia of Discriminatory Animus

285.    Prior to becoming dean of HBS in January of 2021, Dean Datar had been a tenured professor at HBS and had taught in HBS's Accounting & Management Unit since the mid-1990s.

**RESPONSE TO PARAGRAPH NO. 285:** Harvard admits the allegations in Paragraph 285.

---

[24] *See* Meimei Xu*, Following Sexual Harassment Allegations, Comaroff Returns to Teaching at Harvard, Sparking Outrage,* (June 27, 2022), *THE HARVARD CRIMSON,* https://www.thecrimson.com/article/2022/6/24/comaroff-returns-aaas ("After being placed on two years of administrative leave due to allegations of sexual harassment and retaliation, Harvard professor John L. Comaroff will return to the classroom to teach an elective course this fall").

[25] *See* Meimei Xu*, Following Sexual Harassment Allegations, Comaroff Returns to Teaching at Harvard, Sparking Outrage,* (June 27, 2022), *THE HARVARD CRIMSON,* https://www.thecrimson.com/article/2022/6/24/comaroff-returns-aaas ("After being placed on two years of administrative leave due to allegations of sexual harassment and retaliation, Harvard professor John L. Comaroff will return to the classroom to teach an elective course this fall").

[26] *See* Laura Ly, *Harvard professor retires amid allegations of sexual misconduct,* (March 7, 2018), *CNN.COM* ("A female junior professor "filed a complaint with the [Respondent Harvard] in 1983 and Dominguez was found guilty of 'serious misconduct.' Although he was barred from administrative responsibilities for three years, Dominguez was allowed to remain at the university and went on to hold various positions of power, including vice provost for international affairs."), https://www.cnn.com/2018/03/06/us/harvard-professor-retires-amid-allegations-of-sexual-misconduct/index.html.

286.    Accounting & Management is a particularly unwelcome unit for female professors at HBS. On information and belief, in 2019, there had not been a single tenured woman in the Accounting & Management Unit for more than 20 years.

**RESPONSE TO PARAGRAPH NO. 286:**  Harvard denies the allegations in Paragraph 286.

287.    In the fall of 2022, during Appointments Committee meetings in which HBS tenured professors discuss faculty members under consideration for promotion, the tenured professors were reviewing the applications of two female professors for possible promotion within HBS's Accounting & Management Unit. (One female professor was being considered for promotion to Associate Professor and the other one to a position as Full Professor with tenure).

**RESPONSE TO PARAGRAPH NO. 287:**  Harvard admits the allegations in Paragraph 287.

288.    A male professor emeritus who has taught in the Accounting & Management Unit for over 35 years, went outside of the normal review process by drafting two letters in which he subjected each of the two female applicants to harsh criticism for their research.

**RESPONSE TO PARAGRAPH NO. 288:**  Harvard denies the allegations in Paragraph 288.

289.    As a tenured professor, Plaintiff was present in this review process. When she expressed to two of her female colleagues that she was troubled by the male professor's actions and language in the letters, they told her that that this was "always done" to women going through promotion in the Accounting & Management Unit.

**RESPONSE TO PARAGRAPH NO. 289:**  Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 289 and on that basis denies them.

290.    Tenured faculty members participating in the discussion of candidates up for promotion were able to submit their feedback on a card, for review by Dean Datar, together with their vote on the potential promotion. On her card, Plaintiff expressed her concern that two female applicants from the Accounting & Management Unit were subjected to a level of scrutiny to which their similarly situated male colleagues were not subjected in the review process.

**RESPONSE TO PARAGRAPH NO. 290:** Harvard admits that Plaintiff submitted a feedback card. Harvard denies the remaining allegations in Paragraph 290.

291.    On information and belief, Dean Datar took no action to investigate Plaintiff's report or to correct the disparate treatment of women in the Appointments Process.

**RESPONSE TO PARAGRAPH NO. 291:** Harvard denies the allegations in Paragraph 291.

### A.    Datar Cancels Inclusion Course

292.    After placing Plaintiff on unpaid administrative leave, Dean Datar cancelled the Inclusion course as a required MBA course offering in the fall of 2023.

**RESPONSE TO PARAGRAPH NO. 292:** Harvard denies the allegations in Paragraph 292.

293.    As noted *supra*, the focus of the Inclusion course, which had been developed by Plaintiff and a female colleague, was the value of diverse leadership in business and creating more inclusive and gender equitable workplaces.

**RESPONSE TO PARAGRAPH NO. 293:** Harvard admits the allegations in Paragraph 293 that the Inclusion course was developed by Plaintiff and another female HBS professor and that the focus of the course was the value of diverse leadership in business. Harvard denies the remaining allegations in Paragraph 293.

294.    On August 1, 2023, Dean Datar's office sent an email to all incoming MBA students announcing the cancellation of the Inclusion course, and blaming Plaintiff's administrative leave for the cancellation.

**RESPONSE TO PARAGRAPH NO. 294:**  Harvard denies the allegations in Paragraph 294.

295.    Faculty other than Plaintiff had already committed to teaching the Inclusion course in the fall of 2023. If Dean Datar had wanted to continue to offer Inclusion as a required offering, he could have done so, regardless that Plaintiff was unavailable.

**RESPONSE TO PARAGRAPH NO. 295:**  Harvard denies the allegations in Paragraph 295.

296.    Despite Plaintiff's tremendous achievements and success, her competence, knowledge, and credibility have been subjected to greater scrutiny during her employment by Harvard because of her sex in the male-dominated environment at HBS.

**RESPONSE TO PARAGRAPH NO. 296:**  Harvard denies the allegations in Paragraph 296.

297.    Even after Plaintiff became head of her unit at HBS in 2018, the Negotiations, Organizations, Markets ("NOM") Unit, she was second-guessed and subjected to heightened scrutiny by her male colleagues at HBS.

**RESPONSE TO PARAGRAPH NO. 297:**  Harvard denies the allegations in Paragraph 297.

298.    Plaintiff was the only female Unit Head across the ten different units at HBS.[27]

---

[27] As of July 2023, within the NOM Unit, male tenured professors outnumber female tenured professors 8 to 3.

**RESPONSE TO PARAGRAPH NO. 298:** Harvard denies the allegations in Paragraph 298.

299.    After Harvard appointed Srikant Datar as the new dean of HBS, effective January 1, 2021, Dean Datar, asked one of Plaintiff's male colleagues to take over her role as head of the NOM Unit.

**RESPONSE TO PARAGRAPH NO. 299:** Harvard denies the allegations in Paragraph 299.

300.    Due to institutional mistreatment of women, there has been an exodus of capable, bright female professors from HBS. *See Tackling Gender Inequality at HBS: A Case Study,* Julia E. Debenedictis, (May 4, 2016), *THE HARVARD CRIMSON,* https://www.thecrimson.com/article/2016/5/4/tacking-gender-inequality-at-hbs/.

**RESPONSE TO PARAGRAPH NO. 300:** Harvard denies the allegations in Paragraph 300.

301.    As of July 2023, male tenured professors outnumber female tenured professors 87 to 27.

**RESPONSE TO PARAGRAPH NO. 301:** Harvard denies the allegations in Paragraph 301.

302.    Women have left HBS because they have been unfairly denied tenure on the basis of sex.

**RESPONSE TO PARAGRAPH NO. 302:** Harvard denies the allegations in Paragraph 302.

303.     While the ratio of male to female assistant professors (beginning-level professors) is roughly equal (50/50), due to gender bias and discrimination, HBS has promoted female junior professors to positions as full tenured professors at a fraction of the rate of their male colleagues.

**RESPONSE TO PARAGRAPH NO. 303:** Harvard admits that the male to female assistant professors ratio is approximately equal. Harvard denies the remaining allegations in Paragraph 303.

304.     In the history of HBS, Harvard has hired a total of 107 senior lateral hires (i.e., "full professors" with tenure) to teach at HBS. Only seven (7) of these senior lateral hires have been women.

**RESPONSE TO PARAGRAPH NO. 304:** The allegations in Paragraph 304 are vague and Harvard therefore denies them. To the extent that a response is required, Harvard denies the allegations in Paragraph 304.

305.     Women have also left HBS because they have been pressured to resign from Harvard and to seek positions elsewhere due to disparate discipline and selective enforcement of employment policies.

**RESPONSE TO PARAGRAPH NO. 305:** Harvard denies the allegations in Paragraph 305.

306.     The following tables show the proportion of male and female faculty at all levels at HBS, as of July 2023, and illustrates the significant decline in the proportion of female faculty at the more senior levels:

**OVERALL, across units (total number)**

|  | Assistant | Associate | Full | Senior Lecturer | Professor of Management Practice | Visiting Professor | Emeritus |
|---|---|---|---|---|---|---|---|
| Female | 35 | 14 | 27 | 20 | 1 | 0 | 5 |
| Male | 35 | 21 | 87 | 55 | 11 | 10 | 26 |

**OVERALL, across units (%)**

| | Assistant | Associate | Full | Senior Lecturer | Professor of Management Practice | Visiting Professor | Emeritus |
|---|---|---|---|---|---|---|---|
| **Female** | 50% | 40% | 24% | 27% | 8% | 0% | 16% |
| **Male** | 50% | 60% | 76% | 73% | 92% | 100% | 84% |

**RESPONSE TO PARAGRAPH NO. 306:** Harvard denies the allegations in Paragraph 306.

307.    As of today, the demographics shown in ¶ 296 remain substantially the same.

**RESPONSE TO PARAGRAPH NO. 307:** The allegations in Paragraph 307 are vague and Harvard therefore denies them.

308.    Against this backdrop of institutional gender bias, in July 2021, Defendants received false allegations against Plaintiff for purported research misconduct ("data fraud") and created a new policy to investigate the allegations and applied it retroactively to her case as opposed to relying on its existing policy and procedures.

**RESPONSE TO PARAGRAPH NO. 308:** Harvard denies the allegations in Paragraph 308.

309.    Throughout the so-called investigation process, an investigative committee hand-picked by Dean Datar demonstrated Defendants' bias by disregarding evidence and testimony that could have exculpated Plaintiff of Data Colada's false allegations of "data fraud" and purported "research misconduct."

**RESPONSE TO PARAGRAPH NO. 309:** Harvard denies the allegations in Paragraph 309.

310.    One member of Dean Datar's hand-picked, three-member investigative committee included Robert S. Kaplan ("Kaplan"), a professor emeritus in the Accounting & Management

Unit, the same unit where Dean Datar had himself taught for decades, and who was Dean Datar's mentor in his academic career. In Kaplan's more than 35 years teaching in the Accounting & Management Unit, his HBS unit had not promoted a single woman.

**RESPONSE TO PARAGRAPH NO. 310:**  Harvard admits the allegation in Paragraph 310 that Robert Kaplan and Dean Datar were in the Accounting and Management Unit at HBS and that Robert Kaplan was on the investigation Committee. Harvard denies the remaining allegations in Paragraph 310.

311.    After Defendants erroneously found Plaintiff "responsible" for purported "research misconduct," Defendants imposed disparately harsh and punitive sanctions against her employment, which included, among other things, placing Plaintiff on a two-year unpaid administrative leave, a sanction that, on information and belief, is without precedent at HBS.

**RESPONSE TO PARAGRAPH NO. 311:**  Harvard admits the allegations in Paragraph 311 that Dean Datar imposed two-year unpaid administrative leave on Plaintiff. Harvard denies the remaining allegations in Paragraph 311.

