UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


_____

FRANCESCA GINO,

                    Plaintiff,          Civil Action
                                        No. 23-CV-11775-MJJ
V.
                                        February 25, 2026

PRESIDENT AND FELLOWS OF HARVARD
COLLEGE, et al

                    Defendants.
_____




BEFORE THE HONORABLE MYONG J. JOUN

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA  02210






JAMIE K. HALPIN, CRR, RMR, RPR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 7-204
Boston, MA  02210
jkhhalpin@gmail.com

APPEARANCES:

FOR THE PLAINTIFF:

Patrick J. Hannon
     &
Hampton M. Watson
Hartley Michon Robb Hannon LLP
101 Federal Street
Suite 1810
Boston, MA 02110
617-723-8000
Email: Phannon@hmrhlaw.com

FOR THE DEFENDANTS:

Jenny K. Cooper
     &
Laura Gaffney Hoey
     &
Shannon C. Kirk
Ropes & Gray - MA
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
617-951-8473
Email: Jenny.cooper@ropesgray.com

**Z-O-O-M P-R-O-C-E-E-D-I-N-G-S**

THE CLERK:  The United States District Court for the District of Massachusetts is now in session.  The Honorable Myong J. Joun presiding.  Today is February 25, 2025 -- 2026, I'm sorry.  We're on the record in the matter of *Francesca Gino v. President and Fellows of Harvard College, et al.  Case Number is 23-CV-11775.*  Will counsel please identify themselves for the record.

MR. HANNON:  Good afternoon, your Honor.  Patrick Hannon on behalf of the plaintiff and with me is my colleague, Hampton Watson.

THE COURT:  Great, good afternoon.

MS. COOPER:  Good afternoon, your Honor.  Jenny Cooper on behalf of defendants.  With me are my colleagues, Laura Hoey, and immediately next to me at my table is my colleague, Shannon Kirk, and both of them have noticed appearances recently, and just to note at the outset, Ms. Kirk leads our department's electronic discovery team and she's really our expert in the area and she's here with me today to help address any questions or issues related to the forensic images that defendants have requested and the parties two competing protocols.

THE COURT:  Great.  So good afternoon, everyone.  So thank you for the status report.  It was helpful and it looks

like there is still a bit left but here is -- just to save us a little bit of time, I want to start off with the forensic imaging protocol.  I looked at both proposals.  Generally, I think I am with the defendant here.  I mean, what Harvard is really interested in is the context data.  We're talking about the file log, system logs, the metadata.  They're not really so much interested in the content itself, and I think it makes sense to do it in phases in the way that Harvard has proposed which is -- and there was a cutoff date, November -- I forget the exact year -- I believe it's 2021.

MS. COOPER:  That's correct.

THE COURT:  But as an initial stage -- and I don't totally get, maybe Ms. Kirk can help me out here, but a forensically sound image I assume means an exact copy of these various drives and devices and so that a forensic analyst will be able to examine the system data or to figure out when and if certain files have been changed and moved, that sort of thing, and then I think we can move on to the sort of context data after that November 2021 date and then we can proceed to various key searches for content.

I mean, this is obviously generally speaking but I think just based on the differing proposals that I received and based on what I've just said, I think I will be able to give all of you a draft of a proposal consistent with what I've just said for you guys to look at and then to comment and then I

will adopt it one way or the other and I will just make decisions wherever there is disagreements, but hopefully this is a way to resolve the major sticking points so far.  So I will send that to you.  Mr. York will send that to you by the end of the day and then you can send letters or whatever pointing out either something that I've missed or if it's agreeable based on what I've so far decided, then let me know and I will adopt it.

MR. HANNON:  Can I be heard briefly on that, your Honor?

THE COURT:  Go ahead.

MR. HANNON:  And I appreciate that your mind may be made up on this, but just to make the point here.  From the plaintiff's perspective, we have no objection to defendants' obtaining discovery concerning potentially relevant metadata and sort of the context but what they're asking for is metadata regarding everything, metadata regarding purely personal e-mails that may be on her computer, metadata concerning health records of her children, metadata concerning her tax returns and that metadata, it's, you know, that is all the data about the data, right.  So it's all those zeros and ones and just because, you know, they're going to redact out the files themselves, you know, the sort of privacy and overbreadth concern is that they are asking for access to metadata of every single file and anything that was on her computer prior to that

date without any kind of limitation whatsoever as to what would be potentially relevant and that has been the sticking point with respect to that sort of piece of this is, you know, they should be able to identify what metadata they want or at least have their expert identify what metadata they want and really the concern is even if they're getting the metadata, that metadata still communicates information.  It still shows file names.  It still has content that's reflected in metadata even if you weren't getting the file itself and that's the big concern with this sort of phase issue.

THE COURT:  Generally, I think I understand your concern, Mr. Hannon.  I just don't understand, maybe you can explain it to me, how the file or system log data or the metadata can contain this sort of privileged or sensitive information you're worried about if they don't have access to the content itself.

