# EXHIBIT 1
# Filed Under Seal

# In the Matter Of:

## Gino vs President and Fellows of Harvard Coll.

1:23-cv-11775-MJJ

## BENJAMIN EDELMAN

*May 05, 2026*



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Q   Do you maintain separate books and records for the financials of the Law Office of Benjamin Edelman?

A   Law office has very simple financials, and so I -- I do maintain them in an organized way.

Q   How many clients do you currently represent as an attorney?

A   I think it's less than ten.

Q   Is Francesca Gino currently your client as an attorney?

A   Yes.

Q   Do you have any other clients -- I'm not asking for identities.

    Do you have any other clients other than Professor Gino?

A   Yes.

Q   How many approximately?

A   Less than ten.

Q   Again, just asking how many, not identities.

    Approximately how many clients have you represented as an attorney in the last ten years?

A   Taking a class action, considering, quote/unquote, clients to be only the named plaintiffs and not the members of the class, which that would be a lot.  I have certified classes that I -- that I've been involved with in the last ten years.



And I think there may be more than immediately come to mind.  For example, I remember a case for which we had maybe four, five, six named plaintiffs on the case.  That right there is going to start to increase the numbers relative to the less than ten that I gave you a few minutes ago.  I'd say less than 30 within the last ten years.

Q   You said a moment ago that you do not take prepayment of legal fees; is that right?

A   Yes.

Q   Do you bill on an hourly basis, on a contingency basis, some combination thereof?

A   I've accepted some work on an hourly basis and some on a contingent basis.  Maybe some on other bases; project basis, for example.

Q   Do you do any legal work on a pro bono basis?

A   I do.

Q   Can you characterize the extent of your pro bono practice?

A   There are multiple pro bono matters that I have helped with recently within the last year since leaving Microsoft as I've had more control over my time and schedule.  I do like to have matters that are important to me.  And it's been a pleasure to work on some pro bono matters as part of that.



welcomed.

Q    Who did you report to at Microsoft?

A    I reported to Michael Schwarz, S-c-h-w-a-r-z, whose title was CVP, corporate vice president, and chief economist.

Q    Why did you leave Microsoft?

A    I felt that I couldn't achieve my full potential there.  The place is both big and small at the same time, and I preferred to have more control over my schedule and more control over the projects that I worked on.

Q    Before working at Microsoft, you had an appointment at the Harvard Business School, right?

A    I did.

Q    Were there any professional endeavors between Harvard Business School and Microsoft?

A    No.

Q    What was your field of study as a faculty member at the business school?

A    My discipline was economics.  I'm not sure the term "field of study" is routinely used in the interdisciplinary school that it was.  But I was writing primarily in economics, in management, some in law, and some sort of for business practitioners.

Q    What was your -- I've heard this described



A    I will follow the instruction.

Q    There came a time when you filed a lawsuit against Harvard; is that right?

A    Yes.

Q    Did you at some point post a website about your lawsuit against Harvard?

A    Yes.

Q    And was that website called Edelman-v-Harvard?

A    .org, yes.

Q    .org.

When did you create that website?

A    I posted it coinciding with the filing of the complaint.  I suppose I created it in the weeks or maybe months prior to filing the complaint.

Q    Is that website still active?

A    Yes.

Q    Who maintains it?

A    I do.

Q    Does anyone else have control over the content of that website?

A    No.

Q    Are you represented currently in that lawsuit against Harvard?

A    Yes.

Q    By whom?



2023.

Q   (By Mr. Brayley)  Did Larry Lessig approach you about advice for Francesca Gino before or after Francesca Gino had been placed on administrative leave?

MR. HANNON:  You may answer that question "yes" or "no."

MR. BRAYLEY:  I think it's before or after, but...

THE WITNESS:  I don't know.  I just would have to check the timelines.  I don't know one way or the other.

Q   (By Mr. Brayley)  As best as you can recall right now, what is the date on which Larry Lessig approached you concerning Francesca Gino and potential legal advice?

A   I'm not sure.  The date that I noticed in preparation for this deposition was the date that was on my retention agreement with Francesca.  But that retention agreement is not dated the day that Larry Lessig introduced us for this purpose.

Q   What's the date on the retention agreement?

A   I remember that it's July 2023.  I believe it's July 24th.  But the document speaks for itself.  You can just check it, if that's important.

Q   To the best of your recollection, how long --



A    No.

Q    Have you ever had remote access to any of Professor
Gino's devices; for example, through a VPN, Signal,
remote control, or similar technology?

