# EXHIBIT 20

**Exhibit 29**
**Respondent's Written Response to Draft Investigation Report received on February 17, 2023**

To: Teresa Amabile, Investigation Committee Chair
   Robert (Bob) Kaplan, Investigation Committee Member
   Shawn Cole, Investigation Committee Member

Re: Responses to Draft Report of Investigation Committee Concerning Allegations against
   Professor Francesca Gino – Case RI21-001

Date: February 17, 2023

---

I want to thank the committee for your efforts and work. I very much respect the energy you have put into the draft report. Having said that, I fundamentally and totally *disagree* with the conclusions the committee has reached regarding each of the allegations.

I want to take this opportunity to:

 a) Introduce evidence that has not been considered to date

 b) Rectify a number of misinterpretations of the evidence that had already been considered

 c) Call into questions suppositions and inferences that the committee has made without direct evidence of wrongdoing

Before discussing each of these points, I want to clarify upfront a point raised by the committee about providing evidence exonerating me. As the committee states in the draft report, "we conclude that the Respondent, Professor Gino, has "not fulfilled "the burden of proving, by a preponderance of the evidence, any and all affirmative defenses raised (such as honest error)" as required by the HBS Policy" (Draft Investigation Report at pg. 12). While the HBS Policy notes that defenses must be proven by a preponderance of the evidence in their consideration, the burden of proof for making a finding of research misconduct is *actually* on the committee, as any findings of research misconduct must themselves be supported by a preponderance of the evidence (HBS Policy at pg. 2, 9). As noted in the HBS Policy, it is the committee's burden to prove research misconduct, not mine to prove that there was none. That said, I will provide in this document significant evidence not considered by the committee and other considerations to demonstrate my innocence of these allegations.

Before getting into the substantive comments, and introducing new evidence, I would like to explain why I have so much to add now that I did not add previously. I have taken these accusations very seriously since I learned about them on October 27, 2021. However, this process was quite unfamiliar to me, and it was not until I read the draft report that I gained a solid understanding of what was required to address the committee's concerns. In addition to what I noted above, during the time of the inquiry and investigation, I was co-creating and was the sole course head of HBS's new required course on Inclusion. This required a major time commitment and investment, after two years of a very difficult pandemic. At the time the inquiry

1

started, I could have dropped this assignment to focus on the research misconduct process, but I did not think that was in the best interests of HBS or my junior colleague, ████████, who had committed to teach the course for the first time. The course, in the two iterations we taught it throughout 2022, was a far more intense time commitment than I had anticipated, and I believe it hurt my capacity to fully address the concerns the committee raised throughout this process. As evidence of my commitment to the course and the time required to bring it to the Required Curriculum (RC), I've attached a letter from Professor ████████ (see **Exhibit 1**), who worked closely with me on the Inclusion course.

I have worked straight for six weeks on these comments, including evenings and weekends. I simply did not have such a window of time before this last step in the process.

Knowing that I did not commit any wrongdoing and have never revised or altered research data, I also underestimated what it would take to "disprove" the allegations – a burden of proving a negative that the committee has, in essence, improperly imposed. As I mentioned earlier, the HBS Policy indicates that it is the committee's burden to prove research misconduct, not mine to prove that there was none. Nevertheless, I cooperated fully every step of the way, and I was open and transparent in every request the committee made. There was a substantial amount of data and analysis to sort through (e.g., the five Maidstone Consulting Group, LLC (MCG) reports were over 180 pages, including the additional analyses for Allegation 4a) in a fairly limited time. I did my best to provide responses, but the committee made clear in the draft investigation report that it requires more from me.

Throughout these comments, I will introduce not only evidence of my own, but also statements from others *who were not interviewed by the committee* and who provide corroborating evidence. I took this step given that the committee, as stated in the draft report, indicated it doubted "the credibility of [my] written and oral statements to this Committee more generally" (Draft Investigation Report at pg. 13). I encourage the committee to conduct its own interviews of these witnesses, who can provide relevant information demonstrating that a preponderance of the evidence weighs against any research misconduct finding against me.

My hope is that these comments can fully address any and all concerns the committee raised throughout this investigation or still has. I only ask the committee to keep an open mind as you review these comments.

## I. NEW EVIDENCE RELATED TO SPECIFIC ALLEGATIONS

### I.A. Allegation 4a, concerning Study 1 in the 2012 PNAS article with Lisa Shu, Nina Mazar, Dan Ariely, and Max Bazerman

This allegation claims that I misrepresented the study procedures in the published paper by re-writing the description originally used in the first draft so as to deceive the reader. The core issue in this allegation is that the study, as conducted, had a flawed design whereby participants were paid in the first room *before* completing the tax form in the second room (the tax form with the manipulation we used in the study). The allegation implies that I tried to cover this up by

2

changing the description of the study procedures across drafts of the paper before it was submitted. The committee points to the tax form that used the phrase "payment you received" as evidence that the experiment was not properly conducted.



As I pointed out in my previous comments, to believe that participants were paid before completing the tax form that had the manipulation, one would have to believe that experienced experimentalists like ███████████ would have not detected such a basic and fundamental flaw. *More importantly, the committee did not consider the following evidence that strongly supports the validity of the design of the study in question.* In 2018, when ██████████████████ ██ and I joined ███████████████████████, and ████████████████ to run a highly-powered experiment to replicate Study 1 in the 2012 PNAS paper, we discussed the details of the procedure so that we could as faithfully as possible replicate it. At no time in those 2018-2019 discussions among the co-authors did anyone, including ██████████, raise any concerns about the experimental procedure used in the 2012 PNAS paper. For independent corroboration of these circumstances, I will refer you to the answers ██████████ provided to questions I asked her (see **Exhibit 2**). ████████ responded to my email with recorded messages, one for each of the questions I asked. I **attached the files of the recordings** for your reference.[1] ████████ has provided testimony supporting the fact that there was no dispute among the co-authors regarding the procedure used in Study 1 of the 2012 PNAS paper. ████████ testifies that she used the original experimental procedures—which call for paying the participants *after completing the entire study*— to conduct the replication study.[2]

████████ uses the same tax form that was used in Study 1 of the 2012 PNAS paper, which includes the same wording at issue ("payment you received"). ████████'s procedures —which she says replicate the ones used in Study 1 reported in the 2012 PNAS paper— are available for anyone to review (including the committee) on the Open Science Framework (OSF), a public depository of experimental data and procedures. All documents are posted here: https://osf.io/3javq/ The committee may access the procedures used by ████████ at https://osf.io/dxpmc and the tax form at https://osf.io/yqpdm

During my interview, the committee paid extensive attention to the wording in the tax form "payment you received." This could be misinterpreted as meaning that the participants were paid *before* completing the tax form rather than after. It should be noted, however, that this form was available to the reviewers and the editors of the original 2012 PNAS study, and no reviewer or editor ever had that misinterpretation. Moreover, the same procedure and the same form were made available to the editors and reviewers of the 2020 PNAS replication study.[3] Again, there is not a single instance where a reviewer or editor misinterpreted the intention of the design. Co-author ████████ has also testified that she never had that misinterpretation nor did any of her RAs or the co-authors involved in the replication (see **Exhibit 2**). In retrospect, it would have been

---

[1] Please refer to these recordings every time I mention **Exhibit 2** throughout this document.
[2] I did not talk to ████████ about the investigation, in compliance with HBS Policy, and reached out to her with seven specific questions (see **Exhibit 2**) to gather facts that are pertinent to this investigation.
[3] The study was published in 2020 in a paper that included other studies. Reference: "Signing at the beginning vs. at the end does not decrease dishonesty." Kristal, A., Whillans, A., Bazerman, M., Gino, F., Shu, L., Mazar, N., Ariely, D. *Proceedings of the National Academy of Sciences*, 117(13), 7103-7107 (2020).

3

more accurate to use different language on the tax form (e.g., "payment earned" or "payment to receive"). However, that language, while potentially confusing, does not support the implication that I improperly revised the procedures as it was used consistently throughout both Study 1 in the 2012 PNAS paper and the direct replication by myself and others.

The highly-powered study we conducted in 2019, described in the 2020 PNAS paper, failed to replicate the results of the 2012 PNAS Study 1. At that time, I expressed the view to my co-authors that I wanted to correct the records if the signing-first effect did not replicate (see **Exhibits 3a and 3b**). When we submitted the failed replication paper to PNAS, the editor asked us questions that led ██████, █████, ██████ and I to discuss why we were publishing a second paper, rather than retracting the first. In my response to the team (see **Exhibit 4a**), I expressed to them that if we believed there was a flaw in the 2012 PNAS study design or data, we should retract that paper. If, on the other hand, we did not think there was a flaw, we should publish this new study to ensure the accuracy of the record. ██████'s comments also speak to this point (see **recordings with answers to the questions in Exhibit 2**). The conversation that occurred via email between ██████ and the Editor assigned to our 2020 PNAS paper is in **Exhibit 4b**.

Again, let me stress, all co-authors of the original study, including ██████, saw no particular flaws with the original design. And this was, as I noted above and as ██████'s comments and the materials available on OSF corroborate, the same experimental procedures used in the direct replication study conducted by ██████ in 2019.

The committee also had issues with the language included to describe the study in question in the first draft version of the 2012 PNAS paper (dated 2011-02-23). The committee states, "Professor Gino provided no evidence of a prior manuscript with the procedural wording found in the first draft of the manuscript" (Draft Investigation Report at pg. 29). However, I mentioned in my earlier comments to the committee that the matrix task is a procedure I used in many other papers and studies conducted at UNC, and that it is likely I copied and pasted the text from elsewhere, or wrote it up quickly in light of the fact that the procedure was one I had used in many studies before then. I referred the committee to specific papers, but did not include the descriptions from them. The language is in fact highly similar to the one I used in other documents (see evidence presented in **Exhibit 5**).

As I stated in an email to ██████, ██████ and ██████ (dated July 31, 2019) I contacted ██████ to check on the lab studies included in the 2012 PNAS paper and she did not remember the specifics of all the studies she had helped with (see **Exhibit 4a**, where I write "I've been trying to track down the RAs who I think helped with these studies but they moved on. The one I was able to talk to, understandably maybe, does not remember all the studies she helped with."). At no point during those conversations did ██████ raise any doubt about the validity of the studies and the procedures used. If she had, I would have suggested retracting the 2012 PNAS paper.

There are various email exchanges that show the differences in opinions among the various collaborators on this project (see **Exhibit 6**) and that show I took the role of "peacemaker," using

4

███████'s words (see **recordings for Exhibit 2** as well as **Exhibits 7a and 7b**). These differences of opinion further weigh against any finding of research misconduct on my part.

### I.A.1. Highlighting Existing Evidence for Allegation 4a

I recognize how difficult it must be for the committee to go through all the evidence this process generated to understand what happened and come to conclusions. However, the committee appears to assume that every document in my files has a reason to be in certain folders. I do think of myself as a generally well-organized person, but it is not correct to assume that every document in any of my folders is there because it was used in a project. The matrix task, for instance, is one I used in multiple projects, as noted earlier. And it is not the case that the exact version on my computer, in the folder for this project, is the version used in the study. When changes are needed to tasks and other procedures, it is common for me to send materials to research assistants (RAs) in order for them to create what's needed to conduct a specific study.

