# EXHIBIT 21



# H A R V A R D | B U S I N E S S | S C H O O L

**Confidential Memorandum**

| | |
|---|---|
| To: | Srikant Datar |
| | Harvard Business School Dean of the Faculty |
| | |
| From: | Teresa Amabile, Investigation Committee Chair |
| | Robert (Bob) Kaplan, Investigation Committee Member |
| | Shawn Cole, Investigation Committee Member |
| | |
| Re: | Final Report of Investigation Committee Concerning Allegations against Professor Francesca Gino – Case RI21-001 |
| | |
| Date: | March 7, 2023 |

---

## I.      EXECUTIVE SUMMARY

After reviewing the available evidence and interviewing Professor Gino and several witnesses, the Investigation Committee has determined, by a preponderance of the evidence, that Professor Gino significantly departed from accepted practices of the relevant research community and committed research misconduct intentionally, knowingly, or recklessly, with regard to all five allegations examined herein. For one allegation, the determination of the Investigation Committee, as described herein, was not unanimous. Examination of each allegation, independently, is presented in the "Investigation Analysis" section of this report (pp. 8-39) and a set of recommendations for institutional actions is included in the "Conclusion and Recommendations" section (pp. 40-41).

## II.      ALLEGATIONS

Five allegations of research misconduct related to the work of Professor Francesca Gino ("Respondent") were examined as part of case RI21-001. Below are the relevant publications and allegations under consideration:

1

**THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.**

**Relevant Publications**

Gino, F., Kouchaki, M., & Casciaro, T. (2020). Why connect? Moral consequences of networking with a promotion or prevention focus. *Journal of Personality and Social Psychology*, 119(6), 1221–1238 **("*2020 JPSP Paper*")**

Gino, F., Kouchaki, M., & Galinsky, A. D. (2015). The moral virtue of authenticity: How inauthenticity produces feelings of immorality and impurity. *Psychological Science*, 26(7), 983–996 **("*2015 Psychological Science Paper*")**

Gino, F., & Wiltermuth, S. S. (2014). Evil genius? How dishonesty can lead to greater creativity. *Psychological Science*, 25(4), 973–981 **("*2014 Psychological Science Paper*")**

Shu, L. L., Mazar, N., Gino, F., Ariely, D., and Bazerman, M. H. (2012). Signing at the beginning makes ethics salient and decreases dishonest self-reports in comparison to signing at the end. *Proceedings of the National Academy of Sciences of the United States of America*, 109, 15197–15200 **("*2012 PNAS Paper*")**

**Allegation 1**

Dr. Gino falsified and/or fabricated the dataset for **Study 3a in the 2020 JPSP Paper** by altering observations to affect the significance of findings of the study in the hypothesized direction.

**Allegation 2**

Dr. Gino falsified and/or fabricated portions of the datasets for **Study 4 in the 2015 Psychological Science Paper** by altering, adding, or deleting a number of observations. These changes resulted in significant effects supporting the hypotheses, as reported in the published paper. Analyses of the original[1] Qualtrics data do not support the hypotheses.

**Allegation 3**

Dr. Gino falsified and/or fabricated data within the datasets for **Study 4 in the 2014 Psychological Science Paper**. In particular:

---

[1] In her 2/17/2023 response to the final draft of this Report (Exhibit 29 here), Professor Gino objected to our use of the word "original" when referring to datasets in her Qualtrics account (in Allegations 1 and 2), on her hard drive (in Allegation 3), and provided by her former RA, ▮▮▮▮▮▮▮ (in Allegation 4b). She contended that "original" implied an unfounded assumption on our part. Although we cannot, at this point, clarify or change our use of that word in the formal allegations, we did change that wording, where appropriate, throughout the rest of this Report.

2

THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.

- some participant conditions appear to have been switched in a direction that favored the hypothesized and reported results;

- some participants' RAT scores appear to have been altered in a direction favoring the hypothesized and reported results; and

- 13 observations within the cheating condition are out of sort when sorted by whether participants cheated on the task they were asked to perform and by how many uses for a newspaper they found. These 13 observations substantially contribute to the significance of the hypothesized effects.

**Allegation 4**

With respect to Study 1 in the 2012 PNAS Paper:

a) Dr. Gino falsified and/or fabricated the results by removing or altering parts of the descriptions of study procedures from drafts of the manuscript submitted for publication, thus misrepresenting the study procedures in the final publication. The original procedure descriptions (subsequently removed or altered by Professor Gino) pointed to a significant flaw in the execution of the data collection for Study 1, which called into question the validity of the study results.

b) Dr. Gino falsified and/or fabricated the original[2] dataset by altering a number of observations in a way that favored the hypothesized results.

### III.    BACKGROUND

The final report of the Inquiry Committee, which was comprised of Professor Teresa Amabile (Chair) and Professor Robert Kaplan, is contained in Exhibit 1.[3]  As described more fully therein, allegations of research misconduct against Professor Gino were submitted to the Harvard Business School ("HBS") Research Integrity Officer ("RIO") on October 12, 2021, by a Complainant who wished to remain anonymous. Upon receiving the RIO's preliminary assessment on October 15, 2021, Dean Datar, the HBS Deciding Official, asked the RIO to start an official inquiry into the allegations in accordance with the Harvard Business School's Interim Policy and Procedures for Responding to Allegations of Research Misconduct ("HBS Policy" – Inquiry Report, Exhibit 1). Upon sequestration of Professor

---

[2] See previous footnote.

[3] The accompanying Exhibits to the Inquiry Report are referenced herein as "Inquiry Report, Exhibit X." All Inquiry Report exhibits can be found as part of Exhibit 1 to this Investigation Report.

3

**THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.**

Gino's research records (see Exhibit 2 for a list of the sequestered evidence), the RIO sent a notice of inquiry to Professor Gino on October 27, 2021 (Inquiry Report, Exhibit 2). The inquiry started on November 5, 2021.  After reviewing the evidence and conducting interviews with Professor Gino, the Inquiry Committee concluded that an investigation into the allegations was warranted.[4]  On April 13, 2022, the Deciding Official accepted the findings, conclusions, and recommendations of the Inquiry Committee, and an investigation was initiated (Exhibit 3).

## IV.    INVESTIGATION PROCESS

The RIO sent the Respondent a notice of investigation related to allegations of research misconduct on April 15, 2022 (Exhibit 4). Dean Datar proposed appointing Professor Teresa Amabile (Chair), Professor Robert (Bob) Kaplan, and Professor Shawn Cole to the Investigation Committee, pending any objections lodged by the Respondent based upon a proposed Committee member's alleged personal, professional, or financial conflict of interest. Professor Gino had no such objections. Upon confirmation of the Committee members, the official investigation started on May 13, 2022.

Both the Inquiry and the Investigation were conducted in accordance with the HBS Policy, which aligns with the Public Health Services Rule, 42 C.F.R. Part 93, and were administratively staffed by Alain Bonacossa, Research Integrity Officer; John Galvin, Associate Director, Research Administration; Alma Castro, Assistant Director, Research Administration.[5]  In addition, third-party forensic experts, Dr. Mary Walsh and Dr. Corinna Raimondo of Maidstone Consulting Group ("MCG"), conducted a forensic analysis for the Committee's review.

The summary table below provides a chronology of the investigation, including the meetings of the Investigation Committee.[6]

---

[4] "An investigation is warranted if there is - (1) A reasonable basis for concluding that the allegation falls within the definition of research misconduct under this part and involves PHS supported biomedical or behavioral research, research training or activities related to that research or research training, as provided in § 93.102; and (2) Preliminary information-gathering and preliminary fact-finding from the inquiry indicates that the allegation may have substance." 42 C.F.R. § 93.307.

[5]  In addition, a representative from the Harvard University Office of the General Counsel (Heather Quay, J.D.) was available to advise the Committee throughout the proceedings. Professor Gino has been represented in the proceedings by Ms. Sydney Smith Forquer, Associate Attorney with Cohen Seglias Pallas Greenhall & Furman PC.

[6] All meetings were conducted through the Zoom platform unless otherwise stated.

4

**THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.**

| Event Date | Description |
|---|---|
| April 15, 2022 | Notice of investigation sent to Professor Gino (Exhibit 4). |
| May 13, 2022 | Committee Meeting:<br><br>• Orientation, review of charge for investigation;<br>• Discussion of requests for external forensic firm, Maidstone Consulting Group ("MCG");<br>• Discussion of possible list of interviewees;<br>• Request for Professor Gino to:<br>    o Produce a list of research associates, doctoral students and anyone else who had or might have had access to the data at any stage related to Allegations 1, 2, 3, and 4b;<br>    o Provide a chronology of the publication process for each of the papers under investigation;<br>    o Articulate whether paper co-authors had access to the data in any way;<br>    o Provide information about when the write-up of Study 1 (Allegation 4a) was first drafted, by whom, and who reviewed that write-up. |
| May - July, 2022 | Professor Gino provided information about the publication process, access to the data, and her collaborators for each of the papers related to the five allegations (Exhibit 5). |
| June 1, 2022 | Committee Meeting:<br><br>• Preparation for interview with Professor ▇▇▇▇▇▇▇ (Allegations 1 and 2);<br>• Review of witness interview questions for Allegation 1 and 2;<br>• Discussion of written questions for ▇▇▇▇▇ (Allegations 4a and 4b). |
| June 2, 2022 | Interview with Professor ▇▇▇▇▇▇ (Allegations 1 and 2), which was recorded and transcribed. On June 6, 2022, a copy of the transcript was provided to Professor ▇▇▇▇ for her review, correction and attestation (Exhibit 6). |
| June 8, 2022 | Committee Meeting:<br><br>• Preparation for interview with Professor ▇▇▇▇▇▇ (Allegation 3);<br>• Review of witness interview questions for Allegation 3;<br>• Review of written questions for ▇▇▇▇▇ (Allegations 4a and 4b). |
| June 9, 2022 | Interview with Professor ▇▇▇▇▇▇ (Allegation 3), which was recorded and transcribed. On June 15, 2022, a copy of the transcript was provided to Professor ▇▇▇▇ for his review, correction and attestation (Exhibit 7). |

THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.

