**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| FRANCESCA GINO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| PRESIDENT AND FELLOWS OF | ) Case No. 1:23-cv-11775-MJJ |
| HARVARD COLLEGE, SRIKANT DATAR, | ) |
| JOHN DOES 1-10, AND JANE DOES 1-10, | ) Leave to File Granted on June 16, 2026 |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................................... 1

BACKGROUND ............................................................................................................................. 2

    A.   Plaintiff's Employment at Harvard ................................................................................ 2

    B.   HBS' Receipt of the Allegations and Multi-Stage Investigation ...................................... 3

    C.   Tenure Revocation Proceeding Under Harvard's Third Statute ....................................... 6

    D.   Procedural History .......................................................................................................... 7

ARGUMENT .................................................................................................................................. 7

    I.   Defendants Are Entitled to Summary Judgment on Plaintiff's Discrimination
        Claims (Count V; Count VI). ....................................................................................... 7

        A.  Plaintiff Has No Direct Evidence of Discrimination. .............................................. 9

        B.  Plaintiff's Case Fails at Each Step of the *McDonnell Douglas* Framework. ......... 10

            1.   Plaintiff Cannot Establish a Prima Facie Case of Discrimination. ................. 10

            2.   Defendants' Employment Decisions Legitimately Were Based on the
                Overwhelming Evidence of Plaintiff's Research Misconduct. ....................... 11

            3.   Plaintiff Has No Evidence of Pretext or Discriminatory Animus.................. 12

    II.   Plaintiff Has No Evidence of Selective Enforcement on the Basis of Sex (Count
        I). ............................................................................................................................. 15

    III.   Plaintiff Has No Evidence of Retaliation (Count VII). ............................................... 16

    IV.   Plaintiff Cannot Establish That Harvard Breached Any Contract (Count II). ............. 17

        A.  The Only Contract Is Plaintiff's 2014 Offer Letter, Which Was Not
            Breached as a Matter of Law. ............................................................................. 18

        B.  Even If the Third Statute Were Part of Plaintiff's Contract, Harvard Did
            Not Breach It When It Revoked Plaintiff's Tenure. ............................................ 19

        C.  Even If the Third Statute Procedures Were Part of Plaintiff's Contract,
            Harvard Did Not Breach Them. .......................................................................... 20

        D.  Even If the Research Integrity Policy Was Part of Plaintiff's Contract,
            Harvard Did Not Breach Its Terms or Fail to Provide a Fair Process. ................. 22

        E.  Even If the 2021 Interim Policy & Procedures Were Part of Plaintiff's
            Contract, Harvard Did Not Breach Their Terms. ............................................... 23

    V.   Harvard Did Not Breach the Implied Covenant of Good Faith & Fair Dealing by
        Adopting the Interim Policy & Procedures (Count III). ............................................... 28

    VI.   Plaintiff's Request for Declaratory Relief Fails as a Matter of Law (Count VIII). .......... 29

CONCLUSION.............................................................................................................................. 30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AL Prime Energy Consultant, Inc. v. Mass. Bay Transp. Auth.*,
479 Mass. 419 (2018) ................................................................................................21, 28

*Amimi v. Whole Foods Mkts.*,
651 F. Supp. 3d 376 (D. Mass. 2023) ..............................................................................9, 12

*Armstrong v. White Winston Select Asset Funds, LLC*,
648 F. Supp. 3d 230 (D. Mass. 2022) ................................................................................29

*Audette v. Town of Plymouth*,
858 F.3d 13 (1st Cir. 2017)................................................................................................8, 10

*Berkowitz v. Pres. & Fellows of Harvard Coll.*,
789 N.E.2d 575 (Mass. App. Ct. 2003) ...........................................................................18

*Bhatti v. Trs. of Bos. Univ.*,
659 F.3d 64 (1st Cir. 2011)................................................................................................10

*Brandt v. Fitzpatrick*,
957 F.3d 67 (1st Cir. 2020).................................................................................................13

*Bulwer v. Mount Auburn Hosp.*,
46 N.E.3d 24 (Mass. 2016) ................................................................................................17

*Burlington N. & Santa Fe Ry. Co. v. White*,
548 U.S. 53 (2006)...............................................................................................................17

*Butler v. Wellington Mgmt. Co., LLP*,
948 N.E.2d 919 (Table) (Mass. App. Ct. 2011).............................................................8

*Carando Gourmet Frozen Foods Corp. v. Axis Automation, LLC*,
458 F. Supp. 3d 60 (D. Mass. 2020) .................................................................................30

*Casey v. United Parcel Serv., Inc.*,
No. 21-cv-40133, 2022 WL 2834258 (D. Mass. July 20, 2022) ................................8

*Cognex Corp. v. Air Hydro Power, LLC*,
651 F. Supp. 3d 322 (D. Mass. 2023) ..............................................................................30

*Coogan v. FMR, LLC*,
264 F. Supp. 3d 296 (D. Mass. 2017) ...............................................................................8

i

*Dunn v. Trs. of Bos. Univ.*,
761 F.3d 63 (1st Cir. 2014)........................................................................................................7

*Eigerman v. Putnam Invs.*,
877 N.E.2d 1258 (Mass. 2007) ...............................................................................................21

*Farzinpour v. Berklee Coll. of Music*,
516 F. Supp. 3d 33 (D. Mass. 2021) ......................................................................................22

*Febres v. Challenger Caribbean Corp.*,
214 F.3d 57 (1st Cir. 2000).......................................................................................................9

*Feliciano de la Cruz v. El Conquistador Resort & Country Club*,
218 F.3d 1 (1st Cir. 2000).......................................................................................................10

*Goncalves v. Plymouth Cnty. Sheriff's Dep't*,
659 F.3d 101 (1st Cir. 2011)...................................................................................................10

*Haegert v. Univ. of Evansville*,
977 N.E.2d 924 (Ind. 2012) ....................................................................................................20

*Haidak v. Univ. of Massachusetts-Amherst*,
933 F.3d 56 (1st Cir. 2019)...............................................................................................14, 15

*Harrington v. Lesley Univ.*,
554 F. Supp. 3d 211 (D. Mass. 2021) ....................................................................................15

*Hussey v. E. Coast Slurry Co., LLC*,
No. CV 20-11511-MPK, 2022 WL 617568 (D. Mass. Mar. 1, 2022).....................................12

*I&R Mech., Inc. v. Hazelton Mfg. Co.*,
817 N.E.2d 799 (Mass. App. Ct. 2004) ..................................................................................19

*Jackson v. Action for Bos. Cmty. Dev., Inc.*,
525 N.E.2d 411 (Mass. 1988) .................................................................................................18

*Kinzer v. Whole Foods Mkt., Inc.*,
99 F.4th 105 (1st Cir. 2024).....................................................................................................16

*Lee v. Howard Hughes Med. Inst.*,
457 F. Supp. 3d 9 (D. Mass. 2020).........................................................................................18

*Lee v. Howard Hughes Med. Inst.*,
607 F. Supp. 3d 52 (D. Mass. 2022).......................................................................................15

*Lewis v. City of Bos.*,
321 F.3d 207 (1st Cir. 2003)...................................................................................................10

ii

*Malden Police Patrolman's Ass'n v. Malden*,
  82 N.E.3d 1055 (Mass. App. Ct. 2017) ...................................................................28

*Matthews v. Ocean Spray Cranberries, Inc.*,
  426 Mass. 122 (1997) ...........................................................................................11

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973).........................................................................8, 10, 11, 15

*Melendez v. Autogermana, Inc.*,
  622 F.3d 46 (1st Cir. 2010)...................................................................................12

*Mole v. Univ. of Mass.*,
  814 N.E.2d 329 (Mass. 2004) ...............................................................................16

*Morris v. Brandeis Univ.*,
  804 N.E.2d 961 (Mass. App. Ct. 2004) .................................................................28

*O'Horo v. Bos. Med. Ctr. Corp.*,
  131 F.4th 1 (1st Cir. 2025).....................................................................................12

*ORI, U.S. Dep't of Health & Hum. Servs. v. Rakesh Srivastava*,
  No. C-15-3830, 2018 ..............................................................................................27

*Pagliaroni v. Mastic Home Exteriors, Inc.*,
  310 F. Supp. 3d 274 (D. Mass. 2018) ...................................................................30

*Patel v. 7-Eleven, Inc.*,
  No. CV 17-11414-NMG, 2019 WL 4248072 (D. Mass. Sept. 6, 2019)................17

*Pearson v. Mass. Bay Transp. Auth.*,
  723 F.3d 36 (1st Cir. 2013)....................................................................................13

*Perkins v. Brigham & Women's Hosp.*,
  78 F.3d 747 (1st Cir. 1996)....................................................................................14

*Regents of Univ. of Mich. v. Ewing*,
  474 U.S. 214 (1985)..........................................................................................23, 30

*Schaer v. Brandeis Univ.*,
  735 N.E.2d 373 (Mass. 2000) ..........................................................................17, 27

