**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| FRANCESCA GINO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PRESIDENT AND FELLOWS OF | ) | Case No. 1:23-cv-11775-MJJ |
| HARVARD COLLEGE, SRIKANT DATAR, | ) | |
| JOHN DOES 1-10, AND JANE DOES 1-10, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF**
**<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

Pursuant to Local Rule 56.1, Defendant President and Fellows of Harvard College ("Harvard") and Defendant Srikant Datar (jointly, the "Defendants") submit the following Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment, filed concurrently herewith:

## I.    PLAINTIFF'S CAREER AT HARVARD

1.    On or about February 16, 2010, Plaintiff Francesca Gino received an offer of appointment from Harvard Business School ("HBS").  Doc. No. 126, Third Amended Complaint ("TAC") ¶ 50; Ex. 2, Letter from HBS to Plaintiff (GINO_012940)[1].

2.    Plaintiff joined the Negotiation, Organizations, and Markets unit at HBS as an Associate Professor of Business Administration effective July 1, 2010.  Ex. 2, Letter from HBS to Plaintiff (GINO_012940) at -940; TAC ¶ 52.

3.    By letter dated September 22, 2014, the Secretary of the University notified Plaintiff that she was appointed "Professor of Business Administration to serve from July 1, 2014, subject to such terms, conditions and policies as are stipulated by the Faculty of Business Administration, and to the Third Statute of the University," "as these may be amended from time to time."  Ex. 4, Letter from Secretary of the University to Plaintiff ("Appointment Letter") (GINO_012944) at -944.

## II.    HARVARD POLICIES AND PROCEDURES

4.    The Third Statute of the University provides in relevant part: "All Officers who hold teaching appointments, as defined from time to time by the Corporation with the consent of the Overseers, are subject to removal from such appointments by the Corporation only for grave

---

[1] Citations to documents produced in this litigation refer to the last three digits of the Bates number stamped in the lower-righthand corner of each page of the document.

misconduct or neglect of duty." Ex. 4, Appointment Letter at attachment, Statute 3. Officers and Staff of the University ("Third Statute") (GINO_012944) at -945.

5. On October 4, 1971, Harvard adopted Tentative Recommendations concerning the discipline of officers, which set forth procedures for tenure revocation proceedings under the Third Statute, including the convening of Screening and Hearing Committees, and on February 9, 1972, adopted a Statement of Hearing Procedures. Ex. 1, Tentative Recommendations for the Discipline of Officers and Statement of Hearing Procedures ("Third Statute Procedures") (Doc. No. 1-12) at 1-6.

6. The Third Statute Procedures state that "[t]he Hearing Committee shall conduct hearings, make findings of fact, and make recommendations to the President and Fellows on what, if any, action is appropriate." Ex. 1, Third Statute Procedures (Doc. No. 1-12) at 2.

7. The Third Statute Procedures further state that "[u]pon receiving the recommendations of the Hearing Committee, the President and Fellows shall, before acting on the case, allow the Respondent a reasonable opportunity to submit such further arguments as he may deem fit." Ex. 1, Third Statute Procedures (Doc. No. 1-12) at 3.

8. Under the Third Statute Procedures, "the burden of proof . . . that there has been grave misconduct or neglect of duty (as contemplated by the Third Statute of the University) rests with the Complainant and shall be satisfied only by clear and convincing evidence in the record considered as a whole." Ex. 1, Third Statute Procedures (Doc. No. 1-12) at 5-6.

9. Under the Third Statute Procedures, "[t]he findings of fact and the decisions will be based solely on the hearing record." Ex. 1, Third Statute Procedures (Doc. No. 1-12) at 6.

10.      The Third Statute Procedures provide that "[t]he Hearing Committee will grant adjournments to enable either party to investigate evidence as to which a valid claim of surprise is made." Ex. 1, Third Statute Procedures (Doc. No. 1-12) at 6.

11.      The Third Statute Procedures also provide that "[t]he Hearing Committee will not be bound by strict rules of legal evidence, and may admit any evidence which is of probative value in determining the issues involved." Ex. 1, Third Statute Procedures (Doc. No. 1-12) at 6.

12.      The Third Statute Procedures do not entitle Plaintiff to receive discovery in the Third Statute Process. *See generally* Ex. 1, Third Statute Procedures (Doc. No. 1-12).

## III.   INTERIM POLICY & PROCEDURES FOR ALLEGATIONS OF RESEARCH MISCONDUCT

13.      On July 19, 2021, Plaintiff informed HBS administrators that three professors—Leif Nelson, Joseph Simmons, and Uri Simonsohn, who publish under the name "Data Colada"—had contacted her with concerns about fraudulent data in a paper she co-authored with Dan Ariely (among other co-authors), a professor at Duke University Fuqua School of Business. Ex. 8, Email from Plaintiff to Dean Cunningham (HARV00050388).

14.      The concerns that Plaintiff raised to HBS administrators on July 19, 2021 did not relate to Plaintiff's involvement in the paper. Ex. 52, Excerpts from Dean Cunningham Deposition Transcript ("Cunningham Dep. Tr.") at 43:6-15; Ex. 8, Email from Plaintiff to Dean Cunningham (HARV00050388).

15.      Mr. Nelson, Mr. Simmons, and Mr. Simonsohn are professors at the Haas School of Business at the University of California, Berkeley, the Wharton School of the University of Pennsylvania, and the ESADE Business School at Ramon Llull Universitat in Barcelona, respectively. Ex. 68, *About*, Data Colada, https://datacolada.org/about. They now are Co-

Directors of the Credibility Lab at the Wharton School of the University of Pennsylvania. Ex. 69, *About Co-Directors of the Credibility Lab*, Wharton, https://credlab.wharton.upenn.edu/about/.

16. Also in July 2021, Data Colada reached out to a small handful of HBS faculty members to raise concerns about potential data falsification and fabrication in multiple papers co-authored by Plaintiff. Ex. 52, Cunningham Dep. Tr. at 40:18-41:16, 42:4-43:15.

17. Prior to this time, HBS had not received any allegations of data falsification or fabrication against a member of its faculty in its institutional memory. Ex. 52, Cunningham Dep. Tr. at 72:17-73:5, 73:24-74:5, 89:14-90:6.

18. The concerns about Mr. Ariely's and Plaintiff's research prompted HBS to review its policies related to research misconduct. Ex. 52, Cunningham Dep. Tr. at 84:4-85:8, 88:3-89:23; Ex. 50, Excerpts from R. Greenwood Deposition Transcript ("Greenwood Dep. Tr.") at 77:9-78:20, 90:4-20; Ex. 53, Excerpts from Dean Datar Deposition Transcript ("Datar Dep. Tr.") at 33:9-19.

19. In 2013, HBS adopted a Research Integrity Policy for handling allegations of research misconduct by faculty members. Ex. 3, HBS Research Integrity Policy (Doc. No. 1-9).

20. The Research Integrity Policy defined "research misconduct" as "fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results." Ex. 3, HBS Research Integrity Policy (Doc. No. 1-9) at 1.

