# EXHIBIT 83

**Exhibit 2**

**Notice of Inquiry Sent to Respondent on October 27, 2021**



# HARVARD | BUSINESS | SCHOOL

**ALAIN BONACOSSA**
RESEARCH INTEGRITY OFFICER

**Confidential**

October 27, 2021

RE: Notice of Inquiry Related to Allegations of Research Misconduct

Dear Professor Gino,

As the Research Integrity Officer for the Harvard Business School (HBS), I am writing to inform you that HBS will conduct an inquiry (Inquiry) into concerns that have been raised as to whether you falsified and/or fabricated data in the following publications (Appendix B):

> Gino, F., Kouchaki, M., & Casciaro, T. (2020). Why connect? Moral consequences of networking with a promotion or prevention focus. Journal of Personality and Social Psychology, 119(6), 1221–1238 ("*2020 JPSP Paper*")

> Gino, F., Kouchaki, M., & Galinsky, A. D. (2015). The moral virtue of authenticity: How inauthenticity produces feelings of immorality and impurity. Psychological Science, 26(7), 983–996 ("*2015 Psychological Science Paper*")

> Gino, F., & Wiltermuth, S. S. (2014). Evil genius? How dishonesty can lead to greater creativity. Psychological Science, 25(4), 973–981 ("*2014 Psychological Science Paper*")

> Shu, L. L., Mazar, N., Gino, F., Ariely, D., and Bazerman, M. H. (2012). Signing at the beginning makes ethics salient and decreases dishonest self-reports in comparison to signing at the end. Proceedings of the National Academy of Sciences of the United States of America, 109, 15197–15200 ("*2012 PNAS Paper*")

The specific allegations can be found in Appendix A to this letter. The Inquiry will be conducted in accordance with the HBS Interim Policy and Procedures for Responding to Allegations of Research Misconduct ("HBS Policy;" see Appendix C), which defines research misconduct as "fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results." Fabrication is defined as "making up data or results and recording or reporting them," and falsification is defined as "manipulating research materials, equipment, or processes, or changing or omitting data or results such that the research is not accurately represented in the research record." (HBS Policy, Appendix C).

SOLDIERS FIELD | BOSTON, MA 02163 | Ph 617.496.6348 | abonacossa@hbs.edu | **GEORGE F. BAKER FOUNDATION**

The Inquiry will be carried out by a faculty committee, appointed by Dean Datar, which shall be charged with assessing whether an investigation is warranted.[1]  Dean Datar has proposed to appoint the following faculty members to serve on the Inquiry Committee: Teresa Amabile (Chair) and Robert (Bob) Kaplan. Per the HBS Policy, you are afforded five (5) calendar days to lodge objections based upon a proposed committee member's alleged personal, professional, or financial conflict of interest. If you wish to lodge an objection, please do so in writing to me by Monday, November 1, 2021. The Dean or their designee will make the final determination as to whether a conflict exists.

The Inquiry Committee will want to interview you and others who may have relevant information, and I will reach out to you to set up a date and time. Any interviews will be audio recorded and transcribed and you will be given the opportunity to review and correct the transcript of your interview.  Per HBS policy, you may choose up to two personal advisors for support during the process. Personal advisors may be attorneys but may not be principals or witnesses in the research misconduct matter. Personal advisors may be present at any proceedings or interviews that the respondent attends but may not question witnesses or otherwise take part in the research misconduct proceedings. In lieu of or in addition to an interview, you also may wish to submit a written statement to the Committee.

At the conclusion of the Inquiry, the Committee will prepare a draft report with its conclusions and recommendations.  You will be provided with a copy of the draft report and given the opportunity to review and make comments for the Committee to consider before the report is finalized. The Inquiry Committee's final report, along with all exhibits and any comments you provided to the draft report, will be reviewed by the Dean or their designee, who will make a written determination as to whether an investigation is warranted. For further information regarding the Inquiry process, and research misconduct proceedings more generally, please refer to the HBS Policy (Appendix C).

It is essential that all materials, including documents, other physical things, and electronically-stored information, that relate in any way to the issues under review be produced at this time. If such information is located on the HBS campus, or on its computers and data and information systems, I ask that you promptly direct me to the location(s) of such information to facilitate sequestration as required by the HBS Policy. If you have in your possession any materials that relate to the issues under review, I ask that you contact me immediately to make arrangements to deliver them to me.  Please note that no materials relevant to the Inquiry should be altered or destroyed, even in the course, for example, of routine disposal of old papers or electronic files, extra copies, or drafts of documents.  Under the HBS Policy, the destruction of research records, absence of research records, or failure to provide research records adequately documenting the questioned research may be evidence of research misconduct.

We already have sequestered certain research records and other materials relating to your research in a secure manner. As part of the sequestration process, we also need to access and copy your HBS-issued devices and any other devices you may have used to conduct your research so as to complete the sequestration process. If you have not already done so, please bring the following devices to the HBS campus as soon as possible but no later than 5pm on Wednesday, October 27, 2021:

---

[1] An Inquiry's purpose is to decide if the allegations warrant an investigation. An investigation is warranted if there is: (i) a reasonable basis for concluding that the allegation falls within the definition of research misconduct and (ii) preliminary information-gathering and preliminary fact-finding by the faculty panel at Inquiry indicates that the allegation may have substance.  If this matter proceeds to investigation, an investigation panel will charged with conducting the investigation; this panel may include members of the inquiry panel at the Dean's discretion.

- Apple MacBook Pro – Serial# C02T2CB6GTF1
- Apple Mac Pro – Serial# F5NG0HAF694
- Dell Latitude E4310 – Serial# C98V0P1
- Apple Mac Pro – Serial# C02MR2DMFD59
- Apple MacBook Air – Serial# C02XQ15WJK7M

You should contact Christopher Pringle, HBS Information Security Officer, to coordinate this access (cpringle@hbs.edu or 617-495-6018). If there are extenuating circumstances that make it impossible for you to meet this deadline, please let me know as soon as possible. HBS will take a copy of these devices for the purposes of this review process and then will return them to you so that your work may continue with as little disruption as possible.

In addition to what is located at HBS, or on its computers and data and information systems, you also may have information relevant to the matters under review in third-party email services, on personal computers at home or elsewhere, in paper files in your personal possession, or otherwise located outside of HBS. As stated above, no materials relevant to the Inquiry should be altered or destroyed, even in the course, for example, of routine disposal of old papers or electronic files, extra copies, or drafts of documents. All such information must be preserved until HBS informs you that the review of the allegations has concluded and must be provided to the Inquiry Committee if requested.

Please understand that you are to take no steps to retaliate against anyone who came forward with the allegations or against anyone who may participate in the Inquiry process.

We consider this to be a confidential matter and will make every effort to ensure that confidentiality is maintained. Under the HBS Policy, you also are responsible for maintaining confidentiality and cooperating with the conduct of an inquiry. Please be assured that we are committed to a fair, thorough and objective process.

To ensure confidentiality, I will be your main point of contact throughout these proceedings and will be available to answer any questions you may have—about the policy and the process, as well as other issues that might arise—at any time. I can be reached at 617-496-6348 or abonacossa@hbs.edu.


Sincerely,

Alain Bonacossa

**APPENDIX A**
**ALLEGATIONS**

**Relevant Publications:**

Gino, F., Kouchaki, M., & Casciaro, T. (2020). Why connect? Moral consequences of networking with a promotion or prevention focus. Journal of Personality and Social Psychology, 119(6), 1221–1238 ("*2020 JPSP Paper*")

Gino, F., Kouchaki, M., & Galinsky, A. D. (2015). The moral virtue of authenticity: How inauthenticity produces feelings of immorality and impurity. Psychological Science, 26(7), 983–996 ("*2015 Psychological Science Paper*")

Gino, F., & Wiltermuth, S. S. (2014). Evil genius? How dishonesty can lead to greater creativity. Psychological Science, 25(4), 973–981 ("*2014 Psychological Science Paper*")

Shu, L. L., Mazar, N., Gino, F., Ariely, D., and Bazerman, M. H. (2012). Signing at the beginning makes ethics salient and decreases dishonest self-reports in comparison to signing at the end. Proceedings of the National Academy of Sciences of the United States of America, 109, 15197–15200 ("*2012 PNAS Paper*")

**Allegation 1:**

Dr. Gino falsified and/or fabricated the dataset for Study 3a in the *2020 JPSP Paper* by altering observations to affect the significance of findings of the study in the hypothesized direction. In particular:

(a) in the promotion-focus condition, by changing extreme values of "7" to "1" to drive the expected effect. Specifically, for 9 observations there seems to be a mismatch between participants' impurity ratings and the words participants chose to describe how they felt;

(b) in the prevention-focus condition, by changing some values of "1" to either "2" or "3" to drive the expected effect. A number of observations also show a mismatch between participants' impurity ratings and the words participants chose to describe how they felt.

**Allegation 2:**

Dr. Gino falsified and/or fabricated the datasets for Study 4 in the *2015 Psychological Science Paper* by altering a number of observations. Notably, 20 observations substantially contribute to the significance of the hypothesized effects, and these same 20 observations presented an anomalous response pattern,

in which study participants seemingly entered "Harvard" as their response to a question asking them to indicate "Year in School," in contrast to the vast majority of research participants who correctly answered this question.

**Allegation 3:**

Dr. Gino falsified and/or fabricated the datasets for Study 4 in the *2014 Psychological Science Paper* by altering a number of observations. In particular, when sorted by whether participants cheated on the task they were asked to perform and by how many uses for a newspaper they found, it appears there are 13 observations out of sort within the cheating condition. These observations substantially contribute to the significance of the hypothesized effects. When these observations are corrected with the values implied by the sort, the effect in the expected direction is no longer significant (from p=.0003 to p >.17)

**Allegation 4:**

With respect to Study 1 in the *2012 PNAS Paper:*

(a) Dr. Gino falsified and/or fabricated the results by removing part of the description of study instructions to research participants from a draft of the manuscript submitted for publication, thus misrepresenting the study procedures in the final publication. Such instructions pointed to a significant flaw in the execution of the data collection for Study 1, which called into question the validity of the study results.

(b) Dr. Gino falsified and/or fabricated the datasets by altering a number of observations. In particular, when sorted by "experimental condition" and by "participant ID number," the dataset for Study 1 appears to include 1 duplicate observation and 8 observations where the "participant ID number" is out of sort. The out of sort observations substantially contribute to the significance of the hypothesized effects.

**Appendix B**

**Articles Referenced in Appendix A**


AMERICAN
PSYCHOLOGICAL
ASSOCIATION

Journal of Personality and Social Psychology:
Attitudes and Social Cognition

© 2020 American Psychological Association
ISSN: 0022-3514

2020, Vol. 119, No. 6, 1221–1238
http://dx.doi.org/10.1037/pspa0000226

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

## ATTITUDES AND SOCIAL COGNITION

# Why Connect? Moral Consequences of Networking With a Promotion or Prevention Focus

Francesca Gino
Harvard University

Maryam Kouchaki
Northwestern University

Tiziana Casciaro
University of Toronto

Networks are a key source of social capital for achieving goals in professional and personal settings. Yet, despite the clear benefits of having an extensive network, individuals often shy away from the opportunity to create new connections because engaging in instrumental networking can make them feel morally impure. In this article, we explore how the motives people have when engaging in networking impact these feelings and, as result, change how frequently they engage in networking and their job performance. Across a correlational survey study, a laboratory experiment (with samples from the United States and Italy), two online studies, an organizational network survey study, and a field experiment with professionals (total $N = 2,551$), we examine how self-regulatory focus, whether promotion or prevention, affects people's experience of and outcomes from networking. We find that a promotion focus, as compared to a prevention focus or a control condition, is beneficial to professional networking, as it lowers feelings of moral impurity from instrumental networking. As such, networking with a promotion focus increases the frequency of instrumental networking as compared to a control condition, whereas networking with a prevention focus decreases frequency of instrumental networking as compared to a control condition.

*Keywords:* networking, impurity, morality, motivation, regulatory focus

The importance of professional networks for work performance and career advancement has been well-established in hundreds of empirical studies (for reviews, see Borgatti & Foster, 2003; Brass, Galaskiewicz, Greve, & Tsai, 2004; Borgatti, Mehra, Brass, & Labianca, 2009; Fang et al., 2015). More recently, a growing literature has documented that networking behaviors—commonly defined as individuals' efforts to develop and maintain relationships with others who can potentially provide assistance to them in their career or work (Forret & Dougherty, 2004)—are critical to developing such professional networks (Adler & Kwon, 2002).

Despite the benefits people derive from having an extensive and diverse network, they often shy away from playing an active role in cultivating professional connections (Belmi & Laurin, 2016; Bensaou, Galunic, & Jonczyk-Sédès, 2013; Wanberg, Kanfer, & Banas, 2000). In exploring this phenomenon, Casciaro, Gino, and Kouchaki (2014) showed that when networking is the result of individuals' intentional (instrumental) effort to form connections that will help them attain a professional goal (as opposed to social and spontaneous forms of networking), they tend to feel inauthentic and dirty because they have difficulty justifying the selfish intent behind instrumental professional networking morally. This research also showed that people deem instrumental professional networking to be more morally acceptable when they have power and therefore have more to give, because they can more readily self-justify networking as potentially beneficial to others (Casciaro et al., 2014). Yet power is largely an objective experience based on the asymmetric distribution of valued resources in social relations (Magee & Galinsky, 2008); because power is driven by structural and contextual forces, people with lower power may therefore have limited psychological agency to make instrumental professional networking morally palatable to them.

In this article, we wish to identify more universal ways in which people can transform their moral experience of intentional networking as they engage in it to pursue professional goals. We propose that

This article was published Online First June 18, 2020.

Francesca Gino, Harvard Business School, Harvard University; Maryam Kouchaki, Kellogg School of Management, Northwestern University; Tiziana Casciaro, Rotman School of Management, University of Toronto.

All three authors contributed equally and are listed in alphabetical order by first name. All studies' materials can be found on OSF at https://osf.io/kf2ut/?view_only=26073af04f9046cd9e0a62159a5755d4, together with the data from Studies 1, 3A, and 3B.

Correspondence concerning this article should be addressed to Maryam Kouchaki, Kellogg School of Management, Northwestern University, 2211 Campus Drive, Evanston, IL 60208. E-mail: m-kouchaki@kellogg.northwestern.edu

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

people's motives when engaging in instrumental professional networking predict the extent to which they feel inauthentic and morally impure in the process. Specifically, we argue that self-regulatory focus, in the form of prevention and promotion, provides an essential motivational basis for networking behavior which shapes the emotional and psychological experience of networking. Building on earlier self-regulation models (Bowlby, 1969; Higgins, 1987), regulatory focus theory (RFT; Higgins, 1997) identifies two motivational systems that regulate two different basic needs. The promotion-focus system serves nurturance needs. People in a promotion focus care about growth, advancement, and accomplishment, and strive toward ideals, wishes, and aspirations. The prevention-focus system, instead, regulates security needs. People in a prevention focus care about safety, maintaining the status quo, and meeting their responsibilities and duties (Friedman & Förster, 2001; Sacramento, Fay, & West, 2013).

With this research, we aim to advance scholarly understanding of the moral psychology of networking in four ways. First, we theorize that people's motivational approach—promotion versus prevention—predicts how morally impure they feel from instrumental networking for professional goals. Casciaro et al. (2014) demonstrated how moral impurity is heightened by certain types of networking behaviors and not others, and found evidence that impurity reduces the frequency of networking, and thus performance. Though insightful, their research is silent on what people could do to change their perspective toward instrumental networking to avoid the costs of withdrawing from it, nor do Casciaro and her colleagues shed light on the role that motives play in developing and nurturing professional ties. Here, we extend this work by arguing and showing that promotion and prevention focus are independent predictors of how people experience instrumental networking and how much, as a result, they engage in it.

Second, we further develop the theoretical link between regulatory foci and morality advanced by Cornwell and Higgins (2015) and establish it empirically. Third, we elaborate on the theoretical path between people's motives to engage in instrumental professional networking, their experience of moral impurity, and how frequently they network. Fourth, we aim to establish that this path persists across three forms of regulatory focus: (a) the chronic disposition (Higgins, 1997, 1998), (b) the temporarily activated psychological state (Liberman, Idson, Camacho, & Higgins, 1999), and (c) a domain-specific form of promotion and prevention focus (Browman, Destin, & Molden, 2017), which we introduce to allow for the possibility that general trait and state regulatory foci may differ systematically from how a promotion and a prevention focus regulate a specific behavior, such as networking.

### How Motives Influence Moral Purity and Networking

### Self-Regulatory Foci and Moral Impurity

RFT states that promotion and prevention are mutually inhibitory modes of self-regulation: When one mode is unavailable or blocked, the other mode kicks in to compensate (Higgins, 1998). So, while a person may approach the same goal with both promotion and prevention, only one of the two systems is actively engaged in achieving the goal at any point in time. When pursuing goals, people commonly use either a promotion or a prevention mode, and they can switch modes (Shah, Higgins, & Friedman,

1998). Which system is engaged at any given time depends on the characteristics of the situation and the person's regulatory orientation (Higgins, 1997; Strauman, 1996).

Regulatory focus is studied as either a chronic disposition people have (Higgins, 1997, 1998) or a psychological state that is temporarily activated, such that a person's emphasis on one over the other is primed by cues in the external environment (Friedman & Förster, 2001; Liberman et al., 1999). In addition to chronic and state forms of regulatory foci, we echo developments in regulatory-focus theory (Browman et al., 2017) by exploring a domain-specific form of regulatory foci, networking-specific promotion and prevention focus, to introduce the possibility that generalized trait and state regulatory foci may differ systematically from how a promotion and a prevention focus regulate a specific behavior.

Regulating behavior via promotion and prevention foci influences goal attainment in various performance domains. This is because a person's regulatory focus affects the strategies the person uses to get to their goals (e.g., surpassing a high score) and to overcome challenges that impede attainment of those goals (e.g., getting over an error limit; Higgins, 1998). Because regulatory focus influences people's performance, its role has been studied in organizations too (Brockner & Higgins, 2001; Johnson, Chang, & Yang, 2010; Wallace, Johnson, & Frazier, 2009). This research shows that whether people approach work with a promotion or prevention focus is related to distinct behaviors that are organizationally relevant, including productivity, innovation, and safety compliance (e.g., De Cremer, Mayer, van Dijke, Bardes, & Schouten, 2009; Wallace et al., 2009). For instance, Wallace and Chen (2006) found that prevention focus is positively and strongly related to safety behavior, while promotion focus is negatively and weakly related to it.

Similarly, regulatory focus can influence how people experience their social networks and how intensely they engage in professional networking. A promotion focus leads people to notice and remember information and emotions that result from positive outcomes, thus further directing their behavior toward achieving them (Higgins, Roney, Crowe, & Hymes, 1994; Higgins, Shah, & Friedman, 1997; Higgins & Tykocinski, 1992). Promotion-focused people invest their energy in activities that allow them to grow or fulfill their aspirations, and away from those that translate into sticking to the status quo (Neubert, Kacmar, Carlson, Chonko, & Roberts, 2008). By contrast, a prevention focus leads people to pay attention to and remember information and emotions they experienced at some point in their past as a result of losses, failures, or punishments (Higgins & Tykocinski, 1992). As a result, prevention-focused individuals are vigilant and concerned with accuracy when approaching tasks (Förster, Higgins, & Bianco, 2003), as they seek to meet their obligations and others' expectations (Higgins, 1997, 1998). Therefore, a prevention focus leads people to engage in actions that will likely avoid negative outcomes and comply with expectations or policies set by others (Higgins et al., 1994). These motivational orientations lead individuals with a high prevention focus to derive greater life satisfaction when they are part of a highly dense network that allows them to meet obligations and responsibilities. People with a high promotion focus, instead, derive greater life satisfaction from a low-density network that supports creative inspiration and personal development (Zou, Ingram, & Higgins, 2015). Likewise, a promotion focus increases the frequency of professional network-

ing, whereas a prevention focus decreases it (Pollack, Forster, Johnson, Coy, & Molden, 2015).

We inform and deepen these insights by theorizing that the relationship between self-regulatory focus and networking behavior hinges on morality. We posit, in particular, that promotion and prevention regulatory foci have distinct consequences for an individual's sense of moral purity and authenticity when engaging in instrumental professional networking. Our arguments hinge on a moral psychology of motivation that reflects advances in contemporary moral philosophy. A building block for such theorizing stems from Cornwell and Higgins (2015), who underscored the existence of two ethical systems that motivate human behavior, mirroring the dual-process approach to motivation of RFT (Higgins, 1998). Specifically, Cornwell and Higgins (2015) posited that both promotion and prevention regulatory foci have ethical implications: prevention focus refers to "a system of ethical *oughts* that is concerned with maintaining obligations," while promotion focus refers to "a system of ethical *ideals* that is concerned with attaining virtues" (Cornwell & Higgins, 2015, p. 312). When motivated by the pursuit of ethical oughts, the individual responds to duties and obligations imposed externally. By contrast, ethical ideals are internally held aspirations that the individual pursues freely.

Contemporary philosophy in turn sheds lights on the diametrically different implications that ethical oughts and ethical ideals have for authenticity. A fundamental premise of moral philosophy, from Hegel's phenomenology to Nietzsche and Sartre's existentialist analyses, is that conducting one's life by conforming to prevailing morality—that is, in pursuit of the "ought" self—compromises authenticity as an ethical ideal (Varga, 2012). Hegel contrasts the "authentic self" that is incessantly committed to self-creation from the "honest individual" who submits to prevailing duties and thus nullifies the urge of the human spirit to live in complete freedom. In doing so, the "honest individual" in Hegel's analysis is a hypocrite who lacks real freedom and suffers from self-alienation (Golomb, 1995). Hegel's premise paved the way for the existentialist revolution in modern moral philosophy, in which "the concept of authenticity is a protest against the blind, mechanical acceptance of an externally imposed code of values" (Golomb, 1995, p. 11). Rejecting premodern views of morality as justified by recourse to some higher authority, an ethic of authenticity is guided instead by motives and reasons that express a subject's core individuality (Taylor, 1991), the ideal self (Cornwell & Higgins, 2015). An ethic of authenticity does not object to the normative content of motives but focuses instead on how a motive "fits with the wholeness of a person's life, and whether and how it expresses who the person is" (Varga, 2012, p. 12).

Consistent with these arguments, Kim and colleagues (Kim, Chen, Davis, Hicks, & Schlegel, 2019) theorized a link between prevention and promotion self-regulatory focus—defined as the pursuit of externally imposed oughts versus personally held ideals, respectively (Cornwell & Higgins, 2015)—and subjective authenticity. According to their argument, "certain behaviors feel more natural and less constrained by external influences. When individuals engage in these actions, their subsequent psychological mindsets contribute to the expression of core values and thus enhance subjective authenticity"; it follows that "promotion focus, relative to prevention focus, functions similarly in fostering authentic experiences" (Kim et al., 2019, p. 166). Evidence from both correlational studies and controlled experiments consistently supported a link between promotion focus and

subjective authenticity, in the context of both goal pursuit and interpersonal interaction (Kim et al., 2019).

The moral psychological foundations of this association between regulatory focus and subjective authenticity are further corroborated by theory and evidence that people experience feelings of authenticity as moral and pure; conversely, feelings of inauthenticity are experienced as immoral and impure (Gino, Kouchaki, & Galinsky, 2015). These different streams of work in moral philosophy and moral psychology, then, consistently provide arguments suggesting that prevention self-regulatory focus increases feelings of moral impurity because fulfilling the ought-self compromises authenticity; by contrast, promotion self-regulatory focus is negatively linked to moral impurity because fulfilling the ideal-self does not compromise authenticity.

These arguments can be readily applied to the context of instrumental networking. Namely, making professional connections with a prevention focus stems from an ethic consisting of a sense of professional duty and adherence to behavioral norms in one's field of activity. Prevention-focused instrumental networking is therefore likely to induce feelings of inauthenticity and moral impurity because the motivation to network instrumentally stems from oughts that a professional context imposes on the individual. By contrast, people who engage in instrumental networking with a promotion focus do so to achieve the aspirations of their ideal self. They are motivated by the pursuit of advances and virtues that express their core individuality (Taylor, 1991), instead of mechanically accepting an externally imposed code of values (Golomb, 1995). They are thus likely to experience instrumental networking as more authentic and morally pure than prevention-focused networkers are.

According to moral psychology research, morality can be thought in terms of purity and cleanliness (Zhong & Liljenquist, 2006). When people experience moral threats by acting in ways that are not consistent with their moral values (e.g., by cheating when caring about honesty), they feel a greater need to cleanse physically, and cleansing-related concepts become more accessible in their minds (Zhong & Liljenquist, 2006). Thus, moral threats lead people to engage in cleansing so that they can reaffirm their values and clean their tainted consciences (Tetlock, Kristel, Elson, Green, & Lerner, 2000). Regulatory focus may therefore predict how inauthentic and dirty people feel in engaging in instrumental networking. Specifically, a promotion focus may yield networking concerned with authentic virtues and meeting one's ethical ideal, and a prevention focus may yield networking motivated by the "shoulds" prevailing in one's professional environment and thus triggers feelings of inauthenticity and impurity (Gino et al., 2015). Thus, we hypothesize, engaging in instrumental networking with a prevention focus increases feelings of inauthenticity and dirtiness, whereas a promotion focus decreases them. As a result, people who engage in instrumental networking with a prevention focus will experience higher levels of moral impurity as compared to those with a promotion focus.

## Moral Impurity and the Frequency of Instrumental Networking

People vary in terms of both how likely they are to network and how frequently they engage in networking behavior (Forret & Dougherty, 2001; Wanberg et al., 2000), in part because they

GINO, KOUCHAKI, AND CASCIARO

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

have different attitudes toward networking (Azrin & Besalel, 1982). Those with low "networking comfort" (i.e., embarrassment and discomfort when asking others for job leads or advice; Wanberg et al., 2000) or even stronger feelings of moral impurity (which underlies networking discomfort; Casciaro et al., 2014) tend to engage in networking less often than others (Casciaro et al., 2014; Wanberg et al., 2000). Given that a promotion focus versus a prevention focus results in lower levels of feelings of impurity and authenticity when engaging in instrumental networking, we expect people in a promotion focus to engage in instrumental networking more frequently than those in a prevention focus because the former approach lowers feelings of moral impurity.

## Instrumental Networking Frequency and Job Performance

Finally, we wish to further corroborate existing theory and evidence on the consequences of disengaging from instrumental networking on a professional's job performance (Casciaro et al., 2014; Forret & Dougherty, 2001, 2004; Pollack et al., 2015; Wolff & Moser, 2009). Consistent with that prior work, we expect that more frequent instrumental networking will give people greater access to valuable information, opportunities and resources, and thus will lead them to perform better in their jobs.

Given that a promotion focus results in greater frequency of instrumental networking, we expect people with a promotion focus to also experience higher levels of performance. We also expect prevention focus to result in lower frequency of networking and thus lower levels of performance. Figure 1 summarizes the predicted associations between regulatory focus, moral impurity, frequency of instrumental professional networking, and job performance.

## Overview of the Studies

We tested our main hypotheses in six complementary studies of the consequences of regulatory focus for the moral experience of professional instrumental networking, relying on both correlational and causal evidence and using measures capturing either trait regulatory focus (general and domain-specific) or state regulatory focus (see Figure 2 for an overview).

In Study 1, we tested our predictions using a correlational design in which we measured individuals' chronic regulatory focus and assessed their feelings of moral impurity. In Study 2, a laboratory experiment conducted both in the United States (Sample A) and in Italy (Sample B), we manipulated regulatory focus and provided causal evidence for a relationship between people's state regula-

tory focus and their feelings of moral impurity from instrumental networking for professional goals. In Studies 3A and 3B, we use online samples to provide further evidence for these relationships using designs that also include a control condition in addition to a prevention-focus and a promotion-focus condition. In Study 4, we conducted a cross-sectional survey of lawyers in a law firm to test our predictions in a field context, where we measured trait promotion and prevention foci both as a general orientation and one specific to networking. We tested for a serial mediation from a lawyer's trait promotion and prevention focus, to feelings of moral impurity they experience when they network instrumentally, to the frequency with which they network, and to their job performance. Finally, in Study 5, we used a field experiment with working professionals to test the causal link between state networking-specific regulatory focus, moral purity, and frequency of instrumental professional networking.

We report all participants recruited, all experimental conditions, and all measures in each of our studies. The sample size for each study was determined before data collection began. We calculated our sample size based on an estimate of medium effect size ($f = 0.25$), requiring a sample size of approximately 50 participants per condition for a study powered at 80%. These numbers are also consistent with the recommendations of Simmons, Nelson, and Simonsohn (2013). For the laboratory and field studies, the final number was dictated by the availability of participants, we targeted more participants hoping to recruit at least about 50 of them for each condition. For our correlational studies, an a priori power analysis with 80% power and assuming modest correlations among variables ($r = .25$) requires about 99 participants, however, we targeted larger samples at the outset, which would provide higher power to detect a small to medium effect size.

All studies' materials can be found on OSF at https://osf.io/kf2ut/?view_only=26073af04f9046cd9e0a62159a5755d4, together with the data from Studies 1, 3A and 3B. The consent form used in Studies 2 and 5 stated that we would not be sharing any data outside of the research team, even if the data were deidentified. We collected data for these studies before the institutional review board changed the recommended language on consent forms, to allow for data sharing and posting. For Study 4, we are prohibited from sharing the data by a nondisclosure agreement with the law firm where the data was collected.

## Study 1

Study 1 used a correlational design to examine how chronic promotion and prevention regulatory focus affect people's feelings of moral impurity from instrumental networking.



*Figure 1.* Summary of predicted associations.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

| Study | Design | Tested Associations | | | | | | Regulatory Focus Measure |
|---|---|---|---|---|---|---|---|---|
| 1 | Correlational study of M-Turk working adults | Promotion focus — (−) → Moral Impurity from Instrumental Networking ← (+) Prevention focus | | | | | | Trait regulatory focus |
| 2 | Laboratory experiment with students in US and Italian universities | Promotion focus (vs. prevention focus) — (−) → Moral Impurity from Instrumental Networking | | | | | | State regulatory focus |
| 3A and 3B | Online studies of M-Turk working adults | Promotion focus (vs. Control) — (−) → / Prevention focus (vs. Control) — (+) → Moral Impurity from Instrumental Networking → (−) Networking Intentions | | | | | | State regulatory focus (and control condition) |
| 4 | Cross-sectional survey study of law firm | Promotion focus — (−) → / Prevention focus — (+) → Moral Impurity from Instrumental Networking → (−) Frequency of Instrumental Networking → (+) Job Performance | | | | | | Trait & Domain-specific regulatory focus |
| 5 | Field experiment with working professionals | Promotion focus (vs. prevention focus) — (−) → Moral Impurity from Instrumental Networking → (−) Frequency of Instrumental Networking | | | | | | Domain-specific state regulatory focus |

*Figure 2.* Overview of studies.

## Method

**Participants.** A total of 412 people ($M_{age}$ = 36.28, $SD$ = 9.05, 56% male) from Amazon Mechanical Turk (MTurk; all located in the United States) participated in a two-part study for $2. They received $0.50 for completing Part 1 and $1.50 for completing Part 2. We initially recruited 500 people, but only 412 completed both Parts 1 and 2; thus, we used this smaller sample in our analyses.

**Procedure.** The initial instructions that welcomed participants to the study included three attention checks. Those who failed one or more received a message letting them know that they did not qualify for the study given their answer. Their data was not recorded.

In Part 1, participants first indicated their age and gender. Next, they completed the Composite Regulatory Focus Scale (Haws, Dholakia, & Bearden, 2010), which measures a person's trait promotion and prevention regulatory focus on a 7-point scale (ranging from 1 = *strongly disagree* to 7 = *strongly agree*). A sample item for promotion focus is "I see myself as someone who is primarily striving to reach my 'ideal self'—to fulfill my hopes, wishes, and aspirations." A sample item for prevention focus is "I see myself as someone who is primarily striving to become the self I 'ought' to be—to fulfill my duties, responsibilities, and obligations."

