# Exhibit 216

# DANIEL REISBERG

*Patricia and Clifford Lunneborg Professor of Psychology, Emeritus*
*Reed College*

*mailing address*
9220 SW Barbur Blvd
Ste. 119 / # 192
Portland, OR  97219

*email*
reisberg@reed.edu

*telephone*
503.770.0636

*fax* (direct to Reisberg)
503.914.0477

23 April 2026

Patrick Hannon & Hampton Watson, Attorneys at Law
Hartley Michon Robb Hannon LLP
101 Federal Street, Suite 1810
Boston, MA 02110

Re: *Francesca Gino v. President & Fellows of Harvard College and Srikant Datar*

Dear Mr. Hannon and Mr. Watson:

As you requested, I am writing to provide a framework for understanding the nature of *confirmation bias,* with the goal of assisting the finder of fact in determining whether this type of bias might have shaped the events at issue in this case. For this purpose, I will in this report describe what confirmation bias is and list some of the forms that confirmation bias can take (including steps that manifest this bias, and also omissions that fail to protect against this bias).

In preparing this report, I considered the Third Amended Complaint, marked with Leave to File Granted July 22, 2025. I will offer no opinion in this report (nor would I in testimony) about whether this Complaint provides evidence of confirmation bias. Similarly, I will offer no opinion in this report or in testimony about whether there actually was bias on the part of the relevant actors at Harvard. I understand those matters are to be decided by the finders of fact in this dispute.

## FOUNDATION ISSUES

**My background**. I am a research psychologist with a Ph.D. in Experimental Psychology from the University of Pennsylvania (1980). "Research psychology" refers to the scientific arm of psychology – an enterprise that asks systematic questions about behavior, emotion, and cognition, using the standard tools of science.

I have worked as an active member of the scientific community for several decades. For much of that time (more than 30 years), I was on the faculty at Reed College, in Portland (OR); I retired from Reed in 2019. Six years earlier, the college had honored me with an endowed chair and so my formal title is now the *Patricia and Clifford Lunneborg Professor of Psychology, Emeritus*.

Across my career, I have worked in (and continue to work in) the area of cognitive psychology – the scientific study of how people gain information about the world, how they remember information they have gained, and how they think about this information. My professional activities include data collection and also extensive writing, teaching, consulting, and editing (both the editing of books and service as an editor for multiple professional journals) on a range of topics in cognitive psychology. This work has required me to maintain current knowledge of other researchers' work in my field.

Details of my professional work are described in my CV.[1] As you can see, I have a many-year history of publishing research articles in peer-reviewed scientific journals; I estimate that 80-90% of my publications have been through the rigorous process of peer review. (Other, non-peer-reviewed, publications represent my continuing efforts to share peer-reviewed science with a broader audience.) My CV also includes ten titles for which I am either the author or editor. One of these books, a university textbook in cognitive psychology, is now moving into its tenth edition; I believe the longevity of this text (which depends on my colleagues' evaluation of each successive edition) provides an indication of other researchers' assessment of the completeness and accuracy of my professional knowledge.

**Nature of this report**. In this report, I rely on scientific research that can help us understand how perception, memory, and reasoning function. This research is conducted according to standard methodologies for research in my field, has been through vigorous peer review, and the results are generally accepted in the scientific community. I would emphasize, though, that the research outcomes are, in virtually all cases, framed in terms of _probabilities_. In other words, research allows us to identify factors that can increase the risk of error, and also factors that can decrease the risk. I hope it is clear, though, that _being at risk of error_ is distinct from actually _making an error_ – and, of course, there are circumstances in which the risk of error is high but someone's report is nonetheless accurate.

On this basis, the available science would not allow me to form an ultimate opinion about whether the investigation in the immediate case was or was not swayed by confirmation bias. If I am called to testify, therefore, my testimony would focus on the relevant science, leaving it to the finders of fact to decide how (or whether) to connect this framework to the case at bar.

**THE INSTANT CASE**

My understanding is that Harvard University was contacted by the "Data Colada" group, alleging data anomalies and possibly data falsification in studies for which the plaintiff was an author. Harvard then conducted its own investigation, with an investigation committee under the direction of a Research Integrity Officer. This committee's report was submitted to the Dean of Harvard's Business School, who adopted the committee's conclusions. After this, the university initiated so-called "Third Statute" proceedings to consider revoking Plaintiff's tenure. In those proceedings, accusations of data falsification by Plaintiff were considered by a hearing committee (the "TS Committee") which issued its own report. The university adopted the findings of this last Committee and formally revoked Plaintiff's tenure.

**THE CONCERN ABOUT CONFIRMATION BIAS**

In a wide range of contexts, the strength of a conclusion relies on there having been a full, objective, and balanced investigation. The investigation can, of course, be compromised by deliberate bias, or by someone pre-judging the outcome of the investigation before the inquiry has begun. But the investigation can also be

---

[1] My CV is enclosed as an appendix to this report. Also enclosed as an appendix is a list of all other cases in which I have testified as an expert during the previous four years. (All such testimony was given at trial, as opposed to deposition, during this time span.) I also note that I am being compensated for my work on this case at a rate of $350 per hour.

compromised by an array of mechanisms collectively referred to as *confirmation bias*. Here I emphasize the word "array," because confirmation bias is best understood as an umbrella term that encompasses multiple processes. What binds these processes together is the fact that all of these processes (some conscious, some not) serve to maintain and strengthen current beliefs, and to avoid or minimize challenges to those beliefs.

In some settings, a degree of confirmation bias is valuable: If a belief has been amply supported by evidence in the past, and has survived challenges in the past, then it is entirely reasonable to ignore or dismiss apparent challenges to the belief. If I may offer a casual example (adopted from Gilovich, 1991), imagine seeing a headline in a tabloid newspaper that announces, "Statue of Elvis Found on Mars." The headline's assertion is surely contrary to the reader's current beliefs, and it would be entirely sensible for the person to maintain their beliefs and dismiss this challenge – both because the relevant beliefs are well-established, and the source of the report (a tabloid) is of questionable credibility.

The obvious concern, however, is that a similar pattern of confirmation bias can often be observed even when the relevant beliefs should still be regarded as tentative (and in need of further assessment). It cannot be surprising therefore that formal systems (including rules for data gathering, and rules for evidence evaluation) exist to avoid confirmation bias, and these systems are routinely employed by institutions and groups making consequential decisions, or drawing conclusions that will provide a foundation for future reasoning. The scientific community, for example, insists on many steps aimed at ensuring that new claims are fully and objectively tested, and these steps include provisions that avoid confirmation bias. What follows in this report, therefore, is partly shaped by my years of training and experience as a scientist.

I emphasize, though, that similar steps, also aimed at avoiding confirmation bias, are needed for any decision-making group seeking to draw conclusions and make decisions that are guided by the full pattern of evidence. The importance of these steps is underscored by research evidence revealing confirmation bias even when trained professionals are making highly consequential judgments within their area of expertise – including forensic scientists examining case evidence, or police detectives investigating a case or assessing a suspect's guilt. The scientific evidence documenting these points (i.e., showing how people are vulnerable to confirmation bias) is widespread and, in what follows, I draw illustrations from a range of settings. Within this report, when I mention a specific study to illustrate a point, that study is cited within a footnote. I emphasize, though, that the studies cited in this way are merely illustrations of a much broader data pattern and, for a sampling of the relevant studies, see the sources listed at the end of this report.

Before turning to the nature of confirmation bias, three points provide context for understanding this form of bias – why confirmation bias can be so damaging; why confirmation bias is often self-sustaining; and what some of the factors are that can encourage confirmation bias.

### The Crucial Importance of Disconfirming Evidence.

Confirmation bias creates a situation that we can think of as considering only "half" of the evidence (i.e., evidence favoring the current belief). Of course, this omission of the

other "half" of the evidence is troubling. Worse, some scholars argue that the omitted "half" is actually more important than the "half" that is considered. In other words, the search for, and consideration of, _dis_confirming evidence is more valuable and more informative than the search for confirming evidence. This position is historically associated with the philosopher Karl Popper who argued that *falsifiability* is the key criterion distinguishing science from pseudoscience (or other questionable claims).[2] Scientists, Popper noted, make certain that their claims are falsifiable, and regard a claim as "confirmed" only when the claim has been exposed to potential falsification (i.e., disconfirmation) and has survived that challenge (and, preferably, survived many such challenges). Popper's criterion is, of course, also central to the courts' evaluation of evidence, and "falsifiability" is one of the requirements for scientific evidence spelled out in the 1993 Supreme Court ruling in Daubert *v.* Merrell Dow Pharmaceuticals.

### Confirmation Bias is Self-Sustaining.

Consider a study by Ruva et al. (2007)[3] on the effects of pre-trial publicity. In this study, participants were exposed to (simulated) pre-trial publicity ("PTP") that suggested the guilt of a criminal defendant. Participants then viewed an initial bit of (simulated) trial evidence – and their perception of the evidence was clearly influenced by the PTP, so that they perceived the evidence as more incriminating than did participants who had not seen the PTP.

This perception of the evidence as incriminating led the participants to strengthen their belief that the defendant was guilty, and this now-strengthened belief led to an even stronger degree of confirmation bias, coloring how participants perceived the next bit of evidence. This (biased) perception, in turn, further strengthened their belief, creating an even stronger effect of confirmation bias with the third bit of evidence. And so on.

In short, there is an upward spiral here: Confirmation bias shaped how each piece of evidence was perceived. This perception strengthened the initial belief which then strengthened the confirmation bias. This now-stronger bias then caused even more of a distortion of the next bit of evidence, leading to an even stronger belief and an even stronger bias.

Another aspect of this study is important: The research participants, in the end, were honestly able to assert that they had judged the case *based on the evidence they had seen,* just as the legal system requires. In other words, the participants were entitled to argue, in the end, that they had not reached a verdict biased on the PTP. The key, though, is that participants' assessment of the evidence was *through the lens provided by the PTP.* This pathway, with the PTP having no direct effect, but instead working to color how evidence is perceived, is arguably part of what makes confirmation bias so insidious.

---

[2] Popper, K. (1934). *The Logic of Scientific Discovery.* London, England: Routledge.
[3] Ruva, C., McEvoy, C., & Bryant, J. B. (2007). Effects of Pre-Trial Publicity and Jury Deliberation on Juror Bias and Source Memory Errors. *Applied Cognitive Psychology, 21(1),* 45–67.

### *Social and Motivational Contributions to Confirmation Bias.*

It is also important to consider factors that can encourage confirmation bias. In many settings, confirmation bias is simply the product of the ordinary functioning of our cognition, functioning that (as already mentioned) helps to preserve a level of stability in our beliefs. In other words, confirmation bias can often be viewed as a consequence of the routine and automatic functioning of human cognition.

However, confirmation bias can also be fueled by other factors, and I list some of these factors here. These factors are not themselves manifestations of confirmation bias, but can fuel confirmation bias, and can make this bias more difficult to overcome.

a.  It cannot be surprising that confirmation bias will likely be increased if the beliefs at stake are self-flattering or self-serving (perhaps psychologically or perhaps materially).

b.  Confirmation bias is also enhanced if the person (perhaps for personal reasons, perhaps for institutional reasons) is especially motivated to present themselves as *consistent* in their beliefs; this tendency can obviously make the person more resistant to information or insights that would invite a *change* in their beliefs. As an illustration, consider a political leader who points to an opponent's change in position and labels it "waffling." That leader might himself or herself take pride in not "waffling" – i.e., being constant in their views (and so more prone to seek and accept confirmation of those views).

c.  Likewise, confirmation bias is enhanced if, for whatever reason, a person is motivated to present themselves as having been correct in some earlier statement or action. Again, consider a political leader who might hesitate to admit some earlier (and perhaps consequential) error, and who therefore filters and distorts evidence to "prove" that the earlier position was not an error.

d.  The prior two points can concern private judgments – if, specifically, someone quietly thinks of themselves as having been consistent in their beliefs, or quietly takes pride in having been correct in some earlier judgment. These tendencies are, however, magnified if the belief or earlier judgment had been made public. Here, the prospect of public criticism or public embarrassment make confirmation bias more likely.

e.  There has been considerable research attention in the last years on why people often accept misinformation and then hold on to mistaken beliefs, rooted in that misinformation.[4] One important factor is social: By holding onto certain beliefs, someone can claim membership in a particular group – a group that is valued or esteemed. Indeed, evidence suggests that stronger feelings of group membership can

---

[4] For samples of some of the scholarly discussion on this topic, see Ellsworth, P. C. (2021). Truth and advocacy: Reducing bias in policy-related research. *Perspectives on Psychological Science, 16(6),* 1226–1241; Lewandowsky, S., Ecker, U. K., & Cook, J. (2017). Beyond misinformation: Understanding and coping with the "post-truth" era. *Journal of Applied Research in Memory and Cognition, 6(4),* 353–369.  Lewis, N. A., Jr., & Wai, J. (2021). Communicating what we know and what isn't so: Science communication in psychology. *Perspectives on Psychological Science, 16(6)*, 1242–1254.

encourage stronger confirmation bias, with the goal of maintaining that group membership.

f.  Finally, it is important that, by holding onto certain beliefs, one can sustain other preferred beliefs (e.g., belief that a particular public figure is a good person, or that the public figure is a bad person). Likewise, by holding onto certain beliefs, one can sometimes maintain other values (e.g., respect for scientific research, or respect for a particular institution).

