**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

FRANCESCA GINO,

Plaintiff,

v.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE, SRIKANT DATAR, JOHN DOES 1-10, AND JANE DOES 1-10,

Defendants.

Civil Action No. 1-23-cv-11775-MJJ

Leave to File Granted on 8/26/26

**PLAINTIFF'S RENEWED OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Did Plaintiff engage in the acts of data falsification of which she was accused by Harvard? That is the most significant (but far from only) factual question posed by this dispute. If Plaintiff did not engage in those acts, then she did not commit "grave misconduct." And if she did not commit "grave misconduct," then Harvard had no right to revoke her tenure.

In seeking summary judgment, Harvard tries to completely sidestep this issue. It offers no evidence or argument as to why a jury must resolve that factual dispute in Harvard's favor. Instead, Harvard proudly boasts of its determination—acting through its agents—that Plaintiff is guilty as charged.

As discussed below, Harvard's claim that it reached this determination through a fair, impartial and unbiased process is flatly wrong. From the start, Defendants acted with utter disregard for Plaintiff's contractual rights. They literally re-wrote the rules to create a process by which Plaintiff was obligated to prove her innocence, yet deprived her of any reasonable means of doing so. Defendants then prematurely proclaimed her guilt, destroying her reputation and making it impossible to obtain any semblance of a fair or impartial decision from her fellow faculty members.

While a jury must determine whether this course of conduct independently supports any of Plaintiff's claims, the question of "grave misconduct" stands apart from the rest. Harvard's determination—whether reached through a fair process or not—is not entitled to any presumption of correctness or deference. Plaintiff is entitled to have her fate determined by an impartial factfinder, and Harvard has not (and cannot) advanced any argument as to why summary judgment is warranted.

For these and the reasons that follow, Defendants' motion should be denied in its entirety.

## BACKGROUND

The facts underlying this dispute are extensive, and are set forth in the attached Statement of Additional Material Facts, which Plaintiff incorporates herein by reference.

## STANDARD OF REVIEW

As the summary judgment movants, Defendants bear the burden to demonstrate the absence of a genuine issue of material fact that entitle them to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the moving party bears the burden of proof on an issue, it must demonstrate every element of its case such that "no reasonable trier of fact could find other than for [it]." Harley-Davidson Credit Corp. v. Galvin, 807 F.3d 407, 411 (1st Cir. 2015) (cleaned up). As explained below, Harvard bears the burden of proof to show that Gino engaged in "grave misconduct," and consequently bears this additional burden at summary judgment.

Defendants have not carried these burdens, since there are genuine issues of material fact precluding judgment on Gino's contract-based claims, her claims asserting discrimination on the basis of sex and retaliation, and her declaratory judgment claim.

## ARGUMENT

### I. A Reasonable Jury Could Find Harvard Breached its Contractual Obligations to Gino under the Third Statute, the Third Statute Procedures, the Tenure Policy, the 2013 Research Integrity Policy, and the Interim Policy.

Gino was a tenured professor. As further explained below, it is beyond reasonable debate that four Harvard policies: (i) the Third Statute, (ii) the Third Statute Procedures, (iii) the Tenure Policy, and (iv) the 2013 Research Integrity Policy, formed part of Gino's contractual relationship with Harvard that she may enforce as contracts. Ample bases exist for Gino to enforce the (iv) Interim Policy as well, not least because Harvard repeatedly promised that it would be followed and purported to do so.

Since these five policies are contracts, the two questions that Harvard's motion presents on Gino's contract claims are these. First: could a reasonable jury find that Gino did not engage in "grave misconduct"? Harvard's motion fails to address this question, but the central contractual protection Gino had as a tenured professor was not some formulation of process. It was the substantive right **not to lose her tenure**—i.e., her guaranteed lifetime employment—**unless** she engaged in "grave misconduct" or "neglect of duty." It is *Harvard's* burden to prove that one or more of these grounds for tenure revocation existed, and because the question whether Gino engaged in "grave misconduct"[1] is subject to a genuine and extensive factual dispute, summary judgment must be denied. Harvard gets the fundamentals wrong by suggesting that this question is reviewed deferentially. See McConnell v. Howard Univ., 818 F.2d 58, 63 (D.C. Cir. 1987) (reversing grant of summary judgment where district court reviewed tenure revocation deferentially, and emphasizing that the question was whether the professor actually neglected his professional responsibilities.)

Second: could a reasonable jury find that Harvard breached specific contractual provisions in the applicable policies beyond the tenure protection itself? See id. Here there is also an extensive factual dispute, and summary judgment must be denied.

A. Courts enforce the lifetime employment guarantee of tenure like any other contractual obligation, without deference to the university.

"Tenure involves a long-term academic and financial commitment by a university to an individual, providing faculty with unusually secure positions tantamount to life contracts." *Beitzell*

[1] Harvard's 30(b)(6) deponent [redacted] Pl. SAMF (Doc. No. 256) ¶ 486. The phrase "grave misconduct or neglect of duty" was used as boilerplate in various parts of the Third Statute process, but there is not a shred of evidence that Gino "neglected" any of her duties, and it would be Harvard's burden to produce such evidence if it existed. Thus, "grave misconduct" is the sole ground on which Harvard may attempt to rely for revoking Gino's tenure.

*v. Jeffrey*, 643 F. 2d 870, 875 (1st Cir. 1981). Given the seriousness of the commitment, the decision to grant tenure is typically only made after a thorough review of the professor's academic work, merit, and character. Id. HBS followed that practice when granting Gino's tenure and in subsequent tenure conferral decisions. Pl. SAMF ¶¶ 168-69. Its Tenure Policy (Ex. 74) confirms that tenure means placement on HBS's "permanent faculty." Pl. SAMF ¶ 168.

