# EXHIBIT 37

Metafor

# Expert Report of

## Michael F. McGowan

*Gino v. President and Fellows of Harvard College, et. al.*

May 27, 2026

## TABLE OF CONTENTS

I. Engagement Background .......... 1
II. Summary of Opinions .......... 5
III. Background of Metafor LLC .......... 10
IV. Materials Considered .......... 12
V. Methodology .......... 15
A. Forensic Preservation .......... 16
B. Identification of Versions of Datasets at Issue .......... 17
C. Comparison of Datasets .......... 23
D. Searches for Other References to Datasets or Results .......... 24
VI. There are Significant Gaps in the Available Digital Forensic Evidence .......... 27
A. HBS's Incomplete Preservation Resulted in Lost Evidence .......... 31
B. HBS Failed to Identify Relevant Evidence Until After the Investigation Concluded .......... 33
VII. Maidstone's Comparisons Do Not Establish Who Modified the Datasets .......... 34
A. HBS Relied on a Methodologically Unsound Approach .......... 35
B. HBS's Subsequent Searches Were Incomplete .......... 39
C. Proper Approach to Examining Data Modifications .......... 41
i. Metadata Overview .......... 42
ii. Metadata Limitations .......... 44
iii. Interpreting Author and Last Saved By Metadata .......... 47
D. Maidstone's Unsupported Assertions about Who Modified the Allegation 3 Data .......... 49
VIII. HBS's Assertion That There Was a "Clear Progression" in the Editing of the Datasets Does Not Fit the Facts. .......... 51
A. HBS's Conclusion Vastly Overstates Forensic Evidence .......... 52
B. Others Worked With At Least Three of the Four Datasets .......... 53
IX. Allegation 1 .......... 53
A. Background of Study .......... 53
B. Harvard's Allegation .......... 55
C. Available Data .......... 55
D. Chronology .......... 56

E. Digital Forensic Analysis ..... 59

i. Under HBS's Theory, Dr. Gino Would Have Had Only 10 or 12 Minutes to Prepare the Study 3A Spreadsheet ..... 66

ii. The Unavailable R Version Is Crucial for Understanding How the Modifications Were Introduced ..... 68

iii. Evidence Suggests that Dr. Gino Did Not Clean the Qualtrics Data Herself ..... 70

iv. Hearing Committee's Conclusion Misstated the Evidence ..... 72

X. Allegation 2 ..... 73

A. Background of Study ..... 73

B. Harvard's Allegation ..... 75

C. Available Data ..... 75

D. Chronology ..... 76

E. Digital Forensic Analysis ..... 79

i. Harvard Class Years are Present in Original Dataset ..... 80

ii. Maidstone Acknowledged in Later Analysis that its Main Finding concerning Allegation 2 Was Incorrect—the Published Data for Allegation 2 Does, in Fact, Derive from the Qualtrics Survey Data ..... 84

iii. HBS's Assertion of a "Clear Progression" in the Editing of the Datasets is Overstated ..... 87

iv. Wrong Participant Count ..... 91

v. A Modified Data Point Was Later Excluded ..... 92

vi. The Hearing Committee Ignored Pre-November Work ..... 93

XI. Allegation 3 ..... 94

A. Background of Study ..... 94

B. Harvard's Allegation ..... 96

C. Available Data ..... 97

D. Chronology ..... 98

E. Digital Forensic Analysis ..... 104

i. Changes to Four RAT_Perf Values ..... 106

ii. Changes to Rule-Following Scores ..... 109

iii. Modifications to Newspaper Uses ..... 111

a. Coding of Uses Tasks in December 2012 ..... 111

b. Unknown Source of UsesTask Coding in July 2013 Spreadsheet ..... 112

c. Swaps in UsesTask Values ..... 113

d. Coding by Ms. Sweeny ..... 116

e. Changes to UsesTask Data After Ms. Sweeny's Coding ... 117

XII. Allegation 4A ... 120

A. Background of Study ... 120

B. Harvard's Allegation ... 122

C. Available Data ... 122

D. Chronology ... 124

E. Digital Forensic Analysis ... 130

i. First Draft of the Academic Paper is Not Available ... 130

XIII. Allegation 4B ... 132

A. Background of Study ... 132

B. Harvard's Allegation ... 132

C. Available Data ... 132

D. Chronology ... 134

E. Digital Forensic Analysis ... 136

i. The Available Evidence Is Insufficient to Fully Evaluate This Allegation ... 136

XIV. Conclusion ... 140

## I. ENGAGEMENT BACKGROUND

1. Metafor was retained by Hartley Michon Robb Hannon LLP on behalf of Dr. Francesca Gino to conduct a digital forensic analysis of (i) Dr. Gino's laptop computer and other devices; and (ii) other materials provided by Harvard. The work is in connection with the *Gino v. President and Fellows of Harvard College, et. al.* matter pending in U.S. District Court in Boston. The third amended complaint in this matter was filed after the conclusion of a tenure revocation proceeding at Harvard University, *In the Matter of Professor Francesca Gino*, arising from five allegations by Harvard Business School ("HBS") that Dr. Gino falsified or fabricated research results. Metafor was previously retained by Dr. Gino's counsel in the Third Statute Proceeding and I submitted an expert statement and offered testimony before the Hearing Committee.

2. HBS's first allegation concerned the Study 3A dataset for "Why connect? Moral consequences of networking with a promotion or prevention focus," an academic paper by Dr. Gino, Professor Maryam Kouchaki of Northwestern University, and Professor Tiziana Casciaro of the University of Toronto. The paper was published in the *Journal of Personality and Social Psychology* ("JPSP") on June 18, 2020. The paper considers professional networking, which the authors note makes some people feel morally impure. The study in question tested whether one's attitude towards networking affects how morally impure one feels about it, and how much one engages in networking. HBS alleged: "Dr. Gino falsified and/or fabricated the dataset for

Study 3a in the 2020 JPSP Paper by altering observations to affect the significance of findings of the study in the hypothesized direction."[1]

3. HBS's second allegation concerned the Experiment 4 dataset for "The moral virtue of authenticity: How inauthenticity produces feelings of immorality and impurity," an academic paper by Dr. Gino, Professor Kouchaki, and Professor Adam Galinsky of Columbia University. The paper was published online in *Psychological Science* on May 11, 2015. The study in question tested whether participants who had to advocate for positions that were inconsistent with their personal beliefs felt unclean afterwards. HBS alleged: "Dr. Gino falsified and/or fabricated portions of the datasets for Study 4 in the 2015 Psychological Science Paper by altering, adding, or deleting a number of observations. These changes resulted in significant effects supporting the hypotheses, as reported in the published paper. Analyses of the original Qualtrics data do not support the hypotheses."[2]

4. HBS's third allegation concerned the Experiment 4 dataset for "Evil Genius? How Dishonesty Can Lead to Greater Creativity," an academic paper by Dr. Gino and Scott Wiltermuth of the University of Southern California. The paper was published online in *Psychological Science* on February 18, 2014. The paper asserted that dishonesty and creativity both involve breaking rules.[3] HBS alleged: "Dr. Gino falsified and/or fabricated data within the datasets for Study 4 in the 2014 Psychological Science Paper."[4]

[1] Third Statute Proceeding Complaint, *In the Matter of Francesca Gino* (hereinafter, "Compl.") at ¶ 13.
[2] Compl.at ¶ 14.
[3] CX 33 (2014 Psychological Science Paper), at Harvard0000011172.
[4] Compl.at ¶ 15.

5. HBS's fourth allegation (Allegation 4A) concerned the Study 1 dataset for "Signing at the beginning makes ethics salient and decreases dishonest self-reports in comparison to signing at the end," an academic paper by Dr. Gino, Lisa Shu of Northwestern University, Nina Mazar of the University of Toronto, Dan Ariely of Duke University, and Max Bazerman of Harvard University. The paper was published online in the *Proceedings of the National Academy of Sciences* ("PNAS") on August 27, 2012. The paper argued that having people sign at the beginning rather than the end of a form, such as an expense report or tax form, reduces dishonesty.[5] HBS alleged: "With respect to Study 1 in the 2012 PNAS Paper: a) Dr. Gino falsified and/or fabricated the results by removing or altering parts of the descriptions of study procedures from drafts of the manuscript submitted for publication, thus misrepresenting the study procedures in the final publication. The original procedure descriptions (subsequently removed or altered by Dr. Gino) pointed to a significant flaw in the execution of the data collection for Study 1, which called into question the validity of the study results."[6]

6. HBS's fifth allegation (Allegation 4B) concerned the same paper and study that were at issue in Allegation 4A. HBS alleged: "b) Dr. Gino falsified and/or fabricated the original dataset by altering a number of observations in a way that favored the hypothesized results."[7]

7. The allegations against Dr. Gino were first examined by an HBS Investigation Committee, which found that all five allegations were substantiated by a

[5] CX 42 (PNAS 2012 Paper), at 15197 (F.R. at 310).
[6] Compl.at ¶ 16.
[7] *Id.*

preponderance of the evidence. The Investigation Committee made its findings in part based on forensic analyses performed by the Maidstone Consulting Group ("Maidstone"). Maidstone analyzed files provided by HBS and noted modifications to data values between early versions and the final versions of the datasets at issue. Maidstone also performed statistical analyses to determine the results of the studies if the computations had been performed based upon the unmodified data values and compared those results with the published results to determine the statistical effect of the modifications.

8. HBS Dean Srikant Datar accepted the recommendations of the Investigation Committee and convened a tenure revocation proceeding pursuant to the Third Statute of the University Statutes: "All Officers who hold teaching appointments, as defined from time to time by the Corporation with the consent of the Overseers, are subject to removal from such appointments by the Corporation only for grave misconduct or neglect of duty."[8] After reviewing the record and hearing testimony, the Hearing Committee for the Third Statute Proceeding concluded that Dr. Gino "committed research misconduct in connection with each of the four studies at issue" and recommended her tenure be revoked.[9] In May 2025, the Harvard Corporation revoked Dr. Gino's tenure and terminated her employment at HBS.

9. I was asked to (i) identify and analyze the available digital forensic evidence relevant to HBS's five allegations and (ii) evaluate the evidence collection and analysis during Harvard's internal investigation.

[8] Hearing Committee, *Third Statute Proceeding Against Professor Francesca Gino of the Harvard Business School – Findings of Facts and Recommendations,* Jan. 24, 2025 at 1.
[9] *Id.*

10. Consistent with established norms of ethics and professional conduct in the digital forensics field, I am not offering any opinion with respect to the guilt or innocence of any person or party.[10]

11. I am being compensated for my work at a rate of $585 per hour. My compensation does not depend on the outcome of this proceeding or the substance of the opinions I provide.

## II. SUMMARY OF OPINIONS

12. Based upon my review of the digital forensic evidence, I have reached the following opinions:

i. **There are significant gaps in the available digital forensic evidence.** HBS sequestered only a portion of the data on Dr. Gino's devices and did not sequester data for any of the other individuals who Dr. Gino advised worked with the data. Unsurprisingly, if you look at files from Dr. Gino's computer, they will show that she possessed and worked with the data at issue. This gap in the evidentiary record leaves significant open questions for each allegation. **Importantly, the available evidence is insufficient to support a finding regarding who modified the datasets.**

ii. There were issues with the evidence collection and interpretation throughout Harvard's investigation.

[10] This standard is taught as part of digital forensic training and is incorporated into the code of ethics of several digital forensic organizations, *e.g.*, International Society of Forensic Computer Examiners, *Code of Ethics and Professional Responsibility Policy 6.0,* available at http://www.isfce.com/policies/6.0%20Code%20of%20Ethics%20and%20Professional%20Responsibility.pdf (last visited Sept. 12, 2024), and Digital Forensics Certification Board, *Code of Ethics and Standards of Professional Conduct*, available at https://dfcb.org/code-of-ethics-and-standards-of-professional-conduct/ (last visited Sept. 12, 2024).

a. *Sequestration* - HBS did not make forensic images of Dr. Gino's devices in the Fall of 2021. Instead, HBS copied only a portion of the files on Dr. Gino's devices. Had HBS made a forensic image in October 2021, more forensic data may have been available for review like the Internet History logs to understand web browsing activity and downloads during the critical timeframe for Allegation 1.

b. *Inquiry and Investigation* - The Investigation Committee relied on a fragmentary evidentiary record since HBS's searches were incomplete. Relevant data was uncovered for each allegation after the Investigation Committee issued its report. Maidstone's comparisons that the Investigation Committee relied on do not establish who modified the datasets. Maidstone's analysis only established that modifications were made to the datasets at issue, but it does not address who made them, when they were made, or why they were made.

c. *Third Statute Proceeding* - During the Third Statute Proceeding, Dr. Gino requested that HBS collect files from other custodians to repair the deficiencies of only sequestering data from Dr. Gino during the investigations. The searches that HBS performed at Dr. Gino's request uncovered key information, including for Allegation 3, the email correspondence on November 5, 2013 between Francesca Gino and Elizabeth Sweeny about enlisting another person to code survey results;[11] and for Allegation 4B, the write-up of the Tax Study 1 results that Francesca

[11] RX 321

Gino circulated on July 18, 2010, which helped establish the timeframe during which the dataset was modified.[12] However, the searches that were conducted were limited and much of the data from the distant time periods of the studies at issue are no longer available. While improved as compared to the evidentiary record considered by the Investigation Committee, the evidentiary record is still fragmented and it does not allow any sound conclusions about who modified the data to be reached.

iii. The available evidence shows that others were involved in editing the files, and contrary to the Third Statute Complaint, there is no "clear progression" of changes to the datasets that only occurred on Dr. Gino's computer as HBS suggests. Research assistants ("RAs") and others were involved in preparing the datasets at issue in Allegations 1, 3, and 4—at a minimum—before Dr. Gino analyzed the data. Furthermore, for all four datasets, there are sequencing issues—such as modified datasets only being created on Dr. Gino's computer after the relevant draft versions of the paper reflecting the modified data were already prepared—that undercut the premise that Dr. Gino modified the raw dataset into the modified dataset.

a. For Allegation 1, there was hardly time for Dr. Gino to prepare the analysis spreadsheet based upon the Qualtrics data as HBS asserts. It is likely that Dr. Gino would have relied on data that had already been prepared by her RA. Another spreadsheet was analyzed on the afternoon of January 24, 2020, but no copy of it has been located. It could represent an earlier version

[12] RX 402 and RX 403.

of the data, and without knowing what this file contained, no conclusion can be reliably drawn as to as who introduced the data discrepancies seen at the end of the day on January 24.

b. For Allegation 2, the Investigation Committee relied on two incorrect facts. The responses with the "Harvard" class year were not added by the research team as the original complainant conjectured; they are present in the Qualtrics data. Moreover, contrary to the 2022 Maidstone report and the Final Report of the Investigation Committee, the records in the final Open Science Framework ("OSF") data do, in fact, originate from the two Qualtrics studies. The assertion that the final OSF data contained new records not found in the Qualtrics studies stemmed from an error that Maidstone made and the Final Report adopted, which Maidstone later corrected in a December 2023 supplemental report. Finally, once again, HBS's assertion of a "clear progression" in the editing of the datasets is overstated, in part because HBS misconstrued the actual data preparation chronology. Dr. Gino did not begin working with the data on Thanksgiving Day, as HBS's chronology suggests. She worked with interim versions of the online survey results on her hard drive starting almost two months earlier on September 27, 2014. Even with these files, the available evidence is insufficient to answer key questions, including the source of the interim files that Professor Gino worked with and the source of the modified values. There are several factors that suggest others in addition to Professor Gino were involved in working with the dataset at issue in Allegation 2.

c. For Allegation 3, there are gaps in the available data from the collection to the analysis stage. The survey was conducted on Qualtrics, but the dataset was not located in Dr. Gino's Qualtrics account, nor were any files of the Qualtrics dataset located on Dr. Gino's HBS-issued MacBook Pro laptop bearing serial number C02T2CB6GTF1 (the "Gino Laptop"). The earliest available dataset is partially coded by an unknown coder. At least four students and staff participated in coding the datasets. Some of the discrepancies observed in the OSF dataset were introduced before and some after the coding work of these RAs. The dataset that Dr. Gino analyzed in July 2013 is not available.

d. For Allegation 4A, like the other Allegations, there are gaps in the available evidence during critical moments. For example, the first draft of the academic paper is not available, so it is unclear who added the initial study description into the draft.

e. For Allegation 4B, the modifications to the dataset at issue occurred between July 16 and 18, 2010. The spreadsheet emailed by Jennifer Fink would have required data cleaning before the analysis to generate the summary statistics that were included in the draft write-up on July 18, 2010. There is no evidence on Dr. Gino's hard drive of the preparation occurring in this time frame. The available evidence shows the cleaned version of the spreadsheet, which also contained the modified data values, was created on Dr. Gino's hard drive over a year later. The dataset that Dr. Gino analyzed in July 2010 may have additional date/time and authorship metadata that provide further insight into the data analysis process. HBS's analysis of who handled

and modified the dataset is incomplete, because the dataset that Dr. Gino worked with in July 2010 was never identified.

## III. BACKGROUND OF METAFOR LLC

13. Metafor is an objective fact finder who resolves questions involving technical issues and electronic evidence that arise during legal, regulatory, and investigative matters. The digital forensic examination was conducted by, and this report was written by Metafor's founder, Michael F. McGowan, who writes in the first-person below.

14. I have been at the forefront of applying digital forensics, statistical analyses, and investigative skills to resolving issues involving electronic data for over 20 years. I have testified numerous times in state and federal courts on issues relating to digital forensics, including about the authenticity of electronic communications and documents. I have examined hundreds of computers, servers, mobile phones, and other electronic devices in both routine cases and cases in which people's freedom or many millions of dollars have hinged on what was uncovered on the devices. Analysis of metadata, including for Excel spreadsheets and Word documents, is a primary area of focus in my digital forensic practice.

15. I hold a B.A. in Economics and Statistics from the University of Chicago. I have regularly received training in digital forensics. I am a GIAC Certified Forensic Examiner ("GCFE")[13]. I also maintain the Certified Information Systems Auditor ("CISA") and GIAC Advanced Smartphone Forensics ("GASF") certifications.

[13] Global Information Assurance Certification ("GIAC") offers certificates in digital forensics and cybersecurity.

16. I was employed at Aon Cyber Solutions (and its predecessor, Stroz Friedberg, LLC) from 2003 through 2018, where I was a Managing Director. I supervised the New York branch of the digital forensic lab. I am now the founder and principal of Metafor LLC, a technical services company that specializes in digital forensics. A true and correct copy of my curriculum vitae is attached hereto as Appendix A.

17. My analyses of electronic data have resolved key factual questions in high-profile matters, including the following:

i. I led the document authentication investigation in *Ceglia v. Zuckerberg* that established that the plaintiff had electronically forged the contract on which he sued Mark Zuckerberg for half of his shares in Facebook;

ii. I served as Major League Baseball's digital forensic expert in the arbitration over Alex Rodriguez's suspension due to the use of performance enhancing drugs, which the arbitrator upheld citing, in part, my analysis of electronic communications;

iii. I testified as the government's expert witness at trial in *U.S. v. Bayly, et al.* (S.D. Tex.) about what metadata revealed about who had edited a critical document at issue in a deal that preceded the collapse of Enron;

iv. In response to a Congressional investigation, I led a forensic search of servers, computers, smartphones, and backup tapes to recover White House senior staff emails subject to retention under the Presidential Records Act; and

v. I served as the court-appointed neutral expert in the *Commonwealth of Massachusetts v. Ryder Chilcoff* matter and examined a smartphone to identify

evidence potentially relevant to a criminal matter involving a sexual assault charge.

## IV. MATERIALS CONSIDERED

18. In forming my opinions, I examined the following computers, storage devices, and datasets:

i. Dr. Gino's HBS-issued MacBook Pro laptop bearing serial number C02T2CB6GTF1, which contained datasets for the studies at issue as well as contextual information in draft manuscripts, email correspondence, and the SPSS Journal that help establish when certain of the changes were introduced;

ii. A black, unlabeled USB drive used by Dr. Gino with serial number 21013403D7FFA005;

iii. a MicroCenter USB drive used by Dr. Gino bearing serial number 067308185030;

iv. a USB drive with the HBS logo used by Dr. Gino bearing serial number 0B7E18851060;[14]

v. a SimpleTech USB drive used by Dr. Gino with serial number 0196019921036;

vi. a Western Digital 1 TB external hard drive used by Dr. Gino with serial number WXG2AC0AZCUK;

[14] This device was encrypted to an unknown password and I was not able to access its contents.

vii. The files in the "Shared with me" area of Dr. Gino's Google Drive for the francescabgino@gmail.com account;[15]

viii. the materials that Harvard collected and sequestered in or around October 2021 from Dr. Gino's laptop, the same device described above in the first item in this list; a Mac Pro desktop computer bearing serial number F5NG0HAF694 that contained seven files unrelated to the Allegations in a "fgino" folder, Dr. Gino's Qualtrics account, her HBS email account, her Dropbox account, her OneDrive and HBSFiles (the "Sequestered Materials).[16] I examined the Sequestered Materials to determine whether they contained any additional evidence not found on the Gino Laptop and to understand what materials that HBS identified in its analysis.

19. In addition to the forensic evidence, I also reviewed:

i. The Final Report issued by the Investigation Committee and its exhibits;

ii. The files that the Investigation Committee provided to Maidstone;[17]

iii. Emails and files provided by Jennifer Fink to the Investigation Committee;[18]

iv. The non-privileged documents provided to the Investigation Committee;[19]

[15] I identified the shared Google Drive data as a possible source after I preserved Dr. Gino's devices in January 2024. I observed an email from Mr. Rohe to Dr. Gino on January 24, 2024 at 3:27 PM (around the time of the study at issue in Allegation 1) with the subject "RE: coding task" in which he mentioned sharing data with Dr. Gino via Google Drive.
[16] The Sequestered Materials were originally produced on February 26, 2024 as production volume Harvardv002. It was re-produced on May 14, 2024 as production volume Harvardv004 to correct issues present in Harvardv002 where the creation dates of files were updated to dates in 2024.
[17] This was produced in the Third Statute Proceeding on February 9, 2024 as production volume Harvardv001.
[18] This was produced on April 1, 2024 as production volume Harvardv003.
[19] This was produced in Harvardv004 along with the Sequestered Materials.

v. Email messages from HBS email accounts of Professor Max Bazerman, who was a co-author of the academic paper at issue in Allegation 4; Elizabeth Sweeny, a Unit Assistant in the Negotiations, Organizations & Markets Unit who coded a dataset at issue in Allegation 3; Luke Garcia and John Galvin, who were consulted about the survey at issue in Allegation 2; as well as communications with witnesses at other institutions that HBS contacted;[20]

vi. Communications between the RIO and the original complainant;[21]

vii. Communications located in Dr. Gino's Sequestered Materials among Dr. Gino and other individuals at HBS on the research teams or otherwise involved in the studies at issue;[22]

viii. The Third Statute Complaint;

ix. The direct and rebuttal testimony and exhibits of Professor Jeremy Freese, the sociology expert retained by HBS in the Third Statute Proceeding;[23]

x. The rebuttal testimony of Julian Ackert, the digital forensic expert retained by HBS in the Third Statute Proceeding;

xi. The direct testimony of Research Integrity Officer ("RIO") Alain Bonacossa;

[20] This was produced on June 14, 2024 as production volume Harvardv005.
[21] This was produced on June 18, 2024 as production volume Harvardv006.
[22] This was produced on June 26, 2024 as production volume Harvardv007.
[23] I discussed areas where I disagreed with Professor Freese and Mr. Ackert in both my written testimony and oral testimony before the Hearing Committee for the Third Statute Proceeding. But that was based upon opinions they offered almost two years ago in a different proceeding. Since, to date, neither individual has submitted a report in this litigation, I do not address their old opinions or speculate about their current opinions related to this litigation in this report.

xii. The exhibits that Complainant identified in the Third Statute Proceeding, including the initial Maidstone reports, the supplemental Maidstone report attached to RIO Bonacossa memo to Dean Srikant Datar in June 2023, and the further reports that Maidstone prepared in late 2023 as well as the Maidstone supporting spreadsheets;

xiii. The transcript of the Third Statute Proceeding hearing;

xiv. Dr. Gino's and HBS's post-hearing submissions in the Third Statute Proceeding;

xv. The findings and recommendations of the Hearing Committee in the Third Statute Proceeding; and

xvi. The third amended complaint and the counterclaim in this litigation.

## V. METHODOLOGY

20. In examining data modifications, it is important to identify and collect all existing versions of the dataset in question, and then analyze them chronologically. Only then can a digital forensic examiner determine, to the extent possible, when the changes were made and who made them. This is the standard and accepted methodology in the field of digital forensics, and it is, to the extent possible with the information available to me, the methodology I follow in my testimony.

21. HBS employed a fundamentally different approach in its Investigation. Specifically, HBS's approach was to identify the earliest available version of the dataset and, through the work of its forensic consultant Maidstone, compare it to the published version of the dataset. That approach can establish *whether* the datasets changed.

However, it is insufficient to confirm or refute the central questions of the Allegations: did Dr. Gino commit research misconduct by falsifying or fabricating the datasets.

22. The main steps in my analysis were:

i. *Forensic Preservation* - Identify and preserve the data sources containing evidence relevant to the allegations;

ii. *Identification of Dataset Versions* – Identify all copies of the files related to the academic papers at issue contained within the available evidence;

iii. *Comparison of Datasets* – Determine whether the relevant files changed and when the changes were introduced; and

iv. *Searches for Other References to Datasets or Results* – Search for other files, including draft versions of the academic papers, email correspondence among Dr. Gino and her co-authors, or log files, that reference the datasets or results.




*Figure 1: Steps for My Digital Forensic Analysis*

## A. Forensic Preservation

23. Metafor was engaged by Dr. Gino's counsel in the Third Statute Proceeding on behalf of Dr. Gino on or about January 29, 2024. At that time, Dr. Gino had not received copies of the electronic data that the RIO had sequestered for this inquiry.

24. I began my work by creating digital forensic images of the laptop and other electronic devices that Dr. Gino used, which are listed above in the Materials Considered section. A digital forensic image preserves a complete and accurate copy of all the data on the device. This includes emails and files saved on the device by the user. A forensic image also includes system logs that record user activity, such as the connecting of USB devices. System logs may reveal when and how files were created on the hard drive. A forensic image may, in some instances, contain recoverable remnants of deleted data. Deleted data would not be visible to someone using the computer in the ordinary course, but may be recoverable through the use of specialized digital forensic software. I used Cellebrite's Digital Collector, version 3.6, to create a forensic image of the Gino Laptop. Digital Collector is a forensic software program designed to preserve data from Mac computers. To create forensic images of the five external devices, I connected the devices in a read-only fashion to my forensic computer so that I would not change their contents, and used X-Ways Forensics, version 21.0 to create the forensic images. To preserve Dr. Gino's Google Drive account, I used Magnet Forensics' Axiom, version 7.9.1.

### B. Identification of Versions of Datasets at Issue

25. I examined the electronic data sources listed above in the Materials Considered section to identify all copies of the files related to studies at issue.

26. I primarily used X-Ways Forensics, a digital forensic software, for my examination.[24] X-Ways Forensics allows a digital forensic examiner to see all the active and

[24] I used several other software programs as part of my analysis and to verify my results: Cellebrite Inspector to examine the Mac log files, dtSearch Desktop to conduct additional searches of the email data, Magnet Axiom for its timeline feature, and DB Browser for SQLite to view the Microsoft Office Recents information.

recoverable deleted files on a hard drive or to filter the file listings to show only the files that have certain words in their filenames, that are located stored a specific folder, or that date from a particular timeframe. I also used X-Ways Forensics to conduct keyword searches to locate files and emails that matched the search criteria I entered.

