**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| FRANCESCA GINO,<br><br>Plaintiff,<br><br>v.<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE, SRIKANT DATAR, JOHN DOES 1-10, AND JANE DOES 1-10,<br><br>Defendants. | Civil Action No. 1-23-cv-11775-MJJ |

**<u>PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS</u>**

The instant motion is both factually and legally baseless. Nothing has been concealed, nothing has been spoliated, and nothing has been improperly manipulated. But even if Defendants' accusations had some merit—which they do not—the draconian relief that they seek is not supported under any applicable legal theory.

For these reasons, and those that follow, the motion should be summarily denied in its entirety. In the alternative, Plaintiff should be afforded an evidentiary hearing at which Defendants' purported "expert" can be subjected to cross-examination, and the Court can assess for itself the validity and reliability of his opinions.

**FACTS**

**I. <u>Plaintiff Has Not Engaged in "Concealment."</u>**

To begin**,** Plaintiff's personal laptop was never "concealed." While Defendants assert that their interrogatory asked Plaintiff to identify "all devices, external drives, and cloud storage platforms on which she had stored data related to the studies HBS had investigated," Def. Br. at 6-

7, that is false. The Interrogatory asked her to identify devices she used "in connection with the four studies investigated by the Investigation Committee." Ex. 13 at 7.[1] Those four studies ended years before Plaintiff acquired her personal laptop in 2023, so it was plainly never used "in connection" with those studies.[2]

Moreover, when Defendants negotiated the terms of the forensic protocol, they were already aware that Plaintiff's personal laptop existed and that it likely contained discoverable information. Defendants were aware of that because Plaintiff's counsel told them, in writing, that the personal laptop existed and was one of the repositories that Plaintiff searched for responsive documents.[3] Ex. 45.

Despite having that knowledge, Defendants did not ask to have the personal laptop included in the protocol.[4] Instead, they requested that the protocol include, "any other device or other storage location utilized by Plaintiff to store research records relevant to the four studies at issue in this matter." Ex. 46 at 15.[5] That overly broad language was excluded by the Court in its

---

[1] Where applicable, we cite to the exhibits submitted by Defendants in support of their motion (Exs. 1-44). Plaintiff's exhibits continue sequentially beginning with Exhibit 45.

[2] Defendants claim that Plaintiff misled them by her reference to her "current laptop computer" in her Third Statute declaration, is untrue. See Def. Br. at 3 n.3, citing Ex. 5 ¶ 393. That is a passage where Plaintiff observes that she began using the 2017 HBS Laptop in 2017, after the studies at issue for Allegations 2, 3, 4A, and 4B were prepared, which explains why there are gaps in the evidentiary record. Ex. 5 ¶ 393. Plaintiff did not state or imply that the 2017 laptop was her "primary computer" or that she did not also have a personal computer. Id.

[3] Defendants' conclusory assertion that Plaintiff failed to search her personal laptop for responsive documents is unsupported by the record.

[4] Notably, Defendants did ask (and Plaintiff agreed) to include Plaintiff's Google Drive, which like the personal laptop, was not identified in Plaintiff's interrogatory answer because it had not been used "in connection with" with the studies, but was identified by Plaintiff as a likely repository of discoverable information.

[5] For Exhibits 46-48, citations are to the page numbers that have been inserted at the top right.

proposed version of the protocol, which was circulated to the parties for comment on February 25, 2026. Ex. 47 at 13.

Defendants did not object to that exclusion. Instead, they asked Plaintiff to agree that the protocol would include "the device on which the 2023 Cover-Up File (as defined in Harvard's counterclaim, Doc. No. 154, ¶ 78) was edited or otherwise modified, to the extent such editing or modification was performed by Plaintiff or someone at Plaintiff's direction and such device is within Plaintiff's possession, custody, or control." Ex. 48 at 4. Plaintiff initially objected to that language because, among other things, she had used multiple devices to analyze the various files at issue in this case, and she could not reliably determine which devices were used in connection with the so-called "Cover Up File" without having an expert analyze each device. Id. at 2; Ex. 49, p. 163;7-23. To address this concern, Defendants proposed a qualifier: That such a device need only be included if "Plaintiff has knowledge of the identity of such device." Ex. 48 at 1, 17-18.

