# Exhibit 50

Volume: 1

Pages: 1-262

Exhibits: 1-4

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:23:cv-11775MJJ

------------------------------------------- X

FRANCESCA GINO, )

Plaintiff, )

v. )

PRESIDENT AND FELLOWS OF HARVARD COLLEGE, )

SRIKANT DATAR, JOHN DOES 1-10, AND )

JANE DOES 1-10, )

Defendants. )

------------------------------------------- X

DEPOSITION OF JULIAN K. ACKERT

Hartley Michon Robb Hannon LLP

101 Federal Street, Suite 1810

Boston, Massachusetts 02110

Thursday, June 18, 2026

9:32 a.m. to 5:21 p.m.

Reporter: Justina M. Pettinelli, RDR/CRR

A P P E A R A N C E S:

HARTLEY MICHON ROBB HANNON LLP
By Patrick J. Hannon, Esq.
101 Federal Street, Suite 1810
Boston, Massachusetts 02110
(617) 723-8000 phannon@hmrhlaw.com
On behalf of the Plaintiff

ROPES & GRAY LLP
By Shannon Capone Kirk, Esq.
Prudential Tower, 800 Boylston Street
Boston, Massachusetts 02199-3600
(617) 951-7000 shannon.kirk@ropesgray.com
On behalf of the Defendants

ROPES & GRAY LLP
By Christopher Majercin, Esq.
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606-4302
(312) 845-1200
christopher.majercin@ropesgray.com
On behalf of the Defendants

INDEX


| | | |
|---|---|---|
| EXAMINATION OF: | | PAGE |
| JULIAN K. ACKERT | | |
| By Mr. Hannon | | 4 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Ackert Expert Report Binder | 15 |
| Exhibit 2 | Spreadsheet | 28 |
| Exhibit 3 | Expert Statement of Michael F. McGowan | 215 |
| Exhibit 4 | Refutation of Data Reconciliation Claims by HBS, Bates HARV00043075 - 43083 | 230 |


*Exhibits were retained by Mr. Hannon

STENOGRAPHER'S NOTE: All quotations from exhibits are reproduced as they were read into the record.

Quotation marks are used for clarity and do not necessarily reflect a direct quote.

------------

JULIAN K. ACKERT, sworn/affirmed

------------

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. HANNON:

Q. Could you please state your full name, sir?

A. Julian Ackert, J-U-L-I-A-N, last name Ackert, A-C-K-E-R-T.

Q. And, Mr. Ackert, how are you currently employed?

A. I am a senior managing director with iDiscovery Solutions in Washington, D.C.

Q. And what does that role entail?

A. As a senior managing director, my role is threefold. One is to work on and manage my own cases and case work, two is to identify opportunities of growth for the firm, and three is to manage the firm.

Q. And when you say "manage the firm," what do you mean by that?

A. Operational management from a high level of the firm.

Q. Are you sort of the top decision-maker within the firm?

A. I am one of the top decision-makers.
Q. How many other top decision-makers are there?
A. There would be four.
Q. And then I think you identified looking for opportunities to grow as another part of your responsibilities; is that right?
A. Yes.
Q. And what does that entail?
A. Finding relationships with other attorneys that -- and law firms and legal departments that require services that iDS provides.
Q. And how do you go about fulfilling that aspect of your role?
A. Most of the time that's organic via presentations, conference attendance, meetings, lunches, that type of activity.
Q. And since when have you been affiliated with iDiscovery Solutions?
A. I started working there in June of 2008.
Q. And how did that come about?
A. The owner of iDiscovery Solutions and I have a working relationship. We've been working together since 2003 at various firms, and he started

Q. Okay. So since you brought us there, looking at paragraph 89 on page 51 of Exhibit A of Exhibit 1, the second item identified here, it says, "The preservation of data identified by Gino and sequestered by HBS in the Fall of 2021."

So was that -- is that one file? Is that multiple files?

A. That was a collection of files.

Q. Okay. And that collection of files, how was that transmitted to you?

A. Probably via electronic transfer. I can't recall specifically.

Q. Okay. And you indicate here that you believe that this collection of files had been sequestered by HBS in the fall 2021; is that right?

