**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| FRANCESCA GINO,<br><br>Plaintiff,<br><br>v.<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE, SRIKANT DATAR, JOHN DOES 1-10, AND JANE DOES 1-10,<br><br>Defendants. | ) | Civil Action No. 23-11775-MJJ |

**MEMORANDUM OF DECISION**

November 2, 2026

JOUN, D.J.

Plaintiff Francesca Gino is a former tenured professor at Harvard Business School ("HBS") and brings this action against Defendants President and Fellows of Harvard College ("Harvard") and Defendant Srikant Datar ("Dean Datar"). *See generally* [Doc. No. 126]. In 2021, allegations were brought against Plaintiff claiming that she committed research misconduct, which triggered an approximately 18-month long inquiry and investigation by HBS administrators and faculty. *See* [*Id.*]. In March 2023, the investigation committee found, by a preponderance of the evidence, that Plaintiff committed research misconduct. [Doc. No. 264-1 at ¶ 103]. Based on these findings, Dean Datar imposed sanctions, which included a request to Harvard's President that tenure revocation proceedings be initiated pursuant to Harvard's Third Statute. [*Id.* at ¶¶ 121–123]. In January 2025, the hearing committee found that there was clear and convincing evidence that Plaintiff's research

misconduct constituted grave misconduct or neglect of duty. [*Id.* at ¶ 148]. In May 2025, Harvard revoked Plaintiff's tenure and terminated her appointment with HBS. [*Id.* at ¶¶ 161, 162].

Plaintiff claims that Harvard breached its obligations under various policies and procedures governing the investigation of the research misconduct allegations and the tenure revocation proceedings. Specifically, Plaintiff argues that a jury could find that Harvard deviated from its policies and procedures such that Harvard could be found in breach of those agreements, and that Harvard did not carry its burden of proving research misconduct or grave misconduct. Plaintiff also alleges that the proceedings and related findings, including the adverse employment actions taken against her, were pretext for gender discrimination. Based on these allegations, Plaintiff brings the following causes of action: Count I, for violation of Title IX; Count II, for breach of contract; Count III, for breach of implied covenant of good faith and fair dealing; Count IV, for estoppel; Count V, for violation of Title VII; Count VI, for violation of M.G.L. c. 151B; Count VII, for retaliation, and; Count VIII, for declaratory judgment. [Doc. No. 126 at ¶¶ 337–396].

Before me is Defendants' Motion for Summary Judgment. [Doc. No. 230].[1] For the reasons explained below, the Motion is GRANTED as to all of Plaintiff's claims.[2]

---

[1] After Plaintiff filed her opposition and additional statement of facts, the Court granted Defendants' Motion to Strike, and directed Plaintiff to file a renewed statement that complies with the Federal Rules of Civil Procedure, the Court's standing order, and the requirements governing format and organization. [Doc. No. 253]. Plaintiff filed a motion for clarification regarding her renewed statement of facts to understand whether it complies. [Doc. No. 254]. While aspects of the renewed statement are not in perfect compliance, the Court is able to resolve the current motion on the existing record, and a second renewed statement is not required. As such, Plaintiff's Motion for Clarification, is DENIED as moot.

[2] After briefing was completed on Defendants' Motion for Summary Judgment, Defendants filed a Motion for Sanctions on September 11, 2026. [Doc. No. 265]. Defendants seek sanctions in the form of default judgment based on allegations that Plaintiff concealed and/or spoliated evidence. [*Id.*]. Given that this decision grants summary judgment in Defendants' favor on all counts, the only remaining claim is Defendants' counterclaim against Plaintiff for defamation. *See* [Doc. No. 127 at 139–163]. The Court will issue a separate protocol and briefing schedule and will hold an evidentiary hearing regarding the Motion for Sanctions.

## I. BACKGROUND

The following facts are undisputed unless noted otherwise.[3]

### A. Plaintiff's Appointment at Harvard and the Third Statute Procedures

On or about February 16, 2010, Plaintiff Francesca Gino received an offer of appointment from Harvard Business School ("HBS"). [Doc. No. 264-1 at ¶ 1]. Plaintiff joined the Negotiation, Organizations, and Markets unit at HBS as an Associate Professor of Business Administration effective July 1, 2010. [*Id.* at ¶ 2]. Gino was promoted to Full Professor with tenure[4] on July 1, 2014. [*Id.* at ¶ 170]. By letter dated September 22, 2014, the Secretary of the University notified Plaintiff that she was appointed Professor of Business Administration to serve from July 1, 2014, subject to the terms, conditions and policies of the Faculty of Business Administration, and to the Third Statute of the University, which may be amended from time to time. [*Id.* at ¶ 3]. The Third Statute of the University provides:

> Professors and associate professors are appointed without express limitation of time unless otherwise specified . . . All Officers who hold teaching appointments, as defined from time to time by the Corporation with the consent of the Overseers, are subject to removal from such appointments by the Corporation only for grave

[3] Given the unusual length of the parties' statement of material facts, this fact background will only detail the information necessary to understand the context of this case and the motion. Further, I will endeavor to parse which disputes are genuine and material. *See Atain Specialty Ins. Co. v. Davester LLC*, 518 F. Supp. 3d 551, 555 (D. Mass. 2021) ("Disputes over facts that are irrelevant or unnecessary will not preclude summary judgment") (citation omitted). To the extent that any facts are not properly disputed, those will be considered undisputed. *See Muniz v. RXO Last Mile, Inc.*, NO. 4:18-11905, 2023 WL 5353749, at *2 (D. Mass. Aug. 21, 2023) (finding responses to statement of facts obstructive where the dispute merely raises "distinctions without a difference" or "restates legal standards to manufacture a dispute"); *Guerrios Flores v. S.M. Med. Servs., C.S.P.*, NO. 18-1594, 2020 WL 1698993, at *2 (D.P.R. Apr. 7, 2020) ("Responses which do not oppose the truth of the statement offered and are either irrelevant to the matter at hand, provide additional evidence not related to the fact in question and/or failed to contradict it are insufficient to properly controvert a material fact") (citations omitted). "Disputed" facts that are not supported by citations to the record will also be considered undisputed. Fed. R. Civ. P. 56(e)(2); L.R., D. Mass. 56.1 ("A party opposing the motion shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation.").

[4] Under HBS's Tenure Policy, effective September 20, 2007, tenure is an appointment to HBS's "permanent faculty" or a permanent, lifelong commitment to employ a professor. [Doc. No. 264-1 at ¶¶ 167–169].

> misconduct or neglect of duty. Officers who hold professional or administrative appointments are subject to removal from such appointments by the Corporation for grave misconduct or whenever, in its opinion, their duties are not satisfactorily discharged. Officers are subject to other rules not inconsistent herewith from time to time in effect . . . The Corporation may from time to time with the consent of the Overseers adopt rules and procedures to carry out the purposes of this Statute.

[*Id.* at ¶ 4]; [Doc. No. 231-5 at 3]. On October 4, 1971, Harvard adopted Tentative Recommendations concerning the discipline of officers, which set forth procedures for tenure revocation proceedings under the Third Statute, and on February 9, 1972, adopted a Statement of Hearing Procedures (the "Third Statute Procedures"). [Doc. No. 264-1 at ¶ 5]; [Doc. No. 231-2].

The Third Statute Procedures provide, among other things, for: a Screening Committee to conduct an initial inquiry into a complaint, and if further action is necessary, convene a Hearing Committee to make findings of fact; ensure the respondent with a full hearing and fair representation before an impartial tribunal; allow the respondent a reasonable opportunity to submit further argument, and; provide the parties with an opportunity to interview witnesses and obtain and review all necessary evidence. *See* [Doc. No. 264-1 at ¶¶ 6–11]; [Doc. No. 231-2 at 2–7]. The Hearing Committee is not bound by strict rules of evidence and may admit any evidence that is probative to resolving the issues involved. [Doc. No. 264-1 at ¶ 11]. The burden of proof rests with the complainant to prove by clear and convincing evidence that the respondent has committed grave misconduct or neglect of duty warranting revocation of tenure. [*Id.* at ¶ 8].

**B. <u>The 2013 Research Integrity Policy</u>**

In 2013, HBS adopted a "Research Integrity Policy" for handling allegations of research misconduct by faculty members. [Doc. No. 264-1 at ¶¶ 19, 184]; [Doc. No. 231-4]. The Research Integrity Policy defines "research misconduct" as "fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results." [Doc. No. 264-1 at ¶ 20]; [Doc. No. 231-4 at 2]. Under the Research Integrity Policy, "[t]he Dean has principal

responsibility for protecting the research integrity of the School and determining a proper response to allegations of misconduct in research." [Doc. No. 264-1 at ¶ 21]; [Doc. No. 231-4 at 2]. The Research Integrity Policy also ensures that "whatever process the Dean determines to be appropriate is thorough, fair, and objective and should take into account the following concerns:

- Protecting the rights and reputations of the individual accused, good faith complainants, witnesses, and those charged with investigating the complaint;
- Protecting from retaliation those involved in the process by the accused party or others at the University;
- Informing the accused individual of the nature of the allegations, the evidence in support of the allegations, and the procedures to be followed."

[Doc. No. 231-4 at 2–3]. The Research Integrity Policy also provides that:

> Because of variations in such factors as the type and seriousness of alleged misconduct, the course of action that will enable the Dean to fulfill his or her obligations most thoroughly and equitably may vary somewhat from case to case. Accordingly, the procedures set forth below permit flexibility and are designed to provide a framework that should enable equitable resolution of allegations of misconduct in a variety of circumstances.

[Doc. No. 231-4 at 2]; [Doc. No. 264-1 at ¶ 23]. The Research Integrity Policy permits the Dean to resolve the matter through an informal process or discussion, depending on the nature of the allegation. [Doc. No. 231-4 at 3]. However, "[i]f the matter is not appropriate for informal resolution, the Dean may appoint an individual or a committee to investigate the allegation . . . [t]he investigator or investigating committee will be responsible for investigating the facts bearing on the case, and for making a recommendation to the Dean." [*Id.*].

The Research Integrity Policy states that "[t]he Dean shall decide the matter and take whatever action he or she believes justified. The decision of the Dean is final and completes the procedure." [*Id.*].

