**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| FRANCESCA GINO,<br><br>Plaintiff,<br><br>v.<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE, SRIKANT DATAR, JOHN DOES 1-10, AND JANE DOES 1-10,<br><br>Defendants. | Civil Action No. 1:23-cv-11775-MJJ<br><br>Leave to File Under Seal Pending |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR RECONSIDERATION OF THE ORDER GRANTING SUMMARY JUDGMENT ON COUNT II AND, IN THE ALTERNATIVE, FOR CERTIFICATION TO THE SUPREME JUDICIAL COURT OR FOR INTERLOCUTORY APPEAL**

In its summary judgment Order, the Court held that the Third Statute's proscription against removal of a tenured professor except for "grave misconduct or neglect of duty" is "a substantive, enforceable limitation on removal, not a merely aspirational statement." Order (Doc. No. 277) at 22. Yet the Court found that a jury does not get to decide whether that limitation was breached under the usual *de novo* standard of review. Massachusetts law, the Court found, requires a great degree of deference to academic employers, even where the tenure contract contains no provision calling for deference to the university. The Court ruled that Gino's factual record did not overcome the new deferential standard the Court articulated.

For several good reasons, the Court should reconsider its rulings on Gino's breach of contract claim (Count II). Doc. No. 277 § IV.A, at pp. 20–34. The parties disputed whether review is deferential or *de novo*, but neither proposed the standard the Court adopted. That standard is new to the case law of Massachusetts, and there are several reasons to reconsider it. Nor did either party address how the record measures against that standard. Measured against it, the record establishes a triable issue of fact as to whether Harvard acted reasonably and honestly, on a rational evidentiary foundation, and in compliance with enforceable contractual procedures.

Gino respectfully moves that the Court reconsider its ruling in four respects. First, the Court should reconsider its novel standard of review, which is not supported by the case law cited by the Court; is irreconcilable with the controlling decision Balles v. Babcock Power Inc., 476 Mass. 565, 573 (2017) (finding *de novo* review by the trial judge of the employer's determination of "cause" was appropriate where the contract did not contain any language requiring deference to the employer), which the Court did not discuss; and which fails to consider that the language of Harvard's Third Statute itself militates against deference. Moreover, the Court's standard conflates the Hearing Committee process (which results in a recommendation) with the tenure-revocation

decision by the President and Fellows, which is the substantive decision that a court must review *de novo* under Balles. Further, the Court's standard eliminates the burdens of proof under the applicable contracts (preponderance-of-the-evidence for the Interim Policy, and clear & convincing evidence for the Third Statute Procedures) by requiring Harvard only to have some "rational evidentiary foundation" for its conclusions.

Second, even if the Court maintains the standard it announced, the Court should reconsider its application. There is ample record evidence from which a jury could find that Harvard did not act "honestly and reasonably," "upon a rational evidentiary foundation," or "in compliance with its enforceable contractual procedures." Chief among that evidence is an undisputed fact the Order does not address: both forensic experts, one of them Harvard's own, rejected the account of January 24, 2020 on which the Hearing Committee based the only finding within the six-year limitation period (concerning Allegation 1).

Third, the Court's ruling on the 6-year limitations period of the Interim Policy, which was a dispositive question on four of the five research misconduct allegations, improperly granted deference to Harvard on a matter of contractual interpretation, which is an issue of law that should have been determined *de novo* by the Court. Balles, 476 Mass. at 571 n.12. Because the Third Statute proceeding was itself a sanction the Interim Policy authorizes, the limitation also bars the untimely charges from that proceeding.

Fourth, to the extent the Court nevertheless believes university employers may be entitled to deference to tenure revocation decisions, the question should be decided by the Supreme Judicial Court, given its importance to what tenure means in the Commonwealth. Cf. Thompson v. JP Morgan Chase, N.A., 931 F.3d 109, 110 (1st Cir. 2019) (upon petition for rehearing, certifying to

the SJC that was consequential to the mortgage industry). In the further alternative, the Court should certify the question for interlocutory appeal under 28 U.S.C. § 1292(b).

## STANDARD OF REVIEW

No final judgment has entered. Harvard's counterclaim and its motion for sanctions remain pending. Order, Doc. No. 277 at 2 n.2. An order that adjudicates fewer than all the claims "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). Gino asks the Court to exercise that power to revise an interlocutory order. She does not seek entry of partial final judgment under Rule 54(b).