## VI.    Defendants' Continued Campaign of Contractual Breaches and Discriminatory Conduct.

312.    On October 24, 2023, shortly after this action was filed, a newspaper informed Harvard that it intended to publish an article about allegations of research misconduct against then-President Gay.

**RESPONSE TO PARAGRAPH NO. 312:** Harvard admits that on October 24, 2023, a reporter contacted Harvard regarding allegations of plagiarism related to certain of then-President Gay's public works.

313.    The next day, then-President Gay informed Plaintiff that she was convening a hearing committee to formally revoke Plaintiff's tenure under the Third Statute (the "TS Committee").

**RESPONSE TO PARAGRAPH NO. 313:** Harvard admits that on October 25, 2023, then-President Gay informed Plaintiff that, on October 12, 2023, a Screening Committee consisting of three senior tenured HBS faculty members unanimously found that the complaint submitted against Plaintiff under Harvard's Third Statute credibly alleged grave misconduct or neglect of duty, and that then-President Gay was convening a hearing committee to adjudicate the complaint.  Harvard denies any remaining allegations in Paragraph 313.

314.    Around that same time, an HBS Professor asked then-President Gay a question about Professor Gino, to which she responded "We have to make an example of this woman."

**RESPONSE TO PARAGRAPH NO. 314:** Harvard denies the allegations in Paragraph 314.

315.    While Gay would step down as President less than two months later, the TS Committee dutifully continued the work to fulfill Gay's promise.

**RESPONSE TO PARAGRAPH NO. 315:**  Harvard admits that Claudine Gay resigned as President of Harvard on January 2, 2024, and that the Third Statute process continued thereafter for another sixteen months, concluding in May 2025.  Harvard denies the remaining allegations in Paragraph 315.

316.    Pursuant to the Discipline Policy, Professor Gino was contractually entitled to "a full hearing and fair representation before an impartial tribunal." She did not receive any such hearing.

**RESPONSE TO PARAGRAPH NO. 316:** The Discipline Policy cited in Paragraph 316 is a written document that speaks for itself, and Harvard denies any characterization of this document.  Harvard denies the remaining allegations in Paragraph 316.

317.     The TS Committee demonstrated partiality and bias throughout the hearing process. For example, virtually all of Plaintiff's requests for access to relevant documents and information from Harvard were denied without valid reasons and in violation of ¶ 10 of the Hearing Procedures set forth in the Discipline Policy ("Every possible effort will be made to obtain the most reliable evidence available.").

**RESPONSE TO PARAGRAPH NO. 317:** Harvard denies the allegations in Paragraph 317.

318.     Similarly, the TS Committee allowed Harvard to make wholesale changes to the allegations against Plaintiff after she had expended years working to identify the flaws and inconsistencies underlying the investigation committee's report. Specifically, over a year after filing its Complaint, two weeks after Professor Gino had answered that Complaint (having spent almost a year developing her defense to that Complaint), and with just three months left before the TS hearing, the TS Committee allowed Harvard to simply abandon the analysis previously done by MCG and rely instead on a new purported expert who presented hundreds of pages of analysis and advanced a bevy of previously undisclosed and unreviewed claims and assertions against Professor Gino.

**RESPONSE TO PARAGRAPH NO. 318:** Harvard admits that the Hearing Committee allowed both Plaintiff and HBS to introduce evidence from experts who were not involved in the HBS investigation.   By way of further response, Harvard states that Plaintiff submitted approximately 500 pages of new written testimony from herself and three experts, among other

witness testimony, to the Hearing Committee.  Harvard denies the remaining allegations in Paragraph 318.

319.    Additionally, despite Professor Gino being entitled under the Discipline Policy to an adjournment to enable her to investigate and respond to the claims made in the alleged expert's report, the TS Committee wrongfully and unreasonably refused to provide any such opportunity.

**RESPONSE TO PARAGRAPH NO. 319:** The Discipline Policy cited in Paragraph 319 is a written document that speaks for itself, and Harvard denies any characterization of this document.  Harvard denies the remaining allegations in Paragraph 319.

320.    The TS Committee also refused to provide Professor Gino with a meaningful opportunity to examine the witnesses upon whom Harvard relied in support of its allegations. In total, Plaintiff was afforded only six-hours to present testimony—including both direct examination and cross. Given the complexity of information and number of witnesses, this was wholly inadequate, unjustified and unreasonable.

**RESPONSE TO PARAGRAPH NO. 320:** Harvard admits that the Hearing Committee, in consultation with the parties, permitted each party to take up to six hours for live witness examination, in addition to allowing each party to submit hundreds of pages of written witness testimony and exhibits.  Harvard denies the remaining allegations in Paragraph 320.

321.    Most critically, however, the TS Committee's partiality and bias is reflected in its written decision, which grossly mischaracterized the evidence and falsely asserted there was "clear and convincing evidence" that Plaintiff had engaged in "grave misconduct."

**RESPONSE TO PARAGRAPH NO. 321:** The document cited in Paragraph 321 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 321.

322.    For example, the written decision asserted that certain paper receipts, which confirmed the accuracy of the data at issue in Allegation 4b, had not been produced by Professor Gino before the hearing. That was blatantly wrong, however, as the receipts had, in fact, been submitted as an exhibit.

**RESPONSE TO PARAGRAPH NO. 322:** The document cited in Paragraph 322 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard denies the remaining allegations in Paragraph 322.

323.    Indeed, the TS Committee's decision entirely ignored—without any justifiable reason—all of the exculpatory evidence Plaintiff presented at hearing. This included evidence from witnesses who had observed Professor Gino's work first-hand for many years, and uniformly confirmed that she conducts research with the utmost integrity. This also included evidence submitted by the research assistant who conducted the experiment at issue in Allegation 4a and confirmed that the experiment had been conducted in the manner described in Professor Gino's testimony, and therefore had not been falsified as alleged by Harvard.

**RESPONSE TO PARAGRAPH NO. 323:** Harvard denies the allegations in Paragraph 323.

324.    In addition to exhibiting partiality and bias, these same actions by the TS Committee also denied Plaintiff the "full hearing and full representation" to which she was entitled, and denied her the right to meaningfully "confront and cross-examine all witnesses."

**RESPONSE TO PARAGRAPH NO. 324:** Harvard denies the allegations in Paragraph 324.

325.    There was no legitimate non-discriminatory reason for the TS Committee to violate Plaintiff's contractual rights in this manner and, upon information and belief, it did so as a result of discriminatory and/or retaliatory animus.

**RESPONSE TO PARAGRAPH NO. 325:** Harvard denies the allegations in Paragraph 325.

326.    These violations of Plaintiff's contractual rights were also caused in part by Defendants' other prior misconduct. As alleged above, the confluence of Defendants' violations ignited a public firestorm that made it virtually impossible for Plaintiff to obtain a full and fair hearing. Not only were the members of the TS Committee made more partial and biased due to the publicity, but it dissuaded critical witnesses—such as the research assistants who actually handled the data at issue—from cooperating with the hearing process.

**RESPONSE TO PARAGRAPH NO. 326:** Harvard denies the allegations in Paragraph 326.

327.    False testimony provided to the TS Committee by Dean Datar and the RIO also contributed to these breaches. For example, Dean Datar falsely claimed that he had not made a deal with Data Colada, when in fact he had made such a deal and it had precipitated the false and erroneous conclusions set forth in the investigation committee report. Research Integrity Officer Alain Bonacossa also lied to the TS Committee, stating (among other things) that he had "specifically informed Prof. Gino that she could hire her own forensic expert to work on her behalf" during the process conducted under the Interim Policy, when, in fact, he had done the opposite.

**RESPONSE TO PARAGRAPH NO. 327:** Harvard denies the allegations in Paragraph 327.

328.    Harvard also sought to improperly influence the TS Committee by making repeated reference to the fact that Plaintiff had brought this suit against Harvard. Such comments were intended to, and likely had the effect of, fostering retaliatory animus against Plaintiff and causing the TS Committee to act upon it.

**RESPONSE TO PARAGRAPH NO. 328:** Harvard denies the allegations in Paragraph 328.

329.    But even after the TS Proceeding had concluded and its written decision submitted to Harvard, there was still one last chance for "veritas" to prevail. The rebuttal submitted to Harvard on Professor Gino's behalf, a copy of which is attached hereto as Exhibit B, laid out in detail both the procedural flaws and evidentiary weaknesses in TS Committee's report. In short, the written rebuttal laid bare that the evidence could not sustain a finding of "grave misconduct," that Professor Gino had been made the victim of an inherently unjust process, and that this misadventure should conclude with Harvard fully restoring Professor Gino to her position as tenured professor. But Harvard was undeterred, and finished the plan it had devised years before by formally revoking Plaintiff's tenure and terminating her employment.

**RESPONSE TO PARAGRAPH NO. 329:** The document cited in Paragraph 329 is a written document that speaks for itself, and Harvard denies any characterization of this document. Harvard admits that it revoked Plaintiff's tenure and ended her employment after the Third Statute proceedings. Harvard denies the remaining allegation in Paragraph 329.

## VII.    Harvard's Retaliatory Counterclaim

330.    On July 7, 2025, Harvard filed a motion announcing its intention to pursue a counterclaim against Plaintiff for defamation. According to its filing, Harvard now claims that it suffered "reputational harm" because "Professor Gino's statements about HBS using the 'wrong file' during the HBS investigation were lies."

**RESPONSE TO PARAGRAPH NO. 330:** Harvard admits that, on July 7, 2025, it filed a motion for leave to amend its answer to assert a counterclaim against Plaintiff. Harvard's filing cited in Paragraph 330 is a written document that speaks for itself, and Harvard denies any remaining allegations purporting to characterize this document.

331. This claim has no legitimate basis in either law or fact, is simply a further act of retaliation for Plaintiff's filing of this suit, and is intended to annoy, harass and disparage Plaintiff.

**RESPONSE TO PARAGRAPH NO. 331:** Harvard denies the allegations in Paragraph 331.

332. To begin, Professor Gino's statement was not false or defamatory. In fact, Defendants themselves have admitted that they overlooked relevant files in the investigation conducted pursuant to the Interim Policy. Further, the evidence confirms that in many instances Harvard did use the wrong file in its analysis.

**RESPONSE TO PARAGRAPH NO. 332:** Harvard denies the allegations in Paragraph 332.

333. Rather than admit this basic truth, Harvard's filing provides an intentionally misleading account of certain events that unfolded in the final days leading up to the abbreviated hearing conducted by the TS Committee.

**RESPONSE TO PARAGRAPH NO. 333:** Harvard denies the allegations in Paragraph 333.

334. Contrary to Harvard's assertions otherwise, Professor Gino never created any kind of "cover-up file" or otherwise attempted to falsify or manufacture evidence. It was _Harvard_ who attempted to manufacture this false claim on the virtual eve of hearing to distract the TS Committee

from the actual evidence that was being brought forward by Professor Gino—which included the "receipts" referenced in the blogpost that Harvard now claims was false.

**RESPONSE TO PARAGRAPH NO. 334:** Harvard denies the allegations in Paragraph 334.

335.    Indeed, each time that Professor Gino has successfully rebutted one of the false claims made against her, Harvard and its collaborators have employed this same strategy— moving the goalposts by advancing a new, and ultimately meritless, claim of wrongdoing. This is no different.