MR. HANNON:  Well, I believe that the metadata, it can include the content.  I am not sure that there is a clear distinction here between metadata and the content, but one sort of prime example that we see a lot is we see file names.  File names are part of the metadata and file names oftentimes describe what the document is.  I'll sometimes have clients name a file reflecting what it includes, what they think it includes.  Likewise, folder structures, people will oftentimes name their folders based upon what the content of the files

therein are.  So I don't think it's safe to say as a blanket matter that metadata can never include the content.  Indeed, defendants' protocol suggests that it might and says we should have a chance to look at the metadata but that's a lot of data because it's not in any way limited to any particular types of files.  It's not limited to any particular date ranges.  It's anything prior to that first cutoff date.

MS. KIRK:  Can I respond to that, your Honor?

THE COURT:  Yes, Ms. Kirk.

MS. KIRK:  Okay.  So I think that we've got to the start somewhere, right, and the protocol that Harvard has put forward is actually overly redacting information that we're entitled to but it's a way to get us going and I want to talk about the different types of system logs and metadata that we really should be talking about here.  So what we're doing in responding to Mr. Hannon, right, is these are overly general claims and concerns about privilege, and what we have done is an overly redacted protocol to get us started and I appreciate your Honor recognizing that has a first phase.  That's how we view it too, but it's a controlled entry to get that contextual data that we need.

Mr. Hannon talks about file names and file paths.  All of that we know is also highly relevant to our claims and defenses, stuff that we uncovered in the third statute hearing. So when Mr. Hannon talks about file names, for example, what he

is really talking about is file-level metadata that would be the properties of a document.  You may be familiar with it yourself if you right click a word document, okay.  So that is one form of a metadata and we have found that that is relevant for us.

It would be impractical, right, for us to wait for Mr. Hannon to go through what we are entitled to have here to redact everything there, and what we came forward with after, by the way, unilaterally continually updating that protocol three different ways to address these concerns, is impractical to not go at it in the phases that we have.

In addition to that metadata, you're absolutely right, your Honor, there is all kinds of contextual information.  The system logs here that we know are relevant are bash logs. That's definitely one that there is no way there is anything privileged in that.  I have never come across that and I haven't heard Mr. Hannon articulate a reasoned basis that satisfies work product and attorney-client privilege relevance for bash logs.

Bash logs, your Honor, will give us command line prompts that we know somebody executed on relevant data here to back date.  That's just one of them.

There is also a difference between a file level property metadata and application metadata.  Both of those we have found to be highly relevant in this matter, system logs,

et cetera.

So while I appreciate Mr. Hannon has raised privilege claims and concerns and privacy, we dispute, by the way, the privilege claims in large respect to some of these metadata and system logs.  Mr. Hannon has not provided us a practical solution in order for us to get this very necessary forensic information, the contextual information you're talking about, and if you compare our protocol to other protocols in cases that we cited in the letter we gave to you, ours is actually far more conservative and actually will take us a little bit longer, but it is a controlled protocol, your Honor, in order to level set between the two parties to make it easier.

MR. HANNON:  Can I respond, your Honor?

THE COURT:  Well, I don't want to spend too much time on this because again, Mr. Hannon, I think I have a general sense of your concern but the concern that you raise is not specific enough for me to say this is how we can deal with it or protect it.  Part of the -- I mean, even if let's say a file is named "Conversations With My Attorney," they're not going to have access to the actual content of that file.  I mean, they will simply have the name of that file, right, and given that the information isn't being directly given to the defendants but that this is being given to an analyst who will be, at least according to the protocol, will get instructions from the parties, will segregate information that is relevant and not

relevant, could be protected, not protected, that gets sent to -- whatever the findings are get sent to you first, I think, Mr. Hannon, and then you look at it and say, "I think this is protected information," you provide a privilege log and then there is a little bit of back and forth, and if you can't agree, then it will come back to me and then I will get to decide it, but as a starting point, they have to have the system level data to figure out whether some of these files have been manipulated, when it was manipulated, when things were put on her laptop or not put on her laptop. I mean, how are they going to figure that out without this information?

MR. HANNON: Sure, and your Honor, we have never had any objection to them having accesses to that information. It's really just a process matter. I think the process, your Honor, just identified is actually different from the defendants' proposed protocol. So the defendants' proposed protocol would be actually turning over all of the metadata and all of the -- anything besides the -- the sort of documents themselves to the defendants and sort of taking the analyst out of the picture and we would not be able to see what metadata they're actually searching for, what system logs they're actually looking for, how all the zeros and ones on that computer are being manipulated to kind of reconstruct what the potential content is.

THE COURT: So why don't we do this, why don't we wait

until you get a copy of my draft and then if you think that your concern hasn't been met and you still have this concern, then I will hear from you again but at least take a look at the proposal that I am going to send you later today.