A    We've certainly used screen share in some of our work
together.  Whether we used screen share with remote
control versus screen share without remote control,
I'm not sure.  I wouldn't be prepared to testify that
I never pressed the button to request control to show
her something specific on her computer.

Q    Did you ever use remote control or similar technology
to change any file metadata on Professor Gino's
device?

              MR. HANNON:  Objection.
    So given the way that's phrased, I'm going to
instruct you not to answer.

              THE WITNESS:  I'll follow the
instruction.

              MR. BRAYLEY:  What's the basis of
the objection?

              MR. HANNON:  Privilege and work
product.  If -- and, again, you didn't narrow it to,
you know, to a period outside the term of the
relationship.  So if you did ask, you know, prior to
being engaged as legal counsel or otherwise, you



know, outside the work they were doing pursuant to the engagement, I'd let him answer those questions. But as it was phrased, it included anything he would have done in the context of his work as her legal counsel, and that's why I objected.

MR. BRAYLEY:  Well, and this will be a subject for a motion, I'm sure.  But I disagree that even during the term of the engagement, that every single thing that Mr. Edelman may or may not have done is covered by work product protection.  But I will split it out so at least the record is clear.

Q   (By Mr. Brayley)  Outside of the term of your engagement as Francesca Gino's counsel, have you ever used remote control or similar technology to change any file metadata on Professor Gino's device?

A   No.

Q   During the course of your representation of Francesca Gino, have you ever used remote control or similar technology to change any file metadata on Professor Gino's device?

MR. HANNON:  Objection.
I'll instruct you not to answer on the grounds of privilege and work product.

THE WITNESS:  Follow the instruction.



Q    (By Mr. Brayley)  Have you ever walked Professor Gino through accessing certain applications on her computer?

               MR. HANNON:  Objection.

     I'll instruct you not to answer based on privilege and work product.

               THE WITNESS:  Follow the instruction.

Q    (By Mr. Brayley)  Have you ever walked Professor Gino through using Terminal on her Mac?

               MR. HANNON:  Objection.

     And I'll object on the grounds of privilege and work product and instruct you not to answer.

               THE WITNESS:  Follow the instruction.

Q    (By Mr. Brayley)  Have you ever walked Gregory Burd through using Terminal on a Mac?

               MR. HANNON:  So I'll object.

     To the extent that you -- you should not answer in terms of whether or not you did so in connection with your representation of Professor Gino.

     If you ever did outside the scope of your representation with Professor Gino, you may answer that.

               THE WITNESS:  Outside the scope of



the representation, I never did.  Otherwise, follow the instruction.

Q   (By Mr. Brayley)  Did there come a time when you discussed with Francesca Gino the idea that she create a website about this litigation?

MR. HANNON:  So I'm going to object and instruct you not to answer on grounds of privilege and work product.

THE WITNESS:  Follow the instruction.

(Exhibit No. 1 marked for identification.)

MR. BRAYLEY:  Mr. Hannon, I'm pulling up GINO_013239.

MR. HANNON:  Great.  I have it here.  Thank you.

Q   (By Mr. Brayley)  Okay.  Mr. Edelman, I'm showing you a document that's titled "Website Structure."

As you can see from the number in the bottom right-hand corner, this was produced by Francesca Gino in this litigation.  I'll give you a moment to familiarize yourself with it.

And when you are ready, my question will be: What is this document?


ESQUIRE
DEPOSITION SOLUTIONS

answer is no.

Q    What's the domain name for your website about your case against Harvard?

A    It's Edelman-v-Harvard.org.

Q    What's the domain name for Francesca Gino's website?

A    TheGinoCase.info.

Q    Is there a case -- is there a website with the domain Gino-v-Harvard.org?

A    I think there might be or maybe there used to be. I'm not sure.

Q    Were you involved in the creation of Gino-v-Harvard.org or a website similar to that?

            MR. HANNON:  Wait.

    If you had any involvement prior to becoming engaged with Professor Gino, you may answer.

        Otherwise, I instruct you not to answer, based upon privilege and work product.

                THE WITNESS:  I had no involvement prior to being engaged.  And otherwise, I decline to answer.

Q    (By Mr. Brayley)  Did you write any of the content for Francesca Gino's website?

                MR. HANNON:  Objection.  I instruct you not to answer based upon privilege and work product.



THE WITNESS:  Follow the instruction.

Q   (By Mr. Brayley)  Have you at any time had the ability to post content on Francesca Gino's website?