The committee also makes assumptions within the report regarding the different versions of the procedure, claiming that these different versions do not appear accurate across drafts of the paper. In reference to the versions dated 2011-02-23 and 2011-03-08, the committee notes that the procedure matches that from the IRB application (Draft Investigation Report pg. 25). However, UNC IRB has told me they have no records of the IRB applications from this time as they were done on paper. I understand that a copy of an IRB application detailing the study procedure was located on my hard drive, but as noted by the committee, this may not represent how the study was actually run as I would often amend the originally approved protocol (Draft Investigation Report pg. 28). This was further confirmed by ███████ in her interview, though she cannot remember whether the IRB protocol was amended in this particular instance (Draft Investigation Report pg. 24).

In addition, there seem to be important parts of the MCG reports that highlight the difficulty of understanding the various versions of the description of the study in question. A few stood out to me:

> While the metadata may be informative regarding individuals involved in the documentation generation and chronology of developments and alterations within documentation versioning, it is not an unequivocal representation of individual responsibility of content within said documentation. There may be possible scenarios, where another individual (or individuals) may have been involved at a point prior to the "last modified" timestamp that play an unknown role in the data representation. (MCG Report p. 5)

> While we have access to the described versions of documents, and subsets of correspondence(s) in the form of available email, this does not preclude the possible existence of additional documents and correspondence containing details specific to the evolution of the experimental procedure description. (MCG Report p. 8)

> While it was possible to examine the email inbox of Dr. Gino, there is scarce evidence of her outbox content, hence versions of files found on her computer were

5

utilized as potential source documents sent to co-authors. A clear outbox record would strengthen and add clarity to the analysis, particularly with respect to metadata and chronology. Additionally, some of the conversations regarding the study procedure are missing from email exchanges and may have happened via phone or other mode of communication. (MCG Report p. 10)

These excerpts highlight the fact that many of the discussions regarding the revisions and manuscript occurred either in person or in a medium not available to the committee. These excerpts also show that the metadata and revision history cannot now demonstrate the complete picture of what occurred at the relevant time. In addition, the reuse of the tax form with consistent language in both the 2012 and 2020 studies supports the conclusion that the procedure used in 2019 (for the study included in the 2020 PNAS paper) matched that used in 2010—the procedure as described in the 2012 PNAS paper.

Based on the tax form evidence and the consistency across studies, in addition to the lack of evidence supporting the alleged falsification, there cannot be a finding of research misconduct as to this allegation.

### I.B. Allegation 4b, concerning Study 1 in the 2012 PNAS article with Lisa Shu, Nina Mazar, Dan Ariely, and Max Bazerman

Allegation 4b claims that I altered a number of observations in the data (8 of them). In what follows, I provide new evidence but also explain the anomaly claimed in Allegation 4b.

After reviewing the Draft Investigation Report and noting the committee's thoughts, I have noticed inferences not supported by what I know to be true and have found evidence that will demonstrate these inconsistencies.

The MCG forensic report refers to the July 16, 2010 as original data. It is important to note that this is NOT the original data. As I noted previously, *the original data was collected on paper.* I traveled to UNC to see if the data is still in existence, and, unfortunately, it is not. I note that the absence of data can only be considered evidence of research misconduct "where the institution establishes by a preponderance of the evidence that the respondent intentionally, knowingly, or recklessly had research records and destroyed them, had the opportunity to maintain the records but did not do so, or maintained the records and failed to produce them in a timely manner *and* that the respondent's conduct constitutes a significant departure from accepted practices of the relevant research community" (HBS Policy at pg. 2). Here, the data were appropriately left at UNC for maintenance. Furthermore, given the age of the data in question, it is consistent with accepted research practices for data to have been discarded.

The email ▮▮▮▮▮▮ shared with the committee uses language that indicates that I would speak to ▮▮▮▮▮ about the study given how she refers to participants. I have now been able to retrace my steps to where I was in July 2010. I traveled to Chapel Hill from California, where I had worked for a few weeks as a research consultant at Disney, on July 18, 2010. I met with ▮▮▮ the week of July 19 to make sure the data were accurate. I know with 100% confidence that I was at UNC

6

between July 19-July 30. Professor ███████ of UNC corroborates that this is consistent with his memories and calendar in an email (see **Exhibit 8**). During that time, I not only finished packing before the move from UNC to HBS, but I also discussed how I would be working with ███ going forward. We took the time to check on the data so that we would have a data file to use for the analyses. I left Chapel Hill by car on Friday, July 30 with ██████████, at the time a doctoral student from Duke I worked with, and now an Assistant Professor at Tepper, CMU (see **Exhibit 9** for ███ 's confirmation of the trip). As she states, "We left July 30, 2010. In New York July 31, 2010. I think we stayed in New York for a day or two." We met a collaborator and friend, ██████████ in New York, a Post-Doctoral Fellow working in ████████ 's lab, and then I drove up from New York to Boston from there on my own.

As ████ stated in her comments, the lab study (Study 1 in the 2012 PNAS paper) used a very small sample ($N = 101$ participants). Though this was consistent with accepted practices at the time, it likely explains why the results did not replicate when we conducted a highly-powered, direct replication of it ($N = 1,235$ participants) (see **the recordings for Exhibit 2 and Exhibit 4b**).

There have been multiple occasions throughout the collaboration on the 2020 PNAS paper (that failed to replicate the findings on signing first of the 2012 PNAS paper) when, as an author on the team, I had the opportunity to suggest retraction of the original 2012 PNAS paper. As evident from discussions with my co-authors ██████ refers to in her testimony (see **Exhibit 2**) and emails (see **Exhibit 4a**), I was never in favor since I did not believe the data had anomalies of any sort.

I have regularly walked away from projects where follow-up studies did not replicate initial ones or where my collaborators and I discovered an issue with how the study was conducted or with the robustness of the analyses and data. In fact, I dropped papers that were in the Revise and Resubmit (R&R) stage because of these reasons at about the same time as I was working on this project. For evidence beyond my own words, please see the statements of Professor ████████ ████ of Wash U in St. Louis (see **Exhibit 10**) and Professor ████████ of UNC (see **Exhibit 11**). I encourage the committee to speak with both ████ and ████ regarding these topics.

### I.B.1. Explaining the Data Anomalies for Allegation 4b

I do not believe the dataset which I analyzed and that was posted on the OSF has any anomalies suggesting wrongdoing. When studies are conducted on paper, the data is entered in no particular order. It is entered as the paper files are stacked, and it is possible multiple people entered the data. Both possibilities would lead to observations where the "participant ID number" is out of sort. Participant IDs out of sort are not an anomaly, but simply a result of the process used to handle the data. In the absence of the actual paper files collected during the study, it is impossible to know which IDs were used for certain.[4]

---

[4] The Harvard data retention policy requires that research records be retained for seven years after the conclusion of the study activities. HBS Policy at p. 11; Retention and Maintenance of Research Records and Data Frequently Asked Questions p. 4, https://research.harvard.edu/files/2020/07/research_records_and_data_retention_and_maintenance_guidance_rev_20 17.pdf. While this study was conducted at UNC, I do not have access to the data policy that was active during that period. However, data are routinely discarded in as little as three years after the study has concluded. *See, e.g.*, https://ori.hhs.gov/education/products/rcradmin/topics/data/tutorial_11.shtml (noting that in the absence of special

As for the duplicate ID number, it is likely an error due to two participants receiving the same ID for the study by the RAs conducting it. In this study, participant IDs were handed out on index cards by an RA. It is very possible that some index cards were reused. (This is a very likely possibility especially given that the UNC behavioral lab consists of two rather small rooms – each with only four-five desktop computers. Only a few participants, 4 or 5, could take the study at the same time.) This would lead to a duplicate ID number for different participants, but this would in no way affect the integrity of the data describing the participants' responses. The sheer existence of a duplicate ID is not evidence of any data fabrication or falsification as it is quite possible that ID re-use occurred in this setting. Without evidence or witness statements that any wrongdoing occurred, there cannot be a finding by a preponderance of the evidence of research misconduct.

### I.C. Allegation 3, concerning Study 4 in the 2014 Psych Science article with █████

Allegation 3 claims that I altered thirteen observations in Study 4 in the 2014 Psych Science article. It is important to emphasize that the original source data no longer exists, as it was discarded consistent with routine data maintenance practices. It is not standard practice to retain these records for more than 3 years. The MCG forensics firm concluded that though it does not expressly exclude the types of manipulation noted in the allegation, without the original data, no conclusion of research misconduct can be made (MCG Report pg. 2).

As the MCG report states:

> The analysis of available source data files specific to the claimant's identification of 'suspicious' entries, and the methodology utilized by the complainant to do so, brought to light potential assumptions made by the claimant that may not be substantiated. (MCG Report p. 2)

> None of the files provided contains the original raw data. All files either contain some calculations/subset of information, or derive from a file that does. Additionally, all files are identically sorted, independently on the number of columns present. Therefore, in the absence of raw data, there is no way to determine if any other column could have been originally present that accounted for such sorting. […] It is possible that a combination of manual and automatic calculation occurred giving rise to some of the out of order data flagged by the complainant. (MCG Report p. 11)

> Not having access to the raw Qualtrics file it is impossible to determine if more modifications and edits occurred. Regarding the claimant's review, it is unclear that the assertions made by the claimant demonstrate resultant manipulation of the

---

requirements requiring a longer period, records generally must be retained for three years). Regardless, here, the study in question concluded far in excess of the seven years required even by Harvard's data retention policy, which itself exceeds the accepted practices of the research community.

underlying source data. While the 13 observations identified by the respondent certainly impact the final reported results, in the absence of raw data it is impossible to determine if they represent modified participant entries. (MCG Report p. 14)

Beyond the conclusions of the forensics analysis that no research misconduct could be concluded, there is additional evidence that does not support a finding as to this allegation.

In 2014, Leif Nelson of Data Colada, contacted me and ▮▮▮▮▮▮▮▮▮ to ask for the data (the paper was written at a time before it was standard practice to post data online in repositories like the OSF). Nelson is a Professor at the Haas School of Business at Berkeley.[5] Nelson told us that our 2014 *Psych Science* paper would be discussed in a weekly journal discussion group he organizes at Berkeley-Haas.[6] During these weekly meetings, those present (mostly doctoral students interested in marketing, organizational behavior, decision-making and psychology, as well as interested faculty members) discuss the original materials and data from the paper chosen for the week. In general, if an issue arose or was identified in this discussion, the authors of the paper being discussed were contacted requesting an explanation.

We shared the data with Nelson (as indicated in the email copied below). Neither ▮▮▮▮▮▮ nor I were ever contacted about concerns or suspected any issues with the data or the analysis. We additionally had no reason to expect an issue to arise, and shared the data freely with Nelson, as neither ▮▮▮▮▮ nor I fabricated or falsified any of the data entries.

======================================

**From:** Gino, Francesca <fgino@hbs.edu>
**Sent:** Thursday, April 17, 2014 6:08 PM
**To:** Leif Nelson ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Cc:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** Re: following up

Hi Leif,

Here is the data. In the doc file, you'll see a summary of the main variables of interest for each study. I think it should be self-explanatory but do let me know if you have questions. I numbered the studies as they appear in the paper (also attached, in case that's helpful)

As for talking - Do you happen to have some time to chat on Monday next week?