| June 9, 2022 | Committee Meeting:<br><br>• Review of written questions for ▮▮▮▮▮▮ (Allegations 4a and 4b) |
|---|---|
| June 13, 2022 | Written questions sent to ▮▮▮▮▮▮ (Allegations 4a and 4b). On July 5, 2022, ▮▮▮▮▮ notified the RIO that she had decided not to participate in the Investigation. |
| June 16, 2022 | Interview with ▮▮▮▮▮ (Allegation 1), which was recorded and transcribed. On June 23, 2022, a copy of the transcript was provided to ▮▮▮▮▮ for his review, correction and attestation (Exhibit 8). |
| June 24, 2022 | Committee Meeting:<br><br>• Preparation for interview with Professor ▮▮▮▮▮▮ (Allegation 2);<br>• Review of witness interview questions for Allegation 2;<br>• Review of draft MCG forensic report on Allegation 1. |
| June 24, 2022 | Interview with Professor ▮▮▮▮▮▮ (Allegation 2), which was recorded and transcribed. On June 29, 2022, a copy of the transcript was provided to Professor ▮▮▮▮ for his review, correction and attestation (Exhibit 9). |
| July 22, 2022 | Interview with Professor ▮▮▮▮▮▮ (Allegation 1), which was recorded and transcribed. On July 29, 2022, a copy of the transcript was provided to Professor ▮▮▮▮ for her review, correction and attestation (Exhibit 10). |
| August 2, 2022 | Interview with ▮▮▮▮▮▮▮ (Allegations 4a and 4b), which was recorded and transcribed. On August 9, 2022, a copy of the transcript was provided to ▮▮▮▮▮ for her review, correction and attestation (Exhibit 11). |
| August 26, 2022 | Committee Meeting:<br><br>• Review of MCG forensic report on Allegations 4a and 4b;<br>• Review written questions for ▮▮▮▮▮▮ and Professor ▮▮▮▮▮ (Allegations 4a and 4b);<br>• Discussion of final forensic report by MCG on Allegation 1 (Exhibit 12);<br>• Discussion of questions for Respondent interview related to Allegation 1. |
| September 30, 2022 | Committee Meeting:<br><br>• Discussion of draft MCG forensic report for Allegation 2;<br>• Discussion of questions for Respondent interview related to Allegation 2;<br>• Preparation for Respondent interview. |
| September 30, 2022 | MCG forensic report for Allegation 1 provided to Professor Gino |

6

**THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.**

| October 3, 2022 | Committee Meeting:<br><br>• Discussion of written responses from ███████████ (received on September 25, 27, and 28, 2022 – see Exhibit 13) about Allegations 4a and 4b. |
|---|---|
| October 7, 2022 | Committee Meeting:<br><br>• Discussion of written response from Professor ████████ (received on October 3, 2022 – see Exhibit 14) about Allegations 4a and 4b;<br>• Discussion of final MCG forensic reports for Allegations 4a and 4b (Exhibit 15 and Exhibit 16);<br>• Discussion of questions for Professor Gino's interview related to Allegation 4a and 4b. |
| October 12, 2022 | MCG forensic reports for Allegation 4a and 4b provided to Professor Gino |
| October 20, 2022 | Committee Meeting:<br><br>• Discussion of final MCG forensic report for Allegation 2 (Exhibit 17);<br>• Discussion of questions for Professor Gino's interview related to Allegation 2, 4a and 4b;<br>• Discussion of revisions to Allegations 1, 2, 4a, and 4b. |
| October 21, 2022 | • Notice of change to Allegations 1, 2, 4a, and 4b sent to Professor Gino (Exhibit 18);<br>• MCG forensic report for Allegation 2 provided to Professor Gino. |
| October 28, 2022 | Committee Meeting:<br><br>• Discussion of final MCG forensic report for Allegation 3 (Exhibit 19);<br>• Discussion of questions for Professor Gino's interview related to Allegation 3;<br>• Discussion of revisions to language for Allegation 3. |
| October 29, 2022 | Committee Meeting:<br><br>• Preparation for Respondent interview. |
| October 31, 2022 | • Notice of change to Allegation 3 sent to Respondent (Exhibit 20);<br>• MCG forensic report for Allegation 3 provided to Respondent |
| November 11, 2022 | Written statement from Respondent received (Exhibit 21). |
| November 13, 2022 | Committee Meeting:<br><br>• Discussion of Respondent's written response to the Committee;<br>• Finalization of Respondent's interview questions. |
| November 14, 2022 | Interview with Respondent, which was recorded and transcribed. On November 17, 2022, a copy of the transcript was provided to Respondent for her review, correction and attestation (Exhibit 22). |

7

**THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.**

| November 19, 2022 | Additional information was received from Respondent (Exhibit 23). |
| November 21 and 28, 2022 | Committee Decision Conferences. |
| December 14, 2022 | Draft investigation report provided to Respondent for review and comment. |
| February 17, 2023 | Professor Gino's response to the draft investigation report ("Response") was received and is appended to this report (Exhibit 29). |
| February 22, 2023 | Committee Meeting:<br>• Discussion of changes to the draft investigation report based on Professor Gino's Response. |

## V.      RESPONDENT BACKGROUND

Professor Gino is the Tandon Family Professor of Business Administration at Harvard Business School ("HBS"). She joined the Negotiation, Organizations, and Markets (NOM) unit at HBS as an Associate Professor of Business Administration in 2010 and became a full Professor in 2014. Before joining HBS, Professor Gino was an Assistant Professor of Organizational Behavior at The University of North Carolina, Chapel Hill from 2008-2010. From 2006-2008, Professor Gino was a Visiting Assistant Professor of Organizational Behavior at Carnegie Mellon University and from 2004-2006 she was a Post-Doctoral Fellow in the Technology & Operations Management unit at HBS.

Professor Gino earned a B.A. in Business Economics from the University of Trento in Trento, Italy in 2001. She received her Ph.D. in Economics and Management from the Sant'Anna School of Advanced Studies in Pisa, Italy in 2004.

## VI.     INVESTIGATION ANALYSIS

As part of this investigation, we conducted interviews with seven individuals, including the Respondent, and have reviewed the evidence relating to the allegations against Professor Gino, including: the sequestered materials, the forensic analyses of the allegations under investigation, interview transcripts with Professor Francesca Gino, Professor ████████, ████████, Professor ████████, Professor ████████, ████████, and Professor ████████, and written responses from ████████ and Professor ████████. We begin this Investigation Analysis by discussing the standard of review we apply to our findings and presenting observations applicable to

8

**THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.**

all allegations. Subsequently, we set forth each allegation under investigation, the specific evidence considered for the allegation, and our conclusions.

**Investigation Standard of Review**

As members of this Committee, we are charged with determining whether Professor Gino committed research misconduct, defined as the "fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results" by both 42 C.F.R. § 93.103 and the HBS Policy (Inquiry Report, Exhibit 1). Pursuant to the HBS Policy, a finding of research misconduct requires that: (a) there be a significant departure from accepted practices of the relevant research community; (b) the respondent committed the research misconduct intentionally, knowingly, or recklessly; and (c) the allegation be proven by a preponderance of the evidence. (Inquiry Report, Exhibit 1). The HBS Policy further explains that the Respondent "has the burden of proving, by a preponderance of the evidence, any and all affirmative defenses raised (such as honest error)" (Inquiry Report, Exhibit 1). We conducted our Investigation in accordance with both the federal standard and the HBS Policy.

**General Observations Concerning All Testimony and the Respondent's Credibility**

In this section, we discuss factors relevant to our decision-making across all four studies at issue in the five allegations, including Professor Gino's own explanation for the evidence of data anomalies and discrepancies in four of the five allegations.

We acknowledge, and we took seriously in our decision-making, statements by all witnesses that they never doubted the integrity of the data in the study or studies in question. One witness who knew Professor Gino well said they never doubted her integrity in any way. In addition, several exhibits appended by Professor Gino to her Response (Exhibit 29) contained messages to her from co-authors, colleagues, and former doctoral students expressing their admiration for her research rigor and integrity. The witnesses we interviewed also said that they had no evidence that Professor Gino had ever pressured colleagues, doctoral students, post-docs, or research associates, including themselves, to produce particular results in a study, or that Professor Gino had created a negative atmosphere in her lab. Moreover, some witnesses spontaneously said that they had worked on multiple studies with Professor Gino that were never published because the studies didn't work out. We carefully considered all these statements, but did not find them germane to the specific allegations before us or a plausible explanation of data anomalies or discrepancies.

9

**THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.**

Throughout this process, and across the allegations, Professor Gino offered two primary explanations in defense of her assertion that she did not commit any research misconduct.[7] The first is honest error. As we will detail in the sections addressing specific data anomalies and discrepancies, Professor Gino suggests that her RAs may have made errors in data coding, checking, or cleaning. She says that, if such errors occurred, she takes full responsibility because she was the PI ultimately responsible for supervising the research in her lab. However, she does not provide any evidence of RA error that we find persuasive in explaining the major anomalies and discrepancies. In addition, for Allegation 4a, she says that she, herself, may have made honest errors in early drafts of the relevant manuscript before it was first submitted for publication. We will discuss this possibility in detail in the section on that specific allegation.

Professor Gino's second primary explanation is that someone other than herself tampered with the data. Four of the five allegations involve anomalies and/or discrepancies within or between study datasets accessed from one or more of the following sources: the Open Science Framework ("OSF") website, where publicly available versions of study data can be posted by researchers; the sequestered hard drive of Professor Gino's computer; Professor Gino's Qualtrics account; and the RA who collected the data. Professor Gino maintains that she never altered or falsified research data for any of the four studies, or any other study that she has conducted in her career. She states that the data she analyzed for publication were, to the best of her knowledge, the true, valid data that were collected for each study cited in the allegations. However, she does not question or convincingly explain any of the analyses, data anomalies, or data discrepancies described in the forensic reports.

Professor Gino offered only one potential explanation for the data discrepancies described in Allegations 1, 2, and 4b: one or more persons who had access to her computer, Qualtrics account, and/or data files altered copies of data in those locations, after the studies were published and data had been posted on OSF, in a malicious effort to plant false evidence of data manipulation. Professor Gino described this possibility first in her November 11, 2022 memo to the Committee, and subsequently in the

---

[7] In her Response, Professor Gino offers some additional defenses, which we consider irrelevant to the heart of the allegations: (1) that, if "one were to engage in data manipulation, it would make little sense" (Exhibit 29 at p. 15) to do it in such an obvious manner as is evident in some of the allegations; (2) that testimony from RAs ████████ and ████████ should be disregarded because they could not accurately recall certain details of their work for her; (3) that it's unsurprising that witnesses could not explain data anomalies presented to them in interviews; and (4) that, as is evident in several emails from colleagues, she has often abandoned projects because the data didn't reveal significant/interpretable effects.

10

THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.

interview on November 14, 2022. She asserted that an unknown actor with malicious intentions was a more plausible explanation than honest errors or intentional data falsification by herself, or by research associates at the time the studies were conducted, because: (a) she knows that she never falsified data; and (b) she is confident that her training and supervision of research associates renders such errors or falsifications exceedingly unlikely. She named Professor ███████, a collaborator on several research projects, as the person she believed most likely to be such an actor.