*Scott v. Sulzer Carbomedics, Inc.*,
  141 F. Supp. 2d 154 (D. Mass. 2001) ...................................................................12

*Smith v. F.W. Morse & Co.*,
  76 F.3d 413 (1st Cir. 1996)......................................................................................7

*Stanley v. Am. Econ. Ins. Co.*,
  No. 24-CV-10622-DJC, 2026 WL 194632 (D. Mass. Jan. 26, 2026) .....................................30

*Stratton v. Bentley Univ.*,
  113 F.4th 25 (1st Cir. 2024)............................................................................................16

*Sullivan v. Chief Just. for Admin. & Mgmt. of Trial Ct.*,
  858 N.E.2d 699 (Mass. 2006) .........................................................................................28

*Theidon v. Harvard Univ.*,
  948 F.3d 477 (1st Cir. 2020).................................................................................8, 10, 12, 13

*Tyler v. Michaels Stores, Inc.*,
  840 F. Supp. 2d 438 (D. Mass. 2012) ...............................................................................30

*Villanueva v. Wellesley Coll.*,
  930 F.2d 124 (1st Cir. 1991)...............................................................................11, 19, 30

*Wander v. St. John's Univ.*,
  147 A.D.3d 1009 (N.Y. App. Div. 2017) ............................................................................20

**Statutes**

42 U.S.C. § 2000e *et seq.*...............................................................................................7, 12, 16

Declaratory Judgment Act ...............................................................................................29

M.G.L. c. 151B ..............................................................................................................7

**Other Authorities**

42 C.F.R. Part 93..........................................................................................................13

Findings of Research Misconduct, 88 Fed. Reg. 22461 (Apr. 13, 2023) .......................................27

**INTRODUCTION**

After a thorough, eighteen-month process led by a committee of Plaintiff's faculty peers at the Harvard Business School ("HBS"), Defendant President and Fellows of Harvard College ("Harvard") found by a preponderance of the evidence that Plaintiff had committed repeated research misconduct in four studies spanning nearly ten years. After another nearly two-year process involving a multi-step review by two distinct committees of Plaintiff's faculty peers from across the University and further review by the Harvard Corporation (the University's main governing board), Harvard again found—this time by clear and convincing evidence—that Plaintiff had committed repeated research misconduct, constituting "grave misconduct or neglect of duty" warranting revocation of her tenure. In all, Harvard engaged in three and a half years of investigative and deliberative process through which each of the 26 professors, administrators, and Fellows (trustees) who reviewed the evidence came to the same conclusion: that Plaintiff repeatedly had violated Harvard's core tenet of research integrity.

Plaintiff has no meaningful response to the overwhelming evidence of research misconduct. Instead, she attacks the process, asserting sex discrimination, breach of contract, and insufficient evidentiary findings. But even after pursuing extensive discovery, including 16 fact depositions, six expert depositions, and over 12,000 produced documents, Plaintiff cannot muster any evidentiary support for these claims.

***First***, Plaintiff's sex discrimination claims fail. The undisputed facts show that decisionmakers imposed sanctions and revoked her tenure because Plaintiff committed repeated research misconduct—not because of her sex. The record contains no evidence of discriminatory animus whatsoever. At her deposition, Plaintiff could identify no facts supporting her allegations,

1

only vague suspicion that gender bias "***could*** have been" involved. Ex. 59 at 126:7-14. This conjecture is insufficient as a matter of law.

***Next***, Plaintiff's contract and quasi-contract claims are equally unavailing. The only enforceable contract is her one-page appointment letter, and she cannot identify a single breached term of this document. She attempts to characterize other University policies as contractual, although she has adduced no facts that would support doing so. Moreover, the undisputed record shows Harvard provided Plaintiff every promised procedural protection. Plaintiff's implied covenant claim also fails; the Interim Policy and Procedures for Responding to Allegations of Research Misconduct ("Interim Policy & Procedures") were adopted in good faith, provide no less protection for her than existing HBS policies did, were modeled on federal guidelines, are consistent with the research misconduct policy and procedures used at other Harvard schools, and remain in effect today (modified only to track updates to federal regulations).

***Finally***, Plaintiff's declaratory judgment claim is impermissibly backward looking, improperly seeks to displace a university's academic decision with the Court's own judgment, and is foreclosed by the substantial evidentiary record of Plaintiff's misconduct.

This Court should grant summary judgment in Defendants' favor on all of Plaintiff's claims.

## BACKGROUND

### A.     Plaintiff's Employment at Harvard

Plaintiff was hired as an Associate Professor at HBS effective July 1, 2010, and promoted to a tenured Full Professor on July 1, 2014. SUF ¶¶ 1-3.[1] Her appointment was subject to certain

---

[1] Unless otherwise noted, all emphases have been added and all internal citations and quotation marks have been omitted. Citations to "SUF ¶ __" refer to Defendants' Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment. Citations to "TAC ¶ __" refer to the Third Amended Complaint ("TAC" or "Complaint"), Doc. No. 126.

Harvard and HBS terms and policies, as "amended from time to time." SUF ¶ 3. These included Harvard's Third Statute, which provides that tenured professors "are subject to removal . . . for grave misconduct or neglect of duty," SUF ¶ 4, and The Discipline of Officers, Tentative Recommendations, which set forth the procedures for the removal of a tenured appointment (the "Third Statute Procedures"). SUF ¶ 5; *see also* SUF ¶¶ 6-9. Plaintiff also was subject to a Research Integrity Policy applicable to alleged faculty research misconduct, which HBS had adopted in 2013. SUF ¶ 19.

### B.    HBS' Receipt of the Allegations and Multi-Stage Investigation

On July 19, 2021, Plaintiff informed HBS administrators that the data integrity blog Data Colada[2] had contacted her with concerns about fraudulent data in a paper Plaintiff had co-authored with Duke University Fuqua School of Business Professor Dan Ariely (among other co-authors). SUF ¶ 13.[3] Also in July 2021, Data Colada reached out to a small handful of HBS faculty members to raise concerns about potential data falsification and fabrication in multiple papers co-authored by Plaintiff. SUF ¶ 16.

HBS had not previously received any allegations of data falsification or fabrication against a member of its faculty. SUF ¶ 17. After hearing of this outreach, HBS turned to its existing 2013 Research Integrity Policy, which granted the Dean broad discretion to determine appropriate procedures. SUF ¶¶ 21-24. HBS determined that, should an investigation become necessary, it would need a more detailed set of procedures in line with best practices. SUF ¶ 26. In August

---

[2] Data Colada is run by Leif Nelson, Joseph Simmons, and Uri Simonsohn, three professors at the Haas School of Business at the University of California, Berkeley, the Wharton School of the University of Pennsylvania, and the ESADE Business School at Ramon Llull Universitat in Barcelona, respectively. SUF ¶ 15. They are now Co-Directors of the Credibility Lab at the Wharton School of the University of Pennsylvania and are collectively referred to herein as "Data Colada." *Id.*

[3] These allegations did not relate to Plaintiff's involvement in the paper. SUF ¶ 14.

3

2021, HBS adopted the Interim Policy & Procedures to govern "allegations of research misconduct—including fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results." SUF ¶¶ 27, 30. The Interim Policy & Procedures mirrored federal regulations, including a preponderance of the evidence standard and other procedural safeguards for respondents. SUF ¶¶ 29-44, 53.

On October 12, 2021, Data Colada submitted to HBS' Research Integrity Officer ("RIO"), Alain Bonacossa, ▇ allegations of data falsification and fabrication in ▇ papers co-authored by Plaintiff. SUF ¶¶ 65-66. This submission triggered the Interim Policy & Procedures, under which the RIO conducted a preliminary assessment of the allegations and concluded that ▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇ SUF ¶¶ 28, 67-68. On October 15, 2021, Dean Srikant Datar received the RIO's assessment and asked that the inquiry processes under the Interim Policy & Procedures be commenced. SUF ¶¶ 71-72. The RIO then made evidentiary copies of ("sequestered") certain records and evidence, including Plaintiff's HBS email account, HBS cloud-based storage locations, and her online experimental data account ("Qualtrics"). SUF ¶ 73. On October 27, 2021, the RIO sent Plaintiff a Notice of Inquiry identifying the allegations and informing her of the initiation of an inquiry. SUF ¶¶ 74-76. The RIO subsequently sequestered additional files on Plaintiff's computers, relying on Plaintiff to identify the relevant files. SUF ¶¶ 77-78.

In accordance with the Interim Policy & Procedures, Dean Datar appointed an Inquiry Committee comprising two HBS senior professors, Teresa Amabile and Robert Kaplan. SUF ¶ 81. Over five months, the Inquiry Committee gathered and reviewed information, including the datasets that Plaintiff had identified as relevant to the studies in question, and interviewed Plaintiff, who at all times during the research misconduct process was represented by counsel experienced

in representing respondents in research misconduct cases.  SUF ¶¶ 83, 110.[4]  On April 8, 2022, the Inquiry Committee issued a report recommending a full investigation after finding that each allegation met the definition of research misconduct and "preliminary information-gathering and preliminary fact-finding indicates that these allegations may have substance."  SUF ¶¶ 84-85.