21. The Research Integrity Policy provided that: "The Dean has principal responsibility for protecting the research integrity of the School and determining a proper response to allegations of misconduct in research. All allegations of misconduct in research should therefore be brought to the attention of the Dean, who will consult with the Senior Associate Dean for Research or

4

others at the School or University to determine an appropriate course of action." Ex. 3, HBS Research Integrity Policy (Doc. No. 1-9) at 1.

22. The Research Integrity Policy granted the Dean broad discretion to establish appropriate processes for handling allegations of research misconduct, provided "that whatever process the Dean determines to be appropriate is thorough, fair, and objective." Ex. 3, HBS Research Integrity Policy (Doc. No. 1-9) at 1.

23. The Research Integrity Policy provided that, "[b]ecause of variations in such factors as the type and seriousness of alleged misconduct, the course of action that will enable the Dean to fulfill his or her obligations most thoroughly and equitably may vary somewhat from case to case. Accordingly, the procedures set forth below permit flexibility and are designed to provide a framework that should enable equitable resolution of allegations of misconduct in a variety of circumstances." Ex. 3, HBS Research Integrity Policy (Doc. No. 1-9) at 1.

24. The Research Integrity Policy gave the Dean broad discretion to implement sanctions, providing that "[t]he Dean shall decide the matter and take whatever action he or she believes justified." Ex. 3, HBS Research Integrity Policy (Doc. No. 1-9) at 2.

25. Separately, HBS had a Faculty Review Board ("FRB") policy, which carves out allegations of research misconduct, providing in footnote 3: "Allegations of research misconduct . . . are covered . . . by the Research Integrity Policy." Ex. 6, HBS Principles and Procedures for Responding to Matters of Faculty Conduct, Faculty Review Board Procedure ("FRB Policy") (Doc. No. 20-1) at 1 n.3; Ex. 59, Excerpts from F. Gino Transcript ("Gino Dep. Tr.") at 76:14-78:23.

26. HBS leaders determined that the existing Research Integrity Policy did not provide a roadmap or detailed procedures for dealing with serious concerns regarding research misconduct,

5

including any formal allegations of research misconduct that might later come forward.  Ex. 52, Cunningham Dep. Tr. at 88:3-89:23; Ex. 50, Greenwood Dep. Tr. at 77:5-78:20; Ex. 53, Datar Dep. Tr. at 33:9-19.

27.    In August 2021, HBS adopted the Interim Policy and Procedures for Responding to Allegations of Research Misconduct (the "Interim Policy & Procedures") because it wanted to ███████████████████████████████████████████████████████████.  Ex. 9, Interim Policy & Procedures (Doc. No. 1-10); TAC ¶ 84; Ex. 52, Cunningham Dep. Tr. at 88:3-89:23.

28.    HBS applied the Interim Policy & Procedures to evaluate and investigate the allegations against Plaintiff.  TAC ¶ 84.

29.    The Interim Policy & Procedures were modeled on the federal regulations promulgated by the Secretary of Health and Human Services, Office of Research Integrity, found in 42 C.F.R. Part 93, entitled "Public Health Service Policies on Research Misconduct" then in effect ("ORI Regulations"), which govern and guide review of research misconduct allegations at institutions that receive federal research funds in the United States.  TAC ¶ 89; Ex. 9, Interim Policy & Procedures (Doc. No. 1-10) Appendix 2; Ex. 52, Cunningham Dep. Tr. at 91:23-92:2, 93:21-94:9.

30.    The Interim Policy & Procedures "appl[y] to allegations of research misconduct." Ex. 9, Interim Policy & Procedures (Doc. No. 1-10) § II.  Under the Interim Policy & Procedures, "research misconduct" is defined as: "fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results.  Research misconduct does not include honest error or differences of opinion."  Ex. 9, Interim Policy & Procedures (Doc. No. 1-

10) § II.  This is the same definition provided in the ORI Regulations.  *See* 42 C.F.R. § 93.103 (2005).

31.    The Interim Policy & Procedures apply "only to allegations of research misconduct that occurred within six years of the date HBS received the allegation, unless: the respondent has continued or renewed an incident of alleged research misconduct through the citation, republication, or other use for the potential benefit of the respondent of the research record in question; or HBS determines that the alleged misconduct would possibly have a substantial adverse effect on the health or safety of the public."  Ex. 9, Interim Policy & Procedures (Doc. No. 1-10) § II.

32.    This provision of the Interim Policy & Procedures tracks the statute of limitations in the ORI Regulations then in force.  *See* 42 C.F.R. § 93.105(a), (b)(1) (2005) ("This part applies only to research misconduct occurring within six years of the date . . . an institution receives an allegation of research misconduct. . . . The respondent continues or renews any incident of alleged research misconduct that occurred before the six-year limitation through the citation, republication or other use for the potential benefit of the respondent of the research record that is alleged to have been fabricated, falsified, or plagiarized.").[2]

33.    Under the Interim Policy & Procedures, "[a] finding of research misconduct requires that . . . [t]he allegation[s] be proven by preponderance of the evidence. . . . HBS bears the burden of proof for making a finding of research misconduct.  A respondent has the burden of proving, by a preponderance of the evidence, any and all affirmative defenses raised (such as

---

[2] The statute of limitations provision in the ORI Regulations was revised effective January 1, 2025. *See* 42 C.F.R. § 93.104 (2024).

honest error)."  Ex. 9, Interim Policy & Procedures (Doc. No. 1-10) § III.A.  These evidentiary burdens are consistent with those set out in the ORI Regulations.  42 C.F.R. § 93.106 (2005).

34.    The Interim Policy & Procedures require that "[t]hroughout the research misconduct process, which begins at the time an allegation is made, all participants shall bear in mind the importance, both in fact and in appearance, of thoroughness, fairness, and objectivity." Ex. 9, Interim Policy & Procedures (Doc. No. 1-10) § III.A.  These requirements track the language in the ORI Regulations.  *See* 42 C.F.R. § 93.300 (2005).

35.    The Interim Policy & Procedures provide for a preliminary assessment of the allegations, an inquiry, and an investigation.  Ex. 9, Interim Policy & Procedures (Doc. No. 1-10) §§ IV, VI, VII.  This is consistent with the multi-phase structure mandated by the ORI Regulations. 42 C.F.R. §§ 93.306(a), 93.307, 93.310, 93.402 (2005); *see also* 42 C.F.R. § 93.306 (2024).

36.    Under the Interim Policy & Procedures, a finding of research misconduct requires that: (1) "[t]here be a significant departure from accepted research practices of the relevant research community"; (2) "[t]he respondent committed the research misconduct intentionally, knowingly, or recklessly; and" (3) "[t]he allegation be proven by preponderance of the evidence." Ex. 9, Interim Policy & Procedures (Doc. No. 1-10) § III.A.  These are the same requirements set forth in the ORI Regulations.  42 C.F.R. § 93.104 (2005).

37.    The Interim Policy & Procedures include various timelines and deadlines, including that the preliminary assessment should be "preferably concluded within a week," that the inquiry must be completed within 60 calendar days of initiation of the inquiry, and that the investigation phase ordinarily must be completed within 120 days of beginning it.  Ex. 9, Interim Policy & Procedures (Doc. No. 1-10) §§ IV, VI.H, VII.J.  These deadlines track those set forth in the ORI Regulations then in effect.  42 C.F.R. §§ 93.307(c) (2005), 93.311 (2005).