We contacted participants four days later for the second part of the study. In Part 2, participants received the following instructions:

> You will now be asked to recall a certain event and then write about it for about five minutes. We are interested in how people remember and reflect on

events from their past. You will then be asked to answer a few questions.

We asked all participants to recall a situation in which they engaged in professional instrumental networking. The instructions (adapted from Casciaro et al., 2014) read,

> Please recall a time in your professional life where you did something with the intention of strategically making a professional connection. We are interested in a situation where you tried to create or maintain relationships that would aid the execution of work tasks and your professional success.
>
> Other people engaging in this type of introspective task frequently write about instances where they attended receptions or networking events because they wanted to meet potential clients or higher status colleagues.
>
> Please describe the details about this situation. What was it like to be in this situation? What thoughts and feelings did you experience?
>
> Please provide as many details as possible so that a person reading your entry would understand the situation and how you felt.

Next, to test the relationship between participants' self-regulatory focus and the feeling of moral impurity they experience when engaging in instrumental networking, we measured participants' feelings of impurity.

**Moral impurity.** Using a 7-point scale (ranging from 1 = *not at all* to 7 = *very much*), participants indicated the extent to which the situation they described made them feel dirty, tainted, inauthentic, and ashamed ($\alpha$ = .90; adapted from Casciaro et al., 2014). Though drawing on prior research, these items may evoke prevention rather than promotion focus. Thus, we also

GINO, KOUCHAKI, AND CASCIARO

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

included items that are more regulatory-focus neutral: wrong, unnatural and impure ($\alpha = .84$; from the moral foundation questionnaire, Graham et al., 2011). When conducting a factor analysis, we found that the seven items loaded onto the same factor, so we also created a composite measure by averaging all items ($\alpha = .94$).

**Comprehension check.** We asked participants to indicate whether they wrote about a professional or personal situation in the initial writing task they had completed.

## Results

All answers to the comprehension check question were correct. Table 1 reports the descriptive statistics and bivariate correlations among the main variables we measured in this study. As expected, on all three ways we constructed a measure of moral impurity (the four-item measure, the three-item measure with regulatory-focus neutral words, and the composite seven-item measure), we found a negative and significant correlation between the promotion orientation index and feelings of impurity, and a positive and significant correlation between the prevention orientation index and feelings of impurity.

We also conducted partial correlations analyses to test for the independent effects of a promotion focus and a prevention focus on felt moral impurity. When controlling for prevention, the promotion orientation index was negatively correlated with feelings of impurity ($r = -.10$, $p = .04$ for the four-item measure, $r = -.10$, $p = .055$ for the three-item measure with regulatory-focus neutral words, and $r = -.10$, $p = .04$ for the seven-item measure). When controlling for promotion, the prevention orientation index was positively correlated with feelings of impurity ($r = .18$, $p < .001$ for the four-item measure, and $r = .19$, $p < .001$ for the three-item measure with regulatory-focus neutral words, and $r = .19$, $p < .001$ for the seven-item measure).

## Discussion

The results of Study 1 provide initial evidence for the relationship between regulatory focus and feelings of moral impurity that people commonly experience when engaging in instrumental professional networking.

## Study 2

In Study 2, we moved to the controlled environment of the laboratory to examine how promotion and prevention regulatory focus influence how people feel when engaging in instrumental professional networking. In this study, we included two manipulations: one for regulatory focus (promotion vs. prevention) and another for the type of professional networking (instrumental vs. spontaneous). Previous work by Casciaro and colleagues (2014) distinguished between instrumental networking, where a person initiates a social relationship proactively and with the goal of obtaining benefits (e.g., advancement or an advantage), and spontaneous networking, where the social tie emerges naturally, with no premeditated purpose, and is initiated by someone else. The authors found that the former leads to greater feelings of dirtiness and inauthenticity than the latter. We build on this work by examining the effect of regulatory focus for each type of profes-

sional networking. We also extend our findings from Study 1 by examining regulatory focus triggered in the moment rather than measured as an individual difference. To examine the contextual robustness of our findings, we collected data on two culturally different samples of students, one from the United States and one from Italy. This allowed us to test our main proposition in two different cultures.

Across our main dependent measures of interest (i.e., feelings of moral impurity and desire to physically cleanse), we expect to find a significant interaction between the two manipulations, such that a promotion focus leads to lower feelings of moral impurity and a lower desire to cleanse oneself than a prevention focus in the case of instrumental networking, but regulatory focus leads to no differences on these measures in the case of spontaneous networking.

## Method

**Participants and design.** Participants were randomly assigned to one of four conditions in a 2 (Type of Networking: instrumental vs. spontaneous) $\times$ 2 (Motive: promotion vs. prevention focus) between-subjects design.

**Sample A.** A total of 367 students ($M_{age} = 21.93$, $SD = 2.91$; 43% male) recruited through a U.S. university-affiliated research pool participated in the study. Participants received $20 for completing the experiment.

**Sample B.** A total of 254 students ($M_{age} = 20.80$, $SD = 1.76$; 54% male) recruited through an Italian university-affiliated research pool participated in the study. Participants received €15 for completing the experiment. All the materials (including the word completion task) were translated into Italian.

**Procedure.** We used the same procedure in each sample but used materials translated into Italian for the Italian sample.[1] Participants read initial instructions that welcomed them to the study. Next, we asked them to complete a writing task, which was intended to manipulate regulatory focus (as in Freitas & Higgins, 2002). The instructions specified that we were "interested in detailed writing skills, and in the way people naturally express themselves." In the promotion condition, the instructions (as in Zhang, Higgins, & Chen, 2011) read, "Please think about something you ideally would like to do. In other words, think about a hope or aspiration that you currently have. Please list the hope or aspiration below." In the prevention condition, the instructions read, "Please think about something you think you ought to do. In other words, think about a duty or obligation that you currently have. Please list the duty or obligation below."

Next, participants engaged in a task designed to manipulate the type of professional networking. Using the manipulation of instrumental versus spontaneous professional networking in Casciaro et al. (2014), we asked participants to put themselves in the shoes of the protagonist in the story they were about to read. Each story asked participants to imagine being invited to attend an event during which they socialized with other people. In the story used in the instrumental condition, the main character was described as "actively and intentionally pursuing professional connections with

---

[1] To ensure we had a proper translation of the materials, we first translated them from English to Italian (with the help of two Italian native speakers who are fluent in English) and then translated them back into English to resolve any inconsistency.

Table 1

*Descriptive Statistics and Correlations Among the Variables Collected in Study 1*

| | | Bivariate correlations | | | | |
|---|---|---|---|---|---|---|
| Variable | *M* (*SD*) | 1 | 2 | 3 | 4 | 5 |
| 1. Moral impurity (MI; 4 items) | 1.73 (1.27) | | | | | |
| 2. MI, regulatory-focus neutral (3 items) | 1.68 (1.26) | .89*** | | | | |
| 3. MI (7 items) | 1.71 (1.23) | .98*** | .96*** | | | |
| 4. Promotion orientation index | 5.18 (1.08) | −.13** | −.12* | −.13** | | |
| 5. Prevention orientation index | 4.57 (1.05) | .20*** | .21*** | .21*** | −.16** | |

* *p* < .05.    ** *p* < .01.    *** *p* < .001.

the belief that connections are important for future professional success" (from Casciaro et al., 2014). In the story used in the spontaneous condition, instead, the main character found herself or himself making connections rather than pursuing them intentionally.

Next, participants saw a list of behaviors and had to indicate the extent to which they found each of them to be desirable (1 = *completely undesirable* to 7 = *completely desirable*). We listed both cleansing behaviors (i.e., taking a shower, washing hands, and brushing teeth) and neutral behaviors (e.g., talking a walk, having something to eat, going to the movies, listening to music, reading a book, and watching TV), as in Zhong and Liljenquist (2006).

We then asked participants to report how they felt at that moment, by indicating the extent to which they felt various positive and negative emotions from the Positive and Negative Affectivity Schedule (Watson, Clark, & Tellegen, 1988), using a 5-point scale (1 = *very slightly or not at all*, 5 = *extremely*). Using the same scale, they also indicated how much they felt dirty, inauthentic, and impure (as in Gino et al., 2015) to assess feelings of moral impurity ($\alpha_{U.S.\_sample}$ = .64; $\alpha_{Italy\_sample}$ = .70). The order in which the Positive and Negative Affectivity Schedule items (negative affect, $\alpha_{U.S.\_sample}$ = .88, $\alpha_{Italy\_sample}$ = .85; positive affect, $\alpha_{U.S.\_sample}$ = .92, $\alpha_{Italy\_sample}$ = .87) and those used to measure feelings of impurity were presented to participants was random. Though we did not have predictions about positive and negative affect, we included these measures to show that our hypotheses are specific to moral emotions rather than general affect more broadly.

Next, we reminded participants of the writing task they had completed earlier. The instructions for the promotion (prevention) condition (adapted from Lalot, Quiamzade, & Falomir-Pichastor, 2018) read,

> Now please take a minute and think about what you wrote earlier about something *you ideally would like to do [you ought to do]*; in other words, think about *a hope or aspiration [a duty or obligation]* that you currently have. Please reflect on your experience for 1–2 min and then proceed to the next task.

We also reminded participants of the story they read and asked them to reflect on it for a minute or two and write a few words that came to mind regarding the story before proceeding to the next task.

Next, participants moved onto a word-completion task we used to measure how accessible cleansing was in their mind at that moment (adapted from Zhong & Liljenquist, 2006). In this task, participants need to turn word fragments into meaningful words by

relying on the first word they could think of. The task consisted of six word fragments. Three of them (W _ _ H, S H _ _ E R, and S _ _ P) could be turned into cleansing-related words (wash, shower, and soap) or into unrelated, neutral words (e.g., wish, shaker, and step), and the other three word fragments (F _ O _, B _ _ K, and P A _ _ R) could be turned only into unrelated, neutral words (e.g., food, book, and paper). Finally, participants indicated their age and gender.

## Results

We report the results of our analyses separately for each sample. Importantly, the nature and significance of the results did not vary based on the location where the data was collected.

**Sample A: Data collected in the United States.**

*Moral impurity.* A 2 (Regulatory Focus) × 2 (Type of Networking) between-subjects analysis of variance (ANOVA) using feelings of moral impurity as the dependent measure revealed a significant main effect of regulatory focus, $F(1, 363) = 4.41$, $p = .036$, $\eta_p^2 = .012$, such that participants who approached networking with a promotion focus reported feeling less impure ($M = 1.58$, $SD = 0.69$) than those who approached networking with a prevention focus ($M = 1.74$, $SD = 0.77$). The main effect of type of networking was also significant, $F(1, 363) = 5.63$, $p = .018$, $\eta_p^2 = .015$: Participants who imagined engaging in instrumental networking felt more impure ($M = 1.75$, $SD = 0.81$) than did those who imagined engaging in spontaneous networking ($M = 1.57$, $SD = 0.64$). Importantly, consistent with our predictions, the interaction of regulatory focus and type of networking was also significant, $F(1, 363) = 12.66$, $p < .001$, $\eta_p^2 = .034$. When participants imagined engaging in instrumental networking, they reported feeling less dirty when they had a promotion focus ($M = 1.53$, $SD = 0.66$) than when they had a prevention focus ($M = 1.96$, $SD = 0.88$), $F(1, 363) = 16.03$, $p < .001$. However, when they imagined engaging in spontaneous networking, they felt about equally impure, independent of their regulatory focus ($M_{promotion} = 1.62$, $SD = 0.71$ vs. $M_{prevention} = 1.51$, $SD = 0.56$), $F(1, 363) = 1.07$, $p = .30$.

*Negative and positive affect.* A similar 2 × 2 ANOVA using negative affect as the main dependent measure revealed no significant effects (all $ps > .18$). As for positive affect, we only found a marginally significant effect of type of networking, $F(1, 363) = 3.60$, $p = .059$, $\eta_p^2 = .01$: Participants who imagined engaging in instrumental networking reported lower positive affect ($M = 2.64$, $SD = 0.92$) than did those who imagined engaging in spontaneous

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

networking ($M = 2.82$, $SD = 0.89$). No other effects were significant ($ps > .24$).

*Cleansing behaviors.* As predicted, a 2 (regulatory Focus) × 2 (Type of Networking) between-subjects ANOVA using desirability of cleansing behaviors as the dependent variable revealed a significant interaction, $F(1, 363) = 4.15$, $p = .042$, $\eta_p^2 = .011$. When participants imagined engaging in instrumental networking, they reported a lower desire for cleansing behaviors when they had a promotion focus ($M = 4.37$, $SD = 1.16$) than when they had a prevention focus ($M = 5.02$, $SD = 1.13$), $F(1, 363) = 15.48$, $p < .001$. However, when they imagined engaging in spontaneous networking, they reported about the same degree of desire, independent of their regulatory focus ($M_{promotion} = 4.46$, $SD = 1.06$ vs. $M_{prevention} = 4.64$, $SD = 1.12$), $F(1, 363) = 1.11$, $p = .29$. When considering neutral behaviors, however, we did not find any significant effects (all $ps > .34$).

*Accessibility of cleansing-related words.* A similar 2 × 2 between-subjects ANOVA revealed a significant interaction between regulatory focus and type of networking, $F(1, 363) = 6.28$, $p = .013$, $\eta_p^2 = .017$, as predicted. When participants imagined engaging in instrumental networking, they generated fewer cleansing-related words when they had a promotion focus ($M = 1.08$, $SD = 0.97$) than when they had a prevention focus ($M = 1.40$, $SD = 0.88$), $F(1, 363) = 5.88$, $p = .016$. However, when they imagined engaging in spontaneous networking, they generated about the same number of cleansing-related words independent of their regulatory focus ($M_{promotion} = 0.99$, $SD = 0.87$ vs. $M_{prevention} = 0.84$, $SD = 0.93$), $F(1, 363) = 1.28$, $p = .26$.

**Sample B: Data collected in Italy.**

*Moral impurity.* A 2 (Regulatory Focus) × 2 (Type of Networking) between-subjects ANOVA using feelings of moral impurity as the dependent measure revealed the predicted significant interaction of regulatory focus and type of networking, $F(1, 250) = 9.57$, $p < .001$, $\eta_p^2 = .037$. When participants imagined engaging in instrumental networking, they reported feeling less impure when they had a promotion focus ($M = 1.70$, $SD = 0.62$) than when they had a prevention focus ($M = 2.27$, $SD = 0.82$), $F(1, 250) = 19.78$, $p < .001$. However, when they imagined engaging in spontaneous networking, they felt about equally impure, independent of their regulatory focus ($M_{promotion} = 1.66$, $SD = 0.62$ vs. $M_{prevention} = 1.67$, $SD = 0.74$), $F(1, 250) < 1$, $p = .89$.

*Negative and positive affect.* A similar 2 × 2 ANOVA using negative affect as the main dependent measure revealed no significant effects (all $ps > .44$). As for positive affect, we found a significant effect of regulatory focus, $F(1, 250) = 6.28$, $p = .013$, $\eta_p^2 = .024$: Participants in the prevention-focus condition reported lower positive affect ($M = 3.31$, $SD = 0.63$) than those in the promotion-focus condition ($M = 3.51$, $SD = 0.64$). No other effects were significant ($ps > .20$).

*Cleansing behaviors.* As predicted, a 2 (Regulatory Focus) × 2 (Type of Networking) between-subjects ANOVA using desirability of cleansing behaviors as the dependent measure revealed a significant interaction, $F(1, 250) = 11.18$, $p = .001$, $\eta_p^2 = .043$. When participants imagined engaging in instrumental networking, they reported a lower desire for cleansing behaviors when they had a promotion focus ($M = 4.27$, $SD = 1.21$) than when they had a prevention focus ($M = 5.09$, $SD = 1.22$), $F(1, 250) = 11.64$, $p = .001$. However, when they imagined engaging in spontaneous

networking, they reported about the same degree of desire, independent of their regulatory focus ($M_{promotion} = 4.46$, $SD = 1.31$ vs. $M_{prevention} = 4.15$, $SD = 1.58$), $F(1, 250) = 1.66$, $p = .20$. When considering neutral behaviors, however, we did not find any significant effects (all $ps > .14$).

*Accessibility of cleansing-related words.* A similar 2 × 2 between-subjects ANOVA revealed the predicted interaction between regulatory focus and type of networking, $F(1, 250) = 14.80$, $p < .001$, $\eta_p^2 = .056$. When participants imagined engaging in instrumental networking, they generated fewer cleansing-related words when they had a promotion focus ($M = 1.05$, $SD = 0.78$) than when they had a prevention focus ($M = 1.77$, $SD = 1.08$), $F(1, 250) = 20.45$, $p < .001$. However, when they imagined engaging in spontaneous networking, they generated about the same number of cleansing-related words independent of their regulatory focus ($M_{promotion} = 1.02$, $SD = 0.89$ vs. $M_{prevention} = 0.88$, $SD = 0.80$), $F(1, 250) < 1$, $p = .39$.

## Discussion

The results of our second study are consistent with our expectations and provide evidence that the motives people have when they approach networking influence how morally impure they feel after engaging in instrumental networking as well as their resulting desire to physically cleanse themselves. Specifically, a focus on promotion rather than prevention in approaching instrumental networking reduces both feelings of moral impurity and the desire to physically cleanse oneself. We found support for these relationships in two different samples, in the United States and in Italy, suggesting that our observed effects may hold across cultures.

## Study 3

In Studies 3A and B, both conducted online, we further examine the independent effects of promotion and prevention regulatory focus on feelings of impurity and intentions to engage in networking by also including a control condition in the experimental design.

## Study 3A

**Method.**

*Participants and design.* A total of 599 working adults recruited through MTurk ($M_{age} = 36.94$, $SD = 9.15$; 46% male), all located in the United States, participated in a 15-min online study, and received \$2 for their participation. We recruited 600 participants but only 599 completed the study in the time allotted. We randomly assigned participants to one of three conditions: control versus promotion focus versus prevention focus.

*Procedure.* Participants read initial instructions that welcomed them to the study. Next, we asked them to complete a writing task, which was intended to manipulate regulatory focus (as in Freitas & Higgins, 2002). The instructions specified that we were "interested in detailed writing skills, and in the way people naturally express themselves." In the promotion condition, the instructions (as in Zhang et al., 2011) read, "Please think about something you ideally would like to do. In other words, think about a hope or aspiration that you currently have. Please list the hope or aspiration below." In the prevention condition, the instruc-

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

tions read, "Please think about something you think you ought to do. In other words, think about a duty or obligation that you currently have. Please list the duty or obligation below." In the control condition, the instructions read, "Please think about something you usually do in the evening. Please list the activities you engage in during the evening on a typical day below."

Next, participants engaged in a task simulating instrumental networking. Similar to Casciaro et al. (2014), we asked participants to put themselves in the shoes of the protagonist in the story they were about to read. The story asked participants to imagine being invited to attend an event during which they socialized with other people. In the story, the main character was described as "actively and intentionally making professional connections with the belief that connections are important for future professional effectiveness" (from Casciaro et al., 2014).

Next, we asked participants to report how they felt at that moment, by indicating the extent to which they felt using the comprehensive list of 7 items from Study 1: dirty, inauthentic, and impure, ashamed, wrong, unnatural, and tainted ($\alpha = .95$). We then reminded participants of the writing task they had completed earlier. The instructions for the promotion (prevention) condition read,

> Now please take a minute and think about what you wrote earlier about something *you ideally would like to do [you ought to do]*; in other words, think about *a hope or aspiration [a duty or obligation]* that you currently have. Please reflect on your experience for 1–2 min and then proceed to the next task.

We also reminded participants of the story they read and asked them to reflect on it for a minute or two and write a few words that came to mind regarding the story before proceeding to the next task.

Next, all participants were asked to answer questions about their networking intentions, our main dependent measure. We relied on a measure used in prior work (Raj, Fast, & Fisher, 2017): a self-reported measure of the extent to which participants intended to engage in professional networking in the near future. Participants indicated the extent to which they believed they would seek to expand their professional network in the next month. We used the following four items: "To what degree will you try to strategically work on your professional network in the next month?"; "In the next month, how likely are you to voluntarily engage in behaviors that expand your professional network?"; "To what degree do you plan to establish new professional connections in the next month?"; and "In the next month, to what degree is having a strong professional network a goal that you plan to pursue?" Participants indicated their intention to network in the next month using a 7-point Likert-type scale (1 = *not at all*, 7 = *very much*). These items were averaged to create a composite measure of networking intentions ($\alpha = .96$). Finally, participants indicated their age and gender.

**Results.**

*Moral impurity.* Given that all items loaded onto one factor, we averaged them all into a composite measure of moral impurity ($\alpha = .95$).[2] We found that this seven-item measure varied by condition, $F(2, 596) = 17.69$, $p < .001$, $\eta^2_p = .056$. Participants felt more morally impure in the prevention-focus condition ($M = 2.39$, $SD = 1.36$) as compared to the promotion-focus condition ($M = 1.64$, $SD = 1.07$; $p < .001$) or the control condition ($M =$

1.93, $SD = 1.34$; $p < .001$). Moral impurity was also lower in the promotion-focus condition than in the control condition ($p = .024$).

*Networking intentions.* Networking intentions also varied by condition, $F(2, 596) = 19.84$, $p < .001$, $\eta^2_p = .062$. Participants indicated they would network less frequently in the future in the prevention-focus condition ($M = 4.07$, $SD = 1.70$) as compared to the promotion-focus condition ($M = 5.12$, $SD = 1.68$; $p < .001$) or the control condition ($M = 4.74$, $SD = 1.71$; $p < .001$). Network intentions were higher in the promotion-focus condition than they were in the control condition ($p = .024$).

*Mediation.* We tested for moral impurity as the mediator of the relationship between our regulatory focus manipulation and networking intentions. We first conducted analyses using the dummy for the prevention-focus condition as the independent variable, and the dummy for the control condition as covariate. Using bootstrapping with 10,000 iterations, we estimated the direct and indirect effects of prevention focus through moral impurity on our dependent variable, networking intentions. The 95% bias-corrected confidence interval (CI) for the size of the indirect effect ($-0.36$, $SE = .06$) excluded zero (95% CI [$-0.496$, $-0.243$]), suggesting that feelings of moral impurity mediated the link between prevention focus and lower networking intentions.

Next, we conducted analyses using the dummy for the promotion-focus condition as the independent variable, and the dummy for the control condition as covariate. Using bootstrapping with 10,000 iterations, we found that the 95% bias-corrected CI for the size of the indirect effect (0.36, $SE = .06$) excluded zero (95% CI [0.242, 0.496]), suggesting that feelings of moral impurity mediated the link between promotion focus and higher networking intentions.

### Study 3B

**Method.**

*Participants and design.* A total of 572 working adults ($M_{age} = 35.37$, $SD = 8.81$; 52% male), all located in the United States and recruited through MTurk, participated in a 15-min online study. They received $2 for their participation. Only participants who had a LinkedIn account could participate. We recruited 600 participants, but only 572 completed the study in the time allotted. We randomly assigned participants to one of three conditions: control versus promotion focus versus prevention focus.

*Procedure.* In Study 3B, we used the same procedure and design as in Study 3A with one difference: Instead of reading the story as explained above, we asked participants to actually engage in instrumental networking. We did so to add richness to the paradigm as we wanted participants to experience what it feels like to engage in instrumental networking. Specifically, as in Casciaro et al. (2014, Study 4), we asked participants to select a person in their network (someone they were already connected with or someone they would like to connect with), draft a message, and send the message to that individual through their personal

---

[2] Similar to Study 1, feeling of impurity varied by condition, independent of whether moral impurity was measured with four items: dirty, tainted, inauthentic, and ashamed, $\alpha = .91$, $F(2, 596) = 18.10$, $p < .001$, $\eta^2_p = .057$, or the three regulatory-focus neutral items: wrong, unnatural and impure, $\alpha = .89$, $F(2, 596) = 16.15$, $p < .001$, $\eta^2_p = .051$.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

LinkedIn account. Participants were told, "Your intention in sending the message should be to strategically make a professional connection. With this message, you are trying to create a connection that would aid the execution of work tasks and your professional effectiveness." We did not have a way of tracking whether participants actually sent the message they wrote through LinkedIn.

Afterward, all participants answered questions about their networking intentions, as in Study 3A. Specifically, they completed the four-item self-reported measure of the extent to which they believed they would seek to expand their professional network in the next month ($\alpha = .95$, adapted from Raj et al., 2017). Finally, participants indicated their age and gender.

**Results.**

***Moral impurity.***    Given that all seven items loaded onto one factor, we averaged them all into a composite measure of moral impurity ($\alpha = .93$).[3] We found that this seven-item measure varied by condition, $F(2, 570) = 20.66, p < .001, \eta_p^2 = .068$. Participants felt more morally impure in the prevention-focus condition ($M = 2.30, SD = 1.33$) as compared to the promotion-focus condition ($M = 1.53, SD = 0.96; p < .001$) or the control condition ($M = 2.01, SD = 1.17; p = .016$). However, moral impurity was lower in the promotion-focus condition than it was in the control condition ($p < .001$).

***Networking intentions.***    Networking intentions also varied by condition, $F(2, 570) = 19.56, p < .001, \eta_p^2 = .064$. Participants indicated they would network less frequently in the future in the prevention-focus condition ($M = 4.17, SD = 1.53$) as compared to the promotion-focus condition ($M = 5.19, SD = 1.51; p < .001$) or the control condition ($M = 4.53, SD = 1.73; p = .025$). Network intentions were higher in the promotion-focus condition than they were in the control condition ($p < .001$).

***Mediation.***    As in Study 3A, we tested for the mediating role of moral impurity in the relationship between our regulatory focus manipulation and networking intentions. We first conducted analyses using the dummy for prevention-focus condition as the independent variable, and the dummy for the control condition as covariate. Using bootstrapping with 10,000 iterations, we estimated the direct and indirect effects of prevention focus through moral impurity on our dependent variable, networking intentions. The 95% bias-corrected CI for the size of the indirect effect ($-0.29, SE = .06$) excluded zero (95% CI [$-0.422, -0.193$]), suggesting that feelings of moral impurity mediated the link between prevention focus and lower networking intentions.

Next, we conducted analyses using the dummy for the promotion-focus condition as the independent variable, and the dummy for the control condition as covariate. Using bootstrapping with 10,000 iterations, we found that the 95% bias-corrected CI for the size of the indirect effect ($0.29, SE = .06$) excluded zero (95% CI [0.193, 0.426]), suggesting that feelings of moral impurity mediated the link between promotion focus and higher networking intentions.

***Coding.***    We asked a research assistant blind to our hypotheses and study conditions to code the messages participants wrote. We coded the messages on three dimensions. First, we coded whether the message was a new connection attempt: We used 0 if participants wrote the message to someone they already had a connection with (existing connection) and 1 if they wrote the message to someone who would be a new connection (new connection).

Second, we coded whether the message was aimed at forming a connection to meet a professional goal (value of 1), as we had defined instrumental networking in the instructions, or whether they were using the assigned task to just make a social connection (e.g., saying hello to a friend; value of 0 in our coding). Given the instructions we used we expected no differences across conditions on this dimension. Finally, we coded for language indicating promotion or prevention focus. We used a value of 1 when messages related to growth, advancement, and accomplishment, and striving toward wishes and aspirations (for promotion). We used a value of 0 when the messages related to missing opportunities and meeting their responsibilities and duties (for prevention). When messages did not include either, we left the cell in the data blank.

We found no differences across conditions on the first and second dimension ($p = .20$ and $p = .51$, respectively). As for the third dimension, we found differences across conditions, $\chi^2(461) = 6.38, p = .041$: A higher percentage of participants used promotion language in the promotion condition (73% of them) as compared to the prevention condition or the control condition (67.7% and 59.5%, respectively).

## Discussion

The results of Studies 3A and 3B provide further support for the independent effects of promotion and prevention focus on feelings of impurity and instrumental networking, by showing differences as compared to a control condition.

## Study 4

In Study 4, a field setting, we explored the implications of networking-related promotion and prevention regulatory focus for the frequency of instrumental professional networking by professionals and the feelings of impurity they associate with it. To that end, we surveyed lawyers employed at a large North American law firm. Business lawyers work either as counsel when hired by client or as experts on a client's file when asked by a colleague. In either case, acquiring the work requires having relationships with colleagues and clients. Thus, law professionals at both junior and senior levels can benefit from and care deeply about instrumental networking, making this a particularly appropriate empirical context.

## Method

**Sample and procedure.**    When we conducted our study, 425 lawyers were employed at the law firm where we collected survey data. Hierarchically, the law firm was structured according to levels of legal experience, as is common for the industry: junior associate, midlevel associate, senior associate, junior partner (i.e., nonequity partner), and senior partner (i.e., equity partner). The firm had five offices across North America and 13 law practices.

---

[3] Similar to Studies 1 and 3A, feeling of impurity varied by condition, independent of whether moral impurity was measured with four items: dirty, tainted, inauthentic, and ashamed, $\alpha = .87; F(2, 570) = 19.54, p < .001, \eta_p^2 = .064$, or the three regulatory-focus neutral items: wrong, unnatural and impure, $\alpha = .85; F(2, 570) = 19.34, p < .001, \eta_p^2 = .064$.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

The lawyers employed at the firm served business clients working across practices and locations, as the needs of the clients required. We sent to all the lawyers employed at the firm an invitation to complete a survey about their approach to professional networking. In the invitation, we made clear that participation in the survey was voluntary, and withdrawal from the study was available at any time with no penalty. We also reassured participants that all their responses would be entirely confidential, such that the firm's management would never get access to any individual responses, and would only receive aggregated findings with the goal of aiding the firm in supporting its lawyers' development and effectiveness as legal professionals. For their efforts, we offered to participants a confidential and personalized report on how their own professional networking compared to that of their peers at the firm.

In total, 164 lawyers completed the survey in its entirety, for a 39% response rate. We compared participants to nonparticipant s, and we found no statistically significant differences between the two groups regarding office location, legal specialty, sex, or formal rank.

**Dependent and independent variables.**

*Job performance.* We assess performance by using yearly revenue generated by a lawyer, which is the standard metric for evaluating performance in law firms. Firm management shared with us the revenue data they had collected and on record for each of the lawyers working there. We corrected for skewness in revenue distribution using the *lnskew0* function in STATA (STATA 13).

*Frequency of instrumental professional networking.* In the survey, we defined professional networking as "the purposeful building and nurturing of relationships to create a system of information and support for professional and career success" (as in Casciaro et al., 2014). We then asked respondents, "How often do you engage in professional networking?" The respondents indicated their answers using one of the following options on a 5-point scale: *not at all*, *rarely*, *sometimes*, *frequently*, and *a great deal*.

*Feelings of moral impurity from networking.* We measured the experience of impurity from instrumental professional networking by using the average and logged (to correct for skewness) response to three survey items on the 5-point scale (adapted from Casciaro et al., 2014), each starting with the sentence, "When I engage in professional networking, I usually feel. . ." followed by the following adjectives: dirty, inauthentic, and ashamed ($\alpha$ = .78). To reduce demand effects, the list interspersed these adjectives with markers of various emotions (Feldman Barrett & Russell, 1998), such as happy, excited, stressed, and satisfied.

*Trait promotion and prevention regulatory focus.* As in Study 1, we measured chronic regulatory focus with the Composite Regulatory Focus Scale (Haws et al., 2010).