## THE  MANY FORMS OF CONFIRMATION BIAS

As already indicated, the terminology of confirmation bias refers to an array of tendencies and processes. Any one of these tendencies can lead to a conclusion that is not warranted by evidence, or can lead to a conclusion that is more strongly maintained than the actual evidence justifies. Of course, a combination of these tendencies can magnify these concerns. In what follows, I list a dozen tendencies involved in confirmation bias. Other scholars might catalog these tendencies with a different list, but there is no disagreement about the concerns here. There is also some degree of overlap between entries on the following list. However, I believe the list that follows is a useful way to describe the various manifestations of confirmation bias.

1.  *Failure to formulate claims in a fashion that will allow for disconfirmation.*
2.  *Failure to rely on an inquiry that, from the start,*
       *is designed not to favor one outcome rather than another.*
3.  *Failure to seek evidence that might challenge the current view.*
4.  *Tendency toward premature closure.*
5.  *Tendency to interpret ambiguous or incomplete evidence as favoring*
       *the current view.*
6.  *Failure to consider alternative hypotheses that might explain the*
       *evidence as clearly as the current view.*
7.  *Accept at face value evidence that favors the current view,*
       *while subjecting contrary evidence to critical scrutiny.*
8.  *Failure to remember contrary evidence.*
9.  *Tendency to remember contrary evidence in altered form,*
        *robbing the evidence of evidentiary strength.*
10. *Underweighting contrary evidence.*
11. *Relaxing the criterion for accepting belief-consistent claims.*
12. *Failure (or refusal) to allow an independent assessment of the evidence,*
        *to guard against the possibility that your view of the evidence was biased.*

### 1.  *Failure to formulate claims in a fashion that will allow for disconfirmation.*

Proper testing of a belief requires that the belief be formulated in a fashion that is open both to confirmation and to disconfirmation. This point is explicit in scientists' insistence that their hypotheses be *"testable."* The same point was explicit in Popper's description of claims he counted as pseudo-scientific. Popper specifically noted the nature of many of Sigmund Freud's claims, claims that were sufficiently flexible so that *any* observation could be counted as confirming the claim and virtually no

observation would count as disconfirmation.

Some authors describe the concern here as applying to claims that are "open-ended" or claims that allow for "multiple endpoints."[5] An informal example of an open-ended claim would be the assertion, "Good things come in threes." There are multiple reasons why this assertion is not testable, including the time frame: Would we count this claim as confirmed if three good things occur on the same day? In the same week? In the same month? Likewise, this claim about "come in threes" also suffers from multiple endpoints. With no specification of what counts as a "good thing," an enormous array of outcomes could be counted as confirmations of this claim.

As a variant on these concerns, confirmation bias can take the form of someone (to use the common expression) "moving the goal posts." Concretely, imagine an investigation that is unable to find compelling evidence for some allegation and responds to this state of affairs by, late in the process, re-defining the allegation. In this fashion, the lack of confirmation for the first allegation is set aside. In addition, thanks to the fact that the revised allegation arises late in the process, there may be little opportunity for critical examination of that allegation.

### 2.  *Failure to rely on an inquiry that, from the start, is designed not to favor one outcome rather than another.*

One step toward *avoiding* confirmation bias is a reliance on a process or inquiry that is defined prior to the inquiry, has been vetted for its fairness and objectivity, and does not by its nature favor one outcome to the inquiry vs. another. In the world of scientific research, these goals are reached by an insistence on all aspects of the scientific method, and a refusal to rely on some newly created *ad hoc* procedure that may not have been properly vetted, and which may have been created with the specific inquiry in mind (and thus might contain some inherent bias for that inquiry).

In the same spirit, I note that organizations like Data Colada are proponents of (what is often called) the "open-science movement," in which (as one requirement) scientists must "pre-register" any research project. That pre-registration includes an explicit statement of hypotheses (to avoid the multiple end-points problem already described), a clear statement of procedure, and a clear statement of how the data will be analyzed. These latter steps guard against "p-hacking" and other methodological and statistical maneuvers in which the protocol is adjusted, once data collection is underway or even complete, with the potential that these adjustments might be biased in a way to favor the scientists' expectations.

These formal steps are paralleled by many legal and institutional practices, which specify a procedure for collecting and evaluating evidence that is designed to be fair and objective, and not biased toward any particular outcome. In contrast, one aspect of confirmation bias involves the use of procedures that do not have these qualities, and

---

[5] Gilovich, T. (1991). *How we know what isn't so: The fallibility of human reason in everyday life.* N.Y.: Free Press.

which are set up in a fashion that makes one outcome rather than another more likely.

### 3. Failure to seek or consider evidence that might challenge the current view.

Popper argued many years ago that evidence confirming a belief is often of limited value. As one concern (and as already discussed), if a claim is sufficiently open-ended in its implications, then almost any factual observation (or its opposite) might be interpreted as consistent with the claim. In addition, Popper noted the potential for a logical fallacy here, a fallacy formally termed "affirming the consequent." In the domain of confirmation bias, this fallacy takes the form of "If my view is correct, then I will observe X. I have now observed X. Therefore my view is correct." To see that this is a fallacy, consider filling in the argument with these specifics: "The rooster believes his crowing causes the sun to rise. He crows. If his belief is correct, then the sun will rise. We then observe that the sun does rise. Therefore the rooster's belief is correct and he does indeed cause the sun to rise."

Given these limitations of *confirmation,* Popper argued that it is essential that a claim be exposed to (potential) *disconfirmation,* or (better) falsification. For this purpose, it is essential to seek out evidence that might challenge the current view. Yet people often fail to take this step.

This bias in information-seeking can be documented in many settings, including police interrogations of a suspect. Often these interrogations start out with the officer assuming the suspect's guilt (and so the interrogations are said to be "guilt presumptive") and therefore asking questions expressly aimed at gathering evidence that will confirm that guilt, with few (or no) questions aimed at challenging the officer's starting assumption. In one research study, participants committed a mock crime and then were questioned either by an interrogator who was told that the participant was guilty or by an interrogator told the participant was likely innocent.[6] Interrogators assigned to the presumed-guilty condition conducted more coercive interrogations and tried harder to get the "suspect" to confess. In other words, having been given an initial belief, the officers systematically collected evidence only to confirm their belief, and not evidence that might challenge the belief. These expectations and behaviors by the officer then had a self-fulfilling quality, because these more coercive interrogations actually elicited more defensive (and apparently incriminating) behavior from the "suspect," whether the participants was factually guilty or not. (Later, a separate group of people viewed recordings of these interrogations, and were more likely to judge the suspect guilty if the officer had entered the interrogation already believing the suspect to be guilty, even in cases when the suspect had committed no offense whatsoever.)[7]

---

[6] Kassin, S. M., Goldstein, C. C., & Savitsky, K. (2003). Behavioral confirmation in the interrogation room: On the dangers of presuming guilt. *Law and Human Behavior, 27*, 187–203.
[7] A similar form of biased information-seeking can arise when people are choosing among various options. In this setting, people often seem to ask themselves, "What considerations or evidence would justify making this selection?" and seem not to ask themselves, "What would speak against making this choice?" E.g., Shafir, E. (1993). Choosing versus rejecting: Why some options are both better and worse than others. *Memory & Cognition, 21,* 546-556.

Similarly, consider a pattern sometimes decried in criminal investigations, when a detective develops "tunnel vision."[8] In these cases, it is usually clear that a crime (or some sort of offense) had occurred, and early on police develop a hypothesis about who the culprit was. The detectives are said to have developed tunnel vision, however, when they fail to pursue other hypotheses and other culprits, even when the evidence for the initial suspect is thin and the case facts provide some indications that other culprits, and other accounts of the crime, deserve attention.

In still other settings, this selective collection of evidence can take different forms, including some deliberate steps and deliberate omissions. An investigation, for example, might insist on limiting the number of witnesses, advisors, or experts who will provide input to the investigation. Or an investigation might limit the time available for the collection of evidence, or the review of evidence. To be sure, sometimes these constraints are needed (e.g., if some external exigency limits the resources or time that is available for an investigation). Even so, these constraints increase the danger that a tentative (or even putative) claim has not been fully examined and this point can, in obvious ways, shelter the claim from possible challenge.

I note that time limitations can also have a further effect: A great deal has been written about the "cognitive shortcuts" that characterize much of our thinking. Much of the discussion of these shortcuts is rooted in the research of Daniel Kahneman and Amos Tversky, but both their work and subsequent scholarship has led researchers to describe thinking in terms of a "dual process" model, with "Type 1" thinking involving efficient-but-error-prone shortcuts, used even in high stakes judgments, and "Type 2" thinking involving slower but more accurate thought processes (including more accurate assessment of the evidence).[9] Many factors encourage the use of Type 1 thinking, including (not surprisingly) time pressure. Specifically, time constraints routinely lead people to make judgments based on the evidence easily in view, as opposed to evidence more carefully collected (the "availability heuristic"). Likewise, time constraints can lead people to make judgments based on relatively superficial resemblance to prior cases, rather than thoughtful assessments of evidence (the "representativeness heuristic").[10] In short, time constraints (whether necessary or not) can encourage and sustain confirmation bias, and can also compromise other aspects of cognition.

### 4. *Tendency toward premature closure.*

A point linked to the previous concern is a tendency toward premature closure. This term refers to steps that announce a decision or assessment before the information gathering and evaluation is complete – a pattern commonly referred to as a "rush to judgment." This premature closure invites several dangers. First, premature closure

---

[8] For a broad discussion of tunnel vision, see Findley, K. A. (2012). Tunnel vision. In B. L. Cutler (Ed.), *Conviction of the innocent: Lessons from psychological research* (pp. 303–323). Washington DC: American Psychological Association.

[9] Much of this research is summarized in a volume Kahneman published after he had received the Nobel Prize for his work with Tversky. Kahneman, D. (2011). *Thinking, Fast and Slow.* NY: Farrar, Straus & Giroux.

[10] These and other heuristics are discussed at length in Reisberg, D. (2026). *Cognition: Exploring the Science of the Mind, 9th edition.* NY: W.W. Norton.

often means that not all of the evidence has been considered, and this can, as before, shelter a claim from possible challenge.

In addition, premature closure often involves a commitment (perhaps a public commitment) to a particular conclusion, and this commitment can itself encourage confirmation bias, on the logic (as described earlier) that people often hesitate to abandon a prior position, and often hesitate to acknowledge that an earlier assertion was unwarranted or even mistaken.

Premature closure can also signal to outside parties that an inquiry has reached its conclusion. This point can dissuade outside parties from bringing forward other evidence or other considerations. The consequence of these steps, again, would be a potentially incomplete inquiry, and an inquiry that might have overlooked potentially disconfirming evidence.

### 5. *Tendency to interpret ambiguous or incomplete evidence as favoring the current view.*

The evidence people encounter is often of uncertain quality and, in many cases, open to varying interpretations. Confirmation bias, however, can lead people to interpret the evidence in a biased way, so that the evidence is perceived to be entirely consistent with (and even confirming) the person's current views. As a result, in many situations what people see is biased so that they see what they expect to see; likewise what people hear is often biased so that they hear what they expect to hear. This pattern has reliably been confirmed in research that involves people interpreting blurred photographs, pictures of human faces, and degraded speech recordings. The same pattern has been observed when people observe "patterns" in information (including patterns in numerical data) that is, in truth, entirely random.

A troubling historical example of this tendency played a role in the U.S. government's mistaken belief that Saddam Hussein possessed Weapons of Mass Destruction (WMD's); this false belief led to the 2003 invasion of Iraq. Many factors played a role in this error, including confirmation bias that was rooted in long-standing antagonism toward (and suspicion of) Hussein. Among other implications, this bias led to ambiguous evidence (concerning aluminum tubes) being (mis)interpreted as proof of WMD's – a clear case of confirmation bias coloring the interpretation of evidence.[11]

### 6. *Failure to consider alternative hypotheses that might explain the evidence as clearly as the current view.*

Evidence that is merely *consistent* with a belief is often interpreted as *confirming* the belief. This error arises because people often fail to realize that the same evidence might also be consistent with some other hypothesis. In fact, one of the often-mentioned strategies for "debiasing" (i.e., avoiding the effects of confirmation bias) is a "consider-the-opposite" admonition. It is unclear how much of a benefit this

---

[11]  D. Albright, "Iraq's Aluminum Tubes: Separating Fact from Fiction," December 5, 2003. Online at www.isis-online.org; B. Gellman,  "Search in Iraq Fails to Find a Nuclear Threat," Washington Post, October 26, 2003; J. Cirincione, J. Mathews, and G. Perkovich, "WMD in Iraq: Evidence and Implications," Carnegie Endowment for International Peace, January 2004. Online at wmd.ceip.matrixgroup.net/iraq3fulltext.pdf.

admonition has; even so, the salience of this admonition rests on the fact that people do routinely fail to consider hypotheses other than their current view.