Harvard gets it exactly backwards when it contends that "academic… decisions" are reviewed with deference by courts. Def. Br. (Doc. No. 233) at 18. Harvard cites two decisions about *denial* of tenure—not tenure ***revocation***—and the second of those cases explains that deference applies to tenure denial decisions, not tenure revocation decisions: "**the very need for strong procedural protections to prevent the wrongful dismissal of a tenured teacher** concomitantly suggests a need for wide discretion in making an initial tenure award." Berkowitz v. President & Fellows of Harvard College, 58 Mass. App. Ct. 262, 269 (quoting Beitzell, 643 F. 2d at 875) (emphasis added). Far from being deferential where tenure revocation is at issue, "Courts consistently affirm the strength of tenure protections and require universities to adhere to the procedural protections granted by employment contracts." Sullivan v. W. New England Univ., No. 3:19-CV-30063-LTS, 2019 WL 13395618, at *6 (D. Mass. Nov. 22, 2019). "The main purpose behind any faculty tenure system is, of course, the protection of tenured faculty." McNeill v. New England Sch. of L., 1994 WL 879640, at *4 (Mass. Super. July 12, 1994) (collecting cases).

B. The Five Policies are Contracts Between Gino and Harvard.

Harvard's suggestion that it does not have a contractual obligation to observe its own tenure policies and research misconduct policies is wrong. "[T]enure contracts are rarely distilled into a single document. . . Often, the contract comprises a collection of documents, such as an offer letter, a faculty handbook, and other rules or policies of the college." Wortis v. Trustees of Tufts College, 493 Mass. 648, 663 (2024). The five policies at issue are contracts for multiple reasons.

1. The Appointment Letter Incorporates Other Policies by Reference.

First, as Harvard admits, Gino's contractual Appointment Letter (Ex. 4) expressly incorporates the Third Statute (which was attached to the Appointment Letter) and "other terms, conditions and policies as are stipulated by the Faculty of Business Administration." See Def. SOF ¶ 3. A "clearly stated general reference" to a document suffices to incorporate that document into a contract. Chicopee Concrete Servs., Inc. v. Hart Eng'g Co., 398 Mass. 476, 478 (1986); see also Madonna v. Trs. Of Univ. of Mass., 32 Mass. App. Ct. 693, 694-95 (1992) (incorporating into employment contract employer policies that the contract referenced in general terms). The Third Statute is contractual by express incorporation, and because there is evidence that the Third Statute Procedures, the Tenure Policy, and the 2013 Research Integrity Policy were stipulated by the Faculty of HBS, they are incorporated by the same reference. See Pl. SAMF ¶¶ 167, 184-85, 343-45.

2. Gino Reasonably Believed Harvard Would Adhere to All Five Policies.

Employment policies, manuals, and other promises made by an employer are binding on the employer when an employee reasonably expects management will adhere to their provisions. O'Brien v. New England Tel. & Tel. Co., 422 Mass. 686, 694 (1996). O'Brien specifically rejected the narrow interpretation of Jackson v. Action for Boston Cmty. Dev., Inc., 403 Mass. 8 (1988) advanced by Harvard, including the notions that Gino needed to have signed or negotiated these policies for them to be binding or that Harvard's potential ability to modify policies makes them non-contractual.[2] Compare O'Brien, 422 Mass. at 692-94 with Def. Br. 18–19. See also Madonna,

[2] Thus, the O'Brien line of authority explains why Harvard is wrong to claim that, if Gino argues that she did not "assent" to the Interim Policy it cannot as a matter of law be a contract. See Def. Br. at 19 n.16. Specific acts of "assent" are not prerequisites; the question is her reasonable expectations. Further, as explained below, she could enforce its provisions via estoppel.

32 Mass. App. Ct. 693, 694-95 (1992) (enforcing employment agreement that incorporated employer policies "as amended, revised, or repealed from time to time").

Under O'Brien, whether policies are contractually binding depends on an examination of all the factors, the most important of which is the context of the policy's preparation and distribution. 422 Mass. at 694, 691–94. Other factors include whether the employer adheres to the policy, whether the employer calls "special attention" to the policy, and whether the policy by its terms purports to be binding (as opposed to including disclaimers or purporting merely to express "guidance"). Id. at 691–93.

The evidence here overwhelmingly supports Gino having a reasonable expectation that Harvard would adhere to each of the Third Statute, the Third Statute Procedures, the Tenure Policy, the 2013 Research Integrity Policy, and the Interim Policy. Each of these documents purports to be a binding policy of Harvard or HBS, with no "disclaimers" or language suggesting it is only guidance. Pl. SAMF ¶¶ 167-68, 185-86, 204-06, 342, 349-52. Harvard called "special attention" to the Third Statute and Third Statute Procedures throughout the Third Statute process, presenting them to Gino as binding policies that would be followed, and Harvard purported to follow them.[3] Pl. SAMF ¶¶ 353-57. HBS called special attention to the Tenure Policy when considering faculty promotion decisions. Ex. 176, Gino Decl. ¶ 2. The 2013 Research Integrity Policy was distributed widely within HBS, debated, and voted on when it was originally promulgated. Harvard's litigation position is that they followed this policy even when they promulgated the Interim Policy. See Def. Br. at 3 (citing Def. SOF ¶¶ 21-24). HBS called "special attention" to the Interim Policy throughout the research misconduct process and purported to follow it beginning in October 2021,

---

[3] As stated above, the Third Statute was attached to Gino's Appointment Letter, and there is evidence the Third Statute Procedures were promulgated widely within the university and voted on by the faculties of each school (including HBS) when they were first adopted.

and while it was [redacted] and posted to HBS's website. Pl. SAMF ¶¶ 201-03.