27. Maidstone included in its forensic reports the names of the files it received from Harvard for each allegation to analyze. I searched for files with the same or similar names to those described in the Maidstone reports.

28. I conducted keyword searches using the unique identifiers that Qualtrics assigned to the survey.[25] I also searched for identifiers that Qualtrics and Amazon's Mechanical Turk ("M-Turk") assigned to survey responses.[26]

29. I looked through the folders on Dr. Gino's hard drive and examined the files contained within the folders for the studies in question. The two main locations in which I found studies in question were in the "PUBLISHED" folder and the "Work in Progress" folder.[27] The PUBLISHED folder contained 176 sub-folders named for various projects. For instance, files related to Allegation 1 were stored in the "Approaches to networking\JPSP\R&R\Study 3A" folder located under the PUBLISHED folder, as shown in the below figure (a screen shot of the X-Ways Forensics program). The

[25] For instance, "eEdMBRDV26Sd0Fv" and "3n4LusSmSL8eqG1" are the identifiers for the two phases of the survey at issue in Allegation 2.
[26] Qualtrics assigns a ResponseID to each survey response, which takes the form of "R_" followed by fifteen letters and numbers, *e.g.*, "R_eLrYWbEvSCBhSXr".
[27] The PUBLISHED folder was stored under "\Users\fgino\Documents\Submissions". The "Work in Progress" folder was stored under "\Users\fgino\Documents".

"Work in Progress" folder contained 236 sub-folders which appeared to be generally named for a co-author.

/Hard Drive - Data/Users/fgino/Documents/Submissions/PUBLISHED/Approaches to networking/JPSP/R&R/Study 3A

| Name | Created | Modified |
|---|---|---|
| .. = R&R (167) | 01/22/2020 20:47:01 -5 | 04/13/2020 09:51:06 -4 |
| . = Study 3A (21) | 01/22/2020 20:48:14 -5 | 11/16/2021 22:16:48 -5 |
| RF+and+Networking+-+Study+3A+New_January+22%2C+2020_20.52.zip (2) | 01/22/2020 20:52:41 -5 | 01/22/2020 20:52:43 -5 |
| RF and Networking - Study 3A New_January 22, 2020_20.52.csv | 01/22/2020 20:53:27 -5 | 01/23/2020 01:52:38 -5 |
| .DS_Store (1) | 01/22/2020 20:53:27 -5 | 01/24/2020 20:52:55 -5 |
| .data study3A RF networking.xlsx (11) | 01/24/2020 13:53:07 -5 | 01/24/2020 22:42:28 -5 |
| data study3A.sav | 01/24/2020 22:48:10 -5 | 01/24/2020 22:48:10 -5 |
| data study3A anonymous.xlsx | 04/13/2020 09:09:00 -4 | 04/13/2020 09:13:38 -4 |
| data study3A anonymous.sav | 04/13/2020 09:14:29 -4 | 04/13/2020 09:14:29 -4 |

*Figure 2: Files in the Study 3A folder for Allegation 1 on the Gino Laptop*

30. The different file types visible in Figure 2 correspond to and illustrate the different stages of data collection and preparation for a study (as pictured in Figure 2, for Study 3A at issue in Allegation 1), as I briefly describe in the following ¶¶ 30–35.

31. *Survey Conducted* – Three of the four studies at issue (in Allegations 1–3) were administered using the Qualtrics online platform. Participants connect to Qualtrics using a web browser on a computer and respond to the survey. For the study at issue in Allegations 4A and B, participants completed the survey on paper.

32. *Downloading of Results from Qualtrics* – A researcher with access to the Qualtrics account used to conduct the survey can download the survey results to their computer. Qualtrics provides the results in a .csv file stored with a compressed .zip file. CSV stands for comma-separated values. Like Microsoft Excel spreadsheets, CSV files can contain tabular data values in rows and columns. However, .csv files have a simpler file format that does not contain embedded metadata.

33. For one illustrative example, the .zip file showing in the above figure named "RF+and+Networking+-+Study+3A+New_January+22%2C+2020_20.52.zip" was downloaded from Qualtrics. It contains a .csv file named "RF and Networking - Study

3A New_January 22, 2020_20.52.csv". The file directly below the .zip file in the above Figure 2 shows a .csv file that was extracted from the .zip file and saved as a separate file on the Gino Laptop. The date and time metadata information in the Created column shows that the .csv file was saved as a stand-alone file one minute after the .zip file was downloaded. I discuss metadata and its limitations in more detail below in Section VII.C.

34. *Data Preparation (Cleaning, Coding, Merging, and Organizing)* – Additional data preparation work is required before the survey results can be analyzed.

35. Dr. Gino advised the Inquiry Committee that other research team members assisted with data preparation: "In her work, Dr. Gino relies on the help of research associates, doctoral students or junior colleagues collaborating on any given project to prepare IRB applications, conduct laboratory studies, clean the data, prepare it for analyses and often conduct preliminary analyses on the data."[28]

36. These data preparation tasks involve several steps. One is cleaning: "fixing or removing data that's inaccurate, duplicated, or outside the scope of your research question."[29] In his witness interview, Dr. Gino's RA Alex Rohe described how he believed that he participated in the initial data cleaning for the study at issue in Allegation 1 to identify and remove "non-sensical," "bot-like" responses.[30] Coding

[28] CX 1.1.6 (Final Report, Ex. 1 (Ex. 6 thereto) (Respondent's Written Response to Inquiry Committee Memos received on February 22, 2022, Inquiry Committee)), at 4.
[29] National Institutes of Health: National Cancer Institute, Center for Biomedical Informatics and Information Technology, "Data Cleaning: The Basics," available at https://datascience.cancer.gov/training/learn-data-science/clean-data-basics (last visited Sept. 12, 2024).
[30] CX 1.8 (Final Report, Ex. 8 (Transcript of Witness Interview with Mr. Alex Rohe on June 16, 2022)), at 6.

involves assigning numerical ratings to essays and other free-text responses written by the survey participants.

37. Merging occurs when two datasets need to be combined, such as in the case of Allegation 2, for which some survey participants completed the survey at Harvard's CLER lab and a larger group recruited from M-Turk platform completed the survey online, yielding two different datasets in Qualtrics that had to be combined during the data preparation process for analysis. Merging can also occur when an RA codes a dataset in a working file separate from the main dataset, which then must be integrated back into the main dataset. As discussed below in the Allegation 3 section, Dr. Gino provided small excerpts of the dataset—just the columns required to code the results—to several Harvard undergraduates and an HBS support staff member.

38. A dataset may require further organizing before it is analyzed, for example, adding a sequential identifier to each response or variables that identifies the treatment or control group to which the survey participant was assigned. The available data shows that at least some of the data preparation work for the studies in question—the merging of the Allegation 2 datasets and the coding for Allegation 3—was conducted using Microsoft Excel. As another example, the "data study3A RF networking.xlsx" spreadsheet shown in the above figure contains the prepared version of the dataset for Allegation 1. In this report, I will use the term "analysis spreadsheet" to refer to the prepared version of the dataset.

39. *Data Analysis* – Once the data had been prepared, Dr. Gino analyzed the data in SPSS, a software program for statistical analysis. A user can save the data that was analyzed in SPSS; in that case, SPSS will export the data with a .sav file extension.

The "data study3A.sav" file in the above figure contains the data that was analyzed for Allegation 1 in SPSS.

40. *Data Anonymization Prior to Sharing Results* – Prior to sharing the results, the datasets were anonymized by removing the participants' names, email addresses, IP addresses, the unique Qualtrics and M-Turk identifiers, and essays and free-text responses they provided. The anonymization occurred prior to the posting of datasets to OSF.[31] In the above figure, data "study3A anonymous.xlsx" is an anonymized version of the dataset in Excel format and "data study3A anonymous.sav" is an anonymized version in SPSS .sav format.

41. Below is a depiction of the research workflow for a study conducted on Qualtrics that is published to OSF.




*Figure 3: Illustration of Research Workflow*

[31] As discussed in the chronology for Allegation 3 below, when Dr. Gino emailed the Allegation 3 dataset to Professor Leif Nelson at his request, the dataset that was shared was also anonymized (*i.e.*, not the original un-prepared dataset).

### C. Comparison of Datasets

42. I compared the different versions of the datasets found on the Gino Laptop and in the materials provided by Harvard to identify when each file had been created and, insofar as a later version of a dataset was different from an earlier version, how it was different and when the differences had been introduced. I performed this work by (1) comparing the hash values of different files, (2) using the BeyondCompare data comparison tool, and (3) visual inspection of the files. "A hash value is a unique numerical identifier that can be assigned to a file, a group of files, or a portion of a file, based on a standard mathematical algorithm applied to the characteristics of a data set."[32] Hash values are software-generated hexadecimal strings (typically 32 digits) that are (statistically) unique to a digital artifact. A hash value can be thought of as a digital fingerprint—if any change is made to a file, including inserting or removing a space, its hash value will also change. This information is used to identify whether two (or more) files are exact duplicates of one another, or differ in some way.

43. I observed that different versions of some of the datasets contained different data values. For example, by comparing the Qualtrics dataset for Allegation 1 with the analysis spreadsheet, I observed that the data values for the moral impurity scores were lower for 16 of the 201 respondents in the promotion focus group: significantly in some cases, *e.g.*, 7 being changed to a 1, and by a small amount in some cases, *e.g.*, a 5 to a 3.

44. Sections IX–XIII below describe my findings and opinions for Allegations 1, 2, 3, 4a, and 4b, respectively. Appendix B contains a section for each allegation where I

[32] The Sedona Conference, *Commentary on ESI Evidence & Admissibility*, Second Edition, 22 SEDONA CONF. J. 83, 158 (2021).

describe the main changes to the data values in different versions of the relevant datasets.

### D. Searches for Other References to Datasets or Results

45. By examining the computer usage around the time that a file was modified, a digital forensic examiner can often identify information about the user's computer activity that sheds light on the circumstances of the modification, such as from where the file was received, and how it was used. This contextual information can help the digital forensic examiner determine who made the modifications and why. I searched for references to the datasets across the available data, including searching for emails that attached the files, searching for references in the Internet History records to cloud storage services like Microsoft OneDrive or Google Drive, and attempted to locate any information about removable storage devices that were attached to the Gino Laptop in the relevant timeframes. As discussed in Section VI below, the available information was limited. I did locate information in the SPSS Journal and draft versions of the manuscripts that help establish approximately when the changes were introduced.

46. By default, SPSS records the commands that users execute in SPSS in "statistics.jnl" files[33] (referenced below as the "SPSS Journal"). The SPSS Journal shows when or approximately when certain of the datasets at issue in Allegations 1 and 3 were

[33] A user can run a command in SPSS by either typing the text of the command in the console or by clicking buttons, selecting menu options, and/or specifying parameters in the graphical user interface that aids the user in building the command.

analyzed.[34] For example, the SPSS Journal reflects that the "data study3A RF networking.xlsx" file at issue in Allegation 1 was first loaded into SPSS for analysis on January 24, 2020, at 2:03 PM.[35]

47. I say "approximately when" because only some of the entries in the SPSS Journal have timestamps associated with them. The first entry in each session after the SPSS program is opened receives a timestamp, but the subsequent entries do not. The next command in the SPSS Journal after the opening of the "data study3A RF networking.xlsx" is not timestamped. In short, although we know the sequence of commands after the file was opened on January 24, 2020, 2:03 PM, and before SPSS was next opened on January 24, 2020, 10:57 PM (the next timestamped event), the SPSS Journal does not tell us specifically when the commands were performed within that timeframe.

48. The SPSS Journal records only commands that were run. It does not record what data values were present in a spreadsheet at a particular time. Therefore, it does not indicate whether a spreadsheet that was analyzed contained the same data values as the Qualtrics dataset or modified values. The SPSS Journal does, however, provide some helpful information about how a spreadsheet was organized because the SPSS Journal records the names of columns that were used in performing statistical calculations or to filter the data. Thus, it is possible to use the SPSS Journal to confirm that a dataset that was analyzed was at least *structurally* different from an earlier

---

[34] The SPSS Journal records entries for the time periods from January 5, 2013 through July 2, 2014; May 6, 2017 through December 21, 2017; December 23, 2017 through July 9, 2021; July 3, 2020 through April 15, 2021; and December 2, 2021 through May 31, 2022. As such, it covers the time period in January 2020 when the data at issue in Allegation 1 was analyzed and the time periods in July 2013 and November 2013 when the data at issue in Allegation 3 was analyzed.

[35] SPSS Journal for SPSS Version 21 at lines 273548 to 273558. The dates and times in the report are reported according to Eastern Standard Time or Eastern Daylight Time depending on the time of year.

dataset, insofar as the analyzed dataset contained columns that were not present in an earlier dataset.

49. As part of my examination of the datasets and SPSS Journal, I compiled chronologies of the key dates and times when the datasets were created on the Gino Laptop and last modified. These data points were the *starting point* for the Chronology sections that I include in this report that list key events for each Allegation. For Allegations 1 and 3, the SPSS Journal contained information about when the datasets were analyzed in SPSS, which information I added to the chronologies. I examined other files (including emails) that were created or modified around key dates and times for each dataset to identify other related files, and I added additional relevant dates to the Chronology sections.

50. By way of example, it was useful to consider draft versions of the academic papers in question to build the chronologies because those drafts sometimes referenced or relied upon data values from the modified versions of datasets, meaning that the modifications to the data values must have occurred before that version of the draft paper was last modified. For example, a draft version of the paper at issue in Allegation 1, "Why connect 2020-01-24.docx", was saved by Francesca Gino on January 24, 2020, at 11:22 PM and emailed to her co-authors one minute later. The results for Study 3A in the draft paper are the same as in the published version. As Maidstone notes in its analysis for Allegation 1, the results would have been significantly different if the statistical calculations were based upon the unmodified

data values. [36] Therefore, the modifications must have occurred prior to January 24, 2020, at 11:22 PM.

## VI. THERE ARE SIGNIFICANT GAPS IN THE AVAILABLE DIGITAL FORENSIC EVIDENCE

51. There are significant gaps in the available digital forensic evidence. Of central importance here, **the available digital forensic evidence is insufficient to establish who modified the datasets**.

52. The primary source of the data that HBS relies on is the Gino Laptop. She began using this device only in February 2017, years after the data for three of the four studies were analyzed and the papers were published. The study at issue in Allegation 1 is the only one that was analyzed on the Gino Laptop. Although documents from Dr. Gino's prior computers were migrated to the Gino Laptop, system files that record user activities on prior computers are not available. Therefore, records that may show whether Dr. Gino received an analysis spreadsheet prepared by another member of the research team by downloading it from OneDrive or another cloud storage platform or by connecting a USB drive are not available for any of the time periods at issue in the Allegations 2 through 4B. Below are several of the significant limitations in the available data where information that is commonly considered important to a digital forensic examination was not available here:[37]

---

[36] Complainant's Exhibit in the Third Statute Proceeding ("CX") 1.12 (Final Report, Ex. 12 (Maidstone Consulting Group Forensic Report for Allegation 1)), at 2.

[37] Hayes, Darren, *A Practical Guide to Computer Forensic Investigations*, 2020, at the Electronic Mail and Websites Visited and Internet Searches sections of Chapter 1 and Establishing Ownership of a USB Device section of Chapter 2.

i. *No USB Drive Information* – Dr. Gino advised the Investigation Committee that her regular practice was to exchange datasets with RAs via USB drives.[38] Computers record information about USB drive activity, including the times that drives were connected, but that information is not available for the time periods at issue in any of the allegations.

ii. *No Internet History for the Relevant Timeframes* – Computers maintain records of what websites were visited, what Internet searches were conducted, and what files were downloaded. As discussed below, Internet history records may have been available for Allegation 1 if HBS had created a forensic image of the computer in October 2021 as they incorrectly said they did.

iii. *Gaps in Dr. Gino's Email* – Harvard's email server enforces quotas that limit the amount of email that a user can store.[39] If a user exceeds her quota, she cannot send emails until she frees up space by deleting or archiving emails. Dr. Gino began saving emails locally on her computer early in her time at HBS. As a result, considerably more historical emails are available than if she relied solely on Harvard's email server. However, there are gaps, which are most pronounced on the outgoing side: Dr. Gino does not have messages in her Sent Items dating from November 22, 2012 until June 22, 2015 and only sporadic

[38] CX 1.5 (Final Report, Ex. 5 (Respondent's Written Responses to Investigation Committee - May-July 2022)), at 9; CX 1.21 (Final Report, Ex. 21 (Respondent's Written Statement to Investigation Committee received on November 11, 2022)), at 7.

[39] Email from B. Ballou of HBS Technology Support Services to F. Gino on October 12, 2011 with the subject "RE: TSS- Missing Emails" that states, in part, "Unfortunately we cannot grant you more space. We have granted everyone 2GB of space and this takes up all of the space available to us. What we can do is explore the other options for reducing your space. We can try to remove some or all of your attachments from your server space to your machine and this should free up a good deal of space."

messages before November 2012.[40] This gap in Sent Items, thus, inhibits the investigation of the timeframes relevant to Allegations 2, 3, 4a, and 4b. There are also gaps in the incoming emails. As Dr. Gino advised the Inquiry Committee, she deleted emails with attachments to save space.[41]

53. HBS sequestered data only for Dr. Gino and not for any of the other individuals who worked with the data.[42] It is my understanding that HBS advised during the Third Statute Proceeding that the electronic records of Dr. Gino's research teams are now unavailable, have not been preserved, and/or no longer exist. Specifically, Dr. Gino identified 21 individuals affiliated with Harvard at the time of the studies at issue and requested that HBS search their data. HBS responded that data was no longer available for 17 of the 21 individuals.[43] HBS further advised that "any Electronic Storage Areas or e-mail belonging to former Harvard employees no longer exists and thus cannot be searched."[44] This serious limitation in the research record was never mentioned by the RIO, the Final Report of the Investigation Committee, or the Third Statute Complaint.

[40] Dr. Gino's mailbox contains a limited number of messages sent by Dr. Gino in folders under her Inbox. These appear to be messages she sent to herself, the BCC copies of messages that she sent, and incoming messages from others that attached emails from Dr. Gino.

[41] CX 1.1.6 (Final Report, Ex. 1 (Ex. 6 thereto) (Respondent's Written Response to Inquiry Committee Memos received on February 22, 2022, Inquiry Committee)), at 8. One example where Dr. Gino's copy of an email lacks an attachment even though the sender sent one is RX 319, which is discussed below in ¶251. The emails containing the coding results for Study 5A at issue in Allegation 3 that were sent by Ms. Wilkinson on Dec. 26, 2012 at 3:04 PM and Ms. Ngai on Dec. 31, 2012 at 5:14 AM also lack attachments even though attachments are referenced in the emails and spreadsheets with the coding results were created contemporaneously on Dr. Gino's computer. (See ¶¶214(11) to (14) below).

[42] Sequestration here refers to the collection of data files for an individual from their computers, email, and network data—such as what HBS did for Dr. Gino's data in October 2021. Several witnesses, including Ms. Fink and Professor Wiltermuth, provided selected emails to the Investigation Committee, but Harvard did not comprehensively collect the data for anyone other than Dr. Gino.

[43] Respondent's Exhibit in the Third Statute Proceeding ("RX") 016 (Letter from Laura G. Hoey to Timothy Macht (June 7, 2024)), at 3.

[44] RX 020 (Letter from Laura G. Hoey to the Hearing Committee (July 15, 2024)), at 2.

54. While some of the allegations involve events that happened over a decade ago, Allegation 1 is more recent. The relevant events happened in January 2020. That makes the failures in data sequestration more concerning. Mr. Rohe was affiliated with Harvard up until May 2021. His departure occurred less than six months before this inquiry began and data was sequestered. During his witness interview, Mr. Rohe repeatedly urged the Investigation Committee to search his emails, *e.g.*:

> I was not involved in late-stage data cleaning. If I recall correctly, I cleaned some responses earlier in the process, just based on verbatim. Though, again, I really would hope that the committee could look into my email records to see which files I sent to Francesca and whether or not any data cleaning did happen earlier on."[45]

55. Harvard produced documents during the Third Statute Proceeding that were not sequestered, and not considered in the Final Report, but that are important to the data falsification allegations. For example, the search of Professor Bazerman's emails conducted at Respondent's request identified a draft write-up of the results of the tax study at issue in Allegation 4B.[46] The evidence reveals that the modifications to the tax study at issue in Allegation 4B occurred within days of the study concluding and over a year before the spreadsheet on Dr. Gino's computer that contains the modified dataset was created.

56. Based on my experience conducting digital forensic examinations, it is my professional opinion that the discussions of the available evidence in Harvard's investigations present an incomplete and misleading picture. Unsurprisingly, if you look at files from Dr. Gino's computer, they will show that she possessed and worked

[45] CX 1.8 (Final Report, Ex. 8 (Transcript of Witness Interview with Mr. Alex Rohe on June 16, 2022)), at 6.
[46] RX 402 (Email from Francesca Gino to Max Bazerman, Lisa Shu, and Mihir Desai (July 18, 2010, 8:30:33 PM)) (Produced by Complainant as Harvard0000011093).

with the data at issue. **That is insufficient to determine who introduced the changes that are present in the final datasets, especially when we know that other people were involved in making changes to the datasets and we know that the documents of those other people were not sequestered, reviewed, or considered.**

### A. HBS's Incomplete Preservation Resulted in Lost Evidence

57. The Internet History on the Gino Laptop that I would, in the ordinary course of a thorough forensic review, examine to address some of the open questions no longer contains activity records dating from the time period for Allegation 1, the most recent allegation, because HBS failed to properly preserve the data.

58. **HBS did not make forensic images of Dr. Gino's devices in the Fall of 2021, despite representing they did.**[47] Instead, as explained below, HBS copied only a portion of the files on Dr. Gino's devices. The preservations did not include log files that record user actions, such as opening documents and spreadsheets and connecting removable storage drives. The information in log files is not maintained forever. To make room for new entries for recent activity, old entries are purged.

59. On November 4, 2021, RIO Bonacossa advised Dr. Gino that "copies of the hard drives" were obtained for the Gino Laptop and Mac Pro.[48] Dr. Gino continued to use her laptop after this date.[49]

---

[47] RX 001 (Email from Alain Bonacossa to Francesca Gino (Nov. 4, 2021, 3:55 PM)).
[48] *Id.*
[49] RIO Bonacossa maintains in his August 15, 2024 testimony that a forensic copy was made even after Professor Gino identified that Harvard did not make a full forensic image of her laptop: "After sending Prof.

60. Through an examination of the Sequestered Materials that HBS provided to Dr. Gino on February 27, 2024, and the corrected version provided on May 14, 2024, I determined that HBS had _not_ made a forensic image of the Gino Laptop. A forensic image is an exact copy of all the data on a hard drive.[50] Indeed, HBS did not make a copy of the entire laptop at all. Instead, it appears that HBS only copied a subset of the files under the "fgino" profile of the Gino Laptop. The "fgino-home-mac-C02T2CB6GTF1" folder in the Sequestered materials contained 477,137 files totaling 708 GB.[51] By contrast, the forensic image I created of the Gino Laptop contained 2,220,539 files totaling 932 GB.

61. Notably, the HBS preservation did not include Internet history information or the large volume of email that Dr. Gino had stored on her computer in her Microsoft Outlook 15 data files, which is the updated version of the Outlook 2011 email program that Dr. Gino used to send and receive emails from her HBS account.

62. Some of this information is now lost forever. The email was captured by the forensic preservation efforts undertaken at Dr. Gino's counsel's request in January 2024, which is described above in Section V.A. A full forensic image of the Gino Laptop was made at that time. The forensic preservation also captured the current contents of the Internet history. However, some of the entries from the relevant time periods for the

Gino the Notice of Inquiry, I worked again with HBS Information Security Officer Christopher Pringle to make a forensic copy of two of Prof. Gino's computers, which Prof. Gino represented were the only two computers in her possession that had records or evidence relevant to the research misconduct allegations." Witness Statement of Alain Bonacossa at ¶ 29. *See also* CX 12 (Response of Professor Gino to the Third Statute Complaint), at 16-17.

[50] Forensic images are usually stored in the .e01, .dd, or .aff4 file formats and are accompanied by log files created by the forensic software during the acquisition process that can be used to verify that the forensic image is a complete and accurate copy of the data on the original device.

[51] The file counts and file sizes are as reported by X-Ways Forensics version 21.1 before performing any refine volume snapshot processes, which can increase the number of items.

allegations are no longer available due to automatic overwriting of older log entries to make room for new entries.

63. The Internet history information was only available on the Gino Laptop for the "fgino" user account that she used since May 18, 2022, for the Chrome web browser and since September 23, 2022, for the Firefox web browser.[52]

64. In summary, because it appears that HBS did not fully preserve the data on the Gino Laptop in October 2021, log data has been lost. **HBS's failure to preserve this important information impedes the efforts to reconstruct how changes were made many years ago to the datasets, why, and by whom.**

### B. HBS Failed to Identify Relevant Evidence Until After the Investigation Concluded

65. The earlier version of the dataset at issue in Allegation 3 was identified by HBS only in 2023, after the Investigation Committee completed its work. The belated identification highlights the inadequacies of the searches performed of the sequestered materials. A basic first step in a forensic investigation is to identify the relevant evidence. In this case, it was one of the last—and even then, it was seriously incomplete.

66. It is not until after the investigation concluded that HBS conducted additional searches of the sequestered data in response to a request from Dean Datar. This

[52] The Chrome web browser maintains a separate listing of downloaded files, which has entries dating from well before and after the January 2020 time period at issue in Allegation 1, but it is missing the entire period in and around January 2020. The entries in the Chrome downloads jump from January 30, 2019 to April 28, 2020. Firefox also maintains a listing of downloaded files, but the only user files downloaded listed are those downloaded on or after September 25, 2022; the earlier entries pertain to character sets, not user files, and date from 2017. Therefore, there are gaps in the download information, including for the key time period for Allegation 1. Specifically, we know that the .zip file containing the Qualtrics data at issue in Allegation 1 was downloaded from Qualtrics to the Gino Laptop on January 22, 2020, but that is not reflected in the available download information.

belated search identifies additional relevant evidence for each of the four allegations.[53] This additional evidence as well as evidence that had been provided to Maidstone that they did not consider undercuts HBS's straight-line theory that Dr. Gino took the raw data in the Qualtrics .csv files and modified them to prepare the modified spreadsheets. In my professional opinion, one of the main reasons the chronology of modifications remains unknown in significant part for each of the five allegations is that HBS failed to sequester research records from the relevant custodians, leaving critical gaps in the digital record. The fact that Harvard is willing to make assumptions and speculations to *try to fill in* these gaps, and suggest conclusions about who introduced which modifications, does not change the fact that the available evidence is inadequate to make methodologically sound findings on that issue.

## VII. MAIDSTONE'S COMPARISONS DO NOT ESTABLISH WHO MODIFIED THE DATASETS

67. HBS provided Maidstone far less information than they collected from Dr. Gino. I examined a copy of the 343 files that were made available to Maidstone on behalf of the Investigation Committee. That data can establish whether changes were made, but is woefully insufficient to determine who introduced them and why.

68. The information that Maidstone analyzed to prepare the reports that the Investigation Committee relied on was particularly scant. For example, for Allegation 1, only two files were provided to Maidstone for their initial work: the data from Qualtrics and the data posted at the end of the publication process on OSF.