That critical qualifier, which Plaintiff accepted subject to some other wordsmithing, is notably absent in Defendants' memorandum. On page 8 of their brief, they purport to quote the Protocol as requiring "any device on which . . . the '2023 Cover-Up File' was, prior to December 31, 2023, stored, edited, or otherwise modified." But that period after "otherwise modified" does not belong. Defendants have concealed the important qualifier that follows: "…, to the extent Plaintiff has knowledge of the identity of such device…". And Defendants did it again on page 13 of their brief.

Why did Defendants leave that qualifier out of their brief? Because they know that qualifier is the reason why Plaintiff's personal laptop was not initially included in the forensic inspection. It was not because Plaintiff concealed it—she simply did not know whether that particular device had been used in connection with the file they refer to as the "Cover-Up File." Ex. 49, p. 163;7-

23. Defendants have long known that Plaintiff has other devices, including the personal laptop, that could have been used in connection with that file. And when Defendants finally asked that the personal laptop be submitted to the analyst for inspection to determine whether it had, Plaintiff agreed. There was no "concealment."

## II. Plaintiff Has Not Engaged in Spoliation.

Much like their "concealment" argument, Defendants' three claims of spoliation are based on a skewed and utterly misleading view of the facts. We address each in turn.

First, the claim that Plaintiff "destroyed" a file that existed on her 2017 HBS Laptop, Def. Br. at 15, is false. The file that Defendants claim was destroyed was among the materials that Plaintiff had cooperatively worked to preserve at the outset of Harvard's purported investigation. Ex. 50, p. 69:1-70:9; 226:5-228:8. And it remains safe and sound to this day.

Defendants' misleading "destruction" claim is based on a theory advanced by their purported expert, Julian Ackert, that Plaintiff must have overwritten that file in September 2023, when she saved the so-called "Cover-Up File" to her HBS Laptop. But as Ackert's deposition testimony makes clear, that theory is mere speculation, as it is equally possible that the file he assumes was "overwritten" was simply moved to a different folder. Ex. 50, p. 115:3-116:17 ("I don't have evidence that it was there, but I don't have evidence that it was not there.") And, in any event, Ackert was unable to offer any explanation as to how overwriting that file in 2023 could somehow result in a "cover-up," as that file had already been gathered and preserved by Defendants years earlier. Id. at 226:5-228:8.[6]

---

[6] As Plaintiff explained at her deposition, she sometimes needed to move files to her HBS laptop because it had the SPSS statistical software, which was licensed through HBS and which her personal laptop did not have. Ex. 52, p. 231:16-232:7.; Ex. 49, p. 196:17-23.

Second, Defendants' claim that Plaintiff spoliated evidence from her Teams application is also not supported by the evidence. As explained in the accompanying Declaration of Michael McGowan, the activities that Mr. Ackert characterizes as "anti-forensic" are nothing of the sort. Ex. 51.[7] Indeed, Mr. Ackert fails to disclose numerous critical facts, including:

- The Teams "cache" files that Ackert claims were destroyed appear to have been moved to another directory before the cache was cleared;
- The "cache clearing" that Mr. Ackert characterizes as "anti-forensic" is actually a recognized troubleshooting tip for resolving certain issues with Teams; and
- Microsoft has even published a support document for troubleshooting issues that calls for using Terminal to run the same command as was run on the 2023 Laptop.

Id. at ¶¶ 12-17. Further, Mr. Ackert does not disclose that clearing the Teams cache does not delete the data from Teams—it only deletes the locally stored copy. Id. at ¶ 19. The primary copy of Teams data is in the Microsoft cloud platform, and the local cache is restored the next time that Teams is opened. Id. As Mr. McGowan explains, "nothing was actually lost—at most a local copy was cleared." Id.

The record also explains why the cache was cleared. Plaintiff testified that her husband set up a personal Teams account for her because companies she was contacting preferred Teams, that she had trouble joining scheduled Teams calls, and that her husband tried to help her troubleshoot. Ex. 52, p. 224:13-225:21; 224:20-24. She testified that she does not believe she used Teams to communicate with anyone connected to this litigation. Id. at 225:17-21. And no evidence shows

---

[7] When confronted at his deposition with the fact that Defendants' "cover-up" theory makes no logical sense, Mr. Ackert was quick to assert that issues of motive were beyond the ken of a digital forensic expert such as himself. Ex. 50, p. 225:20-22 ("That goes beyond my expertise."). Remarkably, he now opines that he "can conclude to a reasonable degree of professional certainty" that the Teams cache clearing was "used to obfuscate Microsoft Teams conversation history and/or file transmission and view activity."

that Plaintiff - who testified she has never used Terminal - entered any of the commands at issue. Id. at 243:20-244:19.