A. Yes.

Q. And where did you learn that from?

A. I can't recall. That's probably on the record somewhere in a document that I reviewed, but I don't recall specifically.

Q. Okay. And what's your understanding as to how those materials were gathered by HBS?

A. Generally HBS asked Professor Gino what materials would be important to review and consider,

and Gino directed HBS to various parts on her hard drive, various document sets. I think there might have been a Dropbox included in there, emails, et cetera.

Q. Okay. So your understanding is that she directed them to places for information; right?

MS. KIRK: Objection, form.

A. She would have identified the locations. They would have collected the data.

Q. Okay. How did they collect the data?

A. I don't recall specifically. I would have to go back to what's on the record.

Q. Okay. So you don't know if they, for example, put in the USB drive and drag and dropped data?

MS. KIRK: Objection, form.

A. So again, I know there's information on the record. I recall there being information on the record on this. I don't recall it specifically.

Q. Okay. All right. Let's switch gears a little bit here and let's go back to Exhibit 2.

So earlier this morning we were talking about the various columns here, and we had talked about some of these. I want to look at the next

I knew that it got onto the computer from the USB drive.

Q. In your report, you opine that when the so-called Cover-Up File was added to Professor Gino's Harvard laptop, that that would have resulted in some kind of a sort of warning message to her; is that right?

A. Yes.

Q. How do you know that?

A. As a Mac user myself for over 15 years, I know how the operating system works. And from my forensics and use and experience with Mac operating systems, I know what happens when you try to drop a file into a location where the same file exists.

Q. And do you get that same warning message when you do drag/drop versus cut and paste?

A. Yes.

Q. For purposes of your opinion, you were assuming that the Tax Study file that was in that folder in 2021 was still in the same folder on Professor Gino's Harvard laptop; is that correct?

A. So yes, that would be correct. The file would have to exist in that same location on September 23rd, 2023.

Q. Okay. And if it had been moved to a different location or it had been deleted, that warning message would not have popped up; correct?

A. If the file did not exist, then yes, that message would not have come up.

Q. And fair to say that you can't tell us whether or not that file still existed in the same spot in Professor Gino's Harvard computer in 2023 as it had in 2021?

A. I've seen no evidence that it was moved or copied or anything, so I have not been presented any evidence that it was not there.

Q. So you take the lack of evidence as being evidence that it was still there?

MS. KIRK: Objection, form.

A. I don't have evidence that it was there, but I also don't have evidence that it was not there.

Q. Okay. Fair enough. And when a -- on a Mac operating system, if you're working with a file and you drag and drop it to a different folder, does that remove it from its initial folder?

A. Are you talking within the Mac itself or on a USB?

Q. Let's start on the Mac itself.

A. Yes.
Q. Okay. And this shows your -- sorry -- some metadata related to Files 3 and 7; right?
A. Yes.
Q. Okay. And File 7, that's what you've referred to as the Cover-Up File; right?
A. Yes.
Q. And one piece of evidence that you cite as indicating that the Cover-Up File was manually backdated is the difference between the file system date created and the file system date modified; right?
A. The difference being 30 seconds between them, yes.
Q. Okay. Now, one possible explanation for that discrepancy would be file tunneling --
MS. KIRK: Objection.
BY MR. HANNON:
Q. -- right?
MS. KIRK: Objection, form.
A. I have not delved into file tunneling to give you an answer to that.
Q. If you can turn back to Exhibit 2 for a moment. It's the big spreadsheet. Yeah.

A. I'm there.

Q. If you look in the MS Office Modified column, you'll see there are some files there with a timestamp of exactly 0 seconds, meaning that it ends in 00. And specifically I point you to rows 4, 20, 21, 28, 31, 32, and 35, oh, and also 36.

A. Do you have a pen? I just wanted to note the rows that you wanted to point me to.

Q. I'm happy to, but we don't want to mark that up, though. You're welcome to use my copy.

A. Okay.

Q. There's no way you're going to read my handwriting, so there's no --

MS. KIRK: Do you have --

MR. HANNON: Oh. Do you have an extra one for him?