**C. Informal Allegations of Research Misconduct against Plaintiff**

In approximately June of 2021, three professors—Leif Nelson, Joseph Simmons, and Uri Simonsohn, who publish under the name "Data Colada", [Doc. No. 264-1 at ¶ 13]—presented their allegations against Gino to HBS Professor Max Bazerman during a 90-minute Zoom call, [*Id.* at ¶ 180]. Sometime after that meeting, Data Colada brought their allegations to the department heads of Gino's academic department at HBS—Brian Hall and Kathleen McGinn. [*Id.* at ¶ 181]. Sometime prior to July 24, 2021, Department Head McGinn relayed Data Colada's allegations against Gino to HBS's Associate Dean for Faculty and Academic Affairs, Jean Cunningham. [*Id.* at ¶ 182]. Dean Cunningham relayed this information to Srikant Datar, Dean of HBS, either that same night or the following day. [*Id.*]. On July 19, 2021, Plaintiff informed HBS administrators that Data Colada had contacted her with concerns about fraudulent data in a paper she co-authored with Dan Ariely (among other co-authors), a professor at Duke University Fuqua School of Business. [*Id.* at ¶ 13]. The concerns that Plaintiff raised to HBS administrators on July 19, 2021 did not relate to Plaintiff's involvement in the paper. [*Id.* at ¶ 14].

Prior to this time, HBS had not received any allegations of data falsification or fabrication against a member of its faculty. [*Id.* at ¶ 17]. The concerns about Plaintiff's research prompted HBS to review its policies related to research misconduct. [*Id.* at ¶ 18].

**D. The Interim Policy & Procedures**

HBS leaders determined that the Research Integrity Policy did not provide a roadmap or detailed procedures for dealing with serious concerns regarding research misconduct, including any formal allegations of research misconduct that might later come forward. [*Id.* at ¶ 26]. In August 2021, HBS adopted the Interim Policy & Procedures for Responding to Allegations of

Research Misconduct (the "Interim Policy") because it wanted to ensure a fair, thorough analysis and evaluation of serious concerns regarding research misconduct. [*Id.* at ¶ 27].[5]

HBS applied the Interim Policy to evaluate and investigate the allegations against Plaintiff. [*Id.* at ¶¶ 28, 202–203]. The Interim Policy was modeled on federal regulations which govern and guide review of research misconduct allegations at institutions that receive federal research funds in the United States. [*Id.* at ¶ 29] (citing 42 C.F.R. Part 93, then in effect). The Interim Policy outlines the procedure for tackling allegations of research misconduct, including by conducting a preliminary assessment of the allegations, an inquiry, and an investigation. *See* [Doc. No. 264-1 at ¶ 35]; *see also* [Doc. No. 231-10]; [Doc. No. 264-1 at ¶¶ 30–31; 33–45, 48–49, 51–53]. The Interim Policy "applies to allegations of research misconduct-including fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results." [Doc. No. 231-10 at 2]. Research misconduct does not include honest error or differences of opinion. [*Id.* at 14]. The Interim Policy applies "only to allegations of research misconduct that occurred within six years of the date HBS received the allegation," with some enumerated exceptions. [*Id.* at 15]. The Interim Policy states that "[t]hroughout the research misconduct process, which begins at the time an allegation is made, all participants shall bear in mind the importance, both in fact and in appearance, of thoroughness, fairness, and objectivity." [*Id.* at 2]; [Doc. No. 264-1 at ¶¶ 207, 208].

A finding of research misconduct requires that: (1) "[t]here be a significant departure from accepted research practices of the relevant research community"; (2) "[t]he respondent committed the research misconduct intentionally, knowingly, or recklessly; and" (3) "[t]he allegation be proven by preponderance of the evidence." [Doc. No. 231-10 at 3]. Under the Interim Policy,

[5] Plaintiff disputes that this is the basis for HBS's decision to adopt the Interim Policy, stating that the Interim Policy was not adopted in good faith and was instead adopted to deprive Plaintiff of the flexibility provided by the Research Integrity Policy. [Doc. No. 264-1 at ¶¶ 189, 193].

"HBS bears the burden of proof for making a finding of research misconduct. A respondent has the burden of proving, by a preponderance of the evidence, any and all affirmative defenses raised (such as honest error)." [*Id.*].

The Interim Policy requires the appointment of a Research Integrity Officer ("RIO") responsible for "(1) reviewing allegations of research misconduct to determine if they fall within the definition of research misconduct and warrant an inquiry; and (2) overseeing inquiries and investigations." [*Id.* at 14]. After receiving an allegation of research misconduct, the RIO immediately will assess the allegation to determine whether the allegation falls within the definition of research misconduct and is sufficiently credible and specific such that an inquiry must be conducted. [*Id.* at 4–5]. The RIO must take all reasonable and practical steps to obtain custody of all the research records and evidence needed at the start of the inquiry, sequestered materials must be inventoried and stored in a secure manner, and the respondent must be given copies of, or reasonable supervised access to, such materials. [*Id.* at 5].

The purpose of the inquiry is to conduct an initial review to determine whether an investigation is needed. [*Id.* at 6]. An inquiry committee will be appointed by the Dean or their designee and will consist of one or more individuals who do not have unresolved personal, professional, or financial conflicts of interest with those involved with the research misconduct proceeding. [*Id.*]. During the investigation process, the Investigation Committee and RIO must (1) ensure the investigation is sufficiently documented; (2) ensure an impartial and unbiased investigation to the maximum extent practical; (3) ensure that each respondent, complainant, or any other person who has information regarding the investigation have the opportunity to be interviewed, and obtain a transcript of the interview such that the interviewee can provide corrections, and; (4) diligently pursue all significant issues and leads discovered that are relevant

to the investigation. [*Id.* at 9–10]. The respondent is entitled to choose up to two personal advisors, who are not principals or witnesses in the research misconduct, to provide support to the respondent during the process. [*Id.* at 4].[6]

Following the investigation, the Investigation Committee and RIO must prepare a written draft report that, among other things, identifies whether there was research misconduct and describes the evidence supporting that conclusion, including a recommendation of institutional actions. [*Id.* at 10]. The final investigation report will be submitted to the Dean, who will make a written determination as to whether the institution accepts the report and recommendation and the appropriate institutional actions in response to findings of misconduct. [*Id.* at 11]. The Interim Policy outlines potential sanctions that the Dean may issue, which do not include removal of tenure. [*Id.* at 11]; [Doc. No. 264-1 at ¶ 52].

The Interim Policy remains in effect today, with some modifications to track updates to federal regulations. [Doc. No. 264-1 at ¶ 56]. Since HBS began its research misconduct process with respect to Plaintiff, the Interim Policy has been applied to other allegations of potential research misconduct, including against male professors. [*Id.* at ¶¶ 57–63]. In those cases, the RIO determined that the allegations did not fall within the definition of research misconduct. [*Id.* at ¶¶ 61, 63].

### E. <u>Formal Allegations Against Gino and Application of the Interim Policy</u>

On October 12, 2021, the RIO Alain Bonacossa (hereafter, "RIO Bonacossa") received formal allegations of research misconduct against Plaintiff from Data Colada. [*Id.* at ¶ 65].[7] At that

---

[6] The parties dispute whether Gino was prevented from hiring additional consultants or experts, or whether Gino's counsel may retain experts. [Doc. No. 264-1 at ¶¶ 46, 91, 305–306].

[7] Plaintiff disputes this and states that RIO Bonacossa was informed or otherwise aware of the allegations no later than August 6, 2021. [Doc. No. 264-1 at ¶¶ 65, 183].

time, Data Colada submitted thirteen allegations of data falsification and fabrication in nine papers co-authored by Plaintiff. [*Id.* at ¶ 66]. The RIO conducted a preliminary assessment of the allegations under the Interim Policy. [*Id.* at ¶ 67]. On October 15, 2021, the RIO completed his preliminary assessment and concluded that five of the allegations were sufficiently "credible to support further inquiry into the falsification of research records related to the work of [Plaintiff]." [*Id.* at ¶ 68]; [Doc. No. 231-13 at 4]. The five allegations related to four published papers co-authored by Plaintiff. *See* [Doc. No. 264-1 at ¶ 69]. The RIO informed Dean Datar, the HBS Deciding Official, of the results of his preliminary assessment on October 15, 2021. [*Id.* at ¶ 71]. That same day, upon receiving the RIO's preliminary assessment, Dean Datar asked that the inquiry processes under the Interim Policy be commenced. [*Id.* at ¶ 72].

Starting around October 19, 2021, the RIO worked with the HBS Information Security Officer to sequester Plaintiff's available research records and evidence, including from Plaintiff's HBS email account, Office 365 OneDrive data, internal HBS cloud and network storage locations, and Qualtrics survey data. [*Id.* at ¶ 73]. On October 27, 2021, the RIO sent a formal Notice of Inquiry Related to Allegations of Research Misconduct ("Notice of Inquiry") to Plaintiff, informing her of the allegations and the commencement of the inquiry process. [*Id.* at ¶ 74]. The Notice of Inquiry identified the four papers and specific allegations under review, attached the full text of the Interim Policy, identified the proposed Inquiry Committee members, and notified Plaintiff of various procedural rights, including: (i) the right to lodge objections to committee members based on alleged conflicts of interest within five calendar days; (ii) the right to choose up to two personal advisors who may be present at any proceedings, and who may be attorneys; (iii) the right to be interviewed and/or submit written statements; and (iv) the opportunity to review

and comment on the Inquiry Committee's draft report. [*Id.* at ¶ 75]. The Notice of Inquiry also informed Plaintiff that she must preserve and produce all relevant materials. [*Id.* at ¶ 76].

On October 27, 2021, the RIO met with Plaintiff to discuss the sequestration of her devices, and Plaintiff told the RIO where the Inquiry Committee should look for relevant files. [*Id.* at ¶ 77]. The RIO sequestered files from two devices that Plaintiff used. [*Id.* at ¶ 78]. Defendants state that upon completion of the sequestration process, Plaintiff's devices were returned to her with all existing data intact, and Plaintiff continued to have access to all of her existing records and data throughout the HBS investigation process. [*Id.* at ¶ 79]. During the research misconduct proceeding, Plaintiff never informed the RIO that there was any relevant data that she was aware of but had not provided to HBS. [*Id.* at ¶ 80]. Plaintiff disputes Defendants' characterization of what she understood about what evidence was relevant, what evidence would be provided to the Investigation Committee, what information the Investigation Committee purportedly asked for, and whether or not she needed to provide further relevant data. [*Id.* at ¶¶ 77, 79–80].

### 1. The Inquiry & Investigation

Dean Datar appointed an Inquiry Committee that comprised two senior professors at HBS, Teresa Amabile and Robert Kaplan. [*Id.* at ¶ 81]. The Inquiry Committee held its first meeting on November 5, 2021. [*Id.* at ¶ 82]. Over six meetings spanning approximately five months, the Inquiry Committee gathered and reviewed information relevant to the allegations, including the datasets that Plaintiff herself provided, and interviewed Plaintiff. [*Id.* at ¶ 83]. On April 8, 2022, the Inquiry Committee issued its final Inquiry Report, concluding that an investigation was warranted into each of the allegations. [*Id.* at ¶ 84]. On April 13, 2022, Dean Datar accepted the Inquiry Committee's recommendation that an investigation be initiated. [*Id.* at ¶ 88].