A District Court has "substantial discretion and broad authority to grant or deny" a motion for reconsideration. Ruiz Rivera v. Pfizer Pharms., LLC, 521 F.3d 76, 81 (1st Cir. 2008). Four grounds for reconsideration apply here. First, reconsideration may be appropriate where the Court has misapprehended a party or made a manifest error of law. Villanueva v. United States, 662 F.3d 124, 128 (1st Cir. 2011). Second, reconsideration is appropriate to entertain where the Court's decision goes beyond the issues briefed by the parties. See, e.g., Venegas-Hernandez v. Sonolux Recs., 370 F.3d 183, 195 (1st Cir. 2004) (affirming lower court's decision to allow a Rule 59(e) motion where "the issue was never fairly presented to the first district judge").[1] That is the case here. The parties disputed whether review is deferential, but neither briefed the standard the Court adopted, and neither addressed how the record measures against it. Third, reconsideration is appropriate in the Court's discretion "to correct an error and avoid an unjust result." Savini v. Ashland, Inc., No. 11-CV-12277-DJC, 2013 WL 5218194, at *1 (D. Mass. Sept. 16, 2013) (citing Marie v. Allied Home Mortgage Corp., 402 F.3d 1, 7 n.2 (1st Cir.2005)). Fourth, reconsideration

[1] See also Pearson v. Hodgson, No. 18-CV-11130-IT, 2021 WL 1210358, at *2 (D. Mass. Mar. 31, 2021) ("…the court reached a decision outside the adversarial issues presented by the parties.").

is appropriate where an issue would be appropriate to certify to the highest court of applicable state law. See, e.g., Thompson, 931 F.3d at 110.[2]

## ARGUMENT

### I. The Court Should Reconsider its Standard of Review.

The Court suggested that its standard of review applied principles of "contractual enforcement and judicial restraint" derived from Schaer v. Brandeis Univ., 432 Mass. 474, 482 (2000). Doc. No. 277 at 22–23. Respectfully, this reasoning was mistaken and should be reconsidered for at least the following five reasons.

#### A. *Schaer* and *Berkowitz* Do Not Support the Court's Standard of Review.

First, the two cases that the Court cited in support of its standard of review, Schaer v. Brandeis Univ., 432 Mass. 474 (2000) and Berkowitz v. President & Fellows of Harvard Coll., 58 Mass. App. Ct. 262 (2003) do not support the Court's ruling. See Order, Doc. No. 277, at 21, 23.

Schaer was a student discipline case where the outcome was not determined by the standard of review and the SJC did not articulate a standard of review. It held that the student failed to state a claim because his procedural allegations, even if true, did not violate the university's policies or "basic fairness." 432 Mass. at 478–82. The student had no substantive right not to be disciplined except on specified grounds. The SJC's remark that "[c]ourts are chary about interfering with academic and disciplinary decisions made by private colleges and universities," id. at 482, supported its holding that basic fairness did not require court-like procedures. It gives no guidance on the standard of review where a tenure contract bars removal except on specified grounds.

---

[2] See also, e.g., Pearson, 2021 WL 1210358, at *3; A.J. Props., LLC v. Stanley Black & Decker, Inc., No. CIV.A. 11-10835-FDS, 2013 WL 1629169, at *5 (D. Mass. Apr. 8, 2013), certified question answered, 469 Mass. 581, 15 N.E.3d 198 (2014).

The second case, Berkowitz, undermines the notion of academic deference in a tenure *revocation* case. Berkowitz involved denial of tenure to someone who applied for it. The opinion states: "Given the university's overall mission, the creation and transmission of knowledge, the very need for strong procedural protections to prevent the wrongful dismissal of a tenured teacher concomitantly suggests a need for wide discretion in making an initial tenure award." 58 Mass. App. Ct. at 269 (quoting Beitzell v. Jeffrey, 643 F.2d 870, 875 (1st Cir. 1981)) (emphasis added). In other words, Berkowitz indicates that the deference given to an initial tenure denial decision does not carry over to a decision to revoke tenure once it is granted; and it was precisely the fact that tenure is such a strong job protection that explains why the Berkowitz court found it was appropriate to defer to tenure denial decisions. Moreover, Berkowitz states that an "arbitrary and capricious" review only applies "in the absence of a violation of a reasonable expectation created by the contract." Id. at 269–70 (citing Schaer, 432 Mass. at 478). The substantive protection against termination except where "grave misconduct" has occurred is precisely the reasonable expectation created by the tenure contract at issue here—which is what distinguishes this case from Berkowitz and underscores why tenure revocation decisions are not reviewed deferentially.

B. *Balles* States the Controlling Standard of *De Novo* Review.

The Order (Doc. No 277) did not cite or consider Balles v. Babcock, 476 Mass. 565, 573 (2017), but the Court should have found that decision controlling on the standard of review. In Balles, a stockholders' agreement allowed the company to divest an executive's stock if he was terminated for "cause," and provided that "a determination of 'cause' may only be made by the [board]." 476 Mass. at 571. The company argued that this language entitled the board's decision to deference. Id. The SJC disagreed. Id. at 572–73. The language "speaks to which persons in the company are to determine 'cause'" and "is silent as to an appropriate standard of judicial review." Id. at 572. It "merely provides that only the board is authorized to find cause in the first instance."

Id. at 573 n.15. Because the agreement did "not provide for judicial deference to the board's determination of 'cause,' de novo review by the trial judge thus was appropriate." Id. at 572–73. Gino relied on Balles in her Opposition brief. Doc. No. 258 at 8–9 & n.4. Harvard answered it only in a footnote. Doc. No. 263 at 6 n.6.