**RESPONSE TO PARAGRAPH NO. 335:** Harvard denies the allegations in Paragraph 335.

336.    But even [sic] there were a legitimate factual basis for Harvard's defamation claim— which there is not—the lack of a legitimate legal basis is even more obvious. As Harvard's own filing admits that it actually did overlook relevant files in its investigation, the alleged defamatory statements are at least "substantially true" and therefore not actionable. Moreover, the harm that Harvard claims to have suffered, which it describes in wholly conclusory terms as "harm to Harvard's reputation by causing at least some HBS faculty members and members of the pubic to believe that HBS had not been appropriately careful in…its investigation of significant research misconduct allegations against one of its tenured faculty members," falls far short of the actual harm needed to state a valid claim for relief.

**RESPONSE TO PARAGRAPH NO. 336:** The allegations in Paragraph 336 state a legal conclusion to which no response is required.  To the extent a response is required, Harvard denies the allegations.

**COUNT I**
**Violation of Title IX of the Education Amendments of 1972, U.S.C. § 1681 et seq.**
**(As to Defendant President and Fellows of Harvard College)**

337.    Plaintiff repeats and realleges each and every allegation hereinafter above as if fully set forth herein.

**RESPONSE TO PARAGRAPH NO. 337:** Harvard incorporates its responses to Paragraphs 1-336 of the Third Amended Complaint.

338.    Title IX of the Education Amendments of Title IX of the Education Amendments of 1972 20 U.S.C. § 1681 *et. seq.,* provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

**RESPONSE TO PARAGRAPH NO. 338:**  The allegations in Paragraph 338 state a legal conclusion to which no response is required.

339.    Title IX applies to all public and private educational institutions that receive federal funding, including Defendant Harvard.

**RESPONSE TO PARAGRAPH NO. 339:**  The allegations in Paragraph 339 state a legal conclusion to which no response is required.

340.    Title IX may be violated by a school's imposition of discipline where gender is a motivating factor in the decision. *See Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979); *Harrington v. Lesley Univ*., 554 F. Supp. 3d 211, 233 (D. Mass. 2021)

**RESPONSE TO PARAGRAPH NO. 340:**  The allegations in Paragraph 340 state a legal conclusion to which no response is required. To the extent a response is required, Harvard states that the referenced case law and statute speak for themselves, and any interpretation is hereby denied.

341.    Plaintiff is a female.

**RESPONSE TO PARAGRAPH NO. 341:** Harvard admits the allegations in Paragraph 341.

342.    As described in the foregoing paragraphs, when Defendant Harvard abandoned its existing 2013 RI Policy and the procedures outlined in the FRB Principles, and created an onerous policy just for Plaintiff, it subjected Plaintiff to selective enforcement of a Policy, motivated by gender, in violation of Title IX.

**RESPONSE TO PARAGRAPH NO. 342:** The allegations in Paragraph 342 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 342.

343.    Defendant Harvard has never previously applied the Interim Policy to allegations of research misconduct by a male professor at HBS.

**RESPONSE TO PARAGRAPH NO. 343:** Harvard admits the allegation in Paragraph 343 that Plaintiff was the first person accused of research misconduct whose research was investigated under the Interim Policy for research misconduct.

344.    In 2019, Harvard applied its existing 2013 RI Policy and FRB process to investigate allegations of research misconduct made against a junior male faculty member, who was subjected to no punitive sanctions. Unlike the Interim Policy that Harvard created for Plaintiff, the 2013 RI Policy and FRB procedures do not specifically authorize the Dean of Faculty at HBS to terminate the employment of a tenured professor if found responsible for alleged research misconduct.

**RESPONSE TO PARAGRAPH NO. 344:** Harvard denies the allegations in Paragraph 344. By way of further response, the policies cited in Paragraph 344 speak for themselves, and Harvard denies any characterization of these policies.

345.    Defendant Harvard has never placed a similarly situated tenured male professor at HBS on unpaid administrative leave, initiated tenure revocation proceedings, or revoked tenure based on allegations of research misconduct.

**RESPONSE TO PARAGRAPH NO. 345:**  Harvard denies the allegations in Paragraph 345.  By way of further response, Harvard states that there have been no similarly situated tenured male professors at HBS who have been found to have engaged in research misconduct.

346.    Data Colada is known for targeting prominent female behavioral scientists and subjecting their work to unusually high scrutiny.

**RESPONSE TO PARAGRAPH NO. 346:**  Harvard lacks sufficient knowledge to admit or deny the allegations in Paragraph 346 and on that basis denies them.

347.    Harvard and HBS are also known for treating female faculty less favorably than male faculty.

**RESPONSE TO PARAGRAPH NO. 347:**  Harvard denies the allegations in Paragraph 347.

348.    Harvard's gender bias against women was a motivating factor in HBS's decision to subject Plaintiff to an onerous investigation, to impose upon her severe penalties, including unpaid administrative leave for two years, and to ultimately revoke her tenure.

**RESPONSE TO PARAGRAPH NO. 348:**  The allegations in Paragraph 348 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 348.

349.    As a consequence of Defendant Harvard's selective enforcement of its policies, Plaintiff has suffered harms that no similarly situated male tenured professor at HBS has suffered, including, *inter alia,* that Plaintiff: (1) was placed on immediate administrative leave for two years

and stripped of all compensation; (2) had her professorship at HBS revoked; (3) has been removed from all of her teaching, publishing, and research duties, and any opportunity to earn a livelihood; and (4) has had her tenured position at Harvard revoked.

**RESPONSE TO PARAGRAPH NO. 349:**  The allegations in Paragraph 349 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 349.

350.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered damages, including tremendous financial losses, reputational harm, loss of existing contractual relations and prospective economic opportunities and advantage, mental anguish, physical pain and suffering, embarrassment, and severe emotional distress.

**RESPONSE TO PARAGRAPH NO. 350:**  The allegations in Paragraph 350 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 350.

**COUNT II**
**Breach of Contract**
**(As to Defendant President and Fellows of Harvard College)**

351.    Plaintiff repeats and realleges each and every allegation hereinafter above as if fully set forth herein.

**RESPONSE TO PARAGRAPH NO. 351:** Harvard    incorporates    its    responses    to Paragraphs 1-350 of the Third Amended Complaint.

352.    Under Massachusetts law, to state a breach of contract claim the plaintiff must demonstrate that: "(1) there was a valid contract; (2) the defendant breached its duties under the contractual agreement; and (3) the breach caused the plaintiff damage." *NExTT Sols., LLC v. XOS Techs., Inc.*, 113 F. Supp. 3d 450, 456 (D. Mass. 2015).

**RESPONSE TO PARAGRAPH NO. 352:**  The allegations in Paragraph 352 state a legal conclusion to which no response is required. To the extent a response is required, Harvard states that the referenced case law speaks for itself, and any interpretation is hereby denied.

353.    "Tenure involves a long-term academic and financial commitment by a university to an individual, providing faculty with unusually secure positions tantamount to life contracts." *Beitzell v. Jeffrey*, 643 F.2d 870, 875 (1st Cir. 1981).

**RESPONSE TO PARAGRAPH NO. 353:**  The case law referenced in Paragraph 353 speaks for itself, and any interpretation is hereby denied.

354.    At Harvard, pursuant to the Third Statute, a tenured professor enjoys a secure position, tantamount to a lifetime contract.

**RESPONSE TO PARAGRAPH NO. 354:**  The allegations in Paragraph 354 are vague and Harvard therefore denies them.

355.    In accordance with the Third Statute and the Discipline Policy, a tenured professor at Harvard can only be disciplined if it is shown by clear and convincing evidence that they have engaged in "grave misconduct," and only following the procedures set forth in the Discipline Policy.

**RESPONSE TO PARAGRAPH NO. 355:**  The policies referenced in Paragraph 355 are written documents that speak for themselves, and Harvard denies any characterization of these documents. By way of further response, Harvard states that the Third Statute allows for the removal of tenure for grave misconduct or neglect of duty.

356.    Plaintiff's appointment letter, which incorporates the terms of the Tenure Policy, the Third Statute and the Discipline Policy, sets forth the terms of her employment as a full professor with tenure and constitutes an employment contract.

**RESPONSE TO PARAGRAPH NO. 356:** The appointment letter and policies referenced in Paragraph 356 are written documents that speak for themselves, and Harvard denies any characterization of these documents.

357.     Through the conduct alleged above, Defendant Harvard breached Professor Gino's employment contract.

**RESPONSE TO PARAGRAPH NO. 357:** The allegations in Paragraph 357 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 357.

358.     Plaintiff fully complied with all provisions set forth under the terms of her employment and under Harvard's policies and procedures.

**RESPONSE TO PARAGRAPH NO. 358:** Harvard denies the allegations in Paragraph 358.

359.     Without any legal justification, Harvard breached its contract with Professor Gino by failing to follow Harvard's policies and procedures, including, without limitation, by the following:

     a.    Placing Plaintiff on unpaid administrative leave for two years;

     b.    Stripping Plaintiff of her entire compensation, including 100% of her base salary and benefits, as of July 31, 2023;

     c.    Revoking Plaintiff's Tandon Family Professorship;

     d.    Barring Plaintiff from all research, teaching, mentoring, and advising duties;

     e.    Prohibiting Plaintiff from conducting research using Harvard resources to teach, mentor, or advise;

     f.    Cutting Plaintiff off from administrative and research support;

     g.    Barring Plaintiff from campus and her office;

h.     Prohibiting Plaintiff from publishing or disseminating her research through Harvard Business School platforms, and prohibiting her from publishing research on other platforms at Harvard absent approval from Dean Datar;

i.     Disclosing confidential information concerning her misconduct proceeding and findings;

j.     Subjecting Plaintiff to discipline against her employment absent a finding of "grave misconduct," pursuant to the Third Statute, and without a "full hearing and fair representation before an impartial tribunal" and the other procedural protections required under the Discipline Policy;

k.     Subjecting Plaintiff to a disciplinary process in which she was subjected to an unfair and biased investigation, denied the presumption of innocence, and required to bear the burden of disproving the allegations against her; and

l.     Revoking her tenure.

**RESPONSE TO PARAGRAPH NO. 359:** Harvard denies the allegations in Paragraph 359.

360.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered damages, including tremendous financial losses, reputational harm, loss of existing contractual relations and prospective economic opportunities and advantage, mental anguish, physical pain and suffering, embarrassment, and severe emotional distress.

**RESPONSE TO PARAGRAPH NO. 360:** The allegations in Paragraph 360 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 360.

**COUNT III**
**<u>Breach of Implied Covenant of Good Faith and Fair Dealing</u>**
**(As to Defendant President and Fellows of Harvard College)**

361.    Plaintiff repeats and realleges each and every allegation hereinafter above as if fully set forth herein.

**RESPONSE TO PARAGRAPH NO. 361:** Harvard incorporates its responses to Paragraphs 1-360 of the Third Amended Complaint.

362.    "Every contract in Massachusetts is subject, to some extent, to an implied covenant of good faith and fair dealing." *Ayash v. Dana-Farber Cancer Inst.,* 443 Mass. 367, 385 (2005); *Boston. Med. Ctr. Corp. v. Secretary of Executive Office of Health & Human Servs*., 463 Mass. 447, 460 (2012).

**RESPONSE TO PARAGRAPH NO. 362:** The allegations in Paragraph 362 state a legal conclusion to which no response is required. To the extent a response is required, Harvard states that the referenced case law speaks for itself, and any interpretation is hereby denied.