I think given that this is going to a third-party analyst that both sides are going to agree on first and then there is layers of how that information gets then transmitted to the parties, I think is enough protections in there along with the claw back provision, I think the concern that you're raising isn't as great as you think it is right now.  So let's put this on hold for now.

The other thing is the actual content is ways down the road, right.  I mean after -- again, I don't think Harvard is really interested, maybe at some point, for discrete things that can be key word searches to where it goes out, but let's just take this one step at a time.

There was also a dispute about the cost of this analyst.  I just want to quickly touch on that.  I think this is something that the defendants really want in discovery.  My impression was plaintiff wouldn't care whether any searches happened so I think that defendants will initially bear the costs.  I mean, depending on how things develop, we'll figure it out at the end, but I am going to order that the defendants bear the initial costs.

Again, I will send you over my proposal by the end of

day today, but what I really want to get to is the discovery disputes because I know the deadline is over now and I promised that I would give you an extension but I really want to get a scope of how much of this discovery is left and whether we can keep to the schedule that we adopted some time ago with regard to summary judgment.  We have a trial date now.  I want to make sure that we can keep that trial date.

So let me start with the requests for admission and what I would like to do is I would like to go through them one by one.  I am looking at Request for Admission Number 4.  Can someone explain to me just a little bit more what this July 16 OG file is?

MS. COOPER:  So sorry, your Honor.  I didn't quite hear the question.

THE COURT:  The July 16 OG file, is this like a dataset that you, Harvard, alleges that she manipulated?  This is what you call what she fabricated back in 2023?

MS. KIRK:  So I am happy to answer.  Yes, that's exactly right, your Honor.  It is the core document that we have evidence showing was on what we call the unknown device and it is a presumptive replica of a 2019 document that is pure and accurate called a tax study document.  The July OG file, as it's referred, that is the one that was backdated and it was moved on a USB onto the Harvard laptop that was in the third statute proceeding, your Honor.

THE COURT:  So, Mr. Hannon, it seems like a very simple statement that Harvard wants Ms. Gino to either admit or deny.  I mean, was it ever in her custody, control, possession?

MR. HANNON:  Yes, but just to clarify what the defined term that you see here in the request for admission July 16 OG file, that's actually different from what Ms. Kirk just described.

THE COURT:  I am looking at the request now.  It says, "Admit that the July 16 OG file exists in your possession, custody or control."

MR. HANNON:  Correct.  So that's referring to a very specific version of a file, and so part of the complexity in this case is that there are a whole bunch of files with sort of the same exact file name and after this file was discovered by Professor Gino, it was provided to others as part of sort of discovery and whatnot, and candidly speaking, she does not on her own have the ability to confirm precisely which file she has is that file that she found.

THE COURT:  But that wasn't your objection.  Your objection here was it was not relevant.

MR. HANNON:  That was initially an objection, correct, and I believe at the time that we objected on relevance grounds, Harvard had not asserted a counterclaim.  So this is an alleged act that occurred during the third statute proceeding.

THE COURT:  Let me just ask Ms. Kirk and Ms. Cooper then.  Are there multiple versions of the July 16 OG file?

MS. KIRK:  We don't know.  That's our trouble here. What we do know, your Honor, is that what we discovered by way of forensics in the third statute hearing is that on the heavily redacted Harvard laptop that we got in 2024, we found evidence that there is what we call for purposes of this conversation the July 16 OG file.  We know, and Professor Gino's forensic expert in that hearing agreed, we know that that July 16 OG file, also you could think of it, Judge, as another version of the tax study file, was on an unknown device, everybody recognizes that, and then it was transferred via a very specific USB with a serial number.  So plaintiff has that USB, should be able to track that path.  It then goes on the Harvard laptop, Judge, and it replaces the original and accurate 2010 tax study document.  So to answer your question, are there multiple versions of the July 16 OG version file, that is precisely something we want to figure out in forensics.

MS. COOPER:  Your Honor, if I may?  I apologize.  I know it can be confusing to have multiple people speaking. This issue I think does relate both very much and identifies sort of the way in which the outstanding discovery issues are related to the forensic images that we had been seeking, but in case it is helpful, and I want to be very clear, the document, and Mr. Hannon referred to the way it was defined in purposes

of requests for admission, and this is the subject of Harvard's counterclaim for defamation.  So this is a specific file that she spoke publicly about on her website.  That is what we're asking about.  She told the world about this file that she found that exonerated her.  The discovery is related to a statement that she makes that is related to a counterclaim.  We actually, as Mr. Hannon noted, since the time of the plaintiff's initial response, the counterclaim has been filed so it is the file that she spoke about, published about, on her website.

THE COURT:  So, Mr. Hannon, I am going to allow the motion to compel on Request Number 4.  I mean, she acknowledges that she made or caused statements about this July 16 OG file to be posted publicly on her website.  That's a website that she owns.  If the concern is which July 16 OG file, then in your answer in admitting or denying this, you can specify to the extent that you can what versions are in her possession custody or control.

MR. HANNON:  Yes, Judge.