MR. HANNON:  I'm going to object and instruct you not to answer based upon privilege and work product.

THE WITNESS:  Follow the instruction.

Q   (By Mr. Brayley)  Have you ever edited or reviewed any posts on Francesca Gino's website before they were published?

MR. HANNON:  Wait.

I'm going to object on privilege and work product grounds and instruct you not to answer.

THE WITNESS:  Follow the instruction.

Q   (By Mr. Brayley)  Did you provide any technical or statistical expertise for the website content?

MR. HANNON:  So same objection.  Same instruction.

THE WITNESS:  Follow the instruction.

Q   (By Mr. Brayley)  Who was involved in developing Francesca Gino's website about her case against



Harvard?

MR. HANNON:  Same objection.  Same instruction.

THE WITNESS:  Follow the instruction.

Q    (By Mr. Brayley)  Was Frances Frei involved?

MR. HANNON:  Same objection.  Same instruction.

THE WITNESS:  Follow the instruction.

Q    (By Mr. Brayley)  Do you represent Frances Frei?

A    No.

Q    Was Gary Pisano involved?

MR. HANNON:  Same objection.  Same instruction.

THE WITNESS:  Follow the instruction.

Q    (By Mr. Brayley)  Do you represent Gary Pisano?

A    No.

Q    Was Lawrence Lessig involved in developing the website?

MR. HANNON:  Same objection.  Same instruction.

THE WITNESS:  Follow the instruction.



Q   (By Mr. Brayley)  When Mr. Lessig approached you about potentially representing Francesca Gino, did he present himself as currently being her counsel at that time?

A   Yes.

Q   Was Youngme Moon -- Y-o-u-n-g-m-e, last name Moon, M-o-o-n -- involved in developing the Francesca Gino website?

            MR. HANNON:  Objection.  On grounds of privilege and work product.

      I instruct you not to answer.

            THE WITNESS:  Follow the instruction.

Q   (By Mr. Brayley)  What platform is the Francesca-v-Harvard website hosted on?

            MR. HANNON:  Objection as to privilege and work product.

      I instruct you not to answer.

            MR. BRAYLEY:  Really?

            MR. HANNON:  He's a lawyer.  When lawyers gain information during the course of their attorney-client relationship, that is confidential information that they can't disclose.  You know this stuff, Doug.  Come on.

            MR. BRAYLEY:  I know there's a



difference between confidentiality and
attorney-client privilege.

MR. HANNON:  Yeah, but that's --
it's a confidential -- it's gained during the course
of his representation of the -- of the client.  It's
all part of the privilege.

MR. BRAYLEY:  My question is:  Is
the Francesca-v-Harvard website hosted on a platform?

MR. HANNON:  Right.  And I
objected, and I instructed him not to answer.

THE WITNESS:  I'll follow the
instruction.

Q    (By Mr. Brayley)  Do you have a Squarespace account?

A    I do not.

Q    Who has the ability to publish posts on
Francesca-v-Harvard.org?

MR. HANNON:  Objection.  Privilege
and work product.

I instruct you not to answer.

THE WITNESS:  Follow the
instruction.

Q    (By Mr. Brayley)  Who has the authority to take down
posts on Francesca-v-Harvard.org?

MR. HANNON:  Same objection.  Same
instruction.



THE WITNESS:  Same answer.

Q   (By Mr. Brayley)  To your knowledge, has anyone other than Francesca Gino posted content on Francesca-v-Harvard website?

MR. HANNON:  Same objection.  Same instruction.

THE WITNESS:  Follow the instruction.

(Exhibit No. 2 marked for identification.)

Q   (By Mr. Brayley)  Okay.  I'm showing you a document marked as Exhibit No. 2.  You can take as much time to look at it as you like.  I can represent to you that this is the first page of the original privilege log shared with us by Gino's counsel of record in this matter.

After you've taken time to familiarize yourself, my question for you will be:  Have you seen this document before?

A   I think I have.  I received a longer version of which this appears to be part, and I flipped through it when I received it.

Q   When is the first time you saw it?

A   I'm not sure.  I think it was within the last month.



Do you see that?

A    Yes.

Q    Do you have any reason to believe that that is a different Document 619 than we were discussing in the previous two iterations of the privilege log?

A    No, I think it's the same one, as it should be, based on Bates practices.

Q    And so now you see the supplemental detail has changed somewhat.  Now it says, "Spreadsheet modified by Edelman on 9/30/2023, and modified by Gino 7/26/24."