Sorry for not being more responsive in the last few weeks. Between my son's sickness, travel and a personal health-related scare the last couple of months have been a bit harder than usual.

---

[5] https://haas.berkeley.edu/faculty/nelson-leif/
[6] To confirm that the weekly journal discussion about our 2014 Psych Science paper did happen, I reached out to a scholar, ▮▮▮▮▮▮▮▮▮▮ (now at Rutgers), who used to be a doctoral student at Berkeley at the time. He confirmed in an email the discussion did take place (see **Exhibit 12**), even if he cannot remember the specifics of the discussion. In his reply, ▮▮▮▮▮ also provides more details on how the journal meetings were organized.

9

I hope all is well at Berkeley, and I hope you are taking good care of ███ :-)

francesca

═══════════════════════════════

No other scholar or person has asked us to share the data from the paper since, nor the data for Study 4 specifically. Thus, Nelson and his Data Colada colleagues are the only people who had access to the data from this study, unless they themselves shared it with others. ████████ and I did receive another inquiry about this study: it was from a doctoral student of ████████, ████████, asking about the details of the task we used (in an email dated November 19, 2019). In my response, I explained that the task was not Qualtrics based and had been programmed by a software expert. An email from the software expert himself corroborates that he created the program and had it such that the data was recorded in a separate dataset online (see **Exhibit 13**).

In addition, I would often use the data from my experiments, including the data here, in my doctoral classes on Experimental Methods. I co-taught this course for two years with ███ ████ (in the Spring of 2013) or my HBS colleague ████████ (in the Fall of 2014). We would explicitly ask the students to not only reproduce the analyses as reported in the papers, but also asked them to play with the data to understand the robustness of specific effects and analyses. At no point were any data anomalies noticed or brought to our attention during these exercises.

## I.C.1. Explaining the Data Anomalies for Allegation 3

The committee noted in the Draft Investigation Report that "…no witness provided a plausible explanation of data anomalies or discrepancies" (Draft Investigation Report, pg. 9). I am not surprised. I would find it really difficult to explain data on the spot, for studies conducted a long time ago by someone else. However, there is a simple, logical explanation.

The data for this study required merging three different datasets: the answers participants provided on Qualtrics, their answers on the coin-toss task outside of Qualtrics, and the Remote Associates Test (RAT) performance as coded by RAs. The merger needed to be done manually by the RA or RAs responsible for the merging of the various datasets.

*Coin-toss task*. In the study, we used a coin-toss task that was programmed outside of Qualtrics and captured participants' answers in a dataset hosted by the online repository the programmer created for this task. To make it easier to collect the data, the programmer had links one could use to download it. Since the programmer knew I was interested in using the task in future studies, he created a functionality that deleted the collected data for the task, so that new data could be collected when using the task again.

*Creativity tasks*. In the study, we used two creativity tasks, namely the uses task and 17 RAT problems. Both require manual coding from RAs. For the uses task, the RA would have to count the number of uses for an object and assure there were no repetitions or junk answers like "nope" or "n/a" to then compute a fluency measure, and then evaluate the number of uses that were

10

different from one another (flexibility measure) as well as the originality of the ideas participants suggested (originality measure). Both flexibility and originality are subjective measures resulting from the RAs' coding. In addition, the fluency measure requires manual coding and checking of answer quality even if the counting of ideas could be done automatically through an Excel formula.

Similarly, for the RAT problems, participants had to answer as many problems as possible correctly within 5 minutes. The RAs' coding of the answers to produce a performance measure takes two different steps. First, they can use an Excel formula to count how many questions participants answered. For instance, if a participant answered 14 out of 17 questions, the Excel formula would list the count as 14 and show that it resulted from a formula. However, a second quality control step is required. The RA has to go back to the original answers to assess validity. For instance, if a participant responded with the word "no" or a word that is not logically associated with the prompt, these would be considered invalid answers. The RA would then have to adjust the count, *manually*. In the example I provided, if there were two invalid answers, the count would be adjusted from 14 to 12. Given that participants commonly provide invalid answers, we should fully expect the formula count and adjusted response to differ. That is not an anomaly. It is simply the result of appropriate, necessary data cleaning.

I went back to the document I received on January 14, 2022, with the Subject "Additional Information Related to Allegations 1, 2, 3, and 4b of Research Misconduct." The document included the information the committee had obtained from a written document submitted by the anonymous complainant. The complainant had two main issues. The first was about some of the data being out of sort (*i.e.*, out of expected sequence). This is due to the fact that, as I explained, the final dataset I used in the analyses resulted from the merging of different datasets. Thus, the ordering of the observations is a function of the merging process. The second issue was about the computed measure of "number of responses," from the uses task. As I explained above, the measure requires *manual* coding from the RA or RAs, and it is not simply a function of counting that would result from an Excel formula.

More generally, the complainant refers to "out of order" observations as anomalies. Whenever datasets are the result of manual data entry, which is the case both for studies that have been originally conducted on paper (as was the case for Study 1 in the 2012 PNAS paper) as well as studies that require the merge of different datasets (as was the case for Study 4 in the Psych Science paper), "out of order" observations are to be expected. As the MCG report from the forensic firm itself concluded, "It is possible that a combination of manual and automatic calculation occurred giving rise to some of the out-of-order data flagged by the complainant" (MCG Report pg. 11). The out-of-order data in this allegation is not in itself evidence of wrongdoing, and as noted in the MCG Report, manual coding like that used in this study accounts for such anomalies. Additionally, the merging of data further affects the data order.

This paper was written before the time when it was the norm to post data online. These data were not available to anyone. And yet, I willingly shared these data with Data Colada, knowing full well they would scrutinize the results, and knowing full well their reputation for exposing unreproducible research. There are people in my field who are scared of Data Colada. Yet I had no hesitancy to share these data with them. If one was aware of problems with data, it does seem

11

highly unlikely to me that they would be so willing to share their data so freely with a group of people whose very purpose is to expose data problems. I shared my data with Data Colada because I had no doubt, and have no doubt now, that these data were properly and carefully collected, and that there were no problems in the data.

In the absence of evidence of fabrication or falsification, and considering both the lack of intent to falsify, openness to sharing of data, and manual coding and merging, there cannot be a finding by a preponderance of the evidence of research misconduct.



### I.D. Allegation 2, concerning Study 4 in the 2015 Psych Science article with ▮▮▮ and ▮▮▮

Allegation 2 concerns Study 4 in the 2015 Psych Science article with ▮▮▮ and ▮▮▮. In their interviews with my co-authors on this paper, the committee asked both ▮▮▮ and ▮▮▮ whether they were aware of any RAs helping me conduct the study in question. Both ▮▮▮ and ▮▮▮ noted they did not know if someone helped. This response seemed to arouse suspicion that there was actually no RA involved. It should not be surprising that they did not know about the RA since I did not make a practice of introducing RAs to co-authors for projects the RAs were helping with. I do not believe this is an uncommon practice. I often do not know whether my collaborators use RAs and what their names are.

As I mentioned in my prior comments, since the time I created a lab at UNC and recruited ▮▮▮ as the lab manager, I have relied on the help of RAs for conducting studies, cleaning the data and preparing IRB applications, among other tasks. This was the case also for this study. Email exchanges show that ▮▮▮, at the time staff assistant at the Research Computing Services at HBS, posted the sessions for data collection in CLER (see **Exhibit 14**). Email records also show that two RAs helped run the study in CLER (see **Exhibits 15a and 15b**). They had access to the Qualtrics link used to collect data in order for them to help with the study.

One of the RAs who conducted the study in CLER, ▮▮▮, at the time a Harvard college student, sent me a note indicating that they had been directing participants to use a certain code as their ID but that some participants used their Harvard ID instead (see **Exhibit 16**). This email is important because it shows that: 1) Participants make mistakes that are reasonable, which is relevant to explaining the anomalies the complainant points out, and; 2) this is the type of information I have asked RAs to keep track of so that they could use it when cleaning the data.

I reached out to the two RAs, asking whether they had any documents they may have created when meeting with me to discuss the study with exclusions they used when cleaning the data. When replying, one of them noted she does not remember what exclusions she used when cleaning the data (see **Exhibit 17**). The other RA had a similar answer (see **Exhibit 18**). It would be helpful to have more information about the data exclusions they used in this study, but given that they helped with the study nine years ago, and that they helped conduct multiple studies in their role of RAs for the GiNorton lab at HBS and the Harvard Kennedy School lab (that still existed at the time), it should not be a surprise they did not remember.

12

I would like to note that posting data (and study materials) was not required by the journal *Psychological Science*. In April of 2017, the Editor of the journal wrote an editorial in which he spoke to new changes *Psychological Science* was going to introduce to increase data sharing and transparency, but noted even then that "authors *are not required* to do any of these things."[7] I thus voluntarily chose to make my data available on the OSF.

In an email dated Sunday, November 30, 2014, ▮▮▮▮▮▮▮▮ sent ▮▮▮▮▮▮ and me his revisions of the paper so that we could resubmit it. In the email (see **Exhibit 19**), ▮▮▮▮ states "Given the topic (moral cleansing has come under attack) and the strength of the results, my guess is that data detectives may ask for our data. So we should double check all stats and also be prepared to share the data sets." Had I known of any issues with the data (including simple errors), I would not have proceeded with submitting the paper for publication. As other scholars have commented in their testimony, I have never had an issue walking away from studies that did not work either before or after I was tenured. I've published many papers over my career and never thought of any one paper in particular as critically important to my overall research agenda, work, and legacy.

### I.D.1. Explaining the Data Anomalies for Allegation 2

In the document I received on January 14, 2022, with the Subject "Additional Information Related to Allegations 1, 2, 3, and 4b of Research Misconduct," the complainant pointed to strange demographic responses in the dataset. In particular, they noted that 20 students had "Harvard" as their response for "Year in School." Given that the lab pool at HBS draws on students from a variety of schools in the Cambridge and Boston area, when the committee asked me about this anomaly, I did not find it to be problematic, especially given that we had 491 students in the study. Though I would love for every participant to pay close attention to every question we ask, especially when it comes to demographic questions, participants do make errors. As a case in point, I often see a given year (e.g., 1978) as the answer to "Your age." Or, an RA helping with the study herself indicated that not all participants directed to use a certain code as their ID did so correctly (see **Exhibit 16**).

In examining this anomaly, the MCG forensic firm merged two datasets from my Qualtrics account, which I had shared with the committee when asked to provide the original data. Two datasets exist for this study since we needed a large sample and it proved difficult to recruit about 500 Harvard college students in CLER. As documented in an email exchange (see **Exhibit 20**), I worked with staff at HBS to: 1) use appropriate language to modify the IRB application so that additional data could be collected from Harvard college students online, 2) have the proposed changes approved by the IRB, and 3) identify the best way to recruit participants online and pay them appropriately.

The MCG report notes that the online version of the study was shorter than the one conducted in CLER. This is due to the fact that it was known to be difficult to recruit participants for CLER studies unless they were about 45-60 min long (students needed to walk across the river to be in a lab study at the time). So, it was common practice to run two studies within the same session.