Professor Gino indicated that, for most of her career, she routinely and frequently shared her computer and Qualtrics account login credentials with collaborators, research associates, doctoral students, and lab staff, and that she had not changed her Qualtrics password for 12 years, until October 2022—giving many people the means to commit the manipulations. In November 2022, in support of this assertion, Professor Gino provided a list of seven emails she sent to seven different individuals, in 2015, 2016, and 2018, in which she shared her credentials; none of those individuals is a collaborator, RA, or doctoral student named in this report. In her Response of February 2023, she provided emails from one RA (███████) and two Faculty Support Specialists (███████ and ███████) who had previously worked for her, stating that she had shared her Qualtrics login credentials with RAs, doctoral students, collaborators, and the FSSs themselves, using email and oral communication; aside from ███, ███, and ███, no names of people who had the login credentials were shared. In addition, in February 2023, she provided letters from collaborators and former doctoral students confirming that she had sometimes worked with them on research by sitting together, side by side, as they collaborated on data analysis or writing on her laptop or theirs. By providing evidence of this type of physical collaboration, and in describing it in her interview of November 2022, Professor Gino implies (but does not directly state) that a malicious actor could have accessed her hard drive, unbeknownst to her, and tampered with the data in Allegation 3, the only study for which the data can be found only on her hard drive.

Professor Gino suggested that Professor ███ is the most likely actor with malicious intentions, saying that Professor ███ had both the means – access to Professor Gino's Qualtrics account – and the motive – being angry at Professor Gino for not sufficiently defending Professor ███ against perceived attacks by another co-author concerning the field experiment in the 2012 PNAS paper. Although we have no evidence that Professor ███ actually had Professor Gino's login credentials, we believe it is possible that she may have had them and, thus, the means to enter Professor Gino's Qualtrics account, undetected, at any time from the creation of that account in 2010 or 2011 until Professor Gino changed her Qualtrics password in October 2022. As evidence of motive on the part of Professor ███, Professor Gino

11

THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.

provided in her Response (Exhibit 29) a large volume of email correspondence among the co-authors of her 2012 PNAS paper (the subject of Allegations 4a and 4b), and among the co-authors of a 2020 PNAS paper that failed to replicate the 2012 paper (a group that included all five of the co-authors of the original 2012 paper). That correspondence indicated some tension, disagreement, and harsh feelings among those five co-authors, but no tension or harsh feeling (that we could detect) between Professors ███ and Gino specifically.

In her November 14, 2022 interview with us (Exhibit 22), and also in her Response (Exhibit 29), Professor Gino describes a remark that Professor ███ made to her on June 28, 2019 during a private conversation at a conference: "During this conversation, ███ expressed to me her anger and disappointment that I had not done more to support her [against perceived attacks by co-author ███ ███ ]. It was during this conversation that ███ said to me that she wished I 'would suffer as much as she did'" (Response, Exhibit 29 at p. 21). On p. 22 of the Response, Professor Gino described this remark as a "threat," and said that she told HBS colleague Professor ███ of this threat on August 15, 2021. A letter that Professor Gino solicited from Professor ███, corroborating this account, is appended as Exhibit 1 to the Response. While we can believe that this unpleasant remark was, indeed, made by Professor ███ we do not view it as a clear threat. Even if it were a clear threat, we recognize that words do not equate to action. Moreover, based on the available evidence, we do not believe that any negative feelings that Professor ███ may have had toward Professor Gino were sufficiently strong to motivate the extreme and extensive degree of data falsification observed across the four studies at issue in the present allegations (including a study in a paper on which ███ was a co-author).

Professor Gino's Response (Exhibit 29) also included a series of audiotaped and transcribed statements from former HBS doctoral student ███ . These statements, responses to questions that Professor Gino had asked about their work together in general and, specifically, about the failure-to-replicate project that resulted in the 2020 PNAS paper, were offered to support Professor Gino's speculation that the malicious actor could be Professor ███ In our view, although ███ 's replies describe considerable tension among the more senior co-authors of the 2020 PNAS paper ( ███ ███ ), they do not provide evidence of specific hostility on the part of Professor ███ toward Professor Gino. Therefore, given the evidence before us, we do not see a plausible motive for Professor ███ to have committed research misconduct by falsifying Professor Gino's data. In her Response, Professor Gino also suggests that that there might have been one or more other, unknown,

12

THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.

individuals, besides Professor  with both means and motive to plant false data in order to harm her. However, she offers no evidence of such other actors or their possible actions.

In her interview of November 14, 2022, Professor Gino also mentioned "the Data Colada team"[8] and ▮▮▮▮▮▮▮▮ as individuals who might have acted with malicious intentions. ▮▮▮▮▮▮ was Professor Gino's lab manager at the University of North Carolina, Chapel Hill at the time Study 1 in the 2012 PNAS paper was being conducted, and it was ▮▮▮▮ who provided the data files for that study to the Committee in May 2022 – data files that subsequent forensic analysis showed to be highly discrepant with the dataset publicly posted for that study. In the interview, Professor Gino implied that the data files provided to us may have been altered before being sent. In support of these speculations, Professor Gino said that: (a) the Data Colada team members were friendly with Professor ▮▮▮; and (b) ▮▮▮▮ had become friendly with Professor ▮▮▮ when ▮▮▮▮ served as research associate for Professor ▮▮ ▮▮ at Duke University, after leaving UNC, on projects that included collaborative work between ▮▮▮ and ▮▮▮ Ultimately, however, in all of these statements, Professor Gino's explanation focused on Professor ▮▮▮ as the sole or initiating bad actor.

In evaluating the malicious-actor explanation, we note that: (1) Professor Gino has not claimed that the Data Colada team or ▮▮▮▮▮▮ had direct access to her Qualtrics account or to her HBS laptop; (2) speculations about ▮▮ pertain only to one data-falsification allegation (Allegation 4b), and not to the other three; (3) to be responsible for the data falsifications in all four of the data-related allegations, the malicious actor(s) would have needed access to Professor Gino's Qualtrics account (Allegations 1 and 2) and HBS laptop (Allegation 3), and to ▮▮▮▮ or the dataset held by ▮▮▮▮ (Allegation 4b); and (4) the malicious actor theory cannot explain the anomalies in the OSF data sets.

Although we acknowledge that the theory of a malicious actor might be remotely possible, we do not find it plausible, for several reasons. First, Professor Gino has provided no evidence that anyone accessed her Qualtrics account or her computer's hard drive for the purposes of falsifying data at any time, or that ▮▮▮▮ falsified the Study 1 data used in the 2012 PNAS paper or allowed it to be falsified. We acknowledge that such evidence would be very difficult to obtain. However, Professor Gino proposes this theory as one of her two primary affirmative defenses against the allegations (the other being honest

---

[8] The "Data Colada" team refers to three academics (Simonsohn, Nelson, and Simmons) who maintain a blog (datacolada.org) that publishes short posts that "involve quantitative analyses, replications, and/or discussions of interest to at least three behavioral scientists."

13

THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.

error) and, according to the HBS policy on research integrity, she bears the burden of proof for such an affirmative defense by showing that her explanation meets the preponderance of the evidence standard.

Second, although we do not doubt that she shared her login credentials with multiple collaborators, doctoral students, and RAs, we have no evidence that Professor ▮▮▮ her prime suspect, had any of her login credentials or access to her laptop.

Third, in order to falsify data across all four studies' records, actors with malicious intentions would have needed the following: First, they would have needed access to **both** Professor Gino's Qualtrics accounts **and** her computer's hard drive, as two allegations (1 and 2) involve discrepancies in Qualtrics data and one allegation (3) involves discrepancies in the computer's data. Second, with respect to the fourth data-relevant allegation (4b), actors with malicious intentions would have needed access either to ▮▮ ▮▮ personal computer or to ▮▮ ▮▮ herself; if the latter, they would have needed the ability to convince ▮▮ ▮▮ to collude with them in falsifying data, and the ability to either instruct her in how to falsify the data or obtain the data from her, falsify it, and then return it to her before she forwarded it to us in May 2022 (accomplishing all of this in the relatively short timeframe – one week – between our request for ▮▮ ▮▮ records from this study and her submission of those records).

Furthermore, actors with malicious intentions would have needed a significant amount of time, most likely over a very long period of time, and the ability to find multiple relevant versions of datasets in various locations that had idiosyncratic file names, structures, and variable names across the projects. They would also have needed great expertise to make changes to eliminate significant effects on the dependent variables and/or to change condition assignments, while leaving remaining data intact. In order to cause the intended harm and avoid discovery, they would have needed to time their data manipulation carefully, after Professor Gino had accessed and analyzed the data for each study. For hard drive data manipulation, in addition to Professor Gino's HBS login information, they would have needed access to her second "factor," probably her cell phone, in HBS's two-factor authentication system, which was implemented at HBS in 2015. (Notably, before this time, passwords were required to be changed annually, meaning that a bad actor would have had to learn Professor Gino's log-in credentials for the particular year that they accessed the hard drive data cited in Allegation 3.)

14

THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.

Finally, actors with malicious intentions also would have had to somehow plant anomalies in the publicly-available datasets for these allegations[9] – anomalies sufficient to raise the suspicions of the Complainant who initially brought these allegations to HBS and to motivate the Complainant to do the extensive work documented in the Complainant's memo. In this scenario, the malicious actors, after planting the anomalies, could have alerted the Complainant to look for the planted anomalies or served as the Complainant themselves.

Additional information was useful to us in assessing Professor Gino's speculation about data falsification with respect to allegation 4b. As we have noted, ██████ provided the data files that the forensic experts compared to the publicly posted version, revealing data discrepancies. Those data files did not come from Professor Gino's Qualtrics account or her computer's hard drive, so the question of unauthorized access to those locations is moot for this allegation. Above, we addressed the possibility that other individuals with malicious intent falsified the data by accessing ██████'s computer without her knowledge or convinced ██████ to either send them the data for falsification or falsify the data herself, following their instructions. However, Professor Gino's explanation also suggests that ██████ on her own initiative, could have falsified the data. We find this possibility highly implausible. ██████'s online information indicates that she holds ████████████████████████████████████ ████████████████████ and that she has had no involvement in academic research since she ended her research associate work in 2012. In our interview with her, ██████ revealed a lack of knowledge about the basics of experimental design and statistical analysis; ██████ herself said as much in her witness testimony. We think it extremely unlikely that ██████ had the statistical and methodological expertise necessary to falsify data such that significant effects were eliminated while remaining data were left intact. We found her to be a credible witness and do not believe that she had a motive to falsify data or to participate in data falsification. We also find it exceedingly unlikely that actors with malicious intentions would have gained unauthorized, undetected access to ██████'s computer or accounts in order to introduce discrepancies in the data files that she later provided to the Investigation Committee.

To reiterate, Professor Gino presented no evidence of any data falsification actions by actors with malicious intentions. She offered only speculation that one or more such actors were responsible for the

---

[9] The publicly available datasets for Allegations 1, 2, and 4b are on OSF. The dataset for Allegation 3 is not on OSF, but was provided by Professor Gino to a number of faculty members and doctoral students at U.C. Berkeley and HBS (as documented in the Response, Exhibit 29) and is, thus, publicly available in a more limited fashion.