Dean Datar accepted this recommendation on April 13, 2022.  SUF ¶ 88.  He then appointed an Investigation Committee, consisting of the Inquiry Committee members and a third senior HBS faculty member, Shawn Cole.  SUF ¶ 89.  The Investigation Committee interviewed Plaintiff and six of her co-authors or research assistants, and engaged an independent forensic data consulting firm, Maidstone Consulting Group ("MCG"), to produce reports for each allegation, examining forensic evidence of data alterations.  SUF ¶¶ 92-93, 96, 98.  Plaintiff had the opportunity to—and did—provide multiple responses and statements to the Investigation Committee, respond to the draft Final Report, and review witness interview transcripts.  SUF ¶¶ 94-97, 100-02.

On March 7, 2023, the Investigation Committee issued a 41-page Final Report with nearly 1,200 pages of supporting documents that concluded by a preponderance of the evidence that Plaintiff had engaged in research misconduct with respect to all five allegations.  SUF ¶¶ 103-05.  The Final Report recommended correcting the scientific record, placing Plaintiff on an unpaid leave, and initiating steps toward tenure revocation.  SUF ¶ 106.  Dean Datar closely reviewed the Final Report, met with the RIO multiple times, requested additional forensic evidence from the RIO and MCG, and accepted the findings on April 19, 2023.  SUF ¶¶ 115-18.

After consulting with certain additional faculty members—all of whom agreed with the sanctions recommended in the Final Report—Dean Datar met with Plaintiff on June 13, 2023, and informed her that he had accepted the Final Report and was taking the following institutional

---

[4] Plaintiff also had a faculty advisor during the process, HBS professor Gary Pisano.  SUF ¶ 112.

actions: contacting journal editors to request retractions of the relevant articles to correct the scientific record; placing her on an unpaid administrative leave for two years; removing her from a named professorship; barring her from research, teaching, and mentoring during leave; and suspending her campus access. SUF ¶¶ 119-21; *see* SUF ¶ 51. Dean Datar also informed Plaintiff that he intended to request the initiation of proceedings under Harvard's Third Statute to determine whether revocation of tenure was warranted. SUF ¶ 123.

###### C.    Tenure Revocation Proceeding Under Harvard's Third Statute

On July 14, 2023, Dean Datar sent a letter to Harvard's then-President Claudine Gay requesting that she initiate Third Statute proceedings and enclosing a formal complaint on behalf of HBS. SUF ¶¶ 128-29. Pursuant to the University's Third Statute Procedures, President Gay convened a Screening Committee of three tenured HBS professors, and in October 2023, the Screening Committee unanimously found that the Third Statute complaint credibly alleged grave misconduct or neglect of duty. SUF ¶¶ 130-31. A Hearing Committee of seven tenured professors from Harvard's various schools then was appointed. SUF ¶¶ 132-34. Over the following months, the Hearing Committee received submissions from Plaintiff (who was represented by experienced counsel) and the HBS complainant, including Plaintiff's 93-page response to the Final Report, 1,085 pages of written testimony from 13 witnesses, and 571 exhibits. SUF ¶¶ 139, 144. The Hearing Committee held a two-day hearing on November 15–16, 2024, with live testimony, cross-examination, and arguments by counsel. SUF ¶¶ 143, 145.

On January 24, 2025, the Hearing Committee issued its Findings and Recommendations to the Corporation. SUF ¶ 147. "███████████████," the Hearing Committee found "█████ ████████████████████████████████████████████████████ ████████████████████████████████████████████," and unanimously

recommended removal of tenure.  SUF ¶ 148.  Plaintiff submitted a response to the Findings and Recommendations on March 14, 2025.  SUF ¶ 149.  On May 15, 2025, the Corporation unanimously voted to accept the Findings and Recommendations and to remove Plaintiff from her tenured appointment.  SUF ¶ 161.  Her appointment at HBS was terminated.  SUF ¶ 162.

### D.     Procedural History

Plaintiff filed her original complaint on August 2, 2023, and the Third Amended Complaint on August 4, 2025, alleging violations of Title IX (Count I), breach of contract (Count II), breach of the covenant of good faith and fair dealing (Count III), estoppel (Count IV), violation of Title VII (Count V), violation of M.G.L. c. 151B (Count VI), retaliation (Count VII), and declaratory judgment (Count VIII).  Doc. Nos. 1, 126.  On August 18, 2025, Harvard filed a counterclaim against Plaintiff for defamation based on Plaintiff's October 2023 blog post, which falsely stated that HBS overlooked a key data file in its investigation.  Doc. No. 154.

## ARGUMENT

"Summary judgment is appropriate where the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Dunn v. Trs. of Bos. Univ.*, 761 F.3d 63, 68 (1st Cir. 2014).  "[C]onclusory allegations, improbable inferences, and unsupported speculation" are insufficient. *Smith v. F.W. Morse & Co.*, 76 F.3d 413, 428 (1st Cir. 1996).

## I.     Defendants Are Entitled to Summary Judgment on Plaintiff's Discrimination Claims (Count V; Count VI).

Plaintiff asserts disparate-treatment discrimination claims pursuant to Title VII, 42 U.S.C. § 2000e *et seq.*, and the Massachusetts Fair Employment Practices Act, M.G.L. c. 151B, alleging that Defendants took adverse employment actions against her based on her sex.  TAC ¶¶ 374-89.  Because Plaintiff has no direct evidence to support these claims, this Court should use the burden-

7

shifting scheme outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to assess whether it can infer discrimination from circumstantial evidence. *See Theidon v. Harvard Univ.*, 948 F.3d 477, 495 (1st Cir. 2020); *see also Audette v. Town of Plymouth*, 858 F.3d 13, 23 (1st Cir. 2017) (Chapter 151B claims are considered under "the familiar *McDonnell Douglas* burden shifting analysis"). The undisputed record here forecloses any such inference.

Moreover, Dean Datar cannot be held individually liable under Chapter 151B. To the extent Plaintiff is proceeding under Section 4(4A) of Chapter 151B—which prohibits coercion or interference with protected rights—her claim fails because she has no evidence that Dean Datar made any decisions based on her sex or discriminatory animus. *See Coogan v. FMR, LLC*, 264 F. Supp. 3d 296, 309 (D. Mass. 2017) (granting summary judgment for defendant supervisors on Chapter 151B § 4(4A) claim where plaintiff "failed to provide any evidence that [supervisors] supported the plaintiff's termination specifically because of his age"). This claim also fails because it is derivative of the underlying sex discrimination claim, and there is no evidence of sex discrimination. *See id.* To the extent Plaintiff is proceeding under Section 4(5), this claim fails too, as she has no allegations against Dean Datar that are "distinct and separate from the duties and responsibilities of [his] position[]." *Butler v. Wellington Mgmt. Co., LLP*, 948 N.E.2d 919, at *7 (Table) (Mass. App. Ct. 2011); *see Casey v. United Parcel Serv., Inc.*, No. 21-cv-40133, 2022 WL 2834258, at *7 (D. Mass. July 20, 2022) (dismissing claims against individual supervisors where such claims relied on "the very same allegations that give rise to [p]laintiff's claims against [her employer]").[5]

---

[5] The only claim against Dean Datar is the Chapter 151B claim. Should this Court grant summary judgment in Defendants' favor on this claim, Dean Datar should be dismissed from the case.

8

### A.    Plaintiff Has No Direct Evidence of Discrimination.

After extensive discovery, Plaintiff has no direct evidence of discrimination.  Direct evidence "consists of statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision." *Febres v. Challenger Caribbean Corp.*, 214 F.3d 57, 60 (1st Cir. 2000); *see also Amimi v. Whole Foods Mkts.*, 651 F. Supp. 3d 376, 389 (D. Mass. 2023) (plaintiff "must be able to trace the discriminatory intent of which he complains to the person or persons who made the decision to fire him").  Plaintiff alleges five adverse decisions: Dean Datar "(1) plac[ing] Plaintiff on unpaid administrative leave and strip[ping] her of all compensation and benefits[,] (2) revok[ing] her professorship at HBS, (3) strip[ping] Plaintiff of all of her teaching, publishing, and research duties and any opportunities to earn a livelihood, [and] (4) ma[king] her tenured position at Harvard the subject of revocation proceedings," and the Corporation "(5) revok[ing] her tenure."  TAC ¶ 377.  Plaintiff has no evidence of statements by any of the decisionmakers even remotely suggesting, let alone "directly reflect[ing]," discriminatory animus.  Plaintiff similarly has no evidence of statements reflecting discriminatory animus from the Inquiry and/or Investigation Committee members, the Screening Committee members, or the Hearing Committee members.