8

38.      The Interim Policy & Procedures require the appointment of a Research Integrity Officer ("RIO") responsible for "(1) reviewing allegations of research misconduct to determine if they fall within the definition of research misconduct and warrant an inquiry; and (2) overseeing inquiries and investigations." Ex. 9, Interim Policy & Procedures (Doc. No. 1-10) § IV, Appendix 1. This is consistent with ORI Regulations. 42 C.F.R. § 93.306 (2005).

39.      The Interim Policy & Procedures require that "the RIO must take all reasonable and practical steps to obtain custody of all the research records and evidence needed" at the start of the inquiry, that sequestered materials be inventoried and stored in a secure manner, and that the respondent be given copies of, or reasonable supervised access to, such materials. Ex. 9, Interim Policy & Procedures (Doc. No. 1-10) § V. This is consistent with ORI Regulations. 42 C.F.R. § 93.307 (2005); *see also* 42 C.F.R. § 93.

40.      Under the Interim Policy & Procedures, "[u]pon receiving an allegation of research misconduct, the RIO immediately will assess the allegation to determine whether . . . an inquiry must be conducted." Ex. 9, Interim Policy & Procedures (Doc. No. 1-10) § IV. The RIO's responsibilities to assess the allegations are very similar to those found in the ORI Regulations. *See* 42 C.F.R. § 93.305, 93.307(b) (2005).

41.      Under the Interim Policy & Procedures, "[a]t the time of or before beginning an inquiry, the RIO must make a good faith effort to notify the respondent in writing, if the respondent is known." Ex. 9, Interim Policy & Procedures (Doc. No. 1-10) § V.B. The requirement to notify the respondent in writing is similarly found in the ORI Regulations. *See* 42 C.F.R. § 93.307(b) (2005).

42.      The Interim Policy & Procedures state that "[t]he inquiry committee will be appointed by the Dean or their designee . . . and will consist of one or more individuals who do

not have unresolved personal, professional, or financial conflicts of interest with those involved with the research misconduct proceeding." Ex. 9, Interim Policy & Procedures (Doc. No. 1-10) § VI.B. The requirement to avoid conflicts of interest is consistent with the ORI Regulations. *See* 42 C.F.R. § 93.304(b) (2005) (providing that an institution must take "precautions to ensure that individuals responsible for carrying out any part of the research misconduct proceeding do not have unresolved personal, professional, or financial conflicts of interest with the complainant, respondent, or witnesses").

43.    During the investigation process, the Interim Policy & Procedures require the Investigation Committee and RIO to: (1) "[u]se diligent efforts to ensure that the investigation is thorough and sufficiently documented and includes examination of all research records and evidence relevant to reaching a decision on the merits of each allegation"; (2) "[t]ake reasonable steps to ensure an impartial and unbiased investigation to the maximum extent practical"; (3) "[o]ffer each respondent, complainant, and any other available person who has been reasonably identified as having information regarding any relevant aspects of the investigation, including witnesses identified by the respondent, the opportunity to be interviewed; record or transcribe each interview; provide the recording or transcript to the interviewee for correction; and include the recording or transcript in the record of the investigation"; and (4) "[p]ursue diligently all significant issues and leads discovered that are determined relevant to the investigation, including any evidence of any additional instances of possible research misconduct, and continue the investigation to completion." Ex. 9, Interim Policy & Procedures (Doc. No. 1-10) § VII.E. These requirements track the ORI Regulations. 42 C.F.R. §§ 93.304(b), 93.310(d-h) (2005).

44.    The Interim Policy & Procedures require that the investigation committee prepare a written draft report that, among other things: "identif[ies] whether the research misconduct was

10

falsification, fabrication, or plagiarism, and whether it was committed intentionally, knowingly, or recklessly;" "summarizes the facts and the analysis that support the conclusion and consider the merits of any reasonable explanation by the respondent, including any effort by respondent to establish by a preponderance of the evidence that they did not engage in research misconduct because of honest error or a difference of opinion"; "identif[ies] whether any publications need correction or retraction"; and "identif[ies] the person(s) responsible for the misconduct." Ex. 9, Interim Policy & Procedures (Doc. No. 1-10) § VII.F. This is consistent with ORI Regulations. 42 C.F.R. § 93.313 (2005).

45.     The Interim Policy & Procedures afford respondents the right to "choose up to two personal advisors for support during the process," who "may be attorneys." Ex. 9, Interim Policy & Procedures (Doc. No. 1-10) § III.F. The Interim Policy & Procedures note that: "Personal advisors may be present at any proceedings or interviews that the respondent attends but may not question witnesses or otherwise take part in the research misconduct proceedings." Ex. 9, Interim Policy & Procedures (Doc. No. 1-10) § III.F.

46.     The Interim Policy & Procedures do not state that a respondent is prohibited from hiring additional consultants or experts separate from the advisors. *See generally* Ex. 9, Interim Policy & Procedures (Doc. No. 1-10).

47.     The Interim Policy & Procedures also do not prohibit a respondent's counsel from retaining experts. *See generally* Ex. 9, Interim Policy & Procedures (Doc. No. 1-10).

48.     The Interim Policy & Procedures contain a confidentiality provision stating that "[b]ecause of the potential jeopardy to the reputation and rights of a respondent, the RIO and all Committee members . . . shall to the extent possible: (1) limit disclosure of the identity of respondents and complainants to those who need to know in order to carry out a thorough,

competent, objective, and fair research misconduct proceeding; and (2) except as otherwise prescribed by law, limit the disclosure of any records or evidence from which research subjects might be identified to those who need to know in order to carry out a research misconduct proceeding. Where communications about research misconduct proceedings may be considered necessary or advisable, University officials should be guided by the Guiding Principles for Communication in Research Misconduct Proceedings." Ex. 9, Interim Policy & Procedures (Doc. No. 1-10) § III.D.

49.     The Interim Policy & Procedures also state that "[t]he respondent is responsible for maintaining confidentiality and cooperating with the conduct of an inquiry and investigation[.]" Ex. 9, Interim Policy & Procedures (Doc. No. 1-10) § III.F.

50.     The purpose of the Interim Policy & Procedures' confidentiality provisions is to protect the reputations of all of the people involved, including those of the complainant, respondent, students, and collaborators. Ex. 52, Cunningham Dep. Tr. at 104:8-15; Ex. 50, Greenwood Dep. Tr. at 164:4-16.

51.     Under the Interim Policy & Procedures, upon receipt of a final report regarding alleged research misconduct, the HBS Dean "will make a written determination as to: (1) whether the institution accepts the investigation report, its findings, and the recommended institutional actions; and (2) the appropriate institutional actions in response to the accepted findings of research misconduct." Ex. 9, Interim Policy & Procedures (Doc. No. 1-10) § VII.H.

52.     The range of administrative sanctions authorized by the Interim Policy includes, but is not limited to, "the correction of the public record including the withdrawal or correction of all pending or published abstracts and papers emanating from the research where misconduct was found," "suspension, leave without pay, salary reduction, or initiation of steps leading to rank

12

reduction or termination of employment," and "any other action appropriate to the research misconduct." Ex. 9, Interim Policy & Procedures (Doc. No. 1-10) § VII.I.