*Networking-specific trait promotion and prevention focus.* To measure the extent to which instrumental networking resulted from a promotion or a prevention focus, we developed eight survey items intended to capture a concern with growth, advancement, and aspirations of promotion focus on the one hand, and a concern with meeting one's duties and the threat of lost opportunity of prevention focus on the other hand. These items were adapted from the Composite Regulatory Focus Scale (Haws et al., 2010) to fit the domain of instrumental networking. We thus measured promotion focus with the average response to four survey items (each assessed on a 5-point scale): "I am excited about the opportunities that networking can open up for me," "Networking allows me to achieve my professional aspirations," "I engage in professional networking because I want to be successful," and "I engage in professional networking because connections help me do well" ($\alpha$ = .81). The four items measuring prevention focus were "Networking is a necessary part of my job that I just have to do," "It is my professional duty and responsibility to network," "I engage in professional networking because I am concerned that I'll miss opportunities if I don't," and "I engage in professional networking because I don't want to fall behind in my profession" ($\alpha$ = .69).

**Control variables.**

*Law practice and office location.* To control for the law practice a lawyer belonged to, we used indicator variables for each of the 13 departments of the firm (insolvency and restructuring, corporate law, intellectual property, etc.). Likewise, we used indicator variables to control for each of the firm's five offices in which each lawyer was located. None of these dummy variables affected the study's findings, and therefore we excluded them from the analyses reported below because their inclusion reduced the models' goodness of fit.

*Extraversion.* In light of research documenting a positive association between extraversion and networking frequency (Casciaro et al., 2014; Wanberg et al., 2000), as well as a negative association between extraversion and feelings of dirtiness experienced from engaging in instrumental networking (Casciaro et al., 2014), we controlled for a lawyer's extraversion, measured with the two extraversion items of the Big Five Inventory (Rammstedt & John, 2007).

*Power.* Previous research has also documented the effects of power on feelings of dirtiness that result from instrumental networking (Casciaro et al., 2014). To account for these effects, we operationalized power in terms of a lawyer's formal rank (seniority), which defines power differentials clearly in law firms (Nelson, 2004). This variable ranged from senior partner at the top of the hierarchy (denoted with a numerical value equal to 5), followed by junior partner (4), senior associate (3), midlevel associate (2), and junior associate at the bottom of the hierarchy (1).

**Modeling approach.** To test simultaneously the paths that our predictions entail, and also control for all relevant covariates, we estimated direct and indirect effects using the corresponding structural equation model (Kline, 2011) of a path analysis (Wright, 1934). This approach allows us to simultaneously account for effects of promotion focus and prevention focus, so that we can examine the unique effects of each orientation.

## Results

Descriptive statistics and correlation coefficients for all variables are in Table 2, while the results of the path analysis are in Table 3. The estimated models use two measures of promotion and prevention focus: general trait regulatory foci (right-hand side of Table 3) and networking-specific trait regulatory foci (left-hand side of Table 3). The path analysis provides estimate for both direct effects and indirect effects. Directs effects occur when a predictor affects a dependent variable directly. Indirect effects occur when the effect of a predictor on dependent variable is mediated by another variable. Our theory predicted four direct effects in the path analysis: (a) a positive effect of prevention focus on moral impurity from instrumental networking, (b) a negative

GINO, KOUCHAKI, AND CASCIARO

Table 2
*Study 4 Mean, Standard Deviations, and Correlation of Variables*

| Variable | M | SD | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Job performance | 1,603,193 | 3,063,196 | | | | | | | | | | |
| 2. Job performance (log) | 10.568 | 3.886 | .667 | | | | | | | | | |
| 3. Networking frequency | 3.579 | 0.904 | .362 | .458 | | | | | | | | |
| 4. Moral impurity | 1.562 | 0.633 | −.176 | −.208 | −.431 | | | | | | | |
| 5. Moral impurity (log) | −0.664 | 0.847 | −.173 | −.231 | −.494 | .893 | | | | | | |
| 6. Extraversion | 3.102 | 1.491 | .541 | .860 | .401 | −.147 | −.188 | | | | | |
| 7. Seniority | 3.549 | 0.923 | −.032 | −.036 | .342 | −.418 | −.463 | −.089 | | | | |
| 8. Chronic prevention focus | 3.322 | 0.825 | −.217 | −.218 | −.236 | .330 | .308 | −.171 | −.263 | | | |
| 9. Chronic promotion focus | 3.533 | 0.741 | −.081 | −.039 | .199 | −.164 | −.170 | −.065 | .231 | .396 | | |
| 10. Networking prevention focus | 3.624 | 0.810 | −.109 | −.023 | .266 | .028 | −.013 | .046 | −.051 | .158 | .173 | |
| 11. Networking promotion focus | 3.935 | 0.723 | .007 | .037 | .545 | −.302 | −.333 | .035 | .459 | −.058 | .310 | .496 |

*Note.* Correlation coefficients $>.14$ are significant at $p < .05$.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

effect of promotion focus on moral impurity from instrumental networking, (c) a negative effect of moral impurity on the frequency of instrumental networking, and (d) a positive effect of networking frequency on job performance.

When measuring regulatory focus as generalized trait promotion and prevention focus (right-hand side of Table 3), all predictions were supported. Namely, networking frequency had a positive and statistically significant direct effect on job performance ($\beta = .550$; $p < .01$). In turn, moral impurity had a negative direct effect on networking frequency ($\beta = −.364$; $p < .001$). Generalized promotion focus had the predicted negative effect on moral impurity ($\beta = −.282$; $p < .01$), and generalized prevention focus had the predicted positive effect on moral impurity ($\beta = .294$; $p < .001$).

When measuring regulatory focus as networking-specific trait promotion and prevention focus (left-hand side of Table 3), all predictions were supported, except the positive effect of prevention focus on moral impurity. Namely, in addition to the predicted direct effects of networking frequency on job performance and of moral impurity on networking frequency, promotion focus had the predicted negative effect on moral impurity ($\beta = −.250$; $p < .05$), while the negative effect of prevention focus on moral impurity was not statistically significant, contrary to our prediction.

Thus, our predictions were strongly supported when regulatory foci were measured as a general trait, indicating that people with a promotion focus experience lessened feelings of impurity from instrumental professional networking, while those with a prevention focus tend to feel more morally impure when networking instrumentally. When regulatory foci were measured as networking-specific promotion and prevention focus, however, these predictions were supported only for promotion focus, which was negatively associated with moral impurity. Figure 3 summarizes how the findings from Study 4 supported our theoretical model.

In addition to the direct effects we predicted, the path analysis revealed effects of interest, both direct and indirect. Seniority (our operationalization of power in the context of law firms) had positive direct and indirect effects on networking frequency, and negative effects on moral impurity, replicating the findings of Casciaro et al. (2014). Likewise, positive direct and indirect effects of extraversion on networking frequency, and its indirect effect on job performance mediated by networking frequency is consistent with previous work (Casciaro et al., 2014). More relevant to our

theory, promotion focus and prevention focus also had significant indirect effects on network frequency, mediated by moral impurity, consistent with the theoretical model we advanced (see Table 3).

## Discussion

Taken together, the findings of Study 4 show that the effects of trait promotion and prevention focus on moral impurity and instrumental professional networking generalize to professionals in field settings. People who are motivated to pursue ideals, growth, and aspirations feel more authentic and morally pure when networking than do people who are motivated by the fulfilment of duties and obligations. These feelings of moral impurity in turn relate to how frequently professionals engage in networking, with consequences for their job performance. The results of Study 4 also indicate that domain-specific regulatory foci are not as strongly predictive of either moral purity from instrumental networking or of the frequency with which people network professionally. While we did find evidence that networking-specific promotion focus reduces moral impurity and networking frequency, we did not find such evidence for a networking-specific prevention focus.

## Study 5

### Method

Although in Study 4, networking-specific trait measures of regulatory focus exhibited weaker effects on moral purity and networking frequency than did general trait regulatory focus, we wished to explore the possibility that such domain-specific motives might be amenable to manipulation in the field. In organizations, domain-specific situational cues can be particularly important in evoking either promotion or prevention focus, as employees look for and pay attention to information about what behaviors are expected of them and their consequences (James, James, & Ashe, 1990; Scott & Bruce, 1994). For instance, situational cues that highlight potential gains and attainment of ideals are likely to trigger a promotion mindset. Instead, those that highlight potential losses and fulfillment of obligations are likely trigger a prevention mindset (Higgins, 1997, 1998).

Table 3

*Study 4 Results of Path Analysis of Regulatory Focus*

| Dependent variable | Networking-specific trait regulatory focus[a] | | | | General trait regulatory focus[b] | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Direct effects | | Indirect effects | | Direct effects | | Indirect effects | |
| | Standardized coefficient | OIM SE | Standardized coefficient | OIM SE | Standardized coefficient | OIM SE | Standardized coefficient | OIM SE |
| Job performance | | | | | | | | |
| Networking frequency | **.550** | **.172**\*\* | .000 | (no path) | **.550** | **.172**\*\* | .000 | (no path) |
| Moral impurity | .000 | (no path) | −.200 | .075\*\* | .000 | (no path) | −.200 | .075\*\* |
| Seniority | 2.263 | .110\*\*\* | .149 | .052\*\* | 2.263 | .110\*\*\* | .145 | .051\*\* |
| Extraversion | .000 | (no path) | .175 | .065\*\* | .000 | (no path) | .170 | .064\*\* |
| Prevention focus | .000 | (no path) | −.015 | .018 | .000 | (no path) | −.059 | .027 |
| Promotion focus | .000 | (no path) | .050 | .028† | .000 | (no path) | .056 | .027\* |
| Networking frequency | | | | | | | | |
| Moral impurity | **−.364** | **.075**\*\*\* | .000 | (no path) | **−.364** | **.075**\*\*\* | .000 | (no path) |
| Seniority | .217 | .041\*\*\* | .054 | .018\*\* | .217 | .041\*\*\* | .047 | .018\*\* |
| Extraversion | .188 | .068\*\* | .130 | .038\*\* | .188 | .068\*\* | .121 | .034\*\*\* |
| Prevention focus | .000 | (no path) | −.027 | .031 | .000 | (no path) | −.107 | .036\*\* |
| Promotion focus | .000 | (no path) | .091 | .043\* | .000 | (no path) | .103 | .038\*\* |
| Moral impurity | | | | | | | | |
| Seniority | −.149 | .041\*\*\* | .000 | (no path) | −.129 | .040\*\* | .000 | (no path) |
| Extraversion | −.356 | .073\*\*\* | .000 | (no path) | −.331 | .066\*\*\* | .000 | (no path) |
| Prevention focus | **.074** | **.084** | .000 | (no path) | **.294** | **.080**\*\*\* | .000 | (no path) |
| Promotion focus | **−.250** | **.106**\* | .000 | (no path) | **−.282** | **.087**\*\* | .000 | (no path) |

*Note.* OIM = observed information matrix. Coefficients and standard errors in bold are for predicted effects.
[a] *N* = 164; absolute fit: standardized root mean square residual = .063; incremental fit: comparative fit index = .927.  [b] *N* = 164; absolute fit: standardized root mean square residual = .018; incremental fit: comparative fit index = .993.
† *p* < .10.  \* *p* < .05.  \*\* *p* < .01.  \*\*\* *p* < .001. Two-tailed tests.

To that end, with the help of SurveySignal (a survey distribution and survey management platform; Hofmann & Patel, 2015), we recruited professionals to complete a 6-week study. After determining eligibility (participants needed to have a smartphone and work for a professional services firm in law, accounting, consulting, sales, insurance, or realty), participants received informed consent and were asked to register and verify their smartphone in the system. A total of 444 participants consented to participate and successfully registered and verified their smartphones. These participants were then randomly assigned to one of the two conditions (either promotion or prevention focus). The system randomly assigned 207 participants to a promotion focus and 237 to a prevention focus right after verification of registration. For the next 6 weeks, each of these professionals received a text message once a week on Mondays at 9 a.m. as part of our manipulation.

In addition, we invited all participants to complete a survey days before the intervention study started. The survey included some demographic questions, a measure of promotion and prevention focus for networking (similar to law survey), and the Big 5 personality traits (Gosling, Rentfrow, & Swann, 2003). The survey included a definition of professional networking (from Casciaro et al., 2014) as "the purposeful building and nurturing of relationships to create a system of information and support for professional and career success" and asked them to indicate how frequently they currently engage in professional networking using a 5-point scale ranging from 1 (*never*) to 5 (*daily*). At the end, participants indicated their age and gender.

From the original 444 participants in our sample (who would receive the text messages containing the manipulation), 256 completed the initial survey (58% response rate). To assure there were



*Figure 3.* Overview of Study 4 results. All arrows represent predicted effects. The dotted arrow represents a statistically insignificant effect.

GINO, KOUCHAKI, AND CASCIARO

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

no differences between the two conditions, even though participants were randomly assigned to the intervention conditions and had not yet started receiving their text messages, we checked and found there was no condition effect on responses rate ($p > .10$). We also checked the baseline frequency of networking, networking promotion ($\alpha = .90$) and prevention ($\alpha = .79$) focus, and Big 5 personality traits and found no significant differences on any of the measured variables between two conditions ($ps > .10$). Thus, as expected, preintervention, there were no significant differences between the two groups. All participants ($n = 444$) who consented to participate in our study received text messages once a week on Mondays at 9 a.m. for 6 weeks.

In the promotion-focus group, participants received a text that read,

> We are interested in how people create and nurture relationships at work. Many people focus on the opportunities that networking can open up for them. They also consider how networking can help them achieve their professional aspirations. Please set aside a few minutes to identify how you will approach your next opportunity to network with these potential benefits in mind.

In the prevention-focus group, participants read,

> We are interested in how people create and nurture relationships at work. Many people consider networking a necessary part of their job that they just have to do, a professional obligation. They also focus on opportunities they will miss if they do not network. Please set aside a few minutes to identify how you will approach your next opportunity to network with these potential costs in mind.

At the conclusion of the 6 weeks, we asked all 444 participants who received the weekly text messages (whether they completed the initial survey or not) to fill out a final survey, which contained our dependent variables. A total of 183 participants responded to this final survey (41% response rate), and 116 participants completed both surveys. There were no significant differences between conditions (promotion vs. prevention) on whether participants returned to complete the last survey ($p > .10$). This confirms that our manipulation had no effect on participants' likelihood of returning to the final survey. In addition, among those who provided responses to the initial survey, there was no significant difference on baseline networking or Big 5 personality traits between those who responded to the final survey or not ($ps > .10$).

In the final survey, we asked participants to first report their frequency of professional networking over the last month on a 5-point scale ranging from 1 (*not at all*) to 5 (*a great deal*). Next, they were asked to identify how many new people they added to their professional network over the last month (new connections) and how many existing professional relationships they nurtured or rekindled over the last month (nurturing). Afterward, they reported their feelings about the professional networking they engaged in over the last month using 1 (*strongly disagree*) to 5 (*strongly agree*) scales, beginning with the stem, "When I engaged in professional networking over the last month, I usually felt . . . "

**Moral impurity.** We assessed moral impurity with four items (dirty, tainted, inauthentic, and ashamed; $\alpha = .80$) from Casciaro et al. (2014).

**Affect.** To minimize demand effects, we also included positive and negative affect adjectives. Positive affect was measured with five items (enthusiastic, satisfied, happy, relaxed, excited;

$\alpha = .88$) and negative with three items (stressed, tired, and bored; $\alpha = .81$).

## Results

**Moral impurity.** Consistent with our predictions, participants who received the promotion-focus intervention reported feeling less morally impure ($M = 1.71$, $SD = 0.76$) than those who received the prevention-focus intervention ($M = 2.06$, $SD = 0.91$), $t(181) = 2.84$, $p = .005$.

**Positive and negative affect.** Participants' positive and negative affect did not differ depending on whether they were in a promotion focus or a prevention focus, $t(181) = -.98$, $p = .33$ and $t(181) = .98$, $p = .33$, respectively.

**Networking frequency.** Consistent with our hypothesis, participants in a promotion focus reported engaging in networking more frequently over the last month ($M = 3.39$, $SD = 1.16$) as compared to those in a prevention focus ($M = 2.78$, $SD = 1.05$), $t(181) = -3.71$, $p < .001$. Given that we have data on some of our participants' baseline networking frequency, we also ran analyses controlling for the frequency of networking before the start of the study and found a significant effect of regulatory focus manipulation on network frequency on this more restricted sample, $F(1, 113) = 9.33$, $p = .003$, $\eta_p^2 = .076$.

**New connections.** When asked how many new connections they added to their professional network over the last month, 14 participants did not respond. Examining the responses from the remaining 169 respondents, we found a significant effect of regulatory focus manipulation on creating new connections ($M_{promotion} = 7.80$, $SD = 8.05$ vs. $M_{prevention} = 5.52$, $SD = 5.05$), $t(167) = -2.21$, $p = .030$.

**Nurturing existing ties.** Eight participants did not respond to this question. Examining the responses from the remaining 175 respondents, we found a significant effect of regulatory focus manipulation on nurturing existing ties ($M_{promotion} = 8.01$, $SD = 7.01$ vs. $M_{prevention} = 4.64$, $SD = 4.21$), $t(173) = -3.90$, $p < .001$.

**Mediation.** We tested for moral impurity as the mediator of the relationship between our regulatory focus manipulation and networking frequency over the last month. Using bootstrapping with 10,000 iterations, we estimated the direct and indirect effects of regulatory focus condition through moral impurity on our dependent variable, networking frequency. The 95% bias-corrected CI for the size of the indirect effect (0.20, $SE = .07$) excluded zero (95% CI [0.071, 0.368]), suggesting that feelings of moral impurity mediated the link between promotion focus (vs. prevention focus) and higher network frequency.

We also ran the mediation analysis with number of new connections as a dependent variable. The 95% bias-corrected CI for the size of the indirect effect (0.65, $SE = .33$) excluded zero (95% CI [0.134, 1.410]). The mediation analysis with nurturing existing ties yielded similar findings and the 95% bias-corrected CI for the size of the indirect effect (0.99, $SE = .34$) excluded zero (95% CI [0.404, 1.746]). In sum, the three analyses suggest that feelings of moral impurity mediated the link between promotion focus (vs. prevention focus) and higher networking (frequency as well nurturing existing tiles and creating new ones).

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

## Discussion

Together, the results of Study 5 provide further evidence that regulatory focus influences how people react to instrumental professional networking. As compared to participants encouraged to take a prevention focus, participants encouraged to take a promotion focus felt less inauthentic and morally impure, and engaged in networking more often.

## General Discussion

Despite the well-demonstrated and well-known benefits that creating and maintaining professional connections can have on the diversity and size of one's network, people often shy away from engaging in instrumental networking to pursue professional goals. This is because they feel inauthentic, impure, and even dirty (Casciaro et al., 2014) when attempting to create and maintain relationships with other people with the clear purpose of finding or strengthening support for their professional goals and work tasks. Such feelings, unfortunately, are often detrimental to their development and job performance because they do not allow people to access valuable information, resources, and opportunities that are important to their careers. In the current research, we proposed that the motives people have when engaging in networking can impact these feelings by affecting their moral experience of networking, and lead them to network with different frequency.

Using two laboratory studies, two online studies, one field experiment with working professionals, and field data from lawyers from a large North American business law firm, we examined how self-regulatory focus, in the form of promotion and prevention, affects people's experiences and outcomes when networking. Consistent with our propositions, we find that a promotion regulatory focus, as compared to a prevention focus or a control condition, is beneficial to instrumental professional networking. People who are motivated to network professionally for the growth, advancement, and accomplishments they can achieve through their connections network more frequently and experience decreased feelings of moral impurity. In contrast, networking with the prevention focus of meeting one's professional responsibilities reduces the frequency of instrumental networking because it worsens the feelings of impurity people experience from it.

## Theoretical Implications

Our research contributes to the literature on networking, regulatory focus, and morality in various ways. First, building on the work of Casciaro et al. (2014), the current article contributes to the network literature by focusing on the primary motives people have when approaching networking. Despite its many insights, existing work on networks has focused primarily on their structural properties and paid less attention to the important role of individual psychology in network dynamics. Although certain basic psychological phenomena—such as affect, cognition, and personality—have been integrated to varying degrees with the network perspective on organizations, psychological theory on motivation is still largely absent from network research (Casciaro et al., 2015). Our work complements this body of research by suggesting and providing evidence that people's psychological experience when networking has powerful effects on their likelihood of engaging in

instrumental networking and that interventions that specifically change the motives people have when approaching networking can potently impact their psychological experience and subsequent behaviors. A psychological account of motivation in networking behavior can inform network theories of human agency by examining people's motivational approach to goals and by conceptualizing agency itself as a variable that can be measured or manipulated.

Second, our work contributes to research on regulatory focus by extending it to a new context—professional networking—and introducing a domain-specific form of promotion and prevention focus to complement trait and state forms of regulatory foci typically studied in the literature. By doing so, we echo and strengthen new developments in research on regulatory focus (Browman et al., 2017). RFT (Higgins, 1997) concerns how people pursue goals. In a promotion focus, people's goals are represented as hopes and aspirations; in a prevention focus, they are represented as duties and obligations. Given its wide applicability and the importance of goal pursuit in organizations, several scholars have explored the role of regulatory focus in work settings (e.g., Brockner & Higgins, 2001; Wallace et al., 2009) and found that promotion and prevention foci are uniquely associated with a variety of work behaviors (De Cremer et al., 2009; Neubert et al., 2008; Wallace et al., 2009). Our research advances this body of work by examining how regulatory focus affects the way people experience networking and how often they engage in it, with important consequences for performance. We also demonstrate that manipulations of state promotion and prevention foci specific to the domain of networking are sufficient to change the networking behavior of professionals in the field. Manipulating the generalized regulatory foci typically studied in the literature may therefore not be necessary to affect specific behaviors at work. By showing that people's psychological reactions to networking vary depending on their promotion versus prevention focus, our work opens up new investigations of primary human motives, networking, and the structure of networks.

Finally, our work also contributes to research on morality and behavioral ethics—research that has received increased attention in the last decade from both psychology and management scholars. Prior work has shown that authenticity is experienced as a moral state (Gino et al., 2015) and that instrumental networking leads people to feel dirty and impure (Casciaro et al., 2014). Here, we proposed and found that regulatory focus profoundly affects such feelings, as the motives people have to engage in instrumental networking give them room to justify (or discourage) approaching others to accomplish their professional goals. In so doing, we built on Cornwell and Higgins' (2015) view of both promotion and prevention regulatory foci as ethical systems of ideals concerned with attaining virtues (promotion) and of oughts concerned with maintaining obligations (prevention). By connecting ought and ideal selves to the moral philosophy of authenticity and moral purity, we identified an important motivational factor that can change the perceived morality of instrumental professional networking and be directly triggered or manipulated.

Our research both assessed regulatory focus as an individual difference and manipulated it with simple interventions in lab and, importantly, in the field. Short writing tasks that focused participants' attention on their hopes and aspirations or on their duties and obligations influenced the primary motivations they used when approaching instrumental networking. In addition, short text

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

messages that reinforced promotion versus prevention foci affected real networking behaviors. The effectiveness of regulatory focus manipulations narrowly directed at networking behavior shows that interventions to change people's motivational orientations need not generalize to all domains of their lives, but rather can effectively target a specific domain of action. Our manipulations and, in particular, our simple intervention study provide insights into how organizations or managers could similarly focus organizational members' attention on specific aspects of networking, thus influencing their willingness to engage in it and frequency of doing so. Simply helping people focus on specific motives before approaching networking could prove to be an effective means of making networking morally palatable and influence their development and job performance for the better.

## Limitations and Directions for Future Research

Our findings, as well as the limitations of our studies, point to several potential areas of future inquiry. First, our research focused heavily on individuals' psychological states and their reported frequency of networking rather than on objective measures of networking. It is important to examine more objective variables, such as frequency of networking—an outcome we considered in two of our studies—and to measure them in more objective ways. More importantly, potential differences in the psychological and behavioral patterns people display while networking deserve further inquiry. It is possible that promotion-focused or prevention-focused individuals use different emotional and nonemotional expressions consciously or unconsciously. For example, during a networking event, promotion-focused individuals might display more positive emotions and approach their targets with a firm handshake. Additionally, while our studies focused on the person networking, it would be fascinating to examine whether others can recognize the motivation behind individuals' instrumental networking.

In our studies, we both measured and manipulated self-regulatory focus. Future research could extend our work by investigating framing effects. An individual's regulatory focus can be shaped by her environment (e.g., the school she attends, the organization she works in), such that certain environments make one regulatory focus predominant over the other. Future work could examine the active role organizations can play in inducing a promotion focus, because companies can shape members' regulatory focus through their cultures, policies, and incentive schemes. Additionally, in our studies we examined the general self-regulatory focus and networking-specific regulatory focus (measured or manipulated) at one time. It is likely that individuals' past experiences with networking influence the extent to which they adopt a promotion or prevention focus toward networking. For example, negative past experiences could lead people to view networking with dread and thus approach networking with a prevention focus.

Future studies could examine the role of felt authenticity and selfishness in various types of networking. Casciaro and colleagues (2014) argued that networking behaviors create negative self-attributions when the actions are difficult to justify to oneself. People perceive instrumental professional networking specifically as less justifiable to themselves and as morally tainted because it has a selfish intent, as the person initiating the relationship is pursuing certain benefits. Regulatory focus can influence how

people experience networking, because regulatory focus influences creativity (Crowe & Higgins, 1997; Friedman & Förster, 2001), an important factor when individuals are justifying their actions, particularly those that may be morally problematic (Gino & Ariely, 2012). Future research examining how regulatory focus influences one's ability to justify selfish intentions during instrumental networking (through the greater creativity that regulatory focus triggers) would further our understanding of the impact of people's motives on their psychological state and actions when networking.

We note that these insights on the complex interrelationships between selfishness, authenticity, moral purity and regulatory focus could well apply to behaviors beyond instrumental networking. Any form of instrumental relational behavior—be it advice seeking and giving, leadership, social influence, or intergroup relations—undertaken with selfish or altruistic motives, and invoking either promotion or prevention motivational orientations, may have significant consequences for an individual's morality, which may in turn affect the likelihood of engaging in such behavior. Further work is needed to further understand the interplay motivation, and the moral psychology of instrumental behavior and its outcomes.

Future research could also examine whether promotion and prevention focus lead people to use different strategies when networking, and approach new professional connections with a different mindset. For instance, it is possible that people with a promotion focus create or nurture professional relationships to learn something new, more so than people with a prevention focus, and this attention to the potential for learning may contribute to their lower feelings of moral impurity as the connection feels less instrumental.

Finally, in our studies, we tested our predications with different samples, such as Americans recruited through online platforms (Mturk) and panels, as well as U.S. college students and lawyers in a professional services firm. Additionally, we assessed the cultural generalizability of our main prediction with a sample from Italy. Nonetheless, it is possible that some non-Western cultures differ in their views of instrumental networking and as such our effects might not hold in such cultures. Future research could further examine the cultural generalizability of the current findings.

## Conclusion

Why is it that many people do not take on opportunities to network or do so with dread, even when networking would benefit them professionally? How could they be encouraged to do so, and with enthusiasm? Our research addresses both of these questions. Building on recent work showing that engaging in professional instrumental networking makes people feel morally impure and physically dirty, we explored how the motives people have when engaging in networking can reduce these feelings and lead people to network more often, with potentially beneficial effects on their performance. By adopting a promotion focus rather than a prevention one, individuals can orient their motivation to network toward the growth, advancement, and accomplishment they can receive from it and thus network more frequently and experience greater authenticity and moral purity. That is, a promotion focus can help people wash away their dirty feelings and draw their attention to the aspirations they can pursue by creating new professional ties or strengthening existing ones.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

## References

Adler, P. S., & Kwon, S. W. (2002). Social capital: Prospects for a new concept. *Academy of Management Review, 27,* 17–40. http://dx.doi.org/10.5465/amr.2002.5922314

Azrin, N. H., & Besalel, V. B. (1982). *Finding a job.* Berkeley, CA: Ten Speed Press.

Belmi, P., & Laurin, K. (2016). Who wants to get to the top? Class and lay theories about power. *Journal of Personality and Social Psychology, 111,* 505–529. http://dx.doi.org/10.1037/pspi0000060

Bensaou, B. M., Galunic, C., & Jonczyk-Sédès, C. (2013). Players and purists: Networking strategies and agency of service professionals. *Organization Science, 25,* 29–56. http://dx.doi.org/10.1287/orsc.2013.0826

Borgatti, S. P., & Foster, P. C. (2003). The network paradigm in organizational research: A review and typology. *Journal of Management, 29,* 991–1013. http://dx.doi.org/10.1016/S0149-2063(03)00087-4

Borgatti, S. P., Mehra, A., Brass, D. J., & Labianca, G. (2009). Network analysis in the social sciences. *Science, 323,* 892–895.

Bowlby, J. (1969). *Attachment and loss: Vol. 1. Attachment.* London, England: Hogarth Press and the Institute of Psycho-Analysis.

Brass, D. J., Galaskiewicz, J., Greve, H. R., & Tsai, W. (2004). Taking stock of networks and organizations: A multilevel perspective. *Academy of Management Journal, 47,* 795–817.

Brockner, J., & Higgins, E. T. (2001). Regulatory focus theory: Implications for the study of emotions at work. *Organizational Behavior and Human Decision Processes, 86,* 35–66. http://dx.doi.org/10.1006/obhd.2001.2972

Browman, A. S., Destin, M., & Molden, D. C. (2017). Identity-specific motivation: How distinct identities direct self-regulation across distinct situations. *Journal of Personality and Social Psychology, 113,* 835–857. http://dx.doi.org/10.1037/pspa0000095

Casciaro, T., Barsade, S., Edmondson, A. C., Gibson, C., Krackhardt, D., & Labianca, G. (2015). The integration of psychological and network perspectives in organizational scholarship. *Organization Science, 26,* 1162–1176. http://dx.doi.org/10.1287/orsc.2015.0988

Casciaro, T., Gino, F., & Kouchaki, M. (2014). The contaminating effects of building instrumental ties how networking can make us feel dirty. *Administrative Science Quarterly, 59,* 705–735. http://dx.doi.org/10.1177/0001839214554990

Cornwell, J. F., & Higgins, E. T. (2015). The "ought" premise of moral psychology and the importance of the ethical "ideal." *Review of General Psychology, 19,* 311–328. http://dx.doi.org/10.1037/gpr0000044

Crowe, E., & Higgins, E. T. (1997). Regulatory focus and strategic inclinations: Promotion and prevention in decision-making. *Organizational Behavior and Human Decision Processes, 69,* 117–132. http://dx.doi.org/10.1006/obhd.1996.2675

De Cremer, D., Mayer, D. M., van Dijke, M., Bardes, M., & Schouten, B. C. (2009). When does self-sacrificial leadership motivate prosocial behavior? It depends on followers' prevention focus. *Journal of Applied Psychology, 94,* 887–899. http://dx.doi.org/10.1037/a0014782

Fang, R., Landis, B., Zhang, Z., Anderson, M. H., Shaw, J. D., & Kilduff, M. (2015). Integrating personality and social networks: A meta-analysis of personality, network position, and work outcomes in organizations. *Organization Science, 26,* 1243–1260. http://dx.doi.org/10.1287/orsc.2015.0972

Feldman Barrett, L., & Russell, J. A. (1998). Independence and bipolarity in the structure of current affect. *Journal of Personality and Social Psychology, 74,* 967–984. http://dx.doi.org/10.1037/0022-3514.74.4.967

Forret, M. L., & Dougherty, T. W. (2001). Correlates of networking behavior for managerial and professional employees. *Group & Organization Management, 26,* 283–311. http://dx.doi.org/10.1177/1059601101263004

Forret, M. L., & Dougherty, T. W. (2004). Networking behaviors and career outcomes: Differences for men and women? *Journal of Organizational Behavior, 25,* 419–437. http://dx.doi.org/10.1002/job.253

Förster, J., Higgins, E. T., & Bianco, A. T. (2003). Speed/accuracy decisions in task performance: Built-in trade-off or separate strategic concerns? *Organizational Behavior and Human Decision Processes, 90,* 148–164. http://dx.doi.org/10.1016/S0749-5978(02)00509-5

Freitas, A. L., & Higgins, E. T. (2002). Enjoying goal-directed action: The role of regulatory fit. *Psychological Science, 13,* 1–6. http://dx.doi.org/10.1111/1467-9280.00401

Friedman, R. S., & Förster, J. (2001). The effects of promotion and prevention cues on creativity. *Journal of Personality and Social Psychology, 81,* 1001–1013. http://dx.doi.org/10.1037/0022-3514.81.6.1001

Gino, F., & Ariely, D. (2012). The dark side of creativity: Original thinkers can be more dishonest. *Journal of Personality and Social Psychology, 102,* 445–459. http://dx.doi.org/10.1037/a0026406

Gino, F., Kouchaki, M., & Galinsky, A. D. (2015). The moral virtue of authenticity: How inauthenticity produces feelings of immorality and impurity. *Psychological Science, 26,* 983–996. http://dx.doi.org/10.1177/0956797615575277

Golomb, J. (1995). *In search of authenticity: From Kierkegaard to Camus.* London, United Kingdom: Routledge.