### 7. Accept at face value evidence that favors the current view, while subjecting contrary evidence to critical scrutiny.

In many settings, there is an asymmetry in how evidence is interpreted. Evidence that is consistent with someone's view is often taken at face value; inconsistent evidence is carefully scrutinized with the goal of finding flaws or limits in this evidence. If I can offer an informal variant of this pattern, consider how people react to the brief slogans that appear on car bumper stickers. Slogans consistent with someone's political beliefs are often regarded as clever, pithy, and creative ways to frame the issue. Slogans inconsistent with one's beliefs are often regarded as distortions, misrepresentations, or "cheap shots."

Sometimes, the efforts toward dismissing contrary evidence are crude – when, for example, evidence is simply dismissed as "not relevant" or "not germane" or "not credible." Often though, the efforts toward dismissing or discounting contrary evidence are thoughtful and even creative (albeit sometimes ill-informed). This pattern has been documented in gamblers who often cling to their beliefs that they have a winning strategy (despite the evidence provided by their empty wallets; I return to studies of gamblers in a moment). The same pattern has been documented in scientists when they examine studies that are inconsistent with their own hypotheses. (I also return to this point below.)

### 8. Failure to remember contrary evidence.

Confirmation bias is also fueled by a separate and well-established pattern in memory: When people encounter new information, they seek to understand the information by fitting this input into an already existing mental framework. Formally, researchers would say that the information is understood within, and absorbed into, a "schema" or "schematic frame." Then, when the time comes to recall information, the schema serves another function: If bits of information have been forgotten (or were never recorded in the first place), the schema provides a plausible basis for reconstructing what these absent bits of information likely were.[12]

This pattern is generally helpful: Schemas summarize what is typical in the world, and so interpretations, inferences, and suppositions based on the schema will statistically be accurate more often than not. Even so, this routine (and perhaps inevitable) reliance on schematic knowledge produces a consistent bias in how the past is recalled. Information consistent with the schema will be readily absorbed into the framework. Information not consistent with the schema will either not be absorbed (i.e., not recorded into memory, and so not recalled later) or altered in some fashion so that it now does fit with the schema. Then, at the time of recall, schema use guarantees that any reconstruction or supposition will be guided by what the person believes is typical or 'normal' for that situation – and so the supposition will lead to a memory of the previously-encountered information as having been consistent with the person's schema-based beliefs.

---

[12] Again, the pattern of schema-based influence on memory is extensively discussed in Reisberg, D. (2026) Op. cit.

These memory patterns are important for their own sake – including how crime victims remember their experience, or how jurors remember trial testimony. Participants in one study listened to a (simulated) eyewitness describing an event that (depending on experimental condition) was either a mugging, a bank robbery, or a convenience store robbery.[13] In a pre-study, a different group had identified a list of actions that comprise a "typical crime" of each type (e.g., "take out a gun" as part of a convenience store robbery). Half of these "schema typical actions" were included in the testimony; half were not. One week later, a significant number of the unstated "schema typical actions" were erroneously recalled as having been included in the testimony. In this setting and more broadly, people often remember what they expect (based on schematic knowledge) to have happened, and then cannot distinguish between these schema-based inferences and what they actually remember from their own observations.

A similar pattern is referred to as "hind-sight bias." This term refers to situations in which someone knows how an episode evolved, or knows the outcome of an episode, and then (inadvertently, unwittingly) adjusts their memory for the early steps of the episode to bring these early steps (as remembered) into better alignment with later bits. As one version of this, people sometimes come to a view, late in a sequence, that the actions they are considering can be considered within a certain schema. ("I now realize this was all a sham," or "I now realize he was cheating on me all along.") Then, with that schematic frame in place, the person may alter their recollection of earlier events to make that recollection fit with their current understanding.

These patterns contribute in multiple ways to confirmation bias: New information consistent with someone's prior beliefs will be readily absorbed into memory. New information inconsistent with beliefs will in many cases be distorted in memory. Any subsequent recall of not-well-remembered evidence will be supplemented by schema-consistent knowledge so that the evidence is remembered as fitting with the schema.

These memory effects can also have a further impact: Thanks to the selectivity of memory, people may fail to remember evidence contrary to their view. People can then sometimes *notice* this absence-of-evidence, and interpret it as evidence-of-absence, with reasoning along the lines of, "I can think of no evidence challenging my view, therefore there is no evidence challenging my view, and so I can be even more confident that my view is correct."

### 9.  *Tendency to remember contrary evidence in altered form, robbing the evidence of evidentiary strength.*

There is, however, an occasional exception to the memory pattern just described. Sometimes a person encounters contrary evidence that is so jarring that it cannot be ignored. In such cases, the person is likely to focus on the evidence, mull it over at length, and pursue a line of thought akin to "how could this be?". These circumstances actually make the contrary evidence highly memorable – so that the person is likely to remember this evidence, and perhaps more likely to remember it in comparison to belief-consistent evidence.

---

[13] Holst, V. F., & Pezdek, K. (1992). Scripts for typical crimes and their effects on memory for eyewitness testimony. *Applied Cognitive Psychology, 6(7),* 573-587.

However, in the circumstances just described, some of the patterns mentioned earlier come into play and, in particular, the person is likely to spend effort on finding some re-interpretation of the contrary evidence that either robs the evidence of its force, or actually transforms the evidence into being belief-consistent. The earlier mentioned observation of gamblers illustrates this pattern.[14] When the gamblers' strategy led them to a mistaken prediction, they tended to remember their failed bets as the result of some fluke: "I would have won except for the crazy bounce the ball took in the third quarter," or "I would have won except for that awful call by the ref." In this way, rather than remembering their losses as losses, they instead remembered them as "near-wins," and on that basis remembered these events as confirming the success of their prediction strategy.

### 10. Underweighting contrary evidence.

Even when contrary evidence is sought, noticed, understood, and accurately remembered, confirmation bias can lead people to overrule the contrary evidence. A classical research example involved a number of studies in which participants were given some initial evidence as part of the experimental procedure and then, afterward, thoroughly debriefed and told that the "evidence" they had reviewed was entirely fictitious.[15] Despite the debriefing, participants were still influenced by the "evidence" they had seen and expressed beliefs that were in line with that (bogus) evidence.

What was going on here? The results suggests that participants in these studies did what they could to make sense of the (again: fictitious) information they had initially been given, and seemed to have asked themselves why the evidence might make sense. In other words, guided by confirmation bias, the participants sought a causal explanation that would bolster the information they had received. Thoughts about this explanation then remained in place even after the experimenters' debriefing, and this led participants to continue endorsing a view that, in truth, was now supported by no evidence whatsoever.

In thinking about this result, notice that participants invented a "story" for themselves, to explain the evidence, and then they were compelled by their own story even when the basis for that story had been obliterated. This pattern – with people being persuaded by "stories" – is widespread. This pattern is, for example, reflected the "story model" of jury decision making, with jurors seeking to assemble a coherent narrative that would fit with the testimony they had heard; jurors then remember and evaluate the evidence according to the story they had constructed (usually with the guidance of the attorneys).[16] Then, in reaching their verdict, jurors rely on this story and, if multiple stories are available, jurors often have a preference for the simplest and most familiar story, even if some alternative story more closely aligns with all of the evidence.

---

[14] Gilovich, T. (1991). Op. cit.

[15] Anderson, C.A. (1983). Abstract and concrete data in the perseverance of social theories: When weak data lead to unshakeable beliefs. *Journal of Experimental Social Psychology, 19,* 93-108.

[16] Pennington, N. & Hastie, R. (1993). The story model of juror decision making. In R. Hastie (Ed.), *Inside the juror: The psychology of juror decision making* (pp. 192-221) NY: Cambridge University Press.

### 11. *Relaxing the criterion for accepting belief-consistent claims.*

In the legal system, different decisions require different standards of proof – with some decisions requiring proof beyond reasonable doubt; others requiring only a preponderance of evidence; others require only "reasonable suspicion." Similar variations are evident in ordinary reasoning, with people sometimes willing to count a conclusion as established based only on weak evidence, and other times accepting a conclusion only after seeing a large quantity of compelling evidence. Researchers describe these variations in terms of a person's decision criterion, and often this criterion is sensibly determined by the importance of the decision: If the decision is a minor one with few consequences, then it is reasonable to let the decision be swayed by weak evidence. For larger, more consequential decisions, it is reasonable to insist on considerable evidence before moving forward.

Confirmation bias, however, can play a double role here. As one consideration, this bias can influence the decision criterion for what counts as "acceptable" or "persuasive" evidence. Once more, we can draw an illustration from the U.S. government's belief about Iraq's WMD's, with the U.S. relying in that episode on highly questionable informants (including, famously, someone nicknamed "Curveball") in drawing mistaken conclusions about biological weapons.

In addition, confirmation bias can shape the decision criterion used in determining whether a claim has been adequately "proven." Specifically, if someone is favorably inclined toward a particular belief, they are likely to count the belief as confirmed (and perhaps not in need of further test) based on relatively little information. If someone is instead genuinely neutral about a belief, or even skeptical of the belief, they are likely to insist on a greater quantity of clear evidence before counting the belief as confirmed.

This last point is consistent with a principle popularized by astronomer Carl Sagan, who asserted that "extraordinary claims require extraordinary evidence." The converse, obviously, is that claims viewed as highly plausible are likely to be accepted with minimal evidence. The problem, however, is that the notion that a claim is "extraordinary" is often entirely subjective, is (as the saying puts it) "in the eye of the beholder," and is certainly vulnerable to confirmation bias.

### 12. *Failure (or refusal) to allow an independent assessment of the evidence.*

Confirmation bias is a natural, often inevitable, often unwitting process. Fortunately, though, and as already mentioned, there are steps one can take to avoid or at least minimize this bias. One last manifestation of confirmation bias, then, is a failure to use any of these countermeasures. To make this concrete (and returning to an earlier point), concern about confirmation bias is one of the reasons why it is crucial that scientific progress depends on a community of researchers – on the idea that (to put it simply) "I will be harsh in my reading of your data; you will be harsh in the reading of my data; and so, in the end, all of the data will be carefully assessed."[17]

---

[17] In my 2026 book, I discuss this point and other steps scientists take to guard against the limitations often observed in everyday reasoning.

Similarly, in the scientific world, new claims are not taken seriously until (among other steps) those claims have survived a rigorous process of peer review, in which independent experts are asked to evaluate the new claims and, in particular, encouraged to highlight potential flaws or problems in the new claims. It is crucial for this process that the experts doing the review are fully independent of the authors responsible for the claim being evaluated. (In most cases, the review process is one in which the reviewers receive no information about a paper's authors or even the authors' home institution, so that they will not be influenced by the authors' identity; the reviewers themselves are also anonymous, so that there is no concern that they will inhibit their critique.)

Similarly, consider the role of citizen review panels sometimes asked to evaluate the propriety of some police action. These review panels often receive the results of an earlier inquiry, conducted by the police themselves. However, (part of) the value of the citizen panels is that they can offer an independent assessment, typically informed by a background and set of values different from police officers' (thus diminishing the likelihood that the citizen panel will have the same biases as the officers). In addition, it is obvious that the individuals involved in the citizen panel are different people from the individuals involved in the internal police review, again with the aim of maximizing the likelihood of an independent review.

## **CONCLUSION**

In this report, I have tried to catalog the many forms that confirmation bias can take, and also the factors that can sometimes make confirmation bias more likely and more powerful. Above all, I hope that these considerations provide a useful framework for anyone seeking to confirm (or disconfirm) whether the events at issue in this case involved some degree of confirmation bias.

Sincerely,

/   Submitted electronically.      /
/   Please call or email me if      /
/      verification is needed.T      /

Daniel Reisberg, Ph.D.
  *Patricia & Clifford Lunneborg Professor, Emeritus*
      *Reed College*

Page 15 of 17

**ADDENDUM**

As indicated within my report, research on confirmation bias is widespread, with different aspects of this bias evidence in a broad range of settings. Some of the illustrations of this broad pattern of research can be found in the following sources, in addition to those cited above:

Anderson, C.A. (1983). Abstract and concrete data on the perseverance of social theories: When weak data lead to unshakeable beliefs. *Journal of Experimental Social Psychology, 19,* 93-108.

Anderson, C.A., Lepper, M.R., & Ross, L. (1980). Perseverance of social theories: The role of explanation in the persistence of discredited information. *Journal of Personality and Social Psychology, 39,* 1037-1049.