3. Alternatively, Implied Contract or Estoppel Supply Enforcement Grounds.

In the alternative, the Third Statute, Third Statute Procedures, and Interim Policy are enforceable as contracts implied in fact. See, e.g., Katz v. Pershing, LLC, 806 F. Supp. 2d 452, 460 (D. Mass. 2011) (contract may be implied in fact from the conduct or relations of the parties). Gino and Harvard both purported to follow and comply with these policies during the research misconduct investigation and the tenure revocation process, as applicable. Finally, if the Interim Policy were found not to be a contract, Gino could enforce its provisions via estoppel. See, e.g., Sullivan v. Chief Just. For Admin. And Mgmt. of Trial Ct., 448 Mass. 15, 27-28 (2006). Gino detrimentally relied on Harvard's numerous promises that it would apply the Interim Policy by actions she took to follow this policy such as (1) not retaining a forensic expert or additional consultants, (2) not taking investigatory steps that might have breached the confidentiality requirements of the policy such as asking specific questions or requesting specific data from witnesses, and (3) generally maintaining confidentiality of the process. See generally Pl. SAMF ¶¶ 305-15.

C. A Reasonable Jury Could Find that Gino Did Not Engage in "Grave Misconduct," Meaning Harvard Breached the Appointment Letter, the Third Statute, and the Tenure Policy.

As previewed above, the Court's review of Harvard's tenure revocation decision is not deferential, but *de novo*. McConnell, 818 F. 2d at 68 (there is "no basis in law or reason for applying [a deferential] standard to a case involving the rights and obligations of parties to a contract, whether or not the case arises in a university setting"). It is well established that Massachusetts courts review *de novo* where an employee has contractual protections against being terminated except for "cause" and is challenging their termination. See, e.g., Balles v. Babcock

Power Inc., 476 Mass. 565, 572-73 (2017) (upholding trial judge's decision to conduct de novo review of whether employee was fired for "cause")[4]; see also Boothby v. Texon, Inc., 414 Mass. 468, 479-81 (1993) (it was for jury to decide whether employee's performance was objectively unsatisfactory).

It is also well established, in the cases involving contracts that protect an employee from termination except for "cause," that the existence of "just cause" is an affirmative defense. See Goldhor v. Hampshire College, 25 Mass. App. Ct. 716, 720-21 (1988); Chaplain v. Dugas, 323 Mass. 91, 93 (1948). Here, under the Third Statute, Gino could only be terminated for "grave misconduct or neglect of duty," so it is Harvard's burden to demonstrate the existence of "grave misconduct" as an affirmative defense to Gino's claim for breach of her tenure contract. Harvard bears a double burden as both the movant for summary judgment and the party with the burden of proof to show "grave misconduct," that is, to show that no reasonable finder of fact could fail to find in its favor. See Harley-Davidson, 807 F.3d at 411.

As a preliminary matter, Harvard has not carried this burden because Harvard did not offer admissible evidence with its motion to show that Gino engaged in any such "grave misconduct." Harvard's proffered facts discuss only the process followed at Harvard internally. Harvard's committee findings that Gino committed research misconduct or grave misconduct are not admissible, of course, to prove that she did. See, e.g., United States v. Patrick, 248 F.3d 11, 22 (1st

[4] *Balles* states (without deciding) that the standard may be different if the contract provides for a deferential standard of review, see id., but none of the relevant Harvard policies suggests that any level of deference is to be afforded to Harvard's decisions.

Cir. 2001) (informant tips are not admissible for their truth), overruled on other grounds by United States v. Salvador-Gutierrez, 128 F.4th 299 (1st Cir. 2025).[5]

And there is a genuine—and extensive—dispute whether Gino actually committed "grave misconduct" that makes this question inappropriate for summary judgment. Among other things, Gino has consistently denied that she ever falsified data or study descriptions or otherwise committed research misconduct. Pl. SAMF ¶¶ 243-44. The witness evidence of record uniformly supports Gino's good motives, i.e., that she was a person of high integrity who never pressured those in her labs to generate certain results; that she has freely walked away from studies many times when the data did not support her hypothesis; and that she has corrected or retracted papers where appropriate; and Harvard has no specific evidence of any motive by Gino to commit the alleged research misconduct for the specific studies in question. Pl. SAMF ¶¶ 259-65, 468-69. Harvard's evidence is [redacted] Pl. SAMF ¶ 390, and Gino's expert evidence establishes a genuine dispute [redacted] Pl. SAMF ¶ 299. See also Pl. SAMF § IX (¶¶ 414–79) (discussing failures of proof by allegation).

D. A Reasonable Jury Could Find that Harvard Breached the 2013 Research Integrity Policy and Interim Policy in its Research Misconduct Investigation.

There are triable issues of fact on each of the following four points.

1. Harvard Breached the 2013 Research Integrity Policy.

Gino had a reasonable expectation that Harvard would adhere to the 2013 Research Integrity Policy, which by its terms describes what steps HBS would follow in response to an allegation over research integrity. Pl. SAMF ¶ 186. As Harvard concedes, this policy had overall

[5] Defendants offer Mr. Ackert's expert report is only for a limited purpose, that is, to attempt to show that this expert told Harvard certain information that gave Harvard a legitimate basis for its counterclaim. See Def. SOF ¶¶ 140-41, 165.

requirements of thoroughness, fairness, and objectivity. Def. Br. at 22. The allegations against Gino were made when the 2013 Research Integrity Policy was still in effect, but Harvard created a new "Interim Policy" instead to apply just to Gino. Pl. SAMF ¶¶ 189-90, 193, 195. A jury could find that Harvard's *ex post facto* application of the Interim policy harmed Gino because, *inter alia*, unlike the 2013 Research Integrity Policy, the Interim Policy (1) had strict confidentiality provisions limiting Gino's ability to collect evidence or interview potential witnesses to defend herself, Pl. SAMF ¶¶ 191, 307-11, 313-15, and (2) contained a two-adviser limitation that prevented Gino from being able to retain a forensic expert or other consultants or experts to aid her defense. Pl. SAMF ¶¶ 305-06.