---

[53] CX 7 (Memorandum from Alain Bonacossa to Dean Datar Re: Additional Evidence Related to Allegations 1, 2, 3, and 4b), at 2.

69. The Investigation Committee concluded that each of the five allegations of research misconduct against Dr. Gino was substantiated. The Final Report makes clear that the Investigation Committee relied significantly on Maidstone's analysis in reaching these conclusions. However, Maidstone's analysis did not address HBS's allegations. The allegations were pointed: Dr. Gino falsified or fabricated data. Maidstone did not address when the changes were made; by whom; or why they were made. Maidstone could not have done so with the data they received, but Maidstone unfortunately does not explain these limitations in its reports. Indeed, RIO Bonacossa in his Third Statute Proceeding testimony describes the scope of Maidstone's work more broadly than the compare-and-contrast analysis they performed: "Specifically, Maidstone was asked to replicate the complainant's analysis to assess the credibility of the allegations brought against Prof. Gino and to provide an independent assessment of the allegations."[54] At bottom, Maidstone's analysis only established *that modifications were made* to the datasets at issue, but it does not address who made them, when, or why.

### A. HBS Relied on a Methodologically Unsound Approach

70. In its analysis on behalf of the Investigation Committee, Maidstone's approach for each allegation was to compare the earliest available version of the survey results to the published version and note any differences. This is a methodologically unsound way of assessing the allegation that Dr. Gino committed research misconduct. By

[54] Witness Statement of Alain Bonacossa at ¶47.

examining the earliest and latest files, Maidstone establishes that changes were made.[55] Maidstone's approach does not establish who introduced the modifications.

71. Throughout the investigation, Dr. Gino offered information about the research process and the different roles that members of the research team played vis-à-vis the datasets, whereas the Investigation Committee was focused on the difference between final and "original" datasets and whether Dr. Gino could explain specific discrepancies. Such divergent approaches of HBS and Dr. Gino to *understanding* the discrepancies are evident in the email correspondence between RIO Bonacossa and Dr. Gino about the Inquiry Committee's first request. RIO Bonacossa emailed Dr. Gino on November 8, 2022 "asking her to identify the raw (or original) datasets."[56] RIO Bonacossa sent a follow-up email on November 16. As shown in Figure 4 below, he asks for an update on the Inquiry Committee's request and states that the work that Dr. Gino was performing to "reconstruct the history of each study in question [. . .] is something that may be broader in scope than the Committee's initial request of identifying the raw datasets."[57]

[55] Maidstone also performed statistical analyses of the changes and stated that the changes are in favor of the authors' hypothesis since they strengthen the statistical effect.
[56] Witness Statement of Alain Bonocassa, at ¶ 33(a).
[57] CX 13 (Emails between Francesca Gino and Alain Bonacossa, dated Nov. 8, 2021 – May 8, 2022, Re Confidential – Committee Request), at4.

**From:** "Bonacossa, Alain" <abonacossa@hbs.edu>
**Date:** Tuesday, November 16, 2021 at 8:00 AM
**To:** Francesca Gino <fgino@hbs.edu>
**Subject:** Re: Confidential - Committee Request

Good morning, Francesca.

Would you have an update for the committee on the request below?

I understand you're trying to reconstruct the history of each study in question which is something that may be broader in scope than the committee's initial request of identifying the raw datasets.

If you are in possession of the raw datasets, could you please point me to where I can find them in your files and/or Qualtrics account?
If some of the files are in paper format, Chris Pringle and I can make copies of those and return them to you.
If your collaborators have the raw datasets and you don't have immediate access to them, please just include that information in your response.

Thanks,
Alain

*Figure 4: Email Correspondence re: Locating the Raw Datasets*

72. While RIO Bonacossa notes that this scope of the Inquiry Committee's initial request is only to identify the raw datasets—leaving open the possibility of a follow-up request, I have observed no evidence that HBS ever asked Dr. Gino to locate other data files. Dr. Gino responded to a request to provide the location of specific files she discussed in her February 22, 2022 memo to the Inquiry Committee,[58] and also provided the location of email messages related to Allegation 4A were located through a screen-sharing session during her witness interview.[59] However, I have not seen any requests from HBS specifically asking Dr. Gino to identify other interim versions of the datasets, in my review of the Dr. Gino's written responses to the Inquiry and Investigation Committees, the transcripts of the witness interviews with Dr. Gino, the email correspondence between RIO Bonacossa and Dr. Gino about the Inquiry

[58] *Id.* at 1.
[59] CX 1.1.7 (Final Report, Ex. 1 (Ex. 7 thereto) (Transcript of Respondent Interview on February 28, 2022)), at 29 – 30.

Committee's request for the raw datasets, and the other emails exchanged between RIO Bonacossa and Dr. Gino.[60]

73. I am unable to find support in the evidence for RIO Bonacossa's assertion in his testimony that Dr. Gino was asked to identify all relevant datasets and documents and not just the raw datasets: "To be clear, at an early point in the inquiry, when I asked her to identify the location of all of the relevant datasets and documents within her sequestered materials, Prof. Gino had not identified any of the Additional Datasets."[61]

74. Moreover, RIO Bonacossa's first email to request the original datasets suggests that HBS is aware of where the other data is located: "Once you provide me with this information [the location of the original datasets], I can search and compare with the files we have sequestered."[62] This also suggests that *HBS* would be searching for additional datasets against which to "compare" the datasets Dr. Gino provides. We now know that this had not been done thoroughly—not even within the sequestered materials—at the time the Investigation Committee concluded its work, made its findings, and issued its Final Report.

---

[60] CX 1.1.6 (Final Report, Ex. 1 (Ex. 6 thereto) (Exhibit 6 – Respondent's Written Response to Inquiry Committee Memos received on February 22, 2022)); CX 1.1.7 (Final Report, Ex. 1 (Ex. 7 thereto) (Transcript of Respondent Interview on February 28, 2022)); CX 1.5 (Final Report, Ex. 5 (Respondent's Written Responses to Investigation Committee - May-July 2022)); CX 1.22 (Final Report, Ex. 22 (Transcript of Respondent's Interview on November 14, 2022)); and CX 13 (Emails between Francesca Gino and Alain Bonacossa, dated Nov. 8, 2021 – May 8, 2022, Re Confidential – Committee Request).
[61] Witness Statement of Alain Bonocassa, at ¶ 52.
[62] CX 13 (Emails between Francesca Gino and Alain Bonacossa, dated Nov. 8, 2021 – May 8, 2022, Re: Confidential – Committee Request), at 5.

### B. HBS's Subsequent Searches Were Incomplete

75. HBS conducted additional searches of Dr. Gino's data after the Investigation Committee issued its Final Report, but those searches were also incomplete.

76. In June 2023, RIO Bonacossa wrote to Dean Datar, "Following receipt of the Investigation Committee's report ('Investigation Report') for Case RI21-001 on March 7, 2023, you asked me to conduct searches of Dr. Gino's sequestered research records to identify additional datasets relevant to allegations 1, 2, 3 and 4b."[63] This belated search identifies additional relevant evidence for each of the four allegations that was not considered by the Investigation Committee.

77. HBS's post-Investigation searches were still limited *to Dr. Gino's* data as the above quote from RIO Bonacossa's memo makes clear. This falls short of the requirements of HBS's Interim Policy and Procedures for Responding to Allegations of Research Misconduct, which does not limit the data collection only to the Respondent's data, but instead directs that the "RIO must take all reasonable and practical steps to obtain custody of all the research records and evidence needed to conduct the research misconduct proceeding."[64] I made note of this deviation from the Interim Policy because collecting and preserving the digital records of custodians who may have created, sent, received, or edited a file is a basic and necessary step in any competent digital forensic investigation into who modified a file, when, and why, and I was surprised that HBS's investigation protocol would not have required this step. In fact, it does. Nonetheless, HBS did not sequester records from any other individual, even

---

[63] CX 7 (Memorandum from Alain Bonacossa to Dean Datar Re: Additional Evidence Related to Allegations 1, 2, 3, and 4b), at 1.
[64] CX 1.1.1 (Final Report, Ex. 1 (Ex. 1 thereto) (HBS Interim Policy and Procedures for Responding to Allegations of Research Misconduct)), at § V.A.

though it was aware that others worked with the datasets before Dr. Gino touched them, and even though some of them were current HBS employees.

78. That Dr. Gino possessed the modified files is unsurprising given that she was involved in analyzing the data for the studies. HBS neglected to search for relevant evidence in others' files: data was not sequestered from any of the RAs, HBS support staff, or research team members. There are limits on HBS's ability to access and search data, but it does not appear that HBS requested access to research records of custodians outside of Harvard and received only a small number of email messages that were selected and volunteered by witnesses who were interviewed. **As a matter of digital forensic analysis, it is my professional opinion that the scope of Havard's sequestration and collection, and thus the scope of data provided to Maidstone for analysis, is insufficient to make any reliable findings of fact regarding who modified the datasets, when were they modified, and whether the modifications were intentional.**

79. Even with respect to Dr. Gino's data, HBS's post-Investigation searches failed to identify all the relevant data and missed:

i. the SPSS Journal that records every command that the user enters while using the SPSS statistical software, the software used to analyze each of the datasets at issue in the Allegations;

ii. Other versions of the datasets at issue in Allegations 2, which provide a more complete picture of when Dr. Gino began working with the data; and

iii. Spreadsheets relevant to the study at issue in Allegation 3 that RAs and others used to "code" the results by reading the essays written by the survey participants and assigning numerical ratings to them. These coding spreadsheets help to establish who else was involved in working with the data prior to Dr. Gino, what changes they made to the data, and when the process to prepare the data occurred.

### C. Proper Approach to Examining Data Modifications

80. In examining data modifications, it is important to identify all available versions of the data in question. Only after all available versions of the data in question have been identified and collected would a digital forensic examiner potentially be able to make a reliable determination, with respect to any changes to the data, when the changes were made and who made them. Furthermore, the investigation of changes to data should consider more than just document metadata. Metadata is often a helpful data point, but it does not tell the whole story about a document's editing history. For example, document metadata only records the user who *last saved* the document, when the key modifications may have been (a) introduced earlier by someone else in a different version of the same document or (b) introduced earlier in an entirely different document and then copied and pasted into the document in question. Maidstone correctly notes the limitations of document metadata in its Allegation 4A report:

> While the metadata may be informative regarding individuals involved in the documentation generation and chronology of developments and alterations within documentation versioning, it is not an unequivocal representation of individual responsibility of content within said documentation. There may be possible scenarios, where another individual (or individuals) may have been

involved at a point prior to the "last modified" time stamp that play an unknown role in the data representation.[65]

81. This limitation is not mentioned in the Final Report of the Investigation Committee. It is my opinion that this is a significant omission because this inherent limitation prevents any inference that Dr. Gino was responsible for the observed data discrepancies based merely on document metadata.

### *i. Metadata Overview*

82. An electronic file has both content and metadata. Metadata is information *about* a file that is distinct from the file content and provides information that can help an analyst understand the file in context. For example, an email message may contain a request for a meeting. The metadata shows who sent the message and when it was sent. For electronic documents, metadata can identify the dates and times a document was created, last modified, and last accessed.

83. Different computers and software applications record different types of metadata. For instance, Microsoft Word tracks the amount of time spent editing a document, whereas modern versions of Microsoft Excel no longer track the amount of time spent editing a spreadsheet. Metadata can reflect when certain actions occurred, including when a document was originally created; when a copy of the document was created on a device; and when a document was last modified. Metadata can also record the name of the user who created and last saved a document. This information is useful in forensic investigation, but, as discussed below in the next two sections, metadata

[65] CX 1.15 (Final Report, Ex. 15 (Maidstone Consulting Group Forensic Report for Allegation 4a)), at 3.

has limitations that must be acknowledged; further, metadata requires interpretation and is seldom dispositive on its own.

84. There are two sources of metadata commonly available for electronic documents: file system metadata and embedded metadata.

85. File System Metadata: File systems organize the files on a hard drive or other storage media. When a user opens a document in Microsoft Word, for example, the file system information is consulted to locate where the document is stored. File systems also record metadata about the files they store. The file system metadata is not contained within the file.[66] File system metadata can record the file system Creation Date, which is when a file was created.[67] The Creation Date is specific to the file in a particular location. File systems can also record the filesystem last modified time, which reflects when a file was last changed. Mac operating system record additional metadata information in extended metadata attributes, which is especially helpful in determining whether a file was downloaded from the Internet. For example, Mac file system metadata includes the Where From attribute that can provide the URL or web address for files downloaded via a web browser,[68] and the Quarantine attribute that also provides information about downloaded files.[69]

[66] The Gino Laptop used the Apple File System ("APFS"). The APFS file system records when files were created and modified in the directory record for the folder in which the file is stored.
[67] The filesystem creation and last modified metadata contain both a date and a time. However, I will avoid the continued repetition of "date and time" and call the metadata by their traditional names: "creation date" and "last modified date."
[68] *kMDItemWhereFroms*, available at https://developer.apple.com/documentation/coreservices/kmditemwherefroms?language=objc (last visited Sept. 12, 2024).
[69] Different software programs employ different metadata. The Mozilla Firefox web browser stores information in the "com. apple quarantine." Edwards, Sarah, *Mac and iOS Forensic Analysis and Incident Response*, FOR 518, Vol 2: File Systems and Systems Triage, at 41-42.

86. Embedded Metadata: Computer programs, such as Microsoft Word, also can capture similar information in the files themselves. This is commonly referred to as "embedded metadata" to distinguish it from the metadata recorded by the file system, since it is stored within the document.[70] Embedded metadata may include information regarding when the document was created, last printed, and last saved and who authored and last saved the document. The embedded Creation Date reflects when the original version of this document was created. The embedded Last Modified Date reflects when the document was last saved. If an update is made to a document, such as when the user performs further edits of a Word document and saves it, the embedded creation date remains the same, but the embedded last modified date is updated to reflect the time of the change. Microsoft Office programs also record Author metadata, which is the username of the person who initially created the document,[71] and Last Saved By metadata, which is the username of the person who last saved the file.[72]

87. Not all files have embedded metadata. For one example relevant here, the .csv files downloaded from Qualtrics do not.

*ii. Metadata Limitations*

88. There are important limits to what can be known or reliably inferred about a document based solely on document metadata. For instance, metadata can tell you the name of the *user account* that created or last saved a document. Metadata for Excel spreadsheets and Word documents only reports the name of the user who was

[70] Casey, Eoghan, *Digital Evidence and Computer Crime*, 3rd Edition, 2011 at 17.1.4: File System Traces.
[71] Office Open XML File Formats — Open Packaging Conventions, ECMA-376, 5th Edition, December 2021 at p. 37, available at https://ecma-international.org/publications-and-standards/standards/ecma-376/ (last visited Sept. 12, 2024).
[72] *Id.*

logged into the computer or who registered the Microsoft Office software used to work on a file. But that metadata may not match the name of the *individual* who was sitting at the keyboard when the file was created or last saved (*e.g.*, another person with access to the user account or computer might have created or last saved the file, but the fact that someone other than the user was involved could not be discerned from the metadata).

89. Two important investigative points follow from this observation. First, a digital forensic examiner does not examine documents in isolation, but instead seeks access to all the computers or devices on which the file in question was edited over time (including all versions and iterations of a file). Second, a digital forensic examiner would deem it important to consider Dr. Gino's statement to the Inquiry Committee that other members of her research teams worked with datasets using her computer: "Pre-COVID, it was not unusual for research associates or students to work in Dr. Gino's office, entering data on her computer or conducting analyses with her to aid their learning."[73] If Dr. Gino's computer were logged into her account when a research associate or student used it, the metadata would reflect Dr. Gino's name—and not the name of the research associate or student—as the Author for any new documents created during this computing session as well as in the Last Saved By metadata for any documents modified during this computing session.

90. Metadata seems straightforward. If I create a brand-new file on a hard drive, the computer records the current date as when the file was created and when it was last

[73] CX 1.1.6 (Final Report, Ex. 1 (Ex. 6 thereto) (Exhibit 6 – Respondent's Written Response to Inquiry Committee Memos received on February 22, 2022)), at 4.

modified. If I then change the file, the Creation Date remains the same, but the Last Modified Date is updated to reflect the time of the change.

91. Nevertheless, metadata often requires interpretation because the computer might record metadata that does not correspond to when and how files were actually used. For example, a document can have a Last Modified date that *pre-dates* the document's Creation date, which is paradoxical because something cannot be modified before it was created. But this paradox arises when files are copied or moved from one device to another.

92. Specifically, a file's Creation Date will often be updated if the file is copied or moved to a different storage medium.[74] A file's Last Modified Date is a more resilient metadata attribute. The Last Modified Date is generally updated only when the contents of the file change. It is generally not updated when a file is transferred to a different storage medium. This is relevant for Allegation 1 when the fact that the filesystem and embedded Creation Dates match indicate that the analysis spreadsheet was created on the Gino Laptop and not transferred from another source.

93. However, for a file that was attached to an email message and was then saved to a hard drive, the Last Modified Date may pertain to the sent date of the email or when the file was saved to disk as opposed to when it was last edited. This is relevant for the data at issue in Allegation 3 when coders provide the results of their work to Dr. Gino by email.

[74] Carvey, Harlan. *Windows Forensic Analysis*, Second Edition. Burlington: Syngress Publishing, Inc., 2009. 300-301. "Description of NTFS date and time stamps for files and folders." Microsoft Support, Feb. 28, 2007, https://web.archive.org/web/20150328203215/https://support.microsoft.com/en-us/kb/299648. Archived on March 28, 2015.

### iii. *Interpreting Author and Last Saved By Metadata*

94. Author and Last Saved By metadata also require interpretation. When a user creates a new Microsoft Excel or Word file, the user's name is listed in the Author and Last Saved By metadata. If someone else receives a copy of the file, modifies it, and uses the "Save" option, the original author's name is maintained as the Author and the second user's name is listed in the Last Saved By metadata. If a third user then receives the file and saves it, the Last Saved By metadata would list the third user's name and there would be no references in the metadata to the second user. The "Author" may not have ever substantively interacted with a document if someone re-used an existing document as a template. The Sedona Principles cite this example when cautioning that metadata "may not always be contextually accurate."[75]

95. The emails and files related to Allegation 3 provide a concrete example where the name of the research team member that worked with a document was not reflected in the metadata. Dr. Gino prepared a spreadsheet named "coding studies.xlsx" with several of the columns from the full Study 5 spreadsheets related to Allegation 3.[76] The spreadsheet was then emailed to Ms. Sweeny. The file with Ms. Sweeny's coding results, which was named "coding studies Elizabeth.xlsx" was located on the Gino Laptop. The metadata for this file reflects that it was created and last saved by Dr. Gino even though Ms. Sweeny was significantly involved in editing the data before Dr. Gino received it. There is no metadata in the file on the Gino Laptop evidencing

[75] The Sedona Principles, *Best Practices, Recommendations & Principles for Addressing Electronic Document Production,* Third Edition, 19 Sedona Conf. J. 1, 171 (2018). The Sedona Principles are promulgated by The Sedona Conference (https://thesedonaconference.org/), which is the leading legal industry institute on issues of electronically stored evidence.
[76] Section XI.D below provides a detailed chronology of these actions.

Ms. Sweeny's involvement. We are aware of her involvement only through the contemporaneous email correspondence.

96. By examining the computer usage around the time that a file was modified, a digital forensic examiner can often identify contextual information that helps to determine who made the modifications. For example, during digital forensic trainings, examiners are instructed that the Internet history may provide contextual information about who used a computer at a particular time. If the Internet history reflects that a user logged into the password-protected personal webmail account of the computer owner shortly before an Excel spreadsheet was saved, this suggests that the computer owner made the changes. Email messages may also provide context. For example, an outgoing email from Dr. Gino to her co-author, on November 25, 2013, stating, "I am going to do a final pass on the paper and letter this afternoon/evening after teaching but both documents be [sic] in your inbox by tomorrow morning," helps establish who made the changes to the November 26 draft of the paper at issue in Allegation 3.[77]

97. Maidstone knows how to perform this kind of sequencing analysis. They attempted to do it for Allegation 4A when they closely examined email correspondence and multiple drafts of the 2012 PNAS paper to determine when certain language was changed and by whom. But Maidstone did not do this analysis for the Allegations involving modified data in Excel spreadsheets. This is one of the primary reasons that

[77] RX 700 (Email from Francesca Gino to Scott Wiltermuth dated November 25, 2013 with the subject "quick update.") Harvard0000002900 at Harvard0000002902.

Maidstone's analysis of the datasets at issue in Allegations 1, 2, 3, and 4B was based on insufficient evidence analyzed incompletely.

98. To understand the relevance of the foregoing discussion of metadata, I discuss briefly in the next section an example of how superficial consideration of metadata led Maidstone to the incorrect conclusion that Dr. Gino created the earliest and latest versions of the dataset at issue in Allegation 3.

### D. Maidstone's Unsupported Assertions about Who Modified the Allegation 3 Data

99. The executive summaries of Maidstone's reports generally summarize the changes they found between versions of the datasets. For Allegation 3, however, Maidstone strays from its compare-and-contrast analysis and makes unsupported assertions about who modified the data.

100. For Allegation 3, Maidstone concluded that Dr. Gino created and modified the earliest and latest version of the dataset at issue. The analysis, which compares what they call the "2012Excel" spreadsheet to the 2014 version, is flawed. The 2012Excel spreadsheet is neither from 2012 nor the earliest available version. The 2014 version was prepared months after the academic paper was submitted and is not the source of the modifications.

101. In investigating this allegation, Maidstone compared what it asserted was the earliest available dataset, "data CCTRBC SB 2012-11-18c.xls", to the most recent dataset, "data study4 PS 2014-04-17.xls", and concluded: "Both the earliest version and the latest version of the data available for review were created in 2012 by Dr. Gino, and

last saved by Dr. Gino, according to their Excel properties."[78] There are multiple problems with this superficial statement.

102. The file that Maidstone considered the earliest available version and termed the "2012Excel" was not in fact from 2012, but was modified in 2013. This would have been evident had Maidstone examined the last modified metadata for the spreadsheet, which is named "data CCTRBC SB 2012-11-18c.xls". As shown below, the spreadsheet was last modified on November 25, 2013.




*Figure 5: Excel metadata for 2012Excel*

103. Had Maidstone examined the activity on Dr. Gino's computer around the time that the spreadsheet was modified, they would have identified a logical impossibility: the file that they claimed was the ***earliest available dataset*** was created on Dr. Gino's hard drive on November 25, 2013, ***months after*** Dr. Gino prepared a draft version of the academic paper based upon this data. The so-called "2012Excel" that was created on Dr. Gino's hard drive in late 2013 was not the earliest available dataset. Dr. Gino's

[78] *Id.*

hard drive contained an earlier version, "data CCTRBC SB 2012-11-18.xlsx" that was identified by HBS only in 2023 after the Investigation Committee completed its work and issued its Final Report. To my knowledge, Maidstone did not issue a corrected report to the Investigation Committee.

104. The implication of Maidstone's analysis seems to be that Dr. Gino modified the data since she is the only individual reflected in the metadata as having worked with the data. That implication is not supported by the evidence. As discussed below in the Allegation 3 section, Dr. Gino was not the only person to work with the data: at least four other individuals participated in coding the data.

## VIII. HBS'S ASSERTION THAT THERE WAS A "CLEAR PROGRESSION" IN THE EDITING OF THE DATASETS DOES NOT FIT THE FACTS.

105. In ¶ 47 of the Third Statute Complaint, HBS discusses how the additional searches that were conducted after the Investigation concluded show a "clear progression" in the editing of the datasets:

> For each of these allegations, the RIO identified additional documents on Professor Gino's own hard drive that appear to be downloads of the Qualtrics data, such that one can see a clear progression: data were collected in Qualtrics, downloaded to Professor Gino's computer, manipulated on Professor Gino's computer, and then published on OSF.

106. This assertion of a "clear progression" is flawed:

i. The claim vastly overstates what the digital forensic evidence establishes;

ii. It ignores the testimonial and documentary evidence that other individuals worked with at least three of the four datasets; and

iii. There are sequencing issues with the premise that the raw dataset was directly changed into the modified dataset for all four datasets (for example, as

described above in reference to Allegation 4B, the modified dataset was created on Dr. Gino's computer after the relevant draft version of the paper was already prepared).

### A. HBS's Conclusion Vastly Overstates Forensic Evidence

107. A key step in HBS's "clear progression" theory is that the data from Qualtrics were "manipulated on Professor Gino's computer." This assertion is not supported by Maidstone's work or by RIO Bonacossa's searches. As discussed above in Section VII, Maidstone conducted comparisons of (what it thought were) the earliest and more recent versions to identify changes in the datasets. In its work for the Investigation Committee, Maidstone did not examine who made the modifications. It did not even have the evidence needed to do so. Both during and after the investigation, HBS provided Maidstone only with a cherry-picked set of documents and emails from a partial sequestration of a single custodian. From that data, one cannot reasonably investigate when the changes were made to a file and by whom.

108. The searches performed by RIO Bonacossa establish that the modified versions of the datasets were present on Dr. Gino's computer. Given that Dr. Gino co-authored the academic papers at issue, and was involved in certain stages of the data analysis, the presence of these files on her computer is unsurprising. **However, it is a significant leap to conclude that specific modifications occurred on her computer simply because she possessed the modified files.**

### B. Others Worked With At Least Three of the Four Datasets

109. In her written statement to the Investigation Committee, Dr. Gino advised that others were involved in the initial stages of working with the datasets before she conducted her analyses:

> I was not the person who cleaned the data and prepared it for the analyses. As common in my practices, those are tasks RAs are responsible for since they oversee studies when conducted.[79]

110. As discussed below in sections that analyze each of the Allegations in turn, the testimonial, documentary, and forensic evidence establishes that other individuals worked with at least three—and likely all four—datasets before Dr. Gino.

## IX. ALLEGATION 1

### A. Background of Study

111. Allegation 1 relates to the Study 3A dataset of the 2020 paper "Why connect? Moral consequences of networking with a promotion or prevention focus." The paper was authored by Professors Gino, Kouchaki, and Casciaro and published in the JPSP. The paper studies how people's attitudes toward professional networking affects how morally impure they feel about it, and how much they engage in networking. The paper examines three groups: (i) those with a promotion focus, who care about growth and advancement, (ii) those with a prevention focus, who care about maintaining the status quo and meeting their responsibilities, and (iii) a control group.[80]

[79] CX 1.21 (Final Report, Ex. 21 (Respondent's Written Statement to Investigation Committee received on November 11, 2022)), at 2.
[80] CX 16 (2020 JPSP Paper), at Havard0000010732.

112. Study 3A, the study at issue in the allegation, includes the responses given by 694 participants recruited via M-Turk to an online survey conducted using Qualtrics between January 15, 2020, and January 21, 2020. As part of the survey, participants were instructed to read an essay about networking at a corporate holiday party. Afterwards, they were asked seven questions about how they felt after reading it. They were asked to respond on a numeric scale ranging from 1 (not at all) to 7 (very much) whether the situation they read about made them feel: (i) dirty, (ii) tainted, (iii) inauthentic, (iv) ashamed, (v) wrong, (vi) unnatural, or (vii) impure.

113. Later in the survey, participants were asked four questions about their intentions for network:

i. "To what degree will you try to strategically work on your professional network in the next month?

ii. In the next month, how likely are you to voluntarily engage in behaviors that expand your professional network?

iii. To what degree do you plan to establish new professional connections in the next month?

iv. In the next month, to what degree is having a strong professional network a goal that you plan to pursue?"