Lastly, Mr. Ackert's claim about deletion of web browser history is also demonstrably false. Although Mr. Ackert does not explain the basis for his assertion that these logs were deleted, he seems to be relying entirely on information reported by the forensic analyst. Ackert Declaration (Doc. No. 268) ¶ 23. But the analyst never concluded that such deletion took place. The Analyst was asked to report whether there was any "indicia" of log clearing, and reported that the history "appears to have been cleared." Ex. 41.[8]

As explained in the McGowan Declaration, that is an important distinction. Ex. 51 at ¶¶ 23-24. There are many reasons why a history database might "appear" to have been cleared. Id. The browser might simply have not been used; it might have been configured in such a way as to not retain history; or the browser may have settings that result in auto-deletion. Id. Indeed, Google Chrome, one of the browsers at issue here, only retains browser history for 90 days. Id. at ¶ 29.

Compounding this error, Mr. Ackert goes even further and conclusively states that the deletion occurred on May 13, 2026. Ackert Decl. ¶ 23. But again, he cites no evidence and offers no explanation for how he reaches that conclusion. The only apparent source for this claim is metadata produced by the Analyst showing that the web browsing databases were last modified on May 13, 2026. Ex. 42.

As explained in the McGowan Declaration, that metadata does not establish that any "deletion" occurred on that date. Ex. 51 at ¶ 26. Indeed, May 13, 2026 was the day on which Plaintiff provided her laptop to TransPerfect, the forensic vendor who created the image for the

[8] Defendants' reliance on the Analysts answer as substantive evidence in support of their motion violates Judge Hedges' July 7 Order (Doc. No. 239), which provides that the Analyst's answer cannot be used as substantive opinion evidence by either side.

Analyst. Id. at ¶ 27. And their chain of custody form confirms that Plaintiff had relinquished possession of her laptop by 9:10 am—hours before the "modification" of the Firefox database that Mr. Ackert apparently interprets as a deletion. Id.

In short, Mr. Ackert's assertion that deletions occurred on May 13, 2026 is nothing more than rank speculation. And that statement—contained in a sworn affidavit seeking sanctions—should tell this Court everything it needs to know about the reliability of Mr. Ackert's testimony in this matter.

## III. Plaintiff Did Not Improperly "Manipulate" Evidence

Defendants' claim of "manipulation" is predicated on Mr. Ackert's opinion that differences in certain metadata fields are proof that two excel files were manually backdated in an effort to falsify evidence. Ackert Report (Doc. No. 222-1) ¶¶ 42-45. As with his opinions concerning alleged spoliation of Teams data and browser history, these opinions are not based on a reliable methodology or thorough investigation.

For example, Mr. Ackert relies heavily on an apparent anomaly within the File System metadata of the so-called Cover-Up File. Specifically, he points to the fact that the file's "Date Created" time is "6:43:30 PM" and its "Date Modified" time is "6:43:00 PM." Id. Mr. Ackert opines that this discrepancy exists because the "Date Modified" field was manually backdated, and the person performing the backdating accidentally failed to complete the seconds field. Id.

But as Mr. Ackert's deposition testimony makes clear, he failed to consider alternative explanations for this anomaly. In particular, he did not consider whether it could have been caused by "file tunnelling"—a process identified by Mr. McGowan. Ex. 50, p. 220:5-22. Likewise, Mr. Ackert acknowledged that the apparent anomaly could have been caused by an operation within

Microsoft Office that causes the last modified date to become rounded to the minute. Id. at 222; 6-10.

At bottom, Mr. Ackert simply makes observations that *could be* consistent with his backdating theory, and then jumps to the conclusion that those observations are *proof* that backdating occurred. A prime example is the discussion in his most recent affidavit about "unzipping." Specifically, Mr. Ackert observes that there is evidence someone used Plaintiff's personal laptop to "unzip" an Excel file. Ackert Decl. ¶ 16. He then goes on to assert that this is "highly unusual" and opines "to a reasonable degree of forensic certainty" that this was done "for date and time metadata analysis," which he claims "bolsters" his backdating opinion. Id. at ¶¶ 8, 16.