MS. KIRK: Do you mind? I wrote all over mine.

THE WITNESS: All right. May I borrow a pen, please?

MR. HANNON: Yeah, sure.

THE WITNESS: Thank you.

A. All right. What are those rows again?

Q. Row 4 and row 20 and 21, row 28, row 31, row

32, row 35, and row 36.
A. Okay.
Q. And you see in those rows the MS Office modified timestamp ends in 00. Do you see that?
A. I do.
Q. Okay. Are you aware of some kind of process that causes the MS Office last modified date to become rounded to the minute?
A. There could be. I'm not aware of one, though.
Q. When a file is -- then let's focus on an Excel spreadsheet. When an Excel spreadsheet is sent via email and then the recipient of that email saves the Excel spreadsheet to their computer, what would you expect the application metadata to show?
A. The last time the file was saved in the application before it was emailed.
Q. That would be the last modified date?
A. No. The MS Office modified, according to this column, which is the application saved metadata.
Q. Yeah. You would expect that to retain whatever had been before it was emailed?
A. Yes, because I'm not aware of email programs

15-minute window when you're doing nothing else on that computer but slipstreaming the file and looking at advanced metadata properties.

Q. But if you know that your adversary already has a copy of the computer, does it make any sense to try to change your version of something they already have?

A. I don't think that's a question for me to answer. I think that's a question for Gino.

Q. Well, as a forensic examiner, is that even something that you considered, whether or not this scenario makes any sense?

A. I have considered that the activity around the scenario deals with dropping a file and examining metadata and backdated metadata. Why that was done, that's not for me to answer, but I can tell you that the actions were deliberate in that window and were related to metadata and adding this file.

Q. You didn't consider motive?

MS. KIRK: Object.

A. That goes beyond my expertise.

(Court reporter clarification.)

MS. KIRK: I tried to get in an

objection to form.

THE WITNESS: Sorry.

MS. KIRK: No, not you. It's not you.

BY MR. HANNON:

Q. Fair to say that Professor Gino's saving the so-called Cover-Up File to her Harvard laptop in September of 2023, that didn't destroy the prior version of the Tax Study file that had previously been preserved by Harvard --

MS. KIRK: Objection.

BY MR. HANNON:

Q. -- right?

MS. KIRK: Objection, form.

A. There happened to be another copy of that file. But at least on the 2024 computer, the act of copying the file on top of the other file would have destroyed the other file.

Q. You say "happened to be." Based upon your review of the facts here, it was well known to Professor Gino in September 2023 that Harvard already had that Tax Study file; right?

A. I have no idea what Gino knew about that Tax Study file.

Q. No idea?

A. Can you point me to something in the record that says Gino knew about that Tax Study file?

Q. Well, did you review facts concerning Harvard's sequestration of data?

A. Yes.

Q. And Professor Gino was involved in that; right?

A. Yes.

Q. In fact, she -- I think according to you, she pointed them where to look for it; right?

A. Yes.

Q. She pointed them to this very same Tax Study file that now you're claiming in September of 2023 she tried to cover up --

MS. KIRK: Objection.

BY MR. HANNON:

Q. -- right?

MS. KIRK: Form, assumes facts not in evidence. You've twisted the testimony and the facts of the record.

You may proceed, if you can answer that.

A. I have no idea what Gino's intent was. I can tell you the forensics and the data pattern shows that whatever the intent was, it had to do

with backdating of metadata and adding a file to where another file currently existed and nothing else during that time frame, no access to websites, no checking of SPSS, nothing.

You add that in timeline to what she stated about finding the OG File, and all of that, these are questions for Gino. I don't know why she did it.

Q. Back to my question, though. The file that you're saying she tried to cover up in September 2023 is one of the very same files that she had directed Harvard to in 2021 to preserve --

MS. KIRK: Objection.

BY MR. HANNON:

Q. -- is that right?

MS. KIRK: Objection, form, and misstates testimony.

A. I know that Gino was involved in the identification of all of the files that she said, here are the files that you need. That included the 2021 file, but she didn't specifically call out that 2021 Tax Study file.

Q. What'd she say?

A. You'll have to point me to the record.