The Investigation Committee was appointed by Dean Datar and composed of Professor Amabile, Professor Kaplan, and Professor Shawn Cole, each senior faculty members at HBS. [*Id.* at ¶ 89]. The investigation commenced on May 13, 2022 and concluded with the issuance of the Final Report on March 7, 2023, a period of approximately ten months. [*Id.* at ¶ 90].

The Investigation Committee heard evidence of Gino's integrity and intent, including whether she put pressure on her research assistants to obtain particular results. [*Id.* at ¶ 258]. The witness testimony put before the Investigation Committee concerning Gino's integrity, including interview transcripts and written submissions from co-authors and colleagues, was positive and none of it was negative. [*Id.* at ¶¶ 259–261]. The witness testimony before the Investigation Committee uniformly indicated that Gino had not ever pressured anyone in her labs to try to produce particular results and had not created any bad environments in her labs, and all of the witnesses interviewed by the Investigation Committee affirmed they never doubted the integrity of the data in the studies in question. [*Id.* at ¶¶ 262–263].

The Investigation Committee engaged Maidstone Consulting Group ("MCG"), an independent forensic data consulting firm, to conduct forensic analyses of the datasets at issue in the allegations. [*Id.* at ¶ 92]. MCG produced forensic reports for each of the allegations, examining forensic evidence of data alterations. [*Id.* at ¶ 93]. Each MCG forensic report was provided to Plaintiff prior to her interview with the Investigation Committee. [*Id.* at ¶ 94]. Between May and July 2022, Plaintiff submitted detailed written responses to the Investigation Committee's questions, including chronologies for each paper at issue, identification of research assistants and collaborators, and a description of who had access to the data at each stage of each study. [*Id.* at ¶ 95]. Plaintiff disputes this and claims that the RIO and Inquiry Committee limited the scope of Plaintiff's responses. [*Id.*]. The Investigation Committee conducted recorded interviews of four

co-authors and two research assistants with knowledge of the studies at issue and Plaintiff received transcripts of these interviews. [*Id.* at ¶ 96]. On November 11, 2022, Plaintiff submitted a written statement to the Investigation Committee. [*Id.* at ¶ 97]. The Investigation Committee interviewed Plaintiff on November 14, 2022. [*Id.* at ¶ 98].

On December 14, 2022, the Investigation Committee provided Plaintiff with a draft of its report for review and comment. [*Id.* at ¶ 100]. On February 17, 2023, Plaintiff submitted a written response to the draft Final Report, which was 36 pages long and addressed each allegation. [*Id.* at ¶ 101]. In her written response to the draft Final Report, for each allegation, Plaintiff asserted that she "never improperly manipulated data or research results" and "never revised or altered research data" in her papers, attributed discrepancies to errors by research assistants, and suggested the possibility that a "motivated third party" with access to her Qualtrics account had tampered with the data. [*Id.* at ¶ 102].

**2. Investigation Committee's Findings**

On March 7, 2023, the Investigation Committee issued its 41-page Final Report with nearly 1,200 pages of supporting documents, finding by a preponderance of the evidence that Plaintiff committed research misconduct intentionally, knowingly, or recklessly with regard to all five allegations. [*Id.* at ¶ 103]. The Investigation Committee's Final Report considered and rejected Plaintiff's contentions that unnamed "bad actors," research assistants, or other co-authors might have instead been responsible for the data anomalies. [*Id.* at ¶ 104]. The Investigation Committee concluded that Plaintiff's "repeated and strenuous argument for a scenario of data falsification by bad actors across four different studies," involving "different co-authors, different journals, different lab personnel, and different home institutions" and spanning eight years, was "highly implausible." [*Id.* at ¶ 105]. The Investigation Committee recommended corrections of the

scientific record, putting Plaintiff on unpaid leave, and initiation of steps leading to termination of employment. [*Id.* at ¶ 106].

Throughout the HBS research misconduct process, Plaintiff was represented by legal counsel from Cohen Seglias Pallas Greenhall & Furman PC ("Cohen Seglias") with experience in representing individuals accused of research misconduct. [*Id.* at ¶ 110]. Plaintiff's counsel at Cohen Seglias served as one of Plaintiff's advisors under the Interim Policy. [*Id.* at ¶ 111]. HBS Professor Gary Pisano also served as one of Plaintiff's advisors. [*Id.* at ¶ 112]. Plaintiff also engaged an attorney from K&L Gates to assist her during the HBS research misconduct process. [*Id.* at ¶ 113].[8]

### 3. Dean Datar's Acceptance and Imposition of Sanctions

Dean Datar closely reviewed the Investigation Committee's Final Report, met with the RIO multiple times to discuss the allegations and evidence, and sought additional forensic evidence through the RIO and MCG to evaluate some of Plaintiff's assertions. [*Id.* at ¶¶ 115–117]. On April 19, 2023, Dean Datar informed the RIO that he accepted the Investigation Committee's findings. [*Id.* at ¶ 118]. Dean Datar consulted with senior colleagues on the faculty and asked them to advise on whether they agreed with the sanctions that were recommended by the Investigation Committee. [*Id.* at ¶ 119].[9] These colleagues told Dean Datar that they strongly supported the

---

[8] Plaintiff disputes the extent of this attorney's involvement. She states that the attorney was only briefly engaged and his role was limited to a specific review of the draft Final Report and providing comments to Plaintiff's response thereto, after the Investigation Committee had completed its investigation. [Doc. No. 264-1 at ¶ 113]. Plaintiff does not cite to record evidence to support this contention. The parties also dispute whether Plaintiff reached out to several individuals with requests for information while the research misconduct process was ongoing. [*Id.* at ¶ 114].

[9] Plaintiff disputes this fact stating that Dean Datar's consultation with the ad-hoc committee of senior faculty occurred after Dean Datar had already accepted the findings of misconduct. Defendants do not claim that this consultation occurred prior to accepting the findings; rather, as Plaintiff's own citation to the record shows, after accepting the findings of misconduct, Dean Datar sought advice on what sanctions to recommend. [Doc. No. 264-1 at ¶ 119]; [Doc. No. 256-88 at 142:20–22, 143:18–20].

recommended sanctions, and Dean Datar noted that "[t]heir feedback was uniform and unanimous." [*Id.* at ¶ 120].[10]

On June 13, 2023, Dean Datar met with Plaintiff in person and issued a written letter imposing sanctions, which included: contacting journal editors and requesting retraction of the papers at issue to correct the scientific record; placement on administrative leave for two years (salary paid through July 31, 2023; thereafter unpaid); removing Gino from a named professorship; a prohibition on conducting research, teaching, mentoring, or advising during the leave; and suspension of Gino's campus ID card access effective immediately. [*Id.* at ¶ 121]. Dean Datar's letter also stated: "If you are permitted to return from administrative leave, then for a period of two years after your return and at the discretion of the Dean thereafter, we will impose requirements and constraints on your appointment." [*Id.* at ¶ 122]; [Doc. No. 231-30 at 3]. Dean Datar also informed Plaintiff that he would forward to Harvard's President a request to consider tenure revocation proceedings under Harvard's Third Statute, asking that the University revoke her tenured professorial appointment at Harvard on the grounds that her repeated acts of research misconduct constituted grave misconduct and/or neglect of duty. [Doc. No. 264-1 at ¶ 123].

### F. <u>The Third Statute Proceedings</u>

On July 14, 2023, a complaint against Plaintiff under Harvard's Third Statute was submitted to then-President Claudine Gay by Dean Datar, requesting that then-President Gay commence Third Statute proceedings. [*Id.* at ¶ 128]. Robin Greenwood, a Senior Associate Dean for Faculty Development and Research at HBS, served as the Complainant on behalf of HBS. [*Id.* at ¶ 129].

---

[10] Plaintiff disputes that the support for sanctions was "uniform and unanimous" because it ignores dissent from Gary Pisano who served as Gino's advisor. [Doc. No. 264-1 at ¶ 120]. It is unclear whether Mr. Pisano was part of the group of colleagues who were consulted. *See* [Doc. No. 231-25].

Upon receiving the Third Statute complaint, then-President Gay convened a Screening Committee of three HBS professors with tenure (Joseph Badaracco, Cynthia Montgomery, and James Sebenius) in August 2023, as required under the Third Statute Procedures. [*Id.* at ¶ 130]. On October 12, 2023, the Screening Committee sent a memorandum to then President Gay reporting its unanimous findings: that the complaint credibly alleged grave misconduct or neglect of duty and that it was sufficiently serious and justified to be referred to a Hearing Committee for adjudication. [*Id.* at ¶ 131]. Then-President Gay informed Plaintiff of the Screening Committee's findings and stated that she would direct Harvard's University Committee on Rights and Responsibilities ("UCRR") to proceed with selecting Hearing Committee members from among tenured University faculty. [*Id.* at ¶ 132].

The UCRR selected a seven-member Hearing Committee drawn from tenured faculty across Harvard University. [*Id.* at ¶ 133]. The seven members of the Hearing Committee were: Andrew Teeter, Elena Kramer, Ramon Casadesus-Masanell, Annette Gordon-Reed, Catherine Elgin, Lauren H. Cohen, and Rosabeth Moss Kanter. [*Id.* at ¶ 134]. The Complainant and Respondent (i.e., the Plaintiff) were represented by experienced external legal counsel throughout the tenure revocation proceeding; the Hearing Committee was also represented by its own outside counsel. [*Id.* at ¶ 135]. Plaintiff sought to introduce new evidence in connection with the tenure revocation proceeding, and was permitted to do so. [*Id.* at ¶ 136]. The Hearing Committee determined that it would conduct an independent review of the evidence and would not simply defer to the prior work and findings of the HBS Investigation Committee. [*Id.* at ¶ 137]. The Hearing Committee granted certain of Plaintiff's document and information requests that Plaintiff submitted to Complainant but ruled against her on most of her disputes regarding her requests. [*Id.* at ¶¶ 138, 364–365, 369–371].

The parties submitted a collective 1,085 pages of written testimony to the Hearing Committee from 13 witnesses, including five expert witnesses. [*Id.* at ¶ 139]. The Complainant submitted written testimony from Mr. Bonacossa, Professor Amabile, Dean Datar, Julie Gottlieb, Jeremy Freese, and Julian Ackert. [*Id.* at ¶ 140]. In Mr. Ackert's written expert testimony, Mr. Ackert concluded, based on the available forensic evidence, that in September 2023, Plaintiff had falsified and backdated a file on another device and then copied it to her HBS laptop to create the misleading impression that an exonerating data file existed that HBS had overlooked during its investigation. [*Id.* at ¶ 141]. In response to a request for an adjournment from Plaintiff, the Hearing Committee determined that Plaintiff "[did] not have a 'valid claim of surprise' that warrants an adjournment or extension" because Plaintiff had "received adequate notice of the allegations against her [and] both parties agreed at the outset of the hearing process that the Hearing Committee could and should consider information beyond the HBS Final Investigation Report." [*Id.* at ¶¶ 142, 381]; [Doc. No. 231-42 at 2].