The logic of Balles is the same as the logic of the D.C. Circuit's decision in McConnell v. Howard Univ., 818 F.2d 58, 68 (D.C. Cir. 1987), which this Court's Order acknowledged presented a "substantial argument." Doc. No. 277 at 22. But the Court did not explain why Balles does not require the same result here. The Court offered no reason to depart from the established principles of Massachusetts law that when an employee has contractual job protections against termination without "cause" (or the like), whether cause existed is decided by the factfinder, not by the employer. Balles, 476 Mass. at 572–73; Boothby v. Texon, Inc., 414 Mass. 468, 481 (1993) ("The question of satisfactory performance is a question of fact for the jury.").[3]

C. The Third Statute's Text Confirms that Deference is Not Afforded.

Third, the text of the Third Statute, a contract the Court found enforceable, Doc. No. 277 at 21–22, confirms that deference is not to be afforded to Harvard's determination of whether "grave misconduct" occurred because Harvard expressly drafted a deferential standard for other

---

[3] The question for present purposes is who decides whether grave misconduct occurred, not who bears the burden of proof. That is, finding that *de novo* review applies does not require finding that "grave misconduct" is an affirmative defense. Consistent with counsel's statements at the summary judgment hearing, see Hrg. Tr. (Doc. No. 273) 23:1–8, Gino does not ask the Court in this motion to find that "grave misconduct" is an affirmative defense. We note that, contrary to Harvard's summary judgment reply brief (Doc. No. 263 at 6 n.6), any deference afforded to employers under the common-law definition of "just cause" is irrelevant. The common-law meaning of cause only applies where the contract requires "just cause" without defining it. See, e.g., Hamilton v. Baystate Med. Ed. And Research Found., Inc., 866 F. Supp. 51, 55 (D. Mass. 1994) (reciting the common-law meaning of just cause "[a]bsent contractual definition in the context of the contract"). Here the Third Statute permits removal "only for grave misconduct or neglect of duty." Ex. 4, Doc. No. 231-5 at 3. That is not a "just cause" clause. The parties chose a narrower and more serious ground, and the common-law gloss on "just cause" does not carry over to it.

situations but did not draft one for "grave misconduct." Under the Third Statute, officers who hold teaching appointments (like Gino) "are subject to removal from such appointments by the Corporation only for grave misconduct or neglect of duty." Doc. No. 231-5 (Ex. 4) at 3. Officers who hold professional or administrative appointments "are subject to removal from such appointments by the Corporation for grave misconduct or whenever, in its opinion, their duties are not satisfactorily discharged." Id. (emphasis added). Harvard wrote "in its opinion" where it wanted its own judgment to govern, but did not include that in the clause for officers (like Gino) with teaching appointments. That difference must be given effect. See, e.g., Whitecap Int'l Seafood Exporters, Inc. v. E. Ins. Grp., LLC, 97 Mass. App. Ct. 578, 584 n.10 (2020) ("we give the different language its plain (and differing) meanings").

Harvard did not argue otherwise at the hearing. Its counsel agreed that Harvard was "not taking the position that the Court is prohibited from looking at the merits." Hearing Tr. (Doc. No. 273) 6:18–20. The Court asked: "In terms of the breach of contract claim, necessarily doesn't the jury have to answer that question?" Id. at 5:20–22. Under Balles, the answer is yes.

### D. The President and Fellows Have No Process to Defer to.

Fourth, the Court's standard of review conflates the proceedings before the Third Statute Hearing Committee with the tenure revocation decision by the President and Fellows. That is, the Court's decision implicitly holds that the decision by the President and Fellows to revoke Professor Gino's tenure can be reviewed deferentially based on whether the *Hearing Committee* "reached its determination honestly and reasonably, upon a rational evidentiary foundation, and in compliance with its enforceable contractual procedures." See Doc. No. 277 at 22. The Wisconsin Supreme Court's decision in McAdams v. Marquette Univ., 2018 WI 88, ¶ 46, 383 Wis. 2d 358, explains why this does not work. In McAdams, just like here, a hearing committee within the university was convened to hold proceedings and make a recommendation to the relevant decision maker, in

that case the university President. Id. ¶¶ 10, 13. But in McAdams, the tenure contract did not place any procedural strictures on the President limiting how he was required to make his decision after receiving the recommendation. Id. ¶¶ 46-49. As the Wisconsin high court explained, that means "[t]here was no relevant process to which we could defer." Id. ¶ 46. Here, like in McAdams, the Third Statute Procedures do not place any strictures on how the President and Fellows must review the Hearing Committee's recommendations or make their decision to revoke or not revoke tenure.[4] So, while the Hearing Committee procedures are binding contractual obligations, and are obviously meant to protect a professor from arbitrary action, the substantive job protection of the Third Statute are directed at the President and Fellows, who aren't bound by any process to which the Court could grant deference. The independence of the President and Fellows underscores that the substantive job protection against tenure revocation under the Third Statute goes hand in hand with *de novo* review, as the McAdams court found. 2018 WI 88, ¶ 78 (the president "is nonetheless subject to the Contract's substantive restrictions.")