363.    The implied covenant governs "the manner in which existing contractual duties are performed." *Eigerman v. Putnam Investments, Inc*., 450 Mass. 281, 289 (2007).

**RESPONSE TO PARAGRAPH NO. 363:** The allegations in Paragraph 363 state a legal conclusion to which no response is required. To the extent a response is required, Harvard states that the referenced case law speaks for itself, and any interpretation is hereby denied.

364.    Defendant Harvard breached the implied covenant of good faith and fair dealing in the following ways:

    (1)    Abandoning its existing 2013 RI Policy and FRB process and crafting a new employee disciplinary policy, just for Plaintiff, the so-called Interim Policy, that purported to supersede the Third Statute and the Discipline Policy, and to nullify the rules and rights appliable to tenured factual, by authorizing Dean Datar to take disciplinary action against Plaintiff, up to and including the termination of her employment;

    (2)    Seeking to impose upon Plaintiff a so-called two-year unpaid "administrative leave," an adverse employment action that was tantamount to a constructive discharge, but without the procedural protections due Plaintiff under the Discipline Policy;

    (3)    Failing to timely notify Plaintiff of the allegations against her and keeping her in the dark for three months of both the charges against her and

Harvard's impending investigation, as Harvard worked on crafting a new discipline policy, to apply just to her;

(4)    Failing to adhere to the procedural and substantive requirements of the Interim Policy that HBS created, purportedly to investigate and assess allegations of "research misconduct";

(5)    Conducting a bad faith investigation into allegations of research misconduct that were not made in good faith, as required under the Interim Policy;

(6)    Conducting a bad faith investigation into allegations of research misconduct that fell outside the stated "scope" of the Interim Policy and should have been time- barred ;

(7)    Rendering a bad faith decision that concluded that Plaintiff was guilty of charged conduct without meeting its burden of proof, in reliance on inconclusive evidence and unwarranted inferences, in the absence of supporting witness statements and evidence;

(8)    Imposing overly harsh and punitive sanctions that were unreasonable and lacking any connection to Harvard's applicable policies and standards;

(9)    Breaching its duties of confidentiality owed to Plaintiff for **no** legitimate purpose; and

(10)    Exercising contractual discretion in a bad faith manner that was intended to deprive Plaintiff the fruits of her bargain.

**RESPONSE TO PARAGRAPH NO. 364:** The allegations in Paragraph 364 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 364.

365.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered damages, including tremendous financial losses, reputational harm, loss of existing contractual relations and prospective economic opportunities and advantage, mental anguish, physical pain and suffering, embarrassment, and severe emotional distress.

**RESPONSE TO PARAGRAPH NO. 365:**  The allegations in Paragraph 365 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 365.

**COUNT IV**
**Estoppel**
**(As to Defendant President and Fellows of Harvard College)**

366.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

**RESPONSE TO PARAGRAPH NO. 366:** Harvard incorporates its responses to Paragraphs 1-365 of the Third Amended Complaint.

367.     Plaintiff's relationship with Defendant Harvard was governed by her employment contract with Harvard as well as Plaintiff's reasonable expectations based on Harvard's various policies and procedures.

**RESPONSE TO PARAGRAPH NO. 367:**  The allegations in Paragraph 367 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 367.

368.     Under Massachusetts law, a party is liable for estoppel when: (1) a promisor makes a promise which it should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee; (2) the promise did induce action or forbearance; and (3) "injustice can be avoided only by enforcement of the promise." *See Neuhoff v. Marvin Lumber & Cedar Co.*, 370 F.3d 197, 203 (1st Cir. 2004)) (applying Massachusetts law); *Anzalone v. Admin. Office of the Trial Court*, 457 Mass. 647, 661 (2010).

**RESPONSE TO PARAGRAPH NO. 368:**  The allegations in Paragraph 368 state a legal conclusion to which no response is required. To the extent a response is required, Harvard states that the referenced case law speaks for itself, and any interpretation is hereby denied.

369.     Harvard's various policies and procedures constitute unambiguous representations and promises that Harvard should have reasonably expected to induce action or forbearance by Plaintiff and which did induce Plaintiff's actions or forbearance.

**RESPONSE TO PARAGRAPH NO. 369:**  The allegations in Paragraph 369 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 369.

370.    Harvard expected or should have expected Plaintiff to accept its offer of employment and to choose not to pursue employment at other colleges or universities based on its express and implied promises that Harvard would not tolerate, and Plaintiff would not suffer, discrimination, and would not deny Plaintiff basic fairness in its disciplinary proceedings should she be accused of a violation of Harvard policies.

**RESPONSE TO PARAGRAPH NO. 370:**  The allegations in Paragraph 370 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 370.

371.    Plaintiff relied to her detriment on these express and implied promises and representations made by Harvard and was induced by Harvard's promises in making her decision to further her career at Harvard instead of at another school of equal caliber.

**RESPONSE TO PARAGRAPH NO. 371:**  The allegations in Paragraph 371 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 371.

372.    Based on the foregoing, Harvard is liable to Plaintiff based on Estoppel.

**RESPONSE TO PARAGRAPH NO. 372:**  The allegations in Paragraph 372 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 372.

373.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered damages, including tremendous financial losses, reputational harm, loss of existing

contractual relations and prospective economic opportunities and advantage, mental anguish, physical pain and suffering, embarrassment, and severe emotional distress.

**RESPONSE TO PARAGRAPH NO. 373:**  The allegations in Paragraph 373 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 373.

**COUNT V**
**Title VII- Disparate Treatment**
**(As to Defendant President and Fellows of Harvard)**

374.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

**RESPONSE TO PARAGRAPH NO. 374:** Harvard incorporates its responses to Paragraphs 1-373 of the Third Amended Complaint.

375.    Federal law prohibits an employer from taking an adverse employment action based on a person's sex. *See* Title VII, 42 U.S.C. § 2000e *et seq.*.

**RESPONSE TO PARAGRAPH NO. 375:**  The allegations in Paragraph 375 state a legal conclusion to which no response is required.

376.    Plaintiff is a female and a member of a protected class under applicable law.

**RESPONSE TO PARAGRAPH NO. 376:**  Harvard admits the allegation in Paragraph 376 that Plaintiff is female. The remaining allegations in Paragraph 376 state a legal conclusion to which no response is required.

377.    Plaintiff suffered multiple adverse employment actions when Defendant Harvard (1) placed Plaintiff on an unpaid administrative leave and stripped her of all compensation and benefits; (2) revoked her professorship at HBS, (3) stripped Plaintiff of all of her teaching, publishing, and research duties and any opportunities to earn a livelihood, (4) made her tenured position at Harvard the subject of revocation proceedings, and (5) revoked her tenure.

**RESPONSE TO PARAGRAPH NO. 377:** The allegations in Paragraph 377 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 377.

378.    Unlawful discrimination may be inferred where Defendants repeatedly deviated from its employment policies, created a more procedurally onerous new policy just for her, and treated similarly situated male employees more favorably.

**RESPONSE TO PARAGRAPH NO. 378:** The allegations in Paragraph 378 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 378.

379.    Plaintiff's sex and gender were a motivating factor for the aforementioned adverse employment actions.

**RESPONSE TO PARAGRAPH NO. 379:** The allegations in Paragraph 379 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 379.

380.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered damages, including tremendous financial losses, reputational harm, loss of existing contractual relations and prospective economic opportunities and advantage, mental anguish, physical pain and suffering, embarrassment, and severe emotional distress.

**RESPONSE TO PARAGRAPH NO. 380:** The allegations in Paragraph 380 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 380.

**COUNT VI**
**Fair Employment Practices Act, Mass Gen. Laws Ch. 151B**
**<u>Disparate Treatment Based on Sex</u>**
**(As to Defendants President and Fellows of Harvard and Srikant Datar)**

381.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

**RESPONSE TO PARAGRAPH NO. 381:** Harvard incorporates its responses to Paragraphs 1-380 of the Third Amended Complaint.

382.    Massachusetts law prohibits an employer from taking an adverse employment action based on a person's sex. FEPA, Mass. Gen. Laws. Ch. 151B.

**RESPONSE TO PARAGRAPH NO. 382:** The allegations in Paragraph 382 state a legal conclusion to which no response is required.

383.    Professor Gino is a "person" as defined in G.L. c. 151B, § 1(1), and the right to work in an environment free from unlawful discrimination is "unquestionably among the rights encompassed by the statute." *See Thomas O'Connor Constructors, Inc. v. Massachusetts Comm'n Against Discrimination*, 72 Mass. App. Ct. 549, 556-57, 893 N.E.2d 80, 86 (2008).

**RESPONSE TO PARAGRAPH NO. 383:** The allegations in Paragraph 383 state a legal conclusion to which no response is required.

384.    Plaintiff suffered multiple adverse employment actions when Defendants (1) placed Plaintiff on unpaid administrative leave and stripped her of all compensation and benefits; (2) revoked her professorship at HBS, (3) stripped Plaintiff of all of her teaching, publishing, and research duties and any opportunities to earn a livelihood, (4) made her tenured position at Harvard the subject of revocation proceedings, and (5) revoked her tenure.

**RESPONSE TO PARAGRAPH NO. 384:** The allegations in Paragraph 384 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 384.

385.    Unlawful discrimination may be inferred from allegations that include, *inter alia*, the following: (i) Defendants' multiple deviations from its various employment policies; (ii) the creation of a more procedurally onerous research misconduct policy, the Interim Policy, just for Plaintiff; (iii) Defendants' failure to adhere to the provisions set forth in its newly created policy, (including, but not limited to, provisions that barred investigating complaints outside the stated 6-year scope of said policy), and (iv) a pattern and practice of treating similarly situated male and female employees differently, including disparate discipline.

**RESPONSE TO PARAGRAPH NO. 385:**  The allegations in Paragraph 385 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 385.

386.    Plaintiff also alleges unlawful discrimination by her direct supervisor, Dean Datar.

**RESPONSE TO PARAGRAPH NO. 386:**  Harvard admits the allegation in Paragraph 386 that Plaintiff alleges unlawful discrimination against Dean Datar.

387.    Plaintiff has specifically alleged facts that, in their totality, support a reasonable inference that Dean Datar bore discriminatory animus toward Professor Gino's protected class and that the animus was the reason he chose to (i) keep Professor Gino in the dark for three months after receiving Data Colada's false allegations, (ii) chose to further deviate from HBS's existing policies and procedures by creating a new policy by which to investigate the false allegations, and (iii) ultimately chose to impose overly harsh and punitive sanctions against Professor Gino, that purported to supersede the written Discipline Policy.

**RESPONSE TO PARAGRAPH NO. 387:**  The allegations in Paragraph 387 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 387.

388.    Plaintiff's sex and gender were a motivating factor for the aforementioned adverse employment actions and the various decisions taken by Dean Datar.

**RESPONSE TO PARAGRAPH NO. 388:**  The allegations in Paragraph 388 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 388.

389.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered damages, including tremendous financial losses, reputational harm, loss of existing contractual relations and prospective economic opportunities and advantage, mental anguish, physical pain and suffering, embarrassment, and severe emotional distress.

**RESPONSE TO PARAGRAPH NO. 389:**  The allegations in Paragraph 389 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 389.

<u>**COUNT VII**</u>
**Retaliation**
**(As to Defendant President and Fellows of Harvard)**

390.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

**RESPONSE TO PARAGRAPH NO. 390:** Harvard    incorporates    its    responses    to Paragraphs 1-389 of the Third Amended Complaint.