THE COURT:  So let's go to Request Number 6.  I think I am going to grant this one as well.  I mean, that's also a very simple request, "Did she or did she not provide the July 16 OG file to Harvard anytime since the investigation?"  I am not sure what you mean when you say that she doesn't have enough information for her to admit or deny this.  Either she

did or she didn't, right?

MR. HANNON:  Well, the complexity comes from this point, your Honor, is that in the course of the third statute proceeding, Harvard was provided access to various electronic devices and so this July 16 OG file issue, this came up at the sort of eleventh hour in the third statute proceeding, kind of after all the expert work had been done and everything had been submitted.  This was sort of tangential issue that's been dropped in, and as a result of that, there was no analysis done of all these various devices specifically looking for this particular file and so that is the reason why it's sort of impossible to say without actually going back and looking at everything that was produced whether or not sort of a copy of that file was contained in any of those devices that was produced.

THE COURT:  And you're not able to look at it now?

MR. HANNON:  We are, but, again, that requires expert sort of analysis.  Again, there is lots of complexity here because we're talking about different versions of files and a lot of different devices as well.

MS. COOPER:  Your Honor.

THE COURT:  Go ahead.

MS. COOPER:  If I may, I am not sure how that -- she's the one that published her website with the statement about the file.  I hope she knew what file she was talking about at the

time.  Also, there was not analysis of this file in the tenure proceedings because plaintiff refused to answer any questions about it and she withheld information on the ostensible basis of privilege.  It was not that it was raised at the eleventh hour.  It's that the plaintiff refused to engage or any questions or permit her expert to and there was no judge to decide whether privilege applied.

MR. HANNON:  That's not accurate, your Honor.

THE COURT:  The request for Number 6 is granted.

Looking at Number 7, I don't know how she can admit whether or not these eight individuals had handled the data. How would she know?

MS. COOPER:  Your Honor, we have -- that is a request that we had followed up on maybe back in November but we agree with your Honor, we're not pursuing that further at this time. If it's helpful, 4 and 6, which you have addressed, 8 through 11 and 15.  Sorry, your Honor.

THE COURT:  Say that again.  Are you withdrawing?

MS. COOPER:  With respect to our Request for Admission Number 7.

THE COURT:  Yep, okay, but not the others?

MS. COOPER:  Not the others, not 8 through 11 or 15.

THE COURT:  So 7 is withdrawn.

MS. COOPER:  And 12, I'm sorry.  I have them grouped because some relate to data and Number 12 is a different issue.

THE COURT:  So you're withdrawing, I'm sorry, 7, 10 and 12?

MS. COOPER:  No.  We're withdrawing 7.  We continue to press for 8, 9, 10, 11, 12, and 15.

THE COURT:  Okay.  So let's go to 8.  So how about the phrasing here.  I am looking at the other ones as well.  Like 8 says, "Admit that the 2023 tax study file was edited."  9 says, "Admit that the 2023 tax study was placed on the laptop."  10 says, "Admit that this file reflects a file system date modified metadata was this."  So with these requests, unless Gino herself edited it, placed it on her laptop or modified it on this date, then if those are true, Mr. Hannon, then you need to answer the requests for admission and say that, but if she didn't, then I think you can say, deny that Gino edited it or placed it on her laptop, that she didn't do that herself, and Harvard is going to have to figure it out through I guess what we talked about earlier, through forensic examination of this, the data and the laptops as to whether or not all these things occurred.

MR. HANNON:  Just if I could just confirm, would I be right then essentially sort of rephrasing each request as opposed to admit that, admit that --

THE COURT:  So just to be clear, as phrased in these requests for admission, they're denied.  So if you revise the requests for admission to say admit that you modified this,

admit that you placed it on your laptop, then, Mr. Hannon, your client has to admit or deny each of those things, but as phrased now, I am not sure how she can admit or deny.  I agree with Mr. Hannon, and Harvard would have to determine all of these things through the forensic examination of the drives and the laptop.

MS. COOPER:  Your Honor, if I may, and I am not sure exactly if you're suggesting that the request literally be rewritten, we might want to modify it to include something that she directed or knew about instead of doing it physically herself, if so, that is, if they are to be rewritten, but the other point I was going to make is that the request for admission, what the rules require is also that a reasonable inquiry be made.  So, for example, if she has worked with an expert who has confirmed that some of these things are true or she's working with an expert who can, I believe that that is within the scope of a reasonable inquiry that she would make. Our question -- I appreciate the issue that you're raising, she can't know everything in the world.  I very much do appreciate that, and it's true that we articulated these requests purposefully not to just ask if she did it because she may have knowledge about these things happening regardless of whether she's the person who specifically took the action.

THE COURT:  But my suggestion about revising these requests is simply a suggestion --

MS. COOPER:  Understood.