Do you see that?

A    I see that.

Q    Does any of the information in this document refresh your recollection about this Document 619 or File 619?

A    It does not.

Q    Are you familiar with a file called taxstudy.xlsx?

A    I become --

MR. HANNON:  You can answer that "yes" or "no."

THE WITNESS:  Yes.

Q    (By Mr. Brayley)  What is it?

MR. HANNON:  Objection.

If you have any knowledge of that prior to your



engagement with Professor Gino, you may answer.

Otherwise, I instruct you not to answer on grounds of privilege and work product.

THE WITNESS:  My information postdates the engagement, so I follow the instruction and don't answer.

Q   (By Mr. Brayley)  Okay.  For shorthand, I'm going to refer to taxstudy.xlsx as the tax study file.

So you understand what I'm talking about when I say that?

A   Yes.

Q   Okay.  Are you aware that someone using Professor Gino's computer backdated a version of the tax study file on September 23rd, 2023?

MR. HANNON:  Objection.

Instruct you not to answer based upon privilege and work product.

THE WITNESS:  Follow the instruction.

Q   (By Mr. Brayley)  Did you ever personally use Terminal or any other command line tool to create, access, or modify any files related to Professor Gino's matter?

MR. HANNON:  Objection.

Instruct you not to answer based upon privilege



and work product.

THE WITNESS:  Follow the instruction.

Q   (By Mr. Brayley)  Did you ever show Professor Gino how to modify files through the use of Terminal or any other command line tool?

MR. HANNON:  Same objection.  Same instruction.

THE WITNESS:  Follow the instruction.

Q   (By Mr. Brayley)  Did you ever discuss with Gregory Burd the modification of the tax study file by using Terminal or any command line tool?

MR. HANNON:  If you have knowledge of that that precedes your representation of Professor Gino, you may answer.

Otherwise, I instruct you not to answer on the grounds of privilege and work product.

THE WITNESS:  No knowledge that predates.  Follow the instruction.

Q   (By Mr. Brayley)  Did Professor Gino ever ask you to modify any file or to assist her in modifying any file, including by changing its metadata or time stamps?

MR. HANNON:  So you may answer if



you have any knowledge prior to your engagement by Professor Gino.

Otherwise, I instruct you not to answer based upon privilege and work product.

THE WITNESS:  No prior knowledge. Follow the instruction.

Q    (By Mr. Brayley)  Did anyone else ever direct you, request, or suggest that you make any changes to any files in connection with Professor Gino's matter?

MR. HANNON:  So --

MR. BRAYLEY:  You know what?  That was an unclear question.  Let me try that again.

Q    (By Mr. Brayley)  Did anyone other than Professor Gino ever direct you, request, or suggest that you make any changes to any file's metadata or time stamp in connection with Professor Gino's matter?

MR. HANNON:  So I'll object to that question to the extent that any of the -- if you had any such communications in connection with your representation of Professor Gino.

If you had such communications with, you know, someone unrelated to the case or whatnot, you can answer that.

But I instruct you not to answer to the extent you had any such discussions in the course of your



representation of Professor Gino.

THE WITNESS:  No such discussions outside the representation.  Otherwise, follow the instruction.

Q   (By Mr. Brayley)  Have you ever heard of what's been referred to as the July 16 OG file?

MR. HANNON:  You may answer that question "yes" or "no."

THE WITNESS:  Yes.

Q   (By Mr. Brayley)  What is it?

MR. HANNON:  So I'll object. And I'll instruct the witness not to answer on grounds of privilege and work product.

THE WITNESS:  Follow the instruction.

Q   (By Mr. Brayley)  When did you first hear about the July 16 OG file?

MR. HANNON:  Wait. I'm going to object and instruct not to answer on the grounds of privilege and work product.

THE WITNESS:  Follow the instruction.

Q   (By Mr. Brayley)  Have you ever seen the July 16 OG file?

MR. HANNON:  Objection.



I instruct you not to answer on the grounds of privilege and work product.

THE WITNESS:  Follow the instruction.

Q   (By Mr. Brayley)  Does it exist?

MR. HANNON:  Objection. I instruct you not to answer on grounds of privilege and work product.

THE WITNESS:  Follow the instruction.

Q   (By Mr. Brayley)  Do you have a copy of the July 16 OG file?

MR. HANNON:  Objection. Instruct you not to answer on the grounds of privilege and work product.

THE WITNESS:  Follow the instruction.