---

[77] https://journals.sagepub.com/doi/full/10.1177/0956797617704015 (emphasis added).

The MCG report notes those who answered "Harvard" as "Year in school" did not provide a Harvard email address (Draft Investigation Report pg. 18). As these participants who entered email addresses took the study online, participants knew that they would be paid through an Amazon gift card. It is not unlikely that anything related to their Amazon account is not through their Harvard email, but their personal email, leading some participants who took the online survey to choose to enter it instead.

The MCG report also notes differences in the number of participants included in the sample when combining the two datasets from my Qualtrics account and the data I used for analysis that was posted on the OSF platform. Specifically, there were additional participants that are not part of the dataset posted on OSF. There are plausible reasons for this difference. As the MCG report itself notes, it is common practice for the same Qualtrics link used in a study to be used for testing. For instance, an author or RA may want to check how long it takes to complete the study, that the randomization is working, or that everything is clear in the instructions. Though it is good practice to use "test" in the ID box when testing, it is not uncommon for RAs testing the Qualtrics survey to use a different ID, take note of it, and then exclude the data point at the time of the data cleaning.

Additionally, if a participant in the lab was behaving in a problematic way (e.g., checking their phone while completing the study or engaging in any other behavior that would suggest inattention), then the RA running the study would make note of it and their study ID so that the person would be excluded from the analyses (and not counted as a valid participant). When studies are conducted online using Qualtrics links, if the link is not made inactive right after data collection, whoever has the link can complete the study *after* data collection is over. If the RAs helping with data collection did not de-activate the link, then it is possible other data was recorded that did not belong to the study itself. As such, the RA cleaning the dataset would exclude it from the count and final dataset to be used for analyses. Without having access to a description of the exclusions used by the RAs who helped conduct the study, who cleaned the data and merged the two datasets, I am unable to point to the exact reason for the difference. However, it seems highly likely it is the result of data cleaning, where participants were excluded for valid reasons.

The MCG report also points to some discrepancies between the two Qualtrics datasets that were merged by the RAs and the dataset I used in the analyses and posted on OSF. As the report notes, "The rationale for the modifications within the data as they transition from the apparent research record into the published record were less clear (e.g., the modifications, while having some directionality, did not appear to align completely with authors hypothesized outcomes)" (MCG Report pg. 14). If the RAs made any honest errors in the cleaning of the data or during the mergers of the two different datasets, I am certainly responsible for these errors as I was the PI (principal investigator) on the research – however, this does not mean I am responsible for research misconduct. Throughout this process, the committee itself collected evidence that RAs or collaborators working with me never felt the pressure to produce a certain result, or had any incentive to misreport information or alter data (Draft Investigation Report pg. 32). If errors were in fact made, given this evidence, they were not intentional.

14

In comparing the dataset posted on OSF and the Qualtrics data set, it is being assumed in this investigation that the Qualtrics data is accurate and the data posted on the OSF is not. That assumes the "raw" Qualtrics data is the original data and that no one has accessed or modified it. As I have pointed out earlier, and as I will explain in detail on pages 21-22 of this document (facts corroborated by RAs, two FSSs and collaborators), there are others with access to my Qualtrics account and tampering by a motivated third party cannot and should not be ruled out.

I also ask the committee to think about my pattern of behavior and lack of intent. If one were to engage in data manipulation, it would make little sense to alter the data only on one's computer while leaving the original source data as is. This behavior implied by the Draft Investigation Report makes even less sense considering that I willingly posted my data online for anyone to scrutinize, and I was well aware that others had access to my Qualtrics account, and therefore could check my data at any time. My behavior is not consistent with one who fabricates or falsifies data, and in fact, the public sharing of data directly motivates against such data alteration. Additionally, without evidence that fabrication or falsification actually occurred, the anomalous entries in this Allegation alone do not support a finding of research misconduct by a preponderance of the evidence.

### I.E. Allegation 1, concerning Study 3A in the 2020 JPSP article with ██████████ and ██████████.

Allegation 1 concerns Study 3A in the 2020 JPSP article with ██████████ and ██████████. The committee noted that I seemed to have a strong desire to publish this paper, suggesting that such a desire could lead to malfeasance on my part. First, the vast majority of scholars have strong desires to publish their research, so any implications that this makes one more likely to commit fraud seems unwarranted. In addition, the history of this paper demonstrates that publication of this paper was not a particularly high priority for me.

██████████, ██████████ and I published a multi-study paper, titled "The contaminating effects of building instrumental ties: How networking can make us feel dirty" in *Administrative Science Quarterly* in 2014. In this paper, we examined how the content and approach people use when networking influence how they feel during the development and maintenance of social ties and how that, in turn, influences their performance on the job. We also explored the role of power as a moderator.

One of the studies in the ASQ 2014 paper was a survey study of lawyers in a large North American business law firm. ██████ had developed that relationship and, in analyzing the data, noted that another possible moderator for our effects could be whether people who engage in networking do so with a promotion or prevention focus. When people embrace a promotion mindset, they focus on the growth, advancement, and accomplishments that networking can bring them. When people embrace a prevention mindset, instead, they see networking as something they are obligated to do for professional reasons. We decided to work on a second paper to explore this finding further. We also discussed it in a *Harvard Business Review* article titled "Learn to Love Networking" that appeared in the May 2016 issue of HBR.[8]

---

[8] https://hbr.org/2016/05/learn-to-love-networking

15

███████, ████████ and I believed this finding deserved further exploration given that many people find professional networking to be uncomfortable and inauthentic, and we had identified a shift in mindset that could help them approach networking with more ease, and thus benefit their performance and career. We also believed that exploring this finding would contribute to existing theories about the antecedents and consequences of networking, beyond the contributions made by our ASQ 2014 paper. We went on to submit the paper to various management journals. They all rejected the paper over the course of three years based primarily on limited theoretical contributions:

- o January 2016: we submitted the paper to the *Academy of Management Journal* (AMJ)
- o April 2016: we received a rejection from AMJ
- o December 2017: we submitted the paper to *AMJ* a second time, after major revisions to the theory and after collecting new data
- o February 2018: the paper was rejected by *AMJ*
- o Later that February 2018: we submitted the paper to *Organization Science* (OS)
- o June 2018: the paper was rejected by *OS*
- o August 2018: we submitted the paper to the *Journal of Applied Psychology* (JAP)
- o October 2018: the paper was rejected by JAP
- o Later in October 2018: we submitted the paper to *Organizational Behavior and Human Decision Processes* (OBHDP) (I was the Editor of the journal at the time, but the AE handled the paper)
- o March 2019: the paper was rejected by *OBHDP*

As I noted, the main issue the reviewers and editors at these various journals brought up was in relation to what they believed to be *limited theoretical contributions*, indicating that the paper did not advance theory in big enough ways given the existing 2014 ASQ paper we published. The problem with this paper, thus, was not with the data or the data analysis.[9]

In an email exchange (see **Exhibit 21**), after receiving the OBHDP rejection, ████████████ and I discussed the possibility of submitting the paper to a psych-oriented journal. As the email exchange clearly shows, I was in *no hurry* to work on this paper, nor was I the person who regularly checked in about its status and expressed interest in publishing the paper:

- o In an email from March 11, 2019, ████████ states, "I take our collective silence following yet another rejection as a sign that we're ready to try and place this paper in a lower-tier journal—should we be so lucky." (see **Exhibit 21**)
- o In an email from April 12, 2019, ████████ states, "Hi team, Org Science just sent me a manuscript to review that is all about promotion/prevention regulatory foci and network ties. It's a theory-only piece, but it still gives us another incentive to get our paper published sooner than later. Shall we give ourselves a deadline to go through the reviews and compare notes on the changes we'd like to make before submitting again? I should be able to carve out a few days in May to work on the paper rewrite. Best, ██████" (see **Exhibit 21**)

---

[9] I am happy to provide the letters of rejection from these journals should the committee so desire.

- o  In an email from July 31, 2019, ▮▮▮ states, "I conclude from us having found no time to work on our paper that we all have other priorities. May I therefore revamp my suggestion to settle for a B journal, like *Motivation and Emotion*, that would allow us to submit the paper as is?" (see **Exhibit 21**)
- o  And then in an email from September 17, 2019, as ▮▮▮ and I were discussing the potential of submitting the paper to the *Journal of Personality and Social Psychology* (JPSP), ▮▮▮ writes, "If not, you know well that I'm open to placing this paper lower and have it out there, at last." (see **Exhibit 21**)
- o  We submitted the paper to JPSP after revising it on September 20, 2019.

I am not suggesting there is anything wrong with ▮▮▮'s strong desire not to let the paper die and her regular check-ins on the paper status (as evidenced also by other emails she sent, see **Exhibits 22a, 22b, and 22c**). However, as these exchanges and emails clearly show, I was *not* in a rush to work on this paper and understood that, given the 2014 ASQ we published, the paper provided a contribution that was more limited (as the reviewers indicated). Specifically, the paper focused on a moderator for the relationship between networking and a person's feelings about it rather than the main effects pointing to new relationships. As it is also clear from the email exchange, I was also *not* making this paper a priority, nor did I feel the need to necessarily publish it. There are many papers I dropped and stopped working on after receiving reasonable rejections from reviewers at top journals who did not find the ideas as compelling as I did or questioned the size of the theoretical contributions, as was the case for this paper.

Also, for additional context, at the time these discussions about resubmitting the paper to yet another journal were ongoing, I had other responsibilities and personal circumstances that made me less interested in and less available for working on this paper:

- o  I was the Editor in Chief at OBHDP, a very time-consuming role
- o  I was the Unit Head of NOM at HBS, also a time-intensive role
- o  I was co-chairing two Executive Education Programs that were being taught in the Fall back-to-back (*Behavioral Economics* and *Driving Profitable Growth*)
- o  I was close to giving birth to my fourth child, ▮▮▮

▮▮▮

After submitting the paper to JPSP, ▮▮▮ and I received an R&R from JPSP on November 27, 2019, asking for a revision by January 26, 2020. Kouchacki resubmitted the paper on January 26, 2020 (see **Exhibit 24**), and the paper was accepted on May 4, 2020. Though we had a tight deadline for the R&R (two months, which included winter holidays), we all thought we could meet it. But, as we discussed over the phone while working on the revisions, we were ready to ask for an extension if needed. Both ▮▮▮ and I had published papers in JPSP in the past and had experience receiving an extension on an R&R without any issues being raised by the editor or the reviewers. If a study did not work out according to our hypotheses, as we

17

discussed as a team, we would regroup to understand what happened and how to potentially re-run the study making the study itself and the resulting paper stronger.

December and January were busy months for me. Personally, I had four small children at home when we received the R&R, with no family around to help out. I heavily relied on the help of my full-time RA at the time, █████████████, as well as RAs working temporarily or through the BIG lab (i.e., the Behavioral Insights Group lab) to make progress on my research. My email records show that █████ helped with the IRB application for Study 3A, reviewed and provided feedback on the study materials, and also helped with coding (see **Exhibits 25a, 25b, 25c, and 25d**). My records also show that █████ and I met multiple times throughout January to discuss this study and other research (Tuesday, January 7, 2020; Friday, January 10, 2020; Thursday, January 16, 2020; Thursday, January 23, 2020). Two college students were also helping with research at that time: █████████████ (9/23/19 through 6/30/2020) and █████████████ (10/21/2019 through 6/30/2020). The excel file from Beth Hall (Director, Research Staff Services at HBS) corroborates this (see **Exhibit 26**).