15

THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.

data anomalies and discrepancies at issue in the allegations. We note that such acts, had they occurred, would themselves constitute research misconduct. Moreover, either accessing her laptop and falsifying data on the hard drive, or communicating with ████ for the purpose of falsifying data, would carry a high risk of discovery, followed by severe consequences for the individuals responsible. In light of this, and considering what would have been required to successfully plant false data, as Professor Gino suggests happened, we find the "bad actor" explanation highly implausible. Moreover, our investigation revealed that Professor Gino was the only person involved in all four studies. Thus, with respect to this affirmative defense, we conclude that the Respondent, Professor Gino, has not fulfilled "the burden of proving, by a preponderance of the evidence, any and all affirmative defenses raised (such as honest error)" as required by the HBS Policy (Inquiry Report, Exhibit 1). Moreover, Professor Gino's repeated and strenuous argument for a scenario of data falsification by bad actors across four different studies, an argument we find to be highly implausible, leads us to doubt the credibility of her written and oral statements to this Committee more generally.

16

THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.

**Allegation 1**

> **Dr. Gino falsified and/or fabricated the dataset for *Study 3a in the 2020 JPSP Paper* by altering observations to affect the significance of findings of the study in the hypothesized direction.**

Finding of Fact for Allegation 1

In order to evaluate this allegation, the Investigation Committee considered the following evidence: a) a description of the data anomalies identified by the Complainant in the Open Science Framework ("OSF") dataset available to the public (Inquiry Report, Exhibit 3); b) the Inquiry Committee's own analysis of the dataset from Professor Gino's Qualtrics account and the dataset available on OSF (Inquiry Report, Exhibit 4); c) witness testimony by Professor Gino's co-authors on the 2020 JPSP paper, Professor ███████████ and Professor ██████████ as well as testimony by Professor Gino's HBS research associate at the time the data were being collected and analyzed, ███████ ████ (see interview transcripts in Exhibits 6, 10, and 8, respectively); d) email records found on Professor Gino's sequestered hard drive (Exhibit 24); and e) MCG's forensic report detailing discrepancies between the Qualtrics dataset and the OSF dataset (Exhibit 12). A description of the referenced evidence is provided below and appended as exhibits to this report.

In their written response to the Inquiry Committee, the Complainant identified 79 anomalous observations wherein higher ratings of felt moral impurity were paired with positive descriptors of the networking event, all of which were in the prevention-focus condition, and 9 anomalous observations wherein the lowest possible ratings of felt moral impurity (all 1s) were paired with negative descriptors of the networking event, 7 of which were in the promotion-focus condition (Inquiry Report, Exhibit 3, pp. 9-14). All but 2 of these 88 anomalous observations favored the hypothesized effects. In addition, the Inquiry Committee performed its own comparison of the dataset from Professor Gino's Qualtrics account with the publicly posted dataset on OSF, which revealed that the means of the experimental conditions are directionally opposite in the two datasets. An initial analysis by the Inquiry Committee of a small sample of otherwise identical rows of data showed large discrepancies between the two datasets in the numerical ratings of moral impurity feelings, with the numbers in the OSF dataset all strongly favoring the hypothesized and reported effects (Inquiry Report, Exhibit 4, pp. 8-11).

The Investigation Committee separately interviewed each of Professor Gino's co-authors on this paper, Professor ████████ and Professor ████████ and found both of them to be credible. The two co-

17

THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.

authors expressed surprise at the data discrepancies displayed during their interviews, discrepancies that had been identified by the forensic analysts. Neither of the co-author witnesses had explanations for the discrepancies. In addition, each co-author stated that Professor Gino was responsible for the data collection and analyses for Study 3a, that they, personally, had neither access to the data nor any involvement in analyzing the data, and that they were unaware of anyone besides Professor Gino having access to the data. The Investigation Committee also interviewed ███████████ Professor Gino's RA at the time of data collection for these studies, and found him to be a credible witness. In his testimony, ██ ███ indicated that he didn't use Professor Gino's Qualtrics account or have her computer's login credentials, and that he didn't perform any data cleaning beyond simple checking for bot responses or incomplete responses for this study. He also indicated that he didn't analyze the data for this study and didn't know what the hypotheses for this study were.

Email correspondence between Professor Gino and ████████ appeared to indicate that ████████ did not have access to the Qualtrics survey data. In addition, emails from Professor Gino to ████████ suggested that Professor Gino created the Qualtrics survey and posted it online. Lastly, upon studying the email records closely, the Investigation Committee concluded that, in some of his interview responses (specifically, his responses about coding participant essays), ████████ was actually recalling his involvement in the very similar Study 3b in the same paper, not Study 3a (the subject of this allegation).

The Investigation Committee closely examined the forensic report produced by Maidstone Consulting Group for this allegation. The forensic analysis, which compared the dataset retrieved from Professor Gino's Qualtrics account with the dataset posted on OSF, revealed a large number of discrepancies in both dependent variable measures in the two experimental conditions, all of which favored the hypothesized and reported effects, and an absence of any discrepancies in the control condition. Overall, 168 surveys in the promotion-focus and prevention-focus conditions, accounting for 28% of the total data for Study 3a, had discrepancies between the Qualtrics dataset and the publicly available dataset posted on OSF that favored the hypothesized and reported results. (See pp. 8-16. in Exhibit 12.)

Professor Gino's Response for Allegation 1

In her November 11, 2022 memorandum to the Investigation Committee and during her November 14, 2022 interview with the committee (see Exhibits 21 and 22, respectively), Professor Gino responded to the evidence of data anomalies by stating that she never falsified or fabricated any data. She

18

THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.

speculated that an actor with malicious intentions to "hurt" her, an actor with whom she may have shared her login information in the past, may have altered the Study 3a data directly in her Qualtrics account, after the paper was published and the dataset posted on OSF. She reiterated this theory in her Response (Exhibit 29). The Investigation Committee did not find this theory to be plausible for the reasons articulated in the "General Observations Concerning All Testimony and the Respondent's Credibility" section of this report.

In her Response, Professor Gino included several other statements and materials in defense against this allegation. The Investigation Committee carefully considered and discussed these statements and materials, but did not find any of them to be persuasive.[10]

Conclusion for Allegation 1

By a preponderance of the evidence, the Investigation Committee finds that Professor Gino intentionally, knowingly, or recklessly falsified and/or fabricated the dataset for Study 3a in the 2020 JPSP Paper by altering observations to affect the findings of the study in the hypothesized direction. Accordingly, we find Professor Gino responsible for research misconduct with respect to Allegation 1.

---

[10] In brief, Professor Gino: (1) stated that she wasn't placing a high priority on publishing this paper (irrelevant to data anomalies and discrepancies; also, we have removed from this Report language suggesting she desired publishing the results); (2) stated that she often exchanged data with RAs using flash drives (irrelevant); (3) reiterated her statements in 2022 that it is unsurprising that some participants' words don't match their numerical ratings (irrelevant); (4) stated that she did not have access to the data files used or analyses done by MCG (inaccurate; she received those along with the MCG report); (5) stated that a co-author on this paper, Professor ███████, had access to her Qualtrics account (no evidence of this provided); and (6) questioned this Report's statement that email correspondence between her and RA ████████ appears to indicate that he did not have access to the Qualtrics survey data for this study (such evidence appears in her emails of January 7, 2020 and January 14, 2020).

19

THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.

**Allegation 2**

> **Dr. Gino falsified and/or fabricated portions of the datasets for *Study 4 in the 2015 Psychological Science Paper* by altering, adding, or deleting a number of observations. These changes resulted in significant effects supporting the hypotheses, as reported in the published paper. Analyses of the original Qualtrics data do not support the hypotheses.**

<u>Finding of Fact for Allegation 2</u>

In order to evaluate this allegation, the Investigation Committee considered the following evidence: a) a description of the data anomalies identified by the Complainant in the Open Science Framework ("OSF") dataset available to the public (Inquiry Report, Exhibit 3); b) the Inquiry Committee's replication of the anomalies identified by the Complainant (Inquiry Report, Exhibit 4) and its identification of other anomalies; c) witness testimony by Professor Gino's co-authors on the 2015 *Psychological Science* paper, Professor ▇▇▇▇▇▇▇▇ and Professor ▇▇▇▇▇▇ (see interview transcripts in Exhibits 6 and 9, respectively); and d) MCG's forensic report detailing discrepancies between the two datasets for this study in Professor Gino's Qualtrics account and the OSF dataset (Exhibit 17). A description of the referenced evidence is provided below and appended as exhibits to this report.

In their written response to the Inquiry Committee, the Complainant identified 20 lines of data that had "Harvard" as the response to the "Year in School" question in this study and showed that these observations strongly support the hypothesized and reported effects (see Inquiry Report, Exhibit 3, pp. 6-8). The Inquiry Committee replicated the anomalies identified by the Complainant by conducting its own comparison of the datasets from Professor Gino's Qualtrics account and the publicly posted dataset on OSF. In addition, the Inquiry Committee found that some participants who appeared in the datasets from Professor Gino's sequestered hard drive were not in the OSF dataset and that some participants who appeared in the OSF dataset were not in the datasets from Professor Gino's sequestered hard drive (Inquiry Report, Exhibit 4, pp. 16-17). Building on the analyses conducted by the Inquiry Committee, the Investigation Committee noted four additional peculiar features of the 24 lines of data that had "Harvard"

20

**THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.**

as the response for "Year in school" in the Respondent's Qualtrics datasets for this study."[11] First, the text (essay) responses are much shorter than almost all the others. Second, these responses were submitted on three specific dates: September 28, 2014, October 1, 2014 and October 2, 2014, all towards the end of the study's data collection period. Third, almost all the other participants provided a Harvard email address, but none of the 24 participants who responded with "Harvard" as "Year in school" provided a Harvard email address. Fourth, almost all the other participants provided a Harvard ID, but none of the 24 participants who responded with "Harvard" as "Year in school" did so.

The Investigation Committee separately interviewed each of Professor Gino's co-authors on this paper, Professor ████████ and Professor ████████ and found both of them to be credible. Neither of these co-author witnesses had compelling explanations for the discrepancies identified at Inquiry. (The forensic report on Allegation 2 was not complete at the time of these two interviews, so these witnesses could not be shown the discrepancies identified therein.) In addition, each of these co-authors stated that Professor Gino was responsible for the data collection and analyses for Study 4, and each stated that they did not have access to the data or any involvement in analyzing them.

The Investigation Committee closely examined the forensic report produced by Maidstone Consulting Group for this allegation. MCG compared the publicly available data posted on OSF with the datasets for this study found in Professor Gino's Qualtrics account. This analysis showed that some data in the OSF dataset do not appear in either of the two Qualtrics datasets for this study, that those data strongly support the hypothesized and reported results, and that some data in the two Qualtrics datasets do not appear in the OSF dataset. In addition, when the analyses reported in the published paper were run on the data from Professor Gino's Qualtrics account, the key result – that participants in the pro-attitudinal condition expressed significantly lower desirability of cleaning products – failed to replicate. (See pp. 9-14 in Exhibit 17.)