The only specific statement that Plaintiff has alleged is that Dean Datar supposedly said: "[Y]ou are a capable, smart woman.  I am sure you'll find other opportunities."  TAC ¶ 192.  Even if true, this statement does not evince discriminatory intent.  And, if it could be so implausibly interpreted, the First Circuit is clear that "a statement that plausibly can be interpreted two different ways—one discriminatory and the other benign—does not directly reflect illegal animus and, thus, does not constitute direct evidence." *Febres*, 214 F.3d at 61.

9

**B.    Plaintiff's Case Fails at Each Step of the *McDonnell Douglas* Framework.**

In the absence of direct evidence, Plaintiff must make out a prima facie case of discrimination.  *See Lewis v. City of Bos.*, 321 F.3d 207, 213 (1st Cir. 2003).  If she does, and Defendants articulate a legitimate, non-discriminatory reason, *id.* at 213-14, then Plaintiff must "show by a preponderance of the evidence that [Defendants'] proffered reason is pretextual and that the actual reason for the adverse employment action is discriminatory."  *Theidon*, 948 F.3d at 496.  Plaintiff's case fails at each step.

**1.    Plaintiff Cannot Establish a Prima Facie Case of Discrimination.**

To demonstrate a prima facie case, Plaintiff must show that: (i) she was a member of a protected class; (ii) she was qualified for her job; (iii) she suffered an adverse employment action; and (iv) the action was causally connected to her membership in a protected class.[6]  *Bhatti v. Trs. of Bos. Univ.*, 659 F.3d 64, 70 (1st Cir. 2011).  Plaintiff cannot satisfy the second element, as she utterly failed to meet Harvard's legitimate expectations by committing repeated research misconduct.  *See Feliciano de la Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1, 5 (1st Cir. 2000); SUF ¶¶ 85, 103, 118, 148-54, 161; *infra* Section I.B.2.  Nor can Plaintiff show a causal connection; she admitted that she was not even certain whether gender was a factor at all, only theorizing that "gender *could* have been part of it."  Ex. 59 at 124:15-126:14.  Accordingly, Plaintiff's claims "begin[] and end[] with the first stage of the *McDonnell Douglas* framework." *Goncalves v. Plymouth Cnty. Sheriff's Dep't*, 659 F.3d 101, 105 (1st Cir. 2011).

---

[6] While the prima facie elements of a Chapter 151B claim are articulated slightly differently, *see Audette*, 858 F.3d at 23, Plaintiff's claim under Massachusetts law fails for the same reasons stated herein.

**2.    Defendants' Employment Decisions Legitimately Were Based on the Overwhelming Evidence of Plaintiff's Research Misconduct.**

Even if Plaintiff could make out a prima facie case, Defendants' burden to articulate a legitimate, non-discriminatory reason is "not onerous." *Matthews v. Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 128 (1997). Defendants imposed sanctions and revoked tenure based on overwhelming evidence of Plaintiff's repeated research misconduct—not her sex.

The undisputed record shows Defendants undertook lengthy and thorough processes, spanning over three years, to evaluate the allegations and to determine the appropriate institutional actions. The HBS process involved a preliminary assessment, an inquiry, an investigation, and the Dean's decision. SUF ¶¶ 35, 67-72, 81-109, 115-127. The Third Statute process involved a Screening Committee, then a separate Hearing Committee overseeing a two-day hearing with 13 witnesses, and finally, the Corporation, who separately considered the matter before revoking Plaintiff's tenure. SUF ¶¶ 128-62. All told, 26 Harvard professors, administrators, and Fellows considered the allegations. At each stage, they unanimously concluded that the evidence supported a finding of research misconduct that warranted further action. SUF ¶¶ 84-85, 88, 103, 118, 131, 146-48, 160-61.

The outcomes and underlying reasons were memorialized in contemporaneous written documents. SUF ¶¶ 67, 71, 84, 103, 118, 121, 131, 147; *see Villanueva v. Wellesley Coll.*, 930 F.2d 124, 129 (1st Cir. 1991) (college articulated a legitimate, nondiscriminatory reason for tenure decision where relevant decisionmakers "stated their reasons in contemporaneous written documents"). There is no evidence that findings about Plaintiff's misconduct were based on anything other than the evidence presented. *See* SUF ¶¶ 107-09, 126-27 (Dean Datar and all three Investigation Committee members attested that they based their determinations and

11

recommendations on the evidence of research misconduct).  Defendants plainly have met their burden under *McDonnell Douglas*.

### 3.    Plaintiff Has No Evidence of Pretext or Discriminatory Animus.

Since Defendants have shown a legitimate, non-discriminatory reason, Plaintiff must "elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive: [] discrimination." *Melendez v. Autogermana, Inc.*, 622 F.3d 46, 52 (1st Cir. 2010).  To meet her burden under Title VII, Plaintiff must offer evidence "both of pretext *and* of [Defendants'] discriminatory animus." *Theidon*, 948 F.3d at 497.[7]  "To establish pretext, it is not enough for the plaintiff to show that the decisionmaker reached a faulty conclusion . . . . Rather, the plaintiff must show the decisionmaker did not believe in the accuracy of the reason given." *Amimi*, 651 F. Supp. 3d at 384.  Evidence that a plaintiff was treated differently from similarly situated employees might show pretext, but any comparators must be "similarly situated to [the plaintiff] in all relevant respects." *Hussey v. E. Coast Slurry Co., LLC*, No. CV 20-11511-MPK, 2022 WL 617568, at *19 (D. Mass. Mar. 1, 2022).[8]  Plaintiff can show neither pretext nor discriminatory animus.  Nor can she establish discrimination under a mixed-motive theory, as there is no evidence that sex was a motivating factor in *any* step of the process.  *See Scott v. Sulzer Carbomedics, Inc.*, 141 F. Supp. 2d 154, 176 (D. Mass. 2001) (applying mixed-motive analysis and granting summary judgment where there was no direct or

---

[7] For purposes of her Chapter 151B claim, although Massachusetts is a "pretext-only" jurisdiction, summary judgment remains appropriate where, as here, a plaintiff's evidence does not permit a reasonable jury to find that the employer's facially proper reasons were not the real reasons.  *See Theidon*, 948 F.3d at 505; *O'Horo v. Bos. Med. Ctr. Corp.*, 131 F.4th 1, 15-17 (1st Cir. 2025).

[8] This Court holds comparator claims to a high standard, noting in the academic context, for example, that "differences between subfields matter." *Theidon*, 948 F.3d at 501.

circumstantial evidence showing "some proximate link between gender animus and an adverse employment decision").

### a.  Plaintiff Has No Evidence of Pretext.

The record is devoid of facts suggesting that Defendants' decisions were false or a sham. There is no evidence Harvard did not genuinely believe that Plaintiff had committed research misconduct. *See Brandt v. Fitzpatrick*, 957 F.3d 67, 80 (1st Cir. 2020) (a plaintiff "must show that the decisionmaker did not believe in the accuracy of the reason given"). The fact that Plaintiff disagrees with the assessment of 26 Harvard professors, administrators, and Fellows who examined the allegations does not create a question of material fact concerning pretext.[9] *See Pearson v. Mass. Bay Transp. Auth.*, 723 F.3d 36, 42 (1st Cir. 2013) (no triable issue on pretext where allegations were "nothing more than a disagreement with [defendant] regarding its disciplinary policies and rule violations").

Plaintiff also has not identified a similarly situated male employee, let alone one who was treated differently. At her deposition, Plaintiff pointed to ██████████████ , ██████████ ██████████ . *See* TAC ¶¶ 263-65; Ex. 59 at 70:21, 114:6-7. ██████████████████ ██████████████████████ , not "research misconduct," which is defined both in the Research Integrity Policy and Interim Policy & Procedures as data falsification, fabrication, or

---

[9] Plaintiff also cannot show that the creation of the Interim Policy & Procedures was a pretext for discrimination or motivated by discriminatory animus. The Interim Policy & Procedures were adopted "██████████████████████████████████" because "████████████ ████████████████████," SUF ¶¶ 26-27, not because of anything to do with Plaintiff's sex. Moreover, the Interim Policy & Procedures undisputedly were modeled on 42 C.F.R. Part 93, *see* TAC ¶ 89; Am. Answer ¶ 89, defeating Plaintiff's claim that its terms were unreasonably onerous or motivated by discrimination. Finally, the evidence shows that each step of the process was thorough and fair, and does not raise any suggestion that discriminatory animus was involved. *See infra* Section IV.

plagiarism. SUF ¶¶ 20, 30, 62-63. Plaintiff does not dispute that fact. SUF ¶ 63.[10] Thus, ███

is not an appropriate comparator. *See Theidon*, 948 F.3d at 500 (finding "relevant differences

between [plaintiff] and her male comparators that cannot be ignored").