53.        Under the Interim Policy & Procedures, at the close of an investigation, "[t]he Dean . . . will determine whether relevant parties should be notified of the outcome of the case, including . . . editors of journals in which falsified reports may have been published [and] collaborators of the respondent in the work . . . ." Ex. 9, Interim Policy & Procedures (Doc. No. 1-10) § VII.H. The ORI Regulations similarly contemplate that editors and co-authors, among others, will be notified of findings of research misconduct. 42 C.F.R. §§ 93.108(a), 93.411(b) (2005); *see also* 42 C.F.R. § 93.106 (2024) (listing "institutional review boards, journals, editors, publishers, co-authors, and collaborating institution" as those who may have a "need to know").

54.        The Interim Policy & Procedures are similar to the research misconduct policies in place at other Harvard schools, including the Harvard Faculty of Arts and Sciences and Harvard's T.H. Chan School of Public Health. Ex. 53, Datar Dep. Tr. at 40:20-41:6; Ex. 7, Harvard University Faculty of Arts and Sciences Interim Policy and Procedures for Responding to Allegations of Research Misconduct ("FAS Interim Policy & Procedures") (HARV00075987); Ex. 5, Harvard T.H. Chan School of Public Health, Policies & Procedures: Responding to Allegations of Research Misconduct ("Chan Policies & Procedures") (HARV00076095).

55.        The FAS Interim Policy & Procedures and the Chan Policies & Procedures each state that it "is intended to comply with institutional responsibilities under the Public Health Service (PHS) Policies on Research Misconduct, 42 CFR Part 93." Ex. 7, FAS Interim Policy & Procedures (HARV00075987) § II; Ex. 5, Chan Policies & Procedures (HARV00076095) Purpose.

13

56.     The Interim Policy & Procedures remain in effect today, with some modifications to track updates to federal regulations. Ex. 54, HBS Interim Policy and Procedures for Responding to Allegations of Research Misconduct Effective Date: January 2026[3]; *see* 70 Fed. Reg. 28,370; *Public Health Service Policies on Research Misconduct*, 89 Fed. Reg. 76,280 (Sept. 17, 2024) (codified at 42 C.F.R. pt. 93).

57.     ███████████████████████████████████████████████████, the Interim Policy & Procedures have been applied to other allegations of potential research misconduct. Ex. 55, Excerpts from RIO Bonacossa Deposition Transcript, Day 1 ("Bonacossa Day 1 Dep. Tr.") at 84:7-88:3.

58.     ████████████████████████████████████████████████████ ████████ Ex. 55, Bonacossa Day 1 Dep. Tr. at 84:21-85:1, 86:9-88:3.

59.     ████████████████████████████████████████████████████ ██████████████████████████████████████ Ex. 58, Excerpts from A. King Deposition Transcript ("King Dep. Tr.") at 177:11-25.

60.     ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████ Ex. 58, King Dep. Tr. at 128:4-20.

61.     ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████. Ex. 55, Bonacossa Day 1 Dep. Tr. at 86:9-87:11; *see* Ex. 9, Interim Policy & Procedures (Doc. No. 1-10) § IV.

---

[3] Available at: https://www.hbs.edu/about/campus-and-culture/policies/research-misconduct.

62.  Ex. 52, Cunningham Dep. Tr. at 261:15-263:4; Ex. 49, Excerpts from G. Pisano Deposition Transcript ("Pisano Dep. Tr.") at 18:3-22; Ex. 59, Gino Dep. Tr. at 70:12–21; TAC ¶ 263.

63.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 59, Gino Dep. Tr. at 71:5-72:9; Ex. 51, Excerpts from T. Amabile Deposition Transcript ("Amabile Dep. Tr.") at 174:1-14.

64. The HBS dean at the time was not Dean Datar. Ex. 59, Gino Dep. Tr. at 72:10-11; Ex. 51, Amabile Dep. Tr. at 174:21-175:14.

## IV. FORMAL ALLEGATIONS AND THE RIO'S PRELIMINARY ASSESSMENT

65. On October 12, 2021, the RIO (Alain Bonacossa) received formal allegations of research misconduct against Plaintiff from Data Colada. Ex. 10, Email from Research Integrity Officer ("RIO") A. Bonacossa to J. Simmons, et al. (HARV00002215); Ex. 12, Letter from RIO Bonacossa to Dean Datar (HARV00020995) at -995.

66. At that time, Data Colada submitted ▮▮▮ allegations of data falsification and fabrication in ▮ papers co-authored by Plaintiff. Ex. 11, HBS Research Misconduct Allegation Intake & Assessment Form ("Preliminary Assessment") (HARV00062721).

67. The RIO conducted a preliminary assessment of the allegations under the Interim Policy & Procedures. Ex. 11, Preliminary Assessment (HARV00062721).

68. On October 15, 2021, the RIO completed his preliminary assessment and concluded that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 12, Letter from RIO

15

Bonacossa to Dean Datar (HARV00020995) at -995; Ex. 11, Preliminary Assessment (HARV00062721) at -727.

69.     The five allegations related to four published papers co-authored by Plaintiff: (i) Gino, Kouchaki & Casciaro (2020), published in the Journal of Personality and Social Psychology; (ii) Gino, Kouchaki & Galinsky (2015), published in Psychological Science; (iii) Gino & Wiltermuth (2014), published in Psychological Science; and (iv) Shu, Mazar, Gino, Ariely & Bazerman (2012), published in the Proceedings of the National Academy of Sciences. Ex. 12, Letter from RIO Bonacossa to Dean Datar (HARV00020995) at -995; Ex. 11, Preliminary Assessment (HARV00062721) at -727.

70.     ████████████, Plaintiff had cited the 2012, 2014, and 2015 papers at issue in other published papers within the six years preceding the RIO's receipt of the allegations. Ex. 11, Preliminary Assessment (HARV00062721) at -729–34; Ex. 48, Plaintiff's Responses & Objections to Defendants' First Set of Requests for Admission, Request No. 13 (July 11, 2025).

71.     The RIO informed Dean Datar, the HBS Deciding Official, of the results of his preliminary assessment on October 15, 2021. Ex. 13, Email from Dean Datar to RIO Bonacossa (HARV00002586) at -586.

72.     Upon receiving the RIO's preliminary assessment, on October 15, 2021, Dean Datar asked that the inquiry processes under the Interim Policy & Procedures be commenced. Ex. 13, Email from Dean Datar to RIO Bonacossa (HARV00002586) at -586.

## V.     SEQUESTRATION OF RESEARCH RECORDS AND NOTICE OF INQUIRY

73.     Starting around October 19, 2021, the RIO worked with the HBS Information Security Officer to sequester Plaintiff's available research records and evidence, including from Plaintiff's HBS email account, Office 365 OneDrive data, internal HBS cloud and network storage

16

locations, and Qualtrics survey data.  Ex. 15, HBS Sequestration Inventory Log (Doc. No. 20-5 at 257); Ex. 56, Excerpts from RIO Bonacossa Deposition Transcript, Day 2 ("Bonacossa Day 2 Dep. Tr.") at 150:14-151:6; Ex. 16, Report of Inquiry Committee Concerning Allegations against Plaintiff ("Inquiry Report") (Doc. No. 20-5 at 43) at 4.