Gosling, S. D., Rentfrow, P. J., & Swann, W. B., Jr. (2003). A very brief measure of the Big-Five personality domains. *Journal of Research in Personality, 37,* 504–528. http://dx.doi.org/10.1016/S0092-6566(03)00046-1

Graham, J., Nosek, B. A., Haidt, J., Iyer, R., Koleva, S., & Ditto, P. H. (2011). Mapping the moral domain. *Journal of Personality and Social Psychology, 101,* 366–385. http://dx.doi.org/10.1037/a0021847

Haws, K. L., Dholakia, U. M., & Bearden, W. O. (2010). An assessment of chronic regulatory focus measures. *Journal of Marketing Research, 47,* 967–982. http://dx.doi.org/10.1509/jmkr.47.5.967

Higgins, E. T. (1987). Self-discrepancy: A theory relating self and affect. *Psychological Review, 94,* 319–340. http://dx.doi.org/10.1037/0033-295X.94.3.319

Higgins, E. T. (1997). Beyond pleasure and pain. *American Psychologist, 52,* 1280–1300. http://dx.doi.org/10.1037/0003-066X.52.12.1280

Higgins, E. T. (1998). Promotion and prevention: Regulatory focus as a motivational principle. *Advances in Experimental Social Psychology, 30,* 1–46. http://dx.doi.org/10.1016/S0065-2601(08)60381-0

Higgins, E. T., Roney, C. J., Crowe, E., & Hymes, C. (1994). Ideal versus ought predilections for approach and avoidance: Distinct self-regulatory systems. *Journal of Personality and Social Psychology, 66,* 276–286. http://dx.doi.org/10.1037/0022-3514.66.2.276

Higgins, E. T., Shah, J., & Friedman, R. (1997). Emotional responses to goal attainment: Strength of regulatory focus as moderator. *Journal of Personality and Social Psychology, 72,* 515–525. http://dx.doi.org/10.1037/0022-3514.72.3.515

Higgins, T., & Tykocinski, O. (1992). Self-discrepancies and biographical memory: Personality and cognition at the level of psychological situation. *Personality and Social Psychology Bulletin, 18,* 527–535. http://dx.doi.org/10.1177/0146167292185002

Hofmann, W., & Patel, P. V. (2015). SurveySignal: A convenient solution for experience sampling research using participants' own smartphones. *Social Science Computer Review, 33,* 235–253. http://dx.doi.org/10.1177/0894439314525117

James, L. R., James, L. A., & Ashe, D. K. (1990). The meaning of organizations: The role of cognition and values. In B. Schneider (Ed.), *Organizational climate and culture* (pp. 40–84). San Francisco, CA: Jossey-Bass.

Johnson, R. E., Chang, C.-H., & Yang, L.-Q. (2010). Commitment and motivation at work: The relevance of employee identity and regulatory focus. *Academy of Management Review, 35,* 226–245.

Kim, J., Chen, K., Davis, W. E., Hicks, J. A., & Schlegel, R. J. (2019). Approaching the true self: Promotion focus predicts the experience of authenticity. *Journal of Research in Personality, 78,* 165–176. http://dx.doi.org/10.1016/j.jrp.2018.12.001

1238                                    GINO, KOUCHAKI, AND CASCIARO

Kline, R. B. (2011). *Principles and practice of structural equation modeling*. New York, NY: Guilford Press.

Lalot, F., Quiamzade, A., & Falomir-Pichastor, J. M. (2018). Is regulatory focus related to minimal and maximal standards? *Depends on how you ask! European Journal of Social Psychology, 48,* 174–186. http://dx.doi.org/10.1002/ejsp.2314

Liberman, N., Idson, L. C., Camacho, C. J., & Higgins, E. T. (1999). Promotion and prevention choices between stability and change. *Journal of Personality and Social Psychology, 77,* 1135–1145. http://dx.doi.org/10.1037/0022-3514.77.6.1135

Magee, J. C., & Galinsky, A. D. (2008). Social hierarchy: The self-reinforcing nature of power and status. *The Academy of Management Annals, 2,* 351–398. http://dx.doi.org/10.5465/19416520802211628

Nelson, R. L. (2004). *Partners with power: The social transformation of the large law firm*. Berkeley: University of California Press.

Neubert, M. J., Kacmar, K. M., Carlson, D. S., Chonko, L. B., & Roberts, J. A. (2008). Regulatory focus as a mediator of the influence of initiating structure and servant leadership on employee behavior. *Journal of Applied Psychology, 93,* 1220–1233. http://dx.doi.org/10.1037/a0012695

Pollack, J. M., Forster, W. R., Johnson, P. D., Coy, A., & Molden, D. C. (2015). Promotion- and prevention-focused networking and its consequences for entrepreneurial success. *Social Psychological & Personality Science, 6,* 3–12. http://dx.doi.org/10.1177/1948550614543030

Raj, M., Fast, N. J., & Fisher, O. (2017). Identity and professional networking. *Personality and Social Psychology Bulletin, 43,* 772–784. http://dx.doi.org/10.1177/0146167217697299

Rammstedt, B., & John, O. P. (2007). Measuring personality in one minute or less: A 10 item short version of the Big Five Inventory in English and German. *Journal of Research in Personality, 41,* 203–212. http://dx.doi.org/10.1016/j.jrp.2006.02.001

Sacramento, C. A., Fay, D., & West, M. A. (2013). Workplace duties or opportunities? Challenge stressors, regulatory focus, and creativity. *Organizational Behavior and Human Decision Processes, 121,* 141–157. http://dx.doi.org/10.1016/j.obhdp.2013.01.008

Scott, S. G., & Bruce, R. A. (1994). Determinants of innovative behavior: A path model of individual innovation in the workplace. *Academy of Management Journal, 37,* 580–607.

Shah, J., Higgins, E. T., & Friedman, R. S. (1998). Performance incentives and means: How regulatory focus influences goal attainment. *Journal of Personality and Social Psychology, 74,* 285–293. http://dx.doi.org/10.1037/0022-3514.74.2.285

Simmons, J. P., Nelson, L. D., & Simonsohn, U. (2013, January). *Life after p-hacking*. Paper presented at the annual meeting of the society for personality and social psychology, New Orleans, LA.

Strauman, T. J. (1996). Stability within the self: A longitudinal study of the structural implications of self-discrepancy theory. *Journal of Personality and Social Psychology, 71,* 1142–1153. http://dx.doi.org/10.1037/0022-3514.71.6.1142

Taylor, C. (1991). *The ethics of authenticity*. Cambridge, MA: Harvard University Press.

Tetlock, P. E., Kristel, O. V., Elson, S. B., Green, M. C., & Lerner, J. S. (2000). The psychology of the unthinkable: Taboo trade-offs, forbidden base rates, and heretical counterfactuals. *Journal of Personality and Social Psychology, 78,* 853–870. http://dx.doi.org/10.1037/0022-3514.78.5.853

Varga, S. (2012). *Authenticity as an ethical ideal*. New York, NY: Routledge.

Wallace, J. C., & Chen, G. (2006). A multilevel integration of personality, climate, self-regulation, and performance. *Personnel Psychology, 59,* 529–557. http://dx.doi.org/10.1111/j.1744-6570.2006.00046.x

Wallace, J. C., Johnson, P. D., & Frazier, M. L. (2009). An examination of the factorial, construct, and predictive validity and utility of the Regulatory Focus at Work Scale. *Journal of Organizational Behavior, 30,* 805–831. http://dx.doi.org/10.1002/job.572

Wanberg, C. R., Kanfer, R., & Banas, J. T. (2000). Predictors and outcomes of networking intensity *among* unemployed job seekers. *Journal of Applied Psychology, 85,* 491–503. http://dx.doi.org/10.1037/0021-9010.85.4.491

Watson, D., Clark, L. A., & Tellegen, A. (1988). Development and validation of brief measures of positive and negative affect: The PANAS scales. *Journal of Personality and Social Psychology, 54,* 1063–1070. http://dx.doi.org/10.1037/0022-3514.54.6.1063

Wolff, H. G., & Moser, K. (2009). Effects of networking on career success: A longitudinal study. *Journal of Applied Psychology, 94,* 196–206. http://dx.doi.org/10.1037/a0013350

Wright, S. (1934). The method of path coefficients. *Annals of Mathematical Statistics, 5,* 161–215. http://dx.doi.org/10.1214/aoms/1177732676

Zhang, S., Higgins, E. T., & Chen, G. (2011). Managing others like you were managed: How prevention focus motivates copying interpersonal norms. *Journal of Personality and Social Psychology, 100,* 647–663. http://dx.doi.org/10.1037/a0021750

Zhong, C. B., & Liljenquist, K. (2006). Washing away your sins: Threatened morality and physical cleansing. *Science, 313,* 1451–1452. http://dx.doi.org/10.1126/science.1130726

Zou, X., Ingram, P., & Higgins, E. T. (2015). Social networks and life satisfaction: The interplay of network density and regulatory focus. *Motivation and Emotion, 39,* 693–713. http://dx.doi.org/10.1007/s11031-015-9490-1

Received September 22, 2019
Revision received April 20, 2020
Accepted May 4, 2020 ∎

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.



*Research Article*

Psychological Science
2015, Vol. 26(7) 983–996
© The Author(s) 2015
Reprints and permissions:
sagepub.com/journalsPermissions.nav
DOI: 10.1177/0956797615575277
pss.sagepub.com


# The Moral Virtue of Authenticity: How Inauthenticity Produces Feelings of Immorality and Impurity

 

## Francesca Gino[1], Maryam Kouchaki[2], and Adam D. Galinsky[3]

[1]Harvard Business School, Harvard University; [2]Kellogg School of Management, Northwestern University; and [3]Columbia Business School, Columbia University

## Abstract

The five experiments reported here demonstrate that authenticity is directly linked to morality. We found that experiencing inauthenticity, compared with authenticity, consistently led participants to feel more immoral and impure. This link from inauthenticity to feeling immoral produced an increased desire among participants to cleanse themselves and to engage in moral compensation by behaving prosocially. We established the role that impurity played in these effects through mediation and moderation. We found that inauthenticity-induced cleansing and compensatory helping were driven by heightened feelings of impurity rather than by the psychological discomfort of dissonance. Similarly, physically cleansing oneself eliminated the relationship between inauthenticity and prosocial compensation. Finally, we obtained additional evidence for discriminant validity: The observed effects on desire for cleansing were not driven by general negative experiences (i.e., failing a test) but were unique to experiences of inauthenticity. Our results establish that authenticity is a moral state—that being true to thine own self is experienced as a form of virtue.

## Keywords

authenticity, morality, compensatory ethics, helping, prosocial behavior, open data, open materials

Received 6/5/13; Revision accepted 2/8/15

In a notable passage of *Hamlet*, Polonius exhorted his departing son, Laertes, to live to the full extent of his humanity: "This above all: to thine own self be true, . . . Thou canst not then be false to any man" (Shakespeare, 1603/1885, Act 1, Scene iii). Not just the province of a Shakespearean turn of phrase, the desire to be authentic—to act in accordance with one's own sense of self, emotions, and values—seems to be a driving force of human nature (Gecas, 1986, 1991). Scholars, writers, and philosophers have argued that authenticity is a fundamental aspect of individuals' well-being (Harter, 2002). A disconnect between one's expressions and internal states can be psychologically costly, producing palpable discomfort, dissonance, and exhaustion (Ashforth & Tomiuk, 2000; Festinger, 1957; Grandey, 2000). Indeed, some schools of psychotherapy ascribe to Polonius's belief that psychological health can be achieved only by expressing one's true inner thoughts and feelings (Rogers, 1961).

Yet it is also the case that people often profess opinions, modulate their emotional expressions, and act in the service of interpersonal relationships and goal-directed behavior (Ekman & Friesen, 1975; Schlenker, 2002). In fact, the more successful a person is at portraying inauthentic experiences or expressions, the more interpersonally competent he or she is judged to be (Snyder, 1987). Indeed, some scholars have argued that the ability to express thoughts and feelings that contradict one's mental states is an important developmental adaptation (Harter, Marold, Whitesell, & Cobbs, 1996).

In the current research, we attempted to resolve these contradictory claims by exploring whether there is a link

**Corresponding Author:**
Maryam Kouchaki, Kellogg School of Management, Northwestern University, 2001 Sheridan Rd., Evanston, IL 60208
E-mail: m-kouchaki@kellogg.northwestern.edu

*Gino et al.*



**Fig. 1.** Theoretical model for the link between inauthenticity and moral cleansing. Inauthenticity leads to two main consequences of a threatened moral self-concept—feelings of impurity and lower self-regard—as well as dissonance. However, only a threatened moral self-concept explains the link between experiencing inauthenticity and a heightened desire to cleanse oneself and behave prosocially.

between feeling inauthentic and feeling immoral and impure. We suggest that inauthenticity poses a challenge to a person's sense of self. Authenticity involves both owning one's personal experiences (thoughts, emotions, needs, and wants) and acting in accordance with those experiences. A commitment to one's identity and values (Erickson, 1995) is important for effective self-regulation. When this commitment is violated, people feel inauthentic.

Though being untrue to oneself is psychologically costly, by definition it does not constitute immoral behavior. Yet, we argue, people do experience inauthenticity as immoral, feeling that it taints their moral self-concept. Our arguments build on the writings of the numerous philosophers—such as Kierkegaard, Nietzsche, Rand, and Sartre—who have discussed authenticity in relation to morality. For instance, Nietzsche and Sartre believed that individuals need to create their own moral code and act in ways consistent with that code (i.e., they should act authentically).

By contrast, morality is commonly defined in social and interpersonal terms (Haidt & Kesebir, 2010). For example, Turiel (1983) defined morality as "prescriptive judgments of justice, rights, and welfare pertaining to how people ought to relate to each other" (p. 3). Philosophers and psychologists alike have treated being untrue to oneself (inauthenticity) differently from being untrue to others (dishonesty), and have suggested that society tolerates or promotes inauthenticity but universally prohibits dishonesty (Harter et al., 1996).

We, however, suggest that inauthenticity and dishonesty share a similar root: They are both a violation of being true, whether to others or oneself. As a result, they elicit similar psychological and behavioral responses. For instance, expressing excitement for an activity or person

one does not like or trying to fit in with a group that does not share one's values is not defined as immoral behavior per se, but we argue that individuals experience those behaviors as immoral. Feeling as if one is an imposter to oneself produces moral distress and feelings of being morally tainted and impure that are similar to those that accompany dishonesty.

Previous studies have shown that moral threats activate the need to cleanse oneself (Lee & Schwarz, 2010a; Zhong & Liljenquist, 2006). Similarly, the sacred-value-protection model (see Tetlock, Kristel, Elson, Green, & Lerner, 2000) suggests that when people violate their own values, they engage in symbolic or literal moral cleansing to purify their contaminated conscience and reaffirm their core values. Building on this research, we suggest that experiencing inauthenticity results in lower moral self-regard and feelings of impurity, which trigger a desire for physical cleansing and acting prosocially to compensate for violating the true self (Fig. 1). We also argue that cleansing breaks the link between inauthenticity and prosocial compensation.

Our hypotheses differ from cognitive dissonance theory and its variants in two ways. First, building on the sacred-value-protection model, we suggest that the mere contemplation of acting inauthentically is sufficient to produce feelings of moral contamination. It is the inauthenticity and impurity experienced in these situations, and not the inconsistency itself, that lead to the desire to cleanse and morally compensate. Second, dissonance processes are often triggered not by mere inconsistency but rather by aversive consequences (Cooper & Fazio, 1984); what provokes dissonance is the knowledge that one's actions have produced material consequences that violate one's attitudes.

Finally, the research we report here is related to the work by Lee and Schwarz (2010b) showing that the physical act of washing reduces cognitive dissonance by creating a clean slate. However, their research did not examine whether experiencing dissonance increases the desire for physical cleansing, whereas we theorized about and empirically tested the link between inauthenticity and cleansing. Specifically, we directly examined the need for cleansing as a result of feeling morally tainted by experiencing inauthenticity.

## Overview of the Present Research

We tested our predictions in five studies in which people recalled and wrote about a time when they felt authentic or inauthentic. We measured whether inauthenticity influenced people's moral self-regard and feelings of impurity (Experiments 1 and 3) and their desire to cleanse themselves (Experiments 2, 4, and 5). We also linked inauthenticity to prosocial behavior in the form of helping (Experiment 3) and donating money (Experiment 5). To establish discriminant validity, we compared the effects of inauthenticity with the effects of recalling a morally irrelevant, negative experience (i.e., failing a test) in Experiment 3 and with the effects of cognitive dissonance in Experiment 4.

## Experiment 1: The Impurity of Inauthenticity

Experiment 1 examined whether inauthenticity produces feelings of immorality and impurity, independently of whether it involves being untrue to others or untrue only to oneself.

### Method

***Participants and design.*** Two hundred sixty-nine individuals (mean age = 30.73 years, *SD* = 8.07; 143 male) from Amazon Mechanical Turk participated in this study for $1. We calculated our target sample size using an estimated effect size, *f*, of 0.2, which would require a sample size of approximately 270 participants for the study to be powered at 90%.[1] We randomly assigned participants to a 2 (type of behavior: authentic vs. inauthentic) × 2 (type of event: general vs. unrelated to lying) between-subjects design. Two participants did not write an essay and were excluded from the analyses, according to a decision made prior to conducting the study.

***Procedure.*** Participants first read initial instructions welcoming them to the study and answered an attention check. Those who failed the attention check were automatically informed that, on the basis of their answers, they did not qualify for the study. Thus, their data were

not recorded. Participants were then asked to recall an event and write about it for 5 to 10 min. In the authentic-behavior, general-event condition, the instructions read as follows (word changes in the inauthentic-behavior, general-event condition are shown in brackets):

> Please recall a time in your personal or professional life when you behaved in a way that made you feel <u>true [untrue] to yourself, that made you feel authentic [inauthentic]</u>. It should just be a situation in which you felt <u>authentic [inauthentic]</u> with your core self. Please describe the details about this situation that made you feel <u>authentic [inauthentic]</u>. What was it like to be in this situation? What thoughts and feelings did you experience?

In the authentic-behavior, event-unrelated-to-lying condition, the instructions read as follows (word changes in the inauthentic-behavior, event-unrelated-to-lying condition are shown in brackets; boldface is used here for emphasis but was not used in the original instructions):

> Please recall a time in your personal or professional life when you behaved in a way that made you feel <u>true [untrue] to yourself, that made you feel authentic [inauthentic]</u>. **It is important that you choose a situation that is <u>unrelated to telling the truth to others [unrelated to lying or deceiving others]</u>.** It should just be a situation in which you felt <u>authentic [inauthentic]</u> with your core self. Please describe the details about this situation that made you feel <u>authentic [inauthentic]</u>. What was it like to be in this situation? What thoughts and feelings did you experience?

Next, participants completed measures assessing their moral self-regard and feelings of impurity. The order in which these two sets of questions were presented was randomly determined for each participant. Participants then completed manipulation checks and reported their age and gender.

*Moral self-regard.* Participants indicated the extent to which the event they described made them feel moral, generous, cooperative, helpful, loyal to others, dependable, trustworthy, reliable, caring, and respectful (α = .965; adapted from Walker & Hennig, 2004). Responses were on a 7-point scale (ranging from 1, *not at all*, to 7, *to a great extent*).

*Feelings of impurity.* Using the same 7-point scale, participants indicated the extent to which the event they described made them feel impure, dirty, and tainted (α = .94).

**Table 1.** Distribution of Event Descriptions in Experiment 1 by Content Category

| Category | Event unrelated to lying or telling the truth | General event | Average across event types |
|---|---|---|---|
| *Inauthentic-behavior condition* | | | |
| 1. Expressing emotions, attitudes, or opinions that do not match one's internal state | 39.1% | 46.7% | 42.9% |
| 2. Attempting to fit in by conforming to norms or shared attitudes and behaviors, or in the face of social pressure | 53.6% | 30.0% | 41.8% |
| 3. Lying to obtain a material self-interested advantage | 0.0% | 13.3% | 6.7% |
| 4. Theft, stealing | 0.0% | 5.0% | 2.5% |
| 5. Cheating in a relationship | 0.0% | 0.0% | 0.0% |
| 6. Not being able to create something for oneself | 0.0% | 1.7% | 0.8% |
| 7. General[a] | 7.2% | 3.3% | 5.3% |
| *Authentic-behavior condition* | | | |
| 1. Expressing emotions, attitudes, or opinions that match one's internal state | 35.8% | 31.0% | 33.4% |
| 2. Not conforming to norms or shared attitudes and behaviors in the face of social pressure | 32.8% | 36.6% | 34.7% |
| 3. Avoiding lying to obtain a material self-interested advantage | 0.0% | 1.4% | 0.7% |
| 4. Helping (e.g., giving somebody assurance, advice, or support) | 17.9% | 21.1% | 19.5% |
| 5. Being honest in a relationship | 0.0% | 1.4% | 0.7% |
| 6. Creating something for oneself | 6.0% | 4.2% | 5.1% |
| 7. General[a] | 7.5% | 4.2% | 5.9% |

[a]Essays in this category were mainly descriptions of general feelings resulting from the experience.

*Manipulation check: self-alienation*. As a manipulation check, we measured feelings of self-alienation with four items (e.g., "After experiencing the situation I described I felt out of touch with the 'real me,'" "After experiencing the situation I described I felt as if I did not know myself very well"; $\alpha = .88$) that have been used in prior work to measure inauthenticity (Gino, Norton, & Ariely, 2010). We asked participants to indicate their agreement with each of the four items using a 7-point scale (from 1, *strongly disagree*, to 7, *strongly agree*).

*Manipulation check: content of the essay*. As an additional manipulation check, we asked participants to think back to the initial writing task and indicate whether they had written about an event that made them feel authentic, inauthentic, or neutral.

## Results

**Coding of the essays.** Two coders, who were blind to conditions and hypotheses, categorized the situations participants described in their essays. The two coders agreed on the categorization 94% of the time, and disagreements were resolved with a third coder. As Table 1 shows, about 90% of the essays described situations unrelated to ethics. Most were situations in which people expressed emotions, attitudes, or opinions that did not match their internal state or attempted to fit in by conforming to social norms or peer attitudes.

**Manipulation check: content of the essay.** All participants correctly answered the manipulation-check question asking them to indicate how the event they wrote about had made them feel.

**Manipulation check: self-alienation.** A 2 (type of behavior: authentic vs. inauthentic) × 2 (type of event: general vs. unrelated to lying) between-subjects analysis of variance (ANOVA) using self-alienation as the dependent measure revealed only a main effect of type of behavior. Participants in the inauthentic-behavior condition reported greater self-alienation ($M = 4.04$, $SD = 1.37$, 95% confidence interval, CI = [3.82, 4.26]) compared with participants in the authentic-behavior condition ($M = 1.90$, $SD = 1.19$, 95% CI = [1.70, 2.12]), $F(1, 263) = 186.16$, $p < .001$, $\eta_p^2 = .41$.

**Impurity and moral self-regard.** Similar 2 × 2 ANOVAs using impurity and moral self-regard as dependent measures also revealed only a significant main effect of type of behavior. Participants in the inauthentic-behavior condition reported greater feelings of impurity ($M = 3.56$, $SD = 1.86$, 95% CI = [3.30, 3.85]) and lower moral self-regard ($M = 2.90$, $SD = 1.50$, 95% CI = [2.61, 3.16]) than did participants in the authentic-behavior condition (impurity: $M = 1.51$, $SD = 1.29$, 95% CI = [1.25, 1.78]; moral self-regard: $M = 4.99$, $SD = 1.68$, 95% CI = [4.72, 5.26]), $F(1, 263) = 111.06$, $p < .001$, $\eta_p^2 = .30$, and $F(1, 263) = 115.25$, $p < .001$, $\eta_p^2 = .31$, respectively.

***Word count.*** We also examined whether participants' essays varied in length across conditions and found that they did not (all $ps > .30$).

## Discussion

Inauthentic experiences made participants feel more impure and less moral than authentic ones, independently of whether those experiences involved lying to themselves or lying to others. Thus, people experience inauthenticity as a moral state.

## Experiment 2: From Inauthenticity to Cleansing

Experiment 2 examined whether feelings of impurity that result from experiencing inauthenticity lead to a desire to physically cleanse oneself. We measured participants' desire to physically cleanse themselves using both an implicit measure and an explicit measure (Zhong & Liljenquist, 2006).

## Method

***Participants and design.*** Nine hundred six responses were collected from individuals (mean age = 31.88 years, $SD$ = 9.05; 439 male) recruited on Amazon Mechanical Turk, who participated in exchange for $1. We calculated our target sample size using an estimated effect size, $f$, of 0.1, which would require a sample size of 900 participants for the study to be powered at 85%. As in Experiment 1, we randomly assigned participants to a 2 (type of behavior: authentic vs. inauthentic) × 2 (type of event: general vs. unrelated to lying) between-subjects design.

Sixty-eight responses did not meet our inclusion criteria: Some participants completed the study two or more times (22 participants, 49 responses), did not write the requested essay (3 participants), or failed the manipulation check asking them to indicate what type of essay they wrote (16 participants). We excluded the responses of these participants from the analyses, according to a decision made prior to conducting the study. We conducted analyses on the remaining 838 observations.

***Procedure.*** Participants first read some welcoming instructions and then answered two attention checks. Those who failed either attention check were automatically informed that, on the basis of their answers, they could not take part in the study. Participants who passed both attention checks were asked to recall an event and write about it for 5 to 10 min. In each of the four conditions, we used the same instructions for the writing task as in Experiment 1.

Next, participants completed measures assessing accessibility of cleansing-related words, desire to use cleansing-related products (e.g., Tide detergent), and desire to cleanse through behaviors such as taking a shower. The order in which these three sets of measures were presented was randomly determined. Participants then completed manipulation checks and reported their age and gender.

*Accessibility of cleansing-related words.* Participants completed a word-completion task using the first word that came to mind (Zhong & Liljenquist, 2006). The instructions read,

> You will now be presented with a word completion task. You will be given a list of words with letters missing. Your task is to fill in the blanks to make complete words. Please use the first word that comes to mind.

Three of the word segments (W_ _H, SH_ _ER, and S_ _P) could be completed as cleansing-related words (*wash, shower,* and *soap*) or as unrelated, neutral words (e.g., *wish, shaker,* and *step*). The remaining three word segments (F_ O _, B_ _ K, and PA_ _ R) could be completed with neutral words only.

*Cleansing products.* Participants indicated how desirable they found a list of products to be (using a 7-point scale, ranging from 1, *completely undesirable*, to 7, *completely desirable*). The list included five cleansing products (i.e., Dove shower soap, Crest toothpaste, Windex cleaner, Tide detergent, and Lysol disinfectant) and five neutral products (i.e., Post-it Notes, Nantucket Nectars juice, Energizer batteries, Sony CD cases, and Snickers bars). We averaged responses to the five cleansing products to create one aggregate measure ($\alpha$ = .86).

*Cleansing behaviors.* Participants indicated the desirability of various behaviors on a 7-point scale (ranging from 1, *completely undesirable*, to 7, *completely desirable*). Some of the behaviors were related to cleansing (taking a shower, washing hands, brushing teeth, and taking a bath), and others were not (taking a walk, having something to eat, watching TV, and listening to music). We averaged responses to the four cleansing behaviors to create one aggregate measure ($\alpha$ = .75).

*Manipulation checks.* As a manipulation check, we measured self-alienation using the same four-item measure as in Experiment 1 ($\alpha$ = .87). We also asked participants to think back to the initial writing task and indicate the type of essay they wrote, that is, whether they wrote

about an event that made them feel authentic, inauthentic, or neutral.

## Results

***Manipulation check: self-alienation.*** A 2 (type of behavior: authentic vs. inauthentic) × 2 (type of event: general vs. unrelated to lying) between-subjects ANOVA using self-alienation as the dependent measure revealed only a main effect of type of behavior. Participants in the inauthentic-behavior condition reported greater self-alienation ($M = 4.07$, $SD = 1.41$, 95% CI = [3.95, 4.19]) than did participants in the authentic-behavior condition ($M = 1.87$, $SD = 1.07$, 95% CI = [1.75, 1.99]), $F(1, 834) = 655.80$, $p < .001$, $\eta_p^2 = .44$.

***Accessibility of cleansing-related words.*** A similar 2 × 2 ANOVA using the sum of cleansing-related words participants generated as the dependent measure revealed only a main effect of type of behavior (authentic vs. inauthentic). Participants who recalled and wrote about an inauthentic behavior ($M = 1.32$, $SD = 0.99$, 95% CI = [1.23, 1.42]) generated more cleansing-related words than did those who recalled and wrote about an authentic behavior ($M = 1.11$, $SD = 0.93$, 95% CI = [1.02, 1.20]), $F(1, 834) = 10.02$, $p = .002$, $\eta_p^2 = .012$.

***Desirability of cleansing products.*** Similarly, a 2 × 2 ANOVA using participants' desirability ratings of cleansing products as the dependent measure revealed only a main effect of type of behavior (authentic vs. inauthentic). Recalling an inauthentic rather than an authentic behavior led to greater desirability of cleansing products ($M = 3.47$, $SD = 1.48$, 95% CI = [3.33, 3.61], vs. $M = 3.11$, $SD = 1.39$, 95% CI = [2.97, 3.24]), $F(1, 834) = 13.03$, $p < .001$, $\eta_p^2 = .015$, but the desirability of noncleansing products did not differ between the inauthentic-behavior condition ($M = 3.08$, $SD = 1.21$, 95% CI = [2.96, 3.20]) and the authentic-behavior condition ($M = 3.09$, $SD = 1.18$, 95% CI = [2.98, 3.21]), $F < 1$. The effect of inauthenticity on the desirability of cleansing products but not noncleansing ones was confirmed by a significant interaction between type of behavior and type of product (i.e., cleansing related or neutral), $F(1, 834) = 23.94$, $p < .001$, $\eta_p^2 = .028$.

***Desirability of cleansing behaviors.*** Similarly, recalling an inauthentic experience increased the desirability of cleansing behaviors ($M = 4.36$, $SD = 1.37$, 95% CI = [4.22, 4.50], vs. $M = 4.04$, $SD = 1.46$, 95% CI = [3.91, 4.18]), $F(1, 834) = 10.19$, $p = .001$, $\eta_p^2 = .012$, but the desirability of noncleansing behaviors did not differ between the inauthentic-behavior condition ($M = 4.77$, $SD = 1.26$, 95% CI = [4.65, 4.89]) and the authentic-behavior condition ($M = 4.70$, $SD = 1.19$, 95% CI = [4.58, 4.82]), $F < 1$. The effect of inauthenticity on the desirability of cleansing behaviors but not noncleansing ones was confirmed by a significant interaction between type of behavior in the writing task (authentic vs. inauthentic) and type of behavior in the rating task (i.e., cleansing related vs. neutral), $F(1, 834) = 7.92$, $p = .005$, $\eta_p^2 = .009$.