Baron, J. (1995). Myside bias in thinking about abortion. *Thinking & Reasoning, 1,* 221-235.

Bressan, P., & Dal Martello, M. F. (2002). "Talis pater, talis filius:" Perceived resemblance and the belief in genetic relatedness. *Psychological Science, 13,* 213–218

Dror, I. E. (2020). Cognitive and human factors in expert decision making: Six fallacies and the eight sources of bias. *Analytical Chemistry, 92(12),* 7998–8004

Festinger, L., Riecken, H. & Schachter, S. (1956). *When prophesy fails: A social and psychological study of a modern group that predicted the destruction of the world.* Minneapolis: University of Minnesota Press.

Findley, K. A. (2012). Tunnel vision. In B. L. Cutler (Ed.), *Conviction of the innocent: Lessons from psychological research* (pp. 303–323). American Psychological Association.

Gilovich, T. (1991). *How we know what isn't so: The fallibility of human reason in everyday life.* N.Y. Free Press.

Hergovich, A., Schott, R., & Burger, C. (2010). Biased evaluation of abstracts depending on topic and conclusion: Further evidence of a confirmation bias within scientific psychology. *Current Psychology, 29,* 118-209.

Holst, V. F., & Pezdek, K. (1992). Scripts for typical crimes and their effects on memory for eyewitness testimony. *Applied Cognitive Psychology, 6*(7), 573-587.

Kahneman, D. (2011). *Thinking, Fast and Slow.* NY: Farrar, Straus and Giroux.

Kassin, S. M., Dror, I. E., & Kukucka, J. (2013). The forensic confirmation bias: Problems, perspectives, and proposed solutions. *Journal of Applied Research in Memory and Cognition, 2(1),* 42–52

Kassin, S. M., Goldstein, C. C., & Savitsky, K. (2003). Behavioral confirmation in the interrogation room: On the dangers of presuming guilt. *Law and Human Behavior, 27*, 187–203.

Klayman, J. (1995). Varieties of confirmation bias. *Psychology of Learning and Motivation, 32,* 385-418.

Lange, N. D., Thomas, R. P., Dana, J., & Dawes, R. M. (2011). Contextual biases in the interpretation of auditory evidence. *Law and Human Behavior, 35,* 178–187.

Nickerson, R.S. (1998). Confirmation bias: A ubiquitous phenomenon in many guises. *Review of General Psychology, 2,* 175-220.

O'Brien, B. (2009). Prime suspect: An examination of factors that aggravate and counteract confirmation bias in criminal investigations. *Psychology, Public Policy, and Law, 15(4),* 315–334.

O'Rear, A.E. & Radvansky, G.A. (2020). Failure to accept retractions: A contribution to the continued influence effect. *Memory & Cognition, 48,* 127-144.

Popper, K. (1934). *The Logic of Scientific Discovery.* London, England: Routledge.

Reisberg, D. (2026). *Cognition: Exploring the science of the mind, 9th edition.* NY: W.W.Norton.

Ruva, C., McEvoy, C., & Bryant, J. B. (2007). Effects of Pre-Trial Publicity and Jury Deliberation on Juror Bias and Source Memory Errors. *Applied Cognitive Psychology, 21(1),* 45–67.

Schmittat, S. M., Englich, B., Sautner, L., & Velten, P. (2022). Alternative stories and the decision to prosecute: An applied approach against confirmation bias in criminal prosecution. *Psychology, Crime & Law, 28(6),* 608–635.

Tweney, R.D., Doherty, M.E, & Mynatt, C.R. (Eds). (1981). *On scientific thinking.* NY: Columbia University Press.

Whitt, C.M., Tullett, AM., Bowes, S.M., McDiarmid, A.D., Lilienfeld, S.O., & Hard, W. (2023). Weaking the ideological immune system: Can debiasing techniques reduce confirmation bias? *Comprehensive Results in Social Psychology, 7,* 1-24.

# Appendix I

April 2026

# VITA

# Daniel Reisberg
*Patricia & Clifford Lunneborg Professor of Psychology, Emeritus*
*Reed College*

mail:  9220 SW Barbur Blvd      email:  reisberg@reed.edu
      Suite 119 / 192        voice:  (503) 770-0636
      Portland, OR 97219        fax:  (503) 914-0477

Education:  B.A. Swarthmore College, Psychology and Philosophy, 1975
      M.A. University of Pennsylvania, Psychology, 1976
      Ph.D. University of Pennsylvania, Psychology, 1980

Positions:  Assistant Professor, New School for Social Research, 1980–1986.
      Assistant Professor, Reed College, 1986–1989.
      Associate Professor, Reed College, 1989–1993.
      Visiting Scientist, Applied Psychology Unit, Medical Research Council,
        Cambridge, England, 1994.
      Professor, Reed College, 1993–2013.
      Patricia & Clifford Lunneborg Professor of Psychology, 2013–2019.
        *Also: Department Chair, 1995–97, 2002–04, 2006–07, 2009–2011, 2012–2014.*
      Visiting Scholar, Claremont Graduate University, 2021-2025

Honors and Awards:
      High Honors, Swarthmore College, 1975
      Sigma Xi  (Promoted from Associate Member to Member, May 1984)
      Phi Beta Kappa
      National Science Foundation Graduate Fellow, 1975-78
      University of Pennsylvania University Fellow, 1978
      National Institute of Mental Health Predoctoral Fellow, 1978-80
      Fellow of the American Association for the Advancement of Science
       (elected to the rank of Fellow in October, 1994)
      Fellow of the Western Psychological Association
       (elected to the rank of Fellow in September, 1995)
      Visiting Fellow of the British Psychological Association (September, 1999)
      Fellow of the American Psychological Association, Division 3
       (Experimental Psychology; elected to the rank of Fellow in August, 1999)
      First-place team (with James Kalat and Nancy Felipe Russo) in
       the WPA's "Psychology Jeopardy" (April, 2000)
      Fellow of the Association for Psychological Science
       (elected to the rank of Fellow in January, 2007)

Career h-index = 43;  total citations = 11,600+.   *(As of April, 2026)*

| For the readers' convenience, recent additions to my CV are boxed. |
| --- |

-2-

**Publications** (*books marked with* **b**):

1. Reisberg, D. (1972). Objections to the SST. In Siegel, K. (Ed.), *Talking back to The New York Times* (pp. 319-320). N.Y.: Quadrangle Books.

2. Schwartz, B., Reisberg, D. and Vollmecke, T. (1974). Effects of treadle training on autoshaped keypecking:  Learned laziness and learned industriousness, or response competition? *Bulletin of the Psychonomic Society*, *3*, 369-372.

3. Reisberg, D. (1978). Looking where you listen:  Visual cues and auditory attention. *Acta Psychologica*, *42*, 331-341.

4. Reisberg, D., Baron, J. and Kemler, D. (1980). Overcoming Stroop interference:  The effects of practice on distractor potency. *Journal of Experimental Psychology: Human Perception and Performance*, *6*, 140-150.

5. Reisberg, D., Scheiber, R. and Potemken, L. (1981). Eye position and the control of auditory attention. *Journal of Experimental Psychology: Human Perception and Performance*, *7*, 318-323.

6. Reisberg, D. (1983). General mental resources and perceptual judgments. *Journal of Experimental Psychology: Human Perception and Performance*, *9*, 966-979.

7. Reisberg, D., Rappaport, I. and O'Shaughnessy, M. (1984). The limits of working memory: The digit digit-span. *Journal of Experimental Psychology:  Learning, Memory and Cognition*, *10*, 203-221.

8. Reisberg, D. and O'Shaughnessy, M. (1984). Diverting subjects' attention slows figural reversals. *Perception*, *13*, 461-468.

9. Reisberg, D. and McLean, J. (1985). Meta-attention: Do we know when we are being distracted? *Journal of General Psychology*, *112*, 291-306.

10. Chambers, D. and Reisberg, D. (1985). Can mental images be ambiguous? *Journal of Experimental Psychology: Human Perception and Performance*, *11*, 317-328.

11. Reisberg, D. and Morris, A. (1985). Images contain what the imager put there: A non-replication of illusions in imagery. *Bulletin of the Psychonomic Society*, *23*, 493-496.

12. Reisberg, D., Culver, C., Heuer, F. and Fischman, D. (1986). Visual memory: When imagery vividness makes a difference. *Journal of Mental Imagery*, *10*, 51-74.

13. Heuer, F., Fischman, D. and Reisberg, D. (1986). Why does vivid imagery hurt colour memory? *Canadian Journal of Psychology*, *40*, 161-175.

14. Reisberg, D. and Chambers, D. (1986). Neither pictures nor propositions: The intensionality of mental images. In C. Clifton (Ed.), *The Eighth Annual Conference of the Cognitive Science Society* (pp. 208-222). Hillsdale, N.J.: Erlbaum Associates.

-3-

**Publications** (continued; *books marked with* **b**):

15. Reisberg, D. and Leak, S. (1987). Visual imagery and memory for appearance: Does Clark Gable or George C. Scott have bushier eyebrows? *Canadian Journal of Psychology*, *41*, 521-526.

16. Reisberg, D., McLean, J. and Goldfield, A. (1987). Easy to hear but hard to understand:  A lip-reading advantage with intact auditory stimuli. In R. Campbell and B. Dodd (Eds.), *Hearing by Eye: The Psychology of Lip-Reading* (pp. 97-114). Hillsdale, N.J.:  Erlbaum Associates.

17. Reisberg, D. (1987). External representations and the advantages of externalizing one's thought. In E. Hunt (Ed.), *The Ninth Annual Conference of the Cognitive Science Society* (pp. 281-293). Hillsdale, N.J.: Erlbaum Associates.

18. Reisberg, D. and Heuer, F. (1987). Commentary on "Image Psychology and the Empirical Method." *Journal of Mental Imagery*, *11*, 120-129.

19. Reisberg, D., Heuer, F., McLean, J. and O'Shaughnessy, M. (1988). The quantity, not the quality, of affect predicts memory vividness. *Bulletin of the Psychonomic Society*, *26*, 100-103.

20. Janata, P. and Reisberg, D. (1988). Response-time measures as a means of exploring tonal hierarchies. *Music Perception*, *6*, 163-174.

21. Reisberg, D. and Heuer, F. (1988). Vividness, vagueness, and the quantification of visualizing. *Journal of Mental Imagery*, *12,* 89-102.

22. Winters, L. and Reisberg, D. (1988). Mental practice or mental preparation: Why does imagined practice help? *Journal of Human Movement Studies*, *15*, 279-290.

23. Reisberg, D. (1989). Review of Fred Dretske's *Explaining Behavior*. *American Scientist*, *77*, 397.

24. Reisberg, D., Smith, D., Baxter, D. and Sonenshine, M. (1989). "Enacted" auditory images are ambiguous; "pure" auditory images are not. *Quarterly Journal of Experimental Psychology*, *41A*, 619-641.

25. Heuer, F. and Reisberg, D. (1990). Vivid memories of emotional events: The accuracy of remembered minutiae. *Memory & Cognition, 18*, 496-506.

26. Reisberg, D. and Chambers, D. (1991). Neither pictures nor propositions: What can we learn from a mental image? *Canadian Journal of Psychology*, *45*, 336-352.

27. Reisberg, D., Smith, J.D., and Wilson, M. (1991). Auditory imagery. In R. Logie and M. Denis (Eds.), *Mental images in human cognition* (pp. 59-81). Amsterdam: Elsevier.

28. Dodson, C. and Reisberg, D. (1991). Post-event misinformation has no impact on implicit memory. *Bulletin of the Psychonomic Society*, *29*, 333-336.

**b** 29. Schwartz, B. and Reisberg, D. (1991). *Learning and Memory*. New York: Norton.

-4-

**Publications** (continued; *books marked with* **b**):

30. Chambers, D. and Reisberg, D. (1992). What an image depicts depends on what an image means. *Cognitive Psychology*, *24*, 145-174.

31. Smith, J.D., Wilson, M. and Reisberg, D. (1992). The role of inner speech in auditory imagery. In D. Reisberg (Ed.), *Auditory imagery* (pp. 95-119). Hillsdale, N.J.: Erlbaum Associates.

32. Burke, A., Heuer, F. and Reisberg, D. (1992). Remembering emotional events. *Memory & Cognition*, *20*, 277-290.

33. Heuer, F. and Reisberg, D. (1992). Emotion, arousal and memory for detail. In S.-Å. Christianson (Ed.), *Handbook of Emotion and Memory* (pp. 151-180). Hillsdale, N.J.: Erlbaum Associates.

34. Reisberg, D. and Heuer, F. (1992). Flashbulbs and memory for detail from emotional events. In E. Winograd and U. Neisser (Eds.), *Affect and accuracy in recall: The problem of "flashbulb" memories* (pp. 162-190). New York: Cambridge University Press.