2. <u>Harvard Breached Interim Policy Provisions, Including those Cited By Defendants.</u>

There are triable issues on each of the policy violations Harvard lists, Def. Br. 23–27, and others that Harvard did not specify. In order of Harvard's presentation:

**(1) Delayed notification to Gino**. The jury could find that HBS learned of the allegations against Gino in July 2021; and the Research Integrity Officer (Bonacossa) [redacted]. Pl. SAMF ¶¶ 181-83. As the Dean's office negotiated a secret deal with Data Colada to prevent Data Colada from immediately publishing allegations against Plaintiff, <u>Id</u>. ¶¶ 198, Bonacossa [redacted] <u>Id</u>. ¶¶ 199-200. By October 4, 2021—[redacted] Id. ¶ 200. Bonacossa did not apprise Gino of the investigation until October 27, 2021. Def. SOF ¶ 30.

**(2) Failure to collect and preserve data**. Harvard's statement of the RIO's duty is incomplete. Bonacossa had a duty to obtain custody of all research records and evidence needed

for the proceeding at the outset of the inquiry and at the outset of the investigation; and his duty was *continuing*: to sequester "**any additional research records that become pertinent to an inquiry or investigation after the initial sequestration**." Pl. SAMF ¶ 220 (emphasis added). With respect to *Gino's* data, the RIO failed to [redacted] Pl. SAMF ¶¶ 222-30. The RIO [redacted] Pl. SAMF ¶¶ 231-36.

(3) **Gag Order on Gino**. The Interim Policy's confidentiality restrictions prevented Gino from revealing the existence of the investigation or discussing specific facts relevant to the allegations. Pl. SAMF ¶¶ 191, 307-11, 313-15. The Investigation Committee (by contrast) could reveal this information to potential witnesses. Pl. SAMF ¶ 307. Gino avoided contacting third parties, and to the extent she did, she was very limited in what she could ask or say to avoid breaking these rules. Gino could not control (and was not contemporaneously aware of) the Investigation Committee's choices regarding witness interviews or evidence acquisition. Pl. SAMF ¶ 312. The confidentiality restrictions against Gino violated the Interim Policy's requirements of fairness.

**(4) Six-Year Statute of Limitations/ "Subsequent Use" exception**. The language of the policy is ambiguous and should be construed against HBS, the drafter. <u>See</u>, <u>e.g.</u>, <u>James B. Nutter & Co. v. Est. of Murphy</u>, 478 Mass. 664, 669 (2018). So construed, it requires a citation to be "for the potential benefit of" the author to constitute a "continued or renewed" act of research misconduct. <u>See</u> Def. SOF ¶ 31. The jury could find that [redacted]

[redacted], Pl. SAMF, ¶¶ 211-13, which is an absurd reading that allows the exception (subsequent use) to swallow the rule (untimeliness of allegations more than 6 years old). Moreover, the jury could find that a [redacted]. Pl. SAMF ¶¶ 217-19. The jury could find HBS applied its policy more expansively to Gino due to pressure from Data Colada.

(5) **Two-Adviser Limitation**. There is a factual dispute, because Gino has testified that Bonacossa did tell her she could not retain a forensic expert because she used up her limit of two advisers under the policy. Pl. SAMF ¶ 305.[6] HBS's limit violated the obligation of fairness because it was difficult for Gino to investigate the data evidence, and difficult for her to understand the reports of HBS's expert (Maidstone) without forensic expert assistance, so she was not able to provide forensic expert responses to the allegations during the investigation. Pl. SAMF ¶¶ 300-03, 305-06.

(6) **The Investigation Committee's Reversal of the Burden of Proof**. This point is twofold. First, the jury could find that the Investigation Committee placed the burden on Gino to prove that the data differences it observed (a) were not made by Gino, rather than HBS proving Gino had introduced them and (b) were not intentional misconduct, rather than HBS having the burden to prove Gino changed data intentionally, knowingly, or recklessly. Second and more specifically, the jury could find that HBS improperly placed the burden to prove "honest error" on

[6] HBS's claim that Gino could avoid this limit by having experts be retained by her counsel is disingenuous in the extreme; she reasonably understood the limit would have barred this as well. Gino's consultation with a second lawyer was brief and discrete and entirely beside the point, since the prejudice arose from lack of forensic expert help.

Gino when the burden was on HBS to prove the data differences were *not* products of honest error.[7] In criminal law the defendant cannot be assigned the burden to negate the existence of an element of the crime, since that would relieve the prosecution of its burden of proof. Smith v. United States, 568 U.S. 106, 110 (2013); see also Mullaney v. Wilbur, 421 U.S. 684 (1975). Construing the Interim Policy against HBS as the drafter, and in the light of these precepts, "honest error" is necessarily a negation of the intent element of the offense of research misconduct and not a true "affirmative defense." HBS wrongly flipped the burden of proof to Gino when it claimed she had the burden to prove "honest error," and it is undisputed that HBS considered this to be Gino's burden. Pl. SAMF ¶¶ 245-47.

The jury could find that the Investigation Committee ignored evidence that errors could have been introduced by RA's, and refused to acknowledge the inadequacy of the forensic record, much of which was very old and incomplete. Pl. SAMF ¶¶ 247-57, 299.

**(7) Failure to Specify Intent**. It is undisputed that the Investigation Committee's intent findings were phrased "intentionally, knowingly, or recklessly." Def. SOF. ¶ 103. This boilerplate is not a specific finding of intent, and underscores that HBS placed the burden on Gino to disprove her bad intent rather than specifically supporting its finding.

**(8) Harvard Failed to Maintain Confidentiality.** The jury could find that after Dean Datar negotiated a secret deal with Data Colada, Pl. SAMF ¶¶ 198, 200, the RIO [redacted]

---

[7] The Interim Policy is self-contradictory, since it says "honest error" is an affirmative defense, but it also says HBS bears the burden to prove "research misconduct," and defines "research misconduct" to mean intentional, knowing, or reckless conduct that is *not* honest error. Pl. SAMF ¶¶ 241-42. "Honest error" can't be an affirmative defense if it is a negation of the elements of the offense, as explained below.