114. They were instructed to respond to these questions using the same seven-point scale as for the moral impurity questions.

115. The published paper reported that the results of the study confirmed the hypothesis: the promotion-focus group reported lower feelings of moral impurity than the prevention-focus and control groups and higher networking intentions.

116. At the time of the study in question, Mr. Rohe worked with Dr. Gino as an RA. He advised the Investigation Committee that he was involved in the early stages of data cleaning for this study.[81]

### B. Harvard's Allegation

117. HBS alleged "Dr. Gino falsified and/or fabricated the dataset for Study 3a in the 2020 JPSP Paper by altering observations to affect the significance of findings of the study in the hypothesized direction."[82]

### C. Available Data

118. Allegation 1 concerns events that happened in January 2020. This is the allegation for which the most data is available. Below is a summary of the available evidence and where there are important gaps:

i. *Sent and Received Emails for Dr. Gino* – Dr. Gino's email files contains both messages that she sent and received in January 2020. However, her email files do not appear to be a comprehensive archive of all messages exchanged in this period. Mr. Rohe stated that he participated in the initial data cleaning for Study 3A; however, Dr. Gino's emails do not contain any emails with him about this or an email in which he transmitted his results, like he did for other studies for this paper;

---

[81] CX 1 (Final Report), at 18; CX 1.8 (Final Report, Ex. 8 (Transcript of Witness Interview with Mr. Alex Rohe on June 16, 2022)), at 6.
[82] Compl.at ¶ 13.

ii. *Usage Records* – The Most Recently Used records (a log of usage on files opened with Microsoft Office applications) are available for this timeframe showing which files were opened in Microsoft Excel and when they were last opened;

iii. *SPSS Statistics Journal* – The commands executed on the Gino Laptop in SPSS are captured by SPSS Journal available for this period;

iv. *No Internet History* – The Internet history is not available for the fgino user during this timeframe;

v. *No Removable Storage Device Info* – The records that track connections of removable storage devices are not available for this timeframe; and

vi. *No Third-Party Emails* – No emails were sequestered or provided to me from the witnesses or the Harvard students and staff involved with working with the dataset at issue.

### D. Chronology

119. Set forth below is a chronology of the key events for Allegation 1 based upon the available data:

1. Jan. 21, 2020 3:21 PM: The survey for Study 3A concludes.[83]
2. Jan. 22, 2020 8:52 PM: Data is downloaded to Gino hard drive from Qualtrics.[84] The downloaded file is a .zip file named "RF+and+Networking+-+Study+3A+New_January+22%2C+2020_20.52.zip". The .zip file contains one

[83] Based upon "End Date" for the latest entry, R_2P5OsdSUQ0pSjdD, in "*SV_8jeI9PXvlowBnRr_RF_and_Networking_-_Study_3A_New.csv*".
[84] The KMDItemWhereFrom metadata shows that the spreadsheet was downloaded from "https://hbs.ca1.qualtrics.com/responses/$/survys/SV_8jeIPXvlowBnRr".

file named "RF and Networking - Study 3A New_January 22, 2020_20.52.csv" ("Qualtrics CSV File").

3. Jan. 22, 2020 8:53 PM: The Qualtrics CSV File is extracted from the .zip file and saved as its own file on the Gino Laptop.

4. Jan. 23, 2020 1:52 AM: The Qualtrics CSV File is saved and the last modified date is updated. However, none of the data values have changed from the version downloaded from Qualtrics. Its content is still identical.[85]

5. Jan. 23, 2020 2:25 PM: The draft version of 2020 paper "Why connect 2020-01-22.docx" is last modified by Francesca Gino per the metadata. The paper has a placeholder that says "ADD" in the section for the Study 3A results. This draft describes the design of the Study 3A experiment and notes that 600 participants were recruited for the study.[86]

6. Jan. 24, 2020 1:50 PM: The next draft, "Why connect 2020-01-24.docx", of the paper is saved by Francesca Gino per the metadata. This draft still has a placeholder for Study 3A results.

7. Jan. 24, 2020 1:51 PM: The .csv file with the Qualtrics data is opened for the last time on the Gino Laptop.[87]

8. Jan. 24, 2020 1:52 PM: Dr. Gino emails the draft paper to Meghan King, an HBS support staff member. Dr. Gino asks Ms. King to proofread it.

9. Jan. 24, 2020 1:53 PM: The spreadsheet "data study3A RF networking.xlsx" is created on the Gino hard drive by Francesca Gino ("Study 3A Spreadsheet"). We do not know what the spreadsheet contained at this time, but by the end of the day when it was last saved, it contained the modified data values.

10. Jan. 24, 2020 2:03 PM: The Study 3A Spreadsheet is loaded into the SPSS statistical software and analyzed. The SPSS journal shows that the calculations

---

[85] The extracted .csv file has the same hash value as the .csv in the .zip file: 02AC9B5F71A1990CF9857FBEED22ECAF

[86] RX 105A (Why connect 2020-01-22.docx), at 25.

[87] RX 102 (Timestamp for Node_ID 58060 in Microsoft Recents MicrosfotRegistrationDB_17681617811847.reg database).

that were run around 2:03 PM depend on seven columns that were not present in the .csv of the results from Qualtrics.

11. Jan. 24, 2020 sometime after 2:03 PM and before 9:37 PM: another spreadsheet name "data study3A RF networking R.xlsx" is loaded into SPSS and analyzed ("R Version Spreadsheet"). This file no longer exists on the Gino Laptop (or in any of the other available evidence). Its contents are unknown.

12. Jan. 24, 2020 4:58 PM: Dr. Gino updates her co-authors that she will email the draft tonight.

13. Jan. 24, 2020 8:20 PM: A data file for a different study in the paper is created, "data study3B RF networking.xlsx".

14. Jan. 24, 2020 8:52PM: The R Version spreadsheet is last opened in Excel.[88]

15. Jan. 24, 2020 9:37PM: The other spreadsheet, Study 3A Spreadsheet, is loaded into SPSS. After calculations were performed, the data is saved as an SPSS output file, "study3A.sav".

16. Jan. 24, 2020 10:42 PM: The Study 3A Spreadsheet is last saved by Francesca Gino per the metadata. Since this version of the file is available, we know that it contained the modified data values by this point in time (and possibly earlier).

17. Jan. 24, 2020 between 10:42 PM and 10:48 PM: The Study 3A Spreadsheet is loaded into SPSS and calculations are performed.

18. Jan. 24, 2020 at 10:48 PM: SPSS data for the Study 3A study is saved as an SPSS output file, "data study3A.sav", which contains the modified data values.

19. Jan. 24, 2020 at 11:22 PM: The draft paper "Why connect 2020-01-24.docx" is last saved by Francesca Gino per the metadata.

20. Jan. 24, 2020 at 11:23 PM: Francesca Gino emails the draft paper to her co-authors. The results for Study 3A are the same as in the published version and reflect the modified data.

[88] RX 101 (Timestamp for node_id 58064 in Microsoft Recents database).

21. Jan. 26, 2020: After several rounds of edits that did not alter the Study 3A results, the revised paper is submitted to the publisher.
22. Apr. 20, 2020: The dataset is posted to the OSF website.

### E. Digital Forensic Analysis

120. In summary, for Allegation 1, a key date in the editing process was January 24, 2020, when Dr. Gino analyzed the dataset in the afternoon and circulated a draft version of the academic paper that evening with results that were based upon the modified data.

121. The forensic evidence shows that there was hardly time for Dr. Gino to prepare the analysis spreadsheet based upon the Qualtrics data as HBS asserts. Ten minutes after the spreadsheet with the modified data values was created on Dr. Gino's hard drive, it was loaded into SPSS for statistical analysis.

122. For HBS's clear-progression theory to hold, Dr. Gino would have had to create the Study 3A Spreadsheet from the Qualtrics dataset before the Study 3A Spreadsheet was loaded into SPSS. But that seems very unlikely, given that the Study 3A Spreadsheet reflects non-obvious data preparation work, and only 10 minutes elapsed from the time the Study 3A Spreadsheet was newly created to the time a prepared version of the dataset was loaded into SPSS. As detailed below, Dr. Gino would have had to clean and organize the raw data and, at a minimum, make multiple calculations and filter the data several times to add variables for the control and treatment groups. It is likely that Dr. Gino would use the data preparation work of her RA in connection with her statistical analysis.

123. Another spreadsheet, the R Version, was analyzed on the afternoon of January 24, 2020, but no copy of it has been located either in Dr. Gino's computer or elsewhere

in the Sequestered Materials. As described below, although the R Version is no longer available on Dr. Gino's hard drive, the evidence shows that it was different than both the Qualtrics data and the Study 3A Spreadsheet. The R Version could represent an earlier version of the data, *e.g.*, one edited by Dr. Gino's RA Mr. Rohe, who conducted the initial data cleaning for this study. The file name suggests that for two different reasons. But because the file is not available, we do not know where it came from or whether its contents reflected the unmodified or modified data values.

124. There are other reasons to believe that someone else on the research team was working on the data at this time. The day before that statistical analysis occurred, on January 23, 2020, Dr. Gino revised the draft paper at issue in Allegation 1, "Why connect 2020-01-22.docx." This draft states that 600 participants were recruited for Study 3A. However, that number does not come from the dataset she had on her computer at that time, the Qualtrics data, which shows 694 participants. The Study 3A Spreadsheet contains 600 rows, but that file was not created until the next day, January 24, 2020. Therefore, Dr. Gino likely obtained the number 600 on January 23, 2020, from a different source other than the Qualtrics data (*i.e.*, some other, unaccounted for dataset) or someone else communicated it to her on or before January 23, 2020. Either way, the evidence suggests that significant changes to the Qualtrics data had already been made before Dr. Gino started working with the dataset on January 20, 2024, and evidence available from HBS's incomplete sequestration and from Dr. Gino's computer is insufficient to explain what changes were made or who made them.

125. Set forth below is a description of the key data files that were accessed on the Gino Laptop on January 24, 2020—(i) the Qualtrics CSV File, (ii) the Study 3A

Spreadsheet, and (iii) the R Version—followed by a discussion of how our improved understanding on when the modifications had to be introduced before, and where there are still gaps in the additional evidence.

a. <u>The Qualtrics CSV File</u>

126. The Qualtrics CSV File contains 694 records. Of these, 544 have a "1" value in the "Finished" column, which signifies whether the participant completed the Qualtrics survey. Since it contains more records and fewer columns than the Study 3A Spreadsheet, this version could be considered "tall and narrow."

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | StartDate | EndDate | Status | IPAddress | Progress | Duration (in seconds) | Finished |
| 2 | Start Date | End Date | Response | IP Address | Progress | Duration (in seconds) | Finished |
| 3 | {"ImportId":"startDate" | {"ImportId":"endDa | {"ImportIc | {"ImportId":"ipAddress"} | {"ImportIc | {"ImportId":"duration"} | {"ImportId":"finished"} |
| 4 | 1/15/2020 16:18 | 1/15/2020 16:22 | 0 | 47.24.5.170 | 100 | 231 | 1 |
| 5 | 1/15/2020 16:18 | 1/15/2020 16:22 | 0 | 97.82.237.238 | 100 | 288 | 1 |
| 6 | 1/15/2020 16:17 | 1/15/2020 16:22 | 0 | 73.40.40.36 | 100 | 332 | 1 |

*Figure 6: Excerpt of Qualtrics data in "RF and Networking - Study 3A New_January 22, 2020_20.52.csv"*

b. <u>The Study 3A Spreadsheet</u>

127. The Study 3A Spreadsheet contains 599 records, a lower number than the Qualtrics CSV File. The "finished" column appears in a different location and with different capitalization than in the Qualtrics .csv file. All 599 records have a "1" value in the "finished" column.

| BS | BT | BU | BV | BW |
|---|---|---|---|---|
| **cond_nan** | **control_Dummy** | **promotion_Dummy** | **prevention_dummy** | **finished** |
| control | 1 | 0 | 0 | 1 |
| control | 1 | 0 | 0 | 1 |
| control | 1 | 0 | 0 | 1 |
| control | 1 | 0 | 0 | 1 |

*Figure 7: Excerpt of "data study3A RF networking.xlsx" spreadsheet*

128. The SPSS Journal shows that the first analysis performed on January 24, 2024, involved the data in the "morally_impure4" and "cond_name" columns from the

Study 3A Spreadsheet. The Qualtrics CSV File does not contain either of those columns.

129. In total, the Study 3A Spreadsheet contains eight columns not found in the Qualtrics CSV File:

i. morally_impure4, which is an average of three other columns, moralImpurity_1 to 3

ii. moral_wrong3, an average of moralImpurity_5 to 7

iii. moral_impurity7, an average of moralImpurity_1 to 7

iv. networking_intentions, an average of netIntentions_1 to 4

v. cond_name, a column that uses descriptive names for the conditions instead of the quantitative values of 1 to 3 found in the condition column

vi. promotion_Dummy, which is an indicator column that contains a 1 every time a record's condition is "promotion"

vii. prevention_dummy, which is an indicator column that contains a 1 every time a record's condition is "prevention"

viii. CumID, which contains a sequence number from 1 to 694 for each of the survey responses. This sequence number appears to be assigned based upon the order in which the survey responses appeared in the Qualtrics CSV File with the first entry being assigned sequence number 1 and so on.

130. There is also data present in the Qualtrics CSV File that is not present in the Study 3A Spreadsheet. The second and third rows in the Qualtrics CSV File are not present in

the Study 3A Spreadsheet. There were also eight columns present in the Qualtrics CSV File that were not present in the Study 3A Spreadsheet:

i. RecipientLastName

ii. RecipientFirstName

iii. RecipientEmail

iv. ExternalReference

v. LocationLatitude

vi. LocationLongitude

vii. DistributionChannel

viii. UserLanguage

131. The column that records whether the survey participants completed the survey differed in name, placement, and values between the Qualtrics CSV File and the Study 3A Spreadsheet. In the Qualtrics CSV File, the seventh column is named "Finished." In the Study 3A Spreadsheet, the column is named "finished" and appears as the 75th column. The values differ between the two versions. In the Qualtrics CSV, 544 of the 694 records have a 1 in the "Finished" column. In the spreadsheet, all 599 entries have a 1 in the "finished" column.

132. The Excel spreadsheet is not sorted in the same order as the CSV. It is sorted by several of the columns that were added to the dataset: first by "cond_name", then by "networking_intentions", then by "moral_impurity7".

133. Since the Study 3A Spreadsheet contains fewer records, but more columns than the Qualtrics CSV File, it could be considered "short and wide."

c. R Version

134. The R Version is not available on Dr. Gino's computer, so we do not know specifically what data it contained. However, the SPSS journal file provides some information about how the file was structured. The SPSS journal file indicates that the R Version was organized similarly to the Study 3A Spreadsheet, but it contained more records than the Study 3A Spreadsheet.

135. The SPSS journal file shows that statistical computations were run on the R Version that rely on the following columns that were not present in the Qualtrics CSV File, but that were present in the Study 3A Spreadsheet: "networking_intentions", "promotion_Dummy", "prevention_dummy", "moral_impurity7", "finished", "cond_name", "moral_wrong3", "morally_impure4", "moralImpurity_1", "moralImpurity_2", "moralImpurity_3", "moralImpurity_4", "netIntentions_1", netIntentions_2", "netIntentions_3", "netIntenions_4".

136. The SPSS journal shows that the R Version is filtered to only include the records where the participants completed the survey. Specifically, the following command was run:[89]

```
USE ALL.
COMPUTE filter_$=(finished = 1).
VARIABLE LABELS filter_$ 'finished = 1 (FILTER)'.
VALUE LABELS filter_$ 0 'Not Selected' 1 'Selected'.
FORMATS filter_$ (f1.0).
```

[89] A user can run a command in SPSS by either typing the text of the command in the console or by clicking buttons, selecting menu options, and/or specifying parameters in the graphical user interface that aids the user in building the command.

```
FILTER BY filter_$.
EXECUTE.
```

137. The command filters the dataset so that only the records where the "finished" column contained a 1 are visible and included in forthcoming calculations. The R Version was filtered twice on January 24, 2020, to only include the records where the participants completed the survey. By contrast, the Study 3A Spreadsheet was never filtered in SPSS.

138. That the filter command was run on the R Version on two separate occasions suggests that the R Version contained more data than the Study 3A Version. All the records in the Study 3A Version have 1s in the "finished" column, so the filter command would have no effect on the Study 3A Version. The filtering command would only have an effect if it were run on a dataset that had both incomplete and complete survey results. This suggests that the R Version had both the incomplete and complete survey results, like the Qualtrics CSV File.[90] The R Version therefore may represent a distinct dataset: it contains more than just the complete survey records (unlike the Study 3A Spreadsheet); and it contains columns that are not found in the Qualtrics CSV File. Therefore, the R Version could be considered "tall and wide." Figure 8 below depicts how the three distinct Study 3A datasets that existed on January 24, 2020, could have been organized.

[90] Since the R Version is unavailable, I do not know what it contained. It is logically possible that it contained the same number or fewer records that the Study 3A Spreadsheet, a possibility that HBS proposed during the Third Statute Proceeding. (*See* Rebuttal Expert Statement of Jeremy Freese, Sep. 27, 2024 at ¶¶61-66.) I base my assertion that the R Version could have been "taller" than the Study 3A Spreadsheet on the commands in the SPSS Journal since only the R Version was filtered on the "finished" column.




*Figure 8: Datasets for Allegation 1*

139. HBS alleges that Dr. Gino was in possession of the raw data from Qualtrics and that she modified the data. But because HBS did not identify all the relevant versions or the SPSS Journal, and also did not establish a chronology of actions, HBS's theory is simply conjecture divorced from the facts.

140. Dr. Gino did have the unmodified Qualtrics CSV File and the modified Study 3A Spreadsheet on her computer, but the relationship between the two cannot be understood without considering the R Version and knowing how Mr. Rohe's cleaned version fits into the chronology.

*i. Under HBS's Theory, Dr. Gino Would Have Had Only 10 or 12 Minutes to Prepare the Study 3A Spreadsheet*

141. The forensic evidence relevant to Allegation 1, shows there was hardly time for Dr. Gino to have prepared the Study 3A Spreadsheet (which differs significantly from the Qualtrics data) before she loaded that spreadsheet for analysis into SPSS.

142. The Qualtrics CSV File was last opened on January 24, 2020, at 1:51 PM, using Excel on Dr. Gino's computer. While the file had been downloaded to the Gino Laptop, two days prior, the available evidence does not reflect any analysis or changes to the

Qualtrics data during this time. No changes had been made to the columns and the data values in the Qualtrics CSV File still matched what is available on Qualtrics.

143. Two minutes later, at 1:53 PM, the Study 3A Spreadsheet was created on Dr. Gino's hard drive. The metadata reflect that the file was created on the Gino Laptop as opposed to the file having been copied from another source. Based solely on the creation dates, one might conclude that the Study 3A spreadsheet was created from scratch by Dr. Gino at 1:53 PM. However, no one suggests that Dr. Gino typed in thousands of data values from scratch. Rather, the data was copied into the newly created spreadsheet from another source. What is at issue is the source.

144. Professor Freese, HBS's sociology expert in the Third Statute proceeding, contended that Dr. Gino created the Study 3A Spreadsheet from the Qualtrics dataset.[91] But that seems unlikely, given that the Study 3A Spreadsheet reflects non-obvious data preparation work, and only 10 minutes elapsed from the time the Study 3A Spreadsheet was created to the time a prepared version of the dataset was loaded into SPSS. When considering the totality of the available evidence, including analysis of the Study 3A Spreadsheet in SPSS minutes after it was created on the Gino Laptop and the existence of the R Version, a different version of the dataset, it is possible that Dr. Gino copied data into the Study 3A Spreadsheet from another source, *e.g.*, opened the R Version and copied information over into a new spreadsheet, and then saved that spreadsheet as the Study 3A Spreadsheet.

145. At 2:03 PM, a mere ten minutes after the spreadsheet was created, it was loaded into SPSS, a program for statistical analysis. The SPSS Journal shows that the calculations

---

[91] Exhibit 1 to Expert Statement of Jeremy Freese, Aug. 16, 2024 at ¶76.

that were run around 2:03 PM, *i.e.*, the very first calculations run in SPSS on the data, depend on seven columns that were not present in the raw data for Qualtrics.

146. For HBS's theory to hold, Dr. Gino would have had to clean and organize the raw data and, *at a minimum,* make the following modifications in under 10 minutes—or 12 minutes if we count from the moment the Qualtrics file was opened: (i) remove Rows 2 and 3, which contain descriptions of the columns; (ii) create and calculate seven of the eight columns discussed above: (a) morally_impure4, (b) moral_wrong3, (c) moral_impurity7, (d) networking_intentions, (e) cond_name, (f) promotion_Dummy, and (g) prevention_dummy. Performing these tasks in less than 10 minutes would have required Dr. Gino to conduct multiple calculations and filter the data several times to add variables for the control and treatment groups.

147. The short timeframe also means that Dr. Gino would likely have had to know the specific changes and calculations to be made before opening the Study 3A Spreadsheet so she could simply begin executing a pre-planned set of operations. There is no forensic evidence that any such plan existed in writing on her computer, which compounds the implausibility of this alternative.

*ii. The Unavailable R Version Is Crucial for Understanding How the Modifications Were Introduced*

148. The SPSS journal file shows that the R Version was loaded into SPSS several times. The first time was on January 24, 2020, the same day as the Study 3A Spreadsheet was created on Dr. Gino's hard drive. The R Version was analyzed sometime after 2:03 PM and before 9:37 PM.[92]

[92] The time window is based upon the entries in the SPSS journal file. Not every entry is timestamped, so I do not have the exact time that the R Version was loaded into SPSS.

149. In his witness interview with the Investigation Committee, Mr. Rohe discussed using R scripts to prepare data—R is another statistics software program.[93] The "R" in the "data study3A RF networking R.xlsx" file name may refer to the R statistics software. If so, others would have worked with the dataset either before or concurrently with Dr. Gino's access. Dr. Gino stated in her witness interview with the Investigation Committee that she did not use R.[94] R was not one of the applications installed on her computer. The "R" in "data study3A RF networking R.xlsx" file name could also refer to Rohe. I observed other instances where Mr. Rohe added his initials, usually written as "AR," to files he edited.[95]

150. During the Third Statue Proceeding, HBS introduced an alternative explanation for the R Version that did not relate to Mr. Rohe. HBS pointed to two spreadsheets—one with R in the filename and one without—that were analyzed by Dr. Gino in SPSS in the 2013 timeframe, well before Mr. Rohe was her RA.[96] If Mr. Rohe had been specifically asked about the R Version, this might have resolved the question. However, the fact that the R Version had once existed on the Gino Laptop and was analyzed on the same day that the Study 3A Spreadsheet was created on the Gino Laptop was uncovered through the digital forensic analysis I conducted in 2024. The Investigation Committee was not aware of it and did not ask Mr. Rohe about the R Version during his witness interview.

---

[93] CX 1.8 (Final Report, Ex. 8 (Transcript of Witness Interview with Mr. Alex Rohe on June 16, 2022)), at 6.
[94] CX 1.1.7 (Final Report, Ex. 1 (Ex. 7 thereto) (Transcript of Respondent Interview on February 28, 2022)), at 8.
[95] The spreadsheet named "Hiring Video Coding Scorecard for Part 2 (Jan 2019) 01.28.2019 AR.xlsx" was last modified by Mr. Rohe (RX 701). The Word document named "Summarizing Cooperation Across Disciplines (Pt. 1) 7.20.2018 AR.docx" was also last modified by Mr. Rohe (RX 702).
[96] Rebuttal Expert Statement of Jeremy Freese, Sep. 27, 2024 at ¶¶47-49.

151. HBS collected the SPSS logs, but did not provide them to Maidstone or to the Investigation Committee. HBS did not collect the Microsoft Office Recents data that showed when the R Version was last opened on the Gino Laptop.

152. The R Version spreadsheet is no longer present on the Gino hard drive. It could represent an earlier version of the data, *e.g.*, one coded by the RAs. Because the file is not available, I do not know whether its contents would reflect the unmodified or modified data values. I know that the record considered by the Investigation Committee was missing a key document from the most critical timeframe.

*iii. Evidence Suggests that Dr. Gino Did Not Clean the Qualtrics Data Herself*

153. There is further forensic evidence that suggests that Dr. Gino did not create the Study 3A Spreadsheet by cleaning and modifying the Qualtrics CSV File. On the afternoon of January 23, 2020, Dr. Gino last modified a draft document "Why connect 2020-01-22.docx". The draft notes that 600 participants were recruited for the Study 3A.[97]

> **Study 3A: Method**
>
> **Participants and design.** We recruited 600 participants through MTurk ($M_{age}$ = XX, *SD* = XX; XX% male), all working adults located in the United States, and paid them $2 for their participation in a 15-min long study. We randomly assigned participants to one of three conditions: control vs. promotion focus vs. prevention focus.

*Figure 9: Excerpt from "Why connect 2020-01-22.docx"*

154. The 600 number remains in the draft version of the paper that is circulated on January 24. This draft includes other revisions to this section.

[97] RX 105A (Why connect 2020-01-22.docx), at 25.

155. The source of the 600 number is not evident from the available data. It does not come directly from the Qualtrics CSV File that Dr. Gino had on her computer at this time. The Qualtrics data shows 694 participants in total, of which Qualtrics reported that 544 completed the survey. The Study 3A Spreadsheet is not the source of the 600 statistic either. The counts are close: the Study 3A Spreadsheet contains 600 rows and lists 599 records all of which have 1s in the "finished" column. However, it was not created until the day after the draft version of the paper with the participant count was prepared.

156. For this study, determining the number of completed results would have been a lengthy process. There is no single column that one could use to quickly evaluate whether a respondent completed the survey. In this study, the responses for the different control, prevention, or promotion groups are captured in different columns. If, as HBS conjectures, Dr. Gino spent considerable time on the afternoon of January 24, 2020 starting with the Qualtrics data and cleaning it to identify and remove the 95 participants who did not complete the survey, it seems unlikely that she would have then forgotten to include these participants when listing the total number of participants recruited for the study.[98] Rather, it seems more likely that Dr. Gino did not clean the data herself and that the cleaning process was performed earlier on another file Dr. Gino did not have.

[98] Dr. Gino was not merely repeating the same analyses: she switched between datasets, re-opened SPSS, analyzed both the filtered and unfiltered results, and ran commands with different parameters, e.g. UNIANOVA commands with different post-hoc error correction methods and PROCESS mediation analysis commands with different mediators.

### *iv. Hearing Committee's Conclusion Misstated the Evidence*

157. The opinion that I reached differs from the Hearing Committee's conclusion, which misstated the evidence. For Allegation 1, the Hearing Committee concluded:

> On a single day—January 24, 2020—Professor Gino opened the original, unaltered Qualtrics dataset in the afternoon and then hours later saved the altered dataset used in the final analysis. She analyzed these two files over the course of the afternoon using SPSS, running commands in a manner consistent with repeatedly altering the data and then checking whether and how it improved the results.[99]

158. The Hearing Committee is incorrect about what files Professor Gino analyzed on January 24, 2020. There is no evidence that the original, unaltered Qualtrics dataset was ever analyzed in SPSS. The SPSS logs reflect two files were examined: the Study 3A spreadsheet, which contained the modified values (at least at the end of the day on January 24, 2020), and the R Version, whose contents are unknown since the file was not recovered.