But he's wrong again. The first post by Data Colada concerning its allegations against Plaintiff—the one published on June 17, 2023 that spurred threats on her life—was largely about something called "CalcChain." Ex. 53 at 7. As that post explained:

> A little known fact about Excel files is that they are literal zip files, bundles of smaller files that Excel combines to produce a single spreadsheet [4]. For instance, one file in that bundle has all the numeric values that appear on a spreadsheet, another has all the character entries, another the formatting information (e.g., Calibri vs. Cambria font), etc.
>
> Most relevant to us is a file called calcChain.xml.

Id. The post goes on to claim that "CalcChain tells Excel in which order to carry out the calculations in the spreadsheet," and that the Data Colada authors had successfully used CalcChain to confirm their hypothesis of data falsification. Id.

As Plaintiff testified at her deposition, she worked in the summer of 2023 to disprove those allegations.

> Specifically, when it comes to CalcChains, they were making claims that if you alter the files, it gets records in certain ways. And so we were altering files to try to see if we could prove their claims to be wrong. And we did.

Ex. 49, p. 186:20-24. Thus, the evidence makes clear that the "unzipped" files Mr. Ackert references in his recent affidavit have nothing to do with backdating, and his opinion to the contrary is more unfounded speculation.

Plaintiff did not backdate any files, she did not try to fabricate any evidence and she did not engage in any improper "manipulation" of evidence. Gino Affidavit (Doc. No. 216), ¶¶ 2-4. At best, Mr. Ackert's opinion (if found to be admissible) could create a genuine issue of fact for the jury. It does not provide a basis for any award of sanctions.

## LAW

### I. There is no Legal Basis for Entering Default Judgment

The Court's authority to entertain this relief is much more circumscribed than Defendants explain. See Hull v. Municipality of San Juan, 356 F.3d 98 (1st Cir. 2004). Under Hull, dismissal is available as a remedy where there has been a "fraud on the court," meaning dismissal is only proper if:

> a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense.

356 F.3d at 102 (quoting Aoude v. Mobil Oil Corp., 892 F.2d 1115,1118-19 (1st Cir. 1989)). This is a high bar: "committing a fraud on the court requires more than presenting inaccurate assertions in lawsuits, or perjury alone. Rather, it occurs when a party intentionally prevents the court from knowing all the facts required to make an appropriate decision on a pending matter." Gonzalez Tomasini v. Steiner, 166 F.4th 184, 195–96 (1st Cir. 2026) (cleaned up; quotation marks and citations omitted). "[F]raud on the court' is limited to fraud that " 'seriously' affects the integrity

of the normal process of adjudication," "defile[s] the court itself," and prevents "the judicial machinery" from performing its usual function—for example, bribery of a judge or jury tampering." Torres v. Bella Vista Hosp., Inc., 914 F.3d 15, 19 (1st Cir. 2019) (quoting 12 Moore's Federal Practice § 60.21[4][a] (2018)).

A demonstration of "fraud on the court" must be proven by clear and convincing evidence. Gonzalez Tomasini, 166 F.4th at 196. And Courts in this district have refused dismissal of the plaintiff's claims based on "fraud on the court" where the alleged fraud was not on matters "central to [the] plaintiff's claims," cf. Brown v. Wheatleigh Corp., No. 3:18-CV-30056-KAR, 2021 WL 4079779, at *2 (D. Mass. Sept. 8, 2021) or going to the "heart of the case," see Starski v. Kirzhnev, No. CIV.A. 06-10157-DPW, 2011 WL 923499, at *10 (D. Mass. Mar. 15, 2011), aff'd, 682 F.3d 51 (1st Cir. 2012) (collecting cases); contrast Hull, 356 F.3d at 102 (finding the fraud material to what was "likely to be the main issue in the case.")