A two-day evidentiary hearing was held between November 15–16, 2024, which included live testimony, cross-examination of witnesses, opening statements, and closing arguments. [Doc. No. 264-1 at ¶ 143]. Before conducting the evidentiary hearing, the Hearing Committee reviewed all submissions from the parties, including Plaintiff's 93-page response to the Third Statute complaint, 571 exhibits, and the 1,085 pages of written testimony. [*Id.* at ¶ 144]. During the hearing, Plaintiff cross-examined all six witnesses who testified (i.e., submitted witness statements) on the Complainant's behalf. [*Id.* at ¶ 145]. The Hearing Committee met for several hours in December 2024 after all submissions were received to deliberate concerning each of the allegations, and reached a unanimous decision. [*Id.* at ¶ 146].

### G. The Hearing Committee's Findings and Recommendations

On January 24, 2025, the Hearing Committee issued a written memorandum of its Findings and Recommendations. [*Id.* at ¶ 147]. Despite their "hope[] that the evidence might exonerate Professor Gino or at least fall below the threshold set by the Third Statute," and "with profound sadness," the Hearing Committee found "by clear and convincing evidence that Professor Gino committed research misconduct in connection with each of the four studies . . . constituting grave misconduct or neglect of duty." [*Id.* at ¶ 148]; [Doc. No. 231-47 at 2, 12]. The Findings and Recommendations stated that the Hearing Committee "carefully considered" Plaintiff's arguments and evidence to support her claims of innocence and "gave [her] every benefit of the doubt." [Doc. No. 264-1 at ¶ 149]; [Doc. No. 231-47 at 11–12].

The Hearing Committee "did not defer to or rely on the outcome of the HBS inquiry or investigation, nor did [it] limit this proceeding to the arguments or evidence presented in that forum." [Doc. No. 264-1 at ¶ 150]; [Doc. No. 231-47 at 11]. For each allegation and every study at issue, the Hearing Committee concluded that the data or description was altered, the alterations were intentional, and Plaintiff was responsible for the intentional alterations. [Doc. No. 264-1 at ¶ 151]. The Hearing Committee considered:

> "[C]riticisms that the [C]omplainant's case was a moving target; critiques of the expert statements offered by the [C]omplainant; arguments about gaps in the evidentiary record; suggestions of other individuals who contributed to these four studies and potentially could have had some role in the data alterations; evidence of supposedly lax or even sloppy data management standards in the behavioral science field as a whole; protestations that she lacked any motive to alter these data, particularly given that she has abandoned other studies and hypotheses that did not pan out," and concluded that "none overcomes the clear and convincing evidence establishing research misconduct in connection with each of the four studies."

[Doc. No. 264-1 at ¶ 153]; [Doc. No. 231-47 at 12]. The Hearing Committee was "struck by the breadth of this research misconduct, which includes several different types of data manipulation

and appears to reflect a troubling pattern of salvaging studies that did not support Professor Gino's hypotheses at all or did not attain the level of statistical significance required for publication" and determined that "[t]he record evidence leaves [the Hearing Committee]—as representatives of [their] faculties and stewards of this institution—with no choice but to recommend this most serious sanction[.]" [Doc. No. 264-1 at ¶ 154]; [Doc. No. 231-47 at 11–12].

By a unanimous vote, the Hearing Committee recommended to the President and Fellows of Harvard College (the "Corporation") that Plaintiff be removed from her teaching appointment as a tenured professor of Harvard University. [Doc. No. 264-1 at ¶ 155].

### H. President and Fellows' Review and Decision

On January 24, 2025, the Hearing Committee's Findings and Recommendations were transmitted to the Corporation, the University's main governing board. [*Id.* at ¶ 158]. On March 14, 2025, Plaintiff submitted a detailed response to the Findings and Recommendations through Harvard Law School Professor Lawrence Lessig. [*Id.* at ¶ 159]. On May 15, 2025, the Corporation met and voted unanimously to accept the Hearing Committee's findings and to remove Plaintiff from her tenured appointment at Harvard. [*Id.* at ¶ 161]. In May 2025, Plaintiff's tenure was revoked and her appointment at HBS was terminated. [*Id.* at ¶ 162].

## II. PROCEDURAL HISTORY

Plaintiff initiated this action on August 2, 2023, [Doc. No. 1], and filed the operative Third Amended Complaint on August 4, 2025, [Doc. No. 126]. On August 18, 2025, Defendants brought a counterclaim for defamation. [Doc. No. 127 at 139, 161]. On June 23, 2026, Defendants moved for summary judgment on all of Plaintiff's claims. [Doc. No. 230]. On August 26, 2026, Plaintiff filed a renewed opposition to the Motion for Summary Judgment. [Doc. No. 258]. On September 2, 2026, Defendants filed their Reply. [Doc. No. 263].

## III. LEGAL STANDARD

"Summary judgment is appropriate when the moving party shows that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Joseph v. Lincare, Inc.*, 989 F.3d 147, 157 (1st Cir. 2021) (quoting Fed. R. Civ. P. 56(a)). "A dispute is 'genuine' if the evidence is such that a reasonable jury could resolve the point in the favor of the non-moving party, and a fact is 'material' if it has the potential of affecting the outcome of the case." *Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 93 (1st Cir. 2021) (cleaned up). Once a party properly supports a motion for summary judgment, the opposing party "bears the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe." *Lincare*, 989 F.3d at 157 (cleaned up).

In assessing whether a genuine dispute of material fact exists, courts "look to all of the record materials on file, including the pleadings, depositions, and affidavits," while "neither evaluat[ing] the credibility of witnesses nor weigh[ing] the evidence." *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014). The record must be examined, however, "in the light most favorable to the nonmovant[,] . . . drawing all reasonable inferences in that party's favor." *Lopez-Hernandez v. Terumo Puerto Rico LLC*, 64 F.4th 22, 28 (1st Cir. 2023). And the Court "proceed[s] with caution and restraint when considering summary judgment motions where, as here, issues of pretext, motive, and intent are in play." *Taite*, 999 F.3d at 93.

## IV. ANALYSIS

### A. <u>Breach of Contract (Count II)</u>

Plaintiff's breach of contract claim is predicated on Harvard's alleged breach of the Appointment Letter and the policies & procedures incorporated by reference (either explicitly or implied) to that letter. Plaintiff argues that her Appointment Letter constitutes a contract between

Plaintiff and Harvard, which incorporates by reference "terms, conditions and policies as are stipulated by the Faculty of Business Administration" and the Third Statute. [Doc. No. 231-5 at 2]; [Doc. No. 258-1 at 3, 6]. Based on this theory, Plaintiff argues that Harvard breached five related policies & procedures: (1) the Third Statute; (2) the Third Statute Procedures; (3) the Tenure Policy; (4) the Research Integrity Policy, and (5) the Interim Policy. [Doc. No. 258-1 at 3].

Gino identifies the September 2014 Appointment Letter, the Third Statute, the Third Statute Procedures, the HBS Tenure Policy, the 2013 Research Integrity Policy, and the 2021 Interim Policy as sources of contractual protection. Harvard disputes the enforceability of several policies. The Appointment Letter, however, expressly subjects Gino's appointment to the Third Statute, and those two instruments form an enforceable agreement. [Doc. No. 231-5 at 2–3]. For purposes of this motion, I assume without deciding that the other identified policies and procedures also impose enforceable obligations. Even on that assumption, the identified evidence does not establish a triable breach.

Massachusetts courts enforce contractual promises made by private universities, while according appropriate respect to their academic and disciplinary judgments. *Schaer v. Brandeis Univ.,* 432 Mass. 474, 478–82 (2000); *Berkowitz v. President & Fellows of Harvard Coll*., 58 Mass. App. Ct. 262, 269–70 (2003). *Wortis v. Trustees of Tufts College*, 493 Mass. 648, 662–68 (2024), recognizes that the terms of a tenure agreement may be reflected in multiple documents and that a university remains accountable for its contractual commitments. It does not establish that a jury must reconsider de novo a university's expert determination of research misconduct. Likewise, the employee-policy principles described in *O'Brien v. New England Telephone & Telegraph Co.*, 422 Mass. 686, 691–94 (1996), need not be definitively applied to each additional policy here because I assume enforceability in Gino's favor.

The Third Statute permits removal of an officer holding a teaching appointment "only for grave misconduct or neglect of duty." [Doc. No. 231-5 at 3]. I hold that this is a substantive, enforceable limitation on removal, not a merely aspirational statement. The limitation does not, however, confer a right to have a federal jury independently determine scientific authorship, data provenance, or the correct weight of forensic evidence after an academic tribunal has considered those matters. Judicial review asks whether Harvard reached its determination honestly and reasonably, upon a rational evidentiary foundation, and in compliance with its enforceable contractual procedures. This is meaningful review: the University's decision does not prevail merely because a committee announced it.

This standard respects both the contractual restriction on removal and the institutional responsibility to adjudicate research-integrity matters. A court may not uphold a decision procured through dishonesty, resting on no reasonable evidence, or reached through a material violation of promised procedures. It also may not choose among plausible competing forensic interpretations merely because a reasonable factfinder could have drawn different scientific inferences. Gino bears the burden of proving breach in this action. The Third Statute Procedures separately placed on Harvard's complainant a clear-and-convincing burden of establishing grave misconduct or neglect of duty; the record must be examined for whether Harvard applied that burden, not treated as though the civil burden had transferred to Harvard. [Doc. No. 231-2 at 7].

Gino relies on *McConnell v. Howard Univ.*, 818 F.2d 58, 63–70 (D.C. Cir. 1987), which permitted substantive adjudication of a different tenure agreement under District of Columbia law and rejected treating a university's internal decision as conclusive. That case presents a substantial argument and is not distinguishable merely because the disputed employment duty there was uncertain. But it does not govern the scope of review of this Massachusetts agreement. Applying

*Schaer*'s combination of contractual enforcement and judicial restraint, and considering the Third Statute's allocation of grave-misconduct factfinding to an internal hearing process, I decline to read the Statute to promise an independent jury retrial of the scientific allegations. *McConnell* does not require that result under Massachusetts law.