E. The Court's Standard is Irreconcilable with the Contractual Burdens.

Fifth, the Court's "rational evidentiary foundation" standard is irreconcilable with the contractual requirement in the Third Statute Procedures that the complainant prove its claims by "clear and convincing evidence," and the requirement in the Interim Policy for research misconduct to be proven by a preponderance of the evidence. See Doc. No. 264-1 ¶¶ 8, 33. If only a rational evidentiary foundation is required, then the burdens of proof in the parties' contracts are unenforceable and illusory. The Court recognized the clear-and-convincing burden and said the

[4] They only require the President and Fellows to give the Respondent (Gino) an opportunity to submit "further arguments" in response to the Hearing Committee's recommendations, and provide that if the President and Fellows are not disposed to accept the Hearing Committee's recommendations, then they must transmit their findings back to the Hearing Committee. Doc. No. 231-2 (Ex. 1) at 4, ¶¶ 14–15.

record must be examined for whether Harvard applied it. Doc. No. 277 at 22. But a review that asks only whether Harvard had a rational evidentiary foundation cannot test whether Harvard met a clear-and-convincing burden. A rational evidentiary foundation can rest on much less.

## II. Even Accepting the Court's Standard, there is a Genuine Issue of Material Fact.

Even accepting the Court's standard, there was a robust factual record from which the Court should have found a triable issue of fact as to whether Harvard acted "[1] honestly and reasonably, [2] upon a rational evidentiary foundation, and [3] in compliance with its enforceable contractual procedures."[5]

### A. The Only Timely Finding Rests on an Account Both Forensic Experts Rejected.

The Order lists the record Gino relied on to dispute the forensic case. Doc. No. 277 at 24 (citing Doc. No. 264-1 ¶¶ 243–65, 299, 390, 414–79). The list skips her evidence on the 2020 study (Allegation 1), the only allegation within the six-year period. Doc. No. 264-1 ¶¶ 391–404. The Order does not discuss them, and most are undisputed.

The Hearing Committee claimed that on January 24, 2020, Gino "opened the original, unaltered Qualtrics dataset in the afternoon and then hours later saved the altered dataset used in the final analysis." Doc. No. 231-47 (Findings, Ex. 46) at 10; Doc. No. 264-1 ¶ 391 (not disputed). That claim depends on the premise that the Excel file created at 1:53 PM was a conversion of the Qualtrics file opened at 1:51 PM. That was the account of Harvard's statistical expert, Professor Freese. Doc. No. 264-1 ¶¶ 394, 396.

Harvard's own forensic expert disagreed. Mr. Ackert concluded that "[a]n alternate and more likely explanation" is that the 1:53 PM spreadsheet "was likely created on January 24, 2020

---

[5] Given the Court's use of the word "and," a triable issue is presented if Gino casts doubt on any of these three prongs of the deferential standard.

at 1:53 p.m. using a copy/paste process from another spreadsheet or modified thereafter by copy/paste from another spreadsheet." Doc. No. 231-61 (Ex. 60) at 63 ¶ 43(c). Gino's forensic expert agreed: "it's more likely that the data came from another source. But we don't know which one." Doc. No. 256-83 (Ex. 151) at 87:13–15. Professor Freese conceded that "we don't know what [the 1:53 PM file] contains," that the two accounts "are both possible," and that if Mr. Ackert is right, no one knows what spreadsheet was copied into the file. Doc. No. 256-82 (Ex. 150) at 181:12–19, 184:23–185:4, 185:13–17. Harvard does not dispute any of this. Doc. No. 264-1 ¶ 396. Nor does it dispute that the Findings do not address Mr. McGowan's view. Id. ¶ 397. The Findings also do not address Gino's showing that 39 percent of the changed values were in items not used to test the hypothesis. Id. ¶ 392 (not disputed).

The Committee rejected the possibility that a research assistant altered the data because "there is no evidence that a research assistant was working with the data at this late stage." Ex. 46, Doc. No. 231-47, at 10. But the record did point to another source. A second version of the dataset, with a similar file name yet with a letter added, existed on January 24, 2020 and was analyzed in SPSS. Doc. No. 264-1 ¶ 399 (not disputed). Its contents are unknown. Id. Gino's research assistant had done data cleaning for the study and sometimes labeled files with his initials, and his last name started with the same letter. Id. ¶ 400 (not disputed). His emails were never collected, although he invited the Investigation Committee to search them. Id. ¶ 402 (not disputed).

A reasonable jury could find that Harvard's finding of attribution lacked a rational evidentiary foundation. It rested on an account both forensic experts rejected, without explanation, and its finding that the data alterations must have been done by Gino rested on the incorrect claim that there was no evidence the altered data could have come from an RA. If the untimely charges are excluded, see Part III, this study is the whole case.