391.    Through the conduct alleged above, Defendants have retaliated against Plaintiff for engaging in activities protected under Title VII, Title IX and M.G.L. Chapter 151B.

**RESPONSE TO PARAGRAPH NO. 391:** The allegations in Paragraph 391 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 391.

392.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered damages, including tremendous financial losses, reputational harm, loss of existing contractual relations and prospective economic opportunities and advantage, mental anguish, physical pain and suffering, embarrassment, and severe emotional distress.

**RESPONSE TO PARAGRAPH NO. 392:** The allegations in Paragraph 392 state a legal conclusion to which no response is required. To the extent a response is required, Harvard denies the allegations in Paragraph 392.

## COUNT VIII
### Declaratory Judgment
### (As to Defendant President and Fellows of Harvard)

393.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

**RESPONSE TO PARAGRAPH NO. 393:** Harvard incorporates its responses to Paragraphs 1-392 of the Third Amended Complaint.

394.    A controversy exists as to whether there is "clear and convincing evidence" that Plaintiff engaged in "grave misconduct" within the meaning of Harvard's "Third Statute."

**RESPONSE TO PARAGRAPH NO. 394:** The claim to which Paragraph 394 relates is the subject of Harvard's pending motion to dismiss and therefore no response is required.[28]

395.    Plaintiff requests a declaration that such evidence does not exist, that Plaintiff has not engaged in "grave misconduct" within the meaning of Harvard's Third Statute and that grounds do not exist for the revocation of her tenue.

---

[28] Harvard has concurrently filed with this answer a motion to dismiss Plaintiff's Count VIII under Federal Rule of Civil Procedure 12(b)(6). Harvard reserves the right to supplement or amend its answer after the Court rules on Harvard's motion.

**RESPONSE TO PARAGRAPH NO. 395:** The claim to which Paragraph 395 relates is the subject of Harvard's pending motion to dismiss and therefore no response is required.

396.    Plaintiff further requests that the Court enter such further declaratory relief as may be appropriate to fully resolve all disputes that may arise in this action concerning Plaintiff's rights as a tenured professor at Harvard.

**RESPONSE TO PARAGRAPH NO. 396:** The claim to which Paragraph 394 relates is the subject of Harvard's pending motion to dismiss and therefore no response is required.

## Prayer For Relief

**Response to Prayer for Relief:** The concluding paragraphs entitled "Prayer for Relief" states Plaintiff's requests for relief, and therefore no response is required. To the extent a response is required, Harvard denies that Plaintiff is entitled to any of the relief requested or any relief whatsoever.

## AFFIRMATIVE DEFENSES

Harvard incorporates its respective responses to each and every foregoing paragraph as though fully set forth herein and asserts the following defenses with respect to each and every claim pled in the Third Amended Complaint, unless otherwise noted. By virtue of asserting these defenses, Harvard does not assume any burden of proof or persuasion not otherwise legally assigned to them. Harvard reserves all other rights to assert other defenses as appropriate.

### FIRST DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff failed to state a claim upon which relief can be granted, and dismissal with prejudice is proper.

### SECOND DEFENSE

Plaintiff's claims are barred, in whole or in part, because to the extent Plaintiff has suffered any injury, such injuries were not proximately or actually caused by Harvard's actions.

### THIRD DEFENSE

Plaintiff has failed to sufficiently allege an actionable injury caused by Harvard.

### FOURTH DEFENSE

The damages Plaintiff seeks are unwarranted and disproportionate as to Harvard such that any award or damages would constitute unjust enrichment.

### FIFTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because, to the extent Plaintiff has suffered any injuries, such injuries were caused, in whole or in part, by Plaintiff's own recklessness and intentional actions.

## SIXTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because Harvard's alleged conduct was at all times justified and undertaken in the good faith exercise of a valid and legitimate business and educational purpose.

## SEVENTH DEFENSE

To the extent Plaintiff has suffered any damages, any damages awarded to Plaintiff must be reduced on the basis of Plaintiff's failure and refusal to make reasonable efforts to mitigate, minimize, or avoid any alleged damages.

## EIGHTH DEFENSE

Plaintiff's claims are barred as Harvard acted at all times in good faith and Harvard's conduct was at all times lawful.

## NINTH DEFENSE

Plaintiff's claims are barred, in whole or in part, under the doctrine of unclean hands.

## TENTH DEFENSE

Any damages that Plaintiff has purportedly suffered must be offset by the damages to which Harvard is entitled for Plaintiff's defamation of Harvard.

## RESERVATION OF ADDITIONAL DEFENSES

Harvard hereby gives notice that it intends to rely upon such other and further affirmative defenses as may become available or apparent during pre-trial proceedings in this case, and hereby reserves its rights to amend this Answer and assert such defenses.

## RESERVATION OF RIGHTS

Harvard expressly reserves the right to amend its Answer and to assert additional affirmative defenses as may become available during the course of discovery in this action.

Harvard further gives notice that it reserves and will rely upon defenses it may have and further reserves the right to assert counterclaims against any such person to the extent required in order to preserve its rights.

## COUNTERCLAIM

Pursuant to Rule 13 of the Federal Rules of Civil Procedure, Defendant-Counterclaim Plaintiff President and Fellows of Harvard College ("Harvard"), by and through its undersigned counsel, hereby asserts the following counterclaim against Plaintiff-Counterclaim Defendant and alleges as follows:

## NATURE OF THE COUNTERCLAIM

1.      This counterclaim arises out of Professor Gino's false and defamatory statements made in October 2023 on her website, www.francesca-v-harvard.org, namely that Harvard Business School ("HBS") "used the wrong dataset" in analyzing one of the allegations of research misconduct brought against her in the fall of 2021, and that HBS overlooked the "correct dataset," which she called, on her website, the "July 16 OG file."  Professor Gino stated repeatedly and unequivocally on her website that she "***now ha[s] demonstrable proof that the file that HBS used in its investigation was an illegitimate dataset.  That's right, HBS neglected to use the correct dataset.***"  She further castigated HBS, claiming that "**[t]his was one of many errors HBS made in this investigation,**" and that HBS' failure to review the supposed "July 16 OG file" was part of a "**mountain of evidence my team is amassing about HBS' mishandling of this matter.**"

2.      These statements were false, and Professor Gino knew they were false when she made them.  In reality, after HBS received credible allegations that Professor Gino had falsified and fabricated data, HBS conducted a painstakingly thorough, eighteen-month-long investigation, in which it carefully reviewed the relevant datasets in the materials gathered from Professor Gino at the outset of the process—including all of those that Professor Gino herself was responsible for identifying and supplying.  The "July 16 OG file" was not in these materials, and over the course of eighteen months, and despite frequent opportunities to submit new evidence or information,

Professor Gino never provided it to HBS or raised it to anyone's attention.  Instead, she theorized that the data falsifications could have been the result of errors by her research assistants or that a "motivated actor" could have fabricated or falsified the data in order to harm her.

3.     Even after Professor Gino published the false statements on her website about the "July 16 OG file," she did not provide the file to HBS—despite the facts that: (i) the HBS investigation committee had unanimously concluded she had committed research misconduct; (ii) a proceeding to revoke her tenure on the basis of the HBS investigation findings was underway; and (iii) Harvard repeatedly urged her to provide any relevant information that could exonerate her as part of that proceeding.  That proceeding ultimately resulted in a hearing committee's unanimous recommendation to revoke Professor Gino's tenure, and the Harvard Corporation's decision to accept that recommendation.  If the "July 16 OG file" in fact existed, Professor Gino had every incentive to provide it as part of that process.

4.     But Professor Gino couldn't provide the "July 16 OG file," *because it did not exist*.

5.     During the tenure revocation proceeding, Harvard obtained a copy of the data on Professor Gino's HBS-issued laptop that had been made in January 2024—more than two years after the same data had first been copied for purposes of the HBS investigation.  Curiously, on this 2024 copy of Professor Gino's laptop, one key data file relevant to one of the allegations was missing, and it had been replaced with another file: a file that appeared, to an untrained eye, to match the description of the supposed "July 16 OG file."  This file contained the (altered) data used in the publication of the study at issue but gave the appearance of a raw data file from July 2010, when the relevant study had been run.  Thus, were this file genuine, it could have corroborated Professor Gino's claim that she was not responsible for the falsified data in that study (which is precisely what Professor Gino publicly stated the "July 16 OG file" would show).

6.      However, the file is *not* genuine, as Professor Gino's own forensic expert admitted in the tenure revocation proceeding.  Metadata revealed that this new file had been added to Professor Gino's laptop in *September 2023*, only about a week before Professor Gino first made her false statements about the "July 16 OG file" on her website.  In an apparent attempt to cover up the true provenance of the new file, other metadata of the file *had been manually backdated to appear as though it was last modified in July 2010.*

7.      When confronted with this manipulated file during the course of her tenure revocation proceeding, Professor Gino promptly removed any mention of the "July 16 OG file" from her website, and she and her counsel refused, purportedly based on attorney-client privilege, to provide critical information as to the origin of the manipulated file, how it came to be backdated, or its relationship to the supposed "July 16 OG file."  Indeed, despite having publicly posted the false statements regarding the "July 16 OG file" on her website, Professor Gino refused to provide any information about the alleged file at all.

8.      Professor Gino's refusal to answer any questions about this file and concurrent attempt to erase her statements about the "July 16 OG file" from her website further confirm what is already abundantly clear: Professor Gino's statements about HBS using the "wrong file" during the HBS investigation were lies, and Harvard is entitled to recover for the reputational harm caused by her intentionally defamatory statements.

## **PARTIES**

9.      Defendant-Counterclaim Plaintiff President and Fellows of Harvard College ("Harvard") is a Massachusetts non-profit educational corporation commonly known as Harvard University.

10.     Plaintiff-Counterclaim Defendant Francesca Gino, as pled in paragraph 24 of her Third Amended Complaint ("TAC", Doc. No. 126), is a natural person and resident of the Commonwealth of Massachusetts.

## JURISDICTION AND VENUE

11.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because the TAC pleads claims arising under the Constitution and statutes of the United States, and Harvard's claim arises out of the same transaction or occurrence that is the subject matter of Professor Gino's federal law claims, and is so closely related to Professor Gino's federal law claims as to form the same case or controversy under Article III of the United States Constitution.

12.     This Court has personal jurisdiction of Professor Gino on the grounds that she is domiciled in the Commonwealth of Massachusetts.

13.     At all relevant times, the acts and omissions complained of occurred within the Commonwealth of Massachusetts.

14.     Venue properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Harvard's claims occurred in this district.

## STATEMENT OF FACTS

### *Francesca Gino's Career and Employment at HBS*

15.     Professor Gino alleges that she is a behavioral scientist, author, and teacher who has written over 140 academic articles exploring the psychology of people's decision-making. Doc. No. 126 ¶¶ 38–41.  As Professor Gino further alleges, she "has regularly presented her work at conferences and has been invited to speak at some of the most prestigious colleges and universities in the world," and "has received numerous honors and awards."  *Id.* ¶¶ 41–42.

16.    On July 1, 2010, Professor Gino began employment at HBS as an Associate Professor.  On July 1, 2014, following a successful review, Professor Gino was appointed a tenured Professor of Business Administration at HBS.