THE COURT:  -- in order to clarify and make it more clear exactly what you're asking Ms. Gino to admit or deny. However, I degree with you that it goes beyond her personal knowledge and that under the rules she has an obligation to answer this beyond her personal knowledge.  I get that.  But we forget that we haven't even started expert discovery yet and I am not going to force plaintiff now at the present time to consult with her expert before expert discovery has been completed in order to answer these requests for admission.  I am not going to do that.

MS. COOPER:  Understood, your Honor.

THE COURT:  All right.

MS. COOPER:  Number 12.

THE COURT:  Yep, I'm looking at 12.  Give me one second.  So why is this relevant?

MS. COOPER:  Well, the plaintiff has suggested, perhaps not explicitly yet in something that has been filed with your Honor but through the course of discovery and publicly through many voices has -- and in the tenure proceedings at Harvard has indicated that she was forbidden from engaging in forensic experts during the HBS investigation. Harvard disputes that.  There is a dispute about that.  She has made it relevant in claiming that among the reasons she claims the process wasn't fair is the fact that she was prohibited

from doing this.  We are asking this question in particular because she was represented and because she had a lawyer who communicated a number of things including, you know, lengthy letters to the school and to the General Counsel of the university regarding things that they felt were not proper during the process and this was not something among the grievances.

THE COURT:  Well, you can explore that during her deposition.  No one is going to stop you from exploring that with her then but I am going to deny the request here.

MS. COOPER:  It just doesn't compute, your Honor, with all due -- I am not sure why she shouldn't be held to know what her lawyer did on her behalf.

THE COURT:  It's not that.  I am more concerned about the relevance to the claims and defenses in this case and I am sure that this relates in some way to the issues, but as phrased, I am not sure that it is entirely relevant at this time.  I am looking at it now and I am not sure that I completely get it even after hearing from you.

MS. COOPER:  She has made an allegation that Harvard breached obligations to her.

THE COURT:  Right.

MS. COOPER:  By not -- in a number of ways and one way is that Harvard allegedly did not permit her to engage a forensic expert.  Harvard denies this.

THE COURT:  Okay.  But your admission here that the request for admission here wants her to admit is that her attorneys during that investigation did not raise any concerns to Harvard about the inability to retain an expert.

MS. COOPER:  That's correct, your Honor, and this is because, in short, Harvard does not believe that Professor Gino ever thought she was not permitted to engage a forensic expert. Harvard believes that she knew she could do so if she wanted to and Harvard told her that she could.  Harvard believes that it defies any reason, any possibility, that her lawyer, who is very experienced in these matters, would have failed if her lawyer actually believed she was not permitted to engage an expert, that her lawyer would not have told the university at the same time that he was telling the university other things that he thought were unfair that he would not have said that it was unfair that she was forbidden to engage in.  The issue is that Harvard is certain she knew that she could.

THE COURT:  Okay.  It's denied.

MS. COOPER:  Okay.  Thank you, your Honor.

THE COURT:  So looking at 15, so what are data values? Ms. Kirk, can you help me with that?

MS. COOPER:  Go ahead.

MS. KIRK:  Sure, of course, your Honor.  So data values here, we're talking about a lot of numerical calculations in Professor Gino's various studies.  So this

would just be a value within this particular study.  So it could be essentially the data that is within this study, the value, those were the items that were altered and modified and falsified.

THE COURT:  Okay, thank you.  But looking at the question, how can something that was sent before the paper was published contain data values that were modified after the paper was published?

MS. COOPER:  This was something that was sent after the paper was published, the paper in question.

THE COURT:  It says the data was sent to Lief Nelson in April 2014.

MS. COOPER:  And the paper was published earlier than April of 2014.

THE COURT:  I see, all right.  So I think this goes sort of in the same vein as Request Number 9, 10, 11 as well as 8.  If the question was did you modify, then I think, Mr. Hannon, Ms. Gino would have to admit or deny, but as currently phrased, I am going to deny it for the moment.  You will have to discover that during expert discovery and during this forensic examination.

Is that all of it or did I miss any?

MS. COOPER:  That is everything in connection with the requests for admission, your Honor.

THE COURT:  All right.  In your status report, you

also mention various privilege logs and challenges to them.

MS. COOPER:  Yes, and one thing to be clear that we had raised earlier by way of a discovery dispute, if it's okay, your Honor, there are some redacted text messages.

THE COURT:  Yep.

MS. COOPER:  That we were hoping to resolve with your Honor today.

THE COURT:  Sure.

MS. COOPER:  Questions about those.  And specifically, and this is an issue that was outlined both earlier but also in our January 23 letter to the Court and we did discuss this a bit in the January 14 conference.  So there are two different text messages with two different third-parties that the plaintiff has produced in discovery.  Those text messages contain redactions in different places throughout and we believed that redacting for attorney-client privilege was not appropriate since these were communications with third-parties. In the July -- I'm sorry, not July.  In the January 14th hearing, Mr. Hannon, I am confident that I am speaking correctly, although he can speak for himself, indicated agreement that attorney-client privilege had been waived but said that he thought that work product protection would not have been waived.  We had somewhat thought, and it was after that conference, your Honor, that Professor Gino completed what she considered all of her remaining discovery productions.