Q   (By Mr. Brayley)  Are you aware that Francesca Gino published a blog entry on October 1st, 2023, in which she announced the discovery of the July 16 OG file?

MR. HANNON:  You may answer that question "yes" or "no."

THE WITNESS:  I'd need to reread the blog post that you're referring to to make sure you're summarizing it correctly, but I think I recall



something sort of like that.

Q   (By Mr. Brayley)  Well, I wasn't actually trying to summarize it.  It's simply a blog entry that said, among many other things, that there was a July 16 OG file that Harvard had failed to investigate properly.

Do you recall that?

A   I recall something like that.

MR. HANNON:  (Videoconference audio distortion) "yes" or "no."

THE REPORTER:  Repeat that, Mr. Hannon.

MR. HANNON:  You may answer that "yes" or "no."

THE WITNESS:  I just don't want to endorse your characterization of what it says, but I think I saw a document that had some things in common with what you describe.

Q   (By Mr. Brayley)  When did you first see that blog entry?

MR. HANNON:  Objection.

I instruct you not to answer on the grounds of privilege and work product.

THE WITNESS:  Follow the instruction.

Q   (By Mr. Brayley)  This October 1st, 2023, blog entry



relates to the study at issue in Allegation 4B, right?

MR. HANNON:  Wait.

So I'll object on grounds of privilege and work product.

THE WITNESS:  Follow the instruction.

Q   (By Mr. Brayley)  Were you involved in drafting the October 1st, 2023, post?

MR. HANNON:  Object on grounds of privilege and work product.

Instruct you not to answer.

THE WITNESS:  Follow the instruction.

Q   (By Mr. Brayley)  Did you provide Francesca Gino with any data analysis that gave rise to the October 1st blog post?

MR. HANNON:  Objection.  Grounds of privilege and work product.

I'll instruct you not to answer.

THE WITNESS:  Follow the instruction.

Q   (By Mr. Brayley)  Did you edit or provide comments on any drafts of the October 1st post?

MR. HANNON:  Objection.  Privilege



and work product.

I instruct you not to answer.

THE WITNESS:  Follow the instruction.

Q   (By Mr. Brayley)  Are you aware that at some point the October 1st post was taken down from Professor Gino's website or otherwise made inaccessible to the public?

MR. HANNON:  Objection.  Privilege and work product.

I instruct you not to answer.

MR. BRAYLEY:  I actually think you could answer that "yes" or "no," but that's up to you.

MR. HANNON:  I'll stick with my instruction.

THE REPORTER:  Repeat that, Mr. Hannon, please.

MR. HANNON:  I will stick with my instruction.

THE WITNESS:  I'll follow the instruction.

Q   (By Mr. Brayley)  Were you involved in taking down the blog post?

MR. HANNON:  Objection.  Privilege



800.211.DEPO (3376)
EsquireSolutions.com

and work product.

          I instruct you not to answer.

                         THE WITNESS:  Follow the

     instruction.

Q    (By Mr. Brayley)  To your knowledge, have any other

     posts been taken down from Francesca Gino's website?

                         MR. HANNON:  Objection.  Privilege

     and work product.

          I instruct you not to answer.

                         THE WITNESS:  Follow the

     instruction.

Q    (By Mr. Brayley)  Are you aware that, in the third

     statute proceeding, Harvard's experts testified that

     a file was backdated on one of Professor Gino's

     devices on September 23rd, 2023?

                         MR. HANNON:  Objection.  Privilege

     and work product.

          I instruct you not to answer.

                         THE WITNESS:  Follow the

     instruction.

Q    (By Mr. Brayley)  Do you have any knowledge of how

     the backdating happened?

                         MR. HANNON:  Objection.  Privilege

     and work product.

          I instruct you not to answer.



THE WITNESS:  Follow the instruction.

Q   (By Mr. Brayley)  Did you, yourself, backdate any file on Professor Gino's devices?

MR. HANNON:  Objection.  Privilege and work product.

I instruct you not to answer.

THE WITNESS:  Follow the instruction.

Q   (By Mr. Brayley)  Do you believe that Francesca Gino has the technical capabilities to backdate a file system metadata?

MR. HANNON:  Objection.  Privilege and work product.

I instruct you not to answer.

THE WITNESS:  Follow the instruction.

Q   (By Mr. Brayley)  Did you ever upload any devices to Professor Gino's computer or devices, whether remotely or in person?

MR. HANNON:  Objection to privilege and work product.

I instruct you not to answer.

THE WITNESS:  Follow the instruction.