I regularly meet face-to-face with my RAs to be clear on their responsibilities but also on the details of studies being conducted, given that I tend to work on multiple studies and research projects at a time, as was the case for this study. What this means is that, regularly, exchanges of data and materials happen through USB keys or flash drives rather than via email.

We were not required by the *Journal of Personality and Social Psychology* to post our data publicly in 2020, as that requirement began only after 2021.[11] However, we publicly shared our data voluntarily. This choice to share data publicly is inconsistent with the allegation that the data was somehow improperly altered, and instead supports the fact that I was unaware of any data anomalies or other concerns.

### I.E.1. Explaining the Data Anomalies for Allegation 1

When reviewing the initial allegation from the complainant about Study 3A, I did not find the so-called anomaly to be surprising. The complainant indicated they found puzzling that some of the words participants used to describe a networking event were more positive than others, suggesting that their ratings on the "moral impurity" measure should have been a 1 out of a 7-point scale rather than a 2 or a 3. The claimant also indicated that language such as "all that corporate stuff is awful" should result in "moral impurity" ratings greater than 1. In prior research, █████████████ and I found that engaging in professional, instrumental networking does not necessarily change how positive or negative one feels, but does influence how "dirty" and "inauthentic" a person feels. As a person who engaged in networking at a company event, for example, I may feel good about the fact that I did have a conversation with a person I wanted to connect to, but also inauthentic in the medium for reaching out. This is to say that I did not find the explanation provided by the claimant to be convincing. The data only appear "anomalous" because the claimant does not seem to understand the method and seems unaware of the existing literature.

---

[11] https://www.apa.org/pubs/journals/features/psp-pspp0000403.pdf

The complainant concluded that, "This means that a researcher who tampered with this data might have manually altered some participants' ratings without also feeling compelled to manually alter the text that accompanied those ratings. This would leave a trace" (Draft Investigation Report Exhibit 4 pg. 5). I found this point puzzling, and if anything, further bolstering the case against tampering. If a person actually did alter the data intentionally, it would be easy to change the words for the emotions to match the ratings, and thus leave no trace.

The complainant also stated that given the positivity of the words some of the participants used that a "moral impurity" score of 1 should be more likely than a "2" or a "3." This is pure speculation on the part of the complainant. The complainant's conclusion cannot be justified because, as much research has shown, people experience the same event differently, from an emotional standpoint, and also express their emotions differently. I may feel rather excited after a networking event, as an example, and score 1 on the moral impurity scale, while a person who seems equally excited may score a 2 or 3.

Though there are simple explanations for the so-called anomalies identified by the complainant, the additional analyses conducted by MCG and my own re-analysis of the data I downloaded from my Qualtrics account have me puzzled with respect to other gaps. As the report noted, "there appear to be multiple discrepancies in certain sets related to the raw data source ("Qualtrics Data") and public repository data associated with the 2020 JPSP Paper ("OSF data") provided by the client" (MCG Report pg. 2). The discrepancies exist in two of the study conditions, promotion and prevention focus. When downloading the data from my Qualtrics account, and working through the steps an RA likely followed to clean the data, I found myself puzzled since some of the choices seem unreasonable for an RA to have made during data cleaning. For instance, as stated in the MCG report, "evaluation of the Qualtrics data demonstrated that 4 participants did not appear to have given consent to the research, even though the data these participants provided were utilized in the 2020 JPSP paper" (MCG Report pg. 5). It is common practice, and something I always make the point to discuss with RAs tasked with data cleaning, to not include participants that do not consent to the research in the final dataset for analyses.

Though the HBS Policy states that I would be given access to the detailed analyses from the MCG firm and all the files they used, I did not have access to their analyses and excel files other than their final report. I thus tried to recreate their analyses to follow their observations. Though my analyses do not fully match what MCG did, likely because of differences in data exclusion choices, like MCG, I did find discrepancies. I attempted to make sense of these discrepancies as I wondered whether the RA mixed up the conditions, but I could not find a pattern that convincingly pointed to an explanation for each data discrepancy. As the MCG report states, "about 28% of the data in these survey areas" (referring to the survey scores for moral impurity and net intentions) "appear to have been modified … when comparing OSF survey score data to the scores captured in the original Qualtrics survey" (MCG Report pg. 6).

What could explain such discrepancies? One possibility is that an RA who cleaned the data made an honest error in the process. I take full responsibility for errors in the data as I was the principal investigator on the project – but this responsibility does not extend to research misconduct. As different RAs or collaborators working with me have stated, they never felt the pressure to

19

produce a certain result, or had any incentive to misreport information or alter data, and thus any errors would have certainly been unintentional (Draft Investigation Report pg. 32). Should further analysis indicate errors in the data, I will reach out to the journal with an expression of concern. I will also conduct a direct replication of the study in question.

It is also possible that the dataset posted on OSF does reflect the original data and the Qualtrics data set instead does not, as someone with access to my Qualtrics account may have modified it. Thus, tampering by a motivated third party cannot and should not be ruled out.

Though there are potential errors in the data in the study at issue, there is no evidence to suggest that such errors are intentional or that I personally knew about or contributed to such errors. As noted, any subjective inconsistencies in the moral impurity scores are due to the individuality of the test subjects, but I acknowledge that additional inconsistencies exist in the data.

Because I was not motivated to prioritize or publish this paper at all, but once published chose to voluntarily post the data on OSF for public scrutiny, I did not have any intent that would motivate the type of data manipulation alleged. In the absence of evidence as to whether data manipulation actually occurred, and if so, who was responsible for it, there cannot be a finding by a preponderance of the evidence of research misconduct.

## II.    ADDITIONAL CONSIDERATIONS

### II.A. Witness Credibility

During the interview with the investigation committee, I spent much time discussing my relationship with Professor ███████ and any potential role she may have had in the allegations. This topic of discussion went on at the length it did due to the questions I was receiving and my perception that this was a topic the committee was interested in exploring. The committee relied heavily on the email testimony of ███████ during parts of its analysis. ███ ███ is part of a group of Judgment and Decision Making scholars in marketing departments who are closely connected. As she herself told me in conversations leading up to the retraction of the 2012 PNAS paper and afterward, she has been counseled by the Data Colada team. She also presented at their seminar on December 3, 2021.[12]

The committee found ███████ a credible witness. In early 2011, ███████, ███████ and I combined efforts with ███████ and ███████ to work on a paper on the effect of signing first on ethical reporting. As noted in Bazerman's draft of Chapter 7 from his latest book *Complicit* (see **Exhibit 27**),

> The paper combined two previously unpublished empirical efforts: (1) two laboratory experiments by ███ Gino, and I that claimed to demonstrate the 'signing first' effect, and (2) one field experiment conducted at an insurance company, previously described by ███ in multiple public forums. Gino initiated

---

[12] Link to the schedule: http://datacolada.org/past-seminars; link to the talk: https://www.youtube.com/watch?v=LhoDGrY1EEU

the contact with ███ who was positive about joining together, and noted 'I have been working on this with ███ - so this will have to involve her as well.' Gino contacted ███ who also agreed to join noting that 'it's a good idea to combine forces.' By early 2011, the five of us combined efforts, realizing that the two projects responded to limitations of the other: the █████████ studies claimed to offer well-controlled laboratory experiments, while the field study claimed to provide an experiment using data from an insurance company.

As ██████ explains in his chapter, he had many questions about the field study, and directed them over the course of 2011 and early 2012 to ████████ and █████████. ███ had worked under ███ as a Postdoctoral Fellow and collaborated with him on multiple papers. As the person close to ████████ felt attacked on multiple occasions by ████████ As ███ describes herself in responding to a draft of ████████'s chapter (see **Exhibit 28**), the collaboration became quite difficult:

> a. "Given this extreme level of hostility that you directed at me, my response was short but to the point…"
> b. "…bad attempt of diffusing a hostile team dynamic…"
> c. "…dysfunction and 'distrust' in the group…"

The email exchange between ████████ and ████ about the book chapter gives more context (see **Exhibit 29**). Given that I was the person who brought us together as a team for this collaboration (that led to the 2012 PNAS paper), and the person who independently had worked with both sides of the team on other projects prior to this collaboration, ████ accused me of not doing enough to stand up for her when █████ directed "hostility" toward her.

On July 29, 2018, ████████ reached out to me and ███████ to tell us that he had been working with ███████ and █████████ on online studies that used signing and that they had failed to find any significant results. I responded with concern about the lack of significant results and expressed interest in running a highly-powered replication (see **Exhibits 3a and 3b**). We then invited ████ and █████ to join these efforts. Once the highly-powered study was conducted, showing no effect of signing first, the collaboration became very hostile again. Once again, I was in conflict with █████ for not agreeing with her interpretation of the findings from the replication. For independent corroboration of these circumstances, I will refer you to ██████'s comments (see **the recordings in answer to the questions in Exhibit 2**). I myself recognized the difficulty of the collaboration – and expressed that in an email to the team when I decided to give up the role of corresponding author on the 2020 PNAS paper (see **Exhibit 30**).

On June 28, 2019, █████████ and I had a conversation about the collaboration at Boston University, during the Ethics at the Frontier of Technology symposium (a one-day-long conference). During this conversation, █████ expressed to me her anger and disappointment that I had not done more to support her. It was during this conversation that █████ said to me that she wished I "would suffer as much as she did." At the time, I did not report this to anyone because I thought the words were emotional but harmless, and I would not want to accuse someone of harassment lightly. However, on August 15, 2021 (more than two months *before* I was made aware of the allegations against me), I reported the conversation with █████ to my HBS

21

colleague Professor ▨▨▨▨▨. ▨▨▨ who is a neighbor, was walking by my house as she often does on weekends. We were scheduled to meet on a regular basis to prepare for the teaching we'd be doing together soon, and I wanted to inform her about the possibility I would be distracted by the event surrounding the Data Colada post that would go live two days later (on August 17, 2021, http://datacolada.org/98) and the following retraction of the 2012 PNAS paper the post referred to. I confided to ▨▨ that I was particularly worried about ▨▨▨▨▨ talking to the media and lying about the facts behind the collaboration in an attempt to hurt me. It was then that I told ▨▨ about ▨▨▨▨'s threat. Please see Professor Frances ▨▨'s letter commenting on this interaction (see **Exhibit 1**).


### II.B. Data Accessibility

As I noted in my interview, I have long shared my Qualtrics account information and other log-ins with collaborators, RAs, and others whom I have worked with. ▨▨▨▨▨ has had access to my Qualtrics account since I shared with her my Qualtrics account login credentials in the years we collaborated on projects. This is a standard practice I have used with my collaborators and RAs. It helps ensure that I am not a bottleneck on projects.