Professor Gino's Response for Allegation 2

In her November 11, 2022 memorandum to the Investigation Committee and during her November 14, 2022 interview with the committee (see Exhibits 21 and 22, respectively), Professor Gino asserted that she never falsified or fabricated any data, and speculated that an actor with malicious

---

[11] The "ONLINE data" tab from MCG0022_Allegation 2_Alldata.xlsx contains 24 entries where the year in school is reported as "Harvard" or "harvard."

21

THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.

intentions to "hurt" her, an actor with whom she may have shared her login information in the past, may have altered the data collected for this study directly in her Qualtrics account, after the paper was published and the dataset posted on OSF. She reiterated this theory in her Response (Exhibit 29). The Investigation Committee did not find this theory to be plausible, for the reasons articulated in the "General Observations Concerning All Testimony and the Respondent's Credibility" section of this report.

In her Response, Professor Gino included several other statements and materials in defense against this allegation. The Investigation Committee carefully considered and discussed these statements and materials but did not find any of them to be persuasive.[12]

Conclusion for Allegation 2

By a preponderance of the evidence, the Investigation Committee finds that Professor Gino intentionally, knowingly, or recklessly falsified and/or fabricated portions of the datasets by altering, adding, or deleting a number of observations in a way that favored the hypothesized and reported results. Accordingly, we find Professor Gino responsible for research misconduct with respect to Allegation 2.

---

[12] In brief, Professor Gino: (1) stated that many different RAs and CLER Lab staff helped with this study (irrelevant to the substance of this allegation); (2) provided an email from an RA on this study, stating that some participants weren't following instructions about entering the computer ID number (irrelevant to the Committee's finding that data for the people who did not enter a Harvard ID number – as the vast majority of participants did – strongly supported the hypothesized and reported results); and (3) provided an "Explanation of data anomalies" section (pp. 13-15) that fails to address two key MCG findings: first, that a number of observations in the OSF dataset could not be found in the Qualtrics datasets, and these observations strongly supported the hypothesized and reported results; and, second, that the MCG analyses conducted on the combined Qualtrics datasets revealed that the key reported result was no longer significant.

22

**THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.**

**Allegation 3**

>**Dr. Gino falsified and/or fabricated data within the datasets for** *Study 4 in the 2014*
>*Psychological Science Paper***. In particular:**
>
>- **some participant conditions appear to have been switched in a direction that**
>  **favored the hypothesized and reported results;**
>- **some participants' RAT scores appear to have been altered in a direction**
>  **favoring the hypothesized and reported results; and**
>- **13 observations within the cheating condition are out of sort when sorted by**
>  **whether participants cheated on the task they were asked to perform and by**
>  **how many uses for a newspaper they found. These 13 observations substantially**
>  **contribute to the significance of the hypothesized effects.**

Finding of Fact for Allegation 3

In order to evaluate this allegation, the Investigation Committee considered the following evidence: a) a description of the data anomalies identified by the Complainant in the dataset that the Complainant had received "from a researcher who had years ago obtained it from Professor Gino" (Inquiry Report, Exhibit 3, p. 15), a dataset that was not provided to the Committee; b) the Inquiry Committee's replication of the anomalies identified by the Complainant (Inquiry Report, Exhibit 4), using a dataset found on Professor Gino's computer; c) witness testimony by Professor Gino's co-author on the 2014 Psychological Science paper, Professor ███████████ (see interview transcript in Exhibit 7); and d) MCG's forensic report detailing an apparent series of manipulations to the dataset for this study prior to its publication (Exhibit 19), based on examination of the two datasets for this study found on Professor Gino's computer. (Although the data for this study were presumably collected using Qualtrics, no such data file could be found in Professor Gino's Qualtrics account.) A description of the referenced evidence is provided below and appended as exhibits to this report.

In their written response to the Inquiry Committee, the Complainant identified 13 observations within the cheating condition that are out of sort when the dataset is sorted by whether participants cheated on the task they were asked to perform and by how many uses for a newspaper they found. These observations substantially contribute to the significance of the hypothesized and reported effects (Inquiry Report, Exhibit 3, pp. 15-18). In addition, the Inquiry Committee replicated the anomalies identified by the Complainant by conducting its own comparison and analysis of the dataset from Professor Gino's

23

**THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.**

sequestered hard drive. It found that the mean "#Responses" score of "in-sequence" observations in the cheating condition was 7.5, while the mean "# Responses" score of "out-of-sequence" observations was much higher, at 10.1. When the Committee made an adjustment, similar to that made by the Complainant, by replacing an out-of-sequence entry in the "#Responses" column with an adjacent "in sequence" score, the mean score of respondents in the Cheating condition decreased from 8.3 to 7.0, greatly closing the gap to the mean score of 6.5 for Honest respondents (see p. 23 in Exhibit 4 of the inquiry report).

The Investigation Committee interviewed Professor Gino's co-author on this paper, Professor ██████████, and found him to be a credible witness. Professor ████████ was puzzled by the data anomalies displayed during his interview; he tried to come up with benign explanations for how those patterns might have come about, but noted that the possibilities he generated were "unlikely." In addition, he stated that he never had access to the data and that he wasn't involved in writing up the method or findings sections for this study.

The Investigation Committee closely examined the forensic report produced by Maidstone Consulting Group for this allegation. This analysis revealed three anomalies in the earliest versions of the data available in Professor Gino's sequestered hard drive (see pp. 6-10 in Exhibit 19): a) In the 2012 dataset, 12 lines of data had grey highlighting in the "cheat" column. These 12 participants' conditions seemed to have been manually switched, after data collection, from the non-cheating to the cheating condition; all 12 had scores on the RAT (the creativity test) above the mid-point, thus favoring the hypothesized and reported results. The grey highlighting in the 2012 dataset was absent in the 2014 dataset; b) In the 2012 dataset, 4 lines of data in the "cheat" condition had grey highlighting (highlighting also absent in the 2014 dataset), and those 4 participants' scores on the RAT appeared to have been manually entered rather than being computed values. The apparently manually-entered values did not derive from underlying data in any discernible way. Importantly, all these values were  much higher than the values that would have resulted from application of the computation formula, in a direction that supported the hypothesized and reported results; and c) recalculation of the statistical analysis of differences between conditions, using the original condition assignments and the original RAT scores (using the underlying data) apparent in the 2012 dataset, revealed that the key RAT creativity result for this study, as reported in the published paper, disappeared. In fact, recomputed means revealed the reverse: non-cheaters scored higher on the RAT than cheaters did.

24

THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.

Professor Gino's Response for Allegation 3

In her November 11, 2022 memorandum to the Investigation Committee and during her November 14, 2022 interview with the Committee (see Exhibits 21 and 22, respectively), Professor Gino asserted that she never falsified or fabricated any data and speculated that either (a) an actor with malicious intentions to "hurt" her, an actor with whom she may have shared her login information in the past, may have altered the data collected for this study directly in her personal computer, after the paper was published, or (b) her RAs may have made errors, which she couldn't ascertain without access to the raw data in Qualtrics. (As noted earlier, the raw data for this study cannot be found in her Qualtrics account.) The Investigation Committee did not find the first of these theories to be plausible, for the reasons articulated in the "General Observations Concerning All Testimony and Respondent's Credibility" section of this report. Moreover, the Investigation Committee did not find the second of these theories to be plausible, given the nature of the forensic evidence.

Professor Gino's Response (Exhibit 29) reiterated the defenses described above. In addition, she argued that apparent discrepancies between the 2012 and 2014 datasets on her computer, and the anomalies noted by the Complainant, may have resulted not from malicious tampering with her datasets or RA error but, rather, from perfectly appropriate data source merging, data cleaning, and manual data coding and data entry. Professor Gino maintains that, without Qualtrics datasets for this study, it's impossible to ascertain whether the available datasets contain actual anomalies and discrepancies. However, she fails to address the findings by MCG that all of the apparent alterations in the 2012 dataset favor the hypothesized and reported results, and that analyses using the 2012 dataset, with the apparently original condition assignments and calculations based on raw RAT data, fail to replicate the reported RAT results.

In her Response (Exhibit 29), Professor Gino included several other statements and materials in defense against this allegation. The Investigation Committee carefully considered and discussed these statements and materials, but did not find any of them to be persuasive.[13]

---

[13] In brief, Professor Gino: (1) asserted on p. 8 of the Response that, the MCG report on this allegation, at p. 2, concluded that "without the original data, no conclusion of research misconduct can be made" (a gross misstatement of what the Executive Summary of that report actually says); (2) described having shared the 2014 dataset freely for use in a doctoral "journal club" at UC Berkeley and a doctoral course at HBS, stating that no irregularities were identified by the doctoral students (irrelevant to this allegation); and (3) stated that the inability of her co-author

25

**THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.**

Conclusion for Allegation 3

By a preponderance of the evidence, the Investigation Committee finds that Professor Gino intentionally, knowingly, or recklessly falsified and/or fabricated data within the dataset on her hard drive by altering a number of observations in a way that favored the hypothesized results.  Accordingly, we find Professor Gino responsible for research misconduct with respect to Allegation 3.

---

( ████████ to provide an adequate explanation of apparent anomalies is not, in itself, evidence of research misconduct (irrelevant; although the Committee asked Prof. ████████ if he could explain the anomalies to make sure we had not overlooked a possible explanation for them, the Committee did not rely on his failure to provide an explanation in reaching its finding).

26

THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.

**Allegation 4a**

> **With respect to *Study 1 in the 2012 PNAS Paper:***
>
> **Dr. Gino falsified and/or fabricated the results by removing or altering parts of the descriptions of study procedures from drafts of the manuscript submitted for publication, thus misrepresenting the study procedures in the final publication. The original procedure descriptions (subsequently removed or altered by Professor Gino) pointed to a significant flaw in the execution of the data collection for Study 1, which called into question the validity of the study results.**

Finding of Fact for Allegation 4a

In order to evaluate this allegation, the Investigation Committee considered the following evidence: a) the Inquiry Committee's initial analysis of the available evidence from Professor Gino's sequestered hard drive outlined in a memorandum to Professor Gino dated January 24, 2022 (Inquiry Report, Exhibit 5); b) oral and written testimony by Professor Gino's lab manager at the time the data were collected, ▮▮▮▮▮▮▮, and written testimony by Professor Gino's co-author on the 2012 *PNAS* paper, Professor ▮▮▮▮▮ (see Exhibits 11, Exhibit 13, and Exhibit 14, respectively); the Investigation Committee also reached out to the first author of this paper, ▮▮▮▮▮ who decided not to participate in the process after receiving the Committee's written questions; c) email records found on Professor Gino's sequestered hard drive (Exhibit 25); d) MCG's forensic report detailing multiple modifications to the content of the manuscript as it went through drafting and revision in the period of February 2011 through May 2011, before its initial journal submission in May 2011 (Exhibit 15); and (e) the Investigation Committee's own assessment of the manuscript changes during that period, with particular focus on **descriptions of participants' payment for performance, collection of the dependent variable measure, and the purpose of the collection slip** (Exhibit 26 and Exhibit 27). A description of the referenced evidence is provided below and appended as exhibits to this report.