The allegations against ███████████████████████████████

████████████████████████████████████████████

███████████████████████████████████—not data falsification or fabrication, or

plagiarism. SUF ¶¶ 58-61. ███████████████████████████████

████████████████████████████████████████████

███████████████████████. SUF ¶ 61. Plaintiff herself could not support ██████

being a comparator. Ex. 59 at 114:2-114:24. Thus, the ███████████ matters do not provide

a basis to conclude Plaintiff was treated disparately.[11]

> **b.**    **Plaintiff Has No Evidence That Harvard Considered Her Gender or Harbored Discriminatory Animus.**

Plaintiff has adduced no evidence of discriminatory animus. When asked to identify facts

supporting discriminatory bias, Plaintiff cited Pisano's supposed private statement to her that "██

███████████████████████████████████." Ex. 59 at 124:4-6. But this vague,

unsubstantiated opinion from Plaintiff's friend and advisor, who was not part of the relevant

decision-making process, is wholly insufficient to establish pretext or animus.[12] The only other

---

[10] Additionally, the ████ matter involved a different decisionmaker as it was handled by a different HBS dean. SUF ¶ 64.

[11] To the extent Plaintiff has not abandoned the other comparators listed in her Complaint, the Court should reject these comparisons. Plaintiff bears the burden of demonstrating any comparators are sufficiently similar, *Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747, 751 (1st Cir. 1996), and she cannot present any admissible evidence showing that these alleged comparators were subject to the same allegations, same policies, or same decisionmakers.

[12] Moreover, Pisano himself could not identify any evidence of bias by Dean Datar or anyone on the Investigation Committee. *See* Ex. 49 at 244:2-8.

"fact" Plaintiff cited was her belief that, prior to becoming Dean, Dean Datar was "███████

███████████████████████████." Ex. 59 at 120:22-24.  To be clear, Plaintiff

has no evidence supporting this fact, but in any event, it does not establish discriminatory animus.

*See Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56, 75 (1st Cir. 2019) (affirming

summary judgment even where data suggested a statistical disparity, as evidence did not show

causal connection between outcome of disciplinary proceeding and gender bias).

Plaintiff similarly could offer no evidence that any of the Hearing Committee members

were motivated by discriminatory animus, suggesting only that "██████████████

█████████." Ex. 59 at 124:15-126:14.  But "speculation about the influence of bias, unconscious

or otherwise, is, without more, insufficient to survive summary judgment."  *Lee v. Howard Hughes

Med. Inst.*, 607 F. Supp. 3d 52, 65 (D. Mass. 2022).  Thus, Plaintiff can present no admissible

evidence that could lead a reasonable jury to find in her favor on Counts V and VI.

## II.    Plaintiff Has No Evidence of Selective Enforcement on the Basis of Sex (Count I).

To succeed on her "selective enforcement" Title IX claim, TAC ¶ 342, Plaintiff must show

"the severity of the penalty and/or the decision to initiate the proceeding was affected

by . . . gender" and "gender bias was a motivating factor in the disciplinary process."[13]  *Haidak*,

933 F.3d at 74; *see Harrington v. Lesley Univ.*, 554 F. Supp. 3d 211, 233 (D. Mass. 2021) (applying

Title IX to school employees).  She cannot.  As an initial matter, the Interim Policy & Procedures

that Plaintiff claims were adopted "just for her," TAC ¶ 378, remain in effect today (with some

modifications to track updates to the federal regulations on which they are based) and have been

used for other allegations of potential research misconduct.  SUF ¶¶ 56-57.  Nor can Plaintiff show

---

[13] To the extent the Court considers the Title IX claim using the *McDonnell Douglas* burden-shifting framework, Count I fails for the same reasons that the other sex discrimination claims fail.

that any part of the process was affected by her sex, or that any similarly situated males were treated more favorably.  *See* Section I; SUF ¶¶ 58-64, 86-87, 107-09, 126-27, 156; *see Haidak*, 933 F.3d at 75 (affirming summary judgment where university "provided a convincing, sex-neutral explanation" for sanctions).

**III.    Plaintiff Has No Evidence of Retaliation (Count VII).**

Plaintiff's retaliation claim similarly fails under *McDonnell Douglas*.  *Stratton v. Bentley Univ.*, 113 F.4th 25, 42 (1st Cir. 2024).  To make a claim, Plaintiff must show: (i) protected conduct; (ii) an adverse employment action; and (iii) a but-for causal connection.  *Kinzer v. Whole Foods Mkt., Inc.*, 99 F.4th 105, 115 (1st Cir. 2024); *see also Stratton*, 113 F.4th at 44 ("Retaliation claims under Title VII and Massachusetts state law require proof that the protected activity was a but-for cause of the alleged adverse action"; they cannot rest on a mixed-motive theory).  From there, the burden shifts to the defendant to articulate a legitimate, non-retaliatory explanation, and then back to the plaintiff to show that the defendant's explanation is a pretext for unlawful retaliation.  *Kinzer*, 99 F.4th at 115.  Here, Plaintiff cannot show a causal connection or that Harvard's legitimate, non-retaliatory reasons are pretext.

Plaintiff alleges two acts of retaliation for filing charges of discrimination with the Massachusetts Commission Against Discrimination ("MCAD") and the EEOC and her lawsuit: the conduct of the Third Statute proceedings and Harvard's defamation counterclaim.[14]  TAC ¶¶

---

[14] To the extent that Plaintiff claims that the initiation of the Third Statute proceedings itself was retaliatory, the chronology is dispositive and defeats Plaintiff's prima facie showing.  *Mole v. Univ. of Mass.*, 814 N.E.2d 329, 340 (Mass. 2004) ("Where, as here, adverse employment actions . . . predate any knowledge that the employee has engaged in protected activity, it is not permissible to draw the inference that subsequent adverse actions, taken after the employer acquires such knowledge, are motivated by retaliation.").  Dean Datar informed Plaintiff on June 13, 2023 that he would request tenure revocation proceedings, SUF ¶ 121, and submitted the Third Statute complaint on July 14, 2023 (thereby initiating the proceedings), SUF ¶ 128.  Both of these events

16

325, 331.  But Plaintiff has no evidence that anyone at Harvard considered her lawsuit in making any decisions.  Indeed, the record shows they did not.  SUF ¶¶ 156-57; *see supra* Section I.B.2.  Thus Plaintiff cannot show pretext.  Moreover, Plaintiff's retaliation claim as to the Third Statute proceedings is merely a repackaging of her process-based contract claims, and she alleges no adverse employment action.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (adverse action must have "dissuaded a reasonable worker" from making discrimination charge).

As to the counterclaim, "conduct occurring within the scope of litigation does not provide grounds for retaliation."  *Patel v. 7-Eleven, Inc.*, No. CV 17-11414-NMG, 2019 WL 4248072, at *3 (D. Mass. Sept. 6, 2019) ("[U]nlike initiating litigation against an employee, filing a counterclaim will not chill plaintiffs from exercising and enforcing their statutory rights.").  Plaintiff also cannot show that the counterclaim lacks a reasonable basis in fact or law given the supporting evidence.  SUF ¶¶ 141, 165; *see Patel*, 2019 WL 4248072, at *4 (counterclaim did not constitute adverse employment action where it did not lack "reasonable basis in fact or law").  Moreover, the record reflects Harvard chose to file its counterclaim after learning of Plaintiff's deliberate falsification because it felt "█████████████████████████" and "█████████ █████" entirely unrelated to Plaintiff's lawsuit.  SUF ¶¶ 141, 165-66.

## IV.    Plaintiff Cannot Establish That Harvard Breached Any Contract (Count II).

Harvard also is entitled to summary judgment on Plaintiff's breach of contract claim.  To prevail, Plaintiff must demonstrate that there was an agreement between the parties; that it was supported by consideration; that Plaintiff was ready, willing, and able to perform her part of the contract; that Harvard committed a breach; and that Plaintiff suffered harm as a result.  *Bulwer v.*

---

predate the August 2, 2023 lawsuit and the October 31, 2023 MCAD/EEOC charges.  *See* SUF ¶¶ 163-64.

*Mount Auburn Hosp.*, 46 N.E.3d 24, 39 (Mass. 2016).  In interpreting a contract between a university and professor, courts should be guided by: (i) the meaning the university "should reasonably expect the other party to give [the contract]"; and (ii) the principle that "courts are chary about interfering with academic and disciplinary decisions made by private colleges and universities." *Schaer v. Brandeis Univ.*, 735 N.E.2d 373, 378, 381 (Mass. 2000).  Courts "are reluctant to read in restrictions that limit [a] university's discretion." *Berkowitz v. Pres. & Fellows of Harvard Coll.*, 789 N.E.2d 575, 584 (Mass. App. Ct. 2003).

Here, it is undisputed that the terms of the Appointment Letter Plaintiff received confirming her tenured appointment were not breached.  And while the Appointment Letter did not incorporate any of the policies or procedures to which Plaintiff now points, even if it did, Plaintiff cannot establish any breach of the terms of any of these documents.