74.    On October 27, 2021, the RIO sent a formal Notice of Inquiry Related to Allegations of Research Misconduct ("Notice of Inquiry") to Plaintiff, informing her of the allegations and the commencement of the inquiry process.  Ex. 14, Notice of Inquiry (Doc. No. 20-5 at 72).

75.    The Notice of Inquiry identified the four papers and specific allegations under review, attached the full text of the Interim Policy & Procedures, identified the proposed Inquiry Committee members, and notified Plaintiff of various procedural rights, including: (i) the right to lodge objections to committee members based on alleged conflicts of interest within five calendar days; (ii) the right to choose up to two personal advisors who may be present at any proceedings, and who may be attorneys; (iii) the right to be interviewed and/or submit written statements; and (iv) the opportunity to review and comment on the Inquiry Committee's draft report.  Ex. 14, Notice of Inquiry (Doc. No. 20-5 at 72) at 3-4.

76.    The Notice of Inquiry also informed Plaintiff that "[i]t is essential that all materials, including documents, other physical things, and electronically-stored information, that relate in any way to the issues under review be produced at this time" and that Plaintiff was obligated to preserve all relevant materials.  Ex. 14, Notice of Inquiry (Doc. No. 20-5 at 72) at 3-4.

77.    On October 27, 2021, the RIO met with Plaintiff to discuss the sequestration of her devices, and Plaintiff told the RIO where the Inquiry Committee should look for relevant files. Ex. 55, Bonacossa Day 1 Dep. Tr. at 73:10-74:5, 81:9-82:17; Ex. 59, Gino Dep. Tr. at 93:4-8.

78.    The RIO sequestered files from two devices that Plaintiff used.  Ex. 15, HBS Sequestration Inventory Log (Doc. No. 20-5 at 257); Ex. 55, Bonacossa Day 1 Dep. Tr. at 81:9-82:17.

79.    Upon completion of the sequestration process, Plaintiff's devices were returned to her with all existing data intact, and Plaintiff continued to have access to all of her existing records and data throughout the HBS investigation process.  Ex. 37, Witness Statement of RIO Bonacossa (HARV00068990) ¶ 29.

80.    During the research misconduct proceeding, Plaintiff never informed the RIO that there was any relevant data that she was aware of but had not provided to HBS.  Ex. 37, Witness Statement of RIO Bonacossa (HARV00068990) ¶¶ 29, 43.

## VI.    THE INQUIRY

81.    Dean Datar appointed an Inquiry Committee that comprised two senior professors at HBS, Teresa Amabile (Chair) and Robert Kaplan.  Ex. 38, Witness Statement of Dean Datar (HARV00022278) ¶ 16; Ex. 16, Inquiry Report (Doc. No. 20-5 at 43) at 3-4.

82.    The Inquiry Committee held its first meeting on November 5, 2021.  Ex. 16, Inquiry Report (Doc. No. 20-5 at 43) at 5.

83.    Over six meetings spanning approximately five months, the Inquiry Committee gathered and reviewed information relevant to the allegations, including the datasets that Plaintiff herself identified as relevant to the studies in question, and interviewed Plaintiff.  Ex. 16, Inquiry Report (Doc. No. 20-5 at 43) at -135-36; Ex. 51, Amabile Dep. Tr. at 115:16-23, 125:10-16.

84.    On April 8, 2022, the Inquiry Committee issued its final Inquiry Report, concluding that an investigation was warranted into each of the allegations.  Ex. 16, Inquiry Report (Doc. No. 20-5 at 43) at 8-12.

18

85.    Specifically, the Inquiry Committee found that each allegation met the definition of research misconduct and noted that "preliminary information-gathering and preliminary fact-finding indicates that these allegations may have substance," and recommended a full investigation.  Ex. 16, Inquiry Report (Doc. No. 20-5 at 43) at 8.

86.    The Inquiry Committee members did not consider Plaintiff's sex in connection with any of these determinations or recommendations.  Ex. 64, T. Amabile Declaration ¶ 6; Ex. 67, R. Kaplan Declaration ¶ 6.

87.    The Inquiry Committee members based all their determinations or recommendations on their conclusion, based on the relevant data and other evidence, that Plaintiff had engaged in repeated and intentional research misconduct.  Ex. 64, T. Amabile Declaration ¶ 6; Ex. 67, R. Kaplan Declaration ¶ 6.

88.    On April 13, 2022, Dean Datar accepted the Inquiry Committee's recommendation that an investigation be initiated.  Ex. 17, Memorandum from Dean Datar to RIO Bonacossa (HARV00016962) at -962.

## VII.   THE INVESTIGATION

89.    The Investigation Committee was appointed by Dean Datar and composed of Professor Amabile (Chair), Professor Kaplan, and Professor Shawn Cole, each senior faculty members at HBS.  Ex. 21, Final Report of Investigation Committee Concerning Allegations against Plaintiff ("Final Report") (Doc. No. 20-5 at 2) at 4; Ex. 38, Witness Statement of Dean Datar (HARV00022278) ¶ 20.

90.    The investigation commenced on May 13, 2022 and concluded with the issuance of the Final Report on March 7, 2023, a period of approximately ten months.  Ex. 21, Final Report (Doc. No. 20-5 at 2) at 4-8.

91.    During the investigation, the RIO told Plaintiff that she could hire a forensics firm to assist her during the process.  Ex. 42, Supplemental Witness Statement of RIO Bonacossa (HARV00022568) ¶ 12; Ex. 56, Bonacossa Day 2 Dep. Tr. at 168:1-169:16; Ex. 19, Meeting Notes (HARV00077531) at -540; Ex. 44, Excerpts from Transcript of Third Statute Proceeding, Day 1 ("Third Statute Proceeding Day 1 Tr.") (HARV00070153) at 120:4-8, 131:8-19.

92.    The Investigation Committee engaged Maidstone Consulting Group ("MCG"), an independent forensic data consulting firm, to conduct forensic analyses of the datasets at issue in the allegations.  Ex. 21, Final Report (Doc. No. 20-5 at 2) at 4.

93.    MCG produced forensic reports for each of the allegations, examining forensic evidence of data alterations.  Ex. 21, Final Report (Doc. No. 20-5 at 2) at 5-8, 17-39.

94.    Each MCG forensic report was provided to Plaintiff prior to her interview with the Investigation Committee.  Ex. 21, Final Report (Doc. No. 20-5 at 2) at 5-8.

95.    Between May and July 2022, Plaintiff submitted detailed written responses to the Investigation Committee's questions, including chronologies for each paper at issue, identification of research assistants and collaborators, and a description of who had access to the data at each stage of each study.  Ex. 18, Plaintiff's Written Responses to Investigation Committee (Doc. No. 20-5 at 332) at 2-21.

96.    The Investigation Committee conducted recorded interviews of four co-authors and two research assistants with knowledge of the studies at issue.  Ex. 21, Final Report (Doc. No. 20-5 at 2) at 5-8.  Plaintiff received transcripts of these interviews.  Ex. 21, Final Report (Doc. No. 20-5 at 2) at 5-8.