## Discussion

Recalling and writing about an inauthentic experience enhanced a desire for physical cleanliness as measured both implicitly and explicitly. Thus, experiencing inauthenticity heightens the desire to cleanse oneself.

## Experiment 3: Prosocial Compensation and Discriminant Validity

One concern with the previous experiments is the possibility that the results were driven by recalling a negative, or uncomfortable, event. In Experiment 3, we compared effects of inauthenticity and effects of a morally irrelevant negative experience—failing a test—to test whether the observed link between inauthentic behavior and moral cleansing generalizes to any negative experience. By so doing, we tested for discriminant validity and furthered our understanding of the triggers of moral cleansing. We also tested whether inauthenticity produces moral compensation, leading people to act prosocially, and whether feelings of impurity but not dissonance mediate this effect.

## Method

***Participants and design.*** Two hundred ninety-one individuals (mean age = 30.06 years, $SD = 7.87$; 47% male) from local universities in the northeastern United States participated in this study for pay. We calculated our target sample size using an estimated effect size, *f*, of 0.2, which would require a sample size of approximately 280 participants for the study to be powered at 85%. At some of the experimental sessions, however, participants showed up at a higher rate than expected. Experiment 3 was the first in an hour-long series of experiments for which participants received $20 as compensation. Participants were randomly assigned to one of three conditions: inauthenticity, failure, or control. Three participants failed the manipulation check asking them to indicate the type of essay they wrote and were thus excluded from the analyses, according to a decision made prior to conducting the study. We conducted analyses on the remaining 288 participants.

***Procedure.*** Participants first read some general instructions welcoming them to the study, answered one

attention-check question, and then, if they successfully responded to it, moved on to the writing task. In the inauthenticity condition, the instructions read (as in the inauthentic-behavior, general-event condition of Experiments 1 and 2):

> Please recall a time in your personal or professional life when you behaved in a way that made you feel *untrue* to yourself, that made you feel *inauthentic*. It should just be a situation in which you felt inauthentic with your core self.

> Please describe the details about this situation that made you feel *inauthentic*. What was it like to be in this situation? What thoughts and feelings did you experience?

In the failure condition, we asked participants to describe a time when they failed in an activity, test, or project. The instructions read:

> Please recall a time in your personal or professional life when you *failed* in an activity, test, or project in a way that made you feel disappointed.

> Please describe the details about this situation in which you *did not succeed* on a task. What was it like to be in this situation? What thoughts and feelings did you experience?

Finally, in the control condition, we asked participants to describe their activities from the previous day. The instructions read:

> Please recall what happened yesterday, throughout the day.

> Please describe the details about this situation. What was it like to be in this situation? What thoughts and feelings did you experience?

After the writing task, participants completed a questionnaire with a few measures of interest (i.e., feelings of impurity, psychological discomfort, negative and positive affect, and embarrassment), two manipulation-check questions, and demographic questions (age and gender). They then indicated their willingness to help the experimenter with another survey that would take 15 min of their time.

*Feelings of impurity.* As in Experiment 1, participants used a 7-point scale to indicate the extent to which the event they described made them feel impure, dirty, and tainted ($\alpha = .94$).

*Cognitive dissonance.* To assess cognitive dissonance, we used a measure developed by Elliot and Devine (1994) that includes psychological discomfort, negative and positive affect, and also embarrassment. In their work, Elliot and Devine found that psychological discomfort was the distinct affective consequence of engaging in counterattitudinal behavior. For completeness, however, we included all the original items. All items were rated on 7-point scales. Psychological discomfort was assessed through three items: Participants rated how uncomfortable, uneasy, and bothered they felt ($\alpha = .94$). Negative affect was assessed with three items: "angry toward myself," "disgusted with myself," and "annoyed with myself" ($\alpha = .93$). Three items measured positive affect ("happy," "good," and "energetic"; $\alpha = .95$), and two items measured embarrassment ("embarrassed" and "ashamed"; $\alpha = .90$).

*Manipulation Check 1: self-alienation.* As a manipulation check, we measured feelings of self-alienation as in Experiments 1 and 2 ($\alpha = .90$).

*Manipulation Check 2: content of the essay.* As an additional manipulation check, we asked participants to think back to the initial writing task and indicate whether they wrote about an event that made them feel inauthentic, what they did the day before, or a time when they did not succeed.

*Helping.* At the conclusion of the experiment, participants were told that the "research team is interested in understanding how people make choices across various domains (health care, work, food purchases). We have prepared a 15-minute survey. We would love your help. If you can help us out, please click yes below and you will be redirected to the survey. Otherwise, please press No. Note that you will receive no extra payment for completing it." If participants decided to help, they received a message thanking them for choosing to help the research team and then were asked to answer a short questionnaire with general bogus questions.

## Results

Table 2 reports the means and confidence intervals for the variables in this study, separately for each condition.

***Manipulation check: self-alienation.*** A one-way ANOVA using self-alienation as the dependent measure revealed a main effect of condition, $F(2, 285) = 43.23$, $p < .001$, $\eta_p^2 = .23$. Pairwise comparisons (with Bonferroni adjustment) revealed that participants reported greater self-alienation when they recalled and wrote about an inauthentic experience ($M = 3.83$, $SD = 1.51$) than when

*Gino et al.*

**Table 2.** Means and 95% Confidence Intervals (in Brackets) for the Variables Assessed in Experiment 3

| | Condition | | |
|---|---|---|---|
| Variable | Inauthenticity | Failure | Control |
| Self-alienation | $3.83_a$ [3.53, 4.13] | $3.21_b$ [2.92, 3.50] | $1.92_c$ [1.64, 2.21] |
| Feelings of impurity | $3.66_a$ [3.37, 3.95] | $2.09_b$ [1.81, 2.37] | $1.21_c$ [0.93, 1.49] |
| Discomfort | $5.11_a$ [4.78, 5.45] | $4.90_a$ [4.57, 5.23] | $2.41_b$ [2.09, 2.73] |
| Negative affect | $4.62_a$ [4.30, 4.95] | $4.61_a$ [4.30, 4.93] | $1.88_b$ [1.56, 2.19] |
| Positive affect | $1.99_a$ [1.72, 2.27] | $1.84_a$ [1.57, 2.11] | $4.46_b$ [4.29, 4.73] |
| Embarrassment | $4.40_a$ [4.07, 4.74] | $4.69_a$ [4.36, 5.01] | $1.97_b$ [1.64, 2.29] |
| Helping | $33.7\%_a$ [25.3, 42.1] | $17.5\%_b$ [9.4, 25.7] | $16.2\%_b$ [8.1, 24.3] |

Note: Within a row, means with different subscripts are significantly different, $p < .05$.

they recalled and wrote about either a failure ($M = 3.21$, $SD = 1.62$; $p = .012$) or what they had done the previous day ($M = 1.92$, $SD = 1.19$; $p < .001$). Participants also reported greater self-alienation in the failure than in the control condition ($p < .001$).

***Feelings of impurity.*** Feelings of impurity also differed by condition, $F(2, 285) = 72.29$, $p < .001$, $\eta_p^2 = .34$. Pairwise comparisons (with Bonferroni adjustment) revealed that participants reported feeling more impure in the inauthenticity condition ($M = 3.66$, $SD = 1.82$) than in either the failure condition ($M = 2.09$, $SD = 1.57$; $p < .001$) or the control condition ($M = 1.21$, $SD = 0.61$; $p < .001$). Participants also reported greater feelings of impurity in the failure than in the control condition ($p < .001$).

***Psychological discomfort.*** Psychological discomfort, which has been tied to cognitive dissonance, varied across conditions, $F(2, 285) = 82.67$, $p < .001$, $\eta_p^2 = .37$. Pairwise comparisons (with Bonferroni adjustment) revealed that participants reported less psychological discomfort in the control condition ($M = 2.41$, $SD = 1.71$) than in either the inauthenticity condition ($M = 5.11$, $SD = 1.53$; $p < .001$) or the failure condition ($M = 4.90$, $SD = 1.64$; $p < .001$). Participants felt the same amount of psychological discomfort in the failure and inauthenticity conditions ($p = 1.00$).

***Negative and positive affect, and embarrassment.*** Our manipulation also led to differences across conditions in negative affect, $F(2, 285) = 98.28$, $p < .001$, $\eta_p^2 = .41$; positive affect, $F(2, 285) = 116.76$, $p < .001$, $\eta_p^2 = .45$; and embarrassment, $F(2, 285) = 80.77$, $p < .001$, $\eta_p^2 = .36$. As shown in Table 2, participants in the control condition reported lower negative affect, higher positive affect, and lower embarrassment compared with participants in both the failure and the inauthenticity condition (all $ps < .001$), whereas participants in the latter two conditions did not differ on these measures (all $ps > .71$).

***Moral compensation through helping.*** The percentage of participants who decided to help the experimenter varied by condition, $\chi^2(2, N = 288) = 10.35$, $p = .006$, Cramér's $V = .19$. Participants who recalled and wrote about an inauthentic experience were more likely to help the experimenter (33.7%, 31 of 92 participants) than were those in the failure condition (17.5%, 17 of 97 participants), $\chi^2(1, N = 189) = 6.48$, $p = .011$, and those in the control condition (16.2%, 16 of 99 participants), $\chi^2(1, N = 191) = 6.88$, $p = .009$.

***Mediation analysis.*** Next, we examined whether feelings of impurity or psychological discomfort due to cognitive dissonance explained the link between inauthenticity and greater helping. In the logistic regressions, we included a dummy variable for both the inauthenticity condition and the failure condition, using the control condition as the condition of reference. When feelings of impurity and psychological discomfort were included in the equation (in addition to the dummies for the failure condition and the inauthenticity condition), the effect of inauthenticity on helping was reduced (from $b = -0.97$, $SE = 0.35$, Wald $= 7.63$, $p = .006$, to $b = 0.37$, $SE = 0.49$, Wald $= 0.57$, $p = .45$). Feelings of impurity predicted helping ($b = 0.38$, $SE = 0.11$, Wald $= 12.25$, $p < .001$), but psychological discomfort did not ($b = 0.14$, $SE = 0.11$, Wald $= 1.67$, $p = .20$). We conducted bootstrap analyses with 10,000 iterations using a macro provided by Preacher and Hayes (2008) for situations involving multiple mediators. The bootstrapped 95% bias-corrected CI around the indirect effect for impurity, [0.38, 1.56], did not contain zero, but the 95% bias-corrected CI around the indirect effect for psychological discomfort did, [−0.20, 1.01].

### Discussion

Inauthenticity produced greater feelings of impurity and greater moral compensation compared with failing a test. This study demonstrates that the effect of inauthenticity

on moral compensation cannot be attributed to general negative experiences. It also shows that feeling impure, not cognitive dissonance, explains the relationship between inauthenticity and moral compensation through helping.

## Experiment 4: Inauthenticity Is Not Dissonance

Experiment 3 provided preliminary evidence that inauthenticity is distinct from cognitive dissonance. In Experiment 4, we explored this issue further using a cognitive dissonance paradigm. In a typical dissonance study, participants are asked to write a counterattitudinal essay on a personally relevant topic, and perceived choice is manipulated. In the high-choice condition, participants are persuaded to write a counterattitudinal essay, but the request provides a feeling of choice. In the low-choice condition, participants are instructed to write the counterattitudinal essay, which gives them little choice. Dissonance studies show a positive correlation between perceived choice and attitudes toward the counterattitudinal topic (Cooper & Fazio, 1984).

Whereas choice is critical in producing cognitive dissonance, we suggest that choice does not play a role in increasing the desire for cleanliness that is associated with feeling inauthentic. We tested our hypothesis in Experiment 4 by including three conditions: high-choice, counterattitudinal; low-choice, counterattitudinal; and high-choice, proattitudinal. We predicted that participants would experience a greater sense of choice in the high-choice conditions than in the low-choice condition. But we also predicted that participants would express a greater desire for cleanliness whenever they wrote essays that were not consistent with their internal beliefs, regardless of their perceived level of choice. We expected to observe a greater desire for cleanliness in both the high-choice, counterattitudinal condition and the low-choice, counterattitudinal condition compared with the high-choice, proattitudinal condition.

### Method

***Participants and design.*** Four hundred ninety-one college students (mean age = 20.42 years, *SD* = 1.90; 43% male) from Harvard University participated in the study in return for a $10 Amazon gift card. Fifty-four additional students started the study, but dropped out after reading the initial instructions and before the manipulation took place; their data were thus not recorded. We calculated our target sample size using an estimated effect size, *f*, of 0.15, which would require a sample size of approximately 490 participants for the study to be powered at 85%. We recruited 550 participants, knowing—from prior

experience running online studies with this population—that about 10% to 15% of them likely would not complete the study after reading the initial instructions. We randomly assigned participants to one of three conditions: high-choice, counterattitudinal; low-choice, counterattitudinal; or high-choice, proattitudinal.

***Procedure.*** Participants first read initial instructions welcoming them to the study. They were then asked to confirm that they were college students at Harvard. Next, as part of the cognitive dissonance manipulation, we asked participants for their opinion whether or not difficulty ratings should be a part of the Q guide (in which all Harvard courses are rated and reviewed by students who have taken them in the past). This issue was topical and familiar because it was a common topic of debate at the college at the time of the study; most students supported the inclusion of difficulty ratings, and most faculty were against it. Participants indicated whether they were for or against the inclusion of difficulty ratings in the Q guide and reported how strongly they held their opinion (from 1, *not at all*, to 7, *very much so*).

Next, participants were asked for their age, gender, and year in school. They were then told that their first task was to write an essay on a current topic, a task that would take about 5 to 10 min to complete. We manipulated dissonance by giving some participants a choice and other participants no choice regarding whether to write a counterattitudinal essay. All participants were told, "We are interested in the effectiveness of writing on current topics of interest to students." The rest of the instructions varied by condition.

Instructions in the low-choice, counterattitudinal condition indicated,

> We are randomly assigning people to write either a short essay that indicates they are in favor of including difficulty ratings in the Q guide or a short essay that indicates that they are against it. You have been assigned to write a list of arguments in favor of/against [depending on their initial opinion] including difficulty ratings in the Q guide. Therefore, you must argue in support of/against [depending on their initial opinion] including difficulty ratings in the Q guide.

In contrast, the instructions in the high-choice, counterattitudinal condition indicated,

> We are asking people to write a short essay about including difficulty ratings in the Q guide. While we would like to stress the voluntary nature of your decision regarding which side of the issue to write on, we would like you to list arguments in favor of/

*Gino et al.*

**Table 3.** Means and 95% Confidence Intervals (in Brackets) for the Variables Assessed in Experiment 4

| | Condition | | |
|---|---|---|---|
| Variable | Low-choice, counterattitudinal | High-choice, counterattitudinal | High-choice, proattitudinal |
| Perceived choice | $2.85_a$ [2.54, 3.15] | $3.63_b$ [3.29, 3.96] | $5.24_c$ [4.97, 5.52] |
| Self-alienation | $2.70_a$ [2.49, 2.91] | $2.56_a$ [2.36, 2.77] | $1.88_b$ [1.75, 2.02] |
| Desirability of neutral products | $3.84_a$ [3.65, 4.03] | $3.81_a$ [3.61, 4.01] | $3.64_a$ [3.46, 3.83] |
| Desirability of cleansing-related products | $4.34_a$ [4.12, 4.56] | $4.18_a$ [3.95, 4.42] | $3.72_b$ [3.51, 3.93] |

Note: Within a row, means with different subscripts are significantly different, $p < .05$.

against [depending on their initial opinion] including difficulty ratings in the Q guide. Although you are under no obligation to write this, it would be very helpful for us.

Participants in this condition had to check a box to confirm their willingness to write the counterattitudinal essay.

Finally, the instructions in the high-choice, proattitudinal condition were the same as the instructions in the high-choice, counterattitudinal condition except that participants were asked to write about the perspective they supported.

In all three conditions, the last part of the instructions read,

We will be using the essay you write to describe this issue to current undergraduates at Harvard. So it is important that you be as persuasive and convincing as possible to convey the message that difficulty ratings should be included in the Q guide.

Participants in all conditions were instructed to start their essay with the same statement, which appeared at the top of the open box where they wrote their essay: "I believe that Harvard College should [should not] include difficulty ratings in the Q guide because. . . ."

After the writing task, participants received a list of products and indicated how desirable they found them to be, as in Experiment 2. We averaged ratings of the five cleansing products to create one aggregate measure ($\alpha = .84$).

Next, participants indicated the extent to which the writing task they had completed earlier made them feel inauthentic. We measured inauthenticity using the measure of self-alienation we employed in Experiments 1, 2, and 3 ($\alpha = .91$).

Finally, we asked participants, "How much choice did you have in writing the essay you wrote?" (1 = *none at all*, 7 = *a lot*).

### Results

Table 3 reports the means and confidence intervals for the variables measured in this study, separately for each condition.

***Manipulation check: self-alienation.*** A one-way ANOVA using self-alienation as the dependent measure revealed a main effect of condition, $F(2, 487) = 21.14$, $p < .001$, $\eta_p^2 = .08$. Pairwise comparisons (with Bonferroni adjustment) revealed that participants reported lower self-alienation in the proattitudinal condition ($M = 1.88$, $SD = 0.87$) than in both the high-choice, counterattitudinal condition ($M = 2.56$, $SD = 1.31$; $p < .001$) and the low-choice, counterattitudinal condition ($M = 2.70$, $SD = 1.40$; $p < .001$). Participants reported the same perceived self-alienation in the two counterattitudinal conditions ($p = .94$).

***Perceived choice.*** A one-way ANOVA using perceived amount of choice as the dependent measure revealed a main effect of condition, $F(2, 487) = 62.35$, $p < .001$, $\eta_p^2 = .20$. Pairwise comparisons (with Bonferroni adjustment) revealed that participants reported lower perceived choice in the low-choice, counterattitudinal condition ($M = 2.85$, $SD = 1.98$) than in the high-choice, counterattitudinal condition ($M = 3.63$, $SD = 2.16$; $p = .001$) and in the proattitudinal condition ($M = 5.24$, $SD = 1.78$; $p < .001$). Perceived choice was higher in the proattitudinal condition than it was in the high-choice, counterattitudinal condition ($p < .001$).

***Desirability of cleansing products.*** A one-way ANOVA using participants' desirability ratings of cleansing products as the dependent measure revealed a main effect of condition, $F(2, 487) = 8.24$, $p < .001$, $\eta_p^2 = .033$. Pairwise comparisons (with Bonferroni adjustment) revealed that participants reported less desire for cleansing products in the proattitudinal condition ($M = 3.72$, $SD = 1.33$) than in both the high-choice, counterattitudinal condition ($M = 4.18$, $SD = 1.51$; $p = .012$) and the low-choice, counterattitudinal condition ($M = 4.34$, $SD = 1.44$; $p < .001$).

Desirability ratings of cleansing products did not differ between the latter two conditions ($p = .94$). There were no differences across conditions in desirability ratings of the noncleansing products, $F(2, 487) = 1.21$, $p = .30$, $\eta_p^2 = .005$.

## Discussion

Whereas choice is a critical ingredient in producing cognitive dissonance, it played no role in increasing the desire for cleanliness. When participants wrote essays that were not consistent with their internal beliefs, regardless of choice, they showed a greater desire for cleanliness.

## Experiment 5: Reducing Prosocial Compensation Through Cleansing

We have demonstrated that inauthenticity makes people feel morally tainted and leads to a greater desire for cleanliness. In Experiment 5, we used moderation to test whether the relationship between inauthenticity and prosocial compensation is explained through a greater desire for cleansing. We manipulated the opportunity to cleanse to examine whether having this opportunity eliminated the link between inauthenticity and helping.

### Method

**Participants and design.** Two hundred ninety-one individuals (mean age = 22.38 years, $SD = 2.99$; 45% male) from local universities in the northeastern United States participated in this study for pay ($20). We calculated our target sample size using an estimated effect size, $f$, of 0.2, which would require a sample size of approximately 310 participants for the study to be powered at 85%, but the rate at which participants showed up for some of our experimental sessions was lower than expected. We randomly assigned participants to a 2 (behavior recalled: authentic vs. inauthentic) × 2 (opportunity for cleansing: cleansing vs. control) between-subjects design.

**Procedure.** We manipulated authenticity using the same instructions as in the authentic-behavior general-event conditions of Experiments 1 and 2. After completing the writing task, participants were told that the second part of the study consisted of evaluating a product that had been randomly chosen for them. In the cleansing condition, participants were asked to clean their hands carefully with a hand sanitizer placed next to their computer. In the control condition, they were instead asked to place a pen in their hands for a few seconds and examine it carefully. In both conditions, participants were told that they would answer questions about the product later on—which they did, as a filler task.

Following this task, we informed participants that they could donate money to a charity of their choosing. We used willingness to donate money and the amount participants actually donated (from their pay for participating in the experiment) as our main dependent measures.

Next, we asked participants to indicate the extent to which the writing task they had completed earlier made them feel inauthentic. We measured inauthenticity using the measure of self-alienation we employed in our other studies ($\alpha = .88$). Finally, participants reported their age and gender.

### Results

**Manipulation check: self-alienation.** As expected, participants reported feeling more self-alienated in the inauthentic-behavior condition ($M = 3.12$, $SD = 1.42$, 95% CI = [2.89, 3.35]) than in the authentic-behavior condition ($M = 2.36$, $SD = 1.25$, 95% CI = [2.15, 2.57]), $F(1, 287) = 22.82$, $p < .001$, $\eta_p^2 = .074$.

**Likelihood of donating.** We examined whether having the opportunity to cleanse would moderate the effect of inauthenticity on donations. There was a marginally significant interaction between the type of behavior recalled and opportunity for cleansing in predicting the likelihood of donating, $b = 1.65$, $SE = 0.93$, Wald(1) = 3.16, $p = .076$. As depicted in Figure 2, participants in the inauthentic-behavior condition were more likely to donate when they did not clean their hands (25.3%, 95% CI = [16, 35]) than when they did (4.5%, 95% CI = [–0.1, 10]), $\chi^2(1, N = 149) = 11.72$, $p = .001$, Cramér's $V = .28$.

Participants who recalled and wrote about an authentic behavior decided to donate about as often whether they cleaned their hands (6.0%, 95% CI = [0, 12]) or did not (8.0%, 95% CI = [2, 14]; see Fig. 2), $\chi^2(1, N = 142) = 0.22$, $p = .64$, Cramér's $V = .04$. Thus, increased helping was observed in the inauthentic-behavior condition only among those participants who were not given an opportunity to cleanse themselves. Our results suggest that the act of cleaning their hands assuaged participants' feelings of impurity from acting inauthentically and reduced their motivation to compensate for these feelings by acting prosocially.

**Amount donated.** The results for the amount of money participants actually donated mirrored the results for the likelihood of donating. There was a significant interaction between the type of behavior recalled and opportunity for cleansing in predicting the amount donated, $F(1, 287) = 6.17$, $p = .014$, $\eta_p^2 = .021$. Participants in the inauthentic-behavior condition donated a larger amount of money when they did not clean their hands than when

994    *Gino et al.*



**Fig. 2.** Results from Experiment 5: percentage of people who decided to donate by condition.

they did ($M$ = \$1.33, $SD$ = \$2.76, 95% CI = [\$0.72, \$1.93], vs. $M$ = \$0.24, $SD$ = \$1.37, 95% CI = [−\$0.09, \$0.58]), $F$(1, 287) = 12.09, $p$ = .001. But when participants recalled and wrote about an authentic behavior, they tended to donate the same amount of money whether they cleaned their hands with the hand sanitizer ($M$ = \$0.42, $SD$ = \$1.84, 95% CI = [−\$0.03, \$0.87]) or they did not ($M$ = \$0.35, $SD$ = \$1.42, 95% CI = [\$0.02, \$0.67]), $F$(1, 287) < 1, $p$ = .77.

### *Discussion*

Experiment 5 further established that the relationship between inauthenticity and moral compensation is explained through cleansing behavior. When participants had the opportunity to cleanse themselves, the relationship between inauthenticity and prosocial behavior was eliminated.

### General Discussion

People often act inauthentically, in various ways, from arguing for a cause they do not believe in to expressing affection toward someone they truly dislike. Our five experiments establish that authenticity is linked to a moral state. When participants recalled a time that they behaved inauthentically, rather than authentically, they felt more impure and less moral, and experienced a greater desire for physical cleanliness. This heightened desire, in turn, made them more likely to behave prosocially to compensate for their feelings of impurity. We established the role of cleanliness as the link between

inauthenticity and moral compensation through both mediation and moderation. Our results for feelings of impurity, the desire to cleanse, and prosocial behavior cannot be attributed to negative experiences more generally (e.g., failing a test), but rather must be attributed to inauthenticity. Our findings provide the first empirical evidence of discriminant validity in the literature on moral cleansing and moral compensation. We also found that the effects of inauthenticity were not reducible to cognitive dissonance or driven by psychological distress.

Our research contributes to the literature on moral psychology and behavioral ethics. Past research has found that morality is malleable and dynamic, that situational and social pressure can lead moral people to act dishonestly (Monin & Jordan, 2009). It is commonly assumed that unethical behavior involves people violating a norm shared by others and that this violation produces negative feelings. We have shown that violating internal norms can lead to very similar consequences. When people behave in ways that are inconsistent with their own sense of self, they feel morally tainted and engage in behaviors to compensate for these feelings.

Our results also contribute to the literature examining compensatory behaviors that follow threats, and aversive states that accompany threats. Proulx and Inzlicht's (2012; see also Proulx, Inzlicht, & Harmon-Jones, 2012) meaning-maintenance model integrates various social-psychological theories about compensatory behaviors following threats and expectancy violations. Our results are consistent with this model: Inauthenticity serves as a threat and leads people to experience a greater desire for cleanliness, to compensate for the aversive experience that made them feel immoral and impure.

Although we have demonstrated that inauthenticity is not reducible to dissonance, we have not established that inauthenticity is distinct from other inconsistency-related threats (e.g., ambivalence, self-uncertainty). It is possible that the dissonance participants experienced in the low-choice condition of Experiment 4 resulted from a more general sense of ambivalence, inconsistency, or self-uncertainty (e.g., van Harreveld, Schneider, Nohlen, & van der Pligt, 2012). Future research should establish the unique characteristics that differentiate inauthenticity from these other inconsistency-related threats. We expect that ambivalence or self-uncertainty would not increase feelings of impurity or desire for cleanliness but would lead to compensation through other pathways.

From Shakespeare to Sartre to Rand, writers and philosophers alike have suggested that authenticity is a moral state. Our research provides the first empirical demonstration that there is indeed a link between authenticity and morality. Our results suggest why laughing at the jokes of detested colleagues or dancing when one feels blue makes one run for the showers and behave more prosocially.

## Author Contributions

All authors developed the study concept and contributed to the study design. Testing and data collection were performed by F. Gino and M. Kouchaki. F. Gino and M. Kouchaki drafted the manuscript, and A. D. Galinsky provided critical revisions. All authors approved the final version of the manuscript for submission.

## Declaration of Conflicting Interests

The authors declared that they had no conflicts of interest with respect to their authorship or the publication of this article.

## Open Practices

 

All data and materials have been made publicly available via the Harvard Dataverse Network and can be accessed at https://osf.io/sd76g/. The complete Open Practices Disclosure for this article can be found at http://pss.sagepub.com/content/by/supplemental-data. This article has received badges for Open Data and Open Materials. More information about the Open Practices badges can be found at https://osf.io/tvyxz/wiki/view/ and http://pss.sagepub.com/content/25/1/3.full.

## Note

1. We used a high level of power for the first study we conducted and then adjusted power levels as we conducted more studies.

## References

Ashforth, B. E., & Tomiuk, M. A. (2000). Emotional labour and authenticity: Views from service agents. In S. Fineman (Ed.), *Emotion in organizations* (pp. 184–203). London, England: Sage.

Cooper, J., & Fazio, R. H. (1984). A new look at dissonance theory. In L. Berkowitz (Ed.), *Advances in experimental social psychology* (Vol. 17, pp. 229–266). New York, NY: Academic Press.

Ekman, P., & Friesen, W. V. (1975). *Unmasking the face: A guide to recognizing emotions from facial clues*. Englewood Cliffs, NJ: Prentice-Hall.

Elliot, A. J., & Devine, P. G. (1994). On the motivational nature of cognitive dissonance: Dissonance as psychological discomfort. *Journal of Personality and Social Psychology*, *67*, 382–394.

Erickson, R. J. (1995). The importance of authenticity for self and society. *Symbolic Interaction*, *18*, 121–144.

Festinger, L. (1957). *A theory of cognitive dissonance*. Stanford, CA: Stanford University Press.

Gecas, V. (1986). The motivational significance of self-concept for socialization theory. In E. Lawler (Ed.), *Advances in group processes* (Vol. 3, pp. 131–156). Greenwich, CT: JAI.

Gecas, V. (1991). The self-concept as a basis for a theory of motivation. In J. A. Howard & P. L. Callero (Eds.), *The self-society dynamic: Cognition, emotion, and action* (pp. 171–187). New York, NY: Cambridge University Press.

Gino, F., Norton, M., & Ariely, D. (2010). The counterfeit self: The deceptive costs of faking it. *Psychological Science*, *21*, 712–720.

Grandey, A. A. (2000). Emotional regulation in the workplace: A new way to conceptualize emotional labor. *Journal of Occupational Health Psychology*, *5*, 95–110.

Haidt, J., & Kesebir, S. (2010). Morality. In S. Fiske, D. Gilbert, & G. Lindzey (Eds.), *Handbook of social psychology* (5th ed., pp. 797–832). Hoboken, NJ: Wiley.

Harter, S. (2002). Authenticity. In C. R. Snyder & S. J. Lopez (Eds.), *Handbook of positive psychology* (pp. 382–394). London, England: Oxford University Press.

Harter, S., Marold, D. B., Whitesell, N. R., & Cobbs, G. (1996). A model of the effects of perceived parent and peer support on adolescent false self behavior. *Child Development*, *67*, 360–374.

Lee, S. W. S., & Schwarz, N. (2010a). Of dirty hands and dirty mouths: Embodiment of the moral purity metaphor is specific to the motor modality involved in moral transgression. *Psychological Science*, *21*, 1423–1425.

Lee, S. W. S., & Schwarz, N. (2010b). Washing away postdecisional dissonance. *Science*, *328*, 709.

Monin, B., & Jordan, A. H. (2009). The dynamic moral self: A social psychological perspective. In D. Narvaez & D. Lapsley (Eds.), *Personality, identity, and character: Explorations in moral psychology* (pp. 341–354). New York, NY: Cambridge University Press.

Preacher, K. J., & Hayes, A. F. (2008). Asymptotic and resampling strategies for assessing and comparing indirect effects in multiple mediator models. *Behavior Research Methods*, *40*, 879–891.

Proulx, T., & Inzlicht, M. (2012). The five "A"s of meaning maintenance: Finding meaning in the theories of sense-making. *Psychological Inquiry*, *23*, 317–335.

Proulx, T., Inzlicht, M., & Harmon-Jones, E. (2012). Understanding all inconsistency compensation as a palliative response to violated expectations. *Trends in Cognitive Sciences*, *16*, 285–291.

Rogers, C. (1961). *On becoming a person: A therapist's view of personality*. Boston, MA: Houghton Mifflin.

Schlenker, B. R. (2002). Self-presentation. In M. R. Leary & J. P. Tangney (Eds.), *Handbook of self and identity* (pp. 492–518). New York, NY: Guilford Press.