**b**   35. Reisberg, D., *editor*. (1992). *Auditory Imagery*. Hillsdale, N.J.: Erlbaum Associates.

36. Doenias, J., Langland, S. and Reisberg, D. (1992). A versatile, user-friendly tachistoscope for the Macintosh. *Behavior Research Methods, Instruments, & Computers*, *24,* 434-438.
   [The software developed at Reed and described in this article was distributed nationally, and produced modest revenues for Reed. The software was listed on COMPSYCH, a national software listing for psychology software relevant to instruction or research, and was selected for the 1993 COMPSYCH Software Exposition. A demonstration version of this program was also selected by Apple Computer for inclusion on their CD-ROM demonstration package for the Humanities, Arts, and Social Sciences. The software was also selected for inclusion in the CTI Directory of Psychology Software, published by the *Computers in Teaching Initiative*, University of York.]

37. Reisberg, D. and Logie, R. (1993). The ins and outs of working memory. In M. Intons-Peterson, B. Roskos-Ewoldsen, R. Blake and K. Clayton (Eds.), *Imagery, creativity and discovery* (pp. 39-76). Hillsdale, N.J.: Erlbaum Associates.

38. Reisberg, D. (1993). The limits of mental imagery. *Computational Intelligence*, *9,* 346-348.

39. Reisberg, D. (1994). "Visual imagery;" "Eyewitness testimony;" "Synesthesia;" and "Working memory." Entries in *Encyclopedia of Psychology,* 2nd Edition. N.Y.: John Wiley & Sons.

40. Reisberg, D. (1994). Equipotential recipes for unambiguous images: Comment on Rollins. *Philosophical Psychology*, *7*, 359-366.

41. Reisberg, D. (1994). Review of *The Imagery Debate*, by Michael Tye. *Philosophical Psychology*, *7*, 512-515.

-5-

**Publications** (continued; *books marked with* **b**):

42. Reisberg, D. (1995). Emotion's multiple effects on memory. In J. L. McGaugh, N. Weinberger, and G. Lynch (Eds.), *Brain and Memory: Modulation and mediation of neuroplasticity* (pp. 84-92). New York: Oxford University Press.

43. Gallun, E. and Reisberg, D. (1995). On the perception of interleaved melodies. *Music Perception*, *12*, 387-398.

**b** 44. Cornoldi, C., Logie, R., Brandimonte, M., Kaufmann, G. and Reisberg, D., Editors. (1996). *Stretching the imagination: Representation and transformation in mental imagery*. New York: Oxford University Press.

45. Reisberg, D. (1996). The non-ambiguity of mental images. In Cornoldi, C., Logie, R., Brandimonte, M., Kaufmann, G. and Reisberg, D. (Eds.), *Stretching the imagination: Representation and transformation in mental imagery* (pp. 119-172). New York: Oxford University Press.

46. Smith, J.D., Wilson, M. and Reisberg, D. (1996). The role of subvocalization in auditory imagery. *Neuropsychologia*, *33*, 1433-1454.

**b** 47. Reisberg, D. (1997). *Cognition: Exploring the Science of the Mind*. New York: Norton

48. Heuer, F. and Reisberg, D. (1997). The memory effects of *thematically-induced* emotion. In Conrad, F. and Payne, D. (Eds.), *A synthesis of basic and applied approaches to human memory* (pp. 133-132). Hillsdale, NJ: Erlbaum Associates.

49. Porter, R. and Reisberg, D. (1997). Autobiography and memory. *Studies in Autobiography*, *13*, 61-70.

50. Reisberg, D. (1997). "Learning."  Entry in the *MIT Encyclopedia of the Cognitive Sciences*. Wilson, R. A. and Keil, F. C. (Eds.). Cambridge, MA: MIT Press.

51. Reisberg, D. (1998). Constraints on image-based discovery: A comment on Rouw et al. (1998). *Cognition*, *66*, 95-102.

**b** 52. Gleitman, H., Fridlund, H. and Reisberg, D. (1999). *Psychology, 5th edition*. New York: Norton.

53. Wilson, M., Smith, J.D., and Reisberg, D. (2000). Interplay between the inner voice and inner ear. In Behrmann, M., M. Jeannerod and S. Kosslyn (Eds.), *The neuropsychology of mental imagery, 2nd edition*.

54. Reisberg, D. (2000). The detachment gain: The advantage of thinking out loud. In Landau, B., Sabini, J., Newport, E., and Jonides, J. (Eds.), *Perception, Cognition and Language: Essays in honor of Henry and Lila Gleitman*. Cambridge, MA: MIT Press.

**b** 55. Gleitman, H., Fridlund, H. and Reisberg, D. (2000). *Basic Psychology, 5th edition*. New York: Norton.

**b** 56. Reisberg, D. (2001). *Cognition: Exploring the Science of the Mind, 2nd edition*. New York: Norton.

-6-

**Publications** (continued; *books marked with* **b**):

57. Reisberg, D. and Reed's Multimedia Lab (2001). In the ear of the beholder – Some tutorial demonstrations in music perception. Available on line at:
    http://academic.reed.edu/psychology/projects/music/tutorial.html

58. Reisberg, D., Pearson, D., and Kosslyn, S. (2003). Intuitions and introspections about imagery:  The role of *imagery experience* in shaping an investigator's theoretical views. *Applied Cognitive Psychology*, 17, 147-160.

59. Laney, C., Heuer, F. and Reisberg, D. (2003). Thematically-induced arousal in naturally-occurring emotional memories. *Applied Cognitive Psychology, 17,* 995-1004.

**b**  60. Gleitman, H., Fridlund, H. and Reisberg, D. (2004). *Psychology, 6th edition*. New York: Norton.

**b**      (Also published in Portuguese: *Psicologia,* published in Lisbon by Fundaçao Calouste Gulbenkian. *then re-issued, in a new edition, in 2009*)

**b**  61. Reisberg, D. and Hertel, P., Editors (2004). *Memory and emotion.* New York:  Oxford University Press. (This edited volume is part of Oxford's series in Affective Science; the series editors are Richard Davidson, Klaus Scherer, and Paul Ekman.)

62. Reisberg, D. and Heuer, F. (2004). Remembering emotional events. In Reisberg, D. and Hertel, P. (Eds.), *Memory and emotion* (pp. 3-41). New York:  Oxford University Press.

63. Laney, C., Campbell, H., Heuer, F. and Reisberg, D. (2005). Memory for thematically-arousing events. *Memory & Cognition, 32,* 1149-1159.

64. Heuer, F. and Reisberg, D. (2005). Visuospatial imagery. In A. Miyake and P. Shah (Eds.), *Handbook of visuospatial thinking* (pp. 35-80). New York: Cambridge University Press.

**b**  65. Reisberg, D. (2005). *Cognition: Exploring the Science of the Mind, 3rd edition*. New York: Norton.

66. Reisberg, D. (2006) Memory for emotional episodes: The strengths and limits of arousal-based accounts. (pp. 15-36)  In Uttl, B., Ohta, N. & Siegenthaler, A. (*Eds.*), *Memory and Emotion: Interdisciplinary Perspectives*. N.Y.: Blackwell.

67. Kosslyn, S., Reisberg, D. and Behrman, M. (2006). Introspection and mechanism in mental imagery. In Harrington, A. & Zajonc, A. (eds). *The Dalai Lama at MIT* (pp. 79-114). Cambridge, MA: Harvard University Press.
    *(This book reports on the 2003 two-day meeting between 13 western researchers and Tenzin Gyatso, His Holiness the Fourteenth Dalai Lama.)*

**b**  68. Reisberg, D. (2007). *Cognition: Exploring the Science of the Mind, Media edition*. New York: Norton.

-7-

**Publications** (continued; *books marked with* **b**):

    69. Heuer, F. and Reisberg, D. (2007). The memory effects of emotion, stress and trauma. In Ross, D., Toglia, M., Lindsay, R. and Read, D. (Eds.), *Handbook of Eyewitness Psychology*: *Volume 1 – Memory for Events* (pp. 81-116). Mahwah, NJ: Erlbaum Associates.

    70. Reisberg, D. (2007). How big is a stimulus? Learning about imagery by studying perception. In Peterson, M., Gillam, B. and Sedgwick, H. (Eds.), *In the mind's eye: Julian Hochberg on the perception of pictures, film and the world* (pp. 467-472). New York: Oxford University Press.

**b** 71. Gleitman, H., Reisberg, D. and Gross, J. (2007). *Psychology, 7th edition*. New York: Norton.

**b**     (Also published in Portuguese: *Psicologia,* published in Sao Paulo by *artmed.*)

**b** 72. Reisberg, D. (2010). *Cognition: Exploring the Science of the Mind, 4th edition*. New York: Norton.

**b** 73. Reisberg, D. (2010). *The Cognition Workbook: Essays, Demonstrations & Explorations*. New York: Norton.

**b** 74. Gleitman, H., Gross, J. & Reisberg, D. (2010). *Psychology, 8th edition*. New York: Norton.

    75. Reisberg, D. (2011). Auditory Imagery. In Goldstein, B. (Ed.), *Encyclopedia of Perception.* Thousand Oaks, CA:  SAGE Publications.

    76. Reisberg, D., Scheiber, R. & Potemken, L. (2011). Eye position and the control of auditory attention. In Proctor, R. & Read, L. (Eds.), *Attention.* London: Sage Publications. (This is a reprint of a 1981 article, published in a volume that brings together "key articles by leading figures in the field.")

    77. Reisberg, D. (2011). Visual imagery. In Pashler, H. (Ed.), *Encyclopedia of the Mind.* Thousand Oaks, CA:  SAGE Publications.

**b** 78. Reisberg, D. (2013). *Cognition: Exploring the Science of the Mind, 5th edition*. New York: Norton.

**b** 79. Reisberg, D. (2013). *The Cognition Workbook: Essays, Demonstrations & Explorations, to accompany the 5th edition*. New York: Norton.

**b** 80. Reisberg, D., Editor (2013). *The Oxford Handbook of Cognitive Psychology.* New York: Oxford University Press. (In press; this is the companion volume for Kosslyn, S. & Ochsner, K. (Eds.), *Handbook of Cognitive Neuroscience.* New York: Oxford University Press.)
As editor of this volume, I am also the author of Chapter 1 (*Introduction to the Handbook*) and Chapter 64 (*Epilogue: Looking Forward).*
[The paperback edition of this volume was released in January 2014.]

-8-

**Publications** (continued; *books marked with* **b**):

81. Reisberg, D. (2013). Visual imagery, spatial imagery. In Reisberg, D. (Ed.), *The Oxford Handbook of Cognitive Psychology.* New York: Oxford University Press.

82. Porter, D., Moss, A. & Reisberg, D. (2014). The impact of the appearance-change instruction on identification accuracy for same-race and cross-race identifications. *Applied Cognitive Psychology, 28,* 151-160.

**b**  83. Reisberg, D. (2014). *The science of perception and memory: A pragmatic guide for the justice system*. New York: Oxford University Press.

**b**  84. Reisberg, D. (2015). *Cognition: Exploring the Science of the Mind, 6th edition*. New York: Norton.

85. Reisberg, D., Simons, D., & Fournier, L., *Editors*. (2016). Are we there yet? A special forum assessing when and whether psychological research is ready for use in the justice system. *Journal of Applied Research in Memory and Cognition, 5,* 233-317.

86. Reisberg, D., Simons, D., & Fournier, L. (2016). An introduction to the JARMAC forum. *Journal of Applied Research in Memory and Cognition, 5,* 233-235.

**b**  87. Reisberg, D. (2019). *Cognition: Exploring the Science of the Mind, 7th edition*. New York: Norton.

88. Reisberg, D. & Davis, D. (2019). The psychologist as courtroom educator. In Stein, C.T. & Youngren, J.N. (Eds.) *Forensic Psychology in Military Courts-Martial* (pp. 143-174). Washington, D.C.: APA Press.

89. Davis, D. & Reisberg, D. (2019). The psychologist as military trial consultant. In Stein, C.T. & Youngren, J.N. (Eds.) *Forensic Psychology in Military Courts-Martial* (pp. 125-141). Washington, D.C.: APA Press.

90. Reisberg, D. & Heuer, F. (2020). Emotion's (varied) impact on memory for sexual misconduct. In Pozzulo, J., Pica, E., & Sheahan, C. (Eds.) *Memory and sexual misconduct: Psychological research for criminal justice* (pp. 7-41). NY: Taylor & Francis.

91. Pezdek, K., Nguyen, T.B., Abed, E. & Reisberg, D. (2020). Marijuana affects the accuracy of eyewitness memory and the confidence-accuracy relationship too. *Journal of Applied Research in Memory & Cognition, 9,* 60-67.

92. Kenchel, J.M., Greenspan, R.L., Reisberg, D., & Dodson, C.S. (2021). "In your own words, how certain are you?" Post-identification feedback distorts verbal and numeric expressions of eyewitness confidence. *Applied Cognitive Psychology, 35,* 1405-1417.

93. Reisberg, D. (2021) From my perspective: Improving the legal system through psychological science. In Bartol, C.R. & Bartol, A.M. (2021), *Introduction to Forensic Psychology.* N.Y.: Sage.