[redacted], Pl. SAMF ¶ 291, but rather [redacted]. Pl. SAMF ¶¶ 274-77. Then, the RIO [redacted]. Id. ¶¶ 278-82. [redacted] Pl. SAMF ¶ 283. HBS's publication of "administrative leave" on Gino's website profile was an unnecessary disclosure to the entire world that was timed to coincide with Data Colada's blog post and was, *de facto*, tantamount to publicly announcing that it had found Gino 'guilty' and punished her. Pl. SAMF ¶ 339.

3. <u>Harvard Breached the Overall Requirement of Thoroughness, Including Examination of all Significant Issues and Leads.</u>

The jury could find that the Investigation Committee failed to meaningfully investigate the possibility that errors had been introduced to the datasets by RAs even after learning that RAs cleaned and prepared the data. Pl. SAMF ¶¶ 231, 236, 247-57. The Investigation Committee only interviewed two RAs and did not meaningfully gather documents from any RAs aside from a few emails. <u>Id</u>. ¶ 236. The RIO [redacted] Pl. SAMF ¶ 294; <u>see</u> <u>id</u>. ¶¶ 198-200, 274-82.

4. <u>Harvard Breached the Overall Requirements of Fairness and Objectivity, and that the Investigation be Impartial and Unbiased.</u>

Above all, the jury could find that HBS conducted the investigation unfairly. The RIO, [redacted]

[redacted] Pl. SAMF ¶¶ 274-82. [redacted]. Pl. SAMF ¶¶ 285-95, 324.

5. Harvard's False Defenses Reveal its Broken Process.

Finally, it is telling that Harvard attempts to defend its process based on false and disputed factual claims. The jury could find that Harvard and Dean Datar have falsely denied their secret deal with Data Colada. Pl. SAMF ¶¶ 198-200, 321. The jury could find HBS is falsely misrepresenting when Bonacossa learned of the research misconduct allegations and falsely denying his extensive communication with them. Pl. SAMF ¶¶ 183, 199, 274-82, 325. The jury could find that HBS falsely misrepresents the RIO's evidence-gathering failures, Pl. SAMF ¶¶ 222-25, 230; falsely claims Plaintiff was not prevented from hiring a forensic expert, Id. ¶ 305, and falsely claims Plaintiff was not limited in her ability to gather information and evidence from potential witnesses, Id. ¶¶ 308-15.

Harvard misleadingly claims that Gino had "multiple opportunities … to provide information and responses." Def. Br. 23. But the investigation was conducted *by the RIO and Investigation Committee*, not Gino; Gino did not know what they were doing and was not asked for feedback about how they conducted their investigation; Gino was asked merely to provide discrete information or documents from time to time (which she did); and when Gino received the forensic reports she had little time to review them and no expert help. See Ex. 176 (Gino Decl.) ¶¶ 12–14; Pl. SAMF ¶¶ 232, 303, 312. Harvard also misleadingly claims that "Plaintiff never informed the RIO that there were any relevant data that she was aware of but had not provided." Def. Br. 24. The jury could find this to be a deliberately misleading attempt to blame Gino for the

RIO's evidence gathering failures. See Ex. 176 (Gino Decl.) ¶¶ 12–14. The RIO falsely told Gino that he had made a forensic copy of her entire computer, and never asked Gino to identify all of the "relevant" data, as he later falsely claimed under oath. See id.; Pl. SAMF ¶¶ 222-25, 230. The RIO [redacted]. See Pl. SAMF ¶¶ 285, 238-40, 417-19.

### E. A Reasonable Jury Could Find that Harvard Breached the Third Statute Procedures.

The Third Statute Procedures also contain an overall requirement of fairness, that is, that the procedures provide a full hearing with fair representation before an impartial tribunal. Ex. 1 at p. 3 ¶ 13. The jury could find that Harvard violated this general precept and several specific provisions of the Third Statute Procedures:

| Third Statute Procedures Provisions | Evidence |
|---|---|
| "Every possible effort will be made to obtain the most reliable evidence available." Ex. 1, p. 6 ¶ 10 (emphasis added).<br><br>"[t]he Hearing Committee will evaluate all available evidence and rest its recommendation upon the evidence in the record." Ex. 1, p. 5 ¶ 1.<br><br>"The findings of fact and the decisions will be based solely on the hearing record." Ex. 1, p. 6 ¶ 11. | The Hearing Committee [redacted]. Pl. SAMF ¶¶ 370-72. Harvard's argument that it [redacted] Def. Br. at 21, is no answer to the failure to "obtain" the most reliable evidence available.<br><br>The jury could find that HBS successfully biased the Hearing Committee [redacted]. Pl. SAMF ¶¶ 385-86. |
| "[t]he parties will be afforded an opportunity to obtain necessary witnesses and administrative officers of the University will, insofar as it is possible for them to do so, seek to secure the cooperation of such witnesses." Ex. 1, p. 6, ¶ 8 (emphasis added). | Multiple witnesses [redacted] Pl. SAMF ¶¶ 373, 402. The jury could find Harvard was at fault [redacted]. Id. ¶ 339. |