*159.* The Hearing Committee's statement that the files were analyzed over the course of the afternoon is an interpretation that even HBS had abandoned by the time of the hearing in the Third Statute. HBS advanced it earlier during the Third Statute proceeding. However, as I explained in my Third Statute Proceeding report, the SPSS Journal establishes that most of the analysis work was conducted in the late evening sometime after 8:20 PM and that Professor Gino was not merely repeating the same analyses: she switched between datasets, re-opened SPSS, and analyzed both the filtered and unfiltered results.[100]

---

[99] Hearing Committee, *Third Statute Proceeding Against Professor Francesca Gino of the Harvard Business School – Findings of Facts and Recommendations,* Jan. 24, 2025 at 10.

[100] Expert Statement of Michael F. McGowan, Sep. 13, 2024 at ¶¶ 172, 183.

# X. ALLEGATION 2

## A. Background of Study

160. Allegation 2 concerns the Experiment 4 dataset for the "The moral virtue of authenticity: How inauthenticity produces feelings of immorality and impurity" academic paper that was co-authored with Professor Kouchaki and Professor Galinsky. The paper was published in the journal *Psychological Science* in 2015. The paper asserts that "authenticity is directly linked to morality."[101]

161. Experiment 4 tests whether choice increases the desire for cleanliness, which is associated with inauthentic feelings.[102] Participants were first asked to confirm that they were Harvard college students. Then, they were asked their opinion on whether the Q guide (a publication of student ratings and reviews of Harvard courses) should include difficulty ratings. The paper notes that this topic was actively being debated at Harvard at the time of the survey.[103] At the outset, participants were randomly assigned to one of three groups for purposes of the study:

i. A low-choice, counter-attitudinal group—participants in this group were asked to write an essay arguing the side of the Q guide debate *opposite* their true position;

ii. A high-choice, counter-attitudinal group—participants in this group were also asked to write an essay arguing the side of the Q guide debate *opposite* their true position, but who first were asked to check a box to confirm their willingness to write this essay; and

[101] CX 25 (2015 Psychological Science Paper), at Harvard0000010749.
[102] *Id.* at Harvard0000010757.
[103] *Id.*

iii. A high-choice, pro-attitudinal group, who were asked to argue the side of the Q guide debate they truly supported.[104]

162. After completing the essay, participants were shown a list of products and asked to rate their desirability on a 7-point scale where 1 is completely undesirable and 7 is completely desirable.[105]. The products included cleaning products, such as Dove shower soap, and neutral products such as Post-It Notes.

163. Participants then were asked to respond to the following questions about how they felt after writing the essay using a 7-point scale where 1 is strongly disagree and 7 is strongly agree:

i. I did not know how I really felt inside

ii. I felt as if I did not know myself very well

iii. I felt out of touch with the 'real me'

iv. I felt alienated from myself

164. The ratings were saved as the self-alienation scores.

165. Participants were also asked "How much choice did you have in writing the essay you wrote?" using the same 7-point scale. The ratings were saved as the choice scores.

166. The authors hypothesized that participants would rate the cleaning products higher when they rate essays that were not consistent with their internal beliefs, *i.e.*, in the high-choice, counter-attitudinal condition and the low-choice, counter-attitudinal

---

[104] *Id.* at Harvard0000010757 to Harvard0000010758.
[105] *Materials_and_Methods*, posted to OSF project.

condition.[106] Moreover, they expected to find that having a choice does not increase a desire for cleanliness.[107]

167. The published results of Experiment 4 were consistent with these expectations: choice did not increase the desire for cleanliness: "when participants wrote essays that were not consistent with their internal beliefs, regardless of choice, they showed a greater desire for cleanliness."[108]

### B. Harvard's Allegation

168. HBS alleged "Professor Gino falsified and/or fabricated portions of the datasets for Study 4 in the 2015 Psychological Science Paper by altering, adding, or deleting a number of observations. These changes resulted in significant effects supporting the hypotheses, as reported in the published paper. Analyses of the original Qualtrics data do not support the hypotheses."[109]

### C. Available Data

169. Below is a summary of the available evidence and where there are gaps:

i. *No Sent Emails for Dr. Gino* – Dr. Gino's email files contain only messages that she *received* in the fall of 2014. The email files on her laptop do not contain any emails in her Sent Items during this period.

ii. *No Usage Records* – The usage records (an application log for the Microsoft Office programs) showing which files were opened in Microsoft Office programs and when they were last opened are not available.

[106] CX 25 (2015 Psychological Science Paper), at Harvard0000010757.
[107] *Id.*
[108] *Id.* at Harvard0000010759.
[109] Compl. at 5.

iii. *No SPSS Statistics Journal* – The SPSS statistical journal is not available for this period.

iv. *No Internet History* – The Internet history is not available for the fgino user during this timeframe.

v. *No Removable Storage Device Info* – The records that track connections of removable storage devices are not available for this timeframe.

vi. *Few Third-Party Emails* – Professor Galinksy provided certain emails to the Investigation Committee. However, no emails were provided from Harvard RAs, support staff, and students involved with working with the dataset at issue.

### D. Chronology

170. Set forth below is a chronology of the key events for Allegation 2 based upon the available data:

1. Sep. 10 to 22, 2014: The Qualtrics survey was conducted in-person at Harvard's CLER lab.
2. Sep. 22 to Oct. 2, 2014: The Qualtrics survey was conducted online with participants recruited via M-Turk.
3. Sep. 27, 2014 at 9:29 AM: Interim results from the online study (370 survey responses from Sep. 21 through 27) are saved on the Gino Laptop ("data Authenticity__2ndRR_CD_ONLINE 2014-09-27.xls"). The file was created by Francesca Gino per the embedded metadata.
4. Sep. 30, 2014 at 9:34 PM: A later version of the interim results (this time with 577 survey results through Sep. 30) was created by Francesca Gino per the embedded metadata. This file was named "data Authenticity__2ndRR_CD_ONLINE 2014-09-30.xls".

5. Sep. 30, 2014 at 9:49 PM: Both the Sep. 27 and 30 spreadsheets are last saved by Francesca Gino.

6. Oct. 6, 2014 10:30 PM: The results of the online survey were downloaded and saved on the laptop used by Dr. Gino. The file was named "Authenticity__2nd_RR_cogn_dissonance_ONLINE.csv" and it contains 201 records.

7. Oct. 7, 2014 1:20 AM: The .csv with the online results was last modified. The data values were unchanged.

8. Oct. 7, 2014 1:20 AM: A spreadsheet named "data Authenticity__2ndRR_CD_ONLINE 2014-10-07.xls" is created. The metadata reflects that it was authored and last saved by "Francesca Gino". It contains 455 records from Sep. 21 through Oct. 6, including the 24 Harvard values. Some values are highlighted in green. The spreadsheet's second worksheet was labelled "did not continue". The third worksheet contains email addresses. The spreadsheet is last modified 15 minutes later at 1:35 AM.

9. Nov. 11, 2014 8:12 AM: Dr. Gino emails Professor Galinsky: "Also we have amazing data from the Psyc Science R&R and I promised Maryam that I would get the revision done before you get here!"

10. Nov. 27, 2014 10:26 AM: A second copy of the online results was downloaded and saved on the Gino Laptop.

11. Nov. 27, 2014 12:30 PM: A spreadsheet named "data_Authenticity__CD_online 2014-11-26.xls" was created. Per the metadata, it was created by Francesca Gino.

12. Nov. 27, 2014 12:42 PM: A .zip file containing the CLER results was created on the Gino Laptop. A CSV version of the CLER results saved on the Gino Laptop appears to have come from the .zip file.

13. Nov. 27, 2014 1:12 PM: A spreadsheet named "data_authenticity_CD_CLER 2014-11-26.xls" was created. Per the metadata, it was created by Francesca Gino.

14. Nov. 27, 2014 1:20 PM: A spreadsheet named "data_Authenticity__CD_online 2014-11-26.xls" was last modified. Per the metadata, it was last saved by Francesca Gino.

15. Nov. 27, 2014 2:12 PM: The spreadsheet with the CLER results was last saved by Francesca Gino. The data values match the Qualtrics version.

16. Nov. 27, 2014 2:36 PM: The instructions for online survey "survey cogn dissonance study.pdf" were downloaded.

17. Nov. 27, 2014 8:00 PM: The spreadsheet named "data_Authenticity__CD_online & CLER 2014-11-26.xls" was created on the Gino Laptop per the filesystem metadata. We do not know what the spreadsheet contained at this time.

18. Nov. 28, 2014 9:54 PM: The spreadsheet "data_Authenticity__CD_online & CLER 2014-11-26.xls", is last saved by Francesca Gino per the metadata. It contains a combination of the CLER and online survey responses. The spreadsheet reflects the modified data values.

19. Nov. 28, 2014 10:00 PM: The SPSS output file with the combined data is created. It reflects the modified values.

20. Nov. 28, 2014 10:43 PM: A draft version of the paper, "Morality and Authenticity PS revision 2014-11-28.docx" is last saved by Francesca Gino. The statistics reflect the modified values.[110] It is likely circulated to her co-authors shortly thereafter as Professor Kouchaki provides comments in a version dated November 29, 2014 at 1:17 PM.

21. Nov. 30, 2014 11:04 AM: Professor Galinksy writes to Dr. Gino and Professor Kouchaki, "Here is the paper! It is looking great! [...] "Given the topic (moral cleansing has come under attack) and the strength of the results, my guess is that data detectives may ask for our data. So we should double check all stats and also be prepared to share the data sets."

22. Dec. 3, 2014: The revised paper is submitted to Psychological Science.

23. Feb. 8, 2015: The datasets that are posted to OSF are prepared.

[110] The statistics reported on page 24 of draft re: Desirability for cleansing products match those in final version.

## E. Digital Forensic Analysis

171. The Investigation Committee relied on two incorrect factual premises in reaching their conclusion that Allegation 2 was substantiated. The original complainant asserted that the odd "Harvard" entries for class year values indicate data tampering. This was an incorrect conjecture made without access to the Qualtrics data. Rather, the odd Harvard class years are present in the original Qualtrics and appear to represent a scammer taking the survey multiple times for money. The Investigation Committee also relied upon the false premise that there are records in the final OSF data that do not come from either Qualtrics study. This stems from an incorrect comparison that Maidstone performed between the Qualtrics and final OSF data, which did not consider other data that Maidstone received from HBS that would have made clear that all the records in the final OSF do, in fact, come from the Qualtrics studies. Maidstone quietly corrected this finding in their most recent December 2023 supplemental report.[111] I am not aware of Maidstone calling attention to this significant correction in any supplemental report to the Investigation Committee.

172. HBS's assertion of a "clear progression" in the editing of the datasets is overstated. HBS's chronology presents an inaccurate picture. It suggests that Dr. Gino spent Thanksgiving Day, November 27, 2014, starting with the Qualtrics data, coding and organizing it, and then modifying certain data values. This impression only results from numerous missing data points. As set forth in the chronology above, Dr. Gino did not begin working with the data on Thanksgiving Day. She had interim versions

[111] CX 9 (Harvard0000001070 - MCG's Addendum to October 2022 Assessment of Allegation 2), at Harvard0000001072 ("Previously identified and confirmed: Data sets **2a** and **2b** are derived from distinct protocols, although an amalgamation of these two data sets appears to be the source of the published data set **4.**").

of the online survey results starting almost two months earlier on September 27, 2014. Even with a fuller chronology, the available evidence is insufficient to answer key questions, including the source of the interim files that Dr. Gino worked with and the source of the modified values. There are several factors that suggest others in addition to Dr. Gino were involved in working with the dataset at issue in Allegation 2.

173. One of the "Harvard" records with modified data values was withheld from analysis, because the participant did not write an essay. This is the opposite of a clear progression. Under HBS's theory, Dr. Gino would have downloaded the data from Qualtrics, modified survey responses, and then discarded some of the modified data because the participant whose data she had allegedly just falsified did not substantively complete the essay. This is not a coherent theory of data falsification. In my opinion, the facts better support a possible explanation that Dr. Gino received the modified data from someone else and analyzed it unaware of any such modification.

*i. Harvard Class Years are Present in Original Dataset*

174. The crux of the original complainant's argument for this allegation is that 20 participants in the published dataset responded to the survey question asking for their class year with "Harvard".[112] The Inquiry Committee, Maidstone, and the Investigation Committee all examined the "Harvard" class year entries. While they realize that the entries are present in the Qualtrics data, they focus on oddities in the responses, *e.g.*, that the essays were short and submitted in rapid succession, and fail

[112] CX 1.1.3 (Final Report, Ex. 1 (Ex. 3 thereto) (Complainant's Written Response Received on December 3, 2021)), at 13.

to recognize that if such anomalies are already present in the Qualtrics data, those anomalies were not subsequently added by Dr. Gino. None realized that the presence of these entries *in the Qualtrics data* meant that the original complainant's conjecture of falsification was incorrect. Instead, this incorrect assertion is surprisingly codified as a "finding of fact" and relied upon by the Investigation Committee. This supposed finding is flatly wrong.

175. A central component of the original complainant's allegations for Allegation 2 is the "strange demographic responses" it observed when survey participants were asked their class year in school.[113] The original complainant noted that 20 participants answered "Harvard" or "harvard" and that these responses were located in close proximity in the published dataset. The original complainant observed that "it is difficult to imagine many students independently making this highly idiosyncratic mistake."[114] The original complainant surmised, "This is a red flag, for it could indicate that someone had copy-pasted rows of data, without noticing that it resulted in an implausible number of students providing the same strange and erroneous answers to a straightforward question."[115]

176. Maidstone devoted little attention to the original complainant's concern about the "Harvard" class year values. Maidstone determined that the "irregularities" were not attributed to the Harvard values: "[a]n additional check was conducted to evaluate if the irregularities were to be attributed to surveys having 'harvard' (or 'Harvard') as an entry on the 'yearSchool' column."[116] They concluded, "However, the rationale for

[113] *Id.*
[114] *Id.* at 13-14.
[115] *Id.* at 15.
[116] CX 1.17 (Final Report, Ex. 17 (Maidstone Consulting Group Forensic Report for Allegation 2)), at 11.

inclusion or exclusion of value data in the OSF dataset did not appear to be reliant on this category."[117]

177. Maidstone did not point out that the "Harvard" responses are present in the raw data from Qualtrics. The fact that the Harvard records are present in the Qualtrics online set necessarily means that they were not introduced later by Dr. Gino hoping to improve the results. Eight of the Harvard results were among the entries whose values were subsequently modified. If Dr. Gino or an accomplice were behind the odd entries, they would not need to modify the values after the fact; they could have done that at the outset.

178. While the Harvard class year entries were part of the original survey results, the original complainant is correct that they are odd responses. Based upon my review, they appear to have been entered by an individual or small number of individuals not affiliated with Harvard looking to make money online quickly:

i. The surveys were completed rapidly;

ii. The surveys were submitted in quick succession in four batches on September 28, September 30, October 1, and October 2, 2014, with another survey starting minutes after the prior survey concluded;

iii. Non-Harvard emails were supplied, and no IDs were entered;

iv. The essay responses were among the shortest, often consisting of only several words as opposed to the full paragraph(s) that others submitted;

[117] *Id.*

| M | N | V | Y |
|---|---|---|---|
| email | ID | yearSch | eNCS |
| 25 | | Harvard | It can help us learn more things . |
| carolawashington@gmail.com | | Harvard | This is good for us. |
| robinbbrown@hotmail.com | | Harvard | It is better for us |

*Figure 12: Excerpt of emails, IDs, class year responses, and essays for "Harvard" entries*

v. They were submitted from California, Georgia, and China per Qualtrics' geolocation of the IP addresses; and

vi. Seventeen of the IP addresses are currently associated with hosting companies. This suggests that the responses were submitted by a single individual or a small number of individuals using a VPN to mask their location. A possible reason for masking the location is to avoid being disqualified from taking the survey multiple times. When a participant completed the survey, he or she received an Amazon gift certificate.

179. There is no critical analysis by either Maidstone or the Investigation Committee of the fact that the Harvard entries are part of the original dataset, not a subsequent introduction as the original complainant surmised. The Investigation Committee is specifically aware that the Harvard entries are part of the original Qualtrics results:

> Building on the analyses conducted by the Inquiry Committee, the Investigation Committee noted four additional peculiar features of the 24 lines of data that had "Harvard" as the response for "Year in school" in the Respondent's Qualtrics datasets for this study." First, the text (essay) responses are much shorter than almost all the others. Second, these responses were submitted on three specific dates: September 28, 2014, October 1, 2014 and October 2, 2014, all towards the end of the study's data collection period. Third, almost all the other participants provided a Harvard email address, but none of the 24 participants who responded with "Harvard" as "Year in school" provided a Harvard email address. Fourth, almost all the other participants provided a

Harvard ID, but none of the 24 participants who responded with "Harvard" as "Year in school" did so.[118]

180. Even though the original complainant's supposition that the Harvard entries are a red flag for data manipulation has shown to be incorrect by the presence of Harvard entries in the raw dataset, the Investigation Committee still considers this "peculiar feature" as a "Finding of Fact" when determining that Dr. Gino is guilty of manipulating the dataset at issue in Allegation 2. This also shows that Dr. Gino's concern that some malicious actor could have been responsible for some of the anomalies was, in fact, true.

*ii. Maidstone Acknowledged in Later Analysis that its Main Finding concerning Allegation 2 Was Incorrect—the Published Data for Allegation 2 Does, in Fact, Derive from the Qualtrics Survey Data.*

181. One of Maidstone's findings for Allegation 2 was that there were records in the published results set that did not come from the Qualtrics surveys. This is false. It is based upon an incorrect analysis that stems from comparing only the earliest and latest datasets.

182. The survey data for the study at issue in Allegation 2 was collected from two different groups of participants—some took the survey in person at HBS's CLER lab; others took the survey online through M-Turk. The results of the CLER participants and results of the online participants were merged to create an integrated dataset for analysis. To compare the dataset posted to OSF and the datasets found in Qualtrics, Maidstone attempted to match participant responses by searching common data values across columns, *e.g.*, for a record in the Qualtrics data that pertained to a 22-

[118] CX 1 (Final Report), at 20–21.

year-old male in the pro-attitudinal group, Maidstone would look for a record in the OSF data for a 22-year-old male in the pro-attitudinal group with the same data values. Maidstone compared the datasets this way because "no single column could be used to identify a single subject across datasets, and no participant numbers were included."[119] This is a problem of their own making. Both components of the survey, CLER and online, have unique IDs. There is no unique ID present in the published data due to data privacy. However, Maidstone did not consider one of the files that HBS provided them in August 2022, "data_Authenticity__CD_online & CLER 2014-11-26.xls", which contains the unique IDs they needed to match the raw Qualtrics files.

183. Maidstone's erroneous assertion that 27 records are present in the OSF data that cannot be found in the Qualtrics surveys is incorrect and results from incorrect matching logic.[120]

184. The Investigation Committee relied in part on this erroneous assertion in determining that Dr. Gino falsified or fabricated the dataset at issue in Allegation 2:

> The Investigation Committee closely examined the forensic report produced by Maidstone Consulting Group for this allegation. MCG compared the publicly available data posted on OSF with the datasets for this study found in Professor Gino's Qualtrics account. This analysis showed that some data in the OSF dataset do not appear in either of the two Qualtrics datasets for this study, that those data strongly support the hypothesized and reported results, and that some data in the two Qualtrics datasets do not appear in the OSF dataset. [121]

[119] CX 1.17 (Final Report, Ex. 17 (Maidstone Consulting Group Forensic Report for Allegation 2)), at 7.
[120] *Id*. Maidstone also states that records from Qualtrics were excluded from OSF data. This is correct. However, the records appear to have been excluded for legitimate reasons: the records are incomplete or are test entries.
[121] CX 1 (Final Report), 21.

185. However, Maidstone conducted additional analysis of the Allegation 2 files as part of its mid-2023 supplemental work, which was attached to a June 20, 2023 memorandum from RIO Bonacossa to Dean Datar (the "Supplemental Report").[122] Maidstone did not update its analysis about entries it claimed were found only in the published dataset. The Supplemental Report states:

> With regard to the excluded/added entries: there is no effective way to 1:1 consistently compare entries for common features. Given the volume of data and associated multiple modifications, this endeavor 1) may not be quantitatively possible, and b) would require a substantive amount of manual effort to complete. These factors combined would push the data analysis and deliberation efforts beyond the scope and reasonable timeframe for decision making considered by the client.[123]

186. Maidstone quietly corrected this finding in its December 2023 analysis.[124]

187. In their new comparison, Maidstone acknowledges that the records in the published dataset come from the Qualtrics .csv files. In the excerpt quoted below, they refer to the results of the online survey as File 2a, the results of the CLER survey as 2b, and the OSF dataset as either the published data or File 4):

> **2a+2b** = (i) published data + (ii) data that were excluded because of issues in essays (see above) + (iii) data with empty scores and test subjects[125]

188. It requires a close reading of the December 2023 supplemental report to understand that Maidstone is revising its conclusion, particularly since their summary suggests that they previously concluded that data contained in the OSF dataset *was* derived from the Qualtrics datasets (which is not the case). The December 2023 supplemental

---

[122] CX 8 (Harvard0000001170 - MCG0022 Response To Additional Questions), at Harvard0000001176 to 1180.
[123] *Id.* at Harvard0000001172.
[124] CX 9 (Harvard0000001070 - MCG's Addendum to October 2022 Assessment of Allegation 2), at Harvard0000001072.
[125] *Id.* (See also the detailed results of Maidstone's comparison contained on page Harvard0000001072).

report summarized their past results as follows: "Previously identified and confirmed: Datasets **2a** and **2b** are derived from distinct protocols, although an amalgamation of these two datasets appears to be the source of the published dataset **4.**"[126]

189. **This is the opposite of what they previously found.** Their original report states: "there were data points found in the OSF dataset that were not found in either of these apparent source data files, the CLER and ONLINE data."[127]

190. I observed no evidence in the Maidstone reports or the materials produced by Harvard that the Investigation Committee was informed that its forensic consultant identified an error in its prior work and that, consequently, one of the Committee's key findings of fact for Allegation 2 was incorrect.

*iii. HBS's Assertion of a "Clear Progression" in the Editing of the Datasets is Overstated*

191. In ¶ 47 of the Third Statute Complaint, HBS discusses how the additional searches that were conducted by the RIO between April and June 2023, after the Investigation concluded, show a "clear progression" in the editing of the datasets:

> For each of these allegations, the RIO identified additional documents on Professor Gino's own hard drive that appear to be downloads of the Qualtrics data, such that one can see a clear progression: data were collected in Qualtrics, downloaded to Professor Gino's computer, manipulated on Professor Gino's computer, and then published on OSF.

192. However, the chronology presented in Tab 3 of the Complaint and excerpted below presents an inaccurate picture for Allegation 2; [128]

[126] *Id*. at Harvard0000001072
[127] CX 1.17 (Final Report, Ex. 17 (Maidstone Consulting Group Forensic Report for Allegation 2)), at 3. Maidstone does not discuss any further comparisons between the Qualtrics datasets and the data published on OSF in their mid-2023 supplemental report.
[128] CX 7 (Memorandum from Alain Bonacossa to Dean Datar Re: Additional Evidence Related to Allegations 1, 2, 3, and 4b), at Table 1 (p.2).

| | | Activity | File Name | File Created | File Modified | |
|---|---|---|---|---|---|---|
| Allegation 2 Study 4 | 1 | **Data collection in Qualtrics (ONLINE Data)** | SV_3n4LusSmSL8eqG1_Authenticity_-_2nd_R_R__cogn_dissonance__ONLINE.csv | September 22-October 2, 2014 | | |
| | 2 | **Data collection in Qualtrics (CLER Data)** | SV_eEdMBRDV26Sd0Fv_Authenticity_-_2nd_R_R__cogn_dissonance_.csv | September 10 - 22, 2014 | | 2 is different from 5 |
| | 3 | **Data download (ONLINE Data)** | Authenticity__2nd_RR_cogn_dissonance_ONLINE.csv | 11.27.14 at 10:26am | 11.27.14 at 10:26am | 3 is different from 1 |
| | 4 | **Data download (CLER Data)** | Not available | | | |
| | 5 | **Combined data file with revisions** | data_Authenticity_CD_online & CLER 2014-11-26.xls | 11.27.14 at 8:00pm | 11.28.14 at 9:54pm | 5 is not a combination of 1 and 2; 5 is different from 6 |
| | 6 | **OSF/published data** | data_Experiment_4.sav | 2.8.15 at 2:15pm | 2.8.15 at 2:15pm | |

*Figure 13: Excerpt of Files HBS Identified for Allegation 2*

193. It suggests that Dr. Gino spent Thanksgiving Day, November 27, 2014, starting with the Qualtrics data, coding and organizing it, and then modifying certain data values. The impression suggested by HBS's chronology results from numerous missing data points. While the additional searches performed in mid-2023 found *one* additional document for Allegation 2, **the RIO missed five others**:

i. "data Authenticity__2ndRR_CD_ONLINE 2014-09-27.xls", an interim version of the results that was created on September 27, 2014;

ii. "data Authenticity__2ndRR_CD_ONLINE 2014-09-30.xls", a second interim version of the results, which was created on September 30, 2014;

iii. "Authenticity__2nd_RR_cogn_dissonance_ONLINE.csv", a third interim version of the results, which was created on October 6, 2014;

iv. "data Authenticity__2ndRR_CD_ONLINE 2014-10-07.xls", which contains all the responses to the online survey and which was created on October 7, 2014; and

v. "data_authenticity_CD_CLER 2014-11-26.xls", which contains the results from the participants who took the survey at CLER and which was created on November 27, 2014.

194. Had HBS found these additional versions, their chronology would show that Dr. Gino did not begin working with the data on Thanksgiving Day. She had interim versions

of the online survey results starting almost two months earlier, on September 27, 2014.

195. Even with a fuller chronology, the available evidence is insufficient to answer key questions, including the source of the interim files that Dr. Gino worked with and the source of the modified values—which are not present in the September and October 2014 interim files. As discussed below, there are several factors that suggest others in addition to Dr. Gino were involved in working with the dataset at issue in Allegation 2.

196. **The source of these interim versions is not clear.** They lack the ResponseID columns, which are present in the datasets downloaded directly from Qualtrics. The first versions of the Allegation 2 data with the ResponseIDs are created on Dr. Gino's computer on November 27, 2014. **As such, it is possible that someone else prepared the interim versions and provided them to Dr. Gino.**

197. **The spreadsheets that were created on Dr. Gino's computer were in a sequence that does not track how the spreadsheets appear to have been prepared.** "data_Authenticity___CD_online 2014-11-26.xls", the first version to contain the coding results for whether the survey participants wrote complete essays was created on Dr. Gino's computer on November 27, 2014 in the early afternoon. It would have been time-consuming to code the column it contains about whether the participants wrote complete essays since the essays are located in six different areas of the spreadsheet for the different groups. Later that day, "data_Authenticity___CD_online & CLER 2014-11-26.xls", a spreadsheet that combined the results of both the online and CLER surveys was created on the Gino

Laptop. It would have been much easier to code the essays based upon the combined spreadsheet. However, that file was not created on Dr. Gino's computer until hours after the online results spreadsheet was last modified.