As detailed above, there has not been any "fraud on the court"—and Defendants have certainly not met their burden to prove such fraud "by clear and convincing evidence."[9] As such, their request for a default judgment must be denied.[10]

---

[9] As Mr. Ackert himself admits:

> I have now received and reviewed the available Terminal logs from the HBS Laptop and 2023 Laptop but have not identified any logs showing modification of file system metadata. […] the available logs do not establish that Terminal was used to modify metadata […]

Ackert Decl. ¶ 26.

[10] While not cited by Defendants, Rule 37(c)(1) does not supply a basis for entertaining a default judgment for substantially the same reasons. That rule authorizes certain sanctions for failure to supplement discovery responses. The default sanction under Rule 37(c)(1) is preclusion of the non-supplemented evidence, but that sanction is typically pertinent only where the party that did not timely supplement is seeking to use the evidence that was not timely supplemented. See Fed. R. Civ. P. 37, advisory committee notes to 1993 amendments. There does not appear to be any First Circuit authority stating the standards for Rule 37(c)(1) sanctions where a party failed to

## II. There is no Legal Basis for Defendants' Requested Instruction

As an alternative to granting default judgment, Defendants ask the Court to "instruct the jury at trial that Plaintiff has destroyed evidence and that they jury must infer that the evidence she destroyed would provide direct evidence that Plaintiff intentionally falsified research data after filing this lawsuit." Brief at 20. The only legal authority cited in support of this request is United States v. Laurent, 607 F.3d 895, 902 (1st Cir. 2010), and that case in no way suggests that an instruction of this sort would be appropriate.

Indeed, the instruction at issue in Laurent was nothing more than a standard "spoliation" instruction. It would not have—as Defendants now request—usurped the juries factfinding function by telling them that spoliation had incurred. Nor would it have required them to draw any adverse inference. In short, nothing in Laurent suggests that an instruction of the kind requested by Defendants is warranted or permissible here.

## III. There is no Legal Basis to Award Sanctions for Spoliation

As an initial matter, under the 2015 amendments to the Federal Rules, Rule 37(e) supplies the exclusive mechanism to address allegations of spoliation of ESI, displacing common-law spoliation authority based on inherent power of the court. See Advisory Committee Notes to 2015

---

supplement evidence that would have been useful to the opposing party. But there is precedent where a preclusion-of-evidence sanction effectively amounts to a dismissal of the plaintiff's claims. In those cases, the First Circuit has held that courts must ordinarily employ a dismissal sanction "only when a plaintiff's misconduct is extreme." Young v. Gordon, 330 F.3d 76, 81 (1st Cir. 2003). There is a "strong presumption in favor of deciding cases on the merits," and the First Circuit has found abuse of discretion where district courts have dismissed cases in the face of non-extreme conduct where lesser sanctions could have been employed. See Esposito v. Home Depot U.S.A., Inc., 590 F.3d 72, 80 (1st Cir. 2009) (reversing dismissal sanction as abuse of discretion) (quoting Malot v. Dorado Beach Cottages Assocs., 478 F.3d 40, 43 (1st Cir. 2007) (reversing Rule 37(b) dismissal sanctions as abuse of discretion). Also, where *preclusion* under Rule 37(c)(1) is at issue, the First Circuit has stated that the focus should be on "surprise and prejudice" to the opposing party. Lawes v. CSA Architects & Eng'rs LLP, 963 F.3d 72, 92-96 (1st Cir. 2020) (finding the record lacked the surprise or prejudice that would warrant the "strong medicine" of preclusion).

Amendments to 37(e); Walsh v. Tara Constr., Inc., 2021 WL 12094222, at *3 n. 7 (D. Mass. June 7, 2021).[11]

Rule 37(e) applies "If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery[.]" Fed. R. Civ. P. 37(e). This portion of the rule requires proof of four elements by the moving party: (1) that relevant ESI existed; (2) the relevant ESI should have been preserved in anticipation of litigation; (3) that it was not preserved because a party failed to take reasonable steps to preserve it; and (4) the ESI has been lost and cannot be entirely restored or replaced through additional discovery. Castro v. Smith, 2023 WL 5371311 at *7 (S.D.N.Y. Aug. 22, 2023); see also Boudreau v. Petit, 2025 WL 553975, at *2 (D.R.I. Feb. 19, 2025) (requiring movant to show that ESI had been lost, that relevant information in the ESI was not otherwise available, that the ESI was subject to a timely duty to preserve the ESI and that the party was on notice of its relevance). Postle v. SilkRoad Tech., Inc., 2019 WL 692944, at * 3 (D.N.H. Feb. 19, 2019).