Nor does *Wortis* require de novo reconsideration of the underlying misconduct finding. *Wortis* concerned the contractual terms and benefits of tenure, not the proper judicial weight of a completed peer disciplinary determination concerning scientific falsification. Here, I enforce the Third Statute by testing whether the decisionmakers acted honestly, reached a conclusion a reasonable decisionmaker could reach on the evidence presented, and adhered to the promised process. This standard requires attention to Gino's contrary evidence, but only insofar as it tends to show dishonesty, an irrational evidentiary foundation, or a material contractual deviation; an alternative possible account of data anomalies is not by itself sufficient.

The procedural theories require separate treatment. For each, the Court asks what the assumed contractual provision required, whether admissible evidence permits a finding of noncompliance, and whether the asserted deviation was material and supports a legally cognizable injury or remedy. I do not adopt a categorical requirement that every procedural breach be shown to have changed the outcome. Nor is a procedural grievance actionable merely because Gino would have preferred a different investigation. *See Sonoiki v. Harvard Univ.*, 2024 WL 760844, at *11 (D. Mass. Feb. 6, 2024); *Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 335 (D.R.I. 2016).

**1. The Third Statute Determination and Pre-Revocation Sanctions**

Harvard's decision had a substantial contemporaneous evidentiary basis. The record describes forensic examination of anomalous data in four research papers; analysis of the history and characteristics of relevant datasets; consideration of Gino's explanations; a faculty

investigation finding misconduct by a preponderance of the evidence, and; a subsequent hearing committee finding, by clear and convincing evidence, of misconduct grave enough to warrant revocation. [Doc. No. 264-1 at ¶¶ 103, 148]; [Doc. Nos. 231-22; 231-47]. These are not independent judicial findings that Gino altered any data. They establish that Harvard investigated defined allegations and articulated an evidentiary explanation for its decision. The committees' findings alone would not rescue a decision shown to be knowingly false or irrational; the investigative materials, considered together with the contrary submissions, provide the relevant basis for review.

Gino denies intentionally falsifying research data, relies on favorable accounts from coauthors and colleagues, and challenges aspects of the forensic inferences and evidence of access or authorship. [Doc. No. 264-1 at ¶¶ 243–65, 299, 390, 414–79]. I credit these disputes and draw permissible inferences in her favor. But the question under the contract is not whether a jury could reject some of Harvard's inferential steps or prefer an alternative forensic account. Gino must identify evidence from which a reasonable jury could conclude that Harvard did not honestly believe its determination or lacked a rational basis to make it. The identified differences over inference, attribution, and scientific weight do not establish that the peer decisionmakers knowingly adopted a false conclusion or acted without a reasonable evidentiary foundation. Accordingly, no triable breach arises merely from the competing interpretations of the underlying research record.

Plaintiff's other theory of breach with respect to the Tenure Policy is that Dean Datar's imposition of sanctions—after the finding of research misconduct, but prior to the institution of Third Statute Proceedings—were so severe that they effectively mounted to revocation of tenure without a proper proceeding. [Doc. No. 258-1 at 19]. After receiving unanimous feedback from

senior faculty members, Dean Datar issued the following sanctions to Plaintiff: contacting journal editors and requesting retraction of the papers at issue to correct the scientific record; placing her on administrative leave for two years (salary paid through July 31, 2023; thereafter unpaid); removing her from a named professorship; a prohibition on conducting research, teaching, mentoring, or advising during the leave; and suspension of her campus ID card access effective immediately. [Doc. No. 264-1 at ¶ 121]. Dean Datar's letter also stated that if Plaintiff were permitted to return from administrative leave, for a period of two years after her return, there would be further requirements and constraints on her appointment. [*Id.* at ¶ 122].

The Interim Policy states that "[i]ndividuals subject to this policy found to have committed research misconduct may be subject to sanctions up to and including termination." [Doc. No. 231-10 at 3]. The Interim Policy also gives the Dean discretion to decide the appropriate sanctions, in consultation with others, depending on the seriousness of the misconduct. [*Id.* at 11]. The Policy outlines the range of possible sanctions:

> The range of administrative actions includes, but is not limited to, the correction of the public record including the withdrawal or correction of all pending or published abstracts and papers emanating from the research where misconduct was found; removal of the responsible person from the particular project, special monitoring of future work, probation, suspension, leave without pay, salary reduction, or initiation of steps leading to rank reduction or termination of employment; restitution of funds as appropriate; suspension or termination of an active award; and other action appropriate to the research misconduct.

[*Id.*]. The Interim Policy expressly authorizes suspension, leave without pay, restrictions on work, and steps toward termination. The Third Statute separately prohibits removal from a tenured teaching appointment except for grave misconduct or neglect of duty. The two provisions can be given effect together: substantial disciplinary sanctions are not automatically an actual removal from the continuing tenured appointment. The record here reflects finite leave, restrictions on duties and access, and loss of a named professorship, but not formal termination of the tenured

appointment until completion of the Third Statute process. [Doc. No. 264-1 at ¶¶ 121, 161–62]. Even considering the practical severity of the sanctions cumulatively, Gino identifies no term of the Third Statute equating authorized suspension or leave with removal from tenure. The undisputed character of the measures, as opposed to their desirability, governs this contractual question. They did not constitute premature revocation in violation of the Third Statute.

**2. Process-Based Theories of Breach**

Plaintiff's theories of breach with respect to the Research Integrity Policy, Interim Policy, and Third Statute Procedures have to do with Harvard's alleged deviations from the processes outlined by those policies. Specifically, Plaintiff argues that (1) she had a reasonable expectation that Harvard would adhere to the Research Integrity Policy; (2) Harvard did not follow certain procedures or requirements outlined by the Interim Policy, and; (3) Harvard did not follow certain requirements outlined by the Third Statute Procedures. *See* [Doc. No. 258-1 at 10–18].

**a. Alleged Breaches of the Research Integrity Policy**

Gino contends that Harvard replaced the 2013 Research Integrity Policy with the Interim Policy after allegations concerning her emerged, thereby eliminating protections on which she reasonably relied. The earlier policy authorized the Dean to choose a process suited to the seriousness of a case, while requiring a thorough, fair, and objective inquiry and notice of the allegations and supporting evidence. [Doc. No. 231-4 at 2–3]. I assume that the earlier policy is enforceable. The adoption of more detailed interim procedures did not, without an identified inconsistency with a mandatory earlier promise, breach that policy. The disputed adoption chronology does not independently show bad faith; the question is whether Harvard denied a protection that the earlier policy actually promised.

> Because of variations in such factors as the type and seriousness of alleged misconduct, the course of action that will enable the Dean to fulfill his or her

> obligations most thoroughly and equitably may vary somewhat from case to case. Accordingly, the procedures set forth below permit flexibility and are designed to provide a framework that should enable equitable resolution of allegations of misconduct in a variety of circumstances.

[*Id.* at 2]. Nothing in the Research Integrity Policy limits or prevents the Dean from establishing a new, more thorough policy to investigate research misconduct. Further, the Interim Policy, while more extensive than the Research Integrity Policy, still retains the requirement that any process must be "thorough, fair, and objective." [*Id.*]; *See* [Doc. No. 231-10 at 2] ("Throughout the research misconduct process, which begins at the time an allegation is made, all participants shall bear in mind the importance, both in fact and in appearance, of thoroughness, fairness, and objectivity."). Therefore, Plaintiff's reasonable expectations under both policies with respect to the objectivity requirement should be the same. Further, unlike the two-page Research Integrity Policy, the Interim Policy includes a detailed process for investigation, explains what rights the respondent has throughout that investigation, and is in line with federal regulations.

The circumstances and timing of the Interim Policy's adoption merit scrutiny, but temporal proximity alone does not show that the Dean acted to deprive Gino of contractual protections. The declarations of Professors Pisano and Frei reflect concerns and uncertainty about adoption of the new policy. *See* [Doc. No. 256-78 at ¶¶ 22–23]; [Doc. No. 256-76 at ¶¶ 13–14]. However, the identified record does not establish that the adoption decision was prompted by sex bias, an intention to engineer a predetermined finding, or the elimination of a specific procedural right guaranteed by the earlier policy. That conclusion does not depend on deeming all questions concerning the timing immaterial; rather, it follows from the breadth of discretion written into the prior policy and the absence of a showing that Harvard displaced an identifiable mandatory protection.

Accordingly, Plaintiff has not established any breach of the Research Integrity Policy.

### b. Alleged Breaches of the Interim Policy

Plaintiff argues that Harvard breached the Interim Policy in the following specific ways: (1) HBS delayed notifying Plaintiff of the allegations against her; (2) the confidentiality restrictions imposed on Gino violated the Policy's requirements of fairness and Harvard itself failed to maintain confidentiality; (3) Harvard used boilerplate language regarding their findings of intent; (4) there is a factual dispute as to whether Gino was limited from obtaining more than two advisors; (5) Harvard reversed the burden of proof during the investigation; (6) RIO Bonacossa failed to collect and preserve evidence which resulted in a loss of potentially important evidence, and; (7) HBS applied the statute of limitations unfairly against Gino.[11] [Doc. No. 258-1 at 11–15].

For these alleged procedural breaches, I distinguish whether an operative promise was violated from whether the plaintiff sustained legally cognizable injury. A contractual shortcoming that did not prejudice access to evidence, meaningful participation, or another protected interest may not support the requested remedy; nevertheless, neither *Sonoiki* nor the generally applicable law of contracts establishes that every deviation is actionable only upon proof that the disciplinary committee necessarily would have reached a different verdict. I therefore consider the claimed restriction, the evidence of its operation, and any supported causal consequences separately.

***Delayed Notification Theory:*** Plaintiff argues that the Dean's office negotiated a secret deal with Data Colada to prevent Data Colada from publishing allegations against Plaintiff, arguing that even though HBS was aware of the allegations against Gino in July 2021, no formal allegations were brought until October 2021. [Doc. No. 258-1 at 11]. As an initial matter, Plaintiff

[11] Plaintiff also argues that Harvard breached the overall requirements of thoroughness, fairness, objectivity, and that Harvard made false statements throughout the investigation which reveals that it breached its obligations under the Interim Policy. [Doc. No. 258-1 at 15–17]. However, these theories are all dependent on the validity of the more specific theories discussed and rejected herein. As such, I need not address them.

does not provide factual support, beyond speculation, that there was a "secret deal" that Dean Datar made with Data Colada. The only evidence in support of that belief is Mr. Pisano's hearsay statement that Dean Datar told Mr. Pisano that he "made a deal with the complainant (Data Colada) whereby (Data Colada) would not go public with the allegations against Professor Gino and that HBS would do the investigation itself." [Doc. No. 256-76 at ¶ 18]. But even if this were true, Plaintiff does not identify what provision of the Interim Policy was breached or why such delayed notification would have changed the outcome of the investigation, beyond her unsupported inferences that Dean Datar and "HBS's Dean's closest confidants had already decided Gino was guilty." [Doc. No. 258-1 at 11]; [Doc. No. 231-10 at 6] (stating that respondent must be notified in writing "at the time of or before beginning an inquiry").