B. The Jury Could Find Harvard Did Not Act Honestly and Reasonably.

The Court framed its review as asking whether Harvard "reached its determination honestly and reasonably," and it recognized that "[a] court may not uphold a decision procured through dishonesty." Doc. No. 277 at 22. But the Order never applies that principle. Instead, its honesty analysis narrows the question to one of *honest belief*—whether "the peer decisionmakers knowingly adopted a false conclusion or acted without a reasonable evidentiary foundation." Id. at 24. That reframing looks only at the committees. It does not ask whether *Harvard*—through the many officials who initiated, shaped, and ran the process—acted honestly in procuring the findings. On that question, the record presents a genuine dispute for trial. Whether Harvard's process was honest is a question of state of mind. It turns on credibility determinations and inferences, which a court may not resolve at summary judgment. See Doc. No. 277 at 20 (court must "neither evaluat[e] the credibility of witnesses nor weigh[] the evidence," and must "proceed with caution and restraint" where "issues of pretext, motive, and intent are in play") (first quoting Ahmed v. Johnson, 752 F.3d 490, 495 (1st Cir. 2014), and then quoting Taite v. Bridgewater State Univ., Bd. of Trs., 999 F.3d 86, 93 (1st Cir. 2021)).

The record would permit a jury to find that the process was not honest. Gino set out that evidence in her statement of additional facts. Doc. No. 264-1 ¶¶ 182–83, 189–200, 222–25, 230, 273–96, 305, 321–25, 381, 384. We offer five examples of what the jury could find here.

First, Harvard's senior officials were dishonest about the genesis of the investigation and the creation of the Interim Policy. Dean Datar, Dean Cunningham, and the RIO all knew of Data Colada's allegations by early August 2021, Doc. No. 264-1 ¶¶ 182–83—more than two months before October 12, 2021, when Harvard says the RIO "received" them, and October 15, when Harvard says the RIO informed Dean Datar of them, id. ¶¶ 65, 71. In the interim, HBS hastily adopted a new policy, id. ¶¶ 189, 193–95.

Second, Dean Datar "made a deal" with Data Colada under which Data Colada would not go public while HBS conducted the investigation itself. Doc. No. 256-76 (Ex. 144) ¶ 18. Dean Datar later testified that there was no such deal. Doc. No. 264-1 ¶ 321.[6] The Court's rejection of Dean Pisano's testimony as "hearsay," Doc. No. 277 at 29, was error. Dean Datar's statement is an opposing party's statement that Dean Pisano can testify to at trial. Fed. R. Evid. 801(d)(2)(A), (D); Fed. R. Civ. P. 56(c)(2).

Nor is Dean Pisano's account "[t]he only evidence" of the deal. Cf. Doc. No. 277 at 29. On October 4, 2021—eight days before the allegations were supposedly "received"—Dean Cunningham wrote of a "possible path" that she hoped Data Colada would accept involving Gino resigning: "I've alerted Alain about this possible path and he agrees that it would be an outstanding outcome." Ex. 86 (Doc. No. 256-18); Doc. No. 264-1 ¶¶ 198, 200. Moreover, though the Interim Policy gives the complainant no right to information about the status of the process, the RIO kept Data Colada apprised throughout, assuring them that he wanted to be "fully aligned"; sought a meeting with them the day before Dean Datar formally accepted the Investigation Committee's findings, to tell them that Gino had been found guilty; emailed them hours after Gino was placed on leave to coordinate the public release of information; reviewed and commented on a draft of their blog post—which disclosed non-public details of the investigation—before it was published;

[6] The deal also bears on the reasonableness component of the Court's standard. Data Colada did not come to HBS seeking an investigation; it wanted Gino fired. Doc. No. 264-1 ¶ 178. The jury could find it unreasonable for a university to cut a secret deal with a group of bloggers who demand that a tenured professor be fired—particularly when the deal is used to fuel a public outcry against the professor, which becomes a cudgel to pressure her to resign. See id. ¶¶ 200, 279–82, 338. The jury could also find it unreasonable for senior university officials to then repeatedly lie about the existence of that deal.

and praised the post afterward. Id. ¶¶ 273–82; Ex. 167 (Simmons Dep.) at 94:8–96:24.[7] Meanwhile, the RIO misled Gino during the HBS process, falsely telling her (a) in November 2021 that he had copied the hard drives of her computers—a misrepresentation that cost her the chance to preserve forensic evidence—and (b) refusing her request to retain a forensic expert, which he later denied under oath, id. ¶¶ 222–25, 305, 325.

Third, the officials who dealt with Data Colada ran the process. Cf. Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 112–18 (2008) (decision maker's conflict of interest properly weighed when determining if deferential standard is overcome). Dean Datar adopted the Interim Policy and appointed the committees. Doc. No. 264-1 ¶¶ 81, 89, 194. The RIO controlled the evidence: he shared only 343 files with the forensic consultant; the Investigation Committee never had access to the full set of sequestered materials; and he drafted the committee's agendas, interview questions, and reports, told it what conclusions to draw, prevented it from interviewing Data Colada, and talked it out of further interviews. Id. ¶¶ 285–95. When Gino's advisor asked for more time to digest the forensic reports, Dean Datar refused because Data Colada was pressuring HBS and accusing it of "whitewashing." Id. ¶ 304. And the process these officials shaped produced a committee that had concluded misconduct occurred before it interviewed a single research assistant, and five months before it interviewed Gino. Id. ¶ 296. The length of the process and the number of people involved, see Doc. No. 277 at 44–45, do not cleanse it; as the Court itself recognized, legality cannot be inferred "simply from the length or number of participants in that process." Id. at 34.