17.    During her time at HBS, as Professor Gino alleges, she received various awards and became a public figure with global reach through publications such as "The Atlantic, The Boston Globe, Business Week, The Economist, The Financial Times, National Public Radio, Scientific America, The Wall Street Journal, and the New York Times."  *Id.* ¶ 44.

18.    Some of Professor Gino's publications—including those studies whose underlying data she was found to have falsified or fabricated—became well known both inside and outside of the academic community.

19.    One of Professor Gino's most cited papers, "Signing at the beginning makes ethics salient and decreases dishonest self-reports in comparison to signing at the end," published in 2012 in the Proceedings of the National Academy of Sciences (the "2012 PNAS Paper"), found that signing at the top of a form led to more honest completion of the form, as opposed to signing at the bottom or not signing at all.

20.    The 2012 PNAS Paper has been cited by over 260 articles since its publication and upon information and belief, its findings were implemented or studied for implementation by numerous companies and government agencies both in the United States and abroad.

***HBS Receives Allegations of Research Misconduct Against Professor Gino and Sequesters Relevant Materials***

21.    On October 11, 2021, Professor Uri Simonsohn of the ESADE Business School in Barcelona, Professor Leif Nelson of the Haas School of Business at the University of California, Berkeley, and Professor Joe Simmons of the Wharton School of Business at the University of Pennsylvania (collectively, the "Data Colada Professors") contacted HBS's Research Integrity

Officer ("RIO"), Alain Bonacossa, regarding concerns about the integrity of the data in several papers co-authored by Professor Gino, including the study published in the 2012 PNAS Paper.

22.     HBS processed the allegations under its Interim Policy and Procedures for Responding to Allegations of Research Misconduct (the "Interim Policy and Procedures"), which are fully consistent with analogous federal regulations pertaining to research misconduct, *see* 42 C.F.R. Part 93, and provide for a multi-phase, peer-led investigatory process.

23.     In connection with the subsequent inquiry, and consistent with the Interim Policy and Procedures, the RIO oversaw the collection ("sequestration") of relevant records and other pertinent evidence.  Between October 19 and 22, 2021, the RIO worked with the HBS Information Security Officer to sequester available research records and evidence, including from Professor Gino's HBS email account, OneDrive, internal HBS cloud and network storage locations, and Qualtrics account.[29]

24.     On October 27, 2021, the RIO sent Professor Gino a notice of inquiry informing her that HBS intended to conduct an inquiry into concerns that she may have falsified and/or fabricated data in four publications (the "Notice of Inquiry").  Doc. No. 20-5 at 73–75.  The Notice of Inquiry explained the nature of the allegations and informed Professor Gino that the Inquiry Committee would consider the allegations and determine if a full investigation was warranted.

25.     The Notice of Inquiry also explained that "[***i]t is essential that all materials, including documents, other physical things, and electronically-stored information, that relate in any way to the issues under review be produced at this time.***"  The RIO also requested, if Professor Gino had "in [her] possession any materials that relate to the issues under review," that Professor Gino "contact [him] immediately to make arrangements to deliver them."

---

[29] Qualtrics is a cloud-based software platform widely used in academia to conduct survey research and was used by Professor Gino to conduct a number of the studies investigated by HBS.

26. The Notice of Inquiry further attached a copy of the Interim Policy and Procedures, which, consistent with analogous federal regulations pertaining to research misconduct, require that "all individuals subject to [it], including respondents, have an obligation to provide evidence relevant to research misconduct allegations to the RIO or other institutional officials." Doc. No. 20-5 at 127.

27. After sending Professor Gino the Notice of Inquiry, the RIO worked with the HBS Information Security Officer to sequester materials on two of Professor Gino's computers, which Professor Gino represented were the only two computers in her possession that had records or evidence relevant to the research misconduct allegations. One of these computers was Professor Gino's HBS-issued laptop, and the RIO made a copy of all data on that laptop (the "Sequestered Laptop Copy").

28. Upon completion of the sequestration process, Professor Gino's devices were returned to her with all existing data intact, and Professor Gino continued to have access to all of her existing records and data throughout the HBS investigation process.

29. Throughout the remainder of the HBS investigation process, Professor Gino never raised concerns about the sequestration process, asserted that it was inadequate, or alleged that it had failed to capture relevant data. Nor did she raise a concern or make a request that additional material be sequestered.

***HBS' Inquiry and Investigation Committees Investigate the Research Misconduct Allegations***

30. Following the RIO's preliminary assessment, Dean Datar appointed an inquiry committee (the "Inquiry Committee") of two senior HBS professors to determine if the allegations against Professor Gino met the criteria to warrant an investigation.

31.    On November 5, 2021, the Inquiry Committee began its work, and, over the course of the next four months and pursuant to the Interim Policy and Procedures, it gathered and reviewed information relevant to the allegations, including the datasets that Professor Gino herself identified, and interviewed Professor Gino.  The Inquiry Committee also prepared memoranda setting forth their initial analyses; Professor Gino reviewed these memoranda and responded in writing; and the Inquiry Committee reviewed Professor Gino's responses.  Professor Gino also had the opportunity to review and respond to the Inquiry Committee's draft report, which she did and which the Inquiry Committee reviewed before issuing a final report.

32.    Throughout the HBS investigation process, Professor Gino was represented by legal counsel with deep experience in representing individuals accused of research misconduct.

33.    Ultimately, the Inquiry Committee issued a final Inquiry Report to Dean Datar concluding that the criteria for conducting a full investigation under the Interim Policy and Procedures had been met as to the allegations against Professor Gino and recommending that HBS proceed with a full investigation.  Dean Datar closely reviewed the Inquiry Report and the attached materials, agreed with the Inquiry Report's recommendation, and determined that a full investigation was warranted.   He therefore appointed an investigation committee (the "Investigation Committee") of three senior HBS professors, including the two professors who had served on the Inquiry Committee.

34.    As set forth in detail in the Investigation Committee's report, their investigation pursuant to the Interim Policy and Procedures involved a painstaking and comprehensive review during which the Investigation Committee:  (i) met numerous times to discuss and analyze the allegations; (ii) interviewed six of Professor Gino's co-authors and two of her research assistants, and reviewed written responses submitted by another of her co-authors; (iii) engaged an

independent data forensic firm to review and analyze Professor Gino's sequestered research record subject to the Investigation Committee's direction; (iv) conducted two three-hour interviews with Professor Gino; and (v) reviewed Professor Gino's responses to the Investigation Committee's questions, letters from her attorney, and other evidence and submissions that Professor Gino was given the opportunity to provide, including a 36-page written response and over 150 pages of evidence attached thereto, as well as her comments on the Investigation Committee's draft report. Doc. No. 20-5.

35.     Not once during this process did Professor Gino mention the "July 16 OG file." Instead, in an attempt to explain the data alterations, Professor Gino emphasized the possibility of supposed "honest error" by her research assistants.  Professor Gino also theorized that a "motivated actor" may have intentionally planted the data anomalies in a malicious effort to harm her.

36.     In its detailed, 41-page report issued on March 7, 2023, the Investigation Committee unanimously concluded that Professor Gino "engaged in multiple instances of research misconduct, across all four studies at issue," noting "the papers reporting these studies span eight years in their publication dates, with different co-authors, in different journals, assisted by different lab personnel, and out of different home institutions."  Doc. No. 20-5 at 40.

***Dean Datar Reviews the Investigation Committee's Findings and Locates Additional Datasets***

37.     Over the next several weeks, Dean Datar closely reviewed the Investigation Committee's report and accompanying exhibits.  He sought clarification from the RIO on questions regarding the underlying data; requested a meeting with the RIO and the Investigation Committee to learn more about their work and findings; met with Professor Gino's advisor (a faculty member who, at Professor Gino's request, was permitted by the Interim Policy and

Procedures to participate in the research misconduct process in this role); and sought the views of other trusted advisors.

38.     During this process, Dean Datar noted that, while Professor Gino had claimed throughout the investigation to have accessed only the final datasets of each of the studies at issue when working on those studies, her sequestered research records for at least one of the studies indicated that there were two directly relevant datasets saved on her computer, with different data. Dean Datar therefore asked the RIO to search Professor Gino's sequestered research records for any additional datasets relevant to the allegations, and to provide any additional datasets to the Investigation Committee's independent data forensic firm for analysis. Upon conducting a search, the RIO found certain additional datasets that Professor Gino had accessed (contrary to her claim that she had only accessed the final data set), but never identified to the Investigation Committee, and the Investigation Committee's independent data forensic consultant analyzed them. These additional analyses further confirmed the Investigation Committee's findings that Professor Gino was responsible for falsifying or fabricating the data in each of the four studies at issue.

39.     After formally accepting the Investigation Committee's findings, Dean Datar imposed the sanctions on Professor Gino recommended by the Investigation Committee on June 13, 2023. Those sanctions included HBS' placement of Professor Gino on administrative leave and initiation of the formal process to seek revocation of her tenure.

### HBS' Review of Allegation 4b Relating to Study 1 of the 2012 PNAS Paper

40.     One of the allegations investigated by HBS, "Allegation 4b," related to Study 1 of the 2012 PNAS Paper, and asserted that Professor Gino falsified and/or fabricated the data for Study 1 by altering the data in a way that favored the hypothesized results.

41.     Study 1 was conducted in the summer of 2010 at the University of North Carolina, Chapel Hill ("UNC"), where Professor Gino was then a faculty member.  The purpose of the experiment was to determine whether signing a form at the top—that is, before filling it out—promoted more honest behavior.  Study participants first completed a series of math puzzles, with payment based on how many they reported answering correctly.  Then, they filled out a "tax form" for payment, in which some of their earnings from the puzzle task were "taxed" but they could also claim "deductions" in the form of reimbursements for the time and cost of their commute to the lab.  According to the 2012 PNAS Paper, participants had two opportunities to cheat (and hence earn more money): either they could claim to have solved more puzzles than they really had, or they could claim to have more commuting expenses than they in fact incurred.

42.     Participants randomly received one of three versions of the tax form: one in which participants signed at the top, one in which they signed at the bottom, and one in which they were not required to sign at all.  According to the 2012 PNAS Paper, the study found evidence for its hypothesis:  compared both to signing at the bottom and not being asked to sign at all, participants who signed at the top were more honest in reporting their performance on the puzzle task and claimed fewer expenses for reimbursement.

43.     As part of its evaluation of Allegation 4b, the Investigation Committee interviewed Professor Gino's research assistant ("RA") at UNC who had overseen the data collection for Study 1.  The RA also sent the Investigation Committee, through the RIO, data files and emails that she found in her possession relating to Study 1.

44.     These files indicated that, on July 16, 2010, the RA sent Professor Gino an email with the subject line, "That's a wrap:  Tax study," and attaching an Excel file titled "Taxstudy.xlsx."  As the RA confirmed to the Investigation Committee during her interview, the

"Taxstudy.xlsx" file attached to the email contained the newly collected raw data for Study 1 that the RA had entered directly into Excel from the participants' paper forms (the "Initial Dataset").

45.     The Investigation Committee also had access to additional datasets for Study 1, including:

a.  A partial dataset attached to an email from the RA to Professor Gino on July 13, 2010, containing some of the data collected for Study 1.  The data in this dataset match their counterparts in the Initial Dataset exactly.

b.  An additional copy of the full dataset attached to an email from the RA to Professor Gino on July 27, 2010.  The data in this dataset matched the Initial Dataset exactly.

c.  A dataset that had been published on the Open Science Framework ("OSF") website and which was publicly represented to be the data underlying Study 1 of the 2012 PNAS Paper (the "OSF Dataset").[30]  The OSF Dataset contains the data used in the published 2012 PNAS Paper, as it can be used to reproduce precisely the results published in the 2012 PNAS Paper.