There were no changes; that is, we didn't receive any revised production of the text messages.  All of the redactions that were there originally -- we have, in fact not gotten any other documents, but in the produced documents, several redactions are marked only attorney-client privilege and some are marked attorney-client and work product.  We gather that the plaintiff's position now is that all of the communications constitute work product because none of the redactions had been removed.  This seems odd given the way they were produced.  In January, Mr. Hannon suggested maybe these messages could be produced to your Honor for review in camera, but it seems like it might be appropriate to move this along.  We're not sure what the basis of work product protection would be with these two individuals, but certainly, to the extent there are redactions just based on privilege, it seems appropriate.

THE COURT:  And who are these two individuals, like research assistants or co-researchers?

MS. COOPER:  They are not, to my knowledge, co-researchers, at least specifically in connection with any of the papers that were at issues in these proceedings.  They are colleagues or former colleagues.  Frances Frei is one HBS professor with whom she was texting.  Ms. Frei, also appears in over 200 entries on plaintiff's privilege log.  She is someone with whom the plaintiff has collaborated and conferred related to claims and the other is another professor named Laura Wang.

THE COURT:  I see.

MS. COOPER:  Who is another third-party.

THE COURT:  Mr. Hannon.

MR. HANNON:  So, yes, the redactions are being withheld on the basis of work product.  I believe that's identified on our privilege log as being work product.  To the extent this says attorney-client privilege on the actual redaction themselves, that's probably a function of how much room there was, but you know, in terms of why they're work product, these were individuals that were assisting Ms. Gino in terms of organizing her defense and communicating with counsel and so we do believe that these are work product and would have no objection for submitting them for an in camera review.  Candidly, there is nothing terribly interesting, but that might be the quickest way to resolve this.

THE COURT:  All right.  Send it to me.

MR. HANNON:  Judge, mechanically, can we circle back with Mr. York and find out the mechanics for doing that?

THE COURT:  Yes.

MR. HANNON:  Okay, thank you.

THE COURT:  So what are these privilege logs?  You know what, I don't think we can resolve this today, right?  I mean, you need some time to go through them.

MS. COOPER:  I think that's correct, your Honor. There was just one issue that I think might be ripe in terms of

some information we requested but it's certainly the case that we've started the meet and confer process with Mr. Hannon and I think he's indicated that he's going to be sending us some questions about our log.

THE COURT:  So other than these issues that we talked about so far, there is a few depositions that are still outstanding.  Give me an idea, how many depositions are we talking about that you still anticipate taking?

MR. HANNON:  Judge, on the plaintiff's side we have one deposition scheduled for this week and then after that we have four additional ones.

THE COURT:  Okay.  From the defendants' perspective?

MS. COOPER:  So your Honor, from defendants' perspective, there is a third-party deposition.  It happens to be Frances Frei, one of the people we just mentioned, that was going to be taken this week.  It was rescheduled during the blizzard and will be taken next Thursday, and of course, we need to depose the plaintiff, and I know that we mentioned this in the status report, but if I may, your Honor, we're flummoxed by these four additional depositions in addition to the one that's been scheduled that Mr. Hannon indicates he intends to take.

He noticed, the plaintiff noticed, forgive me, depositions on October 10 of 2025.  They were notices, one for Harvard, the 30(b)(6) notice.  The notice contained no

description of the matters for examination as the rule requires, and there were three notices for third-parties. One of those third-parties is Claudine Gay, and to be candid with your Honor in light obviously with her affiliation with Harvard, it was not necessarily unreasonable for Mr. Hannon to serve us with a notice, but we did not let him know that day, October 10, 2025 that we did not represent Ms. Gay, that she has counsel and we could not accept service of the notice on her behalf. He indicated that he intended to issue subpoenas later but there has been nothing further. We also, in October, communicated to Mr. Hannon that we could not schedule or produce any witnesses under Rule 30(b)(6) because there had been no indication of the topics that the plaintiff intended to examine Harvard on.

There has been no action since then. No communication about scheduling. No issuance of any subpoenas for the third-parties. No correction, what I will call a correction, but no articulation of any 30(b)(6) topics. And, you know, here we are. Discovery is supposed to close tomorrow. Nothing happened since October 10. It would burden Harvard. It's true the sixth deposition will be tomorrow and Friday but at this point has produced and prepared six witnesses for deposition. To now, at this time, after multiple extensions of discovery following, you know, real problems getting engagement, for Harvard to have to receive as yet undisclosed topics and

prepare witnesses for a 30(b)(6) deposition as well as to further disrupt the case schedule to permit only now issuing subpoenas to depose three third-parties does not seem appropriate, your Honor.

THE COURT:  Mr. Hannon.