▨▨▨▨▨, an RA whom I worked with for four years (2012-2016), stated in an email (see **Exhibit 31**) that this was the standard practice of mine that she observed. My HBS Faculty Support Specialists, ▨▨▨▨▨ (2010-June 2017) and ▨▨▨▨▨ (July 2017-November 2021) also testified that they had my login credentials and had my permission to share those with my collaborators (see **Exhibit 32a and 32b**). Whoever has login credentials can access my Qualtrics account and also all the data from any study conducted with Qualtrics. As a collaborator on multiple projects over the years, ▨▨▨▨▨ had access to my Qualtrics account, and therefore, all the Qualtrics data at issue in this investigation in Allegations 1 and 2 (the studies with available data on Qualtrics).

My collaborators also often have direct access to my laptop computer. When meeting at conferences, in my office or in other locations, I've regularly worked on projects or analyzed data with collaborators, also allowing them to use my laptop while we are together. (I've never had a desktop computer as a faculty member at HBS. My laptop is the only computer I use for my work.) As evidence of these practices, please see the attached emails from two long-time collaborators of mine, Professor ▨▨▨▨▨ of Wash U in St. Louis (see **Exhibit 10**) and Professor ▨▨▨▨ of UNC (see **Exhibit 11**). The same practices are discussed in a few letters that collaborators and doctoral students submitted when nominating me for the 2018 Academy of Management Award for Mentorship (see **Exhibit 33**, with the relevant part highlighted). My understanding was that this was standard practice in research labs in past years and among people who collaborate on multiple projects. ▨▨▨▨▨'s email corroborates this point (see **Exhibit 31**). In addition, other scholars have used similar practices (see **Exhibit 34** as an example from ▨▨▨▨▨ giving access to her Quatrics account to an RA we were working with). I recognize now that, from a security and privacy point of view, this was likely a mistake, as it provided me little control over access to my data and files. I am highly trusting of the people with whom I work.

22

During my interview with the investigation committee on November 14, 2022, the committee asked me why I did not change my password before October 2022. As it is clear from an email exchange I had with HBS Research Integrity Officer (RIO) Alain Bonacossa in October 2022, I thought others involved in the investigation needed access to my accounts—which is why I kept the same password until then. I changed it right away after Bonacossa confirmed my understanding was mistaken (see **Exhibit 35**).

In the future, I will revise my lab practices to make sure every collaborator has unique Qualtrics login credentials and my laptop will not be physically shared with others.

### II.C. RA Usage



The committee interviewed two of my RAs during this investigation: both ███████ and █ █ (Draft Investigation Report at pg. 15 and 24). In each of their interviews, the RAs noted that they did not know the hypotheses for each study as they did not analyze the data. However, each of the RAs helped with the IRB applications for the studies they worked on, which did specify the hypotheses each of the studies was testing. ███████ additionally helped test the studies so he knew what conditions participants would be randomly assigned (see **Exhibit 25d**). By testing the same study link multiple times, he would get to see the different conditions used in the study.

Both ███████ and ███████ appeared to have difficulty remembering the specifics of what they were asked. As noted in the report, when questioned about Study 3a, ██████ appeared to refer to Study 3b instead (Draft Investigation Report at pg. 15). Similarly, ██████ herself noted that she could not confirm the number of experiments within certain studies nor whether changes were made after the IRB applications were approved (Draft Investigation Report at pg. 24). These lapses in memory are understandable considering the time that has passed, but they also point to the fact that responses by the RAs and other witnesses are not inclusive of every fact and consideration from the relevant time period. The fact that ████ or ████ do not remember something cannot support the fact that such a discussion, task, or other item did not exist or occur. However, I know either RA would have brought any issues in procedure or data collection to my attention for us to resolve accurately and honestly. In the absence of complete memories as to the studies at issue, I have attempted to provide emails and other exhibits from the time period.

### III.    MISINTERPRETATIONS AND FACTUAL ERRORS CONTAINED IN THE DRAFT INVESTIGATION REPORT

There are a number of material misinterpretations and factual errors contained in the committee's draft report. I would like to rectify these in this section. I addressed some of them earlier; I will not repeat them here.

### III.A. General Comments in the Draft Investigation Report

23

**(1)** *The Draft Investigation Report on pg. 9 states: "Nonetheless, no witness provided a plausible explanation of data anomalies or discrepancies."*

The committee interviewed as witnesses four co-authors (████████ ████████ ████████ and ████████ and two RAs I worked with (████ and ████ I've not been in a similar situation in the past, but I would imagine having a hard time explaining any data shown to me on screen for projects where the data was collected years ago. Having had the opportunity to go through the data in the allegations carefully, I know it took me dozens of hours of sitting with it, to understand the data and any discrepancies.

**(2)** *The Draft Investigation Report on pg. 9 states: "Professor Gino maintains that she never altered or falsified research data for any of the four studies, or any other study that she has conducted in her career. However, she does not question any of the data anomalies and discrepancies as described in the forensic reports. Professor Gino asserts that the data she analyzed for publication were, to the best of her knowledge, the true, valid data that were collected for each study."*

The forensics reports were massive, and given my personal and professional time constraints, I was unable to examine the discrepancies in the required detail at the time of my last testimony. I received the five MCG reports on these dates: September 30 (for Allegation 1), October 12 (for Allegations 4a and 4b), October 21 (for Allegation 2), and October 31 (for Allegation 3). My written responses were due by November 11, in time for the November 14 interview with the committee. This was an unreasonably narrow time window for me to undertake a thorough analysis of that data. It also has to be considered that during this time period, I was the course head for the Inclusion course and teaching it.

I have now included my detailed reactions to data anomalies and very plausible explanations for any discrepancies across datasets in my responses in the first section of this report.

**(3)** *The Draft Investigation Report on pg. 10 states: "Professor Gino indicated that, for most of her career, she routinely and frequently shared her computer and Qualtrics account login credentials with collaborators, research associates, doctoral students, and lab staff—and that she had not changed her Qualtrics password for 12 years, until she did so in October 2022—giving many people the means to commit the manipulation. In support of this assertion, Professor Gino provided a list of seven emails she sent to seven different individuals in 2015, 2016, and 2018, in which she shared her credentials; none of those individuals is a collaborator, RA, or doctoral student named in this report.*

As I mentioned in my earlier comments prior to this report, it was common for me to share login information about my accounts face-to-face, rather than in emails. I shared the seven emails to show that, as I had stated, I did share my computer and Qualtrics account login credentials with collaborators, research associates, doctoral students, and lab staff. I have now included testimony from collaborators and RAs speaking to this. I also included testimony from my prior two FSSs stating that they themselves shared my Qualtrics account login credentials with others.

24

I believe this is not an uncommon practice. The testimony from the FSSs corroborates this (see **Exhibits 32a and 32b**). I also include an email from one of my collaborators, ███████████ , sharing her own Qualtrics account with me and an RA (see **Exhibits 34 and 36**).

**(4)** *The Draft Investigation Report on pg. 11 states: "First, they would have needed access to both Professor Gino's Qualtrics accounts and her computer's hard drive, as two allegations (1 and 2) involve discrepancies in Qualtrics data and one allegation (3) involves discrepancies in the computer's data."*

I have now shown that there are very logical and reasonable explanations for Allegations 4a, 4b, 3, and 2. I also provide convincing evidence that shows that I did not commit any wrongdoing in regard to Allegation 1. I would also like to clarify that anyone with access to my Qualtrics login credentials had access to the data for Allegations 1 and 2, without the need to access my hard drive.

**(5)** *The Draft Investigation Report on pg. 11 states: "For hard drive data manipulation, in addition to Professor Gino's HBS login information, they would also have needed access to her second "factor," probably her cell phone, in HBS's two-factor authentication system, which was implemented at HBS in 2015."*

This fact is not relevant to any of the allegations. As others have explained in their testimony, I regularly sit down with collaborators, RAs, and doctoral students in front of my laptop. If my laptop is open, there is no need for an HBS's two-factor authentication system. But, more importantly, to access my Qualtrics data, access to my computer is not needed. This means that an HBS's two-factor authentication system is not needed to access my Qualtrics account. With my Qualtrics login information, one can access my Qualtrics data from *any* computer.

**(6)** *The Draft Investigation Report on pg. 13 states: "Professor Gino's repeated and strenuous argument for a scenario of data falsification by bad actors across four different studies, an argument we find to be highly implausible, leads us to doubt the credibility of her written and oral statements to this Committee more generally."*

First, I am very saddened to learn that the committee doubted the credibility of my written and oral statements. In light of this comment, for any of the claims I made in this document, I corroborated the statement with evidence from email exchanges or testimony from others.

Second, I did not make any claim that a bad actor or actors were involved in manipulating my data across **all four studies**. In fact, while the motives of ██████████ are germane to this investigation, they are not actually necessary to refute all of the claims against me. (They should, however, call into question the credibility of ██████ as a witness).

I have shown, for instance, that my description of the research method in the 2012 PNAS paper reflected accurately the correct research method. I have shown that almost all of the so-called data anomalies were not anomalies at all, but were the result of data processing, handling, and cleaning.

25

### III.B. Comments about Allegation 1



**(7)** *The Draft Investigation Report on pg. 14 states: "The Investigation Committee separately interviewed each of Professor Gino's co-authors on this paper, Professor* ███████ *and Professor* ███████ *and found both of them to be credible."*

The committee asked whether ███████ and ███████ had access to the data. At least ███████ had access to my Qualtrics if she chose to use it. There are multiple email exchanges that show how closely I worked with her when she was a doctoral student and, even more so, when she was a PostDoctoral Fellow at Harvard (see, as an example, **Exhibit 37**). She was in close contact with CLER at HBS, and with ███████, the RA managing the GiNorton lab at the time (see **Exhibits 38a and 38b**). She was also in contact with ███ for studies conducted at UNC when I was at HBS (see **Exhibit 39**). On her behalf I asked HBS to create her own Qualtrics account so that she could have an independent one rather than using mine.

**(8)** *The Draft Investigation Report on pg. 14 states: "Neither of the coauthor witnesses had explanations for the discrepancies. (...)" and "They were unaware of anyone besides Professor Gino having access to the data."*

I don't believe these are relevant facts. As a common practice, people have help from RAs. They do not necessarily let co-authors know who is helping them and, if so, in doing what. And faculty members do not necessarily know the names of RAs helping the lab manager conduct studies. As just one example, in an email exchange between ███████ and ███ from 2014, ███ used the help of RAs for a study she conducted under ███████'s supervision at UNC and she did not convey who the RAs were (see **Exhibit 40**).

**(9)** *The Draft Investigation Report on pg. 15 states: "In his testimony,* ███████ *indicated that he didn't use Professor Gino's Qualtrics account or have her computer's login credentials, and that he didn't perform any data cleaning beyond simple checking for both responses or incomplete responses for this study. He also indicated that he didn't analyze the data for this study and didn't know what the hypotheses for this study were."*

As the committee itself recognizes, ███ was not clear in his memory of the specific study in question. ███ helped with the IRB application for the study, which – among other things – does specify the hypotheses the study was testing. He also helped test the study so he knew what conditions participants would be randomly assigned to (see **Exhibit 25d**). I don't fault ███ for not remembering the specifics, but his memory is not accurate. But, once again, if in fact there were honest errors by him or other RAs in cleaning the data and preparing it for analyses, I would be responsible for their errors as the PI.