The Inquiry Committee's initial analysis of this allegation identified two specific issues, having to do with: (1) a potential procedural flaw related to the timing of the collection of a dependent variable – specifically, that participants' self-report of their puzzle performance (and their opportunity to cheat on that self-report) might have occurred before the independent variable (seeing the tax form, which required signing at the top or the bottom) was manipulated; and (2) the description of the study's procedure in the

27

**THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.**

published article, which could be seen as ambiguous or potentially misleading about the timing of this dependent variable (see Exhibit 5 in the inquiry report).

The study in question was conducted in Professor Gino's lab at the University of North Carolina, Chapel Hill (UNC) in the summer of 2010, a summer during which she transitioned from her faculty appointment at UNC to her faculty appointment at Harvard Business School. The Investigation Committee interviewed ████████, who was Professor Gino's UNC lab manager at the time this study was conducted. We found ██████ to be a credible witness. In her testimony, ██████ indicated that, other than helping Professor Gino with her submissions to the UNC IRB, she was never involved with any write-up of the procedure for any study. She also indicated that she was never involved in data analysis for any of the studies conducted in the lab. She told the Committee that her duties focused primarily on the precise implementation of each study, collecting data according to Professor Gino's directives. ██████ stated that, to the best of her knowledge and recollection, for every study that she ran for Professor Gino, it was Professor Gino (along with, possibly, her study co-authors) who was responsible for the overall conceptualization and design of the study. ██████ also asserted that, as a regular practice, she executed the data collection for a study in line with the description of the study procedure as submitted to the UNC IRB, even though, at that time at UNC, small tweaks were usually allowed without requiring an IRB modification to a previously-approved protocol. Due to the passage of time since data collection in 2010 and the large number of similar studies she conducted or supervised at UNC, ██████ could not confirm with certainty whether one or two experimenters conducted Study 1; whether she, herself, was an experimenter for this study (or whether, as lab manager, she supervised one or more other RAs conducting the study); whether participants were paid only once or twice (i.e., only in room 2 or in both room 1 and room 2); or whether changes were made to the study materials after IRB approval. She made clear, however, that she always executed a study precisely according to the instructions provided to her by Professor Gino. ██████ also said that, in examining the available materials from Professor Gino's sequestered hard drive (which we displayed during our interview with her), it appeared to her that participants may have calculated and reported their puzzle performance, and received payment for it from the experimenter, in room 1, before being exposed to the tax form (which contained the experimental manipulation) in room 2.

The Investigation Committee closely examined the forensic report produced by Maidstone Consulting Group for this allegation (Exhibit 15). Based on that report and its own close review of the manuscript versions, the Committee summarized and analyzed the key changes to the descriptions of the

28

THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.

three central, inter-related elements of the Study 1 procedure (participants' payment for performance, collection of the dependent variable measure of cheating on the self-report of performance, and the purpose of the collection slip) across different versions of the manuscript (Exhibit 26). This analysis revealed the following:

1. <u>Versions dated 2011-02-23 and 2011-03-08</u>: The earliest drafts of the manuscript described the dependent variable of self-reported matrix puzzle performance as derived from the collection slip, which participants filled out in room 1, and on the basis of which participants were paid for puzzle performance before being given the tax form that contained the independent variable manipulation (signature required on the top or the bottom). This is the way the procedure was laid out in the IRB application, and it's the way the procedure was described in the first draft of the manuscript, dated February 23, 2011.That description survived, basically intact, through revisions of the manuscript by ████ and Professor ████ in early March 2011. In the March 8, 2011, revision, ████ added a clear and explicit statement that the cheating dependent variable was the difference between actual performance on the matrix sheet and the self-report on the collection slip.

2. <u>Version dated 2011-03-09</u>: In a comment inserted in the March 9, 2011 version, and also in the body of the email to which it was attached, Professor ████ raised concerns about whether the dependent variable of cheating on puzzle performance self-report had been collected before the independent variable (the tax form) was introduced.

3. <u>Version dated 2011-03-15</u>: On the next version of the manuscript, dated March 15, 2011, Professor Gino made four key alterations:

   a. First, Professor Gino deleted the material that ████ had added to the manuscript on March 8, which had explicitly stated that the source of the dependent variable of cheating on the puzzle performance self-report was the self-report made on the collection slip in room 1.

   b. Second, Professor Gino added a section called "Opportunity to cheat." This section explicitly stated that the puzzle performance dependent variable came from the self-report that participants made on the tax form (which was also referred to as the "payment form") in room 2.

29

**THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.**

c.  Third, in the new "Opportunity to cheat" section, Professor Gino included a sentence relevant to a change she later made to the April 5th revision. That sentence explicitly stated that participants received payment after completing the matrix task and before seeing the tax form (or "payment form"). ("When participants received payment **after completing the first part of the study** [emphasis added], the experimenter gave them a payment form and asked each participant to go to a second room to fill it out…", p. 12).

d.  Fourth, Professor Gino made another change that was also relevant to her subsequent edits to the April 5th revision. She added a phrase explicitly stating that participants were told to submit their collection slip to the experimenter in room 1 "so that she could check their work and give them payment."

4.  <u>Version dated 2011-04-05</u>: Professor Gino's April 5, 2011 revision of the manuscript contained new alterations. Specifically, she removed all mention of participants being paid in room 1 (statements she had previously inserted, see 3c and 3d above, in her March 15 revision). These deletions appear to have been prompted by comments Professor ▓▓▓▓ inserted to the April 4 version, which, again, raised concerns about participants' self-reporting of their puzzle performance on the collection slip and being paid for that performance before they saw the tax form.

This analysis shows that Professor Gino's own written statements about the procedure, added to the manuscript in the March 15, 2011 revision, conflict meaningfully with the published version of the paper. The published paper does not mention any payment to participants until the very end of the study, and it explicitly states that the only purpose of the collection slip was "for the participants themselves to learn how many puzzles in total they had solved correctly" (p. 15199). Moreover, the published paper contains this statement about the dependent variable: *"All of the instructions and dependent measures appeared on one page to ensure that participants knew from the outset that a signature would be required."* (p. 15199).

The Investigation Committee considered Professor ▓▓▓▓'s written response to a series of questions the Committee submitted to her on October 3, 2022 (Exhibit 14).  Professor ▓▓▓ responded that she joined the project in January 2011, upon receiving an invitation from Professor Gino and that, to the best of her knowledge, Professor Gino, Professor ▓▓▓▓▓▓ (a tenured professor at Harvard Business School), and HBS doctoral student ▓▓▓▓ were involved in the study, with the two professors supervising or leading its conceptualization and design. Professor ▓▓▓ responded, multiple times, that

30

**THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.**

she had no direct, first-hand knowledge of how Study 1 had been carried out. She noted that, among all the study materials, she initially had access only to three tax forms embedded in the first draft of the manuscript that Professor Gino shared with her collaborators on February 23, 2011. She also indicated that she did not see or have access to additional study materials until September 16, 2018, when ███, ████████, then a doctoral student at HBS, embarked on a replication of Study 1 from the original PNAS paper. (In drafting this report, we assumed that ████████ had obtained those materials from Professor Gino, because Professor ████ stated that some of them matched materials from Professor Gino's sequestered hard drive, which we had attached to our written questions. This was confirmed by the audio replies (previously described) sent by ████████ to Professor Gino in February 2023 (see Exhibit 2 to Professor Gino's Response (Exhibit 29).) Professor ████ described questions that both she and ████ had about discrepancies between those materials and specifics of the procedure for Experiment 1 as described in the 2012 *PNAS* paper, questions specifically about the number, location, and timing of payments to participants. She also described conversations that the two of them had during September-November 2018 trying to resolve those discrepancies. According to Professor ████ she asked ████ to "check with Professor Gino and confirm which of the two procedures (i.e., payment in room 1 or in room 2) was implemented" (Exhibit 14, p. 6). Professor ████ stated that, a few weeks later, ████ sent "updated materials," which "suggested that the payment happened in room 2 only and that the DV was the matrixes solved as reported on the tax form" (Exhibit 14, p. 6); these materials fit the procedure description of Experiment 1 as published in 2012. Professor ████'s account of interactions between herself and ████ in the Fall of 2018 is close to that provided by ████████, with a key difference: ████████ does not mention a specific perceived discrepancy or confusion about the number, location, and/or timing of payments to participants.

With respect to the Committee's questions about changes to the description of the study procedure across different drafts of the manuscript, Professor ████'s responses closely match the Committee's own analysis, presented above (Exhibit 14, pp. 7-16). Professor ████ indicated that, to the best of her knowledge, none of the other co-authors commented on the concerns she had raised about the puzzle self-report dependent variable on March 9, 2011 and April 4, 2011, and that, given how her concerns were addressed in 2011 and in 2018, when the replication study was conducted, she was under the impression that the April 5, 2011 version of the manuscript accurately described the study procedure for experiment 1. Recently, however, the Committee noticed that one other co-author had, indeed, expressed a concern about collection of the dependent variable. Specifically, in an email to the co-author team dated March 6, 2011 (see Exhibit 14, p. 8), co-author ████████ stated (after his first reading of

31

THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.

the manuscript), "In multiple lab studies, we need to clarify how we know when someone cheats - I couldn't find that in the paper…this may be my error."

Professor Gino's Response for Allegation 4a

In both the Inquiry Committee and Investigation Committee proceedings, Professor Gino acknowledged that paying participants for their matrix puzzle performance on the basis of their self-reported performance to the experimenter in room 1, before they saw the tax form, would have represented a serious flaw in the procedure and invalidated the results for that dependent variable. In her November 11, 2022, memorandum to the Investigation Committee, during her November 14, 2022, interview, and in an email to the Committee dated November 19, 2022 (see Exhibits 21, 22, and 23 respectively), Professor Gino affirmed her confidence in the description of the study procedure as it appears in the published paper and asserted that she has never written anything in her publications with the intention to mislead. She indicated that the revisions she made to the manuscript, at each stage, were aimed at improving the accuracy and clarity of the procedure description. Moreover, she suggested that her changes to the April 5, 2011 version probably reflected what she understood the study procedure to be based on a conversation she would have had with ███████ to clarify exactly what procedure had been used during data collection in July 2010. She also stated that it is possible that, in the first draft of the manuscript, she may have copied a study procedure from a previous, similar study, thereby introducing inaccuracies; she noted that, typically, she doesn't pay much attention to the procedure descriptions in early drafts of her manuscripts. In addition, Professor Gino argued that the UNC IRB application detailing the study procedure, which was on her sequestered hard drive, may not represent how Study 1 was actually run, since it was common to obtain IRB approval with a broad description of the study procedure and stimuli and to make small tweaks after approval without submitting a modification to the IRB to amend the originally approved protocol. (███████ said essentially the same thing about the IRB.) Finally, Professor Gino pointed out (and provided evidence in the form of an email in May 2011 from first author ███████) that different versions of the manuscript were exchanged in rapid succession among the co-authors of the paper and that the forensic analyses performed by MCG and the Committee may have erroneously assumed linearity across versions – that is, that each version took the previous one into proper consideration and improved on it.