### A.    The Only Contract Is Plaintiff's 2014 Offer Letter, Which Was Not Breached as a Matter of Law.

The contract Plaintiff claims Harvard breached—the Appointment Letter—is a one-page letter confirming her tenured appointment.  TAC ¶ 62.  Plaintiff identifies no breached provision.  Instead, she alleges breaches of terms of the Third Statute, the Third Statute Procedures,[15] and certain HBS policies and procedures, claiming they are "incorporated" in the Appointment Letter.  TAC ¶¶ 356, 359.  But there is no evidentiary support for this claim.  Plaintiff did not negotiate these policies with Harvard, and the Appointment Letter permits Harvard's unilateral amendment.  *See* SUF ¶ 3 (appointment "subject to such terms, conditions and policies as are stipulated by the Faculty of Business Administration . . . *as these may be amended from time to time*"); *Lee v. Howard Hughes Med. Inst.*, 457 F. Supp. 3d 9, 12-13 (D. Mass. 2020) (employee failed to

---

[15] Plaintiff refers to this document in her Complaint as the "Discipline Policy."  TAC ¶ 66.

demonstrate reasonable belief that employee handbook subject to unilateral employer modification constituted contract); *Jackson v. Action for Bos. Cmty. Dev., Inc.*, 525 N.E.2d 411, 415-16 (Mass. 1988) (implied contract did not include personnel manual where employer could "unilaterally" modify terms, there were no negotiations over terms, and no indication plaintiff signed the manual). Plaintiff's breach of contract claim fails for this reason alone.[16]

### B. Even If the Third Statute Were Part of Plaintiff's Contract, Harvard Did Not Breach It When It Revoked Plaintiff's Tenure.

The only Third Statute provision that Plaintiff raises is its requirement that "[a]ll Officers who hold teaching appointments . . . are subject to removal from such appointments by the Corporation only for grave misconduct or neglect of duty."  TAC ¶ 65; SUF ¶ 4.  Plaintiff claims Harvard revoked her tenure without a legitimate finding of grave misconduct (ignoring the Hearing Committee's reference to neglect of duty), but the record conclusively contradicts that claim.  After receiving and analyzing extensive evidence, including more than 300 pages of expert testimony detailing the evidence of misconduct, and in light of the lack of evidence suggesting that anyone else was responsible, the Hearing Committee concluded there was "



."  SUF ¶¶ 148-54 (Hearing Committee was "

").  Accordingly, it cannot reasonably be disputed that the Hearing Committee had ample basis on which to make its finding of grave misconduct or neglect of duty.

---

[16] To the extent Plaintiff claims a breach of contract based on a supposed violation of the Interim Policy & Procedures, this claim fails because the policy post-dated the Appointment Letter by seven years, and Plaintiff insists that she did not assent to it, meaning no contract was formed as a matter of law.  *See I&R Mech., Inc. v. Hazelton Mfg. Co.*, 817 N.E.2d 799, 802 (Mass. App. Ct. 2004) (to form a contract, "parties must give their mutual assent by having a meeting of the minds on the same proposition on the same terms at the same time"); TAC ¶¶ 258-59, 266, 364(1).

*See Villanueva*, 930 F.2d at 129 (it is "not the function of the courts to sit as 'super-tenure' committees").

        **C.**     **Even If the Third Statute Procedures Were Part of Plaintiff's Contract, Harvard Did Not Breach Them.**

Plaintiff raises two alleged breaches of the Third Statute Procedures that are both foreclosed by the undisputed evidence. First, she claims HBS could not impose interim disciplinary sanctions before Harvard held a full hearing and found clear and convincing evidence of grave misconduct or neglect of duty (*i.e.*, before undertaking the process outlined in the Third Statute Procedures). But the Third Statute Procedures apply only to removal of tenure. SUF ¶¶ 4-5. The disciplinary sanctions that HBS imposed at the conclusion of the HBS research misconduct process (including a two-year unpaid leave, removing her from a named professorship, prohibiting campus access, and suspending teaching, research, and mentoring activities) were not tenure revocation, nor tantamount to it. SUF ¶ 121; *see Haegert v. Univ. of Evansville*, 977 N.E.2d 924, 939-40, 950 (Ind. 2012) (where plaintiff claimed he was improperly prohibited from entering onto university property, finding that plaintiff "point[ed] to no provision in his employment contract guaranteeing a right of entry" and holding that university did not deprive him of alleged property right of tenured-professor status). Dean Datar plainly had authority under the applicable policies to impose these sanctions, and the disciplinary leave was time limited. SUF ¶¶ 24, 52, 121. Indeed, Dean Datar contemplated Plaintiff might return after her leave, demonstrating these sanctions were not synonymous with tenure revocation. SUF ¶ 122. Moreover, Harvard then undertook the full procedures set forth in the Third Statute Procedures, and Plaintiff's tenure was revoked only after that proceeding concluded. *See Wander v. St. John's Univ.*, 147 A.D.3d 1009, 1010 (N.Y. App. Div. 2017) (upholding university's determination to convert tenured faculty members' paid leave to unpaid leave due to their misconduct); *Haegert*, 977 N.E.2d at 951 (affirming summary

judgment for university that had placed tenured professor on leave after receiving report of misconduct and later initiated tenure revocation process, resulting in tenure revocation).[17]

Second, Plaintiff claims that she did not receive a "full hearing . . . before an impartial tribunal" and was denied the right to "confront and cross-examine all witnesses." TAC ¶ 316. But there is no dispute that Plaintiff received a two-day, in-person hearing before a Hearing Committee of seven tenured faculty members—who considered only the evidence before it—during which she cross-examined all witnesses who testified on HBS' behalf, including ███████████ ████████████████. SUF ¶¶ 140, 143, 145.

Plaintiff also raises a handful of other supposed breaches, but for each of these claims, either: (i) Plaintiff cannot point to any violated provision of the Third Statute Procedures; (ii) the undisputed record contradicts the claim; or (iii) both. Specifically, Plaintiff claims: that the Hearing Committee denied her requests for relevant documents and information from Harvard, TAC ¶¶ 317-18—but in fact, the Hearing Committee ██████████████████████ ████████████████████████████████████████████, SUF ¶¶ 12, 138; that Harvard "abandoned" the expert analysis from the HBS process and introduced a new expert who found additional evidence of her research misconduct, TAC ¶ 16—but the Third Statute Procedures allow the Hearing Committee to admit "any evidence which is of probative value in determining the issues involved," SUF ¶ 11, and Plaintiff also sought to introduce new

---

[17] To the extent Plaintiff claims that the imposition of these sanctions breached the implied covenant (Count III), that theory fails. The covenant is not breached where the contract terms are clear such that the complained-about conduct is expressly permitted. *See AL Prime Energy Consultant, Inc. v. Mass. Bay Transp. Auth.*, 479 Mass. 419, 431, 434 (2018) (rejecting claim based on defendant's termination of contract where contract gave defendant "sole discretion" to terminate); *Eigerman v. Putnam Invs.*, 877 N.E.2d 1258, 1265 (Mass. 2007) (rejecting claim where defendant could not have "misunderstood the broad discretion" under the contract). Here, the Research Integrity Policy gave the Dean broad discretion to implement sanctions. SUF ¶ 24.

evidence, SUF ¶¶ 136-37; that the Hearing Committee failed to provide an adjournment, TAC ¶ 319—but adjournments were only appropriate when a "valid claim of surprise is made," which the Hearing Committee ███████████████, SUF ¶¶ 10, 142; and that the Hearing Committee "grossly mischaracterized the evidence," TAC ¶ 321—but the Hearing Committee "████████████████" Plaintiff's arguments and evidence to support her claims of innocence and "███████████████████," SUF ¶¶ 149, 153.

In sum, Plaintiff received the full process to which she was entitled under the Third Statute Procedures. That she did not receive her preferred procedures or additional ones does not amount to a breach of contract.

### D. Even If the Research Integrity Policy Was Part of Plaintiff's Contract, Harvard Did Not Breach Its Terms or Fail to Provide a Fair Process.

Plaintiff identifies no particular provision of the Research Integrity Policy—the policy she claims should have governed the HBS research misconduct process—that was breached, instead broadly claiming Harvard subjected her to "an unfair and biased investigation." TAC ¶ 359(k). The Research Integrity Policy directed the Dean to develop a process that was "thorough, fair, and objective." SUF ¶ 22. Accordingly, the court must focus on the policy's express terms and not hypothetical procedural alternatives. *See Farzinpour v. Berklee Coll. of Music*, 516 F. Supp. 3d 33, 43 (D. Mass. 2021) (where a policy expressly promises fairness, a court must "focus[] on assuring compliance with the express contractual promise").[18] But the Research Integrity Policy grants broad discretion to the Dean and does not mandate any particular structure for an inquiry or investigation, promising few of the procedural safeguards for the respondent that Plaintiff eventually received under the Interim Policy & Procedures. *See* SUF ¶¶ 21-23. Moreover, the

---

[18] Such express procedural promises also render the implied covenant superfluous. *See* Doc. No. 74 at 20 (citing *Farzinpour*).

policy expressly authorized the adoption of any other procedures that the Dean determined were appropriate, including the Interim Policy & Procedures. SUF ¶¶ 21-23. Thus, Plaintiff cannot point to any provision that Harvard breached (and in any event, Plaintiff received a fair process for the reasons described below, *see infra* Section IV.E).