97.    On November 11, 2022, Plaintiff submitted a written statement to the Investigation Committee.  Ex. 21, Final Report (Doc. No. 20-5 at 2) at 6-7.

20

98.	The Investigation Committee interviewed Plaintiff on November 14, 2022.  Ex. 21, Final Report (Doc. No. 20-5 at 2) at 6-7.

99.	The Investigation Committee examined the allegations and all evidence collected—including evidence provided by Plaintiff—carefully and thoroughly.  Ex. 21, Final Report (Doc. No. 20-5 at 2) at 7; Ex. 39, Witness Statement of T. Amabile (HARV00069013) ¶¶ 34-68.

100.	On December 14, 2022, the Investigation Committee provided Plaintiff with a draft of its report for review and comment.  Ex. 21, Final Report (Doc. No. 20-5 at 2) at 8.

101.	On February 17, 2023, Plaintiff submitted a written response to the draft Final Report, which was 36 pages long and addressed each allegation.  Ex. 21, Final Report (Doc. No. 20-5 at 2) at 8-9; Ex. 20, Plaintiff's Written Response to Draft Investigation Report (Doc. No. 20-5 at 1024).

102.	In her written response to the draft Final Report, for each allegation, Plaintiff asserted that she "never improperly manipulated data or research results" and "never revised or altered research data" in her papers, attributed discrepancies to errors by research assistants, and suggested the possibility that a "motivated third party" with access to her Qualtrics account had tampered with the data.  Ex. 20, Plaintiff's Written Response to Draft Investigation Report (Doc. No. 20-5 at 1024) at 2, 15, 35.

103.	On March 7, 2023, the Investigation Committee issued its 41-page Final Report with nearly 1,200 pages of supporting documents, finding by a preponderance of the evidence that Plaintiff committed research misconduct intentionally, knowingly, or recklessly with regard to all five allegations.  Ex. 21, Final Report (Doc. No. 20-5 at 2) at 1, 9, 40; Ex. 39, Witness Statement of T. Amabile (HARV00069013) ¶¶ 34-68.

21

104.    The Investigation Committee's Final Report considered and rejected Plaintiff's contentions that unnamed "bad actors," research assistants, or other co-authors might have instead been responsible for the data anomalies. Ex. 21, Final Report (Doc. No. 20-5 at 2) at 17, 40.

105.    The Investigation Committee concluded that Plaintiff's "repeated and strenuous argument for a scenario of data falsification by bad actors across four different studies," involving "different co-authors, different journals, different lab personnel, and different home institutions" and spanning eight years, was "highly implausible." Ex. 21, Final Report (Doc. No. 20-5 at 2) at 40.

106.    The Investigation Committee recommended corrections of the scientific record, putting Plaintiff on unpaid leave, and initiation of steps leading to termination of employment. Ex. 21, Final Report (Doc. No. 20-5 at 2) at 40-41.

107.    The Investigation Committee members did not consider Plaintiff's sex in connection with any of their determinations or recommendations with respect to the allegations against Plaintiff. Ex. 64, T. Amabile Declaration ¶ 6; Ex. 66, S. Cole Declaration ¶ 5; Ex. 67, R. Kaplan Declaration ¶ 6.

108.    The Investigation Committee members based all of their determinations and recommendations on their conclusion, based on the relevant data and other evidence gathered during the HBS investigation, that Plaintiff had engaged in repeated and intentional research misconduct. Ex. 64, T. Amabile Declaration ¶ 6; Ex. 66, S. Cole Declaration ¶ 5; Ex. 67, R. Kaplan Declaration ¶ 6.

109.    None of the Investigation Committee members have any reason to believe that any of the other individuals involved in the process were biased against Plaintiff because of her sex, that any conclusions that Plaintiff committed research misconduct were based on her sex, or that

Plaintiff was treated differently because of her sex.  Ex. 64, T. Amabile Declaration ¶ 7; Ex. 66, S. Cole Declaration ¶ 6; Ex. 67, R. Kaplan Declaration ¶ 7.

110.     Throughout the HBS research misconduct process, Plaintiff was represented by legal counsel from Cohen Seglias Pallas Greenhall & Furman PC ("Cohen Seglias") with experience in representing individuals accused of research misconduct.  TAC ¶ 109; Ex. 59, Gino Dep. Tr. at 32:23-33:1, 33:11-19.[4]

111.     Plaintiff's counsel at Cohen Seglias served as one of Plaintiff's advisors under the Interim Policy & Procedures.  TAC ¶ 109; Ex. 59, Gino Dep. Tr. at 32:23-33:1, 33:11-19, 89:4-9.

112.     HBS Professor Gary Pisano also served as one of Plaintiff's advisors.  Ex. 59, Gino Dep. Tr. at 89:4-9.

113.     Plaintiff also engaged an attorney from K&L Gates to assist her during the HBS research misconduct process.  Ex. 59, Gino Dep. Tr. at 98:8-99:8.

114.     Plaintiff also reached out to several individuals with requests for information while the research misconduct process was ongoing.  TAC ¶ 159; Ex. 20, Plaintiff's Written Response to Draft Investigation Report (Doc. No. 20-5 at 1024) at 2.

## VIII.   DEAN DATAR'S ACCEPTANCE AND IMPOSITION OF SANCTIONS

115.     Dean Datar closely reviewed the Investigation Committee's Final Report.  Ex. 53, Datar Dep. Tr. at 105:5–10.

---

[4] *See also Paul Thaler*, Cohen Seglias, https://www.cohenseglias.com/attorney/paul-thaler/ (last visited June 21, 2026) (stating that Plaintiff's counsel is "nationally known for his work in research misconduct matters and represents both scientists and institutions across the United States in matters involving allegations of plagiarism, fabrication, or falsification of data").

116.      Dean Datar met with the RIO multiple times to discuss the allegations and evidence. Ex. 22, Email from RIO Bonacossa to Dean Datar (HARV00005365); Ex. 55, Bonacossa Day 1 Dep. Tr. at 67:8-18.

117.      Dean Datar also sought additional forensic evidence through the RIO and MCG to evaluate some of Plaintiff's assertions.    Ex. 38, Witness Statement of Dean Datar (HARV00022278) ¶¶ 33-34, 38-39; Ex. 30, Memorandum from RIO Bonacossa to Dean Datar (HARV00012015) at -015.

118.      On April 19, 2023, Dean Datar informed the RIO that he accepted the Investigation Committee's findings that Plaintiff had committed research misconduct with regard to all four of the examined papers.  Ex. 23, Letter from Dean Datar to RIO Bonacossa (HARV00004993) at -993.

119.      Dean Datar consulted with senior colleagues on the faculty and asked them to advise on whether they agreed with the sanctions that were recommended by the Investigation Committee.  Ex. 24, Email from Dean Cunningham (HARV00012516); Ex. 53, Datar Dep. Tr. at 167:3-18.