Shakespeare, W. (1885). *Tragedy of Hamlet, Prince of Denmark* (H. B. Sprague, Ed.). Chicago, IL: S. R. Winchell. (Original work published 1603) Retrieved from https://archive.org/details/shakespearestrag251shak

Snyder, M. (1987). *Public appearances/private realities: The psychology of self-monitoring*. New York, NY: Freeman.

Tetlock, P. E., Kristel, O., Elson, B., Green, M., & Lerner, J. (2000). The psychology of the unthinkable: Taboo trade-offs, forbidden base rates, and heretical counterfactuals. *Journal of Personality and Social Psychology*, *78*, 853–870.

Turiel, E. (1983). *The development of social knowledge: Morality and convention*. Cambridge, England: Cambridge University Press.

van Harreveld, F., Schneider, I. K., Nohlen, H., & van der Pligt, J. (2012). Ambivalence and conflict in attitudes and decision-making. In B. Gawronski & F. Strack (Eds.), *Cognitive consistency: A fundamental principle in social cognition* (pp. 285–304). New York, NY: Guilford Press.

Walker, L. J., & Hennig, K. H. (2004). Differing conceptions of moral exemplarity: Just, brave, and caring. *Journal of Personality and Social Psychology, 86*, 629–647.

Zhong, C.-B., & Liljenquist, K. (2006). Washing away your sins: Threatened morality and physical cleansing. *Science, 313*, 1451–1452.

*Research Article*



# Evil Genius? How Dishonesty Can Lead to Greater Creativity

Psychological Science
2014, Vol. 25(4) 973–981
© The Author(s) 2014
Reprints and permissions:
sagepub.com/journalsPermissions.nav
DOI: 10.1177/0956797614520714
pss.sagepub.com
⑤SAGE

## Francesca Gino[1] and Scott S. Wiltermuth[2]

[1]Harvard Business School, Harvard University, and [2]Marshall School of Business, University of Southern California

## Abstract

We propose that dishonest and creative behavior have something in common: They both involve breaking rules. Because of this shared feature, creativity may lead to dishonesty (as shown in prior work), and dishonesty may lead to creativity (the hypothesis we tested in this research). In five experiments, participants had the opportunity to behave dishonestly by overreporting their performance on various tasks. They then completed one or more tasks designed to measure creativity. Those who cheated were subsequently more creative than noncheaters, even when we accounted for individual differences in their creative ability (Experiment 1). Using random assignment, we confirmed that acting dishonestly leads to greater creativity in subsequent tasks (Experiments 2 and 3). The link between dishonesty and creativity is explained by a heightened feeling of being unconstrained by rules, as indicated by both mediation (Experiment 4) and moderation (Experiment 5).

## Keywords

creativity, dishonesty, ethics, moral flexibility, rule breaking, morality, decision making

Received 8/1/13; Revision accepted 12/28/13

Researchers across disciplines have become increasingly interested in understanding why even people who care about morality predictably cross ethical boundaries. This heightened interest in unethical behavior, defined as acts that violate widely held moral rules or norms of appropriate conduct (Treviño, Weaver, & Reynolds, 2006), is easily understood. Unethical behavior creates trillions of dollars in financial losses every year and is becoming increasingly commonplace (PricewaterhouseCoopers, 2011).

One form of unethical behavior, dishonesty, seems especially pervasive (Bazerman & Gino, 2012). Like other forms of unethical behavior, dishonesty involves breaking a rule—the social principle that people should tell the truth. Much of the scholarly attention devoted to understanding why individuals behave unethically has therefore focused on the factors that lead people to break rules.

Although rule breaking carries a negative connotation in the domain of ethics, it carries a positive connotation in another well-researched domain: creativity. To be creative, it is often said, one must "think outside the box" and use divergent thinking (Guilford, 1967; Runco, 2010; Simonton, 1999). Divergent thinking requires that people break some (but not all) rules within a domain to construct associations between previously unassociated cognitive elements (Bailin, 1987; Guilford, 1950). The resulting unusual mental associations serve as the basis for novel ideas (Langley & Jones, 1988; Sternberg, 1988). The creative process therefore involves rule breaking, as one must break rules to take advantage of existing opportunities or to create new ones (Brenkert, 2009). Thus, scholars have asserted that organizations may foster creativity by hiring people slow to learn the organizational code (Sutton, 2001, 2002) and by encouraging people to break from accepted practices (Winslow & Solomon, 1993) or to break rules (Baucus, Norton, Baucus, & Human, 2008; Kelley & Littman, 2001).

Given that both dishonesty and creativity involve rule breaking, the individuals most likely to behave dishonestly and the individuals most likely to be creative may be one and the same. Indeed, highly creative people are

**Corresponding Author:**
Francesca Gino, Harvard University, Harvard Business School, Baker Library 447, Boston, MA 02163
E-mail: fgino@hbs.edu

*Gino, Wiltermuth*

more likely than less creative people to bend rules or break laws (Cropley, Kaufman, & Cropley, 2003; Sternberg & Lubart, 1995; Sulloway, 1996). Popular tales are replete with images of "evil geniuses," such as Rotwang in *Metropolis* and "Lex" Luthor in *Superman*, who are both creative and nefarious in their attempts to ruin humanity. Similarly, news articles have applied the "evil genius" moniker to Bernard Madoff, who made $20 billion disappear using a creative Ponzi scheme.

The causal relationship between creativity and unethical behavior may take two possible forms: The creative process may trigger dishonesty; alternatively, acting unethically may enhance creativity. Research has demonstrated that enhancing the motivation to think outside the box can drive people toward more dishonest decisions (Beaussart, Andrews, & Kaufman, 2013; Gino & Ariely, 2012). But could acting dishonestly enhance creativity in subsequent tasks?

In five experiments, we obtained the first empirical evidence that behaving dishonestly can spur creativity and examined the psychological mechanism explaining this link. We suggest that after behaving dishonestly, people feel less constrained by rules, and are thus more likely to act creatively by constructing associations between previously unassociated cognitive elements.

## Experiment 1: Cheaters Are Creative

In our first study, we examined whether individuals who behave unethically are more creative than others on a subsequent task, even after controlling for differences in baseline creative skills.

### *Method*

**Participants.** One hundred fifty-three individuals recruited on Amazon Mechanical Turk (MTurk; 59% male, 41% female; mean age = 30.08, *SD* = 7.12) participated in the study for a $1 show-up fee and the opportunity to earn a $10 performance-based bonus. We told participants that 10% of the study participants would be randomly selected to receive this bonus.

**Procedure.** The study included four supposedly unrelated tasks: an initial creativity task (the Duncker candle problem), a 2-min filler task, a problem-solving task, and the Remote Association Task (RAT; Mednick, 1962).

Participants first completed the Duncker candle problem (Fig. 1). They saw a picture containing several objects on a table and next to a cardboard wall: a candle, a pack of matches, and a box of tacks. Participants had 3 min "to figure out, using only the objects on the table, how to attach the candle to the wall so that the candle burns properly and does not drip wax on the table or the floor."



**Fig. 1.** The Duncker candle problem presented to participants in Experiment 1.

The correct solution involves using the box of tacks as a candleholder: One should empty the box of tacks, tack it to the wall, and then place the candle inside. Finding the correct solution is considered a measure of insight creativity because it requires people to see objects as capable of performing atypical functions (Maddux & Galinsky, 2009). Thus, the hidden solution to the problem is inconsistent with the preexisting associations and expectations individuals bring to the task (Duncker, 1945; Glucksberg & Weisberg, 1966).

Next, participants performed a filler task. They then completed a problem-solving task under time pressure. Each of 10 matrices presented a set of 12 three-digit numbers (e.g., 4.18; see Mazar, Amir, & Ariely, 2008), and the task was to find two numbers in the matrix that added up to 10. Participants were shown one matrix at a time and had 20 s to solve each one. If participants did not find the solution within the allotted time, the computer program moved to the next matrix. After participants attempted to solve the 10 matrices, they self-reported their performance. For each correct solution, participants could receive $1 if they were among those randomly selected to receive the bonus. The program recorded participants' answer for each matrix, but the instructions did not explicitly state this. Thus, participants could cheat by inflating their performance on this task.

Finally, participants completed the RAT, which measures creativity by assessing people's ability to identify associations between words that are normally associated. Each item consists of a set of three words (e.g., *sore, shoulder, sweat*), and participants must find a word that

is logically linked to them (*cold*). Participants had 5 min to solve 17 RAT items. Success on the RAT requires people to think of uncommon associations that stimulus words may have instead of focusing on the most common and familiar associations of those words.

### Results and discussion

Forty-eight percent of the participants correctly solved the Duncker candle problem. Almost 59% of the participants cheated on the problem-solving task by reporting that they had solved more matrices than they had actually solved. Cheaters performed better on the RAT ($M = 9.00$ items correct, $SD = 3.38$) than did noncheaters ($M = 5.76$, $SD = 3.38$), even when we controlled for creative performance on the Duncker candle problem, $F(1, 150) = 22.03$, $p < .001$, $\eta_p^2 = .13$.

Cheating on the matrix task mediated the effect of participants' initial creativity on their RAT performance (Baron & Kenny, 1986). The effect of baseline creativity weakened (from $\beta = 0.30$, $p < .001$, to $\beta = 0.15$, $p = .056$) when cheating was included in the regression, and cheating significantly predicted RAT performance ($\beta = 0.37$, $p < .001$). A bootstrap analysis showed that the 95% bias-corrected confidence interval (CI) for the size of the indirect effect excluded zero (0.57, 1.80), suggesting a significant indirect effect (MacKinnon, Fairchild, & Fritz, 2007).

These results provided initial evidence that behaving dishonestly enhances creativity. Individual differences in creative ability between cheaters and noncheaters did not explain this finding.

## Experiment 2: The Act of Cheating Enhances Creativity

One limitation of Experiment 1 is that people decided for themselves whether or not to cheat. In Experiment 2, we used random assignment to test whether acting dishonestly increases creativity in subsequent tasks. To induce cheating, we used a manipulation in which cheating occurs by omission rather than commission and in which people are tempted to cheat in multiple rounds. Because of these features, most people tend to cheat on this task (Shu & Gino, 2012).

### Method

**Participants.** One hundred one students from universities in the southeastern United States (39% male, 61% female; mean age = 21.48, $SD = 7.23$) participated in the study for a $5 show-up fee and the opportunity to earn an additional $10 performance-based bonus. We randomly assigned participants to either the likely-cheating or the control condition.

**Procedure.** The study included two supposedly unrelated tasks: a computer-based math-and-logic game and the RAT. The cheating manipulation was implemented in the computer-based game (Vohs & Schooler, 2008; von Hippel, Lakin, & Shakarchi, 2005), which involved answering 20 different math and logic multiple-choice problems presented individually. Participants had 40 s to answer each question and could earn 50¢ for each correct answer.

In the control condition, participants completed the task with no further instructions. In the likely-cheating condition, the experimenter informed participants that the computer had a programming glitch: While they worked on each problem, the correct answer would appear on the screen unless they stopped it from being displayed by pressing the space bar right after the problem appeared. The experimenter also informed participants that although no one would be able to tell whether they had pressed the space bar, they should try to solve the problems on their own (thus being honest). In actuality, the presentation of the answers was a feature of the program and not a glitch, and the number of space-bar presses was recorded. We used the number of times participants did not press the space bar to prevent the correct answer from appearing as our measure of cheating.

After the math-and-logic game, participants completed 12 RAT problems, which constituted our creativity measure.

### Results and discussion

Most participants (51 out of 53) cheated in the likely-cheating condition of the math-and-logic game. An analysis including only these 51 cheaters in the likely-cheating condition revealed that RAT performance was higher in the likely-cheating condition ($M = 6.20$ items correct, $SD = 2.72$) than in the control condition ($M = 4.65$, $SD = 2.98$), $t(97) = 2.71$, $p = .008$. Similarly, we found a significant difference in RAT performance between the two conditions when all 53 participants in the likely-cheating condition were included in the analysis (likely-cheating condition: $M = 6.25$, $SD = 2.70$), $t(99) = 2.83$, $p = .006$. These results indicate that cheating increased creativity on a subsequent task and provide further support for our main hypothesis.

## Experiment 3: Breaking Rules With and Without Ethical Implications

One may argue that people often deviate from rules when they can and that this makes them more creative—even when the rule they break does not have ethical implications. In Experiment 3, we addressed this alternative explanation by using two conditions that did not differ in how likely participants were to disobey the rules

on how to solve the task at hand but did differ in whether they enabled participants to lie. Because of this feature, participants who lied would break an additional rule, a rule with ethical implications. We reasoned that breaking rules with ethical implications (i.e., people should not lie) promotes greater creativity than does violating rules without ethical implications because the former constitutes a stronger rejection of rules. As a result, we predicted that only the condition that enabled lying would enhance creativity, which would provide evidence that cheating specifically increases creativity. Another difference from the prior experiments is that we used two different tasks to measure creativity in Experiment 3.

### Method

**Participants.** One hundred twenty-nine individuals recruited on MTurk (58% male, 42% female; mean age = 27.72, *SD* = 7.86) participated in this study for $2.

**Procedure.** We described the study as including various tasks, the first of which was a standard anagram task that tested verbal abilities. To motivate successful performance on this task, we told participants that performance on an anagram task predicts verbal ability, which is correlated with career potential. In this task (adapted from Irwin, Xu, & Zhang, 2014), participants had to complete as many anagrams as they could in 3 min. The instructions specified several rules participants had to follow (see the Supplemental Material available online). For each anagram, participants had to rearrange a set of letters to form a meaningful word (e.g., *tiarst* can make *artist*). In addition, participants were supposed to provide only one answer per anagram, even if the anagram had more than one solution. Because each anagram had multiple answers, the instructions stated, the computer program could not validate their answers automatically. Thus, participants had to keep track of how many anagrams they had solved and self-report the number at the end of the task.

After participants completed the task, they were randomly assigned to either the likely-cheating or the control condition. These two conditions differed in the choice options people were given to report their performance. In a pretest, we found that, on average, participants recruited on MTurk (age range: 18–50) solved 5 to 8 anagrams in the allotted time. Thus, to induce participants to inflate their performance, in the likely-cheating condition, we used the following options: "0–8: lower verbal learners"; "9–14: average for students in good colleges"; "15–20: typical for students in Ivy League colleges"; and "21–higher: common for English professors and novelists." Because most participants would likely fall into the "lower verbal learners" category, their intelligence would be threatened, and they would therefore be

tempted to cheat by inflating their performance (as in Gino & Mogilner, 2014). In the control condition, we used the following options: "0–5: average for students in good colleges"; "6–10: typical for students in Ivy League colleges"; and "11–higher: common for English professors and novelists." In this case, most participants would likely fall into an acceptable bracket and would therefore not feel tempted to lie. Thus, participants in both conditions had the opportunity to break the numerous rules listed in the instructions, but those in the likely-cheating condition were more tempted to lie.

Following the anagram task, participants completed two tasks assessing their creativity: the uses task and 17 RAT problems (as in Experiment 1). For the uses task, they had to generate as many creative uses for a newspaper as possible within 1 min (Guilford, 1967). To assess creativity on this task, we coded responses for fluency (i.e., the total number of uses), flexibility (i.e., the number of uses that were different from one another), and originality (averaged across the different suggested ideas).

### Results and discussion

Table 1 reports the means for the key variables assessed in this study, separately for the two conditions.

Forty percent of participants (26 out of 65) in the likely-cheating condition cheated, and only 4.7% (3 out of 64) in the control group did, $\chi^2(1, N = 129) = 23.08$, $p < .001$. Actual performance on the anagram task did not differ between conditions, $t(127) = 0.23$, $p = .82$.

All measures of creativity were higher in the likely-cheating condition than in the control condition—RAT performance: $t(127) = 2.17$, $p = .032$; fluency on the uses task: $t(127) = 2.47$, $p = .015$; flexibility on the uses task: $t(127) = 1.82$, $p = .072$; and originality on the uses task: $t(127) = 3.24$, $p = .002$. Thus, cheating enhanced creativity.[1]

### Experiment 4: Feeling Unconstrained by Rules

In Experiment 4, we examined why cheating enhances creativity by measuring the extent to which participants felt that they were not constrained by rules. We also used a different task to assess cheating. In our previous studies, we used tasks in which performance was partially due to ability and effort. Such tasks may be cognitively depleting, and behaving honestly may have required greater cognitive effort than behaving dishonestly. In Experiment 4, we used a coin-toss task in which cheating and acting honestly likely involve the same cognitive effort. Finally, we also measured affect to rule out the possibility that emotions partially explain the effects of dishonesty on creativity.

**Table 1.** Means for the Key Variables in Experiment 3

| Condition | Number of anagrams solved | Uses task | | | Number of RAT items solved |
|---|---|---|---|---|---|
| | | Fluency | Flexibility | Originality | |
| Likely-cheating | 4.17 (3.26) | 6.02 (2.02) | 5.18 (2.01) | 3.69 (1.21) | 6.85 (3.82) |
| Control | 4.05 (2.89) | 5.20 (1.70) | 4.58 (1.78) | 3.06 (0.97) | 5.47 (3.38) |

Note: The values in parentheses are standard deviations. RAT = Remote Association Task (Mednick, 1962).

## Method

**Participants.** One hundred seventy-eight individuals recruited on MTurk (47% male, 53% female; mean age = 28.59, $SD$ = 7.72) participated in the study for $1 and the opportunity to earn a $1 bonus.

**Procedure.** The instructions explained that the goal of the study was to investigate the relationships among people's different abilities, such as attention, performance under pressure, and luck. Participants also learned that they would receive monetary bonuses based on their performance on different tasks.

We first asked participants to guess whether the outcome of a virtual coin toss would be heads or tails. After indicating their prediction, participants had to press a button to toss the coin virtually. They were asked to press the button only once. To give participants room for justifying their own cheating, we included a note at the bottom of the screen that stated, "Before moving to the next screen, please press the 'Flip!' button a few more times just to make sure the coin is legitimate" (a procedure adapted from Shalvi, Dana, Handgraaf, & De Dreu, 2011). Participants then reported whether they had guessed correctly and received a $1 bonus if they had. The program recorded the outcomes of the initial virtual coin tosses so that we could tell whether participants cheated.

Afterward, for each of three pictures (see Fig. 2), participants used a 7-point scale (1 = *not at all*, 7 = *very much*) to respond to the question, "If you were in the situation depicted in the picture, to what extent would you care about following the rules?" We averaged each participant's answers across the three items to create a measure for caring about rules ($\alpha$ = .81).

Participants then completed the same two creativity tasks as in Experiment 3. Finally, participants indicated how they felt right after finishing the coin-toss task, using the 20-item Positive and Negative Affectivity Schedule (PANAS; Watson, Clark, & Tellegen, 1988). The PANAS captured both positive affect ($\alpha$ = .90) and negative affect ($\alpha$ = .90) on a 5-point scale (1 = *very slightly or not at all*, 5 = *extremely*).

## Results and discussion

Twenty-four percent of participants (43 out of 178) cheated on the coin-toss task. Table 2 reports the means for the key variables assessed in this study, separately for cheaters and noncheaters.

Participants who cheated on the coin-toss task reported caring less about rules than did those who did not cheat, $t(176)$ = −6.48, $p$ < .001. All four measures of creativity were higher for cheaters than they were for noncheaters—fluency on the uses task: $t(176)$ = 4.24, $p$ < .001; flexibility on the uses task: $t(176)$ = 4.02, $p$ < .001; originality on the uses task: $t(176)$ = 6.85, $p$ < .001; and RAT performance: $t(176)$ = 2.54, $p$ = .012. Cheaters and noncheaters reported similar levels of positive and negative affect after the coin-toss task ($p$s > .36).

We tested whether participants' feelings about rules explained the link between cheating and creativity. For this analysis, we standardized the four measures of creative performance and then averaged them into one composite measure. The effect of cheating on subsequent creativity was significantly reduced (from $\beta$ = 0.43, $p$ < .001, to $\beta$ = 0.35, $p$ < .001) when participants' caring about rules was included in the equation, and such feeling predicted creative performance ($\beta$ = −0.18, $p$ = .017; 95% bias-corrected CI = [0.02, 0.29]). These results provide evidence that feeling unconstrained by rules underlies the link between dishonesty and creativity.

## Experiment 5: Evidence for Mediation Through Moderation

In Experiment 4, we tested whether caring about rules explained the relationship between dishonesty and creativity using a traditional mediation approach. In Experiment 5, we obtained further evidence for this mediating mechanism using a moderation approach (as recommended by Spencer, Zanna, & Fong, 2005).

## Method

**Participants.** Two hundred eight individuals from the northeastern United States (56% male, 44% female; mean





**Fig. 2.** Images used to assess the extent to which participants in Experiment 4 felt unconstrained by rules.

age = 21.66, *SD* = 2.64; 88% students) participated in the study for $10 and the opportunity to earn additional money.

***Procedure.*** Participants were randomly assigned to one of four experimental conditions in a 2 (cheating condition: opaque vs. transparent) × 2 (prime condition: rule-breaking prime vs. neutral prime) between-subjects design. They read that they would be completing a series of short tasks involving luck and skill, and that some of these tasks involved a bonus payment.

The first task was a die-throwing game (Jiang, 2013). In this game, participants could throw a virtual six-sided die 20 times to earn points (which would be translated to real dollars and added to participants' final payment). Participants were reminded that each pair of numbers on opposite sides of the die added up to 7: 1 vs. 6, 2 vs. 5, and 3 vs. 4. We called the visible side that was facing up "U" and the opposite, invisible side that was facing down "D." Participants received the following instructions:

In each round, the number of points that you score depends on the throw of the die as well as on the side that you have chosen in that round. Each round consists of one throw. Before throwing, you have to choose the relevant side for that round. Note that the die outcomes are random and the outcome you see on the screen corresponds to the upside. . . . For instance, if you have chosen "D" in your mind and the die outcome turns up to be "4," you earn 3 points for that throw, whereas if you have chosen "U" in your mind, you earn 4 points. Across the 20

**Table 2.** Means for the Key Variables in Experiment 4

| Participant group | Uses task | | | Number of RAT items solved | Caring about rules | Positive affect | Negative affect |
|---|---|---|---|---|---|---|---|
| | Fluency | Flexibility | Originality | | | | |
| Cheaters | 8.33 (2.80) | 6.81 (2.85) | 3.60 (1.26) | 9.47 (4.38) | 3.66 (1.76) | 2.52 (0.80) | 1.56 (0.62) |
| Noncheaters | 6.52 (2.31) | 5.25 (1.98) | 2.33 (1.00) | 7.84 (3.38) | 5.28 (1.31) | 2.42 (0.89) | 1.46 (0.63) |

Note: The values in parentheses are standard deviations. RAT = Remote Association Task (Mednick, 1962).

rounds you can earn a maximum of 100 points. Each point is worth 20 cents, so you can make a maximum of $20.

In the opaque condition, participants had to choose between U and D in their mind before every throw, and after each throw, they had to indicate the side they had chosen before the throw. In the transparent condition, participants were also asked to choose between U and D in their mind before every throw, but in this case, they had to report their choice before throwing the virtual die. Thus, the opaque condition tempted participants to cheat (by indicating after each throw that they had chosen the side of the die that corresponded to the higher number of points), whereas the transparent condition did not allow for cheating.

After the die-throwing task, participants performed an ostensibly unrelated task called "Memory Game." Their task was to find matching graphics in a 4 × 4 grid that contained eight different pairs of hidden images; participants could click on two cells in the grid at a time to reveal the images. Participants were reminded that we were interested not in how quickly they completed the task, but rather in how many clicks they needed to complete it successfully. We used this task to introduce our second manipulation. Half of the participants (rule-breaking prime condition) were presented with a grid in which five of the pairs were pictures of people breaking rules (as in Fig. 2), and the remaining three pairs were neutral pictures (e.g., mountains). The other half of the participants (neutral prime condition) saw eight pairs of neutral pictures.[2]

Finally, participants completed the measure of creativity, the same RAT problems used in Experiment 1.

**Prediction.** We expected the rule-breaking prime to promote creative behavior only in the transparent condition. We expected participants in the opaque condition to feel already sufficiently unconstrained by rules after behaving dishonestly in the die-throwing game. We therefore did not expect the rule-breaking prime to influence creativity among these participants.

### Results and discussion

A 2 × 2 analysis of variance using RAT performance as the dependent measure revealed a significant main effect of cheating condition, $F(1, 204) = 10.23$, $p = .002$, $\eta_p^2 = .048$, and a nonsignificant effect of prime condition, $F(1, 204) = 1.63$, $p = .20$. The interaction was significant, $F(1, 204) = 4.08$, $p = .045$, $\eta_p^2 = .02$ (see Fig. 3). In the opaque condition, RAT performance did not vary with prime condition, $F < 1$. In the transparent condition, participants



**Fig. 3.** Performance on the Remote Association Task (RAT) in Experiment 5 as a function of cheating and prime condition. Error bars indicate standard errors.

were more creative in the rule-breaking prime condition than in the neutral prime condition, $F(1, 204) = 5.29$, $p = .023$. These results provide further evidence that acting dishonestly makes people feel unconstrained by rules, and that this lack of constraint enhances creative behavior.

### General Discussion

There is little doubt that dishonesty creates costs for society. It is less clear whether it produces any positive consequences. This research identified one such positive consequence, demonstrating that people may become more creative after behaving dishonestly because acting dishonestly leaves them feeling less constrained by rules.

By identifying potential consequences of acting dishonestly, these findings complement existing research on behavioral ethics and moral psychology, which has focused primarily on identifying the antecedents to unethical behavior (Bazerman & Gino, 2012). These findings also advance understanding of creative behavior by showing that feeling unconstrained by rules enhances creative sparks. More speculatively, our research raises the possibility that one of the reasons why dishonesty is so widespread in today's society is that by acting dishonestly, people become more creative, which allows them to come up with more creative justifications for their immoral behavior and therefore makes them more likely to behave dishonestly (Gino & Ariely, 2012), which may make them more creative, and so on.

In sum, this research shows that the sentiment expressed in the common saying "rules are meant to be broken" is at the root of both creative performance and

dishonest behavior. It also provides new evidence that dishonesty may therefore lead people to become more creative in their subsequent endeavors.

## Author Contributions

Both authors developed the study concept, contributed to the study design, collected data, and performed the data analysis. Both authors worked on various drafts of the manuscript and approved the final version of the manuscript for submission.

## Declaration of Conflicting Interests

The authors declared that they had no conflicts of interest with respect to their authorship or the publication of this article.

## Supplemental Material

Additional supporting information may be found at http://pss .sagepub.com/content/by/supplemental-data

## Notes

1. We obtained the same results when we compared the creativity of cheaters and noncheaters (all $ps < .01$).
2. In a pilot study ($N = 103$), we tested the effect of our primes on participants' willingness to follow rules as indicated by their scores on a four-item scale adapted from Tyler and Blader (2005; e.g., "If I received a request from a supervisor or a person with authority right now, I would do as requested"). Participants in the rule-breaking prime condition demonstrated less willingness to follow rules ($M = 5.65$, $SD = 0.79$) than did participants in the neutral prime condition ($M = 6.03$, $SD = 0.91$), $t(101) = -2.27$, $p = .025$.

## References

Bailin, S. (1987). Critical and creative thinking. *Informal Logic*, *9*, 23–30.

Baron, R. M., & Kenny, D. A. (1986). The moderator-mediator variable distinction in social psychological research: Conceptual, strategic, and statistical considerations. *Journal of Personality and Social Psychology*, *51*, 1173–1182.

Baucus, M. S., Norton, W. I., Baucus, D. A., & Human, S. A. (2008). Fostering creativity and innovation without encouraging unethical behavior. *Journal of Business Ethics*, *81*, 97–115.

Bazerman, M. H., & Gino, F. (2012). Behavioral ethics: Toward a deeper understanding of moral judgment and dishonesty. *Annual Review of Law and Social Science*, *8*, 85–104.

Beaussart, M. L., Andrews, C. J., & Kaufman, J. C. (2013). Creative liars: The relationship between creativity and integrity. *Thinking Skills and Creativity*, *9*, 129–134.

Brenkert, G. G. (2009). Innovation, rule breaking and the ethics of entrepreneurship. *Journal of Business Venturing*, *24*, 448–464.

Cropley, D. H., Kaufman, J. C., & Cropley, A. J. (2003). Malevolent creativity: A functional model of creativity in terrorism and crime. *Creativity Research Journal*, *20*, 105–115.

Duncker, K. (1945). On problem solving. *Psychological Monographs, 58*(5, Serial No. 270).

Gino, F., & Ariely, D. (2012). The dark side of creativity: Original thinkers can be more dishonest. *Journal of Personality and Social Psychology*, *102*, 445–459.

Gino, F., & Mogilner, C. (2014). Time, money, and morality. *Psychological Science*, *25*, 414–421.

Glucksberg, S., & Weisberg, W. R. (1966). Verbal behavior and problem solving: Effects of labeling in a functional fixedness problem. *Journal of Experimental Psychology*, *71*, 659–664.

Guilford, J. P. (1950). Creativity. *American Psychologist*, *5*, 444–454.

Guilford, J. P. (1967). *The nature of human intelligence.* New York, NY: McGraw-Hill.

Irwin, J., Xu, Q., & Zhang, Y. (2014). *The upside of lying: How incidental deceptions increase task performance.* Unpublished manuscript, The University of Texas at Austin, McCombs School of Business.

Jiang, T. (2013). Cheating in mind games: The subtlety of rules matters. *Journal of Economic Behavior & Organization*, *93*, 323–336.

Kelley, T., & Littman, J. (2001). *The art of innovation: Lessons in creativity from IDEO, America's leading design firm.* New York, NY: Currency.

Langley, P., & Jones, R. (1988). A computational model of scientific insight. In R. J. Sternberg (Ed.), *The nature of creativity: Contemporary psychological perspectives* (pp. 171–201). Cambridge, England: Cambridge University Press.

MacKinnon, D. P., Fairchild, A. J., & Fritz, M. S. (2007). Mediation analysis. *Annual Review of Psychology*, *58*, 593–614.

Maddux, W. W., & Galinsky, A. D. (2009). Cultural borders and mental barriers: The relationship between living abroad and creativity. *Journal of Personality and Social Psychology*, *96*, 1047–1061.

Mazar, N., Amir, O., & Ariely, D. (2008). The dishonesty of honest people: A theory of self-concept maintenance. *Journal of Marketing Research*, *45*, 633–644.

Mednick, S. A. (1962). The associative basis of the creative process. *Psychological Review*, *69*, 220–232.

PricewaterhouseCoopers. (2011). *Cybercrime: Protecting against the growing threat* (Global Economic Crime Survey). Retrieved from https://www.pwc.com/en_GX/gx/economic-crime-survey/assets/GECS_GLOBAL_REPORT.pdf

Runco, M. A. (2010). Creativity has no dark side. In D. H. Cropley, A. J. Cropley, J. C. Kaufman, & M. A. Runco (Eds.), *The dark side of creativity* (pp. 15–32). New York, NY: Cambridge University Press.

Shalvi, S., Dana, J., Handgraaf, M. J. J., & De Dreu, C. K. W. (2011). Justified ethicality: Observing desired counterfactuals modifies ethical perceptions and behavior. *Organizational Behavior and Human Decision Processes*, *115*, 181–190.

Shu, L., & Gino, F. (2012). Sweeping dishonesty under the rug: How unethical actions lead to forgetting of moral rules. *Journal of Personality and Social Psychology*, *102*, 1164–1177.

Simonton, D. K. (1999). Creativity as blind variation and selective retention: Is the creative process Darwinian? *Psychological Inquiry*, *10*, 309–328.

Spencer, S. J., Zanna, M. P., & Fong, G. T. (2005). Establishing a causal chain: Why experiments are often more effective than mediational analyses in examining psychological

processes. *Journal of Personality and Social Psychology*, *89*, 845–851.