-9-

**Publications** (continued; *books marked with* **b**):

**b**    94. Reisberg, D. (2021). *Cognition: Exploring the Science of the Mind, 8th edition.* New York: Norton.

95. Reisberg, D. (2021) *Memory 101.* Fifteen-part Learn25 audio course. *www.learn25.com.*  [Also available through Audible.com and other outlets.]

96. Pezdek, K. & Reisberg, D. (2022). Myths regarding cognitive processing of law enforcement officers: How should scientists respond. *Journal of Applied Research in Memory and Cognition, 11,* 143-156.

97. Reisberg, D. & Pezdek, K. (2022). Myths about evidence in the legal system: Some clarifications. *Journal of Applied Research in Memory and Cognition, 11,* 185-187.

98. Reisberg, D. & Pezdek, K. (2024). Police officers have no advantage over civilians when making identifications. *Applied Cognitive Psychology, 38,* 1-7.

*    99. Reisberg, D. & Pezdek, K. (2024). Memory for traumatic events. *The Champion, 48(8),* 43-46, 63.

**b**    100. Reisberg, D. (2025). *Cognition: Exploring the Science of the Mind, 9th edition*. New York: Norton.

101. Reisberg, D. & Pezdek, K. (2025). Prosecutors' Efforts to Exclude Expert Testimony About Memory. *The Champion, 49(5),* 43, 45-46, 48.

102. Pezdek, D. & Reisberg, D. (2025). The complexities of video recorded evidence in the legal system. *The Champion, 49(6),* 49, 51-52.

103. Marsh, B., Reisberg, D., & Pezdek, K. (2025). Does the Cross-Race Effect persist for repeatedly viewed faces? *Memory, 33(10),* 1253-1265.

104. Pezdek, K. & Reisberg, D. (2026). Cross-Race Identification: Well-known but not well-understood. *The Champion, 50(1),* 59-60, 63.

105. Suresh, S., Reisberg, D., & Pezdek, K. (2026). Is the Appearance Change Instruction ever helpful for eyewitness identification? *Psychology, Crime and Law.* [In press. ]

106. Pezdek, D. & Reisberg, D. (2026). Yes, eyewitness confidence is diagnostic of eyewitness accuracy. *The Champion*. [ In press. ]

107. Pezdek, K. & Reisberg, D. (2026). What shapes event memory beyond the event itself? *The Champion.* [ In press. ]

---

\* Kathy Pezdek and I are committed to sharing scientific results with anyone who might find them interesting or useful. In 2024, we agreed to contribute a series of columns to *The NACDL Champion,* each describing a specific topic within the science of perception and memory. The article on trauma memory was the first of these columns. For copies of these articles, interested parties should contact *The Champion* directly.

-10-

**Publications; also projects currently in process** (*books marked with* **b**):

108. Dunn, G., Pezdek, K., & Reisberg, D. (2026). Viewing Police Body-Worn Video of Use of Force Incidents: Does repeated or slow motion viewing matter? *Law & Human Behavior.* [ In press. ]

109. Reisberg, D. & Pezdek, K. (2026). How reliable are intoxicated witnesses? *The Champion.* [ In press. ]

110. Pezdek, K. & Reisberg, D. (2026). Confirmation bias. [ Under review. ]

111. Reisberg, D. & Pezdek, K. (2026). Children's memories. [ Under review. ]

**b**  112. Reisberg, D. (2026). Cognition: Exploring the Science of the Mind, 10th edition. New York: Norton. [ In preparation. ]

113. Reisberg, D. & Pezdek, K. (2026). What attorneys need to know about visual perception. [ In preparation. ]

114. Pezdek, D. & Reisberg, K. (2026). What jurors remember. [ In preparation. ]

115. Reisberg, D. & Pezdek, K. (2026). Memory for conversations. [ In preparation. ]

116. Dunn, G., Reisberg, D., & Pezdek, K. (2026). Persuading jurors to respect the Graham *v.* Connor criterion when judging police use of force. [ In preparation. ]

**Papers presented at scientific meetings**:

Reisberg, D. Preselective processing: Does an identification stage exist? Paper presented at the meetings of the Eastern Psychological Association, New York, April 1975.

Chambers, D. and Reisberg, D. Can images have alternate interpretations? Paper presented at the meetings of the Eastern Psychological Association, Baltimore, April 1984.

McLean, J., Goldfield, A. and Reisberg, D. Lipreading with fully audible stimuli:  Speech perception is an amodal process. Paper presented at the meetings of the Eastern Psychological Association, Baltimore, April 1984.

Reisberg, D., Heuer, F. and O'Shaughnessy, M. Predicting the vividness of autobiographical memories. Paper presented at the meetings of the Psychonomic Society, San Antonio, Texas, November 1984.

Winters, L. and Reisberg, D. Mental practice. Paper presented at the meetings of the Eastern Psychological Association, Boston, March 1985.
  (Also published as: Does imagined practice help in learning a motor skill? *Resources in Education*, Document #SP026624, 1986.)

-11-

**Papers presented at scientific meetings** (continued):

O'Shaughnessy, M., Winters, L. and Reisberg, D. The cognitive component of perception. Paper presented at the meetings of the Eastern Psychological Association, Boston, March 1985.

Reisberg, D. and Chambers, D. Images, pictures and percepts. Paper presented at the meetings of the Society for Philosophy and Psychology, Toronto, May 1985.

Reisberg, D. and Heuer, F. Imagery vividness reliably (but negatively!) predicts visual memory. Paper presented at the meetings of the Psychonomic Society, Boston, November 1985.

Reisberg, D., Smith, J.D. and Sonenshine, M. Can subjects detect ambiguity in auditory imagery? Paper presented at the meetings of the Eastern Psychological Association, New York, April 1986.

Chambers, D. and Reisberg, D. What governs the phenomenal appearance of mental images? Paper presented at the meetings of the Eastern Psychological Association, New York, April 1986.

Reisberg, D. and Chambers, D. The intensionality of mental images. Paper presented at the meetings of the Cognitive Science Society, Amherst, August 1986.

Reisberg, D., Chambers, D. and Rueger, W. Mental images as mental representations: What does an image *resemble*? Paper presented at the meetings of the Psychonomic Society, New Orleans, November 1986.

Reisberg, D. External representations and the advantages of externalizing one's thought. Paper presented at the meetings of the Cognitive Science Society, Seattle, August 1987.

Heuer, F. and Reisberg, D. Vivid memories of emotional events: The accuracy of remembered minutiae. Paper presented at the meetings of the Psychonomic Society, Seattle, November 1987.

Chambers, D. and Reisberg, D. Images are not everywhere dense: An image of a duck does not include a rabbit's nose. Paper presented at the meetings of the Eastern Psychological Association, Buffalo, N.Y., April 1988.

Baxter, D. and Reisberg, D. Auditory imagery is not ambiguous. Paper presented at the meetings of the Western Psychological Association, San Francisco, April 1988.

Wilson, M. and Reisberg, D. Two species of auditory imagery. Paper presented at the meetings of the Western Psychological Association, San Francisco, April 1988

Reisberg, D., Smith, D. and Baxter, D. "Pure" and "enacted" auditory images. Paper presented at the meetings of the Psychonomic Society, Chicago, November 1988.

Chambers, D. and Reisberg, D. What an image includes depends on what an image means. Paper presented at the meetings of the Psychonomic Society, Chicago, November 1988.

-12-

**Papers presented at scientific meetings** (continued):

Dodson, C. and Reisberg, D. Does post-event misleading information erase prior memories? Paper presented at the meetings of the Oregon Academy of Sciences, Portland, February 1989.

Reisberg, D. and Heuer, F. The consequences of vivid imagery: An empirical handle on the function of phenomenal states? Paper presented at the meetings of the Society for Philosophy and Psychology, Tucson, April 1989.

Reisberg, D., Lenoir, G. and Heuer, F. Anticipations and after-thoughts: How far does the "present" extend? Paper presented at the meetings of the Psychonomic Society, Atlanta, November 1989.

Reisberg, D. Do laboratory studies of imagery bear on what we call "being imaginative"? Paper presented at the meetings of the Society for Philosophy and Psychology, College Park, Maryland, June 1990.

Reisberg, D. Shades of Watson: Auditory imagery and its relation to inner speech. Distinguished Guest Lecture delivered at the Workshop on Imagery and Cognition, Aberdeen Scotland, August 1990.

Reisberg, D., Smith, J. David, and Wilson, M. Subvocalization and auditory imagery: Interactions between the "inner ear" and the "inner voice." Paper presented at the meetings of the Psychonomic Society, New Orleans, November 1990.

Reisberg, D. and Logie, R. The ins and outs of working memory. Paper presented at the conference on Imagery, Creativity, and Discovery, Nashville, May 1991.

Reisberg, D. and Chambers, D. Images depict, images describe. Paper presented at the meetings of the Society for Philosophy and Psychology, San Francisco, June 1991.

Logie, R. and Reisberg, D. The nature of rehearsal in working memory. Paper presented at the International Conference on Memory, Lancaster, England, July 1991.

Reisberg, D. and Gossett, D. Some subjects are not influenced by how a problem is framed. Paper presented at the meetings of the Psychonomic Society, San Francisco, November 1991.

Karbo, W. and Reisberg, D. Post-event misinformation about actions:  Remembering actions that never occurred. Paper presented at the meetings of the Oregon Academy of Sciences, February 1992.

Reisberg, D. Voices, music and hallucinations:  What is auditory imagery? Invited address presented at the meetings of the Western Psychological Association, Portland, May 1992.

Reisberg, D. Emotion and learning. Invited paper presented at the Fifth Conference on the Neurobiology of Learning and Memory, University of California, Irvine, October 1992.

Logie, R. and Reisberg, D. Inner eyes and inner scribes: A partnership in visual working memory. Paper presented at the Fourth European Workshop in Imagery and Cognition, Tenerife, December 1992.

-13-

**Papers presented at scientific meetings** (continued):

Reisberg, D. What is contained within an image? Evidence from massive failures to make discoveries from imagery. Paper presented at the Seventh International Conference on Event Perception and Action, Vancouver, B.C., August 1993.

Reisberg, D., Karbo, W., and Scully, J. The laboratory creation of false memories:  How generalizable? Paper presented at the annual meetings of the Psychonomic Society, Washington D.C., November 1993.

Reisberg, D. and Heuer, F. The complex interaction between memory and emotion. Paper presented at the Practical Aspects of Memory Conference, College Park, Maryland, July 1994.

Canseco-Gonzales, E., Hutchinson, M., Reisberg, D., Robinson, S., and Vigileos, A. Arithmetic and bilingualism: Why can't I add in Spanish? Paper presented at the meetings of the Oregon Academy of Science, February 1995.

Koch, Z. and Reisberg, D. Motoric support for visual imagery: Is imagery visual, spatial, or movement-based? Paper presented at the meetings of the Oregon Academy of Science, February 1995.

Porter, R. and Reisberg, D. Autobiography and memory. Paper presented at the meetings of the Modern Languages Association, Chicago, December 1995.

Reisberg, D. and Koch, Z. A role for motoric support in (so-called) visual imagery. Paper presented at the meetings of the Psychonomic Society, Los Angeles, November 1995.

Reisberg, D. and Usui, V. The role of subvocalization in auditory imagery and working memory. Paper presented at the meetings of the Psychonomic Society, Chicago, November 1996.

Reisberg, D. Cognition: Where is the state of the art? Invited paper presented at the meetings of the National Institute for the Teaching of Psychology, Tampa, FL, January 1997.

Schwartzreich, E. and Reisberg, D. Individual differences in perception: The relationship between Inattentional Blindness and Spearman's *g*. Poster presented at the 4th Annual Meeting of the Cognitive Science Association for Interdisciplinary Learning, Hood River, OR, August 1997.

Reisberg, D. What do we know about emotion's effects on memory? Paper presented at special conference, "Memory Overwhelmed: Interdisciplinary Approaches to Trauma."  Atlanta, GA, October 1997.

Reisberg, D. Mental imagery for musical timbre. Paper presented at the 5th Annual Meeting of the Cognitive Science Association for Interdisciplinary Learning, Hood River, OR, August 1998.

Miner, N., Boelter, D., and Reisberg, D., Verbal overshadowing of face memory: When *doesn't* it occur? Paper presented at the Annual Meetings of the Society for Applied Research in Memory and Cognition (SARMAC), Boulder, CO, July 1999.

-14-

**Papers presented at scientific meetings** (continued):

Reisberg, D. Imagery: The state of the art. Keynote address presented at the meetings of the British Psychological Society, York, England, September 1999.

Reisberg, D. Internal representations, external representations, and the intensionality of mental imagery. Invited paper presented at *Intensionality and the Natural Mind*, Washington University in St. Louis, March 19-20, 1999.