| | |
|---|---|
| "…the Hearing Committee shall serve the … Respondent … notice of hearing with specific charges in writing at least 20 days prior to the hearing."<br>Ex. 1, p. 5 ¶ 1 (emphasis added).<br><br>"The Hearing Committee will grant adjournments to enable either party to investigate evidence as to which a valid claim of surprise is made."<br>Ex. 1, p. 6 ¶ 7. | The process calls for the hearing to be based on the specific charges in the complaint. Pl. SAMF ¶ 375.<br><br>But the Hearing Committee allowed HBS to abandon many of the allegations of the Third Statute Complaint, including all material points for Allegation 2 and multiple theories of misconduct for Allegation 3; and to [redacted] Pl. SAMF ¶¶ 380-83.<br><br>Gino presented a valid claim of surprise as to [redacted] differed significantly from the case as it had been presented by the Third Statute Complaint, which was based on the Investigation Committee Report. See id. Gino had spent over a year preparing to defend one case and made numerous litigation choices based on that premise. See id. ¶ 381 The Hearing Committee [redacted]. See id. ¶¶ 382-83.<br><br>Moreover, the Hearing Committee [redacted]. Id. ¶¶ 376-79. |
| "The burden of proof … that there has been grave misconduct or neglect of duty (as contemplated by the Third Statute of the University) rests with the Complainant and shall be satisfied only by clear and convincing evidence in the record considered as a whole."<br>Ex. 1 at 6–7 ¶ 6. | The jury could find that HBS did not carry its burden of proof for the reasons described above with respect to "grave misconduct," see Pl. SAMF ¶¶ 243, 259-70, 299 and as further detailed, allegation by allegation, in Pl. SAMF § IX (¶¶ 387–479). |

F. A Reasonable Jury Could Find that Harvard Breached the Tenure Agreement by Effectively Revoking Plaintiff's Tenure prior to the Tenure Revocation Proceedings.

Additionally, a reasonable jury could find that the sanctions Harvard imposed on Gino in 2023 (see Def. SOF ¶ 121) were tantamount to revoking her tenure, and that by imposing these

sanctions before following the required Third Statute Procedures for tenure revocation, Harvard breached Gino's contractual tenure protections.[8] Though Harvard claims it did not formally revoke Gino's tenure until 2025, Def. Br. at 20, it makes little sense to contend that Harvard could remove nearly all of the substantive trappings of Gino's employment two years earlier without following the required process for terminating her employment; this would reduce "tenure" to a meaningless label and exalt form over substance. See ECF No. 74 at 16-17.

The sanctions Dean Datar imposed (see Ex. 29) not only cut off Gino's income but prohibited her from using Harvard resources to teach, research, mentor, or advise; banned her from campus; removed her email and other electronic resources; and revoked her named professorship. These sorts of sanctions have been held sufficient in a line of cases in Massachusetts and elsewhere to support a claim of constructive discharge, since the employee's loss of authority and other trappings of their employment is severe enough to effectively be a termination. See Rubin v. Household Com. Fin. Servs., Inc., 51 Mass. App. Ct. 432, 441-42, 445–46 (2001).[9] Further, the facts show that Dean Datar [redacted]. Pl. SAMF ¶ 338. Courts have also found lengthy unpaid leave periods with little hope of returning to work to support claims of constructive discharge. Wilson v. Columba Gas of Penn., 676 F. Supp. 3d 424, 440 (W.D. Penn. 2023); Bright-Asante v. Saks & Co., Inc., 242 F. Supp. 3d 229, 243-44 (S.D.N.Y. 2017).

It follows that a jury could find Dean Datar's sanctions tantamount to terminating Gino's employment, and that this was an improper end-run around the protections of the Third Statute

---

[8] This jury issue is presented whether or not Harvard properly revoked Gino's tenure in 2025.

[9] Harvard's cited case, *Haegert v. Univ. of Evansville*, is not instructive, since the sanctions here were far broader than a campus ban alone. Def. Br. at 20.

and Third Statute Procedures. Dean Datar did not have "authority under the applicable policies to impose these sanctions," Def. Br. 20, because the Third Statute by its terms supersedes any policies "inconsistent" with it, See Ex. 4 at 3, and Dean Datar [redacted] . Pl. SAMF ¶¶ 336, 342.

## II. The Jury Could Find a Breach of the Implied Covenant.

Harvard addresses only Plaintiff's claim that it breached the implied covenant when it adopted the Interim Policy. Def. Br. 28-29. The essential inquiry for the implied covenant claim is whether the manner of performance of a contract conformed to the parties' reasonable understanding of their performance obligations in light of the spirit of the bargain. Speakman v. Allmerica Financial Life Ins., 367 F. Supp. 2d 122, 132 (D. Mass. 2005). It is not necessary to show a breach of an express contractual provision, Id., nor is it necessary to affirmatively show bad faith, contrary to Harvard's claim that Plaintiff must show a "wrongful reason." Robert & Ardis James Found. v. Meyers, 474 Mass. 181, 189 (2016); cf. Def. Br. at 29. The jury could find that Harvard (1) adopted the Interim Policy *ex post facto*, after learning of the allegations and after making a secret deal with Data Colada; and (2) that it was different from the 2013 Research Integrity Policy in ways that prejudiced Plaintiff. See Pl. SAMF ¶¶ 186-89, 191, 193, 195-96; 305, 311, 313. This claim should survive.

The jury could also find that Harvard breached the implied covenant in its application of the Third Statute Procedures, since Harvard unfairly limited the evidence and allowed the complainant to unfairly surprise Plaintiff shortly before the hearing with a new case. See Pl. SAMF ¶¶ 376, 380-83. Further, the jury could find that Harvard breached the implied covenant, if not the Third Statute and Third Statute Procedures themselves, by taking actions against Gino tantamount

to tenure revocation in 2023, See Def. SOF ¶ 121, without having first followed the tenure revocation process. See Pl. SAMF ¶¶ 188, 336, 342.

## III. Plaintiff Has Presented a Trial Worthy Claim for Sex Discrimination

Defendants' motion for summary judgment should also be denied with respect to Plaintiff's claim for sex discrimination under Title VII and Chapter 151B.

As an initial matter, Plaintiff's lack of "certainty" as to whether gender played a role in the adverse actions taken against her is wholly irrelevant. Whether the evidence presents a trial worthy claim of sex discrimination is governed by the three-step burden-shifting framework established under McDonnell Douglas. 411 U.S. at 802–804, 93 S.Ct. 1817.