198. To determine the incomplete essays for survey respondents in the no choice group who were in favor of difficulty ratings in the Q guide by using the "data_Authenticity__CD_online 2014-11-26.xls" spreadsheet, one would have to consult the essays in column U labeled "eNCS". For the no choice group against the difficulty ratings, one would have to consider Column AN ("eNCA"). For the respondents in the high-choice group who supported the difficulty ratings, one would have to review their essays in Column AB ("essay_HCS"). For the high-choice respondents against the difficulty ratings, their essays were in Column AU ("essay_HCA"). For the respondents in the pro-attitudinal group in favor of including the difficulty ratings, their essays are in Column BA ("essay_PS"). The essays for the pro-attitudinal respondents opposed are in Column AH ("essay_PA")

199. It would have been much easier to code the "did_not_write_essay" based upon the "data_Authenticity__CD_online & CLER 2014-11-26.xls" dataset, which includes an "essay" column that consolidates the respondents' essays in one place regardless of treatment group and a "word_count" column that could be used to quickly isolate short essays that are more likely to be non-substantive. However, that file was not created on Dr. Gino's computer until November 27, 2014 at 8:05 AM, which is hours after the "data_Authenticity__CD_online.xls" was last modified.

200. Rather than Dr. Gino spending considerable time on Thanksgiving afternoon coding the spreadsheet and only afterwards adding the columns that would make the coding

quicker (which it is difficult to believe any professor with RAs would do, especially on Thanksgiving), it seems more likely that both spreadsheets existed earlier—as the date in the filename suggests—and someone else coded the Allegation 2 dataset before Dr. Gino began working with it. **This coded version of the Allegation 2 dataset as it existed before Dr. Gino began working with it is a critical missing link in determining when the modifications were introduced and who introduced them.**

*iv. Wrong Participant Count*

201. Maidstone notes that the published version of the paper at issue in Allegation 2 understates the number of participants who were excluded.[129] Maidstone observes that raw Qualtrics datasets show that there was a total of 735 participants, instead of the 545 reported in the academic paper.[130] There is also a discrepancy in the number of excluded participants: the final paper reports that 54 participants did not finish the survey and were excluded. The raw data shows that 205 participants were excluded.

202. The number of participants reported in the published version, 545, matches the total count in the "data_Authenticity___CD_online & CLER 2014-11-26.xls" dataset. This spreadsheet was created on November 27, 2014, and it contains a combination of the CLER and online survey responses. This appears to be the file that was analyzed in SPSS on Dr. Gino's computer that same day.

203. Similar to Allegation 1, this discrepancy in number of participants between the Qualtrics dataset and the analysis dataset suggests that Dr. Gino did not work from the raw data, but the combined file. If, as HBS conjectures, Dr. Gino spent

[129] CX 1.17 (Final Report, Ex. 17 (Maidstone Consulting Group Forensic Report for Allegation 2)), at 9.
[130] *Id.*

considerable time on Thanksgiving Day starting with the Qualtrics data and cleaning it to identify and remove the participants who did not complete the survey, it seems unlikely that she would have undercounted the total number of total number of participants recruited for the study by almost 200 people. Rather, it seems more likely that Dr. Gino did not clean the data herself and that the cleaning process was performed earlier on another file Dr. Gino did not have.

204. In sum, the available data does not reveal who performed the cleaning, coding, and analysis of Study 4. There is a gap in the activity with the files in question on Dr. Gino's computer from October 7, 2014, until the activity on Dr. Gino's computer on November 27 and 28, 2014, when she analyzed the data and updated the draft paper. The cleaning and coding work appears to have occurred before Dr. Gino received the datasets she analyzed in SPSS.

*v. A Modified Data Point Was Later Excluded*

205. HBS's clear progression theory is further complicated by a "Harvard" entry whose data values were modified but then later excluded from the analysis.

206. R_0HQlO2DDrh8wFcp, a record that was changed, was subsequently excluded from analysis seemingly because the participant's response was incomplete. In its June Supplemental Report, Maidstone counted this record when it concluded that 23 records had different results in the analysis spreadsheet on Dr. Gino's hard drive than

in the Qualtrics data.[131] In its December 2023 report, Maidstone revised its analysis to state that 20 of the Qualtrics entries had changed values in the published dataset.[132]

207. The fact that this modified record was *dropped* prior to analysis contradicts the clear progression theory undergirding the Complaint. Under HBS's clear progression theory, Dr. Gino downloaded the data from Qualtrics, modified survey responses, but then discarded some of the data she had allegedly just falsified because the participant did not substantively complete the essay. In my professional opinion, that is an incoherent theory of data falsification. A more coherent alternative is that Dr. Gino received the modified data from someone else and analyzed it unaware.

208. Due to Maidstone's oversight, the Investigation Committee was never presented with this information about Dr. Gino excluding modified data values from her analysis because that participant's survey response was otherwise incomplete. In my professional opinion, this was a significant omission. The main rationale for the Investigation Committee's finding that Dr. Gino must have modified the data is that she was presumed to have had a motive to modify the data. But evidence that she *excluded* modified data contradicts that presumed motive, and thus undermines the main rationale for inferring that Dr. Gino must have modified the data.

### *vi. The Hearing Committee Ignored Pre-November Work*

209. The Hearing Committee presented a timeline in its report that favored HBS's chronology and ignored several earlier events without providing any basis for

[131] CX 8 (Harvard0000001170 - MCG0022 Response To Additional Questions), at 2.
[132] CX 9 (Harvard0000001070 - MCG's Addendum to October 2022 Assessment of Allegation 2), at Harvard0000001072. The other difference between Maidstone's June and December 2023 count is that Maidstone incorrectly included two entries, R_3Rh2NEMQR1mEQ97 and R_3rNMeb5WTe4goO9, in the mid-2023 count.

discounting them. The Hearing Committee's chronology focused on the activity on November 27 and 28, 2014.

210. As discussed above, I determined that preparation for analysis began earlier than November 2014. The work in the October 7, 2014 spreadsheet, "data Authenticity___2ndRR_CD_ONLINE 2014-10-07.xlsx" reflects data cleaning: the participants have been split into two worksheets based upon whether they completed the survey and responses to other surveys that were undertaken at the same time on Qualtrics have been removed from the spreadsheet.[133]

211. There are other reasons to believe that data cleaning occurred before Dr. Gino started working with the dataset at issue in Allegation 2 on November 27, 2014. Dr. Gino sent her co-author an email on November 11, 2014, about "amazing data," which suggests prior statistical analysis, which presupposes prior data cleaning. The names of the spreadsheets that Dr. Gino analyzed on November 27, 2014, which bear the prior day's date, suggest that the analysis began earlier. HBS never disputed this argument and did not provide any alternative interpretation for the November 11, 2014 email or the November 26, 2014 date in the filenames.

## XI. ALLEGATION 3

### A. Background of Study

212. Harvard's third allegation concerns the Experiment 4 dataset for the "Evil Genius? How Dishonesty Can Lead to Greater Creativity" academic paper that was co-authored with Professor Wiltermuth. The paper was published in *Psychological*

[133] Expert Statement of Michael F McGowan at ¶¶ 236–237.

*Science* in 2014. The paper asserts that dishonesty and creativity both involve breaking rules.

213. Experiment 4 examines how cheating affects creativity. Participants were shown an image of a coin and were asked to guess whether it would land on heads or tails after it was tossed, and their responses were recorded. Participants were then instructed to flip the coin once by pressing a button on the screen. They were then instructed "Before moving to the next screen, please press the 'Flip!' button a few more times just to make sure the coin is legitimate."[134] The authors note in the paper that this step was included to "give participants room for justifying their own cheating." Participants were then informed:

> We cannot tell whether you made the right prediction for the coin toss. If you guessed correctly, we'll pay you the monetary bonus. If you did not guess correctly, we won't. Please indicate whether you did or did not guess correctly.

214. Their responses were recorded in the "reported_guessed_correctly" variable. As noted above, the survey recorded the outcome of the initial coin toss, so that the experimenters could determine whether participants cheated.

215. In the next portion of the study, participants were shown three photographs of people breaking rules, *e.g.*, bicycling through an area with a "No cycling" sign and asked "If you were in the situation depicted in the picture, to what extent would you care about following the rules."[135] ("Three Pictural Rule-Following Questions"). Participants were asked to respond on a seven-point scale ranging from 1 (not at all) to 7 (very much).

[134] RX 301A (survey CCTRBC study5B.pdf), at 2.
[135] *Id.* at 3-4.

216. Participants were presented with four additional questions about following rules in certain scenarios, *e.g.*, "If I received a request from a supervisor or a person with authority right now, I would do as requested," and asked to rate the extent to which they agree on a seven-point scale ranging from strongly disagree to strongly agree. [136] ("Four Rule-Following Scenarios")

217. Next, participants were asked to list as many uses for a newspaper as they could think of within a minute. The text that the participants typed was recorded in the UsesTask variable.[137]

218. In another part of the survey, participants were asked to perform a Remote Association Test ("RAT") where they are presented with sets of three words and are asked to determine the word that is connected to all three. Participants were asked to answer 17 RAT questions.

### B. Harvard's Allegation

219. HBS alleged "Dr. Gino falsified and/or fabricated data within the datasets for Study 4 in the 2014 Psychological Science Paper. In particular:

> • some participant conditions appear to have been switched in a direction that favored the hypothesized and reported results;
>
> • some participants' RAT scores appear to have been altered in a direction favoring the hypothesized and reported results; and
>
> • 13 observations within the cheating condition are out of sort when sorted by whether participants cheated on the task they were asked to perform and by how many uses for a newspaper they found. These 13 observations substantially contribute to the significance of the hypothesized effects."[138]

[136] *Id.* at 3.
[137] *Id.* at 4
[138] Compl.at ¶ 15.

### C. Available Data

220. Below is a summary of the available evidence and where there are gaps:

i. *No Qualtrics Dataset* – This survey was conducted on Qualtrics, but no copy of the Qualtrics results has been located either on the Gino Laptop, in her Qualtrics account, or any other data source. The earliest available version of the dataset already contains some data coding.

ii. *No Sent Emails for Dr. Gino* – Dr. Gino does not have messages in her Sent Items for this study. The two-and-a-half-year gap in her Sent Items begins on November 22, 2012, which is several days after the survey concludes on November 17, 2012. Dr. Gino's email files do contain messages that she received during the time period at issue in Allegation 3;

iii. *No Usage Records* – The usage records showing which files were opened in Microsoft Office programs and when they were last opened are not available;

iv. *SPSS Statistics Journal* – The SPSS statistical journal is available for January 5, 2013 through July 2, 2014 and includes entries related to the analyses performed in July 2013 and November 2013;

v. *No Internet History* – The Internet history is not available for the fgino user during this timeframe;

vi. *No Removable Storage Device Info* – The records that track connections of removable storage devices are not available for this timeframe; and

vii. *Few Third-Party Emails* – Professor Wiltermuth provided several emails to the Investigation Committee. However, no emails were produced from the Harvard RAs, support staff, and students involved with working with dataset at issue.

## D. Chronology

221. Set forth below is a chronology of the key events for Allegation 3 based upon the available data (note that the relevant Experiment 4 is called "Study 5B" below, the name it was referred to before it was renumbered during the paper drafting process):

1. Nov. 17, 2012 8:17 PM: The Qualtrics survey concludes. No copy of the Qualtrics results has been located either on the Gino Laptop or any other data source.
2. Nov. 18, 2012 6:57 AM: The spreadsheet with the Study 5B results "data CCTRBC SB 2012-11-18.xlsx" is created by Francesca Gino per its embedded metadata. We do not know where this copy was stored. The copy on the Gino Laptop is created a half-hour later (see Entry #5).
3. Nov. 18, 2012 7:05 AM: The instructions for Qualtrics survey in question are viewed in a web browser and saved as a PDF by Francesca Gino. The file name is "survey CCTRBC study5B.pdf".
4. Nov. 18, 2012 7:27 AM: A spreadsheet with the results for Study 5B, "data CCTRBC SB 2012-11-18.xlsx" is created on the Gino Laptop. It is not subsequently changed. The metadata reflects it was created by and last saved by Francesca Gino. This is the earliest available copy of the dataset at issue in the Allegation, but it already contains some data coding.
5. Nov. 18, 2012 7:31 AM: A file "syntax analyses CCTRBC study5B.sps" with SPSS commands to analyze the data is created on the Gino Laptop. It is not subsequently changed. Within a minute, another file "syntax analyses CCTRBC study5.sps" with the commands to analyze another dataset is created. It is also not subsequently changed.
6. Dec. 5, 2012 8:51 AM: Dr. Gino emails Harvard undergraduates Alexis Wilkinson and Nga Nguy to ask for assistance with a coding task.

7. Dec. 7, 2012 5:08 PM: The coding task.xlsx spreadsheet, which contains a small subset of columns from the full results file for Studies 5A, 5B, and 5C (5B is the operative one in this allegation), is created and last saved by Francesca Gino.
8. Dec. 7, 2012 5:14 PM: Dr. Gino emails Ms. Wilkinson and Ms. Nguy the instructions for the coding task and attaches a spreadsheet.
9. Dec. 13, 2012 2:26 PM: Ms. Nguy emails Dr. Gino to ask for clarification about scoring originality.
10. Dec. 14, 2012 10:48 PM: Dr. Gino responds to Ms. Nguy's question.
11. Dec. 26, 2012 3:04 PM: Ms. Wilkinson provides the coding for Study 5A via email to Dr. Gino. (The attachment is not available in the email files on the Gino Laptop).
12. Dec. 26, 2012 5:19 PM: A spreadsheet, "coding task - Wilkinson ratings.xls", which presumably contains Ms. Wilkinson's coding results, is created and last saved on the Gino Laptop. It does not contain any embedded creation or last saved metadata.
13. Dec. 31, 2012 5:14 AM: Ms. Nguy provides the coding via email to Dr. Gino (The attachment is not available in the email files on the Gino Laptop).
14. Dec. 31, 2012 10:18 AM: A spreadsheet, "coding task - Nga ratings.xls", which presumably contains Ms. Nguy's coding results, is created on Dr. Gino's hard drive. The metadata reflects that the author is Francesca Gino and that it was last saved by Nga Nguy.
15. Jul. 18, 2013 9:26 PM: Dr. Gino emails her co-author Professor Wiltermuth: "I need a couple of more days for our Psych Science paper (evil genius)."
16. Jul. 24, 2013 4:29 PM: Another version of the "CCTRBC SB 2012-11-18.xls" spreadsheet from 2012 is created on the Gino Laptop. This one is in the older .xls format and not the .xlsx format. It has the same embedded creation date as the earlier version. The data are the same as the prior version and contain the unmodified data values.

17. Jul. 24, 2013 4:55 PM: Dr. Gino emails Professor Wiltermuth: "I am working on the write up of the last study, but I wanted to pass this along to see what you think of the draft so far (especially the framing in the intro and the progression of the studies)."

18. Sometime between Jul. 24, 2013 3:11:20 PM and Jul. 24, 2013 10:01 PM: A spreadsheet named "data CCTRBC SB 2012-11-18c.xls" is loaded into SPSS and analyzed. We do not have this copy of the spreadsheet, and therefore, do not know its origin, who worked on it, or what data values it contained. We do not know the exact time, because only some of the entries in the SPSS journal file are timestamped.[139] This July 2013 version of the spreadsheet the base filename, but a different file extension than the November 2012 version: the November 2012 file is in the newer Excel ".xlsx" format and is named "data CCTRBC SB 2012-11-18.xlsx"; the July 2013 version is in the older ".xls" format and is named "data CCTRBC SB 2012-11-18c.xls".

19. Jul. 24, 2013 10:01 PM: The data for the study in question is saved in the SPSS output file, "data study5B 2013-07-23.sav". This data file reflects the modified data values for the first three issues discussed above (differences between the Reported_Guessed_Correctly and Cheat columns, the four manually entered values in the RAT_perf column, and the caring about rules columns).

20. July 24, 2013 10:52 PM: A draft version of the paper, "Gino Wiltermuth Evil Genius 2013-07-23.docx" is last saved on the Gino Laptop. Per the embedded metadata, the document was created on July 8, 2013. It was created and last saved by Francesca Gino.

21. Jul. 25, 2013 6:48 AM: Dr. Gino emails Professor Wiltermuth: "I am updating the write up of the last study of our evil genius paper and will send it to you in the next few hours."

22. Jul. 27, 2013 7:57 PM: Another draft of the paper, "Gino Wiltermuth Evil Genius 2013-07-25.docx", is last saved by Francesca Gino on the Gino Laptop.

[139] SPSS Journal for SPSS 21. The approximate time is determined based upon the timestamp in line 11419 and the file creation date for "data study5B 2013-07-23.sav", which was created based upon the command executed in lines 23595 through 23598.

23. Jul. 31, 2013 7:28 AM: A draft version, “Gino Wiltermuth Evil Genius 2013-07-25 sw edits.docx”, that was last saved by Scott Wiltermuth is created on the Gino Laptop.

24. Jul. 31, 2013 2:00 PM: Another version, “Gino Wiltermuth Evil Genius 2013-07-31.docx” is saved on the Gino Laptop. It was last saved by Francesca Gino.

25. Aug. 1, 2013 7:58 PM: Another version, “Gino Wiltermuth Evil Genius 2013-08-01.docx”, is saved on the Gino Laptop. It was last saved by Francesca Gino.

26. Aug. 1, 2013 8:24 PM: Another version, “Gino Wiltermuth Evil Genius submitted.doc” is saved on the Gino Laptop. It was last saved by Francesca Gino. Two minutes later at 8:26 PM, a PDF version, “Gino Wiltermuth Evil Genius submitted.pdf”, is created.

27. Aug. 1, 2013 8:29 PM: Psychological Science emails Francesca to confirm that the Evil Genius manuscript has been submitted.

28. Oct. 18, 2013 8:46 AM: Paul van Lange of Psychological Science provides reviewers comments on "Evil Genius" paper.

29. Oct 28, 2013 8:18 PM: A spreadsheet named “coding studies.xlsx” that contains a subset of the columns from the full results file is created and last modified on Gino hard drive. The metadata reflects that it was created and last saved by Francesca Gino.

30. Oct 29, 2013 10:34 AM: Dr. Gino emails Chang Tang, Sharon Zhou, and Eldo Kim re: a coding task due next week: “reading answers from previous participants on possible uses of a newspaper”.

31. Oct 29, 2013 7:45 PM: Dr. Gino responds to Mr. Kim, who expressed interest in helping: “Thank You! You’ll see three spreadsheets there to code for”. No spreadsheets are attached and it is not clear from the email the location that the “there” refers to.

32. Oct. 29, 2013 7:46 PM: Dr. Gino emails Michael Skocay re: a coding task due next week: “reading answers from previous participants on possible uses of a newspaper”.

33. Oct. 30, 2013 4:38 PM: Mr. Skocay emails Dr. Gino to tell her task has been delegated to Elizabeth Sweeny and asks for further instruction.

34. Oct. 30, 2013 4:52 PM: Dr. Gino responds to a question from Ms. Sweeny.

35. Oct. 31, 2013 7:28 PM: Mr. Kim asks how to code for originality.

36. Oct. 31, 2013 9:38 AM: Ms. Sweeny asks a follow-up question about the coding.

37. Oct. 31, 2013 9:54 AM: Dr. Gino responds to Elizabeth's follow-up question.

38. Nov. 4, 2013 12:13 PM: Ms. Sweeny updates Dr. Gino on her coding work, which seems to be complete although it was not attached: "You probably wanna have someone else run the Originality analysis I know I skewed downward…"

39. Nov. 5 2013 2:37 PM: Dr. Gino responds to Ms. Sweeny stating that another coder is also helping.

40. Nov. 18, 2013 12:55 PM: In an email, Professor Wiltermuth asks Dr. Gino, "how is the coding for the Psych Science R&R going"?

41. Nov. 18, 2013 9:23 PM: Dr. Gino responds, "The results from the coding are great so I started working on the paper again today. This week is a bit busy but I am going to try my best to send you the revised paper in the next few days so that we can send it back before Thanksgiving."

42. Nov. 24, 2013 11:40 AM: The data file, "data study5B 2013-07-23.sav", is loaded into SPSS and calculations performed.

43. Nov. 24, 2013 between 11:40 AM and Nov. 25, 2013 at 10:14 PM: The data file for Study 7 for the same paper is loaded into SPSS and calculations performed.

44. Nov. 26, 2013 12:10 AM: A version of draft paper, "Gino Wiltermuth Evil Genius 2013-11-25.docx", is created and last saved by Francesca Gino. This is the first version to include the updated newspaper use results, which was added since the prior day's draft, which was dated Nov. 25, 2013 at 10:19 AM

45. Nov. 25, 2013 10:38 AM: Dr. Gino updates Professor Wiltermuth by email: "I spent the weekend working on the paper. I am going to do a final pass on the paper and letter this afternoon/evening after teaching but both documents [will] be in your inbox by tomorrow morning."

46. Nov. 25, 2013 10:14 PM: The data for a different study for this paper, Study 7, is loaded in SPSS and analyzed.

47. Nov. 25, 2013 11:02 PM: The spreadsheet, "coding studies Elizabeth.xlsx", which appears to contain the results from the coding work performed by Elizabeth Sweeny is created on the Gino hard drive. The embedded metadata reflects that it was last saved by Francesca Gino at this time. There were no changes to this file after this date.

48. Nov. 25, 2013 11:17 PM: A spreadsheet named "data CCTRBC SB 2012-11-18c.xls" is created on the Gino hard drive. It contains the modified version of the dataset and is the first version to include the results of Fall 2013 coding of the UsesTask. The embedded metadata reflects that it was last saved by Francesca Gino at this time. There were no changes to this file after this date. A version of this file previously existed on the Gino Laptop in the same location, "/Users/fgino/Documents/Work In Progress/Scott Wiltermuth/Ethics and creativity/Paper #2 -- dishonesty and creativity/Study 5B - Coin toss (multiple), rule breaking, creativity" in at least July 2013 (see entry 19 above), but as noted it was not found and its contents are unknown.[140]

49. Nov. 25, 2013 sometime between 11:17 PM and 11:30 PM: the spreadsheet with the modified data values, "data CCTRBC SB 2012-11-18c.xls", is loaded in SPSS and analyzed.

50. Nov. 25, 2013 11:30 PM: The dataset is saved as a SPSS output file "data study5B 2013-11-23.sav".

51. Nov. 26, 2013 12:10 AM: The draft paper "Gino Wiltermuth Evil Genius 2013-11-25.docx" is last saved by Francesca Gino. It contains the results based upon the modified data.

52. Nov. 26, 2013 10:03 AM: The paper is re-submitted to the publisher.

53. Feb. 18, 2014: The paper was published online in *Psychological Science*.

[140] The November 2013 spreadsheet contains three columns that are not present in the Spreadsheet Analyzed in July 2013: "Number of responses", "Originality", and "Flexibility", all of which pertain to the UsesTask. It does not contain two of the UsesTask columns found in the July version: "Num_uses" and "Uses_orig". Finally, the "cheated" column is renamed to "reported_GC".

54. Feb. 20, 2014: Professor Leif Nelson of University of California, Berkeley emails Professors Gino and Wiltermuth and requests copies of the original materials and data noting that his journal discussion group will be discussing the paper the next day.

55. Feb. 21, 2014: Dr. Gino responds that she will not be able to send the materials before the discussion group due to her teaching schedule.

56. Feb. 23, 2014: Professor Nelson states that it would still be helpful to share the data.

57. Feb. 24, 2014: Dr. Gino states that she is offline due to an illness in the family.

58. Mar. 17, 2014: Professor Nelson sends a "quick reminder" about the request for the data and materials.[141]

59. April 16, 2014: Professor Nelson emails again about the data.[142]

60. April 17, 2014 1:43 PM: The anonymized dataset for this study, "data DAC Study_4 PS.sav", that will be shared with Professor Nelson is prepared on the Gino Laptop.

61. April 17, 2014 9:03 PM: Dr. Gino sends the datasets to Professor Nelson.[143]

### E. Digital Forensic Analysis

222. As the foregoing chronology illustrates, the preparation of the dataset for Study 5B is extremely complicated and involved a number of different individuals making various changes to different versions of the data between November 2012 to November 2013. The evolution of the dataset for Study 5B is the opposite of a clear progression. The Investigation Committee did not address this complexity or the forensic challenges it

[141] RX 704 (Email from Professor Nelson dated March 17, 2014 with the subject "Your evil genius paper" at 1).
[142] RX 561 (Email from Scott Wiltermuth to Alain Bonacossa (Feb. 4, 2023, 5:33:16 PM), at Harvard0000011162 ).
[143] *Id.* at Harvard0000011162. The email does not specify the time zone for the time that the forwarded email from Professor Gino to Professor Nelson was sent. On its face, the sent time is listed as 6:03 PM. This time is likely in Pacific Daylight Time since email clients generally use the time zone of the sender when preparing the message to be forwarded. In this case, the sender of the forwarded message is Professor Wiltermuth, who works at the University of Southern California.

presents in determining which person was responsible for which changes in which version of a dataset.

223. There are key gaps in the available data for Allegation 3 from the collection to the analysis stage. The survey was conducted on Qualtrics, but the dataset was not located in Dr. Gino's Qualtrics account, nor were any files of the Qualtrics dataset located on the Gino Laptop. Dr. Gino told the Investigation Committee that she believes that the study was conducted by Ms. Fink.[144] The earliest available dataset is partially coded by an unknown coder, contains highlighted cells, and Excel formulas to compute certain columns.

224. Dr. Gino's email files show that at least four students and staff participated in coding the datasets starting in December 2012 and then nearly a year in October and November 2013. Some of the observed discrepancies are introduced before and some after the coding work of these RAs.

225. Another key dataset, the July 2013 version of the analysis spreadsheet is not available. The information about its contents saved by SPSS shows that it contained three of the four sets of modifications that Maidstone identified at least as of July 24 2014 and possibly earlier. The available forensic evidence is insufficient to determine how the July 2013 version of the spreadsheet came to reside on Dr. Gino's hard drive, the source of this file, and who prepared it.

226. One of the sets of changes present in the July 2013 spreadsheet involves the rule-following scores. These changes suggest that someone other than Dr. Gino was

[144] CX 1.5 (Final Report, Ex. 5 (Respondent's Written Responses to Investigation Committee, May-July 2022)), at 3.

involved in the modifications. The study included two types of rule-following questions: ones where the participants were shown pictures and others that involved descriptions of scenarios. The responses to both the picture-based and scenario-based questions were changed. However, the scenario-based questions were not analyzed by Dr. Gino in preparing the earliest draft version of the paper, nor were they included in any subsequent version. This again is the opposite of a "clear progression" of data editing. Under HBS's theory, Dr. Gino intentionally modified the data to improve the research results. **This theory is contradicted by the facts because there are modified values that were not used in reporting the results of the study**.

227. A later set of changes involved the responses for the uses of a newspaper task. Survey participants were asked to come up with as many uses for a newspaper as they could think of in a minute, and the responses were stored in the "UsesTask" variable. The changes result from a circuitous editing history over the course of almost a year involving at least four other individuals. There are gaps in the available data for two critical periods, but the available data show coding errors, record identifiers being swapped, records lost in the coding process, and truncation of data values. This convoluted process—with multiple editors, multiple errors, and multiple opportunities for error—is not a "clear progression."