Here, each of the alleged acts of spoliation plainly fail to meet these four elements.[12] The file Defendants claim was overwritten on the HBS laptop was preserved as part of the

---

[11] Rule 37(e) and cases interpreting it after the 2015 amendments therefore supply the current legal standards. Defendants cite legal standards from cases prior to the 2015 amendments or cases from outside the realm of ESI. See Def. Br. at 12 (citing Gordon v. DreamWorks Animation SKG, Inc., 935 F. Supp. 2d 306, 313 (D. Mass. 2013) (pre-2015 amendments); E.E.O.C. v. Chipotle Mexican Grill, 98 F. Supp. 3d 198, 209 (D. Mass. 2015) (pre- December 1, 2015 effective date of amended Rule 37(e); Sharp v. Hylas Yachts, LLC, 872 F.3d 31, 42 (1st Cir. 2017) (involving alleged spoliation of a boat)).

[12] While the First Circuit has not specifically ruled on the standard of proof required under each step of Rule 37(e), district courts in this Circuit have held that the standard for the movant's initial burden and intent is clear and convincing evidence, relying on Anderson v. Cryovac, 862 F.2d 910, 926 (1st Cir. 1988). Wai Feng, 2019 WL 118412, at *5 (citing Anderson, 862 F.2d at 926) (noting that First Circuit has not decided standard of proof needed for intent); Postle v. SilkRoad Tech., Inc., 2019 WL 692944, at *2-3, *7 (D.N.H. Feb. 19, 2019) (citing Anderson, 862

sequestration process and, therefore, has not been "lost." See Hefter Impact Tech., LLC v. Sport Maska, Inc., 2017 WL 3317413, at *7 (D. Mass. Aug. 3, 2017) (declining to sanction party for lost emails when movant failed to show that emails were destroyed and when the evidence had been preserved prior to deletion). There is no evidence that the Teams cache contained relevant ESI, or that it should have been preserved—in fact, it was not included in any of Defendants requests when they sought discovery from the personal laptop. Nor is there evidence that it does not still exist—either in the "underscore directory" or in the cloud. And there is likewise no evidence that Plaintiff's browser history was relevant, or that it should have been preserved, or that anything has been lost. Again, the only browser history that Defendants requested form the personal laptop was for September 23, 2023—which was extremely unlikely to have still existed on her personal laptop in May 2026.

Moreover, there is a fourth element that must also be established, under either Rule 37(e)(1) or (e)(2), else sanctions are unavailable. Under Rule 37(e)(1), the court "may order measures no greater than necessary to cure the prejudice" upon a finding of "prejudice to another party from loss of the information." Fed. R. Civ. P. 37(e)(1). According to the Advisory Committee Notes to the 2015 Amendments, "[a]n evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in the litigation." A showing of prejudice typically requires showing that the lost ESI "was not only probative, but also would affirmatively support the movant's claim. . ." Europe v. Equinox Holdings, Inc., 592

---

F.2d at 926) (noting the issue is unresolved but requiring clear and convincing standard for both movant's initial burden and intent); Walsh v. Tara Constr., Inc., 2021 WL 12094222, at *4 (D. Mass. June 7, 2021) (noting that the First Circuit requires clear and convincing evidence to issue severe sanctions for discovery misconduct and applying that standard to deny sanctions); Boudreau, 2025 WL 553975, at *2 (citing Walsh and applying clear and convincing standard to intent).

F. Supp. 3d 167, 178 (S.D.N.Y. 2022); see also Castro v. Smith, 2023 WL 5371311, at *10 (S.D.N.Y. Aug. 22, 2023).

The Court has discretion in how it assesses prejudice, but if it appears the information lost was "unimportant" or that the "abundance of preserved information" is "sufficient to meet the needs of all parties," then it is reasonable to require the moving party to prove prejudice occurred. Id. As one district court in this Circuit has found, "proof that the lost ESI is important or material to a significant issue should fall on the movant." Wai Feng, 2019 WL 118412, at *6.