***Confidentiality Theory:*** Similarly, Plaintiff does not explain how the confidentiality provisions were breached or how that supposed breach impacted the outcome of her investigation. The Interim Policy specifies that HBS has a duty to limit disclosure on a need-to-know basis, and that the respondent has a duty to maintain confidentiality as well. [Doc. No. 231-10 at 4]. Gino argues, without factual support, that the confidentiality restrictions as imposed against her were unfair, but she does not identify on the record whether there were specific provisions of the Policy that Harvard did not comply with or how allowing Gino to reveal specific facts about the investigation to witnesses—which she is not permitted to do under the Policy—would have changed the outcome. Additionally, nothing in the Interim Policy limited HBS from disclosing what it determined would be relevant to aid in its investigation. Plaintiff's arguments that Harvard disclosed certain information to Data Colada does not establish any nexus between that supposed breach and any harm to Plaintiff.

***Boilerplate Language Theory:*** Likewise, Plaintiff does not explain what obligation in the Interim Policy Harvard breached by issuing a finding of research misconduct committed "intentionally, knowingly, or recklessly." [Doc. No. 231-10 at 3] (explaining that it is Harvard's obligation only to find, by a preponderance of the evidence, that respondent committed research misconduct "intentionally, knowingly, or recklessly"). No reasonable jury could conclude that this language leads to a reasonable inference that Harvard failed to carry its burden.

***Limited Advisors Theory.*** The Interim Policy limits designated advisors who participate in the proceedings; it does not expressly promise unlimited appointed or participating consultants. [Doc. No. 231-10 at 4]. The parties dispute aspects of the RIO's statements concerning additional technical assistance. [Doc. No. 264-1 at ¶¶ 91, 110–13, 305–306]. Taking Gino's account favorably, the cited statements do not identify an enforceable entitlement to the particular additional participant she sought. They also do not show that she was foreclosed from all meaningful forensic response. She had designated assistance and submitted challenges to the technical evidence. The presence of lawyers alone would not establish technical fairness, but no material contractual deviation or denial of a reasonable opportunity to answer the allegations follows from the identified advisor limitation.

***Burden of Proof Theory.*** The Interim Policy placed on Harvard the burden to prove intentional, knowing, or reckless research misconduct by a preponderance of the evidence and assigned to the respondent the burden on a distinct affirmative defense, including honest error. [Doc. No. 231-10 at 3]. These provisions are not inherently inconsistent. Gino argues that the committee in practice treated her inability to demonstrate honest error as proof of culpability. The reports, however, describe affirmative evaluation of the anomalous data and competing explanations, not a determination of misconduct solely because Gino failed to establish her

innocence. [Doc. No. 231-22]. Nothing cited creates a genuine dispute that the investigators abandoned Harvard's underlying burden. The later tenure proceeding separately used the clear-and-convincing standard required by the Third Statute Procedures. [Doc. No. 231-47].

***Sequestered Evidence Theory.*** Gino identifies a laptop that she contends was not forensically imaged and additional third-party or historical materials Harvard did not obtain. The Interim Policy's preservation provisions must be distinguished from a duty to pursue every conceivable source of evidence. Assuming the alleged omission concerning the laptop, Gino has not identified a mandatory term requiring the specific forensic step she proposes, or evidence of what material exculpatory contents a missed step would have preserved. Nor does a disagreement about a representation concerning imaging itself show that the misconduct determination was dishonest or unsupported. Without a contractual duty and a material impairment of the promised opportunity to respond, conjecture about potentially helpful evidence does not create an actionable breach.

***Statute of Limitations Theory.*** The Interim Policy generally limits allegations to misconduct within six years, subject to an exception for conduct "continued or renewed" by citation, republication, or another use of the research record for the respondent's potential benefit. [Doc. No. 231-10 at 2]. Gino argues that Harvard relied on the fact of more recent citations without adequately examining renewal and benefit to find that the allegations against her fell into that exception. [Doc. No. 264-1 at ¶¶ 209–10]. The question is contractual compliance, not simply whether the RIO labeled an allegation timely. The cited record identifies later use of the research papers and an application of the exception in the investigation. Gino identifies no specific evidence creating a reasonable inference that Harvard deliberately ignored the exception's conditions, adopted an interpretation no reasonable decisionmaker could apply, or relied on an otherwise stale

charge in a manner amounting to a material breach. I therefore do not substitute my own assessment of the scholarly benefit of each citation for Harvard's reasonable application of the stated criterion.

Plaintiff also argues that Harvard did not meaningfully investigate certain information or evidence that Plaintiff believes should have been investigated. However, Plaintiff does not identify any provision in the Interim Policy that required Harvard to do exactly what Plaintiff thinks they should have done. [Doc. No. 258-1 at 15]. For all of these reasons, Plaintiff has not established a genuine dispute that Harvard breached the provisions of the Interim Policy.

**c. The Third Statute Procedures**

Plaintiff argues that Harvard breached the Third Statute Procedures in the following specific ways: (1) Harvard denied certain of Gino's document requests; (2) Harvard gratuitously referred to Plaintiff's lawsuit to bias the Hearing Committee against Gino; (3) Harvard was responsible for witnesses refusing to participate given Harvard's inadequate confidentiality protections, and; (4) Harvard abandoned certain allegations to present a new case based on analysis from a new expert and refused to grant Gino an adjournment to address these new claims. [Doc. No. 258-1 at 17–18]. As with the Interim Policy, I will address each theory in turn.

***Denied Document Requests Theory.*** The Third Statute Procedures contemplate access to necessary evidence and reasonable opportunities to interview witnesses while allowing the Hearing Committee to determine the probative value of material submitted. [Doc. No. 231-2 at 6–7]. The committee's discretion is not absolute, but neither does the agreement grant unrestricted discovery equivalent to civil litigation. Although Gino disputes specific denials of her requests for certain evidence, she has not identified a required category of withheld evidence whose denial, on this record, deprived her of a fair chance to address an actual charge. Viewing the asserted

limitations favorably to her, the described rulings concerned the committee's evaluation of necessary and probative value, and do not support a reasonable inference that Harvard nullified the promised opportunity to present a defense.

***References to Lawsuit Theory:*** Plaintiff argues that a jury could find that HBS successfully biased the Hearing Committee against Gino by referencing Gino's lawsuit. [Doc. No. 231-2 at 7] ("[F]indings of fact and the decisions will be based solely on the hearing record."). However, the cited exhibits do not support such an inference based on the statements made by counsel in the proceedings before the Hearing Committee. *See* [Doc. No. 256-82 at 11:21–12:1]; [Doc. No. 256-83 at 192:7–11, 257:6–13]. These statements merely reference the lawsuit made public by Gino herself and do not otherwise form the basis for the finding of grave misconduct.

***Witness Participation Theory***. The procedures require reasonable efforts to obtain witness cooperation, not compulsory attendance by persons outside the committee's control. Gino attributes some of the witnesses' reluctance to participate to confidentiality concerns, but her own testimony recognizes that a confidential investigative report became public in connection with this litigation. [Doc. No. 256-83 at 191–92]. The record identified here does not show a specific Harvard breach that prevented a willing, material witness from participating. The analysis does not turn on whether Gino could force a witness to appear; it turns on the scope of Harvard's undertaking and the evidence, if any, of an unreasonable failure to seek cooperation.

***New Expert and Adjournment Theory.*** The procedures require notice of the charges and an adjournment upon a valid claim of surprise. [Doc. No. 231-2 at 6–7]. Gino asserts that a later forensic analysis—including an issue concerning the provenance of an exculpatory file—amounted to a new case and warranted postponement. The record distinguishes new support or rebuttal concerning the noticed data-manipulation charges from a materially new basis for

revoking tenure. The Hearing Committee considered the request and found no valid claim of surprise. [Doc. No. 231-47]; [Doc. No. 264-1 at ¶ 142]. Its conclusion is not conclusive of contractual compliance; nevertheless, on the identified notices, disclosures, and opportunity to respond, Gino has not shown that the committee relied upon an unannounced independent charge or denied a contractually required opportunity to answer material evidence. At most, she disagrees with the committee's assessment of the need for additional time. That disagreement does not create a triable breach.

Considering the Third Statute proceeding as a whole, Harvard afforded notice, a hearing, presentation of competing evidence and argument, and review by faculty committees before the Corporation revoked tenure. [Doc. Nos. 231-22, 231-47]; [Doc. No. 264-1 at ¶¶ 148, 161–62]. I do not infer legality simply from the length or number of participants in that process. Rather, the particular objections discussed above do not furnish evidence from which a reasonable jury could find dishonesty, a decision lacking a rational evidentiary foundation, or a material violation of an assumed enforceable procedure. The disputed correctness of the scientific conclusion cannot supply the missing contractual breach.

***

Accordingly, even assuming that the Third Statute Procedures, the Tenure Policy, the 2013 Research Integrity Policy, and the Interim Policy are enforceable in addition to the Appointment Letter and Third Statute, Defendants are entitled to summary judgment on Count II. No reasonable jury could conclude on the identified evidence that Harvard revoked tenure dishonestly or without a reasonable basis, prematurely removed Gino from her appointment, or materially violated a contractual procedure. This ruling does not amount to an independent judicial finding that Gino committed research misconduct.

### B. Implied Covenant of Good Faith and Fair Dealing (Count III)

Massachusetts law implies in every contract a covenant that neither party will act to destroy or injure the other party's right to receive the benefits of the agreement. The covenant cannot create rights beyond the contract's scope. *Wortis*, 493 Mass. at 671; *Ayash v. Dana-Farber Cancer Inst*., 443 Mass. 367, 385 (2005). Gino principally argues that Harvard adopted and deployed the Interim Policy in bad faith to diminish the fair process and tenure protections promised to her. The chronology permits inquiry but does not itself establish that the policy was designed to secure a predetermined result. The 2013 policy reserved procedural flexibility and retained obligations of thoroughness, fairness, and objectivity. [Doc. No. 231-4 at 2–3]. The question is whether the evidence would permit a finding that Harvard used its discretion to deprive Gino of those existing contractual benefits. On the cited materials, the complaints concerning the timing of policy adoption, without evidence tying the adoption to the frustration of a specific contractual benefit, do not independently establish bad faith; any remaining claim based on misconduct in implementation rises or falls with the specific factual disputes analyzed under Count II.