---

[7] The record further supports the inference that Harvard dishonestly hid this evidence from the Hearing Committee by producing the RIO's communications with Data Colada only through June 13, 2023—a cutoff that intentionally omitted the blog-post exchange. Doc. No. 264-1 ¶ 372.

Fourth, Harvard presented false testimony and misleading arguments to the Hearing Committee, including (a) Dean Datar's false claims that he did not learn of Data Colada's allegations until after the Interim Policy was created and (b) that he never told Dean Pisano that Data Colada was pressuring HBS and accusing it of "whitewashing," (c) Professor Amabile's false claim that she did not know Data Colada was the complainant, and (d) the RIO's false claims that he was unaware of the allegations when he was appointed and that he had made forensic copies of Gino's computers, id. ¶¶ 230, 321–22, 324–25.

Fifth, the Hearing Committee misstated the record in its Findings and Recommendations, which (a) told the President and Fellows that "neither party objected to evidence introduced at the hearing," despite Gino's repeated objections to Professor Freese's testimony; (b) falsely stated that Gino had not provided the paper receipts supporting her account of the Allegation 4B data, when she had submitted them to the Hearing Committee as exhibits; and (c) never disclosed that Harvard had abandoned the charged basis for Allegation 2 and one of its three charged contentions on Allegation 3, Doc. No. 264-1 ¶¶ 381, 384, 422, 436, 459, 462.

C. The Jury Could Find Harvard Failed to Comply with Enforceable Contractual Procedures.

With regard to the Interim Policy, the Court acknowledged the policy's fairness requirement, Doc. No. 277 at 7, but the Order does not analyze Harvard's compliance with that provision in itself, finding it "dependent" on subsidiary theories. Id. at 28 n.11. A jury looking at the totality of the process, including the facts summarized above, could reasonably find Harvard's process to have been unfair based on the summary judgment record even if specific individual theories did not, in isolation, violate specific other provisions of the policy.

On the Third Statute, the Court's discussion of Gino's "New Expert and Adjournment Theory," Doc. No. 277 at 33-34, did not address Gino's contention that the Third Statute

Procedures required the hearing to be based on the allegations of the Third Statute Complaint. Doc. No. 264-1 ¶ 375; Pl. Oppn. Br. (Doc. No. 258) at 18. The Court did not acknowledge the evidence that HBS's theories (introduced via Prof. Freese) were entirely distinct from the Third Statute Complaint on Allegation 2 and significantly different for Allegation 3, explained above. If Gino is right, then at a minimum she was entitled to exoneration on Allegation 2 and the unpleaded parts of Allegation 3 after Harvard abandoned the claims stated in its Third Statute Complaint.

Separately, Gino had a contractual right to adjournment upon a "valid claim of surprise." Doc. No. 264-1 ¶¶ 10, 142, 381. The Court stated that Gino disagreed with the Hearing Committee's "assessment of the need for additional time," Doc. No. 277 at 34, but that misstates the contractual issue, which is whether she legitimately was surprised by Prof. Freese's analysis, which could have occurred even if Prof. Freese's analysis had been limited to addressing the "existing allegations." The record demonstrates that Prof. Freese's sprawling analysis was a legitimate surprise; moreover, a jury could find Harvard was dishonest in leading Gino to believe the Third Statute case would be strictly limited to reviewing the existing record even as Harvard was preparing to introduce evidence based on an expert's wholesale re-examination of the case.

D. The Jury Could Find Harvard Lacked a Rational Evidentiary Foundation.

Gino established a triable issue as to the "rational evidentiary foundation" for each allegation.[8] Part II.A, supra, addresses the 2020 study, the only timely one. The record on the four

---

[8] In short: on **Allegation 4A,** there was no fact witness evidence supporting Harvard's theory that Gino's editing of a study description in the drafting process of the paper necessarily equated to a misrepresentation rather than an appropriate correction. When a substantially similar allegation of study-description-misrepresentation was made against Prof. Serafeim, Harvard ruled it not to meet the "definition" of research misconduct. Doc. No. 264-1 ¶¶ 60-61, 330-31. On **Allegation 4B**, there was no support for the finding (on which the allegation depended) that the July 16, 2010 file was a complete set of the original study data; and the committee falsely claimed that evidence Gino submitted to show the July 18th data was correct had not been submitted in the record. On **Allegation 3**, the committee ignored the long, complex, 248-day data-cleaning history of the file

untimely allegations is set out at Doc. No. 264-1 ¶¶ 414–79, and the Court should consider it if it does not exclude those allegations under Part III.[9]