46.     The Investigation Committee compared the Initial Dataset—versions of which Professor Gino's RA had emailed to Professor Gino on three separate occasions—with the OSF Dataset and found that there were many discrepancies, all but one of which strengthened the evidence in favor of Professor Gino's hypothesis.  Without these discrepancies, the positive evidence for Study 1's hypothesis reported in the 2012 PNAS Paper would not exist.

---

[30] The OSF Dataset had been posted to the OSF site in August 2019 in conjunction with an effort to replicate Study 1 of the 2012 PNAS Paper.  Unsurprisingly given the falsifications in the data for the originally published Study 1, that replication effort failed.  *See* A.S. Kristal, et al., *Signing at the beginning versus at the end does not decrease dishonesty*, Proc. Natl. Acad. Sci. U.S.A. 117 (13) 7103-7107, https://doi.org/10.1073/pnas.1911695117 (2020).

47.    There were also other differences between the Initial Dataset and the altered, OSF Dataset.  For example, the OSF Dataset uses descriptive columns such as "Income" for the data, whereas the Initial Dataset uses terse, non-descriptive column headings, such as "1"; the OSF Dataset contains three additional study participants; and the OSF Dataset contains certain additional columns with summary statistics.

48.    When the RIO searched for additional datasets in Professor Gino's sequestered files at Dean Datar's request, he found an additional version of the Study 1 data in the Sequestered Laptop Copy.  This dataset had been saved on Professor Gino's laptop and last modified July 17, 2010 at 6:43 p.m. (the "July 17 Dataset").  The July 17 Dataset was the same as the Initial Dataset emailed to Professor Gino by Professor Gino's RA on July 16, 2010: it was titled "Taxstudy.xlsx" and it contained the same data as the Initial Dataset.

49.    Professor Gino sent an email to her co-authors with a summary of results of Study 1 on July 18, 2010.  The summary of results was based on data that were not present in the Initial Dataset and that instead are supported by the OSF Dataset—in other words, someone had already falsified the data by the time of Professor Gino's email to her co-authors on July 18, 2010.

50.    The July 17 Dataset therefore demonstrates an important link between (i) the Initial Dataset emailed to Professor Gino by her RA on July 16 and (ii) the falsified data represented in the summary of results Professor Gino sent on July 18: only a day before sending those results, Professor Gino had seen the Initial Dataset from her RA and downloaded and saved it to her computer.  Professor Gino has never been able to explain how or why, in the span of approximately 24 hours, she obtained and came to rely on data that was different from the data she received and downloaded from her RA, who oversaw data collection for the study.  The only plausible explanation supported by the evidence gathered in HBS's exhaustive process is that Prof. Gino

downloaded the data her RA sent her on July 17, 2010, and then, by July 18, 2010, falsified those data to support her hypotheses.

***Professor Gino Files This Lawsuit and Starts Her Public Relations Campaign***

51.     Following Dean Datar's adoption of the Investigation Committee's findings, and her placement on administrative leave, Professor Gino began a public relations campaign falsely seeking to paint herself as the victim of, among other things, a faulty research misconduct process by HBS.

52.     On August 2, 2023, Professor Gino filed this lawsuit against Harvard, Dean Datar, and the Data Colada Professors, claiming that, among other things, HBS denied her the opportunity to respond to the allegations against her or meaningfully engage in the HBS research misconduct process, ignored exculpatory evidence, and failed to critically examine the Data Colada Professors' purportedly bad-faith allegations.  *See generally* Doc. No. 1.  Professor Gino's lawsuit received attention in the media.

53.     Seeking to capitalize on this attention, and apparently dissatisfied with her own complaint's failure to exonerate her, Professor Gino also launched a website to promote her lawsuit and malign HBS in a transparent attempt to sway public opinion in her favor.

54.     On September 29, 2023, Professor Gino sent an email to over forty HBS faculty and staff in which she reiterated many of the allegations in her lawsuit, stating that "**today I am breaking from the silence and launching a website:  www.francesca-v-harvard.org** to share information about both the broken investigation process as well as the analyses I have undertaken over the past few months to prove my innocence."  (emphasis in original).

55.     Professor Gino further stated that "**[o]n the website, you'll find my analyses for one of the studies in question, Study 1 of the 2012 PNAS [P]aper.  The Allegation is simply**

**incorrect.**" (emphasis in original). The "Allegation" to which Professor Gino's email referred was Allegation 4b regarding Study 1 in the 2012 PNAS Paper. In that post, Professor Gino made numerous statements echoing those in her lawsuit, including that "Data Colada alleged that [Study 1] relies on data manipulation" and HBS "concluded much the same thing[,]" but "**[t]hey are both wrong**." (emphasis in original).

56. Professor Gino's website contained numerous claims broadly attempting to discredit HBS' investigation and justify her initiation of this litigation. For example, she stated that "HBS conducted a bad faith investigation into allegations of research misconduct that were not made in good faith," and that she had "specific facts to support each of these serious allegations." In another post, she claimed: "Harvard has ruined my career, wrongfully . . . . Had Harvard followed the process it promised in its preexisting policy or applied correctly the new policy they created for me, I would have been cleared of these charges. Not only because I did not commit these misdeeds, but also because no fair process could conclude, based on the evidence, that I had. **The only way to right this wrong is for me to sue Harvard.**" (emphasis in original).

57. In yet another post, Professor Gino stated that "**[o]n this site, I will work through th[e]se allegations. This process takes time. I hope to share more of my analyses soon.**" (emphasis in original).

*Professor Gino Makes False Statements About a "July 16 OG File" That Would Clear Her of Wrongdoing in Study 1 of the 2012 PNAS Paper*

58. On or around October 1, 2023, Professor Gino published another post on Francesca-v-Harvard.org, entitled "Refutation of Data Reconciliation Claims by HBS." A true and correct archived copy of this post as of October 1, 2023 from Archive.org is attached hereto as Exhibit 1.

59. In this post, Professor Gino sought to refute the Data Colada Professors' purported claim in a June 17, 2023 blog post that "HBS' investigation found **additional** evidence of data

manipulation in this particular study," namely, Study 1 of the 2012 PNAS Paper.  Ex. 1 at 1 (emphasis in original).

60.     According to Professor Gino, HBS had claimed that it (1) "was able to obtain the original (unpublished) dataset for the study in question"; (2) "with the help of a forensics firm, [] was able to compare this original dataset to the dataset published on OSF"; (3) "claimed that this comparison yielded significant discrepancies"; and (4) "claimed that these discrepancies were evidence of fraud on [Professor Gino's] part."  *Id.*

61.     Professor Gino declared her intention to definitively disprove these assertions, starting with Study 1: "Now that I've been able to enlist the help of my own forensics team, I have been able to conduct my own investigation in this matter.  In the analysis below, I offer my findings and refute each of the claims put forth by HBS."  *Id.*

62.     Giving her account of the Investigation Committee's analysis of Study 1's Excel datasets, Professor Gino stated that:  "With multiple versions of the files, HBS needed to figure out which dataset was the 'right' dataset to use.  HBS received three files from [Professor Gino's research assistant]:  A version dated July 13, a version dated July 16, and a version dated July 27 [2010].  ***As far as I know, these are the only files HBS considered . . . .***"  *Id.* at 2 (emphasis in original).  According to Professor Gino:

> "[t]his was one of many errors HBS made in this investigation:  It failed to conduct a comprehensive search for all available versions of the data.  If HBS had done a more thorough investigation, it would have considered a fourth file in its investigation, a file that also had the date stamp of July 16.  I will not go into the details of why HBS failed to include this fourth file in its investigation, but suffice it to say that it is part of the mountain of evidence my team is amassing about HBS'[s] mishandling of this matter."

*Id.* at 2–3 (emphasis in original).

63.    Professor Gino further stated that:  "HBS hired a forensics firm . . . to analyze this data, and [it] concluded that the July 16 version was the one to use in its analysis because it included the [initial] July 13 data and was included in the July 27 dataset.  I will refer to this as the 'July 16 HBS version' of the dataset.  Meanwhile, I will refer to the fourth file as the 'July 16 OG Version.'"  *Id.* at 3.  She included a picture of a chart purportedly showing "a comparison of the metadata from these four files":

| | CREATED | LAST MODIFIED |
|---|---|---|
| **JULY 13 VERSION** | July 13, 2010 10:39am | July 13, 2010 9:46pm |
| *JULY 16 OG FILE – OMITTED FROM INVESTIGATION* | *July 13, 2010 10:39am* | *July 16, 2010 4:30pm* |
| **JULY 16 HBS VERSION** | July 13, 2010 10:39am | July 16, 2010 8:57pm |
| **JULY 27 VERSION** | July 13, 2010 10:39am | May 26, 2022 4:12pm |

*Id.* (emphasis in original).

64.    Below this chart, under the heading "**HBS used the wrong dataset**," (emphasis in original), Gino proclaimed:  "It took a while for my team and me to unpack the evidence in this case, but our unequivocal conclusion is that HBS used the wrong dataset in its investigation.  They used the July 16 HBS version, when they should have used the July 16 OG version."  *Id.*  Not once on the website did Professor Gino ever indicate or explain where this file came from, who created it, or who sent it.

65.    Professor Gino described the purported "July 16 OG file" as follows:  (1) "It contains all of data [sic] from the July 13th version, except for some data that appears to have been discarded or corrected"; (2) "[i]t contains some additional data that is not included in the July 13th

version"; and (3) "*[i]t is completely consistent with the data posted on OSF*, with few exceptions . . . ." *Id.* at 4 (emphasis in original).

66.     Professor Gino stated:  "As I dug into the evidence in this case and started to pore over these different dataset files, I soon became 100% convinced that what I'm calling the July 16 OG file is, in fact, the file HBS should have used in its investigation.  How did I know this with such certainty?  Because in my heart, *I know I did not commit fraud*.  But I still had to figure out a way to prove it."  *Id.* at 6–7 (emphasis in original).  Professor Gino then stated that by "cross-matching data" from paper receipts she had located, she determined that the "July 16 OG file" contained the data on which the study's results were based.  *Id.* at 7.

67.     Toward the end of the website post, Professor Gino reiterated her false statements for good measure:  "**To repeat:  I now have demonstrable proof that the file that HBS used in its investigation was an illegitimate dataset.  That's right, *HBS neglected to use the correct dataset*.  The correct dataset—the July 16 OG file—is 100% consistent with the OSF dataset.**"  *Id.* (emphasis in original).

68.     Professor Gino also stated that "**[t]his is a critical piece of evidence that my team plans to reveal, in its entirety, when the time is right.**"  *Id.* (emphasis added).

69.     After publishing these false statements regarding the so-called "July 16 OG file"—which, as explained below, Harvard now knows were invented out of thin air—Professor Gino continued to publicize her website, including the false statements specifically.

70.     On October 9, 2023, Professor Gino emailed an unknown number of individuals using blind carbon copy, to "all her collaborators" to explain her "unexpected but unavoidable focus on preparing for litigation as a last resort way to defend [her] innocence."  She explained:

> What you may have read may seem compelling:  Data Colada wrote their posts persuasively.  And Harvard conducted an 18-month long process,

which produced a ~1,200 page report. It is easy to assume the investigation was both fair and comprehensive, when in fact it is not. There is another side to this story. About a week ago, I launched a website to explain it: https://francesca-v-harvard.org.