MR. HANNON:  Your Honor, we issued those notices back in October.  The dialogue with Harvard at that point was identifying sort of the entire course of depositions so we could start getting things scheduled and move them along.  So we, I think reasonably, prioritized taking the six depositions of the folks that Harvard controlled before moving on to figuring out if there were additional topics that those individuals didn't have sufficient knowledge on.

As identified in our letter, the last of the six, the one that's going to be happening this week, Harvard did not make him available until this week.  Apparently, he's had some serious health issues.  He is sort of a very key cog in this case and his knowledge relates to other third-parties as well which is why we have been trying to get his deposition done here before wrapping up the rest.  So I think given the delay with respect to getting him scheduled, they just finally gave us dates for him a couple weeks ago, and, again, his availability was limited to this week.  So we are trying to move this forward.  You know, we are confident we can get this wrapped up promptly but getting his deposition done and over

with is really critical.

THE COURT:  But it sounds like, at least from Ms. Cooper's point of view, since October 10 and then soon after defendants notified you that, number one, the 30(b)(6) notice was insufficient because there were no real topics proposed.  You haven't done anything.  You haven't -- I mean, is my impression correct that there hasn't been any further back and forth, any meetings, any discussions about when these depositions are going to take place?

MR. HANNON:  Well, there has been a lot of discussion about getting the six depositions done of the folks that we have been trying to get done here first.  So we coordinated those.  We got those done in December, I believe.  We then moved on to Mr. Bonacossa, and, again, he was not made available to us until this coming week.  So we've been trying to get through these depositions in order to identify what, if any, topics we need with respect to a 30(b)(6) from Harvard.

MS. COOPER:  There has been nothing communicated to us, your Honor, since October 10 regarding a 30(b)(6), just to be clear.

THE COURT:  So besides Mr. Bonacossa, who you just mentioned will be happening soon, who are the other three?  We have Claudine Gay?

MR. HANNON:  Correct, your Honor.  Mr. Simmons who is a third-party member of Data Colada and also Mainstone which

was the entity that Harvard retained to do the original forensic analysis.

THE COURT:  All right.  And explain to me why there weren't any topics attached to that 30(b)(6) Notice of Deposition?

MR. HANNON:  For Harvard?

THE COURT:  Yeah.

MR. HANNON:  At that time, I don't believe we fully received much in terms of document production.  I believe the vast majority of that came after and it's still been trickling in including this week, and the point of doing the 30(b)(6) deposition, your Honor, is to ascertain information that's not known to the individuals that we've deposed.  So we have been taking the depositions of the people directly involved and then trying to ascertain what additional categories of information may exist that they don't know about.

So, for example, one category of information that's sort of come to light is the communications with Data Colada.  There is an e-mail produced in discovery that reflects that there was communication between Harvard and Data Colada at a very critical point in time and the author of one of those e-mails, she, when we took her deposition, she disclaimed any knowledge or any recollection in terms of what the purpose of that was.  We have ascertained through discovery that maybe other individuals within Harvard do have that knowledge.  So

that would be one area that based upon the discovery that's been taken to date that we think would be an appropriate area for a 30(b)(6) deponent.

THE COURT: I am just not sure that I totally understand all of them. I mean, they're just general topics that you want to explore, enough notice so that Harvard can designate witnesses that might have knowledge as to those topics, and they can't move until you provide those topics.

So my plan was that I was not going to give -- extend the discovery deadline by a certain date. I was going to simply leave it up to you, the parties, to fit it in and figure out when you can complete it and I would just simply allow that as long as we can keep the remaining deadlines, but I don't want to prejudice Harvard to the extent that you have all of these additional people that you need to depose and it's hard for me to gauge exactly who, if any, of these additional deponents would have to be deposed first. I mean, in terms of expert discovery, I don't want that to be delayed by not completing these depositions. I guess that's my concern.

MR. HANNON: Yes, Judge. I think given the forensic protocol in that search, my understanding is that Harvard does not intend to take Professor Gino's deposition until all of that is completed. So I think we're already looking at, you know, likely months here.

THE COURT: Ms. Cooper any suggestions?

MS. COOPER:  With respect to Professor Gino's deposition, it is true that we have been focusing on the forensic image discovery for a long time and would like to have it before completing her deposition.  If it makes sense to open her deposition at a time earlier, then that's, you know, completed, we could consider that.  I don't think we know how long it's going to take for certain ones until we see the protocol that your Honor sends today and the parties begin.  Yes, that is discovery Harvard has claimed pending against her about it and the information is otherwise relevant to her claims and Harvard's defense.  So, yes, we do want it before deposing her.  I still don't -- I am not sure how that means that it won't be disruptive to try to subpoena multiple third-parties where no action has been taken since October 10 of last year.