**(10)** *The Draft Investigation Report on pg. 15 states: "Email correspondence between Professor Gino and* ███████ *appeared to indicate that* ███████ *did not have access to the Qualtrics survey data."*

I don't believe this is a conclusion the committee can draw. I may not be looking at the same emails the committee read, but I did read all my correspondence as I prepared my responses. I

26

did not find evidence speaking to this point. And, as I stated earlier, I found evidence of meeting in person with ███ and other RAs after data collection. It is very possible that, as I often did in the past, we exchanged data or any other file via a USB key.

**(11)** *The Draft Investigation Report on pg. 15 states: "Lastly, upon studying the email records closely, the Investigation Committee concluded that, in some of his interview responses (specifically, his responses about coding participant essays), ███████ was actually recalling his involvement in the very similar Study 3b in the same paper, not Study 3a (the subject of this allegation)."*

In reading ███'s answers during the interview, it is clear his memory is not fully accurate. ██ worked with me for years and helped with many studies. I would not expect him to remember the exact details of every study he helped with.

### III.C. Comments about Allegation 2

**(12)** *The Draft Investigation Report on pg. 18 states: "Neither of these coauthor witnesses had compelling explanations for the discrepancies identified at Inquiry."*

I am not surprised that my coauthors did not provide particularly compelling explanations for the discrepancies. I myself would find it hard to provide explanations of any data on the spot, without spending time with it and reminding myself of the specific aspects of the study. I would also imagine it is somewhat anxiety-producing to be interviewed on a matter of integrity like this one. From the way ███████ expressed herself in the interview, it does seem she was a bit stressed by the questions asked.

**(13)** *The Draft Investigation Report on pg. 18 states: "In addition, each of these co-authors stated that Professor Gino was responsible for the data collection and analyses for Study 4, and each stated that they did not have access to the data or any involvement in analyzing them."*

This is information I myself provided to the committee. I have never suggested anything different from this.

███████ did not, as she seems to recognize in her interview, know that I relied on RAs to help with studies, coding, and other responsibilities. She does regularly as well, without me knowing the specifics. While at Harvard, she was in touch with some of the RAs herself, often taking the lead in interacting with them to conduct studies (see **Exhibits 37a and 37b** for email exchanges). Though ███████ and ███████ suggested I was responsible for data collection, they recognized the possibility of RAs being involved to help.

**(14)** *The Draft Investigation Report on pg. 18 states: "MCG compared the publicly available data posted on OSF with the original datasets for this study found in Professor Gino's Qualtrics account. This analysis showed that some data in the OSF dataset do not appear in either of the two Qualtrics datasets for this study, that those data strongly support the hypothesized and*

27

*reported results, and that some data in the two Qualtrics datasets do not appear in the OSF dataset."*

If a motivated actor accessed my Qualtrics account (simply by using my login credentials), they could edit the Qualtrics easily, based on the data posted online that they knew was used for the analyses presented in the paper. If they deleted rows of data or made individual edits in the cells, there would be no records of this happening, unfortunately.

Importantly, though, as I wrote in my earlier responses, there are very plausible explanations for the anomalies. So it is very possible that the original data is not the one currently in my Qualtrics account.

### III.D. Comments about Allegation 3

**(15)** *The Draft Investigation Report on pg. 21 states*: "*Professor* ▮▮▮▮▮ *was puzzled by the data anomalies displayed during his interview; he tried to come up with benign explanations for how those patterns might have come about, but noted that the possibilities he generated were "unlikely.""*

As it was likely the case for him, I would find it hard to comment on data shared on screen at the time of the interview. The data was collected over ten years ago, and it is hard to make sense of any data without thinking carefully about the details of a study and the procedures used for data exclusion and cleaning. In my earlier responses, I provided a very plausible explanation for the anomalies, making it clear that they are not anomalies.

**(16)** *The Draft Investigation Report on pg. 21 states*: *"In addition, he stated that he never had access to the data and that he wasn't involved in writing up the method or findings sections for this study."*

To clarify, I have never claimed ▮▮▮▮▮ had access to data prior to the point when I shared it with Nelson. He never asked for the data, and it was not common practice at the time to share data with coauthors. For example, I do not have data of studies he conducted for projects we worked on together.

### III.E. Comments about Allegation 4a

**(17)** *The Draft Investigation Report on pg. 23 states*: *"written testimony by Professor Gino's co-author on the 2012 PNAS paper, Professor* ▮▮▮▮▮ *"*

Any reliance on ▮▮▮▮'s answers is problematic as she is a biased witness. But, even more importantly, what she claims is not consistent with the comments provided by a co-author on the replication efforts, ▮▮▮▮▮ (see **Exhibit 2**).

**(18)** *The Draft Investigation Report on pg. 23 states: "MCG's forensic report detailing multiple modifications to the content of the manuscript as it went through drafting and revision in the period of February 2011 through May 2011, before its initial journal submission in May 2011"*

Every paper goes through many revisions. Authors respond to each other's questions by hopefully increasing the clarity of how procedures were carried out, draft after draft. It is not a linear process. And if a particular aspect of the description really does not sit right with a co-author, then I would argue it is that author's responsibility to have a conversation about it.

In this case, the allegation that I would intentionally mislead readers is truly mind-boggling. We relied on the same procedure in the replication study done a few years later. Even the ambiguous language "payment you received" in the Tax form is language we retained in the replication study, without any discussion of it being ambiguous.



**(19)** *The Draft Investigation Report on pg. 24 states: "The Investigation Committee interviewed Professor Gino's lab manager at the time this study was conducted in the summer of 2010,* ▮ ▮ *, and found her to be a credible witness."*

▮ repeatedly states she does not remember every single detail of the study. I reached out to ▮ as we were trying to learn more about the study and planning the replication efforts. She did not have any recollection of the procedure being flawed (see **Exhibit 4a**, when I write "I've been trying to track down the RAs who I think helped with these studies but they moved on. The one I was able to talk to, understandably maybe, does not remember all the studies she helped with.").

**(20)** *The Draft Investigation Report on pg. 24 states: "* ▮ *stated that, to the best of her knowledge and recollection, for every study that she ran for Professor Gino, it was Professor Gino (along with, possibly, her study coauthors) who was responsible for the overall conceptualization and design of the study."*

▮ repeatedly gave me feedback on studies I conducted to make sure the procedures were not overly complicated in the way they would be carried out in the laboratory.

**(21)** *The Draft Investigation Report on pg. 24 states: "* ▮ ▮ *also asserted that, as a regular practice, she executed the data collection for a study in line with the description of the study procedure as submitted to the UNC IRB, even though, at that time at UNC, small tweaks were usually allowed without requiring an IRB modification to a previously-approved protocol. Due to the passage of time since data collection in 2010 and the large number of similar studies she conducted or supervised at UNC,* ▮ *could not confirm with certainty whether one or two experimenters conducted Study 1; whether she, herself, was an experimenter for this study (or whether, as lab manager, she supervised one or more other RAs conducting the study); whether participants were paid only once or twice (i.e., only in room 2 or in both room 1 and room 2); or whether changes were made to the study materials after IRB approval. She made clear, however, that she always executed a study precisely according to the instructions provided to her by Professor Gino."*

29

It is important to note that, as shown by email exchanges that I found during the years I worked with ███ after I left UNC, she regularly helped with IRB applications (see **Exhibit 41**). What this means is that she was aware of the study hypotheses because they are specified in the description of the research and what the study aims to examine.

As ███ acknowledges herself, so much time has passed that she cannot remember the details of the procedure. But she would have brought up any issues if issues indeed compromised the quality of the research.

**(22)** *The Draft Investigation Report on pg. 24 states: "*███ ███ *also said that, in examining the available materials from Professor Gino's sequestered hard drive (which we displayed during our interview with her), it appeared to her that participants may have calculated and reported their puzzle performance, and received payment for it from the experimenter, in room 1, before being exposed to the tax form (which contained the experimental manipulation)."*

It is worth noting that ███ herself is not sure about this. and it is worth noting that, as explained earlier, we retained the same, ambiguous language "payment you received" in the direct replication we conducted for the 2020 PNAS paper. As ███ states in her testimony, nobody has an issue with this ambiguous language (see **Exhibit 2**). And, as I have also stated earlier, no editor or referee ever had an issue with this language.

**(23)** *The Draft Investigation Report on pg. 25 states: "This is the way the procedure was laid out in the IRB application, and it's the way the procedure was described in the first draft of the manuscript, dated February 23, 2011"*

The committee does not have access to the IRB that was approved. I reached out to the UNC IRB and talked to them. They have no records since IRBs were done on paper. I would be delighted to provide a written testimony if the committee does not find my words credible.

**(24)** *The Draft Investigation Report on pg. 25 states: "Professor* ███ *raised concerns about whether the dependent variable of cheating on puzzle performance self-report had been collected before the independent variable (the tax form) was introduced."*

███ was satisfied with my answers and did not bring this up for the next 12 years, not even when we were discussing the study to run as a direct replication ███ 's testimony speaks to this clearly (see **Exhibit 2**).

**(25)** *The Draft Investigation Report on pg. 26 states: "[*███*] also indicated she did not see or have access to additional study materials until September 16, 2018, when* ███ ███*, then a doctoral student at HBS, embarked on a replication of experiment 1 from the original PNAS paper."*

███ never asked for the data or the materials. I shared both when I was asked.

**(26)** *The Draft Investigation Report on pg. 26 states: "According to Professor* ███ *she asked* ███ *to "check with Professor Gino and confirm which of the two procedures (i.e.,*

30

*payment in room 1 or in room 2) was implemented" (Exhibit 14, p. 6). Professor ▊▊▊ stated that, a few weeks later, ▊▊▊▊▊ sent "updated materials," which "suggested that the payment happened in room 2 only and that the DV was the matrixes solved as reported on the tax form" (Exhibit 14, p. 6); these materials fit the procedure description of Experiment 1 as published in 2012."*

▊▊▊'s testimony is particularly helpful on this point (see **Exhibit 2**). The materials that ▊▊▊ posted on OSF show the same language that the committee had issues with, and the procedure as carried out by the RAs, which is the same as in the original paper.

Given how strongly ▊▊▊ opposed the language in the 2020 PNAS paper as she did not want the paper to state that signing first does not reduce cheating (but rather that there are moderators to explore), I find it really puzzling that ▊▊▊ agreed to conduct a direct replication using language and a procedure she apparently had issues with. Or that she agreed to replicate a study that may have used a different procedure, without raising this concern.

**(27)** *The Draft Investigation Report on pg. 28 states: "[Professor Gino] also stated that it is possible that, in the first draft of the manuscript, she may have copied a study procedure from a previous, similar study, thereby introducing inaccuracies; she noted that, typically, she doesn't pay much attention to the procedure descriptions in early drafts of her manuscripts."*

I did mention in my November 11, 2022, written responses papers and IRBs that used the same procedure but did not include the language used in them. I have now added the evidence with language directly from those sources (see **Exhibit 5**).

**(28)** *The Draft Investigation Report on pg. 28 states: "In addition, Professor Gino argued that the UNC IRB application detailing the study procedure, which was on her sequestered hard drive, may not represent how Study 1 was actually run, since it was common to obtain IRB approval with a broad description of the study procedure and stimuli and to make small tweaks after approval without submitting a modification to the IRB to amend the originally approved protocol."*

This was confirmed by ▊▊▊ in the interview with the committee and the committee reported ▊▊▊ being a credible source.