The Investigation Committee carefully evaluated these possible explanations as it struggled to make sense of the key procedural issue concerning the validity of the dependent variable measure of cheating on self-reported puzzle performance: specifically, when, where, and how participants self-

32

**THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.**

reported their puzzle performance to the experimenter. The Committee also struggled with two additional findings that emerged from available evidence. First, as shown in the MCG forensic report on allegation 4b, it appears that, in the data provided by ████████ there *is* a significant difference on the matrix cheating measure between the sign-at-top and the sign-at-bottom conditions, with more cheating in the sign-at-bottom condition (see forensic report in Exhibit 16, pp. 12 and 14). The Committee discussed how that measure could show a significant effect, if collection of that dependent variable (self-report of puzzle performance for payment) had occurred before manipulation of the independent variable (location of the signature on the tax form). Second, the Committee noted that, as documented in the MCG forensic report for allegation 4a, if participants had been paid in room 1 for puzzle performance, and then again in room 2, those with claimed expense deductions that were lower than the tax due – 20 or 22 participants (depending on the dataset used) – would have owed money back to the experimenter in room 2 (see forensic report in Exhibit 15, p. 9). According to the Committee's calculations on the OSF data set, 20 of the participants would have owed money; two of these would have owed more than $1 ($1.60 and $2.40). ████████ indicated that she has no memory of ever asking for money back from participants during her time as a lab manager at UNC, nor does she recall an experiment where several participants owed money back at the end of the experiment. Moreover, both Professor Gino and ████████ argued that it is implausible that an experimenter would demand money back from participants at the end of an experiment. The Committee similarly finds this implausible. However, as noted below, the Committee has evidence from ████████'s testimony suggesting that participants could have both owed money at the end of the experiment and been allowed to leave with the money they had already received.

In her Response (Exhibit 29), Professor Gino reiterated the explanations she had given in November 2022, again highlighting the implausibility of so many participants owing the experimenter money at the end of the experiment. In addition, she provided materials to support her earlier defense of possible honest error on her part in the earlier drafts of the Study 1 procedure section of the manuscript. Specifically, in her Exhibit 5, she provided passages of procedure sections from several earlier papers she had published with studies using the same matrix task. Her described purpose in providing these passages was to support her supposition that, in her haste to prepare the early drafts in 2011, she might have simply copied a procedure section from a previous manuscript and inserted it into this manuscript. We found this possibility, as well as her statement that she rarely pays close attention to the procedure sections of manuscripts until they near the final version, to be quite plausible. However, we did not find wording in the passages provided to us to be sufficiently close to the actual wording inserted in the February and March 2011 drafts to support her explanation of a hasty copy-and-paste writing process.

33

THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.

In her Response, Professor Gino also proposed a different form of honest error on her part as an explanation for the manuscript changes, namely that, in her haste to prepare the first draft, she might not have paid close attention to what she wrote in the procedure section, intending to fix it in later drafts. This explanation, too, seemed plausible at face value. However, it became less plausible to us as we considered the specific nature of the revisions made to the procedure section of Study 1 in the March 15 and April 5, 2011 versions of the manuscript.

In her Response (Exhibit 29), Professor Gino included several other statements and materials in defense against this allegation. The Investigation Committee carefully considered and discussed these statements and materials, but did not find any of them to be persuasive.[14]

---

[14] In brief, Professor Gino: (1) attempted to undermine the testimony of Professor ▮▮▮▮ (irrelevant, because we based our decision-making primarily on our analysis of February-May 2011 versions of the manuscript, which Professor ▮▮▮▮'s testimony merely confirmed); (2) questioned Professor ▮▮▮▮'s stance on the Study 1 procedure, for example, on p. 31 of the Response, Professor Gino stated, "I find it really puzzling that ▮▮▮▮ agreed to conduct a direct replication using language and a procedure she apparently had issues with. Or that she agreed to replicate a study that may have used a different procedure, without raising this concern." (This is based on a false assumption, because Professor ▮▮▮▮ never said, in her testimony or her emails in evidence, that she doubted the procedure in Study 1 as it appeared in the published paper. In fact, on p. 14 of her written testimony to us, Professor ▮▮▮▮ said, "Given how my comments/concerns about Experiment 1's procedure were handled in 2011 and 2018, I have been under the impression that the sentences you have noted in the screenshots below more or less accurately describe the procedure of Experiment 1." Those screenshots were of the April 5, 2011 version of the manuscript, which were substantively the same in the final, published paper.); (3) asserted, on p. 31 of the Response, that neither she nor we have the final, approved version of the IRB for Study 1 (speculative, as Professor Gino has produced no evidence that what we found on her hard drive is *not* the final, approved version.); (4) asserted, on p. 32 of the Response, that she may have inserted inaccuracies into the March 15 and April 5, 2011 versions of the manuscript because she was distracted by her duties as a new faculty member at HBS, and teaching at HBS for the first time (implausible, as she proactively inserted changes that we view as serious misstatements); (5) asserted, also on p. 32 of the Response, that Professor ▮▮▮▮'s concerns about the procedure, raised in her comment in and email about the March 9, 2011 version of the manuscript, "did not seem like such a serious question about the procedure" (implausible, because a researcher with Professor Gino's experience should have understood a question about the validity of one of the two dependent variables to be serious); (6) asserted that ▮▮▮▮'s audio replies to her questions, and the fact that the 2020 direct replication study followed the procedure as described in the procedure section of Study 1 in the 2012 paper, including the same tax form, are evidence that the true Study 1 procedure was, in fact, as it was published in 2012 (circular reasoning, because all of the information ▮▮▮▮ had about Study 1, which she and Professor ▮▮▮▮ used to develop the materials and RA instructions for running the 2020 replication study, came from Professor Gino. The procedures of the 2020 direct replication study are irrelevant to this investigation.); (7) reported on p. 4 of the Response that when she contacted her former RA, ▮▮▮▮, about the Study 1 procedure in 2019, ▮▮▮▮ did not "raise any doubt about the validity of the studies or the procedures used." (irrelevant, given the passage of 9 years since the study had been conducted, the many similar studies that ▮▮▮▮ had run or supervised, and the Committee's observation that ▮▮▮▮ didn't possess sufficient knowledge of experimental design to have raised validity concerns at any point.); (8) asserted on pp. 3-4 of the Response that the Committee misinterpreted the past-tense wording of "payment you received" on the tax form as evidence that participants may have been paid for puzzle performance before seeing the tax form, based on the fact that neither ▮▮▮▮ nor the 2020 replication

34

**THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.**

The Investigation Committee struggled to reconcile Professor Gino's explanations, and the two puzzling pieces of evidence described above, with the rest of the available evidence presented herein, evidence that seemed to point to an intentional obfuscation of the actual study procedure by Professor Gino over manuscript versions and in the final publication. Ultimately, after considerable deliberation, the Investigation Committee was split as to whether a finding of research misconduct was warranted for this allegation. One Committee member felt that the burden of proof by a preponderance of the evidence standard was not met, primarily because of the significant difference found between the two experimental conditions in the MCG analysis of ██████ 's dataset, and because of the implausibility that ██████ would have no memory of an experiment with such an unusual situation as 20 or more participants owing money at the end of their sessions.

The other two Committee members were persuaded that research misconduct occurred, based on the following factors: a) The step-by-step experimental procedure outlined in the IRB document, and other study materials found on Professor Gino's sequestered hard drive, contradict the published paper in ways that go beyond small tweaks; b) Even if Professor Gino had copied a study procedure from a previous, similar study and pasted it into the new, first-draft document for this experiment, there is no explanation for why she proactively would have made subsequent revisions to the procedure description,

---

RAs nor any 2020 co-authors nor (according to Professor Gino) the editor and reviewers of the 2012 and 2020 papers ever "had that misinterpretation" about the past-tense wording (inaccurate characterization of what ██ ██████ says; ████████ (in her reply #4, p. 46 of Exhibit 29) – in our view, the person most likely to have noticed this wording because she was responsible for preparing study materials for the replication – says "I didn't notice it [the past-tense wording]," possibly because the print was so small, and she further says that the past-tense wording wasn't right and should be corrected in future studies. Thus, we reason that the failure of all these people to raise a concern about the past-tense wording could simply indicate that they hadn't noticed it.); (9) asserted on pp. 5-6 of the Response that the Committee inappropriately used as evidence the materials on her hard drive that were in a folder that she had previously indicated contained the materials for Study 1 ("Tax study") with "created" dates of spring-summer 2010. (unfounded, because she never provided the Committee with other files created in 2010 that, according to her, are the correct materials used in Study 1. Moreover, ████████ provided some of those same files, identified as files for that study; they were attached to 2010 emails from Professor Gino to her, which she shared with the Committee.); and (10) noted (correctly) that the Committee relied primarily on the February-May 2011 versions of the manuscript that were found on her hard drive, and asserted that such reliance was inappropriate because there may have been other versions of the manuscript. Professor Gino further stated that the Committee assumed linearity of the versions, and provided some evidence (an email from ████████ to the co-author team in May 2011) indicating that the versions being exchanged among co-authors may not have been purely linear, and that (as noted in the MCG report) there could have been other, non-email communications among the co-authors that could constitute important evidence (possible, but not material to our conclusions on this allegation. Upon our request for all versions of this manuscript as it was being prepared for first journal submission, Professor ████ provided us with the same documents found on Professor Gino's hard drive. Moreover, Professor Gino failed to provide any other versions of the manuscript or explain how a non-linearity of versions being exchanged among co-authors, or other communications that the co-authors may have had, could affect the observations we made about the changes made by Professor Gino in chronologically sequential versions.)