### E. Even If the 2021 Interim Policy & Procedures Were Part of Plaintiff's Contract, Harvard Did Not Breach Their Terms.

Plaintiff similarly cannot point to any express terms of the Interim Policy & Procedures that were breached. They set out a multi-phase, faculty-led, non-adversarial investigatory process with a preliminary assessment by the RIO, followed by inquiry and investigation phases, along with multiple opportunities for the respondent to provide information and responses. SUF ¶¶ 29-49. The undisputed facts establish that is exactly what happened here. SUF ¶¶ 65-127.

Plaintiff lodges several specific complaints about the HBS research misconduct process. For the Court's convenience, the chart below addresses each of these grievances in conjunction with the relevant provision of the Interim Policy & Procedures and relevant evidence in the record. As the chart makes plain, there can be no genuine dispute that Harvard complied with each of the specific provisions of the Interim Policy & Procedures and that these provisions—which were based on federal regulations—were fair. SUF ¶¶ 29-44, 53; *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985) (courts "may not override" academic decisions absent "a substantial departure from accepted academic norms").

| Allegation | Interim Policy & Procedures | Undisputed Record Evidence |
|---|---|---|
| Harvard delayed notifying Plaintiff of the research misconduct allegations. TAC ¶¶ 87-88, 364(3). | "*Upon receiving an allegation of research misconduct,* the RIO immediately will assess the allegation to determine whether . . . an inquiry must be conducted." SUF ¶ 40. | These provisions were followed. The RIO received the allegations on October 12, 2021. SUF ¶ 65. He completed his preliminary assessment and provided it to Dean Datar on October 15. SUF ¶¶ 67-68, 71. The RIO notified Plaintiff of the inquiry on October 27, and the Inquiry |

23

| Allegation | Interim Policy & Procedures | Undisputed Record Evidence |
|---|---|---|
| | "*At the time of or before beginning an inquiry,* the RIO must make a good faith effort to notify the respondent in writing . . . ." SUF ¶ 41. | Committee first met on November 5. SUF ¶¶ 74, 82. |
| Harvard failed to adequately preserve Plaintiff's data. TAC ¶ 102. | The RIO "must take *all reasonable and practical steps* to obtain custody of all the research records and evidence needed to conduct the research misconduct proceeding [and must] sequester any additional research records that become pertinent to an inquiry or investigation after the initial sequestration." SUF ¶ 39. | The RIO took all reasonable and practical steps to sequester the research record. The RIO first sequestered Plaintiff's cloud-based data and certain data from her devices. SUF ¶ 73. The RIO later met with Plaintiff and ultimately sequestered files on two of Plaintiff's devices based on her explanation of where her research files were located. SUF ¶¶ 77-78. During the research misconduct proceeding, Plaintiff never informed the RIO that there were any relevant data that she was aware of but had not provided. SUF ¶ 80. |
| HBS required Plaintiff to maintain confidentiality and prohibited her from soliciting assistance from third parties. TAC ¶ 159. | "*The respondent is responsible for maintaining confidentiality* and cooperating with the conduct of an inquiry and investigation[.]" SUF ¶ 49. | HBS was permitted to require Plaintiff to maintain the confidentiality of the process to protect her reputation, as well as those of her students and collaborators. SUF ¶¶ 49-50. In any event, it is undisputed that Plaintiff was not limited in the way she claims, because she reached out to a number of individuals with requests for information while the research misconduct process was ongoing. TAC ¶ 160; SUF ¶ 114. She also was assisted by experienced counsel. SUF ¶¶ 110-11, 135. |
| The HBS research misconduct process evaluated allegations outside of the six-year statute of limitations. TAC ¶¶ 105-06, 364(6). | "This Policy . . . applies only to allegations of research misconduct that occurred within six years of the date HBS received the allegation, *unless: the respondent has continued or renewed an incident of alleged research misconduct through the citation, republication, or other use for the potential benefit of* | In his preliminary assessment, the RIO found that ███████████ █████████████████████ ████████████ SUF ¶ 70. Plaintiff claims that simply citing a paper that relied on falsified or fabricated data does not "continue" or "renew" an incident of research misconduct. Doc. No. 126-2 at 9. But |

24

| Allegation | Interim Policy & Procedures | Undisputed Record Evidence |
|---|---|---|
| | *the respondent of the research record in question[.]*" SUF ¶ 31. | the plain language of the Interim Policy & Procedures makes clear that "citation" is sufficient. SUF ¶ 31. |
| Harvard limited Plaintiff to two advisors, which prohibited her from retaining a data forensics expert. TAC ¶¶ 119-20, 259(3). | "Respondents may choose up to two personal advisors for support during the process. Personal advisors may be attorneys; they may not be principals or witnesses in the research misconduct matter. *Personal advisors may be present at any proceedings or interviews that the respondent attends* but may not question witnesses or otherwise take part in the research misconduct proceedings." SUF ¶ 45. | The Interim Policy & Procedures' limitation about advisors refers to advisors who have the ability to sit in on meetings with the respondent. SUF ¶ 45. The Interim Policy & Procedures do not prohibit a respondent from hiring additional consultants. SUF ¶ 46. The RIO consistently has testified that he told Plaintiff she could hire a forensics firm to assist her, and the documentary record supports his testimony. SUF ¶ 91. Plaintiff claims otherwise but has no evidence other than her self-serving testimony to support this claim.

In any event, any factual dispute is immaterial because the undisputed evidence establishes that Plaintiff felt no obligation to comply with the purported "two-advisor" limit she claims existed. Indeed, Plaintiff admitted that, in addition to Pisano and attorneys from Cohen Seglias, she consulted with an attorney from the law firm K&L Gates, who assisted her while the HBS research misconduct process was ongoing—despite her now-asserted belief that doing so violated the Interim Policy & Procedures. SUF ¶ 113; Ex. 59 at 99:1-8. There is also nothing in the Interim Policy & Procedures prohibiting Plaintiff's experienced counsel from retaining consultants or experts. SUF ¶ 47. |
| The Investigation Committee: (i) "ignored credible evidence of honest error," TAC ¶¶ 173- | "A finding of research misconduct requires that . . . [t]he allegation[s] be proven by preponderance of the evidence. . . . HBS bears the | The Final Report makes clear that the Investigation Committee considered the assertion of honest error that Plaintiff presented, and applied the proper burden of proof. SUF ¶¶ 99- |

| Allegation | Interim Policy & Procedures | Undisputed Record Evidence |
|---|---|---|
| 74; and (ii) reversed the burden of proof and found Plaintiff guilty because she "had not disproved" the allegations, *id.* ¶¶ 172, 359(k). | burden of proof for making a finding of research misconduct. A respondent has the burden of proving, by a preponderance of the evidence, any and all affirmative defenses raised (such as honest error)."  SUF ¶ 33.<br><br>The Investigation Committee also must "consider the merits of any reasonable explanation by the respondent, including any effort by respondent to establish by a preponderance of the evidence that they did not engage in research misconduct because of honest error or a difference of opinion[.]"  SUF ¶ 44. | 105.  Plaintiff's disagreement with the Investigation Committee's thoughtful conclusion does not constitute evidence to the contrary. |
| As to each allegation, the Investigation Committee failed to specify that Plaintiff acted with the requisite intent.  TAC ¶¶ 142, 176(1, 4). | "Each statement of findings must . . . identify whether the research misconduct was falsification, fabrication, or plagiarism, *and whether it was committed intentionally, knowingly, or recklessly[.]*"  SUF ¶ 44. | As to each allegation, the Investigation Committee made a finding that Plaintiff had "intentionally, knowingly, or recklessly" falsified or fabricated data or results.  SUF ¶ 103.  The Interim Policy & Procedures require no further specification of intent.  *See ORI, U.S. Dep't of Health & Hum. Servs. v. Rakesh Srivastava*, No. C-15-3830, 2018 HHSDAB LEXIS 624, at *35 (Sept. 5, 2018) (it is sufficient to "find that Respondent either intentionally or knowingly" engaged in misconduct, where no recklessness was charged); Findings of Research Misconduct, 88 Fed. Reg. 22461 (Apr. 13, 2023) ("ORI found that Respondent engaged in research misconduct by knowingly, intentionally or recklessly falsifying and/or fabricating data . . . ."). |
| Harvard failed to keep the HBS research misconduct process confidential by: (i) announcing Plaintiff's | "The RIO and all Committee members . . . shall to the extent possible: (1) limit disclosure of the identity of respondents and complainants to those who need to know in order to carry out a | The language indicating that Plaintiff was on administrative leave on her HBS faculty webpage did not reveal any facts about the research misconduct proceeding.  TAC ¶ 212. |