120.      These colleagues told Dean Datar that they strongly supported the recommended sanctions.  Ex. 53, Datar Dep. Tr. at 167:3-18.  Dean Datar noted that "█████████████████ ███████████████" Ex. 28, Talking Points re: Meeting with Plaintiff (HARV00013260) at -262; *see also* Ex. 25, Email to Dean Datar (HARV00005382); Ex. 26, Letter to Dean Datar (HARV00009316); Ex. 27, Letter to Dean Datar (HARV00013835).

121.      On June 13, 2023, Dean Datar met with Plaintiff in person and issued a written letter imposing sanctions, including: contacting journal editors and requesting retraction of the papers at issue to correct the scientific record; placement on administrative leave for two years

(salary paid through July 31, 2023; thereafter unpaid); removing her from a named professorship; a prohibition on conducting research, teaching, mentoring, or advising during the leave; and suspension of her campus ID card access effective immediately.  Ex. 29, Letter from Dean Datar to Plaintiff (GINO_000001) at -001–004; Ex. 59, Gino Dep. Tr. at 116:5-14.

122.    Dean Datar's written letter contemplated that Plaintiff might return from leave, stating: "██████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████." Ex. 29, Letter from Dean Datar to Plaintiff (GINO_000001) at -002.

123.    Dean Datar also informed Plaintiff that he would forward to Harvard's President a request to consider tenure revocation proceedings under Harvard's Third Statute, asking that the University revoke her tenured professorial appointment at Harvard on the grounds that her repeated acts of research misconduct constituted grave misconduct and/or neglect of duty.  Ex. 29, Letter from Dean Datar to Plaintiff (GINO_000001) at -002.

124.    Dean Datar based all of his decisions with respect to the allegations against Plaintiff on his belief, based on the relevant data and other evidence gathered through the HBS investigation and the Dean's subsequent work, that Plaintiff had engaged in repeated and intentional research misconduct.  Ex. 65, Dean Datar Declaration ¶ 4; Ex. 53, Datar Dep. Tr. at 149:7-150:14, 225:9-228:4; Ex. 45, Third Statute Proceeding Day 2 Tr. (HARV00070722) at 33:1-17.

125.    Dean Datar believed the evidence of Plaintiff's research misconduct was overwhelming.  Ex. 53, Datar Dep. Tr. at 225:7-228:4.

126.    Dean Datar did not consider Plaintiff's sex in connection with any of his decisions. Ex. 65, Dean Datar Declaration ¶ 4.

127.    Dean Datar has no reason to believe that any of the other individuals involved in the process were biased against Plaintiff because of her sex, that any conclusions that Plaintiff committed research misconduct were based on her sex, or that Plaintiff was treated differently because of her sex.  The individuals with whom he interacted all focused on the evidence and facts of the case.  Ex. 65, Dean Datar Declaration ¶ 5.

## IX.    THIRD STATUTE PROCEEDING

128.    On July 14, 2023, a complaint against Plaintiff under Harvard's Third Statute was submitted to then-President Claudine Gay by Dean Datar.  Ex. 31, Letter from Dean Datar to President Gay (HARV00003214).  Dean Datar requested that then-President Gay commence Third Statute proceedings.  Ex. 31, Letter from Dean Datar to President Gay (HARV00003214) at -214.

129.    Robin Greenwood, a Senior Associate Dean for Faculty Development and Research at HBS, served as the Complainant on behalf of HBS.  Ex. 31, Letter from Dean Datar to President Gay (HARV00003214).

### A.    The Screening Committee

130.    Upon receiving the Third Statute complaint, then-President Gay convened a Screening Committee of three HBS professors with tenure (███████████████████ ███████████████████████) in August 2023, as required under the Third Statute Procedures.    Ex. 32, Email from President Gay to Screening Committee Members (HARV00021736); Ex. 1, Third Statute Procedures (Doc. No. 1-12) at 1.

131.    On October 12, 2023, the Screening Committee sent a memorandum to then-President Gay reporting its unanimous findings: that the complaint credibly alleged grave misconduct or neglect of duty and that it was sufficiently serious and justified to be referred to a

Hearing Committee for adjudication.  Ex. 33, Memorandum from Screening Committee to President Gay (HARV00021291).

132.    Then-President Gay informed Plaintiff of the Screening Committee's findings and stated that she would direct Harvard's University Committee on Rights and Responsibilities ("UCRR") to proceed with selecting Hearing Committee members from among tenured University faculty.  Ex. 34, Letter from President Gay to Plaintiff (HARV00043127).

**B.    The Hearing Committee**

133.    The UCRR selected a seven-member Hearing Committee drawn from tenured faculty across Harvard University.  Ex. 35, Email from J. Caldwell to Hearing Committee Members (HARV00078391); Ex. 46, Memorandum from the Hearing Committee to the President and Fellows of Harvard College (the "Corporation") re: Findings of Facts and Recommendations ("Findings and Recommendations") (HARV00022816) at -817–18.

134.    The seven members of the Hearing Committee were: ███████████████████

███████████████████████████████████████████

██████████████████. Ex. 43, Notice of Third Statute Hearing (HARV00022803).

135.    The Complainant and Respondent (*i.e.*, the Plaintiff) were represented by experienced external legal counsel throughout the tenure revocation proceeding; the Hearing Committee was also represented by its own outside counsel.  Ex. 46, Findings and Recommendations (HARV00022816) at -817.

136.    Plaintiff sought to introduce new evidence in connection with the tenure revocation proceeding, and was permitted to do so.  Ex. 36, Letter from Respondent's Counsel to Hearing Committee (HARV00069780) at -780–783; Ex. 41, Hearing Committee Memorandum (HARV00022713) at -713.

137.    The Hearing Committee determined that it would conduct an independent review of the evidence and would not simply defer to the prior work and findings of the HBS Investigation Committee. Ex. 46, Findings and Recommendations (HARV00022816) at -817.

138.    The Hearing Committee granted several of the document and information requests that Plaintiff submitted to the Complainant. Ex. 46, Findings and Recommendations (HARV00022816) at -818.

139.    The parties submitted a collective 1,085 pages of written testimony to the Hearing Committee from 13 witnesses, including five expert witnesses. Ex. 46, Findings and Recommendations (HARV00022816) at -818.

140.    The Complainant submitted written testimony from ████████████████ ████████████████████████████████ and Julian Ackert. Ex. 40, Letter from Complainant's Counsel to Hearing Committee (HARV00022264); Ex. 60, Expert Report of J. Ackert, Exs. A-B.

141.    In Mr. Ackert's written expert testimony, Mr. Ackert concluded, based on the available forensic evidence, that in September 2023 Plaintiff had falsified and backdated a file on another device and then copied it to her HBS laptop to create the misleading impression that an exonerating data file existed that HBS had overlooked during its investigation. Ex. 60, Expert Report of J. Ackert, Ex. A: Sept. 27, 2024 Rebuttal Expert Statement ¶¶ 65-81.

142.    In response to a request for an adjournment from Plaintiff, the Hearing Committee determined that Plaintiff ████████████████████████████████ ██████████" because Plaintiff had "████████████████████████ ████████████████████████████████████████████

███████████████████████████████████████████████████████████████████" Ex. 41, Hearing Committee Memorandum (HARV00022713) at -713.