Sternberg, R. J. (1988). A three-facet model of creativity. In R. J. Sternberg (Ed.), *The nature of creativity: Contemporary psychological perspectives* (pp. 125–147). Cambridge, England: Cambridge University Press.

Sternberg, R. J., & Lubart, T. I. (1995). *Defying the crowd: Cultivating creativity in a culture of conformity*. New York, NY: Free Press.

Sulloway, F. (1996). *Born to rebel*. New York, NY: Pantheon.

Sutton, R. I. (2001). The weird rules of creativity. *Harvard Business Review*, *79*(8), 94–103.

Sutton, R. I. (2002). *Weird ideas that work: 11½ practices for promoting, managing, and sustaining innovation*. New York, NY: Free Press.

Treviño, L. K., Weaver, G. R., & Reynolds, S. J. (2006). Behavioral ethics in organizations: A review. *Journal of Management*, *32*, 951–990.

Tyler, T. R., & Blader, S. L. (2005). Can businesses effectively regulate employee conduct? The antecedents of rule following in work settings. *Academy of Management Journal*, *48*, 1143–1158.

Vohs, K. D., & Schooler, J. W. (2008). The value of believing in free will: Encouraging a belief in determinism increases cheating. *Psychological Science*, *19*, 49–54.

von Hippel, W., Lakin, J. L., & Shakarchi, R. J. (2005). Individual differences in motivated social cognition: The case of self-serving information processing. *Personality and Social Psychology Bulletin*, *31*, 1347–1357.

Watson, D., Clark, L. A., & Tellegen, A. (1988). Development and validation of brief measures of positive and negative affect: The PANAS scales. *Journal of Personality and Social Psychology*, *54*, 1063–1070.

Winslow, E. K., & Solomon, G. T. (1993). Entrepreneurs: Architects of innovation, paradigm pioneers and change. *Journal of Creative Behavior*, *27*, 75–88.

# Retraction

**PSYCHOLOGICAL AND COGNITIVE SCIENCES**

Retraction for "Signing at the beginning makes ethics salient and decreases dishonest self-reports in comparison to signing at the end," by Lisa L. Shu, Nina Mazar, Francesca Gino, Dan Ariely, and Max H. Bazerman, which was first published August 27, 2012; 10.1073/pnas.1209746109 (*Proc. Natl. Acad. Sci. U.S.A.* **109**, 15197–15200).

The editors are retracting this article and note that Simonsohn, Simmons, and Nelson (http://datacolada.org/98) have provided evidence to question the validity of the data in the article.

May R. Berenbaum
*Editor-in-Chief*

Published under the PNAS license.

Published September 13, 2021.

www.pnas.org/cgi/doi/10.1073/pnas.2115397118

Downloaded by guest on October 21, 2021

RETRACTION

# Signing at the beginning makes ethics salient and decreases dishonest self-reports in comparison to signing at the end

Lisa L. Shu[a], Nina Mazar[b,1], Francesca Gino[c], Dan Ariely[d], and Max H. Bazerman[c]

[a]Kellogg School of Management, Northwestern University, Evanston, IL 60208; [b]Rotman School of Management, University of Toronto, Toronto, ON, Canada M5S 3E6; [c]Harvard Business School, Harvard University, Boston, MA 02163; and [d]Fuqua School of Business, Duke University, Durham, NC 27708

Edited* by Daniel Kahneman, Princeton University, Princeton, NJ, and approved July 23, 2012 (received for review June 11, 2012)

Many written forms required by businesses and governments rely on honest reporting. Proof of honest intent is typically provided through signature at the end of, e.g., tax returns or insurance policy forms. Still, people sometimes cheat to advance their financial self-interests—at great costs to society. We test an easy-to-implement method to discourage dishonesty: signing at the beginning rather than at the end of a self-report, thereby reversing the order of the current practice. Using laboratory and field experiments, we find that signing before–rather than after–the opportunity to cheat makes ethics salient when they are needed most and significantly reduces dishonesty.

morality | nudge | policy-making | fraud

The annual tax gap between actual and claimed taxes due in the United States amounts to roughly $345 billion. The Internal Revenue Service estimates more than half this amount is due to individuals misrepresenting their income and deductions (1). Insurance is another domain burdened by the staggering cost of individual dishonesty; the Coalition Against Insurance Fraud estimated that the overall magnitude of insurance fraud in the United States totaled $80 billion in 2006 (2). The problem with curbing dishonesty in behaviors such as filing tax returns, submitting insurance claims, claiming business expenses or reporting billable hours is that they primarily rely on self-monitoring in lieu of external policing. The current paper proposes and tests an efficient and simple measure to reduce such dishonesty.

Whereas recent findings have successfully identified an intervention to curtail dishonesty through introducing a code of conduct in contexts where previously there was none (3, 4), many important transactions already require signatures to confirm compliance to an expected standard of honesty. Nevertheless, as significant economic losses demonstrate (1, 2), the current practice appears insufficient in countering self-interested motivations to falsify numbers. We propose that a simple change of the signature location could lead to significant improvements in compliance.

Even subtle cues that direct attention toward oneself can lead to surprisingly powerful effects on subsequent moral behavior (5–7). Signing is one way to activate attention to the self (8). However, typically, a signature is requested at the end. Building on Duval and Wicklund's theory of objective self-awareness (9), we propose and test that signing one's name before reporting information (rather than at the end) makes morality accessible right before it is most needed, which will consequently promote honest reporting. We propose that with the current practice of signing after reporting information, the "damage" has already been done: immediately after lying, individuals quickly engage in various mental justifications, reinterpretations, and other "tricks" such as suppressing thoughts about their moral standards that allow them to maintain a positive self-image despite having lied (3, 10, 11). That is, once an individual has lied, it is too late to direct their focus toward ethics through requiring a signature.

In court cases, witnesses *verbally* declare their pledge to honesty *before* giving their testimonies—not after, perhaps for a reason. To the extent that written reports feel more distant and make it easier to disengage internal moral control than verbal reports, written reports are likely to be more prone to dishonest conduct (3, 10, 11). However, for both types of reports (verbal or written) we hypothesize a pledge to honesty to be more effective before rather than after self-reporting. Thus, in this work, we test an easy-to-implement method of curtailing fraud in *written* reports: signing a statement of honesty at the beginning rather than at the end of a self-report that people know from the outset will require a signature.

## Results and Discussion

Experiment 1 tested this intervention in the laboratory, using two different measures of cheating: self-reported earnings (income) on a math puzzles task wherein participants could cheat for financial gain (3), and travel expenses to the laboratory (deductions) claimed on a tax return form on research earnings. On the one-page form where participants reported their income and deductions, we varied whether participant signature was required at the top of the form or at the end. We also included a control condition wherein no signature was required on the form.

We measured the extent to which participants overstated their income from the math puzzles task and the amount of deductions they claimed. All materials were coded with unique identifiers that were imperceptible to participants, yet allowed us to track each participant's true performance on the math puzzles against the performance underlying their income reported on the tax forms. The percentage of participants who cheated by overclaiming income for math puzzles they purportedly solved differed significantly across conditions: fewer cheated in the signature-at-the-top condition (37%) than in the signature-at-the-bottom and no-signature conditions (79 and 64%, respectively), $\chi^2(2, n = 101) = 12.58, P = 0.002$, with no differences between the latter two conditions ($P = 0.17$). The results also hold when analyzing the average magnitude of cheating by condition; Fig. 1 depicts the reported and actual performance, as measured by the number of math puzzles solved, for each condition, $F(2, 98) = 9.21, P < 0.001$. Finally, claims of travel expenses followed that same pattern and differed by condition, $F(2, 98) = 5.63, P < 0.01, \eta2 = 0.10$. Participants claimed fewer expenses in the signature-at-the-top condition ($M = \$5.27$, SD = 4.43) compared with signature-at-the-bottom ($M = \$9.62$, SD = 6.20; $P < 0.01$) and the no-signature condition ($M = \$8.45$, SD = 5.92; $P < 0.05$), with no differences between the latter two conditions ($P = 0.39$). Thus, signing before reporting

Author contributions: L.L.S., N.M., F.G., D.A., and M.H.B. designed research; L.L.S., F.G., and D.A. performed research; N.M., F.G., and D.A. analyzed data; and L.L.S., N.M., F.G., D.A., and M.H.B. wrote the paper.

The authors declare no conflict of interest.

*This Direct Submission article had a prearranged editor.

[1]To whom correspondence should be addressed. E-mail: nina.mazar@rotman.utoronto.ca.

This article contains supporting information online at www.pnas.org/lookup/suppl/doi:10.1073/pnas.1209746109/-/DCSupplemental.

**PSYCHOLOGICAL AND COGNITIVE SCIENCES**



**Fig. 1.** Reported and actual number of math puzzles solved by condition, experiment 1 ($n = 101$). Error bars represent SEM.

promoted honesty, whereas signing afterward was the same as not signing at all.

Experiment 2 investigated the potential mechanism underlying the effect through a word-completion task (12, 13) serving as an implicit measure of mental access to ethics-related concepts (4). Sixty university participants were randomly assigned to one of two conditions: signature at the top or signature at the bottom. Experiment 2 used the same math puzzles and tax form procedure as in experiment 1, but varied the incentives for performance on the math puzzles task and the tax rate. Finally, the one-page tax forms were modified to mimic the flow of actual tax reporting practices in the United States, and as in experiment 1, all materials were imperceptibly coded with unique identifiers.

After filling out the tax forms, all participants received a list of six word fragments with missing letters. They were instructed to complete them with meaningful words. Three fragments ($_ _ R$ $A L$, $_ I _ _ _ E$, and $E _ _ _ C _ _$) could potentially be completed with words related to ethics (moral, virtue, and ethical) or neutral words. We used the number of times these fragments were completed with ethics-related words as our measure of access to moral concepts.

Similar to experiment 1, the percentage of participants who cheated by overstating their performance on the math puzzles task was lower in the signature-at-the-top condition (37%, 11 of 30) than in the signature-at-the-bottom condition (63%, 19 of 30), $\chi^2(1, n = 60) = 4.27$, $P < 0.04$. The same pattern of results held when analyzing the magnitude of cheating (Fig. 2), $t(58) = -2.07$, $P < 0.05$, as well as the travel expenses that participants claimed on the tax return form, $F(1, 58) = 7.76$, $P < 0.01$, $\eta^2 = 0.12$: they were lower in the signature-at-the-top condition ($M = 3.23$, SD = 2.73) than in the signature-at-the-bottom condition ($M = 7.06$, SD = 7.02).

In the word-completion task, participants who signed before filling out the form generated more ethics-related words ($M = 1.40$, SD = 1.04) than those who signed after ($M = 0.87$, SD = 0.97),



**Fig. 2.** Reported and actual number of math puzzles solved by condition, experiment 2 ($n = 60$). Error bars represent SEM.

$F(1, 58) = 4.22$, $P < 0.05$, $\eta^2 = 0.07$; this greater access to ethics-related concepts (our proxy for saliency of morality) significantly mediated the effect of assigned condition (signature at the top or signature at the bottom) on cheating on the tax forms [bootstrapping with 10,000 iterations (14): 95% confidence interval $-1.85$, $-0.04$].

Experiment 3 tested the effect of the signature location in a naturalistic setting. Partnering with an automobile insurance company in the southeastern United States, we manipulated the policy review form, which asked customers to report the current odometer mileage of all cars insured by the company. Customers were randomly assigned to one of two forms, both of which required their signature following the statement: "I promise that the information I am providing is true." Half the customers received the original forms used by the insurance company, where their signature was required at the end of the form; the other half received our treatment forms, where they were required to sign at the beginning. The forms were identical in every other respect. Reporting lower odometer mileage indicated less driving, lower risk of accident occurrence, and therefore lower insurance premiums. We expected customers who signed at the beginning of the form to be more truthful and reveal higher use than those who signed at the end.

We compared the reported current odometer mileage on 13,488 completed policy forms for 20,741 cars to the latest records of each car's odometer mileage to calculate its use (number of miles driven). Customers who signed at the beginning on average revealed higher use ($M = 26,098.4$, SD = 12,253.4) than those who signed at the end [$M = 23,670.6$, SD = 12,621.4; $F(1, 13,485) = 128.63$, $P < 0.001$]. The difference was 2,427.8 miles per car. That is, asking customers to sign at the beginning of the form led to a 10.25% increase in implied miles driven (based on reported odometer readings) over the current practice of asking for a signature at the end. Follow-up analyses suggested that the higher use in the signature-at-the-top condition was not due to more detailed reporting (down to the last digit) in comparison with customers who may have relied on simply rounding their odometer mileage in the signature-at-the-bottom condition. Thus, the simple change in signature location likely reduced the extent to which customers falsified mileage information in their own financial self-interest at cost to the insurance company—who must pass this expense on to all its policyholders, including honest customers who bear the ultimate burden of paying for the dishonesty of others.

According to data from the US Department of Transportation Office of Highway Policy Information, the average annual amount of travel per vehicle in the United States was roughly 12,500 miles in 2005 (15). This suggests that the average driver in our field experiment had been a customer with the insurance company for 2 y. We estimated the annual per-mile cost of automobile insurance in the United States to range from 4 to 10 cents, suggesting a minimum average difference of $48 in annual insurance premium per car between customers in the two conditions. The range of 4–10 cents was determined from comparing usage-based insurance—also known as PAYD, or pay as you drive—and calculating the premiums for different scenarios of car brand, model, mileage, and buyer demographic on two automobile insurance policy sites.

The current practice of signing after reporting is insufficient. It is important to make morality salient, right before it is needed most, so that it can remain active during the most tempting moments. When signing comes after reporting, the morality train has already left the station. The power of our intervention is precisely due to the fact that it is such a gentle nudge (16): it does not impose on the freedom of individuals, it does not require the passage of new legislation, and it can profoundly influence behaviors of ethical and economic significance. In fact, because most self-reports already require signing a pledge to honesty—albeit not in the most effective location—the cost of implementing our intervention is minimal. Given the immense financial resources devoted to prevention, detection, and punishment of fraudulent

behavior, a truly minimal intervention like the one used in our research seems costly not to implement—even if its effectiveness might wane over time as signing before reporting becomes prevalent and individuals may find new "tricks" to disengage from morality.

## Materials and Methods

Informed consent was obtained from all participants, and the Institutional Review Boards of Harvard University and University of North Carolina reviewed and approved all materials and procedures in Experiments 1 and 2.

**Experiment 1: Participants and Procedure.** A total of 101 students and employees at local universities in the southeastern United States ($M_{age}$ = 22.10, SD = 4.98; 45% male; 82% students) completed the experiment for pay. They received a $2 show-up fee and had the opportunity to earn additional money throughout the experiment.

Participants were randomly assigned to one of three conditions: (*i*) signature at the top of the tax return form (before filling it out); (*ii*) signature at the bottom (after filling it out); or (*iii*) no signature (control). The statement that participants had to sign asked them to declare that they carefully examined the return and that to the best of their knowledge and belief it was correct and complete.

At the beginning of each session, participants were given instructions in which they were informed that they would first complete a problem-solving task under time pressure (i.e., they would have 5 min to complete the task). In addition, the instructions included the following information, "For the problem-solving task, you will be paid a higher amount than what we usually pay participants because you will be taxed on your earnings. You will receive more details after the problem-solving task."

*Problem-solving task.* For this task (3), participants received a worksheet with 20 math puzzles, each consisting of 12 three-digit numbers (e.g., 4.78) and a collection slip on which participants later reported their performance in this part of the experiment. Participants were told that they would have 5 min to find two numbers in each puzzle that summed to 10. For each pair of numbers correctly identified, they would receive $1, for a maximum payment of $20. Once the 5 min were over, the experimenter asked participants to count the number of correctly solved puzzles, note that number on the collection slip, and then submit both the test sheet and the collection slip to the experimenter. We assume respondents had no problems adding 2 numbers to 10, which means they should have been able to identify how many math puzzles they had solved correctly without requiring a solution sheet. Neither of the two forms (math puzzles test sheet and collection slip) had any information on it that could identify the participants. The sole purpose of the collection slip was for the participants themselves to learn how many puzzles in total they had solved correctly.

*Tax return form.* After the problem-solving task, participants went to a second room to fill out a research study tax return form (based on IRS Form 1040). The one-page form we used was based on a typical tax return form. We varied whether participants were asked to sign the form and if so, whether at the top or bottom of the page (Figs. S1–S3). Participants filled out the form by self-reporting their income (i.e., their performance on the math puzzles task) on which they paid a 20% tax (i.e., $0.20 for every dollar earned). In addition, they indicated how many minutes it took them to travel to the laboratory, and their cost of commute. These expenses were "credited" to their posttax earnings from the problem-solving task to compute their final payment. The instructions read: "We would like to compensate participants for extra expenses they have incurred to participate in this session." We reimbursed the time to travel to the laboratory at $0.10 per minute (up to 2 h or $12) and the cost of participants' commute (up to $12). All of the instructions and dependent measures appeared on one page to ensure that participants knew from the outset that a signature would be required. Thus, any differences in reporting could be attributed to the location of the signature.

*Payment structure.* Given the features of the experiment, participants could make a total of $42—an amount which breaks down as follows: $2 show up fee, $20 on math puzzles task minus a 20% tax on income (i.e., $4), $12 as credits for travel time, and $12 as credits for cost of commute.

*Opportunity to cheat on the tax return form.* The experiment was designed such that participants could cheat on the tax return form and get away with it by overstating their "income" from the problem-solving task and by inflating the travel expenses they incurred to participate in the experiment. When participants completed the first part of the experiment (problem-solving task), the experimenter gave them a tax return form and asked each participant to go to a second room with a second experimenter to fill out the tax form and receive their payments. The tax return form included a one-digit identifier (one digit in the top right of the form, in the code OMB no. 1555–

0111) that was identical to the digit of one number of one math puzzle of each individual's worksheet (which was unique to each individual's work station). This difference was completely imperceptible to participants but allowed us to link the worksheet and the tax return form that belonged to the same participant. As a result, at the end of each session, we were able to compare actual performance on the problem-solving task and reported performance on the tax return form. If those numbers differed for any individual, this difference represented one measure of the individual's level of cheating.

First, we examined the percentage of participants who cheated by overstating their performance on the problem-solving task when asked to report it on the tax return form. This percentage varied across conditions, $\chi^2$(2, n = 101) = 12.58, P = 0.002: The number of cheaters was lowest in the signature-at-the-top condition (37%, 13 of 35), higher in the signature-at-the-bottom condition (79%, 26 of 33), and somewhat in between those two but closer to the latter for the no-signature condition (64%, 21 of 33).

Both actual and reported mean performances on the math puzzles task are shown in Fig. 1. As depicted, the number of math puzzles overreported in the tax return forms varied by condition, F(2, 98) = 9.21, P < 0.001, $\eta^2$ = 0.16: It was lowest in the signature-at-the-top condition (M = 0.77, SD = 1.44) and higher in the signature-at-the-bottom condition (M = 3.94, SD = 4.07; P < 0.001) and in the no-signature condition (M = 2.52, SD = 3.12; P < 0.05). The difference between these two latter conditions was only marginally significant (P < 0.07).

The credits for travel expenses (travel time and costs of commute) that participants claimed in the tax return forms also varied by condition, F(2, 98) = 5.63, P < 0.01, $\eta^2$ = 0.10 and followed the same pattern: Participants claimed fewer expenses in the signature-at-the-top condition (M = 5.27, SD = 4.43) than in the signature-at-the-bottom (M = 9.62, SD = 6.20; P < 0.01) and the no-signature (control) conditions (M = 8.45, SD = 5.92; P < 0.05). The difference between these two latter conditions was not significant (P = 0.39). These results suggest that the effect of the signature location is driven by the signing-at-the-top condition: Signing before a self-reporting task promoted honest reporting. Signing afterward did not promote cheating. In effect, signing afterward was the same as having no signature at all.

**Experiment 2: Participants and Procedure.** Sixty students and employees at local universities in the southeastern United States ($M_{age}$ = 21.50, SD = 2.27; 48% male; 90% students) completed the experiment for pay. They received a $2 show-up fee and had the opportunity to earn additional money throughout the experiment.

Experiment 2 used one between-subjects factor with two levels: signature-at-the-top and signature-at-the-bottom. The experiment used the same task and procedure of experiment 1 but varied the incentives for the problem-solving task, the tax rate, and the tax return forms participants completed. Namely, participants in this experiment were paid $2 (rather than $1) for each math puzzle successfully solved and were taxed at a higher rate of 50%. Finally, the tax forms were modified such that they mimicked the flow of actual tax reporting practices in the United States: deductions (commuting time and costs) were first subtracted from gross income (earnings from math puzzles task) to compute taxable income, and then taxes were paid on this total adjusted amount (Fig. S4 shows an example of the forms used).

After filling out the tax return forms, participants were asked to complete a word-completion task. Participants received a list of six word fragments with letters missing and were asked to fill in the blanks to make complete words by using the first word that came to mind. Following prior research measuring implicit cognitive processes (12, 13), we used this word-completion task to measure accessibility of moral concepts. Three of the word fragments (_ _ R A L, _ I _ _ _ E, and E _ _ _ C _ _) could potentially be completed by words related to ethics (moral, virtue, and ethical); these were our measures of access to moral concepts.

*Level of cheating.* We first examined the percentage of participants who cheated by overstating their performance on the math puzzles task when filling out the tax return form. This percentage was lower in the signature-at-the-top condition (37%, 11 of 30) than in the signature-at-the-bottom condition (63%, 19 of 30), $\chi^2$(1, n = 60) = 4.27, P < 0.04.

Fig. 2 depicts actual performance on the math puzzles task and reported performance on the tax return form, by condition. This difference (a measure for cheating) was lower in the signature-at-the-top condition (M = 1.67, SD = 2.78) than in the signature-at-the-bottom condition (M = 3.57, SD = 4.19), t(58) = −2.07, P < 0.05.

The deductions participants reported on the tax return form followed the same pattern and varied significantly by condition, F(1, 58) = 7.76, P < 0.01, $\eta^2$ = 0.12: they were lower in the signature-at-the-top condition (M = 3.23, SD = 2.73) than in the signature-at-the-bottom condition (M = 7.06, SD = 7.02).

*Word-fragment task.* Participants who signed before filling out the tax form generated more ethics-related words (M = 1.40, SD = 1.04) than those who

PSYCHOLOGICAL AND COGNITIVE SCIENCES

signed after filling out the form ($M = 0.87$, SD = 0.97), $F(1, 58) = 4.22$, $P < 0.05$, $\eta^2 = 0.07$, suggesting that ethics are more salient when participants signed before—rather than after—the temptation to cheat.

*Mediation analyses.* We also tested whether ethics-related concepts (our proxy for saliency of moral standards) mediated the effect of condition on the extent of cheating. Both condition and the number of ethics-related concepts were entered into a linear regression model predicting extent of cheating measured by the level of overreporting of income. The mediation analysis revealed that the effect of condition was significantly reduced (from $\beta = -0.262$, $P < 0.05$ to $\beta = -0.143$, $P = 0.23$), and that the number of ethics-related concepts was a significant predictor of cheating ($\beta = -0.456$, $P < 0.001$). Using the bootstrapping method (with 10,000 iterations) recommended by Preacher and Hayes (4), we tested the significance of the indirect effect of condition on dishonest behavior through the activation of ethics-related concepts. The 95% confidence interval for the indirect effect did not include zero (−1.85, −0.04), suggesting significant mediation.

Additionally, we computed the *z*-score measure for both the deductions claimed and the magnitude of cheating on the math puzzles for each participant. We averaged the two measures to form an index for each individual's extent of cheating. Both condition and the number of ethics-related concepts were entered into a linear regression model predicting extent of cheating measured by this composite index. The mediation analysis revealed that the effect of treatment condition was significantly reduced (from $\beta = -0.424$, $P = 0.001$ to $\beta = -0.344$, $P = 0.005$), and that the number of ethics-related concepts was a significant predictor of cheating ($\beta = -0.308$, $P = 0.011$). Using the bootstrapping method with 10,000 iterations (4), we found that the 95% confidence interval for the indirect effect did not include zero (−0.29, −0.01), suggesting significant mediation.

Using an implicit measure of ethical saliency, this experiment shows that signing before the opportunity to cheat increases the saliency of moral standards compared with signing after having had the opportunity to cheat; subsequently, this discourages cheating.

**Experiment 3: Participants and Procedure.** We conducted a field experiment with an insurance company in the southeastern United States asking some of their existing customers to report their odometer reading.

When a new policy is issued, each customer submits information about the exact current odometer mileage of all cars insured under their policy, along with other information. For our audit experiment, we sent out automobile policy review forms to policyholders, randomly assigning them to either the original form used by the insurance company or to our redesigned form. The original form asked customers to sign the statement: "I promise that the information I am providing is true," which appeared at the bottom of the form (i.e., after having completed it; control condition), whereas our redesigned form asked customers to sign that same statement but at the top of the form (i.e., before filling it out; treatment condition). Otherwise, the forms were identical.

The data file that we received from the insurance company included a random identifier for each policy, an indication of the experimental condition, and two odometer readings for each car covered (a maximum of four per policy). The first odometer reading was based on the mileage information the insurance company previously had on file, whereas the second was the current odometer reading that customers reported. The data file did not have the date of the first odometer reading (it also did not have any of the other information requested on the policy review forms). Consequently, our measure of use was somewhat noisy, as the miles driven per car have been accumulated over varying unknown time periods. However, because we randomly assigned customers to one of our two conditions, such noise should be evenly represented in both conditions. To calculate each car's use or number of miles driven (our main dependent variable), we subtracted the odometer reading that was in the insurance company's database from the self-reported current odometer reading we received from our audit forms.

Although there was no explicit statement on the policy review forms linking car use to insurance premiums, policyholders had an incentive to report lower use: the fewer miles driven, the lower the accident risk, and the lower their insurance premium. Thus, when filling out the automobile policy review form, customers likely faced a dilemma between honestly indicating the current odometer mileage, and dishonestly indicating lower odometer mileage to reduce their insurance premium. We hypothesized that signing before self-reporting makes ethics salient right when it is needed most. Therefore, we expected that customers who signed the policy review form first, before filling it out, would more likely be truthful, and reveal higher use, compared with those who signed at the end, after filling it out.

Completed forms were received from 13,488 policies for a total of 20,741 cars. A single policy could cover up to four cars; 52% of policies had one car, 42% had two cars, 5% had three cars, and less than 0.3% had four cars. If a customer's policy had more than one car, we averaged the reported odometer mileages for all cars on the same policy. As hypothesized, controlling for the number of cars per policy [$F(1, 13,485) = 2.184$, $P = 0.14$], the calculated use (based on reported odometer readings) was significantly higher among customers who signed at the beginning of the form ($M = 26,098.4$, SD = 12,253.4) than among those who signed at the end of the form [$M = 23,670.6$, SD = 12,621.4; $F(1, 13,485) = 128.631$, $P < 0.001$]. The average difference between the two conditions was 2,427.8 miles. The results also hold for the use of the first car only [signature at the top: $M = 26,204.8$ miles, SD = 14,226.3 miles and signature at the bottom: $M = 23,622.5$ miles, SD = 14,505.8 miles; $t(13,486) = 10.438$, $P < 0.001$].

Asking customers to sign at the beginning of the form led to a 10.25% increase in the calculated miles driven over the current practice of asking for a signature at the end. An alternative explanation for our findings could be that this difference is due to extra diligence of customers in the treatment condition relative to customers in the control condition, rather than higher rates of deliberate falsification of information among customers in the control condition. That is, perhaps those who signed at the top of the form were actually checking their odometers, whereas those who signed at the bottom of the form simply estimated their mileage without actually checking their cars. To address this possibility, we compared the last digits of the odometer mileage that customers in the two conditions reported. Specifically, we ran analyses examining whether the two conditions differed in the number of instances wherein reported odometer mileages ended with 0, 5, 00, 50, 000, or 500. Numbers that end with these digits indicate a higher likelihood that customers simply estimated their mileage. We detected no statistically significant differences between our two conditions in the instances in which these endings appeared (pooled measure: treatment, 19.9% vs. control, 20.8%; $\chi^2 = 2.5$, $P = 0.12$).

An important consequence of false reporting of this type is that the costs extend beyond the insurer to its entire customer base—including the honest policyholders—who bear the ultimate burden of paying for others' dishonesty. Using a field experiment, we demonstrate that a simple change in the location of a signature request can significantly influence the extent to which people on average will misreport information to advance their own self-interest.

**ACKNOWLEDGMENTS.** The authors thank Jennifer Fink and Ruth Winecoff for help with data collection, Madan Pillutla for generous feedback and thoughtful comments on earlier drafts of the paper, and the Fuqua School of Business and Harvard Business School for their financial support.

1. US Department of Treasury (2009). Update on Reducing the Federal Tax Gap and Improving Voluntary Compliance. Available at http://www.irs.gov/pub/newsroom/tax_gap_report_-final_version.pdf. Accessed August 2, 2012.
2. Coalition Against Insurance Fraud (2006) *Coalition Against Insurance Fraud Annual Report* (CAIF, Washington, DC).
3. Mazar N, Amir O, Ariely D (2008) The dishonesty of honest people: A theory of self-concept maintenance. *J Mark Res* 45:633–644.
4. Shu LL, Gino F, Bazerman MH (2011) Dishonest deed, clear conscience: When cheating leads to moral disengagement and motivated forgetting. *Pers Soc Psychol Bull* 37:330–349.
5. Haley KJ, Fessler DMT (2005) Nobody's watching? Subtle cues affect generosity in an anonymous economic game. *Evol Hum Behav* 26:245–256.
6. Rigdon M, Ishii K, Watabe M, Kitayama S (2009) Minimal social cues in the dictator game. *J Econ Psychol* 30:358–367.
7. Bateson M, Nettle D, Roberts G (2006) Cues of being watched enhance cooperation in a real-world setting. *Biol Lett* 2:412–414.
8. Kettle KL, Häubl G (2011) The signature effect: Signing influences consumption-related behavior by priming self-identity. *J Consum Res* 38:474–489.
9. Duval TS, Wicklund RA (1972) *A Theory of Objective Self Awareness* (Academic, New York).
10. Festinger L, Carlsmith JM (1959) Cognitive consequences of forced compliance. *J Abnorm Psychol* 58:203–210.
11. Bandura A, Barbaranelli C, Caprara G, Pastorelli C (1996) Mechanisms of moral disengagement in the exercise of moral agency. *J Pers Soc Psychol* 71:364–374.
12. Bassili JN, Smith MC (1986) On the spontaneity of trait attribution: Converging evidence for the role of cognitive strategy. *J Pers Soc Psychol* 50:239–245.
13. Tulving E, Schacter DL, Stark HA (1982) Priming effects in word-fragment completion are independent of recognition memory. *J Exp Psychol Learn Mem Cogn* 8:336–342.
14. Preacher KJ, Hayes AF (2004) SPSS and SAS procedures for estimating indirect effects in simple mediation models. *Behav Res Methods Instrum Comput* 36:717–731.
15. US Department of Transportation (2009). Office of Highway Policy Information, Federal Highway Administration. Available at http://tinyurl.com/UShighwaystats. Accessed August 2, 2012.
16. Thaler RH, Sunstein CR (1998) *Nudge: Improving Decisions about Health, Wealth and Happiness* (Yale Univ Press, New Haven, CT).

**Appendix C**

**HBS Interim Policy and Procedures for Responding to Allegations of Research Misconduct**

H A R V A R D │ B U S I N E S S │ S C H O O L

**Interim Policy and Procedures for**
**Responding to Allegations of Research Misconduct**
*August 2021*

## I.        Basis for Policy

Integrity in scholarship and research is one of Harvard University's—and Harvard Business School's—fundamental values. Allegations of misconduct in scholarship and research must be treated with the utmost seriousness, and examined carefully and responsibly in a timely and effective manner.