Reisberg, D., Heuer, F., and Laney, C. Memory and emotion:  Comparing memory for visually-arousing and thematically-arousing events. Paper presented at the meetings of the Psychonomic Society, New Orleans, November 2000.

Reisberg, D. Thinking out loud:  The contrasts between stimulus-based and imagery-based discovery. Keynote address presented at the meetings of the meetings of the NorthWest Cognition and Memory (NoWCaM) Society, Vancouver, B.C., May, 2001.

Goard, M. and Reisberg, D. Retrieval-induced forgetting in the recall of complex episodes. Paper presented at the meetings of the Psychonomic Society, Orlando, FL, November 2001.

Laney, C., Heuer, F. and Reisberg, D. Thematic-arousal, visual-arousal, and memory for emotional events. Paper presented at the meetings of the Society for Applied Research in Memory and Cognition (SARMAC), Aberdeen, Scotland, July, 2003.

Reisberg, D. and Heuer, F. Remembering emotional events. Paper presented at the meetings of the annual Cognitive Science And Interdisciplinary Learning (CSAIL) meeting, Hood River, Oregon, July, 2003.

Reisberg, D. Presentation as part of *"The 10th Mind and Life Conference: Exchanges between Buddhism and Biobehavioral Science with His Holiness the XIVth Dalai Lama,"* Massachusetts Institute of Technology, September, 2003.
 *This event featured candid discussions between the Buddhist and scientific communities about the nature of mental imagery (that is the session in which I was participating), emotion, and the nature of attention and concentration. The Dalai Lama was a central participant in all of the discussions. Recordings of this meeting are available on video, and a 2006 book provides a broad summary of our discussions.*

Weingarten, E. and Reisberg, D. What makes a police photo line-up *suggestive?* Paper presented at the annual meetings of the Psychonomic Society, Vancouver, B.C., November, 2003.

Reisberg, D. Memory for emotional events – The need for some distinctions. Invited Distinguished Speaker address delivered at the meetings of the Sixth Tsukuba International Conference on Memory: Memory and Emotion, Tsukuba, Japan, March 2005.

Reisberg, D. Remembering emotional events – Getting beyond a simple "arousal model." Invited address delivered at the meetings of the Western Psychological Association, Portland, Oregon, April 2005.

Getz, S. and Reisberg, D. The effects of training on imagery skills. Paper presented at the Mind and Life Summer Research Institute, Garrison, NY, June 2005.

-15-

**Papers presented at scientific meetings** (continued):

Ogle, C. and Reisberg, D. A comparison of elimination, sequential and simultaneous lineup procedures. Paper presented at the meetings of the Association for Psychological Science, New York, NY, May 2006.

Kushlev, K. and Reisberg, D. The effects of mindfulness on the emotional experience of choosing. Paper presented at the meetings of the Western Psychological Association, Portland, OR, April 2009.

Houston, M. and Reisberg, D. Do jurors trust their own eyes over the expert when presented with finger print evidence? Paper presented at the meetings of the American Psychology-Law Society, New Orleans, LA, March 2014.

Newirth, K. et al. Out of the lab and into the courtroom: How and why eyewitness experts are important in criminal cases. Full day workshop presented at the meetings of the American Psychology-Law Society, Atlanta, GA, March 2016.

Kenchel, J. & Reisberg, D. Eyewitness confidence: Post-identification feedback affects both verbal and numerical expressions. Paper presented at the meetings of the NorthWest Cognition and Memory Association, Vancouver, BC, May 2016.

Kenchel, J., Reisberg, D., & Dodson, C.S. "In your own words, how certain are you?" Post-identification feedback powerfully distorts verbal expressions of witness confidence. Paper presented at the meetings of the American Psychology-Law Society, Seattle, WA, March 2017.

Reisberg, D. Invited discussant: Symposium on 'Why memory matters: Errors (and solutions) in criminal investigations.' Paper presented at the meetings of the American Psychology-Law Society, Memphis, TN, March 2018.

Suresh, S., Pezdek, K., & Reisberg, D. The Appearance Change Instruction is not beneficial even under novel and favorable circumstances. Paper presented at the meetings of the American Psychology-Law Society, Los Angeles, March 2024.

Marsh, B., Pezdek, K., & Reisberg, D. Does the Cross-Race Effect persist for repeatedly viewed faces? Paper presented at the meetings of the American Psychology-Law Society, San Juan, March 2025.

Dunn, G., Pezdek, K., & Reisberg, D. Slow and dangerous: Effect of slow-motion on the interpretation of officer use-of-force video. Paper presented at the meetings of the American Psychology-Law Society, San Juan, March 2025.

-16-

**Extramural activities / Community Service** (*partial list*):

Committee of Examiners for the Graduate Record Examination (GRE) Psychology Test, Educational Testing Service, 1992-1998.

Director and organizer, Reed College's Second Annual Conference on Music and the Liberal Arts: *In the ear of the beholder – The psychology of music perception.* (February, 2000).

Presentation at the Multnomah Athletic Club as part of Reed College's Luncheon Seminars: *Eyewitness Testimony and the Fallibility of Memory: Implications for the Criminal Justice System.* (March, 2000).

Presentation for the Detective Division, Portland Bureau of Police:  *Using the science of memory to improve police work.* (September, 2000).

Presentation for the Reed College Board of Trustees:  *The Fallibility of Memory.* (October, 2000).

Presentation for the Oregon State Bar, Continuing Legal Education (CLE) Program: *The science of memory and eyewitness testimony.* (Portland, OR; October, 2000).

Presentation for the Multnomah County District Attorney's Office, Continuing Legal Education (CLE) Program: *Expert witnesses on eyewitness memory.* (Portland, OR; January, 2001).

Member, Advisory Board for the City of Portland's Bureau of Police Long-Term Training and Development Action Plan (2001 - 2002)

Presentation for Reed College's 'Reed on the Road' series: Eyewitness testimony and The Fallibility of Human Memory. (San Francisco; March, 2002).

Presentation for the annual meeting of the National Defender Investigator Association: *Detecting false memories*. (Portland, OR; April, 2002).

Presentation for the Federal Public Defender's Office, Continuing Legal Education (CLE) Program:  *Eyewitness identification: When is it likely to be reliable, and when not?* (Portland, OR; May, 2003).

Presentation for Metropolitan Public Defenders, Continuing Legal Education (CLE) Program:  *Evaluating eyewitness identifications.* (Portland, OR; July 2003).

Two-part presentation for the Oregon Criminal Defense Lawyers Association Program (CLE). *Eyewitness identifications: How accurate are they?* and *False memories: Remembering things that never happened.* (Portland, OR; December 2003).

Presentation for Congregation Neveh Shalom. *When and how should religious beliefs evolve? Possible lessons from the Tibetan Buddhists.* (Portland, OR, February 2004.)

Presentation for the American Inn of Court. *Questioning a witness: Scientific, legal and professional issues.* (Portland, OR, March 2004.)

-17-

**Extramural activities / Community Service** (*continued; partial list*):

Presentation for the Oregon Society for Clinical Hypnosis. *From the laboratory to the Dalai Lama: What do know about visualization skill?* (Portland, OR: February 2006).

Presentation for the Oregon Criminal Defense Lawyers Association, as part of their Juvenile Law Seminar: Allegations of Sexual Abuse (CLE). (Newport, OR; April 2006).

Interview for *Viewpoints,* a nationally-syndicated weekly radio broadcast, highlighting current affairs, and featured on over 340 stations. *Eyewitness testimony: Can we trust it?* (March 2007).

Member, Advisory Panel for the American Psychological Association's Board of Scientific Affairs, reviewing the *National Standards for High School Psychology Curricula,* July 2007.

Two part presentation for the King County (WA) Prosecutor's office (CLE). Scientific research on eyewitness memory:  Is it probative? Is it prejudicial? Is it useful? Part 1: Identification procedures; Part 2: Eyewitness narratives & the problem of false memories. (Seattle, WA: September 2007).

Presentation for the 12th Annual Insurance Fraud Conference, a year meeting sponsored by the insurance industry's International Association of Special Investigation Units (IASIU). Witness Interview Techniques. (Portland, OR: October 2007).

Two part presentation for Detective Division, Portland Bureau of Police, co-presented with Sergeant Wayne Svilar. Can we use what we know about memory to improve interview procedures? and  Improving identification procedures. (Portland, OR: October 2007).
[This presentation was over-subscribed in advance, and, when given, was very well received. Therefore, we offered an 'encore' performance in November 2007.]

Presentation for fraud investigators, SAIF corporation. Interviewing witnesses: A scientific perspective. (Salem, OR: October 2008).

Presentation for Premium Auditors Training, SAIF corporation. *Detecting lies, and getting complete information: What can a scientific perspective tell us about interviewing?* (Salem, OR: October 2008).

Presentation for the 29th annual meeting of the Oregon Paralegal Association. What can you learn from witnesses; what can't you learn? (Bend, OR: October 2008).

Presentation for the Oregon Criminal Defense Lawyers Association, as part of their Juvenile Law Seminar: Working with younger children (CLE). Interviewing young children: The view from the laboratory. (Newport, OR; April 2009).

Presentation for Premium Auditors Training, SAIF corporation. *Getting the best interview you can – Worries about honesty and memory accuracy*. (Kelso, WA: April 2009).

-18-

**Extramural activities / Community Service** (*partial list;* continued):

Presentation for "OTIS" – the "Old Timers Investigator Society" (a group of investigators working for attorneys). Evaluating Witness I.D.'s. (Portland, OR: June 2009).

Presentation for Metropolitan Public Defenders (CLE). *Getting the best of, and the most from, witness narratives*. (Portland, OR: October 2009).

Presentation for the National Association of Paralegals. *Preparing witnesses, learning from witnesses*. (Portland, OR: October 2009).

Presentation for the Oregon Criminal Defense Lawyers Association (CLE):  *Mastering & controlling the trial venue: A new perspective*. (Co-presented with Laura Graser; Portland OR: December 2010). *This presentation focused on the effects of pre-trial publicity, building on what we know about jurors' memory and judgment processes. How (and when) does pre-trial publicity influence a jury? How effective are the standard "remedies" to pre-trial publicity's impact?*

Interview on Oregon Public Radio's *Think Out Loud* program: "Changing the Child Sex-Crime Law."  Broadcast March 28, 2011.

Presentation for the Oregon Criminal Defense Lawyers Association (CLE):  *Using and choosing expert witnesses*. (Co-presented with Sara Snyder; Newport, OR: September 2011).

Interview on Oregon Public Radio's *Think Out Loud* program: "Memory and Eyewitness Evidence."  Broadcast November 2, 2011.

Presentation for the Oregon Criminal Defense Lawyers Association (CLE):  *Evaluating (and improving) eye-witness identifications*. (Portland, OR: December 2011).

Invited testimony before a joint meeting of the House and Senate Judiciary Committees: The Science of Eyewitness I.D.'s. (Salem, OR: May 2012).

Interview on KATU television news, re: "Witnesses can be wrong; task force to look at how."  (Portland, OR: May 2012).

Presentation for the Oregon Criminal Defense Lawyers Association (CLE): *Oregon's new 2012 Interviewing Guidelines*. (Co-presented with Dr. Wendy Bourg and Lisa Maxfield; Newport, OR: April 2013).

Presentation for the Oregon Criminal Defense Lawyers Association (CLE):  *Classen, Lawson and Eyewitness Law: The scientific evaluation of eyewitness identifications*. (Bend, OR: June 2013).

Presentation at the Center for Advanced Study in the Behavioral Sciences, Second Annual Behavioral Science Summit, on *Creativity & Innovation.* (Palo Alto, CA: July 2013).

Chair, External Evaluators Committee for the Psychology Department at Whitman College. (Walla Walla, WA: September 2013).

-19-

**Extramural activities / Community Service** (*partial list;* continued):

Presentation for Lewis & Clark Amnesty International Chapter: Wrongful Conviction: The Troy Davis Case. (Portland, OR: April 2014).

Presentation for the Oregon Criminal Defense Lawyers Association (CLE): *Oregon's New Protocol for Collecting Identification Evidence.* (Eugene, OR: January 2015; also broadcast statewide as a "webinar").

Interview on WWL radio on "The Think Tank," hosted by Garland Robinette, re: "People confess to crimes they didn't actually commit." (New Orleans, LA: February 2015).

Interview on National Public Radio on "Philosophy Talk," hosted by John Perry and Ken Taylor, re: "Your Lying Eyes: Memory, Perception, and Justice." Recorded before a live audience October 2015; broadcast November 2015.

Presentation for the Oregon Innocence Project (CLE): *The courts' view of psychological science: The sequential lineup as a 'case study'.* (Portland, OR: February 2016).

Two part presentation for the APA Division 42 Forensic Assessment Conference: *Perception and memory in forensic settings: Current controversies,* and *Detecting Liars: Separating science and pseudo-science.* (Pasadena, CA: April 2016).

Presentation for the Idaho Association of Criminal Defense Lawyers: *The scientific assessment of I.D. evidence: Moving beyond Manson.* (Sun Valley, ID: March 2017).