Defendants correctly note that there are differences between how the three-step burden is applied under 151B and Title VII. Def. Br. at 10, n. 6. In particular, Massachusetts law does not require any showing of a "causal connection" between the adverse action and the plaintiff's gender to establish a *prima facie* case. See Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 474 Mass. 382, 396 (2016). Further, Massachusetts is a "pretext only" jurisdiction, meaning that evidence of pretext provides a legally sufficient basis for a jury to infer discriminatory animus. Id. Importantly, this does not require evidence that all of the employer's reasons are false. Lipchitz, 434 Mass. at 506–07. If even just one of the employer's stated reasons could be found false, "the fact finder could infer that [the employer's] discriminatory animus was the determinative cause of the adverse employment decision." Id.

While these differences generally make Chapter 151B the more plaintiff-friendly standard, the differences between the two likely make no difference here. In seeking summary judgment, Defendants' train their argument on two common factual issues: (i) whether Plaintiff "met Harvard's legitimate expectations" and (ii) whether there is sufficient evidence for a jury to

conclude that the adverse actions taken against Plaintiff were because of her sex. For the reasons that follow, there is a trial worthy dispute on both issues.

To begin, a reasonable jury could conclude that Plaintiff did not engage in any data falsification or other "grave misconduct." This is the only reason that Harvard claims Plaintiff did not meet "Harvard's legitimate expectations." And as discussed above, Harvard has not presented any argument or evidence that would justify taking this issue from the jury.

With respect to discriminatory animus, the record is replete with evidence from which a jury could conclude that Plaintiff has met her burden.

First, Defendants' numerous deviations from and breaches of their established policies and procedures—as catalogued above—is evidence from which discriminatory animus can be inferred. Kouvchinov v. Parametric Tech. Corp., 537 F.3d 62 (1st Cir. 2008) ("Pretext can be demonstrated through a showing that an employer has deviated inexplicably from one of its standard business practices."); Downey v. Johnson, 104 Mass. App. Ct. 361, 378-79 (2024): Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 687-88 (2016); see also Hanners v. Trent, 674 F.3d 683 (7th Cir. 2012) ("unexplained or systematic deviations from established policies or practices can no doubt be relative and probative circumstantial evidence of discriminatory intent."). As the First Circuit has explained, "The rationale is that if an employer has a policy or procedure that governs a specific situation but fails to adhere to the same in taking an adverse employment action against an employee, then it might be inferred that the reason articulated for taking the adverse employment action against the employee was not true." Rodriguez-Cardi v. MMM Holdings, Inc., 936 F.3d 40 (1st Cir. 2019). Relying on these principles, courts often point to an employer's policy deviations as grounds for denying summary judgment. Venable v. T-Mobile USA, Inc., 603 F. Supp. 2d 211 (D. Me. 2009) (denying SJ when evidence allowed jury to find that employer had not followed

progressive discipline policy); Banks v. Gen. Motors, LLC, 81 F.4th 242, 274 (2d Cir. 2023) (noting that a jury could find the decision to fire a pregnant employee outside of the normal firing process to be evidence of discriminatory intent).

Second, evidence that Defendants have historically subjected women to less favorable treatment than men is also probative of discriminatory animus. Knight v. Avon Products, Inc., 438 Mass. 426 n.9 (2003) (noting that negative treatment of employees in the same protected category may be used to establish that an employer's articulated non-discriminatory rationale is merely a pretext for unlawful discrimination). Here, the record contains evidence that Harvard has historically favored men over women when it comes to making promotion decisions. Pl. SAMF ¶¶ 326-28. Similarly, there is evidence that Dean Datar has personally engaged in a pattern of disfavoring women professionally. Pl. SAMF ¶¶ 327, 329.

Third, unlawful animus may be inferred because Harvard treated allegations of misconduct by male professors differently than the allegation of misconduct against Plaintiff. See Davignon v. Hodgson, 524 F.3d 91, 107 (1st Cir. 2008) (differences in investigating Plaintiff as compared to her coworkers). This evidence includes Harvard's past practice of applying its existing policies with respect to allegations against men, as well as [redacted] Pl. SAMF ¶¶ 196, 283, 330-32; Pl. Resp. SOF ¶¶ 60–61.

Fourth, unlawful animus may be inferred from the numerous false and inconsistent statements made by Dean Datar and other Harvard leaders. See Haddad v. Wal-Mart, 455 Mass. 91, 96, 97-98 (2009) ("Wal-Mart employees gave inconsistent reasons for plaintiff's termination and were also inconsistent regarding who was responsible for the decision"); Cormier v. Pezrow New England, Inc., 437 Mass. 302, 308-309 (2002) (employer submitted false testimony about the extent of layoffs and the financial need for layoffs). As detailed in Plaintiff's Statement of

Additional Facts, a reasonable factfinder could conclude that Dean Datar, Dean Cunigham, RIO Bonacossa and Professor Amabile all made false statements under oath in connection with this matter. Pl. SAMF ¶¶ 240, 321-25.

And fifth, evidence of unlawful animus can be found based on the gender biased logic of at least one member of the Investigation Committee, who [redacted]. Pl. SAMF ¶¶ 334-35.

In assessing this evidence of unlawful animus, it is important to note that Plaintiff need not show that each decision—or decision maker—was directly motivated by discriminatory animus. Under the "cat's paw" or "innocent pawn" theory of liability, a corporation is held liable for discrimination even though the ultimate decisionmaker may not have been motivated by (or even aware of) any unlawful animus. Staub v. Proctor Hosp., 562 U.S. 411, 422 (2011); Bulwer v. Mount Auburn Hosp., 473 Mass. 672 (2016). The SJC's decision in Bulwer offers a prime example. In that case, the ultimate decision-maker was an "ad hoc committee" that considered information from a variety of sources—including the plaintiff himself—before determining that there were sufficient deficiencies in his performance to warrant termination. While there was no evidence to suggest that the ad hoc committee itself had been motivated by unlawful animus, it had relied on information from sources whose "motives have been impugned." Those motives, the SJC recognized, could therefore "be treated as the motives for the decision." Bulwer, 473 Mass. at 688 (quoting Trustees of Forbes Library v. Labor Relations Comm'n, 384 Mass. 559, 569–570 (1981)). See also Adams, 492 Mass. at 284-285 ("even if [the decisionmaker] were the sole decision maker for which particular employees would be [laid off] and the innocent pawn of an undisclosed

corporate strategy tainted by unlawful discriminatory animus, a rational fact finder could conclude that the [reduction in force] was unlawful.”).