*i. Changes to Four RAT_Perf Values*

228. The spreadsheet containing the modified data that Maidstone discussed in its analysis was created on Dr. Gino's computer in November 2013 per the filesystem metadata. This version was created on her computer too late for it to be the source of the modifications to the "RAT_perf" and the "cheat" values since the modified values

were already included in draft versions of the academic paper that had circulated starting in July 2013. Since HBS did not identify the November 2012 version of the dataset until April 2023, **this important aspect of the data preparation sequence, which contradicts the clear progression theory, was never considered by the Investigation Committee.**[145]

229. Part of Study 5B involved participants performing a RAT where they were provided with sets of three words and were asked to identify a different word that is "logically linked" to all three words provided. Below are the instructions:

**THINKING TASK #2**

**The goal in this task is to find a word that is logically linked to all three of the words provided.**

**For example:**

**Manners Round Tennis = Table**
**Playing Credit Report = Card**

**Thus, the word "table" is a solution because it links the words "manners-round-table" (i.e. table manners, round table, table tennis). The word "card" is a solution because it links the words "playing-credit-report" (i.e. playing card, credit card, report card).**

**In the space below, try to solve as many items as you can. Work as fast as you can without sacrificing accuracy. YOU HAVE FIVE MINUTES (i.e., 300 seconds) TO WORK ON THIS. Please do not use any help other than your own knowledge.**

**Time: 300 seconds**

1. blank-white-lines
2. magic-plush-floor
3. thread-pine-pain

*Figure 16: RAT Instructions*

230. Participants were asked to answer 17 RAT questions. Their responses were recorded by Qualtrics. The experimenters or RAs later examined the responses and determined whether the responses were correct. That coding was entered in a series of columns from RAT1 to RAT17 with 1s indicating correct responses and 0s indicating incorrect responses. The results were totaled in a column named "RAT_perf". In almost all the

[145] Witness Statement of Alain Bonacossa at ¶ 52 and Table 1 on p. 21.

cases, this value was determined by an Excel formula that adds the RAT1 through RAT17 columns. Maidstone noted that there were four instances where the RAT_perf score was manually computed and was higher than it would be if the individual columns were summed.

231. Maidstone's observation is correct. The individual columns seem to correctly reflect the RAT results as opposed to the RAT_perf column. For example, one manually entered RAT_perf score of 13 appears incorrect given that the participant did not answer 9 of the 17 RAT questions (and, thus, would have a maximum possible score of 8).

232. However, the available evidence is insufficient to determine *when* the RAT_perf data values were changed and *who* modified them. The RAT results reported in the published version of the paper were unchanged since the earliest available draft on Dr. Gino's computer, "Gino Wiltermuth Evil Genius 2013-07-23.docx". The document was created on July 8, 2013, and was last modified on July 24, 2023. The document was created and last modified by Dr. Gino, according to the metadata.

233. However, the changes to the RAT_perf values were already present in the data that were used in SPSS on Dr. Gino's computer on July 24, 2013. The SPSS journal file shows that sometime between July 24, 2013, at 3:11:20 PM EDT, and July 24, 2013, at 10:01 PM, an Excel spreadsheet named "data CCTRBC SB 2012-11-18c.xls" was loaded for analysis. After the end of the analysis, the data analyzed was saved to "data study5B 2013-07-23.sav". **While the spreadsheet itself is not available, the SPSS .sav file shows that the data analyzed on July 24, 2013, already had the modified RAT_perf values.**

234. The copy of the "data CCTRBC SB 2012-11-18c.xls" spreadsheet that was present on Dr. Gino's hard drive in July 2013, is no longer available on Dr. Gino's hard drive. There is another spreadsheet with the same name saved in the same laptop, but it was created on November 25, 2013. The November copy is a distinct file that was created in November 2013. It is not an updated version of the copy created on Dr. Gino's hard drive in July 2013.[146]

235. The available forensic evidence is insufficient to determine how "data CCTRBC SB 2012-11-18c.xls" came to reside on Dr. Gino's hard drive on or before July 24, 2013, the source of this file, and who prepared it. **The fact that the November 23, 2013 dataset is modified and is on Dr. Gino's computer does not show that she introduced the changes because the changes were already present in a July 24, 2013 draft of the paper and no one knows the origin of that data or who worked on it.**

*ii. Changes to Rule-Following Scores*

236. The fact that the rule-following score changed suggests that someone other than Dr. Gino was involved in making the modifications at issue in Allegation 3. The participant responses to both the Three Pictural Rule-Following Questions and the Four Rule-Following Scenarios were changed. However, the Four Rule-Following

[146] The November 2013 file is not simply a later version of the July 2013 file given its later creation date. Regardless of whether a user modifies a spreadsheet, and presses "Save" or uses "Save As" to overwrite an existing spreadsheet with a new one, the new file retains the original creation date. The persistence of creation dates in this scenario is called file tunneling. "File System tunnelling" available at https://medium.com/@rajendraprasanth/file-system-tunnelling-058132a22b02 (last visited May 26, 2026). *See also,* Microsoft Knowledge Base, "Windows NT Contains File System Tunneling Capabilities", Q172190, available at https://web.archive.org/web/20160410012540/https://support.microsoft.com/en-us/kb/172190 (last visited May 26, 2026). I have observed the same behavior for Microsoft Excel spreadsheets on MacOS.

Scenarios were not analyzed by Dr. Gino in preparing the earliest draft version of the paper, nor where they included in any subsequent version.[147]

237. The SPSS journal file shows that sometime between July 24, 2013 3:11 PM, and July 24, 2013 10:01 PM, an Excel spreadsheet named "data CCTRBC SB 2012-11-18c.xls" was loaded for analysis. None of the SPSS commands entered during that session examined the "ruleFollow_1", "ruleFollow_2", "ruleFollow_3", and "ruleFollow_4" variables in which the Four Rule-Following Scenario responses were saved.

238. Within an hour of the SPSS analysis session concluding, the first draft of the paper, "Gino Wiltermuth Evil Genius 2013-07-23.docx", is last saved by Dr. Gino. The Four Rule-Following Scenarios were not included in the draft paper. The only discussion is of the Three Pictural Rule-Following Questions: [148]

> Feeling constrained by rules. Afterwards, participants saw each of three pictures (see Figure 2) and for each were asked, "If you were in the situation depicted in the picture, to what extent would you care about following the rules?" (on a 7-point scale, 1=Not at all, 7=Very much). We averaged participants' answers across the three items to create a measure for caring abut rules (α=.81).

239. This section of the draft paper remains essentially unchanged through successive drafts and the final published version. I did not identify any drafts that discuss the Four Rule-Following Scenarios scores that were also changed.

240. This again is the opposite of a "clear progression" of data editing. **It does not make any sense to suggest, as HBS's theory holds, that Dr. Gino intentionally**

[147] The Gino Laptop contains a SPSS command file "syntax analyses CCTRBC study5B.sps" that reference the Four Rule-Following Scenarios. The command file was created within minutes of the earliest version of the dataset being created on Professor 's laptop and within the same minute as another SPSS command file. As such, the commands may have been provided by another person and not Professor Gino.
[148] RX 313A (Gino Wiltermuth Evil Genius 2013-07-23.docx), at 11-12.

**modified the data to improve the research results if some of the modified data was never analyzed and never reported in the study results**.

*iii. Modifications to Newspaper Uses*

241. Maidstone attributes intentionality to the UsesTask modifications: "Of the modified entries, in 19 cases, the results were modified *to increase the fluency of cheaters*. In four cases, they were modified *to decrease the fluency of non-cheaters*."[149] This ascription of intentionality is unusual in Maidstone's analysis. Maidstone generally keeps to its compare-and-contrast reporting; the foundation for its opinion about intentionality is unexplained.

242. Maidstone is correct to point out that the changes had this effect on the results. But Maidstone neglects to mention that the changes result from a circuitous editing history over the course of almost a year involving at least four other individuals. There are gaps in the available data for two critical periods, but the available data show coding errors, record identifiers being swapped, records lost in the coding process, and truncation of data values. In my professional opinion, these facts prevent any reliable conclusions regarding whether changes were made intentionally, much less what the supposed intention was.

a. Coding of Uses Tasks in December 2012

243. The UsesTask data required significant coding by the research team. Survey participants were asked to come up with as many uses for a newspaper as they could think of in a minute. One participant responded: "wrap glassware for packing / start a fire / line a drawer / swat a fly". Coders had to review the responses to count the

[149] CX 10 (Harvard0000001083 - MCG 0022 September 2023 Allegation 3 Overview), at Harvard0000001087.

number of uses the participants came up with and assign them scores for originality and flexibility.

244. In December 2012, two Harvard undergraduates coded UsesTask data for Studies 5A, 5B, and 5C (Study 5B is the study in question). On December 5, 2012, Dr. Gino emailed two Harvard students, Ms. Wilkinson and Ms. Nguy, to ask for assistance with coding the uses for a newspaper. On December 26, 2012, Ms. Wilkinson provided the coding for Study 5A via email to Dr. Gino. On December 31, 2012, Ms. Nguy provided the coding results for all three studies to Dr. Gino via email.

b. Unknown Source of UsesTask Coding in July 2013 Spreadsheet

245. The Spreadsheet Analyzed in July 2013, which is no longer available, contained results for the number of uses for a newspapers test. As discussed above, we have some information about what this spreadsheet contained based upon the SPSS commands that were executed when the spreadsheet was examined on July 24, 2013, between 3:11 PM and 10:01 PM. After the end of the analysis, the data analyzed was saved to "data study5B 2013-07-23.sav". While the spreadsheet itself is not available, the SPSS .sav file shows that the spreadsheet had a column named "Num_uses". This appears to be the basis of the results included in the first available draft version of the paper, which dates from July 24, 2013 at 10:52 PM, shortly after the SPSS analysis:

> **Creative performance.** To assess creativity on the uses task, we coded uses for fluency, defined as the number of responses. Fluency was higher for cheaters than it was for non-cheaters, $t(176)=4.94$, $p<.001$. [150]

246. I do not know the source of the UsesTask results included in the Spreadsheet Analyzed in July 2013. Many of the values differ from those coded by Ms. Nguy in

[150] RX 313A (Gino Wiltermuth Evil Genius 2013-07-23.docx), at 12.

December 2012. Many of the values in the Spreadsheet Analyzed in July 2013 are coded incorrectly. For instance, the first survey participant answered, "Gain knowledge,time pass,used for wrapping things,used for". This response was coded in the Spreadsheet Analyzed in July 2013 as 7 uses instead of 3 uses.[151] The second participant responded, "Reading / Crossword puzzle / fly swatter / coupons / ads / scrap paper / wrapping paper / fire starter / packing material / pet cage liner / mat". This response was coded in the Spreadsheet Analyzed in July 2013 as 5 uses instead of 11.[152]

c. <u>Swaps in UsesTask Values</u>

247. The UsesTask data was coded again in the Fall of 2013—possible due to the coding errors discussed above. As discussed below, the UsesTask responses for five records that were provided to the coders were swapped.

248. The coding spreadsheet included a subset of the data: (i) unique identifiers for the survey respondents, (ii) their UsesTask entries, and (iii) columns where she could code the results (*i.e.*, columns D, E, and F). Below is a screenshot showing an excerpt of the completed coding spreadsheet:

[151] *See* UsesTask entry for Cum_ID 1, Response_ID R_2bHLMDyb0igm2Tr in RX 312A (data study5B 2013-07-23.sav).

[152] *See* UsesTask entry for Cum_ID 2, Response_ID R_begphoX1ITrFKSN in RX 312A (data study5B 2013-07-23.sav).

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | MTurkID | Cum_ID | UsesTask | Number of responses | Originality | Flexibility |
| 5 | A28XLOE0FM | 153 | reading / swatting a fly / wrapping a present / r | 5 | 4 | 5 |
| 6 | A2KCN3N4O\ | 7 | to read the news, to read comics, to look at the | 6 | 2 | 2 |
| 7 | A5VWAZZ49[ | 22 | Washing windows, reading, for birds, for cleanu | 10 | 5 | 9 |
| 8 | A126XP3VIW | 8 | Clean water / Clean butt / Throw Paper ball at s | 5 | 4 | 5 |
| 9 | A2KQQWR8E | 67 | Reading / Entertainment / TV schedule / Compl | 8 | 3 | 4 |
| 10 | AAJ7YKYUGV | 135 | Killing Spiders, Throwing, Kindling, Pirate Hats, ( | 7 | 4 | 7 |
| 11 | A24TR0LI56P | 12 | door stop, cushion in a kennel, fly swatter, dog | 7 | 4 | 7 |
| 12 | A1REWUVT3I | 128 | new / news / paper / pen / pew / sap / sew / pa | RJ | | |

*Figure 17: Excerpt of "coding studies Elizabeth.xlsx"*

249. Several of the UsesTask changes that Maidstone identified were due to the coding template file that Dr. Gino provided to the coder. As further explained, the UsesTask values for five records appear to be swapped.

250. In the 2012 dataset, the UsesTask response for ID 24 is "reading, putting on floor for dog to pee on, wrapping paper, wrapping plates for packing, using as padding in a box, sop up a water spill, hold above". In the coding spreadsheet that was provided to Ms. Sweeny, the response for ID 24 is "reading. train a puppy. stuff in a box to prot".

251. The response for ID 24 in the coding spreadsheet matches (and appears to come from) a different record in the 2012 spreadsheet, ID 146. In turn, the response for ID 146 is different in the coding spreadsheet: "reading, putting on floor for dog to pee on, wrapping paper, wrapping plates for packing, using as padding in a box, sop up a water spill, hold above".

252. In the 2012 dataset, the response for ID 91 is "Stocks, news, comics, movie times, weather, obituaries, sports scores, horoscopes, classifieds, crossword, sudoku". Instead, the response for this ID in the coding spreadsheet is blank.

253. The response for ID 91 in the coding spreadsheet matches a different record in the 2012 spreadsheet, ID 106, which is blank. In turn, the coding spreadsheet has "Stocks,

news, comics, movie times, weather, obituaries, sports scores, horoscopes, classifieds, crossword, sudoku" in ID 106 instead ID 91.

254. The response for ID 126 in the 2012 dataset is "PLEASE ADOPT THE TRAFFIC RULES AND ALSO INTRUCTION". The coding spreadsheet has "reading / origami / pen / hat" for this record instead. It is not clear the origin of this response. It is not found anywhere in the 2012 dataset.

255. The response for ID 144 in the 2012 dataset is "Paper airplane, cleaning a spill, writing down a quick note to myself, starting a fire, origami, patching a hole, drying out running shoes, recycling, rolling it up to hit someone with, entertainment (reading)". The coding spreadsheet has "reading / hat /" for this record instead. This is the response in the 2012 dataset for ID 170. The response for record 170 in the coding spreadsheet contains the response for ID 144 in the 2012 dataset.

256. The available data is insufficient to determine what caused the apparent swaps in UsesTask values. Nor is there sufficient evidence to determine which is the true response. The 2012 dataset was created earlier than the coding spreadsheet, which dates from October 2013. However, the 2012 dataset is not the original source. Because the original Qualtrics responses were not located for this study, it is not possible to determine how the participants actually responded. The seven IDs with apparent swaps in the UsesTask values are among the 23 that Maidstone identified with modified UsesTask responses. Based on the available digital evidence, it is not possible to explain or assign responsibility for these swaps.

d. Coding by Ms. Sweeny

257. On October 29, 2013, Dr. Gino emailed a Faculty Support Specialist, Michael Skocay, to ask for his assistance in coding the uses task results. He delegates the task to Ms. Sweeny due to his unavailability. Dr. Gino also corresponds with Mr. Kim, a Harvard undergraduate student, between October 29 and 30, 2013, about his assistance with coding the newspaper uses results.[153]

258. Ms. Sweeny completed her coding on or about November 4, 2013. Ms. Sweeny emailed Dr. Gino the results of her work. The copy of Ms. Sweeny's email in Dr. Gino's email files does not include any attachments. It is possible that Ms. Sweeny transmitted the file to Dr. Gino via a method other than email. It is also possible that the attachment was later removed as part of Dr. Gino's process to stay under her email quota. I observed that occurring with other emails in this time period. For example, Dr. Gino's copy of Mr. Skocay's response in which he forwarded the coding spreadsheet to Ms. Sweeny did not include any attachments.[154] The copy that Harvard produced in 2024 based upon searches of his or Ms. Sweeny's email files *does* include the attachment.[155]

259. Dr. Gino's computer contains a file that appears to contain the results of Ms. Sweeny's coding (the "Sweeny Coding Spreadsheet"): (i) the file is named "coding studies Elizabeth.xlsx", (ii) it contains the same worksheets and columns as the template that was provided to Ms. Sweeny, and (iii) non-substantive responses are coded with "RJ,"

---

[153] RX 324 (Email from Francesca Gino to Eldo Kim (Oct. 30, 2013, 7:28:40 PM) (Produced by Complainant as Harvard0000002889)).

[154] RX 319 (Email from Michael Skocay to Francesca Gino copying Elizabeth Sweeny (Oct. 30, 2013, 8:38:11 PM) (Produced by Complainant as Harvard0000011127)).

[155] RX 319 and RX 705 (Skocay's copy of Email from Michael Skocay to Francesca Gino copying Elizabeth Sweeny) Harvard0000011127 and Harvard0000011128.

the coding convention that Dr. Gino instructed Ms. Sweeny to use for such cases in their email correspondence.

260. For reasons unknown, the coding results that Ms. Sweeny sent to Dr. Gino contain fewer records than were provided to Ms. Sweeny to code. Ms. Sweeny's spreadsheet has three worksheets: one for Study 5B, the study in question, one labeled "Study7 (B2)", and one labeled "Study 7 (B)". The results for five participants for Study7 (B2) are missing from the Sweeny Coding Spreadsheet.

261. **The changes for all but one of the 23 UsesTask modifications appear to come from the Sweeny Coding Results**.

e. Changes to UsesTask Data After Ms. Sweeny's Coding

262. Once the coding of this subset of the data was completed, these results had to be incorporated back into the full dataset. This would have to occur either through a manual process (*i.e.*, take each unique ID from the full dataset, look up that value in the coding results, and input the corresponding "Number of responses", "Originality", and "Flexibility" values into the corresponding rows in the full dataset) or through an automated process that performs the same lookup and insert steps using Excel formulas. It is possible that this work was performed manually. None of the data files on the Gino Laptop for the studies at issue contained formulas for automated lookups, *e.g.* using the Excel VLOOKUP or INDEX/MATCH functions. Merging files by hand is an error-prone process, particularly if the datasets being merged contain different numbers of records, as is the case here.

263. If one compares the modified UsesTask that Maidstone identified with the values in the earliest spreadsheet, the entries appear entirely different. For example,

Participant 38 provided "wrap glassware for packing / start a fire / line a drawer / swat a fly" as the uses for a newspaper in the earliest dataset. The modified spreadsheet listed the "fly swatter, rag, floor cover, fire, hat, clothes, blanket, ink transfer, writing, reading noise maker, ball, art scrap" for this participant. **The new responses were not invented out of thin air. Instead, they are responses that different participants provided for a related study.** The modified responses were provided by Participant 57 to Study 7(b), which was coded on a different worksheet in the Sweeny Coding Results.

264. As discussed above, seven of the modified responses were based upon values in the Study 5B worksheet that appear to have been swapped before Ms. Sweeny received the data for coding.[156] 13 come from the Study 7 (B) worksheet.[157] Two come from the "Study 7 (B2)" spreadsheet.[158] In total, the Sweeny Coding Results contains 17 entries highlighted in blue, green, or orange on the "Study7 (B)" or "Study7 (B2)" worksheets. 14 of the 23 modified entries were among the highlighted entries. The meaning of the highlighting is not apparent, nor do we know when it was added to the file.

265. The coding result that is not based upon the Sweeny Coding Results is for ID 91. The respondent's entry in the modified dataset reads "for knowing currents news, time of tv shows". The coder assigned "2" for the number of responses. That response does not appear verbatim in the Sweeny Coding Results, but one of the entries in the "Study7(B)" worksheet contains what appears to be an elongated version of that response: "for reading, for knowing currents news, time of tv shows, exchange rates,

[156] IDs 24, 50, 106, 126, 144, 170, and 192
[157] IDs 9, 14, 32, 36, 38, 97, 105, 128, 146, 149, 159, 171, and 191
[158] IDs 63 and 157.

matrimonial". Ms. Sweeny coded the longer response as providing five uses for a newspaper. That the response for ID 91 does not come directly from the Sweeny Coding Results suggests that there was additional coding or review of the UsesTask data after she completed her work. But the available digital evidence does not give any insight into such additional coding and/or review.

266. Since all but one of the swapped data values were based upon the Sweeny Coding Results, the modifications had to have been introduced sometime after Ms. Sweeny finished coding the data, which occurred on or around November 4, 2013 (based upon Sweeny's "RE: help with a task email" email on this date).

267. It is not evident from the available data what happened after Ms. Sweeny completed her coding. In her email to Dr. Gino, Ms. Sweeny suggested that someone else should examine the coding for originality: "You probably wanna have someone else run the Originality analysis I know I skewed downward…" Dr. Gino responded the next day, Nov. 5 at 2:37 PM, thanking Ms. Sweeny and stating that another coder was also helping. It is possible that the additional coder was Eldo Kim. The email correspondence between Mr. Kim and Dr. Gino on October 31, 2013, suggests that he had at least begun working with the data at that time.

268. The available data are insufficient to determine who modified the data, when the modifications occurred, and whether the modifications were intentional or inadvertent. At least seven of the modified values were swapped prior to the most recent coding that started in late October 2013. The rest were modified after Ms. Sweeny completed her coding work around November 4, 2013. Moreover, given that the UsesTask modifications stem from the coding results that were swapped, the

modifications may have resulted from errors in the data compilation process and may not have been introduced intentionally.

269. The Hearing Committee does not mention that at least one other person, Ms. Sweeny, worked with the data when they concluded:

> We find not only clear and convincing evidence of intentional alterations at three different points in time, but also clear and convincing evidence that Professor Gino is responsible. In each instance, Professor Gino had the knowledge and opportunity to alter the data, as well as the incentive to do so; and there is no evidence of another individual or set of individuals with that knowledge, opportunity, and incentive.[159]

270. Nor do they acknowledge the evidence that someone else worked with the data after Ms. Sweeny. As discussed above, Ms. Sweeny suggested that someone else should examine the coding and Dr. Gino stated that another coder was also helping. That additional coder was not identified, interviewed, or asked to produce documents.

## XII. ALLEGATION 4A

### A. Background of Study

271. HBS's fourth allegation (Allegation 4A) concerns the Study 1 dataset for the "Signing at the beginning makes ethics salient and decreases dishonest self-reports in comparison to signing at the end" paper that was co-authored with Professor Shu, Professor Mazar, Professor Ariely, and Professor Bazerman. The paper was published in the *PNAS* on September 18, 2012. The paper argues that having people sign at the beginning rather than the end of a form, such as an expense report or tax form, reduces dishonesty.[160]

---

[159] Hearing Committee, Third Statute Proceeding Against Professor Francesca Gino of the Harvard Business School – Findings of Facts and Recommendations, Jan. 24, 2025 at 7-8.
[160] CX 42 (2012 PNAS Paper), at Harvard0000003717.

272. As opposed to the other studies at issue in the Allegations, Study 1 was administered with hard-copy paper as opposed to using Qualtrics. The results were manually transcribed into an Excel spreadsheet named "Taxstudy.xlsx" by Jennifer Fink, an RA at the University of North Carolina where the study was conducted. According to the published paper, 101 individuals participated in Study 1. They were randomly assigned to one of three conditions:[161]

i. signing at the top of the tax return form;

ii. signing at the bottom; or

iii. no signature, which was the control group.

273. The participants were asked to solve 20 math problems. As part of the instructions, participants were informed that they will be paid a higher amount than usual because they will be taxed on their earnings and that they will receive more details about this when the problem-solving task is over.[162]

274. Afterwards, the participants were asked to note the number of math puzzles that they correctly solved and "submit both the test sheet and the collection slip to the experimenter."[163] The participants went to a second room to fill out what was represented to them as being a tax form. They had to report their income from the task, which was based upon the number of math problems they correctly solved. They were also asked to report the time and cost of commuting to the site where the study

[161] *Id.* at Harvard000003719.
[162] *Id.*
[163] *Id.*

was administered. These commuting expenses were deducted from the tax. According to the published paper, participants received payment in the second room.[164]

275. The math problem worksheet and the tax form had hidden identifiers that allowed the experimenters to measure cheating by comparing how many math problems were actually solved correctly to the self-reported score that the participant listed on the tax form.[165]

276. The published results showed that the sign-at-the-top group cheated the least when reporting the math problem results.[166] The sign-at-the-top group also claimed the fewest commuting-related expenses.

## B. Harvard's Allegation

277. HBS alleged: "With respect to Study 1 in the 2012 PNAS Paper: a) Dr. Gino falsified and/or fabricated the results by removing or altering parts of the descriptions of study procedures from drafts of the manuscript submitted for publication, thus misrepresenting the study procedures in the final publication. The original procedure descriptions (subsequently removed or altered by Dr. Gino) pointed to a significant flaw in the execution of the data collection for Study 1, which called into question the validity of the study results."[167]

## C. Available Data

278. Below is a summary of the available evidence and where there are gaps:

[164] *Id.*
[165] *Id.*
[166] *Id.*
[167] Compl. at ¶ 16.

i. *No Sent Emails and Limited Received Emails for Dr. Gino* – Dr. Gino's email files contain few emails from the June and July 2010 timeframe when the study was designed, executed, and analyzed. None relate to the study. Her email files do not contain any emails she sent during the relevant time period. Notably, it does not include the earliest version of the draft paper that she sent to Professor Shu on or about February 12, 2011.

ii. *Few Third-Party Emails* – Professor Bazerman's emails were searched and messages were produced from them. Ms. Fink provided selected emails to the Investigation Committee. Professor Mazar provided selected emails to the Investigation Committee.[168] No emails were provided for Professor Shu.

iii. *No Usage Records* – The usage records showing which files were opened in Microsoft Office programs and when they were last opened are not available. I understand that Dr. Gino had not yet received her HBS laptop when the study was conducted in July 2010 and in early 2011 when draft versions of the academic paper were prepared.

iv. *No Internet History* – The Internet history is not available for the fgino user during this timeframe.

v. *No Removable Storage Device Info* – The records that track connections of removable storage devices are not available for this timeframe.

[168] The HBS productions do not include identifying information for the custodian, but the production includes at least one email involving Professor Mazar on which Professor Gino was not included. *See* Harvard0000010160: email from Ariella Kristal to Professor Mazar dated September 16, 2018 with the subject "Re: BU subject pool." (RX 706)

### D. Chronology

279. Set forth below is a chronology of the key events for Allegation 4A based upon the available data:

1. Jun. 4, 2010 4:20 PM: A document "Tax study design 2010-06-04.docx" describing the tax study experiment is created. We do not know its contents at this point in time. Per the metadata, it was created by Francesca Gino.
2. Jun. 15, 2010: The IRB form for tax study is signed and submitted to UNC by Dr. Gino.
3. Jun. 16, 2010 6:53 AM: The "Tax study design 2010-06-04.docx" document is last saved by Francesca Gino. Its description of the payments accords with that in the IRB application: the participants would be paid for their problem-solving performance in the first room and then paid a second time in the second room after the taxes and expenses are factored in. The tax study design document is silent on what materials the participants hand in after they complete the problem-solving work.
4. Jun. 24, 2010: IRB form is approved.
5. Jun. 30, 2010 4:33 PM: The document containing the tax forms, "TaxStudyForm.docx" is created by Jennifer Fink per the metadata. We do not know its contents at this time since only a later version is available on the Gino Laptop.
6. Jul. 11, 2010 3:51 PM: The tax forms document is printed. The tax forms document is last modified at 3:58 PM by Francesca Gino per the metadata.
7. Jul. 11, 2010 4:12 PM: The instructions for the study, "instructions.docx", are created. The document is printed at 4:17 PM and last saved at 4:18 PM. The metadata reflects that it was created and last saved by Francesca Gino.
8. Jul. 11, 2010 4:22 PM: The document containing the math puzzle worksheets is created. It is printed at 4:49 PM and last saved at 4:55 PM. The metadata reflects that it was created and last saved by Francesca Gino.
9. Jul. 13, 2010: Data collection for the tax study begins at UNC.