Courts routinely reject spoliation claims when the movant cannot show the importance of the lost ESI to their case. For example, a party cannot be prejudiced from the loss of data on a laptop when no documents on the laptop were shown to be relevant. Id. at *14. And when the movant cannot identify beyond speculation what the spoliated evidence might say, a finding of prejudice is inappropriate. In re TelexFree Sec. Litig., 2025 WL 2371354, at *7 (D. Mass. Aug. 15, 2025); see also Steves and Sons, Inc. v. JELD-WEN, Inc., 327 F.R.D. 96, 110 (E.D. Va. 2018) (noting that, even if movant had made threshold showing, there was no prejudice because movant could not show beyond speculation that the lost ESI "would have significantly improved [defendant's] ability to prove [their case], if at all.").

Here, Defendants have clearly failed to show any such prejudice. Again, the file they claim was "overwritten" still exists. And any claim that the Teams cache data and browser history were would have somehow helped prove their case is nothing more than speculation. Ex. 51 at ¶¶ 28-31.

For the court to issue the most severe sanctions listed in Rule 37(e)(2), the moving party must prove by clear and convincing evidence that the alleged spoliator acted with a specific intent to deprive the movant of the ESI. Postle, 2019 WL 692944, at *7 (finding that movant had failed

to establish intent required by Rule 37(e)(2) by clear and convincing evidence); Fed. R. Civ. P. 37(e)(2). Negligence, gross negligence, or "knowing" intent are insufficient; the court may only issue 37(e)(2) sanctions upon a finding of specific intent. Hoffer v. Tellone, 128 F.4th 433, 438 (2d Cir. 2025); Gregory v. State of Montana, 118 F.4th 1069, 1080 (9th Cir. 2024); see also Leidig v. Buzzfeed, Inc., 2017 WL 6512353, at *11 (S.D.N.Y. Dec. 19, 2017) ("[T]he intent contemplated by Rule 37 is not merely the intent to perform an act that destroys ESI but rather the intent to actually deprive another party of evidence.")

No such showing has been made here. The intent required "is most naturally understood as involving the willful destruction of evidence with the purpose of avoiding its discovery by an adverse party." Jones v. Riot Hosp. Grp. LLC, 95 F.4th 730, 735 (9th Cir. 2024). Courts must also be mindful that while Rule 37(e)(2) sanctions may not be imposed without proof of specific intent, the converse is not true: nothing in the rule requires that the sanctions be imposed even if specific intent is found. Advisory Committee Notes to 2015 Amendments. "The remedy should fit the wrong, and the severe measures authorized by this subdivision should not be used when the information lost was relatively unimportant or lesser measures such as those specified in subdivision (e)(1) would be sufficient to redress the loss." Id.

The cases cited by Defendants resulting in extreme sanctions under Rule 37(e)(2) all involved facts significantly more extreme than Defendants' (already overstated) allegations here. For example, in Red Wolf Energy Trading, LLC v. Bia Cap. Mgmt., LLC, default judgment was entered only after "more meritorious motions to compel and for sanctions against defendants for failure to produce documents than any other case in which this court has presided in more than 37 years." 626 F. Supp. 3d 478, 481 (D. Mass. 2022); Def. Br. at 14. That fact pattern simply is not even alleged here, where Plaintiff has complied with all discovery orders and has not been

previously subjected to any sanctions. And in Glob. NAPs, Inc. v. Verizon New England Inc., default entered only after the plaintiffs had violated numerous discovery orders, deleted files immediately before providing devices in discovery, and provided "wholly incredible" explanations for those actions. 603 F.3d 71, 93-94 (1st Cir. 2010); Def. Br. at 19. Even if Defendants' allegations were true, they do not rise to the level where a court has granted default judgment or even an adverse inference instruction.

## CONCLUSION

For the reasons set forth above, Defendants' motion should be denied.

Dated: September 26, 2026

Respectfully submitted,

Plaintiff Francesca Gino,
by her attorneys,

*/s/ Patrick J. Hannon*
Patrick J. Hannon (BBO# 664958)
Hampton M. Watson (BBO #705983)
Hartley Michon Robb Hannon LLP
101 Federal Street, Suite 1810
Boston, MA 02110
Telephone: (617) 723-8000
Facsimile: (617) 447-2800
phannon@hmrhlaw.com
hwatson@hmrhlaw.com

*Attorneys for Plaintiff Francesca Gino*