### C. Estoppel (Count IV)

Gino alternatively asserts that Harvard represented that the Third Statute Procedures and Interim Policy would govern and that she relied on those assurances. A promissory-estoppel theory ordinarily requires a clear promise, reasonable reliance, and detriment caused by that reliance. *See Neuhoff v. Marvin Lumber & Cedar Co.*, 370 F.3d 197, 203–204 (1st Cir. 2004). The repeated presentation of the policies as operative may support the existence of a promise, but the claim also requires identification of particular conduct taken or forgone in reliance and a corresponding detriment. The record citations discussed above do not establish how Gino

changed her position to her detriment because of a promise distinct from the performance of the policies themselves. Nor does estoppel obviate the need to show that the promised protection was denied. On the grounds presently supported, Count IV does not provide a freestanding alternative basis for relief.

**D. Sex Discrimination and Selective Enforcement (Counts I, V, VI)**

Plaintiff brings several claims premised on her allegations of gender discrimination and disparate treatment under Title IX (Count I) and Title VII (Count V) against Harvard, and the Fair Employment Practices Act, M.G.L. c. 151B (Count VI) against Harvard and Dean Datar. [Doc. No. 126 at ¶¶ 337–350, 374–389]. Defendants argue that they are entitled to summary judgment on these claims because Plaintiff has not provided evidence of discriminatory animus, pretext, or selective enforcement under the *McDonnell Douglas* framework. [Doc. No. 233-1 at 13–22]. I agree.

**1. The McDonnell Douglas Framework**

"Title VII makes it unlawful for employers to discriminate based on sex, and Title IX similarly prohibits gender-based discrimination in a wide array of programs and activities undertaken by educational institutions." *Ing v. Tufts Univ.*, 81 F.4th 77, 82 (1st Cir. 2023) (citations omitted): *see also* 42 U.S.C. § 2000e *et seq.* (Title VII); 20 U.S.C. § 1681 *et seq.* (Title IX). The First Circuit has held that under either statute, where there is no direct evidence of discrimination, the court must invoke the three-step burden-shifting scheme outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1st Cir. 1973) "to assess whether we can infer discrimination from the undisputed material facts." *Id.* (citing *Theidon v. Harvard Univ.*, 948 F.3d 477, 495 (1st Cir. 2020)); *see also Lipsett v. Univ. of P.R.*, 864 F.2d 881, 896-97 (1st Cir. 1988) (concluding that the standards governing claims arising under Title VII and Title IX are the same). The parties agree

that the *McDonnell Douglas* framework must be applied. [Doc. No. 233-1 at 16]; [Doc. No. 258-1 at 21].

For a claim to survive summary judgment, first, Plaintiff must point to evidence that makes out a prima facie case for discrimination, after which the burden shifts to Defendants to point to evidence of legitimate, non-discriminatory reasons for the challenged conduct. *Bhatti v. Trs. of Bos. Univ.*, 659 F.3d 64, 70 (1st Cir. 2011). If Defendants succeed in making this showing, the burden shifts back to Plaintiff to point to evidence that shows that these reasons, though facially legitimate, are actually pretextual. *Id.* "A prima facie case for discrimination based on disparate treatment presents a four-part test: (1) the plaintiff must be a member of a protected class; (2) she must be qualified for her job; (3) she must suffer an adverse employment action at the hands of her employer; and (4) there must be some evidence of a causal connection between her membership in a protected class and the adverse employment action." *Id.* Defendants argue that Plaintiff's case fails at every step of the *McDonnell Douglas* framework. [Doc. No. 233-1 at 16].

While it is clear that Plaintiff is a member of a protected class and she suffered an adverse employment action, Defendants argue that Plaintiff was not qualified for her job because HBS found that Plaintiff committed research misconduct, and there is no causal connection between that finding and Plaintiff's membership in a protected class. [*Id.*]. Defendants further argue that its finding of research misconduct constitutes a legitimate, non-discriminatory reason to revoke tenure, and that Plaintiff has not provided sufficient evidence of pretext. [*Id.* at 18–21]. I find that Plaintiff has not provided sufficient evidence to establish a causal connection between the adverse employment actions taken against her and her gender, and that even if a prima facie case of discrimination were established, Plaintiff has not demonstrated pretext.

Plaintiff points to the following pieces of evidence that she argues supports evidence of discriminatory animus: (1) Harvard deviated from and breached its policies and procedures; (2) Harvard and Dean Datar have historically subjected women to less favorable treatment; (3) Harvard has treated allegations of research misconduct against male professors differently than the allegations against Plaintiff, and; (4) certain statements made by Harvard employees were false and otherwise constitute discriminatory remarks. [Doc. No. 258-1 at 22–24].

**a. Deviation from Policies**

Plaintiff relies on similar arguments she raised in support of her breach of contract claims that Harvard deviated from its policies with respect to investigating research misconduct. *See supra* Section IV.A.2. "Evidence that the employer deviated from its standard procedure or policies in taking an adverse employment action against a plaintiff may be relevant to the pretext inquiry." *Rodriguez-Cardi v. MMM Holdings, Inc.*, 936 F.3d 40, 50 (1st Cir. 2019); *Downey v. Johnson*, 104 Mass. App. Ct. 361, 379 (2024) (citations omitted) ("The failure to follow established procedures or criteria may support a reasonable inference of intentional discrimination."). As discussed, Plaintiff's evidence does not support a finding that Harvard breached its policies. Furthermore, Plaintiff provides no evidence that any purported deviations from Harvard's policies are connected to gender bias.

The cases Plaintiff relies upon are either inapplicable or inapposite. *See, e.g.*, *Kouvchinov v. Parametric Tech. Corp.*, 537 F.3d 62, 69 (1st Cir. 2008) (affirming summary judgment in favor of defendant employer where plaintiff failed to produce any evidence that employer deviated from one of its policies and holding that "where an employer's approach to personnel matters is flexible or discretionary, there is by definition no standard practice from which to deviate"); *Rodriguez-Cardi*, 936 F.3d at 50–51 (affirming summary judgment in employer's favor where plaintiff

pointed to no evidence indicating that deviation from its anti-discrimination policy "had any bearing in the termination decision or was even relevant to it"); *Downey*, 104 Mass. App. Ct. at 378 (denying summary judgment where policy was to investigate complaints but no investigation ever occurred); *Bulwer v. Mount Auburn Hosp.*, 473 Mass. 672, 688 (2016) (finding there was evidence sufficient to create a material dispute where defendants terminated plaintiff without adhering to termination policies, including by prohibiting plaintiff from attending two of the three meetings of the ad hoc committee and failing to provide plaintiff with requested materials from that meeting).

**b. Historic Evidence of Less Favorable Treatment of Women**

Plaintiff argues that there is evidence that Defendants have historically treated women less favorably than men. This evidence includes Plaintiff's own testimony and testimony from Plaintiff's colleague at HBS. [Doc. No. 264-1 at ¶¶ 326–329]. Plaintiff provided testimony in a sworn declaration that she "personally observed that it was more difficult for women to obtain tenure at HBS than men. Indeed, about three times as many male professors get promoted as compared to female ones. In the Accounting & Management Unit, it's worse: closer to four times as many." [Doc. No. 256-107 at ¶ 16]. She also stated that in 2022, she participated in an Appointment Committee meeting in which "gendered language was used to discuss the work of one female professor in the Accounting & Management Unit." [*Id.* at ¶ 17]. When Plaintiff raised the issue to senior colleagues, one of them told Plaintiff that it "has been that way for a while." [*Id.*]. Plaintiff's declaration also states that "there had not been a single tenured woman in the Accounting & Management Unit for more than 20 years." [*Id.*]. Plaintiff's colleague, Professor Frances Frei, also testified to evidence that Dean Datar attempted to prevent another female professor from obtaining tenure. [Doc. No. 256-96 at 144–145]; [Doc. No. 256-78 at ¶ 26].

Plaintiff's evidence is plainly insufficient. This evidence is made up of Plaintiff's own conclusory allegations that it is more difficult for women to obtain tenure, a statement made by an unknown female colleague supporting Plaintiff's belief that obtaining tenure is more difficult for women, vague allegations that unspecified "gendered language" made by unknown speakers was used when discussing an unspecified female professor, and an unsubstantiated statement from a colleague that Dean Datar attempted to "counsel out" another unspecified senior lateral hire. [*Id.*]. There are no other non-speculative facts—documents, communications, data, or otherwise—that support these conclusions or that tend to show a pattern of gender bias. Indeed, when pressed for further information about Dean Datar's alleged "pattern" of disfavoring women, Professor Frei could not provide a response. [Doc. No. 256-96 at 145:14–23] ("A: that is a troubling pattern to do with superstar women. Q: Is there anything else that forms part of the troubling pattern? A: Not that I recall. Q: Are there any other specific instances of counseling out that you are aware of since Dean Datar became the Dean of HBS? A Not that I -- I can't recollect -- I cannot recollect any at this time.").

Further, the record does not demonstrate any other evidence of a pattern or practice of discriminatory conduct or unfavorable treatment that can be applied to reasonably infer gender bias against Plaintiff. *O'Horo v. Bos. Med. Ctr. Corp.*, 131 F.4th 1, 20 (1st Cir. 2025) (affirming summary judgment where plaintiff's claim rested "on incidents with no apparent relation to her gender, and she makes no effort -- beyond pointing to her subjective beliefs -- to demonstrate such gender-based discriminatory animus.").

### c. Disparate Treatment in Allegations of Misconduct

Plaintiff points to evidence that Harvard has treated allegations of misconduct against male professors differently than allegations against Plaintiff. Plaintiff points to two examples where male professors were treated differently.

First, Plaintiff argues that allegations against HBS Professor George Serafeim were treated differently than the allegations against Plaintiff. [Doc. No. 264-1 at ¶ 58]. The complainant in that matter, Andrew King, did not allege that Mr. Serafeim "changed the values of any individual data points" or falsified data. [*Id.* at ¶ 59]. Rather, Mr. King filed two complaints. First, Mr. King complained that research in a paper authored by Mr. Serafeim and others was not conducted in the way that the authors said it was conducted. [Doc. No. 256-97 at 128:4–9]. Later, the authors admitted that this was due to an editing error or accident. [*Id.* at 128:10–20]. When an explanation about that error was issued, Mr. King filed a second complaint because he did not believe the explanation and also thought that some correction should have been made to the paper in the journal itself. [*Id.* at 135:7–136:12]. Mr. King believed that the conduct explained in both the first and second complaints constituted research misconduct. [*Id.* at 130:21–23, 135:11–13]. In 2025, RIO Bonacossa concluded at the preliminary assessment stage that the allegations did not fall within the definition of research misconduct under the Interim Policy, ending the process there. [Doc. No. 264-1 at ¶ 61]; [Doc. No. 231-56 at 86:9–87:11] ("Q: [E]ven if the allegations were true . . . they would not amount to misconduct under the policy? A: Correct.").