## III. The Court Improperly Deferred to Harvard on a Question of Law.

Gino contended that the six-year limitation rule in the Interim Policy made Allegations 2, 3, 4A, and 4B untimely, but Harvard investigated them anyway under the "subsequent use" exception to the limitation rule. See Pl. Oppn. Br. (Doc. No. 258) at 12–13; Doc. No. 264-1 ¶¶ 209–213. The Court reviewed the parties' dispute on this point deferentially to Harvard, asking whether Professor Gino had shown that Harvard "adopted an interpretation no reasonable decisionmaker could apply," and declining to "substitute my own assessment . . . for Harvard's reasonable application of the stated criterion." Doc. No. 277 at 31–32.

Having assumed the Interim Policy enforceable, id. at 21, the Court should have decided what its limitation means rather than granting deference. The interpretation of a contract term is "a question of law for the court," and "a court generally will accord no deference to a party's interpretation of a contract." Balles, 476 Mass. at 571 n.12 (citation omitted). That rule applies with particular force to language Harvard drafted—the Interim Policy—which is construed against the drafter. James B. Nutter & Co. v. Estate of Murphy, 478 Mass. 664, 669 (2018); see Pl. Oppn. Br., Doc. No. 258 at 12.

---

by at least 4 research associates. On **Allegation 2**, the Hearing Committee's conclusions depended on a finding that Gino created a merged dataset on November 27, 2014, despite the file names saying November 26th; and the committee ignored several other facts undermining its chronology.

[9] To the extent the Court's standard does not absolve Harvard of the "preponderance of the evidence" and "clear and convincing evidence" burdens to which it committed itself contractually, then the standard of review warrants clarification by the Court. For example, the standard might better be stated as "whether Harvard had a sufficiently rational evidentiary foundation from which to conclude that the applicable contractual burdens of proof had been met." This would be a more exacting standard than the one applied by the Court's summary judgment Order. And that is all the more reason to re-examine whether the record establishes triable issues of fact.

The record shows why the meaning matters. HBS received the allegations in 2021. The three papers at issue were published in 2012, 2014 and 2015. The RIO agreed they were "older than six years" and treated them as timely because Gino had cited them within the period. Doc. No. 256-82 (Ex. 150) at 320:9–321:3; Doc. No. 264-1 ¶ 70. Harvard's position is that "the specific portion of the paper cited by the respondent is not a relevant consideration." Doc. No. 264-1 ¶ 216 (Harvard's response). It does not dispute that the first citation in Gino's table discusses a different experiment in the 2012 paper, not the tax-reporting study that was the subject of the allegation. Id. Neither the Final Report nor the Findings discusses the limitation at all. Id. ¶¶ 213–14.

Read as written, the Interim Policy's "subsequent use" exception is narrow. The respondent must have "continued or renewed an incident of alleged research misconduct." Doc. No. 264-1 ¶ 31. She must have done so through use "of the research record in question." Id. And the use must be "for the potential benefit of the respondent." Id.; Doc. No. 231-10 at 2. A citation to an experiment no one challenges does not use "the research record in question," and it does not continue or renew the "incident" alleged. Harvard's reading, under which any later citation of the paper revives every charge about it and the portion cited "is not a relevant consideration," reads those words out of the clause. It also lets the exception swallow the rule, because nearly every researcher cites her own earlier work. Under the correct reading, whether Professor Gino's citations satisfied the exception is at least disputed on this record. See Doc. No. 264-1 ¶ 216 (citing Doc. 256-86 (Ex. 153) at A-1744–47).

Though Gino's opposition presented the 6-year limitations issue as a breach of the Interim Policy, Doc. No. 258 at 12–13, the consequence of that breach also extends to the tenure removal, which followed directly from the investigation that included four untimely charges. The Investigation Committee recommended tenure removal as a sanction, Doc. No. 264-1 ¶ 106, and

Dean Datar, the HBS investigation's decision maker, submitted the Third Statute Complaint (which included Allegations 2, 3, 4A, and 4B) and asked the President to commence Third Statute proceedings. Id. ¶ 128. An HBS senior associate dean served as complainant "on behalf of HBS." Id. ¶ 129 (not disputed). The Interim Policy's list of sanctions includes "initiation of steps leading to rank reduction or termination of employment." Doc. No. 231-10 (Ex. 9) at 11; Doc. No. 264-1 ¶ 52. The Court read the Policy the same way. Doc. No. 277 at 25. The Third Statute proceeding was thus itself a sanction under the Interim Policy, initiated by the School that conducted the investigation, on the same four studies. A policy that "applies only to" timely allegations cannot authorize a sanction based on untimely ones. If it could, the limitation would bind HBS when it imposed a two-year leave but not when it initiated removal. HBS could escape the limitation by choosing the more severe course.