I hope you'll read the analyses I've conducted to prove that both Data Colada and HBS **reached conclusions that are wrong.** So far, I posted the analysis for one paper (see here and here). I hope to post the others soon.

(emphasis in original).

71.     In the second paragraph of her October 9 email, the second link was to the article in which Professor Gino identified the so-called "July 16 OG file" that supposedly refuted HBS's findings as to Study 1 of the 2012 PNAS Paper.

72.     Accordingly, Professor Gino sought to convince individuals both inside and outside HBS, through knowingly false statements, that Harvard had conducted a fatally flawed investigation against her, ignoring exculpatory evidence to wrongfully find her culpable for research misconduct. And they had the intended effect: Professor Gino's false statements caused significant harm to Harvard's reputation by causing at least some HBS faculty members and members of the public to believe that HBS had not been appropriately careful in an enormously important undertaking—its investigation of significant research misconduct allegations against one of its tenured faculty members.

73.     Despite having been instructed to provide HBS with all materials relevant to the investigation, and despite having innumerable opportunities to offer evidence to the Investigation Committee and Dean Datar, *and despite the fact that this file purportedly exonerates her*, Professor Gino has never provided the "July 16 OG file" to HBS. Nor has she ever, to Harvard's knowledge, offered any copy of such a file to the public or anyone else.

*Discovery of the 2023 Cover-Up File*

74.    Following the HBS investigation, HBS initiated a formal proceeding according to Harvard's relevant internal processes to determine whether Professor Gino's tenure should be revoked.  As in the research misconduct investigation, Professor Gino was represented by counsel throughout the tenure revocation proceeding.  She was given multiple opportunities to present new evidence, including testimony from fact witnesses and experts, and to cross-examine HBS' witnesses; was permitted to interview additional Harvard witnesses who she claimed had relevant evidence; and received extensions of time on her submissions.

75.    During the tenure revocation proceeding, Professor Gino took issue with the Sequestered Laptop Copy that the RIO had made, and on which HBS had relied during its investigation.  She disclosed to HBS that she had hired her own data forensic expert, and that her expert made a "proper forensic copy" of the same laptop in January 2024 (the "2024 Laptop Copy").  She asserted that the 2024 Laptop Copy contained files that supposedly were either overlooked or never collected at all by HBS during its investigation.

76.    In order to assess Professor Gino's claims about the purported import of the 2024 Laptop Copy and its files, HBS requested a copy of the 2024 Laptop Copy from Professor Gino. Professor Gino provided it, but she redacted certain portions of the copy, on the grounds of an asserted attorney-client privilege.

77.    When examining the 2024 Laptop Copy, HBS' experts discovered something quite unusual: the July 17 Dataset that was present in the Sequestered Laptop Copy was no longer there. Instead, it had been replaced with a *different* file.  This new file had never been provided to Harvard during the HBS research misconduct process or otherwise, ***and was last saved by Professor Gino***

*on September 23, 2023—just a week before Professor Gino published her statements regarding the "July 16 OG file."*

78.    This file, referred to herein as the "2023 Cover-Up File," is titled "Taxstudy.xlsx" just like the July 17 Dataset, and it contains the same terse, non-descriptive column names of the July 17 Dataset (which in turn, are the same as the Initial Dataset).  It also looks like the Initial Dataset in that it lacks certain columns with summary statistics that appear only in the OSF Dataset. But the data in the 2023 Cover-Up File are the data of the (falsified) OSF Dataset, *not* the (original, unfalsified) Initial Dataset, and they include the three additional participants not found in the Initial Dataset.  All told, the 2023 Cover-Up File gives the appearance of raw data that matches the published data of the OSF Dataset.

79.    On her website, Professor Gino claimed that the so-called "July 16 OG file" "*is completely consistent with the data posted on OSF*, with few exceptions (analysis entries with some statistics)."  Ex. 1 at 2.  The 2023 Cover-Up File is exactly as Professor Gino describes the "July 16 OG file" on her website—it contains values consistent with the altered OSF Dataset, while excluding the summary statistics columns.  However, as HBS' forensic examination found, it actually was placed on Professor Gino's laptop on September 23, 2023, just eight days before Professor Gino first published her claims about the "July 16 OG file" on her website.

80.    Even more troubling, HBS found that the metadata of the 2023 Cover-Up File had been *intentionally backdated* using the Mac OS system utility, Terminal.  Specifically, the file system "Date Modified" metadata was backdated to make it appear as if the 2023 Cover-Up File was last modified on July 17, 2010—just like the July 17 Dataset that Professor Gino had downloaded from her RA.  Even Professor Gino's own data forensic expert in the tenure revocation

proceeding agreed that the 2023 Cover-Up File may have been backdated, noting that "there is something odd" with its metadata.

81.    Given the backdating of the 2023 Cover-Up File's metadata, an uninformed observer of only the 2024 Laptop Copy might believe that Professor Gino had received the altered data from her RA, exonerating her of any wrongdoing in regard to Study 1 of the 2012 PNAS Paper—exactly as Professor Gino described in her October 1, 2023 blog post.  Indeed, upon information and belief, the 2023 Cover-Up File represents an abortive attempt by Professor Gino to intentionally manufacture evidence that would appear to exonerate her, which she later planned to and did disclose as the "July 16 OG file."

82.    Rather than explain the origin of the 2023 Cover-Up File and its connection to the supposedly exonerating "July 16 OG file", Professor Gino has repeatedly shut down efforts to learn more about both files, making baseless assertions of privilege and—notably—removing discussion of the "July 16 OG file" from her website.

83.    The application logs for Terminal on Professor Gino's laptop would show exactly how the metadata of the 2023 Cover-Up File had been altered.  The 2024 Laptop Copy contained Terminal logs dated September 23, 2023 (the very same day the 2023 Taxstudy File appeared on Professor Gino's laptop), as well as on October 28, 2021 (the day after the RIO sent Professor Gino the Notice of Inquiry).  But Professor Gino redacted all of these Terminal logs on the 2024 Laptop Copy, supposedly on the grounds of attorney-client privilege, so HBS has not been able to inspect the content of the logs.

84.    Shortly after HBS' experts disclosed their findings about the 2023 Cover-Up File to Professor Gino, Professor Gino removed her October 1, 2023 blog post discussing the "July 16 OG file" from her website, causing all links to such post to redirect to her front page.

85.     During the tenure revocation proceeding, Professor Gino was asked directly to identify the so-called "July 16 OG file" from a chart of all of the Study 1 data files identified to date.  She declined, supposedly on the grounds of attorney-client privilege.

86.     Professor Gino's public statements regarding the "July 16 OG file" were in no way privileged and, to the contrary, were intentionally broadcast by her in connection with her attempts to discredit and refute the work of the HBS RIO, Inquiry Committee, Investigation Committee, and Dean Datar.  Professor Gino's groundless invocation of privilege to shield herself from answering questions about the very document she touted on her website is further evidence that she knows her statements to be false, and knew their falsity when she made them.

### CLAIM FOR RELIEF

### COUNT I

### Defamation (Libel)

87.     Harvard repeats and re-alleges the allegations in the foregoing paragraphs as if fully set forth herein.

88.     On October 1, 2023, Professor Gino made false statements on her publicly available website, Francesca-v-Harvard.org, intending to convey to the public that "[i]f HBS had done a more thorough investigation, it would have considered a fourth file in its investigation, a file that also had a date stamp of July 16 . . . that [] is part of the mountain of evidence my team is amassing about HBS's mishandling of this matter."

89.     These false statements included, without limitation, that:  (1) "HBS used the wrong dataset" in analyzing Allegation 4b and the datasets involved in Study 1 of the 2012 PNAS Paper; (2) "the July 16 OG file is the version that HBS should have used in its investigation"; (3) the "July 16 OG file" was "OMITTED FROM INVESTIGATION"; (4) "the July 16 HBS version was not

the correct dataset to be using"; and (5) Professor Gino "now ha[s] demonstrable proof that the file that HBS used in its investigation was an illegitimate dataset.  That's right, HBS neglected to use the correct dataset.  The correct dataset—the July 16 OG file—is 100% consistent with the OSF dataset."

90.    These statements convey the false and defamatory assertions that HBS's investigation was so inadequate that it overlooked the key, exonerating dataset for Study 1 of the 2012 PNAS Paper.  HBS did not, in fact, overlook this file, because it did not exist.  The supposedly exonerating dataset instead was fabricated by Professor Gino and placed on her laptop in an aborted attempt to substantiate these very same false statements.

91.    Professor Gino made these statements with actual malice and knowledge of their falsity because she, upon information and belief, fabricated the so-called "July 16 OG file" herself in the form of the 2023 Taxstudy File.

92.    Professor Gino's actual malice is further demonstrated by the spurious attorney-client privilege objections interposed by her counsel to prevent Harvard from ascertaining the truth as to how the 2023 Taxstudy File was altered and used to replace the unaltered Initial Dataset on Professor Gino's HBS-issued laptop.  When confronted with these apparent falsehoods, Professor Gino promptly removed her article on the "July 16 OG file," demonstrating further that these were intentionally false statements.

93.    Professor Gino published these statements on her website, Francesca-v-Harvard.org, which she circulated to her colleagues and collaborators, including to over forty HBS faculty and staff on September 29, 2023, and an unknown number of "collaborators" on October 1, 2023.  Professor Gino's claims regarding the "July 16 OG file" have been reposted to and discussed on other sites and blogs, including X, formerly known as Twitter, and cited in one policy

research article.  Professor Gino's professional website also contains a link to her litigation blog, which she has continued to publicize on her LinkedIn, X, and other social media profiles.

94.     As a direct and proximate result of Professor Gino's false, malicious, and defamatory statements, Harvard has suffered reputational damage and economic losses in an amount to be determined.  She impugned and discredited members of the Investigation Committee, eroded internal trust in investigation processes, and damaged external confidence in the Harvard processes for assessing claims of research misconduct.

## PRAYER FOR RELIEF

95.     WHEREFORE, Harvard respectfully requests that this Court grant the following relief:

i.   Judgment in favor of Harvard against Professor Gino, for damages in an amount to be proven at trial.

ii.  Judgment in favor of Harvard, and against Professor Gino, for Harvard's expenses and disbursements in this action, including but not limited to reasonable attorneys' and experts' fees and costs; and

iii. Such other and further relief as the Court may deem just and proper.

Dated: Boston, Massachusetts

August 18, 2025                                        Respectfully submitted,

                                                      *Douglas E. Brayley*
                                                      Douglas E. Brayley (BBO# 676821)
                                                      Jenny K. Cooper (BBO# 646860)
                                                      Elena W. Davis (BBO# 695956)
                                                      Ropes & Gray LLP
                                                      800 Boylston Street
                                                      Boston, MA 02199-3600
                                                      Tel: (617) 951-7000
                                                      Douglas.Brayley@ropesgray.com
                                                      Jenny.Cooper@ropesgray.com
                                                      Elena.Davis@ropesgray.com

                                                      *Counsel for Defendants President and Fellows
                                                      of Harvard College and Srikant Datar*

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on August 18, 2025, this document was filed through the ECF System of the United States District Court for the District of Massachusetts and will be served electronically on the Registered Participants identified in the Notice of Electronic Filing.

<u>*Douglas E. Brayley*</u>
Douglas E. Brayley