THE COURT:  So I'm not happy that plaintiff just sort of sat and has not moved on these depositions for months.  I am not happy about that.  However, given that there is all this other outstanding discovery that's still pending, that still needs to be completed, I am not going to foreclose plaintiff from deposing these additional fact witnesses.  I am just going to give all of you the time to complete whatever it is you think is necessary from your perspective positions, but Mr. Hannon, you really need to start moving on completing these depositions as soon as possible, especially if they're not

dependent on the expert discovery, the forensic examination. If these are -- I don't understand why Claudine Gay could not have been deposed months earlier.  So if they're not -- I think I will just stop here.  I will let you guys figure it out.  But I want to keep the deadlines that we have in terms of expert discovery, summary judgment and trial.  As long as we can keep those dates and you're able to figure out and squeeze in and complete the fact discovery, I am okay with it.

MS. COOPER:  And, your Honor, may I ask a couple things for clarification?

THE COURT:  Yes.

MS. COOPER:  Thank you.

THE COURT:  Yes.

MS. COOPER:  Thank you.  Well, with respect, let me ask about the 30(b)(6) deposition first.  Is your Honor -- is your position, your Honor, that Mr. Hannon -- that the plaintiff is permitted to proceed with that even though we don't have any topics?

THE COURT:  I thought I had said Mr. Hannon needs to provide the topics to Harvard as soon as possible.

MS. COOPER:  Okay.  I wasn't -- if you did say that, I apologize.  I heard you speaking specifically about the third-party depositions and I just wanted to confirm.  And would your Honor not impose any deadline prior to the summary judgment deadline, for example, that these depositions need to

be completed if the plaintiff is going to take them?

THE COURT:  Well, I think the longer depositions -- it seems like Ms. Gino's deposition is going to be last, right? Isn't that --

MS. COOPER:  I don't know that that's the case.  It depends on when these third-parties are available and I don't know what the 30(b)(6) testimony might involve but I am not sure why any of those things couldn't happen before.  I don't know that she would be last.

THE COURT:  Well, summary judgment is due on June 23.

MS. COOPER:  Correct.

THE COURT:  I think, at the latest fact discovery has to be complete by the end of May, right -- I'm sorry, the end of April.  No.  I can give you until the end of May.  That's really cutting it close because you're going to need some time to get a transcript and so forth in order to file your summary judgment motion in time.

MS. COOPER:  That's correct, and so appreciating that we need to get through the forensic protocol, I guess what I am -- I am hoping to avoid that these four depositions that the plaintiff --

THE COURT:  So all discovery, including expert discovery, should be completed by May 5, okay.  So all of the depositions, all of the fact discovery, by that same May 5 date.  Will that work?

MS. COOPER:  I think so, your Honor.

THE COURT:  Okay.

MR. HANNON:  Your Honor, the only challenge I foresee, your Honor, is, you know, to the extent that there is information allegedly obtained throughout the forensic search protocol then -- and depending upon what that protocol looks like, so, for example, if defendants are getting these devices and they're allowed to go off and do a whole bunch of stuff and then come back to us and tell us what they found on May 4, that would just be problematic in terms of us having an opportunity to do something with that.  That being said, your Honor, I think that's also just something we deal with if and when it comes up if there is some sort of a late disclosure that we have concerns about.  We can obviously bring that to your attention as well.

THE COURT:  Well, we really have just a little over two months left, right.  May 5 is going to come up real quick and so I am going to send you my proposal today.  I want to finalize something and I will endorse it by tomorrow if you get it back -- if you get back to me about the draft.  And then going forward, whatever disagreements you have, I want you to immediately have that meet and confer when that disagreement comes up and then within a day or two, bring it to my attention so we can try to resolve it quickly.  It we continue waiting weeks at a time, we're never going to finish by that May 5

deadline.

MR. HANNON:  Yes, Judge.

THE COURT:  So why don't we stop here today.  Review the draft, get back to me as quickly as you can and then you can start.  Do you have an analyst already in mind?

MR. HANNON:  Defendants have proposed someone and I've reached out to try to schedule a call.  Haven't had any success yet in part because of the storm this week but my expectation is that person is probably going to be acceptable.  Just need to have a call with them one on one to sort of touch base and confirm that.

THE COURT:  All right.

MS. KIRK:  I ask your Honor for just one sort of deadline from Mr. Hannon, if I may.  We have been trying to launch this protocol for a long time, months and months.  Would your Honor entertain a deadline for Mr. Hannon to agree on that third-party neutral with us by no later than next Wednesday?

THE COURT:  Is that acceptable to you, Mr. Hannon? That seems reasonable.

MR. HANNON:  Yes, Judge.

THE COURT:  All right, great.

MS. KIRK:  Appreciate it.

THE COURT:  All right.  I want to schedule a status with all of you in a month, about the midway point, just to make sure that we're on track.  How about that last week in

March, Mr. York?

THE CLERK:  This court can be available on March 26 and we can do that at 2:30 p.m.

THE COURT:  All right.  Thank you.

THE CLERK:  This Court is in recess.

**(A-D-J-O-U-R-N-E-D)**

- - - - - - - - - - - -

CERTIFICATION

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.


/s/Jamie K. Halpin_____        March 18, 2026_____
Jamie K. Halpin, CRR, RMR, RPR          Date
Official Court Reporter