**(29)** *The Draft Investigation Report on pg. 29 states: "▊▊ ▊▊ indicated that she has no memory of ever asking for money back from participants during her time as a lab manager at UNC. Moreover, both Professor Gino and ▊▊▊▊ argued that it is implausible that an experimenter would demand money back from participants at the end of an experiment. The Committee similarly finds this implausible. However, as noted below, the Committee has evidence from ▊▊ ▊▊'s testimony suggesting that participants could have both owed money at the end of the experiment and been allowed to leave with the money they had already received."*

Participants would only be allowed to leave the study with extra money they did not actually earn if the amounts were small, like a few cents or a quarter. This was simply a function of

convenience, as payments were usually in the form of $1 bills, $5 bills, or $10 bills. Rarely, we had quarters. We never had cents or dimes.

**(30)** *The Draft Investigation Report on pg. 29 states: "Ultimately, after considerable deliberation, the Investigation Committee was persuaded that research misconduct occurred, based on the following factors: a) The step-by-step experimental procedure outlined in the IRB document, and other study materials found on Professor Gino's sequestered hard drive, contradict the published paper in ways that go beyond small tweaks;"*

They are no documents that are the final version of the IRB that was approved. I also hope the new evidence I provided will lead the committee to reach a different conclusion.

**(31)** *The Draft Investigation Report on pg. 29 states:"Even if Professor Gino had copied a study procedure from a previous, similar study and pasted it into the new, first-draft document for this experiment, there is no explanation for why she proactively would have made subsequent revisions to the procedure description, on both March 15 and April 5, that were also inaccurate, as these subsequent modifications go to the heart of experimental methodology (i.e., the requirement that the independent variable manipulation must occur before the dependent variable is measured)."*

There is a very plausible explanation. I was focusing on other parts of the paper in those drafts. I was teaching for the first time at HBS and I was getting my feet wet understanding HBS. I paid careful attention to the final draft but I may not have had the same level of attention for all parts of the paper for the many versions of this paper we circulated as a team.

**(32)** *The Draft Investigation Report on pg. 29 states: "Moreover, Professor Gino provided no evidence of a prior manuscript with the procedural wording found in the first draft of the manuscript;"*

I have now provided such evidence as the Matrix task is a task I used extensively in my research and in studies conducted at UNC (see **Exhibit 5**).

**(33)** *The Draft Investigation Report on pg. 29 states: "c) Professor Gino suggested that she probably didn't talk to* ▮▮▮▮ *to clear up the procedure until after her March 15th revision, which seems unlikely, given that Professor* ▮▮▮ *raised serious questions about the procedure on March 9."*

From the language used in the email Professor ▮▮▮ sent, and given the relationship I had with her, it did not seem like such a serious question about the procedure. The proof is that nobody else was concerned, not even ▮▮▮ herself once revisions of the study descriptions were made across drafts.

**(34)** *The Draft Investigation Report on pg. 29 states: "it is plausible that Professor Gino made changes to drafts of the manuscript in order to obscure the problem with the dependent variable collection that Professor* ▮▮▮ *had detected."*

32

It is equally plausible that I simply wrote the procedure to reflect what happened when the study was conducted in the laboratory at UNC and that I made changes to the various drafts of the paper to increase the accuracy of the description of the study procedures. The additional evidence I provided about the method (and its use in the replication study) makes my explanation extremely likely.

**(35)** *The Draft Investigation Report on pg. 29 states: "In her testimony,* ▮▮▮▮ *indicated that, on the rare occasions that a participant in the UNC lab was mistakenly paid more money than they were due in an experiment, the experimenter in charge would not request money back from them but would, instead, simply let them keep what they had received."*

This is very different from saying that people received payment (up to $40) and kept it. She is referring to receiving $5.75, receiving $6 and keeping the difference ($.25).

**(36)** *The Draft Investigation Report on pg. 29 states: "We thus believe it is possible that, in this study, the experimenters told participants who had lower expenses than taxes at the end of the study that they would not have to give money back but could keep what they had already received."*

This is very unlikely. The difference in payment would have been substantial. Importantly, the language "payment you received" which the committee found ambiguous is language no one had issues with during the replication efforts.

### III.F. Comments about Allegation 4b

**(37)** *The Draft Investigation Report on pg. 31 and 32 states: "* ▮▮▮▮ *asserted that she conducted the data collection under the direction and supervision of Professor Gino, following standard lab practices at the time, and that she emailed the raw data to Professor Gino upon completion of the data collection (see email correspondence in Exhibit 28).* ▮▮▮▮ *also indicated that she did not have knowledge of the study hypotheses and that she was not involved in the analyses of the data, because she did not have the required statistical and methodological expertise."*



The original data was collected on paper. ▮▮▮ and I met in late July 2010 to check the data based on the email ▮▮▮ sent. It is important to note that, in ▮▮▮'s testimony, there is significant ambiguity in her recollection of this study, especially in her written responses. This is understandable given that the study was conducted about 13 years ago and used a paradigm (the matrix task) that I used in countless other studies ▮▮▮ conducted at UNC.

### IV.    POLICY AND DEFINITIONS

Before concluding, I would like to emphasize that the evidence needs to be evaluated in light of the existing HBS Policies and accepted definitions.

The investigation is meant to "develop a factual record" by "examining the evidence in depth" after "pursu[ing] diligently all significant issues and leads discovered that are determined relevant." Harvard Business School Interim Policy and Procedures for Responding to Allegations of Research Misconduct ("HBS Policy") at pg. 7-9. A finding of research misconduct requires the investigation committee to "identify whether the research misconduct was falsification, fabrication, or plagiarism, and whether it was committed intentionally, knowingly, or recklessly" (HBS Policy at pg. 9). Such a determination must be made by a preponderance of the evidence. *Id.* A preponderance of the evidence means "proof by information that, compared with that opposing it, leads to the conclusion that the fact at issue is more probably true than not." *Id.* at p. 13. Research misconduct also "does not include honest error or differences of opinion." *Id.*

I must emphasize again that, while the HBS Policy notes that defenses must be proven by a preponderance of the evidence in their consideration, the burden of proof for making a finding of research misconduct is actually on the committee, as any findings of research misconduct must themselves be supported by a preponderance of the evidence (HBS Policy at pg. 2, 9). Any ability of my own to support a specific defense by a preponderance of the evidence does not exclude the requirement of the committee to support each of its determinations and findings by a preponderance of the evidence. In other words, any evidence of honest error or differences of opinion must **also** be considered in determining whether the committee has met **its burden** of determining whether there is sufficient evidence to support each and every required element of research misconduct (especially with respect to intent). *See* 42 C.F.R. § 93.106(b); *see also In re Decision of Kreipke*, Recommended Decision, Docket No. C-16-402, Decision No. CR5109 (May 31, 2018) at p. 46 (holding that any evidence of affirmative defenses should **also** be considered in determining whether the institutional burden has been met).

Fabrication and falsification are alleged in this matter. Fabrication means "making up data or results and recording or reporting them." *Id.* at p. 12. Falsification means "manipulating research materials, equipment, or processes, or changing or omitting data or results such that the research is not accurately represented in the research record." *Id.*

The HBS Policy does not define "intentionally, knowingly, or recklessly" (HBS Policy at pg. 9). In the absence of other definitions for these terms, I submit that the definitions from Black's Law Dictionary should apply. The Black's Law Dictionary definitions for these terms were adopted by an Administrative Law Judge ("ALJ") deciding a matter involving federal research misconduct findings (*Kreipke* at pg. 14). Specifically, the ALJ held that Black's Law Dictionary provides "the common definitions for intentional, knowing, and reckless and their adverb forms." *See id*. As described in *Kreipke*, Black's Law Dictionary defines these terms as follows:

- Intentional: Done with the aim of carrying out the act.
- Knowing: Having or showing awareness or understanding; well-informed; deliberate; conscious.
- Reckless: Characterized by the creation of a substantial and unjustifiable risk of harm to others and by a conscious (and sometimes deliberate) disregard for or indifference to that risk; heedless; rash. Reckless conduct is much more than mere negligence: it is a gross deviation from what a reasonable person would do.

34

*See* Black's Law Dictionary; see also *Kreipke* at p. 14.

Though the allegations here do not involve federal research funds, these definitions are a useful benchmark in the absence of HBS's own adoption of definitions for these terms. Importantly, given the definition of reckless to be "much more than mere negligence," even ordinary negligence and carelessness do not rise to the requisite level of intent to support a research misconduct finding. Black's Law Dictionary defines these additional relevant terms as follows:

- Negligence: The failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation.
- Careless [action or behavior]: engaged in without reasonable care.
- Reasonable Care: . . . the degree of care that a prudent and competent person engaged in the same line of business or endeavor would exercise under similar circumstances.

*See* Black's Law Dictionary.

To find research misconduct, the committee must not only determine that there was fabrication or falsification, but ***also*** (1) that the fabrication or falsification was the result of my intentional, knowing, or reckless action ***and*** (2) that I engaged in a significant departure from accepted practices of the research community ***and*** (3) that each of these elements is proven by a preponderance of the evidence (HBS Policy at pg. 2). It is the committee's burden of proof to make such a finding. *Id*.

## V.   <u>CONCLUSION</u>

First, I reiterate my gratitude for the committee's efforts and work throughout this process. I hope that the new evidence I provided and the detailed responses about each allegation will lead the committee to revise their conclusions and recommendations as I believe they clearly show there is no evidence of wrongdoing. I have never improperly manipulated data or research results, and I hope the additional explanations and exhibits I have provided help demonstrate that.

In addition, even if the committee finds that I have not proven any affirmative defense by a preponderance of the evidence, it does not nullify the committee's burden of proving any finding of research misconduct itself by a preponderance of the evidence (HBS Policy at pg. 2, 9). The age of most of the studies subject to the allegations and the medium in which any evidence or records would have been kept has placed me at a distinct disadvantage in responding to this investigation. However, the lack of available original data or other records cannot itself be used to bolster or support a finding of research misconduct.

Research misconduct also requires a finding of *intent*, which requires the weighing of not only any certain action, but also the motivation behind that action. As has been described throughout this process, I have had no issue walking away from projects when results are not strong and have not placed any pressure on my RAs to achieve a certain result. I have additionally been open to sharing my data and placing it in a position to be scrutinized by others, exhibiting my

35

confidence in the honest nature of the data. There has been no motivation described by the committee and/or by the witness statements that could reasonably support a finding of research misconduct. As the committee has not identified with any specificity any action taken within the definition of research misconduct, and has not identified itself evidence to support a specific intent to commit research misconduct, there should be no finding against me for each of these allegations.

In all of my activities, whether it is research, teaching or administrative responsibilities, I have strived to be a respectful and honest person, and colleagues value me for that specifically, as the various statements I provided indicate.

Much has changed over the years about common research practices in psychology, decision making and management alike. I am committed to making changes to how I collaborate with people going forward, how I keep record of meetings with RAs and who is doing what on every single project, and how I run quality checks on data I did not collect. I have already taken many steps in that direction.

Best,
Francesca

36