35

**THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.**

on both March 15 and April 5, that were also inaccurate, as these subsequent modifications go to the heart of experimental methodology (i.e., the requirement that the independent variable manipulation must occur before the dependent variable is measured) and, moreover, Professor Gino provided no evidence of a prior manuscript with the procedural wording close to that found in the first draft of the manuscript; c) Professor Gino suggested that she probably didn't talk to ▆▆▆▆ to clear up the procedure until after her March 15th revision, which seems unlikely, given that Professor ▆▆▆ raised serious questions about the procedure on March 9 (i.e., Professor ▆▆▆ described her concern about the dependent variable at the beginning of her brief March 9th email to co-authors and also described it in a comment within the document); d) Given that Professor Gino's major changes to the aspect of the procedure description at issue (i.e., payment for the puzzle task based on the collection slip submitted to the experimenter in room 1) occurred in the revisions that she made on March 15 and April 5 – in each case, immediately following the versions in which Professor ▆▆▆ had raised questions about that aspect (see March 9 and April 4 emails in Exhibit 25) – it is plausible that Professor Gino made changes to drafts of the manuscript in order to obscure the problem with the dependent variable collection that Professor ▆▆▆ had detected; e) It is possible that the significant effect detected by MCG on the cheating measure in the dataset provided by Ms. ▆▆ may be accounted for by some other, unidentified variable or factor, or by chance; and f) In her testimony, ▆▆▆▆ indicated that, on the rare occasions when a participant in the UNC lab was mistakenly paid more money than they were due in an experiment, the experimenter in charge would not request money back from them but would instead simply let them keep what they had received. We thus believe it is possible that, in this study, with the relatively small amounts of money that were owed, the experimenters allowed participants with lower expenses than taxes to keep the money already received.

Conclusion for Allegation 4a

By a preponderance of the evidence, a majority of the Investigation Committee find that Professor Gino intentionally, knowingly, or recklessly falsified and/or fabricated the results by removing or altering parts of the descriptions of study procedures from drafts of the manuscript submitted for publication, thus misrepresenting the study procedures in the final publication. Accordingly, we find Professor Gino responsible for research misconduct with respect to Allegation 4a.

THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.

**Allegation 4b**

> **With respect to Study 1 in the 2012 PNAS Paper:**
> **Dr. Gino falsified and/or fabricated the original dataset by altering a number of**
> **observations in a way that favored the hypothesized results.**

Finding of Fact for Allegation 4b

In order to evaluate this allegation, the Investigation Committee considered the following evidence: a) a description of the data anomalies identified by the Complainant in the Open Science Framework ("OSF") dataset available to the public (Inquiry Report, Exhibit 3); b) the Inquiry Committee's replication of the anomalies identified by the Complainant (Inquiry Report, Exhibit 4); c) oral testimony by Professor Gino's lab manager at the time the data were collected, ▮▮▮▮▮▮ and written testimony by Professor Gino's co-author on the 2012 *PNAS* paper, Professor ▮▮▮▮▮ (see Exhibits 11 and Exhibit 14, respectively) (the first author of this paper, ▮▮▮▮▮▮ decided not to participate in the process after receiving written questions from the Committee); and d) MCG's forensic report detailing discrepancies between the datasets provided by ▮▮▮▮▮ and the OSF dataset (Exhibit 16). A description of the referenced evidence is provided below and appended as exhibits to this report.

In their written response to the Inquiry Committee, the Complainant identified 8 out-of-sort observations, including 1 duplicate observation, when the dataset is sorted by participants' condition assignment and by participant ID. The Complainant's analysis illustrated a strong directionality to the 8 anomalous responses, in the direction of the hypothesized effect (Inquiry Report, Exhibit 3, pp. 2-5). The Inquiry Committee replicated the anomalies identified by the Complainant by conducting its own comparison and analysis of the dataset from Professor Gino's sequestered hard drive. It found that when the anomalous observations were removed from the dataset, the mean score on travel expenses (one of the dependent measures of cheating) of the "Signature at Top" condition increased from 5.3 to 6.0, and the mean score of the "Signature at Bottom" condition decreased from 9.6 to 8.4. The adjustment reduced the difference between the two groups in a direction opposite to that of the authors' hypothesis (see p. 27 in Exhibit 4 of the inquiry report).

The Investigation Committee interviewed ▮▮▮▮▮ Professor Gino's lab manager at the time, who oversaw the data collection for this study at the University of North Carolina, Chapel Hill. ▮▮▮▮▮ asserted that she conducted the data collection under the direction and supervision of Professor Gino, following standard lab practices at the time, and that she emailed the raw data to Professor Gino upon

37

**THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.**

completion of the data collection (see email correspondence in Exhibit 28). ▆▆▆ also indicated that she did not have knowledge of the study hypotheses and that she was not involved in the analyses of the data, because she did not have the required statistical and methodological expertise. ▆▆▆ also stated that she never felt pressured by Professor Gino to produce certain results in a study, and never doubted Professor Gino's integrity. The Investigation Committee also submitted written questions to Professor ▆▆▆ In her written responses to these questions, Professor ▆▆▆ indicated that she was not a collaborator on this project at the time the data for this study were being collected and analyzed, as she and Professor ▆▆▆ joined the project as collaborators at a later time. Professor ▆▆▆ also indicated she did not have access to the data and was not involved in the data analyses for this study. Professor Gino's testimony agrees with these statements about Professor ▆▆▆'s involvement. The Investigation Committee found the information provided by both ▆▆▆ and Professor ▆▆▆ to be credible.

The Investigation Committee closely examined the forensic report produced by Maidstone Consulting Group for this allegation (Exhibit 16). MCG compared the dataset provided by ▆▆▆ with the dataset posted on OSF, and carried out the same analyses on both. This analysis revealed a large number of discrepancies between the two datasets. Two types of discrepancies are particularly notable: first, 6 participants' condition assignments differed in the two datasets and, second, 52% of the participants that could be confidently matched had data that were different in the two datasets, with no clearly identified reason for the discrepancies. All but one of these discrepancies favor the hypothesized and reported effects. Moreover, the forensic report pointed to differences in the statistical results for both dependent variables that contradict the published paper (see Exhibit 16, pp. 6-15).

Professor Gino's Response for Allegation 4b

In her November 11, 2022 memorandum to the Investigation Committee and during her November 14, 2022 interview with the Committee (see Exhibits 21 and 22, respectively), Professor Gino asserted that she never falsified or fabricated any data; she suggested that ▆▆▆ may have falsified the dataset prior to sending it to the HBS RIO as part of these proceedings, possibly under the influence of Professor ▆▆▆ whom Professor Gino speculated might be a bad actor with intentions to "hurt" her. The Investigation Committee did not find this theory to be plausible for the reasons articulated in the "General Observations Concerning All Testimony and Respondent's Credibility" section of this report.

38

THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.

In her Response (Exhibit 29), Professor Gino included several other statements and materials in defense against this allegation. The Investigation Committee carefully considered and discussed these statements and materials, but did not find any of them to be persuasive.[15]

Conclusion for Allegation 4b

By a preponderance of the evidence, the Investigation Committee finds that Professor Gino intentionally, knowingly, or recklessly falsified and/or fabricated the dataset by altering a number of observations in a way that favored the hypothesized results. Accordingly, we find Professor Gino responsible for research misconduct with respect to Allegation 4b.

---

[15] In brief, Professor Gino: (1) stated on p. 6 of the Response that "Allegation 4b claims that I altered a number of observations in the data (8 of them)" (inaccurate, because the final wording of the allegation, which she received before the draft Report was provided to her in mid-December 2022, says that "a number of observations" were altered, without specifying a number. The MCG report reveals that over 50% of participants' data were altered.); (2) described in great detail her whereabouts in the summer of 2010 and whether/when she met with ▮▮▮▮▮ to discuss Study 1, including a meeting with ▮▮▮▮▮ on July 19, 2010 in order to, in Professor Gino's words, "make sure the data were accurate" (p. 6) (this information is largely irrelevant to our finding of research misconduct, except the information about the purpose of her July 19 meeting with ▮▮▮▮▮, which in fact bolsters our confidence in the accuracy of the dataset that ▮▮▮▮▮ had in her possession.); (3) asserted on p. 7 of the Response that she was never in favor of retracting the 2012 paper because she "did not believe the data had anomalies of any sort" (irrelevant to the substance of this allegation); (4) asserted on p. 7 and elsewhere in the Response that she has "walked away from" many research projects in her career, where she had doubts about the study or the data, and provided letters from collaborators, in Exhibits 10 and 11, to support her statement (accurate but irrelevant to the substance of this allegation); (5) addressed on pp. 7-8 of the Response the data anomalies noted by the Complainant (irrelevant: in our conclusions on Allegation 4b, we do not rely primarily on the Complainant's report or the anomalies it reports, but instead we rely primarily on the anomalies found by MCG and documented extensively in its report; Professor Gino fails to address those anomalies in her section on "Explaining the Data Anomalies for Allegation 4b" (pp. 7-8) or, indeed, anywhere else in her Response.)

39

**THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.**

## VII.    CONCLUSION AND RECOMMENDATIONS

On the basis of the evidence gathered and evaluated by the Investigation Committee, the Committee concludes that Professor Gino has engaged in multiple instances of research misconduct, across all four studies at issue in these allegations. Because the papers reporting these studies span eight years in their publication dates, with different co-authors, in different journals, assisted by different lab personnel, and out of different home institutions for Professor Gino, the Committee is concerned about other possible instances of research misconduct in Professor Gino's studies.

Recognizing that integrity in scholarship and research is one of HBS's fundamental values, the Investigation Committee recommends the following institutional actions in response to its finding of multiple instances of research misconduct by Professor Gino.

**1. Correction of the scientific record**. We recommend that HBS contact the editors of each of the three journals that published the papers containing the four studies in question, to notify them that the School has found reasons to question the validity of the study or studies, and to suggest that appropriate steps be taken to retract the papers (or, in the case of the paper that has already been retracted, to suggest that other appropriate steps be taken).

**2. An audit of Professor Gino's publications**. We recommend that HBS conduct an audit of other published empirical studies by Professor Gino, beyond the four studies at issue in these allegations.

**3. Consideration of Responsible Conduct of Research (RCR) training for the HBS faculty, doctoral students, and other research staff.** We recommend that HBS consider the development and implementation of an RCR training program designed specifically for the HBS research community. RCR training is currently required at the University level for research using federal funds, and implementing an RCR training program specific to HBS would provide the HBS community with appropriate education and guidance with respect to the requirements and best practices related to research integrity, data management and planning, and mentorship.

**4. Inclusion of this matter in any reference letters for Professor Gino**. We recommend that any letters of reference, support, or recommendation provided for Professor Gino by HBS include the Committee's finding that she committed research misconduct.

**5. Other institutional actions**. The HBS Policy provides for a range of potential other administrative actions, including "probation, suspension, leave without pay, salary reduction, or initiation

40

THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.

of steps leading to rank reduction or termination of employment" for those found to have committed research misconduct. The Investigation Committee believes that the severity of the research misconduct that Professor Gino has committed calls for appropriately severe institutional action, and so we recommend that the Deciding Official consider placing Professor Gino immediately on an unpaid leave and initiating steps leading to termination of employment.

41

**THIS DOCUMENT IS CONFIDENTIAL AS REQUIRED BY FEDERAL REGULATIONS AND INSTITUTIONAL POLICIES FOR REVIEW OF ALLEGATIONS OF RESEARCH MISCONDUCT. DISCLOSURE OF THIS DOCUMENT OR OF ANY OF THE INFORMATION IT CONTAINS IS PROHIBITED EXCEPT AS PERMITTED BY THOSE POLICIES OR AS REQUIRED BY LAW.**