26

| Allegation | Interim Policy & Procedures | Undisputed Record Evidence |
|---|---|---|
| administrative leave on the HBS website, TAC ¶¶ 212-17; (ii) issuing retraction notices and letters to co-authors, *id.* ¶¶ 218-41; and (iii) disclosing information to Data Colada, *id.* ¶¶ 242-46. | thorough, competent, objective, and fair research misconduct proceeding; and (2) except as otherwise prescribed by law, limit the disclosure of any records or evidence from which research subjects might be identified to those who need to know in order to carry out a research misconduct proceeding. Where communications about research misconduct proceedings may be considered necessary or advisable, University officials should be guided by the Guiding Principles for Communication in Research Misconduct Proceedings." SUF ¶ 48.<br><br>"***The Dean . . . will determine whether relevant parties should be notified of the outcome of the case***, including . . . editors of journals in which falsified reports may have been published [and] collaborators of the respondent in the work . . . .*" SUF ¶ 53. | The Interim Policy & Procedures do not prohibit the disclosure of information after the research misconduct process has concluded. Indeed, it expressly authorizes the Dean to "determine whether relevant parties should be notified of the outcome of the case." SUF ¶ 53. Thus, HBS' letters to co-authors and publications and communications with certain HBS faculty and students after the process had concluded—*e.g.*, to correct the scientific record—were permitted as a matter of law.<br><br>Nor is there any evidence of improper disclosures to Data Colada. Simmons testified that ███████ █████████████, Ex. 57 at 91:11-92:17, but even if true, that conversation supposedly occurred between April and June 2023 (after the HBS process had concluded), *id.*, and thus would have been permitted for the same reason as above. There is no evidence that confidential information was disclosed to Data Colada during the HBS process. |

Ultimately, as a matter of law, even if the Interim Policy & Procedures (or the Research Integrity Policy) were deemed to be a part of Plaintiff's contract, which Defendants maintain they are not, Plaintiff received the fair process that she had been expressly promised under these documents. The Court's analysis should end there.

To the extent Plaintiff argues Harvard failed to meet her additional, unwritten expectations despite following all express terms of the Interim Policy & Procedures (and the Research Integrity Policy), no reasonable jury could conclude Harvard acted with a dishonest purpose to deprive Plaintiff of rights that Harvard could have reasonably expected her to hold. *See Schaer*, 735 N.E.2d

at 378 (court's review of a university/professor contract should be guided by "[the] meaning. . . the university [] should reasonably expect the other party to give [the contract]"); *cf. Morris v. Brandeis Univ.*, 804 N.E.2d 961, 961 (Table) (Mass. App. Ct. 2004) ("[W]e consider whether the university violated any of the [professor]'s reasonable expectations created by one or more specific provisions of the contract[.]"). Plaintiff received a fair and thorough process.[19]

## V.    Harvard Did Not Breach the Implied Covenant of Good Faith & Fair Dealing by Adopting the Interim Policy & Procedures (Count III).

Plaintiff has no evidence that Harvard breached the implied covenant by "abandoning" the Research Integrity Policy and "crafting" the Interim Policy & Procedures "just for Plaintiff."[20] First, the covenant is not breached where the contract expressly permits the complained-about conduct. *See AL Prime Energy*, 479 Mass. at 434. Here, the Research Integrity Policy—which explicitly authorizes the adoption of any procedures the Dean determines are appropriate, including but not limited to the Interim Policy & Procedures—forecloses Plaintiff's implied covenant claim and entitles Harvard to judgment as a matter of law. SUF ¶¶ 21-23; *see supra* Section IV.D.[21]

---

[19] Plaintiff's estoppel claim fails for similar reasons. She cannot point to an unambiguous promise that she reasonably relied upon. *See Malden Police Patrolman's Ass'n v. Malden*, 82 N.E.3d 1055, 1064 (Mass. App. Ct. 2017); *Sullivan v. Chief Just. for Admin. & Mgmt. of Trial Ct.*, 858 N.E.2d 699, 711-12 (Mass. 2006). This claim further fails because an enforceable contract exists. *See Malden*, 82 N.E.3d at 1064 (no promissory estoppel "[w]here an enforceable contract exists").

[20] The Court already dismissed Plaintiff's claim for breach of the implied covenant arising from the research misconduct investigation under the Interim Policy & Procedures and the Research Integrity Policy. *See* Doc. No. 74 at 19-21.

[21] Plaintiff claims that Harvard should have evaluated the allegations against her under the Research Integrity Policy and Faculty Review Board ("FRB") Policy. Ex. 59 75:19-76:6. As described above, the Research Integrity Policy allowed for the exact process that Plaintiff now complains about, and the FRB Policy explicitly carves out allegations of research misconduct. *See supra* Section IV.D; SUF ¶ 25.

Even if Harvard's permitted adoption of the Interim Policy & Procedures could support a good faith and fair dealing claim, there is no evidence Harvard adopted them for any wrongful reason. *See Armstrong v. White Winston Select Asset Funds, LLC*, 648 F. Supp. 3d 230, 261 (D. Mass. 2022) (implied covenant claim requires evidence of a lack of good faith, such as a dishonest purpose, conscious wrongdoing, or breach of duty through motive of self-interest or ill will). It is undisputed that the Interim Policy & Procedures are closely modeled on the ORI Regulations and are nearly identical to the policies at other Harvard schools, including the T.H. Chan School of Public Health and the Faculty of Arts and Sciences. SUF ¶¶ 29-44, 53-55. It is also undisputed that the Interim Policy & Procedures remain in effect (with some modifications to track updates to federal regulations) and have been applied to other allegations of research misconduct that HBS has received ███████████████████████████ SUF ¶¶ 56-57.

Plaintiff may point to timing as evidencing bad faith, but the record establishes that Harvard adopted the policy to establish detailed procedures when faced with an emergent issue in 2021. SUF ¶¶ 18, 26-27. HBS leaders testified that HBS was prompted to review its policies related to research misconduct in response to informal concerns raised about both Ariely and Plaintiff. SUF ¶ 26 (Dean Jean Cunningham testified that ████████████████████████████



██████████████████ "); *id*. (Dean Robin Greenwood testified that HBS was "███████████" because "███████████████████████").

## VI.    Plaintiff's Request for Declaratory Relief Fails as a Matter of Law (Count VIII).

Summary judgment on Plaintiff's declaratory judgment claim is appropriate for four independent reasons. *First*, the Declaratory Judgment Act "is not an independent grant of federal jurisdiction, so dismissal of the underlying claims"—which is appropriate here—"requires

29

dismissal of the claim for declaratory relief as well." *Tyler v. Michaels Stores, Inc.*, 840 F. Supp. 2d 438, 452 (D. Mass. 2012). ***Second***, to the extent any of Plaintiff's claims survive summary judgment, the declaratory judgment claim is wholly duplicative. *See Stanley v. Am. Econ. Ins. Co.*, No. 24-CV-10622-DJC, 2026 WL 194632, at *7 (D. Mass. Jan. 26, 2026). The declaratory judgment claim should be dismissed where the issues raised "will be adequately resolved" through the resolution of the substantive claims at trial. *See Carando Gourmet Frozen Foods Corp. v. Axis Automation, LLC*, 458 F. Supp. 3d 60, 75 (D. Mass. 2020). ***Third***, "declaratory judgment is meant to define the legal rights and obligations of the parties in anticipation of some future conduct, not simply to proclaim liability for a past act." *Pagliaroni v. Mastic Home Exteriors, Inc.*, 310 F. Supp. 3d 274, 294 (D. Mass. 2018). Yet Plaintiff seeks backward-looking relief (*i.e.*, a declaration regarding the matters already decided by the Hearing Committee) that "runs counter to the purposes underlying the [DJA]." *See Cognex Corp. v. Air Hydro Power, LLC*, 651 F. Supp. 3d 322, 327 (D. Mass. 2023). ***Finally***, courts "may not override" academic decisions absent "a substantial departure from accepted academic norms," *Ewing*, 474 U.S. at 225; it is "not the function of the courts to sit as 'super-tenure' committees." *Villanueva*, 930 F.2d at 129. In any event, there was clear and convincing evidence that Plaintiff engaged in grave misconduct or neglect of duty. *See supra* Section I.B.2, IV.B.

## CONCLUSION

Defendants respectfully request that the Court grant summary judgment in their favor.

Dated: June 23, 2026                                        Respectfully submitted,


                                                            */s/ Douglas E. Brayley*
                                                            Douglas E. Brayley (BBO# 674478)
                                                            Jenny K. Cooper (BBO# 646860)
                                                            Elena W. Davis (BBO# 695956)


30

Stephanie D. Porges (BBO# 703381)
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199-3600
Tel: (617) 951-7000
Douglas.Brayley@ropesgray.com
Jenny.Cooper@ropesgray.com
Elena.Davis@ropesgray.com
Stephanie.Porges@ropesgray.com

Laura G. Hoey (BBO# 650643)
ROPES & GRAY LLP
191 North Wacker Drive
32nd Floor
Chicago, IL 60606
Telephone: (312) 845-1200
Laura.Hoey@ropesgray.com

*Attorneys for Defendants President and Fellows of Harvard College and Srikant Datar*

31

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 23, 2026, this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated: June 23, 2026

 */s/ Douglas E. Brayley*
Douglas E. Brayley

1