143.     A two-day evidentiary hearing was held on November 15-16, 2024, which included live testimony, cross-examination of witnesses, opening statements, and closing arguments. Ex. 46, Findings and Recommendations (HARV00022816) at -818–19.

144.     Before conducting the evidentiary hearing, the Hearing Committee reviewed all submissions from the parties, including Plaintiff's 93-page response to the Third Statute complaint, 571 exhibits, and the 1,085 pages of written testimony. Ex. 46, Findings and Recommendations (HARV00022816) at -818.

145.     During the hearing, Plaintiff cross-examined all six witnesses who testified (*i.e.*, submitted witness statements) on the Complainant's behalf. Ex. 44, Third Statute Proceeding Day 1 Tr. (HARV00070153) at 75:1, 146:16, 258:5, 289:17; Ex. 45, Third Statute Proceeding Day 2 Tr. (HARV00070722) at 8:19, 55:21.

146.     The Hearing Committee met for several hours in December 2024 after all submissions were received to deliberate concerning each of the allegations, and reached a unanimous decision regarding its findings and recommendations. Ex. 46, Findings and Recommendations (HARV00022816) at -818.

## X.     THE HEARING COMMITTEE'S FINDINGS AND RECOMMENDATIONS

147.     On January 24, 2025, the Hearing Committee issued a written memorandum of its Findings and Recommendations. Ex. 46, Findings and Recommendations (HARV00022816).

148.     Despite their "████████████████████████████████████████████████████," and "█████████████████," the Hearing Committee found "███████████████████████████████████

29

███████████████████████████████████████████████████████████

█████" Ex. 46, Findings and Recommendations (HARV00022816) at -816, -825–26.

149.     The Hearing Committee "███████████████" Plaintiff's arguments and evidence to support her claims of innocence and "██████████████████████████." Ex. 46, Findings and Recommendations (HARV00022816) at -825–26.

150.     The Hearing Committee "██████████████████████████

███████████████████████████████████████████████████████████

██████." Ex. 46, Findings and Recommendations (HARV00022816) at -825.

151.     For each allegation and every study at issue, the Hearing Committee concluded that the data or description was altered, the alterations were intentional, and Plaintiff was responsible for the intentional alterations.  Ex. 46, Findings and Recommendations (HARV00022816) at -819.

152.     The Hearing Committee concluded that intentional and repeated data falsification and fabrication constitute grave misconduct or neglect of duty under the Third Statute.  Ex. 46, Findings and Recommendations (HARV00022816) at -819.

153.     The Hearing Committee considered all of Plaintiff's arguments and defenses, including "█████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████," and concluded that "██████████████████████████

30

███████████████████████████████████████████████.”  Ex. 46, Findings and Recommendations (HARV00022816) at -825–26.

154.     The Hearing Committee was "████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████" and determined that ████████

███████████████████████████████████████████████████

████████████████████████████████████" Ex. 46, Findings and Recommendations (HARV00022816) at -825–26.

155.     By a unanimous vote, the Hearing Committee recommended to the President and Fellows of Harvard College (the "Corporation") that Plaintiff be removed from her teaching appointment as a tenured professor of Harvard University.  Ex. 46, Findings and Recommendations (HARV00022816) at -816, -26.

156.     The Hearing Committee based their decision only on the record before it.  Ex. 62, at 143:13-22 (███████████████████████████████████████████).

157.     The Hearing Committee did not consider Plaintiff's then-pending lawsuit in making their findings and recommendations.  Ex. 62, at 91:22-92:15, 143:13-22; Ex. 61, at 105:17-106:13.

## XI.     THE PRESIDENT AND FELLOWS' REVIEW AND DECISION

158.     On January 24, 2025, the Hearing Committee's Findings and Recommendations were transmitted to the Corporation, the University's main governing board.  Ex. 47, Letter from Hearing Committee's Counsel to Harvard Vice President M. Goodheart (HARV00022827).

31

159.    On March 14, 2025, Plaintiff submitted a detailed response to the Hearing Committee's Findings and Recommendations through Harvard Law School Professor Lawrence Lessig.  Doc. No. 126-2, Further Arguments of Plaintiff.

160.    The Corporation reviewed Plaintiff's submission, along with the full record of the Third Statute proceeding.  Ex. 63, Excerpts from Harvard 30(b)(6) Witness S. Glassburn Deposition Transcript ("Harvard 30(b)(6) Dep. Tr.") at 83:9-18.[5]

161.    On May 15, 2025, the Corporation met and voted unanimously to accept the Hearing Committee's findings and to remove Plaintiff from her tenured appointment at Harvard. Ex. 63, Harvard 30(b)(6) Dep. Tr. at 86:18-87:12.

162.    Plaintiff's tenure was revoked and her appointment at HBS was terminated in May 2025.  TAC ¶ 21.

## XII.    THIS LAWSUIT AND HARVARD'S COUNTERCLAIM

163.    On August 2, 2023, Plaintiff filed her initial complaint in this case.  Doc. No. 1, Complaint.

164.    On October 31, 2023, Plaintiff filed an administrative Charge of Discrimination with both the Massachusetts Commission against Discrimination and the United States Equal Employment Opportunity Commission against Defendants.  TAC ¶ 33.

165.    On August 18, 2025, Defendants filed their Answer to Plaintiff's Third Amended Complaint, which asserted a counterclaim for defamation based on Plaintiff's knowingly false statements that HBS overlooked a key data file in its investigation.  Doc. No. 127, Answer to TAC; *see* Ex. 60, May 27, 2026 Expert Report of J. Ackert.

---

[5] One fellow recused herself.  Ex. 63, Harvard 30(b)(6) Dep. Tr. at 54:8-55:21.

166.    Harvard decided to file its counterclaim after learning of Plaintiff's deliberate falsification of records and backdating of a file to impugn the HBS Investigation Committee because it felt "████████████████████████████████" and "████████████████ Ex. 50, Greenwood Dep. Tr. at 223:1-11.

Dated: June 23, 2026                              Respectfully submitted,

                                                 */s/ Douglas E. Brayley*
                                                 Douglas E. Brayley (BBO# 674478)
                                                 Jenny K. Cooper (BBO# 646860)
                                                 Elena W. Davis (BBO# 695956)
                                                 Stephanie D. Porges (BBO# 703381)
                                                 ROPES & GRAY LLP
                                                 800 Boylston Street
                                                 Boston, MA 02199-3600
                                                 Tel: (617) 951-7000
                                                 Douglas.Brayley@ropesgray.com
                                                 Jenny.Cooper@ropesgray.com
                                                 Elena.Davis@ropesgray.com
                                                 Stephanie.Porges@ropesgray.com

                                                 Laura G. Hoey (BBO# 650643)
                                                 ROPES & GRAY LLP
                                                 191 North Wacker Drive
                                                 32nd Floor
                                                 Chicago, IL 60606
                                                 Telephone: (312) 845-1200
                                                 Laura.Hoey@ropesgray.com

                                                 *Attorneys for Defendants President and Fellows of Harvard College and Srikant Datar*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 23, 2026, this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.


Dated: June 23, 2026

                                    */s/ Douglas E. Brayley*
                                    Douglas E. Brayley