Toward that end, HBS has established this **Policy and Procedures for Responding to Allegations of Research Misconduct**[1] to guide its efforts in reviewing, investigating, and reporting allegations of research misconduct.[2]

## II.        Scope

This Policy applies to allegations of research misconduct—including fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results—involving any person who, at the time of the alleged research misconduct, was employed by, was an agent of, or was affiliated by contract or agreement with HBS, including without limitation tenured and non-tenured faculty, teaching and support staff, researchers and research associates, research coordinators, post-doctoral and other fellows, students, volunteers, officials, technicians. The Policy may be applied to any individual no longer affiliated with HBS if the alleged misconduct occurred while the person was employed by, an agent of, or affiliated with the School. This Policy does not apply to authorship or collaboration disputes. It applies only to allegations of research misconduct that occurred within six years of the date HBS received the allegation, unless: the respondent has continued or renewed an incident of alleged research misconduct through the citation, republication, or other use for the potential benefit of the respondent of the research record in question; or HBS determines that the alleged misconduct would possibly have a substantial adverse effect on the health or safety of the public.

## III.        General Policies and Principles

### A.        Research Misconduct Prohibited, Standard of Proof

HBS prohibits research misconduct and investigates and responds to allegations of research misconduct in accordance with this Policy. Throughout the research misconduct process, which begins at the time an allegation is made, all participants shall bear in mind the importance, both in fact and in appearance, of thoroughness, fairness, and objectivity.

---

[1] See Appendix 1 for a glossary of terms and definitions.
[2] See Appendix, here and throughout, for additional specifications and requirements when researchers have received federal or other external funding for their research.

A finding of research misconduct requires that:

- There be a significant departure from accepted practices of the relevant research community;
- The respondent committed the research misconduct intentionally, knowingly, or recklessly; and
- The allegation be proven by preponderance of the evidence.

The destruction of research records, absence of research records, or respondent's failure to provide research records adequately documenting the questioned research is evidence of research misconduct where the institution establishes by a preponderance of the evidence that the respondent intentionally, knowingly, or recklessly had research records and destroyed them, had the opportunity to maintain the records but did not do so, or maintained the records and failed to produce them in a timely manner and that the respondent's conduct constitutes a significant departure from accepted practices of the relevant research community.

HBS bears the burden of proof for making a finding of research misconduct. A respondent has the burden of proving, by a preponderance of the evidence, any and all affirmative defenses raised (such as honest error).

Individuals subject to this policy found to have committed research misconduct may be subject to sanctions up to and including termination.

**B.      Responsibility to Report Misconduct**

All individuals subject to this Policy will report observed, suspected, or apparent research misconduct to the Research Integrity Officer (RIO).[3] If an individual is unsure whether a suspected incident falls within the definition of research misconduct, that individual may meet with or contact the RIO to discuss the suspected research misconduct informally, which may include discussing it anonymously and/or hypothetically. If the circumstances described by the individual do not meet the definition of research misconduct, then the RIO may refer the individual or allegation to other offices or officials, where appropriate.

**C.      Cooperation with Research Misconduct Proceedings**

All individuals subject to this Policy shall cooperate with the RIO and other institutional officials in the review of allegations and the conduct of inquiries and investigations. All individuals subject to this Policy, including respondents, have an obligation to provide evidence relevant to research misconduct allegations to the RIO or other institutional officials.

**D.      Duty to Maintain Confidentiality**

Because of the potential jeopardy to the reputation and rights of a respondent, the RIO and all Committee members (as defined in this Policy) as well as all others at HBS who may be involved in the research misconduct proceeding shall to the extent possible: (1) limit disclosure of the identity of respondents and complainants to those who need to know in order to carry out a thorough, competent, objective, and fair research misconduct proceeding; and (2) except as otherwise prescribed by law, limit

---

[3] For the 2021-2022 academic year, the Research Integrity Officer is Alain Bonacossa (abonacossa@hbs.edu; 617.496.6348).

2

the disclosure of any records or evidence from which research subjects might be identified to those who need to know in order to carry out a research misconduct proceeding. Where communications about research misconduct proceedings may be considered necessary or advisable, University officials should be guided by the Guiding Principles for Communication in Research Misconduct Proceedings.[4] Inappropriate dissemination of information may result in sanctions up to and including termination.

**E.      Rights and Responsibilities of Complainant**

The complainant is responsible for making allegations in good faith, maintaining confidentiality, and cooperating with the inquiry and investigation. If the inquiry committee deems it necessary, the complainant may be interviewed at the inquiry stage and, if so, will be given the transcript or recording of the interview for correction. The complainant ordinarily will be interviewed during the investigation phase, and given the transcript or recording of the interview for correction. After making an allegation of research misconduct, the complainant is responsible for providing evidence and information in connection with the research misconduct process but is not entitled to receive information about the status or outcome of that process.

**F.      Rights and Responsibilities of Respondent**

The respondent is responsible for maintaining confidentiality and cooperating with the conduct of an inquiry and investigation. The respondent is entitled to the procedural rights and protections set forth in this Policy. Respondents may choose up to two personal advisors for support during the process. Personal advisors may be attorneys; they may not be principals or witnesses in the research misconduct matter. Personal advisors may be present at any proceedings or interviews that the respondent attends but may not question witnesses or otherwise take part in the research misconduct proceedings.

The respondent should be given the opportunity to admit that research misconduct occurred and that they committed the research misconduct. With the advice of the RIO and/or other institutional officials, the Dean or their designee may end HBS's review of an allegation that has been admitted.

**G.      Protecting Complainants, Witnesses, the RIO, and Committee Members**

HBS community members may not retaliate in any way against complainants, witnesses, the RIO, or committee members. Any alleged or apparent retaliation against complainants, witnesses, the RIO, or committee members should be reported immediately to the
RIO (or to the Dean's Office, as applicable), who shall review the matter and, as necessary, make all reasonable and practical efforts to counter any potential or actual retaliation and protect and restore the position and reputation of the person against whom the retaliation is directed.

**IV.     Preliminary Assessment of Allegations**

Upon receiving an allegation of research misconduct, the RIO immediately will assess the allegation to determine whether the allegation:

---

[4] https://files.vpr.harvard.edu/files/vpr-documents/files/guiding_principles_for_communication_in_research_misconduct_proceedings.pdf

3

- Falls within the definition of research misconduct, and
- Is sufficiently credible and specific so that potential evidence of research misconduct may be identified.

An inquiry must be conducted if these criteria are met.

If, upon receipt on the allegation, it appears that the RIO has any unresolved personal, professional, or financial conflicts of interest with those involved in the allegations, then another qualified individual shall be appointed by the Dean or their designee to serve as Interim RIO with respect to reviewing the allegation and conducting any research misconduct proceeding.

The assessment period should be brief, preferably concluded within a week. Where it is not feasible to conclude the assessment within a week, the process should proceed expeditiously. In conducting the assessment, it is not necessary to interview the complainant, respondent, or other witnesses, or to gather data beyond any that may have been submitted with the allegation, except as necessary to determine whether the allegation is sufficiently credible and specific so that potential evidence of research misconduct may be identified. The preliminary assessment shall be documented and all records pertaining to the review of allegations will be retained by the RIO for a period of seven (7) years following the completion of the proceeding.

## V.    Sequestration of Research Records and Notice to Respondent

### A.    Sequestration of Research Records

This Policy governs access to research records, including without limitation email records, for purposes of conducting research misconduct proceedings.[5] Those engaged in administering this Policy have all rights necessary to access research records created or maintained by individuals subject to this Policy.[6]

As to timing, on or before the date on which the respondent is notified, or the inquiry begins, whichever is earlier, the RIO must take all reasonable and practical steps to obtain custody of all the research records and evidence needed to conduct the research misconduct proceeding. The RIO also shall sequester any additional research records that become pertinent to an inquiry or investigation after the initial sequestration.

The RIO is responsible for inventorying the records and evidence and sequestering them in a secure manner.[7] Where appropriate, HBS shall give the respondent copies of, or reasonable supervised access to, the research records.

---

[5] For clarification, Harvard's Policy on Access to Electronic Information specifically states that it does not apply to reviews of research misconduct allegations.  Section I, Internal Investigations of Misconduct, p. 4.

[6] Harvard's Research Data Ownership Policy makes clear that "the University asserts ownership over research data for all projects conducted at the University, under the auspices of the University, or with University resources," and further states that "[w]hen it is necessary to secure access (e.g. during a research misconduct proceeding) the University may take custody of research data."  Policy and Procedures, Section 1.B, p. 2.

[7] However, where the research records or evidence encompass scientific instruments shared by a number of users, custody may be limited to copies of the data or evidence on such instruments, so long as those copies are

4

**B.        Notice to Respondent**

At the time of or before beginning an inquiry, the RIO must make a good faith effort to notify the respondent in writing, if the respondent is known. If the inquiry subsequently identifies additional respondents, they must be notified in writing.

## VI.        The Inquiry

**A.        Initiation and Purpose of the Inquiry**

The purpose of the inquiry is to conduct an initial review of the available evidence to determine whether to conduct an investigation. An inquiry does not require a full review of all the evidence related to the allegation.

**B.        Appointment of the Inquiry Committee**

The inquiry committee will be appointed by the Dean or their designee, in consultation with other institutional officials as appropriate, and will consist of one or more individuals who do not have unresolved personal, professional, or financial conflicts of interest with those involved with the research misconduct proceeding. The inquiry committee should include individuals with the appropriate subject-matter expertise to: evaluate the evidence and issues related to the allegation; interview the principals and key witnesses; and conduct the inquiry. When necessary to secure the necessary expertise or to avoid conflicts of interest, the Dean or their designee may select committee members from outside the institution.

Prior to the initiation of the Inquiry, the respondent will be notified in writing of the inquiry committee's membership and shall be afforded five (5) calendar days to lodge objections based upon a committee member's alleged personal, professional, or financial conflict of interest. The Dean or their designee will make the final determination of whether a conflict exists.

**C.        Charge to the Committee and First Meeting**

The RIO will prepare a charge for the inquiry committee that sets forth the purpose of the inquiry and the expected timeframe, the committee's responsibilities, the allegations, and any related issues identified during the preliminary assessment. The charge also shall inform the committee that an investigation is warranted if the committee determines, based on its review during the inquiry, that: (1) there is a reasonable basis for concluding that the allegation falls within the definition of research misconduct; and (2) the preliminary information-gathering and preliminary fact-finding from the inquiry indicates that the allegation may have substance.

At the committee's first meeting, the RIO will review the charge with the committee, discuss the allegations, any related issues, and the appropriate procedures for conducting the inquiry, assist the committee with organizing plans for the inquiry, and answer any questions raised by the committee. The RIO will be present or available throughout the inquiry to advise the committee as needed.

---

substantially equivalent to the evidentiary value of the instruments.

**D.       Inquiry Process**

The inquiry committee ordinarily will interview the complainant, if any, the respondent, and key witnesses as well as examine relevant research records and materials. Any interviews will be recorded or transcribed, with recordings or transcripts provided to the interviewee for correction. Then the inquiry committee will evaluate the evidence, including the testimony obtained during the inquiry. In consultation with the RIO, the committee members will decide whether an investigation is warranted based on the criteria in this Policy.

The scope of the inquiry is not required to and does not normally include deciding whether misconduct definitely occurred, determining definitely who committed the research misconduct, or conducting exhaustive interviews and analyses.[8] However, if a legally sufficient admission of research misconduct is made by the respondent, misconduct may be determined at the inquiry stage if all relevant issues are resolved.

**E.       The Inquiry Report**

A written inquiry report must be prepared that includes the following information: (1) the name and position of the respondent; (2) a description of the allegations of research misconduct; (3) the funding support, including without limitation any grant numbers, grant applications, contracts and publications listing all support; (4) the basis for recommending or not recommending that the allegations warrant an investigation; (5) any comments on the draft report by the respondent.

The Office of General Counsel shall be available to advise the inquiry committee and the RIO with respect to the report. Modifications should be made as appropriate in consultation with the RIO and the inquiry committee.

**F.       Notification of the Results of the Inquiry; Opportunity to Comment**

The RIO shall notify the respondent as to whether the inquiry found an investigation to be warranted, include a copy of the draft inquiry report for comment within 10 business days, and include a copy of or link to this Policy.

Based on the comments, the inquiry committee may revise the draft report as appropriate and prepare it in final form. Any comments that are submitted by the respondent will be attached to the final inquiry report. The committee will deliver the final report to the RIO.

**G.       Institutional Decision and Notification**

1.       *Decision by Deciding Official* – The RIO will transmit the final inquiry report and any comments to the Dean or their designee, who will make a written determination as to whether an investigation is warranted. The inquiry is completed when this determination is made. The RIO will notify institutional officials who have a need to know of the decision.

---

[8] As noted above, an investigation is warranted if the committee determines, based on its review during the inquiry, that: (1) there is a reasonable basis for concluding that the allegation falls within the definition of research misconduct; and (2) the preliminary information-gathering and preliminary fact-finding from the inquiry indicates that the allegation may have substance.

2.      *Documentation of Decision Not to Investigate* – If an investigation is not warranted, the RIO shall secure and maintain for 7 years after the termination of the inquiry sufficiently detailed documentation of the inquiry to permit a later assessment of the reasons why an investigation was not conducted.

## H.      Time for Completion

The inquiry, including preparation of the final inquiry report and the decision on whether an investigation is warranted, must be completed within 60 calendar days of initiation of the inquiry, unless the RIO determines that circumstances clearly warrant a longer period. If an extension is approved, the inquiry record must include documentation of the reasons for exceeding the 60-day period.

## VII.     Conducting the Investigation

### A.      Initiation and Purpose

The investigation ordinarily should begin shortly after completion of the inquiry and no later than 30 calendar days after the determination that an investigation is warranted. On or before the date on which the investigation begins, the RIO must notify the respondent in writing of the allegations to be investigated.

The purpose of the investigation is to develop a factual record by exploring the allegations in detail and examining the evidence in depth, leading to recommended findings on whether research misconduct has been committed, by whom, and to what extent. The investigation committee shall pursue diligently all significant issues and leads discovered that are determined relevant to the investigation, including any evidence of additional instances of possible research misconduct, and continue the investigation to completion. If new allegations are identified, the RIO must also give the respondent written notice of such allegations within a reasonable amount of time of deciding to pursue allegations not addressed during the inquiry or in the initial notice of the investigation.

### B.      Sequestration of Research Records

On or before the date on which the respondent is notified, or the investigation begins, whichever is earlier, the RIO must take all reasonable and practical steps to obtain custody of and sequester in a secure manner all the research records and evidence needed to conduct the research misconduct proceeding that were not previously sequestered during the inquiry. The need for additional sequestration of records may occur for any number of reasons, including the institution's decision to investigate additional allegations not considered during the inquiry stage or identification of records during the inquiry process that had not been previously secured. The procedures to be followed for sequestration during the investigation are the same procedures that apply during the inquiry.

### C.      Appointment of the Investigation Committee

The Dean or their designee, in consultation with other institutional officials as appropriate, will appoint an ad hoc investigation committee and committee chair. The investigation committee must consist of individuals who do not have unresolved personal, professional, or financial conflicts of interest with those involved with the investigation and should include individuals with the appropriate subject-matter

7

expertise to: evaluate the evidence and issues related to the allegation; interview the respondent and complainant; and conduct the investigation. Individuals appointed to the investigation committee also may have served on the inquiry committee. When necessary to secure the necessary expertise or to avoid conflicts of interest, the Dean or their designee may select investigation committee members from outside the institution.

Prior to the initiation of the Investigation, the respondent will be notified of the investigation committee's membership and shall be afforded five (5) calendar days to lodge objections based upon a committee member's alleged personal, professional, or financial conflict of interest. The Dean or their designee will make the final determination of whether a conflict exists.

**D.      Charge to the Committee and the First Meeting**

1.      Charge to the Committee – The RIO will define the subject matter of the investigation in a written charge to the committee that describes the allegations and related issues identified during the inquiry; identifies the respondent; informs the committee that it must conduct the investigation as prescribed by this Policy; defines research misconduct; and instructs the investigation committee on the burden of proof. The charge shall state that the committee is to evaluate the evidence and testimony of the respondent, complainant, and key witnesses to determine whether, based on a preponderance of the evidence, research misconduct occurred and, if so, to what extent, who was responsible, and its seriousness. Finally, the charge shall inform the committee that it must prepare a written investigation report that meets the requirements of this Policy.

2.      First Meeting – At the committee's first meeting, the RIO will review the charge, the inquiry report, and the prescribed procedures and standards for the conduct of the investigation, including the necessity for confidentiality and for developing a specific investigation plan. The investigation committee will be provided with a copy of this Policy and, if applicable, federal regulations. The RIO will be present and available throughout the investigation to advise the committee as needed.

**E.      Investigation Process**

The investigation committee and the RIO must:

- Use diligent efforts to ensure that the investigation is thorough and sufficiently documented and includes examination of all research records and evidence relevant to reaching a decision on the merits of each allegation;

- Take reasonable steps to ensure an impartial and unbiased investigation to the maximum extent practical;

- Offer each respondent, complainant, and any other available person who has been reasonably identified as having information regarding any relevant aspects of the investigation, including witnesses identified by the respondent, the opportunity to be interviewed; record or transcribe each interview; provide the recording or transcript to the interviewee for correction; and include the recording or transcript in the record of the investigation; and

8

- Pursue diligently all significant issues and leads discovered that are determined relevant to the investigation, including any evidence of any additional instances of possible research misconduct, and continue the investigation to completion.

**F.        The Investigation Report**

The investigation committee and the RIO are responsible for preparing a written draft report of the investigation that:

- Describes the nature of the allegation of research misconduct, including identification of the respondent.

- Describes and documents financial support for the research subject to the allegations, including without limitation the numbers of any grants that are involved, grant applications, contracts, and publications listing support;

- Describes the specific allegations of research misconduct considered in the investigation;

- Includes the institutional policies and procedures under which the investigation was conducted;

- Identifies and summarizes the research records and evidence reviewed and identifies any evidence taken into custody but not reviewed; and

- Includes a statement of findings for each allegation of research misconduct identified during the investigation. Each statement of findings must: (1) identify whether the research misconduct was falsification, fabrication, or plagiarism, and whether it was committed intentionally, knowingly, or recklessly; (2) summarize the facts and the analysis that support the conclusion and consider the merits of any reasonable explanation by the respondent, including any effort by respondent to establish by a preponderance of the evidence that they did not engage in research misconduct because of honest error or a difference of opinion; (3) identify the specific funding support (if any); (4) identify whether any publications need correction or retraction; (5) identify the person(s) responsible for the misconduct; and (6) list any current support or known applications or proposals for support that the respondent has pending with federal agencies or external funders.

- Includes recommended institutional actions.

The Office of General Counsel shall be available to advise the investigation committee and the RIO with respect to the report. Modifications should be made as appropriate in consultation with the RIO and the investigation committee.

**G.        Comments on the Draft Report and Access to Evidence**

1.        Respondent – The RIO will give the respondent a copy of the draft investigation report and exhibits for comment and, concurrently, a copy of or supervised access to the evidence on which the report is based. The respondent will be allowed 30 days from receipt of the draft report to submit comments to the RIO. The respondent's comments must be included and considered in the final report.

2.  Confidentiality – In distributing the draft report to the respondent for comment, the RIO will remind the respondent of the confidentiality under which the draft report is made available and may establish reasonable conditions to ensure such confidentiality.

## H.    Decision by Deciding Official

The final investigation report will be submitted to the Dean, who will make a written determination as to: (1) whether the institution accepts the investigation report, its findings, and the recommended institutional actions; and (2) the appropriate institutional actions in response to the accepted findings of research misconduct. If this determination varies from the findings of the investigation committee, the Dean will explain in detail the basis for rendering a decision different from the findings of the investigation committee. Alternatively, the Dean may return the report to the investigation committee with a request for further fact-finding or analysis.

When a final decision on the case has been reached, the respondent will be notified in writing. The Dean, in consultation with institutional officials as needed, also will determine whether relevant parties should be notified of the outcome of the case, including professional societies, editors of journals in which falsified reports may have been published, collaborators of the respondent in the work, professional licensing boards, or law enforcement agencies, .

## I.    Institutional Actions

After a determination of research misconduct is made, the Dean may decide on appropriate actions to be taken, in consultation with others at the University as appropriate. Sanctions for research misconduct shall be based on the seriousness of the misconduct, including but not limited to, the degree to which the misconduct: a) was intentional, knowing, or reckless; b) was an isolated event or part of a pattern; and c) had significant impact on the research record, research subjects, other researchers, institutions, or the public welfare. The range of administrative actions includes, but is not limited to, the correction of the public record including the withdrawal or correction of all pending or published abstracts and papers emanating from the research where misconduct was found; removal of the responsible person from the particular project, special monitoring of future work, probation, suspension, leave without pay, salary reduction, or initiation of steps leading to rank reduction or termination of employment; restitution of funds as appropriate; suspension or termination of an active award; and other action appropriate to the research misconduct. For cases involving research misconduct by students, sanctions shall be determined by the appropriate student disciplinary board.

## J.    Time for Completion

The investigation ordinarily shall be completed within 120 days of beginning it, including conducting the investigation, preparing the draft report of findings, providing it for comment, finalizing the report, and making necessary notifications. However, if the RIO determines that the investigation will not be completed within this 120-day period, the rationale for the delay will be documented.

## IX.    Interim Institutional Actions

Throughout the research misconduct proceeding, the RIO will review the situation to determine if there is any threat of harm to the integrity of the research process. In the event of such a threat, the RIO will,

10

in consultation with institutional and other officials, as necessary, take appropriate interim actions to protect against any such threat.

Interim action might include: additional monitoring of the research process; reassignment of personnel; additional review of research data and results; or delaying publication.

## X.    Completion of Cases

Generally, all inquiries and investigations will be carried through to completion and all significant issues will be pursued diligently.

## XI.    Other Considerations

### A.    Termination or Resignation Prior to Completing Inquiry or Investigation

The termination of the respondent's HBS employment, by resignation or otherwise, before or after an allegation of possible research misconduct has been reported, will not preclude or terminate the research misconduct proceeding or otherwise limit any of HBS's responsibilities to pursue allegations.

If the respondent, without admitting to the misconduct, elects to resign the respondent's position after HBS receives an allegation of research misconduct, the assessment of the allegation will proceed, as well as the inquiry and investigation, as appropriate based on the outcome of the preceding steps. If the respondent refuses to participate in the process after resignation, the RIO and any inquiry or investigation committee will use their best efforts to reach a conclusion concerning the allegations, noting in the report the respondent's failure to cooperate and its effect on the evidence.

### B.    Restoration of the Respondent's Reputation

Following a final finding of no research misconduct, the RIO must, at the request of the respondent, undertake all reasonable and practical efforts to restore the respondent's reputation.

### C.    Allegations Not Made in Good Faith

If relevant, the Dean or their designee will determine whether the complainant's allegations of research misconduct were made in good faith, or whether a witness or committee member acted in good faith. If the Dean or their designee determines that there was an absence of good faith, the Dean or their designee will determine whether any administrative action should be taken against the person who failed to act in good faith.

### D.    Maintaining Records

HBS shall maintain the records of a research misconduct proceeding in a secure manner during its pendency and for seven (7) years after completion of the proceeding or completion of any agency oversight proceeding, or as required by any applicable record retention provision, whichever is later.

**Appendix 1:  Glossary of Terms and Definitions**

*Allegation*: a disclosure of possible research misconduct through any means of communication.

*Committee member*: a member of any ad hoc committee appointed to conduct all or a portion of the research misconduct process under this Policy.

*Complainant*: a person who in good faith makes an allegation of research misconduct.

*Conflict of interest*: financial, personal, or professional relationships that may compromise, or appear to compromise a person's decisions.

*Deciding Official (DO)*: the institutional official who makes final determinations about allegations of research misconduct and any institutional actions, ordinarily the Dean of HBS. The Deciding Official does not serve as the Research Integrity Officer and is not directly involved in the institution's preliminary assessment, inquiry, or investigation. The Deciding Official's involvement in the appointment of individuals to assess allegations of research misconduct, or to serve on an inquiry or investigation committee, is not considered to be direct involvement.

*Evidence*: any document or other record, tangible item, or testimony offered or obtained during a research misconduct proceeding that tends to prove or disprove the existence of an alleged fact.

*Fabrication*: making up data or results and recording or reporting them.

*Falsification*: manipulating research materials, equipment, or processes, or changing or omitting data or results such that the research is not accurately represented in the research record.

*Good faith*
　　*As applied to a complainant or witness*: having a belief in the truth of one's allegation or testimony that a reasonable person in the same position could have, based on the information known to the person at the time. An allegation or cooperation with a research misconduct proceeding is not in good faith if made with knowing or reckless disregard for information that would negate the allegation or testimony.

　　*As applied to a committee member*: cooperating with the research misconduct proceeding by carrying out the duties assigned impartially for the purpose of helping the institution meet its responsibilities under the Policy. A committee member does not act in good faith if the committee member's acts or omissions on the committee are dishonest or influenced by personal, professional, or financial conflicts of interest with those involved in the research misconduct proceeding.

*Inquiry*: preliminary information-gathering and preliminary fact-finding in accordance with the Policy to determine whether an allegation of research misconduct warrants investigation.

*Investigation*: the formal development of a factual record and the examination of that record leading to a decision about whether to recommend a finding of research misconduct, which may include a recommendation for other appropriate actions, including institutional actions.

*Plagiarism*: the appropriation of another person's ideas, processes, results, or words without giving appropriate credit.

*Preponderance of the evidence*: proof by information that, compared with that opposing it, leads to the conclusion that the fact at issue is more probably true than not.

*Research*: a systematic experiment, study, evaluation, demonstration, or survey designed to develop or contribute to general knowledge or specific knowledge by establishing, discovering, developing, elucidating, or confirming information about, or the underlying mechanism relating to, the matters to be studied.

*Research Integrity Officer (RIO)*: the institutional official responsible for: (1) reviewing allegations of research misconduct to determine if they fall within the definition of research misconduct and warrant an inquiry; and (2) overseeing inquiries and investigations.

*Research misconduct*: fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results. Research misconduct does not include honest error or differences of opinion.

*Research record*: the record of data or results that embody the facts resulting from scientific inquiry or other scholarly endeavors, including but not limited to research proposals, laboratory records (physical and electronic), progress reports, abstracts, theses, oral presentations, internal reports, journal articles, correspondence, and any documents and materials provided to an institutional official in the course of a research misconduct proceeding.

*Respondent*: the person against whom an allegation of research misconduct is directed or who is the subject of a research misconduct proceeding.

*Retaliation*: an adverse action taken against a complainant, witness, or committee member by an institution or one of its members in response to a good faith allegation of research misconduct or good faith cooperation with a research misconduct proceeding.

**Appendix 2: Additional Procedures for Allegations Involving Federal Funding**

*Scope*

This Policy is intended to comply with institutional responsibilities under the Public Health Service (PHS) Policies on Research Misconduct, 42 CFR Part 93. Other federal agencies have published their own research misconduct regulations; to the extent those regulations apply to an allegation of research misconduct and are inconsistent with this Policy, HBS shall comply with the applicable regulatory requirements.

This Policy does not apply to authorship or collaboration disputes and applies only to allegations of research misconduct that occurred within six years of the date HBS received the allegation, subject to the subsequent use, health or safety of the public, and grandfather exceptions articulated in 42 C.F.R. § 93.105(b).

With respect to students involved in allegations of research misconduct that involve federal funding, the appropriate student disciplinary board will be notified of the initiation of any inquiries and/or investigations and will be informed of the findings of any such inquiries and/or investigations, including receiving copies of all inquiry and/or investigation reports.  For allegations of research misconduct against students that do not involve federal funding, HBS may, at its discretion, either refer them to the appropriate student disciplinary board, or review them under this Policy and notify the appropriate student disciplinary board as described above.

*Inquiry Process*

If a legally sufficient admission of research misconduct is made by the respondent, misconduct may be determined at the inquiry stage if all relevant issues are resolved. In that case, HBS should promptly consult with the relevant federal agency to determine next steps. Acceptance of the admission and any proposed settlement must be approved by the relevant federal agency.

*Notification to Respondent of the Results of the Inquiry*

The RIO will provide the respondent with a link to or copy of 42 C.F.R. Part 93 (or other applicable federal regulations).

*Notification to Federal Agencies of the Results of the Inquiry*

Within 30 calendar days of the decision whether an investigation is warranted, the RIO will provide the Office of Research Integrity ("ORI")[9] (or the relevant federal agency) with the written decision and a copy of the final inquiry report (or comply with any other notice obligation to a government agency or other funder).

*Time for Completion*

If an investigation cannot be completed within 120 days of beginning it, the RIO will document the

---

[9] The Office of Research Integrity (ORI) in the U.S. Department of Health and Human Services (DHHS) is responsible for the scientific misconduct and research integrity activities of the U.S. Public Health Service (PHS).

14

rationale for the delay and notify federal agencies as required and in accordance with federal regulations. The RIO will ensure that periodic progress reports are filed with federal agencies and in accordance with federal regulations.

### *Notice of Institutional Findings and Actions*

When the Dean reaches a final decision on the case, the investigation is complete, and the RIO will transmit to the applicable funding agency: (1) a copy of the final investigation report with all attachments; (2) a statement of whether the institution accepts the findings of the investigation report; (3) a statement of whether the institution found misconduct and, if so, who committed the misconduct; and (4) a description of any pending or completed institutional actions against the respondent.

### *Interim Institutional Actions and Notifying Federal Agencies of Special Circumstances*

Throughout the research misconduct proceeding, the RIO will review the situation to determine if there is any threat of harm to public health or to federal funds and equipment. In the event of such a threat, the RIO will, in consultation with other institutional officials, and ORI, as necessary, take appropriate interim actions to protect against any such threat. Interim action might include: additional monitoring of the handling of federal funds and equipment and/or reassignment of personnel or of the responsibility for the handling of federal funds and equipment.

HBS shall, at any time during a research misconduct proceeding, notify ORI (or the relevant federal agency) immediately if there is reason to believe that any of the following conditions exist:
- Health or safety of the public is at risk, including an immediate need to protect human or animal subjects;
- Federal resources or interests are threatened;
- Research activities should be suspended;
- There is a reasonable indication of possible violations of civil or criminal law;
- Federal action is required to protect the interests of those involved in the research misconduct proceeding;
- The research misconduct proceeding may be made public prematurely and federal action may be necessary to safeguard evidence and protect the rights of those involved; or
- The research community or public should be informed.

### *Completion of Cases*

For allegations that include PHS funded research, HBS must notify ORI in advance if there are plans to close a case at the inquiry or investigation stage on the basis that respondent has admitted guilt, a settlement with the respondent has been reached, or for any other reason, except: (1) closing of a case at the inquiry stage on the basis that an investigation is not warranted; or (2) a finding of no misconduct at the investigation stage, which must be reported to ORI, as prescribed in this Policy and 42 CFR § 93.315. For allegations that include non-PHS funded research, HBS must comply with any other notice obligation to a government agency or other funder.

### *Restoration of the Respondent's Reputation*

Following a final finding of no research misconduct, including ORI concurrence where required by 42 CFR Part 93 (or, for non-PHS funded research, other applicable federal agency requirements), the RIO must,

15

at the request of the respondent, undertake all reasonable and practical efforts to restore the respondent's reputation.

***Maintaining Records for Review by ORI***

Unless HBS has transferred custody of the records of research misconduct proceedings (as defined by 42 C.F.R. § 93.317) to the funding agency in accordance with applicable law, HBS shall maintain the records of a research misconduct proceeding in a secure manner during its pendency and for seven (7) years after completion of the proceeding or completion of any agency oversight proceeding, or as required by any applicable record retention provision, whichever is later.