Presentation for Metropolitan Public Defenders: *Detecting Lies and Liars: Update on the State of the Art.* (Hillsboro, OR: August 2017, and Portland, OR: October 2017).

Invited testimony before the Oregon State Legislature's Joint Interim Task Force on Testing of Sexual Assault Forensic Evidence Kits. (Salem, OR: June 2018).

Appearance on the Netflix series, *American Vandal,* season 2; cast as "James Milbank, Professor of Psychology." (September 2018.)

Appearance on KGW news, "Our memories are far from perfect: Expert explains the science of accurate memories." [Background discussion for reporting on sexual assault accusation against Supreme Court nominee.] (October 2018.)

Presentation for the American Inn of Court. *Perception and memory: Strengths and weaknesses.* (Medford, OR, May 2019.)

Invited panelist at the annual Quattrone Center Spring Symposium, "Transparency in Criminal Justice: A 2020 Vision." Philadelphia: Quattrone Center for the Fair Administration of Justice, Penn Law School. *(Postponed because of COVID.)*

-20-

**Extramural activities / Community Service** (*partial list;* continued):

Two part presentation for the Alaska Association of Criminal Defense Lawyers: *Litigating confession cases: The Reid Technique and beyond,* and also *ID evidence: Basic findings, and some new insights.* (Anchorage, AK: Sept 2021).

Presentation for King County (WA) Department of Public Defense: *Evaluating Witness Identification Evidence.* (Seattle, WA: April 2022).

Presentation for King County (WA) Department of Public Defense: *Litigating confession cases.* (Seattle, WA: June 2022).

Presentation for King County (WA) Department of Public Defense: *How reliable is children's memory?* (Seattle, WA. January 2023).

Presentation for CARES NW Continuing Education Program: *Children's memories.* (Portland, OR. November 2023).

Presentation for the Oregon Criminal Defense Lawyers Association (CLE): *How and when to use a memory expert.* (Webinar presented online. January 2025).

Consultant and expert witness in judicial proceedings.

My courtroom testimony spans a range of issues, all focused on the scientific examination of how people perceive the world, remember what they have perceived, and think about what they remember. (These are central concerns in cognitive psychology.) Specific topics for testimony have included the proper procedures for eliciting children's memories; eyewitness identifications and also their narrative reports on crimes; earwitness identifications of someone's voice; memory for conversations; how perception is shaped by high stress; the evaluation of confession evidence; *jurors'* memory for pretrial publicity; and more.

I have been recognized as an expert (and allowed to testify) in state court in Alaska, California, Colorado, Idaho, Illinois, Montana, Nevada, New Hampshire, New Jersey, New York, Oregon, Virginia, and Washington, and in multiple jurisdictions in federal court. I have also consulted on civil, criminal, administrative, and military cases in other jurisdictions.

-21-

**Professional activities** (*partial list*):

Service as Editor:

| | |
|---|---|
| *Cognitive Science* | (Editorial board, 1990-1998) |
| *Memory & Cognition* | (Consulting editor, 1993-1998) |
| *Journal of General Psychology* | *(*Consulting editor, 1984-2000) |
| *Psychological Bulletin* | (Associate Editor, 2000-2002) |
| *Psychological Science* | (Editorial Board, 1998- 2006) |
| *Journal of Mental Imagery* | (Associate Editor, 1988- 2009) |
| *Applied Cognitive Psychology* | (Editorial board, 2004-2010) |
| *Review of General Psychology* | (Editorial Board, 2006-2011) |
| *The Behavioral Scientist* | (Appointed as Founding Columnist, 2017) |
| *The PsychReport* | (Board of Scientific Advisors, 2013- 2017) |
| *Philosophical Psychology* | (Editorial Advisory Board, 1990-2021) |

*Emerging Trends in the Social & Behavioral Sciences:*
   *Interdisciplinary Directions*       (Consulting editor, 2012- )
*Journal of Applied Research in Memory & Cognition*  (Associate Editor, 2015-2020;
                        then re-elected for a second term, 2020-2025)

Service as Reviewer (partial list):
*Applied Cognitive Psychology*
*Cognition & Emotion*
*Cognitive Psychology*
*Current Directions in Psychological Science*
*Emotion*
*European Journal of Cognitive Psychology*
*Journal of Applied Developmental Psychology*
*Journal of Experimental Child Psychology*
*Journal of Experimental Psychology:  General*
*Journal of Experimental Psychology:  Human Perception & Performance*
*Journal of Experimental Psychology:  Learning, Memory and Cognition*
*Journal of Forensic Psychology Research and Practice*
*Journal of Memory and Language*
*Journal of Police and Criminal Psychology*
*Journal of Vision*
*Law and Human Behavior*
*Legal and Criminological Psychology*
*Memory*
*Memory & Cognition*
*Neurobiology of Learning & Memory*
*Perception & Psychophysics*
*Psychological Bulletin*
*Quarterly Journal of Experimental Psychology: Human Experimental Psychology*

-22-

**Professional activities** (*partial list,* continued):

Member or former member:
American Psychological Association (Member, Division 3)
*Elected Fellow of Division 3 in 1999*
American Psychology-Law Society
Association for Psychological Science
Oregon Academy of Science
Psychonomic Society
Society for Applied Research in Memory and Cognition
Society for Philosophy and Psychology
*Executive Committee, 1989-1992, 1996 - 1999*
Western Psychological Association
*Elected Fellow in 1995*
*Program Review Committee, 1999, 2000, 2003, 2004.*

# Appendix II

List of Reisberg trial appearances since 2021; this list is as complete as my records will allow.

| | | County | State | Retained by… | | Client | Case Number |
|---|---|---|---|---|---|---|---|
| **2021** | | | | | | | |
| | 28-May | Pierce | WA | Tofflemire | Sarah | Frieze | 19-1-02551-6 |
| | 13-Aug | Skagit | WA | Eckert | Kelly | Gogo | 15-1-00324-0 |
| | 17-Aug | Clark | NV | Saxe | Rebecca | Kinney | 20F02415X |
| | 18-Aug | King | WA | Atwood | Jennifer | DeVeiteo | 19-1-03303-3 KNT |
| | 24-Aug | Denver | CO | Varty | Sarah | Landrock | 19CR6076 |
| | 27 Aug | Washington | OR | Bissonnette | Kelsey | Calderon | 20CR68573 |
| | 4 Oct | [Federal] | WY | Jubin | Thomas | Horn | 19-CR-00026ABJ |
| | 19 Oct | Lane | OR | Coffin | Laura | Dubey | 19CR83747 |
| | 26 Oct | Clark | WA | Wood | Nick | Cone | 20-1-01992-06 |
| | 1 Nov | Crook | OR | Wright | Valerie | Toledo-Vargas | 19CR05897 |
| | 2 Dec | Washington | OR | Weingart | Neal | Mohamed | 19CR37222 |
| | 17 Dec | Yellowstone | MT | Garcia | David | Davis | DC20-1473 |
| **2022** | | | | | | | |
| | 10-Jan | Grant | OR | Dunn | Kati | Rodriguez | 19CR22959 |
| | 18-Feb | Clackamas | OR | Schmonsees | Brian | Proffitt | 19CR71875 |
| | 10-Mar | King | WA | Gibbs | Devon | Starkenberg | 20-2-09766-7SEA |
| | 14-Mar | Skagit | OR | Eckert | Kelly | Gogo | 15-1-00324-0 |
| | 13 Apr | Clackamas | OR | Kmetic | Shannon | Hicks | 21CR45490 |
| | 13 Apr | Yamhill | OR | Whang | Simon | Phipps | 21CR10841 |
| | 21 Apr | Yamhill | OR | Johnstone | Micah | Nolen | 20CR38689 |
| | 25 Apr | Multnomah | OR | Hall | Brett | Perez | 20CR15737 |
| | 18 May | Multnomah | OR | Maxfield | Lisa | Brophy | 18CR59251 |
| | 2 June | Whatcom | WA | Beschen | Emily | Dixon | 19-1-01483-37 |
| | 8 June | Arapahoe | CO | Little | Liz | Johnson | 21CR133 |
| | 14 July | Marion | OR | Patterson | Kobin | Vasquez | 21CR27939 |
| | 20 July | San Joaquin | CA | Lafferty | Brian | Rosiles | |
| | 10 Aug | King | WA | Hooks | Vince | Dampier | 201073292SEA |
| | 21 Sep | El Paso Cty | CO | McClintock | Elizabeth | Warmker | 16CR1309 |
| | 11 Oct | Multnomah | OR | MacPherson | Carl | Cooper | 20CR44575 |
| | 5 Dec | King | WA | Marshall | David | Barthel | 20-00145 SEA |
| | 9 Dec | Jackson | OR | Herbert | Christina | Coffman | 20JU05698 |
| **2023** | | | | | | | |
| | 19 Jan | Spokane | WA | Lindholdt | Karen | Kiernan | 20-1-10519-32 |
| | 20 Jan | Linn | OR | Reid | Tyler | Shew | 21CR07551 |
| | 8 Feb | Marion | OR | Gorham | Steve | Soto | 21CR28066 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 24 Mar | Cowlitz | WA | Couto | Elle | Gomez-Bracken | 22-8-00131-08 |
| 21 Apr | Mult | OR | Levi | Elizabeth | Merlino | 22JU04212 |
| 22 May | King | WA | Nacht | Lin-Marie | Gallegos | 201027941SEA |
| 6 June | Deschutes | OR | Wright | Valerie | Radabaugh | 21CR63237 |
| 8 June | Union | OR | Schaeffer | James | Normandy | 21CR30338 |
| 23 June | Lane | OR | Rowland | Trevor | Jackson | 23CR09790 |
| 15 Nov | Arlington | VA | Marshall | Robert | Archer | CR23-241 |
| 7 Dec | Arapahoe | CO | Hennessy | Kathleen | Bell | D32022CR2743 |
| 8 Dec | Lane | OR | Hillman | Willow | Crabtree | 21CR10987 |
| 14 Dec | Douglas | WA | Beuhler | John | Moser | 21-1-00-09 |

### 2024

| | | | | | | |
|---|---|---|---|---|---|---|
| 12 Feb | King | WA | Rajan | Naresh | Alsatt | 21-1-02517-2SEA |
| 29 Mar | Spokane | WA | Wu | Daniel | Gasabato | 2211023532 ROC 1 |
| 23 Apr | King | WA | Black | Christopher | Messer | 21-1-03076-1 SEA |
| 24 May | Multnomah | OR | MacPherson | Carl | Cooper | 20CR44575 |
| 12 Sep | Multnomah | OR | Engle | Barry | Langley | 22CR42818 |
| 8 Oct | King | WA | Poisel | Joshua | Martinell | 20-1-07909-6 SEA |
| 10 Oct | Denver | CO | Gallegos | Anthony | Martin | 23CR20006 |
| 14 Nov | Multnomah | OR | Meyer | Shawna | Wheeler | 24JU01602 |
| 16 Dec | Multnomah | OR | Anderson | Neil | Turnbull | 22CR24694 |

### 2025

| | | | | | | |
|---|---|---|---|---|---|---|
| 7 Feb | King | WA | Parisky | Liza | Aguilar | 17-1-05829-3 KNT |
| 27 Feb | Jefferson | OR | Sumner | Paul | Gibons | 21CR40978 |
| 27 Mar | 4th Judicial Dt. | AK | Wilson | Spencer | Jeffers | 4FA-20-01136CR |
| 1 Apr | Snohomish | WA | Forde | Rachel | Gebaroff | 22 1 00146 31 |
| 21 Apr | San Juan | WA | Bullock | Robert | Choi | 24-1-05011-28 |
| 21 May | Onondaga | NY | Powers | John | Maddox v. Francemone | 19-cv-678 NDNY |
| 27 June | Clackamas | OR | Maxfield | Lisa | McLemore | 24CR10855 |
| 8 July | King | WA | Yamahiro | Hana | Suggs | 24-1-02130-9 SEA |
| 28 July | King | WA | McGinty | Margery | Wigdor | 231060314SEA |
| 22 Aug | Clark | WA | Kauffman | Katie | Humphrey | 23-1-01258-06 |
| 22 Sep | King | WA | Kahsay | Mahalia | Rumberg | 141028764SEA |
| 9 Oct | Denver | CO | Benninger | Kevin | Gamboa-Sidas | 23CR3872 |
| 16 Oct | Jefferson | WA | Powers | Lilly | Judd | 23-00142-16 |
| 5 Nov | Malheur | OR | Claramunt | Mark | Zuniga | 24CR65696 |
| 6 Nov | Marion | OR | Coran | Ted | Roth | 24CR65696 |

### 2026

| | | | | | | |
|---|---|---|---|---|---|---|
| 5 Feb | Benton | OR | Lee | Rosalind | Tallman | 23CR26538 |
| 25 Feb | Yamhill | OR | Coran | Theodore | Matheny | 24CR54723 |