Based on the evidence here, a reasonable factfinder could readily apply the “cat’s paw” theory of liability to any of the adverse actions claimed by Plaintiff. See e.g., Ex. 145, [redacted] For example, even if the individuals who made the ultimate decision to revoke Plaintiff’s tenure were not motivated by discriminatory animus, their reliance on discriminatory actions that preceded their decision—such as the Defendants’ not following the 2013 Policy and subjecting Plaintiff to an unfair investigation—is enough to impugn the motives of the revocation decision itself. See Tuli v. Brigham & Women's Hosp., Inc., 566 F. Supp. 2d 32 (D. Mass. 2008), aff'd sub nom. Tuli v. Brigham & Women's Hosp., 656 F.3d 33 (1st Cir. 2011) (finding that sexist remarks, characterizations, and representations by doctor “tainted” the decision made by the committee to limit plaintiff’s hospital privileges and granting preliminary injunction).

Lastly, Plaintiff’s claim against Dean Datar under Chapter 151B should also survive summary judgment, as Massachusetts provides for individual liability of the decision-makers who engaged in the discriminatory conduct. See Beaupre v. Cliff Smith & Assocs., 50 Mass. App. Ct. 480, 490–92 (2000). The prototypical example where such liability exists is a supervisor who sexually harasses a subordinate. Under Chapter 151B § 4(16A), the employer is held liable for sexual harassment under a theory of *respondeat superior*, and under Chapter 151B § 4(4A) the supervisor is held liable for “interference.” See McLaughlin v. City of Lowell, 84 Mass. App. Ct. 45, 74, 992 N.E.2d 1036, 1058 (2013) (explaining that “§ 4(4A) is best understood as a device

through which an individual falling outside the scope of the definition of 'employer' may otherwise be liable for conduct which the antidiscrimination statute aims to prevent.").

As detailed above, Dean Datar was the primary decision-maker with respect to many of the adverse actions taken against Plaintiff, see Pl. SAMF ¶ 194, 198, 338, and there are numerous facts from which unlawful animus may be inferred. See e.g., Pl. SAMF ¶¶ 321-22, 327, 329. Accordingly, Plaintiff has presented a trial-worthy claim against Dean Datar under Chapter 151B § 4(4A), which must be decided by a jury.

## IV. Summary Judgment Should be Denied on Plaintiff's Title IX Claim

Plaintiff's claim under Title IX must be decided by a jury for the same reasons as her claims under Chapter 151B and Title VII. As detailed above, a jury could properly infer that Plaintiff was treated differently from her male counterparts, Pl. SAMF ¶¶ 195-96, 283, 326-35, and that these actions were motivated by discriminatory bias.

## V. There is Trial Worthy Claim for Retaliation

A trial worthy claim also exists for retaliation under Chapter 151B and Title VII. Plaintiff engaged in protective conduct by filing claims against Harvard for sex discrimination. Shortly after Plaintiff did so, Harvard subjected Plaintiff to an unfair tenure revocation process that repeatedly breached her contractual rights as an employee. See Supra, § I(E). These breaches are an "adverse action" as a matter of law. See Hishon v. King & Spalding, 467 U.S. 69, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984). And the proximity between Plaintiff's protected activity and the contractual breaches is enough to support a finding that there is a causal nexus between the two. See Mole v. Univ. of Massachusetts, 442 Mass. 582, 592 (2004) ("if adverse action is taken against a satisfactorily performing employee in the immediate aftermath of the employer's becoming aware of the employee's protected activity, an inference of causation is permissible."). This is particularly true given the evidence that Harvard [redacted]

[redacted]. Pl. SAMF ¶¶ 385-86. Moreover, Harvard offers no “legitimate non-discriminatory reasons for its conduct.

Accordingly, summary judgment should be denied.

## VI. Declaratory Judgment.

As Plaintiff previously argued, ECF No. 130, it is possible that the jury could ultimately rule in Plaintiff’s favor on her contractual claim in a way that does not fully resolve whether grave misconduct existed, e.g., by finding that Harvard breached Plaintiff’s procedural rights. That would leave open the question whether or not Plaintiff’s tenure could be revoked if the Third Statute Procedures were observed properly. Declaratory relief could answer this by resolving whether “grave misconduct” occurred. To that extent the count is not duplicative nor would the relief it seeks be backward-looking. Cf. Metro. Prop. & Liab. Ins. Co. v. Kirkwood, 729 F.2d 61, 61 (1st Cir. 1984) (declaratory judgment is appropriate when it would relieve the uncertainty underlying a dispute and expedite its resolution). Hence, there is no reason to dismiss this claim.

## CONCLUSION

For the reasons set forth above, summary judgment should be denied.

Dated: August 21, 2026

Respectfully submitted,

Plaintiff Francesca Gino,
by her attorneys,

*/s/ Hampton M. Watson*

Patrick J. Hannon (BBO# 664958)
Hampton M. Watson (BBO #705983)
Hartley Michon Robb Hannon LLP
101 Federal Street, Suite 1810
Boston, MA 02110
Telephone: (617) 723-8000
Facsimile: (617) 447-2800
phannon@hmrhlaw.com

hwatson@hmrhlaw.com

*Attorneys for Plaintiff Francesca Gino*