10. Jul. 13, 2010 4:57 PM: Ms. Fink emails the initial day's results to Dr. Gino's Harvard email account. Ms. Fink notes in the body of the email: "The people are SERIOUS dumdums on this study. They seem to be having some serious issues, calculating the money, or if they got the amounts right they were written and scribbled in very strange ways on the form. Please let me know if you want these canceled as soon as you can, because I don't have internet at home and won't be able to do it later tonight."

11. Jul. 16, 2010: Data collection ends.

12. Jul. 16, 2010 4:57 PM: Ms. Fink sends Dr. Gino an email with the subject line "That's a wrap: Tax Study" and that attaches the results in a spreadsheet named "Taxstudy.xlsx".

13. Jul. 17, 2010 6:43 PM: The "Taxstudy.xlsx" file is saved to Dr. Gino's computer. Its contents are the same as the attachment sent by Ms. Fink.

14. Jul. 18, 2010: 4:30 PM: Dr. Gino circulated a summary of the results of the tax study and well as the forms and procedure to Professors Bazerman, Shu and Desai.[169] All but one of the statistical values match the published results (which are based on the modified data values).[170] It attaches a file named "Tax Study summary of results 2010-07-18.docx", a file that is not present on Francesca's hard drive. Its description of the two payments (one in each room) accords with the study design and IRB documents—the description appears to include language copied from the IRB application.[171] The summary does not discuss what materials the participants submit after completing the math puzzles.

---

[169] RX 402 (Email from Francesca Gino to Max Bazerman, Lisa Shu, and Mihir Desai (July 18, 2010, 8:30:33 PM) (Produced by Complainant as Harvard0000011093)).

[170] One of the p-values in the academic paper changes between the version of the manuscript submitted to Organizational Behavior and Human Decision Processes ("OBHDP") on May 9, 2011, and the manuscript that is published in PNAS in September 2012. The difference between the signature-at-the-bottom and no-signature groups for participants who cheated by over-claiming income changed from $p<.07$ in the manuscript submitted to OBHDP to $p<.17$ in the manuscript submitted to PNAS. Since none of the other values change, the difference may be due to correcting a typo. The summary of results prepared on July 18, 2010 reflects the $p<.07$ value as do all the early 2011 drafts that Maidstone and the Investigation Committee examined.

[171] The study description appears to carry over a section with a typo from the IRB application: "Participants are welcomed to the lab, asked the read the consent form for the study and sign it" appears in both the IRB application (CX 53 at 9) and the July 2010 summary (RX 403 at 2).

15. Jul. 19, 2010 8:03 AM: Professor Bazerman responded the next morning saying "I have now read the materials more carefully. The results are great! The style of your tax forms are wonderful."[172] He suggested modifying the way the tax form is structured so that it more closely resembles U.S. income tax forms.

16. Jul. 19, 2010 10:47 PM: Dr. Gino writes, "Max: good point on the deductions. I am happy to run an additional study before I officially make the move since we have subjects at UNC. let me know if you think it'd be valuable and I'll arrange for it."[173]

17. Jul. 20, 2010 8:09 AM: Professor Bazerman suggests running another study with revisions to the tax form if it is easy.[174]

18. Jul. 20, 2010 8:16 AM: Dr. Gino responds to Professor Bazerman confirming that it would be easy to run another study and asking Professor Bazerman for his opinion on how to modify the tax form.[175]

19. Jul. 20, 2010 8:21 AM: Dr. Gino emails Ms. Fink and asks if she could run additional studies next week. Dr. Gino states "I would like to run a different version of the TAX STUDY. I just need to change the forms a bit."[176]

20. Jul 20, 2010 8:24 AM, In response from the request from Dr. Gino, Professor Bazerman elaborates on his suggested change in a later email: "I would set it up so that you have

    1) Income
    2) Deductions -ok to have each type and add them up
    3) Income – deductions
    4) Tax = 50% (income-deductions)
    5) Take home pay = income – tax"[177]

---

[172] RX 406 (Email from Francesco Gino to Lisa Shu and Max Bazerman (July 22, 2010, 10:10:47 PM) (Produced by Complainant as Harvard0000011088)), at Harvard0000011089.
[173] *Id.*
[174] *Id.*
[175] *Id.*
[176] RX 707 (Email from Francesca Gino to Jennifer Fink (July 20, 2010, 8:21 AM), at Harvard0000013623).
[177] RX 406, at Harvard0000011088.

21. Jul. 20, 2010 8:35 AM: Professor Shu responds shortly thereafter to concur noting, "I think what Max suggested is exactly what the MA state tax form looks like – see attached."[178]

22. Jul. 22, 2010 6:10 PM: Dr. Gino circulates the new tax form, "TaxStudyForm – STUDY 2.docx", and asks Professor Bazerman and Professor Shu: "are you ok with the new forms?"[179]

23. Jul. 22, 2010 6:17 PM: Dr. Gino emails the new tax study form and the instructions to Jennifer Fink. The form is visually identical to the one circulated to the research team.

24. Jul. 22, 2010 9:08 PM: Dr. Gino emails a revised tax form to Ms. Fink noting "I introduced a small change in the tax forms." There are no substantive changes to the form; this version uses letters instead of numbers to organize the questions under each section.

25. Jul. 27, 2010 3:26 PM: Ms. Fink emails the results of the second tax study to Dr. Gino in a spreadsheet named "Taxstudy.xls." The spreadsheet also includes the results of the first tax study, which match those provided by Ms. Fink on July 16, 2010.

26. Jul. 28, 2010 10:19 AM: The document "Tax Study summary of results 2010-07-28.docx" is last saved by Francesca Gino per the metadata. This version includes the results of the second tax study. All but one of the statistical values for the first study match the published results (which are based on the modified data values). Its description of the two payments (one in each room) accords with the study design and IRB documents. The summary does not discuss what materials the participants submit after completing the math puzzles.

27. Feb 15, 2011 11:23 AM: Professor Shu emails Dr. Gino and attaches the earliest available version of the draft paper. The attachment is named "Tax Study 2011-02-12.docx". Like the July 28, 2010 tax study write-up, this version described

[178] *Id.*
[179] *Id.*

participants being paid twice (once in each room). It does not discuss what materials the participants submit after completing the math puzzles.

28. Feb. 23, 2011 8:09 PM: The next available draft of the manuscript, "Signing on the dotted line turns moral gaze inward 2011-02-23.docx" is saved by Francesca Gino. This version introduces a quote from the instructions that the participants are to only hand in their collection slip and discard their test sheet. This version removes the detail about participants being paid twice.

29. Mar. 8, 2011 4:03 PM: The discussion about handing in only the collection slips is extended in the next available version, "Making Ethics Salient 2011-03-08.docx", which was last saved by Lisa Shu. Her edits appear in redline, so we know the sections she changed and when she changed them.

30. Mar. 9, 2011 10:15 PM: The next available version, "Making Ethics Salient 2011-03-09_vs2.docx", is last saved by Nina Mazar. It includes a margin comment from Professor Mazar asking a question of the differences in results observed between the different treatment groups: "This is odd. I might be misunderstanding but why would there be any differences in cheating on the matrix task which is done before the pledge of honor manipulation? If we do find this, shouldn't we control for these differences in the anlysis [sic] of the signature effect ?"[180]

31. Mar. 15, 2011 8:42 AM: The next available version, "Making Ethics Salient 2011-03-15.docx", is last saved by Francesca Gino. This version changes the description of what materials are handed in to reflect that participants return both their collection slips and worksheets. This version still has the participants receiving payments in both rooms.

32. Apr. 4, 2011 6:43 PM: After several interim versions that do not change the key passages, the next notable version is "Making Ethics Salient 2011-04-04_2nm.docx". It was last saved by Nina Mazar. As noted above, it includes a margin comment from Professor Mazar questioning the payment in the first room: "This doesn't seem to make sense. The tax return suggests that everything

[180] *Making Ethics Salient 2011-03-09_vs2.docx* at 13.

was computed in the 2nd room and then they received their pay. This here, however, would suggest they got paid for the peformance [sic] by experimenter 1, and then for the rest by experimneter [sic] 2. If this latter is true, the tax return form doesn't seem to make too much sense, no? IN that case, box 7 should have been box 6 – box 2, no?"[181] Professor Mazar also asks a question about whether participants would have to pay back money in the second room if their taxes exceeded their expenses: "Does this mean that if the subject didn't claim any expenses in room 2 they would have to pay taxes (after having received their payment for the matrix task in room 1)?"[182]

33. Apr. 5, 2011 11:06 PM: The next available version, Making Ethics Salient 2011-04-05.docx, is last saved by Dr. Gino. This version does not include the reference to payment by the first experimenter. Instead, it reflects that the participants received payment in the second room.[183]

34. May 8, 2011 8:06 PM: In a later version, "nmMaking Ethics Salient 2011-05-08", Professor Mazar deleted the phrase "so that she could check their work" which explained why the participants turned in their worksheets. In a margin comment she explains that "I deleted the last part, since it raises more questions about the procedures."[184]

35. May 9, 2011: The draft manuscript is submitted to the *Organizational Behavior and Human Decision Processes* journal.

36. Jun. 11, 2012: The manuscript is submitted to the *PNAS,* the journal in which the paper is published on September 18, 2012.

37. Aug. 6, 2019: The materials for the 2010 tax study are posted to OSF in connection with the replication study led by Ariella Kristal of Harvard.

[181] *Making Ethics Salient 2011-04-04_2nm.docx* at 14.
[182] *Id.* at 15.
[183] *Making Ethics Salient 2011-04-05.docx* at 14.
[184] *nmMaking Ethics Salient 2011-05-08.docx* at 13.

## E. Digital Forensic Analysis

### *i. First Draft of the Academic Paper is Not Available*

280. Like the other Allegations, there are gaps in the available evidence during critical moments. For Allegation 4A, the first draft of the academic paper is not available.

281. The Final Report noted that the earliest drafts of the manuscript discussed by Maidstone were dated February 23 and March 8, 2011.[185] These were the earliest drafts that Maidstone *discussed*, but HBS had, in fact, identified an earlier version and provided it to Maidstone. Specifically, the earliest available draft is from eight days earlier, on February 15, 2011, when Professor Shu emails Dr. Gino and attaches a version of the draft paper named "Tax Study 2011-02-12.docx". This version was last saved on Feb. 15, 2011 at 9:54 AM.

282. The earliest available draft is not the earliest draft of the manuscript. The author field of the earliest available version has both Dr. Gino's and Professor Shu's names listed. The document was last saved by Professor Shu. It appears to respond to an earlier draft that Dr. Gino sent Professor Shu. I would expect that prior draft, which is unavailable, would only have Dr. Gino's name listed in the author field. The embedded metadata of the earliest available file shows that it was created on Feb. 12, 2011 at 5:24 PM. As such, the available digital evidence does not permit me to determine who introduced the language about the experiment design that is at issue in this allegation into the draft manuscript. While the language corresponds with the language that Dr. Gino included in the July 18, 2010 summary of results that she circulated by email, the available data is insufficient to determine whether Dr. Gino

[185] CX 1 (Final Report), at 29.

included that description of the experiment design, a different description, or no description in the prior, unavailable draft.[186]

283. This important issue is yet another *unknown* in this investigation.

284. The Hearing Committee does not acknowledge this unknown when they conclude that "With respect to the first question, there is clear and convincing evidence that the published paper altered the description of the study procedure that Professor Gino originally prepared, including in the available Internal Review Board (IRB) application and in the first known draft of the paper."[187]

285. The Hearing Committee's subsequent reference to the "earliest available draft of the paper, which was attached to an email from one of Professor Gino's co-authors" establishes that the Hearing Committee is referring to the January 2021 document attached to the email from Professor Shu, not the draft write-up that Dr. Gino prepared in July 2010.

286. As discussed above, Professor Shu attached a document that she revised to her February 15, 2011 email. The document was based on a draft prepared by Dr. Gino on February 12, 2011, but we only know that from the metadata. The draft prepared by Dr. Gino is not available. Therefore, the available evidence does not permit us to conclude who introduced the language about the experiment design that is at issue in this allegation.

---

[186] Tax Study summary of results 2010-07-18.docx attached to RX 402.
[187] Hearing Committee, Third Statute Proceeding Against Professor Francesca Gino of the Harvard Business School – Findings of Facts and Recommendations, Jan. 24, 2025 at 5.

## XIII. ALLEGATION 4B

### A. Background of Study

287. Harvard's fifth allegation (Allegation 4B) concerns the same paper and study that were at issue in Allegation 4A.

288. As a reminder, the paper in question was entitled, "Signing at the beginning makes ethics salient and decreases dishonest self-reports in comparison to signing at the end." The paper concludes that having people sign at the beginning rather than the end of a form, such as an expense report or tax form, reduces dishonesty.[188] The study at issue is Study 1.

289. Ms. Fink, the RA who administered this study provided several email messages to the Investigation Committee that attached data files. The operative one, in both Maidstone's and my view, is named "Taxstudy07162010.xlsx", which Ms. Fink emailed to Dr. Gino at the conclusion of the study on July 16, 2010. It contains the responses for 98 participants in the tax study.[189]

### B. Harvard's Allegation

290. HBS alleged: "b) Dr. Gino falsified and/or fabricated the original dataset by altering a number of observations in a way that favored the hypothesized results."[190]

### C. Available Data

291. Below is a summary of the available evidence and where there are gaps:

---

[188] CX 42 (2012 PNAS Paper), at Harvard0000003717.
[189] The participants were identified by numbers ranging from 1 through 97. Two entries had participant number 13. This seems to be a mistake with the assignment of numbers since the entries appear to represent different people: one was for a graduate student studying library science, and the second was for a college senior studying chemistry.
[190] Compl. at ¶ 16.

i. *No Paper Records of Participant Responses* – This study was conducted on paper, but the original paper records were not located. The earliest available dataset is the results that Ms. Fink manually transcribed into an Excel spreadsheet.

ii. *Few Emails for Dr. Gino* – Dr. Gino's email files contain few emails from the June and July 2010 timeframe when the study was designed, executed, and analyzed. None of the existing emails in Dr. Gino's email files relate to the study.

iii. *No Usage Records* – The usage records showing which files were opened in Microsoft Office programs and when they were last opened are not available. I understand that Dr. Gino had not yet received her HBS laptop when the study was conducted in July 2010.

iv. *No SPSS Statistics Journal* – The SPSS statistical journal is not available for this period.

v. *No Internet History* – The Internet history is not available for the fgino user during this timeframe.

vi. *No Removable Storage Device Info* – The records that track connections of removable storage devices are not available for this timeframe.

vii. *Few Third-Party Emails* – Ms. Fink provided selected emails to the Investigation Committee. No emails were provided for Professors Shu or Desai, the other two individuals with whom Dr. Gino corresponded about the study

design and results. Professor Bazerman's emails were searched and messages were produced from them only after the Final Report was issued.

### D. Chronology

292. Set forth below is a chronology of the key events for Allegation 4B based upon the available data. The chronology does not include the "Taxstudy.xlsx" files modified in 2023, which are discussed in Harvard's counterclaim. For my analysis of this study for which the survey was performed in 2010 and the results were published in 2012, I relied on the copy of the "Taxstudy.xlsx" file in the Sequestered Materials, which Harvard preserved in October 2021. It is more reliable forensic evidence of what occurred in 2010-2012 than versions dating from 2023.[191]

1. Jul. 13, 2010: Data collection for the tax study begins at UNC.
2. Jul. 13, 2010 4:57 PM: Ms. Fink emails the initial day's results to Dr. Gino at Dr. Gino's Harvard email account. Ms. Fink notes in the body of the email: "The people are SERIOUS dumdums on this study. They seem to be having some serious issues, calculating the money, or if they got the amounts right they were written and scribbled in very strange ways on the form. Please let me know if you want these canceled as soon as you can, because I don't have internet at home and won't be able to do it later tonight."
3. Jul. 16, 2010: Data collection ends.
4. Jul. 16, 2010 4:57 PM: Ms. Fink sends Dr. Gino an email with the subject line "That's a wrap: Tax Study" and that attaches the results.

[191] The "Taxstudy.xlsx" file present on the Gino Laptop at the time I preserved the computer in January 2024 contains discrepancies between the file system and embedded metadata. (Versions of this file were also stored on the Black USB and SimpleTech USB drives.) Based on the information I have reviewed to date, I have not reached an opinion as to why the metadata differs. I understand that there is an ongoing forensic inspection being conducted by a third-party analyst, which may yield additional information. To the extent that any such information allows me to form an opinion on the issue, I will do so in a supplemental report.

5. Jul. 17, 2010 6:43 PM: The "Taxstudy.xlsx" file is saved to Dr. Gino's computer. Its contents are the same as the attachment sent by Ms. Fink.

6. Jul. 18, 2010 11:41 AM: A summary document named ""Tax Study summary of results 2010-07-18.docx" was created per the metadata of the email attachment in the next entry. We do not know the document's contents at this time.

7. July 18, 2010 4:30 PM EDT: Dr. Gino emails a summary of the results of the first tax study to Professors Bazerman, Shu, and Desai.[192] Per the metadata provided in the Harvardv005 production, the summary, "Tax Study summary of results 2010-07-18.docx" was last modified at 4:21 PM.[193] The summary includes a statistical analysis of the results that reflect the modified data values.

8. Jul. 27, 2010 3:26 PM: Ms. Fink emails the results of the second tax study to Dr. Gino in a spreadsheet named "Taxstudy.xls." The spreadsheet also includes the results of the first tax study, which match those provided by Ms. Fink on July 16, 2010.

9. Jul. 28, 2010 10:19 AM: A document named "Tax Study summary of results 2010-07-28.docx" is last saved by Francesca Gino per the metadata. Its description of the statistical analysis of the results of the tax study at issue matches the July 18, 2010 summary described above.

10. May 9, 2011: The draft manuscript is submitted to the *Organizational Behavior and Human Decision Processes* journal.

11. Nov. 13, 2011 12:11 PM: The analysis spreadsheet for the first tax study "Tax Study STUDY 1 2010-07-13.xlsx" is saved to Dr. Gino's computer based upon its file system Creation Date.[194] It appears to have been derived from the Taxstudy.xls file that Ms. Fink circulated based upon its embedded Creation Date, July 13, 2010 at 10:39 AM and Author of "Jennifer Fink". This file was subsequently saved by "Francesca Gino" on June 25, 2019 at 9:22 AM.

---

[192] RX 402 (Email from Francesco Gino to Max Bazerman, Lisa Shu, and Mihir Desai (July 18, 2010, 8:30:33 PM) (Produced by Complainant as Harvard0000011093)). The dates and times for the files provided in the Harvardv005 production are listed in UTC. I have adjusted them here to Eastern Daylight Time for consistency.

[193] Harvardv005 load file data for Harvard0000011094.

[194] RX 404B.

12. Jun. 11, 2012: The manuscript is submitted to the *PNAS,* the journal in which the paper is published on September 18, 2012.
13. August 6, 2019: The materials for the 2010 tax study are posted to OSF in connection with the replication study led by Ariella Kristal of Harvard.

## E. Digital Forensic Analysis

### *i. The Available Evidence Is Insufficient to Fully Evaluate This Allegation*

293. **For Allegation 4B, the available evidence is insufficient to fully evaluate this allegation.** The study was conducted at a different university in the Summer 2010 before Dr. Gino received her first HBS-issued computer. There are no emails related to this study available from Dr. Gino's HBS mailbox account or saved locally on her computer from this timeframe. The only correspondence that the Investigation Committee considered were the selected emails that Jennifer Fink provided to HBS. Moreover, the earliest dataset with the modified results was created on Dr. Gino's computer on Nov. 13, 2011, which was more than a year **after** the modified data was incorporated into a draft write-up of the study results.

294. The study in question for Allegation 4B was completed on the evening of Friday, July 16, 2010. Jennifer Fink transcribed the results of the survey, which was administered on paper, into an Excel spreadsheet titled "Taxstudy.xlsx", which she emailed to Dr. Gino.[195]

295. A draft write-up of the results was finalized two days later and circulated by email. This email was not considered by the Investigation Committee, because it was located only during the searches of Professor Bazerman's email files at Respondent's request

[195] CX 1.13 (Final Report, Ex. 13 (Ms. Jennifer Fink's Written Responses to Investigation Committee's Follow-up Interview Questions received on September 25-28, 2022)), at 7-8.

in 2024. The email is sent from Dr. Gino to Professors Bazerman, Shu, and Desai on July 18, 2010 at 4:30 PM.[196] The subject of the email is "summary of results for tax study". Dr. Gino wrote:

> I attached the summary of the results from the study we conducted. Our manipulation worked. For both income and deductions we find significant differences such that "cheating" is lower when the signature is at the top of the form compared to the two other conditions.

296. The email attaches "Tax Study summary of results 2010-07-18.docx". The draft write-up includes results based upon the modified data:

> We first examined the percentage of participants who cheated on the matrix task. This percentage varied across conditions, $\chi^2(2, N=101)=12.58$, $p=.002$. It was lowest in the signature-at-the-top condition (37%, 13 out of 35), and higher in the signature-at-the-bottom condition (79%, 26 out of 33) and in the no-signature condition (64%, 21 out of 33).[197]

297. The statistics excerpted above, and other statistics included in the summary, match the published version of the study, which was prepared based on the modified data. **Therefore, the modifications had to occur between July 16 and 18, 2010.**

298. The spreadsheet emailed by Ms. Fink would have required data cleaning before the analysis to generate the summary statistics that were included in the draft write-up on July 18, 2010. The spreadsheet emailed by Ms. Fink and saved on Dr. Gino's hard drive contains the results before data preparation.[198] It has terse, non-descriptive column headers, *e.g.*, "6" instead of "Deductions." They also lack several of the indicator columns (OverReport, CheatedOnMatrixTax) that are present in the "Tax

[196] RX 402 (Email from Francesco Gino to Max Bazerman, Lisa Shu, and Mihir Desai (July 18, 2010, 8:30:33 PM) (Produced by Complainant as Harvard0000011093)).
[197] RX 403 (Tax Study summary of results 2010-07-18.docx), at Harvard0000011096.
[198] *Taxstudy.xlsx* saved on Professor 's laptop in "Users\fgino\Documents\Work In Progress\Max Bazerman\Tax study."

Study STUDY 1 2010-07-13.xlsx" that Dr. Gino pointed to as the file she used in this analysis.

299. Moreover, Maidstone noted that there were arithmetical errors that were identified and corrected for 10 of the 101 participants.[199] Some of the miscalculations were in the IncomeMinusTax column. There were six instances where that column reported a different value than would be obtained by subtracting the tax column from the income column. There were an additional two participants for which SumDeduction column did not equal the sum of the two deduction columns. There were also miscalculations in the computation of the FinalPayment column for ten participants: two of which were not affected by the other miscalculations. This also required scrutiny of the data.

300. **There is no evidence on Dr. Gino's hard drive of the preparation occurring in this time frame.** The available evidence shows the cleaned version of the spreadsheet, which also contained the modified data values, was created on Dr. Gino's hard drive over a year later. As reflected in the chronology, "Tax Study STUDY 1 2010-07-13.xlsx" was created on Dr. Gino's computer on November 13, 2011 at 12:11 PM. The file likely existed before then—given the date in the filename and the fact that the initial analysis of the tax study results was performed in July 2010; however, this version was created in 2011. The 2011 file system Creation Date is in contrast to the July 2010 file system Creation Dates for the spreadsheet saved from Ms. Fink's email and the summary document "Tax Study summary of results 2010-07-28.docx".

---

[199] *See* entries with blue font in "All entries aligned across sets" worksheet of CX 6 - Harvard0000001069 - MCG022_Allegation 4b_allData_analysis.xlsx.XLSX.

301. The available digital forensic evidence provides limited insight into what occurred in this two-day span. There are no available emails between Dr. Gino and Ms. Fink on the hard drive or with Professor. Shu, her co-author. Dr. Gino had not yet arrived in Cambridge, MA, and had not been issued an HBS computer yet.

302. The prepared version of the tax study spreadsheet after data cleaning may have additional date/time and authorship metadata that provide further insight into the data analysis process. **HBS's analysis of who handled and modified the dataset is incomplete, because the dataset that Dr. Gino worked with in July 2010 was never identified.**

303. For this allegation, the Hearing Committee's conclusion that Dr. Gino is responsible for the data alterations is premised on there being no evidence of another plausible actor: "There was a short timeframe between a Friday afternoon and a Sunday evening when the study data were provided to Professor Gino and she circulated the altered results, and there is no evidence of another individual with the knowledge and opportunity to make the intentional alterations."[200]

304. The Hearing Committee does not acknowledge how scant the actual evidence is. Dr. Gino's email did not contain any emails related to the execution of this study (which happened over 15 years ago). Ms. Fink provided only selected emails to the Investigation Committee. No emails were provided for Professors Shu or Desai, the other two individuals with whom Professor Gino corresponded about the study design and results. The only reason we know about the write-up that was circulated

[200] Hearing Committee, Third Statute Proceeding Against Professor Francesca Gino of the Harvard Business School – Findings of Facts and Recommendations, Jan. 24, 2025 at 5.

on July 18, 2010 was an email located in Professor Bazerman's mailbox, which was only searched in 2024 in at Dr. Gino's request.

305. The fragmentary evidentiary record does not allow any sound conclusions about who modified the data to be reached.

## XIV. CONCLUSION

306. Based upon my review of the digital forensic evidence, I have reached following opinions:

   i. There are significant gaps in the available digital forensic evidence. The evidence gaps I have identified, including HBS sequestering data from only Dr. Gino, HBS's failure to forensically image the Gino Laptop in 2021 and the current unavailability of records for most of the identified custodians, coupled with the forensic evidence that other individuals worked on at least three of the four datasets at issue, prevent any methodologically sound attribution of responsibility for the data modification. In my professional opinion, the available digital forensic evidence does not support reliable conclusions about who modified the datasets.

   ii. Issues with the evidence collection and interpretation throughout Harvard's investigation resulted in the Investigation and Hearing Committees drawing conclusions based on a fragmentary evidentiary record. This includes the Hearing Committee concluding that there is no evidence of other plausible actors for the modifications besides Dr. Gino instead of acknowledging how little evidence is available from distant time periods.

iii. Contrary to the Third Statute Complaint, there is no "clear progression" of changes to the datasets that only occurred on Dr. Gino's computer as HBS suggests. Research assistants and others were involved in cleaning and coding the datasets at issue in Allegations 1, 3, and 4—and likely Allegation 2—before Professor Gino analyzed the data. For the datasets involved in all four of the data-related Allegations, there are sequencing issues—such as modified datasets being created on Professor Gino's computer only after the relevant draft versions of the paper reflecting the modified data were already prepared—that undercut the premise that Professor Gino modified the raw dataset into the modified dataset and suggest the involvement of others in preparing the datasets.

307. This report is based on information and documents made available to me to date. I reserve the right to supplement this report to address any additional material made available, if allowed by the Court.

**Sworn to by:**

DocuSigned by:

Michael McGowan

41AC0D200D8E4CA...

Dated: May 27, 2026

Michael F. McGowan