Second, in 2019, HBS addressed concerns regarding the research of HBS Professor Eugene Soltes. [Doc. No. 264-1 at ¶ 62]. While Defendants argue that the concerns about Professor Soltes's research related to the protection of human subjects, and not research misconduct, [*id.* at ¶ 63], Plaintiff argues that Mr. Soltes lied to the subjects of his interviews such that his conduct

constituted research misconduct, [*id.*]. *See also* [Doc. No. 256-101 at 71:7–13]. Plaintiff also cites to the testimony of Dean Cunningham, who stated that this issue "wasn't viewed as a research misconduct issue either. It was a research integrity question." [Doc. No. 231-53 at 263:1–3].

Neither of these examples are sufficient to show that Plaintiff was treated differently. "A plaintiff can demonstrate that an employer's stated reasons are pretextual . . . by producing evidence that plaintiff was treated differently from similarly situated employees." *Garcia v. Bristol-Myers Squibb Co.*, 535 F.3d 23, 31 (1st Cir. 2008). "To successfully allege disparate treatment, a plaintiff must show that others similarly situated to her in all relevant respects were treated differently by the employer." *Id.* (citations omitted). While these comparison cases "need not be perfect replicas," they must "closely resemble one another in respect to relevant facts and circumstances." *Id.* (citations omitted). Courts have found that summary judgment is warranted where there are no facts from which a jury could conclude that the comparators are factually similar to the plaintiff.

In *Theidon*, for example, the court held that a plaintiff who claimed that Harvard treated her differently than other male candidates who were up for tenure could not meet her burden of showing that those male candidates were similarly situated. 948 F.3d at 500–01. For instance, the subfields of those male professors were different than plaintiff's. *Id.* at 501; *see also Garcia*, 535 F.3d at 31–33 (finding that plaintiff's examples of male comparators were "either unsupported by the record or are distinguishable in important respects from the facts and circumstances that [plaintiff] faced") (citation omitted).

Here too, there are important differences. For instance, in both the case of Mr. Serafeim and Mr. Soltes, Harvard found that the complained-of conduct did not fall within the definition of research misconduct. Plaintiff herself refers to the testimony of Dean Cunningham, who stated that

the issue with respect to Mr. Soltes "was a research integrity question." [Doc. No. 231-53 at 263:1–3]. Further, Plaintiff has not shown how the allegations against Mr. Serafeim or Mr. Soltes are in any way similar to the allegations against Plaintiff, including whether Mr. Serafeim or Mr. Soltes worked in the same subfield, expertise, or specialization as Plaintiff. Additionally, the allegations against Mr. Serafeim had to do with a misleading footnote that was later admitted and explained to be an error, and the allegations against Mr. Soltes had to do with his conduct in connection with subjects that he interviewed. In contrast, the allegations against Plaintiff involved thirteen allegations of data falsification and fabrication in nine papers co-authored by Plaintiff, and after a preliminary assessment, five of those allegations were found to be sufficiently credible to fall within the definition of research misconduct. [Doc. No. 264-1 at ¶ 68]. In short, it is Plaintiff's "burden to connect the dots" between the facts and circumstances surrounding the allegations against her and those of her male colleagues, such that a jury may find that they are similarly situated. *Theidon*, 948 F.3d at 501. Plaintiff has not met that burden here.

**d. False Statements and Discriminatory Remarks**

Finally, Plaintiff points to allegedly false statements made by Dean Datar and other Harvard leaders, as well as a gendered remark by a member of the Investigation Committee, as evidence of unlawful animus. Plaintiff alleges that the following false claims were made: (1) Dean Datar falsely claimed under oath that he did not make any "deal" with Data Colada and Data Colada's allegations against Gino were not brought to his attention until after the Interim Policy was created; (2) Dean Datar falsely denied telling Dean Pisano that Data Colada was pressuring HBS to move the investigation along and accusing it of "whitewashing"; (3) Dean Cunningham falsely stated that she did not ask Professor Frei to counsel out Gino; (4) Professor Amabile falsely claimed under oath that, during the time of the investigation, she was not aware that the allegations

brought against Gino were raised by Data Colada, and; (5) RIO Bonacossa falsely claimed under oath that he was not aware of Data Colada's allegations against Gino at the time he was asked to serve as RIO and he did not tell Gino she could not obtain a forensic expert. [Doc. No. 264-1 at ¶¶ 321–325].

"Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Adamson v. Walgreens Co.*, 750 F.3d 73, 79 (1st Cir. 2014). "In assessing pretext, a court's focus must be on the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible." *Velez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441, 452 (1st Cir. 2009). Additionally, "it is not enough for a plaintiff merely to impugn the veracity of the employer's justification; [s]he must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real and unlawful motive of discrimination." *Id.* (citation omitted).

The facts presented by Plaintiff regarding the false statements do not prove that the adverse employment actions Harvard took against Plaintiff were motivated by gender bias or that the justification offered by Harvard was a sham. The allegedly false statements about what Dean Datar, Dean Cunningham, RIO Bonacossa, or Professor Amabile knew or when they knew it are not relevant to the reasons offered by Harvard that support their adverse employment decisions. Additionally, the other fact disputes—whether Dean Datar made a deal with Data Colada and was pressured by Data Colada to move the investigation along, and whether Dean Cunningham falsely stated that she did not ask Professor Frei to counsel out Gino—are not material. The investigation

that led to the adverse employment actions taken against Gino took place over nearly 18 months, involved several rounds of review by several different committees, including 26 professors, administrators, and trustees who evaluated documents, research, data, and conducted witness interviews. This investigation concluded in a 41-page report detailing the allegations, investigation process, and reasoning supporting the findings. *See* [Doc. No. 231-22]. The Third Statute Proceedings were similarly thorough and resulted in in-depth findings of fact and recommendations. *See* [Doc. No. 231-47]. Plaintiff has offered no evidence to demonstrate that Harvard's reasoning is a sham or a pretext for gender bias. *See Gomez-Gonzalez v. Rural Opportunities, Inc.*, 626 F.3d 654, 663 (1st Cir. 2010) (finding that plaintiff's facts in support of purported implausibilities were "largely irrelevant" and do not "raise a genuine issue of material fact with respect to pretext").

Finally, Gino points to a committee member's observation that she may have experienced professional and personal pressure after her husband lost his job. [Doc. No. 256-29 at 2–3]. Although Gino characterizes the comment as reflecting an assumption about gender and family roles, I assume for purposes of the motion that it could carry such an implication. That does not end the inquiry: the remark must be assessed in context, including the speaker's role, whether it informed a disputed factual finding, and whether the record connects it with any adverse decision because of sex. Viewed together with Gino's other evidence, the quoted remark does not, without such a connection, establish that Harvard's stated reasons were a pretext for sex discrimination.

Considering the evidence cumulatively rather than in isolated categories, Gino identifies criticism of the procedures, comments concerning women's advancement, two male faculty members accused of different forms of impropriety, challenged statements by institutional actors, and the committee member's remark. The asserted procedural irregularities do not, without a

supported causal connection, compel or permit a reasonable finding that the decisionmakers acted because of her sex. The comparator matters identified above concern materially different charges and screening decisions. Even assuming that Gino meets the modest prima facie threshold and that some administrative statements are disputed, the total record cited does not raise a genuine dispute that Harvard's articulated research-misconduct basis was a cover for sex discrimination under federal law. Count I's selective-enforcement theory separately fails because the identified male comparators do not demonstrate selective pursuit of comparable allegations on the basis of sex. The Title VII and Title IX claims are against the institution insofar as authorized by the respective statutes; any individual liability asserted against Dean Datar must be evaluated under the applicable state-law provision rather than presumed from the federal employment claims.

**2. The Massachusetts State Law Claim**

Chapter 151B requires separate attention because, unlike the federal formulation sometimes used to describe pretext, Massachusetts law permits an inference of discrimination upon an adequate showing that an employer's stated reason was not its actual reason. *Theidon*, 948 F.3d at 505 n.39. Thus, the absence of independent evidence of animus is not alone dispositive. But Gino still must adduce evidence from which a reasonable jury could find Harvard's stated reason unworthy of credence as the reason actually motivating the challenged action. Taking the deposition conflicts, alleged deviations, comparative evidence, and remarks together and crediting supported inferences favoring Gino, the evidence identified does not establish that the decisionmakers disbelieved the research-misconduct findings or pursued sanctions for a different impermissible reason. Count VI therefore fails under the distinct Massachusetts standard, including insofar as asserted against Dean Datar.

**E. <u>Retaliation (Count VII)</u>**

Gino's retaliation theory concerns actions after she sued Harvard in August 2023, including the continuation of the Third Statute proceedings and ultimate tenure revocation in May 2025. The initiation of the tenure process before suit is important evidence against an inference that the lawsuit caused its commencement, but it cannot by itself immunize later discretionary decisions. To establish retaliation under Title VII or Chapter 151B, Gino must show protected conduct, a materially adverse action, and a causal connection, subject to the applicable ultimate causation standard. *See Ing v. Tufts Univ.*, 81 F.4th 77, 84 (1st Cir. 2023). I assume for present purposes that protected activity and later adverse consequences are shown and examine causation. The references to Gino's public lawsuit during the hearing do not, on the cited transcripts, show that the committee used the lawsuit as evidence of misconduct or punished her for filing it. [Doc. Nos. 256-82 at 11–12; 256-83 at 192, 257]. Nor has she identified a specific change in the charges, standards, or sanctions attributable to hostility toward her protected activity. The intervening evidentiary review and the absence of a supported link between the lawsuit and the recommendation or the Corporation's decision preclude a reasonable retaliatory-causation finding on this record.

The Court does not infer the absence of retaliation merely from the fact that Harvard's disciplinary inquiry began earlier or that it described legitimate reasons for dismissal. Rather, the decisive deficiency is the lack of evidence that the later decisionmakers took an adverse step because Gino filed suit. Accordingly, Count VII does not survive summary judgment.

**F. <u>Declaratory Relief (Count VIII)</u>**

Count VIII seeks declarations concerning Gino's contractual rights and the validity of the disciplinary action. The Declaratory Judgment Act supplies a remedy rather than an independent

substantive cause of action. Because the Court grants judgment against Gino on the underlying contractual and statutory claims, no remaining theory supports the requested declarations in her favor. Summary judgment is granted on Count VIII. This disposition does not affect Harvard's separate defamation counterclaim.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. No. 230] is GRANTED. Plaintiff's Motion for Clarification [Doc. No. 254] is DENIED as moot.

SO ORDERED.

/s/ Myong J. Joun
United States District Judge