The untimely charges were not incidental to the result. The Hearing Committee defined grave misconduct as "intentional and repeated data falsification and fabrication." Doc. No. 231-47 (Ex. 46), at 4. It described a complaint covering "four studies spanning ten years of her career." Id. at 1. It was "struck by the breadth of this research misconduct" and found "a troubling pattern." Id. at 10. It recommended removal because of "numerous types of research misconduct over multiple studies spanning a decade." Id. at 11. No decisionmaker at Harvard ever decided whether the 2020 study alone was grave misconduct, or whether it alone warranted removal.

This ground does not depend on *de novo* review. The Court's own standard requires that Harvard act "in compliance with its enforceable contractual procedures." Doc. No. 277 at 22. A removal resting on charges the governing policy excludes does not comply with them. The argument is the same claim, breach of the limitation, that Gino pressed at every stage, including

before the Corporation, where she asked that Allegations 2 through 4 be excluded. Doc. No. 264-1 ¶ 211 (not disputed). It depends only on undisputed facts and documents the Court has construed.

## IV. Alternatively, the Court Should Certify the Standard of Review to the SJC.

If the Court does not believe Balles to be controlling as to the standard of review, then there is no controlling SJC precedent on that issue. This Court is not the right place to announce a consequential standard for how breaches of tenure contracts governed by Massachusetts law are reviewed. Instead, this Court should certify the question to the SJC.

Certification is appropriate when a question of law exists that (1) "may be determinative of the cause then pending in the certifying court," and (2) is not subject to "controlling precedent" from the decisions of the SJC. Pearson, 2021 WL 1210358, at *3 (quoting S.J.C. Rule 1:03, § 1). These criteria are met if the Court does not find Balles controlling. Summary judgment was granted based on findings that a deferential standard applied and that Gino did not meet the deferential standard. If, however, a *de novo* standard applies, then summary judgment necessarily must be denied. Harvard did not move on the ground that no reasonable jury could find that Gino did not commit grave misconduct. Its counsel told the Court that "[t]he question before you is not did Professor Gino commit research misconduct." Hearing Tr. (Doc. No. 273) 5:23–25.

Certification would promote efficiency. See A.J. Props., LLC v. Stanley Black & Decker, Inc., No. CIV.A. 11-10835-FDS, 2013 WL 1629169, at *5 (D. Mass. Apr. 8, 2013), certified question answered, 469 Mass. 581, 15 N.E.3d 198 (2014) (after initially denying reconsideration, electing to certify question of state law to SJC rather than allowing an interlocutory appeal). An appeal would send a state-law question to another federal court that cannot answer it definitively, and the First Circuit might certify the same question itself. Certification would also promote the interests of federal-state comity. See id. at *5. In cases involving questions of the meaning of state statutes, the U.S. Supreme Court has admonished that it is "particularly gratuitous" to engage in

"[s]peculation" about the meaning of the state law "when ... the state courts stand willing to address questions of state law on certification[.]" Arizonans for Official English v. Arizona, 520 U.S. 43, 79 (1997) (quotation omitted). That logic applies with equal force to novel issues of common law concerning tenure contracts.

The question also reaches well beyond this case. Cf. Thompson v. JP Morgan Chase, N.A., 931 F.3d 109, 111 (1st Cir. 2019). The SJC has said that the "economic security" and "freedom" tenure provides are "not hortatory concepts but important norms in the academic community." Wortis v. Trs. of Tufts Coll., 493 Mass. 648, 650 (2024). The SJC is the right court to decide whether Massachusetts law lets a university decide for itself when to take that security away.

Gino proposes the following question: "Where a tenured professor's contract permits removal of tenure only for grave misconduct or neglect of duty, does a court in an action for breach of that contract decide *de novo* whether grave misconduct or neglect of duty occurred, or does it review the university's determination by a different and more deferential standard?"

In the further alternative, Gino asks the Court to certify the same question for interlocutory appeal. It is "a controlling question of law as to which there is substantial ground for difference of opinion," and an immediate appeal "may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). The Court has already described the contrary authority as "a substantial argument." Doc. No. 277 at 22.

## CONCLUSION

For the reasons set forth above, Gino respectfully asks the Court to vacate the portion of its Order granting summary judgment on Count II and to deny Harvard's motion as to that count. In the alternative, she asks the Court to certify the question stated in Part IV to the Supreme Judicial Court, or to certify it for interlocutory appeal under 28 U.S.C. § 1292(b).

Dated: November 18, 2026

Respectfully submitted,

Plaintiff Francesca Gino,
by her attorneys,

*/s/ Hampton M. Watson*
Patrick J. Hannon (BBO# 664958)
Hampton M. Watson (BBO #705983)
Hartley Michon Robb Hannon LLP
101 Federal Street, Suite 1810
Boston, MA 02110
Telephone: (617) 723-8000
Facsimile: (617) 447-2800
phannon@hmrhlaw.com
hwatson@hmrhlaw.com

*Attorneys for Plaintiff Francesca Gino*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 18, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to Defendants by electronically serving their counsel of record.

*/s/ Hampton M. Watson*
Hampton M. Watson